UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FT. LAUDERDALE DIVISION

HEAD KANDY LLC,

      Plaintiff,

vs.                                           Case No. 0:23-cv-60345-RAR


KAYLA MARIE MCNEILL,

      Defendant.

_____/

[PLAINTIFF'S PROPOSED][1]

PRELIMINARY INJUNCTION

THIS CAUSE comes before the Court upon Plaintiff, Head Kandy LLC's, Expedited

Motion for Preliminary Injunction and Incorporated Memorandum of Law, filed June 6, 2023 [ECF

No. 47].  The Court held an evidentiary hearing on August 1, 2023, at which both parties presented

evidence and proffered testimony in support of their respective positions. Having reviewed

extensive briefing by both parties, heard the argument of counsel, considered all evidence

presented, and being otherwise fully advised of its premises, the Court finds:

### I.      FINDINGS OF FACT

Plaintiff, Head Kandy LLC ("HK"), is a Delaware limited liability company, with its

principal place of business in Florida, engaged in the business of selling and distributing hair care

products such as shampoos, conditioners, hair dryers, curling irons and straighteners. [ECF 93,

*Stipulated Facts*, ¶15]. On May 3, 2018, HK entered into an Asset Purchase Agreement with

Lashed Out, LLC, acquiring all of the "Purchased Assets" of Lashed Out, LLC for $2,880,000.

---

[1] Plaintiff files its proposed Preliminary Injunction, which includes its proposed Findings of Fact and Conclusions of
Law, pursuant to the Court's August 9, 2023, Order directing its filing.  [ECF No. 118].

[ECF 93, *Stipulated Facts*, ¶8]. Defendant, Kayla McNeill ("Ms. McNeill"), was the sole member of Lashed Out, LLC at the time of the purchase, signed the Asset Purchase Agreement on behalf of Lashed Out, LLC, and personally received the benefits Lashed Out, LLC obtained from said purchase. [ECF 93, *Stipulated Facts*, ¶¶6-7; Transcript of the August 1, 2023, evidentiary hearing ("Hrg. Tr."), at 102:4-21]. After satisfying liabilities of Lashed Out, Ms. McNeill received the remaining proceeds from the multi-million-dollar sale. [Hrg. Tr. 104:5-13].

<u>The Executive Employment Agreement</u>

As part of the Asset Purchase Agreement and as a condition precedent thereto, Ms. McNeill entered into an Executive Employment Agreement with HK [Joint Ex. 2] to serve as the Creative Director, primarily responsible for developing and marketing HK products through her brand-oriented social media accounts. The Executive Employment Agreement also contained restrictive covenants, by which Ms. McNeill agreed to not:

i.    For thirty-six months following her termination from HK, "directly or indirectly" engage in "the manufacture, sale and distribution of hair-related products" or to provide "management, business planning, sales, marketing, financial planning, or other services similar to the services [Ms. McNeill] provided to [HK] during her employment" anywhere in the world. (the "Non-Compete Provision").

ii.   For thirty-six months following her termination from HK, "directly or indirectly, solicit business" related to "the manufacture, sale, and distribution of hair-related products" from any "client, customer, supplier, licensee, licensor or other business relation" of HK, and to not "solicit or encourage any client, customer, supplier, licensee or licensor of [HK] to terminate or reduce such Person's relationship with [HK]." (the "Non-Solicitation of Customers Provision").

iii.    "[A]t any time, make, publish or communicate to any Person or in any public forum any defamatory or disparaging remarks, comments or statements concerning the Company or its affiliates[.]" (the "Non-Disparagement Provision.")

(collectively, the "Restrictive Covenants") [Joint Ex. 2, ¶5]. Ms. McNeill agreed that the Restrictive Covenants would survive termination of her employment [Joint Ex. 2, ¶18] and that in the event of "actual or threatened breach" of the Restrictive Covenants, she would not "challenge the enforceability of [the Restrictive Covenants] nor will she raise any equitable defense to [their] enforcement." [Joint Ex. 2, ¶5(g)]. Ms. McNeill likewise agreed that the Restrictive Covenants were reasonable in territory, time and scope and were "severable and separate" from "the provisions of any other covenant" in the Executive Employment Agreement [Joint Ex. 2, ¶5(e)]. Finally, Ms. McNeill assured Head Kandy that if she believed there to be any material breach of the Executive Employment Agreement, she would provide Head Kandy with written notification of such breach specifying the offending conduct with a thirty (30) day opportunity to Head Kandy to cure any alleged breach.  [Joint Ex. 2, ¶3(b)].

<u>Ms. McNeill's Employment with HK</u>

Throughout her employment with HK, Ms. McNeill utilized social media and "live" social media video broadcasts to engage with HK customers, market HK products and develop a dependable HK customer base. Indeed, Ms. McNeill was synonymous with the HK business [ECF No. 93, *Stipulated Facts*, ¶39], and her social media profiles, her followers, and her influence over those followers were HK's primary considerations in purchasing Lashed Out, LLC from Ms. McNeill for $2.8 million.

