```
1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
2                      FORT LAUDERDALE DIVISION
                     CASE NO.  23-cv-60345-RAR
3


4     HEAD KANDY, LLC,

5                     Plaintiff,

6          vs.

7                                          Fort Lauderdale, Florida
                                           August 25, 2023
      KAYLA MARIE MCNEILL,
8                                          Pages 1-118

9                     Defendant.
      ------------------------------------------------------------------
10
                          TRANSCRIPT OF PROCEEDINGS
11              BEFORE THE HONORABLE JARED M. STRAUSS
                    UNITED STATES MAGISTRATE JUDGE
12
      APPEARANCES:
13    FOR THE PLAINTIFF:     Ethan Jerome Loeb, Esq.
                             Edward Colin Thompson, Esq.
14                           Smolker, Bartlett, Loeb,
                             Hinds & Thompson, P.A.
15                           100 North Tampa Street
                             Suite 2050
16                           Tampa, FL 33602

17    FOR THE DEFENDANT:     Antonio L. Converse, Esq.
                             Converse Law Group, P.C.
18                           600 17th Street
                             Suite 2800 South
19                           Denver, CO 80202

20                           Laura Elizabeth Burgess, Esq.
                             L.E. Burgess, P.A.
21                           5966 South Dixie Hwy
                             Suite 300
22                           Miami, FL 33143

23    TRANSCRIBED BY:        DAWN M. SAVINO, R.P.R., C.R.R.
                             Official Federal Court Stenographer
24                           400 N. Miami Avenue, 10S03
                             Miami, Florida  33128
25                           Telephone:  305-523-5598
                             Dawn_Savino@flsd.uscourts.gov
```

<pre>
1                    P-R-O-C-E-E-D-I-N-G-S
2          THE COURT:  Good afternoon, everyone.  Today is August
3     25, 2023, it's 1:30 p.m., we're here on case number 23-CV-60345,
4     Head Kandy, LLC versus Kayla Marie McNeill.
5          Can I please have appearances from both parties,
6     starting with the Plaintiff.
7          MR. LOEB:  Good afternoon, Your Honor.  Ethan Loeb,
8     along with my partner Collin Thompson, on behalf of Head Kandy,
9     LLC.  And we have with us Mr. David Taney who is general counsel
10    for the parent company also in attendance with us.
11         THE COURT:  Good afternoon to all of you.
12         Who do we have on behalf of the Defendant?
13         MR. CONVERSE:  Good afternoon, Your Honor.  Anthony
14    Converse on behalf of Defendant Kayla McNeill.  Also with us is
15    Laura Burgess, and our client Ms. McNeill.
16         THE COURT:  Good afternoon to all of you as well.
17         We're here for oral argument on the Plaintiff's motion
18    for preliminary injunction following our evidentiary hearing
19    earlier this month.  I've reviewed the parties' findings of fact,
20    proposed findings of fact and conclusions of law that you all
21    submitted following our evidentiary hearing, as well as some of
22    the other briefing you provided.  And again, the motion response
23    and reply that were submitted ahead of the evidentiary hearing as
24    well.
25         What I'd like to do is, as I think we discussed earlier
</pre>

3

1    this week, I have some specific questions on some of the

2    different issues and sub-issues that the Court has to decide that

3    I would like to address with each party specifically.  So I would

4    like to go through those questions starting with the Plaintiff.

5    And then when once I've completed that, I'll make sure to give

6    each side a few moments to either make any additional arguments

7    that we either haven't touched on or that came up in speaking

8    with and questioning the other side that anyone wants to weigh in

9    on.  Okay.

10             MR. LOEB:  Sounds fair, Your Honor.

11             THE COURT:  So I'm going to start with the Plaintiffs --

12   excuse me, the Plaintiff.  And Mr. Loeb, are you going to be

13   arguing or is it your co-counsel.

14             MR. LOEB:  I'm going to be arguing, Judge.  I'm going to

15   take the lead on this.  Yes, sir.

16             THE COURT:  Okay.  So I'd like to start with the issue

17   of the enforceability of the restrictive covenants in the first

18   instance.  Obviously the likelihood of success.

19             First of all, as I meant to say at the start, obviously

20   part of the reason we're starting with the Plaintiffs, it's your

21   motion, it's your burden to carry the burden of persuasion

22   clearly on each of the elements that you need to show for the

23   preliminary injunction to issue, the first of that is substantial

24   likelihood of success.  And I think the first overarching issue

25   in terms of substantial likelihood of success is the

4

1   enforceability of the restrictive covenants.  You rely in part in

2   arguing that the covenants are enforceable; you rely in part on

3   the fact that the employment agreement that has the covenants

4   includes an agreement that the restrictions are enforceable and

5   reasonable, correct.

6          MR. LOEB:  Yes, Your Honor.

7          THE COURT:  Okay.  So my first question is have you

8   found any cases or are you aware of any cases where a court has

9   relied on such an agreement on that issue as opposed to

10  independently examining whether the restrictions are in fact

11  enforceable under Florida law.

12         MR. LOEB:  Your Honor, I think probably the best place

13  to start to answer that question is the GFA International case,

14  it's a 327 So.3d at 872, pin cite 878, it's a Florida Third DCA

15  case.  And really what that -- I'll read the direct quote, it

16  says when the terms of a noncompete agreement are clear and

17  unambiguous, the contracting parties are bound to its terms.

18  It's a general principle, but it is in the context of a

19  noncompete agreement.

20         So from our perspective, Your Honor, taking the issue

21  outside of the context of the actual statute and 542.335, the

22  plain language of the executive employment agreement between the

23  parties in consideration for the $2.8 million purchase of Lashed

24  Out to which Ms. McNeill testified she was the sole managing

25  member; she agreed that the covenants were in fact enforceable;

5

1   that they were reasonable in terms of time, scope and geographic

2   reach, and there's nothing ambiguous about that.

3          I'll note also that if you look at the asset purchase

4   agreement, that APA was in connection with prior litigation

5   between Ms. McNeill's entity and a related entity of Head Kandy.

6   And so this, in many ways, is not only just an agreement which

7   contains restrictive covenants, but it's in the form of a

8   settlement agreement to alleviate and resolve litigation that

9   previously existed in front of the USPTO for allegations of a

10  trademark violation.

11         So from our perspective, the GFA International case

12  really does carry the day in terms of a pure contractual reading

13  of the language within the contract which Ms. McNeill said that

14  she read the contract, she agreed that it was reasonable and that

15  it was enforceable, and she signed it knowingly and with full

16  knowledge of all of the terms and conditions contained in it.

17         So in terms of contractually can the court rely on that,

18  yes, you can.  And the GFA International case stands for that

19  proposition.  That's in addition to it -- go ahead.

20         THE COURT:  Well, but I think I guess where I'm having a

21  hard time understanding though, it was my understanding of the

22  statutory regime is that there is -- sorry, one second.  The

23  Florida Statute 542.18 says no restraints on trade in sum and

24  substances, and then 542.335 is -- you know, carves out the

25  exception to that general principle that says we will enforce

1    contracts that restrict or prohibit competition under certain

2    circumstances if there -- if you meet certain elements, one of

3    which, of course, is that there's a legitimate business interest

4    involved, and we'll get to that in a moment.

5         So I guess what I'm saying is how can -- if Florida's

6    law is you can't have a restraint on competition unless you meet,

7    you know, the parameters of this statute, how can the parties

8    simply contract around that and agree to something that the --

9    that would otherwise be unenforceable.

10        MR. LOEB:  And 542.335 starts out with that in

11   subsection one which references the previous statute you cited,

12   the .18 statute, the general proposition of, you know, restraint

13   on trade, and then it carves it out and it essentially goes

14   through a checklist analysis, if you will.  And the cases bear

15   upon that, Your Honor, by saying, you know, is it signed by the

16   parties?  Yes.  Check.  You've satisfied that criteria.  Have you

17   shown a legitimate business interest, you know.  Check.  You've

18   satisfied that.  Is it, in fact, reasonably necessary to protect

19   the legitimate business interests justifying the restriction.

20   Yes.  And contractually, the parties agreed to that when they

21   were in -- when they executed the contract.  Once that happens --

22   and I'm not going to go into the issues of considering the

23   defenses and everything because I think we'll get to that

24   ultimately, and I don't want to stray from your inquiry.

25        THE COURT:  We will ultimately get there.  Continue.

7

1        MR. LOEB:  Is that the burden then shifts over to Ms.
2   McNeill and her counsel to argue and show is it overbroad,
3   overlong or otherwise not reasonably necessary to protect the
4   legitimate business interests.  And I think when the Court is
5   going through that analysis and looking at all of this, the
6   primary inquiry is the public policy of this particular statute
7   is -- I don't want to say it's counterintuitive because of that
8   general proposition that you can't restrict competition, but the
9   legislature has spoken and said that the public policy for
10  purposes of restrictive covenants is it's to enforce these
11  covenants and to broadly construe them in favor of enforcement.
12        And it makes sense if you think from a pure policy
13  perspective in that regard because businesses like Head Kandy,
14  they buy a business for, you know, almost $3 million, they want
15  certain protections in place.  And so the courts and the
16  legislature have recognized that by setting up this statutory
17  regime, and it's our position based on the papers and the
18  evidence that was presented to the Court on August 1st, is that
19  those checkmarks or those checks, those boxes have been checked
20  off in terms of satisfying each of those criteria to show that it
21  is enforceable.
22        THE COURT:  And we're going to get to the criteria, but
23  I guess where I'm hung up, though, is that part of your argument
24  -- I understand you argue that we can -- that you meet those
25  criteria, and I'm going to address the criteria.  But part of

1    your argument seems to be the Court doesn't even need to address
2    the criteria because the parties have already agreed that the
3    covenants are enforceable.  And I mean, correct me if I'm wrong,
4    if I'm misunderstanding what you're saying.  But as I took you to
5    be the point of referencing those portions of the agreement
6    where, you know, there's an -- it's agreed that the Defendant
7    agrees that they're enforceable, I took that to mean, you know,
8    court, you don't even have to look at whether the boxes are
9    checked because we've already agreed that these are enforceable.
10           MR. LOEB:  Right.  And that's why I started out by
11   citing the GFA International case, because that case says that if
12   the contract terms in a noncompete agreement are clear and
13   unambiguous, the parties are bound by those terms.  In other
14   words, the Court doesn't step in and say well, I know that's what
15   you may have agreed to, and it's clear and unambiguous, but I'm
16   not going to enforce that.  That's not what GFA International
17   suggests, given the fact that --
18           THE COURT:  But is GFA about whether an agreement that
19   the restrictions themselves are enforceable, a priori are
20   enforceable.
21           MR. LOEB:  I think GFA International, the reason I'm
22   citing it is that it stands for just that general proposition
23   that if, you know, there is a somewhat of a tension between
24   542.18 and 452.335.  And what that suggests is that the policy in
25   Florida is to enforce these restrictive covenants, you know, in

PROCEEDINGS RECORDED BY ZOOM VIDEOCONFERENCING
TRANSCRIPT PRODUCED BY MECHANICAL STENOGRAPHY
AND COMPUTER-AIDED TRANSCRIPTION

1    support of giving, you know, the public just general confidence

2    and faith.  And when I use "the system", I don't mean it

3    pejoratively or negatively or anything like that, but to have

4    confidence that these types of agreements are going to be

5    enforced and that bargain for consideration that Head Kandy and

6    Ms. McNeill had when they closed on this transaction was we're

7    going to pay you a substantial amount of money and we hope this

8    relationship lasts for really long time.  It unfortunately

9    didn't.  Like I said, it's a business divorce.

10            THE COURT:  Let me -- I guess let me just take a

11   ridiculous hypothetical just to try to suss it out though.

12            Let's say if -- let's say there was no -- there really

13   was nothing fitting into any of the legitimate business interests

14   listed in the statute, 542.335(1)(b).  If there was really

15   nothing, you know, we have no trade secrets, you know, there's no

16   business information, and let's say for the purposes of the

17   hypothetical there were no customer relationships or anything

18   like that that were really legitimate and protected.  And yet the

19   contract nevertheless says yeah, but the parties agree that it's

20   enforceable.  Are you saying that it's enforceable regardless of

21   the fact that none of the factors in -- none of the legitimate

22   business interests are actually there.

23            MR. LOEB:  No, because I have a clause at the end of

24   that section that you're referring to, I think you're referring

25   to -- and I'll just refer to it as 335 instead of the long

1    version, but 335(1)(b), subsections one through four.  And if you

2    look, those are the legitimate business interests that you have

3    to satisfy.  And the legislature has indicated that if the

4    covenant is not supported by legitimate business interests, it's

5    unlawful, void and unenforceable.  So you don't get past that

6    point.

7                THE COURT:  So I guess that's what I'm saying is that if

8    there is no legitimate business -- I'm sorry.  The parties, it

9    would seem, can't agree that there's a legitimate business

10   interest when Florida law would otherwise say there is no

11   legitimate business interest, right?  What I'm saying is the

12   parties can't agree that the contract's enforceable even if a

13   court would ultimately find that there is no legitimate business

14   interest.

15               MR. LOEB:  Well, I think the parties -- if the parties

16   have one of those enumerated criteria in subsection B, it's a

17   customer, it's a trademark or it's a trade secret, then the

18   parties can then, at that point in time, contractually agree that

19   the restrictive covenant is necessary to protect those

20   relationships.

21               I'll give you a ridiculous hypothetical back to you, if

22   you don't mind.

23               THE COURT:  Sure.

24               MR. LOEB:  If the parties agree that these covenants

25   were necessary to protect, I don't know, dog food, right?  That's

1    not a legitimate business interest, right?  So therefore, who

2    cares what you contracted for because that's not a legitimate

3    business interest that it's designed to protect.  And the case

4    law is very clear on these, and we've cited these, the general

5    principles in our paper that when you have one of those

6    legitimate business interests and it's really just -- makes

7    common sense in my mind, Judge, I don't know if it does in yours,

8    but when you have a legitimate business interest that's specified

9    and enumerated in here such as the -- you know, I'll pick out one

10   such as subsection three, the prospective or existing customers,

11   or even the customer patient goodwill associated with a specific

12   marketing area or trade area, right?  Those are the two kinds of

13   sandboxes we're trying to play in for purposes of this exercise.

14   When you have that those legitimate business interests, you can

15   at that point in time contractually agree that here are certain

16   restrictions designed to protect those interests such as -- and

17   it makes sense.  Look, you're not going to go if you've been with

18   this company like Ms. McNeill has for a while, and as soon as you

19   leave, you're going to be able to go run and take all those

20   customers away from you.  That's not the way business works, and

21   the parties can contractually agree to that as long as it's one

22   of those specified legitimate business interests.

23           THE COURT:  Right.  And I think perhaps we're talking

24   past each other a little bit because I guess -- I do want to turn

25   now to the question of what the legitimate business interests are

12

1    here.  I think we are ultimately saying the same thing is that

2    regardless of whether the parties have agreed that in the

3    agreement that the covenants are enforceable, the court

4    nevertheless would have to determine that there is, in fact, a

5    legitimate business interest at play that would allow the

6    covenants to be enforced.

7            MR. LOEB:  Yes.

8            THE COURT:  In other words, I can't just ignore that,

9    you know, that criteria because the parties have agreed to it

10   already.

11           MR. LOEB:  And the legislature has told you that you

12   cannot do that.  I would agree with the Court, you have to look

13   to see whether or not there is a -- these covenants are designed

14   to protect a legitimate business interest.

15           THE COURT:  Okay.  So then let's turn to that question

16   then.

17           MR. LOEB:  Yes, sir.

18           THE COURT:  As I understand it, you're primarily

19   asserting the legitimate business interest as you said in B 3

20   which is the protection of substantial relationships with

21   specific prospective or existing customers, patients or clients.

22           MR. LOEB:  As well as Subsection 4 which would be the

23   customer, patient or client goodwill associated with the specific

24   marketing area or trade area.  If the Court remembers,

25   Mr. Rosenbaum testified to that.  The Head Kandy brand, if you

13

1   will, and that goodwill that's been built up throughout the

2   years.  So there's two pathways for the Court to analyze that.

3           THE COURT:  So I guess start with the first one.  How do

4   you demonstrate in this context or -- not do you, but have you

5   demonstrated in this context substantial relationships with

6   existing customers that is sufficient to satisfy the statute.

7           MR. LOEB:  Your Honor, that's contained in the McDermaid

8   declaration which is on file with the Court.  It was shared with

9   the Court during opening and it's part of the record.  We see

10  that there are clients, and their names were referenced in terms

11  of Ms. Cavanaugh, Ms. Brown, Ms. Perry and that was just a

12  sampling.  But the relationships with those clients, and they

13  were substantial, they were repeat customers, they were coming

14  back and buying products over and over and over again, and those

15  specific clients were existing customers.  And they were

16  prospective in many ways because they were repeat customers

17  coming back to buy the products over and over.  They weren't just

18  like a one-time purchase, they were purchasing multiple times,

19  time after time again.

20          And we saw, for instance, Ms. Gonzaniga's (ph) purchase

21  history which is in the record, as well as others, showing that

22  these were not just existing customers, but they were customers

23  who had a long history with Head Kandy in terms of purchasing

24  materials and hair care and hair-related products from Head

25  Kandy.  And the argument I think that the other side is making is

14

```
 1    well, how do you know they're going to come back?  Right?  How do
 2    you know they're going to come back.  So until they come back,
 3    they're not existing anymore, right?  They bought, they're not
 4    coming back, you don't know.  In the world of where we have a
 5    track record, they are existing customers.  They are.  And
 6    they're certainly specific prospective customers that we can
 7    identify if they're not existing, meaning they're waiting at the
 8    door with a contract agreement or something like that to buy
 9    like, you know, The Hair Club or something like that, what we do
10    have is that we know that they're certainly existing and they're
11    most definitely specific prospective customers.  Not like the
12    University of Florida case or the Ethan Allen case to where
13    there's some argument about like hey, you know what, you've
14    interfered with the consumer public as a whole and I can't show
15    you who they are.  That's not what we're talking about here.
16            In the record that was introduced into evidence we've
17    identified a set of specific customers who we no longer have
18    purchases from, 1; and Number 2, we have comments from them
19    showing that state of mind that we had a conversation about on
20    August 1st during the hearing where they said I'm not coming
21    back.  I'm not coming back.  And it was a reaction to the
22    Facebook Live and social media campaign that Ms. McNeill engaged
23    in starting in February.
24            THE COURT:  So what I hear you saying is that, you know,
25    because this is difficult in a retail context where there's no
```

15

1   exclusive -- you know, there's no exclusive contract, there's

2   nothing that obligates anyone to purchase from you in the future.

3   Whether you can show that those people are quote, unquote,

4   existing customers, the fact that they have purchased in the

5   past, you know, perhaps even multiple times in the past at least

6   makes them specific prospective customers as opposed to a

7   general, undifferentiated or unidentified, you know, hair care

8   purchasing public.

