UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-CV-60345-RUIZ/STRAUSS

HEAD KANDY, LLC,

      Plaintiff,

v.

KAYLA MARIE MCNEILL,

      Defendant.

_____/

## REPORT AND RECOMMENDATION

**THIS CAUSE** comes before me upon Head Kandy, LLC's ("Plaintiff's") Expedited Motion for and Preliminary Injunction and Incorporated Memorandum of Law ("the Motion"). [DE 47]. The District Court has referred the Motion to me for issuance of a Report and Recommendation. [DE 48]. I have reviewed the Motion, Defendant's response in opposition to the Motion ("the Response") [DE 66], and Plaintiff's reply in support of the Motion ("the Reply") [DE 72] and the record in this case. In addition, I held an evidentiary hearing ("Evidentiary Hearing") on the Motion. [DE 107]. At the Evidentiary Hearing, I took testimony and reviewed evidence pertaining to this matter. Furthermore, I have reviewed the parties' post-hearing briefing [DE 113; DE 116; DE 117; DE 119] and heard oral legal argument on the Motion. [DE 130, 132]. Being otherwise duly advised, I respectfully **RECOMMEND** that the Motion [DE 47] be **GRANTED** for the reasons stated herein.

## PROCEDURAL BACKGROUND

This suit arises from Defendant's contentious separation from Plaintiff, a beauty and hair care company for whom she worked and in which she had an ownership interest. On February 22, 2023, Plaintiff filed a seven-count initial complaint against Defendant. [DE 1]. On April 21, 2023, Plaintiff filed a nine-count Amended Complaint. [DE 25]. Plaintiff's Amended Complaint alleges the following counts:

Count I – Breach of Contract
Count II – Common Law Fraud
Count III – Conversion
Count IV – Civil Theft
Count V – Unjust Enrichment
Count VI – Breach of Fiduciary Duty
Count VII – Intentional Interference with Business Relationship
Count VIII – Common Law Defamation
Count IV – Declaratory Relief

*Id.* at ¶¶ 54-145.[1]

Plaintiff filed the Motion on June 6, 2023. [DE 47]. Only the breach of contract claim is evaluated in the Motion. *Id.* at 12-16. After I was referred the Motion, I held an evidentiary hearing on the Motion on August 1, 2023.[2] [DE 107]. I held separate legal argument on the Motion on August 25, 2023. [DE 130, 132].

---

[1] Defendant filed a Motion to Dismiss the Amended Complaint on May 11, 2023. [DE 34]. In the Motion to Dismiss, Defendant alleges that: (1) this Court lacks both personal and general jurisdiction over her; (2) Florida is the wrong venue for this suit, (3) Plaintiff's Common Law Fraud and Conversion claims are deficient as a matter of law; (4) Plaintiff failed to join indispensable parties; and (5) the Court should abstain from considering the declaratory relief claim. *Id.* Defendant's Motion to Dismiss remains pending.

[2] Although I initially set the hearing for June 28, 2023, at the request of the parties, I re-set the hearing for August 1, 2023. [DE 87].

## FINDINGS OF FACT

### A.  Background regarding the parties

Defendant is a social media influencer residing in Colorado who uses various social media platforms, including Facebook, Instagram, and Tik Tok to connect to her followers.  [DE 93 at ¶ 2].  As a hair stylist, Defendant would connect with followers about hair products, hair care, and a variety of other topics.  [Tr. at 34-35].[3]  Defendant was the sole member of Lashed Out, LLC, a for-profit Colorado Limited Liability Company that previously operated its business as "Head Kandy."  [DE 93 at ¶¶ 5-6].  Plaintiff is a Delaware limited liability company that formed on April 13, 2018; Jerome Falic has been Plaintiff's managing member since its formation.  *Id.* at ¶¶ 3-4.  Plaintiff distributes and sells hair care products such as shampoos, conditioners, hair dryers, curling irons, and straighteners.  *Id.* at ¶ 15.  On May 3, 2018, Plaintiff and Lashed Out, LLC entered into the Asset Purchase Agreement ("the APA").  *Id.* at ¶ 7.  Pursuant to the APA, Plaintiff paid Lashed Out, LLC $2,880,000 to acquire certain assets, including the tradename "Head Kandy" and Lashed Out, LLC's website and social media pages.  *Id.* at ¶ 8; [DE 76-1 at 1].  Under the APA, Defendant also acquired a twenty percent ownership interest in Plaintiff.  [DE 76-1 at 4; DE 93 at ¶ 9].  Lashed Out, LLC also agreed to deliver, or cause to be delivered, executed copies of the Executive Employment Agreement (between Defendant and Plaintiff) at Closing.  [DE 93 at ¶ 11].  On May 3, 2018, Defendant entered into the Executive Employment Agreement with Plaintiff.  *Id.* at ¶ 9.

### B.  Executive Employment Agreement

Under the Executive Employment Agreement, Defendant agreed to serve as Plaintiff's Creative Director and would be responsible for developing and marketing Plaintiff's products on

---

[3] The transcript of the Evidentiary Hearing, cited herein as [Tr. ___], can be found at docket entry 131.

social media.  [DE 73-3 at 2; Tr. 35, 155].  For performing her duties, Defendant was to receive a base salary of $200,000 per year and an Annual Bonus at the end of each fiscal year from Plaintiff. *Id.* at 3.  The Executive Employment Agreement lays out the method for calculating Defendant's Annual Bonus payment. *Id.*

The Executive Employment Agreement also contains certain restrictive covenants.  *Id.* at 6-7; [DE 93 at ¶ 13].  As relevant here, those restrictive covenants included non-compete, non-solicitation (of customers), and non-disparagement provisions.  [DE 73-3 at 6-7].  Those restrictive covenants read as follows:

> ***Non-Compete Provisions***. From and after the Effective Date and continuing for a period of thirty-six (36) months after the Executive's employment terminates for any reason, the Executive will not, within the Restricted Territory (as defined below), directly or indirectly, engage in a Restricted Business (as defined below) or provide Restricted Services (as defined below) to any Person engaged in a Restricted Business; provided that nothing contained herein will be construed to prevent the Executive from investing in the stock of any competing Person listed on a national securities exchange or traded in the over-the-counter market so long as the Executive is not involved in the business of such Person and the Executive does not own more than two percent (2%) of the equity of such Person.

> "**Restricted Business**" means the manufacture, sale and distribution of hair-related products. "Restricted Business" shall not include Executive's business as identified in Addendum A.

> "**Restricted Services**" means the provision of management, business planning, sales, marketing, financial planning, or other services similar to the services the Executive provided to the Company during her employment with the Company.

> "**Restricted Territory**" means worldwide.

> ***No Solicitation of Customers***. Without limiting the generality of the provisions of Section 5(a), the Executive hereby agrees that during the thirty-six (36)-month period after the termination of the Executive's employment with the Company, the Executive will not, and will cause each of her affiliates not to, directly or indirectly, (i) solicit business related to the Restricted Business from any Person which is or was a client, customer, supplier, licensee, licensor or other business relation of the Company during the thirty-six (36)-month period preceding the date of the Executive's termination of employment, or from any successor in interest to any such Person, or (ii) solicit or encourage any client, customer, supplier, licensee or

licensor of the Company to terminate or reduce such Person's relationship with the Company (including any Person engaged in discussions with the Company related to such Person becoming a client, customer, supplier, licensee or licensor of the Company).

***Non-Disparagement***. The Executive agrees and covenants that the Executive will not, at any time, make, publish or communicate to any Person or in any public forum any defamatory or disparaging remarks, comments or statements concerning the Company or its affiliates, or their businesses, or any of their employees, officers, and existing and prospective clients, suppliers, investors, and other associated third parties. This Section 5(d) does not, in any way, restrict or impede the Executive from exercising protected rights to the extent that such rights cannot be waived by agreement, including, without limitation, the Executive's rights under the National Labor Relations Act, or rights to communicate with any other administrative or regulatory agency to report suspected unlawful conduct, or from complying with any applicable law or regulation or a valid order of a court of competent jurisdiction or an authorized government agency, provided that such compliance does not exceed that required by the law, regulation, or order. The Executive shall promptly provide written notice of any such order to an authorized officer of the Company.

*Id.*

Regarding the territorial, time, and scope limitations in the restrictive covenants, Defendant "recognize[d]" that they were "reasonable and are properly required for the protection of the Company's legitimate interest in client relationships, goodwill and trade secrets of the Company's business, and that such limitations would not impose any undue burden upon" her. *Id.* at 8. And, in the event that a court deemed any provision relating to the time period, scope, or geographic area of the restrictive covenants to be unreasonable, Defendant agreed that the provision "shall automatically be considered to have been amended and revised" to a permissible restriction. *Id.* Importantly, Defendant also agreed that she would "not challenge the enforceability of" the restrictive covenants and that she would not "raise any equitable defense" to the enforcement of the covenants. *Id.* at 9. The parties also agreed that "the respective rights and obligations of the parties shall survive the termination of the Executive's employment with the Company and this Agreement." *Id.* at 14.

**C.  Defendant's Employment with Plaintiff**

As Plaintiff's Creative Director, Defendant utilized social media to market Plaintiff's hair care products.  [DE 93 at ¶ 16; Tr. 35].  She marketed products via online posts and live videos on various social media platforms.  [Tr. at 34-35].  Defendant primarily utilized Plaintiff's social media pages to market Plaintiff's products, but sometimes she also would post and promote Plaintiff's products on her personal page.[4]  *Id.* at 35.  Plaintiff employed other affiliates and influencers to market its products, but none were as effective as Defendant.  *Id.* at 217.  Defendant "was synonymous with the Head Kandy business."  [DE 93 at ¶ 39].

