**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

HEAD KANDY LLC,

     Plaintiff,

vs.                                                      Case No. 0:23-cv-60345-JB

KAYLA MARIE MCNEILL,

     Defendant.

_____/

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO PARTIALLY
VACATE PRELIMINARY INJUNCTION AND PARTIAL MOTION TO DISMISS**

Plaintiff Head Kandy LLC ("**Head Kandy**") opposes Defendant Kayla Marie McNeill's ("**Ms. McNeill**") Motion to Partially Vacate Preliminary Injunction and Partial Motion to Dismiss (the "**Motion**") [ECF 214], and in support states:

**Introduction and Relevant Background**

Ms. McNeill's Motion is but the latest episode in her ongoing strategy of contriving obstacles and meritless arguments to avoid rulings of the Court and delay the resolution of this case.  Indeed, Ms. McNeill's Motion is her third attempt to avoid the restrictive covenants of her Executive Employment Agreement and the Court's Preliminary Injunction enforcing them.  Ms. McNeill does so this time by raising a red herring argument based entirely on inapposite decisions construing a statutory scheme that does not even apply to Ms. McNeill, has no relevance to this action, and was available to, but not raised by, Ms. McNeill when she: moved to dismiss Head Kandy's First Amended Complaint asserting, among others, claims for preliminary and permanent injunctive relief, [ECF 30 and 34]; opposed Head Kandy's Motion for Preliminary Injunction, [ECF 66]; objected to Magistrate Judge Strauss's Report and Recommendation on that motion, [ECF 134]; and, filed her proposed Answer, Counterclaims, and Third-Party Claims, [ECF 195-

1].[1]  Regardless, by her Motion, Ms. McNeill relies exclusively on concededly non-binding agency materials applying the National Labor Relations Act ("**NLRA**").  Problematically for her, neither the policy considerations underlying the NLRA, nor the circumstances presented in the decisions she cites, share any commonality at all with the facts of this case.  The NLRA is intended to protect workers' associative freedom to collectively bargain with respect to labor issues; of course, this case is not about concerted action by employees or their labor organization representatives.  The NLRA enumerates various rights, including "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection," and to "refrain from any or all of such activities," 29 U.S.C. §157; of course, none of those rights are, or ever were, at issue in this case.  The NLRA affords Section 7 rights only to ordinary "employees"; Ms. McNeill was a supervisor, manager, executive, and part-owner of the company during her time with Head Kandy.  The decisions to which Ms. McNeill points consider only provisions found in *severance agreements*.  Indeed, *McLaren Macomb*, the primary decision on which Ms. McNeill relies, explicitly "hold[s] that an employer violates Section 8(a)(1) of the Act when it proffers a *severance agreement* with provisions that would restrict employees'

---

[1] Ms. McNeill's attempt to file her *proposed* Answer, Counterclaims, and Third-Party Claims, [ECF 195-1] is another example of her attempt to delay this action.  Rather than comply with the Court's Order Amending Trial Date and Pre-Trial Deadlines [ECF 157] requiring that she "respond to the Second Amended Complaint, assert any Counterclaims and Third-Party Claims," by February 24, 2024, Ms. McNeill first obtained an extension of time to comply by February 29, 2023, which Head Kandy did not oppose.  [ECF 189].  Then, on the February 29, 2023, instead of filing her response to the Second Amended Complaint and "assert[ing]" her Counterclaims and Third Party claims, Ms. McNeill filed her Motion to Stay, or in the Alternative, to Amended Scheduling Order [ECF 194], seeking a stay of this action to assert claims against Head Kandy in Florida administrative forum, and attached to it, as an alternative to a stay, her proposed Answer, Counterclaims, and Third Party Complaint, by which she would attempt to assert 17 claims against Head Kandy, its owners and consultant.  [ECF 195-1].  Of course, she does not seek, as primary or alternative relief, dismissal of any of Head Kandy's claims for injunctive relief.  Moreover, Ms. McNeill has not even attempted to assert the enforceability of the non-disparagement provision of her Executive Employment Agreement as an Affirmative Defense.  *See Gen. S. Indus., Inc. v. Shub*, 300 F. App'x 723, 728-29 (11th Cir. 2008) (explaining that "illegality" is specifically enumerated as an affirmative defense under Fed. R. Civ. P. 8(c), construing an argument that a contract was "unenforceable" under state law as falling within the affirmative defense of "illegality," and concluding that the defendant waived that defense by failing to assert illegality as an affirmative defense in its answer).

exercise of their NLRA rights," 372 N.L.R.B. No. 58, slip op. at 8 (Feb. 21, 2023) (emphasis supplied). Here, the non-disparagement provision at issue is not contained in any severance agreement.  Rather, it is one of the restrictive covenants contained in Ms. McNeill's Executive Employment Agreement, to which she agreed five years prior to her termination as part of arms-length negotiations over the contemporaneous multi-million-dollar sale of the assets of Ms. McNeill's former business to Head Kandy, of which, as part of the transaction, she became a 20 percent owner.  Ms. McNeill's Executive Employment Agreement even contains an express savings clause, which the Motion to Vacate almost entirely ignores, carving out from the non-disparagement provision communications protected by the NLRA.

And on top of that, the National Labor Relations Board ("**NLRB**") opinion on which Ms. McNeill's entire argument is based was decided before this case was even filed, and many months before the Order Adopting Report and Recommendation, Granting Plaintiff's Expedited Motion for Preliminary Injunction, and Setting Bond (the "**Preliminary Injunction**") [ECF 152] was entered.  That alone precludes the relief Ms. McNeill seeks because there has been no change in the law to justify modification or vacation of the Preliminary Injunction.

