```
1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
2                      FORT LAUDERDALE DIVISION
                     CASE NO.  23-cv-60345-JB
3

4        HEAD KANDY, LLC,

5                     Plaintiff,

6            vs.
                                         Fort Lauderdale, Florida
7                                        April 12, 2024
         KAYLA MARIE McNEILL,            Pages 1-103
8
                      Defendant.
9        _____
                        TRANSCRIPT OF MOTION HEARING
10               BEFORE THE HONORABLE JARED M. STRAUSS
                     UNITED STATES MAGISTRATE JUDGE
11
         APPEARANCES:
12
         FOR THE PLAINTIFF:   Ethan Jerome Loeb, Esq.
13                            Edward Colin Thompson, Esq.
                              Jalen Andrew LaRubbio, Esq.
14                            Bartlett, Loeb, Hinds,
                              Thompson & Angelos, P.A.
15                            100 North Tampa Street
                              Suite 2050
16                            Tampa, FL 33602

17       FOR THE DEFENDANT:   Laura Elizabeth Burgess, Esq.
                              L.E. Burgess, P.A.
18                            5966 South Dixie Hwy
                              Suite 300
19                            Miami, FL 33143

20                            Antonio L. Converse
                              Converse Law Group, P.C.
21                            600 17th Street, Suite 2800 South
                              Denver, CO 80202
22
         TRANSCRIBED BY:      DAWN M. SAVINO, R.P.R., C.R.R.
23                            Official Federal Court Stenographer
                              111 North Adams Street
24                            Tallahassee, Florida 32301
                              Telephone:  850-521-3674
25                            Dawn_Savino@flnd.uscourts.gov
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

2

1               P-R-O-C-E-E-D-I-N-G-S

2          THE COURT:  Case number 23-CV-60345, Head Kandy, LLC

3     versus Kayla Marie McNeill.

4          Could I please have appearances from both parties,

5     starting with the plaintiff.

6          MR. LOEB:  Good morning, Your Honor.  Ethan Loeb on

7     behalf of the plaintiff Head Kandy, LLC.

8          I'll let the rest of my name introduce themselves.

9          MR. THOMPSON:  Colin Thompson for Head Kandy as well.

10          MR. LaRUBBIO:  Good morning, Jalen LaRubbio for Head

11     Kandy as well.

12          THE COURT:  Good morning Mr. Loeb, Mr. Thompson and

13     Mr. LaRubbio.  Good morning to you.

14          Who do we have on behalf of Ms. McNeill?

15          MR. CONVERSE:  Good morning, Your Honor.  Anthony

16     converse on behalf of Ms. McNeill.

17          MR. MS. BURGESS:  Good morning, Your Honor.  Laura

18     Burgess also on behalf of Ms. McNeill.

19          THE COURT:  Good morning to you both Mr. Converse and

20     Ms. Burgess.

21          So we are here for an evidentiary show-cause hearing on

22     the plaintiff's motion to enforce the preliminary junction.  Are

23     both parties ready to proceed?

24          MR. LOEB:  On behalf of Head Kandy we are, Your Honor.

25          MR. CONVERSE:  Ms. McNeill is also ready, Your Honor.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1              THE COURT:  Okay.  Before we get to the taking of

2      testimony, I want to address some things about the scope of the

3      hearing, because I'm concerned -- in my mind the scope of the

4      hearing should be focused on whether Ms. McNeill sent the

5      messages that were complained of in the motion; whether those

6      messages constituted a violation of the preliminary injunction,

7      and if so, what the proper remedy is.  And having reviewed the

8      witness list and the exhibit list and the stipulated and

9      disputed facts that the parties submitted, I'm concerned about

10     the hearing going farther afield on things that we don't

11     necessarily need to get into.  I'm also just honestly concerned

12     about timing.  I was hopeful that we could wrap up today by 3:00

13     or so.

14              So the first thing I wanted to address, having looked

15     at what everyone submitted, is the plaintiff's proposed disputed

16     facts included the disputed fact of whether Ms. McNeill sent the

17     messages that are described in the motion and I think attached

18     as Exhibit A to plaintiff's filing.  The defendant's response to

19     the motion didn't include any sort of denial that Ms. McNeill

20     sent the messages; in fact, it included some sentences that

21     seemed to explicitly admit that she had sent them.  On Page 2 it

22     says that "Ms. McNeill's messages targeted Hard Kandy, not Head

23     Kandy."  It also says "Ms. McNeill reached out to the influencer

24     after seeing a post by the influencer congratulating Hard Candy

25     on its collaboration with the Girl Scouts."

1          So I have to ask the defendant, is there a genuine

2     factual dispute as to whether Ms. McNeill sent the messages that

3     were complained of?

4          MR. CONVERSE:  Your Honor, I first apologize.  Perhaps

5     there was some poor drafting there.  I don't know that my mic --

6     my mic is on now.

7          We can no longer access the messages.  So we don't

8     dispute that the messages were sent, it's just to whom and what

9     exactly the messages were.  We don't have -- we're not able to

10    independently verify that.

11         THE COURT:  So Ms. McNeill admits to reaching out to --

12    she reached out to the influencer but can't say what she said?

13    Or I don't quite understand what's in dispute.

14         MR. CONVERSE:  Yes, Your Honor.  She doesn't recall

15    exactly what she sent to this individual, and also there's --

16    she thought that it was a random person that popped up in her

17    time line.  So we don't know exactly the individual, if she was

18    the one receiving them, you know, because it's the same issue

19    we've already discussed with these social media profiles.  But

20    we don't know what exactly the messages were.  It seems as

21    though the text string is cut off in the exhibits that were

22    attached, and so we can't independently verify what the full

23    message was or what the full exchange was, what the specific

24    messages were.  We're unable to access.

25         There are allegations about links to documents.  When

5

1    we tried to follow the link, there was no document that pulled

2    up.  So we're just unable to verify any of that.

3              THE COURT:  How is it that -- I mean, these were

4    messages -- I don't know what social media platform it was on,

5    but it was sent less than a month ago.  How is it that you can't

6    access them anymore?

7              MR. CONVERSE:  I'm not sure.  I think that there are

8    mechanisms.  So there were these direct messages on the

9    platform.  It could be that the person who received them

10   prohibits Ms. McNeill somehow from either communicating with her

11   or viewing the messages on her account.  Unfortunately I'm not

12   an expert, I just know that we tried to access them and we

13   couldn't.  Ms. McNeill didn't delete them.  It's on the

14   platform.  So when you go on the platform she tried to access

15   them, and she's not able to access them.

16             The handle of the -- I think is what it's called for

17   the individual, doesn't even appear whenever we try to access it

18   in Ms. McNeill's -- through Ms. McNeill's accounts.

19             THE COURT:  Okay.  The next thing I wanted to address

20   is there are a number of facts, particularly I think it's the

21   last six facts or so on defendant's proposed disputed facts,

22   that only appear relevant to or don't appear relevant to any

23   issue other than to supporting arguments raised in the

24   defendant's motion to partially vacate that was filed on Monday.

25   Specifically I'm talking about disputed facts 17 through 23,

```
 1    they all get at whether she was a supervisor, or at some point
 2    was demoted and stopped being a supervisor, or whether she
 3    talked to other employees about harassment or complained on
 4    their behalf, the timing and circumstances of her dismissal and
 5    the harassment she allegedly endured.  I'm quite honestly not
 6    sure I need to reach any of those issues to decide this motion
 7    that's before me which is the plaintiff's motion to enforce the
 8    PI.  That's particularly so since the defendant raised -- what
 9    defendant raised in her response to this motion was simply that
10    by clear operation of the McLaren decision from the NLRB that it
11    cited, the disparagement provision in the executive employment
12    agreement was void ab initio.
13         Those other intricacies about whether she's a
14    supervisor or whether she's demoted or terminated in any way
15    that somehow invalidated the disparagement provision in the case
16    weren't raised in the response here, and weren't raised until a
17    separate motion to vacate which wasn't filed until this past
18    Monday which, quite frankly, left the plaintiff virtually no
19    time to reply.
20         So I guess where I'd want to start is, Mr. Converse, am
21    I right in stating those disputed facts that's I referenced are
22    all in service of your NLRA argument that the disparagement
23    provision just simply was never enforceable?
24         MR. CONVERSE:  That's correct, Your Honor.  It does
25    dovetail into whether or not the court has the power to enforce
```

```
 1    the non-disparagement, which is what we're here today to

 2    discuss.  So that's why we filed our motion to reset the hearing

 3    because it's kind of putting the cart before the horse so to

 4    speak, because we have to first determine if the court has the

 5    power to actually enforce the non-disparagement that's the

 6    subject of the motion that we're here on today.  And so I would

 7    agree with Your Honor.

 8         I would also just state that we were trying to comply

 9    with the order, so honestly when I read the order that the court

10    issued, I took that to mean that that topic -- we needed to be

11    prepared to discuss and to present evidence, and so we were just

12    trying to comply with the order.

13         THE COURT:  And I appreciate that.  And look, let me be

14    clear.  One of the main reasons I denied the emergency motion to

15    reset the hearing that is I thought it was fundamentally unfair

16    to the plaintiff, who'd filed their motion nearly a month ago,

17    to further delay addressing the alleged violation of the PI

18    based on a motion that the defendant didn't file until this past

19    Monday.  I understand it complicates things and there is an

20    interplay here, but it seemed paramedially unfair to me to delay

21    the plaintiff at least the opportunity to move forward on the

22    relief that they had sought based on the defendant not having

23    filed anything for several weeks.

24         I don't necessary -- I'd prefer to get to evidence

25    before we have legal argument, but I feel like at the very least
```

1    just to even understand -- because look, I don't want us to get

2    trapped in -- I don't want the majority of our hearing, and

3    perhaps elongating the hearing, to be surrounding facts that we

4    may not even need to get to, but -- so I want to make sure I

5    understand the argument and then, again, why the theory behind

6    the facts that you're raising there, Mr. Converse, about any

7    harassment that she endured or whether she spoke to other

8    employees or her demotion or anything like that, is it relevant

9    to anything other than the -- really, I guess, refuting the idea

10   that the -- she wasn't covered under the NLRA as a supervisor.

11          MR. CONVERSE:  It's not just the supervisor question,

12   but it is the NLRA question.  So it all goes to the NLRA and

13   what's concerted activity under the NLRA.  So no, it doesn't go

14   to the -- so there's a question about whether or not speaking

15   out publicly about what -- if there was protected activity or --

16   whether or not speaking out publicly is protected activity.  So

17   in that sense, it does apply.  But it's all under the rubric of

18   the NLRA analysis.

19          THE COURT:  Okay.  Well, let me ask you again.  Well, I

20   hesitate to get to some of the legal issues before we have

21   testimony.  I do want to make sure we're focusing on the right

22   things, and so I have to ask about your NLRA argument.  That

23   your argument regarding the NLRA, in both your response and in

24   your motion to vacate, is premised on the idea that the *McLaren*

25   decision dictates that this disparagement provision in the

1    executive employment agreement is non-enforceable.

2            MR. CONVERSE:  *McLaren* and its progeny, not just

3    *McLaren*.  But yes.

4            THE COURT:  Well, you said *McLaren* and you said one

5    other case which was *Big Green*.

6            MR. CONVERSE:  Yes, Your Honor.

7            THE COURT:  As is a stipulated fact here, the

8    disparagement provision in the contract in this case

9    specifically carves out the exercise of protected rights

10   specifically mentioning those rights under the NLRA, correct?

11           MR. CONVERSE:  Yes.

12           THE COURT:  Okay.  So doesn't that alone distinguish

13   the provision in this case from what was at issue in *McLaren* and

14   *Big Green*?

15           MR. CONVERSE:  Well, if you follow that NLRA analysis,

16   then the provisions in the non-disparagement are still too broad

17   to be enforceable.  So if you pull out what would be considered

18   illegal under the NLRA, then it would remove -- well, then you

19   couldn't enforce all of the very broad, non-limiting language,

20   which is the concern.  There is no temporal limitation.  It

21   extends to individuals other than just -- or persons other than

22   just the employer.  Those type of expansive language is what has

23   been found to be --

24           THE COURT:  No.  No.  *McLaren* is specifically about the

25   fact that having such broad language would encumber someone's

1    Section 7 rights, correct?

2         MR. CONVERSE:  Correct.

3         THE COURT:  So how is it -- how can a provision, quote,

4    substantially interfere with Section 7 rights when it explicitly

5    carves out anything that would restrict the exercise of Section

6    7 rights?

7         MR. CONVERSE:  To the extent that any of those very

8    broad provisions that have been found to be overly broad are

9    enforced, then it's infringing upon her Section 7 rights.

10        THE COURT:  No.  Because the provision that's being

11   enforced specifically says you can't disparage, but we're not

12   burdening anything that would otherwise fall under, you know,

13   something that is protected by the NLRA.  It's specifically

14   carved out anything that could be -- the NLRA doesn't cover

15   everything you could ever possibly want to say, correct?  It's

16   about protecting your Section 7 rights to the extent that she

17   had any, right?

18        MR. CONVERSE:  Right.

19        THE COURT:  So when the contract says, you know, that

20   she will not, you know, make disparaging remarks, et cetera, but

21   then it explicitly says "this Section 5D does not in any way

22   restrict or impede the executive from exercising protected

23   rights.  To the extent such rights cannot be waived by

24   agreement, including without limitation the executive's rights

25   under the National Labor Relations Act."

1          It seems like the provision had specifically

2    anticipated this type of problem, and is saying to the extent

3    Head Kandy tried to interpret this in a way that would impinge

4    on any rights guaranteed by the NLRA, it's not enforceable as to

5    that.

6          Doesn't that explicitly -- did that kind of language

7    appear in the provision in the issue of *McLaren* or *Big Green*?

8          MR. CONVERSE:  That specific provision did not appear,

9    but I agree the provision says that it's not enforceable to the

10   extent that it has a chilling effect on her Section 7 rights.

11   And so what I was trying to make the point earlier is that due

12   to the expansive language of it, that expansive language is not

13   enforceable because then it does chill her Section 7 rights.

14         THE COURT:  No, it doesn't, because it specifically

15   says that to the extent anything that would apply in the first

16   part impedes Section 7 rights, that that is carved out.  At the

17   very least -- at the very least let me ask you this.

18         MR. CONVERSE:  Okay.

19         THE COURT:  Did the broad provisions, which you've

20   quoted that a number of times, broad provisions that were issued

21   in *McLaren* or in *Big Green* consider the effect of language like

22   appears in this agreement that says explicitly that it was not

23   impeding, you know, rights that can't be waived, including under

24   the NLRA.

25         MR. CONVERSE:  No.

```
1            THE COURT:  Okay.  So doesn't that distinguish this

2     case from McLaren, at least in a way that we cannot say McLaren

3     dictates the outcome in this case.

4            MR. CONVERSE:  Well no, I would say the contract

5     provision itself recognizes that it needs to be -- that if there

6     are provisions that are found to be unenforceable -- excuse me,

7     to violate the Section 7 rights, they're unenforceable.  So our

8     position is that under the express language of the contract

9     itself, these provisions are unenforceable.

10           THE COURT:  I think you're making it circular and

11    backwards.  If the -- if instead of saying Section 5D doesn't

12    restrict or impede executive from exercising protected rights;

13    if it said, you know, regardless of what the preceding sentence

14    just said, if she talks about the color of someone's tie or that

15    someone's a bad dresser, that's not -- you know, this section

16    doesn't impede that, then you -- wouldn't you say that she would

17    then -- we would know that statements about someone's tie aren't

18    excluded or it's not enforceable.  Or if they then came in to

19    say look, they then complained about Jerome Falic's tie, you

20    could say no, no, no, that's not what is prohibited.

