**KANDY LLC vs KAYLA MCNEILL**
**Nicole Cook on 05/09/2024**

```
 1                  UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF FLORIDA
 2                       FT. LAUDERDALE

 3
         HEAD KANDY LLC,
 4
                 Plaintiff,         CASE NO.
 5                                  0:23-cv-60345-JB
         vs.
 6
         KAYLA MCNEILL,
 7
                 Defendant.
 8
         ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
 9

10                       DEPOSITION OF

11                       NICOLE COOK

12

13               Thursday, May 9, 2024

14                    11:07 A.M.

15               Videoconference

16

17

18

19

20

21

22

23

24   Reported By Rocco Franco, Commission No. 202403900042

25                  Job No. 65951
```

**EXHIBIT D**

**KANDY LLC vs KAYLA MCNEILL**
**Nicole Cook on 05/09/2024**

Page 2

```
 1                   APPEARANCES OF COUNSEL

 2

 3    On behalf of the Plaintiff, HEAD KANDY LLC:

 4         CARSON SADRO, ESQ.
           ELLIOT P. HANEY, ESQ.
 5         JALEN LARUBBIO, ESQ.
           BARTLETT LOEB HINDS THOMPSON & ANGELOS
 6         100 North Tampa Street
           Suite 2050
 7         Tampa, Florida 33602
           813-223-3888
 8         carsons@blhtlaw.com
           ellioth@blhtlaw.com
 9         jasonl@blhtlaw.com
           APPEARED VIA VIDEOCONFERENCE

10

11    On behalf of the Defendant, KAYLA MCNEILL:

12         ANTONIO CONVERSE, ESQ.
           CONVERSE LAW GROUP, P.C.
13         600 17th Street
           Denver, Colorado 80202
14         303-534-4499
           anthony@converselawgroup.com
15         APPEARED VIA VIDEOCONFERENCE

16    AND

17         LAURA E. BURGESS, ESQ.
           LEBURGESS LAW
18         5966 South Dixie Highway
           Suite 300
19         Miami, Florida 33143
           305-942-8044
20         laura@leburgesslaw.com
           APPEARED VIDEOCONFERENCE
21

22    Also present:
23
           Olivia Henderson, Videographer
24         Kayla McNeill, Defendant

25
```

**KANDY LLC vs KAYLA MCNEILL**
Nicole Cook on 05/09/2024

Page 3

```
 1                    INDEX OF EXAMINATION

 2

 3   WITNESS:  NICOLE COOK

 4   EXAMINATION                                    PAGE

 5   By Ms. Sadro                                   4

 6   By Mr. Converse                                73

 7   By Ms. Sadro                                   159

 8   By Mr. Converse                                169

 9   By Ms. Sadro                                   177

10   By Mr. Converse                                188

11

12                    INDEX TO EXHIBITS

13

14   NO.            DESCRIPTION                     PAGE

15   Exhibit 1      Declaration                     17

16   Exhibit 2      Text Messages                   22

17   Exhibit 3      New Hire Form                   32

18   Exhibit 4      Calendar Composite              47

19   Exhibit 5      TimeTree Calendar Screenshot    49

20

21        (Exhibits 1 through 5 were attached to the

22   original transcript.)

23

24

25
```

**KANDY LLC vs KAYLA MCNEILL**
**Nicole Cook on 05/09/2024**

```
 1                (On the record at 11:07 A.M.)

 2                THE VIDEOGRAPHER:  Media number 1 deposition

 3   of Nicole Cook in the matter of Head Kandy LLC v. Kayla

 4   McNeill.  Today's date is the 9th of March, 2024, and

 5   the time on the monitor is 11:07 a.m.  Eastern Time.

 6                My name is Olivia Henderson, and I am the

 7   videographer.  The court reporter is Rocco Franco.  We

 8   are here with Huseby Global Litigation.

 9                Counsel, please introduce yourselves, after

10   which the court reporter will swear in the witness.

11                MS. SADRO:  Carson Sadro here on behalf of

12   Head Kandy.

13                MR. CONVERSE:  And on behalf of the

14   defendant is Anthony Converse and Laura Burgess.

15                THE COURT REPORTER:  All right.  Ms. Cook,

16   if you'll please raise your right hand.

17                          NICOLE COOK,

18     having first been duly sworn, testified as follows:

19                THE COURT REPORTER:  Thank you.

20                MS. SADRO:  All right.  My turn?

21                        EXAMINATION

22   BY MS. SADRO:

23       Q.   All right.  Good morning, ma'am.  How are

24   you doing?

25       A.   Good morning.  I'm well.  How are you?
```

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 5

```
1        Q.   Good morning.  And ma'am, could I have you
2   state your first and last name onto the record?
3        A.   Nicole Cook.
4        Q.   All right.  Spelled like it sounds, N-I-C-O-
5   L-E, C-O-O-K?
6        A.   Yep.
7        Q.   All right.  Thank you, Ms. Cook.
8             Ms. Cook, can you tell us a little bit about
9   why you believe you're here today?
10       A.   Just because I was paid by Head Kandy, but
11  apparently Kayla didn't own Head Kandy.
12       Q.   Okay.  Before we start talking about that, I
13  want to talk to you a little bit about a deposition in
14  general.
15            Have you ever had your deposition taken?
16       A.   No.
17       Q.   Okay.  So I'll tell you a couple of the
18  things that I tell everybody when we take a deposition,
19  whether or not they've had one before or not.  The
20  first rule is that to speak nice, loudly, and clearly.
21  Obviously, we're over Zoom, and sometimes the internet
22  might go in and out.  But we want to make sure that
23  we're being clear as -- as best we can.
24            If at any point in time, my video cuts out
25  or your video cuts out, and you can't hear anything, or
```

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 6

1   you're concerned that something you said wasn't put

2   down on the record, please just stop, and let me know.

3           Does that make sense?

4   A.   Okay.  Yeah.

5   Q.   If at any point in time, I ask you a

6   question that doesn't seem clear or seems confusing,

7   you don't understand it, I'm going to ask that you let

8   me know that it's not clear to you.  Because otherwise,

9   if you don't let me know, I'm going to assume that

10  you've understood the question that I've asked.

11          Does that seem fair?

12  A.   Yes.

13  Q.   Okay.  And you're doing a great job of it

14  already.  Another thing I'll ask you is that since

15  we're on a court record, we have to do clear answers

16  like yes or no, just like you just did.  While you and

17  I might be out in the world if we ran into each other

18  and had a conversation, we might do some mm-hms or

19  yeah-huhs or huh-uh, but for the purposes of the

20  record, we've got to make sure that it's a -- a yes,

21  no, or other answer as it applies.

22          Does that make sense?

23  A.   Okay.  Yeah.

24  Q.   Okay.  And if at any point in time we're

25  going throughout this deposition, and you feel that you

**KANDY LLC vs KAYLA MCNEILL**
Nicole Cook on 05/09/2024

```
 1   did not give a complete answer or you remembered

 2   something else or different than as you testified, I'm

 3   going to ask that you let me know.

 4          Does that seem fair?

 5   A.   Yes.

 6   Q.   Okay.  All right, Ms. Cook.  So I want to

 7   talk to you a little bit about a person you mentioned a

 8   few moments ago, Kayla McNeill.

 9          Who is Kayla McNeill?

10   A.   She was the owner of Head Kandy.

11   Q.   How did you know Kayla?

12   A.   Just through friendships, and my partner is

13   really good friends with her, and my sister has worked

14   for her.  And she's a pretty big name around town.

15   Q.   How long have you known Ms. McNeill?

16   A.   I mean, I would say at least -- I mean, I've

17   known her forever because we all went to the same small

18   school.  But, like, friendship-wise, at least, like, 10

19   or 12 years.

20   Q.   When you say friendship wise for -- for 10

21   years, does that mean you two would hang out regularly?

22   A.   No.  I would just say, like, you know,

23   friendship as, like, we would talk or, like, you know,

24   I babysat her kids, or our kids hung out together or,

25   like, stuff like that.  Like, we didn't hang out
```

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 8

1   regularly or do stuff regularly together.

2       Q.   And you said that Ms. McNeill knew -- knows

3   your partner.  Was Ms. McNeill kind of, like, a family

4   friend?

5       A.   Yeah.  I think they're -- well, I mean, his

6   -- my partner, so his -- his -- he's really close with

7   them, so I would assume that they're, like, family

8   friends.

9       Q.   And what's your partner's name?

10      A.   His name is Chris Curtis.

11      Q.   You said, too, that you had a couple of

12  sisters that know Ms. McNeill as well.  Who were they?

13      A.   Sydney Cook and Keli-Lyn Cook.

14      Q.   Okay.  Can you spell Keli-Lyn's name?

15      A.   Yep.  K-E-L-I, hyphen, L-Y-N.

16      Q.   And last name spelled just like yours, C-O-

17  O-K?

18      A.   Yep.  Yep.

19      Q.   Okay.  And Sydney is spelled the normal way

20  you would expect, S-Y-D-N-E-Y?

21      A.   Yep.

22      Q.   All right.  Did your sisters, Sydney and

23  Keli-Lyn, know Kayla, Ms. McNeill, for the same time

24  period that you did?

25           MR. CONVERSE:  Objection.  Form.

**KANDY LLC vs KAYLA MCNEILL**
**Nicole Cook on 05/09/2024**

Page 9

1          Go ahead and answer, please.

2          THE WITNESS:  Yes.  Keli-Lyn would because

3   she's older than I am, so she was closer in age to

4   Kayla in high school.  Sydney, probably not nearly as

5   long because she's 11 years younger than I am.  So

6   she's probably much shorter time frame of knowing Kayla

7   than that.

8   BY MS. SADRO:

9          Q.    And when you and your family would spend

10   time with Ms. McNeill, were Sydney or Keli-Lyn present?

11          A.    No.  I would say no.  Never.

12          Q.    Would you ever -- what -- when you and Ms.

13   McNeill would spend time together, what would you do?

14          A.    I rented her little rental behind their

15   house 10 years ago.  Yeah.  10 years ago.  So I mean,

16   we would just hang out, like, at her house with our

17   kids because she had two boys; I had two boys.  So we

18   would just hang out, like, barbecue or do yard work and

19   stuff like that.  We did go on vacation once.  That was

20   it.

21          Q.    Where did you go on vacation?

22          A.    We went on vacation to Mexico, to Cancun, in

23   2015, I think.  I think it was 2015.

24          Q.    Okay.  Did you take the kids with you?

25          A.    We took her kids.  We didn't take my kids.

**KANDY LLC vs KAYLA MCNEILL**
**Nicole Cook on 05/09/2024**

1    Q.   Okay.  I get it.  Ms. Cook, you said that

2   Ms. McNeill was kind of a big name around town.

3        What do you mean?

4    A.   Just, like, everybody knows her.  Everybody

5   knew that she had a -- a hair company, and she was a

6   hairstylist before.  She did nails, hair.  She started

7   Head Kandy.  She had a tanning salon.  So she was a

8   pretty big name around here because we live in a

9   little, itty-bitty town.  So she had a really nice

10  salon, and, like, everybody went to her, and everybody

11  just knew her.

12   Q.   What's the name of your little, itty-bitty

13  town?

14   A.   Salida, Colorado.

15   Q.   Do you remember the names of the businesses

16  Ms. McNeill operated in Salida?

17   A.   No.  I would say -- I -- I can't remember.

18  But --

19   Q.   Did you ever use Ms. McNeill's services in

20  those businesses prior to Head Kandy?

21   A.   Totally.  Yeah.  She definitely did my hair.

22  She did my nails.  All of that.

23   Q.   And was that regularly?

24   A.   Yeah.  I'd say regularly, like, every --

25  regularly, like, four weeks for nails and three months

Page 11

1    for hair.  So yeah, pretty regularly.

2        **Q.   Now, prior to working for Head Kandy -- and**

3    **we'll -- we'll get to that in a moment.**

4            **Prior to working for Head Kandy, what was**

5    **your experience like with Ms. McNeill?**

6        A.   It was fine.  I had kind of gotten to know

7    her more and, like, know the things that I could tell

8    people and not tell people as far as, like, other

9    people finding out my business.  She was one that I

10   learned quickly not to tell secrets to because they

11   would get out.

12       **Q.   Did you ever have any negative interactions**

13   **with her?**

14       A.   No.  I would say outside of just regular

15   friendship, you know, little spit-spats, nothing ever

16   wild and crazy and arguments and fighting.  Nothing --

17   nothing like that.  Just normal girls' friendship

18   spats.

19       **Q.   Does your partner, Chris, is he still**

20   **friends with Ms. McNeill?**

21       A.   Yeah.  And I respect that boundary for them.

22   That's completely acceptable, and they can still be

23   friends.  I -- I respectfully stay out of that

24   relationship.

25       **Q.   And so you don't spend as much time with Ms.**

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 12

1  McNeill as we sit here today?

2      A.   I don't spend any time with her, no.

3      Q.   Is that true since you left your role at

4  Head Kandy?

5      A.   Yes.

6      Q.   Ms. Cook, before we get into your role at

7  Head Kandy, I -- I want to ask you a quick question on

8  the record.

9           Is there anything that you believe would

10  impact your ability to testify fully?  Is there

11  anything that would impact your memory that we should

12  be aware of?

13      A.   I do have brain cancer, so I do get confused

14  a little bit, and I get lost sometimes.  So I -- I just

15  sometimes will look a little confused, or -- or it

16  takes me a little bit longer just to process the

17  question.  Other than that, I would just say no.

18      Q.   And I'm sorry to hear that, Ms. Cook.  And I

19  certainly don't mean to -- to make you go into more

20  detail than necessary.

21           Do you mind telling me when you received

22  that diagnosis?

23      A.   March of last year.  So March 2023.

24      Q.   And you said sometimes it affects your

25  ability to understand things, or you seem confused.

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 13

1    Has that been true since your diagnosis?

2         A.   Yeah.  I would say it's gotten worse over

3    just the last few months.  But, I mean, even before my

4    diagnosis, it was -- it was an issue, so.

5         Q.   Does it affect your ability to recall major

6    events?

7         A.   So far, it hasn't.  I mean, nothing that I

8    haven't been able to remember, no.

9         Q.   And was the -- or were those issues

10   affecting you from January of 2021 to March of 2021?

11             MR. CONVERSE:  Objection.  Form.

12   BY MS. SADRO:

13        Q.   You can answer.

14             MR. CONVERSE:  Go ahead and answer, please.

15             THE WITNESS:  I don't think so, no.

16   BY MS. SADRO:

17        Q.   Okay.  Ms. Cook, you gave -- do you remember

18   giving previously a declaration in this case titled the

19   Declaration of Nicole Cook?

20        A.   Yes.

21        Q.   Okay.  I am going to share my screen.  All

22   right.

23             Ms. Cook, can you see what I've just shared

24   on the screen?

25        A.   Yes.

**KANDY LLC vs KAYLA MCNEILL**
**Nicole Cook on 05/09/2024**

1      Q.   Does it appear to be the declaration that

2  you submitted and signed?

3      A.   Yes.

4      Q.   And I'm going to scroll to the bottom of

5  this declaration on Page 4.  On Page 4, is that your

6  signature?

7      A.   Yes.

8      Q.   And you would agree with me that you signed

9  with -- under penalties of perjury, that you declared

10  you read the foregoing and the facts stated, and they

11  are true to the best of your knowledge, right?

12     A.   Yes.

13     Q.   And that was on October 4th, 2023?

14     A.   Yep.

15     Q.   Okay.  Ms. Cook, when you made this

16  declaration, were you discussing the time period that

17  you worked from -- for Head Kandy?

18          MR. CONVERSE:  Objection.  Form.

19  BY MS. SADRO:

20     Q.   You can answer, Ms. Cook.

21     A.   Yes.

22     Q.   Okay.  And in subject -- or Paragraph 1 of

23  that declaration, you note that that time period was

24  January 13th, 2021, through March 5th, 2021.

25          Did I read that right?

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 15

```
 1      A.   Yes.

 2      Q.   When you submitted this declaration in

 3  October of 2023, at that point in time, did your memory

 4  issues due to brain cancer affect any of the testimony

 5  that you put in this declaration?

 6      A.   No.

 7           MR. CONVERSE:  Objection.  Form.

 8           THE WITNESS:  Oh.

 9           MR. CONVERSE:  Go ahead.

10  BY MS. SADRO:

11      Q.   You can repeat your answer, Ms. Cook.

12      A.   No.  Sorry.

13      Q.   Okay.  Have you had an opportunity since --

14  or executing this declaration in October of 2023 to

15  review it?

16      A.   Yes.

17      Q.   Okay.  And when was the last time you were

18  able to review this declaration?

19      A.   This morning.  I have a copy of it.

20      Q.   Okay.  And is that the only thing you have

21  in front of you, or do you have anything else in front

22  of you?

23      A.   Nope.  I just have that.

24      Q.   Okay.  Ms. Cook, since being able to review

25  it this morning, when you were reviewing it, did it
```

**KANDY LLC vs KAYLA MCNEILL**
Nicole Cook on 05/09/2024

Page 16

```
 1   appear to you that any of the information that you put

 2   in that declaration needed to be changed or updated?

 3        A.   I don't think so.

 4        Q.   Did any of it look wrong?

 5        A.   No, none of it looks wrong.

 6        Q.   And -- and I want to ask you that, Ms. Cook,

 7   you've included on this declaration a couple of

 8   screenshots of text messages; is that fair to say?

 9        A.   Uh-huh.

10        Q.   And those text messages, are they from your

11   phone?

12        A.   Yes.

13        Q.   Okay.  And are they -- the text messages you

14   submitted in that declaration, did you alter them or

15   change them in any way before you --

16        A.   No.

17        Q.   -- included them in the declaration?

18        A.   Oh, sorry.  No.

19        Q.   Okay.  And these text messages within your

20   declaration, who are you communicating with?

21        A.   With Kayla McNeill.

22        Q.   Okay.  The same Kayla McNeill that we've

23   been discussing thus far this morning?

24        A.   Yes.

25             MS. SADRO:  Okay.
```

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 17

1           Okay.  And, Madam Court Reporter, I will

2   mark that as Exhibit 1.

3           (EXHIBIT 1 MARKED FOR IDENTIFICATION)

4   BY MS. SADRO:

5      Q.   All right, Ms. Cook.  So let's back up.

6           How did you first hear about Head Kandy?

7      A.   Just through Kayla and the friendships and

8   everybody.  I don't know exactly how I heard about it,

9   but I would probably just say word of mouth through the

10  mutual friends we all had.

11     Q.   Okay.  Did you learn what Head -- what the

12  business Head Kandy operated for, if they sold

13  something, if they marketed anything?

14          MR. CONVERSE:  Objection.  Form.

15          THE WITNESS:  No, I --

16          MR. CONVERSE:  Go ahead.

17          THE WITNESS:  I just knew it was haircare

18  products.  I didn't know anything else.

19  BY MS. SADRO:

20     Q.   Okay.  Did you know who was in charge of the

21  company when you first became aware of it?

22     A.   I didn't know for sure, but I figured it was

23  Dusty and Kayla because it was their company.  They

24  were running it, doing it all from home, so.

25     Q.   And how did you know that Dusty and Kayla

**KANDY LLC vs KAYLA MCNEILL**
Nicole Cook on 05/09/2024

Page 18

```
 1   were running it and doing it all from home?

 2        A.   Probably just pictures on Facebook.  She's a

 3   very big poster, and she would post things like

 4   pictures of boxes lined up all over for orders and

 5   boxes that are actually packed and put into a UPS

 6   truck, and just things like that.  She would just post

 7   pictures on Facebook.

 8        Q.   And did you have any interest in working for

 9   Head Kandy itself?

10        A.   I don't think so.  I had had two jobs back

11   then, so I didn't need a third.

12        Q.   And when you say you had two jobs back then,

13   are -- are we talking about the beginning of 2021?

14        A.   Not 2021.  I would say the beginning of Head

15   Kandy, so whenever that was.

16        Q.   And that's a good clarification.  When are

17   you referencing the beginning of Head Kandy?  About

18   what time?

19        A.   I would say 10 years ago when -- just about

20   10 years ago when I lived in their rental, and they

21   lived in the big house.  So yeah.  Just about 10 years

22   ago.

23        Q.   And, Ms. Cook, let's go fast forward to

24   January of 2021.  Did you become aware of an open

25   position that Kayla was advertised -- or Ms. McNeill
```

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 19

1  was advertising?  Excuse me.

2          MR. CONVERSE:  Objection.  Form.

3          THE WITNESS:  Yeah.

4  BY MS. SADRO:

5      Q.   How did you become aware of this position?

6      A.   It was on Facebook.  So she had posted a

7  little help wanted ad on a community Facebook group

8  that I was a part of, and I just responded to that.

9      Q.   What was the community Facebook group?

10     A.   I think, back then, it was called Ark

11  Mountain Valley -- Ark Valley Mountain Mamas.  Ark --

12  Ark Valley Mountain Mamas.

13     Q.   And what did the position say -- or what did

14  Ms. McNeill say what the position was for?

15     A.   Yes.  It was for a babysitter for her

16  daughter, Hayzlee.

17     Q.   Did the post, at that time, have any

18  affiliation with Head Kandy?

19     A.   I'm not sure.  I can't remember fully what

20  it said.  I also can't find it on Facebook, so I'm not

21  sure.

22     Q.   When you were reviewing the position to

23  potentially serve as Ms. McNeill's babysitter, did you

24  have the impression that you would be working for Head

25  Kandy, selling hair products?

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 20

```
1       A.   No.  I knew I was going to be watching
2   Hayzlee.
3       Q.   Okay.  Did you -- how did you get in contact
4   with Ms. McNeill about your interest in working as a
5   babysitter?
6       A.   I just texted her.
7       Q.   And you already had her number at this
8   point, I'm assuming, because you had been living in her
9   home?
10      A.   Yeah.  Yeah.  And, I mean, we were
11  acquaintances.  Like I said, she was still friends with
12  my boyfriend, so I just still had her number.
13      Q.   And what did you reach out to Ms. McNeill
14  and ask her?
15      A.   I don't know that I really asked her
16  anything.  I just said, hey, I can totally help you
17  out.  Like, I'm home.  I had -- had my own baby in
18  September, so I was home.  And I just reached out, and
19  I was like, hey, I can help you.  Like, I'm home with
20  Huxlee.  I'd totally be willing to help you out.  And
21  that's just how it started.
22      Q.   Were you looking to work in an office or to
23  have the ability to work from your home?
24      A.   Just work from home.
25      Q.   And why was that important to you?
```

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 21

1     A.   Because I had just had a baby, and I have

2   two other kids, and so being home was where -- was

3   easiest for me to take care of them.

4     Q.   I'm going to share my screen again in just a

5   moment.  All right.  Ms. Cook, can you see what I've

6   just put on the screen?

7     A.   Yes.

8     Q.   Okay.  Are these your text messages?

9     A.   Yes.

10    Q.   And in those text messages, who are you

11  communicating with?

12    A.   With Kayla.

13    Q.   Okay.  And as you can see, Ms. Cook, as I

14  scroll down, there's a string of text messages.

15    A.   Uh-huh.

16    Q.   Do all of these text messages appear to be

17  from your phone?

18    A.   Yes.

19    Q.   And obviously, these are -- are these text

20  messages still in your phone?

21    A.   Yes.

22    Q.   And since you texted Ms. McNeill back in

23  2021, did you ever make any changes or alterations to

24  your text messages with her?

25    A.   No.

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 22

```
 1            MS. SADRO:  Madam Court Reporter, I'm going
 2   to mark this as Exhibit 2.
 3            (EXHIBIT 2 MARKED FOR IDENTIFICATION)
 4   BY MS. SADRO:
 5       Q.   So Ms. Cook, in Exhibit 2, I'm looking at
 6   the first text message here that says January 10th,
 7   2021, at 7:37 a.m.
 8            What are -- what is going on with this text
 9   message?
10       A.   That's probably when I saw it.  I just was
11   like, I can -- I can watch her.  Like, I'm home.  I'm
12   available.
13       Q.   And it says something.  Are you at the --
14   the dentist's office?
15            Were you working at the dentist's office at
16   that time?
17       A.   Yeah.  So I had worked at the dentist's
18   office until I had had my little guy.  Then I just was
19   there very part-time, just training some people every
20   once in a while.  But I wasn't there full-time, part-
21   time, or anything like that.  It was just to fill in.
22       Q.   And when you reached out to Ms. McNeill
23   about this position, were you and Ms. McNeill able to
24   come to an agreement as you serving as her babysitter?
25       A.   Yes.
```

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 23

1      Q.   What did you understand that agreement to

2 be?

3      A.   Well, I had one son that went to school in

4 Cotopaxi and one son that went to school in Salida.  So

5 I was just going to drive the one to Salida and pick up

6 Hayzlee in the mornings when I dropped him off from

7 school and take her back to my house and then bring her

8 back to town when I had to pick him up from school.

9      Q.   And I -- I got to ask you, Ms. Cook.  At

10 this point in time, did you have any understanding that

11 you would be working at the Head Kandy warehouse?

12     A.   No.

13     Q.   Did you have any understanding that you

14 would be selling Head Kandy products?

15     A.   No.

16     Q.   Was your understanding that your exclusive

17 role was to watch Hayzlee?

18     A.   Yes.

19     Q.   Now, did you have an agreed upon schedule

20 with Ms. McNeill for when you would watch her daughter?

21     A.   Yes.  Kind of.  I mean, it was a -- it was a

22 very scattered kind of babysitting job.  But I had,

23 like, all of the days that she was going to need me, or

24 they weren't going to be around or all of that.  So I -

25 - I had an idea that it was -- I can't remember if it

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 24

1  was four or five days a week, but it was at least four

2  that I was going to have her.

3       Q.   It sounds like there was some flexibility?

4       A.   Yeah.

5       Q.   And would you and Ms. McNeill communicate to

6  determine what days she needed you to watch her child?

7       A.   We did communicate.  We kind of communicated

8  ahead of time on those days and what exactly those days

9  would look like.  She had sent me calendars when they

10  were going to be gone and when I was going to have her,

11  when I wouldn't have her.  So I knew for the most part

12  what days I would have her.

13       Q.   And -- and --

14       A.   Have her to me --

15       Q.   And correct me if I'm wrong.  I -- I think I

16  keep saying it wrong.

17            Is Ms. McNeill's child pronounced Hayzlee or

18  Hasley?

19       A.   Hayzlee.  Sorry.

20       Q.   Okay.  Thank you.  Did you ever watch

21  Hayzlee at the Head Kandy warehouse?

22       A.   No.  I never watched her there.  I did drop

23  her off there, but I never watched her there.

24       Q.   And on the occasions that you would drop

25  Hayzlee off at the Head Kandy warehouse, were you ever

**KANDY LLC vs KAYLA MCNEILL**
Nicole Cook on 05/09/2024

Page 25

```
1    engaging in any business for Head Kandy?

2         A.   No.

3         Q.   Okay.  So when you were at the warehouse,

4    you weren't organizing boxes?

5         A.   No.

6         Q.   You weren't selling any products?

7         A.   No.

8         Q.   Okay.  How often would you go to the

9    warehouse when you had to pick up Hayzlee?

10        A.   Not often.  I would say maybe a handful of

11   times.  Four or five times maybe, at the most, is all I

12   had to take her there.

13        Q.   And so the majority -- it sounds like the

14   majority of the work you did as Ms. McNeill's

15   babysitter you did from your home?

16        A.   Correct.

17             MR. CONVERSE:  Objection.  Form.

18   BY MS. SADRO:

19        Q.   At this point in time, at -- at the

20   beginning of 2021, what was your understanding of what

21   Ms. McNeill's role at Head Kandy was?

22             MR. CONVERSE:  Objection.  Form.

23             THE WITNESS:  My understanding was that she

24   was still the owner.  I had no knowledge of, like, what

25   a partnership with her partners entailed.  I knew there
```

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 26

1  were people involved, other people involved.  But my

2  understanding was that she was the -- the big guy in

3  the company.

