## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-CV-60345-JB/JMS

HEAD KANDY, LLC,

      Plaintiff/Counter Claim Defendant,

v.

KAYLA MCNEILL,

      Defendant/Counterclaimant/Third-Party Claimant,

v.

JEROME FALIC and JONATHAN ROSENBAUM,

      Third-Party Defendants.

_____/

## ANSWER, COUNTERCLAIMS, THIRD-PARTY COMPLAINT AND JURY DEMAND

Defendant Kayla McNeill ("Ms. McNeill"), by and through her undersigned counsel, hereby states for her Answer to the Second Amended Complaint [EFC No. 187] (the "Complaint") as follows:

### ANSWER

### The Parties

1.      Ms. McNeill admits that Plaintiff Head Kandy, LLC ("HK") is a Delaware limited liability company that registered with the Florida Secretary of State as a foreign limited liability company transacting business in the State of Florida on April 12, 2023. Ms. McNeill admits that Mr. Jerome Falic has, at all relevant times, been the managing member of HK and that he authorized a February 17, 2023 resolution (the "Resolution"). Ms. McNeill denies that the resolution was capable of or caused the divesting of her ownership interest in HK. Ms. McNeill

is without adequate information to admit or deny the remaining allegations in Paragraph 1 of the Complaint[1] and, therefore, denies the same.

2.      Ms. McNeill denies the allegations in Paragraph 2.

3.      Ms. McNeill is without adequate information to admit or deny the allegations in Paragraph 3 and, therefore, denies the same.

4.      Ms. McNeill admits that allegations in Paragraph 4.

### Jurisdiction and Venue

5.      Ms. McNeill denies the allegations in Paragraph 5.

6.      Ms. McNeill denies the allegations in Paragraph 6.

7.      Ms. McNeill denies the allegations in Paragraph 7.

### Facts Common to the Counts

8.      Ms. McNeill admits that she founded the Head Kandy brand for the sale of haircare products and promoted the company through her social media presence leading social media platforms, including Facebook and Instagram.  Ms. McNeill denies the remaining allegations in Paragraph 8.

9.      Ms. McNeill admits that her popularity on social media derived from her ability to connect with her followers in a personal way.  Her posts on her personal social media accounts emphasized her small-town roots, often featured her children and contained positive and uplifting messages which resonated with customers.  Ms. McNeill denies the remaining allegations in Paragraph 9.

10.      Ms. McNeill denies the allegations in Paragraph 10.

---

[1] Unless specifically stated otherwise, all future references to "Paragraph" shall refer to paragraphs enumerated in the Complaint.

11.     Ms. McNeill admits that she was the sole owner and operator of Lashed Out, LLC ("LO").  Ms. McNeill denies the remaining allegations in Paragraph 11.

12.     Ms. McNeill admits that HK and LO entered into an Asset Purchase Agreement dated May 3, 2018 (the "APA").  The APA speaks for itself.  Ms. McNeill denies the remaining allegations in Paragraph 12.

13.     Ms. McNeill admits that she became a twenty percent owner of HK.  Ms. McNeill denies the remaining allegations in Paragraph 13.

14.     Ms. McNeill denies the allegations in Paragraph 14.

15.     Ms. McNeill denies the allegations in Paragraph 15.

16.     Ms. McNeill denies the allegations in Paragraph 16.

17.     Ms. McNeill admits that she entered into the Executive Employment Agreement (the "Employment Agreement") with HK.  With regard to the remaining allegations is Paragraph 17, the Employment Agreement speaks of itself.

18.     With regard to the allegations is Paragraph 18, the Employment Agreement speaks of itself.

19.     Allegations in Paragraph 19 require a legal conclusion, particularly with regard to the term "managerial employee," which do not require a response.  Ms. McNeill denies that she was a manager at all times relevant to the claims and allegations.  Ms. McNeill also denies the remaining allegations in Paragraph 19.

20.     Ms. McNeill admits that she was HK's most important social media influencer.  Ms. McNeill denies the remaining allegations in Paragraph 20.

21.     Ms. McNeill denies the allegations in Paragraph 21.

22.     Ms. McNeill denies the allegations in Paragraph 22.

23.     Ms. McNeill denies the allegations in Paragraph 23.

24.     Ms. McNeill states that the Employment Agreement speaks for itself.   Ms. McNeill denies the allegations in Paragraph 24.

25.     Ms. McNeill denies the allegations in Paragraph 25.

26.     Ms. McNeill denies the allegations in Paragraph 26.

27.     Ms. McNeill denies the allegations in Paragraph 27.

28.     Ms. McNeill admits that she formed White Pineapple in March 2022.   Ms. McNeill denies the remaining allegations in Paragraph 28.

29.     Ms. McNeill denies the allegations in Paragraph 29.

30.     Ms. McNeill denies the allegations in Paragraph 30.

31.     Ms. McNeill denies the allegations in Paragraph 31.

32.     Ms. McNeill admits that she made the post on November 23, 2022.  Ms. McNeill denies the remaining allegations in Paragraph 32.

33.     Ms. McNeill denies the allegations in Paragraph 33.

34.     Ms. McNeill denies the allegations in Paragraph 34.

35.     Ms. McNeill admits that she received a Notice of Material Breach of the Executive Employment Agreement and Notice of Breach of Fiduciary Duty on November 28, 2022.  Ms. McNeill denies the remaining allegations in Paragraph 35.

36.     Ms. McNeill denies the allegations in Paragraph 36.

37.     Ms. McNeill denies the allegations in Paragraph 37.

38.     Ms. McNeill denies the allegations in Paragraph 38.

39.     Ms. McNeill denies the allegations in Paragraph 39.

40.     Ms. McNeill admits that Andrew Schankermann served as HK's warehouse manager.  Ms. McNeill denies the remaining allegations in Paragraph 40.

41.     Ms. McNeill denies the allegations in Paragraph 41.

42.     Ms. McNeill denies the allegations in Paragraph 42.

43.     Ms. McNeill denies the allegations in Paragraph 43.

44.     Ms. McNeill denies the allegations in Paragraph 44.

45.     Ms. McNeill denies the allegations in Paragraph 45.

46.     Ms. McNeill denies the allegations in Paragraph 46.

47.     Ms. McNeill denies the allegations in Paragraph 47.

48.     Ms. McNeill denies the allegations in Paragraph 48.

49.     Ms. McNeill denies the allegations in Paragraph 49.

50.     Ms. McNeill denies the allegations in Paragraph 50.

51.     Ms. McNeill denies the allegations in Paragraph 51.

52.     Ms. McNeill denies the allegations in Paragraph 52.

53.     Ms. McNeill denies the allegations in Paragraph 53.

54.     Ms. McNeill denies the allegations in Paragraph 54.

55.     Ms. McNeill is without adequate information to admit or deny the allegations in Paragraph 55 and, therefore, denies the same.

56.     Ms. McNeill denies the allegations in Paragraph 56.

57.     Ms. McNeill denies the allegations in Paragraph 57.

58.     Ms. McNeill denies the allegations in Paragraph 58.

59.     Ms. McNeill denies the allegations in Paragraph 59.

60.     Ms. McNeill admits that she paid, through personal funds of points, all of the personal expenses she charged to her American Express credit card, which she allowed HK to use when it failed to secure another source of credit.

61.     Ms. McNeill admits that she paid, through personal funds of points, all of the personal expenses she charged to her American Express credit card, which she allowed HK to use when it failed to secure another source of credit.

62.     Ms. McNeill denies the allegations in Paragraph 62.

63.     Ms. McNeill admits that she received a Notice of Suspension of Employment due to Fraud and Dishonestly dated December 16, 2022.  The document speaks for itself.

64.     Ms. McNeill denies the allegations in Paragraph 64.

65.     Ms. McNeill denies the allegations in Paragraph 65.

66.     Ms. McNeill denies the allegations in Paragraph 66.

67.     Ms. McNeill denies the allegations in Paragraph 67.

68.     Ms. McNeill denies the allegations in Paragraph 68.

69.     Ms. McNeill denies the allegations in Paragraph 69.

70.     Ms. McNeill denies the allegations in Paragraph 70.

71.     Ms. McNeill admits that she leased a barn and forklift, both owned by Ms. McNeill, to HK which it used in its daily operations.  Ms. McNeill denies the remaining allegations in Paragraph 71.

72.     Ms. McNeill denies the allegations in Paragraph 72.

73.     Ms. McNeill denies the allegations in Paragraph 73.

74.     Ms. McNeill admits that she met with Mr. Falic in New York in December 2022. Ms. McNeill denies the remaining allegations in Paragraph 74.

