UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-CV-60345-BECERRA/STRAUSS

HEAD KANDY, LLC,

     Plaintiff,

v.

KAYLA MARIE MCNEILL,

     Defendant.

_____/

## REPORT AND RECOMMENDATION

**THIS MATTER** comes before the Court upon Plaintiff's Expedited Motion to Enforce the Preliminary Injunction and for an Order to Show Cause ("Motion to Enforce") [DE 199] and Defendant's Motion to Partially Vacate the Preliminary Injunction and Partial Motion to Dismiss ("Motion to Vacate"). [DE 214].[1]  I have reviewed the Motion to Enforce along with the response and reply thereto, the Motion to Vacate along with the response and reply thereto, and all pertinent portions of the record.  Furthermore, on April 12, 2024, I conducted an evidentiary hearing on the Motion to Enforce (which included hearing argument on the Motion to Vacate, despite the fact that it was not-yet fully briefed).  [DE 229, 243].  For the following reasons, I respectfully **RECOMMEND** that the Court **DENY** the Motion to Vacate, **GRANT** the Motion to Enforce, find Defendant in civil contempt, and award Plaintiff attorney's fees as a sanction.

---

[1] The Honorable Jacqueline Becerra has referred both motions to me to take all necessary and proper action as required by law.  [DE 204, 228].  Because the Motion to Vacate seeks to vacate a portion of the Court's order granting Plaintiff injunctive relief and to dismiss certain of Plaintiff's claims in its Amended Complaint, it is a matter excepted from the grant of authority in 28 U.S.C. § 636(b)(1)(A); therefore, I enter a Report and Recommendation on the matter pursuant to § 636(b)(1)(B).  Because the Motion to Enforce seeks a finding of civil contempt, I hereby certify facts and recommend a disposition to the District Judge pursuant to § 636(e)(6)(B)(iii).

## BACKGROUND

This suit arises from Defendant's contentious separation from Plaintiff, a beauty and hair care company for whom she worked and in which she had an ownership interest. At the beginning of the parties' relationship, on May 3, 2018, Defendant, a social media influencer, sold Plaintiff certain assets, including the tradename "Head Kandy" and her LLC's website and social media pages, in exchange for $2.8 million and 20% ownership stake in Plaintiff. [DE 76–1]. The same day, Defendant signed an Executive Employment Agreement with Plaintiff. [DE 230–1].

Under the Executive Employment Agreement, Defendant agreed to serve as Plaintiff's creative director and would be responsible for developing and marketing Plaintiff's products on social media. *Id.* at 2. Defendant's duties also included "oversight and management of strategic initiatives and general operational activities of the Company." *Id.* For performing her duties, Defendant was to receive a base salary of $200,000 per year and an annual bonus at the end of each fiscal year from Plaintiff. *Id.* at 3. The Executive Employment Agreement also contains certain restrictive covenants. *Id.* at 6–7. Only two of those restrictions, the non-solicitation (of customers) and non-disparagement provisions, are relevant to the Motion to Enforce and the Motion to Vacate. Those restrictive covenants read as follows:

> ***No Solicitation of Customers***. Without limiting the generality of the provisions of Section 5(a), the Executive hereby agrees that during the thirty-six (36)-month period after the termination of the Executive's employment with the Company, the Executive will not, and will cause each of her affiliates not to, directly or indirectly, (i) solicit business related to the Restricted Business from any Person which is or was a client, customer, supplier, licensee, licensor or other business relation of the Company during the thirty-six (36)-month period preceding the date of the Executive's termination of employment, or from any successor in interest to any such Person, or (ii) solicit or encourage any client, customer, supplier, licensee or licensor of the Company to terminate or reduce such Person's relationship with the Company (including any Person engaged in discussions with the Company related to such Person becoming a client, customer, supplier, licensee or licensor of the Company).

> ***Non-Disparagement***. The Executive agrees and covenants that the Executive will not, at any time, make, publish or communicate to any Person or in any public forum any defamatory or disparaging remarks, comments or statements concerning the Company or its affiliates, or their businesses, or any of their employees, officers, and existing and prospective clients, suppliers, investors, and other associated third parties.  This Section 5(d) does not, in any way, restrict or impede the Executive from exercising protected rights to the extent that such rights cannot be waived by agreement, including, without limitation, the Executive's rights under the National Labor Relations Act, or rights to communicate with any other administrative or regulatory agency to report suspected unlawful conduct, or from complying with any applicable law or regulation or a valid order of a court of competent jurisdiction or an authorized government agency, provided that such compliance does not exceed that required by the law, regulation, or order.  The Executive shall promptly provide written notice of any such order to an authorized officer of the Company.

*Id.*at 7.

After filing its Amended Complaint, Plaintiff moved for a preliminary injunction to enforce those restrictive covenants and enjoin Defendant from making, publishing, or communicating any defamatory or disparaging remarks, comments or statements regarding Plaintiff to any person or in any public forum and from directly or indirectly soliciting Plaintiff's clients, customers, suppliers, licensees or licensors to terminate or reduce their relationship with Plaintiff.  [DE 47]. I conducted an evidentiary hearing on the matter and submitted a report and recommendation to the Court recommending that the Court enter an injunction.  [DE 133].  The Court then adopted my report and recommendation.  [DE 152].

The preliminary injunction ordered that Defendant:

[B]e enjoined and restrained from further violating Section 5 of the Executive Employment Agreement, including by directly or indirectly:

> (i) engaging in business related to the manufacture, sale, and distribution of hair-related products;

> (ii) providing management, business planning, sales, marketing, financial planning, or other similar services she provided to Plaintiff during her employment therewith, including social media promotion and influencing services, to or for any person engaged in the manufacture, sale, or distribution of hair related products;

(iii) soliciting business related to the manufacture, sale, and distribution of hair- related products from any person who is or was a client, customer, supplier, licensee, licensor or other business relation of Plaintiff;

(iv) soliciting or encouraging any client, customer, supplier, licensee, or licensor of Plaintiff to terminate or reduce such person's relationship with Plaintiff in any manner; and

(v) making, publishing, or communicating to any person or in any public forum any defamatory, disparaging, or otherwise negative or degrading comments, remarks, or statements concerning Plaintiff, or its affiliates, or their businesses or any of their respective employees, officers, existing and prospective clients, suppliers, investors, and other associated third parties.

