# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 23-CV-60345-JB/JMS

HEAD KANDY, LLC,

      Plaintiff/Counterclaim Defendant,

v.

KAYLA MCNEILL,

      Defendant/Counterclaimant/Third-Party Claimant,

v.

JEROME FALIC and JONATHAN ROSENBAUM,

      Third-Party Defendants.

_____/

## AMENDED ANSWER, COUNTERCLAIMS,
## THIRD-PARTY COMPLAINT AND JURY DEMAND

Defendant Kayla McNeill ("Ms. McNeill"), by and through her undersigned counsel, hereby states for her Answer to the Second Amended Complaint [EFC No. 187] (the "Complaint") as follows:

## ANSWER

## The Parties

1.      Ms. McNeill admits that Plaintiff Head Kandy, LLC ("HK") is a Delaware limited liability company that registered with the Florida Secretary of State as a foreign limited liability company transacting business in the State of Florida on April 12, 2023. Ms. McNeill admits that Mr. Jerome Falic has, at all relevant times, been the managing member of HK and that he authorized a February 17, 2023 resolution (the "Resolution"). Ms. McNeill denies that the resolution was capable of or caused the divesting of her ownership interest in HK. Ms. McNeill

is without adequate information to admit or deny the remaining allegations in Paragraph 1 of the Complaint[1] and, therefore, denies the same.

2.      Ms. McNeill denies the allegations in Paragraph 2.

3.      Ms. McNeill is without adequate information to admit or deny the allegations in Paragraph 3 and, therefore, denies the same.

4.      Ms. McNeill admits that allegations in Paragraph 4.

## Jurisdiction and Venue

5.      Ms. McNeill denies the allegations in Paragraph 5.

6.      Ms. McNeill denies the allegations in Paragraph 6.

7.      Ms. McNeill denies the allegations in Paragraph 7.

## Facts Common to the Counts

8.      Ms. McNeill admits that she founded the Head Kandy brand for the sale of haircare products and promoted the company through her social media presence leading social media platforms, including Facebook and Instagram.  Ms. McNeill denies the remaining allegations in Paragraph 8.

9.      Ms. McNeill admits that her popularity on social media derived from her ability to connect with her followers in a personal way.  Her posts on her personal social media accounts emphasized her small-town roots, often featured her children and contained positive and uplifting messages which resonated with customers.  Ms. McNeill denies the remaining allegations in Paragraph 9.

10.     Ms. McNeill denies the allegations in Paragraph 10.

---

[1] Unless specifically stated otherwise, all future references to "Paragraph" shall refer to paragraphs enumerated in the Complaint.

11.     Ms. McNeill admits that she was the sole owner and operator of Lashed Out, LLC ("LO").  Ms. McNeill denies the remaining allegations in Paragraph 11.

12.     Ms. McNeill admits that HK and LO entered into an Asset Purchase Agreement dated May 3, 2018 (the "APA").  The APA speaks for itself.  Ms. McNeill denies the remaining allegations in Paragraph 12.

13.     Ms. McNeill admits that she became a twenty percent owner of HK.  Ms. McNeill denies the remaining allegations in Paragraph 13.

14.     Ms. McNeill denies the allegations in Paragraph 14.

15.     Ms. McNeill denies the allegations in Paragraph 15.

16.     Ms. McNeill denies the allegations in Paragraph 16.

17.     Ms. McNeill admits that she entered into the Executive Employment Agreement (the "Employment Agreement") with HK.  With regard to the remaining allegations is Paragraph 17, the Employment Agreement speaks of itself.

18.     With regard to the allegations in Paragraph 18, the Employment Agreement speaks of itself.

19.     Allegations in Paragraph 19 require a legal conclusion, particularly with regard to the term "managerial employee," which do not require a response.  Ms. McNeill denies that she was a manager at all times relevant to the claims and allegations.  Ms. McNeill also denies the remaining allegations in Paragraph 19.

20.     Ms. McNeill admits that she was HK's most important social media influencer. Ms. McNeill denies the remaining allegations in Paragraph 20.

21.     Ms. McNeill denies the allegations in Paragraph 21.

22.     Ms. McNeill denies the allegations in Paragraph 22.

23.     Ms. McNeill denies the allegations in Paragraph 23.

24.     Ms. McNeill states that the Employment Agreement speaks for itself.   Ms. McNeill denies the allegations in Paragraph 24.

25.     Ms. McNeill denies the allegations in Paragraph 25.

26.     Ms. McNeill denies the allegations in Paragraph 26.

27.     Ms. McNeill denies the allegations in Paragraph 27.

28.     Ms. McNeill admits that she formed White Pineapple in March 2022.   Ms. McNeill denies the remaining allegations in Paragraph 28.

29.     Ms. McNeill denies the allegations in Paragraph 29.

30.     Ms. McNeill denies the allegations in Paragraph 30.

31.     Ms. McNeill denies the allegations in Paragraph 31.

32.     Ms. McNeill admits that she made the post on November 23, 2022.  Ms. McNeill denies the remaining allegations in Paragraph 32.

33.     Ms. McNeill denies the allegations in Paragraph 33.

34.     Ms. McNeill denies the allegations in Paragraph 34.

35.     Ms. McNeill admits that she received a Notice of Material Breach of the Executive Employment Agreement and Notice of Breach of Fiduciary Duty on November 28, 2022.  Ms. McNeill denies the remaining allegations in Paragraph 35.

36.     Ms. McNeill denies the allegations in Paragraph 36.

37.     Ms. McNeill denies the allegations in Paragraph 37.

38.     Ms. McNeill denies the allegations in Paragraph 38.

39.     Ms. McNeill denies the allegations in Paragraph 39.

40.     Ms. McNeill admits that Andrew Schankerman served as HK's warehouse manager. Ms. McNeill denies the remaining allegations in Paragraph 40.

41.     Ms. McNeill denies the allegations in Paragraph 41.

42.     Ms. McNeill denies the allegations in Paragraph 42.

43.     Ms. McNeill denies the allegations in Paragraph 43.

44.     Ms. McNeill denies the allegations in Paragraph 44.

45.     Ms. McNeill denies the allegations in Paragraph 45.

46.     Ms. McNeill denies the allegations in Paragraph 46.

47.     Ms. McNeill denies the allegations in Paragraph 47.

48.     Ms. McNeill denies the allegations in Paragraph 48.

49.     Ms. McNeill denies the allegations in Paragraph 49.

50.     Ms. McNeill denies the allegations in Paragraph 50.

51.     Ms. McNeill denies the allegations in Paragraph 51.

52.     Ms. McNeill denies the allegations in Paragraph 52.

53.     Ms. McNeill denies the allegations in Paragraph 53.

54.     Ms. McNeill denies the allegations in Paragraph 54.

55.     Ms. McNeill is without adequate information to admit or deny the allegations in Paragraph 55 and, therefore, denies the same.

56.     Ms. McNeill denies the allegations in Paragraph 56.

57.     Ms. McNeill denies the allegations in Paragraph 57.

58.     Ms. McNeill denies the allegations in Paragraph 58.

59.     Ms. McNeill denies the allegations in Paragraph 59.

60.     Ms. McNeill admits that she paid, through personal funds or points, all of the personal expenses she charged to her American Express credit card, which she allowed HK to use when it failed to secure another source of credit.

61.     Ms. McNeill admits that she paid, through personal funds or points, all of the personal expenses she charged to her American Express credit card, which she allowed HK to use when it failed to secure another source of credit.

62.     Ms. McNeill denies the allegations in Paragraph 62.

63.     Ms. McNeill admits that she received a Notice of Suspension of Employment due to Fraud and Dishonestly dated December 16, 2022.  The document speaks for itself.

64.     Ms. McNeill denies the allegations in Paragraph 64.

65.     Ms. McNeill denies the allegations in Paragraph 65.

66.     Ms. McNeill denies the allegations in Paragraph 66.

67.     Ms. McNeill denies the allegations in Paragraph 67.

68.     Ms. McNeill denies the allegations in Paragraph 68.

69.     Ms. McNeill denies the allegations in Paragraph 69.

70.     Ms. McNeill denies the allegations in Paragraph 70.

71.     Ms. McNeill admits that she leased a barn and forklift, both owned by Ms. McNeill, to HK which it used in its daily operations.   Ms. McNeill denies the remaining allegations in Paragraph 71.

72.     Ms. McNeill denies the allegations in Paragraph 72.

73.     Ms. McNeill denies the allegations in Paragraph 73.

74.     Ms. McNeill admits that she met with Mr. Falic in New York in December 2022. Ms. McNeill denies the remaining allegations in Paragraph 74.

75.     Ms. McNeill admits that she conducted herself in an exemplary manner during the December 2022 meeting.  Ms. McNeill denies the remaining allegations in Paragraph 75.

76.     Ms. McNeill denies the allegations in Paragraph 76.

77.     Ms. McNeill denies the allegations in Paragraph 77.

78.     Ms. McNeill denies the allegations in Paragraph 78.

79.     Ms. McNeill denies the allegations in Paragraph 79.

80.     Ms. McNeill denies the allegations in Paragraph 80.

81.     Ms. McNeill admits that she received a Notice of Material Breach dated January 10, 2023.  The document speaks for itself.  Ms. McNeill denies the remaining allegations in Paragraph 81.

82.     Ms. McNeill denies the allegations in Paragraph 82.

83.     Ms. McNeill denies the allegations in Paragraph 83.

84.     Ms. McNeill admits the allegations in Paragraph 84.

85.     Ms. McNeill denies the allegations in Paragraph 85.

86.     Ms. McNeill denies the allegations in Paragraph 86.

87.     Ms. McNeill denies the allegations in Paragraph 87.

88.     Ms. McNeill admits that she made the post in February 2023.  Ms. McNeill denies the remaining allegations in Paragraph 88.

89.     Ms. McNeill admits that she made the post in February 2023.  Ms. McNeill denies the remaining allegations in Paragraph 89.

90.     Ms. McNeill admits that she made the post in February 2023.  Ms. McNeill denies the remaining allegations in Paragraph 90.

91.     Ms. McNeill admits that she made the post in February 2023.  Ms. McNeill denies the remaining allegations in Paragraph 91.

92.     Ms. McNeill denies the allegations in Paragraph 92.

93.     Ms. McNeill denies the allegations in Paragraph 93.

94.     Ms. McNeill denies the allegations in Paragraph 94.

95.     Ms. McNeill is without adequate information to admit or deny the allegations in Paragraph 95 because HK deleted numerous social media comments and, therefore, denies the same.

96.     Ms. McNeill is without adequate information to admit or deny the allegations in Paragraph 96 because HK deleted numerous social media comments and, therefore, denies the same.

97.     Ms. McNeill denies the allegations in Paragraph 97.

98.     Ms. McNeill denies the allegations in Paragraph 98.

99.     Ms. McNeill denies the allegations in Paragraph 99.

100.     Ms. McNeill denies the allegations in Paragraph 100.

101.     Ms. McNeill admits that she made the April 11, 2023 post.  Ms. McNeill denies the remaining allegations in Paragraph 101.

102.     Ms. McNeill denies the allegations in Paragraph 102.

103.     Ms. McNeill denies the allegations in Paragraph 103.

104.     Ms. McNeill is without adequate information to admit or deny the allegations in Paragraph 104 and, therefore, denies the same.

105.     Ms. McNeill denies the allegations in Paragraph 105.

106.     Ms. McNeill admits posting on social media accounts between May 1, 2023 and June 6, 2023.  Ms. McNeill denies the remaining allegations in Paragraph 106.

107.     Ms. McNeill denies the allegations in Paragraph 107.

108.     Ms. McNeill denies the allegations in Paragraph 108.

109.     Ms. McNeill admits providing lawsuit updates to her followers.   Ms. McNeill denies the remaining allegations in Paragraph 109.

110.     Ms. McNeill admits the allegations in Paragraph 110.

111.     Ms. McNeill denies the allegations in Paragraph 111.

112.     Ms. McNeill denies the allegations in Paragraph 112.

113.     Ms. McNeill denies the allegations in Paragraph 113.

114.     Ms. McNeill denies the allegations in Paragraph 114.

115.     Ms. McNeill denies the allegations in Paragraph 115.

116.     Ms. McNeill denies the allegations in Paragraph 116.

117.     The Employment Agreement speaks for itself.  Ms. McNeill denies the remaining allegations in Paragraph 117.

118.     Ms. McNeill admits the allegations in Paragraph 118.

119.     Ms. McNeill denies the allegations in Paragraph 119.

120.     Ms. McNeill admits that she immediately edited her post in a good faith effort to avoid further dispute.  Ms. McNeill denies the remaining allegations in Paragraph 120.

121.     Ms. McNeill admits the allegations in Paragraph 121.

122.     Ms. McNeill denies the allegations in Paragraph 122.

123.     Ms. McNeill denies the allegations in Paragraph 123.

124.    Paragraph 124 is a statement of law and does not contain any allegations; therefore, no response is required.

<u>**COUNT I**</u>
**Breaches of Contract**

125.    Paragraph 125 does not contain any new allegations.  Ms. McNeill incorporates, by this reference, all of her preceding responses to allegations set forth in the Complaint.

126.    Ms. McNeill denies the allegations in Paragraph 126 for the purposes of HK's breach of contract claim.

127.    The Employment Agreement speaks for itself and Ms. McNeil denies any allegations in Paragraph 127 that deviate therefrom.

128.    The Employment Agreement speaks for itself and Ms. McNeil denies any allegations in Paragraph 128 that deviate therefrom.

129.    The Employment Agreement speaks for itself and Ms. McNeil denies any allegations in Paragraph 129 that deviate therefrom.

130.    The Employment Agreement speaks for itself and Ms. McNeil denies any allegations in Paragraph 130 that deviate therefrom.

131.    The Employment Agreement speaks for itself and Ms. McNeil denies any allegations in Paragraph 131 that deviate therefrom.

132.    The Employment Agreement speaks for itself and Ms. McNeil denies any allegations in Paragraph 132 that deviate therefrom.

133.    The Employment Agreement speaks for itself and Ms. McNeil denies any allegations in Paragraph 133 that deviate therefrom.

134.    The Employment Agreement speaks for itself and Ms. McNeil denies any allegations in Paragraph 134 that deviate therefrom.

135.    Ms. McNeill denies the allegations in Paragraph 135.

136.    Ms. McNeill denies the allegations in Paragraph 136.

137.    Ms. McNeill denies the allegations in Paragraph 137.

138.    Ms. McNeill denies the allegations in Paragraph 138.

## COUNT II
### Breaches of Fiduciary Duty

139.    Paragraph 139 does not contain any new allegations.  Ms. McNeill incorporates, by this reference, all of her preceding responses to allegations set forth in the Complaint.

140.    Ms. McNeill denies the allegations in Paragraphs 140 – 151.

## COUNT III
### Common Law Fraud

141.    Paragraph 152 does not contain any new allegations.  Ms. McNeill incorporates, by this reference, all of her preceding responses to allegations set forth in the Complaint.

142.    Ms. McNeill denies the allegations in Paragraphs 153 – 175.

## COUNT IV
### Unjust Enrichment

143.    Paragraph 176 does not contain any new allegations.  Ms. McNeill incorporates, by this reference, all of her preceding responses to allegations set forth in the Complaint.

144.    Ms. McNeill denies the allegations in Paragraphs 177 – 179.

## COUNT V
### Declaratory Relief

145.    Paragraph 180 does not contain any new allegations.  Ms. McNeill incorporates, by this reference, all of her preceding responses to allegations set forth in the Complaint.

146.    Ms. McNeill denies the allegations in Paragraph 181.

147.    Ms. McNeill denies the allegations in Paragraph 182.

148.     Ms. McNeill admits the allegations in Paragraph 183.

149.     The Employment Agreement speaks for itself and Ms. McNeil denies any allegations in Paragraph 184 that deviate therefrom.

150.     The Employment Agreement speaks for itself and Ms. McNeil denies any allegations in Paragraph 185 that deviate therefrom.

151.     Ms. McNeill is without adequate information to admit or deny the allegations in Paragraph 186 and, therefore, denies the same.

152.     Ms. McNeill denies the allegations in Paragraph 187.

153.     The Employment Agreement speaks for itself and Ms. McNeil denies any allegations in Paragraph 188 that deviate therefrom.

