**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

HEAD KANDY, LLC,

      Plaintiff/Counterclaim Defendant,

v.                            CASE NO. 23-CV-60345-JB/JMS

KAYLA MARIE MCNEILL,

      Defendant/Counterclaimant/Third-Party Claimant,

v.

JEROME FALIC,

      Third-Party Defendant.

_____/

**HEAD KANDY'S AND MR. FALIC'S *DAUBERT* MOTION**
**TO EXCLUDE TESTIMONY AND OPINIONS OF MELIA ARNETT-ARCHIE**

      Plaintiff/Counterclaim Defendant Head Kandy LLC ("**Head Kandy**") and Third-Party Defendant Jerome Falic ("**Mr. Falic**"), pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), move to exclude from the trial of this matter the testimony and opinions of Defendant/Counterclaimant/Third-Party Claimant Kayla Marie McNeill's ("**Ms. McNeill**") purported expert Melia Arnett-Archie ("**Ms. Arnett-Archie**"), and in support state:

**Introduction and Relevant Background**

      Ms. McNeill offers Ms. Arnett-Archie, a lawyer, to perform a statistical analysis of Ms. McNeill's contributions to Head Kandy's online sales via her social media activity. Ms. Arnett-Archie attempts to use that statistical analysis to opine on the amount of "affiliate marketer commission" to which she believes Ms. McNeill is somehow entitled and on the amount of Ms. McNeill's supposed lost future earnings from an inability to use the social media accounts she used to promote Head Kandy during her time as an owner and executive with Head Kandy. Ms.

Arnett-Archie's opinions, however, have absolutely no relevance to any of the claims at issue in this case because the compensation to which Ms. McNeill was entitled, and which she claims in this case, is entirely set out in her Executive Employment Agreement and Head Kandy's Operating Agreement.  There is simply no contractual or legal basis, and no claim by Ms. McNeill in this case, for her to be entitled to or recover any "affiliate marketer commission" or lost future earnings Ms. Arnett-Archie believes Ms. McNeill could have generated using social media accounts after her termination from Head Kandy

Even if there was a basis or claim for such compensation, Ms. Arnett-Archie is not qualified to render the opinions she attempts to render and did not reliably perform any recognized methodology to come to them.  Indeed, Ms. Arnett-Archie admittedly has no meaningful education, training, or experience in accounting, finance, or statistics, and is in fact merely an attorney who recently began a "novel" practice in the "social media law" space, and who has certifications as a "Privacy Professional" and "Privacy Manager" and previously served as in-house counsel for large corporations advising on "privacy, cybersecurity, and data protection laws." [Tr. at 95:13-16; Report at 13-14].[1]  Nonetheless, Ms. Arnett-Archie, based on misapplied or inapplicable financial and statistical principles, opines that, because of Ms. McNeill's "substantial" influence on sales, Ms. McNeill is entitled to (1) $8,581,046.51 in "affiliate marketer commission" Ms. McNeill could have earned from 2019 through 2022, and (2) $2,786,478 in admittedly "speculative" "lost future earnings" representing "projected revenue" for 2023 and 2024.  [Report at 4].  There is no factual foundation whatsoever for those opinions, no logical connection of those opinions to any of the claims or defenses in this case, and no provision in Ms.

---

[1]  Citations to **Tr.**" reference the transcript of the September 4, 2024, Videotaped Deposition of Melia Arnett-Archie, cited excerpts of which are attached hereto as **Exhibit 1**.  Citations to "**Report**" reference Ms. Arnett-Archie's Expert Witness Report, attached hereto as **Exhibit 2**.

McNeill's Executive Employment Agreement [ECF 187-1] (or anywhere else) suggesting that Ms. McNeill is, or would have ever been, entitled to such compensation, even if Ms. Arnett-Archie were qualified to and had accurately determined that compensation (she is not and has not).

