COPY

1

UNITED STATES DISTRICT COURT FOR THE

SOUTHERN DISTRICT OF FLORIDA

CIVIL ACTION NO.:  23-CV-60345-RAR


HEAD KANDY, LLC,

     Plaintiff,

vs.

KAYLA MARIE MCNEILL,

     Defendants.

_____/


July 31, 2024

10:27 a.m. - 5:56 p.m.

Buro Central

101 N.W. 8th Street, Suite 200

Miami, Florida 33136


VIDEOTAPED DEPOSITION OF BRYAN FELDMAN


    Taken before Julio A. Mocega, Shorthand
Reporter, Notary Public in and for the State of
Florida at Large, pursuant to Notice of Taking
Deposition filed in the above case.

COPY

```
                                                          2
1                         APPEARANCES:

2    ON BEHALF OF THE DEFENDANT:

3    CONVERSE LAW GROUP, P.C.

4    600 17th Street

5    Suite 2800 South

6    Denver, Co 80202

7    BY:  Antonio L. Converse, Esq.

8    ALSO ON BEHALF OF DEFENDANT:

9    L.E. BURGESS, P.A.

10   5966 S. Dixie Highway

11   Suite 300

12   Miami, Florida 33143

13   BY:  Laura E. Burgess, Esq.

14   ON BEHALF OF THE PLAINTIFF:

15   BARTLETT, LOEB, HINDS, THOMPSON & ANGELOS

16   100 N. Tampa Street

17   Suite 2050

18   Tampa, Florida 33602

19   BY:  Collin Thompson, Esq.

20   ALSO PRESENT: Javier Ordonez, Videographer

21   PRESENT ON ZOOM: Ethan Loeb, Esq.

22                  Gina Gazzaniga

23                  Kayla McNeill

24                  Carson Sadro

25                  Jennifer Tegan
```

COPY

```
 1                     I N D E X

 2

 3   BRYAN FELDMAN                        PAGE

 4   By Mr. Converse                        5

 5

 6                   E X H I B I T S

 7

 8   Defendant's Exhibit No. 1           128

 9   Defendant's Exhibit No. 2           137

10   Defendant's Exhibit No. 3           139

11   Defendant's Exhibit No. 4           140

12   Defendant's Exhibit No. 5           142

13   Defendant's Exhibit No. 6           147

14   Defendant's Exhibit No. 7           156

15   Defendant's Exhibit No. 8           167

16   Defendant's Exhibit No. 9           168

17   Defendant's Exhibit No. 10          170

18   Defendant's Exhibit No. 11          173

19   Defendant's Exhibit No. 12          173

20   Defendant's Exhibit No. 13          198

21

22

23

24

25
```

COPY

4

1          THE VIDEOGRAPHER:  Good morning.

2     We are now on the record in the matter

3     of Head Kandy, LLC v. Kayla Marie

4     McNeill.

5          Today's date is July 31st, 2024,

6     and the time is 10:27 a.m.  This is the

7     video-recorded deposition Bryan Feldman

8     being taken at 101 Northwest 8th Street

9     in Miami, Florida.

10          I'm the camera operator.  My name

11     is Javier Ordonez.  The court reporter

12     Julio Mocega.

13          Will all attorneys please identify

14     themselves and the parties they are

15     representing, after which the court

16     reporter will swear in the witness.

17          MR. THOMPSON:  Colin Thompson for

18     the Plaintiff, Head Kandy and

19     Mr. Feldman, whose deposition, and on

20     Zoom is, in my office, Carson Sadro, as

21     well as Ethan Loeb, who will probably

22     be joining, if he's not already on.

23          MR. CONVERSE:  And on behalf of

24     Miss McNeill is Anthony Converse, and

25     with me in the room is Laura Burgess

COPY

5

```
1          and Jennifer Tegan (phonetic) will be
2          joining via Zoom.  I don't know if she
3          is presently on now.
4               THE COURT REPORTER:  All right.
5               Mr. Feldman, you having already
6          shown me your identification, would you
7          please raise your right hand?
8  Thereupon,
9               BRYAN FELDMAN,
10 was called as a witness and, having been first
11 duly sworn, was examined and testified as
12 follows:
13               DIRECT EXAMINATION
14 BY MR. CONVERSE:
15      Q.   All right, Mr. Feldman, it was
16 nice to meet you a few minutes ago.
17          We're here to talk about Head
18 Kandy, LLC; you understand that.
19          Do you currently have one or more
20 roles with Head Kandy?
21      A.   No.
22      Q.   Have you ever had any roles with
23 Head Kandy -- and sorry, before you answer
24 that.
25          If I just refer to Head Kandy, LLC
```

COPY

6

1    as "Head Kandy" will you understand what I'm

2    saying?

3          A.   Yes.

4          Q.   Okay.  Have you ever had any roles

5    with Head Kandy?

6          A.   Yes.

7          Q.   When did you first have a role

8    with Head Kandy?

9          A.   May 18.

10         Q.   Is that when Head Kandy was

11   formed?

12         A.   Correct.

13         Q.   Were you involved in forming Head

14   Kandy?

15         A.   Yes.

16         Q.   What was your involvement in the

17   formation of Head Kandy?

18         A.   I was involved in the transaction,

19   not involved in doing the actual company.

20         Q.   I'm sorry.

21         A.   I was involved in the transaction,

22   not actually setting up the company and

23   incorporating.

24         Q.   Do you know who was involved in

25   forming the company?

COPY

7

1          A.   I can't recall.

2          Q.   And what was your involvement with

3    the company in May of 2018?

4          A.   That's when business started.

5    Started working together, and we were involved

6    in many different areas of the business.

7          Q.   And when you say we "started

8    working together," who are referring to?

9          A.   Kayla McNeill.

10         Q.   Anyone else?

11         A.   90 percent of my work was with

12   Kayla at that time.

13         Q.   Can you describe what type of work

14   you were doing with Miss McNeill at that time?

15         A.   At that time, we just acquired the

16   business and we were making changes, you know,

17   put it under our umbrella.  Talking constantly

18   about how to grow the business, new products,

19   social media, budgets, all sorts.

20         Q.   And when you say "acquired the

21   business," what business are you referring to?

22         A.   A company we acquired was Lashed

23   Out.

24              THE COURT REPORTER:  Was?

25              THE WITNESS:  Lashed Out, LLC.

8

1    BY MR. CONVERSE:

2         Q.   And did you acquire ownership in

3    Lashed Out or assets of Lashed Out?

4         A.   I don't recall, but I'm pretty

5    sure it was assets because we had no ownership

6    in Lashed Out.

7         Q.   And do you know what assets were

8    acquired from Lashed Out?

9         A.   Trade marks, product, business

10   operations.

11        Q.   I just want to ask you a few

12   questions about those three items that you

13   mentioned.

14             Do you know what trademarks were

15   acquired?

16        A.   No, I can't recall.

17        Q.   And with regard to product, are

18   you speaking about inventory?

19        A.   Inventory.

20        Q.   And then, when you say "business

21   operations," what are you referring to?

22        A.   The business that was being run

23   under Lashed Out was basically acquired and it

24   became Head Kandy.

25        Q.   Were you an owner in Head Kandy in

COPY

9

1    May of 2018?

2          A.   I have to confirm that was the

3    closing date, but I was an owner right after we

4    closed.

5          Q.   And when you say "closed," you

6    mean the transaction with Lashed Out?

7          A.   Yes.

8          Q.   Are you currently an owner in Head

9    Kandy?

10         A.   Yes.

11         Q.   Have you always held the same

12   ownership interest throughout the existence of

13   Head Kandy?

14         A.   Yes.

15         Q.   When the transaction with Lashed

16   Out occurred, were there other owners in Head

17   Kandy?

18         A.   It was five of us.

19         Q.   Okay.  Could you please identify

20   the five owners?

21         A.   Myself, Kayla McNeill, Simon

22   Falic, Jerome Falic and Leon Falic.

23         Q.   Has the ownership in Head Kandy

24   changed between May of 2018 and today?

25         A.   No.

COPY

10

1          Q.    We talked about your role with

2     Head Kandy in May of 2018.

3                When -- and I believe you said you

4     are not currently involved with it.

5                So when did your role in any way

6     change with Head Kandy?

7          A.    When we brought in John Rosenbaum.

8          Q.    Do you recall when that was?

9          A.    No.

10         Q.    Do you know if it was in 2022?

11         A.    I believe so.

12         Q.    Do you think it was first half of

13    the year or second half of the year?

14         A.    I'm not a hundred percent certain,

15    but I think it was the first half.

16         Q.    Okay.  And how did your role

17    change once Mr. Rosenbaum was brought on?

18         A.    I basically handed off to John.

19         Q.    All of your responsibilities?

20                Could you just answer verbally for

21    me?  I'm sorry.  So he can take it down.

22         A.    Yes.  Yes.

23         Q.    Were you involved in the

24    decision-making of retaining Mr. Rosenbaum by

25    Head Kandy?

COPY

11

1       A.   Yes.

2       Q.   What was your involvement?

3       A.   I was just asked what I thought

4   about it as an opinion.

5       Q.   Who asked you?

6       A.   Jerome Falic.

7       Q.   How many conversations did you

8   have with Mr. Falic about bringing on

9   Mr. Rosenbaum?

10      A.   I can't remember.

11      Q.   Was it more than one?

12      A.   I don't think so.

13      Q.   In that one conversation you

14   recall, what was discussed?

15      A.   That we wanted to bring an expert

16   to help us grow the business.

17      Q.   Did Mr. Falic propose

18   Mr. Rosenbaum as that expert?

19      A.   Yes.

20      Q.   Did you already know of

21   Mr. Rosenbaum?

22      A.   Did I know him before?  Yes.

23      Q.   How did you know Mr. Rosenbaum?

24      A.   He used to work at a cosmetic

25   manufacturer that we did business with.

COPY

12

1          Q.   Do you recall the name of that

2    cosmetic manufacturer?

3          A.   NuWorld, N-U, World.

4          Q.   Do you know what Mr. Rosenbaum's

5    role with NuWorld was?

6          A.   I don't know the exact role.

7          Q.   Do you know of any

8    responsibilities that Mr. Rosenbaum had at

9    NuWorld?

10          A.   Operations.

11          Q.   Do you know if he was the

12    operations manager for NuWorld or what his --

13          A.   I don't know -- I don't know the

14    exact role.

15          Q.   He was just involved in operations

16    for NuWorld in some capacity?

17          A.   Yes.

18          Q.   Do you know how long he worked

19    at -- in operations for NuWorld?

20          A.   No.

21          Q.   Was he working for NuWorld, to

22    your knowledge, at the time that you had this

23    conversation with Mr. Falic?

24          A.   No.

25          Q.   I'm sorry, that was a poorly asked

COPY

13

1    question.

2            Do you know if he was working for

3    NuWorld when you spoke to Mr. Falic?

4        A.   No.

5        Q.   Do you know when he stopped

6    working for NuWorld?

7        A.   I don't recall.

8        Q.   Did Mr. Falic tell you anything

9    about Mr. Rosenbaum when the two of you had the

10   conversation we were just discussing?

11       A.   Just asked my opinion.

12       Q.   Did he provide you any additional

13   information about Mr. Rosenbaum?

14       A.   No.

15       Q.   Did you give him an opinion at

16   that time?

17       A.   Yes.

18       Q.   What was your opinion?

19       A.   I thought it was a good idea.

20       Q.   And why did you think it was a

21   good idea?

22       A.   He is very knowledgeable.

23       Q.   And what was that based upon?

24       A.   Many conversations with him in the

25   past.  And he had a sizeable business in the

COPY

14

1   same industry.

2        Q.   And I believe you said that -- you

3   used the pronoun "we worked with

4   Mr. Rosenbaum."

5            Was it a specific company, or are

6   you talking that you individually -- can you

7   give me some -- can you provide a little more

8   context?

9        A.   Mr. Rosenbaum manufactured Hard

10  Candy Cosmetics, and I got to meet him and talk

11  to him a couple of times.

12       Q.   What is your role with Hard Candy

13  Cosmetics?

14       A.   None.

15       Q.   Did you ever have a role with Hard

16  Candy Cosmetics?

17       A.   No.

18       Q.   So how is it that you came to meet

19  Mr. Rosenbaum through his relationship with

20  Hard Candy?

21       A.   Through Jerome Falic.

22       Q.   And you said you had several

23  conversations with Mr. Rosenbaum over the

24  years?

25            Sorry.  Could you just answer

COPY

15

1    verbally.

2              A.    Yes.

3              Q.    Thank you.

4              A.    Sorry.

5              Q.    That's all right.  I'll try to

6    remind you if I catch it.

7                    Do you know what time period

8    Mr. Rosenbaum manufactured Hard Candy

9    Cosmetics?

10             A.    No.

11             Q.    At the time that you handed over

12   your responsibilities to Mr. Rosenbaum, you

13   were still an owner, correct?

14             A.    I still am, yes.

15             Q.    Other than your ownership role,

16   have you had any role in Head Kandy since you

17   turned over your responsibilities to

18   Mr. Rosenbaum?

19             A.    No.

20             Q.    Do you know what the relationship

21   was between Mr. Rosenbaum and Head Kandy when

22   he was retained?

23             A.    No.

24             Q.    Do you know if he was an employee?

25             A.    He was not an employee.

COPY

16

```
 1              Q.   Do you know if he was an
 2    independent contractor?
 3              A.   Yes.
 4              Q.   Yes, he was an independent
 5    contractor?
 6              A.   He was not retained by the company
 7    formally, if I remember correctly.
 8              Q.   Okay.  When you say "formally,"
 9    you mean there was no written agreement?
10              A.   Yes.
11              Q.   Okay.  Was he compensated for his
12    role with the Head Kandy, to your knowledge?
13              A.   I don't know.
14              Q.   Do you know if he is currently
15    involved with Head Kandy?
16              A.   I don't know.
17              Q.   Do you know if he was ever given a
18    title by Head Kandy?
19              A.   I don't know.
20              Q.   You had said that 90 percent of
21    your Head Kandy responsibilities involved
22    Miss McNeill.
23                   Do you recall what the other 10
24    percent of your responsibilities were?
25              A.   I -- here and there, at that time,
```

17

1    I spoke to people at the warehouse or

2    operations there.  And then that's when we

3    started.  And more and more, 90 went down

4    because I handled finance and human resources,

5    and operations.

6            Q.   What did you do with regard to

7    your finance responsibilities for Head Kandy?

8            A.   We ran payments.  We looked at

9    cash flow.  And that's it.

10           Q.   When you say "we" when referring

11   to those activities, who are you referring to,

12   other than yourself?

13           A.   We had a lady named Yvelisse.

14           Q.   Do you know if she was an employee

15   of Head Kandy?

16           A.   I don't recall.

17           Q.   Do you know if she's an employee

18   of any other business during the --

19           A.   Yes.

20           Q.   Okay.  What business is she an

21   employee of?

22           A.   I don't know what business

23   actually employs her.

24           Q.   Are there several businesses that

25   you are involved with, with Mr. Falic?

18

1          A.   Yes.

2          Q.   Okay.  And so is there some bleed

3     over between the various businesses?

4          A.   Yes.

5          Q.   Okay.  And that's why you don't

6     know exactly who's formally employing certain

7     individuals?

8          A.   Correct.

9          Q.   Okay.  Do you know if Yvelisse was

10    compensated in any way by Head Kandy?

11         A.   I don't know.

12         Q.   Can you say her last name for me.

13         A.   Diaz.

14              THE COURT REPORTER:  And her first

15         name?

16              THE WITNESS:  Yvelisse,

17         Y-V-E-L-I-S-S-A.

18    BY MR. CONVERSE:

19         Q.   And of the three areas that you

20    worked, we were just speaking about, human

21    resources is the second one you identified.

22              Can you tell me what activities

23    you did with regard to your role in human

24    resources for Head Kandy?

25         A.   When we acquired the business,

COPY

19

```
1    human resources was moved to our Hollywood

2    office for a period of time, and I dealt with

3    that office.

4         Q.   Can you say what you mean by it

5    was moved to Hollywood offices?

6         A.   It was run out of the Hollywood

7    office, for a short period of time.

8         Q.   Okay.  What was that time period?

9         A.   I can't recall.

10        Q.   And who were the Head Kandy

11   employees that worked in the human resources

12   office?

13        A.   None.

14        Q.   Who worked in the human resources

15   office?

16        A.   Raissa, R-A-I-S-S-A.

17        Q.   Raissa.

18        A.   Raissa.

19        Q.   Okay.  Thank you.

20             Do you know who employed Raissa?

21        A.   I don't know who formally employs

22   her.

23        Q.   Do you know what Raissa did in her

24   role in the human resources office?

25        A.   She ran payroll.
```

COPY

20

```
 1          Q.   Do you know of anything else that
 2   she did in that capacity?
 3          A.   The what?
 4          Q.   Do you know of anything else that
 5   she did in that capacity?
 6          A.   No.
 7          Q.   Do you know if she had any other
 8   role with Head Kandy?
 9          A.   She didn't.
10          Q.   And I believe you said that you
11   worked with the office in your human resources
12   role; is that correct?
13          A.   I was liaised between Colorado and
14   Raissa while it was there.  It didn't last too
15   long there.
16          Q.   Do you know who ran payroll after
17   Raissa?
18          A.   I can't remember who, but it was
19   moved back to Colorado.  I know Kaylin Culp ran
20   it at one time, but I can't remember when she
21   ran it, and if there was something -- someone
22   else before her.
23          Q.   Do you know if Miss Culp had a
24   title with Head Kandy?
25          A.   I can't recall the title.
```

21

1          Q.   Do you know if she was an employee

2  of Head Kandy?

3          A.   Yes, she was.

4          Q.   Did you do anything else in your

5  human resources role?

6          A.   No.

7          Q.   All right.  Lastly, you mentioned

8  ops.

9               Can you tell me what you did in

10  your operational role for Head Kandy?

11          A.   Purchase orders, at the beginning,

12  were coordinated, inventory, tracking,

13  logistics.  We tried to always figure out how

14  to make it better.  Warehousing.

15          Q.   Anything else?

16          A.   No.  That's it.

17          Q.   With regard to coordinating the

18  purchase orders, what did Head Kandy use to

19  make its purchase orders?

20          A.   I can't recall but we had

21  software.

22          Q.   And in your role of coordinating

23  those purchase orders, did you place the actual

24  orders?

25          A.   No.

22

1          Q.   Who would place the orders?

2          A.   We had someone in our office named

3    Hernan.

4               THE COURT REPORTER:  Hernan?

5               THE WITNESS:  Hernan.  Hernan

6          Heiber, H-E-I-B-E-R, who placed orders.

7    BY MR. CONVERSE:

8          Q.   And so you would coordinate with

9    Hernan?  And --

10         A.   He would coordinate everything

11   with Colorado.

12         Q.   Were there any metrics that you

13   reviewed or any other information that you

14   reviewed when coordinating with Mr. Hernan to

15   determine purchase orders?

16         A.   There was the specific KBI, but we

17   always looked at cash and inventory on-hand.

18         Q.   With regard to cash, did you look

19   at one specific bank account to determine cash

20   on-hand?

21         A.   Yes.

22         Q.   Did Head Kandy have any other bank

23   accounts, other than that specific one, you

24   were reviewing?

25         A.   I don't recall.

COPY

23

1          Q.    Do you recall what institution?

2          A.    Synovus, S-Y-N-O-V-U-S.

3          Q.    Do you recall, or do you know who

4    set up that account for Head Kandy with

5    Synovus?

6          A.    I don't recall.

7          Q.    You said you would look at

8    inventory on-hand.

9                What did you look at to determine

10   the amount of inventory on-hand?

11         A.    How much inventory did we have,

12   and how much do you think we're going to sell

13   to see if we needed more or we were too low.

14         Q.    And was that through a software?

15         A.    The data came from a software.

16         Q.    Do you recall what that software

17   is?

18         A.    No.

19         Q.    Okay.  And would you pull those

20   numbers or would someone do it for you?

21         A.    Hernan did that.

22         Q.    Did the way in which purchase

23   orders were placed, that we just discussed,

24   ever change with Head Kandy?

25         A.    When we acquired, Ryan Thompson

24

1  would place purchase orders.  And then after a

2  period of time, which I can't recall what

3  period of time, then we asked Hernan to do it

4  because we were using a software.

5          Q.   I may have misunderstood you.

6               Did you say when you acquired the

7  assets from Lashed Out, Ryan Thompson --

8          A.   Yes.

9          Q.   -- initially performed the

10  purchase --

11         A.   When we started doing business.

12         Q.   Okay.  Thank you.

13              Did you coordinate with

14  Mr. Thompson at all when he initially placed

15  the purchase orders?

16         A.   I spoke very little with him.

17         Q.   When you and Hernan took over

18  the -- coordinating the purchase orders, did

19  you notice any problems with the way in which

20  Mr. Thompson had handled the purchase orders?

21              MR. THOMPSON:  Object to form.

22  BY MR. CONVERSE:

23         Q.   He's just lodging an objection for

24  the record.  So you can go ahead and answer.

25         A.   I can't recall.

**COPY**

25

1         Q.    Okay.  If you had, would it have

2    been documented anywhere?

3              MR. THOMPSON:  Object to the form.

4              THE WITNESS:  No.

5    BY MR. CONVERSE:

6         Q.    Okay.  Would you have sent written

7    correspondence to Hernan about needing to fix

8    mistakes that were made?

9         A.    We were just trying to do

10   everything with software more professionally.

11        Q.    Okay.  You also identified

12   inventory tracking.

13             Did you use the same software that

14   you used to determine inventory on-hand for

15   your inventory tracking?

16        A.    The same as purchase orders?

17        Q.    Yes.

18        A.    I don't know.

19        Q.    Okay.

20        A.    But yes, the same software that

21   was for inventory.

22        Q.    Okay.

23        A.    Yeah.

24        Q.    Other than looking at the

25   inventory numbers, did you do anything else in

COPY

26

1    your role concerning inventory tracking?

2           A.    No.

3           Q.    Were you ever aware of any issues

4    with inventory being properly tracked?

5           A.    We wanted to be more professional,

6    so we put in the software to make sure that

7    they were scanned and tracked the right way.

8           Q.    Were there ever any issues of

9    missing inventory?

10          A.    Not that I recall.

11          Q.    Were there ever any other problems

12   concerning the tracking of inventory, that you

13   recall?

14          A.    Yes.  That's why we -- when we

15   inventory counted, it wasn't always perfect,

16   and that is when we decided to make it more

17   professional.

18          Q.    Do you recall when that change was

19   made?

20          A.    No.

21          Q.    Did you identify any problems

22   after you made that change to the software?

23          A.    Not that I recall.

24          Q.    You also identified logistics.

25                Can you tell me what you did with

27

1    regard to logistics for Head Kandy?

2         A.   We always looked and analyzed what

3    were our best shipping methods, what was the

4    best option to have a warehouse in location

5    wise.  And we tried to figure out what was the

6    best way to transport the goods from factory,

7    freight.

8         Q.   And initially that was from

9    Colorado, correct?

10        A.   Yes.

11        Q.   And in making those

12   determinations, was it ever decided that moving

13   from Colorado would be beneficial for Head

14   Kandy?

15        A.   Yes.

16        Q.   Do you recall when that was?

17        A.   No.

18        Q.   And when you say "we looked at

19   it," who, other than yourself, were you

20   referring to?

21        A.   I worked very closely with Kayla.

22        Q.   Okay.

23        A.   When I talk about Kayla, is it

24   Kayla or Miss McNeill or it doesn't matter?

25        Q.   I don't want you to change your

COPY

28

1    manner of speech, so whatever is more

2    comfortable for you, use it.  That's perfectly

3    fine.  As long as we know that when you say

4    "Kayla" you're referring to Miss McNeill.

5         A.   Yes.

6         Q.   Thank you.

7              I believe you said that a decision

8    was made that it was advantageous to move it.

9              Do you recall when that decision

10   was made?

11        A.   No.

12        Q.   And where did you believe it was

13   best to relocate the warehouse?

14        A.    It was decided that we were going

15   to go to North Carolina.

16        Q.   And when you say it was "decided,"

17   who made that decision?

18        A.   Kayla and myself with John's

19   approval.

20        Q.   Do you recall when the move to

21   North Carolina occurred?

22        A.   I can't remember the dates.

23        Q.   Were you involved in any way in

24   the move from Colorado to North Carolina?

25        A.   Hands-on?  No.

COPY

29

1          Q.   Did you have any hands-off

2    involvement?

3          A.   Yes.

4          Q.   What was that involvement?

5          A.   Just the decision.

6          Q.   Okay.  Did you have any

7    involvement in selecting the new warehouse?

8          A.   We went first to a warehouse in

9    North Carolina; I had no involvement in that

10   decision.  And then we selected a building that

11   we purchased.  And yes, I went and looked at

12   the building myself.

13         Q.   When you say "we purchased" the

14   building, who are you referring to?

15         A.   The company.

16         Q.   Head Kandy purchased the building?

17         A.   I can't recall.

18         Q.   Okay.

19         A.   The owners of the company.

20         Q.   The owners of Head Kandy purchased

21   the building?

22         A.   Yeah.

23         Q.   Okay.  Was it a joint decision

24   amongst the owners to acquire the building?

25         A.   Yes.

30

1          Q.    What was the source of the funds

2     that were used to purchase the building?

3          A.    We were financed by a bank.

4          Q.    Okay.  Did the owners have to put

5     in any money?

6          A.    Yes.

7          Q.    Do you recall how much?

8          A.    Don't recall exactly.

9          Q.    At the time the initial move was

10    made from Colorado to North Carolina, do you

11    recall if the inventory tracking and purchase

12    order procedures that you mentioned were put in

13    place to make more professional had been --

14    were already implemented at that time?

15         A.    I can't recall.

16         Q.    Do you know what was involved in

17    moving the operations from Colorado to North

18    Carolina?

19         A.    A lot of trucks.

20         Q.    And you say you weren't involved

21    with it at all?

22         A.    No.

23         Q.    Okay.  Are you aware of anything

24    else that was involved, other than obviously

25    renting a lot of trucks to move it?

**COPY**

31

```
1              A.   For the move, no.

2              Q.   Okay.  I believe the last item you

3    mentioned was warehousing.

4                   What do you mean with regard to

5    your role with warehousing?

6              A.   That's what I meant, looking for

7    where was the right warehouse location.  Was

8    our warehouse the right warehouse?  Did we have

9    space?

10             Q.   Do you know how many employees

11   Head Kandy had prior to the move from Colorado

12   to North Carolina?

13             A.   I don't remember the exact number.

14             Q.   Do you recall how many employees

15   moved with the company to North Carolina?

16             A.   Not the exact number.

17             Q.   Do you know approximately how

18   many?

19             A.   I would say, in Colorado, it had

20   more than ten.

21             Q.   Okay.

22             A.   And move to North Carolina,

23   between three and six.  I don't recall the

24   exact number.

25             Q.   Okay.  So between three and six
```

COPY

32

1    that made the move from Colorado to North

2    Carolina with the company?

3            A.    Again, I don't recall the exact

4    number, but approximately.

5            Q.    Right.  Approximately.  Okay.

6                  When the company was formed in

7    approximately May of 2018, do you know what

8    Miss McNeill's role was with the company?

9            A.    She was in charge of product

10   development, marketing and everything that

11   happened in Colorado.  She was in charge of

12   sales also.

13           Q.    With regard to her role in product

14   development, do you recall any specific tasks

15   that she undertook for Head Kandy?

16           A.    She designed and picked every

17   product that we would manufacture.

18           Q.    Do you know if she worked with

19   anybody with regard to product development?

20           A.    With which one?

21           Q.    Product development.

22           A.    Anybody?

23           Q.    Yes.

24           A.    Not that I recall.  After a couple

25   of years, she worked with someone named Mindy.

33

```
1           Q.   Is Mindy's last name McDermott?

2           A.   Yes.

3           Q.   Do you recall if Mindy came on

4     board before, after or at the same time as

5     Mr. Rosenbaum?

6           A.   No, before.

7           Q.   Do you recall how long before

8     Mr. Rosenbaum?

9           A.   No.

10          Q.   Do you know what Mindy's role with

11    Head Kandy was?

12          A.   Not exactly, but it was to assist

13    Kayla with product development.

14          Q.   So was she -- sorry, strike that.

15               So would Kayla be her supervisor?

16          A.   Sorry.  Mindy's, when she came in,

17    was to develop the hair extension line.

18          Q.   Okay.

19          A.   And then she evolved into working

20    with Kayla developing other products.

21          Q.   And when she was developing the

22    hair extension line, was she doing that, more

23    or less, independently?

24          A.   No, reporting to Kayla.

25          Q.   Okay.  So Miss McDermott would
```

COPY

34

1   always reported to Kayla while she worked with

2   Head Kandy?

3           A.   Yes.

4           Q.   Do you know if she was an employee

5   of Head Kandy?

6           A.   I believe she was.

7           Q.   With regard to marketing, do you

8   recall what Miss McNeill did for Head Kandy?

9           A.   She worked with companies in

10  charge of social media.  She gave them

11  direction on what to do.  And she ran our

12  social media with her posts.

13          Q.   Can you tell me what these

14  companies are that worked in social media?

15          A.   I can't remember the names.

16          Q.   Do they assist with the visibility

17  of a company's social media presence?

18          A.   They buy the adds.

19          Q.   Okay.

20          A.   And develop strategies.

21          Q.   On how to spend money to --

22          A.   Correct.

23          Q.   -- attract users, essentially?

24          A.   And sell more.

25          Q.   Okay.  Other than these

35

1  third-party companies, do you know if

2  Miss McNeill worked with any Head Kandy

3  employees with regard to marketing?

4       A.   I believe Ryan worked with Kayla

5  in marketing.  I think that's it.  Oh, we

6  brought in someone at the -- I can't recall her

7  name -- also working with Kayla.

8       Q.   Specifically for marketing

9  purposes?

10      A.   Yes.  Social media purposes.

11      Q.   And when you say "at the end,"

12 what time period are you referring to?

13      A.   I can't recall the exact time

14 period.

15      Q.   Was it the end of anything

16 specifically that you are thinking of?

17      A.   At the end that I started working

18 with Kayla.  Would say sometime in '22.

19      Q.   Oh, so the time period when

20 Mr. Rosenbaum came on board?

21      A.   It was before.

22      Q.   Okay.

23      A.   It was before.

24      Q.   When I initially asked you about

25 these roles with regard to Miss McNeill, I set

36

1    the time period before Mr. Rosenbaum was

2    employed.

3         A.    Uh-huh.

4         Q.    Simply because I didn't -- you

5    said that your involvement had stopped, so I

6    didn't know if you had any knowledge

7    afterwards.  But I just wanted to clear that up

8    and ask you:  So do you know any way in which

9    Miss McNeill's role with the company changed

10   after Mr. Rosenbaum came on board?

11        A.    I can't define that exactly.

12        Q.    Okay.  When you say you can't

13   define it, do you mean her responsibilities

14   with the company?

15        A.    Her day-to-day activity.

16        Q.    Did you have any involvement with

17   the company to where you would know what her

18   day-to-day activity was with the company?

19        A.    I know that John was overseeing

20   expenses, which was a very for us, and that led

21   to Kayla being more controlled, not being able

22   to do a lot of the things that we were doing

23   before, because controlling expenses was a

24   priority for the survival of the business.

25        Q.    Who set that priority?

COPY

37

1            A.    I can't recall.  I mean --

2            Q.    It wasn't you?

3            A.    Not that I remember.  But the

4    business was not making money.

5            Q.    When you say it's not making

6    money, do you mean that the net income was

7    zero?

8            A.    Profitability was low, and we were

9    very, very tight on cash.

10           Q.    So it was generating some income?

11           A.    I can't recall to say if it was

12   positive or negative.  If it was positive, it

13   was very low.  But we had a lot of debt.

14           Q.    And was that, roughly, zero income

15   for the business consistent through your entire

16   involvement with it?

17               MR. THOMPSON:  Object to the form.

18               THE WITNESS:  It was always a

19           struggle to increase the net income.

20   BY MR. CONVERSE:

21           Q.    Was it ever profitable?

22           A.    It was profitable.

23           Q.    Do you recall when it was that it

24   was profitable?

25           A.    I can't recall.

COPY

38

1          Q.    Going back to Miss McNeill's role

2     in marketing.  You said that Ryan and another

3     individual worked with her.

4                Were they required to report to

5     Miss McNeill, do you know?

6          A.    Yes.  From within the company.  We

7     worked with outside companies, like I said.

8          Q.    Okay.

9          A.    They also worked with Kayla.

10         Q.    "They" being the outside

11    companies?

12         A.    Yes, yes.

13         Q.    With regard to sales, do you know

14    what activities Miss McNeill engaged in on

15    behalf of Head Kandy?

16         A.    Online sales.

17         Q.    What would she do to generate

18    online sales?

19         A.    She would do Facebook videos.

20    That would attract customers.

21         Q.    Were there any other activities

22    that drove online sales, other than

23    Miss McNeill's videos?

24         A.    We put out ads to increase sales,

25    but the biggest driver of the business was the

39

1   videos.

2          Q.   The videos by Miss McNeill?

3          A.   Yes.

4          Q.   Do you recall any of the metrics

5   on the return from those ads?

6          A.   We always looked at -- not per ad.

7   We just looked at what we're spending and what

8   we're selling.

9          Q.   And do you recall what those --

10  what that ratio was?  Can you tell me?

11         A.   I can't recall exactly.

12         Q.   In your opinion, were the ads a

13  net benefit to Head Kandy?

14         A.   The what?

15         Q.   In your opinion, were the ads a

16  net benefit to Head Kandy?

17         A.   Yes.

18              MR. THOMPSON:  Object to the form.

19  BY MR. CONVERSE:

20         Q.   Did Head Kandy ever stop running

21  those ads, to your knowledge?

22         A.   I can't recall.

23         Q.   Do you recall what online

24  platforms Miss McNeill posted on to generate

25  those online sales?

COPY

40

1          A.   Facebook, Instagram and TikTok.

2          Q.   Do you know what account she was

3    posting from on any of those platforms?

4          A.   Head Kandy account and Kandy Life

5    with Kayla.

6          Q.   When you say "Head Kandy account,"

7    is that a business account that was set up for

8    Head Kandy?

9          A.   Yes.

10         Q.   Do you know if that was set up

11   before or after the Lashed Out acquisition?

12         A.   Before.

13         Q.   So that was an account that was

14   acquired from Lashed Out?

15         A.   Yes.

16         Q.   And the other one you mentioned

17   was "Kandy Life with Kayla."

18              Was that a business account?

19         A.   Yes.

20         Q.   And how do you know it was a

21   business account?

22         A.   Because Head Kandy paid for all of

23   the expenses.

24         Q.   What expenses are those?

25         A.   Running ads.

41

1          Q.    Okay.  Is there any expense

2   associated with starting the page?

3          A.    I don't know.  But I doubt it.

4          Q.    Other than running the ads, did

5   Head Kandy pay any experiences for the Kandy

6   Life page?

7          A.    I believe they paid all expenses

8   for the page.

9          Q.    So what would be the other

10  expenses, other than --

11         A.    I don't know if there are any.

12         Q.    Okay.

13         A.    Just advertising and marketing.

14         Q.    Did Head Kandy use any affiliates,

15  influencers?

16         A.    Yes.

17         Q.    Do you recall when Head Kandy used

18  affiliates?

19         A.    I think forever.

20         Q.    The entire time you were involved

21  with Head Kandy?

22         A.    Yeah, yeah.

23         Q.    Did Head Kandy pay for any ads on

24  the affiliate pages?

25         A.    I'm not sure.

COPY

42

```
1            Q.   If it had, would those be Head
2  Kandy pages?
3                 MR. THOMPSON:  Object to the form.
4                 THE WITNESS:  No.
5  BY MR. CONVERSE:
6            Q.   So it requires something more than
7  just paying for ads?
8                 MR. THOMPSON:  Object to the form.
9  BY MR. CONVERSE:
10           Q.   I'm sorry, can you respond
11 verbally?
12           A.   Yes.
13           Q.   Do you know when the Kandy Life
14 page was started?
15           A.   I don't remember the exact date.
16           Q.   Was it before or after the Lashed
17 Out acquisition?
18           A.   After.
19           Q.   Do you know who started it?
20           A.   Kayla did.
21           Q.   Do you know why she started it?
22           A.   Yes.
23           Q.   Why?
24           A.   We had a social media company that
25 we hired, and Kayla thought they were not good.
```

**COPY**

43

1    So to -- she kept telling them that all their

2    doing is because of her videos, that they were

3    not doing anything else.

4              So to prove a point, she said I'm

5    going to create an account, and I'm going to

6    run this account and you run the other account,

7    so the Head Kandy.

8              So Kandy Life became the account

9    that she was running because she thought that

10   she could do better in the social media

11   company.  And the social media company was

12   running Head Kandy.

13             And then part of her strategy was

14   to have Kayla be out there and sell more and

15   tell her story.  And we also thought it was

16   better to do it under Kandy Life with Kayla

17   than Head Kandy.

18        Q.   Do you recall what that social

19   media company's name was?

20        A.   No.  I just remember a guy named

21   Rich.

22        Q.   And this idea that Kayla had about

23   starting the other page that you just

24   mentioned, did she express this in a meeting?

25        A.   I can't recall if it was a formal

COPY

44

1   meeting or a phone conversation.  Obviously it

2   took place.

3         Q.   Did you hear her make these

4   statements to the social media company?

5         A.   No.  She dealt with the social

6   media company.  I dealt in a couple of calls,

7   but it was her day-to-day.

8         Q.   Okay.  So how did you learn about

9   Miss McNeill's idea?

10        A.   She told me.

11        Q.   Okay.  Did you have any opinion on

12   whether or not this social media company was

13   adding value for Head Kandy?

14        A.   Not that I recall.  Again, not my

15   expertise.

16        Q.   Do you recall disagreeing with

17   Miss McNeill when she told you that she didn't

18   believe the social media company was adding

19   value for Head Kandy?

20        A.   I don't recall.

21        Q.   Do you know if Head Kandy

22   ultimately severed its relationship with that

23   social media company?

24        A.   Yes.

25        Q.   Do you recall why?

COPY

45

1          A.   Because she thought they were no

2    good.

3          Q.   Do you know when the relationship

4    was terminated?

5          A.   I don't recall the date.

6          Q.   Do you recall the year?

7          A.   No.

8          Q.   You also mentioned that

9    Miss McNeill was in charge of everything that

10   happened in Colorado.