While HK often exceeded $1 million in monthly sales, by 2022, the business experienced problems staying profitable.  To ensure HK would continue to meet its financial obligations, HK's

shareholders provided the company significant loans.  [Hrg. Tr. 69:07-23].  In July of 2022, HK's Managing Member retained a consultant, Jonathan Rosenbaum, to undertake an exhaustive review of the Company's operations, finances and books and records. [ECF No. 93, *Stipulated Facts*, ¶31]. During Mr. Rosenbaum's review he discovered Ms. McNeill had been engaging in actions HK believed were violations of the Executive Employment Agreement and in breach of her fiduciary duties to HK, including: having HK pay for personal expenses, creating and using other HK employees to assist her in forming a separate company and using HK funds to order products for that company, and otherwise mismanaging aspects of the HK business for which she was responsible.   [ECF No. 47-2, ¶¶ 32-37; Hrg. Tr. 241:21-242:04, 243:10-244:01, 245:03-11]. Indeed, on November 22, 2023, Ms. McNeill appeared on Live Tik Tok to promote her new leggings (and utilized slang references to the female anatomy in connection with her leggings) from her newly created company, White Pineapple, during a time when she was actively marketing Head Kandy products to customers.  [Hrg. Tr. 184:03-187:06; ECF No. 47-3, ¶11].

On November 28, 2022, HK notified Ms. McNeill that she would no longer have an active role in the operations of HK's business [ECF No. 47-2, Ex. 2]. When approached by HK executives to discuss the company's findings, Ms. McNeill expressed contrition for her conduct, and admitted in writing that some of her actions were, indeed, "unethical". [ECF No. 47-2, Ex. 3]. When more evidence of Ms. McNeill's wrongdoing was exposed, on December 16, 2022, HK placed Ms. McNeill "under suspension effective immediately." [ECF No. 47-2, Ex. 4].  On January 30, 2023, HK terminated Ms. McNeill's employment with HK for cause. [ECF No. 47-2, Ex. 5]. HK paid Ms. McNeill's base salary through the date of her for-cause termination and had paid the entire $2,880,000 purchase price to Lashed Out, LLC for the purchase of the Head Kandy business,

which amount, less liabilities of Lashed Out, LLC, flowed through to Ms. McNeill. [Hrg. Tr. 102:4-103:9].

Although Ms. McNeill has claimed in these proceedings that HK breached the Executive Employment Agreement by failing to pay her certain bonuses she claims were due and owing to her, as of the date of her termination, Ms. McNeill had never provided to Head Kandy a written notification of and opportunity to cure within 30 days any alleged breach of the Executive Employment Agreement. [Hrg. Tr. 92:2-5]. Moreover, even after the time Ms. McNeill claims she informed HK it owed her bonuses, she continued to perform and accept benefits, including her base salary, under the Executive Employment Agreement and never herself terminated the Executive Employment Agreement. [Hrg. Tr. 93:10-96:05].

<u>Ms. McNeill's Post-Termination Conduct</u>

Almost immediately after her termination, Ms. McNeill took to social media to review and promote haircare products from other hair-related businesses, encouraging her followers to support those businesses over HK. For instance, on at least March 14, 2023 [Joint Ex. 18], April 7, 2023 [Joint Ex. 40], May 30, 2023 [Joint Ex. 67], June 1, 2023 [Joint Ex. 75], and June 6, 2023 [Joint Ex. 89], Ms. McNeill hosted live video sessions on Facebook and Tik Tok promoting haircare products distributed and sold by HK's competitors, encouraging her followers to purchase such products. Specifically, on March 14, 2023, Ms. McNeill hosted a Facebook Live in which she praised hair products from Bo Stegall – The Collection [Joint Ex. 19, 20], Amika [Joint Ex. 22, 23] and Revlon [Joint Ex. 21], and told her followers where they could purchase such products.[2] Likewise, on April 7, 2023, Ms. McNeill hosted a Facebook Live event to promote hair products

---

[2] In an attempt to evade the requirements of the Restrictive Covenants, Ms. McNeill often employed a tactic of promoting a haircare product, notifying her followers that she could not post a link to such products "because of [her] non-compete", but nonetheless directing her followers to the website from which the products could be purchased, or asking one of her followers to post the link to the specific products for her.

from Bo Stegall – The Collection, including the 5-in-1 interchangeable curling iron [Joint Ex. 43], dry texture spray [Joint Ex. 44], healing clay [Joint Ex. 50], and wet brush [Joint Ex. 51]. During this Facebook Live, Ms. McNeill notified her followers that Bo Stegall – The Collection was offering a buy one get one free promotion [Joint Ex. 43], directed Mr. Stegall to post a link to his products on her live feed [Joint Ex. 42], and acknowledged that her "girls"—AKA, former HK customers who followed her social media accounts—are "about to be [Bo's] girls," and remarked "we share girls." [Joint Ex. 42].