9           MR. LOEB:  I think there's two buckets, yes.  I think

10  you can travel under either one and you can satisfy that criteria

11  under either of those analyses, yes.  This is not like, as I said

12  -- and I don't want to, for the sake of sounding repetitious, not

13  a situation where we can't identify who it is.  We're like hmm,

14  gosh, something seems to be going on here, and you would say you

15  know what, Loeb, where is the exact, where is specific customers.

16  I'm like Judge, it's just the consuming public as a whole, I

17  would be in the Ethan Allen trap at that point in time.

18          THE COURT:  Okay.  So obviously you're pointing at the

19  prior customers, and particularly I guess those that have

20  repeatedly bought from Head Kandy as suggesting that there's an

21  expectation that they will also be future customers.  Am I

22  understanding you correctly.

23          MR. LOEB:  And I think that's a logical inference based

24  upon the language of those customers which is I'm never coming

25  back.

```
 1            THE COURT:  So you've put into evidence, I think it's --
 2  and I'm sorry I don't have the exact number, but you put into
 3  evidence a handful of purchase transaction histories.  I think it
 4  was somewhere between seven to ten.  And some of them show, you
 5  know -- I think it was, you know, one of them showed about, I
 6  think, 50 purchases over the course of five years, some of them
 7  only showed, you know, really just a handful of purchases over
 8  those years.  How can the Court extrapolate from that this idea
 9  that Head Kandy has sufficient substantial relationships with its
10  customers?  In other words, you know, we've got -- it seems like
11  the evidence you've put forward is a handful of purchase
12  histories, you know.  Isn't that subject to, you know, the
13  possibility of cherry-picking such that I can't really
14  extrapolate from that to the main set of Head Kandy's customers.
15            MR. LOEB:  First of all, we're at the preliminary
16  injunction phase and I'm not required to pour in every last drop
17  of evidence.  I've got to meet my burden.
18            THE COURT:  Understood, but you do have to meet your
19  burden and do it by -- clearly meet the burden of persuasion, so
20  that's why I'm belaboring it.
21            MR. LOEB:  Sure.  And I don't mean to be disrespectful
22  by saying hey, I'll get to it later.
23            THE COURT:  I'm not taking it as disrespect, I'm just
24  making sure it's clear that we're operating under the same set of
25  assumptions.
```

17

```
1          MR. LOEB:  What Mr. Rosenbaum also testified to, and
2     that sampling that we have shows that before Ms. McNeill, and
3     I'll say breached the covenants, and it's certainly our position,
4     he testified that Head Kandy had approximately 33,000 customers.
5     That was his testimony that he gave during the hearing.  And
6     after -- the question was after she started her online campaign,
7     how many returning customers does Head Kandy have, approximately
8     7,000.  Okay.  So Head Kandy was moving along, you know, year
9     after year in terms of these sales and it had these 33,000
10    customers.  Okay.  But it dropped, dropped significantly down to
11    7,000.  And then Mr. Rosenbaum went on to correlate that drop
12    with the decline in sales year over year, and that was that chart
13    that was put into evidence at 164 which showed that in January
14    there was a 30% increase in sales year over year, and then after
15    Ms. McNeill started to go online and started engaging in the
16    behavior we contend to run afoul of those restrictive covenants,
17    the percentages dropped and they dropped very quickly.
18          THE COURT:  Right.  But the question is whether that's
19    -- his testimony is sufficient evidence as to those 33,000 that
20    those constitute substantial relationships within the context of
21    the statute.  And his -- as I recall his testimony, and
22    especially on cross, you know, when asked well, what constitutes
23    a repeat customer, he couldn't really identify what the criteria
24    is.  So I don't know if that 33,000, if most of them are more
25    like -- and I'm sorry, I forget the name of the woman with the
```

1    initials G.G. I think was the one who has the 50 or so, you know,

2    significant purchases over five years, whether they're more like

3    that, or more like someone who happens to have bought two or

4    three times over the course of five years, which would seem less

5    indicative of, you know, an active, ongoing relationship,

6    substantial relationship, something that would constitute a

7    substantial relationship that the statute contemplates

8    protecting.

9              MR. LOEB:  And Your Honor, there are.  You're going to

10   have -- just like any kind of consumer goods relationship, you're

11   going to have the type of customers that are going to come and

12   they're going to -- they're going to buy a whole lot, they're

13   going to buy a ton.  And that's G.G., Ms. Gonzaniga.  She liked

14   Head Kandy.  You're going to have others that perhaps buy

15   sporadically or not as much as Ms. Gonzaniga, and then you're

16   going to have those people that are going to perhaps put their

17   toes in the water and try the products out, and then after that,

18   you know, they say okay, I don't want -- or maybe I'll just buy a

19   little bit at a time.

20             But the bottom line is substantial relationships with

21   specific prospective customers doesn't necessarily mean that you

22   have to have all Ms. Gonzaniga-type clients that have been

23   interfered with.  That would basically put this restrictive

24   covenant -- and it would really narrow it and not be in line with

25   what the policy of the statute is, which is to basically protect

1    the business.

2              THE COURT:  Right.  But again, I'm not talking about who

3    was interfered with or not.  We're at a stage where we're looking

4    back in the beginning, back when you're establishing the covenant

5    to begin with, was there sufficient interest.  In other words,

6    were there substantial relationships that the statute will even

7    let you try to protect this way.

8              MR. LOEB:  Oh, sure.  Yes.

9              THE COURT:  Right?  So again, what I'm struggling a

10   little bit with is how the Court can conclude from a matter of

11   what has been proven as to whether those relationships are

12   substantial within the meaning of the statute.

13             MR. LOEB:  I think they are.  I mean, look, if you want

14   to go back to the time that the agreement was first struck, we

15   can look at what the purchase price was which was $2.8 million.

16   That's a substantial amount of money that was paid for the brand

17   and the customers.  And as time went on, as the business went on,

18   yeah, sure, there were more customers that came on, of course.

19   That's the essence of a business when, you know, you do that.  So

20   that's -- I don't perceive the statute as placing such a

21   limitation in terms of at the time the contract was executed you

22   have to have so many people.  And, you know, this is a situation

23   where you have products that are being sold for hair care, the

24   relationships based upon the numbers that Mr. Rosenbaum

25   established.  And sure, we put in, I believe, it was seven

1   samples, if you will, of the purchases that were made.  But

2   certainly that showing, coupled with the other evidence that's in

3   the record, establishes those relationships.

4           THE COURT:  I guess let me make clear, to me it does not

5   seem like it's not a matter of quantum of customers, like the raw

6   number of customers necessarily, but what it seems to me and what

7   the case law seems to suggest is that the statute recognizes

8   substantial relationships that the statute deems, I guess, worthy

9   of this kind of protection when you've got to a certain, I guess,

10  level of customer relationship, whereas transitory, you know,

11  transitory relationships where customers can really go and buy

12  from anybody, and there's no exclusivity and there's no pattern,

13  there's no real expectation of necessarily -- future purchasing

14  is not necessarily considered that kind of substantial

15  relationship.  So I guess what I've struggled to find is a case

16  in the retail context, because unless you disagree with me, Head

17  Kandy is essentially a retail business, right?  It's a

18  direct-to-consumer business.  There are no contracts, there's no

19  subscription even here of you will buy a certain amount every

20  month.

21          So what I'm wondering is are you aware of any cases in

22  the retail context where a court has found that what constitutes

23  a sufficiently substantial customer relationship such that there

24  would be a legitimate business interest allowing the

25  enforceability of a restrictive covenant.

1          MR. Loeb:  Not in the retail context, Your Honor.

2     Because from our perspective, when I hear 33,000 customers and

3     then there's a precipitous drop of 7,000, and I know you said

4     you're not focused on the quantum and I get that, but from our

5     perspective substantial relationships with those prospective or

6     existing customers, if the Court were to interpret that to say

7     you know what, I need to see -- you know, show me the contracts

8     that exist with these customers that have like the Hair of the

9     Month product club or something like that; like, you know, Birch

10    Box or Bark Box where you get something every single month, and

11    all of a sudden you have people starting to, you know, cancel

12    left and right.  If that were the meaning that the Court would

13    attribute to that section, which I would contend is contrary to

14    what the legislature intended, that's a pretty narrow reading and

15    you would, in many ways, put retail businesses -- they would be

16    outside of the protection of this particular statute unless they

17    had a contract with every single one of their customers.

18          THE COURT:  But again, that's somewhat what I've

19    struggled with.  Because the Defendant has cited some cases in

20    circumstances where the relationships with customers were not

21    exclusive or were not long-term, and where courts have found that

22    therefore there was no legitimate business interest.

23          MR. Loeb:  And Your Honor, if that's the Ethan Allen or

24    the University of Florida case, I think those are the cases

25    dealing with the public as a whole.  But here --

1          THE COURT:  No, I understand you're talking about -- I

2     know the cases that you're pointing to, but that's not what I'm

3     talking about.  I'm talking about the -- I think it's Evans which

4     is a Fifth DCA case from 2015, and Environmental Services versus

5     Carter which cites the Ethan Allen case that you're talking about

6     but this is -- that's a Fifth DCA case from 2009.  And the

7     Defendants at least quote Environmental Services as saying the

8     protection of former customers generally does not qualify as a

9     legitimate business interest where no identifiable agreement

10    exists with such customers establishing that they would return

11    for future work.

12          So I guess that's ultimately what I'm trying to

13    understand is how do you distinguish language like that.

14          MR. Loeb:  Because in this instance we have Ms. McNeill,

15    who had -- and we know this because let's just look at what

16    happened.  Ms. McNeill had a substantial following.  I think all

17    parties have agreed that she was the brand of Head Kandy and, you

18    know, she stayed with Head Kandy and she was there and she helped

19    with the clients to build up that business and that goodwill, and

20    continued to have those customers who were repeat customers.  And

21    those customers, but for Ms. McNeill being gone, and then going

22    on social media and engaging in this type of behavior, we just

23    have to look at what the customer said, I'm no longer going to

24    buy from them because you've either said something about, you

25    know, other products to buy, that's the Bo Stegall example, the

23

1   Bo Stegall bucket, or calling saying that Head Kandy exploited

2   her children for commercial gain.  Oh, people saying I'm no

3   longer going to be a part of that.  We have to look at what the

4   customer's behavior is in the social media postings indicating

5   that I was an existing customer, I was a prospective customer

6   that was going to buy again, but now given what Ms. McNeill has

7   said and done on social media, I'm not interested in

8   participating any longer with or having a relationship with Head

9   Kandy in terms of purchasing hair-related goods in the future.

10  And of course, that doesn't take into account the subsection four

11  which is the customer, patient or client goodwill associated with

12  a specific marketing or trade area which we contend is hair.

13        THE COURT:  That's a good transition because I do want

14  to ask about that provision as well.  Explain to me what the idea

15  of goodwill means in that -- in the context of that phrase and

16  how that applies in this circumstance.

17        MR. Loeb:  Sure.  It's our position that Head Kandy,

18  throughout the years, the time of the asset purchase agreement

19  and going forward, had become synonymous with, you know, it had

20  hair-related products.  Ms. McNeill was part of that goodwill,

21  and it was recognized, and I think the parties have stipulated to

22  that effect, that Head Kandy, in the area of hair-related

23  products and goods, that it was known online, at least it

24  gathered 33,000, based on the testimony, customers that

25  associated with that.  And they were repeat customers and that

1  repeat customer purchases in many ways is goodwill.  I mean,

2  that's what businesses do.

3         Goodwill is -- you know, I remember when I was in

4  business school, goodwill is that thing you can't touch, right?

5  You know, it's a reputable brand.  You've got a good customer

6  base.  They're going to come back.  They're going to rely on, you

7  know, they're going to say when I've got to make a purchase, I've

8  got a make a decision, am I going to pick, you know, L'Oreal or

9  Revlon, or am I going to go to Head Kandy.  And we know that

10 based upon the goodwill that had been built up, Head Kandy had a

11 great name in terms of that online space that it was playing in.

12 And so that goodwill had been built up with that name, and so

13 from our perspective, that is what the goodwill means is that --

14        THE COURT:  The goodwill is the brand reputation and the

15 brand recognition.

16        MR. Loeb:  Yeah.  And, you know, that because look, it's

17 33,000 customers.  I mean, is that is that McDonald's numbers?

18 I'm jumping categories, but no, but is it -- yeah, it's pretty

19 good for an online brand.  It is --

20        THE COURT:  And again, the specific marketing or trade

21 area you're asserting, that hair care products area, that

22 constitutes the specific marketing or trade area within which

23 Head Kandy had built up goodwill.

24        MR. Loeb:  They were in that space and they had built up

25 goodwill in that space.

```
1        THE COURT:  Okay.  I want to move on to the question of
2  -- assuming the covenants are enforceable now, how you've
3  demonstrated breach or what would constitute breach.
4        MR. Loeb:  Go ahead.  I'm sorry.  I didn't mean to cut
5  you off, Judge.
6        THE COURT:  The breach.  So I want to start with the
7  noncompete clause.  And I guess let me start here.  First of all
8  regarding White Pineapple.  Are you still contending, at least
9  for purposes of the preliminary injunction, that White Pineapple
10 constituted a competing company?
11       MR. Loeb:  We are not as it pertains to -- I don't want
12 to be heard to, you know, that I'm waiving anything going forward
13 as it pertains to White Pineapple.
14       THE COURT:  I'm not suggesting that you concede
15 anything.  What I'm saying is that I do not recall hearing
16 evidence that would establish that White Pineapple -- at the
17 preliminary injunction hearing that White Pineapple would
18 constitute a competing business, and I'm wondering if that's
19 something you're disagreeing with for purposes of the preliminary
20 injunction or not.
21       MR. Loeb:  For purposes of the preliminary injunction,
22 I'm focused on something else.  White Pineapple, there was
23 evidence at the hearing that Ms. McNeill utilized Ryan Thompson
24 to help set it up.  There was some discussion about that.  But
25 from our perspective, we're traveling right now under a different
```

1   theory that I think is a little more targeted towards what Ms.

2   McNeill did was engage in a prohibited restricted service by way

3   of the testimony.

4           THE COURT:  Okay.

5           MR. Loeb:  And I'm prepared to talk about the evidence

6   with that.

7           THE COURT:  Right.  So that is my next question.  So how

8   do you prove that she is, quote, providing restricted services to

9   restricted business?

10          MR. Loeb:  Sure.  And the analysis, as we talked about

11  during opening and it's identified in our papers, restricted

12  business is a company that's manufactures, sells and distributes

13  hair-related products.  Okay.  That's the business.  And was she

14  providing.  And really what we're focused on -- I'm just going to

15  blow past some of the clauses, words that I don't think we're

16  taking issue with at least at the moment.  We're focused on the

17  issue of marketing or other similar service that the executive

18  provided to the companies during her employment at Head Kandy.

19          If the Court remembers, when I was talking to Ms.

20  McNeill, when I called her, I asked her if she remembered an

21  opening, the videos.  And I said are these the kinds of videos

22  that you would, like the ones that we contend with, are these the

23  types of videos that you performed and you broadcast while you

24  were at Head Kandy, and her answer was unequivocal, it was yes.

25  And so, you know, I even asked her, so when you were at Head

1 Kandy did you host Facebook Live sessions like the ones we saw

2 during opening.  Answer, yes.  And then we went back and forth

3 and sparred a little bit.  I said, but while you were employed

4 with Head Kandy, you would use social media to help promote

5 products.  Yes.

6   So Ms. McNeill, that's not just marketing, but what she

7 did when she was at Head Kandy, she became a social media

8 influencer.  That's a stipulated fact.  That's what she did.  And

9 so from our perspective, those are the two activities that she

10 engaged in related to hair products.  The best example of that is

11 the Bo Stegall evidence that we have.  And you look like you want

12 to say something, Judge.

13   THE COURT:  Well, but -- and I understand that purpose

14 or that portion of that.  She was doing things that were similar

15 to what she did at Head Kandy.  I guess to me, the question

16 really is was she, quote, unquote, providing services as the

17 contract terms contemplate.

18   MR. Loeb:  Sure.

19  THE COURT:  Because the evidence that I think we heard is

20 that she didn't have any formal relationship with any of the

21 competing businesses; there's no evidence, unless you correct me,

22 that she's been hired by or contracted by or has any sort of

23 formal relationship with any other restricted business, and

24 there's no indication that she's earning any money from those

25 activities.  And now you assert in your findings and conclusions

28

1    that it doesn't matter if she makes money because it doesn't say

2    in the contract that she can only -- she has to make money.  But

3    isn't it implicit in the idea of providing services that it's

4    something that is either coordinated or compensated.

5          MR. Loeb:  No, Your Honor.  And I first cite to the

6    Court with regard to the provisions that says Ms. McNeill will

7    not directly or indirectly engage in these businesses, meaning

8    that's pretty broad, right?  And think about that.  Think about,

9    practically speaking, what this means.  It means that if Ms.

10   McNeill were not paid money, right, she could go onto social

11   media and at will, with impunity, like she did here, start

12   promoting and marketing for other hair-related products, and she

13   could say well, I haven't been paid any money so I'm totally

14   fine, there's nothing wrong.  Whether she's made money or not is

15   irrelevant.  The point of these restrictive covenants is to make

16   sure that Head Kandy isn't harmed and injured as a result of what

17   it is that she's doing.  And we showed that Head Candy was harmed

18   as a result of the loss of the customers and the loss of the

19   revenue.  So from our perspective, yeah, is there any form

20   relationship?  Not that I know of right now.  But to us, that's

21   not relevant because it doesn't say, you know, you will not

22   engage in these particular types of activities if you are -- you

23   know, if you have a contract or only if you're hired or only if

24   you make money.  The point of this provision is to make sure that

25   Ms. McNeill, when she leaves for three years, is not going to go

1    on and start promoting like she did at Head Candy other products

2    and it had its intended effect.  I mean, she promoted those

3    products, and we know that there are references within the

4    exhibits that we had during the Bo Stegall evidence that was

5    presented where individuals said oh, I'm going to go buy Bo

6    Stegall right now.  Oh, I just bought his products last week.

7            THE COURT:  But I guess what I'm saying -- let's

8    actually just put Bo Stegall to the side for a moment.  Because

9    it seemed that -- I guess my question is more it's about some of

10   the product reviews that I think happened more in June that you

11   put evidence on.  But the product reviews where she's talking

12   about things that are available, I think, on Amazon or elsewhere,

13   yet can she be providing a service, I guess, to a business that

14   doesn't even know she's providing it.

15           In other words, if she's reviewing a product for just --

16   picking off the top of my head, for Revlon, without Revlon asking

17   her to do it, without Revlon even knowing she's doing it, can

18   that still be providing a service within the scope of the

19   contract?

20           MR. Loeb:  Yes.

21           THE COURT:  Why is that?

22           MR. Loeb:  Because there's that catchall category at the

23   end which talks about providing similar services similar to the

24   services provided to the company during her employment with the

25   company.  There's that catchall meaning that she cannot go on,

1   like I said, do this to the detriment of Head Kandy by going on

2   and saying look at this particular product, this product, this

3   product, this product, and encouraging people to buy that.