When Plaintiff started struggling financially, many of the company's shareholders, including Defendant, had to give the company personal loans to ensure that it stayed afloat.  [Tr. at 96-98, 101, 159].  In July 2022, Falic retained a consultant, Jonathan Rosenbaum, to undertake an exhaustive review of Plaintiff's operations, finances, and books and records.  [DE 93 at ¶ 31].  After his review, Rosenbaum allegedly discovered that Defendant had been engaging in actions that Plaintiff believed were in violation of the Executive Employment Agreement.  [Tr. at 241-45].  Plaintiff also discovered that Defendant created White Pineapple, LLC ("WhiPi"), a Colorado for-profit limited liability company, in March 2022, an action that Plaintiff at that time also believed violated the Executive Employment Agreement.  [DE 93 at ¶¶ 24-25; DE 47-2 at 28-29].

---

[4] A brief history of Defendant's various Facebook pages is as follows: At the time of the APA, Lashed Out operated a Facebook page under the name "Head Kandy" that was transferred to Plaintiff as part of the APA.  [Tr. at 130].  On November 6, 2018, after the sale of assets from Lashed Out, LLC to Plaintiff, Defendant started a new Facebook page called "Kayla McNeill." *Id.* at 131.  Several days after creating that page, Defendant changed the name to "Kandy Life with Kayla." *Id.*  The name of the page is now "Kandy Life," and it is operated by Plaintiff.  *Id.*; [DE 93 at ¶ 27].  According to Defendant, on December 2, 2022, at the direction of Plaintiff's outside counsel, she started a new Facebook page.  [Tr. at 84-85].  This is the "Full Circle with Kayla" Facebook page that Defendant has been using since then.  *Id.* at 85.

On November 28, 2022, Plaintiff informed Defendant that she was going to be removed from the company.  [Tr. at 190; DE 47-2 at 28-31].  On December 1, 2022, Plaintiff's outside legal counsel sent Defendant a letter notifying her that she would no longer have an active role in the operations of the business or management of Plaintiff.  [DE 93 at ¶ 29; DE 85-9].  Plaintiff's outside legal counsel sent Defendant another letter on December 16, 2022, indicating that Plaintiff was placing her employment "under suspension effective immediately" and that she was "no longer permitted to do any work whatsoever for the company."  [DE 93 at ¶ 30; DE 85-10].  On January 30, 2023, Plaintiff terminated Defendant's employment for cause effective immediately.  [DE 93 at ¶ 12; DE 85-12].  On February 17, 2023, Plaintiff exercised its option to repurchase all of the membership units belonging to Defendant, though Defendant has not received any amount for the repurchase of her units.  [DE 93 at ¶¶ 37, 38].

### D.  Defendant's Conduct After Termination

After Defendant's termination, she continued to post on her social media pages and do live videos in which she engaged with her followers.  Notably, in Defendant's live videos, she engaged in discussions with her followers about the progress of this lawsuit, product tutorials, and product reviews.  In her discussions about the lawsuit, which she often called "lawsuit updates," Defendant would tell her users about the progress of the lawsuit and attempt to refute allegations and statements made by Plaintiff or its employees in the Amended Complaint, motions or other court filings.  [DE 75-3 at 3:45-5:20; DE 77-22 at 10:45-23:35; DE 79-12 at 16:30-33:58].  During these "lawsuit updates," Defendant also made many statements about how she believed Plaintiff (and many of Plaintiff's employees) wronged her.  For example, on April 7, 2023, Defendant posted a Tik Tok video in which she accused Plaintiff of kicking her out of her company and paying her

"nothing."[5]  [DE 75-20 at 00:12-00:20].  Defendant also accused Plaintiff of stealing the company

from her and engaging in a "witch-hunt . . . to push [her] out of the company."  [DE 77-22 at 44:00-

44:08; DE 78-23 at 4:15-4:31, 5:18-5:31].  On April 11, 2023, Defendant posted another video on

her Tik Tok page accusing Plaintiff of taking her Facebook page after she left the company and

"capitaliz[ing]" off her children without her consent.  [DE 77-6 at 00:26-00:35, 00:45-00:50].  On

May 30, 2023, Defendant called several of Plaintiff's employees "liars" numerous times.  [DE 77-

22 at 14:15-16:53].  On June 9, 2023, Defendant again called several of Plaintiff's employees

"liars."  [DE 79-12 at 16:38-33:58].  On that same video, Defendant took her comments a step

further and expressly stated that one of Plaintiff's employees committed perjury and insinuated

that others did the same.  *Id.* at 17:29-17:32, 23:42-23:46.

Defendant also did many product tutorials and product reviews on her live videos.

Defendant reviewed an expansive range of retail skin care products, promoted skin and makeup

products that she was creating for WhiPi (skin cream, foundation, tweezers for eyelashes, etc.),

and gave general skin care advice.  [DE 73-16 at 0:00-5:49].  Defendant also reviewed various

hair-related products.  Because of her Executive Employment Agreement, Defendant would often

state that she could not share the links to the hair-related products that she discussed or reviewed.

*Id.* at 15:36-15:40, 17:33-17:40; [DE 75-3 at 46:02-46:11; DE 77-22 at 19:00-19:03].  For

example, on a Facebook Live video on March 14, 2023, Defendant promoted a curling iron (a

three-barrel crimper) from Revlon.  [DE 73-16 at 15:25-20:05].  She stated that she could not share

the link to the Revlon curling iron with her followers "because she could not make money off of

---

[5] On February 13, 2023, Defendant filed a lawsuit in Colorado state court under Colorado's Wage
Claim Act (*Kayla M. McNeill v. Head Kandy, LLC*, Chaffee County District Court, Case No.
2023CV30007), seeking payment of allegedly unpaid wages, bonuses, vacation time and
reimbursements.  [DE 93 at ¶ 35].  That case has been dismissed by order of the court for lack of
jurisdiction under the Federal Arbitration Act, 9 U.S.C. § 1, *et seq*. *Id.*

hair care," but stated that she found the item on Amazon, noted its price, showed her followers how to use the item, and showed her followers the advantages of using the item. *Id.* When one of her followers posted the link to the curling iron in the comments, Defendant thanked them for sharing the link and continued to promote the curling iron. *Id.* at 17:34-17:40.

On that March 14 video, Defendant also promoted hair-related products from Bo Stegall. *Id.* at 7:39-8:02, 8:40-9:00. Stegall, a hairdresser and hair-care product manufacturer, was a friend of Defendant's. [Tr. at 140-41]. According to Defendant, Stegall's products primarily focused on hair care and restoration from hair loss, hair breakage, and other hair issues. [DE 73-16 at 7:39-8:02, 8:40-9:00; Tr. at 91]. During her live video, Defendant stated that Stegall had "phenomenal" and "amazing" products. [DE 73-16 at 7:51-8:02]. Defendant also promoted Stegall's products in an April 3, 2023, Instagram post, April 4, 2023, Instagram story, April 7, 2023, Facebook Live video, and April 8, 2023, Facebook post. [DE 74-15, DE 75-11; DE 75-13; DE 75-14; DE 75-16; DE 93 at ¶¶ 22-23, 26]. In the April 7, 2023, Facebook Live video, Defendant asked Stegall to post his website in the comments so that her "girls" could patronize him. [DE 75-3 at 14:00-14:10] ("Mr. Bo post your website for my girls that are going to be your girls. We share girls."). When asked to share the link to one of Stegall's products she was promoting on the April 7 video (a dry texture spray, [DE 75-13]), Defendant declined to do so stating "Someone else can. I'm not sharing hair care links, because we don't need anybody thinking I'm making any money. I can't make any money off hair care." *Id.* at 44:11, 46:02-46:11. Nevertheless, Defendant encouraged her followers to purchase the item, stating "You should run and go get this. This dry texture spray is bomb." *Id.* at 46:11-46:20.

In addition to the products from Stegall and Revlon mentioned above, Defendant shared and promoted the following hair-related products on her social media pages: Big Sexy Hair Spray

9

[DE 74-3], Contex Karatin treatment [DE 75-10], Hair Dance Volumizing Dry Shampoo [DE 77-22 at 18:30-19:25; DE 78-5], Style Me Texture Spray [DE 78-19], OGX Shampoo [DE 78-20], Loreal Blow Dry Primer [DE 78-22], Cake The Hold Out Hairspray [DE 78-18], SGX The Bodyguard Protective Texture Spray [DE 79-2], Loreal Paris 8 Second Wonder Water [DE 79-10], Hot Tools Curling Iron [DE 78-16], a Bo Stegall wet brush [DE 75-18], and Dorisilk Hair Flat Iron [DE 79-3].  On a Facebook Live video on June 1, 2023, in response to a comment, Defendant stated the following:

> I don't want to use [Plaintiff's products]. I don't want to be constantly reminded of something that you worked so hard for to be taken from you. So that's all. The products are amazing. And I'm working on finding products that I love and just giving you guys ideas and different products that I love and I think are great.

[DE 78-7 at 7:17-7:36].  Defendant stated that she had to abide by a "non-compete" and could not make money off hair care so she was going to test everything she could and find new products that she loved.  *Id.* at 7:36-7:47.  Earlier in the video, Defendant referred to these new products as "replacements" for Plaintiff's products.  *Id.* at 7:02-7:05.  Similarly, on February 9, 2023, in response to one of her follower's comments, Defendant stated that another product she promoted (Smart Keratin Leave-in Conditioner Spray by Evoque) was "identical" to one of Plaintiff's products.  [DE 73-7].