At bottom, after blatantly violating the Preliminary Injunction by disparaging Head Kandy to third party business affiliates of Head Kandy's owners, this is yet another frivolous attempt by Ms. McNeill to come up with a post hoc justification or excuse for her violation, to obstruct, delay, and inject meritless issues into these proceedings, and to inconvenience and waste the resources of Head Kandy and the Court.  To accept Ms. McNeill's argument and excuse her violation of the Court's Preliminary Injunction, the Court would have to upend decades of precedent enforcing a variety of restrictive covenants based solely on one NLRB decision deciding an entirely different issue in a markedly different context, one administrative law judge's recommendation to the

NLRB following that decision, and a related NLRB guidance document, none of which are binding authority in this Court.  Such a holding would defy logic and would constitute reversible error. The Court should reject Ms. McNeill's nonsensical arguments and deny the Motion.

<u>**Argument**</u>

"A motion to modify a preliminary injunction is meant only to relieve inequities that arise after the original order." *CreeLED, Inc. v. Individuals, Partnerships and Unincorporated Associations Identified on Schedule "A"*, 2023 WL 5036192, at *3 (S.D. Fla. Aug. 8, 2023) (internal citation omitted); *accord CWI, Inc. v. LDRV Holdings Corp.*, 2013 WL 12123229, at *2 (M.D. Fla. Oct. 16, 2013) ("Modification of [a preliminary] injunction is proper only when there has been a change of circumstances between entry of the injunction and the filing of the motion that would render the continuance of the injunction in its original form inequitable.").  The movant bears the burden to "show a change in circumstances that justifies the relief requested."  *CWI, Inc.*, 2013 WL 12123229, at *2 (citing, *inter alia*, *Hodge v. Dep't of Hous. & Urban Dev., Hous. Div., Dade Cnty., Fla.*, 862 F.2d 859, 861-62 (11th Cir. 1989) ("Before exercising its power to modify, a court must be convinced by the party seeking relief that existing conditions differ so substantially from those which precipitated the decree as to warrant judicial adjustment.")); *see also Gooch v. Life Investors Ins. Co. of Am.*, 672 F.3d 402, 414 (6th Cir. 2012) ("To obtain modification or dissolution of an injunction, a movant must demonstrate significant changes in fact, law, or circumstance since the previous ruling.") (internal quotation omitted).[2]  Ms. McNeill has failed to, and cannot, point to any change in the applicable law or the facts to satisfy her burden.

---

[2] Ms. McNeill's argument Head Kandy bears any burden on her request deserves short shrift. The only support Ms. McNeill offers for her assertion—which is contrary to the authority cited herein—is a two-decade old bankruptcy case, *In re Lickman*, 286 B.R. 821, 827 (M.D. Fla. Bankr. 2002) (cited at Motion at 9-10), which relies on another bankruptcy case from another circuit, *Dore & Associates Contracting, Inc. v. Am. Druggist's Ins. Co.*, 54 B.R. 353, 360 (W.D. Wis. Bankr. 1985).  Those cases are against the overwhelming weight of circuit and district court opinions, including the binding *Hodge* decision from the Eleventh Circuit, establishing the burden is on Ms. McNeill to show changed circumstances to require modification of the Preliminary Injunction.

A. **The NLRB decision upon which Ms. McNeill's last-ditch arguments are entirely based was decided months before the Preliminary Injunction was entered and could have been presented to the Court long before now.**

Even if the NLRA or the NLRB decisions Ms. McNeill cites could apply to this case—they cannot—the Motion is nonetheless untimely. Despite her disingenuous attempts to paint the decisions upon which she relies as some sort of recent sea change, Ms. McNeill could have raised, but did not raise, these arguments in her filings seeking to dismiss Head Kandy's claims [ECF 19, 30, 34] or in opposing entry of the Preliminary Injunction in June, August, and September 2023 [ECF Nos. 66, 117, 134]. Her failure to do so is fatal. *See, e.g.*, *Hodge*, 862 F.2d at 862; *CreeLED, Inc.*, 2023 WL 5036192, at \*3; *CWI, Inc.*, 2013 WL 12123229, at \*2; *see also Kinsey v. Aledda*, 2018 WL 11352486, at \*4-5 (S.D. Fla. Feb. 28, 2018) (citing *Krinsk v. SunTrust Banks, Inc.*, 654 F.3d 1194, 1202 (11th Cir. 2011) for the proposition that "[t]he filing of an amended complaint will not revive the right to present by motion defenses that were available but were not asserted in timely fashion prior to the amendment of the pleading," and concluding that a motion to dismiss was untimely because the amended complaint "[did] not change the theory or scope of the case").