21           Do you follow my logic?

22           MR. CONVERSE:  Yes.

23           THE COURT:  So by saying that this provision does not

24    restrict her rights, it would seem like that is exactly

25    distinguishing, exactly addressing the -- exactly narrowing the
```

13

| | |
|---|---|
| 1 | disparagement provision in a way that wasn't present in *McLaren*. |
| 2 | MR. CONVERSE:  I understand your hypothetical.  I'm |
| 3 | trying to -- I think we're talking past each other, so I want to |
| 4 | make sure I'm answering your question correctly. |
| 5 | There has to be some scenario in which a provision is |
| 6 | not enforceable under that term because it's as you pointed out |
| 7 | with the tie analogy.  So our argument is that these specific |
| 8 | provisions have found to be unenforceable because they're not |
| 9 | bound by any temporal limitation, so therefore those are the |
| 10 | ones that are outside of the agreements.  They're exempted |
| 11 | through that specific provision. |
| 12 | THE COURT:  I guess I'm still just struggling to see |
| 13 | how -- if the logic of *McLaren* is that we can't have broad |
| 14 | provision, we can't have provisions as broad as what was present |
| 15 | in *McLaren* which, as you've indicated, we have no indication |
| 16 | that it included a carve-out like we have here; and if the |
| 17 | reason and conclusion in *McLaren* is that the broad provisions |
| 18 | under scrutiny violated Section 8A1 of the NLRA because they |
| 19 | would restrict employees' exercise of their NLRA rights, when |
| 20 | the provision we have in the contract here specifically |
| 21 | eliminates any restriction on her NLRA rights, I don't see how |
| 22 | you could say that they're analogous. |
| 23 | MR. CONVERSE:  What we're saying is that the conduct |
| 24 | that she engaged in was protected under the NLRA, so it is part |
| 25 | of the carve-out, essentially. |

14

```
 1              THE COURT:  How is the -- well, first of all, no,
 2     that's not what you've said, because your argument in response
 3     and in your motion to vacate is that McLaren alone -- McLaren
 4     itself dictates that the provision was void ab initio.  In other
 5     words, you've not made any argument that as applied either in
 6     this specific instance or in any other instance, that it's void
 7     because it's going farther than the language in the contract.
 8     That's not an argument you've made at all.
 9              What you've said is based on the language in the
10     contract itself, the entire thing was void the moment it was
11     signed.
12              MR. CONVERSE:  That's our primary argument, Your Honor.
13     Secondarily I'm trying to find the point, but we do address this
14     provision in our briefing.
15              THE COURT:  Which provision?
16              MR. CONVERSE:  The carve-out provision for the NLRA
17     actions.
18              THE COURT:  I don't think you do, but you point out to
19     me where you did.
20              MR. CONVERSE:  I believe it was in our response.  Our
21     response to the motion to enforce.
22              THE COURT:  Hmm-hmm.
23              MR. CONVERSE:  I apologize, Your Honor.  It's in there?
24     So I apologize.  It was where I was looking initially.
25              So in our motion to partially vacate the preliminary
```

```
1    injunction, on Page 18 we discussed that -- this is in

2    subsection three that begins on that page, we discussed that

3    particular provision saying that it does recognize that she

4    cannot waive her right to enforce the -- she cannot waive

5    enforcement of her rights under the NLRA.

6         THE COURT:  Right, which is exactly what the contract

7    provision was acknowledging.  She can't waive those rights, and

8    so it's making clear that in entering into this provision she's

9    not waiving her rights.  But that's not suggesting -- that's not

10   making the argument that, say, in the particular circumstance

11   that we have here triggering the motion to enforce or in any

12   other particular area, that the speech that she was -- the

13   comments that she was making were somehow protected, or that

14   enforcing the provision in that circumstance would fall under

15   the NLRA.

16        MR. CONVERSE:  Well, I think we made the point that her

17   rights are implicated under the -- again, I had pointed out that

18   I used the broad terms phrase several times.

19        I think the thrust of the brief is that they are

20   implicated in these very broad terms.  I think we do discuss

21   that, and it's -- I would just also acknowledge that the motion

22   isn't fully briefed yet, and we can certainly --

23        THE COURT:  Well, I understand the motion is not fully

24   briefed and that plaintiff hasn't had a chance to respond, but

25   you've asked for what you've asked for.
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
 1          MR. CONVERSE:  Correct.

 2          THE COURT:  You've made your primary argument.  And

 3   again, I don't see anywhere in there an idea that this is, for

 4   lack of a better phrase, an as-applied challenge.  What the

 5   plain thrust of your motion is that the language in the

 6   agreement, full stop, was too broad.  So broad such that it was

 7   unenforceable, as you said, ab initio, from the second that it

 8   was signed regardless of how the plaintiff sought to enforce it.

 9          MR. CONVERSE:  And I would agree with that, that is the

10   main thrust.  That is our main argument.

11          THE COURT:  Okay.  Even if the language, the language

12   that appears in, you know, the carve-out as I'm calling it, for

13   anything that would implicate NLRA rights, even if that

14   distinction didn't, you know, sufficiently distinguish this case

15   from McLaren, doesn't the, I guess -- here, let me try to do it

16   this way.

17          The plaintiff in the response, or the reply rather,

18   regarding this motion indicated, you know, they would

19   distinguish it based on how this provision came about compared

20   to those in McLaren.  McLaren is about severance agreements

21   being presented to, I think, employees who are already unionized

22   or organized, you know, being presented to them as part of a

23   severance agreement.  Here we've got Ms. McNeill having

24   negotiated this provision as part and parcel of the sale of

25   coming into the company in an executive role.
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1        Doesn't that power dynamic, and doesn't that situation,

2   distinguish it from the situation that was present in *McLaren*?

3        MR. CONVERSE:  Well, we do have guidance in the NLRB's

4   GC's memo and in that guidance it does state that it applies to

5   any communication by an employer.  So it would apply to any

6   agreement.  And to receive protection you need not be an

7   employee under the NLRA.  So it also wouldn't -- I don't think

8   that the intention was to give former employees more protection

9   than current employees.  So -- and that's essentially what the

10  guidance instructed us.

11       THE COURT:  What legal force does the guidance of the

12  general counsel of the -- a memo of the -- guidance memo of the

13  general counsel of the NLRB have?

14       MR. CONVERSE:  It's not binding on this court neither

15  is *McLaren*.  It needs to be given considerable deference, but

16  it's not binding authority.

17       THE COURT:  And I'm sorry.  Did you say *McLaren* is not

18  binding authority either?

19       MR. CONVERSE:  What I'm saying is that the NLRA case

20  law is not binding, or the NLRB case law is not binding on this

21  court.

22       THE COURT:  Okay.  So then *McLaren* is not binding

23  either.

24       MR. CONVERSE:  Correct, Your Honor.

25       THE COURT:  Okay.  And because as I -- again, as I

1       understood the argument, plaintiff replied hey, even -- you

2       know, this is a distinguishable situation, not least of all

3       because she was entering a supervisory position when she, you

4       know, agreed to this provision.  And supervisors are not, quote,

5       unquote, employees under the NLRA.

6              What I understood your -- that was in their reply.  In

7       this motion, what I understood your position to be in the motion

8       to vacate that you filed, and again, what I think the facts that

9       you were proposing to get into today seem in service of, are the

10      idea that -- well, I guess I wasn't entirely sure whether you

11      were saying, one, she was never a supervisor or, two, if she was

12      a supervisor, she was no longer a supervisor by the time she was

13      let go and therefore, she -- any supervisory exception no longer

14      applied at that point.

15             Was I understanding your argument correctly?

16             MR. CONVERSE:  Yes, Your Honor.  As to both, for the

17      definition of supervisor under the Act, I think there's a

18      dispute as to whether or not she actually was functioning as a

19      supervisor initially.  But certainly by the time Mr. Rosenbaum

20      was retained, she was not a supervisor and then even more so

21      after she was demoted on December 1st of '22, she certainly had

22      no supervisory role, and at that point the protections of the

23      NLRA would apply to Ms. McNeill.

24             THE COURT:  Okay.  But understanding maybe there's a

25      dispute about whether she was a supervisor at the time, at the

1    time she agreed to the provision, if the logic of *McLaren* is

2    that you can't make an employee enter into this provision or

3    even proffer to or communicate it to an employee, how does it

4    affect the analysis if when she was offered and proffered and

5    accepted this provision, if she was a supervisor.

6            MR. CONVERSE:  So first I just want to add a little

7    context.  There are still protections for supervisors, but the

8    bulk of them are for employees.  I was really speaking to the

9    full protections for employees a moment ago.

10           And then with regard to your follow-up question, the --

11   I'm sorry.  Could you repeat your question?  I apologize.

12           THE COURT:  Sure.  It was a bit of a convoluted

13   question.

14           Let's presume for a moment that she met the definition

15   of supervisor at the time she was initially hired.  I understand

16   that may be a factual dispute and we may actually need to hear

17   testimony with regard to that.  But part of your argument seems

18   to be even if she was a supervisor, at some point she lost that

19   status.  And so the way I see your argument going in that case

20   is she was a supervisor when this provision was offered to her

21   and when she entered into it.  But when she gets demoted,

22   somehow then that retroactively voids the disparagement

23   provision.  That's at least how I heard that logic.

24           I don't want a straw man.  Am I accurately describing

25   what you're getting at?

```
 1          MR. CONVERSE:  Yeah.  Essentially our position is
 2   that's a continuing violation, especially whenever there are
 3   enforcement efforts against Ms. McNeill.  So I believe it was --
 4   again, this is more so coming out of the general counsel's
 5   memorandum speaking about continuing violations, and if there's
 6   no time constraints, then they're considered continuing
 7   violations.
 8          THE COURT:  But I guess the -- again, part of my -- is
 9   there any case law, because I don't think you've cited any, but
10   is there any authority for the idea of what happens, how the --
11   you know, the ruling in McLaren applies when someone was a
12   supervisor but then ends up no longer being a supervisor.
13          MR. CONVERSE:  Not that I'm currently aware of, Your
14   Honor.
15          THE COURT:  Okay.
16          MR. CONVERSE:  By case law you mean opinions of the
17   board and court?
18          THE COURT:  I mean any, because I don't know.  I
19   certainly didn't see anything cited in support of the idea that
20   -- because again, part of what McLaren seems to be about is this
21   idea of coercion.  Right?  And you see it in that case, you've
22   got people who are literally about to be furloughed and
23   essentially it's a here, take it or leave it, would you like
24   your severance, because if you would, you've got to agree to
25   this provision.  And one can obviously see the coercive effect
```

```
1    of that and how it's getting them to waive rights.

2              Here we have a very different situation where at the

3    time she's negotiating accepting that provision, none of that

4    coercion exists, both because it's quite a different timing

5    posture and it's also she's going into a quite different type of

6    position.

7              And so I'm not sure how -- especially without any

8    authority, you know, even addressing the situation where someone

9    might have started as a supervisor and then later not been, how

10   to apply what McLaren is saying in that context.

11             MR. CONVERSE:  Well, I would agree that that was the

12   circumstances in McLaren, but I think that the opinion went

13   further than that.  I don't think that it restricted it to just

14   those circumstances, and so that's why I spoke about the mere

15   proffer of an agreement by an employer.  I think it was much

16   broader in context than the specific circumstances of that case.

17             THE COURT:  Okay.  And specifically it seemed to me

18   that a lot of what -- again, a lot of what you were planning to

19   get into today about, you know, whether she was talking to other

20   employees or the -- I want to make sure I'm quoting it

21   correctly, but something like, you know, 22, your disputed fact

22   22, timing and circumstance of the termination of her

23   employment; the extent and nature of the harassing and abusive

24   conduct Ms. McNeill endured; when and to what extent she

25   complained about the harassment and abuse and all the employees
```

1    the complaint was made on or on behalf of, what do those facts

2    bear on?

3            MR. CONVERSE:  Whether or not she was engaging in

4    concerted activity that is protected under the NLRA.

5            THE COURT:  How is that concerted activity that's

6    protected under the NLRA?

7            MR. CONVERSE:  To the extent that she would be deemed

8    to be a supervisor, the fact that she was allowing other

9    employees to air their grievances and she was trying to advocate

10   on their behalf, that is concerted activity under the NLRA.  The

11   fact that she would not continue to enforce the employer's --

12   the working conditions that the employer had imposed upon the

13   employees.  Our position is that that is concerted activity, as

14   well as her speaking about her -- when it comes to her

15   specifically, and if she is deemed to be an employee and not a

16   supervisor, the retaliation for her reporting the sexual abuse

17   that she was the victim of, then that would be protected as

18   well.

19           THE COURT:  How is that protected under the NLRA?  In

20   other words, what does that have to do -- my understanding of

21   the bulk of the protections regarding the NLRA have to do with

22   labor organizing.  Section 7 says employees shall have the right

23   to self-organization; to form, join or assist labor

24   organizations; to bargain collectively through representatives

25   of their own choosing, and to engage in other concerted activity

1  for the purpose of collective bargaining and other mutual aid

2  and protection.

3       So I understand you that there are -- look, sexual

4  harassment and/or other unfair treatment could certainly be

5  something that deserves to get complained of and that there may

6  be protections for complaining about under Title 7.  I'm not

7  entirely sure that what you're claiming, you know, the things

8  that she was complaining about are things that are protected

9  under the NLRA as opposed to Title 7 or some other more general

10  employment statute.

11       MR. CONVERSE:  Sure.  So under our main argument, it's

12  whether or not it has a chilling effect, so it goes to the

13  language.  Then more specifically, what conduct was actually

14  engaged is a separate analysis.  But under that analysis, if an

15  employer fails to allow employees to speak out on unfair working

16  conditions, that, we believe, is a violation of the NLRA.

17       THE COURT:  Okay.  But that's all stuff that seemed to

18  have happened while she was employed.  What effect -- what is --

19  what effect does that at all have on the enforcement of the

20  non-disparagement provision after her employment here?

21       MR. CONVERSE:  So under *McLaren* -- I'm looking for the

22  pin cite here for you.  I apologize.  But under *McLaren*, public

23  statements by employees about the workplace are central to the

24  exercise of employee rights is a quote from the -- and again,

25  I'm trying to find the exact pin cite.

24

1          So the public statements about her workplace

2    conditions, we would argue under the *McLaren* opinion, is

3    protected activity.  And prohibiting that would be a violation.

4          THE COURT:  Okay.  But I still don't quite understand,

5    what does that have to do with whether she spoke to -- let's

6    even assume that, you know, any conversations that she had in --

7    you know, while working at Head Kandy, were protected by the

8    NLRA; and even assume that she was covered by the NLRA at that

9    time, I don't understand what that has to do with enforcing the

10   non-disparagement provision even in this specific circumstance

11   that we have at issue today, or more generally.

12         MR. CONVERSE:  So you mean post-employment?

13         THE COURT:  Yeah.

14         MR. CONVERSE:  Well, that's exactly what *McLaren* was

15   dealing with.  It was dealing with severance agreement.  So

16   they're talking about post-employment circumstances, about what

17   the employees couldn't do post-employment.

18         THE COURT:  Okay.  In what way is the -- again, I don't

19   think you've brought any kind of as-applied challenge here, but

20   in what way were the statements that are alleged to be at issue

21   in this specific hearing an exercise of Section 7 rights or have

22   anything to do with the NLRA?

23         MR. CONVERSE:  Well, I think that at the very least the

24   preliminary injunction deserves a second look because there is

25   not a carve-out for her Section 7 rights, that protects her

```
1    Section 7 rights.  And so what we're saying, again, with regard
2    to the statements which were brought up as violations of the
3    preliminary injunction about sexual harassment, about workplace
4    conditions, that those would be protected under the NLRA.
5              THE COURT:  How would that apply to the statement that
6    the company was taken from her?
7              MR. CONVERSE:  On that specific one, I don't believe
8    that that one applies.
9              THE COURT:  Okay.  All right.  Ultimately again, I
10   think our time is -- I think that we should be -- I'm sorry.
11   What were you going to say?
12             MR. CONVERSE:  I misspoke.  I apologize.  Or I just
13   want to add is that the company being taken from her was part of
14   the retaliation would be the other point to make.
15             So our argument is that in exercising her rights to
16   voice her concern about the workplace conditions, she was
17   retaliated against.  And there's an immediate demotion,
18   suspension, termination and then stripping of her -- well, an
19   attempt to strip her ownership interests even though there's no
20   -- you cannot strip -- there's no repurchase rights under the
21   operating agreement for people who are executives and members at
22   the same time.
23             THE COURT:  All right.  Ultimately here I think we need
24   to focus on the facts that are specific to the violation that
25   we've got here, or alleged violation that we've got here, and
```

```
 1     again, I think our time is best spent focusing on that.  I don't
 2     think therefore we -- I don't think to resolve today's motion I
 3     need to hear facts regarding the circumstances of her dismissal
 4     or the harassment that she alleges to have -- to have endured.
 5            And again, in my mind the only response that -- and the
 6     only position that you've taken is that the NLRA prohibits the
 7     non-disparagement clause itself, and so it was void from the
 8     beginning.  So I think that's where we should focus our time on
 9     today.  I think if we get to the point -- if after the motion to
10     vacate is fully briefed I find that we need to hear facts
11     regarding some of those circumstances in order to decide that
12     motion, I think we can come back for another hearing.  But
13     again, what I'm weary of here is I don't think we should be
14     getting bogged down into facts that ultimately aren't going to
15     bear on the motion that's been filed and that goes to the
16     specific arguments that the defendants made in the response or
17     even in the motion to vacate.
18            And again, I do that at least in part because I don't
19     think plaintiff has had the full opportunity to prepare for a
20     hearing to address all the facts that the motion that was filed
21     on Monday has now tried to inject into the issue.  But I don't
22     know, maybe timing-wise maybe we're going to move faster than I
23     fear here.
24            Does anyone want -- I guess does anyone have an issue
25     of how we're planning to proceed today, or what the focus of the
```

```
1    hearing should be?  Mr. Loeb, let me, I guess, hear from you.

2              MR. LOEB:  Yes, Your Honor.  And thank you.

3         This is a fairly straightforward hearing.  We

4    identified Ms. McNeill as being the one that we would call, and

5    that was generated primarily by us learning that despite the

6    fact that there were representations and a filing that she

7    admitted to sending these, I guess they're called instant

8    messages or direct messages, my technology isn't as good as it

9    should be but I'm getting old, that we were going to talk to her

10   and have her, I guess, validate what she seemed to be retreating

11   from, despite the fact that it was put in the papers.

12        We learned late yesterday evening she's not going to

13   show up today, which was surprising.  She is not here.  Which,

14   strategy call on their part, decision by her.  Usually when

15   you've got a show-cause hearing for contempt, probably a good

16   idea to show up, but she's elected not to.

17        I take what she has written under Rule 11 in her papers

18   that she does not take issue with the fact that the text

19   messages or the direct messages were sent.  And so from our

20   perspective, the issue -- and that's why we have is a disputed

21   statement of fact is that they raised that issue the other day

22   of indicating that, you know, when we were exchanging the

23   information whether Ms. McNeill sent it or not, my response was

24   are you kidding me.  You put this in a paper.  You've signed

25   this as lawyers.  You've said and agreed that this has been
```

 1    done.  And instead of dealing with that, there was a two-part

 2    defense.  The first was this Fair Labor Standards Act, and I'm

 3    prepared to address it.  We've got our filing, it will be ready

 4    to go, we're going to file it on Monday to get this thing

 5    moving, but I've done a crash course in this.  Can't say I'm an

 6    expert because I'm not an employment lawyer, but I know enough

 7    about the law to know that this does not apply.