4  BY MS. SADRO:

5      Q.   When you say, "the big guy," did you

6  understand that Ms. McNeill -- or was it your

7  understanding that Ms. McNeill had authority to make

8  decisions for Head Kandy, or at least that's what you

9  believed?

10     A.   That's what I thought, yes.  Yes.

11     Q.   And obviously, you didn't ask any questions

12  with -- of Ms. McNeill about how Head Kandy was

13  operated or her operating structure at that point in

14  time?

15          MR. CONVERSE:  Objection.  Form.

16          THE WITNESS:  No.

17 BY MS. SADRO:

18     Q.   Ms. Cook, were you and Ms. McNeill able to

19  come to an understanding about how much she would pay

20  you?

21     A.   Yes.

22     Q.   Okay.  So Ms. Cook, still in Exhibit 2, I've

23  gone to a text message now, dated January 10th, 2021,

24  at 8:59 a.m.

25          Can you still see that on my screen?

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

1     A.   Yes.

2     Q.   Okay.  Can you -- I -- I want to make sure

3  I've got it right.  I mean, I think it's obvious.  We

4  all have an iPhone nowadays or an Android.

5     A.   Right.

6     Q.   But -- but fair to say the messages in blue

7  are from you, and the messages in black are from Ms.

8  McNeill?

9     A.   Right.  Yes.

10     Q.   All right.  So in that message up on the

11  screen, can you tell me the first message that you

12  received from Ms. McNeill in that screenshot?

13     A.   Just that the hourly pay was $14.  To let

14  her know what I was going to do for spring break, and

15  she was flexible.  They race a lot for the summer.  She

16  would let you know the schedule when she knew or let me

17  know the schedule when she knew.

18     Q.   And -- and I want to go down a couple of

19  messages.  And you say, "Sounds good."

20          Was that you agreeing to the pay rate?

21     A.   Yeah.

22     Q.   Okay.  And I've got it right, Ms. McNeill

23  said, "Thank you"?

24     A.   Yep.

25     Q.   Now, I want to go to the text message that

**KANDY LLC vs KAYLA MCNEILL**
Nicole Cook on 05/09/2024

Page 28

```
 1   says, "I'll have Kaylin get you paperwork for payroll."

 2            Do you know who Kaylin is?

 3       A.   Yes.

 4       Q.   Who is Kaylin?

 5       A.   She worked in the office doing payroll for

 6   Head Kandy.  Her last name is Culp.  I don't really

 7   know her outside of Head Kandy, so.

 8       Q.   Had you known Ms. Culp prior to working for

 9   Head Kandy?

10       A.   I don't think so.

11       Q.   How did you come to learn that she -- her

12   job at Head Kandy was in payroll?

13       A.   I think I just knew from that and then

14   coming to find out, like, who all worked at Head Kandy

15   and, like, what their job duties were and their roles

16   and all of that.

17       Q.   And, Ms. Cook, after you and -- or excuse

18   me, let me -- let me go down a little bit further.  I'm

19   going to scroll to the next text.  That begins, "So

20   I'll salary you."

21            Is that text again from Ms. McNeill?

22       A.   Yes.

23       Q.   Can you tell me what Ms. McNeill

24   communicated to you in that text message?

25       A.   She was going to salary me instead of paying
```

**KANDY LLC vs KAYLA MCNEILL**
**Nicole Cook on 05/09/2024**

Page 29

1    hourly for $560 a week at $40 -- or 40 hours a week at

2    $14 an hour, and I didn't have to clock in and clock

3    out.  Do you want me to read that?

4         Q.   Sure.  Go ahead and keep telling me what

5    your understanding of the arrangement you had with Ms.

6    McNeill.

7              I mean, did you -- did she tell you about

8    what would happen if you weren't working on a

9    particular day?

10        A.   Yeah.  So then it just said she would keep

11   her that day, or if she kept her, that I would still

12   get paid.  And I'd still get paid when I was on

13   vacation.  Just a set amount for the week, if that

14   worked for me.  So I'd have her until 5:00 or later if

15   I needed to or earlier if I needed to.  And then I

16   would just get paid consistently.  So if I would come

17   to town to get my middle son, Brody, I could bring her

18   with me.  Or if he rode the bus, that she could come

19   pick her up and bring Brody with her too if I needed.

20   So she was helpful when I needed her.

21        Q.   Ms. Cook, during your time working for Head

22   Kandy, did you ever work a full 40-hour week?

23        A.   No.

24        Q.   But that was Ms. McNeill's original offer to

25   you, to pay you $560 for 40 hours a week?

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 30

```
 1            MR. CONVERSE:  Objection.  Form.

 2            THE WITNESS:  Yeah.

 3            MS. SADRO:  And, Mr. Converse, what's your

 4    objection?

 5            MR. CONVERSE:  You're asking leading

 6    questions.  You're telling her -- you're giving her the

 7    answer.  This is direct, and it -- you're -- again,

 8    you're posing inappropriate questions.  And you're also

 9    mischaracterizing the documents.

10            MS. SADRO:  Okay.  Thank you, Mr. Converse.

11    BY MS. SADRO:

12       Q.   All right, Ms. Cook.  So when you were

13    initially reaching out to Ms. McNeill to babysit, did

14    you ever think that you would be working for 40 hours a

15    week?

16       A.   I mean, I knew there was a possibility

17    because I knew she was busy with Head Kandy.  So I knew

18    it was a possibility.  And I will say that I -- I

19    shouldn't say that I know for sure that I didn't work a

20    40-hour week.  I don't know for sure that I didn't work

21    a 40-hour week.  I don't remember having her

22    consistently for 10 hours for four days or eight hours

23    for five days in one whole week.  So there's a

24    possibility, but I don't remember it happening.

25       Q.   And -- and, Ms. Cook, was it your
```

**KANDY LLC vs KAYLA MCNEILL**
Nicole Cook on 05/09/2024

Page 31

1  understanding, based on that text message, that you

2  might get paid even if you weren't working?

3      A.   Yes.

4      Q.   Ms. Cook, when you learned that you might

5  get paid for not working, did you have any thoughts

6  about that?

7      A.   I mean, my first thought was, like, that's

8  great, right.  I -- I didn't really question it because

9  to me, she was the boss of the business.  So like, if

10  she -- that's the decision she wanted to make, great.

11  I wasn't going to question it, right, because it worked

12  in my benefit.  So I wasn't going to question it.  And

13  she was willing to be helpful when I was willing to be

14  helpful.  So I never questioned it because, to me, she

15  was the boss, and she could do whatever she wanted to

16  do.

17      Q.   Now, Ms. Cook, after you and Ms. McNeill

18  exchanged these text messages, did you fill out any

19  paperwork to begin working at Head Kandy?

20      A.   Yes.

21      Q.   Okay.  I -- I'm putting on my screen a -- a

22  document titled New Hire/Rehire Data Sheet.

23          Ms. Cook, can you still see what I put on

24  the screen?

25      A.   Yes.

**KANDY LLC vs KAYLA MCNEILL**
Nicole Cook on 05/09/2024

1    Q.   Is this document the new hire paperwork that

2   you at least partially filled out prior to --

3    A.   Yes.  Yep.

4    Q.   Okay.  And does it appear to be in the same

5   condition as when you filled it out?

6    A.   Sorry, say that one more time.

7    Q.   Does it appear to look the same as when you

8   filled it out?

9    A.   The top part of it that I filled out; not

10   the bottom part of it.

11    Q.   And why does the bottom part not look the

12   same?

13    A.   Because I did not fill that out.  That's not

14   my handwriting.

15    Q.   Okay.  But the top portion, at least, looks

16   the same?

17    A.   Yeah.  The part about -- the whole Section 1

18   is my handwriting.  From Section 2 below is not my

19   handwriting.

20        MS. SADRO:  And, Madam Court Reporter, I'm

21   going to mark this as Exhibit 3.

22        (EXHIBIT 3 MARKED FOR IDENTIFICATION)

23        MS. SADRO:  And just for -- oh, I -- I

24   apologize.  I thought Ms. Cook's Social Security number

25   was on there.  To the extent it is, and I can't -- I'm

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 33

1  not currently recognizing it.  I don't believe it is.

2  It's just the phone number.  I will redact it.  But I

3  don't believe her Social Security number is on it.

4        THE WITNESS:  It is.  It's at the top above

5  my name, my last name.

6        MS. SADRO:  I thought I saw it.  Thank you,

7  Ms. Cook.

8        THE WITNESS:  Yeah.

9        MS. SADRO:  So for the record and for

10  Counsel's benefit, I will redact that Social Security

11  number prior to submitting it to the court reporter, if

12  that is all right with you, Mr. Converse?

13        MR. CONVERSE:  Yes.

14  BY MS. SADRO:

15      **Q.   Okay.  All right.  So Ms. Cook, tell me the**

16  **name of the company that's on this new hire data sheet?**

17      A.   Head Kandy LLC.

18      **Q.   Okay.  So at this point in time, did you**

19  **have any understanding of what company you were working**

20  **for?**

21      A.   I mean, I knew I was working for -- well,

22  okay.  I knew I would be working for Kayla, but under

23  Head Kandy.

24      **Q.   Okay.  The -- your paycheck was coming from**

25  **Head Kandy?**

**KANDY LLC vs KAYLA MCNEILL**
**Nicole Cook on 05/09/2024**

Page 34

1        A.    Right.

2        Q.    Okay.  Ms. Cook, when you filled this form

3    out, was your understanding still that you were going

4    to be serving as Ms. McNeill's babysitter?

5        A.    Yes.

6        Q.    Now, I want to go to the bottom part of the

7    form that you told us a minute ago was not your

8    handwriting.  Do you know whose handwriting this is?

9        A.    I don't.

10       Q.    All right.  And I -- I want to go to the

11   kind of top of that bottom section where it says,

12   position.  What position does that say?

13       A.    Oh, it says Facebook.

14       Q.    Ms. Cook, at any point in time, did you work

15   for Head Kandy in the capacity of serving for Facebook?

16       A.    No.

17       Q.    Did you ever work for Head Kandy's social

18   media team?

19       A.    No.

20       Q.    Did you ever make any social media posts for

21   Head Kandy on behalf of Head Kandy?

22       A.    No.

23       Q.    Okay.  So do you know why that says

24   Facebook?

25       A.    I have no idea why it says Facebook.

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 35

1      Q.   Okay.  And you don't recognize the

2   handwriting?

3      A.   No.  I don't know who -- it had to have been

4   either Keli-Lyn or Kaylin because they were the two in

5   charge of, like, the front of the house or the front of

6   the warehouse.  So it had to have been one of them.

7   From my understanding of the way that the world works

8   would be one of them.

9      Q.   While you were working for Head Kandy, did

10  anybody bring this form back to you and show you the

11  bottom portion?

12     A.   No.

13     Q.   So you had no idea that somebody had listed

14  your position as Facebook?

15     A.   No idea.

16     Q.   All right.  So let's start with when you

17  began work babysitting under Head -- under Head Kandy.

18          What was your day-to-day like?

19     A.   I would get my first one off to school, and

20  I would drive to town with the second one.  I think I

21  would pick Hayzlee up at, like, 8:00 or 8:30 at the

22  hospital, and then I'd just drive her back to my house,

23  and we'd just play and hang out.  And she would play

24  with my little guy, and we'd eat, and she would take a

25  nap.  Then I'd throw her in the car, and we'd head back

**KANDY LLC vs KAYLA MCNEILL**
**Nicole Cook on 05/09/2024**

Page 36

1    to pick him up at 4:00.  We had to pick him up at 3:50,

2    so I would drop her off after I had picked him up,

3    which was anywhere between like 4:30, 4:45, 5:00-ish.

4    It just depended on the day.

5        Q.   Okay.  And did you and Ms. McNeill discuss

6    where you would be keeping Hayzlee while you were

7    babysitting her?

8        A.   Yeah.  She knew she would be at my house.

9        Q.   Okay.  And I'm going to share my screen

10   again here.  And this is within Composite Exhibit 2.

11   All right.

12            So within Composite Exhibit 2, I've got on

13   screen -- can you see the screen there, Ms. Cook?

14       A.   Yes.

15       Q.   And I'm at a text message that begins with,

16   "I'll get her a little potty."  Did Ms. McNeill, in

17   this text message, communicate with you about where you

18   were going to be keeping Hayzlee?

19       A.   Yes.

20       Q.   And where was that?

21       A.   At my house.

22       Q.   And did you ever -- or did Ms. McNeill ever

23   communicate to you to watch Hayzlee on Head Kandy

24   property?

25       A.   On what?

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 37

1     Q.   On Head Kandy property?

2     A.   No.  She never instructed me to watch her on

3 Head Kandy property.  No.

4     Q.   Yeah.  I mean, were -- were any of your

5 conversations, or were all of your conversations, about

6 where you would be watching Hayzlee at was going to be

7 at your house?

8     A.   Yeah.  I think it was just kind of known

9 that I would take her back home with me because I was

10 already home with the baby.  I -- there was never any

11 mention of any other location to watch her.

12     Q.   Now, I -- I know a few moments ago you told

13 us that occasionally, you would drop Hayzlee off at

14 Head Kandy; do I remember that right?

15     A.   Yeah.

16     Q.   Okay.  When you would drop Hayzlee off at

17 Head Kandy, would you go inside?

18     A.   Yeah.

19     Q.   Okay.  Would you go -- would you stay there

20 long when you dropped her off?

21     A.   No, not very long.  Like less than an hour.

22     Q.   And when you were there at the Head Kandy

23 warehouse, what did you notice about the environment?

24     A.   It was very chaotic.  It was a little

25 dramatic.  There was just a lot of moving parts and

**KANDY LLC vs KAYLA MCNEILL**
**Nicole Cook on 05/09/2024**

Page 38

1   pieces and people and things going on in the warehouse

2   as far as, like, orders and, you know, like, people

3   packing and shipping.  And there was just a lot of

4   moving parts in that aspect of it.  It just was very

5   chaotic.  There was a lot of people, a lot of young

6   people, which brings a lot of drama.

7        Q.   And -- and when you say drama, do you just

8   mean the employees, or was that including Ms. McNeill?

9        A.   I feel like it was everybody as a whole.

10       Q.   And again, you weren't there for very long?

11  You would say an hour?

12       A.   Yeah.  No.  Not very long.

13       Q.   Ms. Cook, while you were working for Head

14  Kandy babysitting Hayzlee, what was your experience

15  like?

16       A.   I mean, it was fine.  She was great.  She

17  and my little guy got along well.  Like, he was only --

18  he was just a baby.  But, you know, things were fine.

19  I didn't have any issues with her.  I, honestly, didn't

20  even have any issues with Kayla regarding Hayzlee.  So

21  things were great.

22       Q.   Ms. Cook, while you were watching Hayzlee,

23  were there days that you thought you would be watching

24  Hayzlee, but then Ms. McNeill took her for the day?

25       A.   Yeah.  There were a few.

**KANDY LLC vs KAYLA MCNEILL**
**Nicole Cook on 05/09/2024**

Page 39

1      Q.    Okay.  When that happened, did Ms. McNeill

2    tell you the days that she might be out of town?

3      A.    She tried to give me a heads up, you know,

4    like at least a week in advance.  Like, they were going

5    to be gone on these days or whatever.  There were a few

6    that it was like, oh, I'm just going to keep her today,

7    kind of stuff, which was fine.

8      Q.    Did Ms. McNeill communicate with you about

9    any longer periods of time that she might be out of the

10   area?

11     A.    Yeah.

12     Q.    And what was that like?

13     A.    Like the days that they were going to be

14   gone racing.  They would be gone like for a week or two

15   weeks or three weeks at a time.  I don't know.  I'd

16   have to look.  But that they would be gone for, you

17   know, extended lengths of time because they would be

18   racing.

19     Q.    And when the -- the McNeill family was gone,

20   I'm assuming you weren't watching Hayzlee during that

21   time period; is that right?

22     A.    Right.

23     Q.    Okay.  When that happened on the days you

24   weren't watching Hayzlee, did Ms. McNeill offer to pay

25   you for that time?

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 40

1      A.   Yes.

2      Q.   **What did she offer to pay you?**

3      A.   She just offered to pay me my normal wage.

4  So in those messages, it comes out that, like, I -- I

5  couldn't be salaried, so then she did put me on $14 an

6  hour.  And then it was discussed that because of what

7  she had told me about being salaried and how much I was

8  going to make, that, to be fair to me, she was going to

9  allow me to clock in on the days that I did not have

10 Hayzlee from 10:00 a.m. to 3:00 p.m.  So it wasn't a

11 full day, which was still super helpful, but not to

12 tell anybody, like any of the girls at the warehouse,

13 like Keli-Lyn or Kaylin or Sydney or really anybody at

14 the warehouse, to avoid the drama aspect of it.

15     Q.   **Okay.  And -- and like you said, when you**

16 **communicated about that with Ms. McNeill, was that via**

17 **text message?**

18     A.   It was, yes.

19     Q.   **I'm going to share my screen again.**

20          MS. SADRO:  And for the record, I'm going

21 back into Exhibit 2.

22 BY MS. SADRO:

23     Q.   **And I'm beginning with the text message**

24 **screenshot where -- from Ms. Cook.  The first message**

25 **on that screenshot is, "It's totally fine."  But I want**

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

```
 1    to scroll down to the first message from Ms. McNeill.
 2              Ms. McCook -- or, Ms. Cook, what did Ms.
 3    McNeill communicate to you in that message?
 4        A.   She said that Kaylin -- or she told Kaylin
 5    she wanted to salary me, and she said that they didn't
 6    approve it.  She felt bad because she needed my help,
 7    so that this was between us.  I was just going to clock
 8    in on the days that I didn't have Hayzlee from 10:00
 9    a.m. to 3:00 p.m.
10        Q.   And in that text message, miss -- Ms. Cook,
11    it says "when you don't have her;" is her referring to
12    Hayzlee?
13        A.   Yes.
14        Q.   So was it your understanding that on the
15    days you didn't have Hayzlee, you were still going to
16    get paid?
17        A.   Right.
18              MR. CONVERSE:  Objection.  Form.
19    BY MS. SADRO:
20        Q.   How many hours would you be paid for on
21    those days?
22        A.   Just 10:00 to 3:00.  Ten -- or -- so five
23    hours.
24        Q.   And how much per hour were you making?
25        A.   $14.
```

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 42

1      Q.   Okay.  So how often do you think you were

2   paid for days you didn't have Hayzlee?

3      A.   I would have to go back and look but maybe

4   10 or so.  I'm not sure.

5      Q.   And, Ms. Cook, on the days you didn't have

6   Hayzlee, were you performing any other work for Head

7   Kandy?

8      A.   No.

9      Q.   On the days you didn't have Hayzlee, were

10   you performing any other work for the McNeills?

11      A.   No.

12      Q.   Were you performing any work other than

13   watching your own children at home?

14      A.   No.

15      Q.   And -- and again, Ms. Cook, did this seem

16   odd to you?

17      A.   Yeah.  I mean, weird.  But again, she was

18   the boss, and it was helpful.  To me, she was the boss.

19   And it was helpful to me that she was being helpful

20   because I was helping her out, so I just didn't

21   question it.

22      Q.   Now, Ms. Cook, we were talking about a

23   couple times Ms. McNeill let you know that she wasn't

24   going to be there.  How would she let you know?

25      A.   She would just text me.  Or if I would,

**KANDY LLC vs KAYLA MCNEILL**
Nicole Cook on 05/09/2024

Page 43

1   like, like, hey, are we still meeting at this place?

2           She would be like, I'm just going to keep

3   her.

4           And I'm like, okay.  That's fine.  That's

5   okay.

6       **Q.   Would she also communicate with you when she**

7   **was going to be out of town for long periods of time?**

8       A.   Yeah.  So she had sent me their race

9   calendars for like the whole year when they were going

10  to be gone so that I would know when to expect to have

11  Hayzlee and when to expect to not have Hayzlee.

12      **Q.   And when you weren't going to have Hayzlee,**

13  **was it still your understanding that you would be paid**

14  **for that -- those days?**

15      A.   Yes.

16      **Q.   And how did Ms. McNeill communicate to you**

17  **that she would be gone for long periods of time?  Or**

18  **excuse me, how did she give you the calendars?**

19      A.   She just texted them to me.

20      **Q.   In the same texts we've been talking about?**

21      A.   Yeah.  She just sent pictures of these

22  homemade calendars she had made.

23      **Q.   All right.  I'm still within Exhibit 2.  I'm**

24  **going to another text message that shows a February**

25  **2021 calendar.**

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 44

1          Ms. McCook -- Ms. Cook, what do I see on

2     screen?

3          A.   Yeah.  That's the calendar of the first

4     month she sent me that they would be gone.  So the

5     yellow -- sorry.  Let me just see.  The yellow are the

6     days that they were going to be gone for the month, if

7     I remember that right.  Those are the days that are --

8          Q.   That would be all the days they're gone?

9          A.   I'm sorry.

10         Q.   I'm sorry.

11         A.   Say that again.  I'm sorry.

12         Q.   I interrupted you, Ms. Cook.  I apologize.

13     I asked if you know that the yellow were the days that

14     the McNeills were going to be gone.

15         A.   Yeah.  I think the days that are marked with

16     the yellow highlighter are the days that they would be

17     gone for the month.

18         Q.   And did Ms. McNeill let you know that that's

19     what the yellow meant?

20         A.   Yes.

21         Q.   And is -- does Ms. McNeill communicate that

22     to you via text message?

23         A.   Yes.

24         Q.   Is that in the text message right under the

25     calendar that says, "So the yellow is when we were gone

**KANDY LLC vs KAYLA MCNEILL**
**Nicole Cook on 05/09/2024**

1    -- when we're gone"?

2        A.    Yes.  Yes.

3            MS. SADRO:  Okay.  All right.  Everyone's

4    indulgence for just a minute while I operate the

5    technology.  It's not my strong suit.

6            MR. CONVERSE:  Counsel, while you're working

7    with the technology, there was an agreement that the

8    documents would be shared when they're introduced in

9    the deposition.  Has that been -- is there a Dropbox or

10   something that I can access?  Is it in the chat?  Or

11   how can I access the documents, the -- the exhibits?

12           MS. SADRO:  Mr. Converse, hold on just a

13   second.  Why don't we step off the record?  And I

14   apologize.  I -- I didn't realize that.  Can we step

15   off the record for just a moment?  And I'll handle that

16   and get them over to you.

17           MR. CONVERSE:  Thank you.

18           MS. SADRO:  All right.

19           THE VIDEOGRAPHER:  One moment.

20           MR. CONVERSE:  I didn't want to interrupt

21   your flow.  Oh, sorry.

22           MS. SADRO:  Okay.

23           THE VIDEOGRAPHER:  That's okay.  This is the

24   end of Media number 1 at 11:54 a.m.  Eastern.

25               (OFF THE RECORD)

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 46

```
 1              THE VIDEOGRAPHER:  Time is 12:08 p.m.
 2    Eastern, and this is the beginning of Media 2.
 3    BY MS. SADRO:
 4         Q.   All right, Ms. Cook.  Thank you for letting
 5    us take that quick recess to work out the technical
 6    difficulties.
 7         A.   Sure.
 8         Q.   All right.  I think we were beginning to
 9    talk about the February calendar that Ms. McNeill sent
10    you during those text messages.  Does that sound right?
11         A.   Yes.
12         Q.   All right.  Just a moment.  Okay.  I'm going
13    to share my screen again.  Okay.  Ms. Cook, can you see
14    what I've got up on screen?
15         A.   Yes.
16         Q.   Okay.  And what do I have on screen?
17         A.   The February 2021 calendar, when they would
18    be gone and when they would be home.
19         Q.   Is that the calendar that Ms. McNeill sent
20    you in the text message that we saw?
21         A.   Yes.
22         Q.   Okay.
23              MS. SADRO:  And for the record and, Counsel,
24    there's going to be several calendars from February
25    2021 to December of 2021 that I'll use as Exhibit -- a
```

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 47

1    Composite Exhibit number 4.

2              (EXHIBIT 4 MARKED FOR IDENTIFICATION)

3              MS. SADRO:  And I'll compile them all for

4    the record following the deposition.

5              MR. CONVERSE:  Okay.  And are these just

6    lifted from the text string, or are these separate

7    documents that were produced?

8              MS. SADRO:  These are from the -- the text

9    string.

10             MR. CONVERSE:  Okay.

11   BY MS. SADRO:

12       Q.   Ms. Cook, so let's take a moment to talk

13   about February of 2021.  You told us a moment ago what

14   the color yellow on these calendars meant.

15             Did -- when Ms. McNeill sent you this

16   calendar for February of 2021, did she indicate to you

17   whether or not she would not be in town for several

18   days in February?

19       A.   I don't know that she ever really indicated

20   when and when she wouldn't be in town.  It's just from

21   the calendars is when I kind of knew to expect that

22   they were going to be around.  Is -- is that -- did

23   that answer your question?

24       Q.   Do you mean you expected her to be out of

25   town?

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 48

1       A.   Yeah.  So like, I just went off the

2   calendar.  It wasn't -- she didn't really, like, text

3   me and say, hey, we're going to be gone from this day

4   to this day.  It just was like, here's all of the

5   calendars, so you know when we're going to be gone and

6   when we're going to be home.

7       Q.   Okay.  And --

8       A.   So I just kind of went off that.

9       Q.   And -- and during those days that she -- Ms.

10  McNeill marked with yellow, were there some of those

11  days in February, from the 22nd through the 26th, that

12  you were still paid?

13      A.   I'm not sure.  I would have to look back on

14  it and see.

15      Q.   Ms. Cook, did you keep a record of -- or at

16  least a partial record, if any, of the time that you

17  worked for Head Kandy babysitting Hayzlee?

18      A.   I did.  I kept a calendar myself on the days

19  that I did have Hayzlee and the days that I did not

20  have Hayzlee.  Whether or not I kept track of every

21  single day, I'm not sure.  But I know the majority of

22  the days are there.

23      Q.   And, Ms. Cook, can you see what I just put

24  on screen?

25      A.   Yes.

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

1        Q.    Okay.  What do I have on screen?

2        A.    So that's a screenshot of my personal

3   calendar that I use.  And those are the days that

4   represented -- the days that have an H on them are the

5   days that I actually had Hayzlee.  The days that say,

6   "No H 10:00 to 3:00," are the days that I clocked in

7   when I did not have Hayzlee.

8        Q.    Okay.

9              MS. SADRO:  And for record and, Counsel, I'm

10  going to mark this as Exhibit number 5.

11             (EXHIBIT 5 MARKED FOR IDENTIFICATION)

12             MR. CONVERSE:  Okay.

13  BY MS. SADRO:

14       Q.    So Ms. Cook, I'm scrolling down here to the

15  week of February 22nd through 20 -- the 22nd through

16  the 27th, 2021.  Can you see that?

17       A.    Yes.

18       Q.    So tell me on the 22nd what you've marked in

19  your personal calendar?

20       A.    That I did not have Hayzlee, but I did clock

21  in.