75.     Ms. McNeill admits that she conducted herself in an exemplary manner during the December 2022 meeting.  Ms. McNeill denies the remaining allegations in Paragraph 75.

76.     Ms. McNeill denies the allegations in Paragraph 76.

77.     Ms. McNeill denies the allegations in Paragraph 77.

78.     Ms. McNeill denies the allegations in Paragraph 78.

79.     Ms. McNeill denies the allegations in Paragraph 79.

80.     Ms. McNeill denies the allegations in Paragraph 80.

81.     Ms. McNeill admits that she received a Notice of Material Breach dated January 10, 2023.  The document speaks for itself.  Ms. McNeill denies the remaining allegations in Paragraph 81.

82.     Ms. McNeill denies the allegations in Paragraph 82.

83.     Ms. McNeill denies the allegations in Paragraph 83.

84.     Ms. McNeill admits the allegations in Paragraph 84.

85.     Ms. McNeill denies the allegations in Paragraph 85.

86.     Ms. McNeill denies the allegations in Paragraph 86.

87.     Ms. McNeill denies the allegations in Paragraph 87.

88.     Ms. McNeill admits that she made the post in February 2023.  Ms. McNeill denies the remaining allegations in Paragraph 88.

89.     Ms. McNeill admits that she made the post in February 2023.  Ms. McNeill denies the remaining allegations in Paragraph 89.

90.     Ms. McNeill admits that she made the post in February 2023.  Ms. McNeill denies the remaining allegations in Paragraph 90.

91.     Ms. McNeill admits that she made the post in February 2023.  Ms. McNeill denies the remaining allegations in Paragraph 91.

92.     Ms. McNeill denies the allegations in Paragraph 92.

93.     Ms. McNeill denies the allegations in Paragraph 93.

94.     Ms. McNeill denies the allegations in Paragraph 94.

95.     Ms. McNeill is without adequate information to admit or deny the allegations in Paragraph 95 because HK deleted numerous social media comments and, therefore, denies the same.

96.     Ms. McNeill is without adequate information to admit or deny the allegations in Paragraph 96 because HK deleted numerous social media comments and, therefore, denies the same.

97.     Ms. McNeill denies the allegations in Paragraph 97.

98.     Ms. McNeill denies the allegations in Paragraph 98.

99.     Ms. McNeill denies the allegations in Paragraph 99.

100.    Ms. McNeill denies the allegations in Paragraph 100.

101.    Ms. McNeill admits that she made the April 11, 2023 post.  Ms. McNeill denies the remaining allegations in Paragraph 101.

102.    Ms. McNeill denies the allegations in Paragraph 102.

103.    Ms. McNeill denies the allegations in Paragraph 103.

104.    Ms. McNeill is without adequate information to admit or deny the allegations in Paragraph 104 and, therefore, denies the same.

105.    Ms. McNeill denies the allegations in Paragraph 105.

106.    Ms. McNeill admits posting on social media accounts between May 1, 2023 and June 6, 2023.  Ms. McNeill denies the remaining allegations in Paragraph 106.

107.    Ms. McNeill denies the allegations in Paragraph 107.

108.    Ms. McNeill denies the allegations in Paragraph 108.

109.    Ms. McNeill admits providing lawsuit updates to her followers.   Ms. McNeill denies the remaining allegations in Paragraph 109.

110.    Ms. McNeill admits the allegations in Paragraph 110.

111.    Ms. McNeill denies the allegations in Paragraph 111.

112.    Ms. McNeill denies the allegations in Paragraph 112.

113.    Ms. McNeill denies the allegations in Paragraph 113.

114.    Ms. McNeill denies the allegations in Paragraph 114.

115.    Ms. McNeill denies the allegations in Paragraph 115.

116.    Ms. McNeill denies the allegations in Paragraph 116.

117.    The Employment Agreement speaks for itself.  Ms. McNeill denies the remaining allegations in Paragraph 117.

118.    Ms. McNeill admits the allegations in Paragraph 118.

119.    Ms. McNeill denies the allegations in Paragraph 119.

120.    Ms. McNeill admits that she immediately edited her post in a good faith effort to avoid further dispute.  Ms. McNeill denies the remaining allegations in Paragraph 120.

121.    Ms. McNeill admits the allegations in Paragraph 121.

122.    Ms. McNeill denies the allegations in Paragraph 122.

123.    Ms. McNeill denies the allegations in Paragraph 123.

124.    Paragraph 124 is a statement of law and does not contain any allegations; therefore, no response is required.

## COUNT I
### Breaches of Contract

125.    Paragraph 125 does not contain any new allegations.  Ms. McNeill incorporates, by this reference, all of her preceding responses to allegations set forth in the Complaint.

126.    Ms. McNeill denies the allegations in Paragraph 126 for the purposes of HK's breach of contract claim.

127.    The Employment Agreement speaks for itself and Ms. McNeil denies any allegations in Paragraph 127 that deviate therefrom.

128.    The Employment Agreement speaks for itself and Ms. McNeil denies any allegations in Paragraph 128 that deviate therefrom.

129.    The Employment Agreement speaks for itself and Ms. McNeil denies any allegations in Paragraph 129 that deviate therefrom.

130.    The Employment Agreement speaks for itself and Ms. McNeil denies any allegations in Paragraph 130 that deviate therefrom.

131.    The Employment Agreement speaks for itself and Ms. McNeil denies any allegations in Paragraph 131 that deviate therefrom.

132.    The Employment Agreement speaks for itself and Ms. McNeil denies any allegations in Paragraph 132 that deviate therefrom.

133.    The Employment Agreement speaks for itself and Ms. McNeil denies any allegations in Paragraph 133 that deviate therefrom.

134.    The Employment Agreement speaks for itself and Ms. McNeil denies any allegations in Paragraph 134 that deviate therefrom.

135.    Ms. McNeill denies the allegations in Paragraph 135.

136.    Ms. McNeill denies the allegations in Paragraph 136.

137.    Ms. McNeill denies the allegations in Paragraph 137.

138.    Ms. McNeill denies the allegations in Paragraph 138.


**COUNT II**
**Breaches of Fiduciary Duty**

139.    Paragraph 139 does not contain any new allegations.  Ms. McNeill incorporates,

by this reference, all of her preceding responses to allegations set forth in the Complaint.

140.    Ms. McNeill denies the allegations in Paragraphs 140 – 151.

**COUNT III**
**Common Law Fraud**

141.    Paragraph 152 does not contain any new allegations.  Ms. McNeill incorporates,

by this reference, all of her preceding responses to allegations set forth in the Complaint.

142.    Ms. McNeill denies the allegations in Paragraphs 153 – 175.

**COUNT IV**
**Unjust Enrichment**

143.    Paragraph 176 does not contain any new allegations.  Ms. McNeill incorporates,

by this reference, all of her preceding responses to allegations set forth in the Complaint.

144.    Ms. McNeill denies the allegations in Paragraphs 177 – 179.

**COUNT V**
**Declaratory Relief**

145.    Paragraph 180 does not contain any new allegations.  Ms. McNeill incorporates,

by this reference, all of her preceding responses to allegations set forth in the Complaint.

146.    Ms. McNeill denies the allegations in Paragraph 181.

147.    Ms. McNeill denies the allegations in Paragraph 182.

148.    Ms. McNeill admits the allegations in Paragraph 183.

149.    The Employment Agreement speaks for itself and Ms. McNeil denies any allegations in Paragraph 184 that deviate therefrom.

150.    The Employment Agreement speaks for itself and Ms. McNeil denies any allegations in Paragraph 185 that deviate therefrom.

151.    Ms. McNeill is without adequate information to admit or deny the allegations in Paragraph 186 and, therefore, denies the same.

152.    Ms. McNeill denies the allegations in Paragraph 187.

153.    The Employment Agreement speaks for itself and Ms. McNeil denies any allegations in Paragraph 188 that deviate therefrom.

154.    Ms. McNeill denies the allegations in Paragraph 189.

155.    Ms. McNeill denies the allegations in Paragraph 190.

156.    Ms. McNeill denies the allegations in Paragraph 191.

## General Denial

Ms. McNeill denies all allegations set forth in the Complaint not specifically admitted above.