*Id.* at 13–14.

The Motion to Enforce alleges that, on March 13, 2024, Defendant contacted a social media influencer who made a post about a product from a company called Hard Candy.[2]  Defendant asked if the influencer could call her and stated that she had "a direct tie to [H]ard [C]andy and a company called [H]ead Kandy."  [DE 230–4] at 2.  Defendant told the influencer that she "started a multi[-]million[-]dollar [b]rand and my company was taken from me by the owners of [H]ard [C]andy."  *Id.*  Defendant also told the influencer that she "was sexually harassed and retaliated against" and is "in a federal lawsuit with the owners of [H]ard [C]andy."  *Id.*  The influencer responded to Defendant stating that she was "sorry if that happened to [Defendant] but that doesn't sound like anything [she] want[ed] to be involved in."  *Id.*

In response to Defendant's contact with this influencer, Plaintiff filed its Motion to Enforce, asking the Court to hold Defendant in contempt and impose sanctions for her violation of the preliminary injunction.  [DE 199].  Defendant's response to Plaintiff's Motion to Enforce argues, among other things, that the preliminary injunction is no longer valid as the non-

---

[2] Plaintiff's owners also own and control Hard Candy, a cosmetics brand.  *See* [DE 199–1].

disparagement provision in the Executive Employment Agreement violates the National Labor Relations Act ("NLRA"). [DE 209]. A week after filing her response to the Motion to Enforce, Defendant filed her Motion to Vacate. [DE 214]. The Motion to Vacate contains the same argument Defendant raises in response to the Motion to Enforce.

On April 12, 2024, I conducted an evidentiary hearing on Plaintiff's Motion to Enforce.[3] [DE 229]. Although the hearing primarily focused on Plaintiff's Motion to Enforce, I did permit Defendant to raise several arguments from her Motion to Vacate, as the two issues have considerable overlap. I made it clear, however, that, due to the fact that Defendant filed her Motion to Vacate on the eve of the hearing, and that Plaintiff had not had an opportunity to file a response yet, I would not allow either party to put forth evidence that was exclusively relevant to the Motion to Vacate.[4]

The evidence the parties presented at the evidentiary hearing included documents about the corporate structure of Plaintiff and Hard Candy, the Executive Employment Agreement, Defendant's messages to the influencer, a letter between Plaintiff and Defendant, and the parties' previously stipulated facts. Plaintiff sought to call Defendant as a witness. However, Defendant was not present at the hearing, and Plaintiff had not served a subpoena compelling her attendance.

---

[3] I set the evidentiary hearing on Plaintiff's Motion to Enforce prior to Defendant's response and subsequent Motion to Vacate.

[4] At the April 12 hearing, Plaintiff intended to present witnesses and evidence in furtherance of her argument that, to the extent she had been a supervisor for Defendant and was thus exempt from the NLRA's protections, by the time she was terminated, she was no longer a supervisor and that she had been terminated (in part) for refusing to violate the rights of other employees under Section 7 of the NLRA. I informed the parties that the Court would set a further hearing if, after receiving the full briefing on the Motion to Vacate, the Court deemed it necessary to take evidence on these arguments or other factual disputes surrounding the Motion to Vacate. After evaluating the parties' arguments and briefs, I find that an additional hearing on Defendant's Motion to Vacate is not necessary.

Defendant sought to call two individuals who worked with Defendant as witnesses.  However, they ultimately did not testify, as their testimony was only relevant to Defendant's Motion to Vacate.  As a result, the Court did not hear live testimony from any witnesses at the evidentiary hearing.

<u>**ANALYSIS**</u>

Plaintiff alleges that Defendant violated the Court's preliminary injunction.  Plaintiff's Motion to Enforce consequently requests that the Court find Defendant in contempt and impose sanctions against Defendant for her statements to the influencer.  On the other hand, Defendant's Motion to Vacate requests that this Court modify its preliminary injunction and argues that the restrictive covenants in the Executive Employment Agreement are no longer valid.  Since resolution of the Motion to Vacate may moot Plaintiff's Motion to Enforce, I will address that motion first.  If the preliminary injunction is no longer valid, then the Court cannot recommend Defendant be held in civil contempt.  *See In re Managed Care*, 756 F.3d 1222, 1234 (11th Cir. 2014) ("Notwithstanding the deference afforded to the District Court's interpretation of its own orders, the law is clear that '[i]nvalidity of the underlying order is ... a defense to a civil contempt citation.'") (quoting *In re Novak*, 932 F.2d 1397, 1401 n.6 (11th Cir. 1991)).

I.      **Defendant's Motion to Vacate**

Defendant's Motion to Vacate should be denied.  "The dissolution of a preliminary injunction is a matter within the sound discretion of the [t]rial [c]ourt."  *Collum v. Edwards*, 578 F.2d 110, 113 (5th Cir. 1978).[5]  However, prior to "exercising its power to modify," the party seeking relief from the injunction must convince the court "that existing conditions differ so

---

[5] The Eleventh Circuit is bound by all published decisions of the former Fifth Circuit handed down prior to October 1, 1981.  *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1209 (11th Cir. 1981)

substantially from those which precipitated the decree as to warrant judicial adjustment." *Hodge v. Dep't of Hous. & Urb. Dev., Hous. Div., Dade Cnty., Fla.*, 862 F.2d 859, 862 (11th Cir. 1989).

Defendant contends that the Court must modify the preliminary injunction because the non-disparagement provision in the Executive Employment Agreement is void *ab initio* as it is overly broad and interferes with her Section 7 rights under the NLRA.

"[T]he legislative policy embodied in the NLRA is aimed at 'safeguard[ing], first and foremost, workers' rights to join unions and to engage in collective bargaining.'" *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 521 (2018) (alteration in original); *see also Am. Ship Bldg. Co. v. N. L. R. B.*, 380 U.S. 300, 317 (1965) ("The central purpose of [the NLRA] was to protect employee self-organization and the process of collective bargaining from disruptive interferences by employers.").