154.     Ms. McNeill denies the allegations in Paragraph 189.

155.     Ms. McNeill denies the allegations in Paragraph 190.

156.     Ms. McNeill denies the allegations in Paragraph 191.

## **General Denial**

Ms. McNeill denies all allegations set forth in the Complaint not specifically admitted above.

## **Affirmative Defenses**

HK's claims are barred or diminished by the following affirmative defenses, which Ms. McNeill hereby asserts:

1.     HK's Complaint fails to state a claim for which relief may be granted;

2.     HK's Complaint fails to plead fraud with the required particularity;

3.     Application of the statutes of limitations;

4.     The doctrines of waiver, estoppel, unclean hands and consent;

5.      HK has not suffered any injury-in-fact to a legally protected interest;

6.      Ms. McNeill acted in good faith and exercised reasonable care and diligence when engaging in the allegedly improper conduct;

7.      HK was unable or unwilling to satisfy the requirements of any customers, employees, vendors, suppliers or affiliates who reduced or terminated their relationship with HK;

8.      HK has failed to join indispensable parties, including, without limitation, Ryan Thompson, Jerome Falic, Simon Falic, Leon Falic and Bryan Feldman;

9.      HK's claims are barred by voluntary waiver or acquiescence;

10.      The Employment Agreement contains an unenforceable liquidated damages provision which precludes HK from receiving any damages;

11.      HK has no legitimate, protectable business interest to support the anti-competitive covenants in the Employment Agreement; thus, the anti-competitive covenants are unenforceable as an unreasonable restraint on trade.

12.      The restrictive covenants within the Employment Agreement are unenforceable due to lack of consideration;

13.      The restrictive covenants within the Employment Agreement are unenforceable because they are vague;

14.      The restrictive covenants within the Employment Agreement are unenforceable because they are not reasonable in time, area and line of business;

15.      The Employment Agreement is unenforceable because HK committed one or more prior material breaches of the Employment Agreement, such as, without limitation, failing to pay Ms. McNeill her compensation as it became due, failing to provide Ms. McNeill

reimbursements for HK's expenses and materially changing Ms. McNeill's responsibilities, duties and authority without Ms. McNeill's consent;

16. No act, breach or omission on the part of Ms. McNeill either proximately caused or contributed to damages or injury suffered by HK, if any, and, on account thereof, HK is not entitled to any recovery from Ms. McNeill;

17. HK is not entitled to injunctive relief because it has an adequate remedy at law;

18. HK is not entitled to preliminary injunctive relief because it cannot demonstrate irreparable harm;

19. HK's failure to mitigate, or reasonably attempt to mitigate, its alleged injuries, damages or losses;

20. HK's repeated inducement of Ms. McNeill to engage in the very conduct upon which it now bases its claim for breaches of contract;

21. HK's alleged injuries, damages or losses are subject to the doctrine of set-off due to the damages incurred by Ms. McNeill and caused by HK's improper conduct;

22. Ms. McNeill's only relevant contacts with this forum were for the benefit of HK, not Ms. McNeill; thus, Ms. McNeill is entitled to protection under the corporate shield doctrine;

23. The Court lacks subject matter jurisdiction over this action because HK's damages, to the extent any exist, are less than the jurisdictional minimum required for the jurisdiction of this Court;

24. Ms. McNeill was at all times acting within the scope of her employment with HK and is entitled to protection under the business judgment rule;

25.     To the extent Ms. McNeill communicated any of the alleged information to a third party, such information is not protected as a trade secret or confidential, as defined in the Employment Agreement;

Ms. McNeill reserves the right to assert additional affirmative defenses as may become evident upon further investigation and discovery in this matter.

**WHEREFORE**, Ms. McNeill respectfully requests that judgment enter in her favor and against Head Kandy's remaining claims, and that Ms. McNeill be awarded all expenses incurred in defending against the claims, including litigation costs, attorneys' fees and such further and additional relief as the Court deems appropriate and equitable.

## COUNTERCLAIMS AND THIRD-PARTY COMPLAINT

Defendant / Counterclaimant Ms. Kayla McNeill ("Ms. McNeill"), by and through her undersigned counsel, hereby submits her Counterclaims against Plaintiff / Counterclaim Defendant Head Kandy, LLC ("HK") and Third-Party Complaint against Messrs. Jerome Falic ("Mr. Falic") and Jonathan Rosenbaum ("Mr. Rosenbaum") and states as follows:

1.      Ms. McNeill incorporates each of the foregoing paragraphs as if fully set forth herein.

## PARTIES, JURISDICTION AND VENUE

2.      Upon information and belief, HK is a Delaware limited liability company that registered with the Florida Secretary of State as a foreign limited liability company transacting business in the State of Florida on April 12, 2023.  To date, HK has not produced a certificate of good standing for the times it allegedly operated its human resources and accounting departments out of Florida.

3.      Ms. McNeill is, and for all times relevant to her claims has been, a resident of the State of Colorado.

4.      Pursuant to the Court's Order Granting in Part and Denying in Part Defendant's Corrected Motion to Dismiss the Amended Complaint (the "MTD Order"), the Court has personal jurisdiction over Ms. McNeill pertaining to the actions which give rise to her claims.[2] [ECF No. 151].

5.      Upon information and belief, Mr. Falic is a resident of the State of Florida.

---

[2] Ms. McNeill submits this pleading pursuant to the Court's Order Amending Trial Date and Pre-Trial Deadlines [ECF No. 157], as amended by the Court's February 23, 2024 Paperless Order [ECF No. 189]. Ms. McNeill's averments pertaining to jurisdiction and venue are based upon the Court's MTD Order.  Ms. McNeill neither consents to personal jurisdiction nor waives her jurisdictional challenges by submitting this pleading.

6.      The Court has jurisdiction over Ms. McNeill's claims pursuant to 28 U.S.C. § 1367.

7.      The Court may exercise personal jurisdiction over HK and Mr. Falic pursuant to Section 48.193 of the Florida Statutes.

8.      Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391.

## GENERAL ALLEGATIONS

**<u>Background</u>**

9.      In approximately 2015, while working as a hairdresser in rural Colorado, Ms. McNeill started a direct-to-consumer business in her basement.  The business was named Lashed Out, LLC ("Lashed Out")[3] and sold hair-related products under its "Head Kandy" brand.

10.     Lashed Out was an extension of Ms. McNeill's desire to help women with their personal beauty and haircare needs.  Utilizing social media, Ms. McNeill would provide product reviews, haircare advice and uplifting messages to other women through engaging and honest content.  Ms. McNeill's content and expertise, coupled with her entrepreneurial spirit, also resulted in commercial success for Lashed Out.

11.     In 2016, Ms. McNeill sought to protect Lashed Out's Head Kandy brand by filing an application to register its mark with the United States Patent and Trademark Office, Application Serial No. 86892969 (the "TM Application").

12.     An Opposition to the TM Application was initiated by a third-party entity, Hard Candy, LLC ("Hard Candy"), of which Mr. Falic was an owner and Chief Executive Officer.

13.     As part of the Opposition proceeding, Opposition No. 91229178, Lashed Out was required to provide Hard Candy with all of its financial records.  Those records laid bare the

---

[3] Lashed Out is a registered Colorado limited liability company.

impressive success Lashed Out had attained as a result of Ms. McNeill's tremendous work ethic, talent and business acumen.

14.     After receiving Lashed Out's financial records, Mr. Falic and his business partners – Simon Falic, Leon Falic[4] and Bryan Feldman – approached Ms. McNeill to acquire the assets of Lashed Out for the purpose of forming HK.

15.     Mr. Falic represented to Ms. McNeill that he and his business partners possessed the experience and financial means necessary to complement her talents and amplify the success of the Head Kandy brand, particularly though their ownership and management of Hard Candy.

16.     Seeking an immediate resolution to the Opposition proceeding and based upon Mr. Falic's representations, Lashed Out entered into that certain Asset Purchase Agreement dated May 3, 2018 with HK (the "APA").  Ms. McNeill was not a party to the APA.

17.     At the time, HK and Lashed Out entered into the APA, HK also approached Ms. McNeill, in Colorado, to become HK's Creative Director pursuant to that certain Executive Employment Agreement dated May 3, 2018 between Ms. McNeill and HK (the "Employment Agreement") [ECF No. 187-1] incorporated herein by this reference.

18.     Despite Mr. Falic's representations to Ms. McNeill, Mr. Falic and his business partners failed to provide the promised support that induced Lashed Out to agree to the APA and induced Ms. McNeill to enter into the Employment Agreement.

**HK's Use of Ms. McNeill's Credit Card for All of its Operating Credit**

19.     After HK was formed, it failed to secure operating credit for the business.  In order to ensure that the company could function, Ms. McNeill allowed HK to charge business expenses to her American Express credit card (the "Credit Card"), provided that HK timely made payment for all such expenses.

---

[4] When "Mr. Falic" is used herein, it is solely used to refer to Jerome Falic, as defined above.

20.     The Credit Card account was owned by Ms. McNeill.  Ms. McNeill made at least $1,768,456.94 in payments from her personal checking account to the Credit Card.  Although HK also made payments to the Credit Card, it was agreed that it would only pay for business expenses charged to the Credit Card.

21.     In May 2018, HK put Ms. Deborah Kassab, an employee of another company owned by Mr. Falic, in charge of reviewing, reconciling and processing expense reports.  At that time, Mr. Ryan Thompson, an employee of HK, was responsible for determining, identifying and gathering all information necessary to document business expenses charged to the Credit Card. Mr. Thompson would obtain the monthly statements for the Credit Card and black out all personal expenses charged by Ms. McNeill on her Credit Card.  Mr. Thompson would then submit the expense reports directly to Ms. Kassab.  After Ms. Kassab reviewed, reconciled and processed the expense reports, HK would issue a check to reimburse Ms. McNeill for its business expenses.

22.     HK subsequently revised its practice for payment of company expenses charged to the Credit Card.  On June 6, 2019, Mr. Thompson was instructed by Ylse Lopez, an employee of a different company owed by Mr. Falic who assisted with HK's bookkeeping, to submit the full, unaltered statements for the Credit Card to the "accounting department" every month as expense reports.

23.     Upon information and belief, Mr. Thompson decided the best course of action was to notate on the Credit Card statements which expenses were HK's business expenses and which were Ms. McNeill's personal expenses.

24.     To facilitate submission of the Credit Card statement, Ms. McNeill provided HK her online credentials to access to her Credit Card account. HK's representatives who were

tasked with identifying and auditing HK's business expenses were able to access and review the full monthly statements for the Credit Card.

25.     At no time did Ms. McNeill have any responsibilities concerning submission of the Credit Card statements or reconciling the statements.

**Mr. Rosenbaum Harasses Ms. McNeill and Creates a Hostile Work Environment**

26.     Upon information and belief, in July 2022, Mr. Falic, as HK's managing member, purportedly retained Mr. Rosenbaum to restructure HK's business and operations.

27.     According to Mr. Falic, Mr. Rosenbaum was to take care of all operational matters going forward, while Ms. McNeill would work solely on "creative" matters.

28.     Once Mr. Rosenbaum was retained, he took over the daily business in much the same way a CEO might, and Ms. McNeill had no decision-making authority or control once Mr. Rosenbaum was brought in. Mr. Rosenbaum made significant changes to the business right away, and continued to do so over the next five months, including the termination of employees without Ms. McNeill's input or directly against Ms. McNeill's wishes, terminating affiliate relationships without Ms. McNeill's vote, instructing employees on day-to-day matters, stepping into Mr. Feldman's role to be come Ms. McNeill's direct manager, hiring financial consultants on his own, slashing marketing and other budgets substantially, and pushing for a completely different business model than what the team at Head Kandy had created up to that point.

29.     Mr. Falic and Mr. Rosenbaum were close personal friends at the time HK retained Mr. Rosenbaum, and upon information and belief, remain close personal friends to this day.

30.     At the beginning of July 2022, Ms. McNeill met Mr. Rosenbaum for the first time in person.  During this first meeting, Mr. Rosenbaum began what would become a campaign of severe sexual harassment and abuse for the next six months, up until Ms. McNeill's wrongful

and retaliatory termination.   Specifically, during this first time meeting Mr. Rosenbaum, Mr. Rosenbaum created a hostile work environment through the following conduct:

a.      Mr. Rosenbaum peed with the door to the bathroom open in front of HK's staff present at this meeting, including Ms. McNeill, Rachel Pincus, Mindy McDermaid, Kaylin Culp, and Dustin McNeill;

b.      Mr. Rosenbaum told Ms. McNeill that the romper she was wearing was "way too long" and that "blonds look so hot in blue" while Ms. McNeill's romper was blue;

c.      Told Ms. McNeill that she looked "way hotter in person" that she did online;

d.      Leered at Ms. McNeill for the entire day;

e.      Spoke about Ms. McDermaid's "Mormon underwear," asking Ms. McDermaid if she took them off during sex;

f.      Spoke about his old business partner's sex life, including how he cheated on his wife "all the time" and had "pole dancers come to the conference room" while his wife was okay with it;

g.      Later in the day, told Ms. McNeill "you have nice legs" and told her she looked like she "worked out."

h.      Told HK employees, including Ms. McNeill and Ryan Thompson, that Jerome Falic hates Democrats and that he can't believe Jerome would "let a gay man work for him;"

i.      He also said to Ms. McNeill that he couldn't believe "Jerome would have a business partner who wasn't Jewish."

31.     Every time Mr. Rosenbaum came to the warehouse (which was every one to two weeks) he made sexually suggestive comments about Ms. McNeill's appearance, including what she was wearing and how she dressed, including comments about:

      a.     Ms. McNeill's boobs;

      b.     Ms. McNeill's feet;

      c.     Ms. McNeill's dress being shorter;

      d.     Ms. McNeill's legs;

      e.     Ms. McNeill being "hot";

      f.     How he didn't like "gays," but Kaylin and Ms. McNeill "would be hot because you are 2 women."

32.     During this time, Mr. Rosenbaum also made improper sexually charged and demeaning comments about religion, age and experience to several other women in the office, including Kaylin Culp and Mindy McDermaid.

33.     For example, Mr. Rosenbaum asked Ms. McDermaid, about her "Mormon underwear" and how she would have sex with it on in front of Ms. McNeill almost every day.

34.     On July 11, 2022, Ms. McNeill had her first business conversation with Mr. Rosenbaum concerning the changes he was already implementing, including framing HK as a "discount brand" and putting Ms. McDermaid in charge of pushing sales, something that had been one of Ms. McNeill's primary job duties. Despite Ms. McNeill's protests to these changes, Mr. Rosenbaum did what he wanted, making clear that Ms. McNeill would no longer be in a supervisory or management position, to the extent she previously occupied either position. Ms. McNeill did not believe she previously had management authority, but prior to Mr. Rosenbaum's

entrance, Mr. Feldman would often approve Ms. McNeill's business ideas. Now, it was clear what Mr. Rosenbaum wanted would happen whether or not Ms. McNeill was on board.

35.     On July 13, 2022, Ms. McNeill sent Mr. Rosenbaum photos of her father's yard. In response, he asked Ms. McNeill where the "nooses" were, what about "lynchings," what about "separate bathrooms" and "where is the confederate flag???" Ms. McNeill responded stating "LOL NO" and "wrong kind of red neck" "see, you have them wrong." Ms. McNeill later told Mr. Rosenbaum she had never experienced racism, had many employees of different races and that she felt uncomfortable with Mr. Rosenbaum's racist rhetoric and jokes and that "I do not feel comfortable even talking about or even joking about that."

36.     Thereafter, Mr. Rosenbaum began coming to the office every 2 weeks, even though Ms. McNeill texted and spoke with him every day. During this time, Mr. Rosenbaum began a pattern of abusive behavior similar to that of an emotionally abusive relationship. Mr. Rosenbaum would tell Ms. McNeill how wonderful she was and what an incredible job she was doing. He told her she was the one who was going to make HK a big company and that she could "sell ice in the winter."

37.     He also became much more comfortable with making comments about Ms. McNeill's body and appearance. Every time he came to the warehouse, Mr. Rosenbaum would comment on Ms. McNeill's clothes and would talk about how "amazing" Ms. McNeill's feet, boobs and legs are. He also often told her that her dresses needed to be "shorter." These comments made Ms. McNeill extremely uncomfortable and she began to be weary of being in the office at the same time as Mr. Rosenbaum.

38.     During one in person meeting, Mr. Rosenbaum touched Ms. McNeill's face and said that HK's skin care "must be phenomenal because your skin looks so young and beautiful." Mr.