Ms. Arnett-Archie's methods and opinions are almost completely nonsensical, and culminate in a meaningless report that lends nothing whatsoever to the resolution of this case. Ms. Arnett-Archie's opinions do not clearly pertain to any of the claims or defenses actually in this case. In truth, Ms. Arnett-Archie's report seems merely designed to confuse the issues and to garner sympathy for Ms. McNeill based on her supposedly significant social media contributions to Head Kandy's business during her employment, while completely ignoring the claims and underlying facts of this case and, most crucially, the contractual relationships that govern the outstanding obligations, if any, between the parties. The Court should therefore exclude Ms. Arnett-Archie's testimony and opinions in their entirety under *Daubert*.

## <u>Argument</u>

To be entitled to present the opinions of her expert, Ms. Arnett-Archie, Ms. McNeill must show first that the testimony and opinions to be offered are "fit" the circumstances of this case by having a "valid scientific connection to the pertinent inquiry." *Daubert*, 509 U.S. at 591. If they do, Ms. McNeill must also establish by a preponderance of the evidence that "(1) the expert is qualified to testify competently regarding the matters [s]he intends to address; (2) the methodology by which the expert reaches [her] conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 562 (11th Cir. 1998). Ms. McNeill cannot satisfy her burden on any prong of the analysis.

I.     **Ms. Arnett-Archie's opinions do not fit and are not helpful to the trier of fact because they are methodologically unsound and are wholly divorced from the realities underlying this case and the issues relevant to the claims actually presented.**

For Ms. Arnett-Archie's opinions to be admissible, Ms. McNeill must show that the opinions Ms. Arnett-Archie offers "fit" so as to be helpful to the trier of the fact. *Daubert*, 509 U.S. at 591. The "helpfulness" prong "goes primarily to relevance." *Id.* Ms. Arnett-Archie's opinions are entirely irrelevant to this case, do nothing whatsoever to aid the factfinder in resolving any disputed issue of fact on any of the claims presented in this litigation, and should therefore be excluded. Ms. McNeill has asserted in this case claims against Head Kandy for breach of her Executive Employment Agreement and breach of the Head Kandy Operating Agreement, and asserts that she is due compensation thereunder. The Executive Employment Agreement exclusively governed the terms of Ms. McNeill's compensation as "Creative Director" of Head Kandy. [ECF 187-1 at § 3]. The remaining amount of Head Kandy's profits to which Ms. McNeill was entitled, if any, was set out in the Head Kandy Operating Agreement. [ECF 360-3 at Art. V]. Finally, any amount to which Ms. McNeill may have been entitled for any social media accounts she utilized to promote Head Kandy was set out in the Asset Purchase Agreement between Head Kandy and Ms. McNeill's former company, Lashed Out, LLC. [ECF 360-2 at § 1.1, Bill of Sale (p. 33)]. There are no claims by either party for breach of the Asset Purchase Agreement.[2]

---

[2] While Ms. McNeill has attempted to assert claims against Head Kandy for "Civil Theft" of what she claims are her "social media accounts," those claims are due to be dismissed [ECF 360 at 9-11], or are subject to summary judgment, because, among other things, the agreements between the parties exclusively govern Ms. McNeill's entitlements as to her purported social media accounts. Regardless, Ms. Arnett-Archie has not even offered any opinions of the ultimate value of the social media accounts that are the subject of Ms. McNeill's Civil Theft claims. [Tr. at 41:7-42:18].

Nevertheless, Ms. Arnett-Archie ultimately opines, without any cogent basis for doing so, that Ms. McNeill is entitled to a "standard affiliate marketer commission" based on a percentage of Head Kandy's annual sales during Ms. McNeill's employment.  [Report at 11].  Ms. Arnett-Archie wholly ignores, and in fact did not even consider when formulating her opinions, Ms. McNeill's Executive Employment Agreement, which exclusively governed the terms of Ms. McNeill's compensation, nor any other documents or agreement related to any payments Ms. McNeill was ever due from Head Kandy.  [Tr. at 28:24-29:9, 37:25-38:14].  In fact, Ms. Arnett-Archie admitted that she has no understanding at all of "what the employment relationship was between Ms. McNeill and Head Kandy" or of Ms. McNeill's compensation structure.  [Tr. at 32:6-8, 32:13-17, 34:4-7, 48:8-13, 50:8-15].