11              Did I get that right?

12         A.   Yes.

13         Q.   We've identified a few things that

14   happened in Hollywood, being the HR -- or human

15   resources office, and --

16         A.   Finance maybe.

17         Q.   -- finance --

18         A.   Yes.

19         Q.   -- to work with Yvelisse.

20         A.   Uh-huh.

21         Q.   Was there anything else that was

22   occurring in Hollywood?

23         A.   Hernan, in operations, working in

24   Hollywood.

25         Q.   Okay.

46

1          A.   And then we brought in a lady by

2     the name of Rachel Pincus to co-work with Kayla

3     on product development to relieve -- try to be

4     her right hand, as she had experience in the

5     industry.

6          Q.   Do you know if Miss Pincus was a

7     Head Kandy employee when she was brought on?

8          A.   I don't recall if she was an

9     employee, but she was compensated.  So I just

10    don't know if it was --

11         Q.   And I believe you said she had

12    experience in product development.

13         A.   Yes.

14         Q.   Do you recall what her specific

15    experience was?

16         A.   No.  She worked at NuWorld for

17    many years.

18         Q.   And do you recall when she was

19    brought in?

20         A.   No.

21         Q.   Do you recall when she was brought

22    in, in relation to Mr. Rosenbaum's involvement?

23         A.   Way before.

24         Q.   Do you know who made the decision

25    for her to come on board with Head Kandy?

COPY

47

1           A.   I can't recall exactly how that

2    worked out.

3           Q.   Other than -- well, sorry.  Strike

4    that.

5                Would you have had the authority

6    to hire Miss Pincus when you were involved with

7    Head Kandy?

8           A.   Yes, but I would have asked Kayla

9    if she was okay with it.

10          Q.   Okay.  During your involvement

11   with Head Kandy, would anyone else have had

12   authority to hire Miss Pincus?

13          A.   No one would have hired her

14   without Kayla's approval.

15          Q.   Okay.  We had talked about Jerome

16   Falic speaking to you about bringing on

17   Mr. Rosenbaum.

18          A.   Yes.

19          Q.   Did Mr. Falic have the authority,

20   to your knowledge, to hire people on behalf of

21   Head Kandy?

22          A.   Yes.  But we trusted Kayla with

23   all decisions, and she always got approval.

24          Q.   Okay.  So Mr. Falic obtained

25   Kayla's approval for hiring Mr. Rosenbaum?

COPY

48

1          A.   I don't know.

2          Q.   Do you know any specific

3   activities that Miss Pincus did when she was

4   retained by Head Kandy concerning product

5   development?

6          A.   It was all product development

7   related.  So finding formulas, packaging, ways

8   to increase our assortment and improve it.

9          Q.   Did she have a supervisor that she

10  had to report to?

11         A.   I believe --

12              MR. THOMPSON:  Object to the form.

13              Sorry.

14              THE WITNESS:  I believe everything

15              went through Kayla.

16  BY MR. CONVERSE:

17         Q.   Do you know if she did have a

18  formal supervisor?

19         A.   I don't recall.

20         Q.   Was Miss Pincus still employed by

21  Head Kandy when you -- your involvement ceased?

22         A.   I don't believe so.

23         Q.   Do you know why the relationship

24  between Miss Pincus and Head Kandy was

25  terminated?

COPY

49

1          A.    No.   I just think we were not

2     developing new formulas and products at that

3     time.

4          Q.    Going back to your description of

5     Miss McNeill ran everything that happened in

6     Colorado, can you give me a little more

7     specificity as to what she was required to do

8     with regard to the Colorado operations?

9          A.    Well, she was there.

10          Q.    Okay.

11          A.    So she was indirectly in charge of

12     everything.  Everything happened under her eyes

13     in the office in Colorado.  None of us were

14     there.  So warehousing, hiring of employees,

15     aside from the sales, the marketing, the

16     product development.

17          Q.    So she essentially managed

18     everything in Colorado?

19          A.    Yes.  I believe with help from

20     Dusty, her husband.

21          Q.    Okay.  And did she have autonomy

22     to run it in any way that she wanted to or did

23     she have to report to somebody?

24          A.    Ideally she would report.  And I

25     wouldn't say she reported.  She informed us.

COPY

50

1   And like I said, we trusted her with

2   everything.  So when something happened, she

3   would inform us, I did this or I did that.  So

4   she did inform us of the decisions that she

5   took, but she took those decision.

6          Q.   And when you say "inform us," who

7   are you referring to?

8          A.   Me.

9          Q.   Okay.  But she didn't need your

10  authority to make any decisions when it came to

11  management of the Colorado operations?

12         A.   I think she felt comfortable

13  getting our approval.  And like I said, most of

14  my relationship with Kayla, because of the high

15  level of trust, was, Bryan, I'm going to do

16  this, and the answer was, if you think that's

17  right, do it.  She was there.

18         Q.   With regard to that high level of

19  trust during the time that you worked with

20  Miss McNeill, did you ever feel that she

21  violated that high level of trust between the

22  two of you?

23         A.   Towards the end.

24         Q.   And when you say "towards the

25  end," are you referring to right before

COPY

51

1    Mr. Rosenbaum was brought on board?

2           A.    Right.

3           Q.    And how did you feel that she

4    violated that trust?

5           A.    When we started looking deep into

6    the finances and transactions and operation of

7    the company.  Again, trusted her blindly.  You

8    know, whenever she wanted to do, she did, and

9    we always thought she would do what was best

10   for the company.

11          Q.    Can you describe what you mean by

12   starting to look deeply into the company before

13   Mr. --

14          A.    No, that was right after, not

15   before.

16          Q.    Okay.  Okay.

17          A.    After.

18          Q.    So you did have some involvement

19   after Mr. Rosenbaum came on board?

20          A.    Right.  Yeah.

21          Q.    Do you recall how long you were

22   involved with the company after Mr. Rosenbaum

23   came on board?

24          A.    I can't recall exactly, but it was

25   mostly informational.  Meaning, I know what was

COPY

52

1  going on, but I was not in the day-to-day of

2  the business.

3          Q.   Can you describe that process you

4  were just talking about, about looking deep

5  into the company?

6          A.   When John came in, we were not

7  doing well.  So we asked him to look at

8  everything.  And obviously one of the first

9  things you look at are expenses.  And that's

10 when we started -- you know, he started saying

11 we are spending this and that, and we need to

12 cut expenses.  So we decided to cut expenses.

13         Q.   Do you recall what information

14 Mr. Rosenbaum looked at with regard to the

15 company's expenses?

16         A.   I can't point to one thing.  I

17 would say it's everything.

18         Q.   Was there any information, to your

19 knowledge, that Mr. Rosenbaum reviewed that you

20 didn't have access to before Mr. Rosenbaum was

21 retained?

22         A.   No.

23         Q.   No, you can't recall, or no, you

24 didn't look at it?

25         A.   No, I didn't look at it.

COPY

53

1          Q.   So everything Mr. Rosenbaum

2     reviewed, you had access to before he was

3     retained?

4          A.   Yes.

5               And I go back to what I said.  You

6     know, trusted Kayla completely and never felt a

7     need to look into the details.

8          Q.   And what caused you to believe

9     that she -- that that trust was misplaced?

10         A.   I think after we were looking at

11    everything that was going on, we learned that

12    we could have done some things better --

13         Q.   Okay.

14         A.   -- as any business, when you look

15    at your expenses.

16         Q.   But specifically with regard to

17    the trust in Miss McNeill, what did you review

18    that made you believe that your trust in her

19    was misplaced?

20         A.   I can't point to one specific

21    activity.  Just general, many things.

22         Q.   So of the things we discussed that

23    you had identified that Miss McNeill was in

24    charge of, I'd like you to identify which ones

25    involved the management of expenses.

54

1          So product development, did that

2    involve expenses by the company?

3          A.   Yes.

4          Q.   And after you performed this

5    review, do you believe that -- that expenses

6    weren't properly managed by Miss McNeill with

7    regard to product development?

8          A.   No.

9          Q.   With regard to marketing, did that

10   involve expenses that the company incurred?

11         A.   Yes.

12         Q.   And do you believe that

13   Miss McNeill mismanaged expenses with regard to

14   her role in marketing?

15         A.   I wouldn't say it was -- yeah, it

16   was mismanaged.

17         Q.   Okay.  And --

18         A.   Yeah.

19         Q.   -- what marketing expenses did

20   Miss McNeill cause Head Kandy to incur that

21   were improper?

22         A.   I think the social media expenses

23   could have been lower.

24         Q.   And what are those specific

25   expenses?

55

1          A.    The amount of expenses to post her

2    videos and promote them.

3          Q.    What expenses involved in posting

4    the videos?

5          A.    When you boost -- that's the word

6    they use -- boost the video, you have to pay.

7    And I believe that it got to a point where

8    doing a lot of those videos were not beneficial

9    for the business.

10         Q.    And what did you base that

11   decision on?

12         A.    The lack of growth, customer base.

13         Q.    Were there any other metrics other

14   than customer acquisition?

15         A.    No.

16         Q.    And what -- was there a specific

17   metric that was used to correlate the cost of

18   boosting to customer acquisition?

19         A.    Not that I recall.

20         Q.    So how did you make that

21   correlation?

22         A.    Just customers were not growing.

23         Q.    So it wasn't specifically tied

24   to --

25         A.    Right.

COPY

56

1          Q.    -- the cost of boosting videos?

2          A.    It was not working, and it was

3    still being done, executed.

4          Q.    Did Miss McNeill make the decision

5    to spend money to boost the videos?

6          A.    Yes.

7          Q.    Did anybody else have the

8    authority to determine what videos to boost?

9          A.    I could have gone in and decided,

10   but I don't know what I'm talking about.

11         Q.    Other than you, anyone else?

12         A.    Jerome could have done the same.

13         Q.    Anyone else, other than the two of

14   you?

15         A.    No.

16         Q.    Were there any third-party

17   companies involved?

18         A.    There was -- like I said, she

19   always worked with third-party companies.

20   That's who she runs these accounts with.  But I

21   believe -- I guess a third-party company could

22   have picked, but it was her decision -- her

23   direction.

24         Q.    So, for instance, there was the

25   social media company that you mentioned --

COPY

57

```
 1          A.   Yes.

 2          Q.   -- that she felt wasn't providing

 3   enough value for the company.

 4          A.   Right.

 5          Q.   But was that company involved in

 6   the decision on --

 7          A.   No, it was another company.

 8          Q.   Okay.

 9          A.   It was a company that we worked

10   for sometime.

11          Q.   So there's another company that

12   was involved in boosting --

13          A.   Yes.

14          Q.   -- videos?

15          A.   Yes.

16          Q.   And you don't recall what company

17   that was?

18          A.   I recall the name of the person

19   that ran the company.  I can't recall the name

20   of the company.

21          Q.   Okay.  What's the name of the

22   person?

23          A.   John Max.

24          MR. THOMPSON:  Anthony, whenever

25          you get to a logical place here, we
```

COPY

58

1          could use a restroom break.

2                 MR. CONVERSE:  Yeah.  We can do it

3          now, if you want.

4                 MR. THOMPSON:  Yeah, now works.

5                 MR. CONVERSE:  Yeah.  No problem.

6                 THE VIDEOGRAPHER:  The time is

7          11:43 a.m.  We're going off the record.

8                 (Thereupon, a short recess was

9          taken.)

10                THE VIDEOGRAPHER:  The time is

11         11:53 a.m.  We're back on the record.

12     BY MR. CONVERSE:

13         Q.  All right.  Back from a break.  I

14     just want to pick up where we left off.

15                We were talking about expenses for

16     the boosting of social media posts.  And you

17     had mentioned the name John Max.

18                Do you know if he was an employee

19     of Head Kandy?

20         A.  No.  He was an independent

21     contractor.

22         Q.  Oh, that's right.  You said he

23     worked for a company that you couldn't remember

24     the name of.

25         A.  It was his own.

COPY

59

1          Q.    Okay.  Do you know who retained

2    John Max's company?

3          A.    Kayla.

4          Q.    And was that within her authority

5    to do so?

6          A.    I was aware of it.

7          Q.    Did she need to obtain your

8    approval to retain him?

9          A.    It was back to the same thing.

10   I'm doing this.  Go ahead.

11         Q.    Okay.  So I'm just trying to

12   understand if she had the authority to make a

13   decision independently or not.

14               So did she have the authority to

15   independently make the decision to --

16         A.    Yes.

17         Q.    -- retain them?

18         A.    Yes.

19         Q.    Okay.  Do you know how long John

20   Max's -- John Max, excuse me, the company was

21   retained by Head Kandy?

22         A.    I don't know the exact time.

23         Q.    Was the relationship terminated

24   during your involvement with Head Kandy?

25         A.    Towards the tail end.

COPY

60

1          Q.   Do you know why the relationship

2     was terminated?

3          A.   We decided, as per John Rosenbaum,

4     that he was not delivering.

5          Q.   Did John Rosenbaum make the

6     decision to terminate the relationship?

7          A.   Not by himself.

8          Q.   Who also made the decision with

9     him?

10         A.   Jerome Falic.

11         Q.   So the two types of expenses that

12    you identified that you had concerns with were

13    boosting, and I think you said ad spending; is

14    that correct?

15         A.   While I was involved, yes.  After

16    John Rosenbaum, there was a lot of expenses

17    that I was concerned about.

18         Q.   I'm trying to understand the

19    timing.  So I thought you had said that you

20    didn't have any concerns with Miss McNeill's

21    activities until after Mr. Rosenbaum was

22    retained.

23         A.   Correct.  I had no concerns

24    before.  After he was retained, that's where I

25    learned the truth.

61

1          Q.   Okay.  And again, the truth is

2    that the expenses were too high?

3          A.   The expenses were mismanaged.

4          Q.   Okay.  And did the way in which

5    they were mismanaged, I think you said before,

6    was the spend on boosts and the spend on ads.

7               Does that accurately reflect the

8    mismanagement?

9          A.   After Rosenbaum came in, it was

10   discovered that there were expenses, personal

11   expenses mismanaged.  And yes, expenses like

12   what you mentioned.

13         Q.   Okay.  So when you reference

14   mismanagement of expenses, are there only the

15   two categories of social media expenses and

16   personal expenses?

17         A.   Yes.

18         Q.   And of the social media expenses,

19   are those solely comprised of the spend on

20   boost and the spend on ads?

21         A.   That's a tricky question because

22   you could say that John Max's job had not been

23   delivering for a while.  And that relationship

24   should have ended sooner.

25         Q.   By that do you mean that the

COPY

62

1    expense of John Max --

2          A.    Correct.

3          Q.    -- was also unnecessary?

4          A.    Yes.

5          Q.    How was it determined that John

6    Max wasn't delivering, I believe is how you put

7    it?

8          A.    We were paying him a lot of money

9    and we were not growing our business.   And

10   that's what a social media company job

11   description is, to help increase sales.

12                We tried to open new platforms,

13   nothing worked.

14         Q.    When you say the business was not

15   growing, what metrics do you use to determine

16   that?

17         A.    Revenue and customer base.   And

18   profitability also, obviously.

19         Q.    When you say "customer base," does

20   that include both new customers and retained

21   customers?

22         A.    New customers.

23         Q.    Okay.   So revenue, customer

24   acquisition, and then you said profits as well.

25                Are you aware of any new data that

63

1    Mr. Rosenbaum discovered after he was brought

2    on board that previously was not available to

3    you that was used to determine either revenue,

4    customer acquisition or profits?

5              MR. THOMPSON:  Object to the form.

6              THE WITNESS:  I'll go back to what

7         I said many times, and I'll say many

8         times.  The data was there.  I trusted

9         Kayla completely.  And obviously it's a

10        decision that I should have gotten

11        involved in and cut ties with him

12        beforehand.

13   BY MR. CONVERSE:

14        Q.   With regard to the social media

15   expenses, do you have any reason to believe

16   that Miss McNeill intentionally mismanaged the

17   social media expenses?

18        A.   Yes.

19        Q.   Do you believe she did that for an

20   improper purpose?

21        A.   For what?

22        Q.   An improper purpose?

23        A.   She did that to sell more, not

24   caring about anything else.

25        Q.   So you believe her sole focus was

COPY

64

1    simply on selling more product?

2           A.   Yes.

3           Q.   Sorry, can you --

4           A.   Yes.

5           Q.   So revenue was one of the three

6    metrics that you identified with regards to

7    business growth.

8                Was she successful in driving up

9    the revenue?

10          A.   No.

11          Q.   Are you aware of any actions that

12   Miss McNeill ever took to decrease expenses for

13   Head Kandy?

14          A.   Moving the warehouse.

15          Q.   Are you aware of anything else?

16          A.   Not that I recall.

17          Q.   Did moving the warehouse

18   successfully result in decrease expenses?

19          A.   No.

20          Q.   So it was intended to decrease

21   expenses but it wasn't successful?

22          A.   Yes.

23               We did things to decrease

24   expenses, like talking to UPS and FedEx to

25   renegotiate the rates, and that type of thing

65

1    we did together, and we lowered expenses.

2            Q.    You said you did that together?

3            A.    Yes.

4            Q.    Okay.  Were Head Kandy's expenses

5    ever decreases in what you would consider a

6    meaningful manner during your involvement?

7            A.    Not that I recall.

8            Q.    Do you recall if the expenses were

9    simply increasing year-over-year during your

10   involvement?

11           A.    I don't recall.

12           Q.    What about revenue, do you recall

13   how revenue changed, if at all?

14           A.    I can't recall exactly, but I

15   believe the first year we had an increase, and

16   then it stayed flat.

17           Q.    And do you think that expenses --

18   sorry.  Strike that.

19                Do you recall how expenses

20   changed, if at all, during the period that the

21   revenue was flat?

22           A.    No.

23           Q.    But you do know that when you

24   looked at it, you were able to determine that

25   the expenses were mismanaged?

66

1          A.    Yes.

2          Q.    And do you recall what

3    specifically you looked at to make that

4    determination?

5          A.    The amount of money we were

6    spending to achieve no growth, and we weren't

7    able to attract new customers.

8          Q.    Was that a printout from software

9    that Mr. Rosenbaum provided you?

10         A.    The numbers are the numbers, and

11   then we received an audit from a company who

12   specializes in it.  You know, we looked at the

13   numbers.

14         Q.    So the result of that audit, is

15   that primarily what you're able to use to make

16   the determination?

17         A.    No, I use the bottom line.  If

18   you're not making money, you know, what you are

19   doing is not working.

20         Q.    Okay.

21         A.    And nothing was ever changed.

22         Q.    Specifically with regard to the ad

23   spend, do you know who was making the

24   determination on ad spent during your

25   involvement with Head Kandy?

67

1          A.    Kayla and John.

2          Q.    I'm sorry, you said Kayla --

3          A.    Kayla with John Max.

4          Q.    Okay.  Do you know who would make

5     the determination after John Max was no longer

6     involved with Head Kandy?

7               MR. THOMPSON:  Object to the form.

8               THE WITNESS:  I don't recall.

9     BY MR. CONVERSE:

10         Q.    What about with regard to spending

11    for boosting, do you know who was responsible?

12         A.    I don't.

13         Q.    Okay.

14         A.    We had a lady named Brandy, but I

15    am not a hundred percent certain that she was

16    deciding how much to spend.

17         Q.    Do you know what her role was with

18    Head Kandy?

19         A.    It was to help us with social

20    media.  So she dealt also with Kayla and John.

21         Q.    So was she brought on -- I'm

22    sorry.

23               We have two Johns, John Max and

24    John Rosenbaum.

25         A.    Right.  Yes.

COPY

68

1          Q.   I got confused.

2               Okay.  So she would work with

3     Kayla and John Max?

4          A.   Correct.

5          Q.   Okay.  Do you know if Brandy was

6     an employee of Head Kandy?

7          A.   Yes, she was.

8          Q.   Do you know if she had a title?

9          A.   No.

10         Q.   Do you know who hired her?

11         A.   I am not a hundred percent sure.

12    I believe Kayla hired her, but we got her from

13    Mindy.

14         Q.   Do you know what Brandy did before

15    being hired by Head Kandy?

16         A.   Don't recall.

17         Q.   Do you know how long Brandy worked

18    for Head Kandy?

19         A.   I don't know.

20         Q.   Was she still employed whenever

21    you stopped working with Head Kandy?

22         A.   Yes.

23         Q.   I don't believe if I asked you

24    about your relationship.

25              Were you an employee of Head Kandy

COPY

69

 1  also?

 2          A.    No.

 3          Q.    So all of the services you were

 4  providing were in your role as owner?

 5          A.    Yes.

 6          Q.    Did you receive any compensation

 7  for the services you provided?

 8          A.    I'm pretty sure I never did.

 9          Q.    All right.  We have discussed the

10  social media expenses with regard to your

11  concerns involving Miss McNeill.

12              And then the second category, I

13  believe you said, were personal expenses; is

14  that correct?

15          A.    Yes.

16          Q.    Okay.  I'd like to talk about

17  those personal expenses.

18              What involved personal expenses

19  that made you lose faith in Miss McNeill?

20          A.    The company paying for daycare,

21  her kids' daycare.

22          Q.    Okay.  Anything else?

23          A.    Company paying for her kids'

24  tutors.  And I don't recall in detail, but I

25  believe there were many others.

70

1          Q.   And how did you learn about these

2     expenses?

3          A.   From a report that we received

4     from a forensic auditor.

5          Q.   Do you recall the name of the

6     auditor?

7          A.   No.

8          Q.   Have you heard of K2?

9          A.   K2 was the report.

10         Q.   That was the auditor?

11         A.   I believe so.

12         Q.   Okay.  Do you know how many

13     reports K2 generated?

14         A.   I don't know.

15         Q.   How many reports did you review?

16         A.   I never read the whole report.  I

17     read the summary of the report.

18         Q.   How many --

19         A.   I don't recall the details.  It

20     has been a long time.

21         Q.   Sorry, I didn't mean to cut you

22     off.

23         A.   Go ahead.

24         Q.   Was it just one report summary

25     that you read?

COPY

71

1          A.   Yes.

2          Q.   Do you recall when it was that you

3    either received or reviewed that report

4    summary?

5          A.   I don't recall the exact time.

6          Q.   Do you recall if it was marked

7    "draft" on it?

8          A.   No, I don't recall.

9               And I don't recall if those

10   expenses, I was made aware of actually by that

11   report, or that report showed other expenses,

12   or we were told by other employees in the

13   company that that was happening with the

14   company.

15         Q.   All right.  What did you review on

16   that summary that concerned you?

17         A.   I can't remember the details.  I

18   just remember that they found a lot of expenses

19   that were not supposed to have been paid by the

20   company.

21         Q.   "They" being K2?

22         A.   I think it was a combination of

23   information that we received from either K2 or

24   employees that were working in the company at

25   the time.

**COPY**

72

1          Q.    Do you recall if K2 made any

2  definitive determinations on whether or not

3  expenses were inappropriately charged to the

4  company?

5          A.    I don't recall.

6          Q.    Do you know what information K2

7  was provided?

8          A.    I am not a hundred percent

9  certain, but I think they were allowed all

10  information to all credit cards and bank

11  accounts.

12          Q.    Why did you review the K2 report

13  summary?

14          A.    The what?

15          Q.    The K2 report summary.

16          A.    What was the question?

17          Q.    Why did you review it?

18          A.    Because it was sent to me.

19          Q.    Okay.  Who sent it to you?

20          A.    I can't recall.

21          Q.    Do you know who asked K2 to

22  conduct the review?

23          A.    John Rosenbaum.

24          Q.    Did you know that K2 was going to

25  be engaged before they were retained?

73

```
 1        A.    Yes.

 2        Q.    Do you know -- sorry.  Strike

 3   that.

 4              Were you told why K2 was being

 5   engaged?

 6        A.    Just to look at all of our

 7   expenses.

 8              MR. THOMPSON:  Anthony, I've got a

 9        call coming from my house.  Can we take

10        a quick break?

11              MR. CONVERSE:  Yes.

12              THE VIDEOGRAPHER:  The time is

13        12:17 p.m.  We are going off the

14        record.

15              (Thereupon, a lunch recess was

16        taken.)

17              THE VIDEOGRAPHER:  The time is

18        1:36 p.m.  We're back on the record.

19   BY MR. CONVERSE:

20        Q.    All right.  Back from the lunch

21   break.

22              And when we left off, we were

23   talking about some personal expenses that

24   caused concern for you, and that were reflected

25   in a K2 report.
```

COPY

74

1          Do you recall that?

2          A.   Yes.

3          Q.   Okay.  You had mentioned some

4    specific expenses, daycare and tutors, but you

5    had said that you only reviewed the summary of

6    the K2 report, but you also had, I think you

7    said -- you were told by other employees

8    certain information.

9          I want to ask you about that other

10   information and the employees that you heard it

11   from.

12         So do you recall the names of the

13   employees who provided you the other

14   information?

15         A.   No.  I recall what they said --

16         Q.   Okay.

17         A.   -- as I said.  And as you were

18   saying on the expenses, I think that there were

19   a lot of expenses discovered.  And I think that

20   she even acknowledged to some of those during a

21   certain time period.  So she came back and

22   accepted, and -- that they were wrong, and --

23         Q.   She acknowledged it to you

24   personally?

25         A.   No.

75

```
1            Q.   Okay.  So what's the source of
2     your knowledge concerning her acceptance?
3            A.   I can't recall.
4            Q.   Do you know how many employees
5     notified you of information concerning personal
6     expenses?
7            A.   No.
8            Q.   Did they tell you directly?
9            A.   No.
10           Q.   Do you know who they told?
11           A.   They told someone in the company,
12    but I can't recall if it was John Rosenbaum or
13    someone else.
14           Q.   And how did you learn about it?
15           A.   From John Rosenbaum.
16           Q.   All right.  What did Mr. Rosenbaum
17    tell you?
18           A.   He confirmed that employees said
19    that she had a daycare in the warehouse, and
20    that she had a tutor for her kids in the
21    warehouse.  And they said there were other
22    expenses, which they didn't specify.
23           Q.   Did you do anything after
24    Mr. Rosenbaum shared that information with you?
25           A.   Nope.  Because I knew that he was
```

76

1   doing what had to be done.

2          Q.   What did you feel had to be done,

3   if anything?

4          A.   Explore further and find out what

5   the real story is.

6          Q.   Do you know anything he did, any

7   actions he took in order to do that?

8          A.   I don't know the details.  I

9   believe that she was confronted with it.  And

10  like I said, she agreed that some of the

11  expenses were -- should not have been paid by

12  the company.  I believe she paid back -- we had

13  someone go back, in, I think it was 2022, that

14  she paid back.  But I don't know if the

15  exercise was done for '21 and '20.

16              And like I said, you know, the

17  loss of trust leads me to believe that it

18  probably was happening a long time ago.

19         Q.   Did you do anything to determine

20  if it was happening a long time ago?

21         A.   Me personally, no.

22         Q.   Do you know if the K2 report

23  covered time periods prior to 2022?

24         A.   I don't know.

25         Q.   If it had, do you believe that

77

1    Mr. Rosenthal (sic) -- sorry.  Strike that.

2              If it had, would you have liked

3    Mr. Rosenbaum to investigate those earlier time

4    periods as well?

5         A.   Yes.

6              MR. THOMPSON:  Object to the form.

7    BY MR. CONVERSE:

8         Q.   You said she worked with someone.

9              Do you recall the name of that

10   someone?

11        A.   She worked with someone in --

12        Q.   About the 2022 expenses.

13        A.   With Klei.

14        Q.   Is that K-L-E-I?

15        A.   K-L-E-I.

16        Q.   And then, do you know her last

17   name?

18        A.   I don't know how to spell it.

19             MR. THOMPSON:  P-E-T-R-I-S -- no,

20        P-E-T-R-I.

21             THE COURT REPORTER:  I'm sorry?

22             MR. THOMPSON:  P-E-T-R-I.

23             THE WITNESS:  Is it I?  I think

24        it's I-S, no?

25             I can check.  Can I touch my phone

78

1          at all?

2                    MR. CONVERSE:  Yes.

3                    MR. THOMPSON:  No, just an I.

4                    I always add an "S" as well,

5          that's why I had to double check.  Just

6          an I.

7                    MR. CONVERSE:  I'll just refer to

8          it as Klei.  I just want to make sure

9          we know who we were talking about.

10                   THE WITNESS:  Yeah.

11  BY MR. CONVERSE:

12         Q.   Did you speak with Klei about her

13  work with Miss McNeill?

14         A.   No.  By then I was -- I stepped

15  aside, and it was all John.

16         Q.   Do you know if that work was

17  documented in any way?

18         A.   I don't know.

19         Q.   Do you know if Miss McNeill --

20  sorry.  Strike that.

21                   Do you know how much Miss McNeill

22  repaid for the 2022 expenses?

23         A.   I can't recall.

24         Q.   Do you know --

25         A.   I know it was in the thousands,

COPY

79

1    but I don't recall the exact amount.

2           Q.   Do you know if it was in the ten

3    thousands?

4           A.   Yes.

5           Q.   Less than 100,000?

6           A.   I believe what was repaid was less

7    than a hundred thousand, yes.

8           Q.   Okay.  Do you recall any specific

9    expenses that she paid for?

10               MR. THOMPSON:  Object to the form.

11               THE WITNESS:  I can't recall

12          specific expenses.  I know there was an

13          expense of $6,000, I think in Mexico

14          that was never explained.  Around

15          6,000.  But I can't recall the specific

16          expenses that weren't explained.

17   BY MR. CONVERSE:

18          Q.   Do you know what records were used

19   to document the company expenses?

20               MR. THOMPSON:  Object to the form.

21               THE WITNESS:  Can you explain the

22          question?

23   BY MR. CONVERSE:

24          Q.   Yes.

25               So how were these expenses

80

1   documented?  Were they part of an internal

2   records that Head Kandy maintained, credit card

3   statements?

4         A.   I believe it was credit card

5   statements.

6         Q.   So there was a $6,000 payment in

7   Mexico that you recall that was --

8         A.   Something around that, yes.

9         Q.   -- that was reflected in the

10  credit card statements?

11        A.   Yes.

12        Q.   Okay.  And did you discover that

13  or did someone bring it to your attention?

14        A.   Someone brought it to my

15  attention.

16        Q.   Do you recall the month, by any

17  chance?

18        A.   No.

19        Q.   Okay.  So with regard to the --

20  sorry.  Strike that.

21             And that's the only expense that

22  you recall right now?

23        A.   That's the one I recall.  I know

24  and understand from several people there were

25  many others.

81

```
 1          Q.   Okay.  Oh, other than
 2   Mr. Rosenbaum who spoke to you about that?
 3          A.   It was from conversations with
 4   John or conversations John had with Klei.
 5          Q.   Okay.  So you referenced daycare
 6   in the warehouse.
 7               Were you provided any other
 8   specifics other than just daycare in the
 9   warehouse?
10          A.   I remember being told of others.
11   I just can't recall right now.
12          Q.   Okay.  Do you know if the daycare
13   was used by any other Head Kandy employees?
14          A.   I don't know.
15          Q.   Okay.  And then you also mentioned
16   that there was a tutor in the warehouse?
17          A.   Yes.
18               MR. THOMPSON:  Objection.
19               MR. CONVERSE:  Is that form?
20               MR. THOMPSON:  Form.
21               MR. CONVERSE:  Okay.
22   BY MR. CONVERSE:
23          Q.   Were you provided any other
24   information about the tutor in the warehouse?
25          A.   No.
```

COPY

82

1          Q.   Do you know if any other Head

2     Kandy employees utilized the tutor?

3          A.   I don't know.

4          Q.   Are there any other concerns that

5     you can think of right now that you had

6     concerning personal expenses by Miss McNeill?

7          A.   Like I said, this process was with

8     John Rosenbaum.  My understanding is, there

9     were a lot of other findings.  By then I had

10    stepped aside.  I was just hearing out.  And

11    like I said, you know, I lost trust.  I trusted

12    her blindly and I felt betrayed.

13         Q.   But you didn't have any other

14    interactions with her once you received this

15    information concerning Head Kandy, right?

16         A.   I might have some sort of

17    interaction after, but it was very limited.

18         Q.   Your regular business dealings --

19         A.   No, no, no.

20         Q.   -- were no longer going on?

21         A.   No.

22         Q.   Okay.  Did you ever have

23    discussions with anybody about Head Kandy being

24    liquidated?

25         A.   Again, what?

COPY

83

```
1            Q.    Head Kandy being liquidated?

2            A.    No.

3            Q.    Do you know if Head Kandy products

4    were ever sent to owners of Head Kandy?

5            A.    Yes.

6            Q.    Do you know if they were charged

7    for those products?

8            A.    I can't recall.

9            Q.    Do you know if it would be

10   documented anywhere?

11           A.    It would be, but honestly, I don't

12   know where.

13                 We brought samples to our office

14   like we do with many other brands.

15           Q.    And which offices are you

16   referring to?

17           A.    Hollywood.

18           Q.    I asked you about the information

19   that K2 had, and I believe you said you weren't

20   certain what information they had.

21                 I don't believe you -- I don't

22   believe I asked you if you provided any

23   information to K2.

24                 Did you provide any information to

25   K2?
```

COPY

84

1          A.    Not directly.

2          Q.    Okay.  But did you pass on

3    information to somebody with the intention of

4    them giving that information to K2?

5          A.    I can't recall.

6          Q.    Did you talk with any

7    representative of K2?

8          A.    No.

9          Q.    Do you know who Michael Bernstein

10   (phonetic) is?

11         A.    No.

12         Q.    Do you know who Adam Fraye

13   (phonetic) or Fraye is?

14         A.    No.

15         Q.    Other than that K2 report that

16   we've been talking about, are you aware of any

17   review of expenses by another outside entity?

18         A.    Well, I know that Klei reviewed

19   the credit card, and she's not a Head Kandy

20   employee.

21         Q.    Okay.  Thank you.  I needed to ask

22   you that.

23               Was she an independent contractor?

24   A.    Yes.

25         Q.    Other than Klei -- other than Klei

COPY

85

1    and K2, are you aware of any other outside

2    individual or entity that reviewed the personal

3    expenses?

4            A.   Not that I'm aware of.

5            Q.   Have you had any interactions with

6    KPMG?

7            A.   Me, directly?  No.

8            Q.   Okay.  Are you aware of any work

9    that KPMG did for Head Kandy?

10           A.   KPMG does RK1s.

11           Q.   Okay.  Are you aware of any review

12   of expenses undertaken by KPMG?

13           A.   Not that I'm aware of.

14           Q.   Do you know who would know if an

15   outside entity or individual was retained to

16   review expenses?

17           A.   Yvelisse maybe.

18           Q.   Are you aware of any valuation of

19   Head Kandy that was performed?

20           A.   No.

21                You mean -- at what point?

22           Q.   At any time.

23           A.   Well, I know a valuation of -- of

24   Head Kandy, no.  No.  Head Kandy, no.

25           Q.   Were you thinking of Lashed Out?

86

1          A.    Yes.

2          Q.    Okay.  So it was a valuation done

3    of Lashed Out?

4          A.    Right.

5          Q.    Okay.  Do you know who performed

6    that valuation?

7          A.    We did, Jerome and I, but it

8    wasn't a professional opinion.  We looked at

9    the numbers, like we do, and we came up with a

10   number that we thought was fair.

11         Q.    Do you recall any formulas that

12   you used to determine that?

13         A.    Not really.  It was somewhere

14   around four times net income.  She was saying

15   that she was making around 900,000.  That's

16   what we valued it at.  But it was not very --

17   it's not that we hired investment bankers or

18   anything of that sort.

19         Q.    Do you know if Head Kandy ever

20   changed any of its manufacturers?

21         A.    Yes, we changed.  We actually

22   tried to change.  I don't think -- no, we

23   changed, I think, on the tools.  Again, that

24   was all her.

25         Q.    Uh-huh.

87

1          A.   She dealt directly with the tools.
2     I know that we did change -- I tried -- I got
3     involved more with products that were, call it
4     liquid, so shampoos, conditioners, etcetera,
5     because we tried to make product in the U.S.
6     We were always looking how to make product
7     better.  I'm sure we changed some.  But some of
8     them stayed the way they were before.
9          Q.   Do you have any knowledge of
10    whether Head Kandy changed its manufacturers
11    after you stopped being involved with the
12    company?
13         A.   I believe they did.
14         Q.   Do you know what products?
15         A.   I don't believe it's old products.
16    I believe it's new products.  But I'm not
17    certain.  I'm not certain.
18         Q.   Okay.
19         A.   I know the main core of the
20    business was to be manufactured with the
21    original manufacturers.
22         Q.   When you say "the core of the
23    business," are you referring to, like, the --
24         A.   Best selling items, yes.
25         Q.   Do you know if Miss McNeill was

88

1    asked to develop products for any other company

2    that was involved with the Hollywood offices

3    after Head Kandy was formed?

4            A.   Yes.   At one point we looked at

5    doing Hard Candy Hair Care.

6            Q.   What was Miss McNeill asked to do

7    with regard to Hard Candy Hair Care?

8            A.   She was asked to help us out

9    develop a line of tools.

10           Q.   Did she develop the line?

11           A.   It was never manufactured.

12           Q.   Was a --

13           A.   Not that I recall.   I'm pretty

14   sure it was not.

15           Q.   Were any marketing materials

16   created?

17           A.   For other brands?

18           Q.   For Hard Candy --

19           A.   No.

20           Q.   -- for Hard Candy Hair Care?

21           A.   No.   I don't believe so.

22           Q.   Was there ever any attempt to

23   place Hard Candy Hair Care in any retailer?

24           A.   We had conversations with

25   retailers the same way we had conversations

COPY

89

1   with Head Kandy.  We made many efforts to place

2   Head Kandy with retailers.

3         Q.   Was anything provided in the way

4   of, say, a presentation or a proposed product

5   line during those conversations for Hard Candy

6   Hair Care?

7         A.   Not that I'm aware of.

8         Q.   Was Miss McNeill an employee of

9   Head Kandy when she was asked to assist with

10  the Hard Candy Hair Care?

11        A.   Yes.

12        Q.   And who asked her to assist with

13  the Hard Candy Hair Care?

14        A.   I can't recall.  Might have been

15  me or it might have been Jerome.

16        Q.   You said there were some efforts

17  to place Head Kandy in retailers?

18        A.   Of course.

19        Q.   Were those efforts fruitful?

20        A.   No.  We tried.  It was part of our

21  effort to really grow the business.  When we

22  acquired the business, our idea was to

23  obviously grow it.  You know, we tried lots of

24  things.  Unfortunately it didn't work.  Among

25  them, we got presentations with the biggest

COPY

90

1    hair care retailer in the country.  We failed.