In her June 1, 2023, Facebook Live video—during which Ms. McNeill reviews and encourages her followers to purchase hair products from HK's competitors, Ms. McNeill acknowledged that she is obligated to comply with a "non-compete", but asserts that she nevertheless could, and would, review competing haircare products that she "loves" as a way to give her followers "ideas" of haircare products to purchase as replacements for HK products, even though, she asserted, she could not and would not make any money from such reviews and promotions of hair-care products not manufactured or sold by HK. [Joint Ex. 78; *see also* Joint Ex. 45].  The Court notes, however, there is no requirement that Ms. McNeill "make money" from activities prohibited by the Non-Compete Provision of the Executive Employment Agreement to breach it.  Rather, the purpose of the Non-Compete Provision is to protect HK from losing money as a result of certain actions of Ms. McNeill; Ms. McNeill breaches the Non-Compete Provision where she engages in any of the activities prohibited by it, regardless of whether she "makes money" from engaging in those activities.  [*See* Joint Ex. 3 ¶55(a)]

Throughout her Facebook and Tik Tok videos, in addition to promoting other hair-care products, Ms. McNeill often provided her followers "updates" on the litigation between her and HK, during which she offered negative and disparaging comments aimed toward HK's business

and its employees. For example, on April 7, 2023, Ms. McNeill posted a Tik Tok in which she accused HK of kicking her out of a company she created and giving her "nothing." On April 11, 2023, Ms. McNeill posted a Tik Tok video accusing HK of posting photos of Ms. McNeill's children to promote HK products, alleging that HK was "capitaliz[ing]" off of her children without her permission. [HK Ex. 58].[3] On May 30, 2023, and again on June 9, 2023, Ms. McNeill accused HK and its employees of lying under oath in declarations filed in this action [Joint Ex. 69, 97] and of engaging in a "witch-hunt… to push me out of the company." [Joint Ex. 71]. In at least one instance, Ms. McNeill expressly accuses HK's employees of committing perjury. [Joint Ex. 98]. In her June 6, 2023, Facebook live video, Ms. McNeill tells her followers that "[her] company", i.e., HK, was "stolen from [her]."

Ms. McNeill also frequently promoted hair products sold by HK's competitors outside of her live videos.  On February 8, 2023, Ms. McNeill responded on Facebook to a comment from a follower regarding products the follower previously purchased from Head Kandy, stating "you want the link to the IDENTICAL product from another brand?? Hahahahhaahha wouldn't that rock their world!  🤣😒" [HK Ex. 5].  In the days that followed, Ms. McNeill provided such links. [HK Exs. 6, 8].  On February 9, 2023, Ms. McNeill replied to one of her follower's requests for a haircare product that could replace HK products she had previously purchased.  In that reply, Ms. McNeill posted a link to a keratin leave-in conditioner spray sold by Evoque—one of HK's competitors in the haircare industry. [*Id.*]. Below the link that she shared, Ms. McNeill asserted that the leave-in conditioner spray sold by Evoque was not just a "dupe" of a product sold by HK, but was "identical" to such product. [HK Ex. 6]. A few days later, on February 13, 2023, in

---

[3] While not entirely relevant to the analysis here, it bares noting that the photograph Ms. McNeill alleges HK posted to "capitalize" off of her children was posted by Ms. McNeill while she was still employed by HK, and no evidence was presented at hearing that HK promoted or otherwise utilized that photograph, or any other photographs of Ms. McNeill's children, while marketing HK products following her termination.

response to a question from one of her Facebook followers requesting a "dupe" to the Squad Goals Third Wheel Spray sold exclusively by HK, Ms. McNeill again posted a link to an Evoque reconstructive leave-in conditioner, along with a comment "Try this, it's good." [HK Ex. 8].[4]

At the evidentiary hearing, Ms. McNeill attempted to claim that in directing her followers to an "identical" product to the Third Wheel Spray sold by HK a mere two weeks after her termination by HK she was not promoting a haircare product sold by a competitor because she claimed she thought that Evoque and HK had some type of "licensing deal, that would mean that I was telling them to buy product that was still benefiting Head Kandy." [Hrg. Tr. 51:18-53:01]. However, there was no evidence presented that any such "licensing deal" ever existed. Instead, at the evidentiary hearing Ms. McNeill admitted her claimed belief of the existence of a "licensing deal" was solely based on the fact she had seen a bottle of the Evoque product with the "Head Kandy" logo stamped into the plastic mold of the bottle and she just assumed "that would not be a mistake" that was made by the manufacturer of the two products. [*Hrg. Tr.* 182:2-25]. Ms. McNeill's prior post about a "dupe" that would "rock their world" suggests that Ms. McNeill did not believe, at the time of her posting, that Evoque and Head Kandy had an affiliation such that HK would benefit if its customers bought the Evoque product instead of the HK product. [HK Ex. 5].