4          Now, does this part of this bleed over to the nonsolicit

5   where you're encouraging customers from doing that?  Yes.

6          THE COURT:  We're going to get to that.

7          MR. Loeb:  I'll agree with that.  Bo Stegall is perhaps

8   the strongest evidence of her engaging in a restricted service.

9   And I hear what you're saying about like, well, she went on

10  Revlon.  They didn't have a clue she was doing that.  But I go

11  back to she engaged in these types of activities, similar to what

12  she conceded during the hearing by saying yes, this is what I did

13  when I was at Head Kandy, meaning this is ultimately for the

14  protection of the business consistent with the public policy

15  stated in the statute at 335, where this is designed to protect

16  Head Kandy from Ms. McNeill going on and giving product reviews.

17         Let's put it simply this way:  Did Ms. McNeill go on,

18  when she was at Head Kandy, and start talking about the

19  three-barrel curler and this hair spray and this hair gel and all

20  that?  No.  She was promoting Head Kandy products because that's

21  what she was hired to do, and she was a part owner in the

22  business.  And for her to then go and engage in these similar

23  types of activities, but then after having this large audience

24  and substantial reach across the internet to then show all these

25  other products, we know what she was doing.  She wasn't doing it

1   for review purposes, she was doing it in order to harm Head

2   Kandy.

3         And it's an argument of convenience, Your Honor, in many

4   respects to say oh, well I wasn't paid for this.  Okay.  I didn't

5   have a contract.  I didn't do this.  That's the reason why, when

6   the drafters put this together, and we're looking at it directly

7   or indirectly engaging in these activities, it's designed to

8   prevent Ms. McNeill from trying to find a get-around to be able

9   to engage in this type of activity to Head Kandy's detriment.

10        THE COURT:  Now, Ms. McNeill testified that she was told

11   by Plaintiff's counsel, I don't think you, I think by internal

12   counsel, that she could continue to review hair products as long

13   as it wasn't for payment.  I don't recall hearing any contrary

14   testimony to that.

15        So I guess my first question on this is, Number 1, is

16   there any admitted evidence that contradicts her testimony as to

17   what she was told in terms of what she could or couldn't do in

18   reviewing hair products.

19        MR. Loeb:  Your Honor, I think you might be referring to

20   one of the Ferdinand letters.  That was outside counsel and one

21   of the letters and what they suggested to Ms. McNeill.  My

22   response to that, without getting into the back and forth --

23        THE COURT:  I'm saying I'm referring to transcript, Page

24   145, where she testified about --

25        MR. Loeb:  Okay.  And my response to that is the

1    contract itself, you can't orally modify the contract.  It's not

2    allowed to be orally modified.  If there's a modification, it has

3    to be signed by the managing member of the entity itself, meaning

4    Mr. Falic or one of his designees.  And from our perspective --

5    and that's why I say, I'm trying to stick with legal because the

6    back and forth, it's legally irrelevant in terms of what's in the

7    contract.  If there's a modification that gives Ms. McNeill an

8    out in terms of what she can or can't do, show me the signed

9    writing that the contract contemplates that to be, and we can

10   have a discussion about that.

11          But that's not what happened.  This was somebody told

12   me, he said-she said.  All due respect, everybody on this call,

13   so what.  The contract says there's a way to deal with this

14   modification and that's designed to address these very issues

15   that you and I are talking about right now where somebody says

16   well, I was told this.  Well okay, yeah, you were told that, but

17   the contract tries to avoid the he said-she said so we don't

18   spend a lot of time, money and energy arguing over who said what

19   and in what context, and was it in a context of a settlement

20   agreement, was it in the context of something else.  There was no

21   written modification that was submitted into the evidence.  So

22   what Ms. McNeill said, with all due respect, to the Court and Ms.

23   McNeill and everybody else, it doesn't matter.

24          THE COURT:  Okay.  So in other words, regardless of what

25   understanding she may have had or what she was even told by Head

1    Kandy, the Court shouldn't consider it, that it's just not

2    legally relevant at all.

3          MR. Loeb:  It's not relevant for the purposes of a

4    modification to those particular clauses, no, because that has to

5    be something that's actually in writing, it's got to be something

6    that both sides cite to.  And I'm looking for the particular

7    provision in the contract to cite to the Court.  I believe it's

8    going to be Paragraph 11, and I believe -- and I'll look where it

9    says no term in the agreement may be waived except by writing

10   signed by the party waiving the benefit of such term. It's that

11   no oral modification clauses that are contained in contracts.

12         THE COURT:  Does it affect the extent to which a

13   preliminary injunction is necessary to compel compliance with the

14   contract?

15         MR. Loeb:  I don't understand the question, Your Honor.

16         THE COURT:  Well, I guess the question is that if she

17   was -- you're coming to the Court saying we need the Court to

18   order her to comply with the contract or else that, you know,

19   she's going to continue to breach it and cause us irreparable

20   harm.  If part of what you alleged are violations are instead the

21   product of a misunderstanding or misapprehension of what was

22   allowed and what wasn't that was created by Plaintiff's own

23   counsel, doesn't that suggest that a preliminary injunction isn't

24   necessary to compel compliance?  That perhaps, you know, part of

25   it is a misunderstanding about what the parameters of the

1    contract are?

2         MR. Loeb:  No, because the contract, the best

3    understanding is look at the contract.  And I've actually found

4    the clause I want to tell you about now and that's -- it is in

5    Paragraph 11 where it reads:  This written agreement may not be

6    later modified except by a further written, signed writing,

7    signed by a duly authorized representative of the company and the

8    executive.  So until you have a duly signed agreement -- and

9    these clauses are extraordinarily important, especially in a

10   business context.  Because you want to be able to say here's my

11   First Amendment, my Second Amendment, a supplement to the

12   agreement.  Unless you have something that's signed,

13   misunderstandings -- and like I said, it's not relevant what the

14   understanding is.  If somebody has to look, they look here and

15   they say hey, wait a minute, let me go and look at the contract,

16   that's what governs my behavior, not what a lawyer might have

17   said or somebody might have -- you know, you're talking over

18   coffee or something like that, between somebody.  You've got to

19   have this, according to the contract, a written agreement

20   modifying any of the obligations, terms and conditions of the

21   contract.

22         And that's not what was in evidence.  It was just a

23   statement perhaps by somebody that Ms. McNeill contends they told

24   her without any context, anything of that.  But again, the

25   context really doesn't matter at all because the contract itself

1    deals with this very issue and says all that stuff is irrelevant.

2         THE COURT:  Let me move on to the nonsolicitation

3    clause.

4         MR. Loeb:  Yes, sir.

5         THE COURT:  As I understand it, there are kind of two

6    halves of that.  One is prohibition on soliciting business

7    purchases from a competing business or restricted business in the

8    terms of the contract, and the other is encouraging the customer

9    to reduce their relationship with Head Kandy.  Is that generally

10   accurate?

11        MR. Loeb:  Yes, sir.

12        THE COURT:  So as to the soliciting business portion,

13   again, part of this gets back to my question before of if she's

14   reviewing products for companies with whom she has no financial

15   relationship and, you know, it doesn't have any affiliation for,

16   can that fall within the definition of soliciting where, you

17   know, if the business is not sending you out to get them

18   business, does that fall within the definition of soliciting.

19        MR. Loeb:  I think it can.  I think the stronger form of

20   the argument is the encouragement as opposed to soliciting within

21   its common understanding.  But certainly it's -- and Ms. McNeill

22   has tried to argue that hey, I didn't solicit.  But if you look

23   at 5 B of the agreement and the executive covenant section,

24   Romanette Number 2, Romanette B 2 talks about soliciting or

25   encouraging any client or customer to reduce or terminate such

36

1   person's relationship.

2          And that makes sense, right?  The first one is hey,

3   guess what I'm going to go, I'm going to try to sell you

4   something new in terms of, you know, solicit business related to

5   a restricted business.  I think Bo Stegall can fit into that.

6   You know, soliciting by saying hey -- here, for instance, when

7   Ms. McNeill says hey Bo, put on your internet address or whatever

8   it is, your girls are going to be my girls.  That's soliciting.

9   That's telling Bo Stegall -- that's her utilizing him in an

10  indirect way to help solicit business for his care goods to the

11  detriment of Head Kandy, and we saw evidence of that.

12         But putting the solicitation issue aside we, in spades,

13  showed the acts of encouragement by Ms. McNeill to have the

14  customers reduce or terminate the relationship.  Reduce or

15  terminate the relationship.  And they did it.  She did it in a

16  way, she attempted to do it.  Because remember, this clause is

17  not just a did you do it, did you attempt to do it.  You can't do

18  it or attempt to engage in types of activities that run afoul of

19  these clauses.

20         So it's our position, and the evidence was quite clear

21  on this, that Ms. McNeill, by engaging in these social media

22  activities, in fact encouraged the clients to not only terminate,

23  but to reduce the relationship with Head Kandy.

24         THE COURT:  That encouraging to reduce the relationship,

25  is that based on -- is that simply a reflexive -- if you

1   encourage someone to buy some other company's hair care product

2   regardless of what kind of product it is, you're encouraging a

3   reduced relationship with Head Kandy, or is it more reliant on

4   what you call the disparaging comments of, you know, saying

5   negative things about the company or the people who run it in

6   terms of, you know, encouraging them to reduce the relationship.

7           MR. Loeb:  I think it's both, Your Honor.  I think it

8   started out, candidly, when you look at the evolution, you know,

9   from the winter into the spring of '23, Ms. McNeill was -- she

10  kind of started out with the Bo Stegall campaign, then she moved

11  on to what -- I'll use your product label, Revlon and the like,

12  where she was doing that.  Then it kind of morphed into hey, I'm

13  going to start giving these lawsuit updates where I'm going to be

14  engaging in a conversation, then telling individuals hey, you

15  know what, Head Kandy tried to capitalize on my children.  We

16  know that had an effect because Mr. Rosenbaum said that day the

17  sales boom would drop, drop, you know, through the floor.  And we

18  know that, you know, it's kind of a bleed over between that.

19          But, you know, her giving acts of encouragement, she's

20  encouraging them not just verbally, but she's also -- if you

21  watch those videos, and I don't know if the Court had the chance

22  to look at all of them, but you can see where she's saying oh,

23  look at this, this is a particular spray, oh it smells so great.

24  Oh my God, it's awesome, it's great.  She does that with Bo

25  Stegall.  She does it with all the products.  She does it with

1    that three-barrel curler.

2         And what does she do?  She actually says -- and I found

3    this intriguing when you would watch how she went about doing it.

4    The three-barrel curler one, which was in March and it was

5    something that was showed during opening statement, it was in

6    evidence.  Ms. McNeill, she sits there and she talks about, you

7    know, hey, I can't share a link with this, meaning I can't give

8    you the link.  She knows she can't because in many ways that's an

9    admission on her part.  Oops, I can't give you that because that

10   could perhaps be an act of encouragement.  But she's sitting

11   there talking, and it's March 14th, it's Joint Exhibit 21 where

12   she says it's on Amazon, it's $27.  I can't give you anything

13   because of my noncompete.  And then what does she do?  She's

14   looking at her screen and it comes up and somebody named Courtney

15   Everline says here's the link for the waiver.  And she goes oh,

16   hey, there's the link, thanks for sharing that, I cannot because

17   I can't make any money on hair care.  But she indirectly -- and

18   she encourages and she acts in the acts of solicitation by having

19   somebody else do it, and she's effectively endorsing that and

20   saying thank you for sharing that.

21         Those particular acts, that's not Ms. McNeill at that

22   point in time giving a review saying hey, you know what, I think

23   it's really good product.  I still think that's offensive, right?

24   I think that runs afoul of the contract.  But when she sits there

25   and says it's 27 bucks, it's on Amazon, I can't share the link

1    with you, somebody else does and she says thank you very much,

2    she has indirectly, if not directly, done what Paragraph 5 B

3    specifically prohibits which is not only solicitation, but

4    encouraging others to reduce the relationship with Head Kandy by

5    buying other hair-related brands from other companies.

6            THE COURT:  Let me ask about the nondisparagement

7    clause.

8            MR. Loeb:  Yes, sir.

9            THE COURT:  Even if the term disparaging, you know, does

10   not require falsity; in other words, if we don't even have to get

11   into the truth or falsity of anything that she's saying, I'm

12   concerned with the idea that some -- at least some portion of

13   what you've labeled as disparaging statements are invited by the

14   litigation.

15           In other words a lot of what we have, a lot of the

16   examples of the disparaging comments -- for instance you, many

17   times, referred to her suggesting or saying that Head Kandy --

18   the people at Head Kandy are liars or they're -- you know,

19   they're lying about things.  But as I heard it, it seemed like

20   that was in the context of saying Head Kandy has filed this

21   complaint making allegations against her and she's saying they're

22   not true.

23           Is there -- I guess what I'm saying is that can

24   statements that are made in response to and in refutation of

25   publicly made allegations against her be considered disparaging?

1          MR. Loeb:  Yes.  If she steps outside of the courthouse

2    and it's -- I think the cases that are cited, you know, this kind

3    of goes to the litigation privilege I think is where the Court

4    might be headed.  Go ahead.

5          THE COURT:  It's not so much the litigation privilege.

6    I'm sorry, I didn't mean to cut you off.  I guess it's more of

7    the idea that what she is saying is untruthful are responding to

8    the things that Head Kandy has brought up in the first place.

9          MR. Loeb:  Right.

10          THE COURT:  Do you understand what I'm saying?

11          MR. Loeb:  I understand what you're saying.  And if Ms.

12    McNeill wants to come take the stand like she did, say that's not

13    true, here's why.  If Ms. McNeill wants to file something in the

14    record and say that's not true, here's my evidence of why.

15    That's the forum that you engage in, the kind of back and forth,

16    and it's for the factfinder to make a decision ultimately as to

17    who is telling the truth and who's not.  It is not for Ms.

18    McNeill to then step outside of the court and say hey, here's

19    what's going on.  They're liars.  They're cheats.  They're

20    committing perjury.  Social media is not the place to do it.  And

21    the restrictive covenant specifically says you won't go engage in

22    that type of activity unless it's the proper forum, and I think

23    there's reference to the extent allowable by law meaning yeah, if

24    you've got to defend yourself and Ms. McNeill feels like what

25    Head Kandy has alleged is not accurate, okay, you know, she can

1    do that.

2         But there's other statements, for instance like they

3    went on a witch hunt, they stole my company.  Those types of

4    things, that's not responding to an allegation in the lawsuit,

5    that's just her giving people on social media her disparaging

6    version of the events to which she's not allowed to do that.

7         THE COURT:  If the Court were to grant the motion for

8    preliminary injunction, would the Court need to include some sort

9    of caveat regarding the nondisparagement clause to make clear

10   that it does not prohibit any statements she would make or does

11   not apply to any statements she might make in court filings or

12   testimony or depositions and the like?

13        MR. Loeb:  If I think I understand what you're saying,

14   are you saying hey, I agree with you, I'm going to grant the

15   injunction, but you're allowed to say and defend yourself in

16   court?  Is that what you're asking?

17        THE COURT:  Essentially, yes.

18        MR. Loeb:  Sure.  She can come in court, and you have

19   all the mechanisms available.  If she says what they said is a

20   lie, it's not true, and it turns out to be that what she's saying

21   is not true, she can be charged with perjury, contempt, all that.

22   There's all the tools that are available inside the court that

23   you have at your discretion that deal with that.

24        But what happens is her stepping outside of the

25   courtroom, that's not the place for her to engage in that type of

1    activity.  Putting aside the other statements that have nothing

2    do to do with the litigation itself, just going on -- and I don't

3    mean this to sound disrespectful to Ms. McNeill, but saying that

4    the company, you know, that the company was stolen, kiped, taken

5    from her, all that stuff, that's got nothing to do with the

6    lawsuit.

7              THE COURT:  Regarding the -- you know, the defense

8    argues that the Court should consider its -- her equitable

9    defense of prior breach despite what's stated in the agreement

10   that she won't raise any equitable defenses.  I've read both

11   parties' briefing on this.  Are you aware of any case where a

12   court has upheld such an explicit waiver in a contract in order

13   to not consider an equitable defense?

14             MR. Loeb:  I have.  It's Reliance Wholesale versus

15   Godfrey.  It's a Third DCA case, and that goes into the issue of

16   dependent versus independent covenants.  And there's actually a

17   section in there where it's block quoted, Your Honor.  It's at 51

18   Southern Third 561, pinpoint at 565, in which there's a layout of

19   the court indicating that there was an argument of the first

20   breach defense there and there was analysis -- we're about three

21   steps down the road before I get to what our -- you know, the

22   statute itself and I'll get to that.  I just want to answer your

23   question.  But this deals with that issue.  And it says if you

24   have an agreement that says you will not raise any claim or cause

25   of action to -- you know, as a defense to the enforcement of the

1    agreement, Reliance Wholesale covers that issue.

2            THE COURT:  Okay.  Hold on one second.  Sorry.  I didn't

3    mean to stop you, Mr. Loeb.

4            MR. Loeb:  No worries.  So Reliance Wholesale covers

5    that issue, and that deals with the dependent versus independent

6    covenant doctrine and the analysis in terms of employment and

7    agreements dealing with noncompete clauses.  The argument there

8    was hey, guess what, you didn't pay me what I was owed, you

9    committed a first breach.  And the court looked and looked at the

10   contract itself and said hey, wait a minute, you agreed that you

11   will not raise the -- it says the existence of any claim or cause

12   of action of employee against Reliance, whether predicated on

13   this agreement or otherwise, shall not constitute a defense to

14   the enforcement of this agreement.  The court then said as a

15   matter of law we conclude that because of that language you can't

16   bring forth some sort of a counterclaim or a defense or something

17   like that to the enforcement of the agreement.

18           From our perspective and again, we're a couple steps

19   down the road, I'm excited to tell you about the analysis a

20   little bit more that I think before you get here.  But it's

21   Reliance Wholesale that deals with that specific language in

22   terms of waiver, Your Honor.  But I'm happy to go forward on kind

23   of the --

24           THE COURT:  No, that's fine.  I appreciate you

25   identifying that.

1        I'd like to move on to the question of the substantial

2   threat of irreparable harm.  So give me what is your strongest

3   argument for irreparable harm being present here.

4        MR. Loeb:  Strongest form, I can travel under two paths,

5   right?  I can travel under the statutory presumption that says --

6   and it's under -- again, under 335 that indicates that the

7   violation of a covenant creates a presumption of irreparable harm

8   seeking enforcement.  So there's a statutory mechanism that is

9   here that specifically calls that out.  I'm aware that Judge

10  Mizelle in the Middle District has that decision about the

11  tension between, you know, when the court is sitting in diversity

12  under the injunction rule, what do you do with that.