### E.  Customer's Actions After Defendant's Termination

Since Defendant's termination, many of her current social media followers have stated that they would no longer purchase Plaintiff's products.  For example, in the comments to Defendant's live video on March 18, 2023, A.K.[6] stated that Plaintiff had the "[b]est brand ever but I will never buy again" because she was supporting Defendant.  [DE 74-8 at 23].  A.K. made a similar

---

[6] Since Plaintiff has filed its customer transaction histories under seal, *see* [DE 70, 71, 76], I refer to Plaintiff's customers by their initials only.

statement in the comments to Defendant's live video on April 4, 2023.  [DE 74-19 at 13] ("I LOVED those products BUT will never trust nor buy those again.").  In the comments to Defendant's Tik Tok video on April 11, 2023, in which Defendant claimed Plaintiff was capitalizing off her children, P.F. stated the following: "It's completely unacceptable from them!!! I WILL NOT DO business with them!"  [DE 77-3 at 13].  Plaintiff has also identified several of its former customers who affirmatively stated in comments to Defendant's social media posts or live videos that they either previously stopped buying or would no longer buy Plaintiff's products and found business records from those customers that corroborate those statements.  *Compare* [DE 77-23 at 3] *with* [DE 76-3]; *compare* [DE 77-23 at 7] *with* [DE 76-5]; *compare* [DE 77-23 at 24] *with* [DE 76-7]; *compare* [DE 76-4] *with* [DE 77-17 at 7].[7]  By way of example, L.P. purchased $2,225.00 worth of Plaintiff's products from 2020 to 2023.  [DE 76-7].  L.P. commented on Defendant's May 30, 2023, Facebook Live video stating "I quit buying from [Plaintiff] lol."  [DE 77-23 at 24].  Plaintiff's records as of June 2023 confirm that L.P.'s last purchase from Plaintiff was on March 11, 2023.  [DE 76-7].

At the injunction hearing, Rosenbaum (Plaintiff's interim CEO) stated that Plaintiff's sales have dropped in the months since Defendant was terminated and began posting on social media. [Tr. at 210].  Rosenbaum stated that it lost "about two-thirds" of its customer base since

---

[7] G.G., the customer listed in DE 76-4, filed a declaration in support of Defendant on June 26, 2023.  [DE 86-24].  In the declaration, G.G. stated that she has stopped purchasing Plaintiff's products and that none of Defendant's statements influenced her decision to no longer purchase from Plaintiff.  *Id.* at 1-2.  G.G. also stated that she has never seen any comments from Defendant that she would consider negative or disparaging towards Plaintiff.  *Id.* at 2.  However, G.G. has made comments on social media that are inconsistent with the statements in her declaration.  [DE 114-1 at 1].  Therefore, I have afforded little to no weight to G.G.'s declaration.  Like G.G., eighteen other individuals filed declarations or affidavits in support of Defendant.  *See* [DE 86-13 through DE 86-31].  Many of these affidavits or declarations suffer from the same defects as G.G.'s declaration, in that the individuals have made statements on social media that are inconsistent with the statements in their affidavits or declarations.  [DE 114-1].  Thus, I have similarly decided to afford little to no weight to the other declarations or affidavits submitted in support of Defendant.

Defendant's termination.  *Id.* at 215.  While Plaintiff began to see a decline in its sales in February 2023, just after Defendant was terminated, this decline accelerated in March and April when Defendant's videos and posts became increasingly negative.  *Id.* at 209-11; [DE 76-12].  According to Plaintiff, to make up for this loss of customers and generate cashflow, it has had to offer its products at a discounted rate.  [Tr. at 211-12, 215].  Plaintiff also stated that it has had a hard time keeping its employees and influencers since Defendant was terminated.  *Id.* at 216-17.  Rosenbaum stated that Plaintiff has not had another influencer that was as effective at marketing its products as Defendant.  *Id.* at 217.

**F.  Relief Sought**

Plaintiff seeks an order (1) enjoining Defendant from making, publishing, or communicating any defamatory or disparaging remarks, comments or statements regarding Plaintiff to any person or in any public forum; (2) enjoining her from directly or indirectly soliciting Plaintiff's clients, customers, suppliers, licensees or licensors to terminate or reduce their relationship with Plaintiff; (3) requiring Plaintiff to post a bond of no more than $5,000; and (4) granting all other relief as the Court deems appropriate.

## ANALYSIS

**I.    Legal Standard**

"The chief function of a preliminary injunction is to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated."  *Robinson v. Attorney Gen.*, 957 F.3d 1171, 1178 (11th Cir. 2020) (quoting *Ne. Fla. Ch. of Ass'n of Gen. Contractors v. City of Jacksonville*, 896 F.2d 1283, 1284 (11th Cir. 1990)).

As the Supreme Court has instructed:

Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the

basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. A party thus is not required to prove his case in full at a preliminary-injunction hearing[,] and the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits. In light of these considerations, it is generally inappropriate for a federal court at the preliminary-injunction stage to give a final judgment on the merits.

*Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) (internal citations omitted).

"Upon application for injunctive relief, [Federal Rule of Civil Procedure 52] requires a district court to hear the evidence in support of and opposition to the injunction and, whether the court grants or denies the application, issue an order stating its findings of fact and conclusions of law." *Georgia Advocacy Office v. Jackson*, 4 F.4th 1200, 1208 (11th Cir. 2021) (citing Fed. R. Civ. Pro. 52(a)). And, "[i]f the court grants the injunction, it must state the reasons why it issued, state the terms of the injunction specifically, and describe in 'reasonable detail . . . the act or acts restrained or required.'" *Id.* (quoting Fed. R. Civ. Pro. 65(d)).

To obtain a preliminary injunction, a movant must establish: (1) a substantial likelihood of success on the merits of its claim at trial; (2) a substantial threat of irreparable harm to the movant if injunctive relief is denied; (3) that the injury to the movant outweighs the potential harm that an injunction may cause the defendant; and (4) an injunction will not disserve the public interest. *Forsyth Cnty. v. U.S. Army Corps of Eng'rs*, 633 F.3d 1032, 1039 (11th Cir. 2011). "A preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishes the burden of persuasion as to the four requisites." *Id.* (quoting *Am. Civil Liberties Union of Fla., Inc. v. Miami–Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009)).

## II.    Conclusions of Law

### A.  Substantial Likelihood of Success on the Merits

"Likelihood of success on the merits 'is generally the most important of the four factors.'" *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1124 (11th Cir. 2022) (quoting *Gonzalez v.*

*Governor of Ga.*, 978 F.3d 1266, 1271 (11th Cir. 2020)); *Garcia-Mir v. Meese,* 781 F.2d 1450, 1453 (11th Cir. 1986) (same).  Although Plaintiff has alleged several different causes of action in its Amended Complaint, the Motion is predicated on its breach of contract claim – specifically, Defendant's alleged breach of the restrictive covenants in the Executive Employment Agreement. I find that Plaintiff has shown a substantial likelihood of success on the merits of that claim.

"A breach of contract claim under Florida law requires the existence of a contract, the breach of the contract, and damages resulting from the breach." *Sun Life Assurance Co. of Canada v. Imperial Premium Fin., LLC*, 904 F.3d 1197, 1217 (11th Cir. 2018) (citing *DNA Sports Performance Lab, Inc. v. Club Atlantis Condo. Assoc., Inc.*, 219 So. 3d 107, 109 (Fla. 3d DCA 2017)).  "Under Florida law, claims for breach of a restrictive covenant are governed by 'Fla. Stat. § 542.335, which contains a comprehensive framework for analyzing, evaluating and enforcing restrictive covenants contained in employment contracts.'" *Transunion Risk & Alternative Data Sols., Inc. v. Challa*, 9:15-CV-81049, 2016 WL 1161219, at *4 (S.D. Fla. Mar. 23, 2016) (quoting *Proudfoot Consulting Co. v. Gordon*, 576 F.3d 1223, 1230–31 (11th Cir. 2009)).  This framework enables an employer to obtain an injunction to enforce a restrictive covenant upon a showing that: (1) the contract is reasonable in time, area, and line of business; (2) the covenant is set forth in a writing signed by the party at issue; (3) there are one or more legitimate business interests to justify the covenant; and (4) that the covenant (and the restraint specified therein) is reasonably necessary to protect those legitimate business interests.  *See* Fla. Stat. § 542.335(1).

### 1.  Enforceability of Restrictive Covenants

Plaintiff contends that Defendant breached the non-competition, non-solicitation, and non-disparagement provisions in the Executive Employment Agreement.  Because these provisions are

all restrictive covenants,[8] Plaintiff must first meet the requirements in section 542.335(1).  *See Rauch, Weaver, Norfleet, Kurtz & Co., Inc. v. AJP Pine Island Warehouses, Inc.*, 313 So. 3d 625, 630 (Fla. 4th DCA 2021) (stating that non-competition and non-solicitation provisions are restrictive covenants).  Here, Plaintiff has met these requirements.

### i.    Reasonable in time, area, and line of business

I find that the restrictions in the covenants are reasonable as to time, area, and line of business.  Regarding time, the non-solicitation and non-competition provisions are limited to three years following the termination of employment.  Section 542.335(1)(d)3.a. states that a three-year restrictive covenant is presumptively reasonable when it is enforced against the seller of "all or a part of . . . [t]he assets of a business."  Here, Defendant was the sole member of Lashed Out, LLC, and under the APA, that company sold its assets to Plaintiff.  Defendant has argued that the APA and Executive Employment Agreement were separate agreements between separate entities. However, any practical view of the transaction suggests that, for purposes of evaluating what is a "reasonable" restrictive covenant, it is reasonable to treat Defendant like the seller of the business to Plaintiff.  Moreover, to the extent that Defendant argues the three-year restriction is unreasonable, she already agreed to the reasonableness of this timeframe in the Executive Employment Agreement.  [DE 73-3 at 8].  Furthermore, Defendant also agreed that if the provisions were deemed to exceed the maximum time that is reasonable and enforceable, the Executive Employment Agreement "shall automatically be considered to have been amended and

---

[8] I assume, without deciding, that the non-disparagement clause is a restrictive covenant that must be evaluated under section 542.335.  *See O'Neal v. Am. Shaman Franchise Sys., LLC*, 8:20-CV-936-KKM-AAS, 2022 WL 20478216, at *7 (M.D. Fla. May 23, 2022) (assuming without deciding the non-disparagement clause in the contract at issue was a restrictive covenant).  In the Executive Employment Agreement, Plaintiff includes the non-disparagement clause in its list of "Executive Covenants."  [DE 73-3 at 6-7].  Plaintiff also voluntarily applies the framework in section 542.335 to the non-disparagement clause.

revised to reflect such determination." *Id.* Under Section 542.335(d), a two-year restrictive covenant is presumptively reasonable when it is enforced against a former employee. Defendant does not contend that the provisions would be unreasonable if they were modified to two years. Because Defendant's employment was terminated on January 30, 2023, Plaintiff is seeking to enforce the restrictive covenant well within the time that either a two-year or a three-year provision would have expired.