Indeed, the initial NLRB opinion Ms. McNeill cites was decided in February 2023, the day before the initial Complaint in this case was even filed, three months before Ms. McNeill filed her Motion to Dismiss Head Kandy's First Amended Complaint [ECF 30], ***nearly nine months before the Preliminary Injunction was entered***, and more than a year before her current Motion. *See McLaren Macomb*, 372 NLRB No. 58 (N.L.R.B. Feb. 21, 2023).[3] Ms. McNeill does not, because she cannot, provide any truthful or persuasive explanation for why she waited until now—only after Head Kandy brought another violation of the Preliminary Injunction to the Court's

---

[3] Contrary to Ms. McNeill's representations, that decision by the NLRB did not need to be "confirmed" by the Office of the General Counsel's Memorandum GC 23-05—which was published in March 2023, also long before the Preliminary Injunction was entered—or by an administrative law judge's ("**ALJ**") recommendation in *Big Green*, 2023 WL 8873718 (N.L.R.B. Div. of Judges Dec. 20, 2023), to have whatever effect it had when it was decided.

attention—to raise these arguments, strongly suggesting that this Motion is another meritless delay tactic designed to waste time and to hide the ball from the Court under an ever-rising sea of frivolous contentions.[4]

Moreover, the legal conclusion reached in *McLaren Macomb* and its progeny is not a novel concept. Rather, it is a return to longstanding precedent that existed for decades prior to two outlier NLRB decisions in 2020. *See McLaren Macomb*, slip op. at 1 ("The Board in *Baylor University Medical Center*[, 369 N.L.R.B. No. 43 (2020)] and *IGT d/b/a International Game Technology*[, 370 N.L.R.B. No. 50 (2020)] reversed … long-settled precedent and replaced it with a test that fails to recognize that unlawful provisions in a severance agreement proffered to employees have a reasonable tendency to interfere with, restrain, or coerce the exercise of employee rights under Section 7 of the Act. We accordingly overrule *Baylor* and *IGT* …."); NLRB Office of Public Affairs, *Board Rules that Employers May Not Offer Severance Agreements Requiring Employees to Broadly Waive Labor Law Rights*, Feb. 21, 2023, https://www.nlrb.gov/news-outreach/news-story/board-rules-that-employers-may-not-offer-severance-agreements-requiring (last visited April 9, 2024 9:31 A.M.) ("The decision reverses the previous Board's decisions in *Baylor University Medical Center* and *IGT d/b/a International Game Technology* … which abandoned prior precedent….") [hereinafter "*Board Rules*"]. That reality further illustrates Ms. McNeill's disingenuity in portraying these cases as some drastic and unexpected change in the law.

Ms. McNeill claims that, despite the well-established standard applied by federal courts in determining whether modification of a preliminary injunction is appropriate, she nonetheless

---

[4] Magistrate Judge Strauss effectively recognized Ms. McNeill's improper objective in his Order on Emergency Motion [ECF 218], remarking: "The timing of the Motion is especially curious considering Defendant filed her response to Plaintiff's Expedited Motion to Enforce the Preliminary Injunction and for an Order to Show Cause on April 1, 2024, and indicated that Defendant would file her Motion to Vacate that week. … Defendant's decision to file her Motion to Vacate four days before the evidentiary hearing, and a week after Defendant stated she would, was her choice. Defendant's own dilatory conduct cannot constitute an emergency." (citations omitted).

retains the ability to raise a challenge, apparently at any time of her choosing, so long as the basis of the challenge is that the Preliminary Injunction is "illegal" and "against public policy." Such a proposition would turn the applicable standard on its head and encourage serial motions and strategic maneuvering designed to delay. Stated another way, under the applicable standard, Ms. McNeill had an obligation to present any existing arguments as to the supposed illegality of the Preliminary Injunction prior to its entry, including in her Motion to Dismiss. Because she did not, modification is warranted only if some illegality or inequity arises because of an intermittent change in the law or facts. *See, e.g.*, *Hodge*, 862 F.2d at 862; *CreeLED, Inc.*, 2023 WL 5036192, at *3; *CWI, Inc.*, 2013 WL 12123229, at *2. The cases on which Ms. McNeill relies are not to the contrary; rather, they arise entirely outside of the preliminary injunction context and speak only of the general and unremarkable proposition, applied to wholly distinguishable circumstances, that courts will not enter judgment enforcing contracts that are illegal or contrary to public policy.[5] Ms. McNeill's argument is nothing but another attempt to inject inapposite law to avoid enforcement against her for her acts in violation of this Court's Order.

Because the authorities upon which she entirely relies existed long before she filed her Motion—and two of the three existed more than eight months prior to this Court entering the Preliminary Injunction—Ms. McNeill cannot meet her burden to show that "there has been a change of circumstances between entry of the injunction and the filing of the motion," much less

---

[5] Motion at 17-18, citing *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 83-86 (1982) (concluding that the court could consider a particular NLRA defense to enforcement of a contract, even though such determinations are generally within the exclusive jurisdiction of the NLRB); *Nyhus v. Travel Mgmt. Corp.*, 466 F.2d 440, 447 (D.C. Cir. 1972) (court could consider facial illegality of the contract on summary judgment even though the movant did not raise that argument); *Cal. Pac. Bank v. SBA*, 557 F.2d 218, 223 (9th Cir. 1977) ("It has long been true that although a court will not ordinarily allow recovery on an illegal contract, the illegality of a contract does not automatically render it unenforceable."); *I.U.B.A.C. Loc. Union No. 31 v. Anastasi Bros. Corp.*, 600 F. Supp. 92, 94-95 (S.D. Fla. 1984) (considering the legality of the underlying contract in proceedings to confirm an arbitration award, but also chastising the defendant's "failure to abide by the appropriate procedures" governing arbitration by lodging a timely challenge).

{00080799:1}

one "that justifies the relief requested." *CWI, Inc.*, 2013 WL 12123229, at *2; *accord Hodge*, 862 F.2d at 862; *Gooch*, 672 F.3d at 414.  For that reason alone, the Court should deny the Motion.