 8          Once you get past that, this becomes very basic, and

 9    the question is is what is contained in those text messages

10    violative of the court's preliminary injunction, as well as the

11    executive employment agreement restrictive covenant contained in

12    5 D.

13          I'm a little troubled to learn that in the middle of

14    this federal litigation, especially with the standards regarding

15    preservation of documents, that these communications are somehow

16    gone from Ms. McNeill's, I guess, Instagram account or whatever.

17    She had an obligation under *Zubulake*, and all of the cases that

18    came from that decision with regard to preservation of evidence,

19    certainly should have done something to stop it from

20    disappearing or going away.  And the fact that Ms. McNeill is

21    not here to explain herself is probably more troubling than

22    anything else I've heard so far today.

23          From our perspective I'm prepared to introduce into

24    evidence the necessary documents to establish that there was a

25    violation of the court order, but candidly under the way that I

```
 1   read the law because it's a show-cause hearing, the burden --
 2   we've met our prima facie case in the papers through the
 3   affidavits.  The burden has shifted to Ms. McNeill under the
 4   case law to show why, either A, she could not perform or could
 5   not obey the court's order, or she has some sort of valid
 6   excuse.  And given the fact that Ms. McNeill is not here to
 7   testify, I struggle to see how she's going to carry her burden.
 8           But from my perspective, Judge, I'm happy to introduce
 9   the documents.  I've got business records, affidavits from
10   various individuals within the Head Kandy organization to
11   authenticate those documents.  The text messages are what they
12   are, the case law is what it is, and from our perspective that's
13   probably the best way to go about doing it given that Ms.
14   McNeill has decided not to show up to explain to the court, A,
15   her behavior and, B, why it is that these text messages have
16   suddenly disappeared.  I'm pretty troubled by that, to be candid
17   with the court.
18           THE COURT:  So I guess I'm a little confused.  All
19   right.  So what evidence is the plaintiff then prepared to
20   present today?
21           MR. LOEB:  The evidence I'm prepared to present, and I
22   have a binder here of evidence I could hand the court so I could
23   walk you through it if that would be okay.  We brought Mr. Chang
24   for technology, but I guess we don't have that.
25           THE COURT:  Yeah.  And I apologize we didn't warn you
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
 1    about that.

 2              MR. LOEB:  No worries.  I'm glad I came old school.

 3              THE COURT:  Have you shown everything to --

 4              MR. LOEB:  We delivered an electronic link to them

 5    yesterday.  We don't know what their exhibits are, but we gave

 6    them a link saying here's what we plan to introduce, along with

 7    the list which we served the night before.  So yesterday morning

 8    we had my paralegal serve them with a list.

 9              THE COURT:  So you can hand that up, but I guess

10    Mr. Converse, what were you planning on presenting then today?

11              MR. CONVERSE:  Well, we thought that the scope was much

12    broader, Your Honor.  So we have two witnesses that have come in

13    to testify from out of state.

14              THE COURT:  Right.  Those are the two ladies from North

15    Carolina?

16              MR. CONVERSE:  Yes, Your Honor.

17              THE COURT:  And that was Ms. Culp and Ms. Teaster?

18              MR. CONVERSE:  Yes.

19              THE COURT:  And what were they going to be testifying

20    about?

21              MR. CONVERSE:  They're former employees of Head Kandy

22    as well, and so they were going to testify about the --

23    primarily about the working conditions and interactions with Ms.

24    McNeill.

25              THE COURT:  Okay.  Why is Ms. McNeill not here?
```

```
1          MR. CONVERSE:  Your Honor, I didn't think she was

2    required to be here.  I thought we could appear through counsel,

3    so she didn't appear at the last show-cause hearing.

4          THE COURT:  Mr. Loeb, at some point, you know, she's

5    listed on your witness list.  Did you subpoena her or discuss

6    with plaintiff's counsel or defense counsel you were seeking her

7    testimony?

8          MR. LOEB:  We did not subpoena her.  My bad.  Like I

9    said, it's probably an improper assumption on my part that the

10   target of a show-cause hearing would show up and so that's --

11   I'll take the hit for that.  That's my bad.

12          Candidly, Your Honor, given the pleadings on file, I

13   don't think it's at all necessary for her to testify.  And when

14   it was indicated to us in the exchange of the stipulated facts

15   or the disputed issues of fact, which we waited quite a bit in

16   order to receive a response, almost a week by the time we got

17   that back and trying to pivot to prepare for it, candidly ran

18   out of time to have a valid subpoena in place to force her to

19   show up.  And when we learned about it yesterday afternoon when

20   she wasn't showing up I said okay, well, we'll make a run at

21   what we've got.  We've got to set on the table.

22          But, I mean, from my perspective, Your Honor, in order

23   to go forward and establish my prima facie case, which I

24   candidly think I've done through the motion to enforce with the

25   affidavits, and the burden has shifted, hence the show-cause
```

1    order that the court has entered, simply entering the

2    documentation.  The communications are what they are.

3         And with regard to having other witnesses testify about

4    conditions at the workplace, all due respect to counsel, it's a

5    red herring honestly.  We're talking about communications with

6    regard to the company being taken as Ms. McNeill said in the

7    text, and with regard to sexual harassment.  We want to do a

8    deep dive into whether or not Section 7 even applies here, and

9    whether or not she is a supervisor or a managerial employee,

10   which I'm happy to show the court that she's admitted in

11   pleadings that she was a managerial employee which is a separate

12   exception which has been judicially recognized under the NLRA,

13   in addition to Section 11 which is the supervisor exception.

14   Both of those I'm happy to address with the court through

15   documentation and actually admissions by Ms. McNeill.

16        So, you know, we're -- I guess my point is is that I'm

17   ready to call Ms. McNeill if I need to.  I don't think I am

18   given what it is that she has put in the record through counsel

19   by way of her pleadings admitting and acknowledging that she

20   engaged in this behavior, and that she did this.  They delivered

21   these text messages.

22        And it's a little surprising now that the explanation

23   is well, we don't have the full text thread because it's gone.

24   It certainly wasn't gone when -- or maybe it was and they just

25   relied on what was attached, but it didn't prohibit counsel from

```
 1    filing a paper with this court under the requirements of Rule 11
 2    indicating that she fessed up, she acknowledged that she did it,
 3    and instead she tried to make excuses for it either under this
 4    Section 7 argument that's been recently raised, which I don't
 5    take this accusation lightly, I think it's frivolous candidly, I
 6    do.  And then the second component of it which is that, you
 7    know, she was not talking to somebody about Head Kandy, she was
 8    talking about Hard Candy which, of course, there's common
 9    ownership.  She knows that.  She lays it out by saying I've got
10    a direct link between Hard Candy and Head Kandy through her own
11    statements.
12          THE COURT:  Okay.  Can you hand up the exhibits that
13    you have?
14          MR. LOEB:  Yes, sir.  I had also -- like I did last
15    time, I had a brief PowerPoint to help focus things.  I've got a
16    copy for you, I gave a copy to counsel if we go into it.  But
17    here's the exhibits.
18          THE COURT:  Are there objections to the exhibits?
19          MR. CONVERSE:  Yes, Your Honor.  Will you pull it up
20    please?  Would you like me to go down the list, Your Honor?
21          THE COURT:  Sure.
22          MR. CONVERSE:  So as to the Number 3, the limited
23    liability company agreement of Hard Candy, we had a records
24    custodian, I saw an affidavit from a records custodian about the
25    original.  If the intent is to introduce this as the current
```

34

```
1    limited liability company agreement, the affidavit does not

2    speak to that.

3            THE COURT:  We're starting off with the executive

4    agreement that was the focus of the entire PI hearing.  Do we

5    not have an authenticated copy of that that's already in the

6    record?

7            MR. CONVERSE:  I apologize for interrupting, Your

8    Honor.  I said Number 3.  So yes, we do not dispute 1.  I should

9    have gone through in order.  I apologize.

10           THE COURT:  Okay.

11           MR. CONVERSE:  Yes.  We do not dispute Exhibit 1, we do

12   not dispute Exhibit 2.

13           THE COURT:  Okay.  So 1 and 2 are admitted.

14           (Plaintiff's Exhibits 1 & 2 in evidence)

15           THE COURT:  3, I'm sorry, is the limited liability

16   company agreement of Hard Candy.

17           And please, everyone, let's make sure to articulate,

18   and I'll do that myself, especially because certainly in some of

19   the briefing I think there were even probably some typos on both

20   parties' part where we start mixing up the "hard" and the "head"

21   and the "C" and the "K" in the "candy".  So let's make sure

22   we're being quite clear as to which company we're speaking of.

23           So I'm sorry.  This is the limited liability company

24   agreement of Hard Candy.

25           MR. CONVERSE:  Yes, Your Honor.
```

```
 1            THE COURT:  Okay.  And what is the issue with this?

 2            MR. CONVERSE:  My understanding is that the intention

 3   is to introduce it as the current limited liability company

 4   agreement of Hard Candy, and I don't think it's been

 5   authenticated in that manner.  It was -- I believe that the

 6   affidavit speaks to it being the original one.

 7            THE COURT:  All right.  So Mr. Loeb, what is Exhibit 3?

 8   What's the evidence of its authentication and what is the -- I

 9   assume it's being offered to demonstrate that Mr. Falic is one

10   of the members of Hard Candy in addition to being a member of

11   Head Kandy.

12            MR. LOEB:  It is, Your Honor.  And I have -- rather

13   than drag David Taney, who is the general counsel for Duty Free

14   Americas, as well as these other entities serves as the general

15   counsel and corporate records custodian, I actually have a copy

16   of the affidavit with the attachments, Your Honor.  If I could

17   ask that it presented to the court?

18            THE COURT:  Sure.  Hand it on up.

19            MR. LOEB:  If you look, Your Honor, at what I've

20   submitted to the Court, this is an affidavit of Mr. Taney.

21   Rather than drag him up here and have him do what can be done by

22   way of affidavit, if you look behind Tab Number 2, there's the

23   limited liability company agreement of Hard Candy.  If the court

24   looks, Mr. Taney does, with the requisite degree of formality

25   required under the rules for authentication of a business
```

1   record, does so and identifies as Number 2 saying the limited

2   liability company agreement of Hard Candy.  Within that there's

3   a reference at the bottom saying that Mr. Falic is the manager

4   of Hard Candy.  And if we compare that to the Exhibit 1 to

5   Mr. Taney's affidavit, the amended and restated limited

6   liability company operating agreement of Head Kandy, Mr. Falic

7   is also the authorized representative of that company.

8        Just trying to jump through the hoops here on things

9   that really should not be an issue of disputed fact for the

10   purposes of today's proceeding.

11        THE COURT:  I guess I'm still confused then.  What is

12   -- the objection as to Plaintiff's Exhibit Number 3, which is

13   the limited liability company agreement of Hard Candy, what is

14   the objection?  I guess I don't understand what is the

15   objection, Mr. Converse?  Is it not the same agreement that's

16   referred to as Exhibit 2 of Mr. Haney's affidavit?  Mr. Taney's

17   affidavit.  I'm sorry.

18        MR. CONVERSE:  No, Your Honor.  I believe it is.  The

19   problem is we didn't receive the affidavit.  It wasn't listed as

20   an exhibit.  We didn't receive it until yesterday afternoon, so

21   I'm trying to review and get up to speed while I'm flying

22   yesterday.  And so I was just speaking to the fact that the

23   affidavit -- if it's introduced as the current operating

24   agreement, I don't believe that the affidavit speaks to that.

25   Says that it was the agreement it purports to be as of the date

```
1    executed, and so I --

2         THE COURT:  So the question is not whether this is an

3    authentic operating agreement of Hard Candy; it seems like the

4    objection is we don't know whether there's been some amendment

5    since this was filed that would tell us that the agreement is

6    still the same today as it was in 2009 when it was signed.

7         MR. CONVERSE:  Precisely.  We don't know.  Because the

8    ownership could certainly have -- it need not necessarily be --

9    it could just be a cap table as opposed to the entire agreement

10   itself.

11        THE COURT:  Okay.  Well, I'm going to overrule the

12   objection.  I think the document is authentic.  I also think

13   it's relevant whether -- you know, the specter or possibility

14   that it may have changed in intervening years may go to its

15   weight, but it doesn't go to its admissibility.  And so I'm

16   going to admit Exhibit 3.

17             (Plaintiff's Exhibit 3 in evidence)

18        THE COURT:  What about regarding any of the other

19   exhibits?  Are there any objections to the other exhibits?

20        MR. CONVERSE:  Yes, Your Honor.  So with regard to

21   Number 8, the direct messages, again, so I think Mr. Loeb may

22   have just misspoke.  These aren't text messages, so it was

23   nothing that was ever retained on Ms. McNeill's phone.  So

24   again, we think that this Ms. Burke blocked her access to view

25   them, so they're no longer accessible.  And the affidavit, or
```

1    the declaration rather, that purports to authenticate them is

2    not from Ms. Burke.

3              THE COURT:  All right.  Mr. Loeb, how do you

4    authenticate these messages?

5              MR. LOEB:  Your Honor, first of all I go to the filing

6    that happened.  And Ms. McNeill acknowledges in her pleadings

7    saying that she admits that she sent this.  And in fact, if the

8    court were to look at -- you've already touched on this, but

9    I'll bring it back full circle, Your Honor.

10             Ms. McNeill, in her opposition papers -- let me get to

11   it.  On Page 2 Ms. McNeill reached out to the influencer after

12   seeing a post by the influencer congratulating Hard Candy on its

13   collaboration with Girl Scouts.  That's on Page 2.

14             On Page 6, as for the Head Candy owners, Ms. McNeill

15   fully acknowledges that she told the influencer her company was

16   taken away from her by the owners of Head Kandy, and that she

17   was sexually harassed and retaliated against.  However, Ms.

18   McNeill's statements do not say the owners improperly, in

19   Italics, took her company away, nor did the statements identify

20   individual or either company regarding sexual harassment or

21   retaliation.

22             This defendant has admitted it in her papers that this

23   is what it purports to be.  She's adopted it in her papers in

24   certifying through her counsel, who both separately are here,

25   signed this subject to Rule 11 that this is what it purports to

1   be.  And so to come in here at this evidentiary hearing now and

2   suggest something otherwise, with Ms. McNeill deciding not to

3   show up, if there's an authentication issue saying that this is

4   not an authentic exchange of communication, I'm going to say it

5   again, I don't take it lightly, I don't accuse people of this,

6   but it's frivolous.  She has adopted this particular

7   communication as a defense and fully took it on.

8        THE COURT:  Mr. Converse, yeah, honestly I overlooked

9   that specific statement on Page 6.  It seems, at the very least

10  -- I guess I don't see how can the defendant now challenge the

11  authenticity, or at least the fact of her telling an influencer

12  that her company was taken away from her by the owners of Head

13  Kandy, and I don't know whether that -- this is one of those

14  places where there's a mix-up and I can't quite tell what's

15  being said because the candy here, it's head, H E A D, with

16  candy spelled with a "C", so I don't know if you were trying to

17  refer to it as Hard Candy or Head Kandy, although I think the

18  context of the messages make pretty clear that Ms. McNeill

19  understood them to be one and the same.