22       Q.    And for what hours did you clock in?

23       A.    From 10:00 a.m. to 3:00 p.m.

24       Q.    What about February 23rd?

25       A.    The same.  No Hayzlee, but I clocked it from

Page 50

```
1   10:00 a.m. to 3:00 p.m.

2        Q.    What about the 24th?

3        A.    The same as the 23rd and the 22nd.

4        Q.    And what about the 25th?

5        A.    The same.  No Hayzlee, clocked in from 10:00

6   to 3:00.

7        Q.    And, Ms. Cook, during the time that you

8   worked as a babysitter looking after Hayzlee, who --

9   where did your paychecks come from?

10       A.    They came from Head Kandy.

11       Q.    Did you ever receive any direct payments

12  from Ms. McNeill?

13       A.    No.

14       Q.    Did you ever receive payments from anybody

15  else for watching Hayzlee?

16       A.    No.

17       Q.    And, Ms. Cook, I've got back up on screen

18  what was -- we've already talked about as Exhibit 2.

19  And going back to the text where we originally saw the

20  February 2021 calendar.

21             Did Ms. McNeill send you other calendars?

22       A.    Yes.  I believe there's a calendar for every

23  month through December of 2021.

24       Q.    And -- and like Ms. McNeill said, she said,

25  "So the yellow is when we are gone, and the other days
```

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 51

1    are when we will be home," right?

2         A.   Correct.

3         Q.   Okay.  Did you take that to under -- did you

4    take that to mean that there were going to be some days

5    marked in yellow that you would get paid for not having

6    to watch Hayzlee because the McNeills were out of town?

7         A.   Yeah.  I knew they were going to be gone a

8    lot because they were racing a lot.  I didn't know

9    exactly how often, but I knew they would be gone a lot.

10        Q.   And, Ms. Cook, it looks like under the

11   February calendar, there are a couple of images that

12   aren't in the screenshot.  Like on this one, it says

13   IMG_7661.

14             Were those the additional calendars Ms.

15   McNeill sent you?

16        A.   Yeah.  Those are all the calendars.

17        Q.   Okay.  And so up on screen, I'm putting an

18   additional calendar.  Ms. Cook, can you tell me what

19   you see on your screen now?

20        A.   Yeah.  It's the March 2021 calendar.

21        Q.   And at the time that you received this

22   calendar, were you still employed for Head Kandy,

23   babysitting Hayzlee?

24        A.   Yes.

25        Q.   And this calendar, is it the same one that

Page 52

1    Ms. McNeill sent you when she sent you that group of

2    calendars?

3         A.   Yes.

4         Q.   And did you alter or change this calendar in

5    any way?

6         A.   No.

7         Q.   Now, Ms. Cook, when you received this

8    calendar, were you still employed with Head Kandy?

9         A.   Yes.

10        Q.   And at -- at the time -- or we know now,

11   obviously, you did not work with Head Kandy beyond

12   March 5th; is that right?

13        A.   Correct.

14        Q.   Okay.  But at the time you received this

15   calendar, did you anticipate no longer being employed

16   by Head Kandy at any point?

17        A.   No.

18        Q.   All right.  So when you got this calendar,

19   fair to say, you thought you would be employed during

20   the entirety of March 2021?

21        A.   Correct.

22        Q.   Ms. Cook, is this calendar marked with those

23   same yellow markings?

24        A.   It is.

25        Q.   What do those yellow markings indicate?

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 53

1      A.   That they would be gone the entire month of

2  March.

3      Q.   So did it indicate to you that at any point

4  in March, you anticipated watching Hayzlee?

5      A.   Yeah.  I knew I wasn't going to have her at

6  all in March.

7      Q.   Okay.  And did you anticipate still getting

8  paid during March of 2021?

9      A.   Yes.

10     Q.   And why is that?

11          MR. CONVERSE:  Objection.  Form.

12          THE WITNESS:  It was just the --

13          MR. CONVERSE:  Go ahead and answer.

14          THE WITNESS:  It was just the agreement.

15  And like I said, she was super helpful, being helpful

16  when I needed it because I was helping her out.  So it

17  just -- and I never questioned it.

18  BY MS. SADRO:

19     Q.   And -- and, Ms. Cook, like you've said

20  before, when we were talking about February, you don't

21  remember all the days that you ended up having Hayzlee,

22  right?

23     A.   I don't remember them, no.

24     Q.   Okay.  Is it possible that some of these

25  days, you ended up having Hayzlee?

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 54

1      A.   Potentially.  I could have.  I think if any

2  of that would've happened, it would've just been in the

3  text thread because we rarely spoke on the phone.  It

4  was more through text messages.  Again, because I have

5  a memory issue, undiagnosed back then.  All of my text

6  messages had all of the information I needed in them,

7  so that I wouldn't forget.

8           MS. SADRO:  And again, for -- if I didn't

9  say this for Counsel and record, March 2021 is, of

10  course, going to be a part of that Composite Exhibit

11  number 4.  All right.

12  BY MS. SADRO:

13      Q.   All right, Ms. Cook.  Sorry.  Are you still

14  there?

15      A.   Yeah.  Sorry.

16      Q.   Can you still see up on screen another

17  calendar?

18      A.   Yes.

19      Q.   And what calendar do I have on screen?

20      A.   It's for April 2021.

21      Q.   Another calendar Ms. McNeill sent you?

22      A.   Yes.

23      Q.   And did -- April 2021, did Ms. McNeill

24  indicate to you whether or not she would be in town or

25  out of town for certain days of the month?

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 55

```
 1        A.   Just based off the calendar, there were a
 2   few days that they would be home.
 3        Q.   And did the yellow, like, on this mark -- or
 4   on this calendar indicate days that they would be out
 5   of town?
 6        A.   Yes.
 7        Q.   And again, at the time that you received
 8   this calendar, was it your understanding that you would
 9   be paid for some of the days that Ms. McNeill has
10   marked out of town?
11        A.   Yes.
12        Q.   And was it your understanding that you would
13   be receiving that payment from Head Kandy?
14        A.   Yes.
15        Q.   Okay.  Ms. Cook, what do I have up on screen
16   now?
17        A.   This one is May 2021 calendar.
18        Q.   Okay.  And on this calendar, did Ms. McNeill
19   send this to you?
20        A.   Yes.
21        Q.   And did she indicate to you whether or not
22   she would be in or out of town in May of 2021?
23        A.   Just based off the calendar, the days that
24   she knew she would be gone for sure.
25        Q.   At least at the time she sent it, right?
```

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 56

1    A.   Yeah.

2    Q.   Okay.  And at the time that you received

3    this calendar, did you anticipate again being paid for

4    some of those days marked in yellow?

5    A.   Yeah.  For some of them, like, the weekdays.

6    I knew the weekends weren't -- I wouldn't be paid for

7    because I wasn't going to work weekends.  It was just

8    the middle of the week.

9    Q.   And if you had been paid for those days

10   marked in yellow as out of town, you anticipated that

11   that payment would still come from Head Kandy?

12   A.   Yes.

13   Q.   Bear with me for just a moment.  I'm going

14   to try to save us some time.  Okay.

15        Ms. Cook, on the screen, is that the June

16   2021 calendar?

17   A.   Yes.

18   Q.   And what we've been talking about thus far

19   with the calendars that you received from Ms. McNeill,

20   does the same thing apply for June?

21   A.   Yes.

22   Q.   So yellow indicates when the McNeills are

23   out of town?

24   A.   Yes.

25   Q.   And the days that -- and included at least

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 57

1  some days that you might be paid even when the McNeills

2  are out of town?

3     A.   Yeah.  During the week.

4     Q.   And that payment would have come from Head

5  Kandy?

6     A.   Yes.

7     Q.   Again, part of Exhibit -- composite Exhibit

8  5, July 2021.  In this calendar, does that still apply?

9     A.   Yes.  All the same --

10        MR. CONVERSE:  Oh.  Go ahead and answer.  I

11  -- I apologize.  Go ahead and answer.

12        THE WITNESS:  It's okay.  I was just going

13  to say all the same.  The days they would be gone are

14  marked in yellow.

15  BY MS. SADRO:

16     Q.   What about for August 2021?

17     A.   Yep.  The same.

18        MR. CONVERSE:  Counsel, I think you said

19  Composite Exhibit 5.  Are these --

20        MS. SADRO:  Excuse me. 4.

21        MR. CONVERSE:  4.  Okay.

22        MS. SADRO:  4.  Excuse me.

23  BY MS. SADRO:

24     Q.   Ms. Cook, what about September 2021?

25     A.   The same.  All the days are marked that they

**KANDY LLC vs KAYLA MCNEILL**
**Nicole Cook on 05/09/2024**

Page 58

1    were going to be gone in yellow.

2         Q.   October 2021?

3         A.   Same thing.  All the days they'd be gone

4    were in yellow.

5         Q.   November 2021?

6         A.   The same.  They'd be gone those days.

7         Q.   December 2021?

8         A.   The same.  They'd be gone on those days.

9         Q.   Did Ms. McNeill ever clarify for you that

10   there were days that she was going to be out of town

11   where you shouldn't clock in from 10:00 to 3:00?

12        A.   I don't think so.

13        Q.   Was it your --

14        A.   Or I don't -- go ahead.

15        Q.   No.  I interrupted you.  Go ahead.

16        A.   That's okay.  I just was going to say, I

17   don't -- I would have to go back and look through all

18   of the messages, but I don't think there was a day

19   where she told me not to clock in.

20        Q.   And did you believe you had permission to

21   clock in on those days that you weren't watching

22   Hayzlee?

23        A.   Yes.

24        Q.   And who did that permission come from?

25        A.   From Kayla.

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 59

1      Q.   Okay.  Ms. Cook, can you see what I've

2   shared on my screen again?

3      A.   Yes.

4           MS. SADRO:  And again, this is just

5   Composite Exhibit 2 that's on the screen.

6   BY MS. SADRO:

7      Q.   Okay.  So on Composite Exhibit 2, we're on

8   the text that the first message begins with, "LOL.  She

9   won't care."  Ms. Cook, I want to go down to the text

10   message from Ms. McNeill that begins, "Anyways, it

11   works for me."

12           Did Ms. McNeill indicate to you whether or

13   not she wanted you to share that you were being paid

14   for time not working with anybody else?

15      A.   Yeah.  She definitely told me not to tell

16   anybody else.

17      Q.   How did you know that?

18      A.   That's what she says, is she doesn't want to

19   -- she doesn't want other people to, like, think she's

20   giving me special treatment, so not to tell anybody and

21   to avoid the drama within the warehouse.

22      Q.   And in the text message where it says, "Not

23   even Keli, please," do you know who Keli is?

24      A.   Yeah.  Keli is my older sister who worked in

25   the warehouse.

**KANDY LLC vs KAYLA MCNEILL**
**Nicole Cook on 05/09/2024**

Page 60

1      Q.   Okay.  And so your understanding was that

2   Ms. McNeill didn't want you to tell any Head Kandy

3   employee, right?

4      A.   Right.

5      Q.   Did you ever understand -- did you ever

6   learn why Ms. McNeill did not want other Head Kandy

7   employees to know that you were being paid for time not

8   working?

9      A.   I charged it up to the drama because there

10   was a lot of that.  I didn't question it for any other

11   reason other than, like she said, people saying that

12   she was going to give me special treatment, or it

13   wasn't fair; things like that.

14      Q.   Ms. Cook, how long did this arrangement go

15   on for?

16      A.   Just until the --

17           MR. CONVERSE:  Objection.  Form.

18           THE WITNESS:  Just until the beginning of

19   March.

20   BY MS. SADRO:

21      Q.   Oh, did you -- what happened in the

22   beginning of March?

23      A.   There was just something that happened

24   between Kayla and I.  She was talking about my middle

25   son when I wasn't around.  And I confronted her about

**KANDY LLC vs KAYLA MCNEILL**
Nicole Cook on 05/09/2024

Page 61

```
 1   it because I didn't agree with it.  And essentially,

 2   she just fired me.

 3        Q.   Okay.

 4        A.   I kind of stepped away, but she kind of

 5   fired me at the same time.

 6        Q.   Were you upset to no longer be employed

 7   working as a babysitter for Head Kandy?

 8        A.   It didn't break my heart, so I would -- I

 9   wasn't upset about it.

10        Q.   What -- were you able to find other

11   employment after?

12        A.   I wasn't really looking for other employment

13   after.  I did end up getting my real estate license,

14   but it wasn't anything that was detrimental to my

15   income.

16        Q.   And do you still see Ms. McNeill from time

17   to time?

18        A.   Not really.  I mean, I have maybe seen her

19   once or twice.

20        Q.   Does your partner Chris see Ms. McNeill?

21        A.   That, I'm not sure.  I think he's seen her a

22   few times.  He's stopped by the house and stuff, but

23   I'm not sure.

24        Q.   So have you had any, I mean, negative

25   interactions with Ms. McNeill since you stopped working
```

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 62

1    with Head Kandy?

2        A.   No.

3        Q.   Ms. Cook, when you were working for Head

4    Kandy, did you ever receive any other benefits, like

5    product discounts or anything like that?

6        A.   Yeah.  So we did get employee discounts on

7    products.  I can't tell you what that was because I

8    don't know what it was, but I think it was we got them

9    at cost.

10       Q.   And did Ms. McNeill ever communicate to you

11   that you would be able to get Head Kandy products for a

12   discount?

13       A.   Yeah.  She told me that I would get them at

14   employee pricing.

15       Q.   I'm going to share my screen again and

16   composite Exhibit 2.  The text that begins with a

17   screenshot from Breakfast Club and the message that

18   says, "It's all good."

19            But, Ms. Cook, I want to start with a text

20   message that begins January 21st, 2021, at 1:48 p.m.,

21   at -- what were you and Ms. McNeill discussing at that

22   time?

23       A.   She had showed me a product at the warehouse

24   when I was dropping Hayzlee off one evening.  And so I

25   was asking her which one it was, so I could try and

**KANDY LLC vs KAYLA MCNEILL**
Nicole Cook on 05/09/2024

Page 63

1   find it.

2       Q.   Okay.  And did Ms. McNeill show you the

3   product?

4       A.   Yeah.  She sent me a screenshot of the --

5   it's the acne line, I think.

6       Q.   Is that the screenshot we can see as called,

7   "Go Getter Full Set"?

8       A.   Yes.

9       Q.   What did Ms. McNeill tell you about the Go

10  Getter Full Set?

11      A.   She told me I would get it for employee

12  pricing, for like $15 for all five items.

13      Q.   And again, Ms. Cook, when you received this

14  text message, were you working in the Head Kandy

15  warehouse?

16      A.   No.

17      Q.   Were you working selling any products for

18  Head Kandy?

19      A.   No.

20      Q.   Organize any of -- any products for Head

21  Kandy?

22      A.   No.

23      Q.   Shipping out any products for Head Kandy?

24      A.   No.

25      Q.   Working in the Head Kandy office?

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 64

```
 1       A.   No.
 2       Q.   Do you have at -- at this point in time, Ms.
 3  McNeill is still a friend of your partner's, right?
 4       A.   Correct.  Yeah.
 5       Q.   And have you had any negative interactions
 6  with her since leaving Head Kandy?
 7       A.   No.
 8       Q.   Do you see each other at all?
 9       A.   No.  I would say maybe just in passing, but
10  I have not ran into her.  No.
11       Q.   Have you ever heard about Ms. McNeill's --
12  or whether or not she owns any other businesses?
13       A.   Yeah.  The one she has now.
14       Q.   Okay.  What's that?
15            MR. CONVERSE:  Objection.  Form.
16            THE WITNESS:  WHiPi.Company.
17  BY MS. SADRO:
18       Q.   Do you know anything about it?
19       A.   I just know that it's, like, clothes and
20  anything not related to hair care.
21       Q.   Okay.  When did you first hear about
22  WHiPi.Company?
23       A.   Right before I'd heard about the lawsuit.
24  So I don't know.  It was like fall or winterish area --
25  time area of whatever that year was.  I don't remember.
```

**KANDY LLC vs KAYLA MCNEILL**
Nicole Cook on 05/09/2024

Page 65

1    Sorry.

2         Q.   Okay.  And how did you hear about it?

3         A.   Facebook.  It kind of popped up on my, like,

4    suggested friends or pages and stuff.  And then when I

5    clicked on it, and then I realized it was her new

6    company.

7         Q.   Okay.  Did you join the Facebook group?

8         A.   No.

9         Q.   Did Ms. McNeill ever discuss WHiPi.Company

10   with you?

11        A.   No.

12        Q.   Have you heard anybody else discuss

13   WHiPi.Company besides Ms. McNeill?

14        A.   No.

15        Q.   Okay.  Have you ever heard of a company

16   called Hayzlee's Boutique?

17        A.   Oh, yeah.

18        Q.   And what have you heard about it?

19        A.   I just heard that she was going to start it.

20   I didn't know if she ever did or not.

21        Q.   Is that Ms. McNeill telling you she was

22   going to start it?

23        A.   So --

24        Q.   Or someone else?

25        A.   There was talk at one point between Kayla

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 66

```
1   and I that we were going to start a children's line

2   together, but that did not happen.  So I don't know if

3   that was before or after that conversation had

4   happened.  But I'm so sorry.  What was your question?

5        Q.   No.  That's okay.  How did you learn that

6   Ms. McNeill was involved in or considering opening

7   Hayzlee's Boutique?

8        A.   I think she had made a Facebook post.  Like,

9   not a post, a Facebook page for that as well and

10  labeled it Hayzlee's Closet, Hayzlee's Boutique,

11  something like that.  And again, it came up on my

12  Facebook.

13       Q.   And do you remember when you saw it on your

14  Facebook?

15       A.   That I don't know.

16       Q.   Do you remember if it was several years ago?

17  One year ago?

18       A.   It -- it had to have been sometime in 2021,

19  maybe the end of 2020.  I can't remember if she had

20  started it before we talked about it or after.

21       Q.   And -- and, Ms. Cook, I want to make sure I

22  understood you a moment ago.  Did you say that you and

23  Ms. McNeill were discussing opening a business

24  together?

25       A.   Yeah.  So it was a very short talk about
```

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 67

1  opening up -- because she has a little girl, and I have

2  a little boy.  So we were going to open up a boy/girl

3  boutique together.  But that's as far as the

4  conversation went, was just in a text message.

5      Q.   When did that conversation happen?

6      A.   I can look.  Do you want me to look?

7      Q.   Do you mean in your text messages?

8      A.   Yeah.  Yeah.  That's the only way I'd know

9  is I'd have to -- just have to look back through our

10  texts and see.

11      Q.   Sure.

12      A.   So the first mention of it was December

13  19th, 2020.

14      Q.   Okay.

15      A.   She started the conversation saying, "Ha ha.

16  This is so left field, but I know exactly what we

17  should do for a business.  A children's clothing

18  boutique, Hux and Hayz.  I just thought the name would

19  be so cute."

20      Q.   And, Ms. Cook, just like you've been doing

21  with all of those other text messages, just make sure

22  that you don't delete or alter or change that text

23  message in any way.

24      A.   Sure.

25      Q.   So we ask you to get a screenshot of it.

**KANDY LLC vs KAYLA MCNEILL**
**Nicole Cook on 05/09/2024**

Page 68

```
 1   I'm sure Mr. Converse will want a copy as well.

 2        A.   Sure.

 3        Q.   Okay.  Ms. Cook, you were employed as a

 4   babysitter and working primarily for Ms. McNeill's

 5   child, Hayzlee.

 6             Did you ever learn about any other employees

 7   that were doing work not involving Head Kandy?  Not at

 8   the Head Kandy warehouse, but doing work for Ms.

 9   McNeill?

10             MR. CONVERSE:  Objection to form.

11             THE WITNESS:  I mean, I had --

12             MR. CONVERSE:  Go ahead.

13             THE WITNESS:  I had heard about it.  I don't

14   have any, like, for sure, I-was-there-knowledge of any

15   of it.

16   BY MS. SADRO:

17        Q.   What did you hear?

18        A.   Just that Alisa Lamm watched Hayzlee and

19   Alyssa Lynchard was like a housekeeper, babysitter,

20   personal assistant.  Basically, all the things outside

21   of the warehouse, she was doing for Kayla.  And as far

22   as I know, she was employed by Head Kandy.

23        Q.   As far as you know, was Ms. Lynchard doing

24   work for Head Kandy, like organizing products, working

25   in the office, something like that?
```

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 69

1          MR. CONVERSE:  Objection.  Form.

2          THE WITNESS:  Not that I had ever heard, but

3      I don't know for sure.

4      BY MS. SADRO:

5      Q.   Okay.  Have you ever heard, aside from Alisa

6   Lamm and Alyssa Lynchard, about anybody else doing

7   personal work for Ms. McNeill while working at Head

8   Kandy?

9      A.   Nobody that I know for sure, off the top of

10  my head.  Like, nobody that comes to mind.

11     Q.   Okay.

12         MS. SADRO:  If everybody could just give me

13  one moment.  I just want to check through my notes

14  really quickly, if that's all right.

15         MR. CONVERSE:  Sure.

16  BY MS. SADRO:

17     Q.   All right.  Sorry, Ms. Cook, I'm back.  Ms.

18  Cook, did you ever speak with any other owners or

19  managers of Head Kandy about the work you were doing

20  for Ms. McNeill?

21         MR. CONVERSE:  Objection.  Form.

22         THE WITNESS:  I mean, my sisters knew, but I

23  don't know what their job titles were.  But they knew

24  that I was watching Hayzlee.  I don't think I -- I

25  don't think anybody else.

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 70

1   BY MS. SADRO:

2      Q.   Okay.  Did you -- when this -- did you ever

3   talk to your sisters, Sydney and Keli-Lyn, about the

4   type of work they did for Head Kandy?

5      A.   I don't think so.  Like, maybe, I guess I

6   knew what they did because we -- I knew because we had

7   to have talked about it.  So, I guess, yeah.

8      Q.   Did it -- did any of the job that -- any of

9   the work that they talked to you about include managing

10  or supervising other people?

11     A.   I think Keli-Lyn managed the front of the

12  warehouse, so the girls that worked in, like, the

13  office spaces.  From my understanding, she, for a very

14  short period of time, kind of, quote/unquote, "managed"

15  them.

16     Q.   Was it ever your understanding that either

17  Sydney or Keli were on the same authority level as

18  Kayla McNeill?

19     A.   As Kayla?

20     Q.   Yeah.

21     A.   No.  I don't know that anybody was on the

22  same authority level as Kayla.

23     Q.   Okay.  When you were paid by Head Kandy, how

24  did you receive that pay -- or how did you receive that

25  payment?  Was it a paycheck, direct deposit, or

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 71

1    something else?

2         A.    I believe it was just direct deposit.

3         Q.    Okay.  And when you received that direct

4    deposit, who did it say it was from?

5         A.    From Head Kandy.

6         Q.    Was all of the work that you did,

7    babysitting Hayzlee, paid by Head Kandy?

8         A.    Yes.

9         Q.    And any amount that you were paid by Head

10   Kandy, was that for anything other than watching

11   Hayzlee?

12        A.    No.

13        Q.    All right.  Ms. Cook, those are -- oh -- oh,

14   well, hold on just one second, please.

15             Ms. Cook, did you consider Ms. McNeill to be

16   your boss?

17        A.    Yes.

18        Q.    And was she like your manager?

19        A.    Essentially, yeah.

20             MR. CONVERSE:  Objection.  Objection.  Form.

21   BY MS. SADRO:

22        Q.    Was Ms. McNeill the person who told you what

23   type of work you were going to be doing?

24        A.    Yes.

25        Q.    And when you were going to be doing it?

**KANDY LLC vs KAYLA MCNEILL**
Nicole Cook on 05/09/2024

Page 72

```
 1      A.   Yes.

 2      Q.   And what you were going to do while working?

 3      A.   Yes.

 4      Q.   And Ms. McNeill is the person who hired you,

 5   right?

 6           MR. CONVERSE:  Objection.  Form.

 7           THE WITNESS:  Correct.

 8           MS. SADRO:  All right.  Ms. Cook, that's all

 9   of the questions I have for you right now.  Thanks for

10   hanging in there with me.

11           THE WITNESS:  Yeah.

12           MS. SADRO:  Before we begin, would everybody

13   be okay with a quick comfort break?

14           MR. CONVERSE:  Yeah.  Let's take 20 minutes.

15   I just want to make sure I -- I got the e-mails with

16   the exhibits and -- and just have an opportunity to

17   pull them up and look at them real fast.  So let's just

18   go ahead and take 20 minutes and then come back.

19           MS. SADRO:  All right.  I have 1:05 Eastern

20   time, but if I'm subtracting, that's 11:05 your time?

21           THE WITNESS:  Yeah.

22           MR. CONVERSE:  Yes.  For the -- when we're

23   coming back?  Yes.

24           MS. SADRO:  When we're coming back.  Yeah.

25   All right.
```

**KANDY LLC vs KAYLA MCNEILL**
**Nicole Cook on 05/09/2024**

1              THE VIDEOGRAPHER:  And it's 12:43 p.m.

2    Eastern.  And we are now off the record.  This is the

3    end of Media 2.

4              (OFF THE RECORD)

5              THE VIDEOGRAPHER:  This is the beginning of

6    Media 3 for Ms. Nicole Cook.  The time is 1:07 p.m.

7    Eastern, and we are back on the record.

8                          EXAMINATION

9    BY MR. CONVERSE:

10        Q.   All right, Ms. Cook.  We're back on the

11   record, as you just heard.  And you also probably heard

12   at the beginning that I represent Kayla, Ms. McNeill.

13   My name is Anthony Converse, and I'm going to ask you

14   some questions about your testimony today.  And I -- I

15   just initially want you to know, I -- I'm trying to

16   understand what you know.  And there were several times

17   during your testimony where you weren't sure about

18   something, or you had heard it from somebody else.  And

19   -- and you heard my objection before about the

20   questions and -- and suggesting the answers.

21             So as we go through these, I -- I -- I'm

22   going to, let's say, drill down to try to understand

23   what you heard secondhand, as you had indicated before,

24   and what you actually know.  So you're going to hear

25   that over and over again.  I just wanted to let you

Page 74

1  know that that's going to be a -- a common theme

2  throughout these questions as we go through, just

3  because I'm trying to understand what the -- what the

4  facts are as you know them and then what are

5  assumptions or, you know, something you heard through

6  the grapevine.

7       A.   Sure.

8       Q.   So I just wanted to provide you that context

9  ahead of time as -- as we go through it.  So you had,

10 at first -- and let me just say, also, I'm so sorry to

11 hear about your medical condition.  If there are any --

12 if -- if it's causing you any problems as we're going,

13 just let me know, either remembering, or if you just

14 need a break or anything like that.  I -- I want to be

15 -- I'm sorry you have to be going through this when

16 you're -- when you're -- you know, have that going on,

17 when you're -- when you're in that -- in this state.

18 But just let me know if you need to take a break or

19 something and -- and --

20      A.   Okay.

21      Q.   We'll -- we'll accommodate anything that you

22 need.  Are you okay to -- to go forward right now?

23      A.   Yeah.  No.  It's fine.  I'm good.  Thank

24 you.

25      Q.   Okay.  All right.

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 75

1       A.   I appreciate that.

2       Q.   All right.  So I -- I think you had

3  initially -- or near the beginning of your testimony,

4  you had talked some about your sisters, Sydney and --

5  and Keli-Lyn.

6            Those are their names, correct?

7       A.   Correct.  Yeah.

8       Q.   Okay.  And I just want to know a little bit.

9  And you also referenced drama and that they worked for

10  Head Kandy.  I just want to know about your

11  relationship, starting first with your sister Sydney.