## Affirmative Defenses

Head Kandy's claims are barred or diminished by the following affirmative defenses, which Ms. McNeill hereby asserts:

1.    Failure to state a claim for which relief may be granted;

2.    Failure to plead fraud with specificity;

3.    Statute of limitations;

4.     Estoppel by reason of delay or laches;

5.     Inducement;

6.     Failure to mitigate damages;

7.     Failure of consideration;

8.     Prior material breach;

9.     Doctrine of Set-off;

10.     Head Kandy's own wrongful conduct;

11.     Failure to join indispensable parties, including, without limitation, Ryan Thompson, Jerome Falic, Simon Falic, Leon Falic and Bryan Feldman;

12.     Business Judgment Rule;

13.     Corporate Shield Doctrine;

14.     Competition;

15.     Unlawful restraint on trade;

16.     Unlawful restrictive covenants;

17.     Lack of irreparable injury/damages;

18.     Employment Agreement contains an unenforceable liquidated damages provision, which precludes HK from receiving any damages;

19.     Financial Interest.

Ms. McNeill reserves the right to assert additional affirmative defenses as may become evident upon further investigation and discovery in this matter.

**WHEREFORE**, Ms. McNeill respectfully requests that judgment enter in her favor and against Head Kandy's remaining claims, and that Ms. McNeill be awarded all expenses incurred

in defending against the claims, including litigation costs, attorneys' fees and such further and additional relief as the Court deems appropriate and equitable.

## COUNTERCLAIMS AND THIRD-PARTY COMPLAINT

Defendant / Counterclaimant Ms. Kayla McNeill ("Ms. McNeill"), by and through her undersigned counsel, hereby submits her Counterclaims against Plaintiff / Counterclaim Defendant Head Kandy, LLC ("HK") and Third-Party Complaint against Messrs. Jerome Falic and Jonathan Rosenbaum and states as follows:

1.      Ms. McNeill incorporates each of the foregoing paragraphs as if fully set forth herein.

### PARTIES, JURISDICTION AND VENUE

2.      Upon information and belief, HK is a Delaware limited liability company that registered with the Florida Secretary of State as a foreign limited liability company transacting business in the State of Florida on April 12, 2023.

3.      Ms. McNeill is a resident of the State of Colorado.

4.      Pursuant to the Court's Order Granting in Part and Denying in Part Defendant's Corrected Motion to Dismiss the Amended Complaint (the "MTD Order"), the Court has personal jurisdiction over Ms. McNeill pertaining to the actions which give rise to her claims.[2] [ECF No. 151].

5.      Upon information and belief, Mr. Falic is a resident of the State of Florida.

6.      The Court has jurisdiction over Ms. McNeill's claims pursuant to 28 U.S.C. § 1367.

7.      The Court may exercise personal jurisdiction over HK and Mr. Falic pursuant to Section 48.193 of the Florida Statutes.

---

[2] Ms. McNeill submits this pleading pursuant to the Court's Order Amending Trial Date and Pre-Trial Deadlines [ECF No. 157], as amended by the Court's February 23, 2024 Paperless Order [ECF No. 189]. Ms. McNeill's averments pertaining to jurisdiction and venue are based upon the Court's MTD Order. Ms. McNeill neither consents to personal jurisdiction nor waives her jurisdictional challenges by submitting this pleading.

8.      Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391.

## GENERAL ALLEGATIONS

**Background**

9.      In approximately 2015, while working as a hairdresser in rural Colorado, Ms. McNeill started a direct-to-consumer business in her basement.  The business was named Lashed Out, LLC ("Lashed Out") and sold hair-related products under its "Head Kandy" brand.

10.     Lashed Out was an extension of Ms. McNeill's desire to help women with their personal beauty and haircare needs.  Utilizing social media, Ms. McNeill would provide product reviews, haircare advice and uplifting messages to other women through engaging and honest content.  Ms. McNeill's content and expertise, coupled with her entrepreneurial spirit, also resulted in commercial success for Lashed Out.

11.     In 2016, Ms. McNeill sought to protect Lashed Out's Head Kandy brand by filing an application to register its mark with the United States Patent and Trademark Office, Application Serial No. 86892969 (the "TM Application").

12.     An Opposition to the TM Application was initiated by a third-party entity, Hard Candy, LLC ("Hard Candy"), of which Mr. Falic was an owner and Chief Executive Officer.

13.     As part of the Opposition proceeding, Opposition No. 91229178, Lashed Out was required to provide Hard Candy with all of its financial records.  Those records laid bare the impressive success Lashed Out had attained as a result of Ms. McNeill's tremendous work ethic, talent and business acumen.

14.     After receiving Lashed Out's financial records, Mr. Falic and his business partners – Simon Falic, Leon Falic and Bryan Feldman – approached Ms. McNeill to acquire the assets of Lashed Out for the purpose of forming HK.  Mr. Falic represented to Ms. McNeill that

he and his business partners possessed the experience and financial means necessary to complement her talents and amplify the success of the Head Kandy brand.

15.     In May 2018, HK acquired the majority of Lashed Out's assets through that Asset Purchase Agreement dated May 3, 2018 between HK and Lashed Out.

16.     At that time, Ms. McNeill also became HK's Creative Director pursuant to that Executive Employment Agreement dated May 3, 2018 between Ms. McNeill and HK (the "Employment Agreement") [ECF No. 187-1] incorporated herein by this reference.

17.     Despite Mr. Falic's representations to Ms. McNeill, Mr. Falic and his business partners did not provide the promised support.

**HK's Use of Ms. McNeill's Credit Card**

18.     After HK was formed, it failed to secure operating credit for the business.   In order to ensure that the company could function, Ms. McNeill allowed HK to charge business expenses to her American Express credit card (the "Credit Card"), provided that HK timely made payment for all such expenses.

19.     In May 2018, HK put Ms. Deborah Kassab in charge of processing expense reports.  Mr. Ryan Thompson, an employee of HK, would submit expense reports in the form of statements for the Credit Card with all personal expenses charged by Ms. McNeill blacked out prior to submission.  Mr. Thompson would submit the expense reports directly to Ms. Kassab.

20.     In April 2019, Mr. Thompson was instructed by Ylse Lopez to submit the full, unaltered statements for the Credit Card to the "accounting department" every month as expense reports.

21.     To facilitate submission of the expense reports, Ms. McNeill Provided HK online access to her Credit Card account.  HK's representatives who were tasked with identifying and

auditing HK's business expenses were able to access and review the full monthly statements for the Credit Card.

22.     At no time was Ms. McNeill required to submit reimbursement requests.

**Mr. Rosenbaum's Improper Sexual Conduct**

23.     Upon information and belief, in July 2022, Mr. Falic, as HK's managing member, retained Mr. Rosenbaum to restructure HK's business and operations.

24.     Mr. Falic and Mr. Rosenbaum were close personal friends at the time HK retained Mr. Rosenbaum.

25.     At the beginning of July 2022, Ms. McNeill met Mr. Rosenbaum for the first time in person. During this first meeting, Mr. Rosenbaum began what would become a campaign of severe sexual harassment and abuse for the next six months, up until Ms. McNeill's wrongful and retaliatory termination. At the beginning of July (, Mr. Rosenbaum came to HK's office for the first time. During that first meeting, Mr. Rosenbaum:

      a.  Told Ms. McNeill that she was "hotter in person";

      b.  "Blonds look so hot blue" when Ms. McNeill was wearing a blue jumpsuit;

      c.  He leered at Ms. McNeill for the entire day;

      d.  Later in the day told Ms. McNeill "you have nice legs."

26.     Every week to two weeks, every time Mr. Rosenbaum came to the warehouse, he commented on Ms. McNeill's appearance, including what she was wearing and how she dressed, including comments about:

      a.  Ms. McNeill's boobs;

      b.  Ms. McNeill's feet ;

      c.  Ms. McNeill's dress being shorter;

     d.   Ms. McNeill's legs;

     e.   Ms. McNeill being "hot;"

     f.   How Jon Rosenbaum didn't like "gays," but Kaylin and Ms. McNeill "would be hot because you are 2 women;"

27.    Jon Rosenbaum engaged in the following improper and unwanted touching with Ms. McNeill and Ms. Culp:

     a.   In July 2022—still very early in Jon Rosenbaum's involvement with HK—Jon touched Ms. McNeill's face and said "you look young"

     b.   In August 2022, During a meeting in the conference room regarding HK's tanning products, Jon Rosenbaum placed his hand on Ms. McNeill's knee and rubbed his hand up her thigh, stating she had the "perfect legs" and that she would be a perfect "model for HK's tanner"

     c.   Put his hand on Ms. Culp's face and grazed down toward her breasts

28.    In July 2022, Jon Rosenbaum began to ask another employee Mindy McDermaid, about her "Mormon underwear" and how she would have sex with it on in front of Ms. McNeill . This occurred almost every day.