"Section 7 of the NLRA protects employees' rights 'to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection.'" *Glacier Nw., Inc. v. Int'l Bhd. of Teamsters Loc. Union No. 174*, 598 U.S. 771, 775 (2023) (quoting 29 U.S.C. § 157). "Section 7 affords protection for employees who engage in communications with a wide range of third parties in circumstances where the communication is related to an ongoing labor dispute and when the communication is not so disloyal, reckless, or maliciously untrue to lose the [NLRA's] protection." *McLaren Macomb*, 372 NLRB No. 58, at *7 (Feb. 21, 2023). Under Section 8 of the NLRA, an employer may not "interfere with, restrain, or coerce employees in the exercise of" their Section 7 rights. 29 U.S.C. § 158(a)(1).

In support of her argument, Defendant cites two decisions by the National Labor Relations Board ("NLRB") and a memorandum by the NLRB's general counsel. First, Defendant cites to

*McLaren Macomb*, 372 NLRB No. 58 (Feb. 21, 2023), for the proposition that an employer's proffer of a severance agreement that "has a reasonable tendency to interfere with, restrain, or coerce the exercise of" an employee's Section 7 rights, violates the NLRA. *Id.* at *10.

In *McLaren*, the NLRB considered the legality of a non-disclosure clause contained within an employer's severance agreement offered to eleven unionized employees. *Id.* at *1. The employer first temporarily furloughed the eleven employees and then permanently furloughed them while concomitantly presenting each of them with a severance agreement containing a non-disparagement and confidentiality clauses. *Id.* The employer conditioned severance payments on the employees signing the agreement. *Id.* The non-disclosure clause stated, in relevant part, "[a]t all times hereafter, the Employee agrees not to make statements to Employer's employees or to the general public which could disparage or harm the image of Employer, its parent and affiliated entities and their officers, directors, employees, agents and representatives." *Id.* at *2.

The NLRB held "that an employer violates Section 8(a)(1) of the [NLRA] when it proffers a severance agreement with provisions that would restrict employees' exercise of their NLRA rights." *Id.* at *8. Moreover, the NLRB found it unlawful to condition the receipt of severance benefits on the forfeiture of statutory rights. *Id.* at *9. After examining the clause at issue, the NLRB found the clause too broad as it interfered with, restrained, or coerced "employees' exercise of Section 7 rights." *Id.* The NLRB further observed that the broad language had a chilling tendency on the exercise of the employees' Section 7 rights. *Id.* at *10. That chilling tendency extended "to efforts to assist fellow employees, which would include future cooperation with the [NLRB's] investigation and litigation of unfair labor practices with regard to any matter arising under the NLRA at any time in the future." *Id.*

Defendant next references the NLRB decision in *Big Green Respondent & Kelsey Gray, an Individual Charging Party & Denver Newspaper Guild-Commc'ns Workers of Am., Loc. 37074, Afl-Cio Charging Party*, No. 27-CA-276068, 2023 WL 8873718 (Dec. 20, 2023), which similarly held that the NLRA prohibits an employer from offering an employee a non-disparagement provision that is so broad that it curtails an employee's Section 7 rights.  In *Big Green*, the employer terminated several employees and then offered them separation agreements which they needed to sign to obtain severance benefits.  *Id.*  The separation agreements contained an overly broad non-disparagement provision that was "limitless in its scope and duration" and swept "under its prohibition any conduct regarding any labor issue, dispute or term and condition of employment and any statement or allegation that [the employer] violated the [NLRA]."  *Id.*  The ALJ applied *McLaren*'s analysis to the agreement before it and found that the non-disparagement provision contained within the severance agreement substantially interfered with the employees' Section 7 rights.  *Id.*

Finally, Defendant cites to a memo that the General Counsel of the NLRB prepared following the *McLaren* decision.  The memo, Defendant points out, extends *McLaren*'s logic beyond the severance agreement context and suggests that "overly broad provisions in *any* employer communication to employees that tend to interfere with, restrain or coerce employees' exercise of Section 7 rights would be unlawful if not narrowly tailored to address a special circumstance justifying the impingement on workers' rights."  *Re: Guidance in Response to Inquiries About the McLaren Macomb Decision*, No. MEMORANDUM GC 23-05, 2023 WL 3567920, at *4 (Mar. 22, 2023) (emphasis added).[6]  Consequently, Defendant argues, *McLaren*'s

---

[6] During the April 12 hearing, Defendant conceded that the General Counsel's memo lacks legal force in and of itself.  However, in her reply, Defendant directs the Court to another NLRB case, *Challenge Mfg. Holdings, Inc., Respondent & Kahdeijra Lashay Gee, an Individual Charging*

holding would apply here even though Plaintiff proffered the non-disparagement clause at issue to Defendant in her Executive Employment Contract (prior to her employment) and not part of a severance agreement like in *McLaren*.

In response to Defendant's contentions, Plaintiff puts forth several arguments as to why the Executive Employment Agreement does not run afoul of the NLRA or, in the alternative, why the NLRA does not apply to Defendant.  The Court does not need to address the first argument[7] because the NLRA does not apply to Defendant.

The NLRA applies to private-sector employees with limited exceptions.  29 U.S.C. § 152(3).  One of those exceptions is the judicially created "managerial employee" exception.  One of the earliest examples of the managerial exception comes from the NLRB case *Vulcan Corp.*, 58 NLRB 733 (1944).  There, the NLRB excluded an employee from a unit for the purposes of collective bargaining because the employee's "position and his peculiar relationship to

---

*Party*, No. 07-CA-286573, 2023 WL 2866336 (Apr. 10, 2023), to further support her contention that *McLaren's* holding applies beyond severance agreements.  *See id.* (applying *McLaren* to a non-disparagement contained within a "Last Chance Agreement").