Rosenbaum said this as he was stroking Ms. McNeill's face. Ms. McNeill was disgusted by Mr. Rosenbaum's non-consensual touching that felt sexual in nature, but Ms. McNeill was afraid of telling Mr. Rosenbaum no or saying anything to upset him, given it had been made clear Mr. Rosenbaum was in control.

39.     The non-consensual touching continued where, at another meeting, Mr. Rosenbaum touched Ms. McNeill's thigh and ran his hand up, stating she had the "perfect legs" and that she would be a perfect "model for HK's tanner." Ms. McNeill sat still as stone, waiting for it to be over and hoping Mr. Rosenbaum didn't take the touching further.

40.     In addition to improper verbal harassment and abuse and non-consensual sexual touching of Ms. McNeill, Mr. Rosenbaum improperly and non-consensually touched Ms. Culp as well. Mr. McNeill saw Mr. Rosenbaum put his hand on Ms. Culp's face and graze his hand down toward her breasts. Ms. Culp was scared and did not know what to do. She knew she could not stand up to Mr. Rosenbaum, given his position of power. Mr. McNeill called Mr. Rosenbaum in October and told him this behavior had to stop, but it did not.

41.     Throughout this time period, which was the summer of 2022 into September, as Ms. McNeill was not responding to Mr. Rosenbaum's sexual harassment in the way he wanted, he would then constantly berate her in front of other employees. He consistently yelled at Ms. McNeill in front of HK employees, and would belittle her often in front of others and in private conversations. Mr. Rosenbaum would consistently tell Ms. McNeill she was too young, stupid, and had no idea what she was doing or how to run a business. He would make comments about how everyone was too young at HK to know anything, and that his experience would save the company.

42.     Mr. Rosenbaum often made comments about how stupid he thought younger people were, and in particular, young women, and seemed to insinuate constantly that young women were

only valuable if they were attractive and at that point the company could sell their looks. Mr. Rosenbaum made it clear he did not think young women had any place in running a business or occupying executive positions.

43.     Mr. Rosenbaum also continued to make more frequent and more aggressive racist and homophobic remarks, constantly saying how he "hates gay people," but that he thought it would be hot if Ms. McNeill and Ms. Culp hooked up because they were two young women. Mr. Rosenbaum also made comments about other HK female employees, calling one a "fatty," "too fat" and "chubby." Mr. Rosenbaum made it clear he was disgusted by "fat" people. Because of this, Ms. McNeill told Mr. Rosenbaum she used to be "fat" and that she had lap-band surgery. Mr. Rosenbaum responded, saying he couldn't believe she was ever "fat" but that the surgery was good because "Ur (*sic*) the brand so you need to look good." Ms. McNeill hoped that by telling Mr. Rosenbaum she used to be "fat" he would stop harassing her, but he did not.

44.     During this time, Mr. Rosenbaum also continued to make comments about the fact that Ms. McNeill was not Jewish and how Jerome did not like having non-Jewish business owners. Ms. McNeill felt as if Mr. Rosenbaum wanted her to know that her beliefs were a significant underlying issue for the Falics.

45.     In the past, Ms. McNeill had felt like an outsider due to her religion. For example, Ms. McNeill was required to work on all religious holidays recognized by the Christian faith (including Christmas Eve, Christmas and Easter) which all Jewish holidays were specifically recognized by Jerome Falic and Jewish employees were given the day off for all religious holidays. Ms. McNeill brought this up on occasion, but she was told she had to work on Christmas and Easter to get orders out. Thus, while offended, Ms. McNeill was not altogether surprised at Mr.

Rosenbaum's comments that devalued Ms. McNeill's religious beliefs and made her feel like a target for not being Jewish.

46.     Mr. Rosenbaum regularly engaged in non-sexual, gender-based and age-based harassment.  These actions included, but were not limited to:

a.     Calling Ms. McNeill stupid, dumb, and constantly berating her in front of others;

b.     Constantly yelling at Ms. McNeill and other female employees;

c.     Making comments suggesting young people, and young women specifically, did not belong in executive positions in any company;

d.     Making comments suggesting that young women do not know how to run businesses and are not savvy enough;

e.     Telling Ms. McNeill she did not belong in the warehouse as a woman and should not work in the warehouse;

f.     Making comments to and about female employees at HK, stating they should dress up more, wear more make-up, and generally present as more feminine;

g.     Telling Ms. McNeill she was being too emotional;

h.     Treating male employees like friends, including talking to them, laughing with them, and excusing mistakes. These male employees specifically included males in executive-level positions, including, but not limited to, Dusty McNeill, Richard Graham, Bryan Feldman, and Hernan Heiber.

i.     Treating Ms. McNeill very different from the other owners of HK, all of whom are male and over  40, by showing them respect, providing deference to them, and by not sexually harassing them or harassing them on the basis of their age or religion.

47.     On September 15, 2022, right before Ms. McNeill went to Cancun for her first vacation in year, Mr. Rosenbaum texted Ms. McNeill asking whether she could go on her "live" video in a bikini or topless while in Mexico. Ms. McNeill was with her parents at the time and felt disgusted and ashamed to have gotten such an inappropriate text in their presence. Ms. McNeill showed the text to her mother, who was also disgusted.

48.     Ms. McNeill attempted to rebuff Mr. Rosenbaum's advances by devaluing her looks, saying she was not skinny enough. She also sent a photo to Mr. Rosenbaum of her stomach after he lap band surgery, hoping Mr. Rosenbaum would find it gross and would stop. Ms. McNeill felt hopeless and had no idea how to curb Mr. Rosenbaum's harassing behavior. At this point, Ms. McNeill felt Mr. Rosenbaum had crossed the line into really inappropriate territory.

49.     Ms. McNeill went on vacation and stopped texting Mr. Rosenbaum because she felt so uncomfortable about the recent text messages about her being topless. Right on cue, because Ms. McNeill rebuffed Mr. Rosenbaum's suggestions of her going "live" topless and stopped texting him, Mr. Rosenbaum switched into abuse mode. On September 23, 2022, Mr. Rosenbaum called Ms. McNeill while she was on vacation, berating her and telling her she was stupid and doing a terrible job. He told her he had fired her marketing consultant, despite Ms. McNeill's strong protests right before she left on vacation.

50.     Huge business decisions were now being made without Ms. McNeill's input or approval—done while she was on vacation so she could not do or say anything—in direct response to Ms. McNeill's rebuffs. Ms. McNeill told Mr. Rosenbaum that she did not appreciate not being included in these big decisions as an owner and creative director, and that she felt Mr. Rosenbaum was "bulldozing" over people. Of course, Ms. McNeill was never consulted again on any big business decisions, as Mr. Rosenbaum was running the show.

51.     Ms. McNeill spent a large part of their vacation crying about how Mr. Rosenbaum was treating her. She was in a depressive state while her parents and family tried to help her.

52.     On October 3, 2022, Ms. McNeill spoke with Mr. Rosenbaum for the first time since September 23, because she was so uncomfortable about the topless text Mr. Rosenbaum had sent and his explosion on her thereafter. She emailed Mr. Rosenbaum twice about business, and Mr. Rosenbaum responded apologizing for his behavior and that he doesn't give her enough credit for the hard work she does. This was the same pattern Ms. McNeill was stuck in with Mr. Rosenbaum, where he would harass Ms. McNeill, then have a verbally abusive outburst, followed by compliments a few days later. Ms. McNeill felt that Mr. Rosenbaum was punishing her for not responding to what were becoming blatant sexual advances.

53.     After Mr. Rosenbaum apologized, he immediately began his harassing behavior again. Mr. Rosenbaum told Ms. McNeill he had been watching her posts and videos and noticed she had started to do yoga. Mr. Rosenbaum is a big yoga enthusiast, which Ms. McNeill was aware of. Mr. Rosenbaum told Ms. McNeill that "doing yoga makes you more flexible in bed" and that "women have better orgasms if they are flexible." Ms. McNeill became very uncomfortable with the conversation and tried to steer it back to business matters immediately. Any hope Ms. McNeill had that Mr. Rosenbaum would draw professional boundaries after she had stopped communicating with him after his last inappropriate comments were dashed.

54.     That night, Mr. Rosenbaum texted Ms. McNeill and Ms. Culp that he wanted them to do yoga with him the next day. He instructed them to bring their clothes and mats and was extremely excited.

55.     The next day, October 4, 2022, Mr. Rosenbaum started asking about the yoga immediately. Ms. McNeill told him she had a meeting in the morning and that it would have to

happen later. Ms. McNeill knew Mr. Rosenbaum had a flight and was hoping to avoid the yoga altogether. Mr. Rosenbaum was not going to allow that to happen. He became persistent in asking about when the yoga was going to happen, which made Ms. McNeill more and more uncomfortable.

56.     Mr. Rosenbaum finally decided yoga was going to happen on his timeline. He demanded that two female employees, Amber Teaster and Silvana Tuveri, set up the yoga mats so that Ms. McNeill and Ms. Culp could do yoga with him. He did not invite Ms. Teaster or Ms. Tuveri to also do yoga, and told Ms. McNeill and Ms. Culp that he "did not like old or heavy girls" which is why only wanted Ms. McNeill and Ms. Culp to do the yoga because they are "young and fit." It was clear that Ms. McNeill and Ms. Culp did not have the option to decline participating and they would be required to do the yoga at work.

57.     Mr. Rosenbaum asked Ms. McNeill to pick a yoga video from YouTube. Upon information and belief, this was so Mr. Rosenbaum could position himself behind Ms. McNeill and Ms. Culp and watch them (rather than leading them in yoga).

58.     Ms. McNeill and Ms. Culp felt extremely uncomfortable and found doing yoga during work hours at their boss's demand to be harassing and extremely troublesome. However, both women felt they had no choice but to capitulate, as the yoga session was a demand, not a request.

59.     Ms. McNeill picked a short "Yoga with Adrienne" video. Mr. Rosenbaum had set up the yoga mats so that his was positions behind Ms. McNeill and Ms. Culp. Mr. Rosenbaum forced both women to take off their shoes and socks (something he had mentioned several times previously) so that they had bare feet. Mr. Rosenbaum had spoken to Ms. McNeill about her

"amazing feet" in the past, and Ms. McNeill felt Mr. Rosenbaum had insinuated in the past that he had a sexual inclination toward feet.

60.     During yoga, Mr. Rosenbaum made sexual moaning noises the whole time.  Ms. McNeill was terrified to look at Mr. Rosenbaum and does not know if he was doing yoga or something else while making these sexual noises. During yoga, Mr. Rosenbaum also told Ms. McNeill and Ms. Culp how clean his feet were and made comments about how good Ms. McNeill's body looked and how the tan Ms. McNeill had from her vacation made her look "very attractive." Mr. Rosenbaum said Ms. McNeill "would have been the hottest girl on a nude beach."

61.     Toward the end of yoga, Mr. Rosenbaum again proclaimed that "being flexible makes you good in bed." Ms. McNeill felt that the yoga was sexual for Mr. Rosenbaum and felt disgusted by the entire thing. Right after yoga, she texted Mr. Feldman that she had done yoga with Mr. Rosenbaum. When Mr. Feldman responded like this was a total normal thing for Mr. Rosenbaum to have her do, Ms. McNeill kept it light because she was afraid of repercussions if she told Mr. Feldman that she and Ms. Culp felt they were being constantly harassed by Mr. Rosenbaum and felt the yoga was highly inappropriate.

62.     Ms. McNeill then texted Ms. McDermaid hoping to get a response from her about how inappropriate the yoga was, saying that she had to do yoga with Mr. Rosenbaum and to "shoot me."

63.     Thereafter, Mr. Rosenbaum insisted that he needed a shower after yoga, even though they had already had lunch and no one even broke a sweat during yoga. Ms. McNeill did not understand why Mr. Rosenbaum needed to shower, but she and Ms. Culp both told Mr. Rosenbaum he could use the shower in the apartment upstairs where Mr. Thompson often occupied but was not there right now. Mr. Rosenbaum proclaimed in front of Ms. McNeill, Ms. Culp and Ms. Teaster

that he "[didn't] want to shower where a faggot showers because [he didn't] want to catch the gay disease," referring to Mr. Thompson, who is gay.

64.    Despite Ms. McNeill's protests, Mr. Rosenbaum insisted on showering in the jack and jill bathroom (the smallest bathroom on the premises), which was connected to Ms. McNeill's and Ms. Culp's offices by two doors, one leading into each respective office.

65.    Ms. McNeill was sitting at her desk typing when Mr. Rosenbaum walked out of the bathroom and requested a towel. Ms. McNeill looked up and realized Mr. Rosenbaum was standing in front of her completely naked and front-facing Ms. McNeill, showing his penis.

66.    Ms. McNeill froze and became terrified. She jumped up and felt like she could not breathe and that she was having an anxiety attack. She assumed Mr. Rosenbaum thought she was going to get him a towel. The other door to her office was open and she ran out. Not thinking clearly, Ms. McNeill texted Ms. Culp to bring Mr. Rosenbaum a towel.  Ms. McNeill then ran into Ms. Teaster and was sobbing. Ms. Teaster asked Ms. McNeill what was wrong and Ms. McNeill told her "John showed me his dick." When Ms. Teaster kind of chuckled, seeming to not understand fully what Ms. McNeill was saying, Ms. McNeill said, "Amber, no, I think he would have raped me if my door had been shut."  Ms. McNeill continued running toward her car in the parking lot.

67.    Ms. McNeill then ran to the parking lot and got into her car.  She was sobbing uncontrollably and texted Ms. Culp.  Ms. Culp joined her in the car and Ms. McNeill told Ms. Culp that Mr. Rosenbaum had exposed himself to her. Ms. McNeill told Ms. Culp that they were no longer going to do yoga, that Ms. Culp would no longer provide Mr. Rosenbaum with rides and that they needed to be extremely careful around Mr. Rosenbaum from now on.

68.     Ms. Culp had ended up bringing Mr. Rosenbaum a towel, and Mr. Rosenbaum asked Ms. Culp if she minded him walking across in his towel. Ms. Culp had no idea what to say and Mr. Rosenbaum proceeded to walk across the entire office in nothing but a towel.

69.     Mr. Rosenbaum again requested that Ms. McNeill do yoga with him, and she refused. Mr. Rosenbaum gave Ms. McNeill the silent treatment for the next two days, and then on Mr. Rosenbaum screamed at Ms. McNeill and told her they were liquidating HK and she would get nothing. Mr. Rosenbaum was clearly upping his retaliation.

70.     The threat that HK was going to be liquidated terrified Ms. McNeill. Her family's entire livelihood came from HK and it was her only job prospect. Ms. McNeill had become and owner of HK and sold HK to the Falics with the plan that she would work at HK and build it into a multi-million dollar enterprise. Ms. McNeill texted Jerome Falic on October 17, 2022 that Mr. Rosenbaum told her HK was being liquidated and Mr. Falic never provided a response.

71.     Thereafter, Ms. McNeill avoided Mr. Rosenbaum as much as she could.  She would try to figure out when Mr. Rosenbaum would be in the office so that she could be there at different times.  She confided in multiple co-workers that she became physically ill around Mr. Rosenbaum and would have panic attacks. Multiple HK employees witnessed this and will testify to their concern about Ms. McNeill and how she became a shell of a person after Mr. Rosenbaum's exposure. Meanwhile, Ms. McNeill was falling into a scary depressive state where she was contemplating suicide. She thought constantly that there was nothing she could do to protect herself and that Mr. Rosenbaum had complete control over her and the situation because he was Mr. Falic's best friend.

72.     On October 24, 2022, Ms. McNeill submitted a complaint to Mr. Feldman about Mr. Rosenbaum's inappropriate behavior. Mr. Feldman stopped talking to Ms. McNeill after this call.

73.     Ms. McNeill was also suffering from severe anxiety about telling her husband about Mr. Rosenbaum's exposure. Ms. McNeill was afraid her husband might either say something to Mr. Rosenbaum that would end with them both losing their jobs, or would be mad at Ms. McNeill and blame her. Ms. McNeill finally told her husband what happened on October 27, 2022.

74.     When Mr. McNeill heard about Mr. Rosenbaum's improper behavior, he immediately texted Mr. Feldman asking if he could talk. Mr. McNeill and Mr. Feldman then had a call where Mr. McNeill complained, stating that Mr. Rosenbaum's behavior was beyond inappropriate, that since Mr. Rosenbaum came to work at HK everything had changed for the negative, and telling Mr. Feldman the behavior had to stop.  Mr. Feldman took no action on the harassment, which continued after he was informed, and stopped talking to both of the McNeills.