In reality, Ms. McNeill's Executive Employment Agreement provides for an annual salary, benefits, and a calculable bonus based on the company's year-over-year increase in net profits, if any.  [ECF 187-1 at § 3].  Nowhere does the Executive Employment Agreement provide that Ms. McNeill is also entitled to compensation as an "affiliate" on top of her compensation as an employee and an owner.  In fact, Ms. McNeill does not even assert any claim even purporting to suggest that she is entitled to a "standard affiliate marketing commission" from 2019 to 2022.  And with good reason—Ms. McNeill was not even an "affiliate" under Ms. Arnett-Archie's own definition of the term during that time.  [Tr. at 79:12-15 (defining "affiliate" as "someone who is contacted by a brand to produce content, post content, and use their following count to promote a product")].  Ms. Arnett-Archie's underlying assumption that Ms. McNeill was ever entitled to be compensated as an "affiliate" lacks any basis in fact, is wholly untethered to the circumstances of this case, and in fact is flatly contradicted by the terms of the Executive Employment Agreement setting forth the terms of Ms. McNeill's compensation.  In sum, Ms. Arnett-Archie's opinions on

that score are completely inappropriate.  Therefore, the Court should exclude Ms. Arnett-Archie's opinions and testimony concerning a "standard affiliate marketer commission."  *See, e.g.*, *Mich. Millers Mut. Ins. Corp. v. Benfield*, 140 F.3d 915, 921 (11th Cir. 1998) (affirming exclusion of speculative expert opinion lacking rational connection to facts of the case, and explaining "[n]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert.") (quotation omitted); *Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cnty., Fla.*, 402 F.3d 1092, 1111 (11th Cir. 2005) (excluding opinions "unsubstantiated by any factual basis"); *Bemesderfer v. United Parcel Serv., Inc.*, 2023 WL 6196536, at *6 (M.D. Fla. Sept. 22, 2023) ("generalized opinions" that were "untethered" from the actual plaintiff in the case were "not relevant and [were], therefore, unhelpful to the jury").

Ms. Arnett-Archie goes on to opine that Ms. McNeill suffered lost future earnings after she was terminated by Head Kandy, which Ms. Arnett-Archie calculates based on a percentage of what she projected to be Head Kandy's 2023 and 2024 net profits.  But again, Ms. Arnett-Archie's unexplained and unfounded assumption that Ms. McNeill was or would ever be entitled to Head Kandy's entire net profits at any point during her employment or ownership is readily belied by the Executive Employment Agreement (which provides, inter alia, for a potential bonus calculated as "ten percent (10%) of the amount by which the Company's Net Profit for each such year exceeds the Company's Net Profit for the immediately preceding year" [ECF 187-1 at § 3(b)]) and Head Kandy's Operating Agreement (which discusses the allocation of profits and losses among Head Kandy's members [ECF 360-3 at Art. V]).  Moreover, rather than requesting or using Head Kandy's actual financial data to calculate its net profits, Ms. Arnett-Archie simply applies rudimentary and unexplained mathematical calculations to reach her projected figures.  Thus, these

opinions also must be excluded.  *See, e.g.*, *Benfield*, 140 F.3d at 921; *Cook*, 402 F.3d at 1111; *Bemesderfer*, 2023 WL 6196536, at *6.

Finally, Ms. Arnett-Archie's statistical analysis underlying her opinions, as discussed below, is so hopelessly flawed that it cannot possibly be helpful to the finder of fact, instead would simply cause confusion, and therefore should also be excluded as unhelpful on that basis.  *See, e.g.*, *KW Plastics v. U.S. Can Co.*, 131 F. Supp. 2d 1289, 1294 (M.D. Ala. 2001) (expert opinion excluded when it was "methodologically unsound and unreliable" and connected to the facts of the case "only by *ipse dixit*"); *see also Cook*, 402 F.3d at 1111 ("[A] trial court may exclude expert testimony that is imprecise and unspecific, or whose factual basis is not adequately explained.") (quotations omitted).