2              You know, we -- we followed the

3    process.  We hired a company to do an amazing

4    presentation.  The cost was thousands of

5    dollars, you know, to get it done.

6              Then we had a meeting with another

7    retailer.  And unfortunately, we couldn't get

8    it done.

9         Q.   Were you ever given any specific

10   reason why you weren't able to come to an

11   agreement?

12        A.   We had -- the biggest meeting we

13   had was with Ulta.  It was a very good meeting.

14   We thought it was a done deal.  And they came

15   back and said that it wasn't the right time.

16             And then we had a meeting with

17   Sally's Beauty Supply.  They were extremely

18   interested.  Kayla thought it was not in the

19   best interest of the brand to go to Sally's.

20   And we followed her direction as always.

21             We presented to Target through

22   someone, not directly, that was not us.  They

23   also passed.

24             And we thought that it was, you

25   know, we needed to make some changes after

91

1  these meetings, and that's when we tried to

2  revamp the packaging.  Like I said, like any

3  other business, we kept trying to be better.

4            You know, we got HSM, and that one

5  was successful, at least.  That one we actually

6  got the meeting, present it, and did some

7  business with them.

8        Q.  So with regard to Ulta and Target,

9  did they give you any specific reason why they

10  wouldn't move forward with the brand?

11       A.  I can't remember now.  I know they

12  sent a long e-mail, but I can't recall.

13            Hair care is difficult.  You know,

14  there's -- you go to Ulta, I'm sure you see a

15  thousand brands.

16            So I can't recall the exact reason

17  why.  They just said at that time they were not

18  interested.  You know, follow-up and we'll see

19  what happens.

20       Q.  Do you know who they sent that

21  e-mail to?

22       A.  Kayla got that e-mail.  I don't

23  know if we got it directly, or we got it

24  through someone, but we received a copy of it.

25       Q.  And then with regard to Sally's,

92

1   you said Kayla didn't want to place with

2   Sally's?

3          A.    Correct.

4          Q.    Did Sally's tell you that they

5   would be willing to place?

6          A.    They expressed a lot of interest

7   during the call.  You know, I think they were

8   ready.  Next step, what do we do?  And then we

9   never followed up because Kayla didn't want to.

10              It's not that they were begging

11  for it either.  It's not that they were sending

12  us a hundred e-mails a month saying, please, I

13  need the brand.

14         Q.    Right.

15         A.    You know, that's just where it

16  ended.  It ended right there.

17         Q.    With regard to company expenses on

18  credit cards, do you know what credit cards

19  were used to place company expenses on?

20         A.    Head Kandy's credit card.

21         Q.    Was it just one credit card?

22         A.    That I'm aware of?

23         Q.    Yes?

24         A.    Company -- no, the company -- the

25  main credit card of the company was a Head

93

1    Kandy credit card.  Kayla had one.

2              And then my credit card was used

3    for a short period of time.  And then we ended

4    up moving the credit card to Jerome Falic's

5    credit card, and then his brother, because we

6    were extremely tight on cash.  And the credit

7    cards required us to pay on time.  We didn't

8    have the cash to pay.  And Jerome and Leon were

9    basically financing us at no cost.

10         Q.   When you say Jerome's brother, is

11   it Leon that you referenced?

12         A.   Yes.

13         Q.   Okay.  Can you tell me the time

14   periods -- and if you don't know the exact time

15   period, just sequentially which occurred.  So

16   you could say that there was a time period

17   during which you placed charges on your

18   personal card, and then charges were placed on

19   Head Kandy's card, and then charges were placed

20   on Jerome and Leon's cards?

21         A.   I can't recall.  But the majority

22   of the time I would say 70 percent it was Head

23   Kandy's.

24         Q.   Okay.

25         A.   Mine was for a couple of months.

94

 1   I couldn't front the cash.  It was -- didn't

 2   work out for me.

 3              And at the end, we had to go to

 4   Jerome because of that, because we owed

 5   Facebook and UPS hundreds of thousands, and we

 6   had to make credit card payments on time, and

 7   we couldn't.  So they would make the payments.

 8   They paid the credit card and we would pay them

 9   whenever we could.

10        Q.   When you would place a business

11   expense for Head Kandy on your credit card --

12        A.   Yes.

13        Q.   -- how would those expenses get

14   paid?

15        A.   Well, I would submit my statement.

16   I would highlight all of my expenses, back it

17   up with an Excel, and send it to Yvelisse.  And

18   an explanation for each expense.

19        Q.   And then would you provide the

20   supporting documentation?

21        A.   Of course, yes.

22        Q.   Do you know what process either

23   the Falic brothers followed?

24        A.   I do not.

25        Q.   Do you still have copies of the

95

1  documents that you submitted to Yvelisse?

2         A.   I doubt it.  Mine was very early.

3  Mine was probably, I'm guessing, '19.  I

4  think -- maybe I'm wrong.  Oh, this is correct.

5              So the Falic brothers, they didn't

6  put everything on their card.  They just put

7  UPS and Facebook, which were most of the

8  expenses.  So it was very easy to track, you

9  know, Facebook and UPS.  It's not that they

10  were putting travel expenses, somebody bought a

11  lunch.  It was Facebook and UPS, because I

12  think Facebook and UPS was 90 percent of the

13  volume.

14         Q.   Yes.  And they didn't have

15  individual Facebook expenses?

16         A.   Right.  So it was very easy to

17  track.  Yes.

18         Q.   Did you submit the documents for

19  the charges on your card in electronic form or

20  physical form?

21         A.   Both.

22         Q.   Did you have a Head Kandy e-mail

23  that you submitted them on?

24         A.   Yes.  I don't know if I submitted

25  under Head Kandy, but, yes.

96

1          Q.   Were you ever required to pay any

2    of Head Kandy expenses on your credit cards and

3    then seek reimbursement from Head Kandy?

4          A.   Personal expenses?

5          Q.   No.  Any Head Kandy expenses that

6    you placed on your personal card, were you ever

7    required to pay them and then get reimbursed by

8    Head Kandy?

9          A.   I mean, it was not a process that

10   was directly related.  You know, I would get my

11   statement, I would pay my card, and then I

12   would take out what was, at the time, Facebook,

13   you know, UPS, the actual Head Kandy expenses.

14         Q.   So would Head Kandy pay for the

15   Head Kandy expenses directly to your credit

16   card?

17         A.   No.  I submitted an expense report

18   with backup and then they pay me back.

19         Q.   So they would cut you a check --

20         A.   Of course.

21         Q.   -- personally --

22         A.   Yes.

23         Q.   -- to reimburse you?

24         A.   Right.

25         Q.   Okay.  Do you know if you have any

97

1    perks on that credit card that you received for

2    purchases, like mileage or points?

3             A.    Points.

4             Q.    Did you -- were you ever asked to

5    provide Head Kandy with any of the points that

6    you received for the Head Kandy business

7    expenses?

8             A.    No.

9             Q.    Did you use them for your personal

10   use?

11            A.    No.

12            Q.    Are they still on your credit

13   card?

14            A.    Yes.

15            Q.    Have you ever used points on your

16   credit card?

17            A.    I have but not recently.

18            Q.    Have you since 2019?

19            A.    Not that I recall.

20            Q.    Do you intend to turn over any of

21   the points that you earned for Head Kandy

22   expenses to Head Kandy?

23            A.    It could be -- the issue we had

24   with the points is, when we acquired Lashed

25   Out, for Kayla it was very important to keep

COPY

98

1    the points.  We're talking about a lot of

2    points.  And we could never figure out a

3    process because the most -- the fairest thing

4    to do was, if you get a hundred points, every

5    member gets 20 points.  But you can't transfer

6    points on Amex, or at least that's what we

7    thought at the time.  It's not like you can a

8    hundred points, here's 20 for you, here's 20

9    for you.

10                   So the reason also why she ended

11   up putting everything on her card, which was

12   the company's card, but she was getting the

13   points, was because it was an enormous amount

14   of points.

15                   But we could never figure out a

16   way where we said, okay, take the points and

17   split it five ways.  Would I send them back if

18   I can?  I don't know how it works.  I don't

19   know if you can.

20                   My understanding is, at that time

21   when we found out, there was no way to do it.

22        Q.   So I don't know what type of cards

23   the Falic brothers have.

24                   But have you received any points

25   that they earned on their credit cards from

COPY

99

1  Head Kandy purchases?

2          MR. THOMPSON:  Object to the form.

3          THE WITNESS:  No.

4  BY MR. CONVERSE:

5      Q.  So several times you referred to

6  it as a Head Kandy card.

7      A.  Correct.

8      Q.  Do you know when that card was --

9  sorry, strike that.

10         Do you know when the credit card

11 account that you referred to as the Head Kandy

12 card was opened?

13     A.  No, I don't.

14     Q.  Do you know if it was before Head

15 Kandy was formed?

16     A.  I don't know.

17     Q.  Do you know who opened it?

18     A.  No idea.

19         I would guess Kayla because she

20 handled the Amex relationship, but I can't

21 confirm.

22     Q.  Do you know if it was being

23 utilized when you became involved with Head

24 Kandy?

25     A.  Before?

100

1          Q.    Yes.

2          A.    I don't know.

3          Q.    Okay.  Do you know who the account

4    owner is on the card?

5          A.    You mean who is the card made out

6    to?

7          Q.    No.  Just -- for the account with

8    Amex --

9          A.    Yes.

10         Q.    -- if you called Amex --

11         A.    Yes.

12         Q.    -- do you know who it would show

13   as the account owner?

14         A.    I am not certain --

15              MR. THOMPSON:  Object to the form.

16              THE WITNESS:  -- if it's Head

17         Kandy or Kayla.  But I know Kayla was

18         the guarantor.  Let's call it that way.

19   BY MR. CONVERSE:

20         Q.    Could the owner also be Lashed

21   Out?

22         A.    I don't know.

23              MR. THOMPSON:  Object to the form.

24   BY MR. CONVERSE:

25         Q.    And I just gave two possibilities.

101

1    I just want --

2            A.   Yes.

3            Q.   Do you know if Head Kandy, as part

4    of the acquisition with Lashed Out, acquired

5    any of Lashed Out's debt?

6            A.   I don't recall, but I don't

7    believe so.

8            Q.   So we talked a little bit about

9    the reimbursement process.

10           A.   Uh-huh.

11           Q.   Who in Head Kandy had the

12   authority to pay off any of the credit cards

13   for Head Kandy expenses?

14           A.   Who made the payment for the

15   expenses?

16           Q.   Yes.

17           A.   Kayla.

18           Q.   Did she have the authority to

19   determine which expenses were business

20   expenses?

21           A.   Yes.

22           Q.   Did she have to seek approval from

23   anybody with regard to what expenses were paid

24   by Head Kandy?

25           A.   She would send it in and it goes

102

1  back, like I said, with trust.  We would just

2  process it because, you know, we trusted it.

3  Whatever she requested and said this is what

4  you owe me, that's what we paid.

5          Q.   And I'm referring to all of the

6  credit cards.

7          A.   Yes.

8          Q.   So did she authorize payment to

9  you for the --

10          A.   No.  What I'm saying, she made the

11  Amex payments.  So she was the one that had

12  access to Amex and made payment.  That's what

13  she -- she was the only one that had the

14  authority or log-in password for that account.

15          Q.   And when you're referring to

16  "Amex," you're referring to the card that you

17  are calling the Head Kandy card?

18          A.   Yes.

19          Q.   Okay.  So who had the authority to

20  authorize the payments for the expenses that

21  you placed on your credit card?

22          A.   Knowing Yvelisse, same thing as I

23  did.  She checked my expenses, everything I

24  had, checked the backup and paid.

25                  And when I was missing something,

103

1    she would say, this is missing, highlight it

2    and --

3         Q.    Would she do the same check, to

4    your knowledge, for the expenses that

5    Miss McNeill submitted?

6         A.    My understanding is that a lot of

7    Kayla's expenses had no backup.

8              And honestly, my fault, Yvelisse

9    brought it up to me and she said, listen, we're

10   getting out of this expense, and I just said,

11   listen, whatever she says, we'll reimburse.

12        Q.    Do you recall when that

13   conversation occurred with Yvelisse?

14        A.    I would say sometime, I don't

15   know, '19 or '20.

16        Q.    Do you know what the process was

17   that Miss McNeill followed for submitting Head

18   Kandy expenses?

19              THE VIDEOGRAPHER:  The Zoom froze.

20         I don't know if everyone on Zoom is

21         still with us.

22              MR. CONVERSE:  Are you guys there?

23              THE VIDEOGRAPHER:  Should we go

24         off the record real quick?

25              MR. CONVERSE:  Yeah, let's go off

104

1              the record real quick to make sure

2              they're there.  Thank you for letting

3              us know.

4                   THE VIDEOGRAPHER:  The time is

5              2:13 p.m.  We are going off the record.

6                   (Thereupon, a short recess was

7              taken.)

8                   THE VIDEOGRAPHER:  The time is

9              2:25 p.m.  We're back on the record.

10                  MR. CONVERSE:  Let's try to keep

11             going.

12                  (Thereupon, the above-mentioned

13             question was read by the reporter as

14             above transcribed.)

15                  THE WITNESS:  We went over that,

16             yes.

17   BY MR. CONVERSE:

18        Q.   Okay.  I know you said that she

19   would submit it, but do you know what she

20   submitted?

21        A.   I just remember the Amex

22   statements.

23        Q.   Okay.

24        A.   Yes.

25        Q.   Do you know if she chose to submit

105

1   the Amex statements?

2          A.   No, it was part of the process.

3          Q.   Okay.  Do you know who established

4   the process?

5          A.   I don't think anybody really

6   established.  I just think we said send the

7   expenses and Yvelisse would pay it.

8          Q.   Okay.  While you were working with

9   Head Kandy, do you know who had the authority

10  to instruct Head Kandy's attorneys to take

11  action on its behalf?

12         MR. THOMPSON:  Object to the form.

13         THE WITNESS:  For anything?

14  BY MR. CONVERSE:

15         Q.   For anything.  Yes.

16         A.   It was a combination of any of us.

17         Q.   Do you mean any of the owners?

18         A.   Yes.

19         Q.   Is that still true today?

20         A.   I think it is the same.  It was

21  mostly Jerome when dealing with attorneys, yes.

22         But Kayla or I could call an

23  attorney for a trademark.

24         Q.   We talked about John Max before

25  and decisions he made concerning the expenses.

106

1                    Did you have any conversations

2    with him without anyone else involved in the

3    conversation?

4            A.   I can't recall.

5            Q.   Do you know if you provided him

6    any direction with regard to expenses?

7            A.   I can't recall.  I'm sure I did.

8    You know, profitability was always the message

9    to get across.

10           Q.   We had talked about Miss McNeill

11   running operations in Colorado, right?

12                   Did she have the authority to hire

13   employees at that time?

14           A.   Yes.

15           Q.   Did she have the authority to hire

16   employees after the warehouse was moved to

17   North Carolina?

18           A.   Yes.

19           Q.   Do you know if she ever lost the

20   authority to hire employees?

21           A.   Not that I'm aware of.

22           Q.   Are you aware of any employee that

23   she hired that she was not authorized to hire?

24           A.   Not really, because she -- again,

25   goes back to trust.  So if she wanted to hire

COPY

107

1   the cousin or the other cousin or whoever it

2   is, whatever she said, we did.

3         Q.    And we had talked about some

4   independent contractors, too.

5         A.    Yes.

6         Q.    Are you aware of any independent

7   contractors that she retained that she was not

8   authorized to retain?

9         A.    Not that I recall.  But I don't

10  recall her hiring any independent contractors,

11  that I know of.

12        Q.    Do you know who did retain the

13  independent contractors?

14        A.    I don't think we had that many.

15  That I recall, it was John Max, and that's it.

16        Q.    There's another outfit you said

17  didn't like what they were.

18        A.    That was before.  John Max

19  replaces them.  John Max used to work for that

20  company.

21        Q.    Do you know who retained that

22  company?

23        A.    Kayla.

24        Q.    Okay.  And did she also retain

25  John Max?

COPY

108

```
 1          A.   Yes.

 2          Q.   I think we talked about Klei

 3   also --

 4          A.   Yes.

 5               (Simultaneously speaking.)

 6   BY MR. CONVERSE:

 7          Q.   -- contract here?

 8          A.   Yes.

 9          Q.   Do you know who retained Klei?

10          A.   John did.

11          Q.   And that's John Rosenbaum?

12          A.   Yes.

13          Q.   I know you testified that you

14   don't know the relationship of the individuals

15   in the Hollywood office, but do you know who

16   engaged them?

17          A.   I would say Jerome or myself.

18          Q.   Oh, and we also talked about K2.

19               Do you know who engaged K2?

20          A.   No.

21          Q.   And then we also talked about

22   KPMG, do you know who engaged KPMG?

23          A.   For RK1s?

24          Q.   Yes.

25          A.   Yvelisse.
```

COPY

109

1          Q.    Okay.  Do you know if there were

2     ever any issues with Head Kandy failing to pay

3     taxes?

4          A.    We had an issue with sales tax,

5     state.  It was supposed to be reported after a

6     certain threshold.  I don't know.

7          Q.    Who dealt with that?

8          A.    Who what?

9          Q.    Who dealt with that issue?

10         A.    Yvelisse and Kayla, because it all

11    comes from Shopify.

12         Q.    Can you explain that?

13         A.    Again, not my expertise, Ecomm,

14    but Shopify is the platform used to do online

15    sales.  So they report the sales, and they

16    reported sales by state.  And I just know that

17    it was something that was dealt with Shopify

18    or -- I can't recall.  I know that was the

19    issue.  And it was dealt with Yvelisse and it

20    was dealt with Kayla, and I don't know who

21    else.

22         Q.    Do you know when you became aware

23    of that issue?

24         A.    No.

25         Q.    Was it anyone responsible for

110

1  paying state sales tax for Head Kandy?

2         A.   I am not clear.  Because I think

3  there was a way where Shopify does it for you,

4  but I don't know who ended up doing it or not

5  doing it.

6         Q.   Do you know if that issue was ever

7  resolved?

8         A.   I don't know.

9         Q.   Do you know if Head Kandy ever

10  paid taxes to Florida?

11         A.   I don't know.

12         Q.   Have you heard something called

13  Haisley's Boutique?

14         A.   Yes.

15         Q.   How did you learn of Haisley's

16  Boutique?

17         A.   I don't know how I found out about

18  it.

19         Q.   Do you know when?

20         A.   I don't recall.

21         Q.   Do you know what it was?

22         A.   I can't recall, but I think it was

23  Kayla selling clothing for kids.  I don't know.

24         Q.   Do you think you had any

25  conversation with Kayla about it?

111

1           A.   I think I had one, I'm not sure.
2    But I think she just said it's nothing, and
3    that's where it ended.
4           Q.   We talked about a human resources
5    department.  And you said it was moved to the
6    Hollywood office for a short period of time?
7           A.   Yes.
8           Q.   And that it involved -- I'm going
9    to forget how to pronounce her name.
10          A.   Raissa.
11          Q.   Raissa?
12          A.   Yes.
13          Q.   Raissa running payroll, correct?
14          A.   Yes.
15          Q.   Was there an HR office after that
16   short period of time that it was in Hollywood?
17          A.   No.  We did payroll in Hollywood.
18   Kayla likes to control things, and she didn't
19   like the way Raissa was working, which was more
20   the way, you know, big companies work.  She
21   wanted to be more nimble, you know.
22               She wanted to take decisions.  And
23   she basically told us, I want to run the
24   payroll in Colorado.  And once again, we
25   trusted her, and we moved them back to

COPY

112

1    Colorado.

2          Q.   Was it moved to North Carolina

3    when the warehouse moved?

4          A.   Yes.  That's where Kaylin was

5    running payroll.

6          Q.   Is that K-A-Y-L-I-N?

7          A.   Correct.

8          Q.   Culp?

9          A.   Yes.

10          Q.   I believe we talked about some

11   meetings or discussions that you had with

12   Mr. Rosenbaum.

13               Were any of them in Florida?

14          A.   Not that I recall.

15          Q.   Do you recall ever seeing

16   Mr. Rosenbaum in Florida?

17          A.   I can't remember.  I know I saw

18   him in the office, but I don't know when.

19   Like, I don't know if it was many years ago.  I

20   don't know.

21          Q.   And that would be in the Hollywood

22   office?

23          A.   Yeah.

24          Q.   Are you aware of a coffee brand

25   called DaySmith Coffee?

COPY

113

1          A.   Yes.

2          Q.   Do you know who the owners are?

3          A.   I know that Jerome's family

4   invested in it.  I have no idea who are the

5   owners.

6          Q.   Are you at all involved with the

7   company?

8          A.   No.

9          Q.   Do you know if Miss McNeill was

10  ever asked to post about it on social media?

11         A.   I can't recall.

12         Q.   I have a series of individuals,

13  some of which we already discussed --

14         A.   Yes.

15         Q.   -- so I will skip over those.

16              But I just want to know if you

17  know who these individuals are.

18         A.   Yes.

19         Q.   Do you know a Richard or Rick

20  Graham?

21         A.   No.

22         Q.   Eddie Banks?

23         A.   No.

24         Q.   Jim Conroy?

25         A.   No.

114

1          Q.    Cagray --

2                THE COURT REPORTER:  Cagray?

3                MR. CONVERSE:  C-A-G-R-I.

4                THE WITNESS:  Yes.  Supplier of

5          Head Kandy.  He supplies the best

6          selling item.

7   BY MR. CONVERSE:

8          Q.    What is that?

9          A.    The Third Wheel.

10               He also supplies other items, but

11  that's -- that's the source.

12         Q.    Debra Casale (phonetic)?

13         A.    Yes.

14         Q.    Who is she?

15         A.    When we started, after the

16  acquisition, Debra was doing the financial

17  clerical work, which Yvelisse ended up doing.

18  I think it was a short period of time.  And

19  Yvelisse took it over.

20         Q.    Do you know who engaged Debra?

21         A.    I don't know.

22         Q.    Do you know if she was ever a Head

23  Kandy employee?

24         A.    I don't know if she was

25  compensated.

115

1        Q.   Brandy Webb?  And I think you --

2        A.   I mentioned her, right?

3        Q.   Yes.  That's the --

4        A.   Social media lady.  Yes.

5        Q.   Do you know a Victor Ricci

6   (phonetic)?

7        A.   No.

8        Q.   Is John Boling (phonetic), John

9   Max?

10        A.   Yeah, yeah.

11        Q.   Okay.  Melissa Keenie (phonetic)?

12        A.   That one sounds familiar, but I

13   can't --

14        Q.   Dan Tarmen (phonetic)?

15        A.   Yes.

16        Q.   Who is Dan?

17        A.   Dan is a consultant that we

18   brought in for a couple of months.  His

19   expertise was DTC brands, such as Head Kandy.

20   So we brought him to take a look at what we

21   were doing and to hear any suggestions about

22   how to be better.

23        Q.   And by "DTC" you mean --

24        A.   Direct-to-consumer, yes.

25        Q.   Who retained him?

COPY

116

1          A.    Head Kandy did.

2          Q.    Who made the decision to retain?

3          A.    Jerome.

4          Q.    Do you have an opinion on whether

5    or not his retention was beneficial for Head

6    Kandy?

7          A.    I don't think it was beneficial,

8    but I don't think we gave it enough time.

9    Because Kayla didn't like him.  She didn't like

10   his approach.  And like, again, I'll go back so

11   many times, most of the time what she wanted is

12   what we did.

13         Q.    You deferred to her a lot?

14         A.    Yes, a lot.

15         Q.    Do you know how long he was

16   retained by Head Kandy?

17         A.    I can't recall.

18         Q.    Do you have an opinion as to how

19   long you needed to retain him before Head Kandy

20   received any benefits?

21              MR. THOMPSON:  Object to the form.

22              THE WITNESS:  I think we needed to

23         give more time than we gave him, but it

24         is what it is.

25   BY MR. CONVERSE:

117

```
 1          Q.   You don't have an opinion as to
 2   how long it would have taken?
 3          A.   No.
 4          Q.   The next name I have here is
 5   Alyssa McNab (phonetic).
 6          A.   Alyssa was an employee of Head
 7   Kandy.  But that's all I remember her for.  I
 8   don't --
 9          Q.   You don't know what her roles or
10   responsibilities were?
11          A.   I can't remember.
12          Q.   And then I have another name.  I
13   don't know if it's a short name, but Ylse
14   (phonetic) Lopez?
15          A.   Who?
16          Q.   Ylse?
17          A.   Ylse.  Ylse worked with Yvelisse.
18          Q.   Okay.
19          A.   Yeah.
20               THE COURT REPORTER:  How do you
21          spell it?
22               THE WITNESS:  Ylse, Y-L-S-E.
23               THE COURT REPORTER:  Thank you.
24   BY MR. CONVERSE:
25          Q.   Was Ylse also at the Hollywood
```

1    office?

2            A.   Yes.

3            Q.   Do you know if she was a Head

4    Kandy employee?

5            A.   No, she was not.

6            Q.   I have a Silvana Tuveri.

7                 THE COURT REPORTER:  Silvana?

8                 MR. CONVERSE:  Yes, Silvana.

9                 THE COURT REPORTER:  Last name?

10                MR. CONVERSE:  T-U-R-V-E-R-I.

11   BY MR. CONVERSE:

12           Q.   Do you know who that is?

13           A.   I can't recall.

14           Q.   And then we spoke about Raissa

15   Tejada?

16           A.   Yes.

17           Q.   Do you know who Shawna Webb is?

18           A.   Shawna was a Head Kandy employee.

19           Q.   Do you know what her role or

20   responsibilities or --

21           A.   I know it was taking pictures.  I

22   think it was to go around, be with Kayla, take

23   pictures of her.  And it was part of the

24   propping her up for the -- being an influencer.

25           Q.   So part of the marketing?

COPY

119

1          A.    But I don't know what else.  She

2    was definitely not a photographer only.  I

3    don't know what else she was -- I might be

4    wrong, again, but that's what I remember.

5          Q.    Do you know who Blake Rushman of

6    BR Digital Consulting is?

7          A.    That was a company that we got a

8    report from, basically, that we asked to look

9    at our performance in social media and other

10   EComm --

11         Q.    Sorry, I cut you off.

12         A.    No, no, that's it.

13         Q.    Was that the one we spoke about

14   previously?

15         A.    Yes.

16         Q.    And did you review that entire

17   report?

18         A.    No.

19         Q.    What portion did you review?

20         A.    I just spoke with John about it.

21         Q.    Okay.  So did John relay to you

22   what was in the report?

23         A.    Yes, not word-by-word, but the

24   message was, it's not working.

25         Q.    Right.  And was your discussion

COPY

120

1    with John the only information that you

2    received concerning the contents of the report?

3            A.    That I remember, yeah.

4            Q.    To the extent that it was sent to

5    you, you didn't review it, right?

6            A.    No.

7            Q.    Do you know who Damian Woodruff

8    (phonetic) is?

9            A.    I know the name from Head Kandy,

10   but I don't know what he was doing.  I don't

11   know.

12           Q.    Do you know Wendy Sergeant?

13           A.    Again, sounds -- I remember being

14   a Head Kandy employee, but I don't know what

15   she did.

16           Q.    Do you know a Nora Merlino?

17               THE COURT REPORTER:  Who, sorry?

18               MR. CONVERSE:  Nora, N-O-R-A,

19         Merlino, M-E-R-L-I-N-O.

20               THE WITNESS:  That one I've never

21         heard.

22   BY MR. CONVERSE:

23           Q.    We've already taken a number of

24   depositions of other individuals in this case.

25               Have you been present for any of

COPY

121

1    those depositions?

2            A.    No.

3            Q.    Do you know if Head Kandy utilized

4    any discount codes for its products?

5            A.    I think we did.  I know we had a

6    discount code for military.

7                 THE COURT REPORTER:  We had a?

8                 THE WITNESS:  A discount code for

9            military.  We had a discount code for

10           employees, I think.  And I don't know.

11                And obviously we did.  When we did

12           promotions, Fourth of July, discount

13           code, "HAPPY4TH," you know.

14   BY MR. CONVERSE:

15           Q.    Do you know who set up those

16   discount codes?

17           A.    Kayla or someone on her team.

18           Q.    Do you know who had the authority

19   to set up the discount codes?

20           A.    Kayla or someone on her team.

21           Q.    Are you aware of any discount

22   codes that were created that Kayla didn't have

23   the authority to create?

24           A.    Not that I recall.

25           Q.    Do you know if any of Head Kandy's

122

1  owners had discount codes?

2        A.   I think we had one.  I'm not

3  familiar that we used them.  When I got product

4  from Head Kandy I asked Kayla, you sent me

5  this.  But it was never through a platform.

6        Q.   Do you know if you were charged

7  for any of those products?

8        A.   I don't believe I was ever, no.

9        Q.   So we had talked about the

10  warehouse being moved to North Carolina for the

11  purposes of decreasing expenses, and I believe

12  you said that that wasn't successful.

13        A.   I don't know what to say.  It was

14  definitely not a game changer.  The warehouse

15  wasn't moved because of expenses only.  Salida

16  was very difficult to hire employees.  We

17  didn't have one warehouse; we had to have

18  separate warehouses.

19        Q.   In Colorado?

20        A.   In Colorado.

21        Q.   Okay.

22        A.   Kayla calls me one day in North

23  Carolina because she was there, I think for a

24  race of her kids, and she says, I have an idea,

25  we should move the warehouse to North Carolina,

COPY

123

1    and I already found one.

2              And again, I go back, trust, like

3    everything else.  You want to do that, you

4    looked at it, you like the idea, do it.

5         Q.   So when you said it wasn't

6    effective, or, you know, it wasn't a game

7    changer, is that just based on the total

8    expenses?

9         A.   Based upon that if you look at the

10   P&O, you don't see a dramatic reduction in

11   optics.

12             I think part of the play was,

13   you're in a warehouse that will be better for

14   growth, you know, and you can actually achieve

15   growth from this warehouse.  But we never were

16   able to achieve that.

17        Q.   We have talked about, and you keep

18   noting, every time that you restate the level

19   of trust that you had --

20        A.   Yes.

21        Q.   -- with Kayla.

22             If it was shown to you that she

23   made all of the payments for the personal

24   expenses on the Head Kandy card that you

25   described, would that cause you to regain your

124

1   trust in her?

2               MR. THOMPSON:  Object to the form.

3               THE WITNESS:  No.

4   BY MR. CONVERSE:

5        Q.   Why is that?

6        A.   Because once you lose trust, you

7   lose trust.  It's -- that's what it is.  It's

8   not only the expenses, it's the behavior,

9   it's --

10       Q.   Behavior during what period of

11  time?

12       A.   Towards the tail end.

13       Q.   And that was during

14  Mr. Rosenbaum's relationship with Head Kandy?

15       A.   Yeah.

16       Q.   Is there anything Miss McNeill

17  could do to regain your trust?

18               MR. THOMPSON:  Object to the form.

19               THE WITNESS:  I don't know.

20  BY MR. CONVERSE:

21       Q.   Nothing you can think of?

22               Sorry, can you just --

23       A.   No, I don't know.

24       Q.   Did you know that -- strike that.

25               Are you aware of a meeting that

COPY

125

1   Kayla had with Jerome on approximately November

2   20 of 2022?

3         A.   I think it's the one I think, yes.

4         Q.   Were you aware that that meeting

5   was going to occur before it took place?

6         A.   Yes.

7         Q.   Were you told why it was going to

8   take place?

9         A.   Not the specifics of the meeting,

10  but I know she wanted to talk to Jerome.  And I

11  had suggested she talk to Jerome.

12        Q.   Did she tell you -- strike that.

13             Did Kayla provide you any

14  information as to why she wanted to talk to

15  Jerome in person?

16        A.   She had a couple of issues she

17  wanted to address.  And I told her it was

18  better to address it with Jerome.

19        Q.   Do you recall what those issues

20  were?

21        A.   In general, she was concerned the

22  way the direction the company was moving

23  towards.

24        Q.   Did you receive any information

25  about the meeting after it occurred?

126

1          A.   I recall speaking to Jerome, but

2    it was not full detail about the meeting.  I

3    was told it was a good meeting.

4          Q.   Do you recall when you spoke with

5    him?

6          A.   I can't recall.

7          Q.   Other than him telling you it was

8    a good meeting, do you recall any other things

9    he told you?

10         A.   No.  Like I said, by then I was --

11         Q.   You weren't involved with the

12   company; is that correct?

13         A.   Yes, correct.

14         Q.   Did you speak with Kayla at all

15   about the meeting?

16         A.   After, no.

17         Q.   Are you aware of a meeting in New

18   York in December of 2022, that took place?

19         A.   Yes.

20         Q.   Were you aware that that meeting

21   had been arranged before it took place?

22         A.   Yes.

23         Q.   Who told you?

24         A.   I'm guessing Jerome.

25         Q.   Do you know when it was scheduled?

127

1          A.   No.

2          Q.   Did you attend the meeting?

3          A.   No, I did not.

4          Q.   Did you talk to anybody about the

5    meeting after it occurred?

6          A.   I remember asking Jerome what the

7    meeting was about.  What she wanted.  I

8    remember asking him, you know, if she was in or

9    if she was out.

10              But I can't remember the definite

11   answer.  He just said, you know, we'll have

12   more conversations.

13         Q.   When you say "she was in or she

14   was out," what was being proposed?

15         A.   I don't know what was proposed.  I

16   know she was not happy with the situation --

17   work situation.  Like I said before, she likes

18   to have full control of everything.  And when

19   John Rosenbaum went in, some of that control

20   was on out of her hands, and I think that made

21   her uncomfortable.

22         Q.   Do you know when you had that

23   first conversation with Jerome about the New

24   York meeting?

25         A.   About the what?

COPY

128

1            Q.   About the New York meeting.

2            A.   No.

3            Q.   Did you have any follow-up

4    conversations with him?

5            A.   Nothing.

6                 THE WITNESS:  I'm going to -- do

7            you mind if I take a restroom break?

8                 MR. CONVERSE:  Absolutely.

9                 THE WITNESS:  Quick.

10                THE VIDEOGRAPHER:  The time is

11           3:01 p.m.  We're going off the record.

12                (Thereupon, a short recess was

13           taken.)

14                THE VIDEOGRAPHER:  The time is

15           3:14 p.m.  We're back on the record.

16   BY MR. CONVERSE:

17           Q.   Mr. Feldman, you have been handed

18   what has been marked as Deposition Exhibit 1,

19   and I will represent to you that this was

20   produced by Miss McNeill as part of this

21   lawsuit.

22                Have you seen this document

23   before?

24           A.   No.

25                (Thereupon, the above-mentioned

COPY

129

1          documents were marked as Defendant's

2          Composite Exhibit No. 1, for

3          identification.)

4    BY MR. CONVERSE:

5          Q.    In the lower right-hand corner of

6    each page has a document control number, or

7    Bates number on it.

8               I would like to direct your

9    attention to page KM0065, the third to the last

10   page.

11         A.    Okay.

12         Q.    And these have been produced as

13   WhatsApp messages between Jerome Falic and

14   Kayla.

15         A.    Yes.

16         Q.    The last message that begins on

17   that page was sent on December 29, 2022, at

18   2:34 p.m., by Mr. Falic.

19              Do you see that one?

20         A.    Yes.

21         Q.    And do you see some enumerated --

22   some enumerated terms there in the message?

23              And the message continues on to

24   the next page, KM0066, but -- and only four

25   enumerated terms on that first page.

COPY

130

1          Do you see those?

2          A.   Yes.

3          Q.   Just take a moment to review them,

4   please, and I'm going to ask you some questions

5   about them.

6          A.   Yep.

7          Q.   Do you know if these were

8   discussed at the December meeting that we were

9   just talking about?

10          MR. THOMPSON:   Object to the form.

11          THE WITNESS:   I don't know.

12   BY MR. CONVERSE:

13          Q.   Did you know that this proposal

14   was going to be extended to Miss McNeill by

15   Mr. Falic?

16          A.   Yes.

17          Q.   Were you involved in forming these

18   proposed terms?

19          A.   No.

20          Q.   When did you become aware that

21   they were going to be proposed to Miss McNeill?

22          A.   I can't remember if it was before

23   or after.  He just told me this is what I'm

24   thinking.  What are you thinking?  I remember

25   me saying, that's fine.

131

1              Like I said again, by that time

2    I'm logged off.

3         Q.    Do you know why this was being

4    proposed to Miss McNeill?

5         A.    I think it was -- let me see.

6              I'm not sure.  I think at that

7    time all of the parties involved considered it

8    was best for everybody to go their own ways.

9         Q.    Was there anything in particular

10   that triggered that belief for you that the

11   parties should go their separate ways?

12        A.    I think it was mutual.

13        Q.    You had mentioned some behavior

14   that Miss McNeill engaged in that made you lose

15   trust in her.

16              Had that behavior occurred before

17   or after this was proposed?

18        A.    Before.

19        Q.    And can you tell me specifically

20   what the behavior was that she engaged in?

21        A.    I know she was very upset.  She

22   didn't like having John around because she

23   liked being boss anymore.  You know, she wanted

24   to be the boss, as she always was, and she had

25   someone that was challenging her decisions,

132

1    which I never did.

2             And, you know, she was -- she was

3    not working in the best interest of the

4    company.

5         Q.   How was she not working in the

6    best interest of the company?

7         A.   I think it was clear that she

8    didn't want to be there.

9         Q.   So did it just go to her

10   dedication to the company?

11        A.   No, no.  I think she -- she told

12   other employees.  I think she even mentioned

13   once, I'm going to go and do my own thing.  I'm

14   going to take my employees to another employee,

15   and, you know -- that's what it is.

16        Q.   Who told you that she said she was

17   going to take employees?

18        A.   She had conversations with Mindy

19   about it.

20        Q.   And that's Mindy McDermott?

21        A.   Yes.

22        Q.   And did Mindy tell you that she

23   had conversations with Kayla, that Kayla was

24   going to take employees to a new company?

25        A.   She said she was going to go on

COPY

133

1   her own and take employees, yes.

2        Q.   Did Mindy tell you of any other

3   conversations or conduct that Miss McNeill

4   engaged in that you felt was inappropriate?

5        A.   I think there were several; I just

6   can't recall.  I think Kayla was also very

7   discontent with Brandy, who was a social media

8   person, who was, again, Kayla had someone to

9   challenge what she was doing and Kayla doesn't

10  like that.  And they didn't get along.