As a result of Ms. McNeill's post-termination actions, many of her followers adopted her negative sentiments toward HK and have engaged in a boycott of HK's products. [HK Ex. 76, 78, 82, 98, 167]. HK presented evidence at the evidentiary hearing showing that several of the women who commented on Ms. McNeill's posts vowing never to purchase HK products again indeed

---

[4] HK submitted additional evidence of similar conduct from Ms. McNeill through her social media accounts. [*See e.g.* March 14, 2023 [Joint Exs. 18-24], April 7, 2023 [Joint Exs. 40-45], May 30, 2023 [Joint Exs. 67-73], June 1, 2023 [Joint Exs. 75-82], and June 6, 2023 [Joint Exs. 89-91].

stopped purchasing HK products as a result of Ms. McNeill's social media posts. [*Compare* HK Ex. 82 (cmt. 35) *with* HK Ex. 157]; [*Compare* HK Ex. 98 (cmt. 868) *with* HK Ex. 158]; [*Compare* HK Ex. 98 (cmt. 115) *with* HK Ex. 154]; [*Compare* HK Ex. 98 (cmt. 214) *with* HK Ex. 156]. Mr. Rosenbaum, now interim CEO for HK, testified that HK's sales have plummeted in the months since Ms. McNeill began disparaging HK and promoting competing products on social media. [*Hrg. Tr.* 210:2-212:18; 215:22-216:12]. HK presented evidence that it has lost roughly two-thirds of its customer base since Ms. McNeill's actions began. [215:22-216:12].[5] As a result, HK has been forced to offer its products at a drastically discounted rate to generate cash flow to mitigate against Ms. McNeill's attacks, which discounts are harmful to the long-term success of HK. [215:2-217:20]. HK has also been forced to undertake significant efforts to retain its current employees and influencers (with significant work history and "know how" pertaining to HK's operations) who have threatened to leave due to Ms. McNeill's behavior on social media. [Hrg. Tr. 218:16-219:21].

On June 6, 2023, HK filed its Expedited Motion for Preliminary Injunction [ECF No. 47], as well as declarations from HK's managing member, Jerome Falic [ECF No. 47-2] and its current brand manager, Mindy McDermaid [ECF No. 47-3; 47-4]. HK seeks an order enjoining Ms. McNeill from further violating the Restrictive Covenants. On June 21, 2023, Ms. McNeill filed her Opposition to Expedited Motion for Preliminary Injunction [ECF No. 66], arguing primarily that the Restrictive Covenants were void and unenforceable, that she was excused from adhering to them due to what she alleges was HK's "prior material breach" in allegedly not paying her

---

[5] On April 11, 2023—the day Ms. McNeill posted to Facebook and Tik Tok videos accusing HK of having stolen her Facebook page and "capitalizing off" of her children—HK's sales revenue was $3,439.78, compared to $18,190.44 the day before, and an average of $24,735.05 per day in April of 2022. [HK Ex. 164].

bonuses, and that she was privileged to make the statements she has on social media. The Court held an evidentiary hearing on August 1, 2023.

## II.   CONCLUSIONS OF LAW

For a preliminary injunction to be entered, the moving party must demonstrate: (1) a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest. *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998). Preliminary injunctive relief is generally available when a party establishes that it has a valid, enforceable restrictive covenant, and that such covenant was violated. *See Ansaarie v. First Coast Cardiovascular Ins., P.A.*, 252 So. 3d 287, 289 (Fla. 1st DCA 2018); *see also*, *Picture It Sold Photography, LLC v. Bunkelman,* 287 So. 3d 699, 702-03 (Fla. 4th DCA 2020) (holding "the continued breach of a non-compete agreement threatens a former employer's goodwill and relationships with its customers, and nothing short of an injunction would prevent this loss."). This is particularly the case where, as here, the parties have contractually agreed to injunctive relief as the appropriate remedy in the event of an "actual or threatened breach" of the agreed-upon Restrictive Covenants. [Joint Ex. 2, ¶5(f)].

### A.  Likelihood of Success on the Merits

The Court finds HK has established a likelihood of prevailing on the merits of its claim for breach of the Restrictive Covenants at trial.