13       THE COURT:  And Judge Pryor in the Eleventh Circuit has

14  a concurring opinion suggesting that federal courts shouldn't

15  apply that presumption, that it's a procedural mechanism, not a

16  substantive one.  That's Vital Pharmaceuticals versus Alfieri

17  from 2022.  So I guess the question is if I can't rely on the

18  statute's presumption, how do you establish irreparable harm

19  here?

20       MR. Loeb:  We established it on multiple fronts.  One

21  is, the cases talk about this, the irreparable harm meaning the

22  loss of customers in terms of them as we've established earlier.

23  I don't want to belabor that point but, you know, the loss of

24  customers.  I think there's a reference that -- one of the quotes

25  in the case is that's like the quintessential need for an

1    injunction, because customers are unique in terms of their
2    purchasing behaviors and the like.  And if you can show there's a
3    loss of customers, an injunction is designed to stop that
4    offending behavior in the hopes of rescuing that customer
5    relationship from further deteriorating.  And so that is, as
6    Mr. Rosenbaum said during the testimony, that there was a loss of
7    customers and there was a loss of revenue and that that cannot be
8    cured by way of money damages.
9         In addition to that, Your Honor, and again, I don't want
10   to belabor the point; in addition to that, Mr. Rosenbaum
11   testified that there was a need to do discounts in order to try
12   to boost sales, and that Head Kandy -- and there was a discussion
13   during his direct where he talked about that he and Ms. McNeill
14   were on the same page with regard to that, and that being that
15   the brand, the goodwill that Head Kandy had formed, it's not
16   known as a discount brand.  It's not known as a sales brand.  Ms.
17   McNeill apparently fought that.  And so what's Head Kandy had to
18   do to try to, you know, using Mr. Rosenbaum's direct testimony,
19   it's the only way we can keep some semblance of sales enough to
20   make our payroll and keep a little bit of cash flow.  Giving
21   those discounts is contrary to the brand that Head Kandy had
22   become known in the marketplace with and having to give those
23   discounts created harm.
24        THE COURT:  Well, why aren't monetary damages sufficient
25   to remedy that?  Obviously that's part of what you're seeking in

1    the case are monetary damages as to, you know, lost sales and the

2    like that you may suffer because of the harms that you've

3    alleged.  Why are monetary damages not sufficient to cure that?

4              MR. Loeb:  Because as I said, Your Honor, the customers

5    are themselves unique in terms of who they are, what they

6    purchased, what they look for and those customers can't be

7    replaced.  This is a business that was built upon, as we know

8    given the numbers in that precipitous drop, a repeat consumer

9    business.  They came to Head Kandy because of the brand name that

10   it was, and that loss of customers in terms of trying to save

11   further customers from leaving, I think the Court -- I don't want

12   to misquote it exactly, but I think Your Honor, when you denied

13   their motion to continue the hearing, you said this is what

14   injunction hearings are for.  Not suggesting you're going to

15   succeed on the merits Head Kandy, but that's what injunctions are

16   for is to stop the exodus of the customers leaving as a result of

17   what it is that a particular individual subject to the

18   restrictive covenants are doing, and the cases stand for that

19   proposition.

20             Let's take it out of this context.  You got a doctor,

21   right?  The doctor sitting there engaging in these types of

22   behaviors.  I think there's a case on that point.  And the doctor

23   is engaging in that behavior and the patients are leaving and

24   leaving and leaving.  The court steps in and says stop, you can't

25   violate that solicitation or noncompete clause because the

1    customers belong to the practice that you are formerly owned by.

2    That's the reason we have these particular types of clauses here

3    because customers are unique.  And a lot of times, yeah, we've

4    got a claim for damages.  It's a basis for relief.  But many

5    times it's hard to quantify exactly what it is in terms of the

6    amount of damages and the like.  And I believe, Your Honor, that

7    there is actually a section in the contract that talks about --

8    if you'll give me one moment, please.

9             THE COURT:  I think there is a section where it's sort

10   of agreed that Head Kandy could seek injunctive relief, legal

11   remedy would not be sufficient.

12            MR. Loeb:  It's paragraph F of 5 F.  I've got it in

13   front of me, where there's a discussion about the company not

14   having an adequate remedy at law, meaning money damages can fix

15   this and that's in line with, you know, these types of agreements

16   in general that companies have.  And it's also in line with the

17   cases that interpret those clauses to say look, loss of customers

18   is -- think about it, it's one of the legitimate business

19   interests that are in the statute anyway.

20            THE COURT:  Now, I understand Head Kandy attributes its

21   -- you know, we heard evidence about a drop in sales and lost

22   customers, you know, since December of 2023.  How do you deal

23   with an alternative explanation for that -- specifically, you

24   know, we heard testimony that -- I think even from Mr. Rosenbaum,

25   that Ms. McNeill was very unique to the company, that's part of

1    your argument of kind of the special relationship that she had

2    with the customers, that she was essentially synonymous with Head

3    Kandy.  So how do you disentangle losses in sales that might have

4    occurred simply from the absence of her marketing?

5         In other words, the fact that you now no longer have the

6    person that was synonymous with your business promoting it or

7    cheerleading for it.  How do you disentangle the effect of that

8    on -- as an explanation for loss of sales as compared to, you

9    know, the -- you know, what she is actively saying in, you know,

10   on the other end.  I hope that made sense.

11        MR. Loeb:  I was waiting -- I was ready for this

12   question so I know exactly what you're asking.

13        THE COURT:  Glad to hear it.  I'm excited to hear the

14   answer then.

15        MR. Loeb:  That's a causation issue that relates to

16   damages.

17        THE COURT:  Yes.

18        MR. Loeb:  When we get to an issue of damages and

19   someone is going to file a Daubert motion they say hey, did you

20   get alternative causation.  Because guess what?  You may not have

21   a good damages model that's there.  Totally get it.  That's in

22   the context of damages and causation.

23        Injunctions don't require that particular analysis.

24   It's a damage approach, it's not an injunction issue, Number 1.

25        Number 2, the evidence that we have though shows that

1   people were, in fact, reacting to what Ms. McNeill was doing that
2   we consider to be the offensive conduct and they said I'm not
3   doing it anymore.  I'm not going to go back to Head Kandy based
4   upon what you have said and done.
5        So yeah, were there some declarations that were perhaps
6   filed in the record, we take issue with that, we've briefed that,
7   we've shown you that little summary chart that was probably a
8   little too busy to see where somebody said one thing but their
9   Facebook comment said something perhaps a little different.  But
10  from our perspective, that issue of causation drives to the heart
11  of the damages issue that we can take on at that point in time.
12       But the fact of the matter is that for this purpose, for
13  the purposes of the injunction, that, the causation issue is
14  really not a relevant consideration based upon the plain language
15  of the contract and the need for the injunction in order to stop
16  this particular activity.
17       THE COURT:  In other words, it may be an issue, and
18  perhaps even a significant issue, for you at trial in proving
19  causation and proving what your damages actually are, but it
20  doesn't undermine the case for there being at least some
21  irreparable harm that justifies the injunction.
22       MR. Loeb:  Yes, Your Honor.
23       THE COURT:  Okay.  Last question for Plaintiffs, and
24  then we're going to take a quick break.
25       In terms of a bond, if an injunction should issue,

1    you've proposed $5,000 as the amount of that bond I think

2    essentially saying this isn't -- you know, she agreed that these

3    restrictions wouldn't cause her economic harm, there's no

4    evidence that it's interfering with her ability to make a living

5    and so $5,000 is, you know, should just be a nominal amount.

6            First of all, I don't want to caricature your argument,

7    but that's essentially what I understood you to be saying.

8            MR. Loeb:  That's fine.

9            THE COURT:  Okay.  The Defendant brings up that the

10   Court needs to consider, you know, the cost of litigation, the

11   cost of the suit and other such considerations in fashioning an

12   amount of bond in the event that we issue an injunction and in

13   case, you know, Plaintiff ultimately isn't successful later.  How

14   do you respond to those sort of considerations either about her

15   finances or about the cost of the suit, the cost of the

16   litigation?

17           MR. Loeb:  As it pertains to her cost, the statute talks

18   about when determining the enforceability -- and I don't know if

19   this is an enforceability question you're asking or more of a

20   bond-related question, Your Honor.  But I just point this --

21           THE COURT:  I think it's more about if the injunction

22   were to issue, how the Court is to calculate an appropriate bond.

23           MR. Loeb:  Right.  And I think that win, lose or draw,

24   with regard to this injunction she's going to have the cost of

25   litigation anyway, Judge.  In other words, she's going to incur

1    that.  I anticipate that at some point in time there's probably

2    going to be a counterclaim that's going to be brought by Ms.

3    McNeill.  She's at least -- you know, I think last night she went

4    live and she talked about that, saying how she's going to bring

5    this counterclaim.  She's going to have costs that she's going to

6    have regardless of whether or not there's an injunction in place

7    or not.  So that is something -- those particular costs that she

8    incurs, whether it's by way of taxable costs or attorney's fees,

9    she's going to incur that regardless of whether this injunction

10   issues or not.  I mean, the parties are going to continue on.  So

11   from our perspective, the calculation should not include that

12   because that's what's going to be incurred nevertheless, whether

13   or not we move forward with an injunction in place or we don't.

14          THE COURT:  Okay.  All right.  I've gone on a rather

15   long time with the Plaintiffs.  I apologize, I didn't mean for it

16   to be quite so long and I know Mr. Converse, I'm sure you're

17   itching to get your chance to --

18          MR. Loeb:  Your Honor, I didn't mean to talk over you,

19   Your Honor.  I was just talking to Mr. Thompson.

20          THE COURT:  That's okay.

21          What I was going to propose, what I'd like to do is I

22   need a quick break, at which point I would like to turn to the

23   Defendant for the questions I have for the Defendant, as well as

24   any, you know, responses to some of the issues I've talked about

25   with Mr. Loeb, and then after that I'll give again each party a

1    chance to wrap up on anything that we've left unaddressed.  Okay?

2           MR. Loeb:  That's what I was asking.  I'll cover what --

3    I think there's a couple issues I just want to drive home with

4    you on this first breach defense, but I'll wait until my time is

5    allotted for that.

6           THE COURT:  Okay.  Thanks.  Everyone, I have about 2:51

7    on my clock.  If we could all just take a five minute break and

8    we'll come back at about 2:56 or so, and I'll have some questions

9    for the defense.

10          MR. Loeb:  Thank you, Judge.  Appreciate it.

11          THE COURT:  Thank you.

12          Okay.  Everyone it's 2:56, if everyone could please come

13   on back when you're ready.  Okay.

14          Mr. Converse, I'd like to turn to you now and ask you

15   some questions on behalf of the Defendant.  And I'd like to start

16   at the top with, again, in terms of the substantial likelihood of

17   success, the enforceability of the restrictive covenants at

18   issue, and some of the issues that you've raised suggesting that

19   they're not enforceable.

20          I guess the first question I have for you is that the

21   Plaintiff breached the agreement by terminating Ms. McNeill for

22   cause.  Let me put aside for a moment the arguments about whether

23   the Court can consider your prior breach defense or not.  We're

24   going to get to that in a minute.  But putting aside that

25   argument, does the enforceability of the restrictive covenants

1    change depending on whether she was terminated with or without

2    cause?

3            MR. CONVERSE:  Yes, Your Honor.  That would constitute a

4    prior breach of the agreement.  Our position is that she -- the

5    contract has very specific requirements for a termination with

6    cause, and our contention is that those were not present, those

7    conditions, and therefore a termination for cause is not

8    justified and terminating her in such a manner and depriving her

9    of the consideration under the contract for the remaining of the

10   term and the other items that we discussed concerning her

11   compensation constitutes a breach of the agreement.

12           THE COURT:  Okay.  But as I understood the agreement,

13   even if she had been terminated without cause, that it seemed

14   like the agreement contemplated that even if she was terminated

15   without cause, the restrictive covenants would still apply.  Is

16   that correct or not?

17           MR. CONVERSE:  So everything else aside, just whether or

18   not there was a justifiable breach or -- excuse me, termination

19   without cause, would the restrictive covenants be enforceable?

20           THE COURT:  Right.  In other words, if she was -- even

21   if they said they terminated her with cause, if they terminated

22   her without cause, as I understood the contract -- let's say they

23   terminated her without cause.  I understand that then I think

24   activates a couple of other requirements of things they need to

25   do.  For instance, I think there was a severance package that was

1    supposed to be paid.  But as I understood the contract at least,

2    if they terminated her without cause, the restrictive covenants

3    would still exist.

4          So I guess I'm wondering, do you disagree with that or

5    is it really just a matter of look, this just is all part of the

6    prior breach defense of, you know, either you terminated her with

7    cause improperly or you terminated her without cause and didn't

8    do the things you're supposed to do if you terminate her without

9    cause.

10         MR. CONVERSE:  So maybe one way of saying it would be if

11   there was no dispute that Head Kandy had fully performed under

12   the contract and that they had decided to terminate her without

13   cause, then yes, the remaining provisions would still be

14   enforceable as written in the contract.

15         THE COURT:  Okay.  So this really, this is another

16   portion, I guess, of how you assert that they have -- another

17   instance of the prior breach.

18         So in other words, in addition to the failing to pay her

19   the bonuses and other things that you claim that she was supposed

20   to get paid, that then the termination under the auspices of

21   terminating her with cause was itself another prior breach of the

22   agreement.

23         MR. CONVERSE:  Correct.  Because it would require Head

24   Kandy to comply with additional obligations, which it didn't do.

25         THE COURT:  Okay.  All right.  So let me talk about --

1    let's talk about the enforceability of the covenants themselves.

2    One of the things that you raise is an argument that the

3    restrictions are longer than reasonable, specifically the

4    three-year restrictive covenant is longer than what the statute

5    allows.  But the statute does allow for three-year restrictive

6    covenant and says that reasonable when enforced against the

7    seller or all or part of the assets of the business.  So why

8    doesn't that apply here?  And I guess I understand the asset

9    purchase agreement and the employment agreement may be two

10    separate agreements, but it appears why isn't this really or why

11    shouldn't the Court look at it as part of all one transaction.

12          MR. CONVERSE:  Well, because if it did, then that would

13    be an eight-year nonrestrictive noncompete.  So she was working

14    for five years roughly, a little over four-and-a-half years, and

15    now they're seeking an additional three years.  So for that

16    statute to -- for that provision within the statute to apply, the

17    time limit needs to run from the date of the purchase, because

18    it's intended to protect the acquirer immediately after the

19    purchase so somebody whose practice they're buying out can't just

20    set up shop across the street and start competing with them

21    immediately.  So they've had five years under that provision,

22    nearly five years, now they're seeking an additional three.  So

23    essentially it would be an eight year term under the restrictive

24    covenant.

25          So our position would be if that did apply, then it's

1    even more unreasonable, broader than what is required, because it

2    would then effectively be an eight-year noncompete provision.

3            Also -- sorry.  Go ahead.

4            THE COURT:  No, please.  Please.

5            MR. CONVERSE:  I was just going to say that we do

6    dispute that it was a condition -- that the employment agreement

7    was a condition precedent to the asset purchase agreement because

8    there's no language in the asset purchase agreement stating that

9    it's a position that Head Kandy took in its proposed preliminary

10   injunction order, and there's no language.  In fact both

11   contracts, especially the employment agreement, has an

12   incorporation clause stating that it's the full agreement between

13   the parties.  So we think it stands alone.

14           THE COURT:  Okay.  Even if that provision regarding the

15   sale of the business doesn't apply, the agreement itself,

16   Paragraph 5 E of the employment agreement contemplates that if a

17   provision were to be found unreasonable in time and scope, it

18   would be limited to what that jurisdiction would deem reasonable.

19   So even if I were to say you know what, the three years the

20   contract calls for is unreasonable in time and scope, under that

21   provision of the contract wouldn't it be a matter of well, what

22   is reasonable, what the Court would find reasonable, and wouldn't

23   reducing the covenant to say a year still be a reasonable time

24   and scope?

25           MR. CONVERSE:  Well, it could have been.  I think under

1     the statutory regime it allows for that to potentially be

2     reasonable.  The problem is that the Plaintiff still has the

3     burden to establish that, and I don't believe there's any

4     evidence in the record that establishes that a one-year duration

5     is reasonable versus a two-year duration.

6          THE COURT:  But why -- I mean, hold on.  Because I don't

7     want to speak out of turn.  Let me -- I wanted to pull up the

8     statute again.  But it seemed like the statute contemplates that,

9     if I'm not mistaken, that a year almost by default would be

10    reasonable.  Am I wrong on that?

11         MR. CONVERSE:  I think that the language of the statute

12    states that there's a presumption of reasonableness if it falls

13    within the period of six months to two years.

14         THE COURT:  Okay.  And that we're still within -- I

15    mean, I guess the six months have expired, but we're certainly

16    within a year of her termination.  Why wouldn't that be

17    reasonable here, especially given, you know, the special

18    relationship and special role that she played with Head Kandy.

19         MR. CONVERSE:  Well, because I think that the die was

20    cast whenever they terminated her.  As the parties have

21    stipulated, she was synonymous with the business.  And so as soon

22    as she left the business, there was going to be a loss of

23    customers just from her leaving the business.  And so I don't

24    believe that a one-year is going to -- it's not reasonable

25    because it's not going to provide any protection to Head Kandy

1    once she has left the business.

2              As Mr. Rosenbaum testified, she was the sole sales

3    driving force of the company.  They tried other individuals and

4    they were not effective like she was.  They tried boosting even

5    her lives, and that had no effect on the sales.  She herself was

6    the driving force behind the company.

7              THE COURT:  That has nothing to do with whether it would

8    be reasonable to restrict her from competing.  There's a

9    difference between what effect it might have if she left versus

10   protecting against her openly competing or openly soliciting or

11   disparaging the business.  Why wouldn't a one-year period, which

12   we're still well within, be reasonable to protect that kind of

13   interest?

14             MR. CONVERSE:  Again, I think it's perfectly reasonable

15   under the statutory scheme.  I don't believe that it's been

16   established that that's necessary to protect Head Kandy.  And

17   then the last thing I would say is that again, they've already

18   had five years of a noncompete if they're trying to tie it to the

19   sale of the assets of Lashed Out.  And so we would still, again,

20   be well beyond that period at this time.  Now, if it's the

21   shorter provision that's not tied to that, then a one-year

22   noncompete, I think, is perfectly reasonable within the statutory

23   framework.

24             THE COURT:  Okay.  Let's talk about the legitimate

25   business interests.  And I guess let me first start with where I

1   started with Mr. Loeb, about this provision in the contract where

2   she agreed that -- or she seemed to agree that she wouldn't

3   challenge the enforceability of the restrictive covenants and

4   agreed that these were fair and reasonable restrictions.  Isn't

5   that exactly what you're now attempting to do?

6           MR. CONVERSE:  Well, we're under the framework of the

7   preliminary injunction statutes.  So under those statutes it

8   requires the Court to limit -- so I'm speaking of Florida Statute

9   542.335 that we've been discussing, and this is one subsection

10  consider.  The concluding sentence is:  A court shall modify the

11  restraint and grant only the relief reasonably necessary to

12  protect such interest or interests.