As for the non-disparagement clause, the duration of that term is seemingly endless. *Id.* at 7 (stating that Defendant will not "at any time" make defamatory or disparaging remarks concerning Plaintiff). However, Defendant makes no argument regarding the duration of this provision. And, again, Defendant agreed to the reasonableness of this time provision in the Executive Employment Agreement.

The non-competition provision is also reasonable in area. Although the scope of the restriction is worldwide, such a restriction is warranted in this instance. Plaintiff, an online retailer, has customers in many different states and can reach customers all over the world. Because Defendant, a social media influencer, can promote, sell, or distribute hair-related products online, she can work for a competing company in any location and can similarly reach customers and potential customers anywhere.[9] Thus, a restriction to a particular locale would not suffice. *See Autonation, Inc. v. O'Brien*, 347 F. Supp. 2d 1299, 1307 (S.D. Fla. 2004) (finding that it was reasonable for a former employer to restrict competition "in any geographic space in which [that employer] operates"); *see also Quaker Chem. Corp. v. Varga*, 509 F. Supp. 2d 469, 476–77 (E.D. Pa. 2007) ("If nationwide geographic scopes are reasonable for national companies, it is not hard

---

[9] The non-solicitation and non-disparagement restrictions do not contain any explicit geographic limitations. However, for the same reasons, applying those restrictions without geographic limitation is reasonable.

to extrapolate that worldwide geographic scopes are similarly reasonable for worldwide companies.").

Under Florida law, a non-compete with a worldwide restriction is reasonable as long as "the covenant is [not] being used as a tool simply to eliminate all competition." *Env't Servs., Inc. v. Carter*, 9 So. 3d 1258, 1264 (Fla. 5th DCA 2009); *see MDS (Canada) Inc. v. Rad Source Techs., Inc.*, 09-61652, 2009 WL 10668765, at *5 (S.D. Fla. Oct. 27, 2009). Here, the purpose of this restrictive covenant was not to eliminate all competition as Defendant contends. As a purchaser of the Head Kandy brand, and the resulting goodwill and relationships between that brand and its customers, Plaintiff is "entitled not only to the protection of customers and patrons, but to enter the field of competition unhampered by the adverse influence of the seller." *W. Shore Rest. Corp. v. Turk*, 101 So. 2d 123, 128 (Fla. 1958) (citation omitted). Defendant, the seller of Lashed Out, LLC, and the founder of the Head Kandy brand, would be more than an "ordinary competitor" because she has the capability to exert particular "adverse influence" over Plaintiff's customers. *See id.* Even following the sale, she was a high-level executive who was "synonymous" with the Head Kandy brand and maintained intimate relationships with her followers (and Defendant's customers). Indeed, according to Plaintiff, Defendant was by far its most effective social media influencer. [Tr. at 217]. Thus, the non-competition provision reasonably seeks to protect the customer relationships and goodwill Plaintiff purchased from Defendant (by way of the APA) and maintained during Defendant's years with the company.

Additionally, I find that the non-competition provision is reasonable as to line of business. Defendant is free to engage in work that does not relate to "the manufacture, sale and distribution of hair-related products." *See Milner Voice & Data, Inc. v. Tassy*, 377 F. Supp. 2d 1209, 1219 (S.D. Fla. 2005) (stating that nothing "prevented [the defendants] from engaging in activity that is

not competitive with [the plaintiff's] business").  Pursuant to Addendum A, Defendant is even permitted to continue operating her beauty salon.  [DE 73-3 at 17].  The non-solicitation clause is also reasonable as to line of business for the same reason as the non-competition clause: the restrictions are solely related to "the manufacture, sale and distribution of hair-related products."

### ii.    In Writing and Signed by Defendant

I find that the restrictive covenants at issue are in writing (in the Executive Employment Agreement) and are signed by both Defendant and Falic, Plaintiff's managing member.  *Id.* at 16. Defendant does not contest this factor.

### iii.    Legitimate Business Interests

Next, I find that there is at least one legitimate business interest to justify the restrictions Plaintiff seeks to enforce.  "Legitimate business interests" include (1) trade secrets, (2) confidential business information that is not otherwise protectable as a trade secret, (3) substantial relationships with prospective or existing clients, (4) client goodwill, and (5) extraordinary or specialized training.  *See* § 542.335(1)(b).  Plaintiff has clearly shown that it has a legitimate business interest in "customer goodwill" associated with the hair care area.  § 542.335(1)(b)4., Fla. Stat.; *see Sys. Components Corp. v. Fla. Dep't of Transp.*, 14 So. 3d 967, 984 n. 23 (Fla. 2009) (stating that "goodwill" is "that intangible asset arising as a result of name, reputation, customer loyalty, location, products, and similar factors not separately identified"); *see Goodwill*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("A business's reputation, patronage, and other intangible assets that are considered when appraising the business, esp. for purchase").  At the hearing on the Motion, Plaintiff established that it was known online for its hair care products and that Defendant was an integral part of that reputation.  Again, until her termination, Defendant was "synonymous" with Plaintiff's brand.  Defendant dedicated a substantial amount of time developing her online

following and Head Kandy's customer base.  Indeed, it is reasonable to infer that the connection between Defendant and the Head Kandy customer base was one of the primary reasons Plaintiff purchased Defendant's company, Lashed Out, LLC, in 2018, and kept Defendant as an executive through the Executive Employment Agreement.  Moreover, as Plaintiff's most effective influencer, a significant portion of Defendant's job in the years between the sale and Defendant's termination was to continue expanding her online following and strengthening her relationships with Plaintiff's customers.  In short, Plaintiff clearly has developed customer goodwill and has a legitimate business interest in protecting it.

Although a closer call, I also find that Plaintiff has shown that it has a legitimate business interest in its relationships with customers.  To be classified as a legitimate business interest under section 542.335, a plaintiff's relationship with "specific prospective or existing customers" must be "substantial."  § 542.335(1)(b)3., Fla. Stat.  "[A] substantial relationship is more likely to exist where there is active, on-going business being conducted; exclusivity; a customer who cannot be easily identified by other competitors in the industry; and an expectation of continued business." *IDMWORKS, LLC v. Pophaly*, 192 F. Supp. 3d 1335, 1340–41 (S.D. Fla. 2016); *see Vital Pharm., Inc. v. Alfieri*, 23 F.4th 1282, 1291 (11th Cir. 2022) (stating that a party seeking enforcement of a restrictive covenant must plead and prove "the identity of specific customers and the substantiality of the relationship with those customers").  "[T]he protection of former customers generally does not qualify as a legitimate business interest where no identifiable agreement exists with such customers establishing that they would return with future work." *Env't Servs., Inc.*, 9 So.3d at 1265.

It is difficult to evaluate the application of § 542.335(1)(b)3 to an online retail, direct-to-consumer business like Plaintiff's.  Neither party identified a case applying that section's

Case 0:23-cv-60345-RAR   Document 133   Entered on FLSD Docket 09/12/2023   Page 20 of 43

"substantial" customer relationships standard to such a business, and the Court has not identified any particularly analogous cases. Retail businesses such as Plaintiff lack exclusive relationships with their customers or contracts that indicate "active, on-going business being conducted." Without such contracts, particularly in a consumer industry offering diverse choices from many sellers, it is difficult to know when a business can reasonably expect continued business from a particular customer. Indeed, without some obligation to make future purchases, it is unclear whether even recent past purchasers constitute "existing" customers or merely "former customers." Ultimately, whether Plaintiff has "substantial" relationships with customers within the ambit of the statute largely depends on whether it can demonstrate repeated purchasing behavior from at least some of its customers, such that it can reasonably expect those customers to continue purchasing into the future and consider those customers "specific prospective" customers if not "existing" customers.

To prove that it had substantial relationships with its customers, Plaintiff presented evidence of the purchase histories of eight customers. [DE 76-2; DE 76-3; DE 76-4; DE 76-5; DE 76-6; DE 76-7; DE 76-8; DE 76-9]. These customers were among those Plaintiff had identified as commenting or reacting to some of Defendant's post-termination social media posts. As one could imagine, these eight customers had a variety of purchasing habits. One customer made as many as fifty-eight purchases of Plaintiff's products in a five-year span, another made twenty-five purchases in a three-year span, one also made twenty-five purchases but in a five-year span, and another made only nine purchases in a six-year span. [DE 76-3; DE 76-4; 76-6; 76-9]. The Court cannot necessarily extrapolate these customers' buying habits to all of Head Kandy's customers. However, Rosenbaum also testified that, as of February 2023, Plaintiff had approximately 33,000 "returning customers." [Tr. at 216]. He defined "returning customers" as "customers that continue

20

to reorder," although he could not provide more exact criteria, such as a certain amount or number of purchases within a specific period of time. *Id*. at 226.

Although Plaintiff does not have exclusive relationships with its customers and has little guarantee that its customers will return after any individual purchase, based on the consistent pattern of purchases by at least a sub-set of their customers, Plaintiff has at the least shown that it has substantial relationships with "specific prospective" customers and has arguably shown that it has substantial relationships with "existing" customers. *Cf. Alfieri*, 23 F.4th at 1291 (vacating injunctive relief where the plaintiff failed to name and prove a substantial relationship with specific clients); *Univ. of Fla., Bd. of Trs. v. Sanal*, 837 So. 2d 512, 514 (Fla. 1st DCA 2003) (denying injunctive relief where the plaintiff presented no evidence to identify any specific prospective patients). Therefore, I find that Plaintiff has shown legitimate business interests that can justify restrictive covenants.