> B.  <u>The NLRA, which was designed to protect employees' rights related to collective bargaining and union activity, is not applicable to this case.</u>

As is apparent from even a rudimentary review of Ms. McNeill's arguments, her Motion is based entirely on underlying law—the NLRA—that has no applicability or relevance to the issues presented in this case, and therefore cannot possibly constitute a change in the ***applicable*** law sufficient to justify modification or vacatur of the Preliminary Injunction.

The NLRA reflects a "legislative policy … aimed at safeguard[ing], first and foremost, workers' rights to join unions and to engage in collective bargaining." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 521 (2018).  The NLRB describes the NLRA's purpose as "to encourage collective bargaining by protecting workers' full freedom of association."  *National Labor Relations Act*, https://www.nlrb.gov/guidance/key-reference-materials/national-labor-relations-act  (last  visited April 9, 2024 at 10:00 A.M.); *see also* 29 U.S.C. § 151 ("It is hereby declared to be the policy of the United States to … encourage[e] the practice and procedure of collective bargaining and … protect[] the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection.").  Specifically, Section 7 of the NLRA furthers that policy by guaranteeing employees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection," along with "the right to refrain from any or all of such activities."  29 U.S.C. § 157; *accord Lewis*, 584 U.S. at 511 ("Section 7 focuses on the right to organize unions and bargain collectively.").  In fact, in *Big Green*, on which Ms. McNeill heavily relies, the ALJ explained:

"Section 7 affords protection for employees who engage in communications with a wide range of third parties in circumstances where the communication is related to an ongoing labor dispute and when the communication is not so disloyal, reckless, or maliciously untrue to lose the Act's protection." 2023 WL 8873718.

Undoubtedly, the NLRA has nothing to do with this case, where there have not been any allegations whatsoever concerning labor organizations, collective bargaining, or concerted activities by employees, and particularly no such allegations by or in any way related to Ms. McNeill. *See generally Lewis*, 584 U.S. 497 (explaining the history and purpose of the NLRA). There is not, nor was there ever, any "labor dispute" between Head Kandy and its employees, and although this case may relate to disputes concerning Ms. McNeill's individual employment with Head Kandy, none of them are of the type covered by the NLRA. *See* 29 U.S.C. § 152(9) (under the NLRA, "[t]he term 'labor dispute' includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment"); *Frequently Asked Questions – NLRB*, https://www.nlrb.gov/resources/faq/nlrb (last visited April 9, 2024 12:29 P.M.) ("If your question is about unpaid wages, safety on the job, employment discrimination, workers' compensation, or a number of other work-related issues, you will have to contact a different government agency."); *see also Anchortank, Inc. v. NLRB*, 618 F.2d 1153, 1161-62 (5th Cir. 1980) (explaining that Section 7 only protects "concerted activity"); *Rockwell Int'l Corp. v. NLRB*, 814 F.2d 1530, 1535-36 (11th Cir. 1987) (clarifying that "[p]urely personal griping does not fall within the scope of protected, concerted activity").

In short, the policy and rights enshrined in the NLRA, important as they may be, are not implicated here, and any supposed change in the NLRB's enforcement of the NLRA is wholly

immaterial.  Ms. McNeill's specious attempt to inject inapplicable law into this case, and to thereby

avoid her non-disparagement obligation to which she agreed and with which she has been ordered

by this Court to comply during the pendency of this lawsuit, should be rejected in its entirety.

> C.  <u>Even if the NLRA applied, the NLRB decisions Ms. McNeill cites do not control this case, and even if they did, the non-disparagement provision at issue here does not run afoul of those decisions.</u>

Not only does the NLRA have no relevance to this case, but the cases relied upon by Ms.

McNeill are, plainly and on their face, inapposite.  Both of those decisions—*McLaren Macomb*

and *Big Green*—pertain to contractual provisions in *severance agreements* insofar as such

provisions may impede employees' exercise of collective bargaining rights under the NLRA by

conditioning the availability of severance benefits on the employee's assent to overly broad

restrictions.  But no such factual circumstances exist here.

The NLRB in *McLaren Macomb* described the issue before the Board as "whether the

Respondent violated Section 8(a)(1) of the National Labor Relations Act (Act) by offering a

*severance agreement* to 11 bargaining unit employees it permanently furloughed," which

contained "broad proscriptions on employee exercise of Section 7 rights."  372 N.L.R.B. No. 58,

slip op. at 1 (emphasis supplied).  *McLaren Macomb* specifically held "that an employer violates

Section 8(a)(1) of the Act when it proffers a *severance agreement* with provisions that would

restrict employees' exercise of their NLRA rights."  *Id.* at 8 (emphasis supplied).  Likewise, the

NLRB itself, discussing *McLaren Macomb*, later explained the decision as "holding that employers

may not offer employees *severance agreements* that require employees to broadly waive their

rights under the National Labor Relations Act."  *Board Rules*, *supra* (emphasis supplied).  In other

words, that decision "explains that simply offering employees a *severance agreement* that requires

them to broadly give up their rights under Section 7 of the Act violates Section 8(a)(1) of the Act,"

because "the employer's offer is itself an attempt to deter employees from exercising their statutory rights, at a time when employees may feel they must give up their rights in order to get the benefits provided in the agreement," i.e., a severance payment. *Id.* (emphasis supplied). The ALJ[6] in *Big Green*, likewise, applied *McLaren Macomb* to "*severance documents*," which it found "violate the [NLRA] because they interfere with, restrain, or coerce employees in the exercise of their Section 7 rights[,] [b]ecause the receipt of [severance] benefits is conditioned on the acceptance of unlawful terms." 2023 WL 8873718 (emphasis supplied). Contrary to Ms. McNeill's representations, those decisions do not stand for the proposition that contractual non-disparagement clauses, particularly those contained in employment, and not severance, agreements, are "void *ab initio*" without any further analysis of context or circumstances.