20       But having made this acknowledgment, how can you now

21  object to the authenticity of the messages or suggest that they

22  were not made?

23       MR. CONVERSE:  We're not suggesting that no messages

24  were made, we're objecting to the authenticity of what is being

25  presented and the means by which they're trying to present it

```
1    and the -- that's not an exact quote.  So I think what the exact

2    language of the text is material.

3            THE COURT:  Well, I think it's material too, and quite

4    honestly her decision not know show up here to testify is quite

5    mind-boggling to me, subpoena or not.

6            MR. CONVERSE:  Your Honor, I just --

7            THE COURT:  Hold on.  But this is -- at the very least

8    it seems like the defendant has conceded that she fully

9    acknowledges she told an influencer her company was taken away

10   from her by the owners of Head Kandy, and that she was sexually

11   harassed and retaliated against.  That seems like that has to be

12   a conceded fact.

13           MR. CONVERSE:  I agree with you, we were trying to --

14   sorry.  I don't know the best way to -- we were trying to

15   acknowledge what occurred as best we could in the motion.  So

16   we're not trying to -- we're not disputing that messages were

17   exchanged.

18           As far as the specific facts that she said, there is a

19   typo there, but we're not disputing that she made reference to

20   the company being taken.  She does -- and we're not disputing

21   that she referenced the owners.  I don't know -- again, without

22   looking at what's purported to be the text exchange, I don't

23   know precisely what was said as to which owners of what company

24   and who those owners are.

25           THE COURT:  Okay.  Mr. Loeb, walk me through then.
```

```
1    What do you have to authenticate, what authenticates your

2    Exhibit 8?

3            MR. LOEB:  As it stands now, the question is is this

4    what it purports to be.  Correct?  And based upon the filing of

5    -- that's in the record, Your Honor, I would rely upon the

6    statement of counsel on behalf of Ms. McNeill adopting this and

7    indicating that it is what it purports to be, this is not

8    challenged.

9            THE COURT:  But what is it that states what it purports

10   to be?  Is it the Mehra declaration?  What exactly do you have

11   in the record that authenticates that this is -- in other words,

12   that this is a direct message exchange that occurred between

13   this account bearing the name of Kayla McNeill and Alexis

14   Christine_XO?

15           MR. LOEB:  Your Honor, other than the filing and

16   relying on that and realizing that I don't need to subpoena the

17   influencer or have her to come to court to testify this is what

18   I received, and Ms. McNeill deciding not to fly here from

19   Colorado to testify, I can only rely on what was placed here and

20   filed on April 1st and from that point until Wednesday, assumed

21   that was not an issue.  And you know what, if that's my fault

22   for relying on what counsel filed and taking it at face value

23   that this is not an issue of authentication, I would have

24   figured out a way to subpoena Ms. Burke, who is the full name of

25   the social media influencer, to have her testify.
```

1          The only other thing that I would offer, Your Honor, is

2     what is attached to the motion itself in terms of

3     authentication, and that would be the declaration which is found

4     at Docket 199-2 of Sanjiv Mehra, and I don't know if I'm

5     pronouncing that the right way.  But Mr. Mehra identifies the

6     texts that he received from the influencer, and identifies it as

7     being it is what it purports to be through his declaration.

8          THE COURT:  All right.  So really the evidence of

9     authenticity that we have authenticity that we have is

10     Mr. Mehra's declaration indicating that he received these

11     messages from Alexis Burke.

12          MR. LOEB:  Yes.  In particular, Your Honor, if the

13     court looks at 199-2, which is the Mehra declaration, in

14     particular paragraphs five and six in which there is: "However,

15     on March 13th of 2024, Hayden received a message from influencer

16     via Hayden's Instagram business account stating that the

17     influencer had been contacted by Ms. McNeill.  That attachment

18     which goes to Exhibit A to that is the communication that was

19     received.

20          And then Mr. Mehra goes on to indicate on paragraph 6

21     that the influencer also shared screenshots of influencer's

22     conversation with Ms. McNeill, true and correct copies which are

23     attached hereto as Exhibit B.  The conversation between

24     influencer took place following the influencer's post on social

25     media.  He declares this subject under penalty of perjury.

1              And therefore, putting aside the fact that Counsel,

2       until Wednesday, did not take issue with this communication,

3       Mr. Mehra's indication through his declaration, which is

4       appended to the motion to enforce surely authenticates it.

5              THE COURT:  All right.  I think the potential problem,

6       that Mr. Mehra can authentic that these were the messages that

7       were forwarded to him from Ms. Burke.  His knowledge of whether

8       these are in fact messages exchanged between Ms. Burke and Ms.

9       McNeill is based on hearsay, the representations of Ms. Burke to

10      him.  Correct?

11             MR. CONVERSE:  He's not using it for the truth, he's

12      just saying these are the documents that I received.  He's just

13      saying here's what they are and here's what I received.

14             THE COURT:  And I understand that, and so I think

15      they're authentic to the extent they represent what Mr. Mehra

16      received.

17             MR. LOEB:  Right.

18             THE COURT:  The question though is the next layer of

19      authenticity, of the authentication of what it was she, being

20      Ms. Burke, was sending to him and how they were captured and so

21      forth.  And really, his only knowledge of that is based on --

22      he's only relaying what his understanding of what they are based

23      on what she, Ms. Burke told him, correct?

24             MR. LOEB:  I think what he's saying is here are the

25      whatever it is.  Communications.  Direct message, text messages,

1   here's they are.  That satisfies the existence of those

2   communications.

3         As it pertains to really what Ms. McNeill indicated,

4   that's, A, been admitted in the papers and, B, it would be an

5   admission by a party opponent because this is what Ms. McNeill

6   is writing that she's adopted and agreed to in her papers as

7   saying yeah, I did it, but here's the excuse and justification

8   for it.  So I've satisfied the authenticity of the documents

9   that were received.

10        And as it pertains to what Ms. McNeill communicated to

11  the social media influencer, those communications are -- I mean,

12  those are statements by Ms. McNeill that have been adopted and

13  in the papers that have been filed and the response to the

14  motion to enforce in this dispute.  So I think we've satisfied

15  both hurdles in terms of the authenticity.

16        And if I'm looking at 901, Your Honor, I think the

17  general rule as I'm reading it is to satisfy the requirement,

18  the proponents must produce evidence sufficient to support a

19  finding that the item is what the proponent claims it is.  I've

20  satisfied that burden.  Mr. Converse does not have Ms. McNeill

21  to testify here to say no, that's not it; Ms. McNeill is not

22  here by way of an affidavit saying no, that's not it; and in

23  fact, what is really disturbing is Ms. McNeill apparently

24  doesn't have any of the evidence.

25        So I've met my burden in terms of showing what's

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1  necessary in terms of 901's authenticity requirement.  To the

2  extent there's an argument, the burden is shifted over to Ms.

3  McNeill and they've failed to offer anything other than well,

4  Ms. McNeill doesn't have any messages that they still exist or

5  something's happened to them.  But from an authenticity

6  standpoint that's been met.  And there's nothing in opposition

7  to that that would suggest that, consistent with 901A, that the

8  item is what the proponent claims it is.

9          THE COURT:  All right.  Mr. Converse, last word on

10  this.

11          MR. CONVERSE:  Your Honor, I would just reiterate that

12  -- what's already been brought up, that these are not messages

13  that the individual has any knowledge about, who's purporting to

14  say they're true and correct copies.  It even looks like part of

15  them are obstructed by the signature page.  And the declaration,

16  quite frankly, Paragraphs 6 through 9, all make statements that

17  -- for which the declarant has absolutely no personal knowledge

18  of.  So I don't think they can be authenticated.

19          As to whether or not these messages were made by Ms.

20  McNeill to the individual, we're talking about a document --

21  about authentication of a document, not the party admission I

22  believe is what Mr. Loeb said.

23          So that's all I would say in response, Your Honor.

24          MR. LOEB:  Your Honor, if I could be heard on one other

25  thing?

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
 1              THE COURT:  Sure, Mr. Loeb.

 2              MR. LOEB:  And I'm admittedly look at my federal rules

 3      handbook that I utilize when I go to court, and I admittedly

 4      have not looked at this case, but I will read this out in terms

 5      of driving my point home.  It indicates the courts are

 6      justifiably reluctant to admit social media statements based on

 7      simple name and photograph.  Some have looked at guidelines set

 8      out by a Texas appeals court in holding that, quote, something

 9      more, end quote, might be necessary to adequately represent a

10      prima facie case of authentication.  There are six factors, and

11      it's in the disjunctive, of one through six.  The first one is

12      the purported sender admits authorship.

13              We have, in the papers in this case Ms. McNeill,

14      through her counsel, admitting authorship of the texts.

15              THE COURT:  She admits authorship of something.

16      Something with content.  Look, I understand where you're coming

17      from.  The admission that's in the response I think, at best, it

18      does admit sending some kind of messages that are, quite

19      frankly, consistent with what was attached to the plaintiff's

20      motion.  So I think you're right in some way that there is some

21      corroboration there.  I don't know if it necessarily gets you

22      all the way there, but go on, Mr. Loeb.

23              MR. LOEB:  And when we then look at what the papers

24      that are filed that are found at Docket 209 -- and again, I'll

25      go back and look at Page 2.  Ms. McNeill reached out after
```

```
1    seeing a post, the influencer congratulating on Hard Candy.  She

2    goes on to indicate that Ms. McNeill's statements about Hard

3    Candy do not violate the court's order as Hard Candy is not Head

4    Kandy, business or affiliate.

5         She then goes on to -- on pages two and three to

6    indicate Ms. McNeill's conduct may not violate the letter of

7    additional prohibition or from soliciting or encouraging

8    clients.  Influencer specifically told Ms. McNeill, meaning Ms.

9    McNeill has adopted also what the influencer has said.

10        On Page 3, influencer was not a client, customer,

11   supplier, licensee or licensor of the plaintiff.  Influencer

12   specifically told Ms. McNeill "I just thought it the Girl Scout

13   was a cute package.  I was under no obligation to share not even

14   how I got the pr (sic) list."

15        THE COURT:  I'm sorry.  Where are you reading from now?

16        MR. LOEB:  Page 3 on Docket Entry 209, Your Honor.

17        THE COURT:  I'm sorry.  Page 9 you said?

18        MR. LOEB:  Docket 209, Page 3.

19        THE COURT:  I'm sorry.  Thank you.

20        MR. LOEB:  If I misspoke, I apologize.

21        THE COURT:  No, you didn't.  I misheard.  Yes.  Okay.

22   Right.  Influencer specifically told Ms. McNeill, quote, I just

23   thought it, brackets, the Girl Scout Cookie makeup was a cute

24   package.  I was under no obligation to share.  Not even sure how

25   I got on the pr (sic) list.
```

1           MR. LOEB:  Correct.  So we have further -- as we look

2     at the statements that were made under 901, and then the

3     guidance that I read from the federal rules handbook, gives us

4     an indication that in these papers Ms. McNeill adopts those text

5     messages and admits to them.  She admits in her papers that that

6     is what she -- it is what it purports to be.

7           If we go on to look at Page 5 of Docket 209 towards the

8     bottom part, there's nothing in here that Ms. McNeill says I

9     didn't say this, I didn't exchange this communication or this

10    particular influencer that I was communicating with, that that

11    didn't happen.  Quite the contrary.  On the bottom of Page 5

12    under the subheading B, she says Ms. McNeill's statements did

13    not disparage Head Kandy or its affiliates.

14          As we discussed on Page 6, I want to make sure the

15    record is clear, as for Head Kandy's owners, Ms. McNeill fully

16    acknowledges that she told the influencer her company was taken

17    away from her by the owners of Head Kandy, and that she was

18    sexually harassed and retaliated against.  However, her

19    statements do not say that the owners improperly took her

20    company away, nor do the statements identify any individual of

21    either company regarding sexual harassment or retaliation.  Ms.

22    McNeill does not directly accuse the owners of Hard Candy or

23    Head Kandy of improper conduct.  If plaintiff took Ms. McNeill's

24    20% ownership, which is plaintiff's position, then there could

25    be no unfair castigation.

1       She goes on through here to indicate in the conclusion

2  of the response, she requests a hearing, one that she decided

3  not to show up on.  And that if the court determines that it's

4  improper, sanctions are proper, request that sanctions be

5  minimal because the plaintiff has suffered no damages and Ms.

6  McNeill has a good faith belief that the injunction order did

7  not prohibit her conduct.

8       We have multiple references in this filing, and I'm

9  going to keep the rest of my comments to myself about what's

10  going on in my head right now, but I will say this:  We have a

11  statement, throughout this filing, adopting and indicating that

12  these exchanges occurred.  Multiple references in generality

13  that she did it in the wherefore clause; references to specific

14  statements by the influencer in direct quotes, and statements by

15  Ms. McNeill that are directly quoted in which she is adopting

16  this, and her counsel filed all of this admitting it.

17       So again, we have satisfied the burden, not only of

18  that the text exchange exists, that Ms. McNeill wrote what she

19  wrote and she's adopting and indicating what the influencer said

20  because she's giving context on Page 3 of Docket 209.

21       THE COURT:  All right.

22       So ultimately what I have to decide is whether we have

23  sufficient information to authentic the text exchange that's

24  Plaintiff's Exhibit 8 under Rule 901, and that requires that

25  there be sufficient evidence from which the fact-finder can

1    conclude that it is what it purports to be.  What it is

2    purporting to be is an exchange between Ms. McNeill and Ms.

3    Burke.

4            The evidence that we have to suggest that it is such a

5    thing is that Mr. Mehra declaring that he received -- and again,

6    just so I'm clear, everything that is in 8, that was simply

7    taken from what Mr. Mehra received?

8            MR. LOEB:  Yes, Your Honor.

9            THE COURT:  So it's not like plaintiff did not go on to

10   -- I'm not even sure what the social media platform is.  Didn't

11   go on to the social media platform itself and take screenshots

12   or get them directly from Ms. Burke or anything.

13           MR. LOEB:  No, sir.

14           THE COURT:  Okay.  So I think Mr. Mehra's declaration

15   alone authenticates it as messages that he received from Ms.

16   Burke.  The question is whether there's enough evidence to then

17   get to the next layer of whether this is an exchange between --

18   an accurate depiction of the exchange between Ms. Burke and the

19   person using the name of Kayla McNeill, or whether there is, you

20   know, reason to believe that these are not actually the messages

21   that were exchanged or that they've somehow been altered or

22   such.

23           What Mr. Loeb is arguing is twofold.  Number 1, there

24   are some distinctive characteristics in the exchange, including

25   the use of Ms. McNeill's name, which does appear as one of the

1    speakers, and the picture that appears next to it which, as best

2    I can tell, shows a picture of Ms. McNeill, or at least one that

3    seems consistent with her appearance.  There's also the

4    statements made in the response by the defendant that has

5    effectively taken no issue, and in fact acknowledged, that she

6    sent messages that are consistent with several of the messages

7    that are included, including some by direct quote.  That doesn't

8    necessarily admit the exact -- doesn't exactly admit that every

9    message or every portion of the message that is in Number 8 is

10   authentic, but I'm kind of back where I was at the beginning of

11   the hearing which is there is not a scintilla of argument or

12   indication in the defendant's response that in any way suggests

13   that her defense to or her response to the prima facie case laid

14   out in plaintiff's motion was anything close to I didn't say

15   what they said I said.  Every argument that is in that response

16   is completely based on either you can't enforce this against me

17   because of the NLRA, or even if you can it's not disparaging --

18   if you can, it's not disparaging, or Hard Candy isn't the same

19   as Head Kandy, and none of that puts the plaintiff on any sort

20   of notice that the content of the statements were at all at

21   issue.

22           So what I'm saying is this:  I think ideally plaintiff

23   would have a declaration or testimony from Ms. Burke

24   authenticating that these are messages that I exchanged with

25   this person, and these are a true and accurate representation of

52

1   what those are.  They don't have that.

2         The options seem to be I can admit it based on the

3   combination of what was communicated to Mr. Mehra and his

4   declaration and the consistency of the content of those messages

5   with what defendant has, through her response, already admitted.

6         The other potential option is that we ultimately reset

7   this hearing, because quite frankly I think it's dirty pool to

8   come in and suggest -- not a response that's in any way

9   suggesting a challenge to the content of the messages, but then

10  -- and not have any actual evidence to present to actually

11  undermine any of the indications I've talked about that are --

12  regarding its authentication.  It is plaintiff's burden as the

13  proponent to put that forward.  But how we got to these

14  circumstances just ends up wasting everyone's time.

15        So I'm frankly not -- I'm frankly at a little bit of a

16  loss.  I'm inclined to admit it, but if there is a real -- but I

17  also don't want to bake into a ruling that I've relied on

18  something that isn't going to be -- or that there's going to be

19  an objection to the authentication.  I don't know whether, if

20  given the opportunity, plaintiff could reach out to Ms. Burke

21  and get such a declaration, that would obviate the whole

22  problem, so I'm not quite sure.

23        It's now 11:00, we've been here for an hour and a half.

24  I'm inclined to take a break and let the parties talk about this

25  a little bit.  But at the very least, to me the options are

1    either it's authentic and it's admitted, or as much as I think

2    it's plaintiff's burden, and I'm frustrated that plaintiff did

3    not have what they should have had to button this up, that I'm

4    going to give them an another opportunity rather than denying

5    the motion based on not having the authenticated messages.

6         So I'm inclined to take a break and let you all talk

7    about it.

8         Mr. Loeb, what do you have to say?

9         MR. LOEB:  First of all, I apologize.  Had I been given

10   a little bit more runway I would have had this.  When I take a

11   break, I'm going to make a call to see if I can't get it done in

12   the next hour, Number 1.  So accept my apologies for that.

13        THE COURT:  I understand.

14        MR. LOEB:  Again, I'm keeping my comments to myself.

15        THE COURT:  I understand.

16        MR. LOEB:  Number 2, there's a further indication of

17   this purporting to be what it is with Ms. McNeill's

18   communications.  If you look at Exhibit 8 on the second page,

19   Ms. McNeill writes "can you call me, I swear I'm not weird", and

20   then gives her phone number to the influencer which that is --

21   that's her phone number.

22        THE COURT:  So I understand that, Mr. Loeb.  But I

23   guess where I'm a little hung up is there are two different

24   issues kind of subsumed here.  One is is there enough evidence

25   from which the court could conclude that it was in fact Ms.

54