12            What -- what's your relationship with your

13  sister Sydney?

14       A.   I mean, it's fine.  It's not wonderful and,

15  you know, bubbles and sunshine.  But it's fine.  We

16  talk daily, and we get along really well, if that's

17  what you're asking.

18       Q.   Okay.

19       A.   Her and I's relationship is pretty good.

20       Q.   And is that -- was the relationship in that

21  same state during the time periods that you worked for

22  Head Kandy?

23       A.   I'd say it fluctuated, definitely, because

24  we're sisters.  We're all girls.  We're all hardheaded.

25  So it fluctuated, for sure.

Page 76

1     Q.   Yeah.  And same thing with regard to your

2  other sister Keli-Lyn.  Do you refer to her as Keli-Lyn

3  or Keli?

4     A.   Typically, Keli, but either one is fine.

5     Q.   Okay.

6     A.   I would say our relationship is definitely

7  rockier than mine and Sydney's.  Her and I definitely

8  butt heads the most.  But it's -- I mean, it's -- I

9  feel like it's just a sibling thing.

10     Q.   Right.  And -- and it was -- has it been

11  that same way throughout your time that you worked at

12  Head Kandy?

13     A.   Yeah.

14     Q.   Okay.  Do you know what Sydney's role was at

15  Head Kandy whenever you worked for Head Kandy?

16     A.   I don't know specifically, like, what her

17  job was called, no.

18     Q.   Do you know any of her responsibilities or

19  duties?

20     A.   I know she did, like, e-mails and orders,

21  returns, maybe.  Stuff like that.  I'm not -- I'm not

22  100 percent sure.

23     Q.   Okay.  And then I'd like to ask you about

24  Keli's.  Do you -- are you aware of what her role was

25  whenever you worked for Head Kandy?

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 77

1      A.   I don't remember initially what she started

2   out doing, maybe online stuff.  And then I don't know

3   what changed, but she ended up, like, moving offices

4   into Kayla's office.  And I think that's kind of when

5   her job duties not changed, but maybe she got more job

6   duties, like more responsibilities.  She was

7   overseeing, like, the front of the warehouse, maybe.

8      Q.   Okay.  And were they both employees of Head

9   Kandy the entire time that you were employed by Head

10  Kandy?

11     A.   Yeah.

12     Q.   Do you know if either of them -- we'll start

13  with Sydney.  Are you aware of any issues that Sydney

14  had with Head Kandy concerning activities at work or

15  her performance?

16     A.   No.  No.  As far as I know, she never got,

17  like, written up or anything like that.  So she wasn't

18  doing anything wild and off the wall.

19     Q.   Okay.  What about Keli?  Did she ever do

20  anything wild and off the wall or get reprimanded or

21  have any performance issues?

22          MS. SADRO:  Object to form.

23          THE WITNESS:  Potentially.  Maybe one time,

24  but I, again, was not there in the warehouse, so I

25  don't know exactly what happened.  I just, obviously,

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 78

1   know from them.  Something about the front of the house

2   got into it with the back of the house, the warehouse

3   people, and there was a little argument that went on.

4   That's the only thing I know about.

5   BY MR. CONVERSE:

6        Q.   Okay.  Do you know what the subject of the

7   argument was?

8        A.   I don't know the details.  I don't know.  I

9   do think it was between Keli-Lyn, who, again, I -- from

10  my understanding was, like, the front of the house

11  manager and then Damien (phonetic), who was the back of

12  the warehouse manager.  I don't know exactly what it

13  entailed.  There was some name-calling, arguing, but I

14  don't know exactly what it was for, about, or why it

15  happened.

16       Q.   Did -- sorry.  Strike that.

17            Was -- were Keli and Damien the subject of

18  the dispute or the individuals disputing?

19            MS. SADRO:  Object to form.

20            THE WITNESS:  They were the two that were of

21  -- in the midst of the argument.

22  BY MR. CONVERSE:

23       Q.   Okay.  Did they have a relationship outside

24  of work?

25       A.   They did, but I don't know.  I couldn't tell

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 79

1  you when it started.  At the time, she was married, so

2  -- and not to Damien.  So she was married to someone

3  else during that.

4      Q.  Okay.  Does that mean that the -- the

5  relationship was -- could have been intimate?

6      A.  I don't know.  I don't know any of that.  I

7  just know she was still married to her husband when she

8  was working at Head Kandy.

9      Q.  I was just trying to understand why you made

10  the reference to her being married.  So what the -- why

11  -- why that would be relevant?

12      A.  Well, because you made a reference to them

13  being in a relationship or a partnership or something.

14  And so that just -- I don't know if there was anything

15  intimate going on.  I don't know.  That's not my

16  business.  It had nothing to do with me.

17          I just know the one time I heard of, like,

18  a big argument, it involved Keli-Lyn and Damien, who,

19  again, was front of the house/back of the house.  I

20  don't know what it was about, but it was in -- it

21  happened in the warehouse.  That's what I know.

22      Q.  Okay.  And I -- I apologize.  My question

23  was confusing.  I -- I just meant if -- if they had a

24  relationship outside of work, so it could have been --

25  it could have just been friendly, personal

**KANDY LLC vs KAYLA MCNEILL**
**Nicole Cook on 05/09/2024**

```
 1   relationship.  It could have been -- you know,

 2       A.   Yeah.

 3       Q.   -- intimate, as I just asked you.

 4       A.   Sure.

 5       Q.   I just meant did they know each other

 6   outside of work?  So could -- I was just trying to

 7   understand what the -- the nature of the dispute could

 8   have been.  So if it arose over something at work, or

 9   if they had, you know, a relationship outside of work,

10   it could have been personal.  So if you don't

11   understand any of my questions, just let me know.

12       A.   Sure.

13       Q.   I didn't -- I didn't mean to be confusing.

14       A.   Right.

15       Q.   So I already mentioned your -- you -- you

16   know, your -- your medical issues you're going through

17   right now.  You said you had brain cancer.  And again,

18   I'm -- I'm sorry to hear that.  And I just need to ask

19   you a few questions about that because you had

20   referenced some of the symptoms or -- or effects of it.

21   So I apologize.

22       A.   Uh-huh.

23       Q.   But I just need to ask you a few questions

24   about that.  You had mentioned that it -- it affects

25   your memory some; is that correct?
```

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 81

```
1       A.   Yeah.

2       Q.   Does it -- does it also affect your mood at

3  all?

4       A.   Yeah.  I mean, I'm sure.  It's my brain, but

5  yeah.

6       Q.   Do you know how advanced it was when you

7  received the diagnosis?

8       A.   It's only Stage 2 when I was diagnosed.

9  Still currently only Stage 2, so.

10      Q.   Oh.

11      A.   You know, it's not terrible, but it's not

12  great.

13      Q.   And I don't have here in my notes -- I

14  apologize if you already answered this, but when were

15  you diagnosed?

16      A.   March of 2023.

17      Q.   Are you aware of what effects the cancer had

18  on you prior to the diagnosis?

19           MS. SADRO:  Object to form.

20           THE WITNESS:  No.  I would say really the

21  only thing is that we -- because we don't know how long

22  I've had it, so we don't know how long I've had

23  symptoms or anything.  But I've had kids for 18 years,

24  so I've been forgetful for 18 years.

25  BY MR. CONVERSE:
```

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 82

1      Q.   Sure, yeah.

2      A.   So I'm not -- I'm not 100 percent sure when

3   I could go back and say like, oh, like, these symptoms,

4   like, started here, and this is probably when it

5   started.

6      Q.   Right.  And you had previously testified

7   that, you know, you thought that it probably did affect

8   you before your diagnosis.  So I was just trying to,

9   again, drill down to understand, if -- if you knew.

10  But I -- I -- I think all parents can sympathize with

11  what you just said, so I completely understand.

12           You also testified about Head Kandy and your

13  awareness of Head Kandy.  And I think you said it -- it

14  went back 10 years or so.  Is that -- is that correct?

15     A.   Yeah, somewhere around there.  I think I

16  lived at Kayla's rental.  It had to have been 10 years

17  ago because I've been with my boyfriend for 10 years.

18  And I lived there, like, I don't know, like a year

19  before I met him or before we got together.  So yeah.

20  I would say it was 10 years ago.

21     Q.   Okay.  And do you know of a company called

22  Lashed Out?

23     A.   Oh, yeah.

24     Q.   Do you know what that is?

25     A.   It was what she had before.  And she got in

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 83

1  trouble or something about because it had the same

2  thing to do with whatever, like, one of those other

3  eyelash companies was doing.  So she had to stop doing

4  it because it was the same product or something.  I'm

5  not sure.

6      Q.   Okay.  And is -- do you know if Lashed Out

7  is related to Head Kandy in any way?

8      A.   That, I have no idea.

9      Q.   And -- and you just mentioned again about

10 living in Ms. McNeill's rental.  And I think when you

11 were first asked about your relationship with Ms.

12 McNeill and how you came to know her, I don't think you

13 went over that.  So I just wanted to ask you some more

14 about that.

15          When did you move into her rental?

16     A.   I don't know.  It had to have been like 2012

17 or '13.

18     Q.   And when did you move out of that rental?

19     A.   Had to have been 20 -- I don't know.  '15,

20 maybe.  Maybe.  I'm not sure.

21     Q.   Okay.  So prior to working for Head Kandy?

22     A.   Yeah.

23     Q.   Were there any issues with the rental while

24 you lived there?

25     A.   No.

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 84

```
 1        Q.   Did you have any issues with Ms. McNeill
 2   while you lived in her rental?
 3        A.   No.
 4        Q.   How did you learn that the rental was
 5   available for you to rent it?
 6        A.   I think it was posted on Facebook, so I just
 7   texted her about it.
 8        Q.   Do you know where it was posted on Facebook?
 9        A.   I don't remember.  Maybe, like, Salida Swap
10   or something like that.  I don't remember.
11        Q.   Okay.  And while we're talking about
12   Facebook, you had mentioned, also, another group where
13   you saw a posting from Ms. Neill -- Ms. McNeill,
14   something about Mamas or --
15        A.   Ark Valley Mountain Mamas.
16        Q.   Okay.
17        A.   Uh-huh.  That's where the babysitting job, I
18   think, was posted.
19        Q.   And is that a page that's currently viewable
20   on Facebook, to your knowledge?
21        A.   Yeah.  I think they renamed it Ark Mountain
22   Valley -- wait, Ark Valley Mountain Families.  Because
23   before, it was, like, geared more towards moms, and now
24   it's just kind of geared towards everybody.
25        Q.   Are you a -- a member of that group?
```

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 85

1      A.   Yeah.

2      Q.   Do you know if Ms. McNeill is a member of

3   that group?

4      A.   I don't know.

5      Q.   When you say Ms. McNeill posted a -- or

6   excuse me.  Strike that.

7           When -- when you say that you saw this

8   advertisement for a babysitting position, how did you

9   determine who posted that?

10      A.   It says on there who posts them.  I don't

11   know if she's a member still, but she was a member

12   then.  And so it says, like, their group name, and then

13   it says, like, who posted and what they posted.  So she

14   posted.  It said her name on it.

15      Q.   Okay.  And you -- when did you last look to

16   see if you could find the -- the posting that -- that

17   you're referencing?

18      A.   Back in October, whenever I was contacted by

19   the attorneys for Head Kandy.  Or I guess it would've

20   been before October.  So September, maybe.

21      Q.   Is that of last year, 2023?

22      A.   Yeah.  2023.  Sorry.

23      Q.   Had you looked for it prior to then?

24      A.   No.

25      Q.   And do you recall when you saw that posting?

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 86

 1      A.   I don't remember exactly, but it was like

 2   end of December, beginning of January of 2021.  So

 3   right before I had started working there.

 4      Q.   Did you reference that post in any of your

 5   communications with Ms. McNeill?

 6      A.   I'd have to go back and look.  But I don't

 7   know why I would have, other than to say, like, I saw

 8   your post.  I can help you.

 9      Q.   All right.  I'd like to ask you about the

10   text exchange that you were asked to look at that's

11   been marked as Deposition Exhibit 2.  I'll share my

12   screen.  All right.

13           Are you able to see the text string that you

14   were asked about previously, again, that was marked

15   Deposition Exhibit 2, on my -- on your screen?

16      A.   Yes.  Yep.

17      Q.   All right.  And this starts January 10th of

18   2021; is that correct?

19      A.   Right.

20      Q.   Okay.  Did you have any messages with Ms.

21   McNeill prior to the -- the date of this text string,

22   January 10th, 2021?

23      A.   Yeah.  There's a whole -- I have a whole

24   conversation with her for years.

25      Q.   Okay.  Let -- let me ask you about the

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 87

1    production of this.  So did you provide this to Head

2    Kandy's counsel?

3        A.    I did.

4        Q.    Why did you provide this text string to Head

5    Kandy's counsel?

6        A.    Because they just asked why -- how I started

7    working there, and why I started working there, and

8    basically all the same questions you've asked so far.

9    So I sent them these messages, like, when it started,

10   the conversation with Kayla about employment at Head

11   Kandy.

12       Q.    Did you send them the rest of the text

13   string?

14       A.    Yeah.  They have the whole thing.  There's

15   not a piece missing from January 10th to whatever the

16   last date is, like, March 5th or something, which is

17   the last conversation I have with her.

18       Q.    Oh, I thought I understood you to say that

19   this text sting began prior to January 10th.  So --

20       A.    Oh, no, no.  Like, I just had, like, normal

21   regular conversations with her before this date.

22   January 10th is when this conversation about employment

23   began.

24       Q.    When you say you have other ones, so you

25   have other text strings on your phone with Ms. McNeill?

**KANDY LLC vs KAYLA MCNEILL**
Nicole Cook on 05/09/2024

1      A.   Yeah.

2      Q.   Okay.  How does that work?  Is -- is she

3  under a different number or different name?

4      A.   No.  It's the same.  It just goes above

5  that.  Like, we just have, like, normal conversations

6  because we were friends before.

7      Q.   Okay.

8      A.   And tenants and stuff.  Like, so, like,

9  there's a whole thread above that that just has nothing

10  to do with Head Kandy or employment or any of this.

11      Q.   Got it.  So it is part -- when I say the

12  text string, I'm talking about this entire

13  conversation.

14           So there's more to this conversation that

15  begins prior to this January 10th, 2021, text?

16           MS. SADRO:  Object to form.

17  BY MR. CONVERSE:

18      Q.   Is that correct?

19      A.   As it pertains to Head Kandy, or as it

20  pertains to, like, personally?

21      Q.   I mean, just the conversation itself.  So

22  the -- the -- - this -- your -- your text messages go

23  back prior to January 10th, 2021, with Ms. McNeill?

24      A.   Yes.  In general, yes.  They go way back.

25      Q.   Okay.  Did you produce the entire

**KANDY LLC vs KAYLA MCNEILL**
**Nicole Cook on 05/09/2024**

1  conversation between you and Ms. McNeill?

2      A.   Not the entire thing because that would

3  probably take me a month of Sundays.  But I started the

4  conversation where they were asking me about when my

5  employment started and how it started.  So that's where

6  the beginning of my text message thread starts, is the

7  beginning of the conversation of employment at Head

8  Kandy.

9      Q.   Okay.  And the message that you referred to

10  earlier in your testimony, in order to respond to a

11  question, was it part of this same conversation?

12      A.   No.  It was from sometime in December, which

13  was obviously before that.  But it just -- it was just

14  out of the blue and didn't have anything to do with

15  anything other than that.

16      Q.   So it was part of the same conversation,

17  it's just not included here in this Exhibit 2?

18          MS. SADRO:  Object to form.

19          THE WITNESS:  Well, it didn't -- it doesn't

20  have anything to do with Head Kandy.  It had to do with

21  the boutique.  So I didn't include it because it didn't

22  have anything to do with Head Kandy.  And it never went

23  anywhere, so it wasn't important to me.

24  BY MR. CONVERSE:

25      Q.   Sure.  I'm not suggesting that you didn't

Page 90

1  produce something that you should have.  I'm just

2  trying to understand where it is in your phone when you

3  viewed it just now.  So I -- I'm just trying to

4  understand if it's part of this -- of your overall

5  conversation.  So there -- there's really no question

6  there.  I just -- I'm trying to understand.

7           So let me, I -- I guess, clarify something

8  so we don't talk past each other.  When -- when I was

9  saying, conversation, I mean I wasn't referring to

10  topics, which it sounds like you may be referring to

11  topics.  I just mean when you look at text messages

12  that you have had with Ms. McNeill, that all of them

13  together, I'm referring to that as a text string or the

14  text conversation.

15     A.   Okay.

16     Q.   So with -- with that clarification, is the

17  text that you looked at concerning Hayzlee's boutique

18  part of this conversation that you had with miss -- Ms.

19  McNeill by text?

20     A.   Yes.  It's in the same text thread.  Yeah.

21     Q.   Okay.  Thread.  All right.  I'm -- I'm --

22  I'm happy to use thread if -- if that clarifies it.  So

23  did you -- so I -- I believe, then, your explanation is

24  that you didn't produce the entire thread to Head

25  Kandy's counsel.

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 91

1          Is that -- is that correct?

2      A.   Correct.  I guess from that -- from the very

3   first message I have with Kayla until the very last.

4   Right.

5      Q.   Okay.  And -- and do you know if -- I know

6   it was going fast as -- as Counsel was scrolling

7   through it to show you it, but do you know if -- if

8   this is everything that you produced to Head Kandy

9   Counsel?  And I'm going to scroll down to the bottom so

10  we can see the end dates, if that helps you.  It's

11  quite a bit.  Sorry.  I know it's going fast.

12     A.   That's all right.

13     Q.   All right.  So it looks as though it ends on

14  March 5th, 2021.  So just to restate the question: Do

15  you believe this to be the entire portion of the thread

16  that you produced to Head Kandy's counsel?

17     A.   It looks like it all is there.  Yeah.

18     Q.   And you said you produced it because you

19  were asked questions by Head Kandy's counsel.  Did you

20  also receive a written subpoena from them?

21     A.   Yeah.

22     Q.   Did you produce these documents before or

23  after receiving the subpoena?

24     A.   Before.  So these ones, I -- I produced

25  before.

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 92

1     Q.   In addition to this thread here that's

2  marked Deposition Exhibit 2, did you produce any other

3  documents prior to receiving the subpoena?

4     A.   Prior to receiving what?

5     Q.   The subpoena?

6     A.   No.  I just produced all of those messages,

7  the calendars.  I think that's all.

8     Q.   Okay.  And then after receiving the

9  subpoena, what did you produce, if anything?

10     A.   I sent in my calendar, my personal calendar,

11  where I took -- like, kept track of the days that I had

12  Hayzlee and didn't have Hayzlee.  And then there were

13  just a couple of messages that I made sure to add in

14  there, the one about the employee pricing on the

15  products and the $14 an hour.  I just made sure those

16  two were added in there.

17     Q.   So you produced those individually, those

18  particular messages?

19     A.   Yeah.

20     Q.   Why did you want to make sure that those

21  were in there?  And you can start with the -- the --

22  whichever one you want.

23          But why was it important to you to make sure

24  that those were included?

25     A.   Because I had the calendar, so I knew that I

**KANDY LLC vs KAYLA MCNEILL**
**Nicole Cook on 05/09/2024**

Page 93

```
1   had the majority of the days that I had actually

2   watched her, and that I -- I had proof that I, like,

3   actually had her.  And then just the $14 an hour just

4   to show, like, what she was going to pay me.  And then

5   the -- what was the other one?  Oh, the products.  The

6   employee pricing.

7        Q.   Yes.

8        A.   Just saying that because I was asked if I

9   was given any sort of benefits, you know, insurance or

10  anything else.  And I said I was not given anything

11  other than I was just given products at employee

12  pricing.  Which I don't know exactly what that

13  entailed, I just knew it was a discount.

14       Q.   Okay.  And why did you believe that when you

15  watched Hayley -- Hayzlee, excuse me, was -- was

16  important?

17       A.   Just for the days that I, like, actually did

18  watch her, and the days that I clocked in, and I

19  actually didn't have her.

20       Q.   And -- and why did you think that was

21  important to speak to Plaintiff's counsel about?

22       A.   Just because I was getting a paycheck.  So I

23  wanted to show that, like, I did -- I -- I was

24  organized enough to know, like, these are the days that

25  I did watch her, and these are the days that I did not
```

**KANDY LLC vs KAYLA MCNEILL**
Nicole Cook on 05/09/2024

Page 94

```
1   actually watch her.  I think I could go on to say that
2   I probably knew this was going to happen, so I covered
3   my own hind end.
4        Q.   When you say, you knew this was going to
5   happen, can -- can you tell me a little more
6   specifically what you're referring to?
7        A.   I just -- not necessarily that I knew this
8   was going to happen because Lord knows we don't want
9   this to happen, but I just knew to cover my own hind
10  end, whether it was with Hayzlee, or I didn't hold on
11  to anything, like, that my sisters would tell me
12  because I wasn't a part of it.
13           But I just know, from life experiences, to
14  be able to cover my own end for obvious reasons, right?
15  Like, I did this for this reason, and I have proof that
16  this is what I did.  I have all of that for that
17  reason.  To say, like, so I can't be seen as shady, I
18  guess, essentially is what it is.
19       Q.   Did you have any concerns that your
20  employment was shady?
21       A.   No.  I wouldn't say it was shady.  Because
22  again, to me, she was the boss.  She -- I had no
23  knowledge that she was not the boss, right?  And to me,
24  the boss can do whatever the boss wants to do because
25  they're the boss.  So I don't feel like my employment
```

**KANDY LLC vs KAYLA MCNEILL**
**Nicole Cook on 05/09/2024**

Page 95

1   was shady.  I don't feel like what I did was shady

2   because she was my boss.

3        Q.   With regard to documenting that you just

4   mentioned -- and you were asked to look at Exhibit 5.

5   I'm going to hold that up.  All right.

6             Do you see a document on your screen?

7        A.   Yes.

8        Q.   Is it large enough for you to read it?

9        A.   Uh-huh.

10       Q.   Okay.

11       A.   Yep.

12       Q.   I had to zoom out, so it would fit.  So I

13  just wanted to make sure that it was -- that you could

14  see it.

15       A.   Sure.

16       Q.   Again, I believe it's been marked Deposition

17  Exhibit 5.  Is this the calendar that you were

18  referring to or the documentation, rather, that you

19  were just referring to?

20       A.   Yes.  So that's my personal calendar that I

21  -- I kept track of.

22       Q.   What's the source of this calendar?

23       A.   It's called TimeTree.  So it's just an app.

24  Is that what you mean?

25       Q.   Yes.  Exactly.  So is it an app on your --

**KANDY LLC vs KAYLA MCNEILL**
**Nicole Cook on 05/09/2024**

1    on your phone?

2        A.    Yeah.  It's just an app on my phone.  And

3    you can go in and add things and change things, delete

4    things.  And I'm pretty sure it keeps track of all of

5    that, even if you delete it.  Like, if you delete,

6    like, a -- an event out of the calendar, it will show

7    you that you deleted it.

8        Q.    With regard to the entries about, "No

9    Hayzlee," in reference to the -- a specific day that

10   you didn't see her, when did you make the entry?

11            Was it the same day, the next day, within --

12   do you know within how much time you -- you made those

13   entries?

14       A.    Typically, it was, like, the same day.

15   Because again, I was forgetful.  Typically, it was the

16   same day.  I would say I would give myself about 24

17   hours to have it in.  So I was, like, oh shoot, I had

18   Hayzlee yesterday.  I would put it in.  Or I didn't

19   have Hayzlee.  I would put it in.

20       Q.    Okay.  And you referred to, essentially,

21   metadata that -- where it tracks things, like, if you

22   deleted something and whatnot.  And it -- it probably

23   should also record when you made entries.  Would you be

24   willing to provide that information as to when the

25   entries were made?

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 97

1      A.   Yep.

2           MS. SADRO:  Object to form.

3   BY MR. CONVERSE:

4      **Q.   Okay.**

5      A.   I don't know for sure that it says whether

6   or not -- that you deleted something.  But I do know

7   that it makes a note when you created the thing -- the

8   -- the event.

9      **Q.   And the ones we're looking at here on the**

10  **screen, this particular page within Exhibit 5, this**

11  **looks like it was for the month of January 2021; is**

12  **that correct?**

13     A.   Right.  Yep.

14     **Q.   And this was before your diagnosis, correct?**

15     A.   Correct.

16     **Q.   Okay.  Because you had testified that you**

17  **were -- you were having some memory issues and that's**

18  **why you needed to document this.  So it -- it sounds**

19  **like the -- your memory issues preceded your -- your**

20  **diagnosis?**

21     A.   Sure.  Totally.  Yeah.  So I put -- I mean,

22  like, I put everything in the calendar.  Even before

23  that month, you can go back and, like, when Chris's

24  parents were here, I had to keep track of everything.

25  So that's why I had that, was I literally kept track of

Page 98

1  everything.

2      Q.  All right.  I'm going to remove this

3  document and replace it with the one we were just

4  looking at.  So this, again, is Exhibit 2.  And on the

5  screen is the February 2021 calendar that -- that you

6  said Ms. McNeill sent you.

7          Do you see that?

8      A.  Yes.

9      Q.  All right.  And this is Page 30 of that

10  Exhibit 2.  And then there are indications of images

11  below it.

12          I believe you testified that those are all

13  the other monthly calendars for 2021 that Ms. McNeill

14  had sent you?

15      A.  Right.  Yes.

16      Q.  Did she send you any other calendars than

17  the ones that she sent you on this day?

18      A.  I don't think so.  I think they were all

19  just the white ones that she has with her highlighters

20  on them.

21      Q.  So all the calendars we've looked at today

22  were all sent to you on this -- on February 2nd of

23  2021; is that right?

24      A.  Yeah.  All those white ones.  Yeah.

25      Q.  Did you produce -- excuse me.  Did you

**KANDY LLC vs KAYLA MCNEILL**
Nicole Cook on 05/09/2024

Page 99

1   produce the calendars separately since they're not

2   viewable in this text string?

3        A.   I did, yeah.

4        Q.   And how did you retrieve them?

5        A.   Well, they were just pictures, so I just

6   downloaded them, and I e-mailed them.

7        Q.   And you downloaded them from this text

8   thread?

9        A.   Yeah.  So they're just white like that.

10   They just say image like that because they're not

11   downloaded.  So I just downloaded them and saved them

12   to my phone.

13        Q.   So then they appeared in the -- in this text

14   thread?

15        A.   Yeah.

16        Q.   Okay.  And did you produce all the calendars

17   that you received from Ms. McNeill?

18        A.   Yes.

19             MS. SADRO:  Mr. Converse, if you're at a

20   brief pause, I'm going to have to beg your indulgence

21   for a brief comfort break.

22             MR. CONVERSE:  Absolutely.  No problem.

23             MS. SADRO:  I can just turn my video off and

24   come right back in a minute.