29.    In September 2022, Ms. McNeill went to Cancun and Jon Rosenbaum texted Ms. McNeill asking whether she could go on her "live" video in a bikini or topless.

30.    Thereafter, on October 4, Jon Rosenbaum forced two female employees, Amber and Silvana, to set up yoga mats so that Ms. McNeill and Ms. Culp to do yoga with him.

31.    During yoga, Jon Rosenbaum forced Ms. McNeill and Ms. Culp to do the yoga in front of him while he watched. He forced them to take off their shoes and made comments about their feet.

32.     During yoga, Jon Rosenbaum made sexual moaning noises the whole time. Ms. McNeill was terrified to look at Mr. Rosenbaum and does not know if he was doing yoga or something else while making these sexual noises.

33.     Jon Rosenbaum stated that he chose them for yoga because he "doesn't like old ladies" and he is "into young girls like Kaylin and Ms. McNeill."

34.     Toward the end of yoga, Mr. Rosenbaum told Ms. McNeill and Ms. Culp that "being flexible makes you good in bed."

35.     After yoga on October 4, Jon Rosenbaum insisted on showering next to Ms. McNeill's office even though other showers were available. Ms. McNeill tried to get Ms. Rosenbaum to shower in the apartment in the building, but Mr. Rosenbaum stated in front of Ms. McNeill, Ms. Culp and Ms. Teaster that "Mr. Rosenbaum expressed that he "[didn't] want to shower where a faggot showers because [he didn't] want to catch gaybeties," referring to a gay Head Kandy, Ryan Thompson, who had used the upstairs bathroom area.

36.     Despite Ms. McNeill's protests, Mr. Rosenbaum showered next to her office.

37.     Jon Rosenbaum walked out of the shower into Ms. McNeill's office completely nude, showing his penis, and asking for a towel.

38.     Ms. McNeill froze and became terrified. Her door was open and she ran out, texting Ms. Culp to bring Mr. Rosenbaum a towel. Ms. McNeill then ran into Amber Teaster and was sobbing. Ms. Tiester asked Ms. McNeill what was wrong and Ms. McNeill told her "John showed me his dick."

39.     Ms. McNeill then ran to the parking lot and got into her car. She was sobbing uncontrollably and texted Ms. Culp. Ms. Culp joined her in the car and Ms. McNeill told Ms. Culp that Mr. Rosenbaum had exposed himself to her. Ms. McNeill was terrified and felt that Mr.

Rosenbaum would have raped her had her door to the office been closed. Ms. McNeill told Ms. Culp that they were no longer going to do yoga, that Ms. Culp would no longer provide Mr. Rosenbaum with rides and that they needed to be extremely careful around Mr. Rosenbaum from now on.

40.    Thereafter, Ms. McNeill avoided Mr. Rosenbaum as much as she could. She would try to figure out when Mr. Rosenbaum would be in the office so that she could be there at different times. She confided in multiple co-workers that she became physically ill around Mr. Rosenbaum and would have panic attacks. Multiple Head Kandy employees witnessed this and will testify to their concern about Ms. McNeill and how she became a shell of a person after Mr. Rosenbaum's exposure.

41.    Ms. McNeill also suffered from severe anxiety about telling her husband about Mr. Rosenbaum's exposure. When Ms. McNeill finally told her husband, he immediately called Bryan Feldman to complain, telling Mr. Feldman the behavior had to stop. This was after Ms. McNeill also informed Mr. Feldman about the yoga. At the time, Mr. Feldman took no action on the harassment, which continued after he was informed.

42.    Despite Ms. McNeill's attempts to avoid Mr. Rosenbaum, she could not, given that he was coming to the office multiple times a month. The harassment continued.

43.    For example, on November 3, Jon Rosenbaum texted Ms. McNeill that she looked "really pretty" in her "live" video and "really hot" in her Tik Tok that same day.

44.    On other occasions, Jon Rosenbaum:

   a.  Commented that Ms. McNeill looked so good from her vacation and that she would be "the hottest girl on a nude beach;"

   b.  Asked Ms. McNeill if she skinny dipped in the hot tub at night;

    c.  Spoke constantly about a friend's affairs (with his wife's approval) and all of the sexual activity that occurred;

    d.  Stated that he didn't "want to shower where that faggot showered;"

    e.  Texted Ms. McNeill about her boobs, legs, and looks.

45.    Mr. Rosenbaum spoke about sex, Ms. McNeill's looks, Ms. Culp's looks and other sexual comments on almost **every single occasion** they interacted.

46.    In addition, Mr. Rosenbaum engaged in non-sexual, gender based harassment and discrimination on a regular basis. These actions included, but were not limited to:

    a.  Calling Ms. McNeill stupid, dumb, and constantly berating her in front of others;

    b.  Constantly yelling at Ms. McNeill and other female employees;

    c.  Making comments suggesting women did not belong in high-up positions in any company;

    d.  Making comments suggesting that women do not know how to run businesses and are not savvy enough;

    e.  Treating male employees like friends, including talking to them, laughing with them, and excusing mistakes.

47.    Upon information and belief, Mr. Rosenbaum never berated any male employee, called any male employee dumb, or stupid. Mr. Rosenbaum even told Mr. McNeill that he did not want to deal with his wife, but he would deal with Mr. McNeill.

48.    Many women who worked for Head Kandy will testify that Mr. Rosenbaum treated women differently by punishing them, demeaning them, calling them too emotional and not capable of taking action in the business, which led to both discrimination and harassment.

49.    When Ms. McNeill rebuffed Mr. Rosenbaum's sexual advances, he told her Head Kandy was "liquidating" and that she was going to lose her company. He also taunted Ms.

McNeill, telling her to go ahead and complain and good luck, because Mr. Falic would never do anything to Mr. Rosenbaum. Mr. Rosenbaum constantly made it a point to tell Ms. McNeill that he and Jerome Falic were "best friends" and told Ms. McNeill when they did things as friends outside of the working relationship. Mr. Rosenbaum consistently intimidated Ms. McNeill and discouraged her from complaining about his improper behavior when she rebuffed his advances.

50.     Ms. McNeill believed Mr. Falic would appreciate the significance of Mr. Rosenbaum's conduct given his statements during the "Me Too" movement when Hard Candy attempted to trademark the "Me Too" phrase.   Mr. Falic's statement appeared in an online publication of *Glamour*:[3]

GLAMOUR

NEWSLETTER

**Update (January 18, 2018, 8 P.M.):**

We received the following statement from Hard Candy CEO Jerome Falic:

"As a brand devoted to women since its inception, Hard Candy has and will continue to support women's rights. Hard Candy has always quietly and proudly supported a non-profit organization that directly contributes to many women's causes. When the trademark application for #metoo was filed, one of our objectives was to bring greater awareness to this important and long overdue movement. We planned to donate 100% of all profits arising from this trademark to #metoo. Based on several public responses, we have abandoned the application. We will continue to support the work of this watershed movement and other causes that respect the dignity of women and all people."

51.     On November 20, 2022, Ms. McNeill, with her husband, Dusty McNeill, flew to Mr. Falic's personal residence for an in-person meeting.  Mr. Falic's wife, Deborah Falic, hosted

---

[3] The full article can be accessed at https://www.glamour.com/story/hard-candy-trademark-me-too.

the McNeills and was present for a portion of the meeting.  During the meeting, Ms. McNeill informed Mr. Falic of Mr. Rosenbaum's conduct.

**Retaliation Against Ms. McNeill**

52.    On November 28, 2022, a mere eight days after her meeting with Mr. Falic, Ms. McNeill received a Notice of Material Breach of the Employment Agreement from HK's outside legal counsel.  At this time, HK and Mr. Falic disclosed their desire and intent to steal Ms. McNeill's ownership interest in HK and saddle her with significant financial distress.  In the letter, HK stated that it could "cancel" her ownership interest in HK and "void" all of its financial obligations to her, without providing any authority for such extreme actions.  No complaint or allegation pertaining to Ms. McNeill's conduct had been made during her multi-year tenure with HK prior to November 28, 2022.

53.    On December 1, 2022, again through a letter from HK's legal counsel, HK formally stripped Ms. McNeill of all responsibilities and authority pertaining to the operations, business, management and supervision of HK and its employees.  Ms. McNeill was also no longer allowed to engage in content creation or product development for HK without express direction from HK's marketing team.  In addition, the letter informed Ms. McNeill that Mr. Falic would make a formal announcement on December 2, 2022 naming Mr. Rosenbaum in charge of company business and operations.