[7] Plaintiff's Response distinguishes the non-disparagement provision in the Executive Employment Agreement from those at issue in *McLaren* because the provision here explicitly stated that it did not "restrict or impede [Defendant] from exercising protected rights . . .including, without limitation, [Defendant's] rights under the National Labor Relations Act."  [DE 231] at 13. Indeed, this carve out appears specifically designed to avoid the burdening of Defendant's NLRA rights (to the extent she has any) found objectionable in *McLaren*.  Defendant's Reply cites NLRB decisions suggesting that this carve out (or "savings clause") does not sufficiently save the non-disparagement provision because it does not specifically alert the employee to the "broad panoply of rights protected under Section 7."  [DE 248] at 7 (citing *First Transit, Inc.*, 360 NLRB 619, 621–22 (2014) *Entergy Nuclear Operations, Inc. & United Gov't Sec. Officers of Am., Loc. 25*, 367 NLRB No. 135 (May 21, 2019)).  I find that this is a close question, particularly given that the carve out is explicitly tied to the non-disparagement provision, as opposed to being placed elsewhere among broader employment policies and is not limited only to union votes.  *Cf. First Transit*, 360 NLRB at 621–22.  Nevertheless, since I find the NLRA does not apply to Defendant, the Court need not decide whether the Defendant's motion also fails due to the carve out or "savings clause."

management" rendered his interests different from those of the other employees. *Id.* at 736. Over the next thirty years, the NLRB continued to apply this judicially created exception. The Supreme Court affirmed this exception in *N.L.R.B. v. Bell Aerospace Co. Div. of Textron*, 416 U.S. 267, 285–86 (1974). The Court noted that the NLRB had used (and courts had approved) a definition of managerial employees as those who "formulate and effectuate management policies by expressing and making operative the decisions of their employer." *Id.* at 288[8] (quoting *Palace Laundry Dry Cleaning Corp.*, 75 NLRB 320, 323 n.4 (1947)); *see also Gen. Dynamics Corp.*, 213 NLRB 851, 857 (1974) ("It is clear from . . . prior and subsequent [NLRB] and court decisions that managerial status is not conferred upon rank-and-file workers, or upon those who perform routinely, but rather is reserved for those in executive-type positions, those who are closely aligned with management as true representatives of management.").

The Supreme Court further defined "managerial employee" in *N.L.R.B. v. Yeshiva University*, 444 U.S. 672 (1980). There, the Court recognized that the NLRB did not establish firm criteria for determining when an employee is considered a managerial employee but stated that "normally an employee may be excluded as managerial only if he represents management interests by taking or recommending discretionary actions that effectively control or implement employer policy." *Id.* at 683.

Plaintiff correctly argues that Defendant is a managerial employee. Notably, Defendant does not address this argument in her Motion to Vacate or reply.[9] This reason alone is sufficient

---

[8] After examining the legislative history of the NLRA, the Court reasoned that the NLRA did not specifically mention managerial employees because they were "so clearly outside the [NLRA] that no specific exclusionary provision was thought necessary." *Id.* at 283.

[9] Instead, Defendant focuses her argument on Plaintiff's alternative theory for why the NLRA does not apply to Defendant: the supervisor exception. The supervisor exception is a statutorily prescribed exception and entirely different from the managerial employee exception. *See* 29

to find in favor of Plaintiff.  *See Jones v. Bank of Am., N.A.*, 564 F. App'x 432, 434 (11th Cir. 2014) ("[A] party's failure to respond to any portion or claim in a motion indicates such portion, claim or defense is unopposed.") (quoting *Kramer v. Gwinnett County, Georgia*, 306 F. Supp. 2d 1219, 1221 (N.D. Ga. 2004) (alteration in original)); *see also Ewing v. Carnival Corp.*, No. 19-20264-CIV, 2023 WL 2524530, at *3 (S.D. Fla. Mar. 15, 2023) ("A party's failure to meaningfully respond to the opposing party's responsive counterarguments constitutes a concession of the counterargument's persuasiveness."); *Guzman v. City of Hialeah*, No. 15-23985-CIV, 2016 WL 3763055, at *3 (S.D. Fla. July 14, 2016) ("A plaintiff who, in her responsive brief, fails to address her obligation to object to a point raised by the defendant implicitly concedes that point.").

Nevertheless, I have considered Plaintiff's argument on the merits and conclude that Defendant is a managerial employee.  As a managerial employee, the NLRA's protections do not apply to Defendant.  In determining whether an employee is "managerial," the employee's job title is not controlling.  *Bell Aerospace*, 416 U.S. 267 at 290 n.19.  Rather, courts should look to the employee's "actual job responsibilities, authority, and relationship to management."  *Id.*  Courts must make this determination on a case-by-case basis.  *Waldau v. Merit Sys. Prot. Bd.*, 19 F.3d 1395, 1399 (Fed. Cir. 1994).

Here, Defendant formulated and effectuated management policies "by expressing and making operative the decisions of [her] employer."  *Bell Aerospace*, 416 U.S. at 288.  The Executive Employment Agreement promulgates Defendant's position and duties.  Though of limited evidentiary value, Defendant held the title of "Creative Director."  [DE 230–1] at 2.  More importantly, Defendant's responsibilities, duties, and authority included "oversight and

_____

U.S.C. § 152(3) ("The term 'employee' . . . shall not include . . . any individual employed as a supervisor . . . .").

management of strategic initiatives and general operational activities of [Plaintiff]." *Id.*[10]  Indeed, she was "able to engage in content creation [and] product development without oversight of the marketing team" and was "in charge of the marketing team."  [DE 131] at 155.[11]

Furthermore, Defendant herself was a member of Plaintiff and held a 20% interest in the company.  [DE 230–2] at 37.  Thus, she was not only entitled to receive an annual bonus based on the company's net profit pursuant to the Executive Employment Agreement, [DE 230–1] at 3, she shared in allocation of net profit and net loss under the company's Operating Agreement, [DE 230–2] at 13–16.  In fact, at the preliminary injunction hearing in this case, she referred to the owners and managers of Head Kandy as "the men who were my business partners."  [DE 131] at 71.

Based on these circumstances, Defendant unequivocally represented management interests and recommended actions that controlled Plaintiff's policy.  *See Yeshiva University*, 444 U.S. 672 at 683.  Defendant was responsible for the oversight and management of strategic initiatives and

---

[10] Defendant's Answer, filed on June 10, 2024, denies that she "was a manager at all times relevant to the claims and allegations," and states that she does not need to respond to Plaintiff's allegation that she was a "managerial employee."  [DE 268] ¶ 19.  However, on March 1, 2024, two weeks prior to Plaintiff's Motion to Enforce and before Defendant raised any NLRA issue, Defendant filed her proposed Answer to Plaintiff's Second Amended Complaint.  [DE 195–1].  In that proposed Answer, Defendant admits to being a "key managerial employee."  [DE 187] ¶ 19; [DE 195–1] ¶ 19.