75.     Despite Ms. McNeill's attempts to avoid Mr. Rosenbaum, she could not, given that he was coming to the office multiple times a month.  The harassment, discrimination and abuse continued.

76.     For example, on November 3, 2022, Mr. Rosenbaum texted Ms. McNeill that she looked "really pretty" in her "live" video and "really hot" in her Tik Tok that same day.

77.     Up to this point, Mr. Rosenbaum had spoken about sex, Ms. McNeill's looks, Ms. Culp's looks and made other sexual comments on almost **every single occasion** they interacted. It became clear to Ms. McNeill at this point that Mr. Rosenbaum was never going to stop harassing Ms. McNeill even when she had made it beyond evident the conduct was unwelcome and had complained to her supervisor about the conduct.

78.     At no time did Ms. McNeill or Ms. Culp consent to Mr. Rosenbaum's verbal or physical harassment and abuse, and it was unwelcome at all times. Upon information and belief,

Mr. Rosenbaum was aware his conduct was unwelcome, based on both women's reactions and his own reactions in response.

79.    The conduct was both severe and pervasive and included mental and emotional harassment and abuse and unwelcome and unwanted physical touching.

80.    Both women discussed their mutual discomfort and distress regarding Mr. Rosenbaum's harassment, discrimination and abuse and tried to figure out ways of addressing the actions with awareness of Mr. Rosenbaum's position of power and wanting to keep their jobs.

81.    Upon information and belief, Mr. Rosenbaum never berated any male employee, and never called any male employee dumb or stupid.  Mr. Rosenbaum even told Mr. McNeill that he did not want to deal with his wife, but he would deal with Mr. McNeill.

82.    Mr. Rosenbaum never commented on any of the heterosexual male employees' appearances, clothes, or attitudes.

83.    Many women who worked for HK will testify that Mr. Rosenbaum treated women differently by punishing them, demeaning them, calling them too emotional and telling them they were not capable of taking action in the business, which led to both discrimination and harassment.

84.    Upon information and belief, Mr. Rosenbaum never berated any employees over the age of 40 and never made harassing comments to older people about their inability to perform due to their age.

85.    Upon information and belief, all Jewish employees were provided with any and all religious accommodations requested, including days off to celebrate Jewish holidays, and were treated differently as the "in group," while non-Jewish employees were treated as "others" and were in a more negative position just because they were not Jewish.

86. When Ms. McNeill tried to approach Mr. Rosenbaum's improper and abusive behavior with him, Mr. Rosenbaum taunted Ms. McNeill, telling her to "go ahead and complain" and "good luck," because Mr. Falic would never do anything to Mr. Rosenbaum. Mr. Rosenbaum constantly made it a point to tell Ms. McNeill (and whenever he could, also Mr. McNeill) that he and Mr. Falic were "best friends" and told Ms. McNeill when they did things as friends outside of the working relationship. Mr. Rosenbaum consistently intimidated Ms. McNeill and not only actively discouraged her from complaining about his improper behavior when she rebuffed his advances, but insinuated that if she did, she would be the one who would be punished.

87. In addition, Mr. Rosenbaum told Mr. and Ms. McNeill that at his old company he was "in the HR office" constantly and that nothing ever happened to him. He was making a point to let them both know he was "untouchable" (in his words) and could do whatever he pleased.

**Ms. McNeill Complained about Mr. Rosenbaum's Harassment and Abuse**

88. From the moment Mr. Rosenbaum began working at HK, Ms. McNeill did not know how to complain about his behavior. HK had no Human Resources department, had no anti-harassment or anti-discrimination policies in place, had no complaint procedure, never trained employees about proper workplace behavior, and failed entirely to ensure HK was a place free from harassment and discrimination.

89. When Mr. and Ms. McNeill told Mr. Feldman about the harassment and abuse, Mr. Feldman did nothing, even though he had been Ms. McNeill's supervisor for her entire tenure with HK. Instead, after they complained, they were both stonewalled by Mr. Feldman, who stopped communicating with them after they complained.

90.     Given that Mr. Rosenbaum had taken over the entire operations of HK and was acting manager and supervisor to Ms. McNeill (and all other employees), and, in reality, acting CEO of HK, Ms. McNeill had no one else to complain to but Mr. Rosenbaum himself.

91.     After Mr. Rosenbaum's continued insistence that Ms. McNeill and Ms. Culp continue to do yoga with him, Ms. Culp came to Ms. McNeill stating that she was not comfortable complaining to anyone but her, that she was ridden with anxiety and distress over being around Mr. Rosenbaum and that Ms. McNeill needed to complain.

92.     Ms. McNeill had also become inconsolable and despondent due to Mr. Rosenbaum's harassment and discrimination, to the point that she was not eating or sleeping and felt suicidal.

93.     Ms. McNeill would cry constantly, multiple times per day, and began being unable to make dinner for her children or spend time with her family as she normally had. Instead, her family was trying to pick up the pieces, knowing she was going through an incredibly difficult situation of being harassed and abused by her boss.

94.     Although Ms. McNeill was set on just enduring the harassment in abuse in order to save her job and her husband's job, when Ms. Culp came to her pleading that she complain, Ms. McNeill knew that she had to say something for the both of them, even though Mr. Rosenbaum had warned her multiple times of what would happen.

95.     Thus, on November 19, 2022, Ms. McNeill made a desperate plea to Mr. Falic to meet and discuss Mr. Rosenbaum's conduct towards her and reorganization of HK.  Ms. McNeill told fellow colleagues, friends and family members that she was finally going to tell Mr. Falic about Mr. Rosenbaum's harassing and discriminatory behavior as she could no longer take it.

Everyone Ms. McNeill told about her plan encouraged Ms. McNeill to come forward on behalf of herself and other female employees.

96.     On November 20, 2022, Ms. McNeill, with her husband, flew to Mr. Falic's personal residence for an in-person meeting.   Mr. Falic's wife, Deborah Falic, hosted the McNeills and was present for a portion of the meeting.   During the meeting, Ms. McNeill informed Mr. Falic of Mr. Rosenbaum's conduct, including complaining about the multiple incidents of sexual harassment, discrimination and abuse.

97.     Ms. McNeill believed Mr. Falic would appreciate the significance of Mr. Rosenbaum's conduct given his statements during the "Me Too" movement when Hard Candy attempted to trademark the "Me Too" phrase.   Mr. Falic's statement appeared in an online publication of *Glamour*:[5]

| NEWSLETTER | GLAMOUR | ☰ |
| --- | --- | --- |

**Update (January 18, 2018, 8 P.M.):**

We received the following statement from Hard Candy CEO Jerome Falic:

"As a brand devoted to women since its inception, Hard Candy has and will continue to support women's rights. Hard Candy has always quietly and proudly supported a non-profit organization that directly contributes to many women's causes. When the trademark application for #metoo was filed, one of our objectives was to bring greater awareness to this important and long overdue movement. We planned to donate 100% of all profits arising from this trademark to #metoo. Based on several public responses, we have abandoned the application. We will continue to support the work of this watershed movement and other causes that respect the dignity of women and all people."

---

[5] The full article can be accessed at https://www.glamour.com/story/hard-candy-trademark-me-too.

98.     During the meeting with Mr. Falic, Ms. McNeill broke down at his kitchen table crying. Mrs. Falic was in the kitchen for a lot of the meeting making breakfast, and presented breakfast to Mr. Falic, Ms. McNeill and Mr. McNeill. Ms. McNeill could not even eat the breakfast she was so distraught. Ms. McNeill told Mr. Falic about all of Mr. Rosenbaum's conduct, that he had harassed Ms. McNeill and Ms. Culp on the basis of sex and gender, age and religion, and that he had continuously emotionally abused Ms. McNeill during the past five months, oscillating between overly complimentary, flirtatious and blatantly making sexual advances toward Ms. McNeill to berating her, telling her she was stupid and ineffective, and that HK was being liquidated. Ms. McNeill told Mr. Falic about the yoga and Mr. Rosenbaum exposing himself to her. At one point where Ms. McNeill was sobbing, Mrs. Falic offered Ms. McNeill a tissue.

99.     At the end of the meeting, both Mr. and Mrs. Falic assured Ms. McNeill they would take care of the situation and that everything would be okay.

100.    After the meeting, Ms. McNeill felt, for a very brief period of time, that a weight had been lifted from her. After the meeting, she texted Mr. Falic positive messages she had received from recent purchasers, and he responded that she had a very loyal following and that it was great to see her and Dusty that day.

101.    Ms. McNeill spoke with numerous friends and family about the meeting, including her parents, Ms. Culp and Ms. Teaster, telling them about how the meeting went and that she told Mr. Falic everything about Mr. Rosenbaum and his conduct. People around Ms. McNeill right after she met with Mr. Falic will testify that she was, for the first time in about two months, more like herself again.

102.     Sadly, Mr. and Mrs. Falic were not being truthful when they told Ms. McNeill they would take care of the situation. In reality, a mere eight days after Ms. McNeill complained to Mr. Falic about the terrible hostile work environment created by Mr. Falic, HK began a new campaign of retaliation against Ms. McNeill for complaining that continues to this day.  This was in addition to the retaliation Ms. McNeill experienced when she rebuffed Mr. Rosenbaum's sexual advances, including being told multiple times she was going to lose her membership interest in HK due to liquidation—which Ms. McNeill was told only days after Ms. McNeill rebuffed Mr. Rosenbaum's sexual advances, and the retaliation she experienced from Mr. Feldman when she attempted to complain to him.

**Retaliation Against Ms. McNeill**

103.     On November 28, 2022, only eight days after her meeting with Mr. Falic, Ms. McNeill received a Notice of Material Breach of the Employment Agreement from HK's outside legal counsel.  [Exhibit B to Complaint, ECF No. 187-2].  At that time, HK and Mr. Falic disclosed their desire and felonious intent to steal (for personal gain) Ms. McNeill's ownership interest in HK and saddle her with significant financial distress.  In the letter, HK stated that it could "cancel" her ownership interest in HK and "void" all of its financial obligations to her, without providing any authority for such extreme actions.  No complaint or allegation pertaining to Ms. McNeill's conduct had been made during her multi-year tenure with HK prior to November 28, 2022.

104.     In the November 28, 2022 correspondence, Ms. McNeill was demoted in retaliation for her complaint, effective immediately, and no longer had the power to do anything at HK, including the tasks under her Employment Agreement.

105.    Ms. McNeill was in utter shock after receiving a letter from an HK lawyer purporting to take away her ownership interest in HK and demoting her from all HK business. She was immediately sent into a spiral of self-blame, depression, anxiety, panic and a general sense of self-loathing. Ms. McNeill blamed herself for complaining, instead thinking it would have been better to let Mr. Rosenbaum do whatever he wanted to her if it meant keeping her and her husband's jobs. She knew right then Mr. Rosenbaum's warnings were correct—under no circumstance would Mr. Falic take action to prevent harassment and retaliation in his own business when the perpetrator of that harassment was Mr. Rosenbaum.

106.    On December 1, 2022, again through a letter from HK's legal counsel, HK formally stripped Ms. McNeill of all responsibilities and authority pertaining to the operations, business, management and supervision of HK and its employees.  Ms. McNeill was also no longer allowed to engage in content creation or product development for HK without express direction from HK's marketing team.  In addition, the letter informed Ms. McNeill that Mr. Falic would make a formal announcement on December 2, 2022 naming Mr. Rosenbaum in charge of company business and operations and that she would have to now report to her abuser.

107.    On December 16, 2022, HK suspended Ms. McNeill, effective immediately, and precluded her from doing work of any nature for HK and from entering HK's offices.

108.    On January 30, 2022, while still under suspension, Ms. McNeill was provided formal notice of her termination by HK (the "Termination Notice").

109.    According to the Termination Notice, Ms. McNeill was terminated for "cause" under Section 4(a)(ii) of the Employment Agreement.  In reality, HK changed its pretextual "for cause" termination reasons for two months after Ms. McNeill complained about Mr. Rosenbaum, sending multiple letters to her with various reasons Ms. McNeill was suddenly a horrible

employee in person, all in direct response and retaliation to Ms. McNeill complaining about Mr. Rosenbaum's actions.

110.    Ms. McNeill was never informed of any performance-based issues prior to her report of Mr. Rosenbaum's misconduct, even though were the alleged misconduct true, HK would have known about it well before Ms. McNeill complained.

111.    Sadly, it turns out Mr. Rosenbaum's taunting warnings to Ms. McNeill about complaining were shown to be correct. Ms. McNeill was terminated in retaliation for reporting Mr. Rosenbaum's conduct, Ms. McNeill had not committed any of the alleged acts identified in the Termination Notice or any of the other letters that purportedly formed the basis for her termination.   Additionally, Ms. McNeill had not committed any other acts which could have constituted "cause" for termination, as defined in Section 4(a)(ii) of the Employment Agreement.

112.    Mr. Falic admits that at no time did he ever even question whether Mr. Rosenbaum could have been the perpetrator of harassment and that he did nothing because he felt nothing needed to be done.

113.    Upon information and belief, prior to Ms. McNeill's termination and continuing thereafter, HK made false, disparaging and defamatory statements about Ms. McNeill to third parties.   HK told its affiliate salespersons and others, including Angela Porta, that Ms. McNeill had engaged in illicit business practices when operating both Lashed Out and HK, such as embezzling company funds, mistreating employees, unauthorized use of a company credit card, engaging in deceitful marketing practices and mishandling of corporate records.

114.    As discussed below, HK and Mr. Falic also retaliated against Ms. McNeill by seizing her entire ownership interest in HK without providing any consideration to Ms. McNeill for the value of such interest.

115. Upon information and belief, HK further retaliated against Ms. McNeill by falsely notifying the Internal Revenue Service that she failed to report income she received from HK.

116. The effect of Mr. Rosenbaum's, Mr. Falic's and HK's actions directed against Ms. McNeill were devastating. Ms. McNeill was forced to restart her life. The emotional toll upon her was almost unbearable. Ms. McNeill suffered from suicidal thoughts. She was unable to take care of her basic needs or those of her three children.

117. There were many times where Ms. McNeill has been bed-ridden for days, unable to care for or be there for her children, and unable to function. She has lost core memory strength, has been unable to focus on her new business, and has, in general, become a person she would not recognize as herself. Ms. McNeill was touched, emotionally abused and harassed, and then not only was fired, but lost her entire hope for her future.

118. Ms. McNeill's expert in this case confirmed that she has and continues to suffer extreme emotional distress caused directly by Mr. Rosenbaum's harassment and abuse and HK and Mr. Falic's retaliation, including her termination and the filing of this lawsuit.

119. Ms. McNeill began therapy and got onto medication to assist with her debilitating depression caused by HK, Mr. Falic and Mr. Rosenbaum. However, their actions—in particular Mr. Rosenbaum's sexual harassment, discrimination and abuse that HK not only did nothing about, but *rewarded* with a promotion—continue to cause Ms. McNeill extreme emotional distress. As a result, Ms. McNeill is searching for a therapist that specializes in assisting victims of sexual harassment, discrimination and abuse.

120. Mr. Rosenbaum groomed Ms. McNeill, oscillating between overtly sexual and improper comments, unwanted touching and sexually aggressive come-ons and verbal abuse, knocking Ms. McNeill down and telling her how worthless she was every time she rebuffed Mr.

Rosenbaum's advances.  The extent of the damage this has done to Ms. McNeill is severe and Ms. McNeill continues to discover the ways in which the abuse has affected her.

121.    When HK, Mr. Falic and Mr. Feldman became aware of the abhorrent behavior, they did nothing to protect Ms. McNeill, and instead retaliated against her by taking her ownership interest in HK away from her without compensation, failing to pay her bonuses she had earned, defaming her, demoting her, terminating her and then suing her.

122.    Upon information and belief, these actions were and continue to be taken in retaliation for Ms. McNeill coming forward about the harassment she endured and now in order to prevent Ms. McNeill from speaking out about the harassment and abuse she endured as an employee of HK—all of which Mr. Falic not only condoned, but rewarded.