The Court should exclude Ms. Arnett-Archie's testimony and opinions because they wholly lack factual foundation in or connection to the facts of case and, therefore, would be unhelpful to the factfinder.

**II.      Even if her opinions were relevant and helpful, Ms. Arnett-Archie is not qualified to render those opinions based on financial or statistical analyses because she lacks education, training, and experience in those specific fields.**

To satisfy the qualification requirement, Ms. McNeill must show that Ms. Arnett-Archie has sufficient education, training, or experience to qualify as an expert.  *See Seamon v. Remington Arms Co.*, 813 F.3d 983, 988 (11th Cir. 2016).  Additionally, "if the expert is qualified to testify, the subject matter of the testimony must be within the scope of his or her expertise." *Restore Robotics, LLC v. Intuitive Surgical, Inc.*, 2022 WL 19408080, at *2 (N.D. Fla. Feb. 7, 2022).

Ms. Arnett-Archie's opinions are premised on her supposed statistical analysis of Head Kandy's sales and social media engagement.  However, Ms. Arnett-Archie has no formal, and no meaningful, education, training or experience in finance, accounting, or statistics; indeed, nothing

on Ms. Arnett-Archie's "Expert Witness Qualification Summary" suggests any education or training in the type of statistical computations Ms. Arnett-Archie purportedly performed here. [Tr. at 94:15-96:19; *see generally* Report at 13-14]. Ms. Arnett-Archie's "qualifications" include her Juris Doctor obtained in 2006, her "Bachelors of Arts in Government" obtained in 2003, Bar licenses obtained in Florida in 2006 and Michigan in 2013, and certifications as an "Information Privacy Professional" and "Information Privacy Manager." [Report at 13-14]. Ms. Arnett-Archie admits that she has no relevant academic exposure to statistics beyond mere passing mentions of basic statistical concepts in courses focused primarily on other subjects. [Tr. at 90:12-92:9]. Nor can Ms. Arnett-Archie point to any specific training or experience she may have in finance, accounting, or statistics; at best, when asked about her qualifications, Ms. Arnett-Archie could only provide vague and surface-level generalizations that she had performed or, in her practice as a lawyer, relied on this type of analysis before. [Tr. at 86:15-90:11]. The "Professional Experience Highlights" section of Ms. Arnett-Archie's "Expert Qualification Summary" shows only that in her current role as the founder and principal of her own law firm, she "offers specialized legal support with an emphasis on data privacy, intellectual property, and new digital medial law." [Report at 13]. While she and her firm are "dedicated to assisting influencers, content creators, and small businesses in risk mitigation and navigating the complexities of social media trends and behaviors" [Report at 13], nothing she offered shows from her role as a lawyer she has sufficient experience to actually perform any type of statistical analysis.

The only experience Ms. Arnett-Archie could identify to supposedly qualify her as an expert to perform and render opinions on the statistical analysis she attempted to perform in this case is that in in her previous role as an in-house lawyer for 3M Corporation and Stryker, she relied on, and sometimes attempted to perform herself and supervised others who attempted to perform,

some types of statistical analysis to advise her client on "data privacy" and cyber-related issues. [Tr. at 87:23-89:19]. A look back to her "Professional Experience Highlights" reveals that while at 3M, Ms. Arnett-Archie "formulated a comprehensive privacy and security M&A framework and rendered advice on privacy, cybersecurity, and data protection laws." [Report at 13]. Similarly, while an in-house lawyer at Stryker Corporation, Ms. Arnett-Archie "oversaw extensive data analytics projects, initiated the development of a global privacy framework, and managed a global legal and compliance team, culminating in enhanced privacy analytics and significant risk reduction." [Report at 13]. That Ms. Arnett-Archie may have experience and be qualified to render legal advice regarding privacy or cyber security, based on some statistical analyses, does not render her qualified to herself perform statistical analysis and offer opinions on it. *See Lebron v. Sec'y of Fla. Dep't of Child. & Fams.*, 772 F.3d 1352, 1368 (11th Cir. 2014) ("Expertise in one field does not qualify a witness to testify about others."); *United States v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004) ("Of course, the unremarkable observation that an expert may be qualified by experience does not mean that experience, standing alone, is a sufficient foundation rendering reliable any conceivable opinion the expert may express."). Indeed, if Ms. Arnett-Archie's prior experience as a lawyer advising clients based, in part, on some statistical analysis qualified her to herself perform, interpret, and render opinions based on statistical analysis, then any lawyer who has litigated cases in which statistical analysis was used, or advised clients based, in part, on statistical analysis, would be qualified as an "expert" to themselves perform and opine as an expert witness in other cases. That cannot be the case.