11       Q.   Were your conversations with Mindy

12  written or over the phone?

13       A.   I think it was over the phone, or

14  I -- I don't even know if I spoke to Mindy or

15  it was conversations with John, you know.

16       Q.   Okay.  So the conversations we're

17  talking about with Mindy could have instead

18  have been with --

19       A.   Yeah.

20       Q.   -- John about Mindy?

21       A.   I think I did have a conversation

22  with Mindy about this.  Yes.  On a -- it was a

23  conversation actually.  It was not in writing.

24       Q.   So it was over the phone?

25       A.   Yes.

COPY

134

1          Q.   Do you believe that you also had

2    conversations with John about Mindy and Kayla's

3    interactions?

4          A.   I'm sure.  Yeah.

5          Q.   Do you recall if any of those

6    conversations with John were in writing?

7          A.   I'm sure some of them, but not --

8    I don't recall exactly which one.

9          Q.   How would you communicate in

10   writing about Head Kandy?  What did you use to

11   communicate?

12         A.   WhatsApp.

13         Q.   Did you ever use text messages?

14         A.   Rarely.  I'm sure I did, but

15   not -- not my thing.

16         Q.   What about e-mail?

17         A.   Here and there, but mostly

18   WhatsApp.

19         Q.   What e-mail account would you use

20   when you did communicate about Head Kandy?

21         A.   My work account.

22         Q.   Is that the domain Head Kandy

23   proper?

24         A.   No.

25         Q.   What's that work account?

135

1          A.    Falicfashiongroup.

2                THE COURT REPORTER:  Sally Fashion

3          Group?

4                THE WITNESS:

5          Falicfashiongroup.com.

6    BY MR. CONVERSE:

7          Q.    I had asked you about

8    communications involving Head Kandy.

9                Would the same be true for

10   communications involving or concerning Kayla?

11         A.    Yeah.  WhatsApp mostly.

12         Q.    Did you have any WhatsApp messages

13   with Jerome about Kayla?

14         A.    I'm sure we did, yeah.

15         Q.    Did you have WhatsApp messages

16   with Mr. Rosenbaum about Kayla?

17         A.    Yes.

18         Q.    Did you exchange any WhatsApp

19   messages with Mindy?

20         A.    No.  Not that I recall, at least.

21   If I did, it was very few, but -- not -- I

22   didn't speak to Mindy that often.

23         Q.    And then if I could direct your

24   attention back to this Deposition Exhibit 1,

25   the page labeled KM0066.

COPY

136

1          A.   Yeah.

2          Q.   You'll see about two-thirds of the

3    way down, the last third of the page there is a

4    message on January 1st, 2023 --

5          A.   Yes.

6          Q.   -- at 10:23:32 a.m. from Kayla.

7               Do you see that?

8          A.   Yes.

9          Q.   It says, "A few things we

10   discussed."

11              Can you just review that message

12   real fast.  Just read it to yourself, and then

13   I'll ask you some questions.

14         A.   Yeah.

15         Q.   Were you made aware of these

16   points or topics that Kayla raised?

17         A.   I remember hearing about this, but

18   not at that exact moment.  You know, sometime

19   through the process, I remember that she was

20   asking for a couple of these points.  But it's

21   not that I had a call to review all of this.

22         Q.   Were you involved at all with

23   these discussions?

24         A.   Not really.

25              Are you finished with this,

137

1    Counsel?

2              Q.    Yeah.

3                    All right.  Could you take a

4    moment to look over that exhibit?

5              A.    The what?

6              Q.    Could you take a moment to look

7    over that Exhibit 2, and just tell me if you

8    believe you received it before.

9                    (Thereupon, the above-mentioned

10                   document was marked as Defendant's

11                   Exhibit No. 2, for identification.)

12                   THE WITNESS:  I don't remember if

13                   I received this exact one, but I

14                   received copies like this.

15   BY MR. CONVERSE:

16             Q.    Are you able to determine if this

17   is the -- a statement for the account that

18   you've been referring to as the Head Kandy

19   card?

20             A.    Yes.

21             Q.    Is it?

22             A.    Yes.

23             Q.    And at the top left of the first

24   page, it provides a closing date of 1-2-23, and

25   the next closing date of 2-2-23.

138

1                    Do you see that?

2          A.    Yes, I see it.

3          Q.    And if you could look through this

4    statement and tell me, beginning on what's

5    labeled 4 of 20 in the upper right-hand corner.

6          A.    Okay.

7          Q.    At the bottom quarter of the

8    page --

9          A.    Yes.

10         Q.    -- there's a heeding, "Detail,"

11   and I think that's when all of the charges

12   begin for this --

13         A.    Yes, yes, yes.

14         Q.    -- billing cycle.

15         A.    Yes.

16         Q.    Can you look over those and tell

17   me if you're able to determine if any of those

18   are business expenses for Head Kandy?

19         A.    Some of them, yes; some of them,

20   no.

21         Q.    What other information would you

22   need to determine, the ones that you can't

23   determine by looking at it, whether or not it's

24   business expenses?

25         A.    I do not know what they mean.

COPY

139

1          Q.    So it's insufficient information?

2          A.    Yeah.  To answer your question,

3     right, to know exactly if it's a business

4     expense, I don't -- I don't know.

5          Q.    You now have Exhibit 3.

6               Is that a statement for the same

7     account?

8               (Thereupon, the above-mentioned

9          document was marked as Defendant's

10          Exhibit No. 3, for identification.)

11               THE WITNESS:  Yes.

12     BY MR. CONVERSE:

13          Q.    And it says "April" in the upper

14     right-hand corner of the first page.

15               Do you recognize the handwriting?

16          A.    Yes.

17          Q.    Whose handwriting?

18          A.    No, I don't know.  I just see it.

19          Q.    And then if you can, again, scroll

20     through the ask charges, which I believe also

21     start on page 4 of 21 --

22          A.    Yes.

23          Q.    -- for this one.

24               Do you see that there are some

25     notations?

COPY

140

1          A.    Yes.

2          Q.    Do you recognize any of that

3     handwriting?

4          A.    No.

5          Q.    Would you still need additional

6     information to determine what expenses on here

7     are Head Kandy expenses and what are not?

8          A.    Well, whatever I -- I wouldn't

9     understand, I would ask.

10         Q.    I'm just asking, independently,

11    just looking at this, even with these

12    annotations, are you able to determine what are

13    Head Kandy expenses and what are not?

14         A.    No, not at all.

15         Q.    All right.  We're now on Exhibit 4

16    that you have in front of you.

17         A.    Uh-huh.

18              (Thereupon, the above-mentioned

19              document was marked as Defendant's

20              Exhibit No. 4, for identification.)

21    BY MR. CONVERSE:

22         Q.    Could you just take a moment to

23    look through these documents here.  And if you

24    have seen any of them before, let me know.  Or

25    the pages, I mean, within this document, the

141

1   Exhibit 4.

2           A.   Uh-huh.   What is the question?

3           Q.   And now, if you look at the pages

4   in Exhibit 4 --

5           A.   Yes.

6           Q.   -- there are some numbers that are

7   near the middle of the page.   So the first page

8   has a 1 with a circle around it, and the second

9   page has a 2 with a circle around it.

10          Do you see that?

11          A.   Yes.

12          Q.   And if you compare it to the

13  Exhibit 3 expenses, for instance, page 6 of 21

14  within Exhibit 3, for an April 8, 2019 entry,

15  there's a 1 with a circle around it.

16          Do you see that?

17          A.   Yes, yes.

18          Q.   So is the information that is in

19  Exhibit 4 the type of supporting information

20  you would need --

21          A.   Yes.

22          Q.   -- to determine if these are

23  business expenses?

24          A.   Yes.

25          MR. CONVERSE:   I apologize.   We've

142

1          got a big one here for Exhibit 5.

2               (Thereupon, the above-mentioned

3          documents were marked as Defendant's

4          Composite Exhibit No. 5, for

5          identification.)

6    BY MR. CONVERSE

7          Q.   Based upon the filing information

8    at the top, I can tell you that that was filed

9    as Exhibit G to the complaint in this matter

10   and filed on February 22nd of 2023.

11              Do you know -- I'll give you a

12   chance to look it over.

13              My first question is just going to

14   be, do you know if that is the report summary

15   that you reviewed after you had a chance to

16   look it over?

17        A.   Like I said, I didn't review it in

18   depth, but I think it's the one I saw, yeah.

19        Q.   Okay.  And specifically, what did

20   you review with regard to this summary?

21        A.   I didn't review this.

22        Q.   You didn't review this?

23        A.   No, that's what I said.  That I

24   just know that some things came off of here.

25        Q.   Oh, I apologize.  I thought you

COPY

143

1   had reviewed the summary.

2           A.   No, no.  I don't think I've ever

3   seen this.

4           Q.   Okay.

5           A.   And if I did, I didn't open it and

6   review it.

7           Q.   Okay.  If you could look at the

8   first page there.  There's a background

9   section, and the second paragraph, if you could

10  just read that second paragraph.

11          A.   The one that says "K2 obtained"?

12          Q.   Yes.  And you can read it to

13  yourself.  You don't have to read it out loud.

14          A.   "K2 obtained from HK, general

15  ledger" --

16               THE COURT REPORTER:  Read it to

17          yourself.

18               THE WITNESS:  Oh, to myself?

19  BY MR. CONVERSE:

20          Q.   Yes.

21          A.   Okay.

22          Q.   So you see on that second

23  paragraph, "K2 represents what information they

24  obtained."

25          A.   Uh-huh.

144

1          Q.   Based upon what we just reviewed

2     in the other exhibits, would you agree that

3     that is not adequate information -- just the

4     statements in general ledger are not adequate

5     to determine what expenses are legitimate

6     business expenses?

7          A.   No.  I think they are.  You just

8     have to question each and every one of them,

9     not only the ones they highlighted.

10         Q.   Right.  You need more information

11    to provide context?

12         A.   I don't really think I understand.

13              You're asking me, if this is

14    enough to know if they are or they're not

15    business expenses?

16         Q.   Correct.

17         A.   No.  I would have to ask and find

18    out what is this, what is this and what is

19    this.

20         Q.   Right.  So just having the

21    statement alone isn't enough to determine

22    whether or not it's a legitimate business

23    expense?

24         A.   I think some charges you can say,

25    well, you know, it's definitely not a business

145

1   expense.  But in general, if I see Amazon, I

2   want to know, you know, what is the Amazon

3   expense.

4          Q.   Okay.  We had talked about your

5   means of written communications.

6               Do you delete any written

7   messages, anything in WhatsApp?

8          A.   No.

9          Q.   Do you delete any of your text

10  messages?

11         A.   Only when I'm out of memory.  But

12  it's not one by one.  It's just says clean out

13  who you haven't spoken to and I hit that.

14         Q.   Do you recall the last time you

15  cleaned out our text messages?

16         A.   Not really.

17         Q.   Were you asked to do anything to

18  preserve your text messages?

19         A.   What is the question?

20         Q.   Were you asked by anyone to

21  [reserve your text messages?

22         A.   Yes.

23         Q.   Have you taken any actions to

24  preserve your text messages?

25         A.   I haven't deleted the text

146

1    messages in a very long time.

2         Q.   Okay.  Do you know if any text

3    messages, prior to Head Kandy's formation, have

4    been deleted from your phone?

5         A.   Probably have.

6         Q.   Do you know if those messages are

7    backed up to an iCloud account?

8         A.   No.

9         Q.   No, you don't know, or no, they

10   aren't?

11        A.   No, because when you delete them,

12   you delete them.  If you recover them, yeah.

13   But I don't communicate on text message, so...

14        Q.   How about e-mails, do you delete

15   any of your e-mails permanently?

16        A.   No.  No.  Never.

17        Q.   You have been handed deposition

18   Exhibit 6.

19        A.   Uh-huh.

20            (Thereupon, the above-mentioned

21            document was marked as Defendant's

22            Exhibit No. 6, for identification.)

23   BY MR. CONVERSE:

24        Q.   I can represent to you that this

25   is an e-mail that I sent to a Jed Ferdinand on

COPY

147

1   Friday, January 27, 2023, at 3:54 p.m.

2           Do you know who Jed Ferdinand is?

3       A.   Yes.

4       Q.   Who is he?

5       A.   He was an attorney that we used.

6       Q.   Were you referring to Head Kandy?

7       A.   Yes.

8       Q.   So he represented Head Kandy?

9       A.   Yes.

10          Q.   Do you know if he represented Head

11  Kandy in January of 2023?

12          A.   I can't recall.

13          Q.   If I could direct your attention

14  to the fourth page in this e-mail string, the

15  second message on the page is from

16  Mr. Ferdinand to me, sent January 19 of 2023.

17              Do you see that?

18          A.   Yeah.

19          Q.   And it starts out, "Anthony, some

20  quick updates from Head Kandy" --

21          A.   Yep.

22          Q.   -- "on a few points we discussed?"

23              Do you see that?

24          A.   Uh-huh.

25          Q.   Skipping down after the numbered

148

1   points -- or sorry.

2              Starting with the second numbered

3   point, "Audit of credit card charges."

4              Do you see that?

5       A.   Yes.

6       Q.   And it says, "Here is what I was

7   told.  It was Kayla's card."

8              Do you see that?

9       A.   Uh-huh.

10      Q.   Were you aware that Head Kandy's

11  attorney acknowledge that the Amex was Kayla's

12  card?

13      A.   Not that I remember.

14              MR. THOMPSON:  Object to the form.

15              THE WITNESS:  Not that I remember.

16  BY MR. CONVERSE:

17      Q.   Did you speak with Mr. Ferdinand

18  about the ownership of the Amex card?

19      A.   Not that I recall.

20      Q.   So the second point says, "In

21  2018, she paid the card directly and submitted

22  expense reports to the client for

23  reimbursement."

24              Do you see that?

25      A.   Yes.

COPY

149

1          Q.   Do you believe that that's

2   accurate?

3          A.   I can't recall.

4          Q.   And then it says, "As of late

5   2018, the company began paying the credit card

6   in full."

7               Do you see that?

8          A.   Yes.  I don't remember the exact

9   date, but...

10          Q.   You don't know if that's accurate?

11          A.   No.

12          Q.   And then do you see, it says, "You

13   are correct that the RV has been resolved"?

14          A.   I don't know what that means.

15          Q.   Okay.  You don't know anything

16   about an RV?

17          A.   No.

18               I mean, I know Kayla had an RV, I

19   don't know what it's referring to.

20          Q.   All right.  Also in Exhibit 6,

21   after the e-mail string, are all of the

22   attachments to my January 27 e-mail.  I believe

23   the first one is on page 9.

24          A.   Yes.

25          Q.   Do you see that?

COPY

150

1          A.   Yes.

2          Q.   And I believe you had testified

3    previously that Miss McNeill decided to start

4    submitting the Amex bills?

5          A.   Right.  Yes.

6          Q.   Would you please read this e-mail

7    that was sent on June 6, 2019, to Mr. Thompson

8    from Yvelisse.

9          A.   Yes.

10         Q.   Do you see how she told

11   Mr. Thompson that she needed the --

12         A.   Correct.

13         Q.   -- Amex bill showing all of the

14   amounts in detail?

15         A.   Yes.

16         Q.   And Miss McNeill is not included

17   on this.

18              Do you know why Yvelisse would

19   only be e-mailing Mr. Thompson requesting the

20   full Amex bills?

21         A.   I would assume --

22              MR. THOMPSON:  Object to the form.

23              THE WITNESS:  I would assume she

24         is replying to the e-mail that I'm

25         assuming Ryan Thompson didn't copy

COPY

1          Kayla either.  But I don't know.  Ryan

2          Thompson would submit the expense

3          reports for a period of time.

4    BY MR. CONVERSE:

5          Q.   The next page in this exhibit is

6    an excerpt from an expense report.

7               Do you know if this is how

8    Mr. Thompson would submit the expense reports?

9          A.   Again, I can't recall, but it

10   looks like it.  But I don't recall exactly how

11   he would send the expense reports.

12         Q.   And then, I meant to ask you this

13   with regard to the June 6 e-mail.

14              Yvelisse identifies the reason for

15   the request for the full Amex bills showing all

16   amounts in details being due to accounting

17   legal purposes.

18         A.   Uh-huh.

19         Q.   Are you aware of any accounting or

20   legal reason why Head Kandy would need to know

21   all of Miss McNeill's personal expenses?

22              MR. THOMPSON:  Object to the form.

23              THE WITNESS:  Not that I recall.

24   BY MR. CONVERSE:

25         Q.   And then if you turn to the next

152

1   page on this exhibit after the expense report,

2   the orientation is now in -- changes the

3   landscape.

4          A.   Uh-huh.

5          Q.   On the left-hand side there is an

6   excerpt from an Amex bill.

7          A.   Uh-huh.

8          Q.   Is that the same account that we

9   have been referring to?

10         A.   Yes.

11         Q.   And on the right-hand side is a --

12   is a statement of account from PB&T Bank.

13              Do you see that?

14         A.   Uh-huh.

15         Q.   And the recipient is Lashed Out,

16   LLC, d/b/a Head Kandy.

17              Do you see that?

18         A.   Yes.

19         Q.   Is this a bank account of Head

20   Kandy?

21         A.   I don't know.

22         Q.   This looks like PB&T Bank is

23   located in Pueblo, Colorado.

24              Does that help you determine

25   whether or not this is a Head Kandy bank?

COPY

153

```
 1          A.   I don't believe it's a Head Kandy
 2    bank.
 3          Q.   But it says "Head Kandy" --
 4          A.   Right.
 5          Q.   -- right after "Lashed Out,"
 6    right?
 7          A.   Yes.  I don't recall having an
 8    account in Colorado, but --
 9          Q.   And then if you see, you can
10    reconcile a payment that was made to the Amex
11    account from this bank account in the amount of
12    $29,000, in April of 2019, to a payment that
13    was credited on April 19 on the Amex statement
14    on the left-hand side for $29,000.
15               Do you see that?
16          A.   Yes.
17          Q.   Were you aware that this
18    documentation was provided to Head Kandy's
19    counsel in January of 2023?
20          A.   Not that I recall.
21          Q.   And if you could turn to the
22    seventh from last page in this Exhibit 6.
23          A.   How does it look like?
24          Q.   It is a cover page of an Amex
25    statement with a closing date of 9-2-21.
```

COPY

154

```
1          A.    Okay.  Got it.

2          Q.    And it has account ending number.

3                Is this the same --

4          A.    Yes.

5          Q.    -- account we have been looking

6    at?

7          A.    Yes.

8          Q.    And then if you look on the

9    right-hand column, there's a category "Account

10   Total," and it has "Previous Balance, Payments,

11   New Charges" --

12         A.    Yes.

13         Q.    -- "Fee and Interest Charge."

14               Do you see that?

15         A.    Yep.

16         Q.    You see there was $780 charged in

17   interest?

18         A.    Correct.

19         Q.    Would you agree that the interest

20   charged on the card indicates that the card was

21   not paid in full the prior month?

22               MR. THOMPSON:  Object to the form.

23               THE WITNESS:  I don't know if it

24         was not paid in full or not paid on

25         time.
```

155

1   BY MR. CONVERSE:

2          Q.   Do you know if there is a

3   difference between late fees and interest?

4          A.   I don't know.

5          Q.   Okay.  Would you agree that if

6   interest is charged on a balance it's because

7   the balance was not paid at the time it was

8   due?

9               MR. THOMPSON:  Object to the form.

10              THE WITNESS:  Yes.

11  BY MR. CONVERSE:

12         Q.   Would you agree that that

13  contradicts the statement that "As of late

14  2018, the company began paying the credit card

15  in full"?

16         A.   On the what?

17         Q.   Mr. Ferdinand's statement on

18  January 19, that we reviewed, that "As of late

19  2018, the company began paying the credit card

20  in full"?

21              MR. THOMPSON:  Object to the form.

22              THE WITNESS:  I don't understand

23          the statement of us paying the credit

24          card in full?

25  BY MR. CONVERSE:

156

1          Q.    Uh-huh.

2          A.    Like I said, we were not paying

3    the credit card in full.  That's why we needed

4    Jerome and Leon to save the business, by paying

5    them the credit card because we couldn't pay

6    the credit card on time.

7          Q.    Okay.

8          A.    Are we done with this?

9          Q.    Yes.

10               Have you seen Exhibit 7 before?

11               (Thereupon, the above-mentioned

12          document was marked as Defendant's

13          Exhibit No. 7, for identification.)

14               THE WITNESS:  I can't remember.

15    BY MR. CONVERSE:

16          Q.    Take a moment to --

17          A.    Yes.

18          Q.    -- read it, please.

19          A.    Okay.

20          Q.    This resolution is dated February

21    17 of 2023.

22               Did you approve these resolutions

23    before February 17 of 2023?

24          A.    I can't remember.

25          Q.    Did you ever approve them?

157

1          A.   I can't remember.

2          Q.   Did you ever have any

3    conversations about them with any other

4    members?

5          A.   Like I said, I can't remember.

6          Q.   Did you become aware that these

7    resolutions had been adopted by the company?

8          A.   I was not aware of this.  Like, I

9    don't remember this document.  I might have

10   seen it in an e-mail, but I don't remember this

11   document.

12         Q.   You remember the resolutions that

13   are being proposed, though --

14         A.   Yes.

15         Q.   -- with regard to --

16         A.   Yes.

17         Q.   You do?

18              Do you recall when you became

19   aware that the company was going to take this

20   action?

21         A.   No, no.

22         Q.   Do you know how you became aware

23   of these resolutions?

24         A.   I don't remember how.

25         Q.   And you don't recall talking to

158

1    any of the other owners about them?

2          A.    I remember talking to Jerome about

3    this, but I don't know the exact, you know,

4    when was it going out or a document being sent,

5    I don't remember.

6          Q.    What did you talk to him about?

7          A.    I can't remember.

8          Q.    Did you express any concerns about

9    these resolutions?

10         A.    No.  Again, not that I remember.

11         Q.    Are you aware of any allegations

12   of inappropriate conduct by Mr. Rosenbaum?

13         A.    I am aware.

14         Q.    What allegations are you aware of?

15         A.    I believe there is harassment

16   being claimed by Kayla.

17         Q.    Are you aware of any allegations

18   of improper conduct by anyone other than Kayla?

19         A.    No.

20         Q.    When did you become aware of those

21   allegations?

22         A.    When I found out about the

23   lawsuit.

24         Q.    Do you know any of the specifics

25   about the conduct that is alleged to constitute

COPY

159

1    harassment?

2         A.   No, because everything that I know

3    has nothing to do with harassment, so...

4         Q.   Are you aware of any yoga sessions

5    that Mr. Rosenbaum engaged in with

6    Miss McNeill?

7         A.   Yes.

8         Q.   When did you become aware of

9    those?

10        A.   I remember Kayla texted me about

11   it.

12        Q.   Do you recall if she texted you

13   before or after they occurred?

14        A.   I think after.

15        Q.   Did you have any thoughts whenever

16   you had learned that they were doing yoga in

17   the offices?

18        A.   No.

19        Q.   Are you aware of allegations about

20   comments concerning Miss McNeill's appearance

21   by Mr. Rosenbaum?

22        A.   No.

23        Q.   Have you ever heard Mr. Rosenbaum

24   make statements about any Head Kandy employees'

25   appearance?

160

1          A.    No.

2          Q.    Have you talked with anybody about

3     the allegations by Miss McNeill concerning

4     Mr. Rosenbaum's conduct?

5          A.    With Jerome I just said, I don't

6     believe they are true.

7          Q.    Was it just one conversation?

8          A.    I can't recall.

9          Q.    Have you ever had an opportunity

10    to observe Mr. Rosenbaum in the workplace?

11         A.    Yes.

12         Q.    When was that?

13         A.    Long time ago.

14         Q.    Was that at his prior employer?

15         A.    Correct.

16         Q.    That's NuWorld?

17         A.    Yes.

18         Q.    How many occasions did you have an

19    opportunity to --

20         A.    Couple of times.

21         Q.    For how long?

22         A.    Couple of hours.

23         Q.    Each time or total?

24         A.    Each time.

25         Q.    And was that in NuWorld's offices?

COPY

161

1          A.   Yes.

2          Q.   Did you observe him engaging with

3    any female employees?

4          A.   Never.

5          Q.   Why would you tell Jerome that you

6    believed the allegations weren't true?

7          A.   Because Kayla never said anything.

8    And I know John personally, and I don't believe

9    he would do that.

10         Q.   So do you believe that if the

11   allegations were true, Miss McNeill would have

12   told you when the conduct occurred?

13         A.   Yes.

14         Q.   Did Head Kandy have any policies

15   or procedures for reporting that kind of

16   conduct?

17         A.   Not that I recall.

18         Q.   Did Head Kandy have an employee

19   handbook?

20         A.   I think we did, but I'm not a

21   hundred percent certain.

22         Q.   Do you know for what time period?

23         A.   I don't remember.

24         Q.   Who would know?

25         A.   It would be a question for Raissa.

COPY

162

1          Q.   Other than your relationship with

2    Mr. Rosenbaum and the reporting discrepancy

3    that you identified, is there any other reason

4    why you don't believe the allegations

5    Miss McNeill has made concerning

6    Mr. Rosenbaum's conduct?

7          A.   I think someone would have said

8    something.

9          Q.   Do you know if any investigation

10   was made by Head Kandy concerning the

11   allegations?

12         A.   Not that I'm aware of.

13         Q.   Do you know if anybody on behalf

14   of Head Kandy asked any other employees if they

15   had any information concerning Mr. Rosenbaum's

16   conduct?

17         A.   Not that I'm aware of.

18         Q.   Are you aware of anybody who would

19   have been responsible to do that on behalf of

20   Head Kandy?

21         A.   I mean, Kayla was running human

22   resources.

23         Q.   And after -- are you aware whether

24   or not she was running human resources after

25   Mr. Rosenbaum was engaged by Head Kandy?

163

```
 1          A.    What?
 2          Q.    I believe you had said that you
 3    were only involved with the company
 4    peripherally after Mr. Rosenbaum --
 5          A.    Yes, yes.
 6          Q.    -- was engaged.
 7          A.    Yes.
 8          Q.    And it was only for a short
 9    period.
10          So do you have any knowledge,
11    after you handed over responsibilities to
12    Mr. Rosenbaum, who was in charge of human
13    resources?
14          A.    No.
15          Q.    Are you aware of any comments
16    Mr. Rosenbaum made about Miss McNeill's
17    capabilities vis-à-vis her age?
18          A.    No.
19          Q.    Do you know if any Head Kandy
20    employees were required to work on holidays?
21          A.    I don't know exactly, but I'm sure
22    they would.  Holidays were important dates for
23    us.
24          Q.    Do you know if any individuals
25    were excluded from working on religious
```

COPY

164

1    holidays?

2              A.    I don't know.

3              Q.    Do you know who would know?

4                    MR. THOMPSON:   Object to the form.

5                    THE WITNESS:   It would be Kayla.

6    BY MR. CONVERSE:

7              Q.    You talked about social media

8    posts, and I think you said you didn't have any

9    involvement, but I just want to clarify.

10                   Would you be aware of whether or

11   not any content on the Head Kandy pages or the

12   Kandy Life with Kayla pages was removed?

13             A.    No.

14             Q.    And I guess "content" can mean

15   different things.  So when I say "content," I'm

16   referring to both items uploaded and comments

17   made by third parties; would you have any

18   knowledge concerning --

19             A.    No.

20             Q.    -- any alteration of that content

21   at all?

22             A.    No.

23                   I know that -- I don't know if

24   this answers your question -- when somebody

25   posted on Head Kandy, I remember bad comments

COPY

165

1  Kayla deleted.

2       Q.   I'm sorry, could you say that

3  again.

4       A.   Somebody posted on our -- if we

5  put a post and somebody wrote something bad,

6  Kayla would erase the comment.

7       Q.   Okay.  How do you know she

8  would --

9       A.   Oh, she would say, like, you know,

10  you don't want bad comments out there, and she

11  would say, it's against the rules.

12            But I don't know if that answers

13  your question.

14       Q.   Yes.  Thank you.  That does.

15            So you were -- you're aware of

16  Kayla deleting some comments.

17            Any specific ones?

18       A.   I think it's whenever they -- they

19  bashed or they spoke in a rude way.  I don't

20  know.  I don't know if it was Kayla or people

21  that handled Facebook.

22       Q.   Okay.  And your belief that they

23  would be deleted is due to comments that Kayla

24  made about not wanting negative comments?

25       A.   No.  If somebody came in and

166

1  trashed a product of ours, or spoke

2  disrespectfully, I think those comments were --

3  again, I'm not an expert, I'm not 100 percent

4  sure, but I think (inaudible).

5       Q.   And that's why I'm just trying to

6  understand.

7       A.   Yeah.

8       Q.   What makes you think that?  It's

9  just because Kayla had made some comments about

10 not wanting that information?

11      A.   Yes.

12      Q.   Okay.

13           MR. CONVERSE:  Why don't we take a

14      five, ten-minute break.

15           THE WITNESS:  Okay.

16           THE VIDEOGRAPHER:  The time is

17      4:10 p.m.  We're going off the record.

18           (Thereupon, a short recess was

19      taken.)

20           THE VIDEOGRAPHER:  The time is

21      4:34 p.m.  We're back on the record.

22 BY MR. CONVERSE:

23      Q.   Back and hopefully the last --

24           You have the deposition, Exhibit

25 8, which I believe is a text, or WhatsApp --

COPY

167

1   you can correct me --

2          A.   Text.

3          Q.   -- exchange between you and Dusty

4   McNeill.

5               What did you say, it was a text?

6          A.   Text.

7               (Thereupon, the above-mentioned

8          document was marked as Defendant's

9          Exhibit No. 8, for identification.)

10  BY MR. CONVERSE:

11         Q.   Do you recall receiving this from

12  him?

13         A.   Yes.

14         Q.   Do you know if the two of you

15  spoke after these texts were exchanged?

16         A.   Yes.

17         Q.   What did the two of you discuss?

18         A.   He called me; he was concerned

19  about the direction of the business.  And I

20  told him that we should all have a meeting

21  together.

22         Q.   Who did you mean when you said

23  "we"?

24         A.   Jerome, Kayla, John, Dusty,

25  everybody.

168

1        Q.   Did that meeting ever occur?

2        A.   No.

3        Q.   Do you know why?

4        A.   No, we never followed up.

5        Q.   He never followed up?

6        A.   He never followed up.  I never

7   followed up.  It was never -- it never

8   happened.

9        Q.   Okay.  You have Deposition Exhibit

10  9.

11            It's a text exchange between

12  Mr. Rosenbaum and Kayla.  Just take a moment to

13  read it, and I just have a question for you

14  whenever you are done.  Read it to yourself.

15            (Thereupon, the above-mentioned

16            document was marked as Defendant's

17            Exhibit No. 9, for identification.)

18            THE WITNESS:  Okay.

19  BY MR. CONVERSE:

20       Q.   All right.  And at the top the

21  says that it was November 3rd, 2022.

22            Do you see that?

23       A.   Yes.

24       Q.   Did you have any involvement with

25  Head Kandy's business in November of 2022?

169

1          A.   Very little.

2          Q.   Sorry.  Go ahead.

3          A.   '22 was John in already?

4          Q.   Yes.

5          A.   Yeah, no.  Very little.

6          Q.   Do you know why there was an issue

7     with you being in Israel?

8          A.   No.

9          Q.   Do you know if Head Kandy ever

10    sponsored the racing organization that her boys

11    engaged in?

12              MR. THOMPSON:  Object to the form.

13    BY MR. CONVERSE:

14         Q.   I'm sorry?

15         A.   We sponsored something in racing.

16    I don't know exactly what we sponsored.

17         Q.   Who had the authority to approve

18    that sponsorship?

19         A.   Kayla asked me once if I was okay

20    with it, and I said, yes.  It was a low dollar

21    number, and it was a one-time thing.

22         Q.   Are you aware of any sponsorships

23    that Kayla approved that she wasn't authorized

24    to approve?

25         A.   Not that I'm aware of.

COPY

170

```
 1                (Thereupon, the above-mentioned
 2           document was marked as Defendant's
 3           Exhibit No. 10, for identification.)
 4   BY MR. CONVERSE:
 5           Q.   All right.  I'll hand you Exhibit
 6   10.
 7                Do you recognize that document?
 8           A.   Yes.
 9           Q.   And did you execute this
10   declaration for this lawsuit?
11           A.   Yes.
12           Q.   If I could direct your attention
13   to the second page, paragraph 9.
14           A.   Uh-huh.
15           Q.   Where you state that "Miss McNeill
16   traveled to Head Kandy's office in Hollywood,
17   Florida on numerous occasions."
18           A.   Uh-huh.
19           Q.   And you go on to identify specific
20   dates.
21           A.   Yes.
22           Q.   How are you able to determine what
23   dates Miss McNeill travelled to Florida?
24           A.   I just looked at e-mails and
25   texts.
```

171

1          Q.    Okay.  Do you know the purpose of

2    these visits, as you sit here today?

3          A.    Not specifically all of them.

4    Some of them, but not specifically the dates.

5    So I know she came to me with Dan Tarmen

6    once -- I think twice or two of them would be

7    that.  I don't know.

8          Q.    Would you be able to determine the

9    reason for these visits based upon a review of

10   e-mails and texts?

11         A.    No.

12         Q.    Okay.  So --

13         A.    Maybe one or two, but not all of

14   them.

15         Q.    So you're only able to determine,

16   based upon reviewing the e-mails and texts, the

17   fact that she came but not the reason?

18         A.    Right.  Like I said, a couple of

19   them was Dan Tarmen.  She came to me to our

20   office with someone from her office who was

21   helping her develop fragrance.

22               There was another one -- I can't

23   recall exactly.

24         Q.    Did you ever reprimand

25   Miss McNeill for any conduct of hers prior to

172

1    Mr. Rosenbaum being involved with Head Kandy?

2              MR. THOMPSON:  Object to the form.

3              THE WITNESS:  Not that I recall.

4         Again, I'll say it again, it was a

5         trust thing.

6    BY MR. CONVERSE:

7         Q.   What caused you to trust her so

8    much?

9         A.   I don't know if the right word is

10   trust.  It was dependency.  So, you know, I was

11   always concerned of how to manage her because

12   she was so important to the business.

13             And that's why I didn't supervise

14   her the same way I supervised other employees

15   because there was a trust factor for sure, but

16   there was also a wanting to make sure she was

17   comfortable so she -- she was in a happy place.

18        Q.   Did some of that trust come from

19   her performance or success with Lashed Out?

20        A.   Yes.

21        Q.   Do you know if anyone ever

22   reprimanded Miss McNeill for conduct related to

23   Head Kandy, prior to Mr. Rosenbaum being

24   involved?

25        A.   I can't recall.

COPY

173

1          Q.   Do you know if she was ever told

2     that any of the expenses that she was

3     authorizing were inappropriate?

4          A.   Not that I recall.

5          Q.   Was she ever told to reduce the

6     expense for boosting, to your knowledge?

7          A.   For what?

8          Q.   Boosting.

9          A.   She was always told to make sure

10    that when we spend, we sell.  If we didn't

11    sell, to make sure we didn't spend.

12         Q.   But nothing granular as far as

13    specific expense categories?

14         A.   No KDMs.  Again, if you're not

15    selling, don't spend.  Or you spend too much,

16    we didn't sell it, it didn't work.

17              (Thereupon, the above mentioned

18              documents were marked as Defendant's

19              Exhibit Nos. 11 and 12, for

20              identification.)

21    BY MR. CONVERSE:

22         Q.   You have just been handed Exhibits

23    11 and 12.

24              Have you seen -- well, sorry,

25    strike that.

COPY

174

1              These were previously marked by

2    the parties with regard to the hearing on the

3    preliminary injunction.  That's why they have

4    exhibit labels on the bottom.

5              Have you seen Exhibit 11 before?

6         A.   Not that I recall.

7              MR. THOMPSON:  I don't think I

8         have 12.

9              MR. CONVERSE:  I'm still trying to

10        put it together.

11             MR. THOMPSON:  Okay, thanks.

12   BY MR. CONVERSE:

13        Q.   And then with regard to Exhibit

14   12, have you seen that document before?

15        A.   I think I saw this one.

16        Q.   I just want to go over some of the

17   financials that you were talking about before

18   that were problematic so you can point them

19   out.

20             So with regard to Exhibit 12, this

21   is an e-mail string.  You can see that on the

22   first page.  It was sent from Klei on August

23   26, 2022.

24             Do you see that?

25             And then do you recognize the

175

1    JR@headkandypro.com e-mail?

2          A.   Yes.

3          Q.   Do you know whose that is?

4          A.   John.

5          Q.   And then Kayla was also copied.

6          A.   Uh-huh.

7          Q.   And there is an attachment by

8    Klei, and specifically, if I could direct you

9    to page 11.

10         A.   Okay.

11         Q.   You'll see some financials for

12   Head Kandy for the years 2018, 2019 --

13         A.   Uh-huh.

14         Q.   -- 2020 and 2021.

15              Do you see that?

16         A.   Yes.

17         Q.   And then it has "Total income," it

18   has a line item "Total Cost of Goods Sold" --

19         A.   Uh-huh.

20         Q.   -- and "Gross Profit."

21              Do you see that?

22         A.   Yes.

23         Q.   And then on the following page

24   there is a "Net Income."

25         A.   Correct.

176

1          Q.   All right.  And then if you look

2    at Exhibit 11, beginning on page 8 --

3          A.   Got it.

4          Q.   -- it starts with "2022 Sales" --

5          A.   Yes.

6          Q.   -- and "Cost of Goods Sold."

7          A.   Uh-huh.

8          Q.   And then it concludes on the final

9    page with a total --

10         A.   Right.

11         Q.   -- of both of those columns.

12              Do you see that?

13         A.   Yes.

14         Q.   So comparing these, if you could

15   just tell me, looking, again, from 2018 to

16   2022, between the two exhibits, what were the

17   chief concerns?

18              I think you talked about growth

19   and the concern with revenue and customer

20   acquisition and profits.

21         A.   Where do you see '22?  I don't

22   see --

23              Oh, okay.

24         Q.   Yes, very last page --

25         A.   Right.

COPY

177

1      Q.   And if you were looking at

2   different numbers, just -- if you don't think

3   that these are accurate, please tell me.

4           But I'm trying to understand what

5   numbers you are looking at that caused concern

6   with regard to the health of the business.

7      A.   So, again, if you see from '19 to

8   '20, it was an even year.  Same thing with '21,

9   no growth.