As a preliminary matter, the Court rejects Ms. McNeill's argument that it should consider what she alleges as HK's prior material breach of the Executive Employment Agreement as a defense to her breach of the Restrictive Covenants. Although section 542.335 of the Florida

Statutes directs the Court to consider all "**pertinent** legal and equitable defenses" to enforcement of restrictive covenants, Ms. McNeill contractually waived her ability to raise any equitable defenses to such enforcement (emphasis added).[6] [Joint Ex. 2, ¶5(g) ("[Ms. McNeill] covenants that she will not challenge the enforceability of Section 5 and Section 6, nor will she raise any equitable defenses to its enforcement."; ¶19 ("[Ms. McNeill] acknowledges and agrees that she has read and fully understands the contents and the effect of this Agreement. [Ms. McNeill] accepts each and every term, condition and provision of this Agreement, and does so voluntarily and with full knowledge.")]. Florida law undeniably provides that a party may waive any and all constitutional or statutory rights by valid contract, and the Court has not been presented any compelling justification for ignoring that policy here. *See e.g[s]., Band v. Libby*, 113 So. 3d 113, 115 (Fla. 2d DCA 2013) ("A party may waive **any** rights to which he or she is legally entitled, by actions or conduct warranting an inference that a known right has been relinquished."); *Kilpatrick v. McLouth*, 392 So. 2d 985, 986 (Fla. 5th DCA 1981) (same). The prior material breach defense Ms. McNeill asserts is not statutorily "pertinent" here, and will not be considered.[7]

---

[6] *See Leighton v. First Universal Lending, LLC*, 925 So. 2d 462 (Fla. 4th DCA 2006) ("An employer's breach of the contract is an equitable defense to the enforcement of a non-compete clause."); *see also, DTC Energy Group, Inc. v. Hirschfeld*, 912 F. 3d 1263, 1274 (10th Cir. 2018) ("The prior breach doctrine is an equitable argument typically asserted by a defendant who has been sued for specific performance by a plaintiff who was the first to breach the contract.").

[7] Nonetheless, even if Ms. McNeill had not contractually waived her right to assert equitable defenses such as prior material breach to enforcement of the Restrictive Covenants, Ms. McNeill waived such a right by her conduct, which included continuing her employment with HK long after she alleges it failed to pay her annual bonuses in accordance with the Executive Employment Agreement, and by expressly agreeing to postpone payment of her annual bonuses until certain HK shareholders, including specifically Leon Falic, had been repaid loans he provided to HK. [McNeill Ex. D]. *See Barron Bancshares, Inc. v. U.S.*, 366 F.3d 1360, 1382 (Fed. Cir. 2004) (holding defendant "waived its right to treat [plaintiff's] actions as having terminated the contract" by "continuing performance under the contract despite perceived material breaches."). Further, courts will not consider the defense of prior material breach where there appears an intention in the contract to make the restrictive covenants independent of all other obligations therein. In near identical circumstances, the court in *Reliance Wholesale, Inc. v. Godfrey*, 51 So. 3d 561 (Fla. 3d DCA 2010) refused to consider defendant's allegations that the plaintiff seeking to enforce restrictive covenants breached the contract first, finding a clause stating "the existence of any claim or cause of action of Employee against [Plaintiff], whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement of this Agreement[,]" to evidence the parties' intentions for the restrictive covenants to be independent of all other obligations.

        i.        <u>The Restrictive Covenants are enforceable</u>.

Aside from Ms. McNeill's contractual assent to the reasonableness and enforceability of the Restrictive Covenants, the Restrictive Covenants are indeed valid and enforceable by law. Pursuant to section 542.335(1) of the Florida Statutes, a restrictive covenant is enforceable when it is: (a) set forth in writing, signed by the parties against whom enforcement is sought; (b) supported by the existence of one or more legitimate business interests; and (c) reasonably necessary to protect the legitimate business interests.

The Restrictive Covenants in Sections 5 of the Executive Employment Agreement are set forth in writing and signed by HK and Ms. McNeill. [Joint Ex. 2, ¶5(f)].  They are also supported by legitimate business interests, as Florida law specifically recognizes customer relationships among the most significant business interests worth protecting. *See Ansaarie*, 252 So. 3d at 289; *see also*, *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Hagerty*, 808 F. Supp. 1555, 1558 (S.D. Fla. 1992) (the right to prevent solicitation of existing customers is, "per se, a legitimate business interest subject to protection."); *Avalon Legal Srvcs., Inc.*, 110 So. 3d at 82 ("a purchaser of the assets and goodwill of a business has a legitimate business interest in preventing the seller from servicing former clients[.]").