13          So what we're really speaking to is the mandates upon

14  the courts to limit -- in the context of a preliminary

15  injunction, limit the restrictive covenants to what truly is

16  necessary, reasonably necessary to protect the interests.

17          THE COURT:  Right.  But what I'm saying is she seemingly

18  agreed that these were reasonably necessary in the employment

19  agreement.  And so why shouldn't she be held to that agreement?

20  She got the benefit of a bargain, part of which was seemingly

21  agreeing that if we got to this point, that she wasn't going to

22  raise these sort of arguments that actually no, never mind, this

23  is unenforceable.  That seems to then undermine the benefit of

24  the bargain that the parties struck.  Why shouldn't she be

25  prohibited from, you know, sticking with what she agreed to in

1   the agreement?

2          MR. CONVERSE:  And we're presuming for purposes of this

3   discussion that she did receive the full benefit of the bargain,

4   right?  Is that it, Your Honor?  Okay.

5          THE COURT:  Well, I mean, again, I guess that goes to

6   your prior breach defense.  But again, you know, here she's

7   seemingly agreed that these are enforceable and reasonable

8   restrictions.

9          MR. CONVERSE:  Okay.  So presuming that she received the

10  benefit, I think there are two issues that are encompassed here.

11  One are the requirements upon the court, and I believe that those

12  are statutorily mandated requirements at this juncture for the

13  purposes of a preliminary injunction.  So I think we need to

14  visit these issues for the purposes of the court discharging its

15  duties under the statutory framework.

16          Secondly, it goes back to the waiver issue and the

17  strong public policy against waiver of rights like this.  And so

18  our position has been with regard to her waiving the right to

19  challenge these provisions, that is not an enforceable provision

20  of the contract and there are additional ones like that within

21  the agreements.  It's not enforceable under Florida law because

22  it's void *ab initio* as against strong Florida public policy.

23          THE COURT:  When she agreed that, you know, these were

24  fair and reasonable and that she wouldn't challenge the

25  enforceability, that was essentially an illusory promise.

1          MR. CONVERSE:  Correct.  Same thing, not leaving the

2    employment context.  Parties couldn't contract to pay or receive

3    less than minimum wage because Florida has minimum wage statutes

4    that establish a strong public policy against individuals

5    contracting around those requirements.

6          THE COURT:  Okay.  Can the fact that she agreed to it,

7    however, can that inform the Court's thinking at all if it's

8    maybe a close call?

9          In other words, the idea that she at one point seemed to

10   contemplate that these would be reasonable, does that inform or

11   can it inform the Court's thinking at all?

12         MR. CONVERSE:  As to the first issue that I raised

13   concerning the requirements imposed by the statute, no, I don't

14   believe so.  I think that those stand alone, and the Court still

15   needs to consider all of them.

16         As to the second issue about her rights and waiver, I

17   think that that would be a closer call and the Court might be

18   able to consider it in that context.

19         THE COURT:  Okay.  Let me address the statutory factors

20   that the Plaintiff is citing as saying they have a substantial --

21   a legitimate business interest to protect through these

22   covenants.

23         You argue essentially that Head Kandy has not shown

24   substantial customer relationships, and as I understood your

25   arguments to be, at least the cases you cited to in your findings

1  and conclusions are discussed that there is no exclusive or

2  active agreement with the customers.  Is that correct?

3          MR. CONVERSE:  Yes.  That's part of our position is that

4  there is no contractual relationship between these individuals.

5  As Mr. Rosenbaum testified, they're free to the market, they can

6  continue to purchase or not continue to purchase from Head Kandy,

7  especially in this environment where we're talking about women's

8  hair care where they buy multiple products from different

9  entities as Ms. McNeill testified to.

10         THE COURT:  But is an exclusive or contractual

11  relationship required?  I mean, in other words, is that *sine qua*

12  *non*, to use fancy Latin that I don't like to do, or is that a

13  factor to consider in determining whether there's a substantial

14  relationship?

15         MR. CONVERSE:  It's a factor.  In this context I believe

16  the Supreme Court, to use the fancy Latin, said the *sine qua non*

17  was irreparable injury for the purposes of seeking injunctive

18  relief.

19         THE COURT:  Okay.  I mean, because there are cases that

20  seem to talk about, you know, if there's an active or ongoing

21  business relationship or an expectation of future business, that

22  those are hallmarks that might suggest there is such a

23  substantial relationship.

24         Given what, you know, what Mr. Loeb has argued is that,

25  you know, they've put on evidence that they have a number of

1   repeat customers, some of them buy -- you know buy substantially

2   repeatedly.  Doesn't that show that or why doesn't that show the

3   existence of at least some active, ongoing business relationships

4   that would be substantial customer relationships.

5        MR. CONVERSE:  One, because of the extent of the

6   evidence adduced and the content of the evidence.  If I may have

7   just to give a little bit of leeway to expound upon them?

8        THE COURT:  Sure.  Please.

9        MR. CONVERSE:  So first Mr. Rosenbaum testified that

10  Head Kandy has lost two thirds of its customer base.  So in

11  response to that, assuming that it truly is or -- excuse me, yes,

12  two thirds, it should be pretty easy for them to produce purchase

13  history documents showing all of these individuals who have

14  stopped purchasing from Head Kandy because of Ms. McNeill's

15  conduct.  Instead, they produced eight of these purchase history

16  documents.  And we are in the preliminary injunction phase, but

17  these are internal corporate records of Head Kandy.  So it's not

18  that they need the opportunity to conduct additional discovery to

19  obtain these records, they have all of these records.  And so of

20  the two thirds of these customers, they've only provided eight

21  individuals.

22        And so just to speak about the content of those a little

23  bit, and I have more to say, but I'll just give you some quick

24  snapshots.  So of the eight -- well first, let me back up.

25        Mr. Rosenbaum testified that the sales fell off in

1    February.  Then if we look at the purchase histories of those

2    eight individuals, actually three of them did make purchases in

3    February and those are Exhibits 154, 155 and 156 within

4    Plaintiff's Exhibits.  And then yet another one of those

5    individuals made a purchase in March, and that's Exhibit 158.  So

6    now we have half who have actually made purchases after

7    Mr. Rosenbaum testified that these individuals stopped purchasing

8    from Head Kandy because of Ms. McNeill's actions.  And yet

9    another one, Ms. Ellie Amos, that is at Exhibit 153, if we look

10   at her purchase history, she actually stopped buying on November

11   22nd of 2022 and that's before Ms. McNeill even received a first

12   notice of breach from Head Kandy.

13        THE COURT:  Okay.  And I understand that.  But I guess

14   what you're saying seems more targeted at whether, you know, Ms.

15   McNeill's conduct is what is causing or not causing a drop in

16   customers, correct me if I'm wrong.  What I'm trying to focus on

17   though is to the extent they need to show that they have these

18   substantial customer relationships, you know, doesn't substantial

19   customer relationships with either existing customers or

20   identifiable prospective customers, doesn't the fact that they

21   have people who have purchased multiple times, some of whom even

22   as recently as February or March or January of this year, doesn't

23   that show that they do have these existing relationships that are

24   -- that they do have a legitimate interest in protecting --

25   regardless of whether Ms. McNeill is undermining those

1    relationships or not, the question here, I think, is whether the

2    statute -- whether there are relationships that the statute says

3    they can protect through a provision like those that they're

4    trying to enforce.

5         MR. CONVERSE:  Well, then I don't think that these go to

6    that point because they're saying that these individuals are

7    included within the two thirds that they've lost.  So I think

8    your question is have they established that the remaining one

9    third of customers, have they established that those are

10   substantial relationships that they still maintain they need to

11   protect, and we haven't seen any evidence of those concerning

12   those one third.

13        THE COURT:  But as I understand it, and maybe again I'm

14   wrong, it's not do they still have them now; the question is can

15   we enforce these provisions that are in the contract.  And in

16   order to have those provisions in the first place, they need to

17   have an interest that the state of Florida is saying is something

18   you're allowed to protect.

19        So again, I don't think it's necessarily a -- it's

20   somewhat of a question of what were -- you know, what is the

21   state of play, what is this business like that they're trying to,

22   you know, protect before any of the conduct that they say might

23   harm.  In other words, is there something worth protecting in the

24   first place.  Right?

25        MR. CONVERSE:  At the time of contracting?

```
 1          THE COURT:  Or at least at the time before the covenants
 2   are going to be enforced.
 3          MR. CONVERSE:  So that would be at the time of
 4   termination?
 5          THE COURT:  Well, either at -- I'm not sure if it's at
 6   the time of contracting or at the time of termination, but it
 7   would certainly seem that by the time of termination at the very
 8   least.
 9          MR. CONVERSE:  So as far as establishing substantial
10   relationships at the time of contracting, several of these
11   individuals did not make a purchase in 2018 and we don't -- and
12   only -- so we have Exhibits 158, 156, 153 --
13          THE COURT:  I think it's essentially 152 or 153 through
14   160.
15          MR. CONVERSE:  Yes.  And so all of those that I just
16   mentioned, those individuals didn't start purchasing until 2020 I
17   believe, so there wouldn't have been a substantial relationship
18   with any of those individuals at the time of contracting.  And
19   then there are -- I believe we only have purchase history -- of
20   the ones that we received and that were introduced into evidence,
21   only one individual made a purchase prior to the asset purchase
22   agreement and that would be the individual at 154.  So we only
23   know about the existing relationship to some degree concerning
24   the individual identified in Exhibit 154, and she did make a
25   purchase from Ms. McNeill, or from Lashed Out rather, prior to
```

1    the asset purchase agreement.  But then there was a little over a

2    year before she made another purchase.

3            So as to what these exhibits speak to, only one of them

4    speaks to any relationship at the time that the asset purchase

5    agreement was executed.

6            THE COURT:  Okay.  Is there anything else you want to

7    say regarding the substantial customer relationship interest that

8    the Plaintiffs have put forward?

9            MR. CONVERSE:  One moment, Your Honor.  I did jot down

10   some notes, I just wanted to review them real fast.

11           THE COURT:  Sure.

12           MR. CONVERSE:  Okay.  Well, there was a discussion about

13   the number, the 33,000 number, and perhaps we can -- I can

14   address that whenever we talk about the actual damage that's

15   occurred and the prospect for future or imminent irreparable

16   damage.

17           THE COURT:  If you want to say something about it in

18   this context, that's fine.  If it's more towards the irreparable

19   harm context, you can save it for later.  Whichever you prefer.

20           MR. CONVERSE:  Well, I think it's more or less subsumed

21   within the general statements I made earlier about there not

22   being any evidence presented concerning any of these other

23   individuals.  So we only have Mr. Rosenbaum's testimony.  We have

24   no documentation, no other evidence that was presented concerning

25   any of these other individuals or substantiating this 33,000

1    number in any manner.

2              THE COURT:  What about this question of goodwill.

3    Mr. Loeb also argued about beyond subsection three, I think it's

4    either subsection four or five, about one of the legitimate

5    business interests discussed in the statute is, you know,

6    customer goodwill within a specific, you know, trade or marketing

7    area.  Why doesn't Head Kandy have -- and here as I understand

8    the Plaintiff's argument we're talking about the brand that's

9    been developed and that you're the brand that seems like Ms.

10   McNeill herself had a large hand in developing.

11             Why is that brand and customer goodwill not a legitimate

12   business interest that allows for a restrictive covenant like the

13   ones at issue?

14             MR. CONVERSE:  So I think it is under the statutory

15   framework.  The question is does it apply in this situation.  And

16   Mr. Rosenbaum stated earlier that Ms. McNeill was part of the

17   goodwill.  And again, by her mere termination, her not being

18   affiliated with the company anymore, if she is considered the

19   goodwill, if that's how broadly they are arguing it should be

20   applied, well then they can't -- that goodwill is damaged simply

21   by her no longer being associated with the company.  And so I

22   don't understand what the argument was or what evidence has been

23   presented that the goodwill is being damaged by Ms. McNeill.  I

24   do understand the statements and the disparaging, I know we'll

25   address that momentarily.

1        THE COURT:  We will get to that, but I guess the point
2   is that, as I understand the statute, what the statute is saying
3   is that if you've got customer goodwill like a brand identity,
4   that's something that the statute would allow you to protect if
5   that kind of goodwill could be undermined by, you know, or could
6   be protected by prohibiting -- by imposing restrictive covenants.
7   So that seems like it would almost obviously include the idea of,
8   you know, some kind of restriction that would prevent, you know,
9   like your main spokesperson from suddenly going out and promoting
10  other competing businesses.

11       For instance, my analogy would be this.  I don't know
12  what sort of agreements he has with Nike, but if Michael Jordan
13  tomorrow went out and said Adidas makes far superior basketball
14  shoes, you've got the person who is most identifiable with the
15  Nike brand for basketball shoes now suddenly going out and
16  promoting a different brand as being far superior.  That would
17  seem almost axiomatically to have the potential to affect the
18  goodwill that Nike has developed with its customers.  And that
19  would seem like the kind of interest that the statute
20  contemplates Nike could seek to protect by having an agreement to
21  say you're not going to go out and start promoting another shoe
22  business or start saying that, you know, that there are problems
23  with Nike and you shouldn't buy from them.

24       Do you understand what I'm saying?  I guess I'm saying
25  isn't that similar to the situation we have here, albeit on a

1    smaller scale.

2          MR. CONVERSE:  Sure.  I actually agree wholeheartedly

3    with the analogy.  And as far as just as a conceptual matter

4    under the statute, yes, I believe that that is a protectable

5    interest.  I was more speaking to the effect of it.  So if Nike

6    comes out tomorrow and terminates Michael Jordan and says that

7    he's been stealing from the company and that he, you know, made

8    purchases and had the company pay for it when in fact that is not

9    true on company credit cards, there would be an immediate effect

10   upon Nike's business just upon Jordan's no longer association

11   with the brand and the allegation, the customers of Nike.  So I

12   was speaking more to whether or not it's the evidence that's been

13   presented to show that that legitimate business interest has

14   actually -- would be protected by the restrictive covenants, and

15   there actually has been actions by Ms. McNeill that demonstrate

16   that there's an imminent danger of Head Kandy suffering an

17   irreparable injury to its goodwill.  And we can speak about that,

18   we can save that for when we talk about the specific provisions

19   perhaps.

20         THE COURT:  Okay.  So then let's talk about the breaches

21   or the alleged breaches of the employment agreement.  And I

22   actually want to focus on the nonsolicitation agreement because I

23   think that's -- I think the noncompete and nonsolicitation,

24   there's certainly some overlap and it bleeds in.

25         I guess what I want to understand is what is the

1    argument from you as to -- assuming they're enforceable, how is

2    it that the, you know, the statements that she's made, the

3    activities that she made, how is it that they do not violate the

4    nonsolicitation provision.

5         MR. CONVERSE:  Well, I'd like to start perhaps with the

6    definition of solicitation which -- so the case of Massey

7    Services v Sanders, which is 312 South Third 209, and

8    specifically referring the Court to Page 215.  And this is a 2021

9    opinion from the District Court of appeals.  Here they recognize

10   -- they cite to the First District Court of Appeals opinion in

11   Scarborough v Liberty National Life Insurance which is at 872

12   South Second 283, where it states that the former employee --

13   there has to be evidence that the former employee, quote,

14   proactively sought to entice any employee to leave Massey, the

15   employer, as is required for, quote, solicitation, closed quote.

16   So solicitation under Florida law requires the former employee to

17   proactively seek out these -- this was an employee, but customers

18   also to leave the brand.  And we do not have that situation here,

19   and I can speak more about that.

20        But just going to the rest of the provision, when you're

21   questioning Mr. Loeb, it was about the various provisions.  He

22   was retreating to what I would call the overly-broad dragnet

23   portions of these provisions that are think are not enforceable.

24   So solicitation in and of itself I think is, under Florida law,

25   is enforceable, but a much broader language like -- I'm trying to

1    find the exact language for you, about encouraging them in any

2    way.  That is so broad as to not be enforceable.  There's no way

3    to construct a preliminary injunction order such that it could be

4    effective because the language "not encourage in any way" -- now

5    I've found it.

6         As Mr. Loeb pointed out, it's Section 5 B, Romanette 2

7    of the employment agreement.  So encourage clients to terminate

8    or reduce the person's relationship with the company.  What is

9    considered reducing.  Is it engaging on social media?  Is it just

10   strictly product purchases?  Is it product purchases within a

11   particular category?  Because some of these products have --

12   well, all of the products have different useful lives.

13        So if an individual -- for instance, a curling iron was

14   raised earlier.  Once a person buys a curling iron, if that's all

15   that they've purchased from Head Kandy, that curling iron has a

16   very long, useful life.  So they're not going to come back to

17   Head Kandy to come back to purchase another curling iron, you

18   know, hopefully it doesn't break on them for several years.

19        So in any way encourage them to reduce their

20   relationship I think is just too broad, it's an overreach of this

21   provision under the framework of the statute concerning

22   enforcement of preliminary injunctions.  Our position is that

23   this is too broad as to be unenforceable.

24        THE COURT:  Do you have any cases to support that?

25        MR. CONVERSE:  No, Your Honor, we don't have any

1    specific cases.  We've searched for cases concerning broad

2    language of that nature, and we found no cases that would support

3    the imposition of a preliminary injunction on such broad

4    language, specifically encourage anybody to reduce their

5    relationship with a former employer.

6          THE COURT:  Okay.  Why wouldn't the instances regarding

7    Bo Stegall and, you know, essentially talking up his products,

8    encouraging him to put his -- you know, the link where people can

9    buy his products into the chat, why does that not constitute the

10   kind of actively seeking out that you were describing?

11         MR. CONVERSE:  So I think we need to discuss -- in order

12   to address that properly, if you'll give me the ability, I think

13   we need to discuss the environment in which these statements are

14   being made.  This is not on Head Kandy's social media platform.

15   This also -- because we have essentially three different social

16   media platforms that have been discussed here.  So one is Head

17   Kandy's that was transferred as part of the asset purchase

18   agreement in 2018.  Another one is a personal page that Ms.

19   McNeill started after that time which she used to discuss her

20   family and a number of other things, and there was a dispute

21   between the parties about ownership of that page.  That page has

22   since been taken over by Head Kandy.  Ms. McNeill has no access

23   to it.  So none of these statements are being made on that page

24   either.  These statements are being made on a page that Ms.