### iv. Reasonably Necessary to Protect Legitimate Business Interests

Finally, I find that the restrictive covenants are reasonably necessary to protect Plaintiff's legitimate business interest in its customer relationships and customer goodwill. As an initial matter, Defendant already recognized that the limitations in the Executive Employment Agreement were "reasonable and . . . properly required for the protection of [Plaintiff's] legitimate interest in client relationships, goodwill, and trade secrets of [Plaintiff's] business." [DE 73-3 at 8]. Regardless, Plaintiff, as a purchaser of the assets and goodwill of Defendant's previous business, has a legitimate business interest in preventing Defendant from marketing hair-related products to followers that she had both before and during her employment with Plaintiff. *See USI Ins. Servs. of Fla. Inc. v. Pettineo*, 987 So. 2d 763, 766 (Fla. 4th DCA 2008) ("As a purchaser of the assets and goodwill of a business, the buyer has a legitimate business interest in preventing the seller

21

from servicing . . . former clients."). Additionally, "[c]ase law has recognized the right of employers to enforce similar non-solicitation provisions when a former employee solicits its customers." *Ansaarie v. First Coast Cardiovascular Inst., P.A.*, 252 So. 3d 287, 292 (Fla. 1st DCA 2018).

As discussed above, Defendant is uniquely positioned to affect Plaintiff's customer goodwill and relationships with customers. As the founder of the Head Kandy brand, the most effective influencer for the brand, and the person "synonymous" with the brand, Defendant is likely the person most responsible for creating and developing that goodwill and those relationships, both before and after the sale of Lashed Out to Plaintiff. However, that circumstance and the fact that Plaintiff's business relied so heavily on the direct social media connections Defendant nurtured with existing and potential customers also enables Defendant to significantly – and uniquely – adversely affect those relationships. Notably, Plaintiff not only purchased the goodwill and relationships Defendant created prior to the sale. It also employed her (in part) to maintain and expand her connections with customers over the last several years, which she did. For example, Defendant testified that Head Kandy's Facebook page, on which she would promote Head Kandy's products, expanded from 600,000 followers at the time of the sale to more than a million followers at the time of her termination. [Tr. at 34-35, 134]. Meanwhile, the "Kandy Life with Kayla" page – the "public figure" page that Defendant established a few months after the sale and on which she discussed her family but also "sometimes" promoted Plaintiff's products – grew to 100,000 followers. *Id*. at 34-35, 132-134. Given Defendant's unique ability to undermine Plaintiff's customer goodwill and customer relationships, and the fact that Defendant developed many of her connections with customers during her employment, the restrictive covenants in the

Executive Employment Agreement were reasonably necessary to protect Plaintiff's legitimate business interests.

### v.    Defendant's Defenses to Enforcement

Before determining that these restrictive covenants are enforceable, I must consider "all other pertinent legal and equitable defenses." *See* § 542.335(1)(g)3.  Defendant's primary defense is that Plaintiff cannot enforce the restrictive covenants because Plaintiff breached the Executive Employment Agreement in several ways, most significantly, by not paying her the amounts due under the contract.  Defendant contends that Plaintiff has failed to pay her annual bonuses, accrued vacation time, salary for the remainder of her term under the Executive Employment Agreement, and reimbursement for paid company expenses.[10]  [DE 84-1 at 2; DE 99 at 2].  According to Defendant, because of Plaintiff's prior breach of the Executive Employment Agreement, this Court should not enforce the restrictive covenants.  *See Bradley v. Health Coalition, Inc*., 687 So.2d 329 (Fla. 3d DCA 1997) ("If the employer wrongfully refuses to pay the employee his compensation, the employee is relieved of any further obligation under the contract and the employer cannot obtain an injunction."); *Benemerito & Flores, M.D.'s, P.A. v. Roche*, 751 So. 2d 91, 93 (Fla. 4th DCA 1999) (quoting *Bradley*); *Simpkins*, 10-21136-CIV, 2011 WL 124631, at *7 (same).

In response to Defendant's claim of a prior breach, Plaintiff asserts that Defendant has waived that argument as a defense against enforcement of the restrictive covenants.  I agree.  In the Executive Employment Agreement, Defendant agreed that she would "not challenge the enforceability of Section 5 or Section 6, nor will she raise any equitable defense to its enforcement."  [DE 73-3 at 9].  The non-competition, non-solicitation, and non-disparagement

---

[10] Defendant also maintains that Plaintiff breached the employment agreement by terminating her "for cause" while lacking any legitimate cause for firing her and by retaliating against her for reporting sexual misconduct by Rosenbaum.  [DE 117 at 21-23].

provisions are all in Section 5 of the Executive Employment Agreement, and the prior breach argument Defendant now raises is an equitable defense. *See Leighton v. First Universal Lending, LLC*, 925 So. 2d 462, 464 (Fla. 4th DCA 2006) ("An employer's breach of the contract is an equitable defense to the enforcement of a non-compete clause."). A party, by their own knowledge and conduct "may waive any rights to which he or she is legally entitled." *Band v. Libby*, 113 So. 3d 113, 115 (Fla. 2d DCA 2013) (quoting *Torres v. K–Site 500 Assocs.*, 632 So. 2d 110, 112 (Fla. 3d DCA 1994)). Indeed, one Florida appellate court has expressly held that an employee may waive their right assert a prior breach defense to the enforcement of an employment agreement. *See Reliance Wholesale, Inc. v. Godfrey*, 51 So. 3d 561, 565 (Fla. 3d DCA 2010) (finding that an employee could not raise prior breach as a defense to the issuance of an injunction in light of the employee's agreement that "the existence of any claim or cause of action" against the employer "shall not constitute a defense to the enforcement of this Agreement").

As a response to Plaintiff's waiver argument, Defendant contends that such a waiver is void as against public policy. Defendant generally states that, in Florida, "[t]he right to contract is limited by public policy, and where a private agreement contravenes an established interest of society or has a tendency to be injurious to public welfare, it is void as against public policy." *Coastal Caisson Drill Co. v. Am. Cas. Co. of Reading*, 523 So. 2d 791, 793 (Fla. 2d DCA 1988). However, Defendant does not cite to a case voiding a private employment agreement for containing a waiver like the one at issue in this case.

Defendant points to section 542.335(1)(g)3., which requires a court to consider "all other pertinent legal and equitable defenses," as the public policy that her equitable defense waiver violates. She argues that if the Florida Legislature intended to allow an individual to waive application of this subsection, it would have stated so explicitly. But the text of section 542.335

cuts against Defendant's argument.  In sections 542.335(j) and (k), the Legislature explicitly stated that courts cannot enforce contractual provisions either waiving the requirement of an injunction bond or limiting a court's authority to award attorney's fees and costs to the prevailing party.  Thus, it follows that if the Legislature wanted to prevent employees from waiving defenses to the enforcement of restrictive covenants in employment contracts as a matter of public policy, it would have instructed courts not to enforce those provisions, as it did in subsections (j) and (k).  Here, where Defendant has contractually agreed not to raise a prior breach (or other equitable) defense, such a defense is no longer a "pertinent" or viable one and it need not be considered. *See Godfrey*, 51 So. 3d at 565.  Accordingly, I find that Defendant waived the right to assert prior breach as a defense to the enforcement of the restrictive covenants in the Executive Employment Agreement and that this waiver is not contrary to public policy.  Thus, given my other findings above, I find that the restrictive covenants in the Executive Employment Agreement are enforceable.

## 2.  Breach of Non-Competition Provision

After determining that the restrictive covenants in the Executive Employment Agreement are enforceable, I must next determine whether Plaintiff is substantially likely to succeed in proving that Defendant breached those covenants.  First, I find Plaintiff has met its burden regarding the non-competition provision.  Under the non-competition provision, Defendant agreed that, for a period of thirty-six months after her employment was terminated, she would not, directly or indirectly, engage in a "Restricted Business," that is, "the manufacture, sale and distribution of hair-related products." [DE 73-3 at 6-7].  She also agreed that she would not provide "Restricted Services" – that is, "management, business planning, sales, marketing, financial planning, or other services similar to the services [she] provided to [Plaintiff] during her employment with [Plaintiff]"

– to any person engaged in a Restricted Business.  *Id*.  I find that Plaintiff proffered sufficient evidence to show that Defendant breached the non-competition provision.

Although Plaintiff did not produce evidence that Defendant engaged in a Restricted Business herself, it did produce evidence that she provided Restricted Services to Restricted Businesses by engaging in "marketing" and "services similar to the services [she] provided to [Plaintiff] during her employment."  Specifically, the services she provided to Plaintiff during her employment included frequently making social media posts discussing, using, and promoting hair-related products.  [Tr. at 35; DE 93 at ¶ 16].  Defendant thus violated the non-compete provision by promoting hair-care products on her social media accounts after she was terminated.  For example, by showing her followers how to use the Revlon curling iron, directing those followers where to purchase the item, and telling them how much it cost, Defendant marketed the Revlon curling iron in her Facebook Live video on March 14, 2023.  Defendant also marketed and performed similar services for Stegall's hair-related products during the March 14 video, on the April 3 Instagram post, April 4 Instagram story, April 7 Facebook Live video, and April 8 Facebook post.  Even though Defendant did not personally share links to Stegall's website,[11] she encouraged other followers (and even Stegall himself) to post links to Stegall's website in the comments to the live video.  Acting upon Defendant's encouragement and suggestion, Stegall and her followers often posted the requested links.  Defendant also marketed and provided similar services for a number of other hair-related products after her employment with Plaintiff was terminated.  *See e.g.*, [DE 74-3; DE 75-10; DE 77-22; DE 78-19].