Here, **there is no severance agreement at all**, and certainly not one into which Ms. McNeill was forced to enter under coercive circumstances. In fact, the only agreements Ms. McNeill entered, voluntarily and before the beginning of her employment, were in connection with a multi-million-dollar sale of her entire business and its assets, which included a deal between Ms. McNeill and the purchaser of her business, Head Kandy, by which Ms. McNeill would stay on as a key managerial employee of Head Kandy for a specified term and became a 20 percent owner of Head Kandy. Contrast that with *McLaren Macomb*, which dealt only with severance agreements forced upon vulnerable outgoing employees under conditions where the employees had little opportunity to refuse provisions chilling their Section 7 rights, lest they be denied a severance payment. The differences are stark, and the markedly distinguishable power dynamic in the negotiations and the resulting relationship in this case is apparent. Despite Ms. McNeill's assertion to the contrary, the mere fact that the Executive Employment Agreement (the execution of which

---

[6] Ms. McNeill repeatedly misrepresents that the *Big Green* decision came from "a court" and insinuates that *Big Green* amounted to a judicial application or approval of *McLaren Macomb*. Motion at 16. That is simply not correct.

was a condition of the Asset Purchase Agreement, *see* ECF 133 at 3, 15) contains a non-disparagement provision does not bring this case within the ambit of *McLaren Macomb*.[7]

But even if *McLaren Macomb* and *Big Green* did apply to other types of contractual arrangements, those decisions hold merely that **overbroad** non-disparagement and confidentiality provisions are improper because they have a chilling effect on the exercise of Section 7 rights. *See McLaren Macomb*, 372 N.L.R.B. No. 58, slip op. at 7 ("[I]t is the high potential that coercive terms in separation agreements may chill the exercise of Section 7 rights that dictates the Board's traditional approach of viewing severance agreements requiring the forfeiture of Section 7 rights…as unlawful unless narrowly tailored."); *id.* at 8 (discussing the "chilling tendency" of overbroad restrictions); *Big Green*, 2023 WL 8873718 ("The Broad language sweeps under its prohibition any conduct regarding any labor issue, dispute or term and condition of employment and any statement or allegation that Respondent violated the Act.  This provision standing alone has a chilling tendency on the exercise of Section 7 rights.  It places broad restrictions of employees protected Section 7 rights and violates Section 8(a)(1) of the Act.").[8]  Here, on the other hand, the non-disparagement provision at issue is not overbroad, and is not contained in a severance agreement.  Rather, unlike the agreements at issue in *McLaren Macomb* and *Big Green*, the non-disparagement provision contained in Ms. McNeill's Executive Employment Agreement, into

---

[7] As a practical matter, it is unclear with whom Ms. McNeill could possibly have engaged in concerted action, as Head Kandy had no other employees in a position or with interests even remotely similar to hers.  *See The Trustees of Columbia Univ. in the City of New York & Graduate Workers of Columbia-GWC, UAW*, 364 N.L.R.B. No. 90 (Aug. 23, 2016) (distinguishing employees and managers and observing that placing the two in the same "camp" would "eviscerate" the purpose and traditional underpinnings of the NLRA).  Unsurprisingly, there are not, nor have there ever been, any allegations associated with Ms. McNeill's inability to exercise any alleged Section 7 right to collectively bargain because of any agreement with Head Kandy, let alone a severance agreement.  Likewise, there is no evidence that Ms. McNeill ever engaged in or even attempted to engage in concerted activity protected under Section 7.

[8] Ms. McNeill's only authority for the proposition that the *McLaren Macomb* decision does apply outside of the severance agreement context is one single sentence from a nonbinding guidance document issued by the NLRB's Office of General Counsel.  Motion at 13 (citing *Guidance*, 2023 WL 3567920, at *4).  That guidance document, obviously, is not binding upon this Court, nor should it be given more than minimal, if any, weight.

which she entered prior to the start of her employment and five years before her termination, contains a savings clause which explicitly **_carves out_** and potential communications in which she may have engaged during her employment that would be protected by the NLRA:

> This Section 5(d) does not, in any way, restrict or impede the Executive from exercising protected rights to the extent that such rights cannot be waived by agreement, **_including, without limitation, the Executive's rights under the National Labor Relations Act_**, or rights to communicate with any other administrative or regulatory agency to report suspected unlawful conduct, or from complying with any applicable law or regulation or a valid order of a court of competent jurisdiction or an authorized government agency, provided that such compliance does not exceed that required by the law, regulation, or order.

Executive Employment Agreement at § 5(d) (emphasis supplied). Accordingly, even under *McLaren Macomb* and *Big Green*, the provision would still be valid, because it does not have any tendency to preclude Ms. McNeill from making disparaging statements which, unlike Ms. McNeill's violative statements referenced in the pleadings and in Head Kandy's enforcement filings, would be protected under the NLRA.[9] Ms. McNeill also remains free to communicate with regulators and other agencies under the savings clause.