```
 1    McNeill sending these messages, and I think -- I understand your
 2    argument of it references her phone number, it's using her name,
 3    it's got a photo consistent with her, it's got the content, it's
 4    got content consistent with what's talked about, you know,
 5    throughout this case and other messages she's sent and the
 6    admissions in the response.  So that's that.  I get that.
 7         The other question though is is what is in Exhibit 8,
 8    does it fairly and accurately depict what Ms. McNeill did send
 9    to Ms. Burke.  And that is where I think that is the hole that I
10    think Mr. Converse is pointing to.
11         MR. LOEB:  I hear what you're saying.  I just -- I'm
12    speechless, candidly, because this is not how I play as a
13    lawyer.  If I've got an authenticity issue, I let someone know.
14    I don't wait for a week after we've sent proposed stipulated
15    facts to get something back on Wednesday with a bunch of
16    nonsense fact issues to talk about.  But you know what, I'm a
17    big boy, I'll figure it out and I'll make the call, see if I
18    can't get it down now so we don't have to delay and come back.
19         THE COURT:  So look, it's 11:05.  Why don't you take
20    until 11:15.  I'm going to step into the jury room over there
21    and if you all are ready to proceed before then, you all let me
22    know.  Okay?
23         MR. LOEB:  Thank you, Judge.
24         COURTROOM DEPUTY:  All rise.
25         THE COURT:  Back on the record in case number
```

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1    23-CV-60345 Head Kandy LLC versus Kayla Marie McNeill.

2         Both parties ready to proceed Mr. Loeb?

3         MR. LOEB:  We are, with one issue.  Before you walked

4    in I inquired of counsel if they could share with me their

5    exhibits that they had identified and were going to be using,

6    and in particular one that's kind of got this vague reference of

7    declaration of Ms. McNeill.  I've been informed that they don't

8    have any of their exhibits here.  So I'd like to see what this

9    declaration is that Ms. McNeill has as an exhibit.  I think

10   that's fair game.

11        THE COURT:  But if it hasn't been admitted though, does

12   it matter?

13        MR. LOEB:  I don't know what's in it, but I suspect

14   there's -- yeah, it does.  I mean, you know, you asked me did I

15   share exhibits beforehand, I extended the courtesy, I did that,

16   I've not seen the exhibits there and there seems -- why would I

17   not be entitled to see that is my question.  I'm not trying to

18   be disrespectful at you by coming back at you like that.

19        THE COURT:  I didn't think you were being

20   disrespectful, but I guess from if the court is not going to

21   consider it, which I'm not because it's not admitted, I mean,

22   you may be entitled to it for some discovery purpose I guess.

23   But I guess I'm just not -- I'm not sure if it's not going to be

24   part of the record, and the court's not going to consider it,

25   I'm not quite sure what to order or what the utility of it is.

```
1            MR. LOEB:  I may want to admit it in this case.  There

2    may be something in that declaration that bears upon perhaps

3    this issue of authenticity and declaration, I don't know.  But,

4    I mean, it just seems strange we head into an evidentiary

5    hearing, Ms. McNeill doesn't show up, we've got this reference

6    to a declaration but there's no exhibits here.  I'm not trying

7    -- maybe perhaps I'm being a little bit paranoid and if I am, I

8    am.  But they've got this list here, they showed up to this

9    hearing with copies of no exhibits and they don't want to show

10   me what this declaration is?

11           THE COURT:  Mr. Converse, what's your response?

12           MR. CONVERSE:  We conferred about that.  That's a

13   completely inaccurate statement of what I told him.  All of the

14   documents, save and except for that one declaration, have been

15   sitting in a production folder.  Many of them are identified on

16   their exhibit list as well.  These are not new documents.

17           THE COURT:  Okay.

18           MR. CONVERSE:  I told him that we were attempting to

19   get the declaration signed, and as Mr. Loeb said, he didn't have

20   time to get a declaration signed from an individual they knew

21   was relevant from the time they signed the motion.  We attempted

22   to get a declaration signed by Ms. McNeill has I'm making travel

23   plans, and I was just here last week.  It's my mistake.  I

24   didn't send it to her, so we weren't intending on introducing

25   it.  All it was going to do, it was just a declaration to
```

```
1    authenticate messages between her and representatives from Head

2    Kandy.  That's it.  It was some text messages, some What's App

3    messages.  It was just meant to authenticate.  They're not being

4    introduced.  It didn't have any other information in it.  I

5    didn't get it sent to her in time, and so we didn't get it

6    executed.  So we can't introduce it.

7             THE COURT:  So it hasn't been signed.

8             MR. CONVERSE:  No, it hasn't been signed.

9             THE COURT:  So based on that Mr. Loeb, I'm not

10   considering it or the content of it.  If it hasn't been signed,

11   it's not actually a statement of her.  So if there is some

12   reason why it needs to be produced in discovery, if there's some

13   other discovery purpose for it, that's one thing.  But I don't

14   have testimony or anything else from Ms. McNeill one way or the

15   other here, so I'm not sure there's really anything to order

16   here.  And again, I'm not -- whether this is something good or

17   bad in that for either side, I'm not considering because it's

18   not --

19            MR. LOEB:  Fair enough, Judge.

20            THE COURT:  So tell me, can you update me on where you

21   are regarding any further authentication of Exhibit 8.

22            MR. LOEB:  We have delivered the affidavit draft to

23   Mr. Mehra.  Sorry if -- I call him Sanjiv.  They are working

24   with Hayden's social media group, and they are trying to make

25   contact.  I've told him I've got a federal judge saying make it
```

1    happen, so they are moving as quick as they can.

2         THE COURT:  So this is what we're going to do.  I'd

3    like to hear argument.  I'm not ruling from the bench anyway, so

4    what I'm going to do is I'm going to give plaintiff until

5    Wednesday to complete the record and submit that affidavit, and

6    based on the contents of that affidavit I will make a final

7    determination regarding authenticity and thus admissibility.

8    And if there's some issue with that, I guess you can file a

9    motion if there needs some further relief.

10        MR. LOEB:  Yes, sir.  Thank you.

11        MR. CONVERSE:  So Your Honor, can I be heard on the

12   evidence?  I was -- in pivoting earlier and trying to quickly

13   look through our exhibit list, I made an error.  There were two

14   exhibits that are relevant that we would like to introduce to

15   the limited scope of the hearing.  Those two exhibits are -- the

16   first one is Exhibit 3.  I think it was on Plaintiff's Exhibit

17   list as well, it's a November 28th letter from Head Kandy's

18   counsel on behalf of Head Kandy to Ms. McNeill.

19        THE COURT:  I'm sorry.  Which exhibit number?  Number

20   9?

21        MR. CONVERSE:  Well, it was Exhibit 3 on defendant's

22   list -- on plaintiff's list.

23        THE COURT:  November 28, 2022 letter from Head Kandy to

24   Ms. McNeill.

25        MR. CONVERSE:  Yes, Your Honor.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
 1            THE COURT:  And what's the relevance of that letter?

 2            MR. CONVERSE:  It addresses Head Kandy's -- the way in

 3    which her ownership interest was exchanged to Head Kandy, let's

 4    say.

 5            THE COURT:  Okay.  Is that part -- was that already

 6    admitted at the PI hearing?

 7            MR. CONVERSE:  Yes.  Yes, it was, Your Honor.

 8            THE COURT:  Okay.  What relevance does it have to the

 9    issue here?

10            MR. CONVERSE:  Whether or not the specific language in

11    the text that may be admitted with the declaration, whether or

12    not what she said was disparaging.

13            THE COURT:  Okay.  Mr. Loeb, what's your response?

14            MR. LOEB:  There's multiple paths for a violation of

15    the PI.  One is defamation, which is, I guess, a true defense

16    would apply, disparagement and the other language that, taken

17    out of the Black's Law Dictionary that's contained in the PI,

18    truth is not a defense so I don't see what the relevance of this

19    November 28, 2022 letter has as it bears upon what Ms. McNeill

20    not only texted, but has admitted to saying in her opposition

21    papers.  That's one issue that's not disputed.  She admits it.

22    I don't see the relevance of this November 28, 2022.

23            THE COURT:  I'm not sure what the relevance is either,

24    but I'll admit it especially given that it's already part of the

25    record from the PI hearing and it's something the court can rely
```

60

```
 1    on anyway.  So I'll admit Defense Exhibit 3.
 2              (Defense Exhibit 3 in evidence)
 3              THE COURT:  And then Mr. Converse, what else did you
 4    want to put in?
 5              MR. CONVERSE:  Your Honor, the other one was Exhibit
 6    11.  And just to your point about Exhibit 3, it's already part
 7    of the record, it's the stipulated facts of the parties for the
 8    PI hearing.  We just listed it out of an abundance of caution,
 9    and it also speaks to the same issue that I referenced with
10    regard to the November 28th letter.
11              THE COURT:  Okay.  So is there any objection, Mr. Loeb?
12              MR. LOEB:  Can I just have reference to which
13    particular paragraph he's seeking to have --
14              MR. CONVERSE:  38.
15              MR. LOEB:  Just Paragraph 38?  I think 38 is
16    sufficient, I believe it's a follow-on from 37.  Again, going
17    back to the issue of the language that's being used, the defense
18    that would be offered, I guess this is a truth defense?  I don't
19    see how that's relevant here, but it's a stipulated fact that's
20    already part of the record, Your Honor.
21              THE COURT:  Yeah.  I think given that it is a
22    stipulated fact then and already part of the record, I don't see
23    any harm to admitting it.  So I'm going to admit Defendant's
24    Exhibit 11.
25              (Defense Exhibit 11 in evidence)
```

```
1          MR. LOEB:  And just as it pertains to Paragraphs 37 and

2    38 correct, Your Honor?  Because there's other portions in here

3    that bear upon potential NLRA issues I suspect, so I just want

4    to make sure that that's what we're driving at.

5          THE COURT:  Well, I mean, if the facts are stipulated,

6    I think the facts are stipulated.

7          MR. LOEB:  They just may not be developed yet.

8          THE COURT:  They may not be.  Mr. Converse, are you

9    pointing to anything other than 37 and 38?

10         MR. CONVERSE:  Not currently, but I think if the

11   argument that we heard previously was that statements in a brief

12   constitute stipulated facts, I don't see why the stipulated

13   facts can't be admitted.

14         THE COURT:  I mean, I think I can review the stipulated

15   facts and to the extent they're relevant, the court can consider

16   them.  So again, they're already in the record.

17         MR. LOEB:  The only reason I bring it up, and not to be

18   persnickety, if there's going to be a reference to something

19   with NLRA issues, there's other letters that I think help

20   supplement and inform that I did not introduce, and that's the

21   only reason I bring that up.

22         THE COURT:  Okay.  I think that's a "cross that bridge

23   when we come to it" type of issue.

24         So let me hear argument then starting -- so let me

25   start with the plaintiff of you have to show by clear and
```

1      convincing evidence that there was a violation of the

2      preliminary injunction.  So explain to me your theory for the

3      violation and how you have done that.

4              MR. LOEB:  Yes.  And Your Honor, just for clarity so I

5      can frame this appropriately, do you want to hear anything about

6      the NLRA?  I've got something in there --

7              THE COURT:  I think we fairly well exhausted the

8      arguments on that.  I know your response is forthcoming.  So I

9      think I've addressed those questions.

10             I guess let me just -- and I think I understand the

11     bulk of your argument based on the motion.  So I don't want you

12     to just re-hash the whole motion, but why don't you just give me

13     what your argument is.

14             MR. LOEB:  On the breach or the --

15             THE COURT:  On the breach, and I guess how you've met

16     the elements of showing contempt and what the proper remedy is.

17             MR. LOEB:  Okay.  Very well.

18             Your Honor, I think probably the best part or the best

19     place to start out at is the order itself and the injunction.

20     And I focus my efforts here on -- it's on the slide deck 22,

21     I've blown it up for the court to really focus this, but it's on

22     slide number 22, but I'll read it into the record.

23             The preliminary injunction order specifically says

24     "defendant shall be enjoined and restrained from further

25     violating Section 5 of the executive employment agreement

1    including by directly or indirectly."  So we have two pathways

2    for there to be a potential violation, both direct conduct that

3    would satisfy under Romanette 5 of Subsection 3 of the

4    injunction order or indirect activity.  I would posit that both

5    of these have been satisfied, but let's move on real quick to

6    talk about 5 which prohibits the "making, publishing or

7    communicating to any person or in any public forum any

8    defamatory", that could be one path, "disparaging", another way

9    or three, "otherwise negative or degrading comments, remarks or

10   statements concerning the plaintiff, its affiliates or their

11   businesses, or their respective employees, officers, existing

12   and prospective clients, suppliers, investors and other

13   associated third parties."

14        So the first part of this is was there a making or

15   publication or communications to any person.  Clearly there was,

16   yes.  And that's on the second slide.  I've tried to break this

17   down elementally for the court to really kind of walk us through

18   using this clear and convincing evidence standard, and the first

19   one is easily satisfied.  And what did I do, I took the Exhibit

20   8, one of the screenshots, and I've made that a little less

21   transparent and I've put full-on what Ms. McNeill indicates that

22   she did.  She fully acknowledges this.  We had a long exercise

23   and a journey through 901.  It was interesting.  It still

24   remains interesting.  But we know now that Ms. McNeill has fully

25   acknowledged that she told the influencer her company was, one,

```
1    taken away from her by the owners of Head Kandy, and that she
2    was sexually harassed and retaliated against.  So right there we
3    have a communication.  She admits it.  There can't be any
4    credible debate about that.  Whether Exhibit 8 comes into
5    evidence, I get this affidavit to you by Wednesday or not, or we
6    have to do some follow-up in figuring it out; right now, as a
7    matter of what's in the file at Page 6 of 8 in Docket Entry 209,
8    Ms. McNeill admits that she engaged in communications; one
9    saying that her company was taken from her, and that she was
10   sexually harassed and assaulted.  So first part is satisfied,
11   right?
12          The next part is what she communicated was a
13   disparaging or otherwise negative or a degrading comment, remark
14   or statement concerning the plaintiffs, dot, dot, dot, meaning
15   plaintiffs or their -- make sure I get it right, plaintiff,
16   affiliates, employees, officers, et cetera, et cetera, et
17   cetera.
18          THE COURT:  Why -- well, sorry.  I want you to split
19   that up.  One is how is it disparaging, degrading or otherwise;
20   and second, who was being disparaged and how did they fit within
21   the people covered by the PI.
22          MR. LOEB:  I'm just writing this down.  How is it
23   disparaging is the first question, and then who were the, I
24   guess, targets or the recipients of disparaging?
25          THE COURT:  Yes.
```

```
1              MR. LOEB:  All right.  How is it disparaging.  Well, if

2    you remember at the preliminary injunction hearing we heard a

3    lot of video where Ms. McNeill was saying her company was

4    stolen.  Her company was -- there were a whole bunch of

5    different words that the court already found that's disparaging

6    conduct.

7              And we heard a similar defense during the oral argument

8    of well, what I meant was that it was, you know, they took my

9    company.  My company was taken away from me.  You know, it was

10   -- I think there were stolen, a whole bunch of other words that

11   Ms. McNeill that the court found to be violative.

12             In this instance we know that Ms. McNeill, when you

13   look at the body of the communications here, she indicates that

14   I built a brand and it was taken from me by the owners of Head

15   Kandy, "taken" has a certain connotation to it in this instance.

16   And let's be clear here, the social media influencer, it had its

17   impact.  If we look at the actual text communications here, she

18   indicates in response to this specifically "so sorry if that

19   happened to you, but that doesn't sound like anything I want to

20   be involved in."

21             So the question is was it disparaging, did it have a

22   negative connotation, did it make something suggestive that was

23   negative; well, of course it did.  Look at the reaction that was

24   had by the social media influencer in response to that.

25             But I would suggest that you don't really need to do
```

1   that except for further context, but to suggest here that

2   looking at what Ms. McNeill writes, it's a very somewhat

3   sophisticated way of trying to skirt her way around the

4   preliminary injunction ruling.  And why do I say that.  Let's

5   look at how she sets this up.  She says "can you call me."  She

6   gives her phone number which we know that exists.  "You can look

7   me up.  I have a direct tie to Hard Candy and a company called

8   Head Kandy.  I started a multimillion dollar brand and my

9   company was taken from me by the owners of Hard Candy", which we

10  know now with the evidence of the owners of Hard Candy and the

11  owners of Head Kandy are one and the same, it's the Falic

12  family.  We know that when she sets this up saying "this is a

13  multimillion dollar brand that I built up" when you say

14  something is taken from me that has a connotation to it.  Just

15  like when, you know, I deal with my kids all the time, Riley and

16  Regan.  Regan says "dad, Riley took something from me."  I say,

17  "Riley, what did you do that for?"  Regan's not saying that in

18  order to be -- you know, she's trying to get her brother in

19  trouble.  So we know that.