25             MR. CONVERSE:  Yeah.  So five minutes?

**KANDY LLC vs KAYLA MCNEILL**
**Nicole Cook on 05/09/2024**

Page 100

```
 1              MS. SADRO:  That's fine.  Sure.  Thank you.

 2              MR. CONVERSE:  Okay.  All right.  Yeah.

 3              THE VIDEOGRAPHER:  Time is 1:44, and we are

 4    off the record.

 5              (OFF THE RECORD)

 6              THE VIDEOGRAPHER:  The time is 1:48 Eastern.

 7    This is the beginning of Media 4.  We are back on the

 8    record.

 9    BY MR. CONVERSE:

10        Q.   All right, Ms. Cook.  We were talking about

11    some of the items that you produced, and I don't think

12    I have any more questions for you on that topic.  So

13    I'd like to now talk to you about when you first

14    started with Head Kandy and, as we discussed,

15    concerning the text string and why you produced what

16    you produced.  Other than seeing the post on the

17    Facebook page in --

18              Did you say it was either December of 2020

19    or January of 2021?  Is that -- is that when you saw

20    the post -- or is that when you thought it was posted?

21    I'm sorry.

22        A.   I'm not sure.  Either one of those.  It had

23    to have been posted end of December or beginning of

24    January.  I feel like I reached out, like, within a

25    week of seeing the post, to her.
```

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

 1      Q.   And by reaching out, are you referring to
 2   that text message --
 3      A.   Yeah.
 4      Q.   -- that began the text thread on January
 5   10th?
 6      A.   Yes.
 7      Q.   Okay.  So you -- so if it was within a week,
 8   then it's probably fair to say that -- or my question
 9   to you is, is it fair to say that you did not see the
10   post prior to January of 2021?
11      A.   Probably not.
12      Q.   But certainly not before December of 2020?
13      A.   Yeah.  No.  Not before December.
14      Q.   Why did you reach out to Ms. McNeill about
15   helping her?
16      A.   Because I was home with my own baby, and I
17   thought it was helpful to -- for her to know that she
18   knew me, for her daughter to be able to come stay with
19   me, right?  Like, she was going to be safe.  She knew
20   who I was.  And it worked out for me because I was
21   already home, give me a little bit of income.  And it
22   also helped her because she was so busy.  And she could
23   trust me with her daughter.
24      Q.   Right.  So part -- it sounds like there were
25   two reasons there.  I just want to clarify.

**KANDY LLC vs KAYLA MCNEILL**
**Nicole Cook on 05/09/2024**

Page 102

1           You were -- you thought that you could help

2     out Ms. McNeill in a way that's convenient for both of

3     you; is that fair to say?

4           A.    Yeah.

5           Q.    And -- and then it also gave you some income

6     as well?

7           A.    Sure.  Yep.

8           Q.    Did you need that income to be consistent?

9           A.    Not particularly.  It would've been nice,

10    right, to have just a steady stream of income.  But it

11    -- it wasn't like I was dying to have a steady stream

12    of income.  We were okay because we had just -- I had

13    just gone on maternity leave, so.

14          Q.    So it wasn't intended to be used for any

15    type of expense in particular?

16          A.    No, nothing in particular.

17          Q.    Were you at the Head Kandy offices ever

18    prior to texting Ms. McNeill about watching Hayzlee on

19    January 10th?

20          A.    Nothing that comes to mind that I would be

21    there for.  But Chris used to help them.  Well, don't

22    think I went there with Chris.  Nothing that jumps out

23    to me that I was there before working for Head Kandy.

24          Q.    If -- if there were other employees of Head

25    Kandy that had signed affidavits saying that -- that

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 103

1    you -- you were at their offices prior to that date,

2    would that cause you to believe that you'd forgotten

3    that you were at the offices?

4              MS. SADRO:  Object to form.

5              THE WITNESS:  Oh, for sure.  I mean, there's

6    obviously a possibility I could forget because I don't

7    know why I would remember a trip to Head Kandy

8    warehouses because that's a pretty uneventful journey.

9    I've bought products.  So whether or not I was with

10   Hayzlee when I bought that product.  I could have been

11   there without Hayzlee buying product.  There was not an

12   event that was so catastrophic that I would remember

13   every trip to Head Kandy.  So I was there, yes.  I

14   cannot tell you when I was there.

15   BY MR. CONVERSE:

16        Q.   With regard to your onboarding process with

17   Head Kandy, if you will, do you recall everything that

18   was required of you in order to start working at Head

19   Kandy?

20        A.   In terms of -- what do you mean?

21        Q.   So were there any routine tasks that -- we

22   saw a -- a new hire sheet that you had filled out

23   partially, and that was marked as an exhibit.

24             Was there -- do you recall anything else

25   that you did as part of the -- the new hire process?

**KANDY LLC vs KAYLA MCNEILL**
Nicole Cook on 05/09/2024

1      A.   No.

2      Q.   Do you recall any training that you received

3   as part of your onboarding with Head Kandy?

4      A.   No.  I didn't receive any training.

5      Q.   And then, in particular, you did not receive

6   any training from your sister?

7      A.   No.  Which sister specifically?

8      Q.   Sure.  So maybe I should ask either.  So

9   either sister.

10          Did you receive any training from Sydney or

11   Keli-Lyn?

12     A.   I don't think so.  I don't know what I

13   would've received training for.  I wasn't working in

14   the office.

15     Q.   This was during the COVID restrictions,

16   wasn't it?

17     A.   Yeah.  The next -- the second year of COVID.

18   Yeah.  Going into.

19     Q.   Do you know if any individuals were working

20   from home during that time period?

21          MS. SADRO:  Object to form.

22          THE WITNESS:  I have no idea.  I couldn't

23   even list who worked there during that time.

24   BY MR. CONVERSE:

25     Q.   Did -- you referenced that you weren't at

**KANDY LLC vs KAYLA MCNEILL**
Nicole Cook on 05/09/2024

1  the offices.  So I'm trying to determine if it was

2  possible to do work remotely.

3          Do you have any information about whether or

4  not it was possible for Head Kandy employees to do work

5  from home during that time period?

6      A.   I mean, I'm sure it was possible.  She did

7  have people that worked from home on social media and,

8  like, I don't know, handling -- at one point, I thought

9  somebody was at home handling grievances and stuff.  I

10 don't know.  I don't know for sure because, like I

11 said, I didn't work with any of those people.  I didn't

12 work in the office.  I didn't cohabitate with them

13 ever, unless I made a very short trip to Head Kandy to

14 either drop Hayzlee off or buy product.  That was --

15 those were the only intentions for being at Head Kandy.

16 So I -- I can't speak to what she was allowing people

17 to do from home because I don't know.

18     Q.   And when you say she, are you referring to

19 Ms. McNeill?

20     A.   Yeah.  Sorry.  Kayla.

21     Q.   And -- and speaking of Ms. McNeill and --

22 and her authority, I believe you testified a few times

23 that to you, she was the boss.  But it -- it seemed as

24 though that understanding may have changed.  Did your

25 understanding as to what Ms. McNeill's role with the

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

1    business changed at all?

2        A.    Yeah.  I eventually found out she owned,

3    like, a very small portion of the company instead of

4    the majority of the company, which was like later on

5    now.  Like, I don't even know when it was.  But this

6    had to have been maybe the end of '21 -- 2021,

7    beginning of 2022.  I don't know.  It was much later

8    down the road where I found out that she actually

9    wasn't the boss.

10        Q.    How did you find that out?

11        A.    Just word of mouth.  Everybody.  I don't --

12    I don't know who told me, but there was just talk about

13    her.  Something specifically about only owning 20

14    percent of the company.  I don't know.  I don't know

15    the specifics.  That's just a number I remember being

16    told.  And I was like, wait, what?  I don't remember

17    who told me that.

18        Q.    You also -- also made reference to learning

19    about the lawsuit.  Do you recall when you learned

20    about this lawsuit?

21        A.    Yes.  Well, I don't remember exactly when it

22    was.  So it had to have been -- what is it?  So it's

23    '24 now, '23 then.  So the end of 2022, when -- is that

24    when she started WHiPi?  I don't remember.  I can't

25    tell you times.  But whenever I saw the WHiPi Facebook,

**KANDY LLC vs KAYLA MCNEILL**
**Nicole Cook on 05/09/2024**

Page 107

```
 1   then that's when I found out that all of the lawsuit

 2   was happening, and she wasn't allowed to do anything

 3   with haircare, only everything that wasn't haircare.

 4   And that I knew because that was posted on WHiPi.  So a

 5   lot of the information was -- a lot of the information

 6   she had given online came from her.

 7        Q.   So when you say posted, do you know who

 8   posted that information that you're referencing?

 9        A.   Kayla.

10        Q.   And how was that posted?  Was it in a

11   comment to a video?  Was it a -- a separate posting?

12   Do you -- do you know how those were posted?

13        A.   I think they were just like posts, like a

14   picture or a video or something with a description on

15   them.  I don't really know for -- 100 percent exactly

16   how they were posted.  But a lot of what I learned, I

17   learned from watching Kayla's videos and not

18   necessarily from my sisters, for instance, because that

19   -- I mean, it just wasn't a conversation really.

20        Q.   Do you know any of the individuals that you

21   referenced with regard to learning things word of

22   mouth, do you know any specific individuals you spoke

23   with about Ms. McNeill and her role at Head Kandy?

24        A.   No.  I don't know anyone specific.  I feel

25   like it -- it wasn't like a conversation of like, oh my
```

Page 108

```
 1  gosh.  Did you know she wasn't the owner?  It more so

 2  was like, she has partners.  And I knew there were

 3  partners.  I just didn't know that she was a small guy,

 4  not the big guy.  So I don't know.

 5      Q.   And then same question with regard to the

 6  lawsuit.  Do you recall any specific individuals that

 7  you spoke with concerning the lawsuit?

 8      A.   My sisters told me, probably first.  And I

 9  was like, I thought they were a mess, but --

10      Q.   Did you review any of the filings with the

11  courts for this lawsuit?

12      A.   You're talking about like the actual

13  lawsuit?

14      Q.   Yeah.  So there are a lot of filings

15  oftentimes in -- in lawsuits.  You'll have a -- a

16  complaint or an -- an answer and various briefs about

17  specific topics.

18          Have you reviewed any filings with the Court

19  in this lawsuit that you're aware of?

20      A.   I have seen the lawsuit.

21      Q.   And when you say, lawsuit, do you know what

22  that document was titled?  Is it complaint or --

23      A.   I don't remember what it was called.  It was

24  a very long piece of paper.  So I'm not quite sure what

25  it was.  I --
```

**KANDY LLC vs KAYLA MCNEILL**
Nicole Cook on 05/09/2024

1      Q.   Do you recall any --

2      A.   I think it was just the initial motion.

3  Does that sound familiar?  Because that sounds familiar

4  to me.  That's, I think, what it was, was a motion.

5  That's what I read.  But that's the only thing I've

6  seen.

7      Q.   Okay.  Do you recall any of the specific

8  contents or subjects that were within that document?

9      A.   I remember something in there about she flew

10  to Mexico for a procedure.  That's what I remember.  I

11  don't remember anything else in that piece of paper.

12  But that's what I remember.

13     Q.   Okay.  You had also testified about your

14  understanding, as you put it, concerning your role with

15  Head Kandy.

16          Was that understanding based upon the text

17  thread that we've been looking at as Exhibit 2?

18     A.   My understanding of what?  Like my

19  employment at Head Kandy?

20     Q.   Yes.

21     A.   Yeah.  So I'm confused.  Sorry.

22     Q.   I'm just trying to understand if there were

23  any conversations you had with Ms. McNeill outside of

24  the text thread about your role with Head Kandy.  And

25  so that would include your responsibilities, any type

Page 110

```
 1   of job, title, pay.  So just your relationship with

 2   Head Kandy is what I mean with -- with regard to -- to

 3   your -- your role with Head Kandy.

 4           So with -- with that understanding, do you

 5   recall any phone calls or other conversations you had

 6   with Ms. McNeill about your role with Head Kandy other

 7   than what's contained within the text thread that we've

 8   been looking at, at least -- at least partially, in

 9   Exhibit 2?

10       A.   No.  I think for the most part, everything

11   is there.

12       Q.   Okay.  You were also asked questions about

13   Ms. McNeill telling you not to tell anyone in the

14   warehouse, I believe, is how you put it, about your

15   role with Head Kandy.

16           Do you recall what the specific facts were

17   that you were not supposed to share with anyone?

18       A.   Yeah.  I wasn't supposed to tell anybody

19   that I was clocking in when I didn't have Hayzlee.  I

20   think that's just the biggest one, is not to tell

21   anybody that I was clocking in when I didn't have her.

22       Q.   Do you know why Ms. McNeill told you to not

23   tell anyone about the clocking in?

24           MS. SADRO:  Objection.

25           THE WITNESS:  Her message says to avoid the
```

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 111

1  drama within the warehouse.  She didn't want people to

2  think that she was giving me special treatment or being

3  unfair to anyone else.

4  BY MR. CONVERSE:

5       Q.   Other than that text message, is there

6  anything else that pertains to why Ms. McNeill told you

7  not to tell anyone about your clocking-in habits?

8       A.   I would have to go back and look, but that's

9  -- that's what I remember from that message.

10      Q.   Did you ever tell anyone about your

11  clocking-in habits?

12      A.   I'm pretty sure my sisters knew, just

13  because they're my sisters.  I don't think anyone else

14  at Head Kandy knew because I was not friends with

15  anyone else at Head Kandy.

16      Q.   When you say they knew, is that because you

17  told them?

18      A.   Yeah.  I'm sure I told them.  I can't say

19  for sure that I, like, had a conversation with my

20  sisters and told them, but I'm pretty sure I probably

21  did.

22      Q.   Did any drama, as you referred to it, occur

23  as a result of -- of you telling either of your

24  sisters?

25      A.   Not with my sisters.  Neither one of them,

**KANDY LLC vs KAYLA MCNEILL**
**Nicole Cook on 05/09/2024**

Page 112

1  really.  I -- I -- I mean, I can't say that Keli-Lyn

2  had anything to say about it.  Sydney didn't have

3  anything to say about it in either way, like, whatever.

4  Do you, kind of thing.  So Sydney knew for sure, but I

5  don't -- I think, but I don't know that I would have

6  told Keli-Lyn.

7      Q.  And so you had referenced a discussion in

8  the text thread on that topic.  So I just want to --

9  and you're previously asked about it, so I just want to

10  pull it up real fast.  And then --

11     A.  Sure.

12     Q.  I can ask you some questions.  All right.

13         Are you able to see a document on the

14  screen?

15     A.  Yes.

16     Q.  All right.  And again, this is Exhibit 2.

17         THE VIDEOGRAPHER:  One out.  [Inaudible

18  02:21:00].

19         MR. CONVERSE:  I'm sorry.  Are -- are you

20  talking to us?  We -- we can hear you.  Were you trying

21  to tell us something?

22         THE VIDEOGRAPHER:  No.  I apologize.  I was

23  trying to make sure the audio was good.  I'm sorry.

24         MR. CONVERSE:  Oh, no worries.  I just

25  wanted to make sure that something wasn't wrong that --

Page 113

1    that you were trying to alert us to.

2              THE VIDEOGRAPHER:  No.  I'm just trying to

3    make sure the audio is sounding good because it sounded

4    muffled for a second, so I was testing it.  I

5    apologize.

6              MR. CONVERSE:  No worries.  Just please let

7    us know if -- if there are any issues with the audio,

8    and -- and we'll take a break.

9              THE VIDEOGRAPHER:  I appreciate that.

10   BY MR. CONVERSE:

11       Q.   Sorry.  I'm just trying to advance to the

12   specific texts you were asked about.  Here we go.  So

13   is it Page 35 of Exhibit 2, and the -- the first text

14   on the page from Ms. McNeill is the one that you were

15   asked about previously.  And it talks about at -- at

16   the conclusion, "Just clock in on the days you don't

17   have her from 10:00 to 3:00; is that fair?"

18            Do you see that?

19       A.   Yeah.

20       Q.   Okay.  And do you remember being asked about

21   that earlier?

22       A.   Yeah.

23       Q.   So this reference to "is that fair," do you

24   know what Ms. McNeill is referring to?

25            MS. SADRO:  Object to form.

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 114

1          THE WITNESS:  Just fair like, is that fair

2    to me?  Because she had already told me that she was

3    going to salary me, and then the salary didn't go

4    through.  So she just was asking like, is this fair,

5    compared to what we agreed upon first.

6    BY MR. CONVERSE:

7          Q.    And did you feel it was fair?

8          A.    Yeah.

9          Q.    And there were several questions put to you

10   by Plaintiff's counsel about the calendars that Ms.

11   McNeill had sent you in this text thread.  I'm going to

12   go back to that page.  And you were asked about what

13   you anticipated whenever you review these calendars

14   concerning clocking in and being paid when you weren't

15   watching Hayzlee.

16          Do you recall those?

17         A.    Yes.  Sorry.

18         Q.    And you had testified that you were

19   anticipating clocking in and -- and getting paid for

20   the days that are marked in yellow on these calendars

21   that were sent to you; is that correct?

22          MS. SADRO:  Objection.

23          THE WITNESS:  Yeah.  Just Monday through

24   Friday, not Saturdays and Sundays.  I didn't -- I

25   wasn't planning on clocking in for the weekends because

**KANDY LLC vs KAYLA MCNEILL**
**Nicole Cook on 05/09/2024**

 1    that wasn't what we agreed upon.

 2    BY MR. CONVERSE:

 3        Q.    Thank you for that clarification.  So -- and

 4    again, I -- I understand that you suffer some -- from

 5    some memory issues.  So I'm just trying to clarify, I'm

 6    not accusing you of anything.  But the -- so if we go

 7    up to Page 29 of the text thread, it shows us that

 8    these messages were exchanged on February 2nd of 2021.

 9            So the calendars were sent to you February

10    2nd of 2021; is that correct?

11        A.    Yeah.

12        Q.    And then if we go back to the -- the text

13    about you clocking in on Page 35, and we scroll up to

14    Page 33, this was sent on February 7th of 2021.

15            Do you see that?

16        A.    Uh-huh.  Yes.

17        Q.    So you received the calendars before there

18    was any conversation about you clocking in and out?

19        A.    Yeah.

20        Q.    Okay.  So you -- you wouldn't have had any

21    understanding at all about clocking in or out at the

22    time that you received those calendars; is that

23    correct?

24            MS. SADRO:  Object to form.

25            THE WITNESS:  I mean, I guess.  Yeah.  But

**KANDY LLC vs KAYLA MCNEILL**
**Nicole Cook on 05/09/2024**

Page 116

1   there was no talk of that before.  There was no talk of

2   clocking in before or when -- on the days I didn't have

3   her before that happened.  Before she told me that they

4   didn't salary, there was no mention of having to clock

5   in or anything.  So it was only brought up because they

6   wouldn't put me on salary.  And so that was her

7   solution.

8   BY MR. CONVERSE:

9        Q.   Right.  And -- and speaking of that, it says

10  in this same text message on Page 35 that, "So I told

11  Kayla, I wanted to salary you, and she said they didn't

12  approve it."

13           So at least through this text message, and

14  as you just referenced, you knew that there were people

15  who had more authority than Ms. McNeill at -- at least

16  as of February 7th of 2021?

17           MS. SADRO:  Object to form.

18           THE WITNESS:  I wouldn't say that I knew

19  they had more authority.  I didn't know the logistics

20  of who she was asking to put me on salary.  So if it

21  wasn't fit for the company to put me on salary, then

22  they weren't going to put me on salary.  That's not for

23  me to understand.  I don't give a shit.  What she told

24  me was she was going to salary me, and then because

25  they wouldn't salary me, this was her solution.

**KANDY LLC vs KAYLA MCNEILL**
**Nicole Cook on 05/09/2024**

Page 117

```
 1              So there's always bigger people above other
 2    people.  But to me, that didn't matter because at the
 3    time, she was the bigger person, right?  Like, I don't
 4    know the details of the accounting people.  I don't
 5    know the details of the payroll people.  I don't know
 6    the details of -- of all of those people and why they
 7    wouldn't salary me.  I didn't ask questions.  She
 8    needed help, and I was willing to be helpful, right?
 9    So because they wouldn't salary me, that's fine.  I
10    don't care.  So now, we had a different solution.
11    BY MR. CONVERSE:
12         Q.   And I was just referring to the -- her
13    authority.  So it was -- as of the time you received
14    this text, you understood that, as you said, there are
15    always bigger people.  So some bigger person did not
16    approve of the original arrangements that had been
17    proposed to you by Ms. McNeill?
18         A.   Correct.
19              MS. SADRO:  Object to form.  Asked and
20    answered.
21              THE WITNESS:  Someone somewhere didn't
22    approve of me being salaried, is what I understood.
23    BY MR. CONVERSE:
24         Q.   Right.  So she didn't --
25         A.   Not necessarily my job title but me being
```

**KANDY LLC vs KAYLA MCNEILL**
Nicole Cook on 05/09/2024

Page 118

1   salaried, not being allowed to be salaried, is what I

2   understood.

3        Q.    Did you -- did you have a job title?

4        A.    I guess this would technically be considered

5   a babysitter.  But I don't know what -- my official job

6   title is different on that paperwork somebody filled

7   out.

8        Q.    Is that the reference to Facebook?

9        A.    Yeah.  So that says that I'm part of

10  Facebook, but I wasn't part of Facebook.  I was just a

11  babysitter.

12       Q.    But -- but are you aware of any formal title

13  that you had other than what's written on that document

14  you're referring to?

15       A.    No.  No.

16       Q.    And you referred to a -- a solution that Ms.

17  McNeill came up with after the salary proposal wasn't

18  approved; is that correct?

19       A.    Right.

20       Q.    What was the proposal?

21       A.    That I would just clock in from 10:00 to

22  3:00 on the days that I didn't have Hayzlee.

23       Q.    And do you know if that was approved by

24  whomever it was that didn't approve the original salary

25  proposal?

**KANDY LLC vs KAYLA MCNEILL**
**Nicole Cook on 05/09/2024**

1    MS. SADRO:  Objection.

2    THE WITNESS:  I have -- I have no idea.

3 BY MR. CONVERSE:

4    Q.  **Going back to the days that were marked in**

5 **yellow on those calendars that Ms. McNeill sent you, do**

6 **you know if you were paid for all of the weekdays that**

7 **were marked in yellow on those calendars?**

8    A.  I don't think so.  I don't think so.  I

9 would have to look at my calendar versus those

10 calendars.  Well, I have February and part of March.

11 So I would have to look.  I don't know.

12    Q.  **So would your payroll records be a -- a**

13 **better indication as to what days you were paid for?**

14    A.  Yeah.  If there's an access to see which

15 days I clocked in and which days I didn't clock in,

16 yeah, absolutely.

17    Q.  **Do you know how many days you clocked in and**

18 **were paid for that you did not watch Hayzlee?**

19    A.  I don't know.  I would have to look.

20    Q.  **So you were asked before, as -- as we've**

21 **already talked about, to reference the complete thread**

22 **of this -- of this complete text thread of this Exhibit**

23 **2 in your phone.  And I -- I'd like to impose upon you**

24 **as well.**

25    **Do you still have your phone with you?**

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 120

1       A.   Yeah.

2       Q.   **Could you please go to this text thread with**

3  **Ms. McNeill?**

4       A.   Let me turn my background off.  You want me

5  to go all the way up to this date?

6       Q.   **If -- actually, if you could go before the**

7  **January 7th -- or January 10th, excuse me, message to**

8  **actually September 8th of 2020.**

9       A.   Uh-huh.

10       Q.   **Did you have any communication with Ms.**

11  **McNeill on September 8th?**

12       A.   Yeah.  Yeah.  We talked about having a work-

13  from-home position because I was leaving the dental

14  office.

15       Q.   **Okay.  And is that position with Head Kandy?**

16       A.   Yeah.

17       Q.   **And what work were you going to be**

18  **performing from home for Head Kandy?**

19       A.   I don't really know.  Let me look.  I'm not

20  sure.  It doesn't say, but I would assume it was

21  probably something on social media.

22       Q.   **Okay.  Social media as in Facebook?**

23       A.   Yeah.  Managing the page, the comments, the

24  videos.  I'm -- I can't speak to that for sure, but I -

25  - that's my inclination as I'm reading these.  Yeah.  I

**KANDY LLC vs KAYLA MCNEILL**
**Nicole Cook on 05/09/2024**

Page 121

1   think so.

2       Q.   So based upon that, are you now able to

3   recall whether or not there were positions available at

4   Head Kandy that people could do from home?

5       A.   Yeah.  I mean, I know there's work from home

6   positions, I just don't know what they entailed because

7   I didn't do any of them.

8       Q.   Well, is it possible, similar to not

9   recalling having this conversation with Ms. McNeill

10  about a position with Head Kandy, far before this

11  reported posting occurred for a -- a babysitter

12  position -- is it possible that you also don't recall

13  some work that you performed from home --

14          MS. SADRO:  Form.

15  BY MR. CONVERSE:

16      Q.   -- for the social media department at Head

17  Kandy?

18          MS. SADRO:  Object to form.

19          THE WITNESS:  I mean, it's definitely

20  possible, but I don't remember working for Head Kandy

21  before that.  I mean, if there's evidence to prove that

22  I worked for Head Kandy before that, then great.

23  That's fine.  That's --

24  BY MR. CONVERSE:

25      Q.   And I'm not --

**KANDY LLC vs KAYLA MCNEILL**
**Nicole Cook on 05/09/2024**

Page 122

```
 1      A.   If you can show me that to refresh my

 2   memory.

 3      Q.   No.  Sorry.  I -- I -- I didn't mean to cut

 4   you off.

 5      A.   It's okay.

 6      Q.   I'm not suggesting that you did work for

 7   Head Kandy prior to that -- that new hire form.  I --

 8   I'm just asking about the -- the services performed

 9   because we're -- and again, I understand the reason

10   why.  So this is not a criticism, but we have seen a --

11   a lapse in memory with regard to the calendars and what

12   you were expecting with regard to clocking in when you

13   received the calendars.  And you also testified that

14   you didn't speak at all to Ms. McNeill about working

15   for Head Kandy until you -- until that January 10th

16   text.  And -- and we see that you actually reached out

17   in September.

18          And so I'm just -- so the question posed is,

19   is it possible that you did perform some services for

20   Head Kandy other than the babysitting services that you

21   just don't recall at this time?

22          MS. SADRO:  Mr. Converse, I -- there's a

23   couple of times that I've -- I've given you some --

24   I've given you some leniency here.  There's a couple of

25   times where you are testifying on the record prior to
```

**KANDY LLC vs KAYLA MCNEILL**
**Nicole Cook on 05/09/2024**

1  asking a question, and specifically in that testimony,

2  making reference to broad, sweeping memory loss as --

3  as it applies to every topic that this witness has

4  discussed.  And I'm going to ask that you not do that

5  outside the form of a question.  And please keep in

6  mind to remain respectful with the witness as -- as it

7  goes towards her memory.

8          MR. CONVERSE:  I -- I -- I think I, several

9  times, mentioned how sensitive this is and how deeply

10  empathetic I am for her situation, and that I'm not

11  being accusatory.  If there's a specific reference,

12  again, talking about, you know, not making a correct

13  record.  If -- if you have a specific reference of me

14  not being respectful to her, please tell me because I

15  shouldn't have done that.  I've gone out of my way to

16  do the opposite.  So it sounds like you're actually

17  making an incorrect record here.  So do you -- do you

18  have any instance where I was, in any way, not being

19  respectful to the witness about her memory?