54.    Pursuant to Section 2 of the Employment Agreement, Ms. McNeill's responsibilities, duties and authority necessarily included oversight and management of strategic initiatives and general operational activities of HK.

55.    On December 16, 2022, HK suspended Ms. McNeill, effective immediately, and precluded her from doing work of any nature for HK and from entering HK's offices.

56.     On January 30, 2022, while still under suspension, Ms. McNeill was provided formal notice of her termination by HK (the "Termination Notice").

57.     According to the Termination Notice, Ms. McNeill was terminated for "cause" under Section 4(a)(ii) of the Employment Agreement.  However, because Ms. McNeill was terminated in retaliation for reporting Mr. Rosenbaum's conduct, Ms. McNeill had not committed any of the alleged acts identified in the Termination Notice that purportedly formed the basis for her termination.  Additionally, Ms. McNeill had not committed any other acts which could have constituted "cause" for termination, as defined in Section 4(a)(ii) of the Employment Agreement.

58.     Upon information and belief, prior to Ms. McNeill's termination and continuing thereafter, HK made false, disparaging and defamatory statements about Ms. McNeill to third parties.  HK told its affiliate salespersons and others, including Angela Porta, that Ms. McNeill had engaged in illicit business practices when operating both Lashed Out and HK, such as embezzling company funds, mistreating employees, unauthorized use of a company credit card, engaging in deceitful marketing practices and mishandling of corporate records.

59.     At the time HK acquired Lashed Out's assets, Ms. McNeill obtained a twenty percent ownership interest in HK.

60.     Ms. McNeill, as an owner of HK, has the right to, among other things, inspect and copy minutes of board of directors meetings, records of any actions taken by the board of directors, and the accounting records of HK.  Since at least November 28, 2022, HK and Mr. Falic have intentionally prevented Ms. McNeill from enjoying all rights, privileges and activities afforded members under that May 3, 2018 Amended and Restated Limited Liability Company Operating Agreement of Head Kandy LLC (the "Operating Agreement").

61.     On February 17, 2023, Mr. Falic executed a resolution (the "Resolution") wherein HK and Mr. Falic falsely claimed that HK held an option to repurchase all of Ms. McNeill's twenty percent ownership interest in HK under Section 8.5 of the Operating Agreement.

62.     Ms. McNeill was not an Executive, as defined in the Operating Agreement, at the time of her termination by HK.

63.     Section 8.5 of the Operating Agreement provides a comprehensive method for determining the purchase price of units repurchased pursuant to that Section.  Section 8.5 does not allow for credit against or setoff of the prescribed purchase price.

64.     As of the filing of this pleading, Ms. McNeill has not received any payment for her HK ownership interest purportedly repurchased by HK.

65.     Mr. Falic's and HK's felonious theft of Ms. McNeill's ownership interest in HK has denied her of the rights she is entitled to under the Operating Agreement as a member of HK.

66.     Upon information and belief, HK further retaliated against Ms. McNeill by falsely notifying the Internal Revenue Service that she failed to report income she received from HK.

67.     The effect of Mr. Rosenbaum's, Mr. Falic's and HK's actions directed against Ms. McNeill were devastating.  Ms. McNeill was forced to restart her life.  The emotional toll upon her was almost unbearable.  Ms. McNeill suffered from suicidal thoughts.  She was unable to take care of her basic needs or those of her three children.

**HK's Failure to Pay Ms. McNeill's Compensation**

68.     Ms. McNeill continuously remained an employee of HK pursuant to the Employment Agreement, without amendment, until she was terminated by the company on January 30, 2023.

69.     Pursuant to the terms of the Employment Agreement, Ms. McNeill was entitled to certain compensation that included, among other things, an annual base salary, paid vacation and performance-based bonuses.

70.     Pursuant to Section 3(a), Ms. McNeill was entitled to an annual salary.  At the time of her termination, Ms. McNeill had earned ten (10) days of unpaid salary totaling $5,479.50.

71.     The initial term of the Employment Agreement ran from May 3, 2018 to May 2, 2023.  At that time of Ms. McNeill's termination, approximately four months of the initial term remained.  Pursuant to Section 4(c)(i) of the Employment Agreement, Ms. McNeill was entitled to payment of her base salary for the remainder of the initial term if HK terminated the Employment Agreement without "cause," as defined in the Employment Agreement.  No for "cause" basis existed for terminating Ms. McNeill at the time HK provided her with notice of termination.  Ms. McNeill is entitled to approximately $50,000 in additional unpaid base salary.

72.     Pursuant to Section 3(c) of the Employment Agreement, Ms. McNeill was entitled to fifteen days paid vacation for every year of her employment with HK.  At the time of her termination, Ms. McNeill was entitled to payment by HK for her accrued and unused vacation totaling $39,041.11.

73.     Pursuant to Section 3(b) of the Employment Agreement, Ms. McNeill was entitled to an annual bonus comprised of ten percent of HK's net profit for the subject year and calculated using HK's audited financial statements.

74.     As of August 26, 2022, Head Kandy had failed to satisfy its obligation under Section 3(b) of the Employment Agreement to obtain audited financial statements to calculate Ms. McNeill's bonus for any year during her employment.

75.     HK has not paid Ms. McNeill a bonus for any calendar year she worked for HK. As of the time of filing this pleading, Ms. McNeill is unable to independently calculate the amount of her unpaid bonuses because she has not received any audited financial statements from HK.   Nonetheless, on August 25, 2022, Mr. Rosenbaum wrote to HK's Chief Financial Officer, Ms. Kleitias Petri, stating: "Klei, I need the figure by Monday morning.  Meeting with Jerome on Monday afternoon and I want this diners [sic]."  By email dated August 26, 2022, Ms. Petri notified Mr. Rosenbaum that HK owed Ms. McNeill unpaid bonuses for the period of 2018-2021 in the amount of $84,554.39.  Ms. Petri also acknowledged that Head Kandy had never obtained audited financials.  Mr. Rosenbaum also acknowledged that the bonuses were owed and outstanding in correspondence with Ms. McNeill.  On August 24, 2022, Mr. Rosenbaum assured Ms. McNeil in a text message that "I'll get ur bonus paid."   On August 31, 2022, Mr. Rosenbaum again confirmed to Ms. McNeil that "I'll make sure ur bonus is paid."

76.     HK's ordinary supplies, inventory and other expenses were charged to the Credit Card.  HK was required to then reimburse Ms. McNeill for such expenses.

77.     At the time of her termination, there were company expenses charged to the Credit Card in the amount of $99,679.77.

78.     Despite the established, agreed upon process for payment of the expenses and Ms. McNeill subsequently demanding payment of the outstanding expenses, HK refused to pay the expenses prior to the payment due date.

79.     As a result, Ms. McNeill was forced to personally pay all of HK's charged expenses to avoid penalties, such as late charges, default interest and deterioration of her credit.

80.     In addition, Ms. McNeill had previously paid $39,110.71 in HK business expenses.  Thus, HK owed Ms. McNeill $138,790.48 for its business expenses she was forced to pay.

81.     At the time HK fired Ms. McNeill and refused to pay almost $139,000 in business expenses it charged to her Credit Card, HK also fired Ms. McNeill's husband.  As a result, the McNeills lost all household income and were simultaneously forced to pay HK's business expenses.

82.     Ms. McNeill made a global demand for all unpaid wages and other compensation through correspondence between counsel for the parties on February 3, 2023.

83.     On February 10, 2023, counsel for Head Kandy informed the undersigned that no payment would be made in response to the final demand.

84.     As a result, Ms. McNeill was forced to initiate a proceeding against HK on February 13, 2023 in Colorado state court, styled as *Kayla M. McNeill v. Head Kandy, LLC*, Chaffee County District Court, Case No. 2023CV30007 (the "Colorado Action"), to obtain her unpaid compensation.

85.     HK learned of the pending Colorado Action on February 21, 2023.  This matter was commenced on February 22, 2023 for the sole purpose of depriving Ms. McNeill of her chosen forum for resolution of her Colorado wage claim.

86.     HK successfully obtained dismissal of the Colorado Action on the basis that the parties are contractually obligated to arbitrate their claims pursuant to the Federal Arbitration Act, 9 U.S.C. § 1, *et seq*.  Despite its representations, HK never submitted any of its claims to Arbitration.