[11] Defendant's Motion to Vacate, and her testimony at the preliminary injunction hearing, both indicate that she had managerial and operational duties up until December 1, 2022, a few weeks before her termination.  [DE 214] at 5 ¶ 8; [DE 131] at 154–55.  Defendant's Motion to Vacate argues that her "demotion" in December 2022 meant that "the NLRA supervisor exception . . . would not have applied to Ms. McNeill during the latter part of her employment or when [Plaintiff] has attempted to enforce the Non-Disparagement Provision."  [DE 214] at 11.  Again, Defendant fails to address the managerial exception at all, much less attempt to make the same argument about application of the managerial exception after December 2022.  Regardless, her Motion to Vacate and Reply fail to provide any authority or analysis for the proposition that her demotion in the few weeks prior to her termination retroactively invalidates the non-disparagement agreement she signed three-and-a-half years earlier.

general operation activities of Plaintiff, had the authority to at least recommend hiring and firing other employees, and was a part owner of Plaintiff.  *See* [DE 214] at 4-5 (describing Plaintiff's employment duties); [DE 230–1]; *see also Bell Aerospace*, 416 U.S. 267 at 290 n.19.  It seems axiomatic that an individual who owned 20% of a company and shared in allocations of profits and losses is "closely aligned with management."  *See Sci. Applications Corp.*, 309 NLRB 373, 375 (1992) ("Where the [NLRB] finds that stockholder-employees enjoy additional benefits or privileges, such as higher pay or job protection, it has excluded shareholder-employees from other bargaining units due to a lack of a community of interest."); *Brookings Plywood Corp.*, 98 NLRB 794, 798–99 (1952) (concluding stockholder-employees enjoyed preferential treatment from other non-stockholder employees thereby necessitating their exclusion from the bargaining unit); *see also Gen. Dynamics Corp.*, 213 NLRB at 857 (managerial exception appropriate for those "closely aligned with management").

Accordingly, Defendant is a managerial employee.  Consequently, the NLRA's protections do not apply to her, and *McLaren*'s reasoning does not void the non-disparagement clause "*ab initio*" as she argues.  Therefore, her Motion to Vacate should be denied.

## II.   Plaintiff's Motion to Enforce

Plaintiff has established that Defendant violated the preliminary injunction, warranting a finding of civil contempt.

### A.  Legal Standard for Granting a Motion for Contempt

"Courts have the inherent power to enforce compliance with their lawful orders by the exercise of contempt powers."  *Campos v. Chavam Enterprises, Inc.*, No. 15-14370-CIV, 2021 WL 1178548, at *2 (S.D. Fla. Feb. 16, 2021), *report and recommendation adopted,* 2021 WL 1177485 (S.D. Fla. Mar. 29, 2021) (citing *Citronelle-Mobile Gathering, Inc. v. Watkins*, 943 F.2d

1297, 1301 (11th Cir. 1991)).  "On a contempt motion, the movant bears the initial burden of proving, by clear and convincing evidence, the defendant's noncompliance with a court order." *Thomas v. Blue Cross Blue Shield Ass'n.*, 594 F.3d 813, 821 (11th Cir. 2010).  "This requires proving that (1) the allegedly violated order was valid and lawful; (2) the order was clear and unambiguous; and (3) the alleged violator had the ability to comply with the order."  *S.E.C. v. Greenberg*, 105 F. Supp. 3d 1342, 1345 (S.D. Fla. 2015) (quoting *Ga. Power Co. v. N.L.R.B.*, 484 F.3d 1288, 1291 (11th Cir. 2007)).  "To meet the initial burden for a finding of civil contempt, a moving party need only show that defendant failed to comply with the court's order."  *Van De Velde NV v. Felder*, 15-24096-CIV, 2017 WL 8895345, at *2 (S.D. Fla. May 25, 2017), *report and recommendation adopted*, 2017 WL 8895340 (S.D. Fla. June 16, 2017) (citing *United States v. Rylander*, 460 U.S. 752, 755 (1983)).  "Upon the plaintiff's satisfaction of the initial burden, the burden then shifts to the defendant to come forward with evidence showing in detail why a contempt finding should not be found."  *Id.*

"[T]o avoid contempt, a defendant must show that he or she either did not violate the court order as alleged or that she was 'excused' from complying with such order."  *Id.*  A defendant may only be excused from compliance upon a showing that "despite all reasonable efforts to comply with the court's order, compliance was impossible."  *Brother v. BFP Invs., Ltd.*, No. 03-60129-CIV-MARRA, 2010 WL 2978077, at *2 (S.D. Fla. June 1, 2010), *report and recommendation adopted,* 2010 WL 2978080 (S.D. Fla. July 26, 2010).  The Eleventh Circuit "construe[s] this requirement strictly."  *Combs v. Ryan's Coal Co., Inc.*, 785 F.2d 970, 984 (11th Cir. 1986).  "[T]hus even if the efforts made by defendants are 'substantial,' 'diligent' or 'in good faith,' the fact that a defendant did not make 'all reasonable efforts' to comply with the order, establishes that the defendant has failed to rebut the showing of contempt."  *United States v. D'Argenio*, 01-

00010-CR, 2019 WL 297091, at *8 (S.D. Fla. Jan. 3, 2019), *report and recommendation adopted*, 2019 WL 296534 (S.D. Fla. Jan. 23, 2019). A defendant must also do more than merely assert that he is unable to comply and that he has made all reasonable efforts to do so; he must "introduce[] evidence in support of his claim." *United States v. Hayes*, 722 F.2d 723, 725 (11th Cir. 1984). "The burden shifts back to the moving party only upon a sufficient showing by the alleged contemnor." *Combs*, 785 F.2d at 984.

## B. Certified Facts

Based on the evidence presented, I find and certify the following facts. In March of 2024, Defendant reached out to a social media influencer, whom she never knew or engaged with before, and began asserting allegations against Plaintiff and its owners. [DE 230–4]. Specifically, Defendant informed the influencer that she had "a direct tie to [H]ard [C]andy and a company called [H]ead Kandy," that her "company was taken from [her] by the owners of [H]ard [C]andy," that she "was sexually harassed and retaliated against," and that she is "in a federal lawsuit with the owners of [H]ard [C]andy." *Id.* at 2. She went on to tell the influencer that she wanted the influencer to "see what you didn't realize you're supporting" and wanted "to give [the influencer] the chance to educate yourself as an 'influencer' to see the side you didn't realize you supported." *Id.* at 3.