123.    Mr. Falic's public persona of understanding the "me too" movement and wanting to bring more awareness to the issue could not be further from the truth.  Behind the scenes, Mr. Falic rewarded Mr. Rosenbaum after becoming fully aware of the harassment, discrimination and abuse he had inflicted on Ms. McNeill and other female employees and, at the same time, destroyed Ms. McNeill's life as she knew it. Mr. Falic stated he never so much as considered Ms. McNeill was telling the truth and completely brushed off the allegations.

124.    HK and Mr. Falic also allowed Mr. Rosenbaum to continue his abusive behavior after termination Ms. McNeill.  After terminating Ms. McNeill, Mr. Rosenbaum continued in his management role of HK.  Ms. Culp had quit her employment out of extreme fear of being around Mr. Rosenbaum without Ms. McNeill, but Ms. Teaster remained employed.  Mr. Rosenbaum immediately turned his eye to Ms. Teaster and began sexually harassing her, making sexually suggestive comments to her about her tattoos and telling her she should dress up and wear red lipstick.

125.    HK continues to go out of its way to ensure Ms. McNeill cannot speak out about Mr. Rosenbaum's and Mr. Falic's conduct, including filing a motion with the Court accusing Ms. McNeill of illegally disparaging Mr. Rosenbaum and Mr. Falic when she told another influencer she had been the victim of harassment and discrimination.  This is not the behavior of a person who cares about bringing positive awareness to harassment, discrimination and abuse and putting a stop to such conduct.  To the contrary, Mr. Falic is a perpetrator who has gone to extreme lengths to protect Mr. Rosenbaum, the abuser and who continues to retaliate against Ms. McNeill to this day by suing her in direct response to her complaints about harassment and submitting untruths about Ms. McNeill to the Court to supports those claims.

126.    Mr. Rosenbaum still performs services for HK. On the other hand, Ms. McNeill has been forced to sell her family's home and most of her other assets, move into her motorhome with her three children and her husband, and relocate in order to defend the retaliatory and untrue claims made against her and to ensure HK, Mr. Falic and Mr. Rosenbaum do not get away with their abhorrent retaliatory behavior.

**Head Kandy Failed to Properly Investigate Ms. McNeill's Claims of Harassment**

127.    HK had no policies regarding harassment and discrimination and had no polices on reporting harassment and discrimination. Thus, Ms. McNeill had no idea who to go to when she began experiencing discrimination, harassment and abuse at the hands of Mr. Rosenbaum, who was acting as her supervisor and who was Mr. Falic's right hand man (and best friend).

128.    Mr. Rosenbaum consistently threatened Ms. McNeill and Ms. Culp about reporting the discrimination, harassment and abuse, warning her that Mr. Falic would take his side.

129.    As a result, Ms. McNeill was left for months to fend off the harassment herself and had no idea how she should report the improper conduct.

130.     Mr. McNeill complained about Mr. Rosenbaum's creation of a hostile work environment after hearing about the exposure. Mr. Feldman took no action.

131.     Ms. McNeill also complained about Mr. Rosenbaum's harassment and abuse of her and Ms. Culp to Mr. Feldman in October 2022, and Mr. Feldman took no action, instead refusing to further communicate with Ms. McNeill.

132.     Having no other choice, Ms. McNeill then complained about Mr. Rosenbaum's creation of a hostile work environment to Jerome Falic in November 2022.

133.     Mr. Falic took no action to determine whether the allegations were true, instead choosing not to even ask Mr. Rosenbaum whether the allegations were true, and deciding instead that based on his personal relationship with Mr. Rosenbaum, there was no way the allegations were true and that Ms. McNeill had manufactured the months of daily abuse.

134.     HK did not speak to any other employees about the allegations. HK did not conduct an investigation to determine whether the allegations were true.

135.     HK did not take steps to remove Mr. Rosenbaum from the position of Ms. McNeill's supervisor and manager.

136.     Instead, eight days after Ms. McNeill complained, she was sent a letter from HK's lawyer advising her she would be removed from her position. Shortly thereafter, Ms. McNeill received another letter from HK's lawyer advising that she was immediately demoted and that moving forward, Mr. Rosenbaum would formally be announced as HK's CEO and her supervisor and manager.

137.     Shortly thereafter, Ms. McNeill was terminated and Mr. Rosenbaum was formally promoted to the CEO position.

138.    On August 19, 2024, Ms. McNeill learned for the first time, through HK's counsel's cross-examination of Mr. Falic in his deposition that only after Ms. McNeill filed her charges of discrimination, harassment and retaliation with the Florida Human Relations Commission did HK hire a firm to allegedly perform an investigation and respond to the charges on behalf of HK. Mr. Rosenbaum and Mr. Falic both stated in their depositions prior to this, under oath, that no investigation had ever occurred. The firm and the results of the investigation have never been disclosed.

139.    Mr. Rosenbaum still works for HK to this day, despite HK's awareness that multiple employees have now attested to their personal experiences of being harassed and abused by Mr. Rosenbaum, in addition to having witnessed Mr. Rosenbaum harass, discriminate against, and retaliate against Ms. McNeill, including when Ms. McNeill rebuffed Mr. Rosenbaum's sexual advances.

**Ms. McNeill Received Reasonable Cause Determinations from the Florida Human Relations Commission**

140.    On January 30, 2024, Ms. McNeill filed charges of discrimination, harassment and retaliation against HK.

141.    On April 5, 2024, HK filed a Position Statement (through the same lawyers that allegedly conducted an investigation into the allegations) denying Ms. McNeill's allegations.

142.    On July 26, 2024, the Florida Human Relations Commission issued its determinations of reasonable cause, finding that Ms. McNeill had asserted *prima facie* claims, as follows:

- Hostile Work Environment/Harassment on the basis of sex;

- Hostile Work Environment/Harassment on the basis of age;

- Hostile Work Environment/Harassment on the basis of religion;

- Sexual Harassment based on her gender/harassment was sexual in nature;

- Retaliation.

143.    The Florida Human Relations Commission found that all acts which constitute the claims above are part of the same unlawful employment practice and that Ms. McNeill's charge was timely filed with the Florida Human Relations Commission.

144.    The Florida Human Relations Commission found that Ms. McNeill is a member of three protected classes: sex, age and religion (Christian).

145.    The Florida Human Relations Commission found Ms. McNeill was subjected to unwelcome conduct based on each protected class.

146.    The Florida Human Relations Commission found that the alleged harassing conduct or comments were sufficiently severe or pervasive to alter the terms and conditions of Ms. McNeill's employment.

147.    The Florida Human Relations Commission found that Ms. McNeill provided sufficient information to suggest she complained about the unlawful conduct to HK and that HK did not take sufficient remedial action.

148.    The Florida Human Relations Commission found HK was aware of the allegations of Mr. Rosenbaum's improper conduct and was aware that Ms. McNeill had complained about Mr. Rosenbaum's improper conduct.

149.    The Florida Human Relations Commission found sufficient evidence that Ms. McNeill's termination was causally linked to her engaging in protected activity.

150.    The Florida Human Relations Commission found that all reasons HK provided as legitimate non-discriminatory reasons for termination were mere pretext. Specifically, the Commission found that Ms. McNeill did not make any inappropriate purchases on the American

Express card, as the card was Ms. McNeill's Personal Credit Card, and that any personal purchases made on the card after 2018 were reimbursed by Ms. McNeill.

151.     The Florida Human Relations Commission found that it had jurisdiction over Ms. McNeill's claims in Florida.

152.     Based on the Reasonable Cause Determinations, Ms. McNeill has fully exhausted her administrative remedies and is authorized to file her claims in this lawsuit.

153.     The Court has jurisdiction over Ms. McNeill's claims.

**HK's Breach of the Operating Agreement**

154.     At the time HK acquired Lashed Out's assets, Ms. McNeill obtained a 20% ownership interest in HK.

155.     Ms. McNeill, as an owner of HK, has the right to, among other things, inspect and copy minutes of board of directors meetings, records of any actions taken by the board of directors and the accounting records of HK. Since at least November 28, 2022, HK and Mr. Falic have intentionally prevented Ms. McNeill from enjoying all rights, privileges and activities afforded members under that May 3, 2018 Amended and Restated Limited Liability Company Operating Agreement of Head Kandy LLC (the "Operating Agreement").

156.     On February 17, 2023, Mr. Falic (unilaterally) executed a resolution (the "Resolution") wherein HK and Mr. Falic falsely claimed that HK held an option to repurchase all of Ms. McNeill's 20% ownership interest in HK, as an Executive, under Section 8.5 of the Operating Agreement.

157.     Ms. McNeill was not an Executive, as defined in the Operating Agreement, at the time of her termination by HK.

158.    Section 8.5 of the Operating Agreement provides a comprehensive method for determining the purchase price of units repurchased pursuant to that Section.  Section 8.5 does not allow for credit against or setoff of the prescribed purchase price.

159.    Nonetheless, the Resolution states that HK applied a setoff to the amount it would owe Ms. McNeill under Section 8.5 for her ownership interest.

160.    Notably, the Resolution also stated: "It is further determined that McNeill presently owes the Company an amount to be determined for reimbursement of improper charges and for other damage to the Company, in excess of $1,000,000.00, and the amount originally paid for McNeill's Units, based on the books and records of the Company, is not more than $720,000."  However, HK has since disclosed in this action that its damages for the allegedly improper charges are not more than $520,000.

161.    As of the filing of this pleading, Ms. McNeill has not received any payment for her HK ownership interest purportedly repurchased by HK.

162.    Mr. Falic's and HK's theft of Ms. McNeill's ownership interest in HK has denied her of the rights she is entitled to as a member of HK.

**HK's Failure to Pay Ms. McNeill's Compensation**

1.    Ms. McNeill continuously remained an employee of HK pursuant to the Employment Agreement, without amendment, until she was terminated by the company on January 30, 2023.

2.    Pursuant to the terms of the Employment Agreement, Ms. McNeill was entitled to certain compensation that included, among other things, an annual base salary, paid vacation and performance-based bonuses.

3.      Pursuant to Section 3(a), Ms. McNeill was entitled to an annual salary.  At the time of her termination, Ms. McNeill had earned ten (10) days of unpaid salary totaling $5,479.50.

4.      The initial term of the Employment Agreement ran from May 3, 2018 to May 2, 2023.  At that time of Ms. McNeill's termination, approximately four months of the initial term remained.  Pursuant to Section 4(c)(i) of the Employment Agreement, Ms. McNeill was entitled to payment of her base salary for the remainder of the initial term if HK terminated the Employment Agreement without "cause," as defined in the Employment Agreement.  No for "cause" basis existed for terminating Ms. McNeill at the time HK provided her with notice of termination.  Thus, Ms. McNeill is entitled to approximately $50,000 in additional unpaid base salary, which HK and Mr. Falic have willfully refused to pay, in addition to accrued penalties for the unpaid salary in the amount of approximately $150,000.

5.      Pursuant to Section 3(c) of the Employment Agreement, Ms. McNeill was entitled to fifteen days paid vacation for every year of her employment with HK.  At the time of her termination, Ms. McNeill was entitled to payment by HK for her accrued and unused vacation totaling $39,041.11, which has not been paid to date.

6.      As a resident of Colorado, Ms. McNeill is entitled to the protections afforded to employees under the Colorado Wage Act, C.R.S. § 8-4-101, *et seq*. ("CWA").

7.      Paid vacation is considered wages and cannot be forfeited, waived, or subject to a "use it or lose it" provision.

8.      HK's and Mr. Falic's failure to pay Ms. McNeill her accrued and unused vacation days was and continues to be willful.  Thus, Ms. McNeill is entitled to $39,041.11 in accrued and

unused vacation, in addition to accrued penalties for the earned and unpaid vacation days in the amount of $117,123.33.

9.      Pursuant to Section 3(b) of the Employment Agreement, Ms. McNeill was entitled to an annual bonus comprised of ten percent of HK's net profit for the subject year and calculated using HK's audited financial statements.

10.     As of August 26, 2022, HK had failed to satisfy its obligation under Section 3(b) of the Employment Agreement to obtain audited financial statements to calculate Ms. McNeill's bonus for any year during her employment.

11.     HK and Mr. Falic have willfully refused to pay Ms. McNeill a bonus for any calendar year she worked for HK, although, upon information and belief, Ms. McNeill earned bonuses each year which were vested and determinable prior to her termination (but HK and Mr. Falic never determined by, upon information and belief, purposefully failing to obtain audited financial statements).

12.     Prior to August 2022, HK told Ms. McNeill she was not entitled to any bonus under the Employment Agreement.   Ms. McNeill had no reason to believe HK was misrepresenting her bonus eligibility and was not provided the necessary documentation to scrutinize HK's representations.  Thus, Ms. McNeill reasonably relied upon HK's representation that it had determined no bonus was owed, through obtaining and reviewing audited financials for HK.

13.     On August 25, 2022, Ms. McNeill was informed that she had earned and was owed bonuses for multiple years of her employment.  Specifically, on August 25, 2022, Mr. Rosenbaum emailed HK's chief financial officer, Ms. Kleitias Petri, stating: "Klei, I need the figure by Monday morning.  Meeting with Jerome on Monday afternoon and I want this diners

[sic]." By email dated August 26, 2022, Ms. Petri notified Mr. Rosenbaum that HK owed Ms. McNeill unpaid bonuses for the period of 2018-2021 in the amount of $84,554.39. Ms. Petri also acknowledged that HK had never obtained audited financials. Ms. McNeill was copied on the August 26 email. Thereafter, Mr. Rosenbaum separate acknowledged to Ms. McNeill that her bonuses were owed and outstanding. On August 24, 2022, Mr. Rosenbaum assured Ms. McNeil in a text message that "I'll get ur bonus paid." On August 31, 2022, Mr. Rosenbaum again confirmed to Ms. McNeil that "I'll make sure ur bonus is paid."

14.     As of the time of filing this pleading, Ms. McNeill is unable to independently verify the amount of her unpaid bonuses because she has not received any audited financial statements from HK. It is HK's and Mr. Falic's responsibility to calculate and determine the amount of bonuses owed to Ms. McNeill by obtaining audited financial statements.

15.     HK's and Mr. Falic's refusal and failure to pay Ms. McNeill the accrued bonus amounts she is owed is, at best, willful, if not fraudulent, given that, for years, HK misrepresented to Ms. McNeill that she was not owed any bonuses. Thus, Ms. McNeill is also entitled to penalties in an amount of three times the amount of bonus she is owed.

16.     HK's ordinary supplies, inventory and other expenses were charged to the Credit Card. HK was required to then reimburse Ms. McNeill for such expenses.

17.     At the time of her termination, there were company expenses charged to the Credit Card in the amount of $99,679.77.

18.     Despite the established, agreed upon process for payment of the expenses and Ms. McNeill subsequently demanding payment of the outstanding expenses, HK refused to pay the expenses prior to the payment due date.

19.     As a result, Ms. McNeill was forced to personally pay all of HK's charged expenses to avoid penalties, such as late charges, default interest and deterioration of her credit.

20.     In addition, Ms. McNeill had previously paid $39,110.71 in HK business expenses.  Thus, HK owed Ms. McNeill $138,790.48 for its business expenses she was forced to pay.

21.     At the time HK fired Ms. McNeill and refused to pay almost $139,000 in business expenses it charged to her Credit Card, HK also fired Ms. McNeill's husband.  As a result, the McNeills lost all household income and were simultaneously forced to pay HK's business expenses.

**Ms. McNeill's Demand for Accrued and Unpaid Wages and Reimbursement of Expenses**

22.     HK and Mr. Falic failed to pay Ms. McNeill all or any part of her accrued wages or reimburse her for any expenses on her last day of employment on January 30, 2023, which they were statutorily required to pay Ms. McNeill on her last day of employment.

23.     Ms. McNeill made a global demand for all unpaid wages and other compensation through correspondence between counsel for the parties on February 3, 2023.

24.     On February 10, 2023, counsel for HK informed the undersigned that no payment would be made in response to the final demand.

25.     As a result, Ms. McNeill was forced to initiate a proceeding against HK on February 13, 2023 in Colorado state court, styled as *Kayla M. McNeill v. Head Kandy, LLC*, Chaffee County District Court, Case No. 2023CV30007 (the "Colorado Action"), to obtain her unpaid compensation.

26.     HK learned of the pending Colorado Action on February 21, 2023.  This matter was commenced in Florida on February 22, 2023 for the sole purpose of depriving Ms. McNeill of her chosen forum for resolution of her Colorado wage claim.