It is not surprising that Ms. Arnett-Archie has never before been qualified as an expert in any court of law in the areas of expertise relevant to her opinions here, nor in any other area. [Tr. at 6:20-23, 94:11-14]. She simply does not have sufficient training, education, knowledge, or

experience to be so qualified.  For these reasons, Ms. McNeill cannot meet her burden to show that Ms. Arnett-Archie is qualified to render the opinions she espouses in this case.  *See, e.g.*, *Corp. Fin., Inc. v. Principal Life Ins. Co.*, 2006 WL 3365600, at *1 (S.D. Fla. Nov. 20, 2006) (expert was not qualified when he had no experience in the subject area of his purported opinion, "had never been qualified previously as an expert" with respect to that subject area, and taught courses "only incidentally address[ing]" that subject area); *McAllister v. Savage Arms Inc.*, 2023 WL 10406718, at *4 (N.D. Fla. Oct. 23, 2023) (expert who had "no specific education or experience" in the relevant subject matter was not qualified).

### III.    Ms. Arnett-Archie's opinions are not reliable because they are not based on proper application of financial and statistical methods to the known facts of this case.

To satisfy the reliability prong, Ms. McNeill must show that the "reasoning or methodology" underlying Ms. Arnett-Archie's testimony "is scientifically valid" and "properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93; *accord Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999).  Ms. Arnett-Archie's opinions are, at bottom, founded on her (flawed) statistical analysis of the supposed relationship between Head Kandy's sales and social media engagement on Head Kandy's "Kandy Life" Facebook page (which Ms. Arnett-Archie, with no basis other than her say-so, attributes entirely to Ms. McNeill).  However, Ms. Arnett-Archie's reasoning and purported application of statistical principles to this case are, in numerous respects, fatally flawed.

Ms. Arnett-Archie was unable to explain the process she followed to come up with her results, other than to broadly state that she used Microsoft Excel to run an analysis.  [Tr. at 139:21-142:14.  Indeed, as Head Kandy's expert explains, Ms. Arnett-Archie failed to "provide[] even the minimum amount of information necessary to replicate her analysis or even understand what,

in fact, she calculates." [Expert Report of David W. DeRamus, Ph.D. ("**DeRamus Report**," attached hereto as **Exhibit 3**) at ¶ 94].[3] *See, e.g.*, *In re Zantac (Ranitidine) Prods. Liab. Litig.*, 644 F. Supp. 3d 1075, 1236 (S.D. Fla. 2022) ("[The expert] must explain her methodology in a way that permits the methodology to be tested and vetted for reliability.").

Ms. Arnett-Archie based her analysis on only a subset of selective data points, with no objective or coherent explanation for how she chose those points or excluded others, and in fact, appears to have selected and based her analysis on only outliers. [Tr. at 73:24-74:13, 76:20-24]. Ms. Arnett-Archie also failed to explain or account for, and instead simply assumed away, any variables outside of social media engagement that might have impacted (and almost certainly did impact) sales. [Tr. at 128:12-132:6]. *See, e.g.*, *Navelski v. Int'l Paper Co.*, 244 F. Supp. 3d 1275, 1301 (N.D. Fla. 2017) (explaining that although an expert's decision to include or exclude certain data points in a statistical model sometimes goes to weight rather than admissibility, sufficiently significant flaws, such as those that make the expert's results "skewed, misleading, and overall unreliable" for their intended purpose, are grounds for exclusion).