10     Q.   Uh-huh.

11     A.   Bottom line, we lost money in '19,

12  we made a little money in '20.  We finally made

13  some money in '21.

14          In '22, I'd have to question if

15  this includes shipping.  As you can see this on

16  10-1 in '19, 10-2 in '20, and 9-9 in '21.  So I

17  don't understand if this includes or doesn't

18  include, because the cost of goods -- I'm not

19  sure if this includes shipping or not.

20     Q.   Okay.

21     A.   And I can't say anything about '22

22  because I don't -- do we have this for '22?

23     Q.   Not the same type of -- the

24  document is what is in Exhibit 12.

25     A.   Right.

178

1                    So I would like to see it for '22.

2                    From a -- what you don't see here

3      is a balance sheet.  So what you don't see here

4      is inventory on that.

5                    And the way the business worked

6      is, Kayla, whatever she makes, her customers

7      they buy, right, so any new products she would

8      make, she would sell.  But you would have

9      remainders of that product.

10                   So all of a sudden you were seeing

11     a lot of inventory.  It was hard to move.

12     Right?  You were stuck with it.

13                   And the reason why I keep

14     emphasizing a new customer base is because your

15     customers, which are always the same, already

16     bought everything.  If you don't get new

17     customers, you don't increase sales.  So the

18     only way to increase sales and hit stuff like

19     12 before, are going and doing things like what

20     she did, which is, let's do nails, let's do

21     eyelashes, let's expand the portfolio, which is

22     a short-term fix, because yes, you're hitting

23     this, but it doesn't fix the problem.

24                   The problem is, if you don't

25     expand your customer base, you're not

179

1  increasing the business.

2       Q.   Right.

3       A.   And that was one of our main

4  concerns with the business.  And, you know, I

5  think we were in agreement with that.  Her, you

6  know, John Max.  Our main challenge was

7  reaching new customers.

8       Q.   Why can't you count on existing

9  customers to buy more?  Is that because there

10 is -- it takes a while to use the product

11 before they need to reorder?

12      A.   Because the high dollar items are

13 tools that last a long time.  Existing

14 customers by Third Wheel shampoo and

15 conditions, $10 items.  So not getting you

16 anywhere.

17           So for you to feed them a very

18 wide assortment of goods, you have to become a

19 flea market, right?  I mean, I have to come out

20 with 500, a thousand, 10,000 SKUs.  Eventually

21 you hit a wall because that requires cash, you

22 know, that requires perfect planning from a

23 purchase order planning.  Right?

24           You're stuck with inventory of --

25 you have ten pieces of one SKU is nothing, but

180

1    if you have ten pieces of 10,000 SKUs, you

2    know, you have a hundred thousand units.

3              Q.    Right.

4              A.    So that's the problem of not

5    reaching the customers.  You could always --

6    yeah, they come and repurchase the Third Wheel

7    as per the numbers, you know, we spoke about

8    what's the best seller, but dollar wise,

9    doesn't add up.

10             Q.    In addition to a higher price

11   point for the tools, was there also a larger

12   margin that Head Kandy would make on the tools?

13             A.    I can't recall exactly, but I

14   would say the opposite.

15             Q.    Okay.

16             A.    But it wasn't, like, tools were

17   making you 30 percent and wet lines would make

18   you 80 percent.  In this business you always

19   want to focus on wet lines because of that, the

20   return customers.  You hit a lot of customers

21   and they hit the return customer, you know, it

22   really works.

23                   If you have the best tool in the

24   world, unless you're Dyson, how many people can

25   have blow dryers?

181

```
1          Q.    Right.

2                Do you know if Head Kandy tracked

3    how long it took for the average customer to

4    reorder product?

5          A.    No.

6          Q.    Do you have any indication as to

7    how long it would take between intervals when

8    the regular customer base would --

9          A.    No.  What we had was data that

10   showed -- assuming a period of time was your

11   last 12 months -- how much inventory we're

12   sitting on.  Right.

13               So if you had x-number of pieces

14   sold in '22, and it was January, you could say,

15   okay, I'm going to sell the same in '23 or it

16   will grow.  And then obviously as you get stuck

17   with it, you know, the months vary, but that

18   was the projection that we used.  Historicals.

19               And another issue is, we expanded

20   the line tremendously.  I mentioned eyelashes,

21   I mentioned nails.  Cosmetics.  A lot of other

22   things.  Nothing really hit.  You know, we got

23   the customer to buy it, but the reorders were

24   not there.

25         Q.    What time period did the expansion
```

182

1  occur with these additional SKUs?

2          A.   I would say '22.

3          Q.   Beginning?

4          A.   I would say so.  I mean, again,

5  I'm not sure, but it was definitely '22.  I

6  don't know if it was beginning, middle --

7          Q.   Was it while you were involved

8  with the company?

9          A.   Yeah.  Yeah.

10         Q.   Okay.  If we look back at this

11  Exhibit 12.

12         A.   Uh-huh.

13         Q.   Just one number that stands out

14  under "Expense:  The advertising and

15  promotion."

16         A.   Uh-huh.

17         Q.   Looks like it went up

18  significantly for 2019, but then by 2021 it was

19  less than half of that number.

20         A.   Uh-huh.

21         Q.   Do you know what accounts for this

22  advertising and promotion line item?

23         A.   Well, I think we just did a good

24  job to control expenses.  And we were able to

25  sell, spending less.  I would love to see the

COPY

183

1   '22 numbers, but in '22 you had to spend more

2   to sell more.

3          Q.   Why is it that you had to spend

4   more to sell more in '22?

5          A.   Yes, again, I think it was part of

6   the same problem.  No matter the advertising

7   that we made, we couldn't get more customers,

8   you know.  We tried Instagram shopping.  It

9   didn't work.  Other avenues didn't work.

10              And like I said before, we did a

11  lot to grow the business.  You know, I

12  mentioned the meetings that we had with --

13  potentially, there's a report I'm able to get

14  growing the business tremendously, but it

15  didn't work out.

16         Q.   With regard to these various

17  efforts and ideas to grow the business, are

18  there any that Miss McNeill prevented, that you

19  are aware of?

20         A.   Example?

21         Q.   Anything she did to stop it.  So,

22  you know, not attending meetings or sending --

23  you know, not making an effort to say, like,

24  reduce the advertising cost.  Anything that

25  your recall that she did, any initiative or

184

1   idea that somebody had that she intentionally

2   prevented from moving forward?

3           A.   Not specifically.  I think she was

4   resistant to change for anything that would

5   take her out of her comfort zone.

6                So whenever we brought in someone,

7   whether it's a Dan Tarmen or John Rosenbaum or

8   anybody else, it would make her uncomfortable,

9   she would lose control and power.  That's on a

10  decision-making basis.  On business wise, it

11  was only Sally's Beauty, but it was -- she

12  didn't feel it was right with them.

13          Q.   Did she elaborate at all with you

14  as to why she --

15          A.   She just thought that -- I can't

16  recall exactly.  I think she said it was not

17  the right place or fit.  You know, we always

18  wanted Target, that was the ideal destination.

19  Very different than Sally's.

20          Q.   How would you describe Sally's?

21          A.   It's a beaut supply.  You know,

22  it's a great store.  I think it's an older

23  customer.  And there are a lot of very

24  successful brands that sell at Sally's.

25          Q.   Do you know of any reason why

185

1    Target would be good, that you guys always

2    wanted to get Target?  Why would Target be more

3    desirable than, say, Sally's?

4             A.    Image.

5             Q.    Is Sally's like a discount?

6             A.    No, no.  It's just Target is a

7    great image.  And I think she felt at that time

8    that her customers shop at target.

9             Q.    I'm nearly done, so I might jump

10   around a little bit just to, kind of, finish

11   off a couple of topics.  So I apologize.  If

12   you need me to slow down or clarify, just let

13   me know.

14            A.    Yeah.

15            Q.    So going back to the daycare and

16   the tutor expenses.

17                  Do you know if those occurred

18   during COVID?

19            A.    I don't believe they were during

20   COVID.

21            Q.    I believe you said you thought

22   they were in 2022?

23            A.    I think so.

24                  I want to add something.  You

25   said, was there anything that she did to

COPY

186

1    prevent business?

2           Q.   Oh, yes.

3           A.   So after I wasn't there, I think

4    there were a lot of actions taken by her to

5    prevent business.

6           Q.   Okay.  How did you learn of these

7    actions?

8           A.   I mean, I think they're on the

9    Internet.

10          Q.   Okay.

11          A.   All over the web, you know.  And I

12   think her actions have damaged the business

13   tremendously.

14          Q.   Okay.  Are you talking about

15   social media posts?

16          A.   Yeah.

17          Q.   And what makes you think that her

18   social media posts damaged the business?

19          A.   That her social media posts did

20   what?

21          Q.   What makes you think that those

22   social media posts by Kayla damaged the

23   business?

24          A.   Well, I see the sales.  I see

25   disgruntled customers because our customers --

187

1 and we've spoken about it -- she had a very

2 loyal base.

3          So when she goes out and tells a

4 story and says that, you know, she was thrown

5 out of the company and stuff like that, it

6 hurts our business.  You know.

7          So to answer your question, did

8 she do anything to prevent business, yes,

9 tremendously.

10     Q.   And I was talking about the

11 initiatives.  But we can discuss this as well.

12     A.   Yes.

13     Q.   So you said you -- she has a loyal

14 following?

15     A.   Yes, very much.

16     Q.   What else led you to believe that

17 she damaged the business?

18     A.   I mean, information that she put

19 out there making Head Kandy look like, you

20 know, like we treated her wrong, or divulging,

21 in my opinion, more information than she should

22 have to the customers.

23     Q.   Are you aware of any confidential

24 information that Head Kandy has that she

25 provided to third parties?

COPY

188

1          A.    For example?  I don't understand
2     the question.
3          Q.    Are you aware of any confidential
4     information that Head Kandy has?
5               MR. THOMPSON:  Object to the form.
6               THE WITNESS:  No, not really.  I
7          mean, you could argue that our best
8          cues, you know, the suppliers.
9     BY MR. CONVERSE:
10         Q.    Are you aware of Kayla sharing any
11    of that information with third parties?
12         A.    I'm not a hundred percent certain,
13    but I believe so.
14         Q.    What do you think she shared with
15    the customers?
16         A.    I think she showed, you know, the
17    formula that we get from the Third Wheel.  I
18    think she posted something similar, basically
19    saying this is the same formula, in a very
20    deceiving way.  But definitely hurts.  So I
21    will answer the question again.
22               Did she do stuff to prevent
23    business?  Absolutely.
24         Q.    And I was just asking -- initially
25    the question was, did she prevent any of the

COPY

189

1    ideas or initiatives from going forward?

2           A.   Right.

3           Q.   And so now, are you talking about

4    ways that she caused Head Kandy to lose

5    business?

6           A.   Yes.

7           Q.   Okay.  Did her comment about the

8    other product you were just referring to

9    disclose the formula?

10          A.   No.  But it disclosed where to buy

11   it.

12               And I believe that was one of

13   many.  I don't recall many others.  I think

14   that's their job to put together.  But I think

15   there were various other comments that have

16   tremendously hurt the business.  And I think

17   those comments were made mal intentioned.

18          Q.   Well, I'm just trying to

19   understand how you formed your belief.

20          A.   Right.

21          Q.   So with regard to damaging the

22   business, you said she posted, concerning a

23   product similar to Third Wheel.

24          A.   Yes.

25          Q.   Are you aware of any other

190

1    specific instances that Miss McNeill posted

2    something that damaged the business?

3           A.   Like I said, I think there were

4    many others.  I just don't recall right now

5    specific examples, but I'm sure they'll come

6    up.

7           Q.   Are you aware of any trade secrets

8    that Head Kandy has?

9                MR. THOMPSON:  Object to the form.

10                THE WITNESS:  Trade secrets?

11                Do you consider a formula of a

12           product a trade secret?

13    BY MR. CONVERSE:

14           Q.   Anything that you consider a trade

15    secret.

16           A.   I would say product formulas of

17    certain items, yes.

18           Q.   Are you aware of Miss McNeill

19    sharing product formulas with any third

20    parties?

21           A.   No.

22           Q.   Other than posts -- and I know you

23    can only recall one right now, but set those

24    aside.

25                Other than social media posts, are

191

1   you aware of anything else that Miss McNeill

2   did that led you to believe that she hurt Head

3   Kandy's business?

4           A.   I'll answer the same way.  I can't

5   remember the exact examples, but I know there

6   were many of them.  And I know that other

7   people -- they were more involved in the

8   day-to-day business by that time, which I've

9   said before that I was already -- stepped

10   aside.  Remember it perfectly, and will bring

11   it up.

12           Q.   Are you talking about things other

13   than social media posts?

14           A.   I'm talking about social media

15   posts and other things that she might have

16   done.

17           Q.   Okay.  And that's -- so those

18   other people know about it.

19                But what leads you to believe that

20   she damaged the business?  Is that them telling

21   you?

22           A.   Well, you see the sales numbers --

23           Q.   Okay.

24           A.   -- which have dropped

25   dramatically.  And we -- we get feedback from

COPY

192

1   her customers, you know.  The customer base is

2   upset, they're angry, because there was a story

3   portrayed the way she wanted to portray it and

4   it made us look bad.  And I think that was on

5   purpose.

6           Q.   How much of the decrease in the

7   sale numbers do you attribute to Kayla no

8   longer being part of the Head Kandy company?

9           A.   I can't quantify it because you're

10  going to ask me how do I get to that number,

11  and the answer is, I don't know.

12          Q.   Because if you're just looking at

13  the drop in sales, it seems like -- well,

14  strike that.

15               Would you say that typically a

16  drop in sales in a company is attributed to

17  multiple factors?

18          A.   Yes.

19          Q.   And given your testimony about how

20  essential Kayla was to Head Kandy, would it be

21  fair to say that her removal from the company

22  would affect sales negatively?

23          A.   Yes.

24          Q.   And you have no way of quantifying

25  that?

193

1          A.   I can't quantify it.

2               But your question was, did she do

3     any actions to prevent sales?  And the actions

4     were there.

5          Q.   Are you aware of any statements

6     she made online that are untrue?

7          A.   I can't recall the exact

8     statements.

9          Q.   So is your belief that she damaged

10    the company solely based upon the sales numbers

11    and information that you received from third

12    parties?

13         A.   No.  Because I would look back and

14    look for the statement, I can find them.  They

15    are out there.

16         Q.   And you don't recall any of the

17    other statements that you personally viewed

18    that harmed Head Kandy?

19         A.   I know that she went out in public

20    and gave details over the lawsuit, and, you

21    know, again, made us look bad.  And like I

22    said, she has a very loyal customer base.

23              Even if they love the products,

24    they're not going to buy from us because of the

25    story she put out there.

194

```
 1          Q.    But you're not aware of anything
 2    that she said that was false?
 3          A.    I remember seeing a lot of things
 4    that I considered were false, I just can't
 5    recall right now.
 6          Q.    Okay.  And you mentioned the
 7    lawsuit.
 8                Are you aware that Head Kandy
 9    filed the lawsuit against her?
10          A.    Yes.
11          Q.    And to your knowledge, is that a
12    public document?
13          A.    Yes.
14          Q.    Do you know if Miss McNeill made
15    any statements that you consider harmful to
16    Head Kandy before the lawsuit was filed?
17          A.    I can't recall.
18          Q.    What time period are you looking
19    at sales when you say that they decreased and
20    you attribute some component of that to
21    Miss McNeill's conduct?
22          A.    The period where she was, for
23    example, posting stuff about the lawsuit and
24    Head Kandy company.  I'm looking at the
25    transition.
```

195

1          Q.   But you don't know what time

2    period that is?

3          A.   No.

4          Q.   And how would you receive that

5    sales information?

6          A.   Again, I can't quantify.  I cannot

7    say that 33.3 percent was probably because of

8    what she said.

9               What I'm saying is, it dropped and

10   it was intended for it to drop.  That's what

11   she wanted and what she did.

12         Q.   What I was trying to understand

13   is, how did you obtain the information just

14   showing that sales dropped?

15         A.   Because I can go in and ask

16   someone to send me the sales.

17         Q.   Because you still were involved

18   with the company at that time?

19         A.   Right.

20         Q.   Okay.  So you had asked somebody

21   to send you the sales figures?

22         A.   I get a report of the daily sales.

23         Q.   So you have always received a

24   daily sales report?

25         A.   Yes.

196

1          Q.    Okay.  And you also mentioned that

2    she intended to harm Head Kandy sales, right?

3          A.    Uh-huh.

4          Q.    What leads you to believe that she

5    intended to harm Head Kandy sales?

6          A.    The way she spoke and a lot of the

7    information that she put out there.  Which,

8    like I said, you're asking me for clear

9    examples, no, I don't have them, but I'm sure

10   if I can look for them, I will find them.  And

11   other people that will sit here and have them

12   more fresh.

13         Q.    Kayla was still the owner of Head

14   Kandy during this time period, right?

15         A.    I don't exactly know the dates

16   when she was or wasn't an owner.

17         Q.    Did -- do you believe that the

18   decrease in sales also decreased the value of

19   Head Kandy?

20         A.    You're asking me if today, is Head

21   Kandy worth the same as it was?

22         Q.    The decrease in sales that you've

23   been discussing that Miss McNeill contributed

24   to, do you believe that that decreased the

25   overall value of the company?

197

1          A.   Yes.

2          Q.   So if Miss McNeill was an owner at

3     that time, she would have been acting against

4     her financial interest?

5          A.   Correct.

6          Q.   Did you ever hear Kayla praise any

7     Head Kandy products on social media after she

8     was terminated?

9          A.   Not that I'm aware of.

10         Q.   Do you know when she was

11    terminated?

12         A.   I can't recall the dates.

13         Q.   Do you know if she was suspended

14    before she was terminated?

15         A.   I don't remember.

16         Q.   Did you ever see any

17    correspondence from Head Kandy to Kayla

18    concerning breaches of her employment

19    agreement?

20         A.   I can't recall exactly, but I

21    remember seeing something.

22         Q.   Did you approve any of them before

23    they went out?

24         A.   No.

25              (Thereupon, the above-mentioned

198

1            document was marked as Defendant's

2            Exhibit No. 13, for identification.)

3                 THE WITNESS:   What page are we

4            looking for?

5   BY MR. CONVERSE:

6            Q.   We are going to -- so this is

7   Exhibit 13.

8            A.   Yes.

9            Q.   We are going to look at the third

10  page --

11           A.   Uh-huh.

12           Q.   -- which is subparagraph 2(b) of

13  paragraph 6.

14           A.   Uh-huh.

15           Q.   And that paragraph -- I'll give

16  you an opportunity to review it.

17                And it says that Miss McNeill had

18  daily telephonic meetings with you to discuss

19  and plan company operations, staffing, product

20  development, sales, marketing and strategic

21  direction.

22                Do you see that?

23           A.   Yes.

24           Q.   Is that an accurate statement?

25           A.   Yes.

COPY

199

1          Q.   All right.  If you could turn to

2     page 6, paragraph 21.

3               There it states that "Miss McNeill

4     served as the administrator of Head Kandy

5     social media accounts."

6               Do you have any knowledge as to

7     who was the administrator on the social media

8     account?

9          A.   Yes.  It was her.

10         Q.   How do you know that?

11         A.   She decided what was posted and

12    what was not posted.

13         Q.   Do you have any information as to

14    whether or not she was the actual registered

15    administrator?

16         A.   No.  No.

17         Q.   You had mentioned that someone

18    told you that Kayla expressed an interest to

19    leave Head Kandy and take certain employees

20    with her.

21              Do you remember that?

22         A.   Yes.

23         Q.   Do you know who the employees

24    were --

25         A.   No.

COPY

200

1          Q.    -- that she intended to take with

2     her?

3          A.    No.

4          Q.    Are you familiar with a company

5     called White Pineapple or Whippy?

6          A.    Yes.

7          Q.    Do you know what it is?

8          A.    That's her new company now.

9          Q.    So if you could look at page 7 --

10         A.    Uh-huh.

11         Q.    -- of paragraph 27.

12         A.    Yes.

13         Q.    In there it says that White

14    Pineapple was eventually competing with Head

15    Kandy.

16              Do you have any knowledge as to

17    how White Pineapple was competing with Head

18    Kandy?

19         A.    I think that it's a similar

20    business model.  And I think they sell similar

21    products that's not hair care because of the

22    noncompete.  Because if not, it would be an

23    exact copy.  Copy based on -- (inaudible).

24         Q.    During your involvement with Head

25    Kandy's operations, do you know who was in

201

1   charge of customer service?

2           A.    Someone from her team.  She

3   oversee that -- oversaw that.  Sorry.

4           Q.    And was that the entire time you

5   were involved with Head Kandy?

6           A.    Yes.  Customer service was always

7   run from somebody in her team, or -- I don't

8   know what you call it, but people that she

9   worked with.

10          Q.    Somebody in either Colorado or

11  North Carolina?

12          A.    I think she had some remote

13  employees also.

14          Q.    And staying on page 7 of Exhibit

15  13, paragraph 28.

16          A.    Uh-huh.

17          Q.    It speaks about installment

18  payment being due.

19          A.    Uh-huh.

20          Q.    Excuse me.

21                The final installment payment

22  being due.

23                Did you make the final installment

24  payment to Miss McNeill?

25                MR. THOMPSON:  Object to the form.

COPY

202

1              THE WITNESS:  I personally didn't.

2              THE COURT REPORTER:  I personally

3        didn't?

4              THE WITNESS:  No, didn't.

5   BY MR. CONVERSE:

6        Q.   Did you previously pay a portion

7   of the installment payments?

8        A.   Yes.  All of them.

9        Q.   Why didn't you pay a portion of

10  the final installment payment?

11       A.   Because I was tight on cash, so I

12  had Jerome pay it on my behalf.

13       Q.   If you turn to page 8, paragraph

14  29 --

15       A.   Uh-huh.

16       Q.   -- it speaks of individuals

17  assisting Kayla in creating and promoting White

18  Pineapple.

19       A.   Uh-huh.

20       Q.   Are you aware of any activities

21  that individuals did in creating White

22  Pineapple?

23       A.   I'm aware that Ryan Thompson

24  helped her place the first purchase order for

25  White Pineapple.

203

1          Q.   Do you know when that occurred?

2          A.   No.

3          Q.   How do you know that Ryan assisted

4     her?

5          A.   I read it somewhere.

6          Q.   In one of the documents concerning

7     the lawsuit?

8          A.   Yes.

9          Q.   Are you aware of any actions that

10    individuals took to assist Miss McNeill in

11    promoting White Pineapple?

12         A.   Not that I'm aware of.

13         Q.   So on page 10, paragraph 35 --

14         A.   Yes.

15         Q.   -- it talks about Miss McNeill's

16    use of company resources concerning White

17    Pineapple.

18              Are you aware of any Head Kandy

19    resources that Miss McNeill usurped with regard

20    to White Pineapple?

21         A.   Again, I can't point to one

22    specifically.  I was not involved by that

23    point, and like I said, they'd tell me.

24         Q.   Do you know who Andrew Shankerman

25    (phonetic) is?

204

1          A.   Name sounds familiar.  Did he work

2    in the warehouse?  I think he worked in the

3    warehouse.  I'm not sure.

4          Q.   Do you know anything else about

5    him?

6          A.   No.

7          Q.   We talked previously about

8    employees working on holidays.

9               Do you know if Kayla had any set

10   hours she was required to work?

11         A.   I don't.

12         Q.   Do you know if she was required to

13   work during any --

14         A.   Oh, Kayla, set hours?  No.  I

15   don't -- she didn't have set hours she was

16   supposed to work.

17         Q.   Did she have specific times of the

18   day she was required to work?

19         A.   No.

20         Q.   So on page 12, paragraph 41 --

21         A.   Uh-huh.

22         Q.   -- there's an allegation about

23   personal services, and it talks about setting

24   up Christmas decorations at Miss McNeill's

25   home.

205

1             Do you have any knowledge

2    concerning this allegation about Christmas

3    decorations?

4             A.   Can't recall.

5             Q.   Do you know if there were any

6    promotional photo shoots that were conducted in

7    Miss McNeill's home around the Christmas

8    holiday?

9             A.   I think she shot for some Head

10   Kandy products that had a Christmas theme, but

11   that was it.

12            Q.   Are you aware of any forklifts

13   that were utilized by Head Kandy?

14            A.   Yes.

15            Q.   How many forklifts were used by

16   Head Kandy in Colorado, that you're aware of?

17            A.   That I recall, one.  But again, I

18   can't remember if there were more.

19            Q.   Who owned the forklift in

20   Colorado?

21            A.   Kayla.

22            Q.   Did Head Kandy pay to use the

23   forklift in Colorado?

24            A.   Yes.

25            Q.   Was there a set agreement?

COPY

206

1           A.    She would just send an invoice and

2    we would pay her monthly.

3           Q.    Did she discuss that arrangement

4    with you before she began submitting the

5    invoice?

6           A.    Yes.

7           Q.    Did you approve it?

8           A.    At that time we were paying for

9    it, yes.

10           Q.    Are you aware of any forklifts

11   that were used for the North Carolina

12   warehouse?

13           A.    I thought it was the same one.

14           Q.    Do you know if the payments

15   changed between the use for the Colorado

16   warehouse and the use for the North Carolina

17   warehouse?

18           A.    No, not at all.  But it's hers, so

19   she can pick it up.

20           Q.    Do you know if she was forced by

21   Head Kandy to leave the forklift in North

22   Carolina when she was terminated?

23           A.    I don't recall that.

24           Q.    And the use that we were

25   discussing for the forklifts, both in Colorado

COPY

207

1   and North Carolina, were those legitimate

2   business uses, to your knowledge?

3          A.   I don't know because I wasn't

4   there.

5          Q.   Do you know who would know?

6          A.   Only Kayla would know.  Or

7   employees that were at the warehouse.

8          Q.   On page 35 at the bottom,

9   paragraph 122 begins, and then it continues

10  on --

11         A.   122?

12         Q.   Yes.

13              -- continues on to page 36.

14         A.   Uh-huh.

15         Q.   In this Exhibit 13.  And it talks

16  about a number of categories of persons that

17  Kayla allegedly encouraged to reduce or

18  terminate their relationships with Head Kandy.

19              We already spoke about customers

20  and employees.

21              Are you aware of any actions that

22  Kayla took to encourage vendors, suppliers or

23  affiliates to reduce or terminate their

24  relationships with Head Kandy?

25         A.   I can't recall.  I mean, vendors,

COPY

208

1   suppliers.  No.  I don't know.  I really don't

2   know.

3          Q.   So on page 44, paragraph 144, it

4   talks about Miss McNeill causing employees to

5   fail to fulfill orders and respond to customer

6   complaints.

7          Do you see that?

8          A.   Uh-huh, uh-huh.

9          Q.   Do you have any knowledge as to

10  how Miss McNeill caused those things to occur?

11         A.   Like I said, right now I can't

12  recall exactly what she said.  But at that time

13  I saw clearly what was out there and what she

14  was saying.

15         Q.   And are you just referring to the

16  social media posts?

17         A.   Yes.

18         Q.   Do you know if Kayla was eligible

19  to receive bonuses as part of her employment

20  agreement with Head Kandy?

21              MR. THOMPSON:  Object to the form.

22              THE WITNESS:  I believe so.

23  BY MR. CONVERSE:

24         Q.   Do you know if she ever earned a

25  bonus under the terms of her employment

209

1    agreement?

2             MR. THOMPSON:  Object to the form.

3             THE WITNESS:  I think that because

4         of -- I think she earned a bonus while

5         she was a good person for the company.

6         And then knowing what we know today,

7         she didn't get a bonus.

8    BY MR. CONVERSE:

9         Q.   Do you know why she didn't get the

10   bonus when it was earned?

11        A.   I think the breach of contract by

12   an employee.

13        Q.   No.  You're saying that now she

14   didn't get it.  She wasn't paid it.

15             But do you know why it wasn't paid

16   whenever it was earned?

17        A.   I don't know.

18        Q.   We talked a little bit about

19   people doing personal things for Miss McNeill.

20             Did Miss McNeill ever do favors

21   for employees or owners that you witnessed?

22        A.   Like what?  Not that I recall.

23        Q.   Did she ever lend you her car to

24   use?

25        A.   Yes.

COPY

210

1          Q.    Why did she lend you her car?

2          A.    Because I asked for it as a favor.

3          Q.    Did she charge you for it?

4          A.    No.

5          Q.    She just did it as a favor?

6          A.    Yes.

7          Q.    Do you recall why you needed to

8    borrow her car?

9          A.    Because I was going on a trip

10   close to where she lived, and she was out of

11   town.  So I asked her if I could borrow the

12   car.

13         Q.    She was out of town; is that what

14   you said?

15         A.    She was out of town -- yes, she

16   left it at the airport.

17         Q.    Was that a ski trip?

18         A.    Yes.

19         Q.    We also talked about her using

20   employees to allegedly do personal tasks for

21   her.

22         A.    Uh-huh.

23         Q.    Did you have any Head Kandy

24   employees do any personal tasks for you during

25   that trip?

211

1          A.   Not that I recall.  I just went to

2  visit the warehouse.

3          Q.   Was it a ski trip that you were

4  going on?

5          A.   Yes.

6          Q.   Did you have a Head Kandy employee

7  purchase ski school tickets for your kids?

8          A.   Not that I recall.

9          Q.   Do you know someone named Ian

10  Smith?

11          A.   Yes.

12          Q.   Do you know if he went during

13  business hours to purchase ski school tickets

14  for your kids during that trip?

15          A.   I don't believe so.

16               I think I asked at one point if it

17  was possible, but I don't think that happened.

18               THE VIDEOGRAPHER:  The time is

19          5:44 p.m.  We're going off the record.

20               (Thereupon, a short recess was

21          taken.)

22               THE VIDEOGRAPHER:  The time is now

23          5:52 p.m.  We're back on the record.

24  BY MR. CONVERSE:

25          Q.   I wanted to go back and ask you

212

1  about your comments concerning Kayla

2  complaining about the alleged inappropriate

3  conduct by Mr. Rosenbaum.  You had said that

4  she didn't complain or tell anyone.

5          How do you know that she didn't

6  notify anyone of his actions?

7      A.   I don't know that she notified

8  anyone.  I know she didn't notify me or anyone

9  in the company because those allegations we

10 would take very seriously.  And they were never

11 mentioned.

12          If they would have, you know,

13 those allegations are not a joke, so we take

14 that type of behavior very serious, and nobody

15 ever said anything.  Her only comment was John

16 is like a bull in a China shop.

17     Q.   As part of taking it seriously,

18 allegations like that, did Head Kandy establish

19 a process for employees to notify management or

20 ownership of conduct like that?

21     A.   Not that I recall, but I'm not

22 sure.

23     Q.   You had answered a couple of

24 questions right before the break, kind of in

25 that same manner, so I just want to clarify.

213

1          A.    Uh-huh.

2          Q.    When you say you don't recall, is

3    it possible that Head Kandy had any policies or

4    procedures concerning reporting inappropriate

5    sexual conduct by or in the workplace?

6          A.    It's a question that I would have

7    to ask Raissa.

8          Q.    Okay.  And then -- oh, with regard

9    to Ian Smith, right before the break you said

10   you don't recall if you had him do something

11   for you.

12               Is that -- does that mean that

13   it's possible that you did have him acquire

14   tickets for you?

15         A.    It was not really acquiring

16   tickets.  It was going and standing in a line

17   for somebody, my group, that was getting there

18   to buy tickets.  It's first come, first serve.

19               I have to check, but I believe at

20   the end he wasn't asked.  I didn't ask him to

21   do that favor.  I'm not sure.  I might have,

22   but I'm not certain that that happened.

23         Q.    So that's a lot of details that

24   you have coming out of the break.

25               Is there anything that you

COPY

214

1    reviewed to now recall all of those details?

2          A.    No.

3          Q.    Is there anybody that you spoke

4    with to recall those details?

5          A.    No.

6          Q.    They just came to you during the

7    break?

8          A.    Uh-huh.

9                MR. CONVERSE:  All right.  I don't

10           have anything else.

11               MR. THOMPSON:  I have no

12           questions.

13               MR. CONVERSE:  Thank you.

14           You are done.

15               THE WITNESS:  Thank you very much.

16               THE VIDEOGRAPHER:  That concludes

17           today's testimony.  The time is now

18           5:56 p.m. and we're going off the

19           record.

20               (Thereupon, the deposition was

21           concluded at 5:56 p.m., and the

22           formalities or reading and signing were

23           not waived.)

24

25

COPY

215

1                   CERTIFICATE OF SHORTHAND REPORTER

2

3   STATE OF FLORIDA

4   COUNTY OF MIAMI-DADE

5

6        I, the undersigned authority hereby certify that

7   the foregoing transcript, pages 1 through 214 are a true

8   and correct transcription of the deposition of Bryan

9   Feldman, taken before me at the time and place stated in

10   the caption hereof.

11        I further certify that the said witness was duly

12   sworn according to law.

13        I further certify that I am not of counsel to either

14   of the parties to said cause or otherwise interested in

15   the event thereof.