The Court also finds the Restrictive Covenants reasonable in time, scope and territory, and otherwise reasonably necessary to protect HK's legitimate business interests. Indeed, the three-year duration of the Restrictive Covenants is presumed reasonable by law where the covenants were agreed to as part of (and as a condition precedent to) HK's purchase of all of Ms. McNeill's former company's assets. *See* Fla. Stat. § 542.335(d)(3) (a restrictive covenant "sought to be enforced against the seller of all or part of [t]he assets of a business or professional practice" is presumed reasonable if "3 years or less in duration."). In addition, the worldwide scope of the

Restrictive Covenants does not override their enforceability under the circumstances, as Ms. McNeill's role at HK necessitated a large online presence (an inherently global platform), and the Restrictive Covenants are accompanied by "relatively narrow restriction[s]", including prohibitions only as to "hair-related products" and the non-solicitation of only HK's current and former clients and customers. [Joint Ex. 2, ¶5(a)-(d)]. Courts have upheld the enforceability of restrictive covenants under similar circumstances. *MDS (Canada) Inc. v. Rad Source Techs., Inc.*, 2009 WL 10668765, at *5 (S.D. Fla. Oct. 27, 2009) (finding worldwide restriction on non-compete agreement reasonable because the intent was to prevent "diminishing the value" of the company by "developing a substantially similar replacement product—particularly with the monies paid by [the company] in consideration for the license[.]"); *Environ. Srvcs., Inc. v. Carter*, 9 So. 3d 1258, 1264 (Fla. 5th DCA 2009) (finding worldwide restriction on non-compete agreement reasonable).

  ii.  Ms. McNeill breached the Restrictive Covenants.

Upon a finding that the restrictive covenants at issue are valid and enforceable pursuant to section 542.334 of the Florida Statutes, all that is required by the moving party is evidence of the defendant's breach. *Picture It Sold Photography, LLC*, 287 So. 3d at 703. The Court finds it readily apparent that Ms. McNeill has breached the Restrictive Covenants. Specifically, Ms. McNeill breached the Non-Compete Provision by, at minimum, promoting hair-related products sold by companies other than HK in her March 14, 2023, April 7, 2023, May 30, 2023, June 1, 2023, and June 6, 2023, videos posted on Facebook and Tik Tok, and by sharing with her followers links to competing hair-related products which Ms. McNeill admits are "identical" to those sold by HK. By these actions, Ms. McNeill unquestionably performed "services similar to the services" she provided for HK during her employment for other businesses engaged in the "manufacture, sale and distribution of hair-related products." [Joint Ex. 2, ¶5(a)].  It is no matter that Ms. McNeill did

not, as she claims, "make money" from the activities in which she engaged as the Non-Competition Provision does not require Ms. McNeill to "make money" from her activities to be in breach the provision. [*Id.*].

The same conduct found to be in violation of the Non-Compete Provision evinces Ms. McNeill's breach of the Non-Solicitation of Customers Provision. By engaging in such conduct, there can be no doubt Ms. McNeill "solicit[ed] and encourag[ed]" HK's customers "to terminate or reduce" their relationship with HK—the Court need look no further than HK's (former) customers' comments to Ms. McNeill's posts. HK presented sufficient evidence showing Ms. McNeill's comments on social media reached existing customers of HK—in the form of comments posted by customers in direct response to Ms. McNeill's posts [*see e.g.,* HK Exs. 82, cmt. 32 (comment by K.M.); 98, cmt. 868 (comment by L.P.); 98 cmts. 115 and 215 (comments by C.B.); 98 cmts 214, 214-2 (comment by A.H.); 71, cmt. 126 (comment by S.R.)]—and evidence that her comments had the intended effect, causing those customers to lessen or terminate their relationship with HK—in the form of specific HK customer transaction records [*see e.g.,* HK Exs. 157 (K.M. Transaction History); 158 (L.P. transaction history); 154 (C.B. transaction history); 156 (A.H. transaction history); 159 (S.R. transaction history).[8]

Finally, the Court finds Ms. McNeill has breached the Non-Disparagement Provision by accusing HK and its employees of stealing, committing perjury, and exploiting her children for profit. The Court rejects Ms. McNeill's argument that the alleged truth of her statements precludes a finding that the Non-Disparagement Provision has been breached.[9] The Non-Disparagement Provision at issue prohibits Ms. McNeill from publishing or communicating "defamatory *or*

---

[8] HK customer transaction records were admitted into evidence under seal. Herein, HK's former customers are identified by their initials to protect their identity.

[9] Because such a determination is irrelevant to the issues here, the Court makes no finding as to whether the statements disparaging HK and its employees are true or false.

disparaging remarks, comments or statements" concerning HK and its employees, and the Court

thereby interprets "disparaging" as having a meaning distinct from "defamatory" so as to avoid

redundancy or "mere surplusage." *See Dear v. Q Club Hotel, LLC*, 933 F.3d 1286, 1293 (11th Cir.