25   McNeill started after her termination by individuals who sought

74

 1    her out, because she also testified she has done no marketing,

 2    she hasn't directed anything towards Head Kandy's customers, she

 3    hasn't used any solicitation like Head Kandy's hashtag, hashtag

 4    Head Kandy in any of her discussions in order to, let's say,

 5    attract individuals who are interested in Head Kandy.  Instead,

 6    these are solely individuals who sought Ms. McNeill out and

 7    became her followers after her termination.  And rather than the

 8    hundreds of thousands or 100,000 that's been alleged as we saw in

 9    the evidence at the preliminary injunction hearing, we're talking

10    about, at most, around 15,000 individuals.  So it's a very small

11    pool of individuals that we're talking about here.  These are not

12    -- this is not Head Kandy's platform, these are -- we don't know

13    when these people started following Ms. McNeill, if they were

14    still Head Kandy customers because they followed her after she

15    left the company.  So again, talking about just the organic

16    departure of these individuals, that could have been part of

17    that.  So I just want to make it --

18            THE COURT:  Isn't it a reasonable inference though that

19    -- I think she even had some testimony to this effect that, you

20    know, people that -- you like them on social media, people are

21    going to seek out the people that they like, you know, even when

22    they perhaps change platforms, you change pages.  Isn't it a

23    reasonable inference that the people that were following her as

24    part of the Head Kandy pages because they liked to hear what she

25    had to say about hair care products and liked -- wanted to hear

1    her opinions on things that those same people are the crowd that

2    would then be following her to another page?

3          MR. CONVERSE:  Yes.  I think that that's personally

4    reasonable.  I just wanted to clarify first that the allegation

5    that these are Head Kandy's core base customers I think has not

6    been substantiated because, again, we don't know when they

7    started following her, if they had any intent to purchase from

8    Head Kandy at that point or they were just migrating over because

9    they were following Kayla, excuse me, Ms. McNeill and her

10   departure is what caused them to sever their relationship with

11   Head Kandy.  So I just wanted to clarify that first as to who is

12   hearing these statements and the small universe of individuals

13   who are hearing them.

14         And then secondly as to comments about Mr. Stegall, Ms.

15   McNeill testified, and there's also a video that was in evidence,

16   I forget the date, where Ms. McNeill stated that the products she

17   was talking about about Mr. Stegall did not compete with Head

18   Kandy.  They have to do with hair loss and hair restoration.

19   It's a multi-step product, it's very expensive, much more

20   expensive than Head Kandy's products, and Head Kandy does not

21   sell any products that are designed to restore hair.  When she

22   was with Head Kandy, she stated she did not see Mr. Stegall as a

23   competitor, at least with regards to the products that she was

24   discussing of Head Kandy.

25         THE COURT:  Doesn't, though, encouraging someone to

1    develop a relationship with another hair care company, even if

2    it's through buying things that you may not be able to get at

3    Head Kandy, doesn't that, one, constitute -- even if they don't

4    make the same product, doesn't it still fall under the definition

5    of a restricted business for, I guess, that first part of the

6    nonsolicitation provision, and even if it doesn't, doesn't it

7    then fall -- doesn't that encourage the establishment of a

8    relationship with a different hair care company, you know,

9    implicitly encourage them to reduce their relationship with Head

10   Kandy.

11        MR. CONVERSE:  Well, not all companies are the same.

12   They don't provide all the same products and I don't believe

13   there was any testimony that Mr. Stegall's products do compete.

14   So if the question is well, if there is a gateway product that

15   gets them into the door with Mr. Stegall, do they then buy all of

16   their subsequent products from Mr. Stegall instead of Head Kandy,

17   I don't believe there's been any evidence produced at the hearing

18   to demonstrate that is even a possibility, because Mr. Stegall

19   offers the exact same products that Head Kandy does.

20        THE COURT:  Well, but even if it isn't all, even if it's

21   some, even if it's well, I'm just going to buy one kind of

22   shampoo from him instead of them, doesn't that still fall within

23   the parameters of the covenant?

24        MR. CONVERSE:  Well, so I would say that again, I don't

25   think that -- I think would have to assume that.  I don't

1    think there's any evidence that there were even some products

2    that were overlapping.  But nonetheless, it still does not fall

3    within the recognized definition of solicitation under Florida

4    law.  And Ms. McNeill testified that she did speak with Head

5    Kandy concerning whether or not she could discuss other products

6    and this wasn't -- this was discussed previously, and Mr. Loeb

7    discussing an amendment, this was not an amendment to the

8    agreement.  This was just an acknowledgement that Head Kandy did

9    not believe discussing other products was a breach of the

10   restrictive covenants under the employment agreement.

11           And this is similar to the White Pineapple discussion,

12   and we have an exhibit in evidence Defendant's Exhibit J

13   concerning the fact that they are recognizing the parameters of

14   the agreement.  They're not altering the agreement, they're

15   simply saying that for the purposes of White Pineapple, you

16   operating an athleisure brand at the same time you're working for

17   Head Kandy on your off hours is not a violation of the

18   restrictive covenants.

19           THE COURT:  Explain to me the effect of what she

20   testified that Plaintiff's attorneys told her about, you know,

21   suggesting the scope of the restrictive covenant, what is the

22   legal effect of that communication.

23           MR. CONVERSE:  I believe it shows the understanding of

24   the parties at the time that they were contracting.  And so that

25   is material as to the interpretation of the contract terms.

1          THE COURT:  But isn't that -- I mean, if you mean that

2     it's parole evidence, that would only come in if the Court found

3     the provisions were otherwise ambiguous, right?

4          MR. CONVERSE:  That's correct for parole evidence.  I

5     think that it is also a party admission as to what they

6     understood the terms to be at the time that they were

7     contracting, and then again at the time where there was actually

8     a dispute between the parties as to potential breaches under the

9     agreements.  And so I think that it is relevant to show, again,

10    the contours of the agreement, not an amendment to the agreement,

11    but the understanding of the parties.

12         THE COURT:  Okay.  I'd like to move on to the

13    nondisparagement clause, unless there's anything else you wanted

14    to say about either the nonsolicitation or nondisparagement

15    clauses.  I'm sorry, the nonsolicitation or the noncompete

16    clauses.  Is there anything else you want to address that?

17         MR. CONVERSE:  So on the solicitation, just one more

18    point because it came up earlier about Ms. McNeill stating that

19    she can't share the link to certain products.  She actually

20    testified why she stated that she couldn't or why she didn't want

21    to post a link.  It has to do with the compensation component of

22    -- that's ubiquitous in the online sales market whereby an

23    affiliate will post a link for a product, and if individuals

24    purchase through that link, the affiliates will receive

25    compensation.  And she was trying to avoid the specter of any

1    type of compensation she was receiving, so that's why she didn't

2    want to post the link.  It wasn't a situation where you're saying

3    "won't someone rid me of this meddlesome priest" and then they go

4    do it.  This is an issue of her trying to avoid any illusion of

5    her receiving compensation.

6        THE COURT:  But doesn't that also show that she at least

7    was cognizant she was, if nothing else, skating very close to the

8    line of what her obligations were.  Seems like it's a tacit

9    acknowledgement that she knows she has these restrictions that

10   are preventing her from playing at least in the sandbox where she

11   was -- where she seemed to be playing.

12       MR. CONVERSE:  Again, her understanding with Head

13   Kandy's representatives was that she could not make money from

14   her discussions of products online.  She couldn't receive any

15   compensation.  So she understood that to be the line in the sand

16   so to speak.  So it was actually her trying to avoid any gray

17   area, not playing in the gray area so to speak, because she was

18   trying to make a clear delineation that she's not even posting a

19   link that could even give the specter that she was actually

20   receiving compensation.

21       THE COURT:  Okay.  Anything else you wanted to say about

22   the nonsolicitation agreement?

23       MR. CONVERSE:  That was all I had for the

24   nonsolicitation.  You also asked about the noncompete.  And I

25   guess with regards to the nonsolicitation, the only other thing I

80

1    would say about -- excuse me for going back on my word.

2         With your analogy about Michael Jordan and Nike, this

3    situation also departs from that because we have substantial

4    evidence in the record that Ms. McNeill is actually singing the

5    praises of the products.  She never made any statements negative

6    about the products, about a competitor making a better product.

7    She only spoke in very glowing terms about Head Kandy's products,

8    how much she loved them.  She told her followers to keep using

9    them, keep buying them.  If you love it, you use it, these are

10   great products, I developed them.  So we also don't have an issue

11   where she's speaking ill of any of the products.

12        THE COURT:  Okay.  Let me move on to the

13   nondisparagement clause then.  And as I understand it, there are

14   kind of two components to your argument here.  One is your

15   assertion that disparagement, in order to disparage would require

16   falsehood.  In other words, that it would require that she be

17   saying things that are demonstrably false as opposed to simply

18   negative.  My read of the cases that you've cited though, they're

19   cases about the tort of disparagement of title, but didn't seem

20   the cases, to me, that you were citing are interpreting the plain

21   meaning of the word disparage.  What's the justification, I

22   guess, for importing the requirement of falsehood into the term

23   disparage.

24        MR. CONVERSE:  Well, it was an effort to identify

25   Florida cases dealing with the term "disparagement", and it

1  appears as though if we look at Head Kandy's proposed preliminary
2  injunction motion, they too had difficulty finding Florida case
3  law on point because they cite to an unpublished opinion out of
4  Minnesota for the common definition of disparagement.
5      I would -- you know, in situations like this as far as
6  the common meaning, I always look to Black's Law, and the courts
7  have done the same.  My definition in Black's Law for
8  disparagement is, quote, a false and injurious statement that
9  discredits or detracts from the reputation of another's property,
10  product or business.
11      THE COURT:  But that's for the tort of disparagement.
12  The definition in Black's right before that, as the one that I
13  have, that's Number 3.  Number 2 is the act or instance of
14  unfairly castigating or detracting from the reputation of someone
15  or something.  And says although many disparagements are
16  untruthful or otherwise unfair, falsity is not a requirement.
17  Any statement cast in a negative light may amount to a
18  disparagement in the general sense.
19      To me, that suggests that the plain language, the plain
20  definition of the word "disparage" is about casting in a false
21  light whether true, or casting in a negative light whether true,
22  untruthful or not.
23      MR. CONVERSE:  Your Honor, we wouldn't challenge that.
24  I apologize.  My definition -- I must have -- excuse me.  I must
25  have the older version, so I wasn't trying to move the Court away

1    from that definition.

2            THE COURT:  I don't think you were.  But I guess what

3    I'm saying is it seems like the authority provided is really

4    about torts, and I can understand why in the tort context there

5    -- you know, there's a reluctance to have a tort, an action in

6    tort for simply saying something that puts someone in a negative

7    light that's true.

8            The problem here is that we're not dealing with the

9    tort, we're dealing with a contract, right?  And so in a contract

10   we have to look at the plain language of the agreement, and to me

11   the ordinary meaning of the term "disparage" doesn't require the

12   statement to be false.  I guess that's what I'm trying to get,

13   what I'm asking about as to whether that's true or not.

14           MR. CONVERSE:  Sure.  So again, I think it's unsettled

15   under Florida law on that point.  But as far as the Black's Law

16   definition, like I said, that's, I think, appropriate certainly

17   under Florida law to refer to the Black's Law definition.  So

18   under the circumstances I think that that is a reasonable

19   definition.

20           THE COURT:  Okay.  So then the other part of your

21   argument seemed to be your First Amendment argument, that this

22   amounts to a prior restraint on speech.  And again, I don't want

23   to caricature your argument, but that seemed like the general

24   gist of your argument.

25           MR. CONVERSE:  Yes, Your Honor, that's a fair general

1    gist.

2            THE COURT:  So again, I have to come back to though that

3    we're dealing with the enforcement of an agreement.

4            So first of all, are any of the cases that you cited

5    regarding prior restraint, do any of them have to do with the

6    enforcement or nonenforcement of an agreement to not speak on a

7    certain subject.

8            MR. CONVERSE:  Your Honor, we were unable to find any

9    Florida authority on point on this issue.  And really this only

10   goes to the breadth of the restrictive covenants that are trying

11   to be enforced.  The position is not that it's an unreasonable

12   restraint as to any restrictive covenant or any injunction that

13   could be imposed, it's just what we're arguing is the overbreadth

14   of these specific restrictive covenants that then impede upon her

15   free speech rights and the ability to speak about a public

16   judicial proceeding.  And so it's just limited to that.

17           THE COURT:  And I guess the Plaintiff's argument is

18   that, you know, she may, in the ordinary course of life, she

19   would ordinarily have a First Amendment right to talk about

20   anything she wanted to.  But she's also allowed to waive that

21   right, and that this contract provision has waived her right to

22   speak on this particular topic or waived her right to disparage,

23   speak about Head Kandy in a negative light.  Is there anything

24   that prevents her from waiving that right and -- well, let me

25   stop there.  Is there anything that prevents her from entering

1   into a contract to waive that right.

2        MR. CONVERSE:  To in any way speak about a pending

3   litigation, essentially to defend herself in the court of public

4   opinion, I think that that -- I don't believe that there's been

5   any authority to provide that is enforceable on such a broad

6   restrictive covenant.  Certainly there are -- she can restrict

7   some of her speech as to nondisparagement.  But again, the

8   breadth of the position that Head Kandy is taking concerning the

9   scope of these restrictive covenants, I think it does then impede

10  upon her protected right to engage in her defense in this

11  litigation.  And so we need not conflate this right with the

12  litigation privilege.  So the litigation privilege is an absolute

13  privilege that was discussed earlier.  We're not arguing that.

14       THE COURT:  But again, she is perfectly free -- even

15  with the enforcement of the nondisparagement, she is perfectly

16  free to defend herself against the allegations that have been

17  made.  That's what we're doing here, that's what the court

18  process is for, and she can testify and she can submit evidence

19  and all of that in the context of the court proceeding.  The

20  question is whether, you know, the enforcement of an agreement

21  that she entered into and why that is itself unenforceable.

22       MR. CONVERSE:  And so in that regard, the cases that we

23  cited, I would argue, do speak about a right to discuss public

24  proceedings in the public, particularly if it involves

25  allegations against the individual speaker.  And so for that

1    purpose I would say that those are on point with regard to

2    discussing, especially one's -- the falsehood of the allegations

3    that have been alleged against an individual.

4              THE COURT:  But parties enter into agreements to not

5    speak or not react to things that they would ordinarily have a

6    right to do so all the time.  And for instance, not a perfect

7    analogy, but parties enter into settlement agreements all the

8    time where they agree to keep the terms of the agreement

9    confidential and not to talk about what happened in the lawsuit

10   confidential.  And courts enforce those sort of provisions.  That

11   is an agreement that restricts their First Amendment right and

12   even their First Amendment right to speak about, you know,

13   allegations that were made in court.  Why would this be

14   different?

15             MR. CONVERSE:  So there is case law on that point.  That

16   involves a competing public interest and that is the interest in

17   the resolution of proceedings, of court proceedings and the

18   finality through settlement agreements.  And so the Courts have

19   been more -- well, there's case law where courts are willing to

20   enforce the provisions of a settlement agreement where, you know,

21   the similar provisions would not be enforced outside of the

22   context of settlement because of this competing public interest

23   and, again, the resolution of litigation enforcement of

24   settlement agreements.  I believe it was in our brief, the

25   citation to some of those cases.  I don't have them in front of

1    me right now.

2            THE COURT:  What about an NDA though, a nondisclosure

3    agreement.  There's a separation from employment and there's an

4    agreement not to discuss anything that happened then.  You know,

5    those are also enforced.  Again, why doesn't that similar logic

6    apply here?

7            MR. CONVERSE:  I don't believe that they're enforced

8    once a litigation has been filed.  I think the NDA predates

9    litigation.  And so once an action has commenced, I haven't seen

10   any authority in Florida stating that the individual is still

11   prohibited from making statements in defense of the lawsuit.

12           THE COURT:  Okay.  Let me circle back for a minute to

13   the prior breach defense and then this issue of waiver, whether

14   she's waived raising that defense as an equitable defense here.

15           First, have you found any case in which a party was

16   prevented -- again, you've argued that such a waiver is against

17   public policy, citing to the statute.  Have you found any cases

18   where a party was prevented from waiving a prior breach or other

19   equitable defense based on that kind of public policy argument?

20           MR. CONVERSE:  No, Your Honor.  Not on that specific

21   point, no.

22           THE COURT:  Okay.  How does the waiver that's in this

23   contract, how does that defeat the purpose of the statute that's

24   at issue here?

25           MR. CONVERSE:  So there are a couple waivers as to the

1    reasonableness and enforceability and so, I'm sorry, which one?

2         THE COURT:  Here I'm talking about you've raised prior

3    breaches, several different forms of prior breach as an equitable

4    defense to the enforcement of the restrictive covenants.  And

5    what the Plaintiff has argued is that in the agreement itself,

6    Ms. McNeill agreed not to raise any equitable defenses.  And I

7    think everyone's agreed that a prior breach is an equitable

8    defense.  She agreed not to raise equitable defenses against the

9    enforcement of the restrictive covenants.  As I've understood

10   your argument to be is well, that waiver, waiving the ability to

11   raise equitable defenses is itself against public policy and

12   couldn't be enforced against her.

13        So I guess that's what I'm trying to focus on.  As I

14   understand it, in order to say that a contract provision is

15   unenforceable because it violates public policy, you have to show

16   that it defeats the purpose of the remedial statute or defeats

17   the purpose of that public policy.  So I guess I'm asking you how

18   have you shown that.

19        MR. CONVERSE:  Again, going back to there being two

20   separate issues at play here, again, the first one has to do with

21   the statutorily mandated consideration by the courts.  And so I

22   don't think -- so waiver is a second issue.  The first issue is

23   whether or not the statute requires the court to consider the all

24   of the relevant defenses.  And so I think that that in and of

25   itself requires consideration of the prior breach.

1        The second issue is the waiver issue and whether or not

2   it's against public policy.  And the statute itself, again

3   looking at that provision, I think that that would not be -- it

4   would defeat the purpose of that statute to allow a party to

5   waive their right to assert equitable defenses.  And so the

6   provision itself is controlling as to both issues, but I think

7   those are two separate and distinct issues.

8        THE COURT:  So I guess I understand what you're saying

9   there, but I think there are two other parts of the statute that

10  I think potentially cut against your argument, and I'm wondering

11  if you can -- how you react to them.

12       So again, we're talking about 542.335.  There's a

13  subsection J that talks about that the court can't enter a

14  temporary injunction without entering a proper bond, and that

15  provision explicitly says and the court shall not enforce any

16  contractual provision waiving the requirement of an injunction

17  bond or limiting the amount of such bond.  Then in Subsection K

18  it talks about attorney's fees provisions and says that, you

19  know, in the absence of a contractual provision authorized an

20  award of attorney's fees, the court may award attorney's fees and

21  costs to prevailing party, and says a court shall not enforce any

22  contractual provision limiting the court's authority under this

23  section.

24       So to me, that seems to be saying that at least

25  elsewhere in the statute where there are things that the statute

1   is saying court do this, and where we want to make -- there are

2   places where it's saying court do this, much like it's elsewhere

3   saying court consider all equitable defenses.  But here it's

4   explicitly saying court do this and ignore any contractual

5   provisions that tell you not to, whereas with court consider

6   equitable defenses, there isn't any such explicit language.