---

[11] Defendant personally shared links to other hair-related products.  For example, in a Facebook comment on February 9, 2023, Defendant personally shared a link to the Smart Keratin Leave-in Conditioner Spray by Evoque (a hair-related product) and told one of her followers it was "identical" to one of Plaintiff's products.  [DE 73-7].

Defendant contends that she was told by Plaintiff's outside legal counsel that she could perform hair-care product reviews and tutorials, as long as she did not earn money from them. [Tr. at 145]. In response, Plaintiff argues that the plain language of the non-compete provision does not limit it to services performed for money and that any interpretation or variance suggested by its outside counsel, or another employee of Plaintiff, is irrelevant. I agree with Plaintiff. Paragraph 11 of the Executive Employment Agreement states that the agreement "may not be later modified except by a further writing signed by a duly authorized representative of the Company and [Defendant]." [DE 73-3 at 12]. Defendant's hair-related product reviews can surely be classified as "marketing" or similar services that she provided to Plaintiff when she was employed by the company. Therefore, in order to authorize the product reviews Defendant sought to perform, the Executive Employment Agreement had to be modified by a writing signed by both Defendant and a representative of Plaintiff. Defendant fails to present evidence that the Executive Employment Agreement was modified in this manner. Consequently, I find that Plaintiff has shown a substantially likelihood of success in proving that Defendant breached the non-competition provision.

### 3. Breach of Non-Solicitation Provision

I also find that Plaintiff has shown a substantial likelihood of success as to breach of the non-solicitation provision. Under the non-solicitation (of customers) provision, Defendant agreed that, for a period of thirty-six months after her employment was terminated, she would not "directly or indirectly . . . solicit business related to the Restricted Business from any Person which is or was a client, customer, supplier, licensee, licensor or other business relation of the Company." [DE 73-3 at 7]. Defendant also agreed that she would not "directly or indirectly . . . solicit or

encourage any client, customer, supplier, licensee or licensor of the Company to terminate or reduce such Person's relationship with the Company." *Id.*

Here, the same facts that support a substantial likelihood of success against Defendant for breach of the non-competition provision also support a substantial likelihood of success against Defendant for breach of the non-solicitation provision. By discussing and promoting the Revlon curling iron, Stegall's products, and other hair-related products on her live videos, Defendant was directly or indirectly soliciting business from Plaintiff's customers. Even if some of these products were different from products Plaintiff offers, the makers of the hair-care products Defendant was reviewing and promoting undoubtedly fall within the definition of a "Restricted Business." And by promoting the quality of these products, Defendant was, at least indirectly, "soliciting" business for these Restricted Businesses, even if she was not being paid for her promotions. *See Solicit*, MERRIAM-WEBSTER'S ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/solicit (last visited September 12, 2023) ("To urge[.]"). Additionally, by sometimes showing Plaintiff's customers products that were identical or similar to products that Plaintiff sold and products that could serve as "replacements" for Plaintiff's products, Defendant was directly or indirectly soliciting or encouraging Plaintiff's customers to reduce their relationship with Plaintiff, whether by directly replacing Plaintiff's products with a Restricted Business's or by building a relationship and familiarity with a Restricted Business that might lead to a reduction in purchasing Plaintiff's products later. This is so even if Defendant sometimes added caveats that Plaintiff's products were still good or that her followers should buy Plaintiff's products if they liked them. Furthermore, Defendant's statements that Plaintiff "stole" her company and were "capitalizing" off her children without permission also directly or indirectly encouraged Plaintiff's customers to terminate their relationship with Plaintiff.

Defendant contends that she posted her product reviews on her private social media accounts (personal "Full Circle with Kayla" Facebook page, personal Tik Tok page, and personal Instagram page) and was not aware that Plaintiff's customers were following her or otherwise viewing what she posted.  However, the evidence indicates that Defendant knew or reasonably should have known that her personal social media followers overlapped, at least to some extent, with Plaintiff's customers.  This is a reasonable inference because Defendant was synonymous with Plaintiff's brand before she was terminated.  She built that brand and Plaintiff's customer base through her social media presence.  Indeed, the evidence indicates that Defendant's personal "brand" was intertwined with Head Kandy's brand.  As described earlier, in November 2018, after Plaintiff took control of the Head Kandy business Facebook page, Defendant created a "public figure" page initially named "Kayla McNeil" but then changed to "Kandy Life with Kayla," clearly using the same "Kandy" moniker associated with Head Kandy.  [Tr. at 132-33].  While she used this page to post comments and pictures about her family life, she also "sometimes" posted about Head Kandy products and promotions on this "personal" page.  *Id*. at 34-35.  This evidence indicates that Defendant understood that the people following her "personal" "public figure" Kandy Life with Kayla page were interested in Head Kandy products and likely overlapped with those used to seeing her videos and posts on the Head Kandy business page.  After her termination, Defendant created new personal and business social media pages, and those pages have significantly fewer followers than Plaintiff's social media pages did when she was employed by the company.  *Id.* at 134-36.  However, although not all of Plaintiff's customers and social media followers sought out Defendant's new social media accounts, it is reasonable to infer (and Defendant likely would have inferred) that at least some of Plaintiff's customers or social media followers also now follow Defendant's new social media accounts.  After all, the people who were

most interested in viewing Defendant's videos and product promotions on the Head Kandy business page, and then the Kandy Life with Kayla personal page, would likely be the prime audience for Defendant's new videos and posts regarding hair care and hair-care products. Defendant even conceded that some of Plaintiff's customers or followers probably sought to find her new social media accounts. *Id.* at 87 ("I would assume that if people like to follow someone on the internet, they will search you out."). The comments of individuals on Defendant's Facebook live videos (stating, among other things, that they will no longer purchase hair-care products from Plaintiff) further showed Defendant that these individuals were once customers of Plaintiff's who viewed videos and posts on Defendant's new personal Facebook page or other social media channels. *See e.g.*, [DE 77-23 at 3, 7, 24]. Thus, Defendant's contention that she did not know Plaintiff's customers were viewing her social media posts and videos is an unreasonable one. For the foregoing reasons, I find Plaintiff has met its burden of showing a substantial likelihood of proving that Defendant breached the non-solicitation provision.

### 4.  Breach of Non-Disparagement Provision

Finally, I find Plaintiff has met its burden regarding breach of the non-disparagement provision. Under the non-disparagement provision, Defendant agreed that she would not "at any time, make, publish or communicate to any Person or in any public forum any defamatory or disparaging remarks, comments or statements concerning the Company or its affiliates, or their businesses, or any of their employees, [or] officers." [DE 73-3 at 7]. Because the terms "defamatory" or "disparaging" are not defined in the Executive Employment Agreement, this Court must "ascertain the plain and ordinary meaning" of those terms. *State Farm Fl. Ins. Co. v. Crispin*, 290 So. 3d 150, 152 (Fla. 5th DCA 2020). In Florida, Black's Law Dictionary is a valid source for determining the plain and ordinary meaning of an undefined contractual or statutory

term.  *See Broward Cnty. v. Fla. Carry, Inc.*, 313 So. 3d 635, 639 (Fla. 4th DCA 2021).  In Black's

Law Dictionary, "defamatory" is defined as a statement or communication "tending to harm a

person's reputation . . . [b]y subjecting the person to public contempt, disgrace, or ridicule, or by

adversely affecting the person's business."  *Defamatory*, BLACK'S LAW DICTIONARY (11th ed.

2019).  Black's Law Dictionary defines "disparagement" as "the act or an instance of unfairly

castigating or detracting from the reputation of someone or something."  *Disparagement*, BLACK'S

LAW DICTIONARY (11th ed. 2019).  The definition of "disparagement" goes on to state: "Although

many disparagements are untruthful or otherwise unfair, falsity is not a requirement.  Any

statement cast in a negative light may amount to a disparagement in the general sense."  *See id.*

       Based on these definitions, I find that Plaintiff is substantially likely to succeed in proving

that Defendant made disparaging (even if not defamatory) remarks about Plaintiff in violation of

the non-disparagement provision.  Defendant made several comments that can be viewed as

disparaging.  She stated that Plaintiff kicked her out of the company and paid her "nothing,"

accused Plaintiff of stealing the company from her and engaging in a "witch-hunt" to push her out,

stated that Plaintiff was "capitalizing" off her children without her permission, called several of

Plaintiff's employees "liars," and accused one of Plaintiff's employees of committing perjury.

       Defendant primarily argues that she did not breach the non-disparagement provision

because all the statements she made were true.  According to Defendant, defamatory and

disparaging comments are generally false, citing to cases discussing the torts of defamation and

disparagement of title.  However, while the tort of defamation may require proof of falsity, the tort

of "disparagement of title" does not cabin the ordinary definition of "disparage."  And, as stated

above, in Black's Law Dictionary, a "disparaging" remark need not be false.  *See Disparagement*,

BLACK'S LAW DICTIONARY (11th ed. 2019); *see also GAF Materials LLC v. Lipinskiy*, 20-CV-

2194 (PJS/TNL), 2020 WL 6867412, at *3 (D. Minn. Nov. 23, 2020) (confirming that the ordinary meaning of disparagement does not require the statement to be false); *FreeLife Intern., Inc. v. Am. Educ. Music Publ'ns Inc.*, CV07-2210-PHXDGC, 2009 WL 3241795, at *6 (D. Ariz. Oct. 1, 2009) (same).  A "disparaging" remark need only "detract from the reputation of someone or something." *See Disparagement*, BLACK'S LAW DICTIONARY (11th ed. 2019).  The comments of Plaintiff's former customers on Defendant's Facebook Live and Tik Tok videos clearly show that Defendant's statements detracted from Plaintiff's reputation. *See*, *e.g.*, [DE 77-23 at 3] ("[I] won't buy anything else from [Plaintiff]."); [DE 77-23 at 5] ("I deleted all of my association with [Plaintiff] as soon as I realized what they have done.").