In sum, the circumstances of *McLaren Macomb* and *Big Green* have no applicability whatsoever to this case, and even if they did, the non-disparagement provision that the Preliminary Injunction enforces is not overbroad because it includes an express exclusion of communications protected under the NLRA. Ms. McNeill's attempt to have the Court topple long-established law upholding the validity of restrictive covenants by adopting an astoundingly overbroad (and absurd)

---

[9] Ms. McNeill's contrary interpretation and application of the non-disparagement provision's carve out is simply farcical. Rather than reading the provision's plain language holistically—as the Court must, *see Grovehurst Homeowners Ass'n, Inc. v. Stone Crest Master Ass'n, Inc.*, 365 So. 3d 1282, 1285 (Fla. 6th DCA 2023) (explaining that contractual terms must be interpreted in context and by giving effect to all of the contract's provisions); *Cafe Int'l Holding Co. v. Westchester Surplus Lines Ins. Co.*, 536 F. Supp. 3d 1291, 1298-99 (S.D. Fla. 2021) (same)—Ms. McNeill attempts to entirely divorce the prohibition on disparagement from the NLRA-protected-speech exclusion in the very next sentence. As far as Head Kandy can discern, Ms. McNeill goes so far as to argue that the savings clause is somehow an acknowledgement that the non-disparagement provision is unenforceable. But that patently illogical reading would require the Court to flat out ignore the plain language and obvious import of the savings clause.

reading of those NLRB decisions to invalidate restrictive covenants entered into as part of the sale of the assets of a business for valuable consideration and at the beginning of Ms. McNeill's employment—factual circumstances well outside of the severance agreement context in which those cases arose—should be rejected.

D.  <u>Even if the NLRA and the decisions Ms. McNeill cites had some relevance to this case, Ms. McNeill, by her own admission, was a "managerial employee" or "supervisor," not an "employee" subject to the protections of the Act.</u>

Even if the NLRA and the NLRB decisions Ms. McNeill cites are pertinent to this case and were timely presented to the Court—they are not and were not—Ms. McNeill, as a "supervisor" and/or a "managerial employee" (and a part owner), is not a protected "employee" under the NLRA, and therefore has no "Section 7 rights" that could be "chilled" by the Preliminary Injunction.  Indeed, it is well-established that the NLRA, specifically Section 7, protects the rights of only ordinary "employees."  29 U.S.C. § 157 (affording rights to "employees," as defined in the NLRA); 29 U.S.C. § 158(a)(1) (establishing that it is an "unfair labor practice for an employer … to interfere with, restrain, or coerce **employees** in the exercise of the rights guaranteed in [Section 7]." (emphasis supplied)).  A supervisor or manager, however, has no Section 7 rights.

First, "managerial employees" are not afforded Section 7 rights.  *See NLRB v. Health Care & Retirement Corp. of Am.*, 511 U.S. 571, 577 (1994); *NLRB v. Bell Aerospace Co. Div. of Textron, Inc.*, 416 U.S. 267, 287-88 (1974).[10]  "Managerial employees" are "those who formulate and effectuate management policies by expressing and making operative the decisions of their employer."  *Bell Aerospace*, 416 U.S. at 288 (internal quotation omitted).  In other words, managerial employees are those "aligned with management" who "tak[e] or recommend[]

_____

[10]  This exclusion is judicially created, rather than statutory, because, as the courts have observed, Congress "regarded [managerial employees] as so clearly outside the Act that no specific exclusionary provision was thought necessary." *NLRB v. Yeshiva Univ.*, 444 U.S. 672, 682 (1980) (quoting *Bell Aerospace*, 416 U.S. at 283).

discretionary actions that effectively control or implement employer policy." *Yeshiva Univ.*, 444 U.S. at 683.  Although "the specific job title of the employee[] … is not in itself controlling," relevant considerations include the employee's "actual job responsibilities, authority, and relationship to management." *Bell Aerospace*, 416 U.S. at 290 n.19; *accord E. Camera & Photo Corp.*, 140 N.L.R.B. No. 58 (Jan. 9, 1963) ("[T]he determination of an employee's 'managerial' status depends upon the extent of his discretion.").  "[A]ll managerial employees are excluded, not just those in positions which may give rise to labor-related conflicts of interest." *NLRB v. Meenan Oil Co.*, 139 F.3d 311, 319 (2d Cir. 1998) (citing *Bell Aerospace*, 416 U.S. at 275).

Ms. McNeill was, by any definition, a "managerial employee."  Indeed, in her proposed Answer, Counterclaims, Third-Party Complaint and Jury Demand, ***Ms. McNeill admits to being a "key managerial employee" of Head Kandy***.  [ECF 195-1 at 3 (¶ 19)].  And with good reason— Ms. McNeill, in reality, exercised nearly unfettered discretion and authority over multiple integral facets of Head Kandy's business, including strategic direction, inventory, product development, and marketing.  Ms. McNeill's Executive Employment Agreement bolsters that conclusion inasmuch as it provided that Ms. McNeill would be the "Creative Director" of Head Kandy and have "such responsibilities, duties and authority as are consistent with her position and reasonably assigned to her by the Managing Member of the Company" and further provided that "[s]uch responsibilities, duties and authority of the Executive include, but are not limited to, oversight and management of strategic initiatives and general operation activities of the Company."  What is more, Ms. McNeill was a part owner of Head Kandy throughout the relevant time period, showing that her interests were entirely "aligned with management," *Yeshiva Univ.*, 444 U.S. at 683, a core judicial consideration underlying the exclusion of managerial employees in the first place.