20         So when we look at this, stop right there, that right

21  there is disparaging, and it also satisfies the tests contained

22  in the preliminary injunction order saying that "otherwise

23  negative or degrading comments, remarks or statements."  Okay.

24  So we stop right there.

25         Now, but let's keep going with this threat.  "I was

```
1    sexually harassed and retaliated against, and I'm in a federal
2    lawsuit with the owners of Hard Candy." So here we go. We've
3    got not only something being taken, but in the same thread she's
4    loading up as much as information as she can to catch the
5    attention of the influencer and the reader of this message
6    saying wow, your company was taken from you? And on top of that
7    you were sexually harassed and retaliated against? Oh, and "I'm
8    in a federal lawsuit with the owners of Hard Candy who say they
9    support little girls" dot, dot, dot, "entrepreneurship." I read
10   that, and if you are literally without having any knowledge of
11   this case, you read this and you go, boy that sounds really bad.
12   That doesn't sound positive. Okay. You take that and you say
13   my goodness, this is something that sounds like an awful
14   organization to deal with. How do we know that? Remember, I
15   told you, if we're looking at just Ms. McNeill's statements,
16   what she's admitted in her papers as having done without regard
17   to the authenticity or admissibility, her plain statements in
18   her papers, that right there is bad. But if we look, the
19   influencer responds and says "that's not something I'd want to
20   be involved in." So that shows a reaction. That shows some
21   further evidence that I don't think you need, but it provides
22   context.
23          Ms. McNeill continues on, and she takes the opportunity
24   not only to talk about something being taken from her or being
25   sexually harassed or being retaliated against, she goes on. And
```

1    if you look, there is an embedded message here that she sends.

2    If you look, it shows she sends the motion to stay and the

3    exhibit that's attached to the motion that's filed in this

4    court, that remains pending before Judge Becerra, where all of

5    these salacious allegations are sitting in there.  Awful stuff.

6    Allegations saying all of these things that Ms. McNeill contends

7    to have happened and, quote, have occurred, and she takes that

8    information and she is utilizing that to further drive a wedge

9    between the influencer and Hard Candy by saying look at all

10   these things.

11          THE COURT:  How do you prove that what that link is is

12   in fact to the exhibit to the motion to stay?

13          MR. LOEB:  Well, I look at it and I see "motion"

14   "stay", and "exhibit."  If I look it's various attachments and

15   the like.  You see this?  Part of my declaration I'm having the

16   influencer sign is going to take that issue on, so I'll get that

17   resolved.  But that is what she received as well with this link.

18          But in response to that, the influencer says "very

19   sorry if this happened to you."  That's the thread that goes --

20   that she responds with.  And so Ms. McNeill even says "I'm in a

21   federal lawsuit.  I already asked my attorney about all this, I

22   just want to give you to -- wanted to give you to see that

23   supporting a brand like that, because it was sent to you, you

24   don't do your due diligence because people going viral means

25   more to people.  That's all."  It's a little bit of gibberish

1    candidly, but it's nevertheless statements that are made by Ms.

2    McNeill and indicated and directed to the Falic family.  Because

3    I will be candid with you, my reaction after going through all

4    this, this is vengeance and this is spite and this is a former

5    executive who is taking it upon herself to do whatever she can

6    to get to the Falic family, even crossing over brands by going

7    now not only to Head Kandy because she's been told you can't do

8    that; now she's playing a game by trying to cross over into Hard

9    Candy and say aha, I've found a loophole in Magistrate Strauss'

10   report and recommendation and Judge Ruiz's preliminary

11   injunction, I'm going to try to see if I can't fit between that

12   hole and still accomplish the objective that they had previously

13   told me you can't do.  Right?  I mean, it's as clear as day

14   that's what's going on.

15           And how do you know that?  Look at the response.  The

16   response they filed is oh, well, you told us we couldn't talk

17   about Head Kandy.  You didn't say anything about Hard Candy.  We

18   totally thought that was okay.  And saying oh, well, we just

19   said "took", we didn't say "wrongfully took" or "intentionally

20   took", we just said "took."  Again, when we look at this

21   communications that Ms. McNeill has admitted to using the words

22   "took", the same thread with sexual harassment and retaliation

23   being involved in a federal lawsuit, you put all of that

24   together, I don't mean disrespect to anybody in this courtroom,

25   but you-all must got to be intellectually dishonest with

1    yourself to say that that's not a disparaging comment, and it

2    was designed for one purpose and one purpose only which was to

3    drive a wedge or interfere with the relationship that Head Kandy

4    or -- strike that, Hard Candy has with its influencer, and it's

5    being designed to harm, ultimately, the ownership and officers

6    of Head Kandy, that being the Falic family.

7              THE COURT:  So which portions of the list of people to

8    whom remarks could not disparage do -- are you traveling under

9    and how do you prove that?

10             MR. LOEB:  Could you say that one more time?  I'm

11   sorry?

12             THE COURT:  So in pointing to the owners of Hard Candy,

13   which are the people that are being disparaged, or entities, and

14   how does that fall, which specific words in the PI are you

15   traveling under?

16             MR. LOEB:  She is -- the specific words as to the

17   individuals?  That would be -- please hold.  Sorry.  Would be

18   officers -- that would be the Falic family.  They are officers,

19   they're members of Head Kandy, as we saw based on exhibit Number

20   2 -- one sec.  Make proper reference to the record.

21             As we see in Exhibit Number 2, which is the Head Kandy

22   operating agreement, we know, based upon facts that are not in

23   dispute, that Jerome Falic is the member.  We know that he is

24   the managing member, according to Exhibit Number 1, which is the

25   executive employment agreement, and identifies him as such.  We

```
1    also know that looking at the Hard Candy operating agreement

2    that Jerome Falic is also the manager for Hard Candy.

3            So there is a link between Mr. Falic, who is the

4    manager for Hard Candy, and Mr. Falic the managing member or

5    officer of Head Kandy.  So clearly, boom, that link has been

6    made.

7            And we don't have to look -- I mean, I've tied it up

8    here, but how about we go back to see what Ms. McNeill thinks.

9    She writes "I have a direct tie to Hard Candy and a company

10   called Head Kandy."  She makes that link in her mind.  Based on

11   what she has written, she has said there's a direct link between

12   those two.  And so if she's saying there's that direct link

13   right there, those disparaging comments that we know to exist,

14   she has tied it up for us by her own words.  In many ways I

15   would proffer I didn't need to tie that up.

16           And she also, in her pleadings, admits as for Hard

17   Candy's owners, Ms. McNeill fully acknowledges that she told the

18   influencer her company was taken away from her by the owners of

19   Head Kandy, and that she was sexually harassed and retaliated

20   against.  So not just in her texts, but also in her filings she

21   makes that connection that she acknowledges that Head Kandy and

22   Hard Candy, for the purposes of her text communications, are

23   synonymous.  And so she's made that link, and we've made that

24   link too by the proper admission of the operating agreements

25   between the two entities.
```

1          THE COURT:  You've referred to officers.  What about,

2     there's the term "investors."

3          MR. LOEB:  Yes.  The investors, they're investors in

4     the sense of they are owners.  They've invested money, they're

5     equity investors, yes.  They certainly are investors.  I would

6     posit that they are investors.  I would also suggest that

7     they're affiliates, that they have similar ownership structure

8     between the two of Hard Candy and Head Kandy.  And that in and

9     of itself is sufficient.  It's not -- it has to satisfy all of

10    these, it's just one.

11         So we have a direct disparaging comment concerning the

12    plaintiff, because she's referencing Head Kandy in her text;

13    she's making that direct link with Hard Candy, and then she's

14    grabbing it and pulling it all together by making reference to

15    the Falic family, and specifically Mr. Jerome Falic as an

16    officer and an investor and certainly an associated third-party.

17         And again, for the sake of not sounding too repetitive,

18    Ms. McNeill in her papers and in her texts makes that direct

19    link, hence the fact that she's reaching out to this person in

20    an effort to, quote, alert her about the company, quote, being

21    taken or her being sexually harassed.

22         The other component of this is that John Rosenbaum has

23    really been a target of a lot of untoward and improper

24    allegations.  That attachment to the motion to stay is replete

25    with salacious allegations.

```
1          In addition to that, Mr. Rosenbaum, who was an officer
2    employee of Head Kandy, she -- even though she indicates that
3    oh, I didn't say exactly who engaged in the sexual harassment,
4    again, that's somebody who's trying to tiptoe their way around
5    to see if they can't violate -- you know, get away with not
6    violating the injunction.
7          We all know that Ms. McNeill, when she writes this, it
8    was designed to grab the attention of the reader.  She included
9    sexual harassment and retaliation as a way to grab the attention
10   of the social media influencer.  And I've cited in our papers,
11   in our reply, a case called Schabacker versus Ferens.  It's at
12   224 Westlaw 710632.  It's at star page 4-6 Eastern District of
13   Pennsylvania, dealing with non-disparagement clauses and
14   allegations by a former employee saying there was sexual
15   harassment by the CEO, or being accused of sexual harassment by
16   the CEO, and the court found that that was disparaging.  And of
17   course it is.
18         This allegation of sexual harassment is still sitting
19   up in Tallahassee going through a pre-suit administrative
20   process that, I don't know how long that's going to take, don't
21   know if they're ever going to give a right to sue letter or not,
22   or they're going to say you have no claim.  But as it stands
23   now, there's nothing that has been adjudicated saying that
24   Mr. Rosenbaum, Mr. Falic, whether it's Simon, Leon or Jerome
25   Falic, ever engaged in sexual harassment of this -- of Ms.
```

```
1    McNeill.  And so to suggest that the sexual harassment occurred
2    and that you're involved in a federal lawsuit, those are the
3    kinds of things that that Eastern District of Pennsylvania case
4    found to be disparaging, because of course it is.  Anybody who's
5    accused of something or saying that, you know, that's a big
6    deal.
7            And it's not as if Ms. McNeill in this, okay, says I am
8    accusing somebody of sexual harassment.  If you're accusing
9    somebody of it, it gets somebody's attention but it's -- you
10   know, we look at the news all the time, somebody's accused of
11   doing something.  She didn't say that.  I was sexually harassed.
12   I was sexually harassed and retaliated against, not I'm accusing
13   somebody of this, I'm involved in a federal lawsuit, I'll let
14   you know what's going on.  She just comes right out and says it.
15   So from that perspective she's made the disparaging statements,
16   they're negative, they're degrading and they're remarks and
17   statements concerning the plaintiffs, they're concerning the
18   investors, they're concerning the officers, they're concerning
19   the employees.  They're direct attacks against these individuals
20   and this organization.  She's crossing over to go to an
21   affiliate.
22           Now, in the papers there is a reference to, on that
23   Page 6, "Ms. McNeill does not directly accuse the owners of Head
24   Kandy or Hard Candy of improper conduct."  I disagree with that.
25   I really do.  But you know what, we have the fortune, I suppose,
```

```
 1    of the language contained within the preliminary injunction

 2    which specifically says "directly or indirectly."  Both.  And so

 3    the court was very mindful when it entered the preliminary

 4    injunction, and after seeing kind of how Ms. McNeill with -- I

 5    mean, let's take the Bo Stegall example that we talked about so

 6    much, or when she was promoting the various hair brands that she

 7    had.  Remember when she was saying to us well, I wasn't getting

 8    paid for it so therefore I wasn't actually, you know, violating

 9    the terms of the non-solicit or, you know, of that agreement.

10    And it was like really?  That may not -- that's a nice way for

11    you to try to get around it indirectly, but the court -- I can't

12    get in your mind, but I've got to think the court recognized

13    that you can't do it directly, you can't do it indirectly.

14         And so Ms. McNeill in her papers says oh, I haven't

15    done this directly accusing the owners of Hard Candy or Head

16    Kandy of improper conduct.  I disagree.  If she hasn't done it

17    directly, by God she's sure done it indirectly.

18         And so from our perspective, you know, we spent a lot

19    of time here, and when I first stood up and talked to you today

20    I said this is a fairly straightforward argument in terms of

21    this.  We've got, unfortunately, a lot of noise.  I guess

22    there's a lot of noise because, you know, you can distract and

23    you can create a bunch of stuff and hopefully, you know, we

24    don't get to the real meat of the issue.

25         But the real meat of the issue, those text exchanges.
```

```
 1    And I want to make sure I'm very clear on this, Judge.  I'm
 2    pretty confident I'm going to get the declaration from Ms.
 3    Burke.  Assuming I don't, I can't get it, all I have to do is go
 4    and look at Ms. McNeill's statement on Page 6 of her response.
 5    She acknowledges that she told the influencer her company was
 6    taken away and that she was sexually harassed and retaliated
 7    against.  I've got a binding admission by a party in response to
 8    an order from the court directing her response.  A binding
 9    admission by that.
10         So in many ways, whether Exhibit 8 comes in or not, Ms.
11    McNeill's acknowledged that.  She's admitted to it.  And so from
12    our perspective, not only have we proven it by clear and
13    convincing evidence -- I mean, I did one criminal case and I
14    told myself I'd never do it again.  This is, we're talking proof
15    beyond a reasonable doubt at this point.  This is a woman who
16    has admitted to this.  Said yes, I did it; yes, I acknowledge
17    it, and at the end of her motion, after you get through the NLRA
18    stuff, it's -- I have a good faith belief that I -- you know,
19    that the preliminary injunction order did not prohibit her
20    conduct.
21         Now, interestingly Ms. McNeill is not here to tell you
22    that.  She's offered no defense to that.  And, you know, for
23    somebody who has been practicing in state and federal courts
24    throughout the country for probably more years than I am
25    prepared to admit, I've never seen somebody subject to a
```

```
1    contempt proceeding not show up and explain it.  Not show up and
2    offer some justification that's not been offered.  And so to the
3    extent that the court even considers during a phase of this
4    proceeding where you find that there's been a violation, I would
5    suggest that there cannot be any consideration to this, quote,
6    good faith belief because Ms. McNeill never showed up.  That
7    witness stand has remained empty all day along.
8            And so for her to come here, for her lawyers to come
9    here and suggest that she had this good faith belief that the
10   order didn't prohibit her conduct, there's a word for that
11   that's not appropriate to say in a federal courthouse.  But from
12   our perspective, Judge, it's pretty clear.
13           THE COURT:  Your motion makes some reference to the
14   comments violating the spirit, if not the letter, of the
15   nonsolicitation provision.  Are you relying on that provision or
16   are you relying only on the disparagement?
17           MR. LOEB:  To be candid, Your Honor, the primary, if
18   not the 95%, is on the disparagement.  Do I think what Ms.
19   McNeill was doing was undertaking efforts to interfere with an
20   influencer working on behalf of Hard Candy?  Absolutely,
21   totally, 100%.  That's exactly what she's trying to do.  But I
22   think the more direct violation is the disparagement under 5D.
23   I just want to be candid with the court.
24           THE COURT:  If the court ultimately finds a violation
25   of the preliminary injunction, what is the appropriate remedy?
```