20          MS. SADRO:  When you characterize all of the

21  testimony that she's given as having difficulty with

22  her memory, I don't believe that that is respectful of

23  the testimony in her appearance here today.  I'm not

24  suggesting you've been rude or raised your voice or

25  your tone, but I do think it is disrespect.  And that's

**KANDY LLC vs KAYLA MCNEILL**
Nicole Cook on 05/09/2024

Page 124

```
 1   all I've got to say about it.  I don't mean to turn it
 2   into a big old argument.  I -- I -- I let it go for a
 3   little bit, said my piece, and certainly don't mean to
 4   -- to keep rehashing it.
 5              MR. CONVERSE:  Right.  And I didn't subpoena
 6   a person with Stage 2 brain cancer to be here.  I'm
 7   just crossing her on the questions.  And so I -- I
 8   really do feel sorry for her that she has to go through
 9   this.  I don't think she should have to.  I was being
10   as respectful as I could.
11              So the fact that she has memory loss is
12   critical to this case, critical to testimony.  It goes
13   to the credibility of the witness and her testimony.
14   And so I have to ask her questions about it.  And I'm -
15   - when I refer to aspects of her testimony, I'm
16   perfectly allowed to do that because I'm trying to
17   remind her of what I'm asking about.  And so I -- I
18   will continue to reference things she testified to
19   because that's the basis for crossing her on it.
20              MS. SADRO:  I've said my piece, Mr.
21   Converse.
22   BY MR. CONVERSE:
23      Q.   So I -- I'm sorry for that little aside, Ms.
24   Cook, but did you have an opportunity to answer that?
25   I don't -- I don't remember if you provided an answer
```

Page 125

1  to the last question.

2      A.   Lucky for you, I don't remember either.  So

3  I -- can ask again.

4      Q.   **The -- the question was, is it possible that**

5  **you don't recall performing some services for Head**

6  **Kandy other than the -- the babysitting services that**

7  **you've referenced?**

8           MS. SADRO:  Object to form.

9           THE WITNESS:  It's always possible because

10 everyone forgets everything.  However, I would remember

11 some sort of job duty for Head Kandy that entailed

12 anything other than babysitting, and I did not provide

13 that.  I didn't ship things.  I didn't pack things.  I

14 didn't pull orders.  I didn't answer e-mails.  I didn't

15 answer the phones.  I didn't have access to social

16 media.  I didn't -- what else?  I didn't take any

17 packages to the post offices.  I didn't pick any

18 packages up from post offices.  I didn't put any

19 products together.

20           I didn't -- I did not get paid for Head --

21 from Head Kandy to provide a service for Head Kandy.  I

22 provided a service for Kayla McNeill.  That's what I

23 did.  So if I did, and you have something to refresh my

24 memory, I'll happily -- but all of my messages show

25 what I did for Head Kandy was specifically for Kayla,

**KANDY LLC vs KAYLA MCNEILL**
**Nicole Cook on 05/09/2024**

Page 126

1  which was watching Hayzlee and had nothing to do with

2  products manufactured by Head Kandy.

3  BY MR. CONVERSE:

4      Q.   All right.  I'd like to ask you now about a

5  reference you've made several times about drama.  How

6  are you aware of this drama within Head Kandy that --

7  that you've referred to?

8      A.   Well, Kayla has referenced it in my text

9  messages, in that exhibit that you have up there.  And

10  then my sisters have told me stories about things that

11  go on or went on in the warehouse, outside of the

12  warehouse, messages, and it's just what girls do.  They

13  gossip.

14      Q.   Did -- yeah.  Did you observe any of the --

15  any activities that you would consider drama?

16      A.   I'm sure I've witnessed something, but it's

17  not important enough for me to remember.  So I will say

18  no.  I have not witnessed anything that is memorable.

19      Q.   And I believe your testimony concerning your

20  departure from Head Kandy was that you stepped away.

21  What did you mean by that?

22      A.   Well, I feel like it kind of just

23  dissipated.  But I messaged her because she was talking

24  about my kid.  And she actually was like, I'm just

25  going to keep Hayzlee home with me.  So it was like a

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 127

```
 1   mutual agreement.  Like, that's fine.  I'm okay with

 2   that.

 3        Q.   Did you ever take any sick days while you

 4   were working for Head Kandy?

 5        A.   Sick days as in, like, did I get paid for a

 6   sick day, or did I tell Kayla I was sick?  Because I'm

 7   not sure how to answer that.

 8        Q.   Sure.  Yeah.  Did you -- were you ever paid

 9   for days that you were sick and unable to work?

10        A.   No.  I was just paid for the days that I did

11   have Hayzlee or that I didn't have Hayzlee because

12   Kayla had Hayzlee.

13        Q.   And is the only documentation that you have,

14   concerning the days that you did not have Hayzlee, the

15   TimeTree calendar that you provided as Exhibit 5?

16        A.   Yes.  That's all I have.

17        Q.   Do you know what Ms. McNeill did while you

18   were watching Hayzlee?

19        A.   I have no idea.

20        Q.   So I believe in your testimony earlier, you

21   talked about your son.  And I think you -- your

22   testimony was that you confronted Ms. McNeill about

23   your son.

24             Did I hear you correctly?

25        A.   Yeah.
```

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

1    Q.   Why did you confront Ms. McNeill?

2    A.   Because she was talking about my kid.

3    Q.   And --

4    A.   To other people, not to me.

5    Q.   Was that a -- a negative interaction that

6    you had with Ms. McNeill?

7    A.   That was the last interaction.  Yes, it was

8    negative.  It's at the bottom of that exhibit you have

9    pulled up there.  It's the very last couple paragraphs.

10   Q.   So I've scrolled down to the last Page 50 of

11   this Exhibit 2.  Is it just the ones on Page 50, or as

12   I'm scrolling up to 49, is it -- is -- is any of it

13   discussed here on -- on Page 50?

14   A.   It's maybe one more up.  Yeah.  Right there.

15   Q.   Okay.  So it looks like this started on

16   March 4th, 2021?

17   A.   Uh-huh.  Yep.

18   Q.   That's the -- is that the day you confronted

19   Ms. McNeill?

20   A.   Yes.

21   Q.   And when you say confront her, is it just

22   through these text messages that are in this Exhibit 2?

23   A.   Yeah.  So prior to this conversation, there

24   was a conversation that happened in the warehouse while

25   I was there while I was dropping off Hayzlee.  And it

**KANDY LLC vs KAYLA MCNEILL**
Nicole Cook on 05/09/2024

Page 129

1   transpired into this because after I left there, she

2   took it upon herself to just continue to talk about it

3   when I wasn't around, which my kids' parents weren't

4   there.  So there's no reason she needed to be talking

5   about it.  So I brought it up again.

6        **Q.   When you say there was a conversation in the**

7   **warehouse, was that conversation between you and Ms.**

8   **McNeill?**

9        A.   Yeah.  Kayla, my sister Keli-Lyn, my oldest

10  son, Kaiden, me.  I had my youngest son, Huxlee.  My

11  other sister Sydney was in the room just outside the

12  door.  The door was open.  I think Alisa Lamm was

13  there, and I think Kaylin was there.  Yeah.  They were

14  all there.

15       **Q.   And do you recall what the date was that**

16  **that conversation occurred?**

17       A.   It had to have been just within a couple of

18  days, a few days of this last message on March 4th, so

19  end of February, beginning of March.

20       **Q.   And I think that you said that that**

21  **conversation was also about Ms. McNeill talking about**

22  **your son; is that correct?**

23       A.   Yes.

24       **Q.   Okay.  How did it make you feel when you**

25  **learned that Ms. McNeill was talking about your son?**

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

1        A.   I was pissed.

2        Q.   Why were you pissed?

3        A.   Because you just don't do that.  You don't

4    talk about people's kids behind other people's backs.

5        Q.   Do you recall anything specific that she was

6    saying about your son?

7        A.   I don't remember anything specific.  This

8    was four years ago, so I -- I don't remember.  I

9    remember I was mad because she continued to talk about

10   it away from me instead of with me and joke about it,

11   make jokes, and think it was funny.  And so I don't

12   know exactly what it entailed, but she was talking

13   about it with my sisters.  And obviously, my sisters

14   are my kids' aunts.  So they told me that she was still

15   talking about it.  And that's when I decided to handle

16   it.

17       Q.   So we've discussed a -- a conversation that

18   occurred at Head Kandy's offices and then this text

19   message exchange on March 4th.  Did you guys have any

20   other communications after those two about your son?

21       A.   No.  I have not spoke to her since the end

22   of this thread.

23       Q.   Is the reason why you haven't spoken to her,

24   this dispute concerning your son?

25       A.   I mean, it's part of it.  It's just -- it's

**KANDY LLC vs KAYLA MCNEILL**
**Nicole Cook on 05/09/2024**

Page 131

1   -- there's -- there's a whole big, wide puzzle around

2   it.  So there was a -- this was just the last piece to

3   that puzzle where I have chosen to distance myself from

4   her, to remove the drama out of my own life because

5   that comes with Kayla.  So yes.  I have chosen to not

6   speak to her since this.

7        **Q.   Okay.  I'd like to understand better the --**

8   **the puzzle that -- that you're referring to.  So what**

9   **are the other pieces in this puzzle that -- that you're**

10  **referring to?**

11       A.   I mean, are they important?  Because they

12  don't have anything to do with Head Kandy.

13       **Q.   Well, let me ask you --**

14       A.   I'm just trying to be respectful of her and

15  my partner's relationship as friends because they're

16  still friends.  And that's, very much so, okay with me.

17  I want to be respectful in that aspect of the two of

18  them.  So if I don't have to bring out my problems

19  because they're my problems -- and essentially, her and

20  I are fine.  I just choose to keep my distance.

21            I would just rather not say how I feel, to

22  hinder their relationship in any sort of way, if it's

23  not relevant to Head Kandy because it's my own personal

24  opinion.  It's my own personal experience.  And I'm not

25  being rude, but it doesn't have anything to do with

Page 132

1  Head Kandy because it was before Head Kandy's time,

2  before I had anything to do with Head Kandy.  I just

3  would prefer not to say anything if I don't have to.

4      Q.   Right.  And I tell you what.  I'll -- I want

5  to be respectful of that, so I -- I'm not going to

6  inquire about anything that isn't relevant.  And let --

7  I'm just trying to understand your relationship with

8  Ms. McNeill and your -- how it got to the state it --

9  it's currently in.  So can you tell me -- you said this

10  was just one piece of it, the discussion about your

11  son.

12          Is there anything within that puzzle that

13  has to do with your departure from Head Kandy?

14      A.   No.

15      Q.   What about your current relationship with

16  Ms. McNeill?  As non-existent as it may be, does

17  anything within that puzzle have to do with your

18  relationship with Ms. McNeill?

19      A.   Yeah.  I would say all of it has to do with

20  why I choose to keep my distance.

21      Q.   Okay.  And -- and that's what I'm trying to

22  understand is -- is the current state of your

23  relationship and why.  So unfortunately, I just -- I --

24  I need to ask more questions on your relationship with

25  Ms. McNeill.

**KANDY LLC vs KAYLA MCNEILL**
Nicole Cook on 05/09/2024

Page 133

```
 1           So with regard to, as you put it, keeping
 2   your distance, does that have to do with your feelings
 3   towards Ms. McNeill?
 4      A.   Yeah.
 5      Q.   Okay.  And -- and what are your feelings
 6   towards Ms. McNeill?
 7      A.   I wouldn't say that I have, like, hard
 8   feelings for her, that I think she's terrible and,
 9   like, all of that.  I would just say that I think maybe
10   she's maybe a bit selfish, which is fine.  To each
11   their own.  I don't think she's a terrible person.  I
12   don't think she is -- you know, I also don't think
13   she's God's greatest gift.  So I am not the kind of
14   person that just because you, like, think you're rich
15   and famous, I'm going to treat you rich and famous.
16           I think what she's done is great.  I give
17   her mad props for her work ethic.  I just choose to
18   stay away because the drama follows her everywhere she
19   goes.  Everywhere.  I don't -- I don't -- I mean, it
20   could be as minuscule as the grass is brown.  I don't
21   fault them.  But drama just follows her everywhere.  So
22   I choose to try to stay away from that, which includes
23   not being friends with her, but also other people.
24           There -- she is not the only person I'm not
25   friends with in this town because they're full of
```

**KANDY LLC vs KAYLA MCNEILL**
Nicole Cook on 05/09/2024

Page 134

1   drama.  There are a lot of them.  So I will say, I do

2   think she's really great.  I think mad props to her.  I

3   just choose to keep my distance because there just have

4   been instances where I've seen a not-so-perfect side,

5   and that's okay.

6        Q.   Other than the dispute over your son, are

7   there any other particular disputes that you had with

8   Ms. McNeill?

9        A.   Oh, I'm sure.  I just can't name them off

10   the top of my head.  If we go back through the

11   messages, they're in there.  Just -- just dumb stuff.

12   You know, petty, childish things that are completely

13   irrelevant at this point in life because they happened

14   so long ago.  It just is a -- a recurring thing for me,

15   so I choose to step away from it.

16        Q.   And you had mentioned other people and that

17   you no longer have a relationship with concerning Ms.

18   McNeill.  Have you had any disputes or fights with

19   anyone else about Ms. McNeill?

20        A.   No.  I mean, Chris, my significant other,

21   but no.  There's no one else that -- I don't mean this

22   in a terrible -- a negative way, but she's not relevant

23   in my life for me to, like, want to fight about her.

24   Do you know what I mean?  Because I've just chosen to

25   keep my distance.  I don't choose to defend anybody if

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 135

1    they're not in my life, and I don't choose to not

2    defend anybody.  I just choose to stay out of it.

3        Q.  And the dispute with your husband, is it --

4    well, strike that.

5            You had testified that he's still friends

6    with either Ms. McNeill or Ms. McNeill's family.  Is

7    your dispute with Chris concerning just the friendship?

8        A.  No.  It's concerning the lawsuit now that

9    I'm involved.  He's mad I'm involved, which is fine.  I

10   -- and I understand.  I get it.  However, it is not

11   really my choice to be here.

12       Q.  Right.  And again, I'm sympathetic to that.

13   I wish you didn't have to be.  Are those the only two

14   dispute topics between you and -- and -- and Chris --

15       A.  Yeah.

16       Q.  -- concerning Ms. McNeill?

17       A.  Yeah.  I mean, I'm sure there are more, but

18   they're not important.

19       Q.  Nothing you recall right now?

20       A.  No.

21       Q.  Okay.  And -- and just one more question

22   about the dispute because I don't remember if I asked

23   about it with -- concerning your son.  Do you recall

24   any of the things Ms. McNeill said about your son?

25       A.  I don't remember anything that she was

**KANDY LLC vs KAYLA MCNEILL**
**Nicole Cook on 05/09/2024**

Page 136

1  saying.  It was something that happened on the school

2  bus with other kids.  He's 10.  He's a boy.  I'm sure

3  he said something inappropriate and something -- I

4  don't know.  Somebody couldn't believe that he said it.

5  And I just was like, okay, well, he's 10, so it's not a

6  big deal.  And she continued to make a joke about it

7  when I was in the warehouse, which was fine.  Like,

8  whatever, he's 10.  I don't care that he said it.  And

9  then the fact that she was talking about it after I was

10  gone, was -- I -- I don't remember exactly what it was,

11  but she brought it up again.

12          MR. CONVERSE:  Okay.  I think this is a good

13  stopping break for five minutes, if somebody needs five

14  minutes.  Does anybody need a few minutes?  Okay.

15          THE WITNESS:  I'm okay.

16          MS. SADRO:  I'm okay with a few or five,

17  whatever works for everybody else.

18          MR. CONVERSE:  You're okay with a few?

19          MS. SADRO:  Sure.

20          THE WITNESS:  Sure.  Yeah.

21          MS. BURGESS:  I could -- I could use a few.

22  Yes.

23          MR. CONVERSE:  Yeah, yeah.  Get up and

24  stretch the legs.  All right.  Yeah.  Let's do five

25  minutes, then.

**KANDY LLC vs KAYLA MCNEILL**
**Nicole Cook on 05/09/2024**

Page 137

```
 1           MS. SADRO:  Five minutes.  Okay.

 2           MR. CONVERSE:  Okay.

 3           THE VIDEOGRAPHER:  Time is 2:48 Eastern, and

 4   we are off the record.

 5           (OFF THE RECORD)

 6           THE VIDEOGRAPHER:  Time is 2:59 p.m.

 7   Eastern, and we are back on the record.

 8   BY MR. CONVERSE:

 9      Q.   All right.  Ms. Cook, we're back on the

10   record.  So I took a little bit longer than five

11   minutes because I was -- wanted to review my notes, so

12   -- because I want to get you out of here as quick as

13   possible.  And I --

14      A.   Sure.

15      Q.   I think I only have two more topics that we

16   haven't talked about to go over with you.  So I'll try

17   to move through it as -- as quick as possible so I can

18   get done with my questions.

19      A.   Okay.

20      Q.   The first is your declaration, which has

21   been marked Exhibit 1.  So I'm going to display that on

22   the screen and then ask you some questions about it.

23   All right.

24           Do you see a document on your screen?

25      A.   Yes.
```

**KANDY LLC vs KAYLA MCNEILL**
Nicole Cook on 05/09/2024

Page 138

1      Q.   All right.  And is that the declaration that

2  you were asked about previously?

3      A.   Yes.

4      Q.   Did you talk to Head Kandy's counsel before

5  you received this declaration?

6      A.   I mean, she called me and told me that she

7  was sending it over.  I needed to review it and sign

8  it, if it was right.

9      Q.   So in that conversation, did you talk about

10  the contents of the declaration?

11      A.   I don't -- I don't really remember.  I don't

12  think so.  I mean, she told me to review it.  If it was

13  right, sign it, send it back.  If it wasn't right, not

14  sign it, she would fix it.  I mean, that -- it wasn't

15  like a detailed conversation.

16      Q.   So did you have prior conversations?

17      A.   Just they called me.  I sent them my stuff.

18  They called me and sent me -- they were sending me

19  this, sent me this, and that's it.

20      Q.   Okay.  I just want to go through those

21  conversations, though.  It might make it easier.

22           So do you recall when you were first

23  contacted by Counsel for Head Kandy?

24      A.   I'd have to look back.  I don't remember.

25      Q.   What would you look at to determine when you

**KANDY LLC vs KAYLA MCNEILL**
Nicole Cook on 05/09/2024

1  were first contacted?

2      A.   Probably, like, my phone records, or I'd go

3  back to my e-mail records and see when I found my first

4  -- had my first e-mail from them.  And then trace my

5  phone records back from there.

6      Q.   Do you recall if the first contact was by

7  phone or by e-mail?

8      A.   I think it was by e-mail.  I mean, not e-

9  mail. So sorry.  Phone.  I -- it was by phone.

10     Q.   And do you recall when that was?

11     A.   Maybe like August or September of last year.

12     Q.   But that would be in your call log, within

13  your cell phone?

14     A.   Yeah.  Because I think they left me a

15  message, and so -- the -- like, I would be able to find

16  it with the phone number.

17     Q.   Do you recall the name of the individual

18  that left you the message?

19     A.   No.  I remember somebody I talked to, I

20  think with this, was Kathryn.  Kathryn?  I'm not sure.

21  I'd have to look back, honestly.

22     Q.   Okay.  And I'm going to go through all of

23  them, so I'll -- I'll ask you some more questions about

24  the contact by Kathryn.

25         So do you recall when you were next

**KANDY LLC vs KAYLA MCNEILL**
Nicole Cook on 05/09/2024

1   contacted after that phone message?

2      A.   It was within a couple of weeks of the first

3   phone message.

4      Q.   Was that by phone as well?

5      A.   Yeah.

6      Q.   Had you received an e-mail from Plaintiff's

7   counsel in the interim?

8      A.   I don't think so.  I don't think I received

9   an e-mail until I needed to do this.

10     Q.   By this, you mean --

11     A.   Like, the declaration.  Sorry.

12     Q.   Yes.  Thank you.  That's what I was

13  following up on.  You read my mind.

14     A.   Sorry.

15     Q.   Do you recall what you spoke about during

16  that second phone call?

17     A.   Just about what I did, what my job entailed,

18  that I had text messages, that -- I think I even

19  provided my W-2 from Head Kandy.  Just all that, just

20  getting the gist of my side of things.

21     Q.   Do you recall how long that conversation

22  lasted?

23     A.   I have no idea.  Maybe half an hour.

24     Q.   Would that be also reflected in your phone

25  records?

**KANDY LLC vs KAYLA MCNEILL**
Nicole Cook on 05/09/2024

Page 141

1      A.   Should be, the time that I was on the phone.

2   Yeah.

3      **Q.   And do you recall when you were next**

4   **contacted by Plaintiff's counsel?**

5      A.   I signed this declaration, sent it, and I

6   did not hear from anybody until I was subpoenaed to be

7   here today.

8      **Q.   Was that the second subpoena that you had**

9   **received from Head Kandy?**

10     A.   No.  That was the first.

11     **Q.   So all the conversations that you've**

12  **referenced, and the document production that you**

13  **referenced, occurred prior to receiving the subpoena?**

14     A.   Yes.

15     **Q.   Did you produce additional records after**

16  **receiving that subpoena?**

17     A.   Yeah.  So my TimeTree calendar I sent and

18  then those messages just stating the $14 an hour and

19  the employee pricing.  And I resent, individually, all

20  of those calendars.

21     **Q.   Do you recall who the individual was that**

22  **you spoke with during that second phone call?**

23     A.   Like, way back before I signed the

24  declaration?

25     **Q.   Correct.**

**KANDY LLC vs KAYLA MCNEILL**
Nicole Cook on 05/09/2024

Page 142

1      A.   I don't remember, but I would assume it was

2   probably Kathryn.  I think it was Kathryn.  I'd have to

3   look back at the e-mail, but I'm pretty sure it was.  I

4   just talked to one person and then Carson.

5      Q.   And you had referenced talking with Kathryn

6   with regard to the declaration, I believe.  Were you

7   referring to that second phone call?

8      A.   Of it being with Kathryn?

9      Q.   Yes.

10     A.   Yeah.  I'm pretty sure she's the only person

11  I've spoken to in that office.

12     Q.   Did you have a -- so by second, I just mean

13  the second time that you were contacted.  I'm just

14  trying to go through the timeline.

15          So there was a first phone call and

16  voicemail in August or September of 2023; is that

17  correct?

18     A.   Yeah.

19     Q.   Okay.  And then a second phone call with

20  Kathryn; is that correct?

21     A.   Yeah.  But I think was --

22     Q.   Do you recall --

23     A.   Sorry, go ahead.

24     Q.   No.  Please, finish the -- your answer.

25     A.   I just was going to say I think that second

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 143

1   phone call was like -- so the first one I spoke to her,

2   sent her all I had.  Second phone call was like, this

3   is the declaration.  Read it, sign it if it's right.

4   If it's not right, tell me, and I'll fix it.  And then

5   that was the last time I spoke to anybody.

6       Q.  Did you make any corrections to the

7   declaration you received?

8       A.  No.

9       Q.  So the declaration here that you signed,

10  it's Deposition Exhibit 1, it's up on the screen, is

11  dated October 4th, 2023.

12          Do you see that?

13      A.  Yes.

14      Q.  Do you recall when you received the draft of

15  this declaration?

16      A.  I'd have to look back in my e-mail, but, I

17  mean, it was within a few days of me signing it.

18      Q.  And since you testified you didn't make any

19  changes, is this declaration that's executed exactly

20  the same as the draft that you received, other than,

21  obviously, your -- your signature?

22      A.  Yeah.  As far as I know, it's the same.  I

23  mean, I didn't -- I haven't compared the two.  But I

24  don't -- there was nothing on there that I needed to

25  change.

**KANDY LLC vs KAYLA MCNEILL**
**Nicole Cook on 05/09/2024**

Page 144

1      Q.   So I'm scrolling back up.  Were all of the

2   statements contained in here discussed in one of those

3   phone calls with Kathryn?

4      A.   Yeah.  You mean, like, did we review this

5   declaration together?  Is that what you're asking?

6      Q.   No.  I -- I'm just asking if you spoke with

7   Kathryn about each of the statements that are in this

8   declaration before you received the draft?

9      A.   Yeah.  So like, the first phone call when I

10   filled her in on all of this, and then she typed this

11   up and sent it to me to sign.  So we -- we spoke about

12   it in the first phone call.

13      Q.   And when you say first phone call, was that

14   the second time they had reached out to you?

15      A.   It had to have been at least the second time

16   because they had left me a voicemail because I don't

17   answer phone numbers that aren't in my phone.  And they

18   weren't in my phone.  So they left me a voicemail.  And

19   I don't know if I called them back, or they called me

20   back.  I don't -- I don't remember.  I'd have to,

21   obviously, look back and see, but -- yeah.  So that

22   would have been the second time that they tried to

23   contact me.

24      Q.   So in this first numbered paragraph within

25   your declaration, it references that your position was

**KANDY LLC vs KAYLA MCNEILL**
**Nicole Cook on 05/09/2024**

Page 145

 1    listed as Facebook on your new hire data sheet.

 2              Do you see that?

 3        A.   Yes.  Yeah.

 4        Q.   I thought you testified previously that you

 5    didn't have your new hire -- you didn't see the new

 6    hire data sheet when it was filled out by the other

 7    person.

 8              So when did you first receive the -- your

 9    new hire data sheet?

10        A.   So I didn't -- I mean, I -- obviously, I

11    filled that out because that's my handwriting.  But I

12    haven't seen that since they sent it to me in this.  So

13    somebody was asking the difference in the two

14    handwritings.  So my handwriting is in the top, and

15    whoever put that I was in Facebook was at the bottom,

16    and it's clearly different.

17              They -- Head Kandy's attorney's office sent

18    it to me first, and said, is this your handwriting?

19    Did you fill this out?  Like, did you do this?  And I

20    was like, the top is my handwriting.  The bottom is not

21    my handwriting.  So I didn't testify that I have never

22    seen that before because I have seen that before.  They

23    sent it to me, and I did not fill out the middle

24    section of that piece of paper.