**Ms. McNeill's Loan to HK**

87.     In or around May 2019, Ms. McNeill entered into a loan agreement with HK (the "Loan").

88.     Pursuant to the terms of the Loan, Ms. McNeill agreed to loan HK $145,000 and HK agreed to repay Ms. McNeill through annual payments of principal and interest, which accrued at seven percent.

89.     HK stopped servicing the Loan in January 2022.

90.     As of the filing of this pleading, the Loan remains in default and unpaid.

**Lease of Ms. McNeill's Forklift to HK**

91.     Beginning in May 2018, Ms. McNeill leased her personal forklift (the "Forklift") to HK, without payment from HK.

92.     On June 10, 2021, Ms. McNeill and HK entered into a lease agreement (the "Forklift Lease") for HK's use of the Forklift.

93.     Pursuant to the lease, HK was required to make monthly lease payments of $1,000, without any back payments.

94.     HK failed to make lease payments for December 2022, January 2023, February 2023 and March 2023.

95.     HK unilaterally terminated the Forklift Lease in March 2023.

96.     Since its purported termination of the Forklift Lease, HK has failed and refused to return the Forklift to Ms. McNeill.

**HK's Surreptitious Takeover of Ms. McNeill's Social Media Accounts**

97.     On November 6, 2018, Ms. McNeill created a personal Facebook page, which was assigned Page ID 1642077422564196 (the "FB Account").

98.     In or around November 2018, Ms. McNeill also created a personal TikTok account (together with the FB Account, the "Personal Social Media Accounts").

99.     Ms. McNeill was the registered owner of the Personal Social Media Accounts at all times during her employment with HK.  Ms. McNeill has always maintained that the Personal Social Media Accounts are her sole and exclusive property.  HK acknowledged Ms. McNeill's assertion of her rights in and to the Personal Social Media Accounts on several occasions, at least as early as December 1, 2022.

100.     Following Ms. McNeill's dispossession of the Personal Social Media Account by HK, HK began using the Accounts for its exclusive commercial benefit.

101.     Up to at least April 11, 2023, pictures and videos owned by Ms. McNeill of herself and her family were visible on the Personal Social Media Accounts (the "Social Media Content").

**HK's Unauthorized Use of Ms. McNeill's Name, Likeness and Identity**

102.     Since Ms. McNeill's termination, HK has engaged in and continues to engage in the unauthorized use of Ms. McNeill's name, likeness and identity for its exclusive benefit. During the time period, HK has used Ms. McNeill's name, likeness and identity, without authority, in its marketing materials, product inserts and other materials.  The following are examples of such use:



103.    Ms. McNeill has not authorized HK to use her name, image or likeness for any

purpose.  Ms. McNeill has made multiple demands to HK that it cease its unauthorized use.  HK

has refused to comply with Ms. McNeill's requests.

**HK's Inducement to Breach the Employment Agreement**

104.    During Ms. McNeill's discussions with HK following her November 28, 2022

meeting with Mr. Falic, HK, through counsel, informed Ms. McNeill that HK did not consider

her continued operation of a company she recently started named White Pineapple ("Whipi") to

be a violation of the Employment Agreement.  HK also informed Ms. McNeill that it did not

consider product reviews or tutorials she conducted on her social media accounts to be in

violation of the Employment Agreement.  Following this inducement, Ms. McNeill continued

her involvement with Whipi and posted product reviews and tutorials to social media.  HK now

maintains claims against Ms. McNeill in this proceeding for engaging in the vary conduct it

induced her to engage in.

### FIRST CLAIM FOR RELIEF[4]
### Breach of Contract, Employment Agreement, against HK

105.     Ms. McNeill realleges and incorporates the allegations of all other paragraphs of this pleading as if fully and completely restated herein.

106.     The Employment Agreement is a valid and binding contract as of the date of HK's breach.

107.     HK materially breached the Employment Agreement by failing to satisfy its obligations thereunder, including at least the following:

   a.     Failing to timely obtain audited financial statements pursuant to Section 3(b);

   b.     failing to timely determine Ms. McNeill's bonuses for the years of 2018, 2019, 2020, 2021 and 2022 pursuant to Section 3(b);

   c.     failing to pay Ms. McNeill her bonuses when they became due pursuant to Section 3(b);

   d.     demoting Ms. McNeill and preventing her from engaging in and exercising the responsibilities, duties and authority described in Section 2;

   e.     falsely terminating Ms. McNeill "for cause" under Section 4(a)(ii);

   f.     non-payment of Ms. McNeill's base salary;

   g.     non-payment of Ms. McNeill's accrued vacation; and,

   h.     failing to reimburse Ms. McNeill for HK's business expenses charged to Ms. McNeill's Credit Card; and,

---

[4] Ms. McNeill presently has a charge pending against the HK Parties with the Florida Human Rights Commission. Consequently, pursuant to Florida State law, Ms. McNeill is precluded from asserting claims under Florida State law related to the pending charge. Ms. McNeill reserves her right to file such claims and hereby provides notice to all other parties of her intent to pursue such claims if and when she is able.

        i.      inducing Ms. McNeill to breach the restrictive covenants within the Employment Agreement.

108.    Ms. McNeill performed all of her obligations under the Employment Agreement at the time each of HK's material breaches occurred.

109.    Ms. McNeill has substantially performed under the terms of the Employment Agreement.

110.    Ms. McNeill has suffered and continues to incur damages as a result of HK's conduct, in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF
### Breach of Contract, Amended and Restated Limited Liability Company Operating Agreement, against HK and Mr. Falic

111.    Ms. McNeill realleges and incorporates the allegations of all other paragraphs of this pleading as if fully and completely restated herein.

112.    The Operating Agreement is a valid and binding contract.

113.    Mr. Falic has served as HK's agent through his role as managing member since its formation in 2018.

114.

115.    In the alternative, HK and Mr. Falic materially breached the Operating Agreement by failing to pay Ms. McNeill the contractually mandated purchase price for her membership interest set forth in Section 8.5.

116.    Ms. McNeill performed all of her obligations under the Operating Agreement at the time each of HK's and Mr. Falic's material breaches occurred.

117.    Ms. McNeill has substantially performed under the terms of the Operating Agreement.

118.    Mr. Falic's conduct constitutes willful misconduct and unlawful acts.

119.    Ms. McNeill has suffered and continues to incur damages as a result of HK's and Mr. Falic's conduct, in an amount to be proven at trial.

## THIRD CLAIM FOR RELIEF
### Breach of Contract, Loan Agreement, against HK

120.    Ms. McNeill realleges and incorporates the allegations of all other paragraphs of this pleading as if fully and completely restated herein.

121.    The Loan is a valid and binding contract between Ms. McNeill and HK.

122.    HK materially breached the Loan by failing to make interest and/or principal payments as they became due.

123.    Ms. McNeill performed all of her obligations under the Loan at the time each of HK's material breaches occurred.

124.    Ms. McNeill has substantially performed under the terms of the Loan.

125.    Ms. McNeill has suffered and continues to incur damages as a result of HK's conduct, in an amount to be proven at trial.

## FOURTH CLAIM FOR RELIEF
### Breach of Contract, Forklift Lease, against HK

126.    Ms. McNeill realleges and incorporates the allegations of all other paragraphs of this pleading as if fully and completely restated herein.

127.    The Forklift Lease is a valid and binding contract between Ms. McNeill and HK.

128.    HK materially breached the Forklift Lease by failing to make lease payments thereunder as they became due.

129.    Ms. McNeill performed all of her obligations under the Forklift Lease at the time each of HK's material breaches occurred.

130.    Ms. McNeill has substantially performed under the terms of the Forklift Lease.

131.    Ms. McNeill has suffered and continues to incur damages as a result of HK's conduct, in an amount to be proven at trial.

**FIFTH CLAIM FOR RELIEF**
**Colorado Civil Theft, C.R.S. § 18-4-405, against HK and Mr. Falic**

132.    Ms. McNeill realleges and incorporates the allegations of all other paragraphs of this pleading as if fully and completely restated herein.

133.    Ms. McNeill was a resident of Colorado at all relevant times.

134.    Ms. McNeill owns and has exclusive rights to the Personal Social Media Accounts, the Social Media Content, her Forklift and her ownership interest in HK.

135.    HK and Mr. Falic, through deception and fraud, obtained exclusive control over the Personal Social Media Accounts, the Social Media Content, the Forklift and Ms. McNeill's ownership interest in HK with the intent to deprive Ms. McNeill of their use and value.  Neither HK nor Mr. Falic was legally entitled to the Personal Social Media Accounts, the Social Media Content, the Forklift or Ms. McNeill's ownership interest in HK.