After examining the submitted evidence, I find that the owners of Hard Candy and Plaintiff (Head Kandy) have considerable overlap. [DE 199–1; 230–2; 230–3]. Plaintiff submitted a declaration from Jerome Falic, in which he declares that he is an "owner and the Managing Member of Head Kandy, LLC" and also "the owner of Hard Candy, LLC." [DE 199–1] at 1. Plaintiff also submitted the operating agreements for both companies which specified who the owners and members were of each. [DE 230–2; 230–3]. Head Kandy's operating agreement lists

Jerome Falic, Simon Falic, and Leon Falic as "Members" (in addition to Bryan Feldman and Defendant).  [DE 230–2] at 32–36.  Hard Candy's operating agreement lists another LLC (Urban Decay Cosmetics LLC) as its "Member" (with Simon Falic signing as Urban Decay Cosmetics' "Manager") and lists Jerome, Simon, and Leon Falic as Hard Candy's "Managers" and "Officers." [DE 230–3] at 1–3.  Defendant has not presented any evidence to the contrary.

Furthermore, I find that Defendant was the individual who contacted the influencer and made these comments.  First, the name at the top of the messages says "Kayla McNeill," and the picture next to the name resembles Defendant.  [DE 230–4] at 1–3.  Additionally, the content of the messages themselves corresponds with previous and current allegations Defendant has made in these proceedings.  *Id.*  Defendant has not presented any evidence contradicting these findings. In her response to the Motion to Enforce, Defendant does not even contend that she did not send the messages.  Defendant states that she "told the [i]nfluencer her company was taken away from her by the owners of Head Candy (sic) and that she was sexually harassed and retaliated against." [DE 209] at 6.

### C. Analysis

Based on the facts described above, I find that Defendant failed to comply with the preliminary injunction.  The preliminary injunction ordered the Defendant to not further violate the Executive Employment Agreement, including (as relevant here) "by directly or indirectly . . . making, publishing, or communicating to any person or in any public forum any defamatory, disparaging, or otherwise negative or degrading comments, remarks, or statements concerning Plaintiff, or its affiliates, or their businesses or any of their respective employees, officers, existing

and prospective clients, suppliers, investors, and other associated third parties."  [DE 152] at 13–14.[12]

Defendant's comments to the influencer were about individuals or entities covered by the Executive Employment Agreement's non-disparagement provision and the preliminary injunction's corresponding order not to violate that provision.  The preliminary injunction's prohibition on any defamatory, disparaging, or otherwise negative or degrading comments, applied to not only Plaintiff but to "its affiliates, or their businesses or any of their respective employees, officers, existing and prospective clients, suppliers, investors, and other associated third parties" as well.  [DE 152] at 14.  The owners of Hard Candy (specifically, Jerome Falic and, seemingly, Simon and Leon Falic) are, at the very least, investors or other associated third parties of Plaintiff.  Thus, when Defendant says "the owners of [H]ard [C]andy" took her company from her, Defendant referred to individuals covered by the preliminary injunction's non-disparagement prohibition.

Although Defendant did not explicitly say Plaintiff, or its investors and associated third parties, owned Hard Candy, her statements nonetheless left the influencer with no other reasonable

---

[12] In its Motion to Enforce, Plaintiff also raises the argument that Defendant's comments violate the spirit "of her obligation not to solicit or encourage business partners of Head Kandy to terminate their relationship with the company" pursuant to the non-solicitation provision within the Executive Employment Agreement.  [DE 199] at 3.  During the April 12, 2024 evidentiary hearing, Plaintiff conceded that the main thrust of its argument in the Motion to Enforce is that Defendant violated the non-disparagement provision, not the non-solicitation provision.  Indeed, the non-solicitation provision itself is inapplicable to the facts at hand.  The provision prohibits Defendant from directly or indirectly soliciting or encouraging any client, customer, supplier, licensee or licensor of Plaintiff to terminate or reduce their relationship with Plaintiff including individuals engaged in discussions with Plaintiff related to those individuals becoming a client, customer, supplier, licensee or licensor of Plaintiff.  [DE 230–1] at 7.  Here, the influencer was neither a client, customer, supplier, licensee or licensor of Plaintiff nor was she in engaged in discussions with Plaintiff in becoming one of those individuals.  Thus, Defendant did not violate the non-solicitation provision.

inference.  Defendant explicitly told the influencer that Defendant had "a direct tie to [H]ard [C]andy" (with whom Defendant has no apparent connection) "and a company called [H]ead Kandy" (with whom the influencer had no apparent connection).  [230–4] at 2.  There is no reasonable explanation for why Defendant would mention Hard Candy and Head Kandy together except to indicate that they are related to each other.  In fact, her statements to the influencer make it clear that Defendant knew of this connection and was equating the two companies' ownership.  Defendant informed the influencer that her "company was taken from [her] by the owners of [H]ard [C]andy" and that she is "in a federal lawsuit with the owners of [H]ard [C]andy."  *Id.*  These statements clearly refer to the substance of this case (against Head Kandy) and show Defendant equating the owners of Hard Candy with Plaintiff and its individual owners.[13]

Defendant's statements about Plaintiff's owners were "disparaging."  *See Disparagement*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "disparagement" as "the act or an instance of unfairly castigating or detracting from the reputation of someone or something.").  As stated in the Report and Recommendation recommending the Court grant Plaintiff's motion for preliminary injunction, whether those statements were true or not is of no import because "[a]lthough many disparagements are untruthful or otherwise unfair, falsity is not a requirement.  Any statement cast in a negative light may amount to a disparagement in the general sense."  *Id.*; [DE 133] at 31.  Defendant's statements clearly cast Plaintiff's owners in a negative light.  Her statement that her "company was taken from me by the owners of [H]ard [C]andy" is analogous to the statements accusing Head Kandy of stealing her company which the Court found justified the preliminary injunction in the first place.  *See* [DE 133] at 31.  The further accusations of retaliation and sexual

---

[13] Defendant has even submitted proposed counterclaims seeking to add the individual members of Plaintiff as counter-defendants.  [DE 195–1].

harassment (leading to the "federal lawsuit with the owners of [H]ard [C]andy") obviously cast those owners in a negative light as well.