27.     HK successfully obtained dismissal of the Colorado Action on the basis that the Employment Agreement required the parties to arbitrate their claims pursuant to the Federal Arbitration Act, 9 U.S.C. § 1, *et seq*.  Despite its representations to the court in the Colorado Action, HK never submitted any of its claims to Arbitration.

**Ms. McNeill's Loan to HK**

28.     In or around May 2019, Ms. McNeill entered into a loan agreement with HK (the "Loan").

29.     Pursuant to the terms of the Loan, Ms. McNeill agreed to loan HK $145,000 and HK agreed to repay Ms. McNeill through annual payments of principal and interest, which accrued at 7%.

30.     HK initially made annual payments of outstanding interest, only; however, HK's last payment to Ms. McNeill was in January 2022 for interest accrued in calendar year 2021.

31.     As of the filing of this pleading, HK remains in default under the Loan.  Presently, the full original principal amount of $145,000, as well as the accrued interest for years 2022, 2023 and 2024, is due and payable.

**HK's Theft of Ms. McNeill's Forklift**

32.     Beginning in May 2018, Ms. McNeill leased her personal forklift (the "Forklift") to HK without payment from HK.

33.     On June 10, 2021, Ms. McNeill and HK entered into a lease agreement (the "Forklift Lease") for HK's use of the Forklift.

34.     Pursuant to the lease, HK was required to make monthly lease payments of $1,000, without any back payments.

35.     HK failed to make lease payments for December 2022, January 2023, February 2023 and March 2023.

36.     HK unilaterally terminated the Forklift Lease in March 2023.

37.     Ms. McNeill demanded return of the Forklift in writing on February 21, 2023. Plaintiff continued to intentionally and permanently deprive Ms. McNeill of the Forklift and rights and benefits from it.

38.     In light of the theft of the Forklift, a pre-suit civil theft letter was issued demanding treble damages.   HK failed to pay the treble damages requested within 30 days of receipt of the demand letter.

**HK's application of a setoff to the amount owed for her 20% Membership Interest in HK amounts to civil theft.**

39.     As set forth above, pursuant to the Operating Agreement, Ms. McNeill was a 20% owner of HK. On February 17, 2023, Mr. Falic (unilaterally) executed a resolution (the "Resolution") wherein Mr. Falic falsely claimed that HK held an option to repurchase all of Ms. McNeill's twenty percent ownership interest in HK under Section 8.5 of the Operating Agreement.

40.     Assuming the buyout was proper, and although the Operating Agreement required a majority vote to approve any buyout, HK moved forward with the buyout.

41.     However, HK did not stay within the bounds of the Operating Agreement, and instead reached outside the Operating Agreement, determining that it was allowed to apply a setoff to the amount owed to Ms. McNeill under the Operating Agreement.

42.     Specifically, the Resolution stated that "It is further determined that McNeill presently owes the Company an amount to be determined for reimbursement of improper charges and for other damage to the Company, in excess of $1,000,000.00, and the amount originally paid for McNeill's Units, based on the books and records of the Company, is not more than $720,000."

43.     Thus, based on HK's and Mr. Falic's improper, unsupported, unsubstantiated and baseless claim that Ms. McNeill owed HK "in excess of $1,000,000.00," Mr. Falic determined on behalf of HK that Ms. McNeill was not owed any amount for her Ownership Interest.

44.     HK has later claimed Ms. McNeill's alleged breaches of the Employment Agreement for prohibited competition allow it to withhold the full amount of the Purchase Price for her Ownership Interest.

45.     The Operating Agreement does not allow for credit against or setoff of the prescribed purchase price, nor does the Operating Agreement allow HK to withhold payment for a Ownership Interest because of breaches of any agreement, let alone Ms. McNeill's Employment Agreement.

46.     HK has since admitted that the amount in the Resolution "in excess of $1,000,000.00" was grossly exaggerated and that HK's claimed amount is actually $500,000.

47.     In reality, HK has never even tried to figure out whether Ms. McNeill owes it any money.

48.     HK terminated Ms. McNeill on January 30, 2023 prior to Ms. McNeill completing her reconciliation of the charges to her personal American Express card, which would have shown that Ms. McNeill did not owe HK anything. HK discontinued all

conversations regarding Ms. McNeill's efforts to provide the reconciliation. HK pretextually claimed that theft was the reason for the termination even though they had no basis to do so.

49.     Mr. Falic then caused HK to pass the Resolution less than a month later, without any reconciliation, fabricating that Ms. McNeill owed HK "in excess of $1,000,000," a number HK has now admitted is a fabrication.

50.     HK acted with the felonious intent to permanently deprive Ms. McNeill of her Ownership Interest by passing a Resolution with terms outside the Operating Agreement that allowed for an offset of a baseless number.

51.     HK also withheld the bonuses owed to Ms. McNeill as part of the "repayment" to them that was not permitted under the Operating Agreement (or any other agreement).

52.     A year later, HK finally began its own process of reconciliation, only after Ms. McNeill informed HK she would be asserting these civil theft claims. It took three people working for HK six months to perform the reconciliation for 2022, for which, it turned out, there were no problems. HK did not review reconciliation for years 2018-2021 until around August 5th, one week prior to Kleitias Petri's deposition (HK's non-retained expert).

53.     In the meantime, Ms. McNeill has produced an expert report which, in the words of the Florida Human Relations Commission, "fully shows" Ms. McNeill does not owe HK anything related to charges on her American Express card.

54.     At no point has HK ever been interested in actually determining if there were any unaccounted charges on the American Express or actually determining if Ms. McNeill owed HK anything. HK has acted with felonious intent to permanently deprive Ms. McNeill of her Ownership Interest from day one by putting themselves outside the Operating Agreement to argue a baseless set off. This farce continues to today.

55.     For example, although HK has since admitted that, pursuant to its (erroneous) calculations showing Ms. McNeill actually only owed HK $500,000, HK has not paid Ms. McNeill a single dollar. If set off for amounts owed was the intention, HK should have paid Ms. McNeill at least $330,000 (based on its valuation of the business at $720,000, which Ms. McNeill disputes).

56.     Ms. McNeill believes her Ownership Interest is actually worth just shy of $1,000,000, per the cap table in the Operating Agreement.

57.     Assuming the set off approach was valid, even if outside the terms of the Operating Agreement, HK cannot deprive Ms. McNeill of the entire amount of her Ownership Interest.

58.     HK has not set forth a single dollar lost as a result of Ms. McNeill's alleged competitive activities, and even pursuant to offset, Ms. McNeill cannot be deprived of the Purchase Price of her Ownership Interest merely by breaching a term of her Employment Agreement when no damages have been suffered.

59.     Based on HK's felonious conduct and intent, which resulted in a civil theft of Ms. McNeill's Ownership Interest, HK is liable for damages for the civil theft in the amount of the Purchase Price owed under Section 8.5 of the Operating Agreement, less any amount Ms. McNeill actually owes to HK, and not the unsubstantiated, baseless (and changing) figures HK has set forth to this point.

60.     On May 10, 2024, Ms. McNeill set HK a demand for all amounts owed as a result of the civil theft, including treble damages, pursuant to Fla. Stat. 812.014.

61.     As of the filing of this pleading, Ms. McNeill has not received any payment for her HK Ownership Interest purportedly repurchased by HK.

62.     Mr. Falic stole Ms. McNeill's Ownership Interest for his own benefit by causing HK to take actions outside of the Operating Agreement

63.     All of HK's actions set forth above that resulted in civil theft were caused solely by Jerome Falic. Mr. Falic unilaterally passed the Resolution without the proper number of votes to do so (and without even consulting the other members of HK).

64.     Mr. Falic solely came up with the amount Ms. McNeill allegedly owed HK in "excess of $1,000,000" knowing there was no basis for the amount.

65.     Mr. Falic solely caused HK to apply an offset of $1,000,000 to the amount HK believed was owed to Ms. McNeill under the Operating Agreement.

66.     Mr. Falic solely made the decision to draft a Resolution bringing the buyout outside the bounds of the Operating Agreement.

67.     Mr. Falic took all of these actions with felonious intent to deprive Ms. McNeill of her full Ownership Interest for his benefit. Mr. Falic then did benefit from the civil theft by gaining a 5% membership interest in HK. Mr. Falic took these actions in direct retaliation as a result of Ms. McNeill's complaints of abuse and harassment by Jonathan Rosenbaum, his best friend and business confidant.

68.     As is true for HK, Mr. Falic has taken no real steps until forced to do so to defend Ms. McNeill's claims in this lawsuit to determine whether Ms. McNeill actually owes HK a dollar. Mr. Falic had and currently has no intention of ever figuring that out, and instead continues to assert a variety of different arguments than those in the Resolution as to why Ms. McNeill is not owed anything for her Ownership Interest (including the directly contradictory statement to the one he made in the Resolution that HK was worthless at the time Ms. McNeill

was terminated). Mr. Falic acted, and continues to act with felonious intent to permanently deprive Ms. McNeill of her Ownership Interest.

69.     Mr. Falic must divest himself (and the rest of the members) of their ownership interests that were gained by his civil theft and Ms. McNeill must be paid in the amount equivalent to the value of her Ownership Interest at the time the Resolution was signed, less any amount Ms. McNeill might actually owe HK, which is to be determined in this litigation.

70.     On May 10, 2024, Ms. McNeill sent Mr. Falic a demand for all amounts owed as a result of the civil theft, including treble damages, pursuant to Fla. Stat. 812.014.

71.     As of the filing of this pleading, Mr. Falic has not made any payment to Ms. McNeill and remains a 25% owner of HK.

72.     Mr. Falic, and HK, through Mr. Falic's sole actions, engaged in an intricate sophisticated scheme of deceit and theft in order to divest Ms. McNeill of her Ownership Interest without payment. The scheme involves, but is not limited to, unilaterally passing the Resolution without other member input (when a majority vote was required) to allow an offset of expenses Ms. McNeill allegedly owed to HK against what HK should have paid Ms. McNeill for her Ownership Interest; going back on years of prior approvals of business expenses; taking back years of previous approvals Ms. McNeill got from her supervisor for business expenses; manipulating facts in an attempt to turn Ms. McNeill's personal credit card into HK's credit card; review of tens of thousands of credit card payments over a period of five years; engaging various consultants to try to dig up information on Ms. McNeill; accusing Ms. McNeill of theft without basis; and constantly changing the story as to why Ms. McNeill is not owed any money for her Ownership Interest (when she put in close to $1,000,000 of capital and paid $100,000 in HK expenses), all in retaliation for Ms. McNeill's protected complaints of harassment and abuse.

73.     Mr. Falic and HK, through Mr. Falic's actions, converted Ms. McNeill's Ownership Interest into interests for the other members of HK for their own personal benefit through fraud and false pretenses.

74.     HK and Mr. Falic are liable to Ms. McNeill for the value of her Ownership Interest as set forth above, treble damages, attorneys fees, costs and any other damages available to Ms. McNeill pursuant to Colorado and Florida law.

**HK's Surreptitious Theft of Ms. McNeill's Social Media Accounts**

75.     Pursuant to Section 1.1(c) of the APA, HK acquired Lashed Out's "user accounts and user names/handles with Twitter, Facebook, Instagram and other social media or similar companies and the content found thereon.

76.     As of the effective date of the APA, May 3, 2018, through to the closing date, Lashed Out owned one Facebook account, one Twitter account and one Instagram account, all in Lashed Out's name.

77.     Several months later, on November 6, 2018, Ms. McNeill created a personal Facebook page for herself, which was assigned Page ID 1642077422564196 (the "FB Account").

78.     In or around November 2018, Ms. McNeill also created a personal TikTok account (together with the FB Account, the "Personal Social Media Accounts").

79.     After Ms. McNeill created the Personal Social Media Accounts, it quickly became apparent that people enjoyed viewing the Personal Social Media Accounts more that HK's social media accounts.  As a result, Ms. McNeill sought to increase awareness of HK by frequently discussing and sharing information pertaining to HK's products on her Personal Social Media Accounts.

80.     Nonetheless, Ms. McNeill was at all times the registered owner of the Personal Social Media Accounts.  Ms. McNeill has always maintained that the Personal Social Media Accounts are her sole and exclusive property.  HK acknowledged Ms. McNeill's assertion of her rights in and to the Personal Social Media Accounts on several occasions, at least as early as December 1, 2022.

81.     As HK ratcheted up its retaliatory attacks upon Ms. McNeill, discussed in depth below, it demanded, without explanation, that Ms. McNeill provide it with her login credentials for the Personal Social Media Pages.  Under duress, Ms. McNeill provided her login credential to HK.

82.     At or near the time of Ms. McNeill's termination, HK surreptitiously changed her login credentials and has continually prevented her from accessing the Personal Social Media Accounts or obtaining the information she uploaded to the Accounts.

83.     Following Ms. McNeill's dispossession of the Personal Social Media Account by HK, HK began using the Accounts for its exclusive commercial benefit.

84.     Up to at least April 11, 2023, pictures and videos owned by Ms. McNeill of herself and her family were visible on the Personal Social Media Accounts (the "Social Media Content").

**HK's Unauthorized Use of Ms. McNeill's Name, Likeness and Identity**

85.     Since Ms. McNeill's termination, HK has engaged in and continues to engage in the unauthorized use of Ms. McNeill's name, likeness and identity for its exclusive benefit.  During the time period, HK has used Ms. McNeill's name, likeness and identity, without authority, in its marketing materials, product inserts and other materials.  The following are examples of such use:



86.     Ms. McNeill has not authorized HK to use her name, image or likeness for any purpose.  Ms. McNeill has made multiple demands to HK that it cease its unauthorized use.  HK has refused to comply with Ms. McNeill's requests.

## HK Previously Authorized Conduct it Claims Constitutes Breach of Employment Agreement

87.     Much later, during Ms. McNeill's discussions with HK following her November 28, 2022 meeting with Mr. Falic, HK, through counsel, informed Ms. McNeill that HK did not consider her continued operation of a company she recently started named White Pineapple ("Whipi") to be a violation of the Employment Agreement.  HK also informed Ms. McNeill that it did not consider product reviews or tutorials she conducted on her social media accounts to be in violation of the Employment Agreement.

88.     As a result of HK's inducements, Ms. McNeill continued her involvement with Whipi and posted product reviews and tutorials to social media.  HK now maintains claims

against Ms. McNeill in this proceeding for engaging in the vary conduct it induced her to engage in.

### FIRST CLAIM FOR RELIEF[6]
**Breach of Contract, Employment Agreement, against HK**

89.     Ms. McNeill realleges and incorporates the allegations of all other paragraphs of this pleading as if fully and completely restated herein.

90.     The Employment Agreement is a valid and binding contract as of the date of HK's breach.

91.     HK materially breached the Employment Agreement by failing to satisfy its obligations thereunder, including at least the following:

      a.     Failing to timely obtain audited financial statements pursuant to Section 3(b);

      b.     failing to timely determine Ms. McNeill's bonuses for the years of 2018, 2019, 2020, 2021 and 2022 pursuant to Section 3(b);

      c.     failing to pay Ms. McNeill her bonuses when they became due pursuant to Section 3(b);

      d.     demoting Ms. McNeill and preventing her from engaging in and exercising the responsibilities, duties and authority described in Section 2;

      e.     falsely terminating Ms. McNeill "for cause" under Section 4(a)(ii);

      f.     non-payment of Ms. McNeill's outstanding base salary for the remainder of the initial term as required by Section 4(c);

---

[6] Ms. McNeill presently has a charge pending against the HK Parties with the Florida Human Rights Commission. Consequently, pursuant to Florida State law, Ms. McNeill is precluded from asserting claims under Florida State law related to the pending charge.  Ms. McNeill reserves her right to file such claims and hereby provides notice to all other parties of her intent to pursue such claims if and when she is able.

g.      failing to reimburse Ms. McNeill for HK's business expenses charged to Ms. McNeill's Credit Card as required by Section 4(c); and,

h.      inducing Ms. McNeill to breach the restrictive covenants within the Employment Agreement.

92.     Ms. McNeill performed all of her obligations under the Employment Agreement at the time each of HK's material breaches occurred.

93.     Ms. McNeill has substantially performed under the terms of the Employment Agreement.

94.     Ms. McNeill has suffered and continues to incur damages as a result of HK's conduct, in an amount to be proven at trial.

**SECOND CLAIM FOR RELIEF**
**Breach of Contract, Amended and Restated Limited Liability Company Operating Agreement, against HK**

95.     Ms. McNeill realleges and incorporates the allegations of all other paragraphs of this pleading as if fully and completely restated herein.