Ms. Arnett-Archie provides no explanation for her decision to use a linear model as opposed to some other type of model, other than that a linear model (putting the cart well before the horse) would "show" the "direct relationship" she was hoping to find. [Tr. at 98:25-99:17]. Indeed, in so doing, Ms. Arnett-Archie ignored the "first step" described in the very materials she claimed to be authoritative, which is "to check the relationship by a scatterplot for linearity" before applying linear-based models. [Arnett-Archie Dep. Ex. 9 (attached hereto as **Exhibit 4**) at 2]. At

---

[3]   Because the DeRamus Report contains and discusses confidential Head Kandy business information going to Dr. DeRamus's rebuttal of another one of Ms. McNeill's experts, Daniel Korczyk, portions of the DeRamus Report attached hereto are redacted. Those redacted portions are not cited nor relied upon in this Motion.

bottom, Ms. Arnett-Archie simply forced the methodology she claims familiarity with on to (some, but not all of) the data derived from this case, without any real assessment of its suitability for that purpose. [Tr. at 118:6-119:5]. *See, e.g.*, *In re Zantac*, 644 F. Supp. 3d at 1253, 1257 (excluding opinions based on a "results-based, conclusion-oriented process" and the "situational science" of "appl[ying] whatever method is expedient to get to her desired conclusion").

And that reality is evident in the results Ms. Arnett-Archie reaches. Indeed, despite repeatedly drawing ostensibly definitive conclusions from her analysis, Ms. Arnett-Archie even admits (as is evident from the correlation coefficient of .4188 and p-value of .1543)[4] that the correlation she purports to find, and on which she bases her entire report, is "moderate[ly]" strong (at best) and is not statistically significant. [Report at 10-11]. *See, e.g.*, *In re Abilify (Aripiprazole) Prod. Liab. Litig.*, 2021 WL 4951944, at *7 (N.D. Fla. July 15, 2021) ("While statistical significance, alone, is not dispositive on the issue of reliability, federal courts generally require that non-statistically significant evidence bear other indicia of reliability to be admissible. Here, there is no such other indicia of reliability. To the contrary, as already discussed, the underlying dataset on which [the expert's] statistical analyses were based itself presents reliability and helpfulness problems. [The expert] offered no explanation for—or even an acknowledgement of—these shortcomings …. Consequently, his … analyses … must be excluded as unreliable and unhelpful.").

---

[4] According to the materials Ms. Arnett-Archie provided in response to Head Kandy's subpoena duces tecum, the correlation coefficient ("*r*") expresses the linear relationship between two variables, and results closer to ±1 indicate stronger correlation, while the p-value ("*p*") indicates the statistical significance of that correlation, and a low p-value (typically under .05) suggests that it is unlikely that the observed correlation occurred by chance. [*E.g.*, Exhibit 4 at 2-3]. Here, the results Ms. Arnett-Archie reaches show a weak/moderate positive correlation, but the high p-value suggests that her opinions based thereupon are unreliable. [*See* DeRamus Report at ¶ 88].

Undeterred, Ms. Arnett-Archie proceeds to make incoherent observations based on her analysis that readily demonstrate her lack of understanding of the methodology she purports to use and her misapplication of statistical principles to this case.  Ms. Arnett Archie finds a "perfect negative correlation" ($r = -1.0$) between engagement and sales after Ms. McNeill's employment [Report at 11], which result is nonsensical in real world conditions [DeRamus Report at ¶ 87] and has no useful application given Ms. Arnett-Archie had and considered only incomplete sales data for those years and apparently simply used her own "projected" figures that she knew would yield a correlation [Report at 7; Tr. at 143:6-147:19].  Ms. Arnett-Archie also purports to calculate correlation statistics from individual data points representing individual days [Report at 9-10], which is impossible since a correlation analysis (and the numerical results therefrom) inherently requires multiple observations to generate any kind of result [DeRamus Report at ¶ 86].  These opinions underscore the unreliability (and the unhelpfulness) of Ms. Arnett-Archie's analysis, and demonstrate that Ms. Arnett-Archie's opinions and testimony should be excluded.  *See, e.g.*, *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1243 n.8 (11th Cir. 2005) ("Although the court understands that *Daubert* focuses on the methodology used to derive opinions rather than on the accuracy of the opinion, when the opinions clearly demonstrate something about the expert's methodology, as in this case, the court can draw inferences about the methodology from the opinions.").