16        IN WITNESS WHEREOF, I hereunto set my hand and

17   affix my official seal of office this 3rd day of

18   September, 2024.

19

20   _____

21   Julio A. Mocega, Shorthand Reporter

22   Notary Public, State of Florida

23   Commission Expires: 6-29-2026

24   Commission No.: HH 235349

25

COPY

216

1                    CERTIFICATE OF OATH

2

3   STATE OF FLORIDA

4   COUNTY OF MIAMI-DADE

5

6       I, the undersigned authority, certify that Bryan

7   Feldman personally appeared before me and was duly sworn.

8       WITNESS my hand and official seal this 3rd day of

9   September, 2024.

10

11

12

13   _____

14       Julio A. Mocega, Shorthand Reporter

15       Notary Public, State of Florida

16       Commission Expires: 6-29-2026

17       Commission No.: HH 235349

18

19

20

21

22

23

24

25

**A**

**a.m** 1:13 4:6 58:7
58:11 136:6
**able** 36:21 65:24
66:7,15 90:10
123:16 137:16
138:17 140:12
170:22 171:8
171:15 182:24
183:13
**above-mention...**
104:12 128:25
137:9 139:8
140:18 142:2
146:20 156:11
167:7 168:15
170:1 197:25
**Absolutely** 128:8
188:23
**acceptance** 75:2
**accepted** 74:22
**access** 52:20 53:2
102:12
**account** 22:19
23:4 40:2,4,6,7
40:13,18,21
43:5,6,6,8
99:11 100:3,7
100:13 102:14
134:19,21,25
137:17 139:7
146:7 152:8,12
152:19 153:8
153:11,11
154:2,5,9 199:8
**accounting**
151:16,19
**accounts** 22:23
56:20 72:11
182:21 199:5
**accurate** 149:2
149:10 177:3
198:24
**accurately** 61:7
**achieve** 66:6

123:14,16
**acknowledge**
148:11
**acknowledged**
74:20,23
**acquire** 8:2 29:24
213:13
**acquired** 7:15,20
7:22 8:8,15,23
18:25 23:25
24:6 40:14
89:22 97:24
101:4
**acquiring** 213:15
**acquisition** 40:11
42:17 55:14,18
62:24 63:4
101:4 114:16
176:20
**acting** 197:3
**action** 1:3 105:11
157:20
**actions** 64:11
76:7 145:23
186:4,7,12
193:3,3 203:9
207:21 212:6
**activities** 17:11
18:22 38:14,21
48:3 60:21
202:20
**activity** 36:15,18
53:21
**actual** 6:19 21:23
96:13 199:14
**ad** 39:6 60:13
66:22,24
**Adam** 84:12
**add** 78:4 180:9
185:24
**adding** 44:13,18
**addition** 180:10
**additional** 13:12
140:5 182:1
**address** 125:17

125:18
**adds** 34:18
**adequate** 144:3,4
**administrator**
199:4,7,15
**adopted** 157:7
**ads** 38:24 39:5,12
39:15,21 40:25
41:4,23 42:7
61:6,20
**advantageous**
28:8
**advertising** 41:13
182:14,22
183:6,24
**affect** 192:22
**affiliate** 41:24
**affiliates** 41:14
41:18 207:23
**affix** 215:17
**age** 163:17
**ago** 5:16 76:18,20
112:19 160:13
**agree** 144:2
154:19 155:5
155:12
**agreed** 76:10
**agreement** 16:9
90:11 179:5
197:19 205:25
208:20 209:1
**ahead** 24:24
59:10 70:23
169:2
**airport** 210:16
**allegation** 204:22
205:2
**allegations**
158:11,14,17
158:21 159:19
160:3 161:6,11
162:4,11 212:9
212:13,18
**alleged** 158:25
212:2

**allegedly** 207:17
210:20
**allowed** 72:9
**alteration** 164:20
**Alyssa** 117:5,6
**amazing** 90:3
**Amazon** 145:1,2
**Amex** 98:6 99:20
100:8,10
102:11,12,16
104:21 105:1
148:11,18
150:4,13,20
151:15 152:6
153:10,13,24
**amount** 23:10
55:1 66:5 79:1
98:13 153:11
**amounts** 150:14
151:16
**analyzed** 27:2
**Andrew** 203:24
**ANGELOS** 2:15
**angry** 192:2
**annotations**
140:12
**answer** 5:23
10:20 14:25
24:24 50:16
127:11 139:2
187:7 188:21
191:4 192:11
**answered** 212:23
**answers** 164:24
165:12
**Anthony** 4:24
57:24 73:8
147:19
**Antonio** 2:7
**anybody** 32:19
32:22 56:7
82:23 101:23
105:5 127:4
160:2 162:13
162:18 184:8

214:3
**anymore** 131:23
**apologize** 141:25
142:25 185:11
**appearance**
159:20,25
**APPEARANC...**
2:1
**appeared** 216:7
**approach** 116:10
**approval** 28:19
47:14,23,25
50:13 59:8
101:22
**approve** 156:22
156:25 169:17
169:24 197:22
206:7
**approved** 169:23
**approximately**
31:17 32:4,5,7
125:1
**April** 139:13
141:14 153:12
153:13
**areas** 7:6 18:19
**argue** 188:7
**arranged** 126:21
**arrangement**
206:3
**aside** 49:15 78:15
82:10 190:24
191:10
**asked** 11:3,5
12:25 13:11
24:3 35:24 47:8
52:7 68:23
72:21 83:18,22
88:1,6,8 89:9
89:12 97:4
113:10 119:8
122:4 135:7
145:17,20
162:14 169:19
195:20 210:2

210:11 211:16
213:20
**asking** 127:6,8
136:20 140:10
144:13 188:24
196:8,20
**assets** 8:3,5,7
24:7
**assist** 33:12 34:16
89:9,12 203:10
**assisted** 203:3
**assisting** 202:17
**associated** 41:2
**assortment** 48:8
179:18
**assume** 150:21
150:23
**assuming** 150:25
181:10
**attachment**
175:7
**attachments**
149:22
**attempt** 88:22
**attend** 127:2
**attending** 183:22
**attention** 80:13
80:15 129:9
135:24 147:13
170:12
**attorney** 105:23
147:5 148:11
**attorneys** 4:13
105:10,21
**attract** 34:23
38:20 66:7
**attribute** 192:7
194:20
**attributed**
192:16
**audit** 66:11,14
148:3
**auditor** 70:4,6,10
**August** 174:22
**authority** 47:5,12

47:19 50:10
56:8 59:4,12,14
101:12,18
102:14,19
105:9 106:12
106:15,20
121:18,23
169:17 215:6
216:6
**authorize** 102:8
102:20
**authorized**
106:23 107:8
169:23
**authorizing**
173:3
**autonomy** 49:21
**available** 63:2
**avenues** 183:9
**average** 181:3
**aware** 26:3 30:23
59:6 62:25
64:11,15 71:10
84:16 85:1,4,8
85:11,13,18
89:7 92:22
106:21,22
107:6 109:22
112:24 121:21
124:25 125:4
126:17,20
130:20 136:15
148:10 151:19
153:17 157:6,8
157:19,22
158:11,13,14
158:17,20
159:4,8,19
162:12,17,18
162:23 163:15
164:10 165:15
169:22,25
183:19 187:23
188:3,10
189:25 190:7

190:18 191:1
193:5 194:1,8
197:9 202:20
202:23 203:9
203:12,18
205:12,16
206:10 207:21

---

**B**

**B** 3:6
**back** 20:19 38:1
49:4 53:5 58:11
58:13 59:9 63:6
73:18,20 74:21
76:12,13,14
90:15 94:16
96:18 98:17
102:1 104:9
106:25 111:25
116:10 123:2
128:15 135:24
166:21,23
182:10 185:15
193:13 211:23
211:25
**backed** 146:7
**background**
143:8
**backup** 96:18
102:24 103:7
**bad** 164:25 165:5
165:10 192:4
193:21
**balance** 154:10
155:6,7 178:3
**bank** 22:19,22
30:3 72:10
152:12,19,22
152:25 153:2
153:11
**bankers** 86:17
**Banks** 113:22
**BARTLETT**
2:15
**base** 55:10,12

62:17,19
178:14,25
181:8 187:2
192:1 193:22
**based** 13:23
123:7,9 142:7
144:1 171:9,16
193:10 200:23
**bashed** 165:19
**basically** 8:23
10:18 93:9
111:23 119:8
188:18
**basis** 184:10
**Bates** 129:7
**beaut** 184:21
**Beauty** 90:17
184:11
**began** 149:5
155:14,19
206:4
**begging** 92:10
**beginning** 21:11
138:4 176:2
182:3,6
**begins** 129:16
207:9
**behalf** 2:2,8,14
4:23 38:15
47:20 105:11
162:13,19
202:12
**behavior** 124:8
124:10 131:13
131:16,20
212:14
**belief** 131:10
165:22 189:19
193:9
**believe** 10:3,11
14:2 20:10 28:7
28:12 31:2 34:6
35:4 41:7 44:18
46:11 48:11,14
48:22 49:19

53:8,18 54:5,12
55:7 56:21 62:6
63:15,19,25
65:15 68:12,23
69:13,25 70:11
76:9,12,17,25
79:6 80:4 83:19
83:21,22 87:13
87:15,16 88:21
101:7 112:10
122:8,11 134:1
137:8 139:20
149:1,22 150:2
153:1 158:15
160:6 161:8,10
162:4 163:2
166:25 185:19
185:21 187:16
188:13 189:12
191:2,19 196:4
196:17,24
208:22 211:15
213:19
**believed** 161:6
**beneficial** 27:13
55:8 116:5,7
**benefit** 39:13,16
**benefits** 116:20
**Bernstein** 84:9
**best** 27:3,4,6
28:13 51:9
87:24 90:19
114:5 131:8
132:3,6 180:8
180:23 188:7
**betrayed** 82:12
**better** 21:14
43:10,16 53:12
87:7 91:3
115:22 123:13
125:18
**big** 111:20 142:1
**biggest** 38:25
89:25 90:12
**bill** 150:13 152:6

**billing** 138:14
**bills** 150:4,20
  151:15
**bit** 101:8 185:10
  209:18
**Blake** 119:5
**bleed** 18:2
**blindly** 51:7
  82:12
**blow** 180:25
**board** 33:4 35:20
  36:10 46:25
  51:1,19,23 63:2
**Boling** 115:8
**bonus** 208:25
  209:4,7,10
**bonuses** 208:19
**boost** 55:5,6 56:5
  56:8 61:20
**boosting** 55:18
  56:1 57:12
  58:16 60:13
  67:11 173:6,8
**boosts** 61:6
**borrow** 210:8,11
**boss** 131:23,24
**bottom** 66:17
  138:7 174:4
  177:11 207:8
**bought** 95:10
  178:16
**Boutique** 110:13
  110:16
**boys** 169:10
**BR** 119:6
**brand** 90:19
  91:10 92:13
  112:24
**brands** 83:14
  88:17 91:15
  115:19 184:24
**Brandy** 67:14
  68:5,14,17
  115:1 133:7
**breach** 209:11

**breaches** 197:18
**break** 58:1,13
  73:10,21 128:7
  166:14 212:24
  213:9,24 214:7
**bring** 11:15
  80:13 191:10
**bringing** 11:8
  47:16
**brother** 93:5,10
**brothers** 94:23
  95:5 98:23
**brought** 10:7,17
  35:6 46:1,7,19
  46:21 51:1 63:1
  67:21 80:14
  83:13 103:9
  115:18,20
  184:6
**Bryan** 1:18 3:3
  4:7 5:9 50:15
  215:8 216:6
**budgets** 7:19
**building** 29:10,12
  29:14,16,21,24
  30:2
**bull** 212:16
**Burgess** 2:9,13
  4:25
**Buro** 1:14
**business** 7:4,6,16
  7:18,21,21 8:9
  8:20,22 11:16
  11:25 13:25
  17:18,20,22
  18:25 24:11
  36:24 37:4,15
  38:25 40:7,18
  40:21 52:2
  53:14 55:9 62:9
  62:14 64:7
  82:18 87:20,23
  89:21,22 91:3,7
  94:10 97:6
  101:19 138:18

138:24 139:3
  141:23 144:6
  144:15,22,25
  156:4 167:19
  168:25 172:12
  177:6 178:5
  179:1,4 180:18
  183:11,14,17
  184:10 186:1,5
  186:12,18,23
  187:6,8,17
  188:23 189:5
  189:16,22
  190:2 191:3,8
  191:20 200:20
  207:2 211:13
**businesses** 17:24
  18:3
**buy** 34:18 178:7
  179:9 181:23
  189:10 193:24
  213:18

──────────
          **C**
**C-A-G-R-I** 114:3
**Cagray** 114:1,2
**call** 73:9 87:3
  92:7 100:18
  105:22 136:21
  201:8
**called** 5:10
  100:10 110:12
  112:25 167:18
  200:5
**calling** 102:17
**calls** 44:6 122:22
**camera** 4:10
**Candy** 14:10,12
  14:16,20 15:8
  88:5,7,18,20,23
  89:5,10,13
**capabilities**
  163:17
**capacity** 12:16
  20:2,5

**caption** 215:10
**car** 209:23 210:1
  210:8,12
**card** 80:2,4,10
  84:19 92:20,21
  92:25 93:1,2,4
  93:5,18,19 94:6
  94:8,11 95:6,19
  96:6,11,16 97:1
  97:13,16 98:11
  98:12 99:6,8,10
  99:12 100:4,5
  102:16,17,21
  123:24 137:19
  148:3,7,12,18
  148:21 149:5
  154:20,20
  155:14,19,24
  156:3,5,6
**cards** 72:10
  92:18,18 93:7
  93:20 96:2
  98:22,25
  101:12 102:6
**care** 88:5,7,20,23
  89:6,10,13 90:1
  91:13 200:21
**caring** 63:24
**Carolina** 28:15
  28:21,24 29:9
  30:10,18 31:12
  31:15,22 32:2
  106:17 112:2
  122:10,23,25
  201:11 206:11
  206:16,22
  207:1
**Carson** 2:24 4:20
**Casale** 114:12
**case** 1:23 120:24
**cash** 17:9 22:17
  22:18,19 37:9
  93:6,8 94:1
  179:21 202:11
**catch** 15:6

**categories** 61:15
  173:13 207:16
**category** 69:12
  154:9
**cause** 54:20
  123:25 215:14
**caused** 53:8
  73:24 172:7
  177:5 189:4
  208:10
**causing** 208:4
**ceased** 48:21
**Central** 1:14
**certain** 10:14
  18:6 67:15 72:9
  74:8,21 83:20
  87:17,17
  100:14 109:6
  161:21 188:12
  190:17 199:19
  213:22
**CERTIFICATE**
  215:1 216:1
**certify** 215:6,11
  215:13 216:6
**challenge** 133:9
  179:6
**challenging**
  131:25
**chance** 80:17
  142:12,15
**change** 10:6,17
  23:24 26:18,22
  27:25 86:22
  87:2 184:4
**changed** 9:24
  36:9 65:13,20
  66:21 86:20,21
  86:23 87:7,10
  206:15
**changer** 122:14
  123:7
**changes** 7:16
  90:25 152:2
**charge** 32:9,11

34:10 45:9
49:11 53:24
154:13 163:12
201:1 210:3
**charged** 72:3
83:6 122:6
154:16,20
155:6
**charges** 93:17,18
93:19 95:19
138:11 139:20
144:24 148:3
154:11
**check** 77:25 78:5
96:19 103:3
213:19
**checked** 102:23
102:24
**chief** 176:17
**China** 212:16
**chose** 104:25
**Christmas**
204:24 205:2,7
205:10
**circle** 141:8,9,15
**CIVIL** 1:3
**claimed** 158:16
**clarify** 164:9
185:12 212:25
**clean** 145:12
**cleaned** 145:15
**clear** 36:7 110:2
132:7 196:8
**clearly** 208:13
**clerical** 114:17
**client** 148:22
**close** 210:10
**closed** 9:4,5
**closely** 27:21
**closing** 9:3
137:24,25
153:25
**clothing** 110:23
**co-work** 46:2
**code** 121:6,8,9,13

**codes** 121:4,16
121:19,22
122:1
**coffee** 112:24,25
**Colin** 4:17
**Collin** 2:19
**Colorado** 20:13
20:19 22:11
27:9,13 28:24
30:10,17 31:11
31:19 32:1,11
45:10 49:6,8,13
49:18 50:11
106:11 111:24
112:1 122:19
122:20 152:23
153:8 201:10
205:16,20,23
206:15,25
**column** 154:9
**columns** 176:11
**combination**
71:22 105:16
**come** 46:25 90:10
172:18 179:19
180:6 190:5
213:18
**comes** 109:11
**comfort** 184:5
**comfortable** 28:2
50:12 172:17
**coming** 73:9
213:24
**comment** 165:6
189:7 212:15
**comments** 159:20
163:15 164:16
164:25 165:10
165:16,23,24
166:2,9 189:15
189:17 212:1
**Commission**
215:23,24
216:16,17
**communicate**

134:9,11,20
146:13
**communications**
135:8,10 145:5
**companies** 34:9
34:14 35:1 38:7
38:11 56:17,19
111:20
**company** 6:19,22
6:25 7:3,22
14:5 16:6 29:15
29:19 31:15
32:2,6,8 36:9
36:14,17,18
38:6 42:24
43:11,11 44:4,6
44:12,18,23
51:7,10,12,22
52:5 54:2,10
56:21,25 57:3,5
57:7,9,11,16,19
57:20 58:23
59:2,20 62:10
66:11 69:20,23
71:13,14,20,24
72:4 75:11
76:12 79:19
87:12 88:1 90:3
92:17,19,24,24
92:25 107:20
107:22 113:7
119:7 125:22
126:12 132:4,6
132:10,24
149:5 155:14
155:19 157:7
157:19 163:3
182:8 187:5
192:8,16,21
193:10 194:24
195:18 196:25
198:19 200:4,8
203:16 209:5
212:9
**company's** 34:17

43:19 52:15
98:12
**compare** 141:12
**comparing**
176:14
**compensated**
16:11 18:10
46:9 114:25
**compensation**
69:6
**competing**
200:14,17
**complain** 212:4
**complaining**
212:2
**complaint** 142:9
**complaints** 208:6
**completely** 53:6
63:9
**component**
194:20
**Composite** 129:2
142:4
**comprised** 61:19
**concern** 73:24
176:19 177:5
**concerned** 60:17
71:16 125:21
167:18 172:11
**concerning** 26:1
26:12 48:4 75:2
75:5 82:6,15
105:25 120:2
135:10 159:20
160:3 162:5,10
162:15 164:18
189:22 197:18
203:6,16 205:2
212:1 213:4
**concerns** 60:12
60:20,23 69:11
82:4 158:8
176:17 179:4
**concluded** 214:21
**concludes** 176:8

214:16
**conditioners** 87:4
**conditions**
179:15
**conduct** 72:22
133:3 158:12
158:18,25
160:4 161:12
161:16 162:6
162:16 171:25
172:22 194:21
212:3,20 213:5
**conducted** 205:6
**confidential**
187:23 188:3
**confirm** 9:2
99:21
**confirmed** 75:18
**confronted** 76:9
**confused** 68:1
**Conroy** 113:24
**consider** 65:5
190:11,14
194:15
**considered** 131:7
194:4
**consistent** 37:15
**constantly** 7:17
**constitute** 158:25
**consultant**
115:17
**Consulting** 119:6
**content** 164:11
164:14,15,20
**contents** 120:2
**context** 14:8
144:11
**continues** 129:23
207:9,13
**contract** 108:7
209:11
**contractor** 16:2,5
58:21 84:23
**contractors**
107:4,7,10,13

contradicts
155:13
contributed
196:23
control 111:18
127:18,19
129:6 182:24
184:9
controlled 36:21
controlling 36:23
conversation
11:13 12:23
13:10 44:1
103:13 106:3
110:25 127:23
133:21,23
160:7
conversations
11:7 13:24
14:23 81:3,4
88:24,25 89:5
106:1 127:12
128:4 132:18
132:23 133:3
133:11,15,16
134:2,6 157:3
Converse 2:3,7
3:4 4:23,24
5:14 8:1 18:18
22:7 24:22 25:5
37:20 39:19
42:5,9 48:16
58:2,5,12 63:13
67:9 73:11,19
77:7 78:2,7,11
79:17,23 81:19
81:21,22 99:4
100:19,24
103:22,25
104:10,17
105:14 108:6
114:3,7 116:25
117:24 118:8
118:10,11
120:18,22

121:14 124:4
124:20 128:8
128:16 129:4
130:12 135:6
137:15 139:12
140:21 141:25
142:6 143:19
146:23 148:16
151:4,24 155:1
155:11,25
156:15 164:6
166:13,22
167:10 168:19
169:13 170:4
172:6 173:21
174:9,12 188:9
190:13 198:5
202:5 208:23
209:8 211:24
214:9,13
coordinate 22:8
22:10 24:13
coordinated
21:12
coordinating
21:17,22 22:14
24:18
copied 175:5
copies 94:25
137:14
copy 91:24
150:25 200:23
200:23
core 87:19,22
corner 129:5
138:5 139:14
correct 6:12
15:13 18:8
20:12 27:9
34:22 60:14,23
62:2 68:4 69:14
92:3 95:4 99:7
111:13 112:7
126:12,13
144:16 149:13

150:12 154:18
160:15 167:1
175:25 197:5
215:8
correctly 16:7
correlate 55:17
correlation 55:21
correspondence
25:7 197:17
cosmetic 11:24
12:2
Cosmetics 14:10
14:13,16 15:9
181:21
cost 55:17 56:1
90:4 93:9
175:18 176:6
177:18 183:24
counsel 137:1
153:19 215:13
count 179:8
counted 26:15
country 90:1
COUNTY 215:4
216:4
couple 14:11
32:24 44:6
93:25 115:18
125:16 136:20
160:20,22
171:18 185:11
212:23
course 89:18
94:21 96:20
court 1:1 4:11,15
5:4 7:24 18:14
22:4 77:21
114:2 117:20
117:23 118:7,9
120:17 121:7
135:2 143:16
202:2
cousin 107:1,1
cover 153:24
covered 76:23

COVID 185:18
185:20
create 43:5
121:23
created 88:16
121:22
creating 202:17
202:21
credit 72:10 80:2
80:4,10 84:19
92:18,18,20,21
92:25 93:1,2,4
93:5,6 94:6,8
94:11 96:2,15
97:1,12,16
98:25 99:10
101:12 102:6
102:21 148:3
149:5 155:14
155:19,23
156:3,5,6
credited 153:13
cues 188:8
Culp 20:19,23
112:8
currently 5:19
9:8 10:4 16:14
customer 55:12
55:14,18 62:17
62:19,23 63:4
176:19 178:14
178:25 180:21
181:3,8,23
184:23 192:1
193:22 201:1,6
208:5
customers 38:20
55:22 62:20,21
62:22 66:7
178:6,15,17
179:7,9,14
180:5,20,20
183:7 185:8
186:25,25
187:22 188:15

192:1 207:19
cut 52:12,12
63:11 70:21
96:19 119:11
cycle 138:14

_____

D

D 3:1
d/b/a 152:16
daily 195:22,24
198:18
damaged 186:12
186:18,22
187:17 190:2
191:20 193:9
damaging 189:21
Damian 120:7
Dan 115:14,16,17
171:5,19 184:7
data 23:15 62:25
63:8 181:9
date 4:5 9:3
42:15 45:5
137:24,25
149:9 153:25
dated 156:20
dates 28:22
163:22 170:20
170:23 171:4
196:15 197:12
day 122:22
204:18 215:17
216:8
day-to-day 36:15
36:18 44:7 52:1
191:8
daycare 69:20,21
74:4 75:19 81:5
81:8,12 185:15
DaySmith 112:25
deal 90:14
dealing 105:21
dealings 82:18
dealt 19:2 44:5,6
67:20 87:1

109:7,9,17,19
109:20
**Debra** 114:12,16
114:20
**debt** 37:13 101:5
**deceiving** 188:20
**December** 126:18
129:17 130:8
**decided** 26:16
27:12 28:14,16
52:12 56:9 60:3
150:3 199:11
**deciding** 67:16
**decision** 28:7,9
28:17 29:5,10
29:23 46:24
50:5 55:11 56:4
56:22 57:6
59:13,15 60:6,8
63:10 116:2
**decision-making**
10:24 184:10
**decisions** 47:23
50:4,10 105:25
111:22 131:25
**declaration**
170:10
**decorations**
204:24 205:3
**decrease** 64:12
64:18,20,23
192:6 196:18
196:22
**decreased** 194:19
196:18,24
**decreases** 65:5
**decreasing**
122:11
**dedication**
132:10
**deep** 51:5 52:4
**deeply** 51:12
**DEFENDANT**
2:2,8
**Defendant's** 3:8

3:9,10,11,12,13
3:14,15,16,17
3:18,19,20
129:1 137:10
139:9 140:19
142:3 146:21
156:12 167:8
168:16 170:2
173:18 198:1
**Defendants** 1:9
**deferred** 116:13
**define** 36:11,13
**definite** 127:10
**definitely** 119:2
122:14 144:25
182:5 188:20
**definitive** 72:2
**delete** 145:6,9
146:11,12,14
**deleted** 145:25
146:4 165:1,23
**deleting** 165:16
**delivering** 60:4
61:23 62:6
**Denver** 2:6
**department**
111:5
**dependency**
172:10
**deposition** 1:18
1:23 4:7,19
128:18 135:24
146:17 166:24
168:9 214:20
215:8
**depositions**
120:24 121:1
**depth** 142:18
**describe** 7:13
51:11 52:3
184:20
**described** 123:25
**description** 49:4
62:11
**designed** 32:16

**desirable** 185:3
**destination**
184:18
**detail** 69:24
126:2 138:10
150:14
**details** 53:7 70:19
71:17 76:8
151:16 193:20
213:23 214:1,4
**determination**
66:4,16,24 67:5
**determinations**
27:12 72:2
**determine** 22:15
22:19 23:9
25:14 56:8
62:15 63:3
65:24 76:19
86:12 101:19
137:16 138:17
138:22,23
140:6,12
141:22 144:5
144:21 152:24
170:22 171:8
171:15
**determined** 62:5
**develop** 33:17
34:20 88:1,9,10
171:21
**developing** 33:20
33:21 49:2
**development**
32:10,14,19,21
33:13 46:3,12
48:5,6 49:16
54:1,7 198:20
**Diaz** 18:13
**difference** 155:3
**different** 7:6
164:15 177:2
184:19
**difficult** 91:13
122:16

**Digital** 119:6
**direct** 5:13 129:8
135:23 147:13
170:12 175:8
**Direct-to-cons...**
115:24
**direction** 34:11
56:23 90:20
106:6 125:22
167:19 198:21
**directly** 75:8 84:1
85:7 87:1 90:22
91:23 96:10,15
148:21
**disagreeing**
44:16
**disclose** 189:9
**disclosed** 189:10
**discontent** 133:7
**discount** 121:4,6
121:8,9,12,16
121:19,21
122:1 185:5
**discover** 80:12
**discovered** 61:10
63:1 74:19
**discrepancy**
162:2
**discuss** 167:17
187:11 198:18
206:3
**discussed** 11:14
23:23 53:22
69:9 113:13
130:8 136:10
147:22
**discussing** 13:10
196:23 206:25
**discussion** 119:25
**discussions** 82:23
112:11 136:23
**disgruntled**
186:25
**disrespectfully**
166:2

**DISTRICT** 1:1,2
**divulging** 187:20
**Dixie** 2:10
**document** 79:19
128:22 129:6
137:10 139:9
140:19,25
146:21 156:12
157:9,11 158:4
167:8 168:16
170:2,7 174:14
177:24 194:12
198:1
**documentation**
94:20 153:18
**documented** 25:2
78:17 80:1
83:10
**documents** 95:1
95:18 129:1
140:23 142:3
173:18 203:6
**doing** 6:19 7:14
24:11 33:22
36:22 43:2,3
52:7 55:8 59:10
66:19 76:1 88:5
110:4,5 114:16
114:17 115:21
120:10 133:9
159:16 178:19
209:19
**dollar** 169:20
179:12 180:8
**dollars** 90:5
**domain** 134:22
**double** 78:5
**doubt** 41:3 95:2
**draft** 71:7
**dramatic** 123:10
**dramatically**
191:25
**driver** 38:25
**driving** 64:8
**drop** 192:13,16

195:10
**dropped** 191:24
195:9,14
**drove** 38:22
**dryers** 180:25
**DTC** 115:19,23
**due** 151:16 155:8
165:23 201:18
201:22
**duly** 5:11 215:11
216:7
**Dusty** 49:20
167:3,24
**Dyson** 180:24

**E**

**E** 2:13 3:1,6
**e-mail** 91:12,21
91:22 95:22
134:16,19
146:25 147:14
149:21,22
150:6,24
151:13 157:10
174:21 175:1
**e-mailing** 150:19
**e-mails** 92:12
146:14,15
170:24 171:10
171:16
**earlier** 77:3
**early** 95:2
**earned** 97:21
98:25 208:24
209:4,10,16
**easy** 95:8,16
**Ecomm** 109:13
119:10
**Eddie** 113:22
**effective** 123:6
**effort** 89:21
183:23
**efforts** 89:1,16,19
183:17
**either** 63:3 71:3

71:23 92:11
94:22 151:1
201:10 215:13
**elaborate** 184:13
**electronic** 95:19
**eligible** 208:18
**emphasizing**
178:14
**employed** 19:20
36:2 48:20
68:20
**employee** 15:24
15:25 17:14,17
17:21 21:1 34:4
46:7,9 58:18
68:6,25 84:20
89:8 106:22
114:23 117:6
118:4,18
120:14 132:14
161:18 209:12
211:6
**employees** 19:11
31:10,14 35:3
49:14 71:12,24
74:7,10,13 75:4
75:18 81:13
82:2 106:13,16
106:20 121:10
122:16 132:12
132:14,17,24
133:1 161:3
162:14 163:20
172:14 199:19
199:23 201:13
204:8 207:7,20
208:4 209:21
210:20,24
212:19
**employees'**
159:24
**employer** 160:14
**employing** 18:6
**employment**
197:18 208:19

208:25
**employs** 17:23
19:21
**encourage**
207:22
**encouraged**
207:17
**ended** 61:24
92:16,16 93:3
98:10 110:4
111:3 114:17
**engaged** 38:14
72:25 73:5
108:16,19,22
114:20 131:14
131:20 133:4
159:5 162:25
163:6 169:11
**engaging** 161:2
**enormous** 98:13
**entire** 37:15
41:20 119:16
201:4
**entity** 84:17 85:2
85:15
**entry** 141:14
**enumerated**
129:21,22,25
**erase** 165:6
**Esq** 2:7,13,19,21
**essential** 192:20
**essentially** 34:23
49:17
**establish** 212:18
**established** 105:3
105:6
**etcetera** 87:4
**Ethan** 2:21 4:21
**event** 215:15
**eventually**
179:20 200:14
**everybody** 131:8
167:25
**evolved** 33:19
**exact** 12:6,14

31:13,16,24
32:3 35:13
42:15 59:22
71:5 79:1 91:16
93:14 136:18
137:13 149:8
158:3 191:5
193:7 200:23
**exactly** 18:6 30:8
33:12 36:11
39:11 47:1
51:24 65:14
134:8 139:3
151:10 163:21
169:16 171:23
180:13 184:16
196:15 197:20
208:12
**EXAMINATI...**
5:13
**examined** 5:11
**example** 183:20
188:1 194:23
**examples** 190:5
191:5 196:9
**Excel** 94:17
**excerpt** 151:6
152:6
**exchange** 135:18
167:3 168:11
**exchanged**
167:15
**excluded** 163:25
**excuse** 59:20
201:20
**execute** 170:9
**executed** 56:3
**exercise** 76:15
**exhibit** 3:8,9,10
3:11,12,13,14
3:15,16,17,18
3:19,20 128:18
129:2 135:24
137:4,7,11
139:5,10

140:15,20
141:1,4,13,14
141:19 142:1,4
142:9 146:18
146:22 149:20
151:5 152:1
153:22 156:10
156:13 166:24
167:9 168:9,17
170:3,5 173:19
174:4,5,13,20
176:2 177:24
182:11 198:2,7
201:14 207:15
**exhibits** 144:2
173:22 176:16
**existence** 9:12
**existing** 179:8,13
**expand** 178:21
178:25
**expanded** 181:19
**expansion** 181:25
**expense** 41:1
62:1 79:13
80:21 94:11,18
96:17 103:10
139:4 144:23
145:1,3 148:22
151:2,6,8,11
152:1 173:6,13
182:14
**expenses** 36:20
36:23 40:23,24
41:7,10 52:9,12
52:12,15 53:15
53:25 54:2,5,10
54:13,19,22,25
55:1,3 58:15
60:11,16 61:2,3
61:10,11,11,14
61:15,16,18
63:15,17 64:12
64:18,21,24
65:1,4,8,17,19
65:25 69:10,13

69:17,18 70:2
71:10,11,18
72:3 73:7,23
74:4,18,19 75:6
75:22 76:11
77:12 78:22
79:9,12,16,19
79:25 82:6
84:17 85:3,12
85:16 92:17,19
94:13,16 95:8
95:10,15 96:2,4
96:5,13,15 97:7
97:22 101:13
101:15,19,20
101:23 102:20
102:23 103:4,7
103:18 105:7
105:25 106:6
122:11,15
123:8,24 124:8
138:18,24
140:6,7,13
141:13,23
144:5,6,15
151:21 173:2
182:24 185:16
**experience** 46:4
  46:12,15
**experiences** 41:5
**expert** 11:15,18
  166:3
**expertise** 44:15
  109:13 115:19
**Expires** 215:23
  216:16
**explain** 79:21
  109:12
**explained** 79:14
  79:16
**explanation**
  94:18
**Explore** 76:4
**express** 43:24
  158:8

**expressed** 92:6
  199:18
**extended** 130:14
**extension** 33:17
  33:22
**extent** 120:4
**extremely** 90:17
  93:6
**eyelashes** 178:21
  181:20
**eyes** 49:12

**F**

**Facebook** 38:19
  40:1 94:5 95:7
  95:9,11,12,15
  96:12 165:21
**fact** 171:17
**factor** 172:15
**factors** 192:17
**factory** 27:6
**fail** 208:5
**failed** 90:1
**failing** 109:2
**fair** 86:10 192:21
**fairest** 98:3
**faith** 69:19
**Falic** 9:22,22,22
  11:6,8,17 12:23
  13:3,8 14:21
  17:25 47:16,19
  47:24 60:10
  94:23 95:5
  98:23 129:13
  129:18 130:15
**Falic's** 93:4
**Falicfashiongr...**
  135:1
**Falicfashiongr...**
  135:5
**false** 194:2,4
**familiar** 115:12
  122:3 200:4
  204:1
**family** 113:3

**far** 173:12
**Fashion** 135:2
**fast** 136:12
**fault** 103:8
**favor** 210:2,5
  213:21
**favors** 209:20
**February** 142:10
  156:20,23
**FedEx** 64:24
**Fee** 154:13
**feed** 179:17
**feedback** 191:25
**feel** 50:20 51:3
  76:2 184:12
**fees** 155:3
**Feldman** 1:18 3:3
  4:7,19 5:5,9,15
  128:17 215:9
  216:7
**felt** 50:12 53:6
  57:2 82:12
  133:4 185:7
**female** 161:3
**Ferdinand**
  146:25 147:2
  147:16 148:17
**Ferdinand's**
  155:17
**figure** 21:13 27:5
  98:2,15
**figures** 195:21
**filed** 1:23 142:8
  142:10 194:9
  194:16
**filing** 142:7
**final** 176:8
  201:21,23
  202:10
**finally** 177:12
**finance** 17:4,7
  45:16,17
**financed** 30:3
**finances** 51:6
**financial** 114:16

197:4
**financials** 174:17
  175:11
**financing** 93:9
**find** 76:4 144:17
  193:14 196:10
**finding** 48:7
**findings** 82:9
**fine** 28:3 130:25
**finish** 185:10
**finished** 136:25
**first** 5:10 6:7
  10:12,15 18:14
  29:8 52:8 65:15
  127:23 129:25
  137:23 139:14
  141:7 142:13
  143:8 149:23
  174:22 202:24
  213:18,18
**fit** 184:17
**five** 9:18,20
  98:17 166:14
**fix** 25:7 178:22
  178:23
**flat** 65:16,21
**flea** 179:19
**Florida** 1:2,16,22
  2:12,18 4:9
  110:10 112:13
  112:16 170:17
  170:23 215:3
  215:22 216:3
  216:15
**flow** 17:9
**focus** 63:25
  180:19
**follow-up** 91:18
  128:3
**followed** 90:2,20
  92:9 94:23
  103:17 168:4,5
  168:6,7
**following** 175:23
  187:14

**follows** 5:12
**forced** 206:20
**foregoing** 215:7
**forensic** 70:4
**forever** 41:19
**forget** 111:9
**forklift** 205:19,23
  206:21
**forklifts** 205:12
  205:15 206:10
  206:25
**form** 24:21 25:3
  37:17 39:18
  42:3,8 48:12
  63:5 67:7 77:6
  79:10,20 81:19
  81:20 95:19,20
  99:2 100:15,23
  105:12 116:21
  124:2,18
  130:10 148:14
  150:22 151:22
  154:22 155:9
  155:21 164:4
  169:12 172:2
  188:5 190:9
  201:25 208:21
  209:2
**formal** 43:25
  48:18
**formalities**
  214:22
**formally** 16:7,8
  18:6 19:21
**formation** 6:17
  146:3
**formed** 6:11 32:6
  88:3 99:15
  189:19
**forming** 6:13,25
  130:17
**formula** 188:17
  188:19 189:9
  190:11
**formulas** 48:7

49:2 86:11
190:16,19
**forward** 91:10
184:2 189:1
**found** 71:18
98:21 110:17
123:1 158:22
**four** 86:14
129:24
**fourth** 121:12
147:14
**fragrance** 171:21
**Fraye** 84:12,13
**freight** 27:7
**fresh** 196:12
**Friday** 147:1
**front** 94:1 140:16
**froze** 103:19
**fruitful** 89:19
**fulfill** 208:5
**full** 126:2 127:18
149:6 150:20
151:15 154:21
154:24 155:15
155:20,24
156:3
**funds** 30:1
**further** 76:4
215:11,13

———————
**G**
**G** 142:9
**game** 122:14
123:6
**Gazzaniga** 2:22
**general** 53:21
125:21 143:14
144:4 145:1
**generate** 38:17
39:24
**generated** 70:13
**generating** 37:10
**getting** 50:13
98:12 103:10
179:15 213:17

**Gina** 2:22
**give** 13:15 14:7
49:6 91:9
116:23 142:11
198:15
**given** 16:17 90:9
192:19
**giving** 84:4
**go** 24:24 28:15
53:5 59:10 63:6
70:23 76:13
90:19 91:14
94:3 103:23,25
116:10 118:22
123:2 131:8,11
132:9,13,25
169:2 170:19
174:16 195:15
211:25
**goes** 101:25
106:25 187:3
**going** 23:12
28:14 38:1 43:5
43:5 49:4 50:15
52:1 53:11 58:7
72:24 73:13
82:20 104:5,11
111:8 125:5,7
128:6,11 130:4
130:14,21
132:13,14,17
132:24,25
142:13 157:19
158:4 166:17
178:19 181:15
185:15 189:1
192:10 193:24
198:6,9 210:9
211:4,19
213:16 214:18
**good** 4:1 13:19
13:21 42:25
45:2 90:13
126:3,8 182:23
185:1 209:5

**goods** 27:6
175:18 176:6
177:18 179:18
**gotten** 63:10
**Graham** 113:20
**granular** 173:12
**great** 184:22
185:7
**Gross** 175:20
**group** 2:3 135:3
213:17
**grow** 7:18 11:16
89:21,23
181:16 183:11
183:17
**growing** 55:22
62:9,15 183:14
**growth** 55:12
64:7 66:6
123:14,15
176:18 177:9
**guarantor** 100:18
**guess** 56:21 99:19
164:14
**guessing** 95:3
126:24
**guy** 43:20
**guys** 103:22
185:1

———————
**H**
**H** 3:6
**H-E-I-B-E-R**
22:6
**hair** 33:17,22
88:5,7,20,23
89:6,10,13 90:1
91:13 200:21
**Haisley's** 110:13
110:15
**half** 10:12,13,15
182:19
**hand** 5:7 46:4
170:5 215:16
216:8

**handbook** 161:19
**handed** 10:18
15:11 128:17
146:17 163:11
173:22
**handled** 17:4
24:20 99:20
165:21
**hands** 127:20
**hands-off** 29:1
**Hands-on** 28:25
**handwriting**
139:15,17
140:3
**happened** 32:11
45:10,14 49:5
49:12 50:2
168:8 211:17
213:22
**happening** 71:13
76:18,20
**happens** 91:19
**happy** 127:16
172:17
**HAPPY4TH**
121:13
**harassment**
158:15 159:1,3
**hard** 14:9,12,15
14:20 15:8 88:5
88:7,18,20,23
89:5,10,13
178:11
**harm** 196:2,5
**harmed** 193:18
**harmful** 194:15
**Head** 1:5 4:3,18
5:17,20,23,25
6:1,5,8,10,13
6:17 8:24,25
9:8,13,16,23
10:2,6,25 15:16
15:21 16:12,15
16:18,21 17:7
17:15 18:10,24

19:10 20:8,24
21:2,10,18
22:22 23:4,24
27:1,13 29:16
29:20 31:11
32:15 33:11
34:2,5,8 35:2
38:15 39:13,16
39:20 40:4,6,8
40:22 41:5,14
41:17,21,23
42:1 43:7,12,17
44:13,19,21
46:7,25 47:7,11
47:21 48:4,21
48:24 54:20
58:19 59:21,24
64:13 65:4
66:25 67:6,18
68:6,15,18,21
68:25 80:2
81:13 82:1,15
82:23 83:1,3,4
84:19 85:9,19
85:24,24 86:19
87:10 88:3 89:1
89:2,9,17 92:20
92:25 93:19,22
94:1 95:22,25
96:2,3,5,8,13
96:14,15 97:5,6
97:21,22 99:1,6
99:11,14,23
100:16 101:3
101:11,13,24
102:17 103:17
105:9,10 109:2
110:1,9 114:5
114:22 115:19
116:1,5,16,19
117:6 118:3,18
120:9,14 121:3
121:25 122:4
123:24 124:14
134:10,20,22

135:8 137:18
138:18 140:7
140:13 146:3
147:6,8,10,20
148:10 151:20
152:16,19,25
153:1,3,18
159:24 161:14
161:18 162:10
162:14,20,25
163:19 164:11
164:25 168:25
169:9 170:16
172:1,23
175:12 180:12
181:2 187:19
187:24 188:4
189:4 190:8
191:2 192:8,20
193:18 194:8
194:16,24
196:2,5,13,19
196:20 197:7
197:17 199:4
199:19 200:14
200:17,24
201:5 203:18
205:9,13,16,22
206:21 207:18
207:24 208:20
210:23 211:6
212:18 213:3
**health** 177:6
**hear** 44:3 115:21
197:6
**heard** 70:8 74:10
110:12 120:21
159:23
**hearing** 82:10
136:17 174:2
**heeding** 138:10
**Heiber** 22:6
**held** 9:11
**help** 11:16 49:19
62:11 67:19