2019). The term "disparaging" as used in the Non-Disparagement Provision—commonly defined

as "to lower someone or something in rank or reputation"[10]—begs a lower standard than that

applied to "defamatory" under tort theory and therefore does not require proof of falsity. *See e.g.*,

*GAF Materials LLC v. Lipinskiy*, 2020 WL 6867412, at *1-3 (D. Minn. Nov. 23, 2020) (rejecting

defendant's argument that "a statement must be false in order to be deemed disparaging"; instead,

interpreting the term "disparage" in a non-disparagement agreement under "the ordinary and usual

meaning of the word… to criticize (someone or something) in a way showing that one considers

the subject of discussion neither good nor important[.]"); *Boros v. Lobell*, 176 So. 3d 689, 694

(La.App. 5 Cir. 2015) (holding that the term "disparage" in non-disparagement clause should be

interpreted by "commonly understood meanings that do not require case law" and finding that

"because the prohibition is not limited to defamatory statements, the truth of such statements is

not a defense as to whether they are… disparaging."); *Eichelkraut v. Camp*, 236 Ga.App. 721, 722

(1999) (rejecting appellant's argument that "disparagement… contemplates the making of a false

statement in order to be actionable" and finding "the parties' intent that the non-disparagement

clause applied to *all* derogatory comments, whether true or not."). Ms. McNeill's assertions that

HK "stole" her business from her "for nothing," that its employees committed perjury in these

proceedings, and that HK attempted to "capitalize" on her children for their own benefit certainly

meets the applied definition of disparagement—irrespective of whether such statements are

truthful or not.

---

[10] *Disparage*, Merriam-Webster Dictionary (Online Ed. 2023).

By way of the evidence presented, the Court finds that HK has established that Ms. McNeill has already breached the Restrictive Covenants, and has a substantial likelihood of success on the merits of such claim at trial.

### B. Irreparable Injury

The Court finds that HK has suffered and will continue to suffer irreparably injury if Ms. McNeill is not enjoined from further breach of the Restrictive Covenants. A party seeking preliminary injunction meets its burden of establishing irreparable injury where it shows "conduct of former employees that would irreversibly alter the status quo." *Southeastern Mech. Srvcs., Inc. v. Brody*, 2008 WL 4613046, at *15 (M.D. Fla. Oct. 15, 2008); *see also*, *Picture It Sold Photography*, 287 So. 3d at 702-03 (Fla. 4th DCA 2020) (holding "the continued breach of a non-compete agreement threatens a former employer's 'goodwill and relationships with its customers, and nothing short of an injunction would prevent this loss*.*"). Section 542.335(1)(j) of the Florida Statutes presumes that Ms. McNeill's conduct would cause irreparable harm to HK.

Ms. McNeill did not overcome the statutory presumption of irreparable harm; regardless, HK presented evidence that it has and will continue to suffer irreparable harm.  First, in the Executive Employment Agreement Ms. McNeill agreed,

> that in the event of the Executive's or any of her affiliate's actual or threatened breach of any of the provisions contained in Section 5 and Section 6, the Company will have no adequate remedy at law… [and] the Company will be entitled to seek… such injunctive and other equitable relief as may be deemed necessary or appropriate by a court of competent jurisdiction.

[Joint Ex. 2, ¶5(f)

Next, HK provided compelling evidence of irreparable injury caused by Ms. McNeill.  Mr. Rosenbaum testified and presented evidence demonstrating that Ms. McNeill's actions in breach of the Restrictive Covenants have caused HK to lose approximately two-thirds of its customer

base, [215:22-216:12], that its daily sales have been significantly negatively impacted by specific posts by Ms. McNeill and its monthly sales have declined year-over-year by nearly 70% since Ms. McNeill began violating the Restrictive Covenants, [HK Ex. 164], and that HK has had to offer extraordinary discounts to generate cash flow, which discounts harm HK's brand in the long term, [Hrg. Tr. 215:2-217:20].  Finally, the comments from HK's former customers in direct response to Ms. McNeill's social media posts that are in violation of the Restrictive Covenants, and transaction histories of HK former customers show that HK has and will continue to suffer a loss of customers if Ms. McNeill is not enjoined from violating the Restrictive Covenants. [*See e.g* HK Exs. 82, cmt. 32 (comment by K.M.); 157 (K.M. Transaction History); 98, cmt. 868 (comment by L.P.); 158 (L.P. transaction history); 98 cmts. 115 and 215 (comments by C.B.); 154 (C.B. transaction history); 98 cmts 214, 214-2 (comment by A.H.); 156 (A.H. transaction history); 71, cmt. 126 (comment by S.R.); 159 (S.R. transaction history)].  Such evidence is more than sufficient to establish irreparable harm from Ms. McNeill's continued breach of the Restrictive Covenants.  *See Southeastern Mech. Srvcs., Inc. v. Brody*, 2008 WL 4613046, at \*15 (M.D. Fla. Oct. 15, 2008) (employer establishes irreparable harm where "threatened by conduct of former employees that would irreversibly alter the status quo."); *see also*, *Picture It Sold Photography*, 287 So. 3d at 702-03 (holding "the continued breach of a non-compete agreement threatens a former employer's 'goodwill and relationships with its customers, and nothing short of an injunction would prevent this loss*.*").