7           So does that not suggest that if the legislature wanted

8   to, you know, tell me look, you have to consider equitable

9   defenses and ignore a contractual provision that tells you not

10  to, that if they wanted to do that they would have done it

11  explicitly like they did in J and K.

12          MR. CONVERSE:  Sure.  So I think that these are

13  tangential to the heart of the intent of the statute.  So the

14  statute goes to employment agreements and restrictions upon

15  individuals' right to work and limitations on fair competition.

16  So I don't think it was necessary for that provision, the

17  explicit language to be in the defense's provision because it

18  goes to the heart of the statute, the intent of the statute and

19  the public policy codified in the statute.

20          THE COURT:  So wait one minute.  What you're saying is

21  that while J and K here is sort of ancillary provisions, the part

22  about equitable defenses really goes to the heart of the matter

23  and that should make a difference.

24          MR. CONVERSE:  Yes.  And that has to do with all of the

25  other provisions outside of J and K.  So all of the provisions

90

1    that are in the same portion of the statute that the language is

2    about the defenses.  Again, there's no language in there saying

3    that the parties cannot waive any of these other requirements.

4    So with regard to the legitimate business interest, those type of

5    inquiries and requirements, we haven't discussed waiver on those

6    because, again, those go to the heart of the statutory intent and

7    the public policy codified here.  So that's why it's not required

8    in any of those provisions.

9         These ancillary provisions concerning attorney's fees

10   and bond are -- I don't think are the same.  I think they are

11   quite easily distinguishable from the court provisions.  So I

12   think that's why the language is in here to expressly inform the

13   courts, and that's why the legislature put it in these

14   provisions.

15        THE COURT:  Okay.  Is there anything else you want to

16   say about either the prior breach defense or, I guess, anything

17   else regarding the likelihood of success that we've left

18   unaddressed?  Because I want to move on to some of the other

19   factors.

20        MR. CONVERSE:  So the likelihood of success goes to the

21   irreparable injury, I believe because the damages are a necessary

22   component to a contract claim.  So if we want to just talk about

23   that in the same context of the injury, then I'm happy to do

24   that.  That was the only other --

25        THE COURT:  Well, the next thing I was going to move to

1  was the substantial threat of irreparable harm, and so it sounds

2  like that's where you're heading also.

3          MR. CONVERSE:  Yes.

4          THE COURT:  Okay.  So why don't we talk about that then.

5          So obviously what the Plaintiff is relying on here is

6  that what's at issue is really reputation and -- you know,

7  reputation and brand, and the damage to the company's reputation

8  and brand and having the potential of customers leaving, that

9  constitutes irreparable harm.  That's not something that can just

10  be compensated by money.  So why wouldn't that constitute an

11  irreparable harm.

12          MR. CONVERSE:  Well, I don't believe it's been

13  established that that is actually an imminent threat, that that

14  irreparable harm is an imminent threat.  Head Kandy has argued

15  and I actually have a slide that I could put up on the screen if

16  it will be helpful.  But Head Kandy, since the onset of this

17  case, has argued that it has lost two thirds of its customer

18  base.  Nothing that Ms. McNeill has done in the interim has

19  decreased the customer base.  Because Mr. Rosenbaum, at the

20  hearing, again testified that they've only lost two thirds of

21  their customer base.  And so the damage, again, as I said

22  earlier, the die was cast when they terminated Ms. McNeill.  That

23  was the damage to their business.  Nothing in the interim that

24  she has done has caused them to lose any additional customers

25  based upon Mr. Rosenbaum's testimony, and I can show you the

1    excerpts if you would like me to.  Like I said, I have just a
2    slide that I can share on my screen if you're comfortable with
3    that, Your Honor.
4                THE COURT:  Yeah, if you would like to share that,
5    that's fine.
6                MR. CONVERSE:  All right.  Says it's disabled.
7                THE COURT:  Do you want to try now?
8                MR. CONVERSE:  There we go.
9                So this first slide is going to deal with the amount of
10   the damages, which I'm happy to address.  This second slide is
11   more to the point.
12               So the first amended complaint you can see was filed on
13   April 21st.  In Paragraph 51 of this first amended complaint, the
14   highlighted language shows that Head Kandy is alleging that its
15   sales were down 90% at that time, and that it has lost two thirds
16   of its customer base.  Then on June 6th of this year, at docket
17   47, Head Kandy filed its expedited motion for preliminary
18   injunction, and there on Page 11, the highlighted language, you
19   can see it states that its sales rebounded because now they're
20   only down 60%, but it had still lost two thirds of its customer
21   base.
22               And so this is an excerpt from the hearing transcript
23   where Mr. Rosenbaum testifies at the top.  It says well, first
24   off asks what do you attribute to the lost of two thirds of your
25   customers to, and it's Ms. McNeill's disparaging of the brand.

1     And then it discusses that prior to February, this is that 33,000

2     number, and then today as we sit here it's 7,000.  But again,

3     this is two thirds.  This was according to Head Kandy, this

4     damage had already occurred prior to April 21st, or at least as

5     of April 21st of this year.  So all of the disparaging comments

6     actually were not, according to Head Kandy's allegations and the

7     evidence provided at the preliminary injunction hearing, have had

8     no effect on Head Kandy's customer retention.  Not that we're

9     stipulating to these numbers necessarily, because Mr. Rosenbaum

10    was also asked how Head Kandy determines what its returning

11    customers are, and this last excerpt from the hearing transcript

12    at 231, and they count even individuals who haven't purchased for

13    two years to still be returning customers.  And so again, there

14    was no evidence adduced at the hearing to support this 33,000

15    because we're certainly within the two year period from her

16    termination.  And as of February when Mr. Rosenbaum testified

17    that they lost sales, that's only a month.  And so to determine

18    which customers are still Head Kandy customers and which aren't,

19    it seems like there's no metric for them to determine that.  But

20    nonetheless, according to their metric, they have not lost any

21    customers between at least April 21st of this year to the August

22    1st hearing date.

23              THE COURT:  Okay.  I'm not quite sure I actually follow

24    you there.  Even if that were so, I mean, wouldn't it fairly

25    logically follow that there's a threat to harm of Head Kandy's

1    brand and reputation with its customers if Ms. McNeill is, you

2    know, the person who was, as everyone has already said, was

3    synonymous with the business, is out either, you know, promoting

4    other products or more importantly disparaging and, you know,

5    disparaging Head Kandy and its leadership or its company.  I

6    mean, that would seem almost, again, axiomatic that this is

7    likely to lead to some damage to their brand.  Whether that

8    explains all of the customer loss or not, you know, that's like

9    more of an issue for -- you know, that may be an issue for, like

10   I spoke with Mr. Loeb about, for causation and what the actual

11   ultimate quantifiable damage could be.  But it seems almost

12   obvious that her out there disparaging the company would pose a

13   threat to their reputation amongst customers.

14            MR. CONVERSE:  Our first issue would be that there

15   hasn't been any disparagement that has occurred.  So if the

16   question is in a vacuum is that possible, absolutely.  If a

17   person is disparaging a brand, it can have ramifications upon the

18   brand.  I think when we look at this case in particular and the

19   potential for the imposition of a preliminary injunction, there

20   it matters what the facts are.  So even if we assume that the

21   allegations that disparagement did occur, because there were no

22   allegations that disparagement occurred prior to that.

23   Mr. Rosenbaum spoke to an April 11th video was the only one in

24   Head Kandy's -- I'm sorry, didn't mean to stop the share screen,

25   because the next slide showed when Head Kandy alleges that the

1    disparagement occurred.  But it occurred after that time period.

2         And so I think when we're looking at the realities of

3    this case and what effect the statements have had, regardless of

4    whether Plaintiff is right and they are disparaging or Ms.

5    McNeill's position is more accurate and they were not

6    disparaging, the effect has been that it has not -- Head Kandy

7    has not lost any customers from those comments.  And so there has

8    to be a threat of that imminent irreparable injury.  And based

9    upon Head Kandy's own allegations and their representative

10   testifying, that just has not occurred.

11        THE COURT:  Okay.  Anything else that you want to argue

12   regarding irreparable harm?

13        MR. CONVERSE:  So another topic that was discussed was

14   that discounts, product discounts were necessary as of February

15   because of Ms. McNeill's actions, and there was also -- Mr. Loeb

16   mentioned a discussion between a Head Kandy representative and

17   Ms. McNeill about it becoming a discount brand.  The reason why

18   that discussion took place is because those discounts actually

19   predated Ms. McNeill's termination, and Mr. Rosenbaum testified

20   that there were substantial discounts that predated her

21   termination.  And that's at hearing transcript Page 225, lines 21

22   through 23.

23        THE COURT:  Okay.

24        MR. CONVERSE:  Sorry?

25        THE COURT:  Go on.

```
 1          MR. CONVERSE:  And then Mr. Loeb mentioned the purpose
 2     of the enforcement of the restrictive covenants, why Head Kandy
 3     is attempting to enforce them, is that seeking to prevent an
 4     exodus of customers.  And I think what I just showed concerning
 5     what Head Kandy has represented concerning its customer base
 6     demonstrates that, again, these statements have not in any way
 7     diminished the number of customers that they have.  And again, we
 8     don't have any documentary evidence to support any of those
 9     numbers that Mr. Rosenbaum spoke about at the hearing.  And then
10     I think that that's all I wanted to say on the irreparable.
11          And again, going back to our discussion about the
12     purchase orders that have been introduced into evidence, I think
13     that the deficiencies in those that I discussed earlier are also
14     relevant to the irreparable damages.  And so I don't want to go
15     over it again because of our time, but I would just offer that
16     discussion is relevant with regards to irreparable damages as
17     well.
18          THE COURT:  Let me address the balance of harms.
19     Obviously the Court has to decide, even if there is a likelihood
20     of success or substantial likelihood of success, or even if there
21     is a substantial threat of irreparable harm, then the Court needs
22     to consider the balance of harms between the Plaintiff and the
23     Defendant.
24          Part of what you have argued is that, you know, she
25     shouldn't be prevented from engaging in -- this burdens her
```

1   livelihood and shouldn't be prevented in engaging in the only

2   business she's ever known.  I'm paraphrasing, but I think that

3   was part of your argument.  What is your argument regarding the

4   balance of harms and why enforcing the covenants against her

5   would cause more harm to her than to the company?

6           MR. CONVERSE:  That's a fair statement, Your Honor,

7   concerning our position, and I think it's exemplified by the

8   recent filing by Head Kandy concerning how it views the breadth

9   of the restrictive covenants where there was discussion that she

10  has -- or an allegation that she has violated the restrictive

11  covenants by posting a 25-second video where there's music

12  playing, she doesn't speak at all, there are no brand names

13  visible in the video.  But by the simple fact that she's using a

14  rubber band or a hair tie, that's nondescript, it's clear, to fix

15  her hair, to demonstrate to her followers another way to fix

16  their hair, that is in some weigh promoting a business, it's a

17  violation, it's solicitation, it's a violation of one or more of

18  the restrictive covenants.  If she's prohibited from doing

19  something as simple as that, then she's essentially unable to

20  post at all concerning the content that she provides to her

21  followers and that is how she has made a living for her entire

22  adult life.  And so if she's unable to do that, it would

23  essentially preclude her from earning a living in the industry

24  that she has expertise in and has been practicing in, again, her

25  entire adult life.

1    THE COURT:  But she testified -- her testimony included

2    that she has multiple other businesses that includes White

3    Pineapple, which she says is non-hair related, it's an athleisure

4    brand, it's exempted her personal service of doing hair care that

5    she says that she has in her home.  She talked about I think she,

6    along with her husband, I think she said they have business

7    regarding real estate or home construction.  She's also indicated

8    that she doesn't earn any money off of the reviews that she's

9    doing, and at least at some point -- the ship may have sailed,

10   but at some point when we were talking, the filings seemed to

11   represent that she was voluntarily stopping the kind of

12   commenting and reviews that were at issue.

13        So if all of that is true, how can I conclude that

14   requiring her to abide by the restrictive covenants in the

15   employment agreement burdens her livelihood?

16        MR. CONVERSE:  Well again, it goes to what ultimately is

17   the breadth of these.  So that's why I was speaking that under, I

18   believe, Head Kandy's interpretation of it, it would burden her

19   substantially, and Head Kandy has explained this in multiple

20   filings with the court that Ms. McNeill is connecting with her

21   audience on a very personal level.  She's getting ready with

22   them.  She's speaking about her daily activities.  And a core

23   part of getting ready for her and the women who follow her is

24   doing their hair.  So she has stopped speaking about specific

25   products, she's put tape over any product names that appear in

1    the video, but she still needs the ability to engage in her daily

2    activities in order to maintain that relationship with her

3    followers that then helps her with her other businesses like

4    White Pineapple.  Women, once they trust her as to one item,

5    they're more willing to purchase from one of her different

6    businesses and really it's just White Pineapple.

7            The real estate investment was a very small matter that

8    never really developed, it's not a substantial source of income.

9    The housing market has greatly changed, and it's illiquid.  So as

10   far as satisfying her daily -- her and her family's daily cash

11   flow needs, that business doesn't provide the necessary liquid

12   assets.  And so it's really her White Pineapple business.  And

13   that's why her followers returned to her, because she is, again,

14   getting ready with them, she's engaging with them on a personal

15   level.  And so if she can't even fix her hair with, again, a

16   nondescript clear rubber band -- and I don't pretend to know all

17   the ins and outs of how she gets ready and what that requires,

18   but it certainly requires those items which Head Kandy has

19   already identified as a breach of the restrictive covenants.

20           So it really goes to the breadth of the restrictive

21   covenants.  If it's solely just providing product reviews, those

22   actions have ceased.  Although again, there was an

23   acknowledgement by both parties that those were within the

24   contours of the language of the contract.  Out of an abundance of

25   caution, she has stopped providing those reviews.

```
 1        THE COURT:  Last question regarding the amount of a bond
 2   if a preliminary injunction should issue.  You suggested that
 3   $5,000 would -- that the Plaintiff suggested was deficient and
 4   you placed emphasis on their anticipated costs and damages.  What
 5   do you suggest would be the appropriate amount of bond and what
 6   is that based on?
 7        MR. CONVERSE:  Again, unfortunately this goes to the
 8   breadth.  And so we were speaking more to Head Kandy attempting
 9   to enforce its interpretation of the restrictive covenants
10   entirely.  And again, under the statute as we discussed, I think
11   the Court's required to limit those to only what is necessary.
12   So we don't think that that is an appropriate scope.  But if that
13   is the scope, then it would significantly impede upon Ms.
14   McNeill's ability to, say, earn a living as we just discussed.
15   So to the extent that it imposes a limitation on her ability to
16   just get ready and post her videos in the normal course that
17   she's done, and she's unable to continue to post and earn a
18   living, then I think that one reasonable metric would be her
19   salary under the employment agreement of a base of 200,000, plus
20   the opportunity to get bonuses, which she did earn.  So a bond of
21   something more like $250,000 would be appropriate under that
22   metric.  But again, it really depends upon the scope of any type
23   of injunction that may be ordered as to what is reasonable.
24        THE COURT:  Okay.  So what I'd like to do is I'd like to
25   turn back to the Plaintiffs, give Plaintiff an opportunity to
```

1    either respond to anything or make any final summation on

2    anything they haven't been able to touch on.  Given the time

3    here, it's almost 4:30, I would like to try to limit that to 15

4    minutes at most, and then I'll give Mr. Converse similarly 15

5    minutes to finish responding or any further argument that he

6    would like to make.

7            Does anyone need a break before we do that?

8            MR. Loeb:  Please.  Please.  Could I have a brief

9    comfort break?

10           THE COURT:  Why don't we take five minutes and then

11   we'll return for the final argument.

12           MR. Loeb:  Thank you.  Appreciate that.

13           MR. CONVERSE:  Thank you.

14           THE COURT:  Okay.  If we could all come back, it's now

15   4:32.

16           Okay.  So Mr. Loeb, again, I'd like to give you, at

17   most, 15 minutes to either respond to arguments that we heard

18   from Defendant or address any other arguments that my questions

19   haven't given you a chance to make.

20           MR. Loeb:  Yes, Your Honor.  I had a PowerPoint slide

21   presentation, but based on all the evidence you've heard, today's

22   discussion, the findings of fact, the conclusions of law, I'm

23   going to blow past that and try to touch on each of the points

24   there.  I think that's probably more productive, and I'm going to

25   try to get it done in 15 minutes.

1           THE COURT:  All right.

2           MR. Loeb:  So, there we go.  First issue with regard to

3 your question about termination for cause or without cause.

4 There's nothing in Paragraph 5 or 6 that tethers that issue to

5 with or without cause in terms of the termination.  Those

6 particular covenants stand on their own and they are enforceable.

7           In terms of when that period begins, there was

8 discussion about the executive covenants and when do they start.

9 They don't start until after the termination of the employment

10 relationship.  There was conversation by counsel saying oh, this

11 is eight years already in the running if you were to enforce

12 that.  The plain language of the covenant says after the

13 executive leaves, meaning Ms. McNeill.  That's the triggering

14 event for the executive covenants to kick in.

15           And there was reference to -- with regard to the timing

16 of it.  This is a preliminary injunction, and so right now we're

17 trying to preserve the status quo in terms of making a decision

18 and finality in terms of it's one year, it's three years, you

19 know that we just need to hit pause in terms of enforcing them in

20 terms of likelihood of success on the merits.  But Your Honor, I

21 think if you're headed down that road, there was a discussion

22 about citation who -- 335, and there's two that really are in

23 play.  The first one that Ms. McNeill relies upon deals with a

24 restrictive covenant that is not associated with the sale of all

25 or part of assets of a business or professional practice.

1   Meaning is this a covenant that's just somebody who comes along

2   and becomes employed at company X, Y, Z, that's the play in that

3   sandbox.  You don't play in that sandbox because as we know the

4   asset purchase agreement incorporates as Exhibit D to that

5   agreement the executive employment agreement, and that executive

6   employment agreement was part and parcel of the $2.8 million sale

7   which then throws us into Subsection 3 of 335 (1)(b).  That says,

8   as the Court's recognized in the discussion, the case of a

9   covenant to be enforced against the seller of all or part of the

10  assets, it's presumptively reasonable for three years or less in

11  duration and presumptively unreasonable of seven or more years in

12  duration.  Ms. McNeill testified that she was the sole managing

13  member of Lashed Out; that she received, after all the

14  liabilities were paid, the consideration of $2.8 million paid and

15  as I said, in connection with the execution of the asset purchase

16  agreement, she signed and delivered the employment agreement with

17  regard to the covenants.

18          Now, with regard to first breach, one of the things that

19  I said that I was excited to talk about, I know we didn't cite it

20  in our papers, but a little bit of, you know, wind out of my

21  sails, I was going to cite to Paragraphs J and K as the Court

22  indicated because that is a legislative indication, and it's

23  presumed that the legislature knows what it is that they're doing

24  when they draft a statute, at least we hope they do.  And as it

25  pertains to the bond, there's a specific instruction, the court

1    won't enforce a waiver.  Same thing with attorney's fees.  And

2    that makes sense from a policy standpoint that an employer can't

3    have an employee waiving bonding requirements or the right to

4    enforcement of attorney's fees.  That deals with other sections

5    of other Florida Statutes with regard to reciprocity of fees and

6    the like contained in contracts.