Defendant also argues that her statements relaying the status of the pending litigation are "protected" and that an injunction may not issue to enforce the non-disparagement provision. However, Defendant is mistaken.   Defendant does not explicitly state the source of the alleged protection.  However, she cites several cases prohibiting injunctions as prior restraints on speech, specifically in the context of ongoing litigation. *See* [DE 66 at 7, 10; DE 117 at 24].  To the extent that Defendant argues that her statements are protected by the First Amendment, she voluntarily waived any such protections by agreeing to the non-disparagement provision. *See Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC*, 679 F. App'x 33, 36 (2d Cir. 2017) (stating that the defendant's argument challenging an injunction as violative of the First Amendment failed "because the injunction's prohibition on speech that is false, misleading, defamatory, or disparaging effectively enforces defendants' own covenant not to engage in such speech"); *Democratic Nat. Comm. v. Republican Nat. Comm.*, 673 F.3d 192, 205 (3d Cir. 2012) ("Court enforcement of a private agreement to limit a party's ability to speak or associate does not necessarily violate the First Amendment.").

To the extent that Defendant contends her statements are protected by Florida's litigation privilege, Defendant has failed to show that this privilege applies to her statements. For context, "Florida recognizes two types of privilege which shield litigation participants from liability for uttering defamatory or otherwise tortious statements during or in connection with litigation." *Spagnuolo v. Ins. Office of Am., Inc.*, 356 So. 3d 908, 918 (Fla. 5th DCA 2023). The first privilege provides judges, counsel, parties, and witnesses with absolute immunity regarding "acts occurring or comments made during the course of a judicial proceeding as long as it has some relationship to the proceeding." *Id.* The acts or comments at issue must occur at a deposition or "in front of a judicial officer or in pleadings or documents filed with the court or quasi-judicial body." *DelMonico v. Traynor*, 116 So. 3d 1205, 1217 (Fla. 2013). The second privilege is a qualified privilege that "offers protection to a litigation participant for a comment or action that occurs during informal litigation-related circumstances . . . if it is relevant to the litigation-related subject of inquiry." *Spagnuolo*, 356 So. 3d at 918. Here, Defendant has failed to show that her comments, which were made on social media in non-litigation-related circumstances (even if related to the issues in this litigation), fall under either privilege.[12] *See DelMonico*, 116 So. 3d at 1218 (stating that the litigation privilege should not apply where a litigation participant "steps outside of both the courtroom and the formal discovery process"); *Boumazzoughe v. Roudebush*, 615CV798ORL40TBS, 2015 WL 5821519, at *4 (M.D. Fla. Oct. 1, 2015) (stating that the litigation privilege did not apply where the statements at issue were not made in a judicial proceeding); *cf. James v. Leigh*, 145 So. 3d 1006, 1007 (Fla. 1st DCA 2014) (finding that the litigation privilege applied to disparaging statements that a former husband made about his former

---

[12] Furthermore, to the extent that Defendant argues that her statements merely relay the status of the pending litigation, I disagree. Defendant did more than simply relay the status of pending litigation in her Facebook Live videos by, for example, specifically commenting on the veracity and character of certain of Plaintiff's employees.

wife in documents submitted to the court adjudicating their divorce even though the former husband's statements violated the parties' non-disparagement agreement).

For the foregoing reasons, I find that Plaintiff has shown a likelihood of success regarding breach of the non-disparagement provision.

### 5. Injury

In order to prevail on its breach of contract claim, Plaintiff must show injury resulting from the breach. Plaintiff alleges that since Defendant was terminated and began posting on social media, it has lost two-thirds of its customer base and many of its social media followers. Plaintiff also states that its sales and revenue have decreased since February 2023, which was just after Defendant was terminated. [DE 76-12]. According to Plaintiff, it has had to resort to discount sales to make a profit. While it is unclear whether Defendant's conduct was the *sole* cause of Plaintiff's loss of customers and followers, Plaintiff has demonstrated that it is substantially likely to succeed in showing at least *some* injury from one of Defendant's breaches of the Executive Employment Agreement. For example, Plaintiff presented evidence of a Facebook Live video Defendant hosted on May 30, 2023. In that video, Defendant promoted the Hair Dance Volumizing Dry Shampoo and gave her followers a "lawsuit update" (during which she called several of Plaintiff's employees liars). In the comments to Defendant's May 30 video, multiple customers vowed never to purchase Plaintiff's products again because of what Defendant stated during her "lawsuit update." Purchase histories of those customers confirm that they have not purchased any of Plaintiff's products since May 30, 2023. Therefore, while the extent of Plaintiff's injury is ultimately an issue for trial, Plaintiff has shown a substantial likelihood of proving at least some injury from Defendant's breaches.

Having found that Plaintiff has shown a substantial likelihood of success in proving each of the elements of its breach of contract claim, I therefore conclude that Plaintiff has met its burden on the first element necessary for a preliminary injunction.

### B.  Substantial Threat of Irreparable Harm

"[P]reventing irreparable harm in the future is the sine qua non of injunctive relief." *Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1133 (11th Cir. 2005).  Thus, "even if Plaintiff[] establish[es] a likelihood of success on the merits, the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000); *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am.*, 896 F.2d at 1285 ("The plaintiff's 'success in establishing a likelihood it will prevail on the merits does not obviate the necessity to show irreparable harm.'" (citation omitted)). "Irreparable harm presupposes an injury that is 'neither remote nor speculative, but actual and imminent.'" *Carbone v. Ocean Breeze Recovery, LLC*, 15-61700-CIV, 2015 WL 11201203, at *5 (S.D. Fla. Oct. 7, 2015) (quoting *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am.*, 896 F.2d at 1285).  "In order for an injury to be irreparable, it cannot be undone through monetary remedies." *VAS Aero Servs., LLC v. Arroyo*, 860 F. Supp. 2d 1349, 1362 (S.D. Fla. 2012).  "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am.*, 896 F.2d at 1285 (quoting *Sampson v. Murray*, 415 U.S. 61, 90 (1974)).

As an initial matter, Plaintiff argues for a presumption of irreparable harm under section 542.335(1)(j), Florida Statutes.  However, I decline to utilize this presumption in light of Chief Judge Pryor's reasoning that a federal court should not apply state law presumptions when

deciding whether to grant a preliminary injunction—a procedural issue.  *See Alfieri*, 23 F.4th at 1299 (Pryor, C.J., concurring); *see also Blue-Grace Logistics LLC v. Fahey*, 340 F.R.D. 460, 466 (M.D. Fla. 2022) (utilizing the same reasoning as Chief Judge Pryor in *Alfieri*); *Simpkins*, No. 10-21136, 2011 WL 124631, at *8 (same).  However, even without utilizing the presumption afforded under section 542.335(1)(j), I find that Plaintiff has shown the requisite threat of irreparable harm.  Here, Plaintiff has shown that it has already been, and will continue to be, injured by Defendant's promotion of competing products and disparaging statements about Plaintiff.[13]   Defendant's actions have threatened Plaintiff's goodwill and relationships with its customers, something that monetary remedies cannot adequately recompense.  *See Picture It Sold Photography, LLC v. Bunkelman*, 287 So. 3d 699, 702–03 (Fla. 4th DCA 2020) ("[T]he continued breach of a non-compete agreement threatens a former employer's 'goodwill and relationships with its customers, and nothing short of an injunction would prevent this loss.'" (citations omitted)); *Grant v. Robert Half Intern., Inc.*, 597 So. 2d 801, 802 (Fla. 3d DCA 1992) (stating that the defendant's solicitation of the plaintiff's client's and the plaintiff's injuries to its goodwill and business reputation supported a finding of irreparable harm); *see also Millennial Plastic Surgery PLLC v. James*, 21 CIV. 9590 (ER), 2021 WL 5988322, at *2 (S.D.N.Y. Dec. 16, 2021) (stating that because of the defendant's large social media following and the "immeasurable reach" of defendant's disparaging social media post, the reputational damage and loss of goodwill were sufficient to constitute

---

[13] Unlike a traditional defamation claim, which typically does not support a finding of irreparable harm, *see Mil Mujeres, Inc. v. Rubic, LLC*, 23-CV-14056, 2023 WL 4363907, at *5 (S.D. Fla. May 31, 2023), this case involves the breach of a non-disparagement provision in an employment agreement, which can support a finding of irreparable harm, *see NAC Found., LLC v. Jodoin*, 216CV01039GMNVCF, 2016 WL 3769348, at *2 (D. Nev. July 14, 2016) (stating that the defendant's breach of non-disparagement clause, *inter alia*, supported a finding of irreparable harm); *USA Techs., Inc. v. Tirpak*, CIV.A. 12-2399, 2012 WL 1889157, at *6 (E.D. Pa. May 24, 2012) (finding that the violation of a non-disparagement clause supported a finding of irreparable harm).

irreparable harm); *Lipinskiy*, 20-CV-2194 (PJS/TNL), 2020 WL 6867412, at *6 (finding irreparable harm where the defendant's disparaging posts reached thousands of viewers and persuaded those viewers not to purchase the plaintiff's products). Defendant also agreed that if she breached either the non-compete, non-solicitation, or non-disparagement provisions, Plaintiff would "have no adequate remedy at law." [DE 73-3 at 8]. Therefore, I find that Plaintiff has shown a substantial likelihood of irreparable harm.