Second, and similarly, "supervisor[s]" do not enjoy Section 7 rights.  *See Lakeland Health Care Assocs., LLC v. NLRB*, 696 F.3d 1332, 1335-36 (11th Cir. 2012).  A supervisor is:

> any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

29 U.S.C. § 152(11).  And, because "[t]he statutory definition lists the functions of a supervisor in the disjunctive," Head Kandy need only show that Ms. McNeill fulfilled one of those functions to show that she was a supervisor and not an employee subject to NLRA protections.  *Cooper/T. Smith, Inc. v. NLRB*, 177 F.3d 1259, 1263 (11th Cir. 1999).

Ms. McNeill, again by her own admission, fulfilled multiple of these functions for Head Kandy by hiring employees and assigning and directing the performance of their day-to-day tasks.  Indeed, during the Preliminary Injunction hearing, Ms. McNeill confirmed her role at Head Kandy included authority to hire employees, testifying "I have permission from Brian Feldman [one of the other members of Head Kandy] to hire the people I needed to help me."  [Tr. of 08/01/23 Hrg. 41:13-14].  Evidence adduced in discovery further illustrates Ms. McNeill's supervisory role, as text messages and employment applications show that she directed employees in the performance of their duties, hired employees on behalf of Head Kandy, and made payroll decisions related to those employees.  *See* **Composite Exhibit 1** (various employment documents approved by Ms. McNeill); **Exhibit 2** (text exchanges in which Ms. McNeill discusses adding Nicole Cook to Head Kandy's payroll and directs Ms. Cook's daily tasks).  Moreover, Ms. McNeill, using her own independent judgment, exercised that authority (at least ostensibly) to the benefit of Head Kandy to further Head Kandy's business of selling its products to the public.  29 U.S.C. § 152(11) (a

supervisor exercises her authority "in the interest of the employer" and using "independent judgment"); *see also Cooper*, 177 F.3d at 1263 (same).

Ms. McNeill admits in her Motion that she "at times, had some authority over other employees," but then attempts to backtrack by claiming that she "did not have the right to exercise that authority independently" because she sometimes sought approval from other owners of Head Kandy. [Motion at 12]. Ms. McNeill, however, misstates the test—the question is whether her authority over other employees "requires the use of independent judgment" such that it is not merely "routine or clerical," not whether Ms. McNeill herself may have had to obtain assent from other owners of Head Kandy. 29 U.S.C. § 152(11); *see also NLRB v. Attleboro Assocs., Ltd.*, 176 F.3d 154, 164 (3d Cir. 1999) (explaining that the fact that an individual's decision or recommendation is subject to review or investigation does not preclude that individual from being a "supervisor" under the NLRA); *STP Nuclear Operating Co. v. NLRB*, 975 F.3d 507 (5th Cir. 2020) (finding that "unit supervisors" and "maintenance supervisors" within a hierarchy of employees were "supervisors" because they performed numerous statutorily listed functions, despite having other supervisors above them). Ms. McNeill, who undoubtedly had authority to at least recommend hiring employees, even if her recommendation had to be corporately approved, is still a "supervisor" under the NLRA. 29 U.S.C. § 152(11) (one who has the authority to perform specified functions, "***or effectively to recommend such action***," is a "supervisor") (emphasis supplied); *accord Lakeland Health Care*, 696 F.3d at 1341-42 (11th Cir. 2012) (rejecting finding that LPNs lacked supervisory authority to "effectively recommend" termination of lower level nurses); *Empress Casino Joliet Corp. v. NLRB*, 204 F.3d 719, 721 (7th Cir. 2000) ("Gehrke's uncontradicted testimony was that the captains … interviewed job applicants and that he relied heavily on their recommendations, and no more was necessary to show that those officers are

supervisors, for the statutory term embraces not only individuals who have the authority to hire but also those who have the authority 'effectively to recommend such action.'").

Next, Ms. McNeill claims that the NLRA still protects a supervisor "who is retaliated against … because they are refusing to act on their employer's behalf in committing an unfair labor practice against employees."  [Motion at 12].  But, under the NLRA, an "unfair labor practice" is one of a set of enumerated acts, 29 U.S.C. § 152(8) ("The term "unfair labor practice" means any unfair labor practice listed in section 158 of this title."), which include, simply put, interference with employees' exercise of collective bargaining rights, interference with the formation of a labor organization, employment discrimination based on membership in a labor organization or initiation of or participation in an NLRA claim, or refusal to collectively bargain.  *See* 29 U.S.C. § 158(a).  No such act is alleged here.  Ms. McNeill claims instead that she was retaliated against for, in essence, refusing to suffer or enable alleged sexual harassment, which even if true, is not an unfair labor practice.  *See Flanigan v. Westrock Servs., LLC*, 2023 WL 8257855, at *6 (N.D. Ohio Nov. 29, 2023) (distinguishing between types of retaliation prohibited under the NLRA and civil rights laws, and explaining "[t]he NLRA protects against retaliation motivated by an employee's participation in protected labor activity, such as by filing a union grievance," while "Title VII … protects against retaliation motivated by an employee's opposition" to, e.g., sex discrimination); *cf. Devers v. SNC-Lavalin Generation, Inc.*, 2014 WL 4954623, at *6-7 (E.D.N.Y. Sept. 30, 2014) (explaining that the plaintiffs' claim for alleged "retaliation for complaining about racial discrimination" was "an archetypical civil rights retaliation claim," not "for opposing unfair labor practices of the type addressed by the NLRA").  The Court should reject Ms. McNeill's attempt to shoehorn her unripe claims of Title VII or Florida Civil Rights Act retaliation into the case.