78

```
1         MR. LOEB:  We've talked about that, and I've struggled
2   with it.  Because this is the second time that we've had an
3   issue.  The first was the removal of the social media posts that
4   were directed to be taken down.  They ultimately were.  There
5   was no sanction involved in that instance.  It is what it is.
6         I think at the very least she ought to pay for the
7   attorney's fees and the costs of seeking to prosecute this
8   matter.  I think that's pretty well-accepted in the case law
9   that we've cited, and I think it's recognized by the courts.
10        I think that if she is -- what we heard today, and it
11  was just through counsel, that these messages are gone and they
12  were not preserved, I think there is an opportunity for the
13  court to at least entertain some sort of an adverse inference,
14  or to the extent there is a jury on this although there's some
15  jury waivers, some sort of a recommendation of an adverse
16  inference regarding this.  I certainly think, as it pertains to
17  this matter, the fact that Ms. McNeill doesn't have them
18  anymore, certainly an adverse inference could be considered by
19  the court in evaluating this because, you know, when messages --
20  I've only had an adverse inference instruction once, it's in
21  state court.  It's a heavy instruction you get.  When you get it
22  it's strong.  But in this instance I think the court can
23  consider an adverse inference, at least as it pertains to this
24  issue if not further broad.
25        And finally, and I don't take this lightly, I honestly
```

```
1    think there needs to be a message sent.  And I'm sounding more
2    like a parent here than a lawyer but, you know, look, this is a
3    business divorce.  I said it from day one.  They're unpleasant.
4    But there's got to be a message sent to Ms. McNeill that if you
5    keep doing this, there's going to be more severe consequences to
6    this.  There really is.  I thought the preliminary injunction
7    would have halted it.  We went through a big exercise with
8    getting the stuff taken down.  It is what it is, I don't want to
9    get into it.  But, you know, certainly a fine, certainly
10   consideration of some sort of an adverse inference, and then
11   honestly saying if you do it again, and I got to come back here
12   again and we've all got to fly here to deal with this stuff and
13   you've done something wrong, I'm going to consider invoking --
14   you know, referring this to somebody or looking into it for
15   potential criminal contempt.  I don't say it lightly, and I'm
16   not trying to, you know, up the ante on this thing but, you
17   know, I've got two great kids, I know when to, you know, tell
18   them, all right, you've got your iPhone for the day or you've
19   lost your electronics for two weeks.  And we're at the you've
20   lost your electronics for two weeks stage.
21            THE COURT:  Is a finding of civil contempt allowed to
22   be punitive?
23            MR. LOEB:  No, it's only allowed to be coercive and the
24   case law, unfortunately, says that.  And, you know, when you
25   have situations where somebody is just kind of just -- I hate to
```

1    say this, thumbing their nose at an order, your hands are kind

2    of tied.  You can only do things that are coercive and I'm not

3    in the privilege that you are but --

4            THE COURT:  Well, as I understand it, it can be -- a

5    civil contempt remedy can be coercive or it can be compensatory.

6            MR. LOEB:  Yes.

7            THE COURT:  But coercive is to try to coerce some

8    concrete action to be taken.  I don't think we have that here.

9    It's not a situation of I need you -- you know, you were

10   supposed to turn something over, you've been ordered to turn it

11   over and now I'm -- you haven't, so I'm punishing you until you

12   have accomplished the thing I've asked.

13           You're essentially talking about having done -- you

14   want to coerce the absence of further conduct, but it appears to

15   me that the remedy here is only compensatory of -- to compensate

16   the plaintiff for the harm done by the violation that's

17   occurred.

18           MR. LOEB:  I would tend to agree with that.  I'm not --

19   yeah.  And that's the part that really stinks is that in this

20   instance, you know, we were talking about this because there's

21   reference to -- let me pull it up, because I saw this.  Like, oh

22   look at that, maybe this could be a potential remedy.  Hold on.

23   Shoot.  I think it's on the first tab here.

24           Yeah.  It's actually a Southern District case, *Consumer*

25   *Electronics*.  It's in our initial papers.  2009 Westlaw

1    10667730.  I mean, In that case the appropriate sanctions for

2    civil contempt include a coercive fine, a compensatory fine,

3    attorney's fees and costs, and coercive incarceration.  That's

4    at star page 6 right before you get to star 7.

5         And from our perspective, Your Honor, it's like -- like

6    I said, we talked about this.  If Ms. McNeill had, like, a

7    financial affidavit to prepare or turn something over, you could

8    say "you're going to jail until you do it."  Usually, she

9    doesn't make her way into booking because she says okay, fine,

10   here.  So unfortunately, that coercive incarceration is probably

11   not a remedy that's going to be -- you just can't do it.  Your

12   hands are tied.  A coercive fine, meaning I'm coercing you to do

13   something.  By issuing a fine, you are, hopefully, coercing her

14   not to do something.  You are coercing -- don't violate this

15   injunction.

16        You know, there's the attorney's fees and costs.  I

17   think that's well-received throughout the case law, and

18   certainly by the Southern District.  I would ask for that at a

19   minimum.

20        THE COURT:  What are the attorney's fees and costs?

21        MR. LOEB:  I have not calculated them right now, but

22   they're a chunk of change.  I mean, they are.  They're enough.

23   What's that?  Oh, yeah.  And they're ongoing.  Sitting here

24   today.

25        And a compensatory fine.  I don't know what

1    compensatory fine means in that context.  I really don't.  I

2    mean, I know what compensatory damages are.  Fortunately, based

3    on what I understand, there's no, quote, damages, but is there a

4    compensatory fine.  "Fine" is -- that's an interesting word.

5          THE COURT:  Yeah, I'm not sure about that language.  I

6    don't see how -- a fine -- in my mind, a fine is something

7    punitive.  A fine is punishment.  It's not -- you know,

8    compensatory, if there were damages you can point to I think

9    compensation could be warranted.  But from what I've heard,

10   other than the fees and costs of prosecuting this enforcement

11   which, could very well be considerable, I haven't heard any

12   evidence of concrete damage that you can point to or estimate

13   that would serve the basis for that kind of compensatory

14   sanction.

15         MR. LOEB:  I agree with you.  I'm just keying off the

16   words from this decision that says "fine", and I thought it was

17   like that -- kind of jumped out at me, because it just seemed to

18   be different than compensatory damage.  That's why I said I

19   don't know what that means.  But in fairness, I would tend to

20   agree with Your Honor that fine invokes something that sounds

21   like you're going to be subject to incarceration, penalties,

22   fines, so fair enough.

23         I would like to draw your attention though, Your Honor,

24   to -- you know, you are using your powers to try to fashion a

25   remedy here to really honor and obey what the court has done.

1    And in that *Consumer Electronics* case right above where I read,

2    I'd just like to share with you, is says "in crafting a remedy,

3    the court should consider the type and magnitude the harm

4    threatened by the continuing contumacy, and the likely

5    effectiveness of the imposed sanction bringing about the desired

6    result."

7           So, you know, when you asked me what would it be in

8    terms of sanctions to impose, I think that there's certainly the

9    award of the attorney's fees and costs.  I think that the court

10   could entertain other avenues to try to get Ms. McNeill, or to

11   coerce her to obey the order, and that's really within the

12   court's sound discretion I think.  I don't think there's

13   anything that's -- you know, not asking her to be, like I said,

14   thrown in jail.  Is there something that could say hey, if you

15   keep doing this I would consider, you know, or entertain a

16   suggestion for that perhaps.  Is there an adverse inference that

17   the court could utilize in this instance for the messages that

18   Ms. McNeill no longer has apparently, or something of that

19   nature to also try to ensure not just compliance now, but future

20   compliance so we don't have to take the time to keep coming back

21   and seeing you and talking about this stuff instead of the

22   merits of the case.  And so, you know, if it's a slap on the

23   wrist and I'm -- you know, now I'm sounding like a prosecutor

24   instead of a civil attorney, a slap on the wrist, I don't

25   think's, going to work.  So I know it's a hard decision for you

1    to have to make if you get there.  I respect that, and I know

2    that the case law is pretty -- you know, got your hands tied on

3    it but, you know, if I were sitting in your situation I would

4    award the attorney's fees, I would award the costs to -- you

5    know, they are subject to further affidavits or whatever if they

6    get to that point, and then I would, in addition to that,

7    fashion something to indicate that if you come back -- if we

8    have to come back in here again for a violation; A, you've got

9    to show up, and B, the sanctions may be more severe.

10            THE COURT:  And just so everyone's clear under the 28

11   USC 636 which governs magistrate judge duties, and as I think I

12   said in response to the emergency motion to continue the

13   hearing, I'll be entering a report and recommendation on this

14   motion.  And if I recommend a finding of contempt, it would

15   include a recommendation as to the appropriate remedy, but

16   ultimately Judge Becerra is the one who decides how that would

17   come out.

18            MR. LOEB:  Yes.

19            THE COURT:  Okay.  Mr. Loeb, I think we've got your

20   argument.

21            Why don't I hear from the defendant.

22            MR. LOEB:  Okay.  Thank you, Your Honor.  The only last

23   thing I would say, and if I said it already I apologize for

24   repeating myself.  When I look at the *Consumer Electronics* case,

25   and then I look at the Eleventh Circuit's *Mercer versus*

1    *Mitchell*, there's this burden shifting that goes on.  We contend

2    that we have met our burden with or without Exhibit 8.  I think

3    Exhibit 8 adds context.  We've got all this other information

4    contained in the filings, and Ms. McNeill made these binding

5    admissions.  It now flips over to her to show that she didn't

6    violate the court order or that she was excused from complying.

7    There's been no evidence that has been submitted other than

8    those stipulated facts, and I guess that November 28th letter,

9    none of which, from our perspective, has relevance to the

10   violation of the preliminary injunction.

11            But with that being said, Your Honor, thank you for

12   giving me the time to argue.

13            THE COURT:  Okay.  Thank you, Mr. Loeb.

14            Mr. Converse.  And again, Mr. Converse, I think we've

15   touched on all the portions of the NLRA defense.  I guess if you

16   have further argument on it, I can hear it, but I think we've

17   addressed those issues fairly thoroughly.  I guess what I would

18   like you to focus on is the other defenses you raised about

19   whether or not the alleged conduct violates the preliminary

20   injunction.

21            MR. CONVERSE:  Understood, Your Honor.  And since, you

22   know, we don't have the benefit of their response to the motion

23   and we weren't able to submit any evidence, I just want to make

24   sure that we preserved all those arguments that were raised.

25            THE COURT:  Yes.

```
 1          MR. CONVERSE:  And then secondarily, if I could just
 2    address this declaration briefly.  I understand the court's
 3    giving them an opportunity to submit it until Wednesday, and I
 4    heard Mr. Loeb saying he's going to expand the scope now to
 5    clean up other issues that weren't even addressed in the
 6    original declaration that they submitted to try to get the
 7    documents in?  And so we would object to them. There was a
 8    deadline to submit them.
 9          Mr. Loeb has made great hay out of the fact that the
10    person who he thinks should be our key witness isn't here.
11    Their key witness, the person who is relevant to the facts that
12    they've raised, they haven't brought her.  They haven't even
13    managed to get an affidavit from her, and it took less than 12
14    hours to, you know, get in motion essentially get it done.  So
15    it could have been done as well.  So we don't have the
16    opportunity to cross her, she's not here.  And so to the extent
17    that they're going to be allowed to, you know, expand the scope
18    of that, we would object to that, Your Honor.
19          THE COURT:  I understand.
20          MR. CONVERSE:  Okay.
21          THE COURT:  So let's operate under the assumption that
22    the messages are authenticated.  What is your argument as to why
23    they do not amount to a violation of the preliminary injunction?
24          MR. CONVERSE:  Well, first we have no relationship
25    between Ms. Burke and any entity.  Mr. Loeb said that she's
```

```
1    operating on behalf of Hard Candy.  Her messages that were
2    attached to the affidavit -- and actually there's a bit of a
3    discrepancy.  I apologize.
4           If we could talk about this too.  They submitted two
5    affidavits.  I think there's been reference to the original
6    affidavit all day, but there was a subsequent one that was filed
7    at 208 after the original submission that expanded it; expanded,
8    I believe, the attachment to the declaration.  So I just wanted
9    to get some clarity as to what they're proposing that's actually
10   going to be admitted, because I think the court only entered
11   199, and there's a 208 that's also been filed.  208-1.
12          MR. LOEB:  And I can clarify that if necessary.
13          THE COURT:  Sure.  Why don't you go ahead.
14          MR. LOEB:  Be happy to.  The second filed one included
15   all of the screenshots of the texts.  The original one,
16   inadvertently, it happened with our copy machine, has a mind of
17   its own when it scans things in.  Sometimes it scans a single
18   instead of double.  So once we realized that, we said hey, this
19   needs to get fixed.  So we corrected that.  So the latter filed
20   exhibit and affidavit of Ms. -- Sanjiv is the operative one.
21   It's just because the scanning and double copying.  Once we
22   realized that, we corrected it.
23          THE COURT:  I think ultimately what's in 199, which is
24   -- 199-2, which I think is the really upshot of things is "I
25   have a direct tie with Hard Candy and a company called Head
```

```
 1    Kandy.  I started a multimillion dollar brand and my company was
 2    taken from me by the owners of Hard Candy.  I was sexually
 3    harassed and retaliated against.  I'm in a federal lawsuit with
 4    the owners of Hard Candy who said that they support
 5    entrepreneurship of little girls", and it goes on from there.
 6    But that seems to be what the heart of the matter is.
 7              So Mr. Converse, why don't you go on with your
 8    argument, but let me -- perhaps I can just redirect you for a
 9    minute.  I'm not sure why it matters what relationship Ms. Burke
10    has or doesn't have with Hard Candy.  It sounds like what the
11    theory of the plaintiff's motion is is that she is disparaging
12    to Ms. Burke the owners of Hard Candy who are the owners of Head
13    Kandy, who are within the group of people covered by the PI who
14    she's not to disparage.
15              MR. CONVERSE:  I think that's the thrust of their
16    argument.  I also heard a lot of argument about her being --
17    again, operating on behalf of Head Kandy.  So to the extent the
18    court was going to consider that about driving a wedge in
19    between Head Kandy and its retained influencer, I was just
20    trying to address the arguments I heard raised.
21              THE COURT:  I think that really goes to whether the
22    comments are disparaging, less about -- from what I heard from
23    Mr. Loeb, they're not really relying on the anti-solicitation
24    portion, and quite honestly I don't think it quite rises to
25    that.  I don't think this rises to -- I don't think there's
```

1   sufficient evidence of solicitation or attempting to get someone

2   to limit or eliminate their relationship with Head Candy.  I

3   think this is really focused on disparagement of the owners of

4   Hard Candy who are the owners of Head Kandy.

5          MR. CONVERSE:  Understood, Your Honor.  So then perhaps

6   I'll speak about the affiliate relationship.

7          We haven't seen any evidence of an affiliate

8   relationship between Hard Candy and Head Kandy.  My Black's Law

9   definition of an affiliate company is a company effectively

10  controlled by another company; a branch, division or subsidiary.

11  It's not sufficient that there's just a common owner, there has

12  to be an actual legal connection between the companies.  Again,

13  it has to be controlled by another company.  And the evidence

14  that we saw from Exhibit 3, which is the operating agreement, it

15  seems to show that Urban Decay might be the parent company of

16  Hard Candy, not Head Kandy.

17         THE COURT:  What about officers, investors and other

18  associated third parties?

19         MR. CONVERSE:  So with regards to the officers, she

20  didn't speak about an officer.  She did reference the owners.