25        Q.   And when you say, they sent it to me, you're

**KANDY LLC vs KAYLA MCNEILL**
Nicole Cook on 05/09/2024

Page 146

```
 1    -- you're referring to Plaintiff's counsel?

 2         A.    Yes.

 3         Q.    And did they send it to you before they sent

 4    you the draft declaration?

 5         A.    I think so.  I'd have to double check, but I

 6    think so, just to make sure, like, because obviously

 7    the handwriting is different.  They asked if I filled

 8    that out, and I was like, the top, yes.  The bottom,

 9    no.  I did not do that.

10         Q.    I'm scrolling down to the second page of the

11    declaration, and I'd like to direct your attention to

12    Paragraph 3, again, in this Exhibit 1.  You make

13    reference to Alisa Lamm and Alyssa Lynchard as

14    providing childcare for Ms. McNeill while being paid by

15    Head Kandy.

16              Do you see that?

17         A.    Yes.

18         Q.    How do you know that to be a true fact?

19         A.    I wouldn't say that I know it to be a true

20    fact.  Again, I just have gotten all of my information

21    from the people that work at Head Kandy.  So I did, at

22    one day, just drop off Hayzlee with Alisa while Alisa

23    was working at Head Kandy, but she picked her up in

24    town.  So she was still on the clock for Head Kandy.

25    That's what that one is referencing.
```

**KANDY LLC vs KAYLA MCNEILL**
**Nicole Cook on 05/09/2024**

```
 1                Alyssa Lynchard is just referencing the

 2   outside-of-the-warehouse stuff that she was doing for

 3   Kayla.  So the babysitting before I was babysitting.

 4   The housekeeping, essentially, like a personal-

 5   assistant-at-home kind of stuff.  That's what Alyssa

 6   Lynchard is referencing.

 7        Q.   Do you have any knowledge about their

 8   employment arrangements with Head Kandy?

 9        A.   I don't know anything for sure, no.  But I

10   know -- okay.  I don't know for sure.  I'll just say

11   that.  I don't know for sure.

12        Q.   Okay.  And -- and I don't know if -- if it

13   was brought to your attention, but right above your

14   signature line, it says, "Under penalties of perjury, I

15   declare that I have read the foregoing and that the

16   facts stated are true to the best of my knowledge."

17                So would -- looking back on it now, based

18   upon what we've talked about, would you still say that

19   your statements concerning Ms. Lamm and Ms. Lynchard

20   are, in fact, true?

21                MS. SADRO:  Object to form.

22                THE WITNESS:  I would say they're true to

23   the best of my knowledge.  From what I knew, yes,

24   that's true.  So I didn't know anything different.

25   What I knew was that they were also babysitting for
```

**KANDY LLC vs KAYLA MCNEILL**
Nicole Cook on 05/09/2024

Page 148

```
 1   Kayla before I was babysitting.  So what I knew was

 2   what I thought was true.  So yes.  I would still stand

 3   by what I said.

 4   BY MR. CONVERSE:

 5       Q.   I thought you testified that you have no

 6   knowledge about their employment with Head Kandy?

 7       A.   I don't know for sure.  Alisa was employed

 8   by Head Kandy, worked in the warehouse with my sisters.

 9   And I dropped Hayzlee off with her one day at the gas

10   station while she was still working at the warehouse.

11   So that's why Alisa is mentioned in there is because

12   she picked up Hayzlee during the day when she was

13   supposed to be working at Head Kandy.  That's what that

14   part is that they've referenced in there, right?  That

15   she picked up Hayzlee in the afternoon during Head

16   Kandy working hours.

17           The stuff about Alyssa is, like, I just was

18   told that.  So as far as, like, knowing for sure, I

19   don't know for sure.  I don't know anything for sure,

20   but my understanding was that she was doing the

21   housekeeping.  She was doing the babysitting.  She was

22   doing, like, the personal-assistant stuff for Kayla at

23   Kayla's house.

24           And I could even go as far as saying, like,

25   maybe Kayla even mentioned it one time, like Alyssa was
```

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 149

1  her house -- Alyssa Lynchard was her housekeeper.  As

2  far as details go, I don't know.  But I will stand by

3  what I have said, which is what I was understanding is

4  what is in that.

5       Q.   So I've scrolled down now to the third page

6  of this Exhibit 1.  And the enumerated Paragraph 4

7  speaks about you being hired after responding to a job

8  posting for childcare position by Ms. McNeill on

9  Facebook.

10            Do you see that?

11      A.   Yes.

12      Q.   Okay.  Is that referring to this posting

13  that you testified about on the -- trying to find the

14  name.  Sorry.  Ark Valley Mama Facebook Group, which

15  may have subsequently been changed?

16      A.   Yeah.

17      Q.   So I've now scrolled down to the fourth page

18  of this Exhibit 1.  So Paragraph number 6.  It states

19  your gross earnings from Head Kandy.

20            How did you verify that number?

21      A.   My W-2.

22      Q.   Okay.  And so that's the number identified

23  on your W-2 for 2021?

24      A.   Yeah.

25      Q.   Was there any other income you received from

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 150

1  Head Kandy other than that amount that's identified

2  here?

3      A.   No.

4      Q.   All right.  Going back to the communications

5  with Plaintiff's counsel, I believe you stated that you

6  also spoke to Plaintiff's counsel in reference to your

7  deposition today; is that correct?

8      A.   Yeah.

9      Q.   How many times did you speak with

10 Plaintiff's counsel about your deposition?

11     A.   Just once on the phone.

12     Q.   Do you recall when that was?

13     A.   Two days ago.

14     Q.   And do you recall how long you spoke?

15     A.   At least an hour and a half.

16     Q.   Wow.  So what did you guys talk about?

17     A.   She just explained, like, what a deposition

18 was, what it would entail, and all of that.  Like, what

19 this whole process meant and why I had to be here.

20 Essentially that.

21     Q.   Aside from the formalities of the

22 deposition, did you speak about any particular topics?

23     A.   Yeah.  That's why I sent in the pictures of

24 the calendars, individually, and the minimum wage -- or

25 the hourly and the employee pricing.

**KANDY LLC vs KAYLA MCNEILL**
Nicole Cook on 05/09/2024

Page 151

1      Q.   Okay.  So I have as topics, the calendars,

2   employee pricing.  And what was that third one?  I'm

3   sorry.

4      A.   The $14 an hour.

5      Q.   All right.  Do you recall any other topics

6   that were discussed?

7      A.   No.

8      Q.   All right.  With regard to the calendars,

9   what did you talk about?

10      A.   I don't know that they had -- that Carson

11   had a copy of every one of these individual calendars,

12   so I just resent them all.  Oh, no.  What did I send?

13   Did I send the white -- I sent the white calendars and

14   my TimeTree calendars.  That's what I sent because I

15   wasn't sure if I had kept track of when I did have her

16   or didn't have her.  But my TimeTree calendar was also

17   on there.

18      Q.   So you provided both the calendars from Ms.

19   McNeill and from the TimeTree app?

20      A.   Yes.

21      Q.   Were you asked any specific questions about

22   the calendars?

23      A.   No.  Just, like, what they meant.  Like, why

24   there was a yellow line in them.  Why I had them.

25      Q.   Anything that you didn't testify about

**KANDY LLC vs KAYLA MCNEILL**
**Nicole Cook on 05/09/2024**

1   today?

2        A.    No.

3        Q.    All right.  The second topic, I believe, was

4   the employee discount; is that correct?

5        A.    Uh-huh.  Yeah.

6        Q.    What did you talk about concerning the

7   employee discount?

8        A.    That -- she just asked if I got any

9   benefits, right?  Like, health insurance, vision,

10  dental, anything like that, or employee discounts or

11  anything.  And I said, I didn't get any sort of health

12  benefits, but I did get employee discounts.  I didn't

13  know what that discount was.  I just knew, like, if I

14  bought one bottle of this, instead of paying $15

15  online, I paid like 12 or $13, I want to say.  Maybe it

16  was -- something like that.  I don't know.  I'd have to

17  look.  And she asked if I had used a discount code on

18  the website, and I didn't -- I don't -- I don't order

19  off the website when I live 10 minutes from the

20  warehouse.

21       Q.    So how did the employee discount get

22  applied?

23       A.    Whoever would check you out, I guess.  I

24  don't know.  It just was at cost.  From my

25  understanding, it was just cost.  So I don't know if

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 153

1  somebody clicked a button because I didn't -- I didn't,

2  like, check myself out, like, do my own payment.

3  Somebody else would check me out.  So I would buy from

4  someone else, and they would do whatever they did for

5  their employee discount.

6      Q.  Do you know who checked you out?

7      A.  Probably Sid.  Sydney.  Sorry.  Sister

8  Sydney.  She has done it before.  I think maybe Alisa

9  Lamm had done it before.  I wasn't buying products very

10  often.

11      Q.  And you always received the employee

12  discount when you bought those products?

13      A.  When I worked for Head Kandy.  Yeah.

14      Q.  Right.  So -- sorry.  I'll rephrase it.

15  When -- when you were working for Head Kandy and buying

16  products, did you always receive the employee discount?

17      A.  Yeah.

18      Q.  Did you receive any other discounts?

19      A.  I don't think so.

20      Q.  And then, I believe, the third category is

21  your pay rates?

22      A.  Right.

23      Q.  What did you discuss about your pay rates?

24      A.  We were just trying to figure out which days

25  or how many days I had clocked in and clocked out for

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 154

1    watching Hayzlee, whether or not I had her.  So we were

2    just talking about, like, doing the math to figure that

3    out.  But then I realized I had my TimeTree calendar,

4    which says the days that I did and didn't have her.  So

5    we really didn't need to do the math to figure out how

6    many days I had her.

7        Q.   So did you ever come to any type of results

8    when you were doing the calculation?

9        A.   No.  I didn't end up doing it because I

10   found my TimeTree calendar that just has the days

11   labeled.

12       Q.   So you started it, but you abandoned it

13   before you --

14       A.   Yeah.

15       Q.   -- you obtained any information concerning

16   when you worked and when you didn't work?

17       A.   Yeah.

18       Q.   All right.  I think we've only referenced

19   the person you spoke with as Plaintiff's counsel.  Who

20   did you -- do you know the -- the name of the

21   individual you spoke with?

22       A.   I spoke with Carson the other day.

23       Q.   Was there anybody else on the call?

24       A.   No.

25       Q.   Did you -- did you guys discuss any topics

Page 155

1   that were going to be discussed at your deposition?

2      A.   I mean, all of it in its entirety.  She kind

3   of just gave me a rundown of how -- what it looked

4   like, and I'm not quite sure what you're asking.  But

5   yeah.  We talked about how this would go and, right,

6   questions would be asked.  And she would ask me

7   questions, and then you would ask me questions, and --

8   and then she would be able to cross examine me and ask

9   me more questions.

10     Q.   And I'm sorry if my question was -- was

11  confusing.  The -- outside of the process, were you

12  told that any specific topics would be discussed during

13  your deposition?

14     A.   I wouldn't say we discussed anything was

15  going to be discussed specifically.  Just my employment

16  with Head Kandy and my job duties.  That was the only

17  thing that was specific is, like, what I did for Head

18  Kandy, for Kayla.

19     Q.   Did you discuss specific questions that

20  would be asked during your deposition?

21     A.   No.  She did mention that maybe you would

22  say that it's weird that I didn't question the fact

23  that she didn't want me to tell anybody she was letting

24  me be paid for days I wasn't working.  But it's not

25  weird to me because, again, that's just Kayla.  She was

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 156

1  being helpful, so it wasn't weird to me.  And it's not

2  weird to me.  Even if you were to ask me, it's not

3  weird to me because she was being helpful for me

4  because I was being helpful for her.

5      Q.   After you were told it might be weird, did

6  you discuss how you might respond if I did --

7      A.   No.

8      Q.   -- pose that question to you?

9      A.   No.  I mean, she asked me the question.

10 That's literally what I said.  It's -- it's not weird.

11 I can see how it's weird, but it's not weird.

12     Q.   Did you have any additional contacts with

13 Counsel for Plaintiff that we haven't yet gone over?

14     A.   Huh-uh.  No.  I just sent in all of the

15 things that I just told you I sent in.

16     Q.   Other than that last conversation we were

17 just referring to, did you do anything else to prepare

18 for your deposition today?

19     A.   No.

20     Q.   Did you review any documents recently?

21     A.   I just printed out that declaration so that

22 I had a copy of it, but that's it.

23          MR. CONVERSE:  All right.  So those were the

24 two topics I said I was going to ask you about.  I

25 think those are all the questions.  I'm going to take

**KANDY LLC vs KAYLA MCNEILL**
**Nicole Cook on 05/09/2024**

1   two minutes, real fast, just to go over my notes.  And

2   -- and then we can come right back, and I'll let you

3   know if I have anything else real fast.

4            How does that sound?

5            THE WITNESS:  Okay.

6            MR. CONVERSE:  Okay.

7            THE WITNESS:  That's fine.

8            MR. CONVERSE:  Thank you.

9            THE WITNESS:  Sure.

10           MR. CONVERSE:  Or do you need longer,

11   Counsel?  I was just going to take two minutes to look

12   at my notes.  Do you want a little longer to look at

13   yours?

14           MS. SADRO:  No.  As far as that, no.  I'm

15   all right.  I'll stay at the computer.  You just let me

16   know when you're ready.

17           MR. CONVERSE:  Okay.  Thanks.

18           THE VIDEOGRAPHER:  Would you like to go off

19   the record or just stay while you look?

20           MR. CONVERSE:  Let's go off the record,

21   please.

22           THE VIDEOGRAPHER:  Time is 3:31, and we are

23   off the record.

24           (OFF THE RECORD)

25           THE VIDEOGRAPHER:  Time is 3:36 p.m.

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 158

1  Eastern, and we are back on the record.

2  BY MR. CONVERSE:

3      Q.   All right.  Ms. Cook, I just have one

4  question and one follow-up, the -- the latter being the

5  records that we discussed about the e-mail exchanges

6  and the calls.

7          Could you provide those to my office

8  whenever you get an opportunity?

9      A.   Yeah.  All the same stuff that I've already

10 sent the other?

11     Q.   Well, you -- you had said that there were e-

12 mail exchanges with Plaintiff's counsel.  And -- and

13 they already have a copy, so you -- you didn't produce

14 them, so --

15     A.   Oh.

16     Q.   Yeah.

17     A.   Okay.  So like the declaration and the --

18 that sort of stuff?

19     Q.   Exactly.

20     A.   Okay.

21     Q.   Yeah.

22     A.   Okay.

23     Q.   All those e-mails.  And then you said that

24 your -- your call logs would reflect when you spoke

25 with Plaintiff's counsel and for how long.  If you

Page 159

1   could just send those over to me, I appreciate it.  And

2   -- and then I just have one last question,

3   unfortunately.  Again, I apologize.  It's about your

4   health condition.  The -- when -- sorry.  Strike that.

5           Did you disclose your health condition to

6   Plaintiff's counsel prior to signing the declaration?

7       A.   No.

8       Q.   When did you disclose that?

9       A.   The other day when I talked to Carson.

10          MR. CONVERSE:  Okay.  All right.  That's --

11  that's everything that I have here.  Thank you very

12  much.

13          THE WITNESS:  Thank you.

14                          EXAMINATION

15  BY MS. SADRO:

16      Q.   All right.  Ms. Cook, like I told you, I get

17  to ask you a couple more questions.  Fortunately, I

18  only have about two hours left of questions.

19      A.   Okay.

20      Q.   But before I ask you a couple more

21  questions, any e-mails or call logs or anything that

22  you send over to Mr. Converse, would you mind cc'ing me

23  on those e-mails as well?

24      A.   Sure.

25      Q.   All right.  Thank you so much.  I got to ask

Page 160

 1    you because we've talked a lot today about your health

 2    condition and whether or not that affects your memory.

 3              Where is most of the information about your

 4    work with Head Kandy, and your communications with

 5    Kayla, contained?

 6         A.   They're all in my phone.

 7         Q.   Would that be your text messages?

 8         A.   Yeah.  Text messages, the calendar, my

 9    calendar.  Yeah.  I feel like all of it is just

10    contained, for the most part, in those messages.

11         Q.   And those messages haven't been changed or

12    altered in any way?

13         A.   Nope.

14         Q.   And Mr. Converse was asking you a little bit

15    ago about your relationship with Kayla and how you feel

16    about Kayla, and you've had some interactions where you

17    disagree about your son.

18              Ms. Cook, your feelings about Kayla McNeill,

19    whether or not they're positive or negative, have they

20    impacted your testimony here today?

21         A.   No.

22         Q.   And I think, Ms. Cook, what you said a

23    moment ago was -- or a bit ago, was that Ms. McNeill

24    isn't a big enough person in your life to bring up with

25    your partner, Chris.

**KANDY LLC vs KAYLA MCNEILL**
Nicole Cook on 05/09/2024

1           Do I remember that right?

2      A.   Right.  Yeah.

3      Q.   So is she a big enough person in your life

4  that you'd be willing to -- to perjure yourself, to not

5  tell the truth under oath?

6      A.   No.

7      Q.   All right.

8      A.   No.

9      Q.   I want to ask you, too.  I want to go back

10  to Exhibit 1, the declaration, briefly.  So put that up

11  on my screen.

12           And, Ms. Cook, can you see that again?

13      A.   Uh-huh.  Yeah.

14      Q.   All right.  We're back at Paragraph 3, where

15  it's talking about Alisa Lamm and Alyssa Lynchard.  And

16  we were talking a little bit about Alisa Lamm picking

17  up Hayzlee from you.

18           Did you and Ms. McNeill discuss Alisa Lamm

19  coming to pick up Hayzlee from you?

20      A.   Yeah.

21      Q.   Where did you discuss it?

22      A.   It's in one of those messages where she

23  says, Alisa will meet you.

24      Q.   All right.  Ms. Cook, I'm going to put

25  Exhibit 2 back up on the board.  We're at a text

Page 162

1  message from March 4th, 2021, at 2:56 p.m.

2         What does -- what does Ms. McNeill tell you?

3      A.   That she sent Alisa in her car to pick up

4  Hayzlee from me.

5      Q.   Is that how you know Alisa was coming to

6  pick up Hayzlee?

7      A.   Yes.

8      Q.   We were talking a little bit, briefly, about

9  whether or not the time period you were working for

10  Head Kandy, that was during COVID.

11         Ms. Cook, there were a couple times you went

12  over to the warehouse for various reasons; is that

13  right?

14      A.   Yeah.  I mean, various reasons just

15  pertaining to either, like, picking up product or

16  dropping off Hayzlee --

17      Q.   Sure.

18      A.   -- type stuff.  Yeah.

19      Q.   Sure.  When you were there, were other

20  employees there?

21      A.   Yeah.

22      Q.   Were other people in the warehouse working?

23      A.   Yeah.

24      Q.   Warehouse seem operational?

25      A.   Yeah.

**KANDY LLC vs KAYLA MCNEILL**
**Nicole Cook on 05/09/2024**

1      Q.   Okay.  You talked, too, a little bit about

2   how you heard about the lawsuit.  Can -- can you tell

3   us where you heard about the lawsuit?

4      A.   I don't remember exactly where I heard it

5   first.  I want to say it was probably my sisters, and

6   then it -- the motion or whatever it's called was -- I

7   don't want to say sent around because I didn't receive

8   it in a text message.  It was on the internet.  So

9   somebody had, like, posted it on Facebook or something,

10  and that's how I saw it.  Was -- it was just for

11  everybody to see.  Public knowledge.  So I just clicked

12  on it and read it.  And then that's when I knew for

13  sure that it was, like, an actual thing, instead of

14  just gossip or all talk, was when I actually saw the

15  document.

16     Q.   Okay.  Like, up in your Facebook news feed?

17     A.   Yeah.

18     Q.   So it's not something you sought out

19  yourself?

20     A.   No.

21     Q.   Do you -- do you know who posted it?

22     A.   I don't remember.  I don't remember who

23  posted it.  I don't know if it was, like -- I don't

24  know that somebody, like, you know, went online and

25  was, like, maliciously like, oh my God.  Everybody read

**KANDY LLC vs KAYLA MCNEILL**
**Nicole Cook on 05/09/2024**

Page 164

1   this piece of paper.  Or if it just was, like, kind of

2   word of mouth, like, every-so-few people were like, oh

3   my gosh.  Look at this.  Oh my gosh.  Look at this.  So

4   I want to say it was like a link, and you clicked on

5   that link, and it took you to, like, an external

6   website, which was the full motion.  So I'm not sure.

7        Q.   Is that -- is that motion, as you called it,

8   something that you've gone back and read over and over

9   again?

10       A.   No.  I read it once.  And it's so long that

11  I didn't even read the whole thing.

12       Q.   Okay.  Ms. Cook, have you ever seen Ms.

13  McNeill post online, whether it's on a website or on

14  social media, about WHiPi Pineapple?  Or excuse me.

15  WHiPi.Co or White Pineapple?

16       A.   Yeah.  Yeah.

17       Q.   Okay.  Have you seen her post about her time

18  at Head Kandy?

19       A.   Yes.

20       Q.   What have you seen Ms. McNeill post about

21  her time at Head Kandy?

22       A.   There was a lot of sad posts, crying posts,

23  crying videos.  Lots of stuff about how she's going to

24  lose everything.  They're taking everything from her.

25  This isn't her fault.  She didn't do anything wrong.

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 165

```
1   Lots of poor me, pity me, feel bad for me kind of
2   stuff.  Also, stuff like she can't talk about hair care
3   stuff for so long and that sort of thing.  Like, all
4   that.
5       Q.   During that time period, were you seeing
6   posts about WHiPi.Co?
7       A.   Which time period?
8       Q.   During the time period where you saw Ms.
9   McNeill making those posts about Head Kandy you were
10  just telling me about?
11      A.   Yeah.  So right -- right as I found out
12  about this whole thing, she had started a new WHiPi.Co
13  Facebook page, and that's where I was seeing all of the
14  stuff about her feelings going on with the whole Head
15  Kandy thing that had happened.  Because she had been
16  removed from the owner of the Head Kandy page.  So she
17  was only posting on White -- WHiPi.Co page at that
18  point.  So yeah.
19      Q.   And, Ms. Cook, I want to -- sorry.  I'm
20  jumping around a little bit.  I promise I'm trying to
21  get you out of here as quick as I can.
22      A.   You're fine.
23      Q.   One of those text messages we were talking
24  about a little bit ago was when Ms. McNeill was trying
25  to get you salary.  Do you remember that?
```

**KANDY LLC vs KAYLA MCNEILL**
**Nicole Cook on 05/09/2024**

Page 166

```
 1      A.   Uh-huh.  Yeah.

 2      Q.   And do you remember Ms. McNeill telling you

 3   that "they" didn't approve it?

 4      A.   "They," yes.  "They."

 5      Q.   Did you know who "they" was?

 6      A.   No.  I mean, essentially, I just thought it

 7   was like the payroll department, the accounting

 8   department.  I don't know.  I -- one of the two said

 9   no.  And that's fine with me.  I didn't need to be

10   involved in, like, the logistics of why they were

11   saying no to being salary.  Not my business.  None -- I

12   didn't -- I didn't care.

13      Q.   Do you have any idea what information Ms.

14   McNeill would have conveyed to whoever "they" are?

15           MR. CONVERSE:  Objection.  Form.

16           THE WITNESS:  I do not.  I have no idea.

17   BY MS. SADRO:

18      Q.   And -- and, Ms. Cook, I'm going to put back

19   up on screen what's part of the declaration.

20           MS. SADRO:  And I've also entered this, for

21   the -- for the purposes of the record, as a separate

22   Exhibit, Exhibit 3.

23   BY MS. SADRO:

24      Q.   But as I've got it on the screen here, this

25   is a continuation of the declaration, Exhibit 1.
```

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 167

1        A.    Uh-huh.

2        Q.    Ms. Cook, like we've said, this is your new

3   hire sheet that was submitted into the record at Head

4   Kandy, right?

5        A.    Correct.

6        Q.    And on that new hire sheet that Head Kandy

7   had in their possession, what does your job title say?

8        A.    Facebook.

9        Q.    Does it say babysitter?

10       A.    No.

11       Q.    When -- a moment ago, you were talking about

12   the text message exchange between you and Ms. McNeill

13   on September 8th.  And I think it was 2020 or 2022; do

14   you remember?

15       A.    It would've been 2020.

16       Q.    2020.

17       A.    So before this.  Yeah.

18       Q.    Thank you.  And so that would've been a

19   couple months prior to you working at Head Kandy,

20   right?

21       A.    Right.

22       Q.    And in that exchange, you discussed working

23   from home?

24       A.    Right.

25       Q.    Do you remember during that exchange -- I

**KANDY LLC vs KAYLA MCNEILL**
Nicole Cook on 05/09/2024

Page 168

1   mean, you -- you've talked about it, right?  You told

2   us that that was potentially for a social media job,

3   right?

4       A.   Right.

5       Q.   Did you ever end up doing social media work

6   for Head Kandy?

7       A.   No.

8       Q.   Did you ever end up doing any work for Head

9   Kandy?

10      A.   No.

11           MR. CONVERSE:  Objection.  Form.

12   BY MS. SADRO:

13      Q.   Did you ever manage any Head Kandy social

14   media pages?

15      A.   No.

16      Q.   Comments?

17      A.   No.

18      Q.   Head Kandy videos?

19      A.   No.

20      Q.   At any point in time, have you served any

21   other role with Head Kandy than as Ms. McNeill's

22   babysitter?

23           MR. CONVERSE:  Objection.

24           THE WITNESS:  No.

25           MR. CONVERSE:  Form.

**KANDY LLC vs KAYLA MCNEILL**
**Nicole Cook on 05/09/2024**

1          THE WITNESS:  No.

2          MS. SADRO:  All right.  Ms. Cook, that's all

3    I've got for you.  I appreciate you hanging on there

4    with us today.

5          THE WITNESS:  Thank you.

6          MS. SADRO:  That's all right.

7                    EXAMINATION

8    BY MR. CONVERSE:

9     Q.   Ms. Cook, you were -- you were just asked

10    about a link that you followed to view a motion that --

11    that you reviewed.  And I know you -- you testified

12    that you didn't know who posted it; is that correct?

13     A.   Correct.  Yeah.

14     Q.   Do you know whether or not it was Ms.

15    McNeill that posted it?

16     A.   I don't know for sure.  I don't -- I don't

17    know.

18     Q.   Did you also testify that Ms. McNeill wasn't

19    important enough for you to talk with your partner

20    about her?

21     A.   Yeah.  In the sense of, like, this, right?

22    Because we're on opposite ends.  So for us to talk

23    about it would mean we would get into an argument

24    because we're on both -- opposite ends.  So it's not --

25    she's not a big enough key player for me to want to

**KANDY LLC vs KAYLA MCNEILL**
Nicole Cook on 05/09/2024

1  initiate an argument.  So yes.  That's essentially

2  right.

3      Q.  So it's a point of contention?

4      A.  Yeah.

5      Q.  Did you ever have a dispute with your

6  partner about him viewing or being in possession of

7  inappropriate pictures or videos of Ms. McNeill?

8          MS. SADRO:  Objection.  Mr. Converse, that's

9  out of -- objection.  Form.

10         THE WITNESS:  Yes.

11 BY MR. CONVERSE:

12     Q.  So there have been disputes between you and

13 your partner about Ms. McNeill that didn't just involve

14 his continued friendship with her family?

15     A.  What do you mean?

16     Q.  Well, we just spoke about the dispute

17 concerning the inappropriate material.  So that dispute

18 had nothing to do with just his continued friendship

19 with -- with Ms. McNeill's family, correct?

20     A.  Yeah.  Well, I mean, yeah.  I guess so.  It

21 -- it's not a big enough thing for me to want to

22 initiate an argument is what I mean.

23     Q.  So --

24     A.  Like, Kayla is not important enough to me

25 for me to want to defend my side of this, right?  As to

**KANDY LLC vs KAYLA MCNEILL**
Nicole Cook on 05/09/2024

Page 171

```
 1   why I'm participating.  Whereas his side is, like, you
 2   just need to not get involved.  I'm aware I don't need
 3   to get involved.  I don't want to be involved.
 4   However, I have to be involved.  So I'm not going to
 5   initiate a conversation.
 6           Like, I'm not going to go to him and say,
 7   hey, Kayla did this.
 8           Because then he's going to be like, well,
 9   what did you do?
10           Right?  So just she's not important enough
11   to me for me to want to initiate any sort of riffle in
12   our house.  But he's free to be friends with her,
13   completely.  But that's completely acceptable.
14        Q.   And he has always just been friends with --
15   with Ms. McNeill?
16        A.   And her husband.  He's friends with Dusty.
17        Q.   And the relationship between your partner
18   and Ms. McNeill has always been a -- simply a platonic
19   friendly one, correct?
20        A.   As far as I know.  I don't know.
21        Q.   Okay.
22        A.   That's a them-question.
23        Q.   Just lastly, concerning your declaration.
24   I'm going to put it back on screen.  One moment.  All
25   right.
```

**KANDY LLC vs KAYLA MCNEILL**
Nicole Cook on 05/09/2024

Page 172

1              Do you see a document on your screen there?

2        A.    Yeah.

3        Q.    All right.  And I'm going to scroll up to

4   the top so you can see what it is.  This is just where

5   we left off last time on Page 4.