136.    Ms. McNeill has suffered and continues to incur damages as a result of HK's and Mr. Falic's conduct, in an amount to be proven at trial.

**SIXTH CLAIM FOR RELIEF**
**Florida Civil Theft, Fla. Stat. §§ 772.11 and 812.014, against HK and Mr. Falic**

137.    Ms. McNeill realleges and incorporates the allegations of all other paragraphs of this pleading as if fully and completely restated herein.

138.    Ms. McNeill owns and has exclusive rights to the Personal Social Media Accounts, the Social Media Content, her Forklift and her ownership interest in HK.

139.    HK and Mr. Falic knowingly obtained and used the Personal Social Media Accounts, the Social Media Content, the Forklift and Ms. McNeill's ownership interest in HK with the intent to temporarily or permanently deprive Ms. McNeill of her exclusive ownership, possession and use rights in and to the Personal Social Media Accounts, the Social Media Content, the Forklift and Ms. McNeill's ownership interest in HK.

140.    Ms. McNeill has suffered and continues to incur damages as a result of HK's and Mr. Falic's conduct, in an amount to be proven at trial.

## SEVENTH CLAIM FOR RELIEF
### Colorado Wage Act, C.R.S. § 8-4-101, *et seq*., against HK and Mr. Falic

141.    Ms. McNeill realleges and incorporates the allegations of all other paragraphs of this pleading as if fully and completely restated herein.

142.    Ms. McNeill was a resident of Colorado at all relevant times.

143.    Ms. McNeill was an employee of HK at all relevant times until her employment was terminated at HK's volition.

144.    Mr. Falic has served as HK's agent, acting in the interest of HK, through his role as managing member since its formation in 2018.

145.    At the time Ms. McNeill was terminated, Ms. McNeill had earned, vested, determinable and unpaid wages and other compensation that HK and Mr. Falic failed and refused to pay her.

146.     Ms. McNeill has made multiple demands to HK and Mr. Falic for payment of the unpaid wages and other compensation.

147.     HK and Mr. Falic have falsely denied the amount, validity and status of Ms. McNeill's wage claim with the intent of securing a discount upon or underpayment of such indebtedness.

148.     HK and Mr. Falic have falsely denied the amount, validity and status of Ms. McNeill's wage claim with the intent to annoy, harass, oppress, hinder, coerce, delay or defraud Ms. McNeill.

149.     HK and Mr. Falic have willfully failed and refused to pay Ms. McNeill any portion of the unpaid wages and other compensation.

150.     Mr. Falic's conduct constitutes willful misconduct and unlawful acts.

151.     Ms. McNeill has been injured in an amount of at least $278,754.77, plus interest and attorneys' fees, which continue to accrue, as a result of HK's and Mr. Falic's conduct.

**EIGHTH Claim for Relief**
**Invasion of Privacy by Appropriation against HK**

152.      Ms. McNeill realleges and incorporates the allegations of all other paragraphs of this pleading as if fully and completely restated herein.

153.     HK used Ms. McNeill's name, likeness and/or identity.

154.     HK's use of Ms. McNeill's name, likeness and/or identity was for HK's own purposes or benefit, commercially or otherwise.

155.     Ms. McNeill has been injured and will continue to be injured as a result of HK's conduct, in an amount to be proven at trial.

**NINETH CLAIM FOR RELIEF**
**Invasion of Right of Publicity, Fla. Stat. § 540.08, against HK**

156.     Ms. McNeill realleges and incorporates the allegations of all other paragraphs of this pleading as if fully and completely restated herein.

157.     HK published, printed, displayed and/or otherwise publicly used Ms. McNeill's name, photograph and/or other likeness for commercial and advertising purposes.

158.     At the time HK engaged in the foregoing actions, it had not been given express written or oral consent by Ms. McNeill to do so.

159.     Ms. McNeill has been injured and will continue to be injured as a result of HK's conduct, in an amount to be proven at trial.

**TENTH CLAIM FOR RELIEF**
**Conversion against HK**

160.     Ms. McNeill realleges and incorporates the allegations of all other paragraphs of this pleading as if fully and completely restated herein.

161.     Ms. McNeill owns and has exclusive rights to the Personal Social Media Accounts, the Social Media Content and her Forklift.

162.     HK's exercise of control over the Personal Social Media Accounts, the Social Media Content and the Forklift was not authorized by Ms. McNeill and was intended to permanently deprive Ms. McNeill of the full use and benefit of the Personal Social Media Accounts, the Social Media Content and the Forklift.

163.     Ms. McNeill has suffered and continues to incur damages as a result of HK's conduct, in an amount to be proven at trial.

**ELEVENTH CLAIM FOR RELIEF**
**Unjust Enrichment against HK**

164.     Ms. McNeill realleges and incorporates the allegations of all other paragraphs of this pleading as if fully and completely restated herein.

165.    Through Ms. McNeill's labor, lease of the Forklift, granting of access to the Social Media Accounts and payment of HK's business expenses, Ms. McNeill conferred a benefit on HK.

166.    HK knew of these benefits and retained them, and it would be inequitable for HK to retain the benefits without paying for them.

167.    Ms. McNeill has been injured and will continue to be injured as a result of HK's conduct, in an amount to be proven at trial.

**TWELFTH CLAIM FOR RELIEF**
**Intentional Infliction of Emotional Distress against HK, Mr. Falic and Mr. Rosenbaum**

168.    Ms. McNeill realleges and incorporates the allegations of all other paragraphs of this pleading as if fully and completely restated herein.

169.    HK's and Mr. Falic's conduct, which was designed to demoralize, oppress, harass and oust Ms. McNeill from her employment and ownership positions with HK, was extreme and outrageous, including their failure to protect Ms. McNeill from severe and grotesque sexual harassment, failure to respond to Ms. McNeill's complaints and other intentional and deliberate actions meant to degrade Ms. McNeill and deprive her of her livelihood.

170.    HK's and Mr. Falic's conduct was intended to cause Ms. McNeill severe emotional distress.

171.    Ms. McNeill's mental suffering was deliberately and recklessly inflicted by HK and Mr. Falic.

172.    HK's and Mr. Falic's conduct resulted in severe emotional distress to Ms. McNeill.

173.    Ms. McNeill has been injured and will continue to be injured as a result of HK's and Mr. Falic's conduct, in an amount to be proven at trial, but at least in an amount equivalent

to the amount Ms. McNeill has spent on therapy trying to cope with her extreme emotional distress.

174.    Mr. Rosenbaum's persistent, unwanted and inappropriate sexual conduct specifically targeted at Ms. McNeill was extreme and outrageous.

175.    Mr. Rosenbaum's conduct was intended to cause Ms. McNeill severe emotional distress.

176.    Ms. McNeill's mental suffering was deliberately and recklessly inflicted by Mr. Rosenbaum.

177.    Mr. Rosenbaum's conduct resulted in severe emotional distress to Ms. McNeill.

178.    Ms. McNeill has been injured and will continue to be injured as a result of Mr. Rosenbaum's conduct, in an amount to be proven at trial, but at least in an amount equivalent to the amount Ms. McNeill has spent on therapy trying to cope with her extreme emotional distress.

**THIRTEENTH CLAIM FOR RELIEF**
**Negligent Infliction of Emotional Distress against HK, Mr. Rosenbaum and Mr. Falic**

179.    Ms. McNeill realleges and incorporates the allegations of all other paragraphs of this pleading as if fully and completely restated herein.

180.    HK had a duty to exercise reasonable care in preventing workplace discrimination.

181.    HK failed to exercise reasonable care in its hiring and retention of Mr. Rosenbaum, and in its treatment of Ms. McNeill following her disclosure of inappropriate sexual conduct by Mr. Rosenbaum.

182.    Upon information and belief, HK was aware that Mr. Rosenbaum had previously sexually harassed other women.

183.     It was reasonably foreseeable that HK's conduct would cause Ms. McNeill severe emotional distress.

184.     Ms. McNeill suffered severe emotional distress as a result of HK's conduct.

185.     Ms. McNeill has been injured and will continue to be injured as a result of HK's conduct, in an amount to be proven at trial.

186.     Mr. Rosenbaum had a duty to exercise reasonable care in his conduct towards Ms. McNeill.

187.     Mr. Rosenbaum failed to exercise reasonable care by engaging in persistent, unwanted and inappropriate sexual conduct specifically targeted at Ms. McNeill.