Defendant's contention that her statements did not violate the non-disparagement agreement because she did not say that "the owners *improperly* took her company away" is unpersuasive.  [DE 209] at 6.  While in certain contexts the word "take" may have a neutral meaning, in the context of business ownership, a neutral meaning is implausible.  The inescapable connotation of Defendant's message to the influencer is that Plaintiff improperly or unjustifiably took her company from her.  Further, Defendant's subsequent allegations and comments about sexual harassment, retaliation, and a lawsuit (all of which are inherently negative) immediately after mentioning that Plaintiff took her company from her make even clearer that Defendant meant "take" in a negative way.  *See* [DE 230–4] at 2.  The influencer had no trouble making the connection that Defendant implicitly provided.  In response to these statements, the influencer told Defendant that she was "[s]o sorry if that happened to you but that doesn't sound like anything I want to be involved in."  *Id.*  Defendant's further comments that she wanted the influencer to "see what you didn't realize you're supporting" and to "educate" herself "to see the side you didn't realize you supported" also show Defendant knew her statements, and other information to which she was pointing the influencer, would show Plaintiff's owners in a negative light.

In sum, Plaintiff has presented clear and convincing evidence that Defendant did not comply with a court order (i.e., the preliminary injunction).  *See Thomas*, 594 F.3d at 821.  Plaintiff has provided clear and convincing evidence that Defendant sent unsolicited disparaging messages, through social media, to an influencer about Plaintiff and individuals covered by the non-disparagement prohibition.  *See* [DE 230–4].  Defendant has not presented any contradicting evidence.  As explained above, the preliminary injunction was – and still is – lawful and valid.

The injunction is clear in that it prohibits Defendant from making disparaging remarks, which the Report and Recommendation defined, about Plaintiff, its affiliates, their businesses, any of their respective employees or officers, investors, or other associated third parties.[14]

Finally, there are no meritorious arguments as to why Defendant could not comply with the preliminary injunction.  Defendant did not appear at the evidentiary hearing, nor did she argue that she made "all reasonable efforts," or was otherwise unable, to comply with the preliminary injunction.  *See Brother*, 2010 WL 2978077, at *2.  Instead, Defendant asserted the same argument she made in her Motion to Vacate (rejected above) that the Executive Employment Agreement's non-disparagement provision was void *ab initio*, that her comments to the influencer were not disparaging, and that her comments were not necessarily about Plaintiff's owners.[15]  Accordingly, I recommend that the District Judge find Defendant in civil contempt.

### D.  Sanctions

"[S]anctions in civil contempt proceedings may be employed 'for either or both of two purposes: to coerce the defendant into compliance with the court's order, and to compensate the

---

[14] As quoted above, the non-disparagement provision in the Executive Employment Agreement does not prohibit Defendant from exercising whatever rights she may have under the NLRA.  As analyzed above, I have concluded that the managerial exception applies, meaning that Defendant was outside the ambit of the NLRA.  However, since Defendant has argued (in her Reply on the Motion to Vacate) that Section 7 of the NLRA does protect even employees that fall within exceptions in certain circumstances, I note that Defendant failed to argue in her response to the Motion to Enforce that her comments to the influencer somehow amounted to exercise of her Section 7 rights.  In other words, while Defendant's Reply to the Motion to Vacate makes arguments about actions she took while still employed being activity protected by the NLRA, she has made no argument explaining how the actions complained of in the Motion to Enforce would fall within the scope of Section 7, assuming she has any rights under the NLRA at all.

[15] As to the latter two arguments, Defendant does not provide any evidence or testimony explaining how the statements were anything but disparaging and about Plaintiff's owners.  Defendant, instead, relies solely on argument of counsel.

complainant for losses sustained.'" *Loc. 28 of Sheet Metal Workers' Int'l Ass'n v. E.E.O.C.*, 478 U.S. 421, 443 (1986). A district court has "broad discretion in fashioning civil contempt sanctions." *Howard Johnson Co. v. Khimani*, 892 F.2d 1512, 1519 (11th Cir. 1990). The court's broad discretion to impose non-coercive sanctions is "only limited by the requirement that they be compensatory." *F.T.C. v. Leshin*, 618 F.3d 1221, 1239 (11th Cir. 2010) (quoting *Howard Johnson*, 892 F.2d at 1521).

Presently, Plaintiff may only seek compensatory damages as there is no discrete action to coerce Defendant into taking. Put simply, Plaintiff's Motion to Enforce cites a specific (and apparently completed) instance of violating the injunction, rather than a violation that is ongoing.[16] While Plaintiff urges a sanction designed to deter future potential violations of the preliminary injunction, *see* [DE 243] at 78–79, such a sanction would be punitive in nature and consistent with criminal, but not civil, contempt. *See In re Stewart*, 571 F.2d 958, 963–64 (5th Cir. 1978); *United States v. Boursiquot*, No. 17-60550-CIV, 2021 WL 2176859, at *3 (S.D. Fla. May 27, 2021). Thus, compensatory damages are the only appropriate remedy at this time.

Plaintiff has not identified any specific damages caused by Defendant's messages to the influencer. Instead, for a compensatory sanction, Plaintiff seeks an award of attorney's fees and costs for its efforts to enforce the preliminary injunction and prevent Defendant from violating it again. "[A]n award of attorney fees to the injured party in a civil contempt case is within the district court's discretion." *Sizzler Fam. Steak Houses v. W. Sizzlin Steak House, Inc.*, 793 F.2d

---

[16] While the Court has been considering this Motion to Enforce, Plaintiff has filed a new Motion to Enforce the Preliminary Injunction [DE 266] alleging a different violation of the non-disparagement provision. The alleged statements described in that motion were made to a different audience and discuss different types of conduct compared to those described in the instant Motion to Enforce. While the Court is cognizant of Plaintiff's new allegations, the new Motion to Enforce is not yet ripe.

1529, 1534 (11th Cir. 1986).   The award of attorney's fees, however, is "limited to those reasonably and necessarily incurred in the attempt to enforce compliance."   *Abbott Lab'ys v. Unlimited Beverages, Inc.*, 218 F.3d 1238, 1242 (11th Cir. 2000).   Additionally, if a district court chooses to award costs as a sanction for contempt, it is "not bound by [28 U.S.C.] § 1920's list of costs that may be taxed pursuant to a final judgment."   *Tom James Co. v. Morgan*, 141 F. App'x 894, 900 (11th Cir. 2005).