96.     The Operating Agreement is a valid and binding contract.

97.     HK materially breached the Operating Agreement by failing to pay Ms. McNeill the contractually mandated purchase price for her membership interest set forth in Section 8.5.

98.     Ms. McNeill performed all of her obligations under the Operating Agreement at the time each of HK's and Mr. Falic's material breaches occurred.

99.     Ms. McNeill has substantially performed under the terms of the Operating Agreement.

100.    HK's conduct constitutes willful misconduct and unlawful acts.

101.    Ms. McNeill has suffered and continues to incur damages as a result of HK's conduct, in an amount to be proven at trial.

### THIRD CLAIM FOR RELIEF
**Breach of Contract, Loan Agreement, against HK**

102.    Ms. McNeill realleges and incorporates the allegations of all other paragraphs of this pleading as if fully and completely restated herein.

103.    The Loan is a valid and binding contract between Ms. McNeill and HK.

104.    HK materially breached the Loan by failing to make interest and/or principal payments as they became due.

105.    Ms. McNeill performed all of her obligations under the Loan at the time each of HK's material breaches occurred.

106.    Ms. McNeill has substantially performed under the terms of the Loan.

107.    Ms. McNeill has suffered and continues to incur damages as a result of HK's conduct, in an amount to be proven at trial.

### FOURTH CLAIM FOR RELIEF
**Breach of Contract, Forklift Lease, against HK**

108.    Ms. McNeill realleges and incorporates the allegations of all other paragraphs of this pleading as if fully and completely restated herein.

109.    The Forklift Lease is a valid and binding contract between Ms. McNeill and HK.

110.    HK materially breached the Forklift Lease by failing to make lease payments thereunder as they became due.

111.    Ms. McNeill performed all of her obligations under the Forklift Lease at the time each of HK's material breaches occurred.

112.    Ms. McNeill has substantially performed under the terms of the Forklift Lease.

113.    Ms. McNeill has suffered and continues to incur damages as a result of HK's conduct, in an amount to be proven at trial.

### FIFTH CLAIM FOR RELIEF
**Colorado Civil Theft, C.R.S. § 18-4-405, against HK and Mr. Falic**

114.    Ms. McNeill realleges and incorporates the allegations of all other paragraphs of this pleading as if fully and completely restated herein.

115.    Ms. McNeill was a resident of Colorado at all relevant times.

116.    Ms. McNeill owns and has exclusive rights to the Personal Social Media Accounts, the Social Media Content, her Forklift and her ownership interest in HK.

117.    HK and Mr. Falic, through deception and fraud, obtained exclusive control over the Personal Social Media Accounts, the Social Media Content, the Forklift and Ms. McNeill's ownership interest in HK with the felonious intent to deprive Ms. McNeill of their use and value. Neither HK nor Mr. Falic was legally entitled to the Personal Social Media Accounts, the Social Media Content, the Forklift or Ms. McNeill's ownership interest in HK.

118.    Ms. McNeill has suffered and continues to incur damages as a result of HK's and Mr. Falic's conduct, in an amount to be proven at trial.

### SIXTH CLAIM FOR RELIEF
**Florida Civil Theft, Fla. Stat. §§ 772.11 and 812.014, against HK and Mr. Falic**

119.    Ms. McNeill realleges and incorporates the allegations of all other paragraphs of this pleading as if fully and completely restated herein.

120.    Ms. McNeill owns and has exclusive rights to the Personal Social Media Accounts, the Social Media Content, her Forklift and her ownership interest in HK (the "Stolen Property").

121.    HK has knowingly obtained and used the above-mentioned Stolen Property of my Client with the intent to temporarily or permanently deprive her of a right or benefit from the Property.

122.     The corporate Resolution executed by Mr. Falic, founded on unsupported allegations, including but not limited to that Ms. McNeill "improperly charged[] various improper expenses to the Company [Head Kandy, LLC]…in excess of $1,000,000.00…", was a (fraudulent) and knowing action by Mr. Falic to steal (with felonious intent) Ms. McNeill's ownership interest in HK without legal basis.

123.     HK and Mr. Falic knowingly obtained and used the Personal Social Media Accounts, the Social Media Content, the Forklift and Ms. McNeill's ownership interest in HK with felonious intent to temporarily or permanently deprive Ms. McNeill of her exclusive ownership, possession and use rights in and to the Personal Social Media Accounts, the Social Media Content, the Forklift and Ms. McNeill's ownership interest in HK.

124.     Ms. McNeill has suffered and continues to incur damages as a result of HK's and Mr. Falic's conduct, in an amount to be proven at trial.

### SEVENTH CLAIM FOR RELIEF
**Colorado Wage Act, C.R.S. § 8-4-101, *et seq*., against HK and Mr. Falic**

125.     Ms. McNeill realleges and incorporates the allegations of all other paragraphs of this pleading as if fully and completely restated herein.

126.     Ms. McNeill was a resident of Colorado at all relevant times.

127.     Ms. McNeill was an employee of HK at all relevant times until her employment was terminated at HK's volition.

128.     Mr. Falic has served as HK's agent, acting in the interest of HK, through his role as managing member since its formation in 2018.

129.     At the time Ms. McNeill was terminated, Ms. McNeill had earned, vested, determinable and unpaid wages, including base salary, accrued and unused vacation, and

bonuses, and unpaid reimbursement for HK's business expenses that HK and Mr. Falic failed and refused to pay her.

130.    Ms. McNeill has made multiple demands to HK and Mr. Falic for payment of the unpaid wages, including base salary, accrued and unused vacation, and bonuses, and unpaid reimbursement for HK's business expenses, including on February 3, 2023.

131.    HK and Mr. Falic have falsely denied the amount, validity and status of Ms. McNeill's wage claim with the intent of securing a discount upon or underpayment of such indebtedness.

132.    HK and Mr. Falic have falsely denied the amount, validity and status of Ms. McNeill's wage claim with the intent to annoy, harass, oppress, hinder, coerce, delay or defraud Ms. McNeill.

133.    HK and Mr. Falic have willfully failed and refused to pay Ms. McNeill any portion of the unpaid wages and other compensation.

134.    HK's and Mr. Falic's conduct constitutes willful misconduct and unlawful acts.

135.    Ms. McNeill has been injured in an amount of at least $278,754.77 plus interest and attorneys' fees, which continue to accrue, as a result of HK's and Mr. Falic's conduct.

<u>**EIGHTH CLAIM FOR RELIEF**</u>
**Invasion of Privacy by Appropriation against HK**

136.    Ms. McNeill realleges and incorporates the allegations of all other paragraphs of this pleading as if fully and completely restated herein.

137.    HK used Ms. McNeill's name, likeness and/or identity.

138.    HK's use of Ms. McNeill's name, likeness and/or identity was for HK's own purposes or benefit, commercially or otherwise.

139.    Ms. McNeill has been injured and will continue to be injured as a result of HK's conduct, in an amount to be proven at trial.

### NINETH CLAIM FOR RELIEF
### Invasion of Right of Publicity, Fla. Stat. § 540.08, against HK

140.    Ms. McNeill realleges and incorporates the allegations of all other paragraphs of this pleading as if fully and completely restated herein.

141.    HK published, printed, displayed and/or otherwise publicly used Ms. McNeill's name, photograph and/or other likeness for commercial and advertising purposes.

142.    At the time HK engaged in the foregoing actions, it had not been given express written or oral consent by Ms. McNeill to do so.

143.    Ms. McNeill has been injured and will continue to be injured as a result of HK's conduct, in an amount to be proven at trial.

### TENTH CLAIM FOR RELIEF
### Conversion against HK

144.    Ms. McNeill realleges and incorporates the allegations of all other paragraphs of this pleading as if fully and completely restated herein.

145.    Ms. McNeill owns and has exclusive rights to the Personal Social Media Accounts, the Social Media Content and her Forklift.

146.    HK's exercise of control over the Personal Social Media Accounts, the Social Media Content and the Forklift was not authorized by Ms. McNeill and was intended to permanently deprive Ms. McNeill of the full use and benefit of the Personal Social Media Accounts, the Social Media Content and the Forklift.

147.    Ms. McNeill has suffered and continues to incur damages as a result of HK's conduct, in an amount to be proven at trial.

## ELEVENTH CLAIM FOR RELIEF
### Unjust Enrichment against HK

148.    Ms. McNeill realleges and incorporates the allegations of all other paragraphs of this pleading as if fully and completely restated herein.

149.    Through Ms. McNeill's labor, lease of the Forklift, granting of access to the Social Media Accounts and payment of HK's business expenses, Ms. McNeill conferred a benefit on HK.

150.    HK knew of these benefits and retained them, and it would be inequitable for HK to retain the benefits without paying for them.

151.    Ms. McNeill has been injured and will continue to be injured as a result of HK's conduct, in an amount to be proven at trial.

## TWELFTH CLAIM FOR RELIEF
### Intentional Infliction of Emotional Distress against HK, Mr. Falic and Mr. Rosenbaum

152.    Ms. McNeill realleges and incorporates the allegations of all other paragraphs of this pleading as if fully and completely restated herein.

153.    HK's and Mr. Falic's conduct, which was designed to demoralize, oppress, harass and oust Ms. McNeill from her employment and ownership positions with HK, was extreme and outrageous, including their failure to protect Ms. McNeill from severe and grotesque sexual harassment, failure to respond to Ms. McNeill's complaints and other intentional and deliberate actions meant to degrade Ms. McNeill and deprive her of her livelihood.

154.    HK's and Mr. Falic's conduct was intended to cause Ms. McNeill severe emotional distress.

155.    Ms. McNeill's mental suffering was deliberately and recklessly inflicted by HK and Mr. Falic.

156.    HK's and Mr. Falic's conduct resulted in severe emotional distress to Ms. McNeill.

157.    Ms. McNeill has been injured and will continue to be injured as a result of HK's and Mr. Falic's conduct, in an amount to be proven at trial, but at least in an amount equivalent to the amount Ms. McNeill has spent on therapy trying to cope with her extreme emotional distress.

158.    Mr. Rosenbaum's persistent, unwanted and inappropriate sexual conduct specifically targeted at Ms. McNeill was extreme and outrageous.

159.    Mr. Rosenbaum's conduct was intended to cause Ms. McNeill severe emotional distress.

160.    Ms. McNeill's mental suffering was deliberately and recklessly inflicted by Mr. Rosenbaum.

161.    Mr. Rosenbaum's conduct resulted in severe emotional distress to Ms. McNeill.

162.    Ms. McNeill has been injured and will continue to be injured as a result of Mr. Rosenbaum's conduct, in an amount to be proven at trial, but at least in an amount equivalent to the amount Ms. McNeill has spent on therapy trying to cope with her extreme emotional distress.

**THIRTEENTH CLAIM FOR RELIEF**
**Negligent Infliction of Emotional Distress against HK, Mr. Rosenbaum and Mr. Falic**

163.    Ms. McNeill realleges and incorporates the allegations of all other paragraphs of this pleading as if fully and completely restated herein.

164.    HK had a duty to exercise reasonable care in preventing workplace discrimination.

165.    HK failed to exercise reasonable care in its hiring and retention of Mr. Rosenbaum, and in its treatment of Ms. McNeill following her disclosure of inappropriate sexual conduct by Mr. Rosenbaum.

166.    Upon information and belief, HK was aware that Mr. Rosenbaum had previously sexually harassed other women.

167.    It was reasonably foreseeable that HK's conduct would cause Ms. McNeill severe emotional distress.

168.    Ms. McNeill suffered severe emotional distress as a result of HK's conduct.

169.    Ms. McNeill has been injured and will continue to be injured as a result of HK's conduct, in an amount to be proven at trial.

170.    Mr. Rosenbaum had a duty to exercise reasonable care in his conduct towards Ms. McNeill.

171.    Mr. Rosenbaum failed to exercise reasonable care by engaging in persistent, unwanted and inappropriate sexual conduct specifically targeted at Ms. McNeill.

172.    It was reasonably foreseeable that Mr. Rosenbaum's conduct would cause Ms. McNeill severe emotional distress.

173.    Ms. McNeill suffered severe emotional distress as a result of Mr. Rosenbaum's conduct.

174.    Ms. McNeill has been injured and will continue to be injured as a result of Mr. Rosenbaum's conduct, in an amount to be proven at trial.

175.    Mr. Falic had a duty to exercise reasonable care in his management of HK.

176.    Mr. Falic failed to exercise reasonable care by hiring and retaining Mr. Rosenbaum despite knowing of Mr. Rosenbaum's inappropriate sexual conduct.  Further, Mr.

Falic failed to exercise reasonable care in addressing Ms. McNeill's complaint of sexual misconduct by Mr. Rosenbaum, and instead terminated her for making her legally protected complaint.

177.    It was reasonably foreseeable that Mr. Falic's conduct would cause Ms. McNeill severe emotional distress.

178.    Ms. McNeill suffered severe emotional distress as a result of Mr. Falic's conduct.

179.    Ms. McNeill has been injured and will continue to be injured as a result of Mr. Falic's conduct, in an amount to be proven at trial.

## FOURTEENTH CLAIM FOR RELIEF
### Extreme and Outrageous Conduct against HK, Mr. Falic and Mr. Rosenbaum

180.    Ms. McNeill realleges and incorporates the allegations of all other paragraphs of this pleading as if fully and completely restated herein.

181.    Following Ms. McNeill's November 20, 2022 meeting with Mr. Falic during which she notified Mr. Falic of Mr. Rosenbaum's persistent, unwanted and inappropriate sexual conduct specifically targeted at her, HK and Mr. Falic engaged in extreme and outrageous conduct, including their failure to protect Ms. McNeill from severe and grotesque sexual harassment, failure to respond to Ms. McNeill's complaints and other intentional and deliberate actions meant to demoralize, oppress, harass and oust Ms. McNeill from her employment and ownership positions with HK and, in the process, depriving her of her livelihood.

182.    HK and Mr. Falic acted with the intent to cause severe emotional distress or with reckless disregard of the high probability of causing severe emotional distress to Ms. McNeill.

183.    Ms. McNeill has been injured and will continue to be injured as a result of HK's and Mr. Falic's conduct, in an amount to be proven at trial.

184.    Mr. Rosenbaum engaged in extreme and outrageous conduct through his persistent, unwanted and inappropriate sexual conduct specifically targeted at Ms. McNeill.

185.    Mr. Rosenbaum acted with the intent to cause severe emotional distress or with reckless disregard of the high probability of causing severe emotional distress to Ms. McNeill.

186.    Ms. McNeill has been injured and will continue to be injured as a result of Mr. Rosenbaum's conduct, in an amount to be proven at trial.

## FIFTEENTH CLAIM FOR RELIEF
### Negligent Hiring/Supervision/Retention against HK

187.    Ms. McNeill realleges and incorporates the allegations of all other paragraphs of this pleading as if fully and completely restated herein.

188.    HK had a duty to exercise reasonable care in preventing workplace discrimination.

189.    HK was aware or had constructive notice of Mr. Rosenbaum's inappropriate sexual behavior; particularly, after Ms. McNeill's November 20, 2023 meeting with Mr. Falic. Upon information and belief, HK was aware or had constructive notice of Mr. Rosenbaum's inappropriate conduct, including harassment, which occurred during his prior employment.

190.    When HK became aware of Mr. Rosenbaum's improper conduct toward Ms. McNeill, HK failed to protect Ms. McNeill, failed to properly address the complaint, failed to take corrective action against Mr. Rosenbaum and, instead, retaliated against Ms. McNeill by terminating her.

191.    Mr. Rosenbaum's behavior resulted in injury to Ms. McNeill, including extreme emotional distress and loss of employment.

192.     Ms. McNeill has been injured and will continue to be injured as a result of HK's conduct, in an amount to be proven at trial, including compensation for her emotional distress, back and front pay, and future wages.

### SIXTEENTH CLAIM FOR RELIEF
**Wrongful Discharge in Violation of Public Policy of North Carolina**

193.     Ms. McNeill realleges and incorporates the allegations of all other paragraphs of this pleading as if fully and completely restated herein.

194.     Ms. McNeill suffered discrimination on the basis of her sex when Mr. Rosenbaum engaged in persistent, unwanted and inappropriate sexual conduct specifically targeted at Ms. McNeill.   The majority of Mr. Rosenbaum's conduct occurring at HK's offices in North Carolina.