Ms. Arnett-Archie then used that flawed statistical analysis as the basis (without any explanation beyond her mere say-so) to attribute all of Head Kandy's sales from 2019 to 2022 to Ms. McNeill's social media activity, and used that assumption to claim (again, without any cogently explained basis for doing so) that Ms. McNeill was entitled to an "affiliate marketer commission" at the "standard rate" of 20% applied to all of Head Kandy's sales for the entire

period of 2019 through 2022.  [Report at 11].  Ms. Arnett-Archie also purports to project Head Kandy's 2023 and 2024 sales by assuming without any explanation that Head Kandy's sales would also grow linearly, and then proceeds to attribute all of those sales to Ms. McNeill as well, assume a 10% net profit margin without any foundation for doing so, and claim that Ms. McNeill experienced "lost future earnings" in the amount of Head Kandy's projected profits in 2023 and 2024.  [Report at 12].  That supposed "methodology" does not come close to passing muster under the *Daubert* standard.  *See, e.g.*, *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence ... by the *ipse dixit* of the expert."); *United States v. Azmat*, 805 F.3d 1018, 1042 (11th Cir. 2015) ("A district court cannot simply accept that an opinion is reliable because the expert says that his methodology is sound.").  Indeed, Ms. Arnett-Archie herself even admits that her ultimate opinions are purely "speculative."  [Report at 4].

In sum, no proven, properly applied, or even identifiable methodology underlies any of Ms. Arnett-Archie's conclusions, which the Court should exclude in their entirety.

## Conclusion

For the above reasons, Head Kandy and Mr. Falic respectfully request that the Court exclude Ms. Arnett-Archie's testimony and opinions from this case in their entirety, and order such other and further relief the Court deems appropriate.

## CERTIFICATE OF LOCAL RULE 7.1(A)(3) CONFERRAL

I HEREBY CERTIFY that on November 7, 2024, counsel for Head Kandy conferred via Zoom with counsel for Ms. McNeill, and counsel for Ms. McNeill advised that Ms. McNeill opposes the relief requested herein.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on November 18, 2024, I filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send notice of this filing to: Laura E. Burgess, Esquire, laura@leburgesslaw.com, L.E. Burgess, P.A., 5966 S. Dixie Highway, Suite 300, Miami, Florida 33143, *Counsel for Defendant*; Antonio L. Converse, Esquire, anthony@converselawgroup.com, Converse Law Group, P.C., 600 17th Street, Denver, Colorado 80202, *Counsel for Defendant;* Jennifer Tiedeken, Esquire, jennifer@lawfortcollins.com, jamie@lawfortcollins.com, Massey, Kelly & Priebe, PLLC, 125 S. Howes Street, Suite 1100, Fort Collins, CO 80521*, co-counsel for Defendant;.* and Jed Ferdinand, Esquire, jferdinand@fiplawgroup.com, Kathleen B. Moore, Esquire, kmoore@fiplawgroup.com, Ferdinand IP Law Group, 450 Seventh Avenue, Suite 2300, New York, New York 10123, *Counsel for Plaintiff.*

/s/ Edward C. Thompson
**ETHAN J. LOEB**
FL Bar No. 668338
ethanl@blhtlaw.com
KerriR@blhtlaw.com
eservice@blhtlaw.com
**EDWARD C. THOMPSON**
FL Bar No. 684929
colint@blhtlaw.com
heatherw@blhtlaw.com
**JALEN A. LARUBBIO**
FL Bar No. 1039258
JalenL@blhtlaw.com
**CARSON A. SADRO**
FL Bar No. 1026159
CarsonS@blhtlaw.com
**BARTLETT LOEB HINDS THOMPSON & ANGELOS**
1001 Water St., Suite 475
Tampa, FL 33602
Telephone: 813-223-3888
Facsimile: 813-228-6422

***Counsel for Head Kandy LLC and Jerome Falic***