88:8 152:24
**helped** 202:24
**helping** 171:21
**hereof** 215:10
**hereunto** 215:16
**Hernan** 22:3,4,5
22:5,9,14 23:21
24:3,17 25:7
45:23
**HH** 215:24
216:17
**high** 50:14,18,21
61:2 179:12
**higher** 180:10
**highlight** 94:16
103:1
**highlighted**
144:9
**Highway** 2:10
**HINDS** 2:15
**hire** 47:6,12,20
106:12,15,20
106:23,25
122:16
**hired** 42:25 47:13
68:10,12,15
86:17 90:3
106:23
**hiring** 47:25
49:14 107:10
**Historicals**
181:18
**hit** 145:13 178:18
179:21 180:20
180:21 181:22
**hitting** 178:22
**HK** 143:14
**holiday** 205:8
**holidays** 163:20
163:22 164:1
204:8
**Hollywood** 19:1
19:5,6 45:14,22
45:24 83:17
88:2 108:15

111:6,16,17
112:21 117:25
170:16
**home** 204:25
205:7
**honestly** 83:11
103:8
**hopefully** 166:23
**hours** 160:22
204:10,14,15
211:13
**house** 73:9
**HR** 45:14 111:15
**HSM** 91:4
**human** 17:4
18:20,23 19:1
19:11,14,24
20:11 21:5
45:14 111:4
162:21,24
163:12
**hundred** 10:14
67:15 68:11
72:8 79:7 92:12
98:4,8 161:21
180:2 188:12
**hundreds** 94:5
**hurt** 189:16
191:2
**hurts** 187:6
188:20
**husband** 49:20

### I

**I-S** 77:24
**Ian** 211:9 213:9
**iCloud** 146:7
**idea** 13:19,21
43:22 44:9
89:22 99:18
113:4 122:24
123:4 184:1
**ideal** 184:18
**Ideally** 49:24
**ideas** 183:17

189:1
**identification** 5:6
129:3 137:11
139:10 140:20
142:5 146:22
156:13 167:9
168:17 170:3
173:20 198:2
**identified** 18:21
25:11 26:24
45:13 53:23
60:12 64:6
162:3
**identifies** 151:14
**identify** 4:13 9:19
26:21 53:24
170:19
**image** 185:4,7
**implemented**
30:14
**important** 97:25
163:22 172:12
**improper** 54:21
63:20,22
158:18
**improve** 48:8
**inappropriate**
133:4 158:12
173:3 212:2
213:4
**inappropriately**
72:3
**inaudible** 166:4
200:23
**include** 62:20
177:18
**included** 150:16
**includes** 177:15
177:17,19
**income** 37:6,10
37:14,19 86:14
175:17,24
**incorporating**
6:23
**increase** 37:19

38:24 48:8
62:11 65:15
178:17,18
**increasing** 65:9
179:1
**incur** 54:20
**incurred** 54:10
**independent** 16:2
16:4 58:20
84:23 107:4,6
107:10,13
**independently**
33:23 59:13,15
140:10
**indicates** 154:20
**indication** 181:6
**indirectly** 49:11
**individual** 38:3
85:2,15 95:15
**individually** 14:6
**individuals** 18:7
108:14 113:12
113:17 120:24
163:24 202:16
202:21 203:10
**industry** 14:1
46:5
**influencer** 118:24
**influencers** 41:15
**inform** 50:3,4,6
**information**
13:13 22:13
52:13,18 71:23
72:6,10 74:8,10
74:14 75:5,24
81:24 82:15
83:18,20,23,24
84:3,4 120:1
125:14,24
138:21 139:1
140:6 141:18
141:19 142:7
143:23 144:3
144:10 162:15
166:10 187:18

187:21,24
188:4,11
193:11 195:5
195:13 196:7
199:13
**informational**
51:25
**informed** 49:25
**initial** 30:9
**initially** 24:9,14
27:8 35:24
188:24
**initiative** 183:25
**initiatives** 187:11
189:1
**injunction** 174:3
**Instagram** 40:1
183:8
**installment**
201:17,21,23
202:7,10
**instance** 56:24
141:13
**instances** 190:1
**institution** 23:1
**instruct** 105:10
**insufficient** 139:1
**intend** 97:20
**intended** 64:20
195:10 196:2,5
200:1
**intention** 84:3
**intentionally**
63:16 184:1
**intentioned**
189:17
**interaction** 82:17
**interactions**
82:14 85:5
134:3
**interest** 9:12
90:19 92:6
132:3,6 154:13
154:17,19
155:3,6 197:4

199:18
**interested** 90:18
91:18 215:14
**internal** 80:1
**Internet** 186:9
**intervals** 181:7
**inventory** 8:18
8:19 21:12
22:17 23:8,10
23:11 25:12,14
25:15,21,25
26:1,4,9,12,15
30:11 178:4,11
179:24 181:11
**invested** 113:4
**investigate** 77:3
**investigation**
162:9
**investment** 86:17
**invoice** 206:1,5
**involve** 54:2,10
**involved** 6:13,18
6:19,21,24 7:5
10:4,23 12:15
16:15,21 17:25
28:23 30:16,20
30:24 41:20
47:6 51:22
53:25 55:3
56:17 57:5,12
60:15 63:11
67:6 69:18 87:3
87:11 88:2
99:23 106:2
111:8 113:6
126:11 130:17
131:7 136:22
163:3 172:1,24
182:7 191:7
195:17 201:5
203:22
**involvement** 6:16
7:2 11:2 29:2,4
29:7,9 36:5,16
37:16 46:22

47:10 48:21
51:18 59:24
65:6,10 66:25
164:9 168:24
200:24
**involving** 69:11
135:8,10
**Israel** 169:7
**issue** 97:23 109:4
109:9,19,23
110:6 169:6
181:19
**issues** 26:3,8
109:2 125:16
125:19
**item** 31:2 114:6
175:18 182:22
**items** 8:12 87:24
114:10 164:16
179:12,15
190:17

_____

**J**

**January** 136:4
147:1,11,16
149:22 153:19
155:18 181:14
**Javier** 2:20 4:11
**Jed** 146:25 147:2
**Jennifer** 2:25 5:1
**Jerome** 9:22 11:6
14:21 47:15
56:12 60:10
86:7 89:15 93:4
93:8,20 94:4
105:21 108:17
116:3 125:1,10
125:11,15,18
126:1,24 127:6
127:23 129:13
135:13 156:4
158:2 160:5
161:5 167:24
202:12
**Jerome's** 93:10

113:3
**Jim** 113:24
**job** 61:22 62:10
182:24 189:14
**John** 10:7,18
36:19 52:6
57:23 58:17
59:2,19,20 60:3
60:5,16 61:22
62:1,5 67:1,3,5
67:20,23,24
68:3 72:23
75:12,15 78:15
81:4,4 82:8
105:24 107:15
107:18,19,25
108:10,11
115:8,8 119:20
119:21 120:1
127:19 131:22
133:15,20
134:2,6 161:8
167:24 169:3
175:4 179:6
184:7 212:15
**John's** 28:18
**Johns** 67:23
**joining** 4:22 5:2
**joint** 29:23
**joke** 212:13
**JR@headkand...**
175:1
**Julio** 1:20 4:12
215:21 216:14
**July** 1:12 4:5
121:12
**jump** 185:9
**June** 150:7
151:13

_____

**K**

**K-A-Y-L-I-N**
112:6
**K-L-E-I** 77:14,15
**K2** 70:8,9,13

71:21,23 72:1,6
72:12,15,21,24
73:4,25 74:6
76:22 83:19,23
83:25 84:4,7,15
85:1 108:18,19
143:11,14,23
**Kandy** 1:5 4:3,18
5:18,20,23,25
6:1,5,8,10,14
6:17 8:24,25
9:9,13,17,23
10:2,6,25 15:16
15:21 16:12,15
16:18,21 17:7
17:15 18:10,24
19:10 20:8,24
21:2,10,18
22:22 23:4,24
27:1,14 29:16
29:20 31:11
32:15 33:11
34:2,5,8 35:2
38:15 39:13,16
39:20 40:4,4,6
40:8,17,22 41:5
41:5,14,17,21
41:23 42:2,13
43:7,8,12,16,17
44:13,19,21
46:7,25 47:7,11
47:21 48:4,21
48:24 54:20
58:19 59:21,24
64:13 66:25
67:6,18 68:6,15
68:18,21,25
80:2 81:13 82:2
82:15,23 83:1,3
83:4 84:19 85:9
85:19,24,24
86:19 87:10
88:3 89:1,2,9
89:17 93:1
94:11 95:22,25

96:2,3,5,8,13
96:14,15 97:5,6
97:21,22 99:1,6
99:11,15,24
100:17 101:3
101:11,13,24
102:17 103:18
105:9 109:2
110:1,9 114:5
114:23 115:19
116:1,6,16,19
117:7 118:4,18
120:9,14 121:3
122:4 123:24
124:14 134:10
134:20,22
135:8 137:18
138:18 140:7
140:13 147:6,8
147:11,20
151:20 152:16
152:20,25
153:1,3 159:24
161:14,18
162:10,14,20
162:25 163:19
164:11,12,25
169:9 172:1,23
175:12 180:12
181:2 187:19
187:24 188:4
189:4 190:8
192:8,20
193:18 194:8
194:16,24
196:2,5,14,19
196:21 197:7
197:17 199:4
199:19 200:15
200:18 201:5
203:18 205:10
205:13,16,22
206:21 207:18
207:24 208:20
210:23 211:6

212:18 213:3
**Kandy's** 65:4
92:20 93:19,23
105:10 121:25
146:3 148:10
153:18 168:25
170:16 191:3
200:25
**Kayla** 1:8 2:23
4:3 7:9,12 9:21
27:21,23,24
28:4,18 33:13
33:15,20,24
34:1 35:4,7,18
36:21 38:9 40:5
40:17 42:20,25
43:14,16,22
46:2 47:8,22
48:15 50:14
53:6 59:3 63:9
67:1,2,3,20
68:3,12 90:18
91:22 92:1,9
93:1 97:25
99:19 100:17
100:17 101:17
105:22 107:23
109:10,20
110:23,25
111:18 116:9
118:22 121:17
121:20,22
122:4,22
123:21 125:1
125:13 126:14
129:14 132:23
132:23 133:6,8
133:9 135:10
135:13,16
136:6,16
149:18 151:1
158:16,18
159:10 161:7
162:21 164:5
164:12 165:1,6

165:16,20,23
166:9 167:24
168:12 169:19
169:23 175:5
178:6 186:22
188:10 192:7
192:20 196:13
197:6,17
199:18 202:17
204:9,14
205:21 207:6
207:17,22
208:18 212:1
**Kayla's** 47:14,25
103:7 134:2
148:7,11
**Kaylin** 20:19
112:4
**KBI** 22:16
**KDMs** 173:14
**Keenie** 115:11
**keep** 97:25
104:10 123:17
178:13
**kept** 43:1 91:3
**kids** 75:20 110:23
122:24 211:7
211:14
**kids'** 69:21,23
**kind** 161:15
185:10 212:24
**Klei** 77:13 78:8
78:12 81:4
84:18,25,25
108:2,9 174:22
175:8
**KM0065** 129:9
**KM0066** 129:24
135:25
**knew** 75:25
**know** 5:2 6:24
7:16 8:7,14
10:10 11:20,22
11:23 12:4,6,7
12:11,13,13,18

13:2,5 15:7,20
15:24 16:1,13
16:14,16,17,19
17:14,17,22
18:6,9,11 19:20
19:21,23 20:1,4
20:7,16,19,23
21:1 23:3 25:18
28:3 30:16
31:10,17 32:7
32:18 33:10
34:4 35:1 36:6
36:8,17,19 38:5
38:13 40:2,10
40:20 41:3,11
42:13,19,21
44:21 45:3 46:6
46:10,24 48:1,2
48:17,23 51:8
51:25 52:10
53:6 56:10
58:18 59:1,19
59:22 60:1
65:23 66:12,18
66:23 67:4,11
67:17 68:5,8,10
68:14,17,19
70:12,14 72:6
72:21,24 73:2
75:4,10 76:6,8
76:14,16,22,24
77:16,18 78:9
78:16,18,19,21
78:24,25 79:2
79:12,18 80:23
81:12,14 82:1,3
82:11 83:3,6,9
83:12 84:9,12
84:18 85:14,14
85:23 86:5,19
87:2,14,19,25
89:23 90:2,5,25
91:4,11,13,18
91:20,23 92:7
92:15,18 93:14

94:22 95:9,24
96:10,13,25
98:18,19,22
99:8,10,14,16
99:17,22 100:2
100:3,12,17,22
101:3 102:2
103:15,16,20
104:3,18,19,25
105:3,9 106:5,8
106:19 107:11
107:12,21
108:9,13,14,15
108:19,22
109:1,6,16,18
109:20,22
110:4,6,8,9,11
110:17,19,21
110:23 111:20
111:21 112:17
112:18,19,20
113:2,3,9,16,17
113:19 114:20
114:21,22,24
115:5 116:15
117:9,13 118:3
118:12,17,19
118:21 119:1,3
119:5 120:7,9
120:10,11,12
120:14,16
121:3,5,10,13
121:15,18,25
122:6,13 123:6
123:14 124:19
124:23,24
125:10 126:25
127:8,11,15,16
127:22 130:7
130:11,13
131:3,21,23
132:2,15
133:14,15
136:18 138:25
139:3,4,18

140:24 142:11
142:14,24
144:14,25
145:2,2 146:2,6
146:9 147:2,10
149:10,14,15
149:18,19
150:18 151:1,7
151:20 152:21
154:23 155:2,4
157:22 158:3,3
158:24 159:2
161:8,22,24
162:9,13
163:19,21,24
164:2,3,3,23,23
165:7,9,12,20
165:20 167:14
168:3 169:6,9
169:16 171:1,5
171:7 172:9,10
172:21 173:1
175:3 179:4,6
179:22 180:2,7
180:21 181:2
181:17,22
182:6,21 183:8
183:11,22,23
184:17,21,25
185:13,17
186:11 187:4,6
187:20 188:8
188:16 190:22
191:5,6,18
192:1,11
193:19,21
194:14 195:1
196:15 197:10
197:13 199:10
199:23 200:7
200:25 201:8
203:1,3,24
204:4,9,12
205:5 206:14
206:20 207:3,5

207:5,6 208:1,2
208:18,24
209:6,9,15,17
211:9,12 212:5
212:7,8,12
**knowing** 102:22
209:6
**knowledge** 12:22
16:12 36:6
39:21 47:20
52:19 75:2 87:9
103:4 163:10
164:18 173:6
194:11 199:6
200:16 205:1
207:2 208:9
**knowledgeable**
13:22
**KPMG** 85:6,9,10
85:12 108:22
108:22

———— **L** ————

**L** 2:7
**L.E** 2:9
**labeled** 135:25
138:5
**labels** 174:4
**lack** 55:12
**lady** 17:13 46:1
67:14 115:4
**landscape** 152:3
**Large** 1:22
**larger** 180:11
**Lashed** 7:22,25
8:3,3,6,8,23 9:6
9:15 24:7 40:11
40:14 42:16
85:25 86:3
97:24 100:20
101:4,5 152:15
153:5 172:19
**Lastly** 21:7
**late** 149:4 155:3
155:13,18

**Laura** 2:13 4:25
**law** 2:3 215:12
**lawsuit** 128:21
158:23 170:10
193:20 194:7,9
194:16,23
203:7
**leads** 76:17
191:19 196:4
**learn** 44:8 70:1
75:14 110:15
186:6
**learned** 53:11
60:25 159:16
**leave** 199:19
206:21
**led** 36:20 187:16
191:2
**ledger** 143:15
144:4
**left** 58:14 73:22
137:23 210:16
**left-hand** 152:5
153:14
**legal** 151:17,20
**legitimate** 144:5
144:22 207:1
**lend** 209:23
210:1
**Leon** 9:22 93:8
93:11 156:4
**Leon's** 93:20
**let's** 100:18
103:25 104:10
178:20,20,21
**letting** 104:2
**level** 50:15,18,21
123:18
**liaised** 20:13
**Life** 40:4,17 41:6
42:13 43:8,16
164:12
**liked** 77:2 131:23
**likes** 111:18
127:17

**limited** 82:17
**line** 33:17,22
66:17 88:9,10
89:5 175:18
177:11 181:20
182:22 213:16
**lines** 180:17,19
**liquid** 87:4
**liquidated** 82:24
83:1
**listen** 103:9,11
**little** 14:7 24:16
49:6 101:8
169:1,5 177:12
185:10 209:18
**lived** 210:10
**LLC** 1:5 4:3 5:18
5:25 7:25
152:16
**located** 152:23
**location** 27:4
31:7
**lodging** 24:23
**Loeb** 2:15,21
4:21
**log-in** 102:14
**logged** 131:2
**logical** 57:25
**logistics** 21:13
26:24 27:1
**long** 12:18 20:15
28:3 33:7 51:21
59:19 68:17
70:20 76:18,20
91:12 116:15
116:19 117:2
146:1 160:13
160:21 179:13
181:3,7
**longer** 67:5 82:20
192:8
**look** 22:18 23:7,9
51:12 52:7,9,24
52:25 53:7,14
73:6 115:20

119:8 123:9
137:4,6 138:3
138:16 140:23
141:3 142:12
142:16 143:7
153:23 154:8
176:1 182:10
187:19 192:4
193:13,14,21
196:10 198:9
200:9
**looked** 17:8
22:17 27:2,18
29:11 39:6,7
52:14 65:24
66:3,12 86:8
88:4 123:4
170:24
**looking** 25:24
31:6 51:5 52:4
53:10 87:6
138:23 140:11
154:5 176:15
177:1,5 192:12
194:18,24
198:4
**looks** 151:10
152:22 182:17
**Lopez** 117:14
**lose** 69:19 124:6
124:7 131:14
184:9 189:4
**loss** 76:17
**lost** 82:11 106:19
177:11
**lot** 30:19,25
36:22 37:13
55:8 60:16 62:8
71:18 74:19
82:9 92:6 98:1
103:6 116:13
116:14 178:11
180:20 181:21
183:11 184:23
186:4 194:3

196:6 213:23
**lots** 89:23
**loud** 143:13
**love** 182:25
  193:23
**low** 23:13 37:8,13
  169:20
**lower** 54:23
  129:5
**lowered** 65:1
**loyal** 187:2,13
  193:22
**lunch** 73:15,20
  95:11

---

**M**

**M-E-R-L-I-N-O**
  120:19
**main** 87:19 92:25
  179:3,6
**maintained** 80:2
**majority** 93:21
**making** 7:16
  27:11 37:4,5
  66:18,23 86:15
  180:17 183:23
  187:19
**mal** 189:17
**manage** 172:11
**managed** 49:17
  54:6
**management**
  50:11 53:25
  212:19
**manager** 12:12
**manner** 28:1
  65:6 212:25
**manufacture**
  32:17
**manufactured**
  14:9 15:8 87:20
  88:11
**manufacturer**
  11:25 12:2
**manufacturers**

86:20 87:10,21
**margin** 180:12
**Marie** 1:8 4:3
**marked** 71:6
  128:18 129:1
  137:10 139:9
  140:19 142:3
  146:21 156:12
  167:8 168:16
  170:2 173:18
  174:1 198:1
**market** 179:19
**marketing** 32:10
  34:7 35:3,5,8
  38:2 41:13
  49:15 54:9,14
  54:19 88:15
  118:25 198:20
**marks** 8:9
**materials** 88:15
**matter** 4:2 27:24
  142:9 183:6
**Max** 57:23 58:17
  59:20 62:1,6
  67:3,5,23 68:3
  105:24 107:15
  107:18,19,25
  115:9 179:6
**Max's** 59:2,20
  61:22
**McDermott** 33:1
  33:25 132:20
**McNab** 117:5
**McNeill** 1:8 2:23
  4:4,24 7:9,14
  9:21 16:22
  27:24 28:4 34:8
  35:2,25 38:5,14
  39:2,24 44:17
  45:9 49:5 50:20
  53:17,23 54:6
  54:13,20 56:4
  63:16 64:12
  69:11,19 78:13
  78:19,21 82:6

87:25 88:6 89:8
  103:5,17
  106:10 113:9
  124:16 128:20
  130:14,21
  131:4,14 133:3
  150:3,16 159:6
  160:3 161:11
  162:5 167:4
  170:15,23
  171:25 172:22
  183:18 190:1
  190:18 191:1
  194:14 196:23
  197:2 198:17
  199:3 201:24
  203:10,19
  208:4,10
  209:19,20
**McNeill's** 32:8
  36:9 38:1,23
  44:9 60:20
  151:21 159:20
  163:16 194:21
  203:15 204:24
  205:7
**mean** 9:6 16:9
  19:4 31:4 36:13
  37:1,6 51:11
  61:25 70:21
  85:21 96:9
  100:5 105:17
  115:23 138:25
  140:25 149:18
  162:21 164:14
  167:22 179:19
  182:4 186:8
  187:18 188:7
  207:25 213:12
**Meaning** 51:25
**meaningful** 65:6
**means** 145:5
  149:14
**meant** 31:6
  151:12

**media** 7:19 34:10
  34:12,14,17
  35:10 42:24
  43:10,11,19
  44:4,6,12,18,23
  54:22 56:25
  58:16 61:15,18
  62:10 63:14,17
  67:20 69:10
  113:10 115:4
  119:9 133:7
  164:7 186:15
  186:18,19,22
  190:25 191:13
  191:14 197:7
  199:5,7 208:16
**meet** 5:16 14:10
  14:18
**meeting** 43:24
  44:1 90:6,12,13
  90:16 91:6
  124:25 125:4,9
  125:25 126:2,3
  126:8,15,17,20
  127:2,5,7,24
  128:1 130:8
  167:20 168:1
**meetings** 91:1
  112:11 183:12
  183:22 198:18
**Melissa** 115:11
**member** 98:5
**members** 157:4
**memory** 145:11
**mentioned** 8:13
  21:7 30:12 31:3
  40:16 43:24
  45:8 56:25
  58:17 61:12
  74:3 81:15
  115:2 131:13
  132:12 173:17
  181:20,21
  183:12 194:6
  196:1 199:17

212:11
**Merlino** 120:16
  120:19
**message** 106:8
  119:24 129:16
  129:22,23
  136:4,11
  146:13 147:15
**messages** 129:13
  134:13 135:12
  135:15,19
  145:7,10,15,18
  145:21,24
  146:1,3,6
**methods** 27:3
**metric** 55:17
**metrics** 22:12
  39:4 55:13
  62:15 64:6
**Mexico** 79:13
  80:7
**Miami** 1:16 2:12
  4:9
**MIAMI-DADE**
  215:4 216:4
**Michael** 84:9
**middle** 141:7
  182:6
**mileage** 97:2
**military** 121:6,9
**mind** 128:7
**Mindy** 32:25
  33:3 68:13
  132:18,20,22
  133:2,11,14,17
  133:20,22
  134:2 135:19
  135:22
**Mindy's** 33:1,10
  33:16
**Mine** 93:25 95:2
  95:3
**minutes** 5:16
**mismanaged**
  54:13,16 61:3,5

61:11 63:16
65:25
**mismanagement**
61:8,14
**misplaced** 53:9
53:19
**missing** 26:9
102:25 103:1
**mistakes** 25:8
**misunderstood**
24:5
**Mocega** 1:20
4:12 215:21
216:14
**model** 200:20
**moment** 130:3
136:18 137:4,6
140:22 156:16
168:12
**money** 30:5
34:21 37:4,6
56:5 62:8 66:5
66:18 177:11
177:12,13
**month** 80:16
92:12 154:21
**monthly** 206:2
**months** 93:25
115:18 181:11
181:17
**morning** 4:1
**move** 28:8,20,24
30:9,25 31:1,11
31:22 32:1
91:10 122:25
178:11
**moved** 19:1,5
20:19 31:15
106:16 111:5
111:25 112:2,3
122:10,15
**moving** 27:12
30:17 64:14,17
93:4 125:22
184:2

**multiple** 192:17
**mutual** 131:12

**N**

**N** 2:16 3:1
**N-O-R-A** 120:18
**N-U** 12:3
**N.W** 1:15
**nails** 178:20
181:21
**name** 4:10 12:1
18:12,15 33:1
35:7 43:19 46:2
57:18,19,21
58:17,24 70:5
77:9,17 111:9
117:4,12,13
118:9 120:9
204:1
**named** 17:13
22:2 32:25
43:20 67:14
211:9
**names** 34:15
74:12
**near** 141:7
**nearly** 185:9
**need** 50:9 52:11
53:7 59:7 92:13
138:22 140:5
141:20 144:10
151:20 179:11
185:12
**needed** 23:13
84:21 90:25
116:19,22
150:11 156:3
210:7
**needing** 25:7
**negative** 37:12
165:24
**negatively** 192:22
**net** 37:6,19 39:13
39:16 86:14
175:24

**never** 53:6 69:8
70:16 79:14
88:11 92:9 98:2
98:15 120:20
122:5 123:15
132:1 146:16
161:4,7 168:4,5
168:6,6,7,7
212:10
**new** 7:18 29:7
49:2 62:12,20
62:22,25 66:7
87:16 126:17
127:23 128:1
132:24 154:11
178:7,14,16
179:7 200:8
**nice** 5:16
**nimble** 111:21
**noncompete**
200:22
**Nope** 75:25
**Nora** 120:16,18
**North** 28:15,21
28:24 29:9
30:10,17 31:12
31:15,22 32:1
106:17 112:2
122:10,22,25
201:11 206:11
206:16,21
207:1
**Northwest** 4:8
**Nos** 173:19
**Notary** 1:21
215:22 216:15
**notations** 139:25
**notice** 1:22 24:19
**notified** 75:5
212:7
**notify** 212:6,8,19
**noting** 123:18
**November** 125:1
168:21,25
**number** 31:13,16

31:24 32:4
86:10 120:23
129:6,7 154:2
169:21 182:13
182:19 192:10
207:16
**numbered**
147:25 148:2
**numbers** 23:20
25:25 66:10,10
66:13 86:9
141:6 177:2,5
180:7 183:1
191:22 192:7
193:10
**numerous** 170:17
**NuWorld** 12:3,5
12:9,12,16,19
12:21 13:3,6
46:16 160:16
**NuWorld's**
160:25

**O**

**OATH** 216:1
**Object** 24:21
25:3 37:17
39:18 42:3,8
48:12 63:5 67:7
77:6 79:10,20
99:2 100:15,23
105:12 116:21
124:2,18
130:10 148:14
150:22 151:22
154:22 155:9
155:21 164:4
169:12 172:2
188:5 190:9
201:25 208:21
209:2
**objection** 24:23
81:18
**observe** 160:10
161:2

**obtain** 59:7
195:13
**obtained** 47:24
143:11,14,24
**obviously** 30:24
44:1 52:8 62:18
63:9 89:23
121:11 181:16
**occasions** 160:18
170:17
**occur** 125:5
168:1 182:1
208:10
**occurred** 9:16
28:21 93:15
103:13 125:25
127:5 131:16
159:13 161:12
185:17 203:1
**occurring** 45:22
**office** 4:20 19:2,3
19:7,12,15,24
20:11 22:2
45:15 49:13
83:13 108:15
111:6,15
112:18,22
118:1 170:16
171:20,20
215:17
**offices** 19:5 83:15
88:2 159:17
160:25
**official** 215:17
216:8
**oh** 35:5,19 58:22
81:1 95:4
108:18 142:25
143:18 165:9
176:23 186:2
204:14 213:8
**okay** 6:4 9:19
10:16 16:8,11
17:20 18:2,5,9
19:8,19 23:19

24:12 25:1,6,11
25:19,22 27:22
29:6,18,23 30:4
30:23 31:2,21
31:25 32:5
33:18,25 34:19
34:25 35:22
36:12 38:8 41:1
41:12 44:8,11
45:25 47:9,10
47:15,24 49:10
49:21 50:9
51:16,16 53:13
54:17 57:8,21
59:1,11,19 61:1
61:4,13 62:23
65:4 66:20 67:4
67:13 68:2,5
69:16,22 70:12
72:19 74:3,16
75:1 79:8 80:12
80:19 81:1,5,12
81:15,21 82:22
84:2,21 85:8,11
86:2,5 87:18
93:13,24 96:25
98:16 100:3
102:19 104:18
104:23 105:3,8
107:24 109:1
115:11 117:18
119:21 122:21
129:11 133:16
138:6 142:19
143:4,7,21
145:4 146:2
149:15 154:1
155:5 156:7,19
165:7,22
166:12,15
168:9,18
169:19 171:1
171:12 174:11
175:10 176:23
177:20 180:15

181:15 182:10
186:6,10,14
189:7 191:17
191:23 194:6
195:20 196:1
213:8
**old** 87:15
**older** 184:22
**on-hand** 22:17
22:20 23:8,10
25:14
**once** 10:17 82:14
111:24 124:6
132:13 169:19
171:6
**one-time** 169:21
**ones** 53:24
138:22 144:9
165:17
**online** 38:16,18
38:22 39:23,25
109:14 193:6
**open** 62:12 143:5
**opened** 99:12,17
**operation** 51:6
**operational**
21:10
**operations** 8:10
8:21 12:10,12
12:15,19 17:2,5
30:17 45:23
49:8 50:11
106:11 198:19
200:25
**operator** 4:10
**opinion** 11:4
13:11,15,18
39:12,15 44:11
86:8 116:4,18
117:1 187:21
**opportunity**
160:9,19
198:16
**opposite** 180:14
**ops** 21:8

**optics** 123:11
**option** 27:4
**order** 30:12 76:7
179:23 202:24
**orders** 21:11,18
21:19,23,24
22:1,6,15 23:23
24:1,15,18,20
25:16 208:5
**Ordonez** 2:20
4:11
**organization**
169:10
**orientation** 152:2
**original** 87:21
**Out's** 101:5
**outfit** 107:16
**outside** 38:7,10
84:17 85:1,15
**overall** 196:25
**oversaw** 201:3
**oversee** 201:3
**overseeing** 36:19
**owe** 102:4
**owed** 94:4
**owned** 205:19
**owner** 8:25 9:3,8
15:13 69:4
100:4,13,20
196:13,16
197:2
**owners** 9:16,20
29:19,20,24
30:4 83:4
105:17 113:2,5
122:1 158:1
209:21
**ownership** 8:2,5
9:12,23 15:15
148:18 212:20

---

**P**

**P-E-T-R-I** 77:20
77:22
**P-E-T-R-I-S**

77:19
**P&O** 123:10
**P.A** 2:9
**P.C** 2:3
**p.m** 1:13 73:13
73:18 104:5,9
128:11,15
129:18 147:1
166:17,21
211:19,23
214:18,21
**packaging** 48:7
91:2
**page** 3:3 41:2,6,8
42:14 43:23
129:6,9,10,17
129:24,25
135:25 136:3
137:24 138:8
139:14,21
141:7,7,9,13
143:8 147:14
147:15 149:23
151:5 152:1
153:22,24
170:13 174:22
175:9,23 176:2
176:9,24 198:3
198:10 199:2
200:9 201:14
202:13 203:13
204:20 207:8
207:13 208:3
**pages** 41:24 42:2
140:25 141:3
164:11,12
215:7
**paid** 40:22 41:7
71:19 76:11,12
76:14 79:9 94:8
94:14 101:23
102:4,24
110:10 148:21
154:21,24,24
155:7 209:14

209:15
**paragraph** 143:9
143:10,23
170:13 198:13
198:15 199:2
200:11 201:15
202:13 203:13
204:20 207:9
208:3
**part** 43:13 80:1
89:20 101:3
105:2 118:23
118:25 123:12
128:20 183:5
192:8 208:19
212:17
**particular** 131:9
**parties** 4:14
131:7,11
164:17 174:2
187:25 188:11
190:20 193:12
215:14
**pass** 84:2
**passed** 90:23
**password** 102:14
**pay** 41:5,23 55:6
93:7,8 94:8
96:1,7,11,14,18
101:12 105:7
109:2 156:5
202:6,9,12
205:22 206:2
**paying** 42:7 62:8
69:20,23 110:1
149:5 155:14
155:19,23
156:2,4 206:8
**payment** 80:6
101:14 102:8
102:12 153:10
153:12 201:18
201:21,24
202:10
**payments** 17:8

94:6,7 102:11
102:20 123:23
154:10 202:7
206:14
payroll 19:25
20:16 111:13
111:17,24
112:5
PB&T 152:12,22
people 17:1 47:20
80:24 165:20
180:24 191:7
191:18 196:11
201:8 209:19
percent 7:11
10:14 16:20,24
67:15 68:11
72:8 93:22
95:12 161:21
166:3 180:17
180:18 188:12
195:7
perfect 26:15
179:22
perfectly 28:2
191:10
performance
119:9 172:19
performed 24:9
54:4 85:19 86:5
period 15:7 19:2
19:7,8 24:2,3
35:12,14,19
36:1 65:20
74:21 93:3,15
93:16 111:6,16
114:18 124:10
151:3 161:22
163:9 181:10
181:25 194:18
194:22 195:2
196:14
periods 76:23
77:4 93:14
peripherally

163:4
perks 97:1
permanently
146:15
person 57:18,22
125:15 133:8
209:5
personal 61:10
61:16 69:13,17
69:18 73:23
75:5 82:6 85:2
93:18 96:4,6
97:9 123:23
151:21 204:23
209:19 210:20
210:24
personally 74:24
76:21 96:21
161:8 193:17
202:1,2 216:7
persons 207:16
phone 44:1 77:25
133:12,13,24
146:4
phonetic 5:1
84:10,13
114:12 115:6,8
115:11,14
117:5,14 120:8
203:25
photo 205:6
photographer
119:2
physical 95:20
pick 58:14
206:19
picked 32:16
56:22
pictures 118:21
118:23
pieces 179:25
180:1 181:13
Pincus 46:2,6
47:6,12 48:3,20
48:24

Pineapple 200:5
200:14,17
202:18,22,25
203:11,17,20
place 21:23 22:1
24:1 30:13 44:2
57:25 88:23
89:1,17 92:1,5
92:19 94:10
125:5,8 126:18
126:21 172:17
184:17 202:24
215:9
placed 22:6 23:23
24:14 93:17,18
93:19 96:6
102:21
Plaintiff 1:6 2:14
4:18
plan 198:19
planning 179:22
179:23
platform 109:14
122:5
platforms 39:24
40:3 62:12
play 123:12
please 4:13 5:7
9:19 92:12
130:4 150:6
156:18 177:3
point 43:4 52:16
53:20 55:7
85:21 88:4
148:3,20
174:18 180:11
203:21,23
211:16
points 97:2,3,5
97:15,21,24
98:1,2,4,5,6,8
98:13,14,16,24
136:16,20
147:22 148:1
policies 161:14

213:3
poorly 12:25
portfolio 178:21
portion 119:19
202:6,9
portray 192:3
portrayed 192:3
positive 37:12,12
possibilities
100:25
possible 211:17
213:3,13
post 55:1 113:10
165:5
posted 39:24
164:25 165:4
188:18 189:22
190:1 199:11
199:12
posting 40:3 55:3
194:23
posts 34:12 58:16
164:8 186:15
186:18,19,22
190:22,25
191:13,15
208:16
potentially
183:13
power 184:9
praise 197:6
preliminary
174:3
presence 34:17
present 2:20,21
91:6 120:25
presentation 89:4
90:4
presentations
89:25
presented 90:21
presently 5:3
preserve 145:18
145:24
pretty 8:4 69:8

88:13
prevent 186:1,5
187:8 188:22
188:25 193:3
prevented 183:18
184:2
Previous 154:10
previously 63:2
119:14 150:3
174:1 202:6
204:7
price 180:10
primarily 66:15
printout 66:8
prior 31:11 76:23
146:3 154:21
160:14 171:25
172:23
priority 36:24,25
probably 4:21
76:18 95:3
146:5 195:7
problem 58:5
178:23,24
180:4 183:6
problematic
174:18
problems 24:19
26:11,21
procedures 30:12
161:15 213:4
process 52:3 82:7
90:3 94:22 96:9
98:3 101:9
102:2 103:16
105:2,4 136:19
212:19
produced 128:20
129:12
product 8:9,17
32:9,13,17,19
32:21 33:13
46:3,12 48:4,6
49:16 54:1,7
64:1 87:5,6

89:4 122:3
166:1 178:9
179:10 181:4
189:8,23
190:12,16,19
198:19
**products** 7:18
33:20 49:2 83:3
83:7 87:3,14,15
87:16 88:1
121:4 122:7
178:7 193:23
197:7 200:21
205:10
**professional** 26:5
26:17 30:13
86:8
**professionally**
25:10
**Profit** 175:20
**profitability** 37:8
62:18 106:8
**profitable** 37:21
37:22,24
**profits** 62:24
63:4 176:20
**projection**
181:18
**promote** 55:2
**promoting**
202:17 203:11
**promotion**
182:15,22
**promotional**
205:6
**promotions**
121:12
**pronoun** 14:3
**pronounce** 111:9
**proper** 134:23
**properly** 26:4
54:6
**proposal** 130:13
**propose** 11:17
**proposed** 89:4

127:14,15
130:18,21
131:4,17
157:13
**propping** 118:24
**prove** 43:4
**provide** 13:12
14:7 83:24
94:19 97:5
125:13 144:11
**provided** 66:9
69:7 72:7 74:13
81:7,23 83:22
89:3 106:5
153:18 187:25
**provides** 137:24
**providing** 57:2
69:4
**public** 1:21
193:19 194:12
215:22 216:15
**Pueblo** 152:23
**pull** 23:19
**purchase** 21:11
21:18,19,23
22:15 23:22
24:1,10,15,18
24:20 25:16
30:2,11 179:23
202:24 211:7
211:13
**purchased** 29:11
29:13,16,20
**purchases** 97:2
99:1
**purpose** 63:20,22
171:1 192:5
**purposes** 35:9,10
122:11 151:17
**pursuant** 1:22
**put** 7:17 26:6
30:4,12 38:24
62:6 95:6,6
165:5 174:10
187:18 189:14

193:25 196:7
**putting** 95:10
98:11

---

## Q

**quantify** 192:9
193:1 195:6
**quantifying**
192:24
**quarter** 138:7
**question** 13:1
61:21 72:16
79:22 104:13
139:2 141:2
142:13 144:8
145:19 161:25
164:24 165:13
168:13 177:14
187:7 188:2,21
188:25 193:2
213:6
**questions** 8:12
130:4 136:13
212:24 214:12
**quick** 73:10
103:24 104:1
128:9 147:20

---

## R

**R-A-I-S-S-A**
19:16
**race** 122:24
**Rachel** 46:2
**racing** 169:10,15
**raise** 5:7
**raised** 136:16
**Raissa** 19:16,17
19:18,20,23
20:14,17
111:10,11,13
111:19 118:14
161:25 213:7
**ran** 17:8 19:25
20:16,19,21
34:11 49:5
57:19