At bottom, the Court concludes that HK has satisfied this element for preliminary injunctive relief by: (i) the evidence presented through Mr. Rosenbaum's testimony and the documentary evidence placed into the record; (ii) the plain language of the Executive Employment

Agreement (*see* Joint Ex. 2, ¶5(f)); and (iii) the statutory presumptions contained in section 542.335(1)(j) of the Florida Statutes.

### III.   Balance of Equities

As a matter of law, enforcing bargained-for restrictive covenants is not a hardship to the covenantee. *See TransUnion Risk & Alternative Data Solutions, Inc. v. MacLachlan*, 2015 12910652, at *3 (S.D. Fla. Oct. 29, 2015) ("In the context of non-competition agreements… courts have held that enjoinment from something one has no right to is not a hardship."). Ms. McNeill has not provided any evidence that enforcement of the Restrictive Covenants—to which she expressly agreed—is outweighed by any harm that she would suffer as a result. Regardless, by statute, the Court is prohibited from considering "any individualized economic or other hardship that might be caused to the person against whom enforcement is sought." Fla. Stat. § 542.335(1)(g). Accordingly, the balancing of equities in the present case favors enforcement of the Restrictive Covenants against Ms. McNeill.[11]

### IV.   Consideration of the Public Interest

To refuse enforcement of an otherwise enforceable restrictive covenant based on public policy considerations, "the specified public policy must substantially outweigh the need to protect the legitimate business interest or interests established by the person seeking enforcement of the restraint." *Pitney Bowes, Inc. v. Acevedo*, 2008 WL 2940667, at *6 (S.D. Fla. July 28, 2008). "Public policy in Florida favors enforcement of reasonable covenants not to compete… because it

---

[11] The Court rejects Ms. McNeill's argument that enforcement of the Restrictive Covenants would constitute an unconstitutional "prior restraint" on her speech. It is well-established that anyone can waive First Amendment rights of free speech by voluntarily entering into a contract waiving such rights. *See Leonard v. Clark*, 12 F.3d 885, 889 (9th Cir. 1993) ("The Supreme Court has held that First Amendment Rights may be waived upon clear and convincing evidence that the waiver is knowing, voluntary and intelligent."). Without this bedrock principle, courts could never enjoin conduct in violation of a contractual restrictive covenant, and Florida Statute § 542,335(1)(j)—which specifically calls for "temporary and permanent injunctions" as the appropriate remedy for breach of restrictive covenants—would indeed be unconstitutional.

demonstrates that courts will uphold agreements, and employers can rely on non-compete

agreements to protect their legitimate business interests." *GFA Intl., Inc. v. Trillas*, 327 So. 3d 872,

878 (Fla. 3d DCA 2021). Ms. McNeill's appeal to her "ability to engage in commerce and exercise

her First Amendment speech rights" is insufficient to overcome the public policy considerations

in favor of enforcement, particularly where the contract sought to be enforced has been established

to contain an express waiver by the defendant of such abilities to engage in commerce and exercise

free speech with respect to certain activities. The Court finds that policy favors enforcement of the

Restrictive Covenants.

     Accordingly, it is hereby **ORDERED and ADJUDGED**:

     1.    HK's Expedited Motion for Preliminary Injunction is **GRANTED**.

     2.    Ms. McNeill is hereby restrained from further violating Section 5 of the Executive

Employment, including directly or indirectly: (i) soliciting business related to the manufacture,

sale and distribution of hair-related products; (ii) providing management, business planning, sales,

marketing, financial planning, or other similar services Ms. McNeill provided to HK during her

employment therewith, including social media promotion and influencing services, to or for any

person engaged in the manufacture, sale or distribution of hair related products; (iii) soliciting or

encouraging any client, customer, supplier, licensee or licensor of HK to terminate or reduce such

person's relationship with HK in any manner; (iv) employing, hiring, engaging, recruiting, or

soliciting for employment or engagement (other than by general advertisement not targeted toward

HK's employees) any person who is or was employed by HK in the year preceding the date of such

hire or solicitation; and (v) making, publishing, or communicating to any person or in any public

forum any defamatory, disparaging, or otherwise negative or degrading comments, remarks or

statements concerning HK, or its affiliates, or their businesses or any of their respective employees, officers, existing and prospective clients, suppliers, investors, and other associated third parties.

3.      Within five (5) business days of receiving this Order, Ms. McNeill shall remove all videos, posts, comments and other related communications posted on any social media platforms to which she has access, that exist in violation of Section 5 of the Executive Employment Agreement.

4.      The Court will set by separate notice a hearing to determine the amount of bond that HK must post.

   **DONE AND ORDERED** in Fort Lauderdale, Florida on this _____ day of August, 2023.


_____
**Jared M. Strauss**
**United States Magistrate Judge**


cc:      Counsel of Record