7          But the bottom line here, Your Honor, is this:  The

8    statute is a carve-out and a 180-degree turn from the general

9    public policy under 542.18 which is let's not restrain trade or

10   activity or commerce in the state of Florida.  This is the exact

11   opposite.  And how do we know that.  All we have to do, Your

12   Honor, is look at the plain language of the statute in which the

13   court is to construe a restrictive covenant in favor of providing

14   reasonable protection to all legitimate business interests

15   established by the person seeking enforcement.  This is contrary

16   to what counsel has argued that the public policy is for the

17   protection of the employee.  Quite the contrary.  The protection

18   is for the business and the enforceability of the restriction,

19   the legislature has said that.  How do we know?  The legislature

20   goes on in Subsection H of main Paragraph 1 under 335 to mandate

21   a court shall not employ any rule of contract construction that

22   requires the court to construe a restrictive covenant narrowly

23   against the restraint or against the drafter of the contract.

24         If you think about that, that is the specified public

25   policy that's contained in this statute, and that is designed to

1    ensure that if an employer provides benefits and a contract to an
2    employee, we want to honor those contracts and give confidence in
3    a pro-business state like Florida that these are the types of
4    things that we need to enforce.
5            So then when you take all of this and you wrap it
6    together in a bow, Your Honor, that puts -- makes Paragraph G
7    three super easy to understand.  The legislature did not write
8    that the court shall consider all legal and equitable defenses.
9    They used the word "all" but they added two different words,
10   "other" and "pertinent."  So here we have the legislature
11   indicating not all legal equitable defenses, it says all other
12   pertinent legal and equitable defenses.  That has meaning that
13   the Court should give in terms of its analysis here.
14           Moreover, given what we see in Paragraph J and K, as the
15   Court cited to counsel the legislature surely could have said the
16   court shall consider all other pertinent legal and equitable
17   defenses, and the court shall not give any effect to any waiver
18   of the requirement that it consider all defenses or all legal
19   defenses or all equitable defenses.
20           The bottom line is, Judge, that when you look at all of
21   the analysis here, what Ms. McNeill did was perfectly
22   permissible.  And what Head Kandy received and what Ms. McNeill
23   received in terms of the back and forth consideration, that
24   waiver is completely enforceable and it is not contrary to public
25   policy.  In fact, I would suggest to the Court that accepting Ms.

1    McNeill's argument would actually be contrary to public policy in

2    terms of the cases cited in terms of enforcing the plain language

3    of these agreements.  The legislature's decision that these types

4    of contracts need to be enforced is really in favor of

5    businesses.

6           In terms of the goodwill issues, Your Honor, that you

7    spoke about, I don't know if you remember what I said in opening

8    but I thought it was -- aside from the fact that I said it, I

9    thought it was pretty well said.  What makes Ms. McNeill so

10   talented is what makes her so incredibly dangerous.  Ms. McNeill

11   has a knack for being a social media influencer.  It's a

12   stipulated fact.  She knows how to get on the screen and she

13   knows how to influence consumer behavior.  If you've had the

14   chance to watch her, it's infectious.  You watch her over again

15   and over again and over again, and she knows what she is doing.

16   Her ability to do that and to sway the minds of consumers is

17   absolutely huge.

18          How do we know that?  In the record and in evidence --

19   and there was a discussion about whether Ms. McNeill provided

20   links to existing customers because there was a discussion about

21   which platform she was playing in.  I reference the Court to

22   Exhibit 81 which is the April 11th TikTok video where there's

23   mention of exploitation of her children and capitalizing on it,

24   and the corresponding Exhibit 76 which are the comments to that

25   in which there's one reference from a name called Drillers Lady

1    who says I will not purchase from that company anymore, but you

2    let us know when you can start something new.  What does Ms.

3    McNeill do in response?  She gives them a link to Whipi Co.  She

4    sees an existing customer of Head Kandy who reacts to her social

5    media behavior and her posting, and she says I have a new

6    company, it's called Whipi Co.  And then others behind her say

7    oh, yeah, Whipi Co has great products.  I'll continue to support

8    you through Whipi Co.  Ms. McNeill, and the argument that she did

9    not use her company and communicate with Head Kandy customers is

10   flat-out wrong when we look at Exhibit Number 76.  It's very

11   clear that that's what she did, and it's very clear that she

12   engaged in activities that harm the goodwill of Head Kandy and

13   its customer base.

14        What does Ms. McNeill say about Bo Stegall?  If you

15   watch those videos, there's many times when Ms. McNeill not just

16   once, not twice, but she goes on a series of activities promoting

17   and talking about Mr. Stegall.  She talks about Head Kandy, and

18   she even indicates I thought when I was with Head Kandy that

19   Mr. Stegall was one of my competitors.  She says that.  And she

20   says hey, if you want to buy Head Kandy products, go ahead.  But

21   if you want really good -- I'm even using that tone because

22   that's when she says if you want really good stuff, go to Bo

23   Stegall.  She's making that comparison between the two products.

24   And instead of directing people by saying hey, go to Head Kandy,

25   but if you want really good stuff, like off-the-chart awesome

1    stuff, go talk to Bo Stegall.  And Mr. Stegall's sitting here

2    watching, watching her do that, and they were communicating and

3    suggesting to provide those links were acts of encouragement and

4    were acts designed to have Head Kandy customers go and buy stuff.

5    And the comments that's in the record show that those particular

6    consumers actually went ahead and bought materials from Bo

7    Stegall.

8              Your Honor, in terms of saying negative statements about

9    Head Kandy products, there's actually evidence in the record

10   which Ms. McNeill does do that.  She actually tells people Head

11   Kandy is a trigger for me.  I mean, I'm not going to use those

12   products.  Those things, I just uh-huh, and she does something

13   like that in terms of one of her live videos.  She tells the

14   people who are following her -- her ability, as Mr. Converse

15   says, she can connect with people.  I mean heck, she can kind of

16   connect with me, I watch her.  I mean, that's how good she is.

17   But at the same time when she can do that, she can tell people,

18   hey, look, you know what, Head Kandy is a trigger for me, I can't

19   do it, and goes on to say in those same phrases, go try Bo

20   Stegall's stuff out.

21             Last point with regard to prior restraint on speech.

22   I've litigated these matters in other cases, standard employment

23   agreements, especially with high-ranking executives, always in

24   there.  Do not defame, do not disparage.  You contractually

25   agreed when you entered into a sophisticated business

1    transaction, especially one for $$2.8 million with a $200,000

2    draw and all the benefits that are there, every company has the

3    rightful expectation that you are not going to engage in

4    disparaging activity or defamatory activity at any point in time,

5    whether you're at the company or any time that you leave the

6    company that you are not going to do that.  That's what Ms.

7    McNeill did.  That is not a prior restraint on her speech, that

8    is what businesses do in order to enter into contracts with

9    employees and executives to guarantee that when there is

10   eventually a business divorce, if it ever happens, that the

11   executive is not going to run out and do exactly what she did.

12   That is a completely enforceable clause, it is something that has

13   been litigated and upheld in terms of the cases that we've cited.

14          And with reference to what Mr. Ferdinand may or may not

15   have said to Ms. McNeill, there is an Exhibit J that's in the

16   record, Your Honor, in which there's a discussion about White

17   Pineapple and athleisure.  I invite you to read that letter,

18   because it starts that Head Kandy is presenting a plan for you to

19   remain employed.  Under a full reservation of rights, Head Kandy

20   is prepared to withdraw its breach notices to you and allow your

21   continued employment.  Ms. McNeill never got back to

22   Mr. Ferdinand.  There was no signing between the two parties as

23   to what modifications may or may not have happened under the

24   executive employment agreement and what Ms. McNeill could or

25   could not do.

1    Your Honor, at bottom we believe we've satisfied all the

2    criteria necessary for an injunction as well as the applicable

3    statute which is 542.335.  We've checked those boxes off.  It is

4    imperative that we have a preliminary injunction so we don't lose

5    any more customers and we can try to repair the harm that Ms.

6    McNeill has already caused.  Thank you.

7         THE COURT:  Thank you, Mr. Loeb.  Briefly before I turn

8    to Mr. Converse, Mr. Converse mentioned, you know, the breadth,

9    excuse me, issues, you know, regarding the scope of, I guess, the

10   covenants and with particular reference to -- and I don't have

11   this video in front of me so I don't have the facts of it in

12   front of me but, you know, the idea that Head Kandy would view a

13   video of her simply getting ready with her followers on Facebook

14   would amount to a breach of the covenant, presumably without

15   even, I guess as Mr. Converse is describing, without mentioning

16   Head Kandy or mentioning any other product or anything like that.

17        One, tell me if you think that's correct that such a

18   video in and of itself would amount to a breach; and two, whether

19   the Court needs to address that kind of scope issue.

20        MR. Loeb:  Your Honor, I know it's not before you, but I

21   can tell you this in response to that video:  One of the comments

22   was where did you get those cute little hair bands at.  And

23   somebody responds, who is part of this group, and discovery is

24   going to flush this out, okay?  But somebody says oh, go to

25   Amazon, here's where you can find those bands, I know what those

1    are.  What you have here is yes, is Ms. McNeill doing her hair?

2    Yes, she is.  Is she saying anything?  No.  Is she turning around

3    and saying look what I've done?  Yes.  Are people saying where

4    did you get those hair bands?  Yes.  Are her followers saying

5    here's where you can go get those?  Yes.  So is that video a

6    breach?  I'll use your word, I think that's walking really close

7    to the line.  I think she's crossed it many times.

8         But when you put it in the full context of what it is

9    that she's done in terms of her behaviors, I mean, I'll tell you,

10   if it's not a direct effort, it's darned sure an indirect effort

11   to try to, what I'll call, skirt and walk the line, which is what

12   Ms. McNeill's been trying to do since the moment she got

13   terminated.

14        THE COURT:  All right.  Thank you, Mr. Loeb.

15        MR. Loeb:  Yes, Your Honor.  Thank you.

16        THE COURT:  And Mr. Converse, again, you know, about 15

17   minutes.  Anything that you'd like to -- first of all, take

18   yourself off mute, but anything that you'd like to respond to or

19   further argue that perhaps my questions didn't give you a chance

20   to address.

21        MR. CONVERSE:  Yes, Your Honor.  Thank you.

22        So I would begin I believe where Mr. Loeb began about

23   when the noncompete provision began to run.  Mr. Loeb pointed to

24   the plain language of the contract.  So Paragraph 5 A begins at

25   the bottom of Page 6 of the executive employment agreement, and

1    it states, quote, from and after the effective date and

2    continuing for a period of 36 months.  Then it goes on, but I'll

3    end it there.

4           So no, by the express language of the contract, the

5    noncompete began on the effective date.  And to remind the Court,

6    the effective date of this contract is the same date that the

7    Lashed Out assets were sold which was May 3rd of 2018.  Again,

8    these are legally distinct entities.  I know that there's an

9    attempt to make these one and the same and the same contracting

10   parties, but Ms. McNeill was not a party to the asset purchase

11   agreement, she's only a party to this executive employment

12   agreement and Lashed Out, similarly, is not a party to this

13   executive employment agreement.

14          The question about whether or not the stipulations must

15   be scrutinized, and I think that there are two things that need

16   to be addressed on that point.  One, first we would argue yes,

17   they need to be and then -- two points.  One is because if you

18   look at Paragraph 5 E on the reasonable limitations, the

19   stipulation is that the reasonable -- in part to protect Head

20   Kandy's trade secrets.  And Head Kandy doesn't have any trade

21   secrets.  There's no evidence that Head Kandy has any trade

22   secrets and that they're at play here.

23          So the basis -- even for the stipulation.  Now, I do

24   acknowledge that the client relationships and goodwill are there,

25   but I think that is just evidence that a mere stipulation isn't

1    adequate, that the Court needs to consider the bases for them.

2         And then also I would say in that regard, the point that

3    I touched on before is that it also needs to comply with the

4    statutory requirements and the prescriptions in there concerning

5    ensuring that it involves a legitimate business interest.  And

6    the case law that we've cited before, the courts have all

7    scrutinized without exception the legitimate -- whether or not

8    business interests is truly present, not simply a stipulation.

9         That also touches on the case that was relied upon by

10   Head Kandy, Reliance Wholesale or -- excuse me.  That's not

11   correct.  GFA International.  In there on Page 876, the court

12   states that, quote, the enforceability of the restrictive

13   covenants is uncontested in this action, end quote.  So this case

14   is distinguishable from the present one because the

15   enforceability wasn't even considered in this opinion.

16        Also I'd like to point out that the executive employment

17   agreement concerning the waiver only relates to equitable

18   defenses.  It does not state that she has waived legal defenses

19   to the provisions within the agreement.

20        Moving to the basis for the noncompete that was

21   discussed.  Mr. Rosenbaum himself testified that he found no

22   evidence of a breach of the noncompete.  That's found in the

23   hearing transcript on Page 249 starting on Line 23 and running

24   through Page 251, Line 6.

25        Also with regard to the allegedly disparaging

114

1    statements, Mr. Loeb stated that Ms. McNeill can take the stand
2    and make these statements, and that's exactly what she did.  She
3    took the stand at the hearing, she reiterated all the statements
4    that she had made and -- concerning their truth and also the
5    falsity of the statements that were made against her, and her
6    testimony went unimpeached.  And it was also not rebutted by
7    testimony of Mr. Rosenbaum, Head Kandy's representative who
8    testified at the hearing.  So she's now put these into the
9    record.  So the statements that Head Kandy is trying to prevent
10   Ms. McNeill from making through the imposition of an injunction
11   are now in the record.  And so at this point she would be free to
12   make those statements just stating what she testified to at the
13   hearing.  And again, those statements were subject to cross and
14   impeachment on those.
15          Let's see here.  There's also discussion about dependent
16   versus independent covenants, and the case cited in support of
17   Head Kandy's position is Reliance Wholesale.  The language in
18   that contract is clearly distinguishable from the savings clauses
19   that we have in the executive employment agreement.  The
20   executive employment agreement has the traditional savings
21   clause.  It says if any other provision is found to be invalid,
22   the rest of the provisions are still enforceable.
23          With regard to the restrictive covenants, there's an
24   additional savings clause that makes all the restrictive
25   covenants independent of one another.  So if there's overreach on

1       one of the restrictive covenants, the other restrictive covenants

2       are enforceable.  There's no language in there similar to the

3       language that was at issue and was discussed in the Reliance

4       Wholesale case.  In that case, the language of the contract was

5       -- this is on Page 565 of that opinion.  It was, quote, the

6       covenants set forth herein shall be construed as agreements

7       independent of any other provision in any other agreement, end

8       quote.  So there you have express language that takes the

9       restrictive covenants and makes them independent of any (audio

10      distortion) this contract.  So these are dependent covenants with

11      regard to the other provisions of the agreement making Ms.

12      McNeill's prior breach defense still valid.

13              And then I would also mention there was talk about the

14      link to Whipi Co.  Again, that link was not on Head Kandy's

15      pages.  It was a comment on Ms. McNeill's personal page, and

16      rather than address the content of the statement about whether or

17      not Head Kandy mistreated her, she similarly just said hey, you

18      can follow me at Whipi Co.  And so she was responding to her

19      follower about her business, not one of Head Kandy's followers.

20              And then with regard to the comments and what they show,

21      there's reference to Ms. McDermaid's affidavit previously which

22      is Exhibit C to the preliminary injunction motion which is docket

23      47-3.  One of these individuals, this Ms. Ellie Amos -- again,

24      this goes to the unreliability of these comments that were just

25      kind of -- that are -- that were introduced as to all of the

1  videos that she made.  Ellie Amos is an individual that Head

2  Kandy has identified as an individual that has stopped purchasing

3  because of Ms. McNeill's conduct.  And they point to a January 7,

4  2023 comment in Ms. McDermaid's affidavit stating that if the

5  company was stolen from her, I don't think I want to support it.

6  First of all, this statement occurred before Ms. McNeill made any

7  statement.  So to the extent these are reliable, it shows that

8  information about the dispute between the parties is publicly

9  available and being discussed actively prior to Ms. McNeill

10  making any statements because, again, this is January 7, 2023.

11  But also, and importantly, it does not support their contention

12  that Ms. Amos stopped buying from Head Kandy, made the decision

13  on this date.  You can't tie her statement to any decision to

14  stop buying on this date as with any of the other individuals,

15  because in Plaintiff's Exhibit 153 where it provides Ms. Amos'

16  purchase history, she stopped buying (audio distortion) 2022.  So

17  she had already stopped buying from Head Kandy long before she

18  made this statement.  So again, trying to tie when somebody

19  decided to stop purchasing from Head Kandy based upon the date of

20  a Facebook comment is not reliable.

21       Sorry, Your Honor.  I'm just checking real fast.

22       And then also there was a reliance upon DTC Energy Group

23  by Head Kandy concerning irreparable harm.  And in that opinion

24  the Court actually found that, again, as we said before, the most

25  important prerequisite for the issuance of a preliminary

1    injunction is the demonstration that such an injury, meaning

2    irreparable harm, is likely to occur.  And it's not sufficient,

3    the court found, to remedy past harm, but to protect from

4    irreparable injury that will surely result without issuance of a

5    preliminary injunction.  So that goes to the point I was making

6    previously about Head Kandy's customer base not decreasing.  Even

7    after all of the allegedly improper or breaching comments were

8    made, their customer base has remained stagnant through these

9    many months, and the only time when Mr. Rosenbaum testified that

10   it fell off was immediately after Ms. McNeill was terminated in

11   that February month.

12            So I believe that's all I have written down.  Do you

13   have questions, Your Honor?

14            THE COURT:  No, I think you've covered everything.

15   Thank you.  Thank you, Mr. Converse.

16            Everyone, it's now 5:00 Eastern time.  I know I've kept

17   you here quite a long time, but I very much appreciate everyone's

18   arguments and insight into the case.

19            We're going to take all those arguments under advisement

20   and try to get a report and recommendation out to Judge Ruiz as

21   soon as we possibly can.  In the meantime, we're going to stand

22   in recess for today.

23            Thank you to everyone for your appearances.  I hope

24   everyone has a good evening.

25            MR. Loeb:  Thank you, Judge.

1          MR. CONVERSE:  You as well.

2          (PROCEEDINGS CONCLUDED)

3                    *  *  *  *  *

4                  C E R T I F I C A T E
   I certify that the foregoing is a correct transcript from the
5  digital audio recording of proceedings in the above-entitled
   matter.
6
   9-11-2023              /s/ Dawn M. Savino, R.P.R., C.R.R.
7  Date                   DAWN M. SAVINO, R.P.R., C.R.R.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25