### C. Balancing of Harms

The third element of the preliminary injunction test requires that the movant prove "the threatened injury outweighs the harm the preliminary injunction would cause the other litigant." *Chavez v. Fla. SP Warden*, 742 F.3d 1267, 1271 (11th Cir. 2014). Thus, the Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

I find that the balance of harms weighs in favor of granting Plaintiff an injunction. This result is warranted given Plaintiff's likelihood of success on its breach of contract claims. As a result of Defendant's breaches of the Executive Employment Agreement, Plaintiff has argued that it has already lost a substantial number of customers. Plaintiff has further argued that it is at risk of suffering irreparable reputational damage if Defendant is not prohibited from making disparaging or defamatory remarks regarding Plaintiff and from promoting competing brands. While, again, it is unclear at this stage the extent to which Plaintiff's loss of customers or decline in revenue can be attributed to Defendant's breaches (as opposed to the absence of Defendant as a promoter or some other reason), continued breaches of the restrictive covenants have the potential to cause significant harm to Defendant's customer goodwill and customer relationships, especially given Defendant's unique relationship to Plaintiff's brand.

Defendant contends that preventing her from "engaging in protected speech and participating in the only profession she has ever engaged is an extreme penalty that outweighs" any harm to Plaintiff. I disagree. First, to the extent the proposed preliminary injunction limits what Defendant may say on social media or through other channels about Plaintiff or this litigation, this harm does not outweigh the potential harm to Plaintiff. Again, such restrictions come only as a result of Defendant having voluntarily agreed to the non-disparagement provision. As discussed above, by agreeing to that provision Defendant has waived the protection the First Amendment might otherwise provide to such speech. *See Romeo & Juliette Laser Hair Removal, Inc.*, 679 F. App'x at 36; *Democratic Nat. Comm. v. Republican Nat. Comm.*, 673 F.3d at 205. Significantly, Defendant also agreed in the Executive Employment Agreement that the restrictive covenants, including the non-disparagement provision, would not impose any "undue burden" on her. [DE 73-3 at 8]. Defendant clearly has a strong interest in protecting her own reputation and seeking justice for wrongs she believes Plaintiff has committed against her – whether by refuting Plaintiff's allegations against her, litigating her own claims against Plaintiff, or both. However, this litigation provides her with a full and fair opportunity to contest and determine those issues (with the protection of the litigation privileges discussed above for statements made in court or in connection with the litigation process). Therefore, I find this first argument unavailing.

As for Defendant's suggestion that she will be prejudiced because she has only ever engaged in hair-related professions, her testimony proves otherwise. Defendant testified that she owns WhiPi, which sells at least some products that are not hair-related, and that she and her husband own at least two other businesses that are not related to hair care. [Tr. at 138]. Defendant also remains able to operate a beauty salon that offers hair care products for sale, pursuant to Addendum A of the Executive Employment Agreement. [DE 73-3 at 17]. *See United*

*Subcontractors, Inc. v. Godwin*, 11-81329-CIV, 2012 WL 1593173, at *12 (S.D. Fla. Feb. 3, 2012) ("Courts do not hesitate to find that an injunction's potentially severe impact upon a former employee does not outweigh harm to the former employer for purposes of granting a preliminary injunction as long as the employee has potential for employment that would not violate the non-competition agreement."), *report and recommendation adopted*, 11-81329-CV, 2012 WL 8652471 (S.D. Fla. Mar. 9, 2012).  Further, as part of the negotiated Executive Employment Agreement, Defendant also acknowledged and agreed that the restrictive covenants "will not interfere with [Defendant's] ability to earn a livelihood" in addition to the aforementioned acknowledgement that the restrictive covenants do not amount to an "undue burden."  [DE 73-3 at 8].  Thus, I find that the potential harm to Plaintiff outweighs the potential harm to Defendant.

### D.  Public Interest

The fourth element requires that the injunction serve the public interest.  *See Superior Consulting Servs.*, 710 F. App'x at 853.  The public has an "interest in upholding and protecting freedom to contract and to enforce contractual rights and obligations."  *Mohr v. Bank of New York Mellon Corp.*, 393 F. App'x 639, 646 (11th Cir. 2010).  Additionally, "[t]he Florida Legislature has determined that injunctions to protect . . . restrictive covenants serve the public interest." *Mulleavey*, 19-60833-CIV, 2019 WL 4693575, at *5; *see GFA Int'l, Inc. v. Trillas*, 327 So. 3d 872, 878 (Fla. 3d DCA 2021) ("Public policy in Florida favors enforcement of reasonable covenants not to compete.").

I find that the public interest will be served by the grant of an injunction in this case. Defendant signed a valid contract which contained the non-competition, non-solicitation, and non-disparagement provisions.  These provisions were designed to protect Plaintiff's legitimate business interests in their customer relationships and goodwill, among other things.  Thus, an

injunction designed to protect those legitimate interests and enforce the contract that Defendant voluntarily entered surely serves the public interest.  Furthermore, while Defendant again points to the prior restraint on speech caused by enforcing the non-disparagement provision as affecting the public interest, I find that the publicly open litigation process both sufficiently serves Defendant's interest in asserting her defenses and the public's interest in a free and full disclosure of facts regarding this dispute.

### E. Bond

Under Federal Rule of Civil Procedure 65(c), "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  "Generally, the amount of the bond in this type of case[] reflects the potential loss of salary reduced by the possibility of other employment opportunities in non-restricted areas and other mitigating factors." *See Pitney Bowes Inc. v. Acevedo*, 08-21808-CIV, 2008 WL 2940667, at *6 (S.D. Fla. July 28, 2008) (citing *Montville v. Mobile Med. Indus., Inc.*, 855 So. 2d 212, 215-16 (Fla. 4th DCA 2003)).  "[I]t is well-established that 'the amount of security required by the rule is a matter within the discretion of the trial court." *BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 971 (11th Cir. 2005) (citations omitted).  "The burden is on the party seeking security to establish a rational basis for the amount of a proposed bond." *Cont'l Grp., Inc. v. KW Prop. Mgmt., LLC*, 09-60202-CV, 2009 WL 3644475, *6 (S.D. Fla. Oct. 30, 2009) (quoting *Int'l Equity Invs., Inc. v. Opportunity Equity Partners, Ltd.*, 441 F.Supp. 2d 552, 566 (S.D.N.Y.2006)).

Plaintiff argues that it should be required to post a nominal bond of no more than $5,000 because it is only seeking to require Defendant to abide by the terms of the Executive Employment

Agreement, which she already agreed to do.  Although Defendant did not propose an amount in her written filings, she argued at the August 25 hearing that the Court should require Plaintiff to post a bond equal to Defendant's yearly salary under the Executive Employment Agreement.  That agreement set Defendant's base salary at $200,000.  [DE 73-3 at 3].  While I tend to agree that Defendant's proposal is closer to a reasonable bond than Plaintiff's, the parties have not presented sufficient evidence from which the Court can determine a reasonable bond as of yet.

A proper bond must take into account what Defendant would suffer from improperly being enjoined from working for or in conjunction with businesses manufacturing or selling hair-related products.  *See Lab. Corp. of Am. Holdings v. Kearns*, 84 F. Supp. 3d 447, 465 (M.D.N.C. 2015).  Therefore, the nominal bond of $5,000 that Plaintiff suggests is not only speculative, but also inadequate.  *Equip. & Sys. For Indus., Inc. v. Zevetchin*, 864 F. Supp. 253, 258 (D. Mass. 1994) (stating that a nominal bond was not adequate to compensate two former employees for the losses they would sustain if they were wrongfully enjoined).   Indeed, if Plaintiff were correct that only a nominal bond is warranted because Defendant is obligated to comply with the restrictive covenants in any event, then cases such as these would never require more than a nominal bond (and that is clearly not the case).   Defendant's citation to her yearly salary is a reasonable starting place for estimating the loss she could suffer if wrongfully enjoined, as it is a reasonable approximation of what she might earn if she was allowed to compete against Plaintiff in the hair-care realm or work for a similar company.  However, this estimate fails to account for other income that Defendant may be earning, or able to earn, in non-restricted employment opportunities.  *See Pitney Bowes*, 2008WL2940667 at *6.  While the Court has heard some evidence regarding Defendant's other businesses and potential businesses, that evidence has been scant, and the parties have not presented sufficient evidence for calculating the amount of a proper bond.  Therefore, if

the District Court accepts my recommendation to grant Plaintiff's Motion, I recommend that it order the parties to further confer as to the amount of a proper bond and, absent an agreement, submit further briefing.

### III.   Conclusion

In conclusion, I find that Plaintiff has established all four prerequisites for a preliminary injunction.  Thus, I respectfully **RECOMMEND** that:

1.  The Motion [DE 47] be **GRANTED**.

2.  Defendant be enjoined and restrained from further violating Section 5 of the Executive Employment Agreement, including by directly or indirectly: (i) engaging in business related to the manufacture, sale and distribution of hair-related products; (ii) providing management, business planning, sales, marketing, financial planning, or other similar services she provided to Plaintiff during her employment therewith, including social media promotion and influencing services, to or for any person engaged in the manufacture, sale or distribution of hair related products; (iii) soliciting business related to the manufacture, sale and distribution of hair-related products from any person who is or was a client, customer, supplier, licensee, licensor or other business relation of Plaintiff; (iv) soliciting or encouraging any client, customer, supplier, licensee or licensor of Plaintiff to terminate or reduce such person's relationship with Plaintiff in any manner; and (v) making, publishing, or communicating to any person or in any public forum any defamatory, disparaging, or otherwise negative or degrading comments, remarks or statements concerning Plaintiff, or its affiliates, or their businesses or any of their respective

employees, officers, existing and prospective clients, suppliers, investors, and other associated third parties.

3. The parties be ordered to confer as to the amount of a proper bond and, absent an agreement, provide the Court with supplemental briefing on the issue of a bond. This supplemental briefing should provide a good faith assessment of a sum that would compensate the Defendant if it is determined that she was wrongfully restrained.

The parties will have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable Rodolfo A. Ruiz, United States District Judge.  Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary in the interest of justice.  *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1.

**DONE AND SUBMITTED** in Fort Lauderdale, Florida, this 12th day of September 2023.

Jared M. Strauss
United States Magistrate Judge