Finally, Ms. McNeill argues that the "supervisor" exclusion does not apply because "she was no longer a supervisor" after she was "demoted" by Head Kandy on December 1, 2022.  But even if Ms. McNeill was not a "supervisor" for a handful of days as the end of her employment drew near, she was still concededly a supervisor throughout the vast majority of her employment, including when the Executive Employment Agreement was first entered (hence that contract being called an ***Executive*** Employment Agreement), and Ms. McNeill cites no case law (nor has Head Kandy located any) holding that one would lose supervisory status under these circumstances.  In addition, Ms. McNeill's characterization of the December 1, 2022, letter is misleading.  As is apparent on the face of the letter [ECF 214-1], and particularly when it is read in context with the preceding and succeeding communications [ECF 187-2 and 187-3], Head Kandy did not "demote" Ms. McNeill; rather, Head Kandy explained that it was "prepared to withdraw its breach notices" and "allow [Ms. McNeill's] continued employment" if Ms. McNeill assented to certain "stated conditions," including proposed changes to Ms. McNeill's role with the company.  But Ms. McNeill never accepted those terms, was never demoted, and was ultimately suspended and then terminated within a matter of weeks for her continuing wrongful conduct.  Ms. McNeill never actively worked for Head Kandy in any capacity other than as a "supervisor" or "managerial employee."  And regardless, the December 1, 2022, letter indicates that despite her "demotion," Ms. McNeill would still continue to act as a supervisor over a particular Head Kandy employee.  Thus, Ms. McNeill's attempt to avoid the "supervisor" exclusion is wholly without merit.

In sum, Ms. McNeill has no rights under the NLRA, and particularly no Section 7 rights, because she was a "supervisor" or "managerial employee."  Therefore, the decisions cited by Ms. McNeill discussing restrictive covenants that may chill Section 7 rights are inapplicable.

E. <u>As the Court has already found, Head Kandy has proven a substantial likelihood of success on the merits of its claim for breach of contract based on the non-disparagement clause, and that likelihood is the same now as it was when the Court made that finding.</u>

Ms. McNeill goes on to argue that Head Kandy no longer has a substantial likelihood of success on the merits of its claims sufficient to maintain the Preliminary Injunction. Putting aside the fact that Ms. McNeill incorrectly places the burden on Head Kandy to reprove the preliminary injunction factors at this stage of the case, it is apparent that nothing has changed since the Court previously found that Head Kandy had proven a likelihood of success on the merits of its claim for breach of the restrictive covenants. Specifically, with respect to the non-disparagement provision, it is as valid today as it was when the Preliminary Injunction was considered and entered by the Court, and the extensive evidence of Ms. McNeill's breach of that obligation—including her breach by the recent conduct that is the subject of the Court's Order to Show Cause, ECF 207—clearly supports Head Kandy's claim for breach of that provision.

Accordingly, the Court should not modify or vacate, in any part, the Preliminary Injunction. For the same reason, Ms. McNeill's request that unspecified allegations and causes of action be dismissed [Motion at 20], while also procedurally improper, *see Leonard v. Enterprise Rent a Car*, 279 F.3d 967, 971 n.6 (11th Cir. 2002) (explaining that a defendant may not move to dismiss on 12(b)(6) grounds after filing an answer), is substantively without merit.

<u>**Conclusion**</u>

For the above reasons, Head Kandy respectfully requests that the Court (1) deny Ms. McNeill's Motion to Partially Vacate Preliminary Injunction and Partial Motion to Dismiss [ECF 214], and (2) order such other and further relief the Court deems appropriate.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 15, 2024 I filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send notice of this filing to: Laura E. Burgess, Esquire, laura@leburgesslaw.com, L.E. Burgess, P.A., 5966 S. Dixie Highway, Suite 300, Miami, Florida 33143, *Counsel for Defendant*; Antonio L. Converse, Esquire, anthony@converselawgroup.com, Converse Law Group, P.C., 600 17th Street, Denver, Colorado 80202, *Counsel for Defendant;* Jennifer Tiedeken, Esquire, jat@davisandceriani.com, Davis & Ceriani, P.C., 1600 Stout Street, Ste. 1710, Denver, CO 80202 *(pro hac vice admission pending), co-counsel for Defendant;.* and Jed Ferdinand, Esquire, jferdinand@fiplawgroup.com, Kathleen B. Moore, Esquire, kmoore@fiplawgroup.com, Ferdinand IP Law Group, 450 Seventh Avenue, Suite 2300, New York, New York 10123, *Counsel for Plaintiff.*

/s/ Ethan J. Loeb
ETHAN J. LOEB
FL Bar No. 668338
ethanl@blhtlaw.com
KerriR@blhtlaw.com
EDWARD C. THOMPSON
FL Bar No. 684929
colint@blhtlaw.com
heatherw@blhtlaw.com
JALEN A. LARUBBIO
FL Bar No. 1039258
JalenL@blhtlaw.com
eservice@blhtlaw.com
ELLIOT P. HANEY
FL Bar No. 1018829
ellioth@blhtlaw.com
**BARTLETT LOEB HINDS THOMPSON & ANGELOS**
100 N. Tampa Street, Suite 2050
Tampa, FL 33602
Telephone: 813-223-3888
Facsimile: 813-228-6422
*Counsel for Plaintiff Head Kandy LLC*