21  And so with regard to the investor component, again, that was

22  what I was -- my concern about the exhibit is it doesn't speak

23  to who the current owners are.  We don't have any evidence as

24  to, or at least when she made this statement who the owners are

25  of Hard Candy.

```
1           THE COURT:  But Ms. McNeill is clearly drawing in the

2     messages she's drawing that -- she's equating them herself.

3     She's saying -- sorry.  Let me make sure I have it up.  "I have

4     a direct tie to Hard Candy and a company called Head Kandy.  I

5     started a multimillion dollar brand and my company was taken

6     from me by the owners of Hard Candy."

7           Does she have another multimillion dollar business that

8     has been taken from her?

9           MR. CONVERSE:  No, Your Honor.

10          THE COURT:  Okay.  So isn't that a clear implication

11    that she is equating -- and then the next message is "I was

12    sexually harassed and retaliated against and I'm in a federal

13    lawsuit with the owners of Hard Candy."

14          So by her own statements she is equating the owners of

15    Hard Candy with the people she's accusing of conduct in this

16    case who are the owners of Head Kandy, is she not?

17          MR. CONVERSE:  Your Honor, my point is that if she's

18    mistaken as to the facts, I don't think that she can violate the

19    preliminary injunction.  So yes, I agree she thought that

20    Mr. Falic owned -- had some ownership interest in both

21    companies.

22          THE COURT:  So she meant to disparage him but she might

23    have made a mistake?

24          MR. CONVERSE:  Well, I'm not conceding that it's

25    disparagement.
```

```
 1              THE COURT:  Okay.  Go on.

 2              MR. CONVERSE:  Okay.  Also, where you began she said

 3    that she had a tie to Hard Candy and a company called Head

 4    Kandy.  So she had a tie to both companies is what she's saying.

 5    She's not saying they're one and the same company, as I believe

 6    I heard argued moments ago.

 7              THE COURT:  But she's saying my company was taken from

 8    me by the owners of Hard Candy.  So again, that -- whether she

 9    has a tie to Hard Candy or not, the point here is that she is

10    talking about actions by the owners of Hard Candy and referring

11    to them as having taken the actions they did regarding Head

12    Kandy.

13              I didn't say that very clearly, but she's saying the

14    owners of Hard Candy, she doesn't name them by name, but the

15    clear implication by talking about a multimillion dollar company

16    taken from her is clearly referring to Head Kandy and the owners

17    of Head Kandy, is it not?

18              MR. CONVERSE:  Well, I don't think it's referring to

19    the owners of Head Kandy, it's referring to the owners of Head

20    Kandy.

21              THE COURT:  You just it's not "referring to the owners

22    of Head Kandy, it's referring to the owners of Head Kandy."

23              MR. CONVERSE:  I meant to say Hard Candy.  So I

24    apologize, Your Honor.  You warned us.

25              THE COURT:  So are there other owners of Hard Candy
```

```
 1    different from Mr. Falic who somehow took a multimillion dollar

 2    company from her?  Is there any reasonable argument that she's

 3    referring to someone other than Mr. Falic?

 4            MR. CONVERSE:  We don't know who the owners are.

 5            THE COURT:  Okay.  Okay.  Please proceed.

 6            MR. CONVERSE:  Okay.  And again, this individual has no

 7    relationship with either company.  She doesn't know who the

 8    owners of -- so without naming Mr. Falic specifically, this

 9    individual doesn't know who the owners of Head Kandy are, she

10    doesn't know who the owners of Head Kandy are, she's been

11    dealing with this Hayden Products.  She only knows of, I

12    believe, it's Hayden Products LLC.

13            THE COURT:  Okay.

14            MR. CONVERSE:  So with regard to disparaging.  Again,

15    we do stand by the argument that was made in the response that

16    "took" is not -- doesn't have the negative connotation that the

17    court found that the other language that had been used

18    previously did.  "Took" is all that's in the text.  And this is

19    where -- again, it's already admitted by -- and this is why we

20    believe that the Exhibits 3 and 11 that we spoke about briefly

21    about, they stipulated -- Head Kandy stipulated that it did not

22    pay her any compensation.  This is in Paragraph 38.  Did not pay

23    her any compensation for her ownership interest.  So -- and they

24    did it under their own volition.  So they took it.  It's not a

25    negative connotation, they took the company and they didn't pay
```

```
 1      her any compensation.

 2              THE COURT:  You don't think that using the word "take"

 3      implies that it was taken improperly?

 4              MR. CONVERSE:  Well, I think Mr. Loeb references his

 5      kids.  I'm sure he's asked them if they took the coat that he

 6      left for them, that's not improper.  He wants them to take the

 7      coat that he left for them or the lunch box or whatever the case

 8      may be.  I don't think that that's colloquially, in a short text

 9      exchange, I don't think that has a negative connotation,

10      especially when it's --

11              THE COURT:  You don't think in the context of this

12      conversation it doesn't have a negative connotation?  As opposed

13      to saying they bought the company from me, that I left the

14      company or anything like that?  Was taken from me?  You don't

15      think that has a negative connotation?

16              MR. CONVERSE:  Our position is that that by itself, no,

17      it's not a negative connotation.  It was taken from me, and we

18      think that it's supported by the record that it was taken.

19              THE COURT:  Okay.

20              MR. CONVERSE:  Again, I appreciate the court's

21      determination about the scope, and I'm not getting into the NLRA

22      as we already talked about.  I would just say that if the NLRA

23      carve-out applies, because you are asking me about the --

24      basically the reference to the NLRA being a savings clause

25      within the non-disparagement, I would say so if it really does
```

```
1   save it, well then the non-disparagement definition under the

2   NLRA would apply to the non-disparagement provision, as opposed

3   to the definition that's used in the preliminary injunction

4   because it doesn't consider the NLRA.

5           THE COURT:  Okay.  I don't think you've actually made

6   that argument in your pleadings, but I'll consider that.

7           MR. CONVERSE:  Okay.

8           THE COURT:  I'm sorry.  Proceed.

9           MR. CONVERSE:  I would just say I think in the response

10  we do reference the NLRA argument, and then we -- to incorporate

11  our motion.  And again, we haven't filed the reply yet so it's

12  not fully briefed, and we certainly will address that in the

13  reply.

14          Moreover, these messages here, they don't say who

15  sexually harassed Ms. McNeill.  And I'm not parsing, I'm reading

16  the text for what it is.  This is -- it says I was sexually

17  harassed.  It could have been by, you know, any number of

18  people.  It doesn't say that I was sexually harassed by the

19  owners.  And we don't think that -- we don't have any

20  information that Mr. Rosenbaum is currently an owner, and that's

21  who the allegations are against.  So again, she wouldn't have

22  said that because we don't know him to be an owner currently.

23  He may be, but there hasn't been any evidence.  So it doesn't

24  state who she was sexually harassed by, it says that she was

25  retaliated against.  And again, since we're not speaking in an
```

```
 1    NLRA context, I would look to the colloquial sense in, you know,
 2    retaliated, it doesn't imply that the employer retaliated
 3    against.  It doesn't say who retaliated against her, it just
 4    says she was retaliated against.  Again, I'm acknowledging -- I
 5    think the court's point a moment ago was stick to the plain
 6    reading and so I acknowledge that.  It suggests that she was
 7    retaliated against by the person who sexually harassed her, but
 8    again, it doesn't say who sexually harassed her and as we
 9    understand it, it's not an owner of Head Kandy currently.
10         Also, there was discussion and argument about the
11    reaction that this had on the influencer.  And again, she wasn't
12    here to testify, so we don't know what the reaction was of her.
13    She came back and said she liked the products and she wasn't
14    going to -- seems like she's not going to change anything, so I
15    think in the end that it didn't have a negative impact on her.
16    But again, we could ask her if she was called.  There's no
17    evidence as to what the actual impact was.
18         Again, it was stated just that the sexual harassment
19    allegations are frivolous.  It's been brought up multiple times
20    in these proceedings.  It's never been refuted.  Mr. Rosenbaum
21    was here as a testifying fact witness when it was brought up at
22    the PI hearing.  It wasn't asked about, it wasn't refuted at
23    all, so we don't think there's anything in the record that
24    suggests that any of these sexual allegations, as was argued by
25    my colleague, that it's -- that they're completely frivolous or
```

1    unfounded.  They have not been refuted when there was a perfect

2    opportunity to do so, for instance in the PI hearing.

3           Really, your question was about the substance of the

4    argument, so that's all I have on that part.  And I'll just save

5    the rest and answer whatever questions you have for me.

6           THE COURT:  In terms of remedy, if the court were to

7    find a violation what is -- what's your position regarding what

8    an appropriate remedy would or would not be?

9           MR. CONVERSE:  So I know it's been used against us a

10   lot, but in the reply what we were trying to do was acknowledge

11   what had been done.  And Ms. McNeill, I can tell you, certainly

12   respects the court and respects the court's orders and

13   understands that she must comply with them.

14          And as far as a sanction to ensure her compliance,

15   there's -- again, she's not being required to hand over

16   anything, and I think -- speak about the elephant in the room,

17   if I may, she's an individual.  She's not a corporation.  A big

18   financial sanction against her would be devastating.  And, you

19   know, this case has already put her on the precipice.  She's

20   getting ready to file for bankruptcy if something doesn't change

21   soon.

22          So I would say that as far as ensuring compliance,

23   which is the intention, that a -- I think a fee of, I don't want

24   to say a nominal amount, but not less than 2000 or -- excuse me,

25   yes.  Not more than $2,000 would send a message to Ms. McNeill,

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1     it would ensure compliance, and anything larger than that

2     certainly isn't going to have any more of an impact given what

3     that type of a sanction would have on her.  Not sanction, I'm

4     sorry, but -- yeah, financial sanction to ensure compliance.

5             THE COURT:  What about the idea of compensating the

6     plaintiff for, you know, expenses for having had to bring the

7     motion in the first place?  Is that a proper compensatory

8     vehicle?  Is that a proper thing to look at in determining what

9     the appropriate remedy would be.

10            MR. CONVERSE:  Sure.  That amount was speaking to the

11     compensatory component as well.  Again, speaking to the elephant

12     in the room, we know that there are multiple, multiple attorneys

13     on the other side.  I'm sure that there are -- the attorney's

14     fees are quite large.  But I wouldn't -- I would say that that's

15     not reasonable.  We've heard that this is a very straightforward

16     motion, so I don't know why there would be such substantial

17     attorney's fees on the other side if it's so straightforward.

18     It's a motion and a reply, so I was thinking the compensatory

19     would include that 2000.  I think that it's a reasonable

20     benchmark or I think it's a reasonable metric, but I think that

21     the attorney's fees have to be reasonable at the same time.

22            THE COURT:  Okay.  All right.  Thank you, Mr. Converse.

23     Anything further?

24            MR. CONVERSE:  If you'll allow me to just say something

25     about the last contempt proceeding, because that got brought up

1      as one of the bases for enhancing the sanction against her.

2             At that hearing, actually right just prior to it, we

3      had filed a declaration by another attorney that's working on

4      the case where she had gone through every single one of the

5      videos that were in dispute.  So again, there was an issue about

6      taking down videos.  Our position was we had taken down all

7      videos save and except for the ones that couldn't be preserved.

8      And so we were asking the other side how they wanted to handle

9      it.  You had asked them at the hearing if they had proposed any

10     type of resolution, and they admittedly said no, they hadn't.

11     So we did as much as we could do to get to that point.

12            At the hearing we had two individuals, and we had two

13     individuals who were ready to testify that they could not view

14     any of those videos that we said had been taken down.  Mr. Loeb

15     said absolutely not, he viewed them, and they were still up

16     there and he could see them, and the court ordered us to confer

17     immediately afterwards.  When Ms. Burgess conferred with

18     Mr. Loeb, it was discovered that he absolutely could not see

19     those.  So the only reason why that motion was brought was

20     because of the misrepresentation about whether or not those

21     videos had been taken down, and the fact that there was no offer

22     as to how to comply with both the preservation demand that

23     they're making upon us, and the take-down demand that they're

24     making upon us.

25            I haven't brought up this issue because I have read

1    your opinions on attorney conduct, and my Strauss-ian reading of

2    that is the court doesn't want a baby-sitter.  The parties need

3    to figure it out.  This is still a distinguished profession, the

4    attorneys need to figure it out amongst themselves.

5         We signed a resolution.  I thought that this was over,

6    so I didn't bring it up, but now I'm having to bring it up

7    because it's being used against Ms. McNeill just like the

8    stipulated facts are.  And I have e-mails over there about the

9    stipulated facts from the PI hearing where I asked them to

10   stipulate to facts that were taken verbatim, in quotations, from

11   their complaint, and I cited the complaint and I asked them to

12   reconsider the fact that they would not consider those.  They

13   would not stipulate to those facts, and they told me they would

14   -- there was no way that they would stipulate to those after I

15   had pointed it out.

16        So things are going on behind the scenes.  I'm trying

17   not to bring the court into it because I don't think that the

18   court should be burdened with those type of arguments and those

19   type of issues.  But when it's used against me, I feel the need

20   and I have to bring it to the court's attention, Your Honor.

21        THE COURT:  Okay.  Thank you, Mr. Converse.

22        Folks, we're going to wrap up.  As I said, I'll be

23   considering everything and entering a report and recommendation.

24        As I said, by Wednesday the plaintiff must file its

25   affidavit from Ms. Burke to further wrap up the authenticity of

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

100

1    Exhibit 8, and the court will consider it for that purpose by

2    then.

3           I'm also going to direct -- and I have not decided

4    anything yet but because both parties have indicated that the

5    cost of bringing the motion is at least something that the court

6    could consider in deciding an appropriate remedy for a violation

7    if one were found.  I'm going to direct that the plaintiff file

8    a notice -- I was also going to say by Wednesday, articulating

9    what those costs and expenses are, including justification for

10   hourly rate and hours expended so that the court can have that

11   as a reference.

12          The final thing I want to say is this:  First of all, I

13   understand that, you know, defendant has made a motion to vacate

14   a portion of the preliminary injunction.  I would hope it would

15   go without saying that while the court is considering that

16   motion, that's not license for her to assume that it's going to

17   be granted, and go out and assume that she has license to

18   violate the order that's currently in place.

19          I also want to wrap up just by saying this:  And again,

20   I have to consider everyone's arguments regarding whether there

21   is a violation here or not.  But this is what Judge Ruiz said to

22   both of you in the November status conference that he had, and

23   it came up in the context, I think, actually of the videos that

24   might have to get taken down, but it was really pointed towards

25   any future posts or anything like that.

1      Judge Ruiz said:  "The only thing I will say about it,

2    and I say this generally to everybody, stay off social media as

3    much as you possibly can while this thing is ongoing.  Not

4    because I want to inhibit your ability to generate business,

5    because I know nowadays, especially in this space, from what

6    I've read, social media is a strong driver of consumer interest

7    and of brands management.  And while this case is ongoing,

8    especially with the injunctive relief, we just don't want to get

9    into a back and forth where the court has to do orders enforcing

10   the injunction, and then it opens up the door to sanctions.  And

11   it's something I definitely don't want to do."

12      He then later goes on to say:  "But I would just ask in

13   this window, without knowing anything, if I've got to deal with

14   it I will deal with it, but I urge the parties to do your very

15   best to try to pull back on any sort of social media engagement

16   that would run afoul of the court's order, because we don't want

17   to have a situation where I have to issue orders having you take

18   stuff down."

19      The upshot of what Judge Ruiz was saying, at least as

20   far as I can interpret it, is that this exact hearing is exactly

21   where we didn't want to be.  And I can understand if Ms. McNeill

22   thinks the order is unfair.  I understand, based on her

23   allegations, if it makes her blood boil.  All that is something

24   to continue getting litigated.  But what I take Judge Ruiz

25   saying there is that discretion is the better part of valor, and

1    pushing the envelope or trying to go up to the line on anything

2    is simply asking for us to end up right back here.  And if we

3    end up back here again, someone is going to lose, someone

4    someone's going to win.  Either way, it's going to be expensive

5    for everybody and that doesn't help anybody.

6          So I can only reiterate what Judge Ruiz said which is,

7    again, discretion is the better part of valor.  And, you know, I

8    wish Ms. McNeill were here so I could make that point to her

9    directly, that even trying to come up close to the line is a

10   recipe for ending up right back here.  And I would urge defense

11   counsel to have another conversation with her, because it is

12   incumbent upon you to make sure she understands not just what

13   the limits are, but what the consequences of and the downsides

14   of even pushing the limits are, even if it's not found to be a

15   violation.

16         And so that's really the best message I think I can

17   send.

18         I'm going to consider everyone's evidence and arguments

19   here today.  Like I said, we'll get an R and R out.  I look

20   forward to getting the response and then the reply regarding the

21   motion to vacate, partially vacate the preliminary injunction,

22   and we'll issue an R and R on that also.

23         Otherwise, we're going to wrap up here for today.  Hope

24   everyone has a good weekend.  Safe travels back to Tampa and to

25   Colorado, and we'll stand in recess.

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

```
1              MR. LOEB:  Thank you, Your Honor.

2              MR. CONVERSE:  Thank you, Your Honor.

3              COURTROOM DEPUTY:  All rise.

4              (PROCEEDINGS CONCLUDED)

5                     C E R T I F I C A T E
             I certify that the foregoing is a correct transcript
6      from the record of the proceedings in the above-entitled matter.
       Any redaction of personal data identifiers pursuant to the
7      Judicial Conference Policy on Privacy is noted within the

       _____           /s/ Dawn M. Savino, R.P.R., C.R.R.
9      Date                 DAWN M. SAVINO, R.P.R., C.R.R.

10
                            I N D E X
11
                           WITNESSES
12
       None
13

14                          EXHIBITS

15     NO.:    DESCRIPTION:                        PAGE:

16     For Defense:

17     3       :
               In Evidence                         60:2
18
       11      :
19             In Evidence                         60:25

20     For Plaintiff:

21     1 & 2   :
               In evidence                         34:14
22
       3       :
23             In Evidence                         37:17

24

25
```