6              But now that I've gone to the top, do you

7   see where it -- it says Declaration of Nicole Cook?

8        A.    Yes.

9        Q.    So excuse me, you were asked about the

10  source of the information, and I believe that your

11  testimony was that it's in your text messages; is that

12  correct?

13       A.    Correct.

14       Q.    What text message supports this second

15  statement here on Page 1 of Exhibit 1 that, "Ms.

16  McNeill had Kaylin Culp put me on Head Kandy's payroll

17  for my childcare services"?

18       A.    If you scroll down to that picture of that

19  text message right there, it says, "I'll have Kaylin

20  get you paperwork for payroll."

21       Q.    Okay.  Outside of getting the paperwork or

22  requesting that the paperwork -- sorry.  Strike that.

23             Outside of Ms. McNeill asking Kaylin to

24  provide you the paperwork, is there anything else in

25  that text exchange that supports that Ms. McNeill had

**KANDY LLC vs KAYLA MCNEILL**
Nicole Cook on 05/09/2024

Page 173

1  the authority to have you put on Head Kandy's payroll?

2      A.   I don't -- it's not in that -- that same

3  message, but there's one, the one that says -- let me

4  find out.  Wherever she says that I told Kaylin to

5  salary you.  Because Kaylin was the head -- the head of

6  payroll.  She was in charge of payroll.

7          So the second one says, "I told Kaylin I

8  wanted you salary, but they didn't approve it."  And

9  then where it says, "Don't tell anybody."

10          And I say, "That works for me.  I won't say

11  anything."

12          She says, "She won't care, but I don't want

13  her to throw it in my face that I do it for you and not

14  others."

15      Q.   Who is she referring to as the she?

16      A.   Kaylin.  Because that was all the same --

17  these ones are down at the bottom, these three messages

18  at the bottom of that declaration.

19      Q.   Okay.

20      A.   They're the three messages down there.  And

21  that's where it says she told Kaylin to salary me, and

22  then she said, "LOL.  She won't care."

23      Q.   We have similar sounding names, so I just

24  want to be clear on -- on what you testified to

25  concerning being head of payroll.  Did you say it was

**KANDY LLC vs KAYLA MCNEILL**
Nicole Cook on 05/09/2024

1  Ms. Culp who was the head of payroll?

2      A.    Yeah.  As far as my understanding, Kaylin

3  Culp was in charge of payroll.

4      Q.    So scroll down to Page 2 of this Exhibit 1,

5  the Paragraph 3 that we looked at previously,

6  concerning Ms. Lamm and Ms. Lynchard.  Do you have any

7  text messages or any other documentation that show when

8  either of those two were clocked in for Head Kandy?

9      A.    I don't have anything about Alyssa because I

10  didn't deal with Alyssa.  I just knew that from gossip.

11  Alisa's is just where she references that she'll have

12  Alisa meet me and pick up Hayzlee.  And that's at, like

13  -- she picked her up at, like, 3:00 in the afternoon.

14      Q.    So you know when and where -- I'm -- yes.

15  You know when and where she picked up Hayzlee.

16          Do you have any documentation concerning

17  this allegation that she was being paid by Head Kandy

18  during that specific instance?

19      A.    Well, she was at work at Head Kandy, and she

20  left the warehouse to come and pick up Hayzlee and take

21  her back to the warehouse with her.

22      Q.    Okay.  And does it state in the text

23  messages that she took her back to the warehouse?

24      A.    I don't -- I don't know.  I can look really

25  quick.  I don't know if it's on there.  Sorry.  I've

**KANDY LLC vs KAYLA MCNEILL**
**Nicole Cook on 05/09/2024**

Page 175

```
 1   got to scroll back through all of these.  So what day
 2   was that?  Do we know what day that was?
 3       Q.   I don't.  I'll try to pull it up as well.
 4       A.   March 4th.  So earlier that day on March
 5   4th, I said, "Hey, I forgot to make sure it was okay if
 6   I met you guys at 3:00 -- to get her at 3:45.  I can
 7   meet you at the highway.  I just have to be to school
 8   by 4:00."  And then I said, "I actually can meet you in
 9   town.  I can meet you by Stotler & Young."  So I said,
10   "If you could meet me at the car wash, that would be
11   helpful."
12            She said Loaf & Jug --
13            Or I said, "Loaf & Jug."
14            She said, "Okay."  And then she just said,
15   "Okay.  I sent Alisa.  She's in my car."
16            So they were working at Head Kandy.
17       Q.   So does it say in there whether or not Alisa
18   clocked out before leaving?
19       A.   No.  But if you have access to the clock-in
20   app, I bet you could find out whether or not she
21   clocked out at 2:56 on March 4th, 2021.  2:56 is when I
22   told her I was parked behind the gas station.
23       Q.   Right.  I'm -- I'm asking about your
24   knowledge, though.  So do you have any --
25       A.   I don't know.  I don't know.
```

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

1      Q.   -- any knowledge or documentation about

2   whether or not either of these employees were being

3   paid by Head Kandy whenever they were providing

4   childcare services?

5      A.   I don't have any evidence of that.

6      Q.   But you still want to reaffirm your

7   declaration that they were being paid by Head Kandy at

8   that time?

9      A.   I think if you're asking if I want to change

10  my declaration, I will go back through my text messages

11  first and see if I can find anything that pertains to

12  Alyssa Lynchard that Kayla mentions her being her

13  housekeeper or babysitter or something.  Because that's

14  possible.  But as far as now, that is to the best of my

15  knowledge, so I'll leave it.

16     Q.   Right.  But you have no knowledge as to

17  whether or not they were being paid at the time they

18  provided the services that you've stated that --

19     A.   I don't know for sure, no.

20          MR. CONVERSE:  Okay.  Those are all my

21  questions.  Thank you so much.

22          THE WITNESS:  Thank you.

23          MS. SADRO:  Hold tight, Ms. Cook.

24          THE WITNESS:  Sure.

25          MS. SADRO:  Ms. Cook, I -- I'm sorry.  Mr.

**KANDY LLC vs KAYLA MCNEILL**
**Nicole Cook on 05/09/2024**

Page 177

```
 1   Converse asked you about something just a moment ago,

 2   and -- and I apologize, but I've got to ask you some

 3   follow-up questions about what just came up.

 4                         EXAMINATION

 5   BY MS. SADRO:

 6        Q.   I -- I believe a moment ago, Mr. Converse

 7   was asking you about inappropriate pictures and videos.

 8             MS. SADRO:  Oh, and, Mr. Converse, could you

 9   just stop your screen share, please?

10             MR. CONVERSE:  Oh, yes.  Sorry.

11   BY MS. SADRO:

12        Q.   Ms. Cook, he was asking you about some

13   inappropriate pictures and videos of Ms. McNeill.

14   What's he talking about?

15        A.   She used to do essentially porn, kind of,

16   where she would make her own sexual videos with her

17   breast milk.  That was a huge thing.  And I will say

18   that's probably why she is so popular because that's

19   how she got her start in town, is she started doing

20   that when she had just had a baby.  And she was on,

21   like, a site you had to pay for.  He, apparently, paid

22   for them to watch them.  They were, like, a script --

23   subscription or something.  You could pay to watch all

24   these videos, or I don't even know.  I don't know how

25   it worked.  But that's what she used to do.
```

**KANDY LLC vs KAYLA MCNEILL**
Nicole Cook on 05/09/2024

Page 178

1          Q.    When you say he paid to watch them, who do

2    you mean?

3          A.    Sorry.  Chris, my partner.

4          Q.    How did you become aware of these videos?

5          A.    I have no idea.  Everyone and their mother

6    knew about these videos in this town.  I will say she's

7    not somebody to keep things quiet, so she probably told

8    everybody about it.  When we took that trip to Mexico,

9    went on vacation, she was -- that's what she was doing

10   when we were in Mexico, was making videos.  So I knew

11   about it.  I knew what she was doing.  I knew that that

12   was, like, part of her life.  No judgment from me.  Do

13   what you got to do to make money.  I don't give a shit.

14          But -- and then I found out that Chris had

15   purchased them.  Why?  Who knows?  I don't know.

16   Because he's a man.  But he did buy them, watch them.

17   Enjoyed them or not, I'm not sure.  I don't -- I don't

18   really care.

19          Q.    Do you know what site he purchased them or

20   watched them on?

21          A.    I can't remember.  I know the name that she

22   went by on it was MilkyKay (phonetic).  So maybe it

23   was, like, her own website.  I'm not sure.

24          Q.    At any -- did that have anything to do with

25   you working for Ms. McNeill?

**KANDY LLC vs KAYLA MCNEILL**
Nicole Cook on 05/09/2024

1      A.    No.

2          Q.    And did it impact you leaving Head Kandy?

3      A.    No.  That was years ago.  That was -- gosh,

4   she was doing that back when we went to Mexico in 2015.

5   So it was years ago.  No judgment.  Again, do what you

6   got to do to make some money.  No judgment.

7          Q.    And so is the -- the discussion you had with

8   Chris about it, was that a long time ago as well?

9          A.    I honestly don't know that I've ever talked

10   to Chris about it.  So the fact that he knew that Chris

11   had those, it's -- it's funny to me that she brought

12   that up because I don't know that I've ever spoken to

13   Chris about the fact that I know that he knows or that

14   I know that he has bought those videos.

15          Q.    Understood.  So Mr. Converse was educating

16   you that Chris knew about these photos -- or videos?

17          A.    Right.  Which means Kayla knows that Chris

18   bought these videos.  And she maybe thought that I

19   knew, but I didn't know, which is fine.

20          Q.    Okay.  So let me phrase it this way, then.

21   How long ago did you become aware that Chris had seen

22   these videos?

23          A.    Probably 2016, 20 -- yeah.  2016, 2017.  A

24   long time ago.

25          Q.    So significantly before you worked for Ms.

**KANDY LLC vs KAYLA MCNEILL**
Nicole Cook on 05/09/2024

1    McNeill?

2        A.   Yes.

3        Q.   And did that -- obviously, did you continue

4    to spend time around Ms. McNeill after you learned of

5    those videos?

6        A.   Oh, yeah.  Totally.

7        Q.   Did it impact your -- your ability to work

8    for Ms. McNeill later down the road?

9        A.   No.  No.

10       Q.   Did -- Ms. Cook, did you ever see the videos

11   Ms. McNeill did for Head Kandy on social media?

12       A.   Yeah.

13       Q.   Do you think -- how many videos of Ms.

14   McNeill did you see in -- in regard to Head Kandy on

15   social media?

16       A.   Oh, gosh.  Probably almost essentially

17   nearly all of them.

18       Q.   Ms. Cook, is the person that Ms. McNeill

19   portrays herself to be in those videos for Head Kandy

20   the same person you saw in those videos of an

21   inappropriate or sexual nature?

22           MR. CONVERSE:  Objection.  Form.

23           THE WITNESS:  No.  No.

24   BY MS. SADRO:

25       Q.   Why do you say no?

**KANDY LLC vs KAYLA MCNEILL**
**Nicole Cook on 05/09/2024**

Page 181

```
 1      A.   No.  I'm sorry.  Say that again?
 2      Q.   Why do you say no?
 3           MR. CONVERSE:  Objection.  Form.
 4           THE WITNESS:  I would say because they're
 5  two completely different people.  And, like, I feel
 6  like that kind of goes to -- back to, like, my personal
 7  opinion about her is she's fake and that -- I mean,
 8  that's shown a lot in the videos and stuff.  And that -
 9  - and that's just my personal opinion that I didn't
10  really want to get into.  But that's essentially why,
11  is she's fake.
12  BY MS. SADRO:
13      Q.   Is -- so the -- the Kayla McNeill that you
14  saw on the videos for Head Kandy, is that the Kayla
15  McNeill you know in your personal life?
16           MR. CONVERSE:  Objection.  Form.
17           THE WITNESS:  The -- the ones that she did,
18  like, to promote Head Kandy or the ones that she was
19  doing to, like, cry about Head Kandy?
20  BY MS. SADRO:
21      Q.   Let's start with promote Head Kandy.  When
22  she was promoting Head Kandy, is that the same Kayla
23  McNeill you knew in your personal life?
24           MR. CONVERSE:  Objection.  Form.
25           THE WITNESS:  Yes and no.  I will say she's,
```

**KANDY LLC vs KAYLA MCNEILL**
Nicole Cook on 05/09/2024

Page 182

1   you know, like, super friendly and stuff upfront to

2   your face, which she shows that in those videos.  She's

3   very outgoing and very knowledgeable on the things that

4   she was talking about.  Which yes.  That is the Kayla

5   McNeill I knew in real life.

6          There is just another side of that where she

7   just wants people to like her, so she'll just say

8   whatever, right?  So she'll tell you one thing, and

9   then she'll come and tell me what I want to hear if

10  it's different from what she said to you.  It doesn't

11  really matter.  So yeah.  I would say that those are --

12  that's how she was in real life.

13  BY MS. SADRO:

14      **Q.   And what about the -- the Kayla McNeill you**

15  **saw after being let go from Head Kandy in those posts?**

16          MR. CONVERSE:  Objection.  Form.

17          THE WITNESS:  I would say I noticed a

18  difference.  I don't know if it was the -- the turmoil

19  of this.  Maybe a little more compassion for things

20  that people go through, which was a little new.  So I

21  guess after I got fired and -- and this whole thing

22  happened, she got a little more compassionate in her

23  videos that I noticed, but I don't know that it lasts.

24  BY MS. SADRO:

25      **Q.   Ms. Cook, the -- the videos that we were**

**KANDY LLC vs KAYLA MCNEILL**
**Nicole Cook on 05/09/2024**

Page 183

```
 1   talking about a minute ago, had you -- did you see them

 2   yourself, or did you just know that other people had

 3   seen them?

 4        A.   The, like, essentially porn videos?

 5        Q.   Sure.  I'll -- I'll use your word in this

 6   moment.  Yeah.

 7        A.   I had seen a couple of them.  I had heard

 8   about all of them, but I had -- I'd seen a couple.  She

 9   had mentioned ones that she was doing while we were in

10   Mexico because we had her youngest.  We were watching

11   the littlest guy.  So she had mentioned it.  We had

12   talked about it.

13        Q.   Anybody else from Head Kandy on the trip to

14   Mexico with you?

15        A.   No.

16        Q.   Okay.  Did Kayla ever talk about these

17   videos in front of you outside of Mexico?

18        A.   Maybe once or twice.  It wasn't, like,

19   something that we were like, oh my God, how did your

20   videos turn out kind of thing.  If anything, it would

21   just, like, every once in a while, like, how's it

22   going?  What's new?  And then just like that.

23             I -- I don't really remember what happened

24   and why it kind of went away.  But, all of a sudden, it

25   just stopped.  And then she wasn't doing them anymore.
```

**KANDY LLC vs KAYLA MCNEILL**
**Nicole Cook on 05/09/2024**

Page 184

1   I don't know if -- I don't remember.  I'd have to think

2   about why it stopped.

3        Q.   So -- so am I right that would you say that

4   Ms. McNeill was pretty open about talking about these -

5   - these videos, to use your word, porn, in her life?

6        A.   Yes.  She was a hairdresser and a nail tech.

7   And I feel like with being a hairdresser, like, it's

8   just known, like, you just -- you have clients every

9   day, right?  Say you have, like, 20 clients a day.  You

10  just gossip with everybody.  Which is fine.  But she's

11  very much-so the kind of person that wanted everyone to

12  know her business every day.

13       Q.   Would she initiate it?

14       A.   Yes.

15            MR. CONVERSE:  Objection.  Form.

16            THE WITNESS:  Yes.

17  BY MS. SADRO:

18       Q.   How -- it sounds -- it sounds like the way

19  you're answering that, Ms. Cook, was it regular?

20       A.   Yeah.

21            MR. CONVERSE:  Objection.  Form.

22  BY MS. SADRO:

23       Q.   Would -- outside of just the -- the videos

24  themselves, did you know Ms. McNeill to be a person who

25  liked to have sexually explicit conversations?

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

1          MR. CONVERSE:  Objection.

2          THE WITNESS:  I wouldn't necessarily say,

3   like, liked to have sexual conversations.  It just

4   wasn't, like, something she was embarrassed about,

5   which is fine.  Like, if you want to -- if you want

6   people to see your body and you want to talk about your

7   body, that's fine.  So I wouldn't say that she was --

8   she just wasn't afraid for people to know.

9   BY MS. SADRO:

10     Q.   Comfortable?

11     A.   Yeah.  She was comfortable.

12     Q.   And comfortable initiating those kinds of

13  conversations?

14          MR. CONVERSE:  Objection.  Form.

15          THE WITNESS:  Yes.

16  BY MS. SADRO:

17     Q.   Did you ever -- were you ever present when

18  Ms. McNeill had a conversation about the videos in

19  front of anybody that worked for Head Kandy?

20     A.   No.  I don't think so.

21     Q.   Were you ever present when Ms. McNeill had a

22  conversation or engaged in a conversation of a sexual

23  nature in front of other Head Kandy employees?

24     A.   No.

25     Q.   Would -- is miss -- we talked a little bit

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 186

1    about Ms. McNeill being comfortable talking about this.

2    Would she joke about sexual things?

3             MR. CONVERSE:  Objection.  Form.

4             THE WITNESS:  Oh, sure.

5    BY MS. SADRO:

6        Q.   Did -- I -- I -- what kind of jokes would

7    she make?

8             MR. CONVERSE:  Objection.  Form.

9             THE WITNESS:  I mean, I don't know that it -

10   - necessarily, like, jokes.  But, like, maybe something

11   like, oh, remember I used to do those videos, type

12   thing, right?  So it wasn't like she was afraid for

13   people to know that she did them, does them, like,

14   whatever, in the moment or later.  I don't want to say

15   she was sitting around joking.  I -- I mean, we never

16   just sat around, joked about it.  But it had been

17   brought up once or twice where it was kind of a joke.

18   Like, oh, remember when I did that, kind of thing.  It

19   was like everybody remembers.

20   BY MS. SADRO:

21       Q.   Would she make sexual quips?

22            MR. CONVERSE:  Objection.  Form.

23            THE WITNESS:  Not that I remember.  I don't

24   think so.

25   BY MS. SADRO:

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 187

```
 1        Q.   Was she comfortable when other people made
 2   sex jokes around her?
 3             MR. CONVERSE:  Objection.  Form.
 4             THE WITNESS:  I don't remember really ever a
 5   time that somebody made something, like, super
 6   inappropriate joking towards her.  Again, the only
 7   thing I would have -- I remember is her just being
 8   like, oh, remember when I did that, kind of stuff?  I
 9   mean, that's it.  Like, why she would just -- she would
10   be the one to bring it up.  Like, remember when that
11   happened?  Like, remember when I made those videos?
12   Remember when MilkyKay was a thing?
13   BY MS. SADRO:
14        Q.   Sure.
15        A.   And it was like, yes.
16        Q.   And, Ms. Cook, do you remember who showed
17   these videos to you?
18        A.   I -- well, the one time that I saw some of
19   them, her sister-in-law is the one that showed me.
20        Q.   Okay.  Do you remember her name?
21        A.   Jessica.
22        Q.   Jessica?
23        A.   McNeill.
24        Q.   Jessica McNeill.  Did Jessica McNeill say
25   where she had gotten them from?
```

**KANDY LLC vs KAYLA MCNEILL**
Nicole Cook on 05/09/2024

Page 188

1      A.   I think she bought them off of the website,

2   too.  So you couldn't see them unless you paid for

3   them.  You had to pay for them in order to be able to

4   view them.  But, like, once you paid for them, you had

5   access to them.  So she had to have paid for it to be

6   able to see it because she showed them to me.

7      **Q.   Do you know if people had the ability or**

8   **did, like, download these videos and send them around?**

9      A.   Oh, sure.  I'm sure somebody did.

10     **Q.   Would your -- did your sisters see them?**

11     A.   That, I have no idea.  I don't -- I don't

12  think I've ever asked my sisters if they had seen them

13  before.

14          MS. SADRO:  All right.  Ms. Cook, thank you

15  for indulging me a little bit longer.  I think that's

16  all I have.

17          THE WITNESS:  Thank you.  Thanks.

18                          EXAMINATION

19  BY MR. CONVERSE:

20     **Q.   Yeah.  I just need to follow up on -- on --**

21  **on those questions.**

22          **You -- you -- when you were asked about**

23  **conversations about the -- the videos and -- and**

24  **comments, did you -- was it your testimony that there**

25  **were only one or two conversations that you had with**

**KANDY LLC vs KAYLA MCNEILL**
Nicole Cook on 05/09/2024

 1   Ms. McNeill about it?

 2       A.   About the videos?

 3       Q.   **Yes.**

 4       A.   Yeah.

 5       Q.   **What about any sexually -- things of -- of a**

 6   **sexual nature?**

 7       A.   With Kayla?

 8       Q.   **Yes.**

 9       A.   I mean, it -- no.  I mean, it wasn't ever

10   anything like, oh my God.  What did you guys plan to do

11   for your next video?  Like, tell me all about it.  I

12   don't want to know those things because that's not my

13   business.

14       Q.   **Okay.  So -- so then when you were**

15   **testifying about statements Ms. McNeill makes and how**

16   **she behaves whenever hearing jokes or other statements,**

17   **was -- were you testifying just based upon rumors that**

18   **you had heard?**

19       A.   Just from what, like, I've heard.

20            Like, if somebody was like, your kids are

21   going to see those one day.

22            And she's like, I don't care.  Like, let

23   them see them, right?  Like, there's nothing wrong with

24   them seeing them.

25            Okay, great.

**KANDY LLC vs KAYLA MCNEILL**
Nicole Cook on 05/09/2024

Page 190

1            Like, just conversations like that.  Like,

2    we never had conversations about anything deeper than

3    that regarding the videos.  And when I say we, I mean,

4    like, a group of girls, right?  Like, a group of girls

5    together.

6            And it's like, somebody would say something.

7            She's like, yeah.  Remember when I did

8    those?

9            It was like, yes.  We remember.

10       Q.   So you were -- you were responding to

11   questions about how Ms. McNeill behaved around Head

12   Kandy employees.  You have no firsthand knowledge about

13   communications between Ms. McNeill and other Head Kandy

14   employees concerning sexual matters?

15       A.   No.  I have no idea because I was not in the

16   warehouse.

17            MR. CONVERSE:  Okay.  Thank you very much.

18   Those are all my questions.

19            THE WITNESS:  Sure.  Thank you.

20            MS. SADRO:  All right, Ms. Cook.  Thanks for

21   hanging in there.  I've got nothing else for you, but I

22   do need to tell you about a right you have, okay?

23            THE WITNESS:  Okay.

24            MS. SADRO:  At the end of every deposition,

25   every witness has the right to either do what's called

**KANDY LLC vs KAYLA MCNEILL**
**Nicole Cook on 05/09/2024**

Page 191

```
 1  a read or a waive.  What that means is that the court
 2  reporter is going to go back to their office and type
 3  up a transcript of today's proceedings.  And you, as
 4  the witness, have the right to read that transcript
 5  that the court reporter puts together prior to it being
 6  finalized, effectively.  Because if you review it and
 7  you think that something was transcribed incorrectly or
 8  wrong or maybe there's just a word off, you would have
 9  the ability to correct it.
10           I do have to tell you that if you do make
11  any corrections, Mr. Converse and I would have the
12  ability to come back, potentially, and ask you about
13  them.  In the alternative, you have the ability to --
14  to waive that right to read the deposition transcript.
15  It is entirely your choice.  So knowing that
16  information, would you like to read or waive?
17           THE WITNESS:  I'll read it.
18           MS. SADRO:  Okay.  Once we step off the
19  record, I'll have you hang on for just a moment so you
20  can give your contact information to the court
21  reporters to make sure that they can get in contact
22  with you and send that over, okay?
23           THE WITNESS:  Okay.
24           MS. SADRO:  All right.  Other than that, I
25  think we're ready to conclude and go off record.
```

**KANDY LLC vs KAYLA MCNEILL**
**Nicole Cook on 05/09/2024**

Page 192

```
 1              MR. CONVERSE:  All right.  Thank you so

 2    much.

 3              THE COURT REPORTER:  And, Counsel?

 4              THE WITNESS:  Thank you.

 5              THE COURT REPORTER:  Just before we go off

 6    the record, can I get your orders on the record?

 7              THE WITNESS:  Yes.  Are you talking to me?

 8    Sorry.

 9              THE COURT REPORTER:  No.  I'm talking to the

10    attorneys.  Sorry.

11              THE WITNESS:  Oh, so sorry.  So sorry.

12              MS. SADRO:  Yes.  Can we order a copy of the

13    transcript and with the video synced?  And an

14    electronic copy of the transcript as well, please.

15              THE COURT REPORTER:  A physical and

16    electronic?

17              MS. SADRO:  Yes, please.

18              THE COURT REPORTER:  Okay.  And just regular

19    delivery for that?

20              MS. SADRO:  Yeah.  I believe that's fine.

21    Sure.

22              THE COURT REPORTER:  Okay.  And then Mr.

23    Converse, did you want a copy?

24              MR. CONVERSE:  Yes, please.  Right now, we'd

25    just like a -- a digital copy of the transcript,
```

**KANDY LLC vs KAYLA MCNEILL**
**Nicole Cook on 05/09/2024**

Page 193

1    please.

2            THE COURT REPORTER:  Okay.  And same,

3    regular delivery time is okay?

4            MR. CONVERSE:  Yes.

5            THE COURT REPORTER:  All right.  Thank you,

6    everyone.

7            THE VIDEOGRAPHER:  Okay.  Perfect.  The time

8    is 4:19 p.m.  Eastern, and we are off the record.  And

9    this concludes the deposition of Nicole Cook.

10           (DEPOSITION CONCLUDED AT 4:19 P.M.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**KANDY LLC vs KAYLA MCNEILL**
Nicole Cook on 05/09/2024

```
 1                  REPORTER'S CERTIFICATE

 2

 3           I, ROCCO FRANCO, a Court Reporter and

 4    Notary Public in and for the State of North

 5    Carolina, do hereby certify:

 6           That NICOLE COOK, the witness whose

 7    examination is hereinbefore set forth, was first

 8    duly sworn by me and that this transcript of said

 9    testimony is a true record of the testimony given by

10    said witness.

11           I further certify that I am not related

12    to any of the parties to this action by blood or

13    marriage, and that I am in no way interested in the

14    outcome of this matter.

15           IN WITNESS WHEREOF, I have hereunto

16    subscribed my name this 22nd day of May, 2024.

17                    Ricardo R Franco

18           _____

19           ROCCO FRANCO

20           Court Reporter and Notary Public

21           Notary Commission No. North

22           Carolina/202403900042

23           Commission Expires:  February 5, 2029

24

25
```

**KANDY LLC vs KAYLA MCNEILL**
Nicole Cook on 05/09/2024

Page 195

```
1                 DEPOSITION ERRATA SHEET

2

3    Our Assignment No. 65951

4    Case Caption: HEAD KANDY LLC v. KAYLA MCNEILL

5

6            DECLARATION UNDER PENALTY OF PERJURY

7

8            I declare under penalty of perjury that I

9    have read the entire transcript of my deposition

10   taken in the above-captioned matter or the same has

11   been read to me, and the same is true and accurate,

12   save and except for changes and/or corrections, if

13   any, as indicated by me on the DEPOSITION ERRATA

14   SHEET hereof, with the understanding that I offer

15   these changes as if still under oath.

16

17      Signed on the _____ day of _____, 2024.

18

19

20          _____

21                  NICOLE COOK

22

23

24

25
```