188.     It was reasonably foreseeable that Mr. Rosenbaum's conduct would cause Ms. McNeill severe emotional distress.

189.     Ms. McNeill suffered severe emotional distress as a result of Mr. Rosenbaum's conduct.

190.     Ms. McNeill has been injured and will continue to be injured as a result of Mr. Rosenbaum's conduct, in an amount to be proven at trial.

191.     Mr. Falic had a duty to exercise reasonable care in his management of HK.

192.     Mr. Falic failed to exercise reasonable care by hiring and retaining Mr. Rosenbaum despite knowing of Mr. Rosenbaum's inappropriate sexual conduct.  Further, Mr. Falic failed to exercise reasonable care in addressing Ms. McNeill's complaint of sexual misconduct by Mr. Rosenbaum, and instead terminated her for making her legally protected complaint.

193.     It was reasonably foreseeable that Mr. Falic's conduct would cause Ms. McNeill severe emotional distress.

194.    Ms. McNeill suffered severe emotional distress as a result of Mr. Falic's conduct.

195.    Ms. McNeill has been injured and will continue to be injured as a result of Mr. Falic's conduct, in an amount to be proven at trial.

**FOURTEENTH CLAIM FOR RELIEF**
**Extreme and Outrageous Conduct against HK, Mr. Falic and Mr. Rosenbaum**

196.    Ms. McNeill realleges and incorporates the allegations of all other paragraphs of this pleading as if fully and completely restated herein.

197.    Following Ms. McNeill's November 20, 2022 meeting with Mr. Falic during which she notified Mr. Falic of Mr. Rosenbaum's persistent, unwanted and inappropriate sexual conduct specifically targeted at her, HK and Mr. Falic engaged in extreme and outrageous conduct, including their failure to protect Ms. McNeill from severe and grotesque sexual harassment, failure to respond to Ms. McNeill's complaints and other intentional and deliberate actions meant to demoralize, oppress, harass and oust Ms. McNeill from her employment and ownership positions with HK and, in the process, depriving her of her livelihood.

198.    HK and Mr. Falic acted with the intent to cause severe emotional distress or with reckless disregard of the high probability of causing severe emotional distress to Ms. McNeill.

199.    Ms. McNeill has been injured and will continue to be injured as a result of HK's and Mr. Falic's conduct, in an amount to be proven at trial.

200.    Mr. Rosenbaum engaged in extreme and outrageous conduct through his persistent, unwanted and inappropriate sexual conduct specifically targeted at Ms. McNeill.

201.    Mr. Rosenbaum acted with the intent to cause severe emotional distress or with reckless disregard of the high probability of causing severe emotional distress to Ms. McNeill.

202.    Ms. McNeill has been injured and will continue to be injured as a result of Mr. Rosenbaum's conduct, in an amount to be proven at trial.

## FIFTEENTH CLAIM FOR RELIEF
### Negligent Hiring/Supervision/Retention against HK

203.    Ms. McNeill realleges and incorporates the allegations of all other paragraphs of this pleading as if fully and completely restated herein.

204.    HK had a duty to exercise reasonable care in preventing workplace discrimination.

205.    HK was aware or had constructive notice of Mr. Rosenbaum's inappropriate sexual behavior; particularly, after Ms. McNeill's November 20, 2023 meeting with Mr. Falic. Upon information and belief, HK was aware or had constructive notice of Mr. Rosenbaum's inappropriate conduct, including harassment, which occurred during his prior employment.

206.    When HK became aware of Mr. Rosenbaum's improper conduct toward Ms. McNeill, HK failed to protect Ms. McNeill, failed to properly address the complaint, failed to take corrective action against Mr. Rosenbaum and, instead, retaliated against Ms. McNeill by terminating her.

207.    Mr. Rosenbaum's behavior resulted in injury to Ms. McNeill, including extreme emotional distress and loss of employment.

208.    Ms. McNeill has been injured and will continue to be injured as a result of HK's conduct, in an amount to be proven at trial, including compensation for her emotional distress, back and front pay, and future wages.

## SIXTEENTH CLAIM FOR RELIEF
### Wrongful Discharge in Violation of Public Policy of North Carolina

209.    Ms. McNeill realleges and incorporates the allegations of all other paragraphs of this pleading as if fully and completely restated herein.

210.     Ms. McNeill suffered discrimination on the basis of her sex when Mr. Rosenbaum engaged in persistent, unwanted and inappropriate sexual conduct specifically targeted at Ms. McNeill.   The majority of Mr. Rosenbaum's conduct occurring at HK's offices in North Carolina.

211.     Eight days after Ms. McNeill explicitly reported Mr. Rosenbaum's conduct to Mr. Falic, Ms. McNeill received a Notice of Material Breach of the Employment Agreement from HK's outside legal counsel.   Such notice was improper retaliation against Ms. McNeill for reporting the sexual harassment and abuse Mr. Rosenbaum had inflicted upon her.

212.     North Carolina has a clear public policy in prohibiting sexual harassment of employees and prohibiting retaliation of employees for reporting improper sexual conduct to their employer.

213.     It is against North Carolina's public policy to terminate an employee for experiencing sexual harassment and/or retaliating against an employee for reporting harassment.

214.     Head Kandy terminated Ms. McNeill's employment as a result of Ms. McNeill reporting Mr. Rosenbaum's persistent, unwanted and inappropriate sexual conduct specifically targeted at Ms. McNeill.

215.     Ms. McNeill has been injured and will continue to be injured as a result of HK's conduct, in an amount to be proven at trial, but at minimum including back and front pay, emotional distress damages and future potential earnings.

## SEVENTEENTH CLAIM FOR RELIEF
### Defamation against HK

216.     Ms. McNeill realleges and incorporates the allegations of all other paragraphs of this pleading as if fully and completely restated herein.

217.    HK made defamatory statements to third parties about Ms. McNeill, including when it published or caused to be published false statements that Ms. McNeill had engaged in illicit business practices when operating both Lashed Out and HK, such as embezzling company funds, mistreating employees, unauthorized use of a company credit card, engaging in deceitful marketing practices and mishandling of corporate records.

218.    Ms. McNeill has been injured and will continue to be injured as a result of HK's conduct, in an amount to be proven at trial.

## Prayer for Relief

**WHEREFORE**, having stated the foregoing facts, Counterclaims and Third-Party Complaint, Ms. McNeill prays for this Honorable Court to:

a.      enter judgment in her favor and against HK consistent with each of the Counterclaims;

b.      enter judgment in her favor and against Messrs. Falic and Rosenbaum consistent with each Claim asserted against them;

c.      award her all general, consequential, punitive, statutory, compensatory and other damages, in amounts to be proven at trial, to the fullest extent allowable by law, including C.R.S. § 8-4-109(3)(b) and Fla. Stat. §§ 772.11 and 812.014;

d.      award her all legal expenses, such as litigation costs and attorneys' fees not otherwise awarded as damages, to the fullest extent allowable by law, including C.R.S. § 8-4-110(1)(b)(I) and Fla. Stat. §§ 772.11 and 812.014;

e.      award her pre- and post-judgment interest, or moratory interest, whichever is greater, to the fullest extent allowable by law; and,

f.      Award her such other and further relief which the Court deems just and proper.

**Ms. McNeill demands trial by jury on all issues so triable.**

DATED this 10th day of June, 2024.

Respectfully Submitted,

By: _/s/ Laura Burgess_
Laura E. Burgess, Esq.
Florida Bar No. 0105073
L.E. Burgess P.A.
5966 S Dixie Highway, Suite 300
Miami, FL 33143
Tel.: 305.942.8044
Alt. Tel.: 713.818.5055
laura@leburgesslaw.com

and

By: _/s/ Antonio L. Converse_
Antonio L. Converse, Esq.
Admitted _Pro Hac Vice_
Converse Law Group, P.C.
600 17th Street, Suite 2800 South
Denver, CO 80202
Tel: 303.228.9471
anthony@converselawgroup.com

and

By: _/s/ Jennifer A. Tiedeken_
Jennifer A. Tiedeken, Esq.
Admitted _Pro Hac Vice_
Davis & Ceriani, P.C.
1600 Stout Street, Suite 1710
Denver, CO 80202
Tel:  303.534.9000
jennifer@fortcollinslaw.com

COUNSEL FOR KAYLA MCNEILL

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 10, 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF and through that filing served all counsel of record.

*/s/ Laura E. Burgess*