Unlike a standard attorney fee motion, when "awarding fees for contempt, the court is not required to conduct a lodestar analysis."   *LD Acquisition Co. 13 LLC v. Palmetto Bay Ctr., Inc.*, No. 1:19-CV-21857, 2021 WL 4976330, at *13 (S.D. Fla. Aug. 26, 2021), *report and recommendation adopted,* 2021 WL 4451365 (S.D. Fla. Sept. 29, 2021); *see also Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Olympia Holding Corp.*, 140 F. App'x 860, 864 n.1 (11th Cir. 2005) ("Sanctions for civil contempt are not equivalent with typical payment of attorneys' fees, and civil contempt sanctions do not require the use of the lodestar method.").   Instead, the analysis focuses on whether the fees were "reasonably and necessarily incurred in the attempt to enforce compliance."   *Abbott Lab'ys*, 218 F.3d at 1242.   When conducting the analysis, a court may consider "the character and magnitude of the harm threatened by continued contumacy, the probable effectiveness of any suggested sanction in bringing about compliance, and the amount of the contemnor's financial resources and consequent seriousness of the burden to him."   *Matter of Trinity Indus., Inc.*, 876 F.2d 1485, 1493–94 (11th Cir. 1989).

Plaintiff submitted an affidavit from its lead trial attorney in the case attesting to the hours Plaintiff's attorneys spent prosecuting the Motion to Enforce as well as their hourly rate.   [DE 233].   Additionally, Plaintiff submitted billing records and costs associated with prosecuting the Motion to Enforce.   *Id.*   In total, Plaintiff seeks to recover $50,326.00 in attorney fees and

$1,794.66 in costs for a grand total of $52,120.66.  *Id.*  After reviewing the billing records and costs, I find that a reduction of Plaintiff's proposed fees and costs is necessary.

Plaintiff states that its attorneys expended a total of 107.5 hours prosecuting this matter. Plaintiff's counsel's billing records show that three partners and an associate contributed to the Motion to Enforce.  *See* [DE 233–1, 233–2].[17]  Despite Defendant's assertions at the evidentiary hearing that Plaintiff's fees and costs should not be high, as it only filed a motion and reply, Defendant's Motion to Vacate complicated this matter.  After Plaintiff filed its Motion to Enforce, Defendant filed her response where she raised – for the first time – the argument that the preliminary injunction was invalid and void because it contained terms that violated the NLRA. *See* [DE 209].  To prevail on its Motion to Enforce, Plaintiff had to respond Defendant's arguments (and related Motion to Vacate) about the NLRA, an issue and source of law neither party raised in the preceding year of litigation.  Accordingly, it is reasonable that Plaintiff spent a considerable amount of time on its reply and research into the issue that was never previously present in this litigation as well as preparing for and attending the hearing.

That said, Plaintiff's billing records show that its three attorneys engaged in overlapping and sometimes duplicative tasks.  For example, Plaintiff's lead trial attorney, Ethan Loeb, and

---

[17] Plaintiff's lead trial attorney, Ethan Loeb, has a discounted billing rate of $600.00 an hour.  This is a reasonable rate for a partner with over twenty years of experience.  *See Kleiman v. Wright*, No. 18-80176-CV, 2020 WL 1980601, at *4 (S.D. Fla. Mar. 17, 2020) (awarding partner with over twenty-five years of experience $675.00 an hour); *PDVSA US Litig. Tr. v. LUKOIL Pan Ams. LLC*, No. 1:18-CV-20818, 2020 WL 3052403, at *7–10 (S.D. Fla. Feb. 1, 2020), *report and recommendation adopted*, 2020 WL 996854 (S.D. Fla. Mar. 2, 2020) (holding hourly rates of $625.00 for partners and shareholders reasonable).  The same can be said with the hourly rates of Plaintiff's other attorneys who worked on this matter, Colin Thompson, Allison Doucette, and Jalen LaRubbio.  They have hourly billing rates of $500.00, $450.00, and $290.00 respectively. Considering Thompson and Doucette are partners with years of experience and LaRubbio is an associate with federal law clerk experience, these rates are reasonable.  The billing records also include one entry for 0.8 hours from an individual with the initials "HAW" whom Plaintiff never identifies.

associate, Jalen LaRubbio, each billed for time they spent conferencing with one another. [DE 233–2]. Loeb, and fellow partner, Colin Thompson, along with LaRubbio, also all extensively worked on the reply to Plaintiff's Motion to Enforce. *Id.* Loeb also billed over twenty hours for "prepare for hearing on contempt motion," with no further explanation as to what was done during that time. *Id.* Moreover, the records reflect a handful of hours on tasks not related to the Motion to Enforce. While Defendant unexpectedly interjected new arguments into this litigation, which understandably required significant additional preparation, I cannot find all of the hours billed reasonable due to the duplicative staffing and imprecise explanations of hours.

As a result, I find the reasonable amount of attorney's fees for bringing the Motion to Enforce and attend the evidentiary hearing is $25,000.00. Plaintiff may also recover the $1,794.66 it requests for two round-trip plane tickets from Tampa to Miami. These tickets were for two of Plaintiff's attorneys to attend the evidentiary hearing on April 12, 2024. In total, I recommend awarding Plaintiff $26,794.66. This amount reflects Plaintiff's fees and costs reasonably and necessarily incurred in its attempt to enforce compliance with the Court's order. Awarding Plaintiff attorney's fees and costs in this scenario is appropriate as it rewards Plaintiff for its efforts to monitor and enforce Defendant's compliance with the preliminary injunction. *See Sizzler Fam.*, 793 F.2d at 1535.

## **CONCLUSION**

For the reasons discussed above, I respectfully **RECOMMEND** that the Motion to Vacate, [DE 214], be **DENIED**, the Motion to Enforce, [DE 199], be **GRANTED**, and that the Court award Plaintiff **$26,794.66** in attorney's fees and costs as a sanction against Defendant for her violation of the preliminary injunction.

The parties will have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable Jacqueline Becerra, United States District Judge.  Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except for plain error if necessary in the interests of justice.  *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1.

**DONE AND SUBMITTED** in Fort Lauderdale, Florida this 11th day of June 2024.

**Jared M. Strauss**
**United States Magistrate Judge**