195.     Eight days after Ms. McNeill explicitly reported Mr. Rosenbaum's conduct to Mr. Falic, Ms. McNeill received a Notice of Material Breach of the Employment Agreement from HK's outside legal counsel.   Such notice was improper retaliation against Ms. McNeill for reporting the sexual harassment and abuse Mr. Rosenbaum had inflicted upon her.

196.     North Carolina has a clear public policy in prohibiting sexual harassment of employees and prohibiting retaliation of employees for reporting improper sexual conduct to their employer.

197.     It is against North Carolina's public policy to terminate an employee for experiencing sexual harassment and/or retaliating against an employee for reporting harassment.

198.     HK terminated Ms. McNeill's employment as a result of Ms. McNeill reporting Mr. Rosenbaum's persistent, unwanted and inappropriate sexual conduct specifically targeted at Ms. McNeill.

199.     Ms. McNeill has been injured and will continue to be injured as a result of HK's conduct, in an amount to be proven at trial, but at minimum including back and front pay, emotional distress damages and future potential earnings.

## SEVENTEENTH CLAIM FOR RELIEF
**Defamation against HK**

200.     Ms. McNeill realleges and incorporates the allegations in paragraphs of this pleading as if fully and completely restated herein.

201.     HK made defamatory statements to third parties about Ms. McNeill, including when it published or caused to be published false statements that Ms. McNeill had engaged in illicit business practices when operating both Lashed Out and HK, such as embezzling company funds, mistreating employees, unauthorized use of a company credit card, engaging in deceitful marketing practices and mishandling of corporate records.

202.     Ms. McNeill has been injured and will continue to be injured as a result of HK's conduct, in an amount to be proven at trial.

## EIGHTEENTH CLAIM FOR RELIEF
**Harassment/Hostile Work Environment on the basis of Sex**
**Florida Civil Rights Act, F.S.A. § 760.10**

203.     Ms. McNeill realleges and incorporates the allegations in paragraphs _____ of this pleading as if fully and completely restated herein.

204.     Sex is a protected class under the Florida Civil Rights Act.

205.     HK did not take reasonable steps to prevent harassment in its workplace. HK did not have any policies on harassment or discrimination or any policies on how to report offensive conduct to HK. HK did not train employees on proper workplace conduct and did not inform employees that they would not be retaliated against for complaining against offensive conduct.

206.     Ms. McNeill is a member of a protected class—female.

207.    Ms. McNeill was subjected to unwelcome harassment based on her sex, as detailed above at pp. ___. The harassment occurred at the hands of HK's acting CEO, Mr. Rosenbaum.

208.    The harassment based on sex was both severe and pervasive.

209.    The affect the harassment based on sex had on Ms. McNeill was both objectively and subjectively unwelcome, objectionable, and hostile.

210.    The harassment based on sex created a discriminatory hostile and abusive working environment.

211.    The harassment based on sex altered Ms. McNeill's terms, conditions and privileges of employment.

212.    Ms. McNeill complained about the harassment based on sex to her supervisor, Bryan Feldman and the managing member of HK, Jerome Falic. Thus, HK knew or should have known about the harassing behavior.

213.    HK failed to take prompt remedial action to stop the harassing behavior based on sex.

214.    HK was intentionally and recklessly indifferent to Ms. McNeill's claims of harassment based on sex and did nothing to even determine whether the claims were true. HK took no steps to stop the harassment based on sex, and instead terminated Ms. McNeill for complaining.

215.    Ms. McNeill was suspended 8 days after complaining about the harassment based on sex, was demoted __ days after that, and was terminated thereafter. The harassment based on sex and Ms. McNeill's complaint thereof was causally related to her suspension, demotion and termination.

216.   The harassment based on sex caused Ms. McNeill to suffer extreme emotional distress, as set forth above at pp. ___.

217.   HK should be vicariously liable for the harassment based on sex, as it was the cause of the adverse employment actions against Ms. McNeill.

218.   HK is liable to Ms. McNeill for damages in an amount to be determined at trial, including back and front pay, emotional distress damages, punitive damages, attorneys fees, costs, and all other damages available under the Florida Civil Rights Act.

**NINETEENTH CLAIM FOR RELIEF**
**Harassment/Hostile Work Environment on the basis of Age**
**Florida Civil Rights Act, F.S.A. § 760.10**

219.   Ms. McNeill realleges and incorporates the allegations in paragraphs of this pleading as if fully and completely restated herein.

220.   Age under 40 is a protected class under the Florida Civil Rights Act.

221.   HK did not take reasonable steps to prevent harassment in its workplace. HK did not have any policies on harassment or discrimination or any policies on how to report offensive conduct to HK. HK did not train employees on proper workplace conduct and did not inform employees that they would not be retaliated against for complaining against offensive conduct.

222.   Ms. McNeill is a member of a protected class—age under 40.

223.   Ms. McNeill was subjected to unwelcome harassment based on her age, as detailed above at pp. ___. The harassment occurred at the hands of HK's acting CEO, Mr. Rosenbaum.

224.   The harassment based on age was both severe and pervasive.

225.   The affect the harassment based on age had on Ms. McNeill was both objectively and subjectively unwelcome, objectionable, and hostile.

226.     The harassment based on age created a discriminatory hostile and abusive working environment.

227.     The harassment based on age altered Ms. McNeill's terms, conditions and privileges of employment.

228.     Ms. McNeill complained about the harassment based on age to her supervisor, Bryan Feldman and the managing member of HK, Jerome Falic. Thus, HK knew or should have known about the harassing behavior.

229.     HK failed to take prompt remedial action to stop the harassing behavior based on age.

230.     HK was intentionally and recklessly indifferent to Ms. McNeill's claims of harassment based on age and did nothing to even determine whether the claims were true. HK took no steps to stop the harassment based on age, and instead terminated Ms. McNeill for complaining.

231.     Ms. McNeill was suspended 8 days after complaining about the harassment based on age, was demoted days after that, and was terminated thereafter. The harassment based on age and Ms. McNeill's complaint thereof was causally related to her suspension, demotion and termination.

232.     The harassment based on age caused Ms. McNeill to suffer extreme emotional distress, as set forth above.

233.     HK should be vicariously liable for the harassment based on age, as it was the cause of the adverse employment actions against Ms. McNeill.

234.     HK is liable to Ms. McNeill for damages in an amount to be determined at trial, including back and front pay, emotional distress damages, punitive damages, attorneys fees, costs, and all other damages available under the Florida Civil Rights Act.

## TWENTIETH CLAIM FOR RELIEF
### Harassment/Hostile Work Environment on the basis of Religion
### Florida Civil Rights Act, F.S.A. § 760.10

235.     Ms. McNeill realleges and incorporates the allegations in paragraphs of this pleading as if fully and completely restated herein.

236.     Religion is a protected class under the Florida Civil Rights Act.

237.     HK did not take reasonable steps to prevent harassment in its workplace. HK did not have any policies on harassment or discrimination or any policies on how to report offensive conduct to HK. HK did not train employees on proper workplace conduct and did not inform employees that they would not be retaliated against for complaining against offensive conduct.

238.     Ms. McNeill is a member of a protected class based on her religion-Christian.

239.     Ms. McNeill was subjected to unwelcome harassment based on her religion, as detailed above The harassment occurred at the hands of HK's acting CEO, Mr. Rosenbaum, as well as the managing member of HK, Jerome Falic, her supervisor, Bryan Feldman, and the other owners of HK, Leon and Simon Falic.

240.     The harassment based on religion was both severe and pervasive.

241.     The affect the harassment based on religion had on Ms. McNeill was both objectively and subjectively unwelcome, objectionable, and hostile.

242.     The harassment based on religion created a discriminatory hostile and abusive working environment.

243. The harassment based on religion altered Ms. McNeill's terms, conditions and privileges of employment.

244. Ms. McNeill complained about the harassment based on religion to the managing member of HK, Jerome Falic. Thus, HK knew or should have known about the harassing behavior.

245. HK failed to take prompt remedial action to stop the harassing behavior based on religion.

246. HK was intentionally and recklessly indifferent to Ms. McNeill's claims of harassment based on religion. HK took no steps to stop the harassment based on religion, and instead terminated Ms. McNeill for complaining.

247. Ms. McNeill was suspended 8 days after complaining about the harassment based on religion, was demoted days after that, and was terminated thereafter. The harassment based on religion and Ms. McNeill's complaint thereof was causally related to her suspension, demotion and termination.

248. The harassment based on religion caused Ms. McNeill to suffer extreme emotional distress, as set forth above

249. HK should be vicariously liable for the harassment based on religion, as it was the cause of the adverse employment actions against Ms. McNeill.

250. HK caused Ms. McNeill damages in an amount to be determined at trial, including back and front pay, emotional distress damages, punitive damages, attorneys fees, costs, and all other damages available under the Florida Civil Rights Act.

## TWENTY-FIRST CLAIM FOR RELIEF
**Sexual Harassment**
**Florida Civil Rights Act, F.S.A. § 760.10**

251.     Ms. McNeill realleges and incorporates the allegations in paragraphs of this pleading as if fully and completely restated herein.

252.     Sexual harassment based on sexual advances is prohibited under the Florida Civil Rights Act.

253.     HK did not take reasonable steps to prevent sexual harassment in its workplace. HK did not have any policies on sexual harassment or any policies on how to report offensive conduct to HK. HK did not train employees on proper workplace conduct and did not inform employees that they would not be retaliated against for complaining against offensive conduct.

254.     Ms. McNeill is a member of a protected class based on her sex-female.

255.     Ms. McNeill was subjected to unwelcome sexual harassment based on her sex, as detailed above at pp. ___. The harassment was sexual in nature and occurred at the hands of HK's acting CEO, Mr. Rosenbaum, literally, as Mr. Rosenbaum touched Ms. McNeill in a sexual manner without her consent.

256.     The sexual harassment was both severe and pervasive.

257.     The affect the sexual harassment had on Ms. McNeill was both objectively and subjectively unwelcome, objectionable, and hostile.

258.     The sexual harassment created a discriminatory hostile and abusive working environment.

259.     The sexual harassment altered Ms. McNeill's terms, conditions and privileges of employment.

260.     Ms. McNeill rebuffed Mr. Rosenbaum's sexual advances and was retaliated against for rebuffing those advances every time, affecting the terms, conditions and privileges of

her employment, including loss of job duties, loss of colleagues, constant verbal abuse, threats of liquidation of her ownership interest, and termination, among other things.

261.   Ms. McNeill complained about the sexual harassment to her supervisor, Bryan Feldman and the managing member of HK, Jerome Falic. Thus, HK knew or should have known about the harassing behavior.

262.   HK failed to take prompt remedial action to stop the sexual harassment.

263.   HK was intentionally and recklessly indifferent to Ms. McNeill's claims of sexual harassment. HK took no steps to stop the sexual harassment, and instead terminated Ms. McNeill for complaining.

264.   Ms. McNeill was suspended 8 days after complaining about the sexual harassment, was demoted ___ days after that, and was terminated thereafter. The sexual harassment and Ms. McNeill's complaint thereof was causally related to her suspension, demotion and termination.

265.   The sexual harassment caused Ms. McNeill to suffer extreme emotional distress, as set forth above at pp. ___.

266.   HK should be vicariously liable for the sexual harassment, as it was the cause of the adverse employment actions against Ms. McNeill.

267.   HK caused Ms. McNeill damages in an amount to be determined at trial, including back and front pay, emotional distress damages, punitive damages, attorneys fees, costs, and all other damages available under the Florida Civil Rights Act.

### TWENTY-SECOND CLAIM FOR RELIEF
**Retaliation**
**Florida Civil Rights Act, F.S.A. § 760.10**

268.   Ms. McNeill realleges and incorporates the allegations in paragraphs of this pleading as if fully and completely restated herein.

269.     Ms. McNeill engaged in protected activity by refusing to capitulate to Mr. Rosenbaum's sexual advances and by complaining about the harassment/hostile work environment on the basis of sex, age and religion.

270.     Ms. McNeill suffered adverse employment action for refusing to capitulate to Mr. Rosenbaum's sexual advances, including loss of job duties, loss of colleagues, constant verbal abuse, threats of liquidation of her ownership interest, and termination, among other things.

271.     Ms. McNeill suffered adverse employment action for complaining about the sex, age and religious-based discrimination by being suspended eight days later, then being demoted and asked to work for Mr. Rosenbaum, and then terminated.

272.     HK then retaliated against Ms. McNeill by taking her ownership interest in HK from her without compensation, depriving her of bonus payments and other benefits.

273.     HK further retaliated against Ms. McNeill by initiating this lawsuit alleging baseless allegations against Ms. McNeill that she stole from HK and has caused HK damages from breaching her contract, directly in order to silence her from speaking about the harassment she endured and to retaliate against Ms. McNeill for daring to complain about Mr. Rosenbaum's harassing and abusive behavior.

274.     HK's retaliation is meant to besmirch Ms. McNeill in the public eye in order to protect Mr. Falic's public representations that he is a person who fights against harassment and #metoo and cares deeply about the cause—when he clearly does not.

275.     The temporal proximity between Ms. McNeill's rebuffs of Mr. Rosenbaum's sexual advances and the adverse employment actions establishes causation.

276.     The temporal proximity between Ms. McNeill's complaints about the sex, age and religious-based harassment and her suspension, demotion, termination, loss of her ownership

interest and the filing of the lawsuit establishes causation, in addition to Mr. Falic's statements that he did nothing in response to hearing about the allegations and would believe Mr. Rosenbaum no matter what, due to their personal friendship.

277.    But for Mr. Rosenbaum's sexual advances and Ms. McNeill's complaints of the sex, age and religious-based harassment, Ms. McNeill would not have suffered the adverse employment actions.

278.    HK's retaliation caused Ms. McNeill to suffer extreme emotional distress, as set forth above at pp. ___. In addition, Ms. McNeill has had to sell off most of her personal possessions in order to defend and respond to the retaliatory and unfounded lawsuit, including her personal home. She is now living in her motor home with her three children and her husband.

279.    HK has caused Ms. McNeill damages in an amount to be determined at trial, including back and front pay, emotional distress damages, punitive damages, attorneys fees, costs, and all other damages available under the Florida Civil Rights Act.

### Prayer for Relief

**WHEREFORE**, having stated the foregoing facts, Counterclaims and Third-Party Complaint, Ms. McNeill prays for this Honorable Court to:

    a.    enter judgment in her favor and against HK consistent with each of the Counterclaims;

    b.    enter judgment in her favor and against Messrs. Falic and Rosenbaum consistent with each Claim asserted against them;

    c.    award her all general, consequential, punitive, statutory, compensatory and other damages, in amounts to be proven at trial, and penalties to the fullest extent

allowable by law, including C.R.S. §§ 8-4-109(3)(b) and 18-4-405 and Fla. Stat. §§ 772.11 and 812.014;

d.      award her all legal expenses, such as litigation costs and attorneys' fees not otherwise awarded as damages, to the fullest extent allowable by law, including C.R.S. §§ 8-4-110(1)(b)(I) and 18-4-405 and Fla. Stat. §§ 772.11 and 812.014;

e.      award her pre- and post-judgment interest, or moratory interest, whichever is greater, to the fullest extent allowable by law; and,

f.      award her such other and further relief which the Court deems just and proper.

**Ms. McNeill demands trial by jury on all issues so triable.**

DATED this 26th day of August, 2024.

Respectfully Submitted,

By:  /s/ Laura Burgess
Laura E. Burgess, Esq.
Florida Bar No. 0105073
L.E. Burgess P.A.
5966 S Dixie Highway, Suite 300
Miami, FL 33143
Tel.: 305.942.8044
Alt. Tel.: 713.818.5055
laura@leburgesslaw.com

and

By:  /s/ Antonio L. Converse
Antonio L. Converse, Esq.
Admitted *Pro Hac Vice*
Converse Law Group, P.C.
600 17th Street, Suite 2800 South
Denver, CO 80202
Tel: 303.228.9471
anthony@converselawgroup.com

and

By: _/s/ Jennifer A. Tiedeken_____
Jennifer A. Tiedeken, Esq.
Admitted *Pro Hac Vice*
125 S. Howes Street, Suite 1100
Fort Collins, CO 80521
Tel: 970.482.5058
jennifer@fortcollinslaw.com

*COUNSEL FOR KAYLA MCNEILL*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 26, 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF and through that filing served all counsel of record.

*/s/ Laura E. Burgess*