**Rarely** 134:14
**rates** 64:25
**ratio** 39:10
**reaching** 179:7
180:5
**read** 70:16,17,25
104:13 136:12
143:10,12,13
143:16 150:6
156:18 168:13
168:14 203:5
**reading** 214:22
**ready** 92:8
**real** 76:5 103:24
104:1 136:12
**really** 86:13
89:21 105:5
106:24 136:24
144:12 145:16
180:22 181:22
188:6 208:1
213:15
**reason** 63:15
90:10 91:9,16
98:10 151:14
151:20 162:3
171:9,17
178:13 184:25
**recall** 7:1 8:4,16
10:8 11:14 12:1
13:7 16:23
17:16 19:9
20:25 21:20
22:25 23:1,3,6
23:16 24:2,25
26:10,13,18,23
27:16 28:9,20
29:17 30:7,8,11
30:15 31:14,23
32:3,14,24 33:3
33:7 34:8 35:6
35:13 37:1,11
37:23,25 39:4,9
39:11,22,23
41:17 43:18,25

44:14,16,20,25
45:5,6 46:8,14
46:18,21 47:1
48:19 51:21,24
52:13,23 55:19
57:16,18,19
64:16 65:7,8,11
65:12,14,19
66:2 67:8 68:16
69:24 70:5,19
71:2,5,6,8,9
72:1,5,20 74:1
74:12,15 75:3
75:12 77:9
78:23 79:1,8,11
79:15 80:7,16
80:22,23 81:11
83:8 84:5 86:11
88:13 89:14
91:12,16 93:21
97:19 101:6
103:12 106:4,7
107:9,10,15
109:18 110:20
110:22 112:14
112:15 113:11
116:17 118:13
121:24 125:19
126:1,4,6,8
133:6 134:5,8
135:20 145:14
147:12 148:19
149:3 151:9,10
151:23 153:7
153:20 157:18
157:25 159:12
160:8 161:17
167:11 171:23
172:3,25 173:4
174:6 180:13
183:25 184:16
189:13 190:4
190:23 193:7
193:16 194:5
194:17 197:12

197:20 205:4
205:17 206:23
207:25 208:12
209:22 210:7
211:1,8 212:21
213:2,10 214:1
214:4
**receive** 69:6
125:24 195:4
208:19
**received** 66:11
70:3 71:3,23
82:14 91:24
97:1,6 98:24
116:20 120:2
137:8,13,14
193:11 195:23
**receiving** 167:11
**recess** 58:8 73:15
104:6 128:12
166:18 211:20
**recipient** 152:15
**recognize** 139:15
140:2 170:7
174:25
**reconcile** 153:10
**record** 4:2 24:24
58:7,11 73:14
73:18 103:24
104:1,5,9
128:11,15
166:17,21
211:19,23
214:19
**records** 79:18
80:2
**recover** 146:12
**reduce** 173:5
183:24 207:17
207:23
**reduction** 123:10
**refer** 5:25 78:7
**reference** 61:13
**referenced** 81:5
93:11

**referred** 99:5,11
**referring** 7:8,21
8:21 17:10,11
27:20 28:4
29:14 35:12
50:7,25 83:16
87:23 102:5,15
102:16 137:18
147:6 149:19
152:9 164:16
189:8 208:15
**reflect** 61:7
**reflected** 73:24
80:9
**regain** 123:25
124:17
**regard** 8:17 17:6
18:23 21:17
22:18 27:1 31:4
32:13,19 34:7
35:3,25 38:13
49:8 50:18
52:14 53:16
54:7,9,13 63:14
66:22 67:10
69:10 80:19
88:7 91:8,25
92:17 101:23
106:6 142:20
151:13 157:15
174:2,13,20
177:6 183:16
189:21 203:19
213:8
**regards** 64:6
**registered** 199:14
**regular** 82:18
181:8
**reimburse** 96:23
103:11
**reimbursed** 96:7
**reimbursement**
96:3 101:9
148:23
**related** 48:7

96:10 172:22
**relation** 46:22
**relationship**
14:19 15:20
44:22 45:3
48:23 50:14
59:23 60:1,6
61:23 68:24
99:20 108:14
124:14 162:1
**relationships**
207:18,24
**relay** 119:21
**relieve** 46:3
**religious** 163:25
**relocate** 28:13
**remainders** 178:9
**remember** 11:10
16:7 20:18,20
28:22 31:13
34:15 37:3
42:15 43:20
58:23 71:17,18
81:10 91:11
104:21 112:17
117:7,11 119:4
120:3,13 127:6
127:8,10
130:22,24
136:17,19
137:12 148:13
148:15 149:8
156:14,24
157:1,5,9,10,12
157:24 158:2,5
158:7,10
159:10 161:23
164:25 191:5
191:10 194:3
197:15,21
199:21 205:18
**remind** 15:6
**remote** 201:12
**removal** 192:21
**removed** 164:12

**renegotiate** 64:25
**renting** 30:25
**reorder** 179:11
181:4
**reorders** 181:23
**repaid** 78:22 79:6
**replaces** 107:19
**replying** 150:24
**report** 38:4 48:10
49:23,24 70:3,9
70:16,17,24
71:3,11,11
72:12,15 73:25
74:6 76:22
84:15 96:17
109:15 119:8
119:17,22
120:2 142:14
151:6 152:1
183:13 195:22
195:24
**reported** 34:1
49:25 109:5,16
**reporter** 1:21
4:11,16 5:4
7:24 18:14 22:4
77:21 104:13
114:2 117:20
117:23 118:7,9
120:17 121:7
135:2 143:16
202:2 215:1,21
216:14
**reporting** 33:24
161:15 162:2
213:4
**reports** 70:13,15
148:22 151:3,8
151:11
**represent** 128:19
146:24
**representative**
84:7
**represented**
147:8,10

**representing**
4:15
**represents**
143:23
**reprimand**
171:24
**reprimanded**
172:22
**repurchase** 180:6
**request** 151:15
**requested** 102:3
**requesting**
150:19
**required** 38:4
49:7 93:7 96:1
96:7 163:20
204:10,12,18
**requires** 42:6
179:21,22
**reserve** 145:21
**resistant** 184:4
**resolution** 156:20
**resolutions**
156:22 157:7
157:12,23
158:9
**resolved** 110:7
149:13
**resources** 17:4
18:21,24 19:1
19:11,14,24
20:11 21:5
45:15 111:4
162:22,24
163:13 203:16
203:19
**respond** 42:10
208:5
**responsibilities**
10:19 12:8
15:12,17 16:21
16:24 17:7
36:13 117:10
118:20 163:11
**responsible** 67:11

109:25 162:19
**restate** 123:18
**restroom** 58:1
128:7
**result** 64:18
66:14
**retailer** 88:23
90:1,7
**retailers** 88:25
89:2,17
**retain** 59:8,17
107:8,12,24
116:2,19
**retained** 15:22
16:6 48:4 52:21
53:3 59:1,21
60:22,24 62:20
72:25 85:15
107:7,21 108:9
115:25 116:16
**retaining** 10:24
**retention** 116:5
**return** 39:5
180:20,21
**revamp** 91:2
**revenue** 62:17,23
63:3 64:5,9
65:12,13,21
176:19
**review** 53:17
54:5 70:15
71:15 72:12,17
72:22 84:17
85:11,16
119:16,19
120:5 130:3
136:11,21
142:17,20,21
142:22 143:6
171:9 198:16
**reviewed** 22:13
22:14 52:19
53:2 71:3 74:5
84:18 85:2
142:15 143:1

144:1 155:18
214:1
**reviewing** 22:24
171:16
**Ricci** 115:5
**Rich** 43:21
**Richard** 113:19
**Rick** 113:19
**right** 5:4,7,15 9:3
15:5 21:7 26:7
31:7,8 32:5
45:11 46:4
50:17,25 51:2
51:14,20 55:25
57:4 58:13,22
67:25 69:9
71:15 73:20
75:16 80:22
81:11 82:5,15
86:4 90:15
92:14,16 95:16
96:24 106:11
115:2 119:25
120:5 137:3
139:3 140:15
144:10,20
149:20 150:5
153:4,5,6
168:20 170:5
171:18 172:9
176:1,10,25
177:25 178:7
178:12 179:2
179:19,23
180:3 181:1,12
184:12,17
189:2,20 190:4
190:23 194:5
195:19 196:2
196:14 199:1
208:11 212:24
213:9 214:9
**right-hand** 129:5
138:5 139:14
152:11 154:9

**RK1s** 85:10
108:23
**role** 6:7 10:1,5,16
12:5,6,14 14:12
14:15 15:15,16
16:12 18:23
19:24 20:8,12
21:5,10,22 26:1
31:5 32:8,13
33:10 36:9 38:1
54:14 67:17
69:4 118:19
**roles** 5:20,22 6:4
35:25 117:9
**room** 4:25
**Rosenbaum** 10:7
10:17,24 11:9
11:18,21,23
12:8 13:9,13
14:4,9,19,23
15:8,12,18,21
33:5,8 35:20
36:1,10 47:17
47:25 51:1,19
51:22 52:14,19
52:20 53:1 60:3
60:5,16,21 61:9
63:1 66:9 67:24
72:23 75:12,15
75:16,24 77:3
81:2 82:8
108:11 112:12
112:16 127:19
135:16 158:12
159:5,21,23
160:10 162:2
162:25 163:4
163:12,16
168:12 172:1
172:23 184:7
212:3
**Rosenbaum's**
12:4 46:22
124:14 160:4
162:6,15

**Rosenthal** 77:1
**roughly** 37:14
**rude** 165:19
**rules** 165:11
**run** 8:22 19:6
43:6,6 49:22
111:23 201:7
**running** 39:20
40:25 41:4 43:9
43:12 106:11
111:13 112:5
162:21,24
**runs** 56:20
**Rushman** 119:5
**RV** 149:13,16,18
**Ryan** 23:25 24:7
35:4 38:2
150:25 151:1
202:23 203:3

**S**

**S** 2:10 3:6 78:4
**S-Y-N-O-V-U-S**
23:2
**Sadro** 2:24 4:20
**sale** 192:7
**sales** 32:12 38:13
38:16,18,22,24
39:25 49:15
62:11 109:4,15
109:15,16
110:1 176:4
178:17,18
186:24 191:22
192:13,16,22
193:3,10
194:19 195:5
195:14,16,21
195:22,24
196:2,5,18,22
198:20
**Salida** 122:15
**Sally** 135:2
**Sally's** 90:17,19
91:25 92:2,4

184:11,19,20
184:24 185:3,5
**samples** 83:13
**save** 156:4
**saw** 112:17
142:18 174:15
208:13
**saying** 6:2 52:10
74:18 86:14
92:12 102:10
130:25 188:19
195:9 208:14
209:13
**says** 103:11
122:24 136:9
139:13 143:11
145:12 148:6
148:20 149:4
149:12 153:3
168:21 187:4
198:17 200:13
**scanned** 26:7
**scheduled** 126:25
**school** 211:7,13
**scroll** 139:19
**seal** 215:17 216:8
**second** 10:13
18:21 69:12
141:8 143:9,10
143:22 147:15
148:2,20
170:13
**secret** 190:12,15
**secrets** 190:7,10
**section** 143:9
**see** 23:13 91:14
91:18 123:10
129:19,21
130:1 131:5
136:2,7 138:1,2
139:18,24
141:10,16
143:22 145:1
147:17,23
148:4,8,24

149:7,12,25
150:10 152:13
152:17 153:9
153:15 154:14
154:16 168:22
174:21,24
175:11,15,21
176:12,21,22
177:7,15 178:1
178:2,3 182:25
186:24,24
191:22 197:16
198:22 208:7
**seeing** 112:15
178:10 194:3
197:21
**seek** 96:3 101:22
**seen** 128:22
140:24 143:3
156:10 157:10
173:24 174:5
174:14
**selected** 29:10
**selecting** 29:7
**sell** 23:12 34:24
43:14 63:23
173:10,11,16
178:8 181:15
182:25 183:2,4
184:24 200:20
**seller** 180:8
**selling** 39:8 64:1
87:24 110:23
114:6 173:15
**send** 94:17 98:17
101:25 105:6
151:11 195:16
195:21 206:1
**sending** 92:11
183:22
**sent** 25:6 72:18
72:19 83:4
91:12,20 120:4
122:4 129:17
146:25 147:16

150:7 158:4
174:22
**separate** 122:18
131:11
**September**
215:18 216:9
**sequentially**
93:15
**Sergeant** 120:12
**series** 113:12
**serious** 212:14
**seriously** 212:10
212:17
**serve** 213:18
**served** 199:4
**service** 201:1,6
**services** 69:3,7
204:23
**sessions** 159:4
**set** 23:4 35:25
36:25 40:7,10
121:15,19
190:23 204:9
204:14,15
205:25 215:16
**setting** 6:22
204:23
**seventh** 153:22
**severed** 44:22
**sexual** 213:5
**shampoo** 179:14
**shampoos** 87:4
**Shankerman**
203:24
**shared** 75:24
188:14
**sharing** 188:10
190:19
**Shawna** 118:17
118:18
**sheet** 178:3
**shipping** 27:3
177:15,19
**shoots** 205:6
**shop** 185:8

212:16
**Shopify** 109:11
109:14,17
110:3
**shopping** 183:8
**short** 19:7 58:8
93:3 104:6
111:6,16
114:18 117:13
128:12 163:8
166:18 211:20
**short-term**
178:22
**Shorthand** 1:20
215:1,21
216:14
**shot** 205:9
**show** 100:12
**showed** 71:11
181:10 188:16
**showing** 150:13
151:15 195:14
**shown** 5:6 123:22
**sic** 77:1
**side** 152:5,11
153:14
**significantly**
182:18
**signing** 214:22
**Silvana** 118:6,7,8
**similar** 188:18
189:23 200:19
200:20
**Simon** 9:21
**simply** 36:4 64:1
65:9
**Simultaneously**
108:5
**sit** 171:2 196:11
**sitting** 181:12
**situation** 127:16
127:17
**six** 31:23,25
**sizeable** 13:25
**ski** 210:17 211:3

211:7,13
**skip** 113:15
**Skipping** 147:25
**SKU** 179:25
**SKUs** 179:20
180:1 182:1
**slow** 185:12
**Smith** 211:10
213:9
**social** 7:19 34:10
34:12,14,17
35:10 42:24
43:10,11,18
44:4,5,12,18,23
54:22 56:25
58:16 61:15,18
62:10 63:14,17
67:19 69:10
113:10 115:4
119:9 133:7
164:7 186:15
186:18,19,22
190:25 191:13
191:14 197:7
199:5,7 208:16
**software** 21:21
23:14,15,16
24:4 25:10,13
25:20 26:6,22
66:8
**sold** 175:18 176:6
181:14
**sole** 63:25
**solely** 61:19
193:10
**somebody** 49:23
84:3 95:10
164:24 165:4,5
165:25 184:1
195:20 201:7
201:10 213:17
**sooner** 61:24
**sorry** 5:23 6:20
10:21 12:25
14:25 15:4

33:14,16 42:10
47:3 48:13 64:3
65:18 67:2,22
70:21 73:2 77:1
77:21 78:20
80:20 99:9
119:11 120:17
124:22 148:1
165:2 169:2,14
173:24 201:3
**sort** 82:16 86:18
**sorts** 7:19
**sounds** 115:12
120:13 204:1
**source** 30:1 75:1
114:11
**South** 2:5
**SOUTHERN** 1:2
**space** 31:9
**speak** 78:12
126:14 135:22
148:17
**speaking** 8:18
18:20 47:16
108:5 126:1
**speaks** 201:17
202:16
**specializes** 66:12
**specific** 14:5
22:16,19,23
32:14 46:14
48:2 53:20
54:24 55:16
74:4 79:8,12,15
90:9 91:9
165:17 170:19
173:13 190:1,5
204:17
**specifically** 35:8
35:16 53:16
55:23 66:3,22
131:19 142:19
171:3,4 175:8
184:3 203:22
**specificity** 49:7

COPY

specifics 81:8
  125:9 158:24
specify 75:22
speech 28:1
spell 77:18
  117:21
spend 34:21 56:5
  61:6,6,19,20
  66:23 67:16
  173:10,11,15
  173:15 183:1,3
spending 39:7
  52:11 60:13
  66:6 67:10
  182:25
spent 66:24
split 98:17
spoke 13:3 17:1
  24:16 81:2
  118:14 119:13
  119:20 126:4
  133:14 165:19
  166:1 167:15
  180:7 196:6
  207:19 214:3
spoken 145:13
  187:1
sponsored 169:10
  169:15,16
sponsorship
  169:18
sponsorships
  169:22
staffing 198:19
standing 213:16
stands 182:13
start 139:21
  150:3
started 7:4,5,7
  17:3 24:11
  35:17 42:14,19
  42:21 51:5
  52:10,10
  114:15
starting 41:2

43:23 51:12
  148:2
starts 147:19
  176:4
state 1:21 109:5
  109:16 110:1
  170:15 215:3
  215:22 216:3
  216:15
stated 215:9
statement 94:15
  96:11 137:17
  138:4 139:6
  144:21 152:12
  153:13,25
  155:13,17,23
  193:14 198:24
statements 44:4
  80:3,5,10
  104:22 105:1
  144:4 159:24
  193:5,8,17
  194:15
states 1:1 199:3
stayed 65:16 87:8
staying 201:14
step 92:8
stepped 78:14
  82:10 191:9
stop 39:20 183:21
stopped 13:5
  36:5 68:21
  87:11
store 184:22
story 43:15 76:5
  187:4 192:2
  193:25
strategic 198:20
strategies 34:20
strategy 43:13
Street 1:15 2:4
  2:16 4:8
strike 33:14 47:3
  65:18 73:2 77:1
  78:20 80:20

99:9 124:24
  125:12 173:25
  192:14
string 147:14
  149:21 174:21
struggle 37:19
stuck 178:12
  179:24 181:16
stuff 178:18
  187:5 188:22
  194:23
submit 94:15
  95:18 104:19
  104:25 151:2,8
submitted 95:1
  95:23,24 96:17
  103:5 104:20
  148:21
submitting
  103:17 150:4
  206:4
subparagraph
  198:12
success 172:19
successful 64:8
  64:21 91:5
  122:12 184:24
successfully
  64:18
sudden 178:10
suggested 125:11
suggestions
  115:21
Suite 1:15 2:5,11
  2:17
summary 70:17
  70:24 71:4,6
  72:13,15 74:5
  142:14,20
  143:1
supervise 172:13
supervised
  172:14
supervisor 33:15
  48:9,18

Supplier 114:4
suppliers 188:8
  207:22 208:1
supplies 114:5,10
supply 90:17
  184:21
supporting 94:20
  141:19
supposed 71:19
  109:5 204:16
sure 8:5 26:6
  41:25 68:11
  69:8 78:8 87:7
  88:14 91:14
  104:1 106:7
  111:1 131:6
  134:4,7,14
  135:14 163:21
  166:4 172:15
  172:16 173:9
  173:11 177:19
  182:5 190:5
  196:9 204:3
  212:22 213:21
survival 36:24
suspended
  197:13
swear 4:16
sworn 5:11
  215:12 216:7
Synovus 23:2,5

---

**T**

T 3:6
T-U-R-V-E-R-I
  118:10
tail 59:25 124:12
take 10:21 73:9
  96:12 98:16
  105:10 111:22
  115:20 118:22
  125:8 128:7
  130:3 132:14
  132:17,24
  133:1 137:3,6

140:22 156:16
  157:19 166:13
  168:12 181:7
  184:5 199:19
  200:1 212:10
  212:13
taken 1:20 4:8
  58:9 73:16
  104:7 117:2
  120:23 128:13
  145:23 166:19
  186:4 211:21
  215:9
takes 179:10
talk 5:17 14:10
  27:23 69:16
  84:6 125:10,11
  125:14 127:4
  158:6
talked 10:1 47:15
  101:8 105:24
  106:10 107:3
  108:2,18,21
  111:4 112:10
  122:9 123:17
  145:4 160:2
  164:7 176:18
  204:7 209:18
  210:19
talking 7:17 14:6
  52:4 56:10
  58:15 64:24
  73:23 78:9
  84:16 98:1
  130:9 133:17
  157:25 158:2
  174:17 186:14
  187:10 189:3
  191:12,14
talks 203:15
  204:23 207:15
  208:4
Tampa 2:16,18
target 90:21 91:8
  184:18 185:1,2

185:2,6,8
**Tarmen** 115:14
171:5,19 184:7
**tasks** 32:14
210:20,24
**tax** 109:4 110:1
**taxes** 109:3
110:10
**team** 121:17,20
201:2,7
**Tegan** 2:25 5:1
**Tejada** 118:15
**telephonic**
198:18
**tell** 13:8 18:22
21:9 26:25
34:13 39:10
43:15 75:8,17
92:4 93:13
125:12 131:19
132:22 133:2
137:7 138:4,16
142:8 161:5
176:15 177:3
203:23 212:4
**telling** 43:1 126:7
191:20
**tells** 187:3
**ten** 31:20 79:2
179:25 180:1
**ten-minute**
166:14
**terminate** 60:6
207:18,23
**terminated** 45:4
48:25 59:23
60:2 197:8,11
197:14 206:22
**terms** 129:22,25
130:18 208:25
**testified** 5:11
108:13 150:2
**testimony** 192:19
214:17
**text** 134:13 145:9

145:15,18,21
145:24,25
146:2,13
166:25 167:2,5
167:6 168:11
**texted** 159:10,12
**texts** 167:15
170:25 171:10
171:16
**Thank** 15:3
19:19 24:12
28:6 84:21
104:2 117:23
165:14 214:13
214:15
**thanks** 174:11
**theme** 205:10
**thereof** 215:15
**they'd** 203:23
**thing** 52:16 59:9
64:25 98:3
102:22 132:13
134:15 169:21
172:5 177:8
**things** 36:22
45:13 52:9
53:12,21,22
64:23 89:24
111:18 126:8
136:9 142:24
164:15 178:19
181:22 191:12
191:15 194:3
208:10 209:19
**think** 10:12,15
11:12 13:20
23:12 35:5
41:19 49:1
50:12,16 53:10
54:22 60:13
61:5 65:17
71:22 72:9 74:6
74:18,19 76:13
77:23 79:13
82:5 86:22,23

92:7 95:4,12
105:5,6,20
107:14 108:2
110:2,22,24
111:1,2 114:18
115:1 116:7,8
116:22 118:22
121:5,10 122:2
122:23 123:12
124:21 125:3,3
127:20 131:5,6
131:12 132:7
132:11,12
133:5,6,13,21
138:11 142:18
143:2 144:7,12
144:24 159:14
161:20 162:7
164:8 165:18
166:2,4,8 171:6
174:7,15
176:18 177:2
179:5 182:23
183:5 184:3,16
184:22 185:7
185:23 186:3,8
186:12,17,21
188:14,16,18
189:13,14,16
190:3 192:4
200:19,20
201:12 204:2
205:9 209:3,4
209:11 211:16
211:17
**thinking** 35:16
85:25 130:24
130:24
**third** 114:9 129:9
136:3 164:17
179:14 180:6
187:25 188:11
188:17 189:23
190:19 193:11
198:9

**third-party** 35:1
56:16,19,21
**Thompson** 2:15
2:19 4:17,17
23:25 24:7,14
24:20,21 25:3
37:17 39:18
42:3,8 48:12
57:24 58:4 63:5
67:7 73:8 77:6
77:19,22 78:3
79:10,20 81:18
81:20 99:2
100:15,23
105:12 116:21
124:2,18
130:10 148:14
150:7,11,19,22
150:25 151:2,8
151:22 154:22
155:9,21 164:4
169:12 172:2
174:7,11 188:5
190:9 201:25
202:23 208:21
209:2 214:11
**thought** 11:3
13:19 42:25
43:9,15 45:1
51:9 60:19
86:10 90:14,18
90:24 98:7
142:25 184:15
185:21 206:13
**thoughts** 159:15
**thousand** 79:7
91:15 179:20
180:2
**thousands** 78:25
79:3 90:4 94:5
**three** 8:12 18:19
31:23,25 64:5
**threshold** 109:6
**thrown** 187:4
**tickets** 211:7,13

213:14,16,18
**tied** 55:23
**ties** 63:11
**tight** 37:9 93:6
202:11
**TikTok** 40:1
**time** 4:6 7:12,14
7:15 12:22
13:16 15:7,11
16:25 19:2,7,8
20:20 24:2,3
30:9,14 33:4
35:12,13,19
36:1 41:20 49:3
50:19 58:6,10
59:22 70:20
71:5,25 73:12
73:17 74:21
76:18,20,23
77:3 85:22
90:15 91:17
93:3,7,13,14,16
93:22 94:6
96:12 98:7,20
104:4,8 106:13
111:6,16
114:18 116:8
116:11,23
123:18 124:11
128:10,14
131:1,7 145:14
146:1 151:3
154:25 155:7
156:6 160:13
160:23,24
161:22 166:16
166:20 179:13
181:10,25
185:7 191:8
194:18 195:1
195:18 196:14
197:3 201:4
206:8 208:12
211:18,22
214:17 215:9

times 14:11 63:7
  63:8 86:14 99:5
  116:11 160:20
  204:17
timing 60:19
title 16:18 20:24
  20:25 68:8
today 9:24
  105:19 171:2
  196:20 209:6
today's 4:5
  214:17
told 44:10,17
  71:12 73:4 74:7
  75:10,11 81:10
  111:23 125:7
  125:17 126:3,9
  126:23 130:23
  132:11,16
  148:7 150:10
  161:12 167:20
  173:1,5,9
  199:18
tool 180:23
tools 86:23 87:1
  88:9 179:13
  180:11,12,16
top 137:23 142:8
  168:20
topics 136:16
  185:11
total 123:7
  154:10 160:23
  175:17,18
  176:9
touch 77:25
town 210:11,13
  210:15
track 95:8,17
tracked 26:4,7
  181:2
tracking 21:12
  25:12,15 26:1
  26:12 30:11
trade 8:9 190:7

190:10,12,14
trademark
  105:23
trademarks 8:14
transaction 6:18
  6:21 9:6,15
transactions 51:6
transcribed
  104:14
transcript 215:7
transcription
  215:8
transfer 98:5
transition 194:25
transport 27:6
trashed 166:1
travel 95:10
traveled 170:16
travelled 170:23
treated 187:20
tremendously
  181:20 183:14
  186:13 187:9
  189:16
tricky 61:21
tried 21:13 27:5
  62:12 86:22
  87:2,5 89:20,23
  91:1 183:8
triggered 131:10
trip 210:9,17,25
  211:3,14
trucks 30:19,25
true 105:19 135:9
  160:6 161:6,11
  215:7
trust 50:15,19,21
  51:4 53:9,17,18
  76:17 82:11
  102:1 106:25
  123:2,19 124:1
  124:6,7,17
  131:15 172:5,7
  172:10,15,18
trusted 47:22

50:1 51:7 53:6
  63:8 82:11
  102:2 111:25
truth 60:25 61:1
try 15:5 46:3
  104:10
trying 25:9 59:11
  60:18 91:3
  166:5 174:9
  177:4 189:18
  195:12
turn 97:20
  151:25 153:21
  199:1 202:13
turned 15:17
tutor 75:20 81:16
  81:24 82:2
  185:16
tutors 69:24 74:4
Tuveri 118:6
twice 171:6
two 13:9 50:22
  56:13 60:11
  61:15 67:23
  100:25 167:14
  167:17 171:6
  171:13 176:16
two-thirds 136:2
type 7:13 64:25
  98:22 141:19
  177:23 212:14
types 60:11
typically 192:15

——————
U
——————

U.S 87:5
uh-huh 36:3
  45:20 86:25
  101:10 140:17
  141:2 143:25
  146:19 147:24
  148:9 151:18
  152:4,7,14
  156:1 170:14
  170:18 175:6

175:13,19
  176:7 177:10
  182:12,16,20
  196:3 198:11
  198:14 200:10
  201:16,19
  202:15,19
  204:21 207:14
  208:8,8 210:22
  213:1 214:8
Ulta 90:13 91:8
  91:14
ultimately 44:22
umbrella 7:17
uncomfortable
  127:21 184:8
undersigned
  215:6 216:6
understand 5:18
  6:1 59:12 60:18
  80:24 140:9
  144:12 155:22
  166:6 177:4,17
  188:1 189:19
  195:12
understanding
  82:8 98:20
  103:6
undertaken
  85:12
undertook 32:15
unfortunately
  89:24 90:7
UNITED 1:1
units 180:2
unnecessary 62:3
untrue 193:6
updates 147:20
uploaded 164:16
upper 138:5
  139:13
UPS 64:24 94:5
  95:7,9,11,12
  96:13
upset 131:21

192:2
use 21:18 25:13
  28:2 41:14 55:6
  58:1 62:15
  66:15,17 97:9
  97:10 134:10
  134:13,19
  179:10 203:16
  205:22 206:15
  206:16,24
  209:24
users 34:23
uses 207:2
usurped 203:19
utilized 82:2
  99:23 121:3
  205:13

——————
V
——————

v 4:3
valuation 85:18
  85:23 86:2,6
value 44:13,19
  57:3 196:18,25
valued 86:16
various 18:3
  183:16 189:15
vary 181:17
vendors 207:22
  207:25
verbally 10:20
  15:1 42:11
Victor 115:5
video 55:6
video-recorded
  4:7
Videographer
  2:20 4:1 58:6
  58:10 73:12,17
  103:19,23
  104:4,8 128:10
  128:14 166:16
  166:20 211:18
  211:22 214:16
videos 38:19,23

39:1,2 43:2
55:2,4,8 56:1,5
56:8 57:14
**VIDEOTAPED**
1:18
viewed 193:17
violated 50:21
51:4
vis-à-vis 163:17
visibility 34:16
visit 211:2
visits 171:2,9
volume 95:13
vs 1:7

W

waived 214:23
wall 179:21
want 8:11 27:25
58:3,14 74:9
78:8 92:1,9
101:1 111:23
113:16 123:3
132:8 145:2
164:9 165:10
174:16 180:19
185:24 212:25
wanted 11:15
26:5 36:7 49:22
51:8 106:25
111:21,22
116:11 125:10
125:14,17
127:7 131:23
184:18 185:2
192:3 195:11
211:25
wanting 165:24
166:10 172:16
warehouse 17:1
27:4 28:13 29:7
29:8 31:7,8,8
64:14,17 75:19
75:21 81:6,9,16
81:24 106:16

112:3 122:10
122:14,17,25
123:13,15
204:2,3 206:12
206:16,17
207:7 211:2
warehouses
122:18
warehousing
21:14 31:3,5
49:14
wasn't 26:15 37:2
55:23 57:2 62:6
64:21 86:8
90:15 122:12
122:15 123:5,6
169:23 180:16
186:3 196:16
207:3 209:14
209:15 213:20
way 10:5 18:10
23:22 24:19
26:7 27:6 28:23
36:8 46:23
49:22 61:4
78:17 87:8
88:25 89:3
98:16,21
100:18 110:3
111:19,20
125:22 136:3
165:19 172:14
178:5,18
188:20 191:4
192:3,24 196:6
ways 48:7 98:17
131:8,11 189:4
we'll 91:18
103:11 127:11
we're 5:17 23:12
39:7,8 58:7,11
73:18 98:1
103:9 104:9
128:11,15
133:16 140:15

166:17,21
181:11 211:19
211:23 214:18
we've 45:13
84:16 120:23
141:25 187:1
web 186:11
Webb 115:1
118:17
Wendy 120:12
went 17:3 29:8
29:11 48:15
104:15 127:19
182:17 193:19
197:23 211:1
211:12
weren't 30:20
54:6 66:6 79:16
83:19 90:10
126:11 161:6
wet 180:17,19
WhatsApp
129:13 134:12
134:18 135:11
135:12,15,18
145:7 166:25
Wheel 114:9
179:14 180:6
188:17 189:23
WHEREOF
215:16
Whippy 200:5
White 200:5,13
200:17 202:17
202:21,25
203:11,16,20
wide 179:18
willing 92:5
wise 27:5 180:8
184:10
witness 4:16 5:10
7:25 18:16 22:5
25:4 37:18 42:4
48:14 63:6 67:8
77:23 78:10

79:11,21 99:3
100:16 104:15
105:13 114:4
116:22 117:22
120:20 121:8
124:3,19 128:6
128:9 130:11
135:4 137:12
139:11 143:18
148:15 150:23
151:23 154:23
155:10,22
156:14 164:5
166:15 168:18
172:3 188:6
190:10 198:3
202:1,4 208:22
209:3 214:15
215:11,16
216:8
witnessed 209:21
Woodruff 120:7
word 55:5 172:9
word-by-word
119:23
work 7:11,13
11:24 45:19
68:2 78:13,16
85:8 89:24 94:2
107:19 111:20
114:17 127:17
134:21,25
163:20 173:16
183:9,9,15
204:1,10,13,16
204:18
worked 12:18
14:3 18:20
19:11,14 20:11
27:21 32:18,25
34:1,9,14 35:2
35:4 38:3,7,9
46:16 47:2
50:19 56:19
57:9 58:23

62:13 68:17
77:8,11 117:17
178:5 201:9
204:2
working 7:5,8
12:21 13:2,6
33:19 35:7,17
45:23 56:2
66:19 68:21
71:24 105:8
111:19 119:24
132:3,5 163:25
204:8
workplace
160:10 213:5
works 58:4 98:18
180:22
world 12:3
180:24
worth 196:21
wouldn't 49:25
54:15 91:10
140:8
writing 133:23
134:6,10
written 16:9 25:6
133:12 145:5,6
wrong 74:22 95:4
119:4 187:20
wrote 165:5

X

X 3:1,6
x-number 181:13

Y

Y-L-S-E 117:22
Y-V-E-L-I-S-S...
18:17
yeah 25:23 29:22
41:22,22 51:20
54:15,18 58:2,4
58:5 78:10
103:25 112:23
115:10,10
117:19 120:3

124:15 133:19
134:4 135:11
135:14 136:1
136:14 137:2
139:2 142:18
146:12 147:18
166:7 169:5
180:6 182:9,9
185:14 186:16
**year** 10:13,13
45:6 65:15
177:8
**year-over-year**
65:9
**years** 14:24 32:25
46:17 112:19
175:12
**Yep** 130:6 147:21
154:15
**Ylse** 117:13,16,17
117:17,22,25
**yoga** 159:4,16
**York** 126:18
127:24 128:1
**Yvelisse** 17:13
18:9,16 45:19
85:17 94:17
95:1 102:22
103:8,13 105:7
108:25 109:10
109:19 114:17
114:19 117:17
150:8,18
151:14

**Z**
**zero** 37:7,14
**zone** 184:5
**Zoom** 2:21 4:20
5:2 103:19,20

**0**

**1**
**1** 3:8 128:18
129:2 135:24

141:8,15 215:7
**1-2-23** 137:24
**1:36** 73:18
**10** 3:17 16:23
170:3,6 179:15
203:13
**10-1** 177:16
**10-2** 177:16
**10,000** 179:20
180:1
**10:23:32** 136:6
**10:27** 1:13 4:6
**100** 2:16 166:3
**100,000** 79:5
**101** 1:15 4:8
**11** 3:18 173:19,23
174:5 175:9
176:2
**11:43** 58:7
**11:53** 58:11
**12** 3:19 173:19,23
174:8,14,20
177:24 178:19
181:11 182:11
204:20
**12:17** 73:13
**122** 207:9,11
**128** 3:8
**13** 3:20 198:2,7
201:15 207:15
**137** 3:9
**139** 3:10
**140** 3:11
**142** 3:12
**144** 208:3
**147** 3:13
**156** 3:14
**167** 3:15
**168** 3:16
**17** 156:21,23
**170** 3:17
**173** 3:18,19
**17th** 2:4
**18** 6:9
**19** 95:3 103:15

147:16 153:13
155:18 177:7
177:11,16
**198** 3:20
**1st** 136:4

**2**
**2** 3:9 137:7,11
141:9
**2-2-23** 137:25
**2(b)** 198:12
**2:13** 104:5
**2:25** 104:9
**2:34** 129:18
**20** 76:15 98:5,8,8
103:15 125:2
138:5 177:8,12
177:16
**200** 1:15
**2018** 7:3 9:1,24
10:2 32:7
148:21 149:5
155:14,19
175:12 176:15
**2019** 97:18
141:14 150:7
153:12 175:12
182:18
**2020** 175:14
**2021** 175:14
182:18
**2022** 10:10 76:13
76:23 77:12
78:22 125:2
126:18 129:17
168:21,25
174:23 176:4
176:16 185:22
**2023** 136:4
142:10 147:1
147:11,16
153:19 156:21
156:23
**2024** 1:12 4:5
215:18 216:9

**2050** 2:17
**21** 76:15 139:21
141:13 177:8
177:13,16
199:2
**214** 215:7
**22** 35:18 169:3
176:21 177:14
177:21,22
178:1 181:14
182:2,5 183:1,1
183:4
**22nd** 142:10
**23** 181:15
**23-CV-60345-...**
1:3
**235349** 215:24
216:17
**26** 174:23
**27** 147:1 149:22
200:11
**28** 201:15
**2800** 2:5
**29** 129:17 202:14
**29,000** 153:12,14

**3**
**3** 3:10 139:5,10
141:13,14
**3:01** 128:11
**3:14** 128:15
**3:54** 147:1
**30** 180:17
**300** 2:11
**31** 1:12
**31st** 4:5
**33.3** 195:7
**33136** 1:16
**33143** 2:12
**33602** 2:18
**35** 203:13 207:8
**36** 207:13
**3rd** 168:21
215:17 216:8

**4**

**4** 3:11 138:5
139:21 140:15
140:20 141:1,4
141:19
**4:10** 166:17
**4:34** 166:21
**41** 204:20
**44** 208:3

**5**
**5** 3:4,12 142:1,4
**5:44** 211:19
**5:52** 211:23
**5:56** 1:13 214:18
214:21
**500** 179:20
**5966** 2:10

**6**
**6** 3:13 141:13
146:18,22
149:20 150:7
151:13 153:22
198:13 199:2
**6-29-2026** 215:23
216:16
**6,000** 79:13,15
80:6
**600** 2:4

**7**
**7** 3:14 156:10,13
200:9 201:14
**70** 93:22
**780** 154:16

**8**
**8** 3:15 141:14
166:25 167:9
176:2 202:13
**80** 180:18
**80202** 2:6
**8th** 1:15 4:8

**9**
**9** 3:16 149:23