# Deposition Transcript

Case Number: 23-CV-60345-JB
Date: September 6, 2024

In the matter of:

# Head Kandy LLC v KAYLA MARIE MCNEILL, et al.

# Ryan Thompson

**CERTIFIED COPY**

Reported by:
SOLANGE RUIZ-URIBE



Steno
Official Reporters

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: Firm #108F

1               UNITED STATES DISTRICT COURT
                        for the
2               Southern District of Florida

3                      ---oOo---

4   HEAD KANDY, LLC,                )CASE NO. 23-CV-60345-JB
                                    )
5                                   )
                Plaintiff,          )
6   vs.                             )
                                    )
7   KAYLA MARIE MCNEILL,            )
                                    )
8               Defendant.          )
    _____)
9

10

11

12

13

14                     VOLUME I

15          REMOTE VIDEO DEPOSITION OF RYAN THOMPSON

16   located in Tampa, Florida,  commencing at 9:03 A.M. MST

17   on Friday, September 6, 2024, before SOLANGE

18   RUIZ-URIBE, Court Reporter, in and for the State of

19   South Carolina.

20

21

22

23

24   STENO
     Concierge@Steno.com
25   (888)707-8366

```
 1   APPEARANCES VIA STENO CONNECT:

 2

 3   FOR THE PLAINTIFF HEAD KANDY, LLC AND THE WITNESS:

 4             BARTLETT LOEB HINDS THOMPSON & ANGELOS,
              PLLC
 5             BY:  CARSON SADRO
              VIA VIDEOTELECONFERENCE
 6             101 Water Street, Suite 475
              Tampa, FL 33602
 7             (813) 223-3888
              CarsonS@blhtlaw.com
 8
     ATTORNEYS FOR THE DEFENDANT KAYLA MARIE MCNEILL:
 9
              LAW OFFICE OF ANTONIO L. CONVERSE, ESQ.
10             BY:  ANTONIO L. CONVERSE
              VIA VIDEOTELECONFERENCE
11             600 17th Street, Suite 2800 South
              Denver, CO 80202
12             (303) 228-9471
              anthony@converselawgroup.com
13

14

15

16

17

18

19   OTHER APPEARANCES:

20   LEGAL VIDEOGRAPHER - MATTHEW PASTER

21

22

23                    ---oOo---

24

25
```

```
 1                      INDEX

 2                    ---oOo---

 3                                            Page

 4   WITNESS EXAMINATION:  RYAN THOMPSON        6

 5   DIRECT EXAMINATION:  ATTORNEY CONVERSE     7

 6   SIGNATURE OF DEPONENT

 7   CERTIFICATE OF REPORTER                   162

 8

 9

10

11           REQUESTED INFORMATION INDEX

12

13         (No Information Index Requested)

14

15

16

17                    ---oOo---

18

19

20                    EXHIBITS

21                                            Page

22   DEFENDANT'S

23   EXHIBIT NO. 1   SIGNED DECLARATION OF RYAN   8

24               THOMPSON DATED 05/24/2023

25   (exhibits continued)
```

```
 1   (exhibits continued)

 2                                                     Page

 3   EXHIBIT NO. 2   TEXT MESSAGES BATES PAGES         54

 4                   KM6698 TO KM8876

 5   EXHIBIT NO. 3   03/02/2020 RESIGNATION EMAIL      77

 6                   LETTER BATES PAGES HK_044714

 7                   TO 044715

 8   EXHIBIT NO. 4   EMAILS BATES PAGE KM5308          114

 9

10

11                       ---oOo---

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

08:56:21  1          FRIDAY, SEPTEMBER 6, 2024, 9:03 A.M. MST

08:56:21  2                        ---oOo---

09:03:00  3          THE VIDEOGRAPHER:  Good morning.  We are

09:03:01  4   on the record at 9:03 Mountain time -- 9:03 a.m.

09:03:04  5   Mountain time on September 6, 2024 to begin the

09:03:07  6   deposition of Ryan Thompson in the matter of Head

09:03:12  7   Kandy, LLC versus Kayla Marie McNeill, et. al.

09:03:16  8          The venue for this case is United States

09:03:16  9   District Court Southern District of Florida.  The case

09:03:19 10   number is 0:23-CV-60345.

09:03:29 11          This deposition is taking place via Zoom

09:03:31 12   videoconference.  The legal videographer is Matthew

09:03:32 13   Paster on behalf of Steno.  And the court reporter is

09:03:36 14   Solange Uribe also here on behalf of Steno.

09:03:40 15          Will counsel please identify yourself and

09:03:42 16   state whom you represent.

09:03:43 17          ATTORNEY CONVERSE:  Anthony --

09:03:47 18          ATTORNEY SADRO:  Yes.  Carson --

09:03:48 19          ATTORNEY CONVERSE:  Go.

09:03:48 20          ATTORNEY CONVERSE:  Ahead.

09:03:49 21          ATTORNEY SADRO:  Okay.  Carson Sadro on

09:03:51 22   behalf Head Kandy and Ryan Thompson.

09:03:55 23          ATTORNEY CONVERSE:  Anthony Converse on

09:03:58 24   behalf of Kayla McNeill.

09:04:00 25          THE VIDEOGRAPHER:  Thank you, Counsel.

09:04:01  1         Will the reporter please swear in the

09:04:01  2    witness.  Oh, it looks like you are muted.

09:04:01  3         THE COURT REPORTER:  Thank you.

09:04:01  4         I have a stipulation for Counsel first.  This

09:04:01  5    is Solange Ruiz-Uribe and I am the court reporter.

09:04:01  6         The attorneys appearing in this deposition

09:04:01  7    acknowledge that I am not physically present in the

09:04:01  8    deposition room, that I will be reporting this

09:04:01  9    deposition remotely, and that I will administer the

09:04:01 10    oath remotely to the witness.

09:04:01 11         The parties and their counsel further

09:04:01 12    agree that while I'm the court reporter and licensed

09:04:01 13    notary, the witness may be in a state where I'm not

09:04:01 14    licensed.  The parties stipulate that this

09:04:01 15    deposition will be taken before me.

09:04:01 16         If any party does have an objection to

09:04:01 17    this manner of reporting or anything that I have

09:04:01 18    stated above, please state so now.

09:04:01 19         Hearing none, we can proceed.

09:04:01 20                        ---oOo---

09:04:52 21              RYAN THOMPSON,

09:04:52 22    called as a witness herein, having been administered an

09:04:52 23    oath remotely, was examined and testified as follows:

09:04:52 24         THE COURT REPORTER:  Thank you.  Please

09:04:52 25    state where you are currently at?

RYAN THOMPSON
SEPTEMBER 06, 2024

JOB NO. 1164890

| | | |
|---|---|---|
| 09:04:52 | 1 | THE WITNESS:  Tampa, Florida. |
| 09:04:52 | 2 | THE COURT REPORTER:  Thank you.  You may |
| 09:04:52 | 3 | proceed. |
| 09:04:52 | 4 | ---oOo--- |
| 09:04:52 | 5 | DIRECT EXAMINATION |
| 09:04:52 | 6 | BY ATTORNEY CONVERSE: |
| 09:05:07 | 7 | Q.   Mr. Thompson, have you ever referred to |
| 09:05:09 | 8 | Kayla McNeill as your best friend? |
| 09:05:13 | 9 | A.   Yes. |
| 09:05:14 | 10 | Q.   Were you being truthful when you said |
| 09:05:16 | 11 | that? |
| 09:05:19 | 12 | A.   Yeah. |
| 09:05:19 | 13 | Q.   Were you being truthful every time you |
| 09:05:22 | 14 | referred to her as your best friend? |
| 09:05:24 | 15 | A.   Yes, I considered her and I very close. |
| 09:05:27 | 16 | Q.   Is she still very friend? |
| 09:05:29 | 17 | A.   I cannot say that now. |
| 09:05:33 | 18 | Q.   During what time period were the two of |
| 09:05:36 | 19 | you best friends? |
| 09:05:38 | 20 | A.   I would say we became very close starting |
| 09:05:42 | 21 | in 2017 up until her departure of Head Kandy in |
| 09:05:46 | 22 | 2020 -- it was 2022, I guess. |
| 09:05:50 | 23 | Q.   So we've had a number of depositions in |
| 09:05:54 | 24 | this matter and there's other testimony that |
| 09:05:59 | 25 | Ms. McNeill was terminated on January 30th, 2023. |

| | | |
|---|---|---|
| 09:06:04 | 1 | Does that sound more accurate to you? |
| 09:06:07 | 2 | A.   Yeah, that's probably correct. |
| 09:06:14 | 3 | Q.   So you -- you would consider the two of |
| 09:06:18 | 4 | you very close and best friends from 2017 to the |
| 09:06:22 | 5 | time of her termination by Head Kandy? |
| 09:06:27 | 6 | A.   Correct. |
| 09:06:39 | 7 | Q.   All right.  I'm going to attempt to pull |
| 09:06:43 | 8 | up a document that we'll mark as deposition Exhibit |
| 09:06:50 | 9 | One. |
| 09:06:51 | 10 | (Defendant's Exhibit No. 1, SIGNED |
| 09:06:51 | 11 | DECLARATION OF RYAN THOMPSON DATED 05/24/2023, was |
| 09:06:51 | 12 | marked for identification.) |
| 09:06:57 | 13 | ATTORNEY SADRO:  Is that going in the |
| 09:06:59 | 14 | chat, Anthony? |
| 09:07:03 | 15 | ATTORNEY CONVERSE:  I dropped it in the |
| 09:07:04 | 16 | app, so I don't know if you have access to it, but |
| 09:07:09 | 17 | this is -- and I'll say this for you also, |
| 09:07:12 | 18 | Mr. Thompson, as you can see, I'm zooming in to make |
| 09:07:17 | 19 | it larger for you. |
| 09:07:18 | 20 | But as you can see from the blue court |
| 09:07:22 | 21 | information this was filed in this matter as document |
| 09:07:29 | 22 | 44-1.  It was Exhibit A to the response to the motion |
| 09:07:34 | 23 | to dismiss that was submitted by Head Kandy in this |
| 09:07:38 | 24 | matter and I'm scrolling down to the bottom of page 1, |
| 09:07:41 | 25 | you can see the Exhibit A labeled.  Are you able to |

RYAN THOMPSON
SEPTEMBER 06, 2024

JOB NO. 1164890

```
09:07:47  1   you --
09:07:48  2            To you, Carson, are you able to see or to
09:07:50  3   access the -- the document for download or can you
09:07:55  4   only see it?
09:07:57  5            ATTORNEY SADRO:  I did not attempt to
09:07:59  6   download it yet.
09:08:00  7            ATTORNEY CONVERSE:  Okay.  Well, just
09:08:02  8   going forward let me know.  Obviously, this --
09:08:04  9            ATTORNEY SADRO:  I'll -- I'll let you
09:08:04 10   know.
09:08:06 11            ATTORNEY CONVERSE:  Okay.  Great.
09:08:06 12            ATTORNEY SADRO:  Yeah, I'll let you know,
09:08:08 13   thank you.
09:08:09 14            ATTORNEY CONVERSE:  Yeah.
09:08:09 15   BY ATTORNEY CONVERSE:
09:08:12 16       Q.   Mr. Thompson, I'm scrolling down to
09:08:17 17   page 2, paragraph nine.  Actually beginning in
09:08:26 18   paragraph eight, you -- sorry, paragraph seven, you
09:08:33 19   reference some Amex statements and you continue to
09:08:35 20   speak about the Amex statements in subsequent
09:08:38 21   paragraphs eight and nine.  And then in paragraph
09:08:41 22   nine, you state that, Ms. McNeill instructed you to
09:08:47 23   categorize as business expense every charge that
09:08:50 24   could in any conceivable way be viewed as expense
09:08:54 25   for Head Kandy, LLC even if I believe it was a
```

09:08:59   1   charge for personal item.

09:09:00   2           Do you see the sentence that I just read?

09:09:03   3       A.   Yes, sir.

09:09:03   4       Q.   During what time period were you

09:09:05   5   instructed by Ms. McNeill to make these

09:09:09   6   categorizations?

09:09:11   7       A.   So I was not instructed to do any Amex

09:09:16   8   expenses or expense reports until a purchase in 2018

09:09:22   9   by the Falic brothers.  So it would have been 2018

09:09:29  10   until I quit in 2020, I think is the timeframe that

09:09:37  11   I was doing expense reports for Ms. McNeill.

09:09:44  12       Q.   Okay.  And you filled out the paperwork,

09:09:46  13   correct?

09:09:50  14       A.   Yeah, there were -- it was more email

09:09:52  15   communications between myself and the expense report

09:09:57  16   department, I guess you could say, the accountants

09:10:02  17   at Head Kandy, Inc.

09:10:04  18       Q.   Okay.  So you made the designations for

09:10:08  19   some person -- strike that.

09:10:12  20               As you stated here, you designated

09:10:14  21   some personal expenses as business expenses in those

09:10:21  22   communications, right?

09:10:23  23       A.   That it correct.

09:10:24  24       Q.   Okay.  And then you submitted that

09:10:27  25   paperwork to another Head Kandy representative for

RYAN THOMPSON
SEPTEMBER 06, 2024

JOB NO. 1164890

09:10:31   1   approval and payment, right?

09:10:34   2        A.   That's correct.

09:10:35   3             ATTORNEY SADRO:   Object to form.

09:10:36   4             THE WITNESS:   That's correct.

09:10:36   5   BY ATTORNEY CONVERSE:

09:10:37   6        Q.   Sorry.   It was -- a little unclear.

09:10:41   7   What -- you had said that you submitted paperwork.

09:10:45   8   To whom did you submit the -- or excuse me, not

09:10:49   9   paperwork.   Strike that.

09:10:52   10            You said that you had exchanged

09:10:53   11  emails.   To whom did you exchange emails?

09:10:58   12       A.   There were quite a few different contacts

09:11:00   13  at the corporate office that I dealt with that

09:11:03   14  changed quite a few time.   So I can't think

09:11:07   15  specifically think of a lot of the names, but I'm

09:11:09   16  pretty sure -- I can't think of the names right off

09:11:15   17  the top of my head, I apologize.

09:11:17   18       Q.   That's okay.   You said the corporate

09:11:21   19  office, are you referring to Head Kandy's corporate

09:11:23   20  office?

09:11:24   21       A.   Yes, yeah.

09:11:25   22       Q.   And were those Head Kandy representatives

09:11:28   23  whatever their names may have been that you were

09:11:31   24  sending the information to?

09:11:33   25            ATTORNEY SADRO:   Object to form.

09:11:35  1        THE WITNESS:  Sorry.  Can you repeat that?

09:11:38  2   BY ATTORNEY CONVERSE:

09:11:38  3        Q.   Yes.  The individuals you said couldn't

09:11:41  4   recall their name that you were senting the

09:11:43  5   information to, were you were they representatives

09:11:45  6   of Head Kandy?

09:11:47  7        ATTORNEY SADRO:  Object to form.

09:11:48  8        THE WITNESS:  Yes, they were part of the

09:11:51  9   Falic group.

09:11:53 10   BY ATTORNEY CONVERSE:

09:11:54 11        Q.   Were you instructed to submit the

09:11:56 12   information to those individuals?

09:11:58 13        A.   Yes, sir.

09:11:59 14        Q.   By whom?

09:12:00 15        A.   I don't know specifically who instructed

09:12:02 16   me.

09:12:04 17        Q.   Someone within Head Kandy?

09:12:06 18        A.   Within the ownership, yes.

09:12:35 19        Q.   Why were you submitting that documentation

09:12:39 20   to those individuals in the corporate office?

09:12:43 21        A.   That was who was taking over the

09:12:45 22   financials at that time since the purchase happened.

09:12:52 23        Q.   Would they approve the expense report that

09:12:56 24   you were submitting?

09:12:58 25        A.   I don't know that there was ever an

09:13:00  1   approval process that was returned to me.  I was

09:13:03  2   simply just filling out -- basically I would take

09:13:06  3   the Amex report and state what were business

09:13:16  4   expenses and what weren't.  And I would send them in

09:13:19  5   for payment or reimbursement or whatever needed to

09:13:22  6   be done.  After that, I don't recall what the

09:13:25  7   procedure was after that.

09:13:36  8       Q.   Did you believe what Ms. McNeill was

09:13:38  9   asking you to do as we read in this paragraph nine

09:13:42 10   to be wrong?

09:13:54 11       A.   Yeah, there were -- I mean, there were

09:13:55 12   things that we would put on the expense report that

09:13:58 13   I didn't really necessarily think should be on

09:14:00 14   there, but I was simply doing as instructed.

09:14:02 15       Q.   Well, here you say you believe to be a

09:14:04 16   charge for a personal item.  So were you able to

09:14:08 17   determine if charge was a business expense or a

09:14:10 18   personal item?

09:14:12 19       A.   I would make that determination based off

09:14:14 20   instructions of anything that could be related to

09:14:17 21   Head Kandy or used at Head Kandy at any point was to

09:14:19 22   be included on the expense report for reimbursement

09:14:22 23   and/or payment.

09:14:24 24       Q.   Well, what led you to believe that a

09:14:27 25   particular charge was for personal item?

09:14:31  1      A.   I mean, I think it's fair to say that

09:14:35  2  writing off clothing just because it was worn on a

09:14:41  3  video or makeup because it was used for a video or

09:14:45  4  such things like that, I don't believe that those

09:14:48  5  are necessarily a writeoff all the time.  So that's

09:14:51  6  what I mean when I say that.

09:14:55  7      Q.   So you thought it was obvious that some of

09:15:01  8  the expenses you told to mark as business were

09:15:05  9  actual personal expenses?

09:15:08 10           ATTORNEY SADRO:  Object to form.

09:15:08 11           THE WITNESS:  Yes.

09:15:08 12  BY ATTORNEY CONVERSE:

09:15:10 13      Q.   Was Ms. McNeill essentially asking you to

09:15:13 14  lie for her?

09:15:14 15      A.   I feel so, yes.

09:15:16 16      Q.   And then if we scroll down to paragraph 12

09:15:22 17  in this Exhibit One, you explain why you took the

09:15:33 18  actions that you did and in this paragraph 12,

09:15:35 19  there's a sentence that begins, out the fear for

09:15:39 20  loosing my job or being subject to verbal emotional

09:15:43 21  abuse, I followed Ms. McNeill's direction in

09:15:46 22  submitting her Amex charges for payment by Head

09:15:47 23  Kandy, LLC which included what I believe to be

09:15:52 24  personal expenses which I believe Ms. McNeill

09:15:55 25  understood were personal expenses.

RYAN THOMPSON                                              JOB NO. 1164890
SEPTEMBER 06, 2024

09:15:58   1              Do you see that?

09:15:58   2        A.   Yes.

09:15:59   3        Q.   And -- and is that true you submitted

09:16:02   4   the -- that falsified documentation out of fear for

09:16:05   5   losing your job?

09:16:07   6              ATTORNEY SADRO:  Object to form.

09:16:08   7              THE WITNESS:  Yes, that's correct.

09:16:08   8   BY ATTORNEY CONVERSE:

09:16:09   9        Q.   Okay.  Well, other than lie, what else

09:16:15  10   would you do to protect your job?

09:16:18  11              ATTORNEY SADRO:  Object to form.

09:16:19  12              THE WITNESS:  I would do anything that I

09:16:20  13   was asked to.

09:16:21  14   BY ATTORNEY CONVERSE:

09:16:22  15        Q.   Okay.  And is that true for all time

09:16:24  16   periods?

09:16:25  17        A.   Yes.

09:16:25  18        Q.   Okay.  You said that you were employed by

09:16:43  19   Head Kandy from 2018 until 2020 and then you left.

09:16:48  20   Did I understand you correctly?

09:16:49  21        A.   I started in August 2017 to 2000 -- until

09:16:51  22   March of 2020.  That's correct.

09:16:55  23        Q.   Sure.  I think -- maybe a clarification.

09:16:58  24   I was speaking about Head Kandy.  I believe Head

09:17:03  25   Kandy was formed in 2018.  Is that your

09:17:07  1  understanding?

09:17:07  2      A.   I believe Head Kandy was under the

09:17:09  3  technical name of Lashed Out, LLC.  But it was

09:17:13  4  always referred to as Head Kandy around 2017 when I

09:17:16  5  started.

09:17:17  6      Q.   Okay.  Do you know what entity you were

09:17:19  7  working for in 2017?

09:17:22  8      A.   It would have been Ms. McNeill, Head Kandy

09:17:26  9  or Lashed Out, LLC, I guess.

09:17:28 10      Q.   And so you don't know who your employer

09:17:32 11  was in 2017?

09:17:35 12          ATTORNEY SADRO:  Object to form.

09:17:35 13          THE WITNESS:  Yes, my employer was Head

09:17:38 14  Kandy.

09:17:39 15  BY ATTORNEY CONVERSE:

09:17:39 16      Q.   Okay.  Were you ever employed by Lashed

09:17:44 17  Out?

09:17:48 18      A.   I believe Head Kandy was under the branch

09:17:51 19  of Lashed Out.  So I don't really -- I -- I guess I

09:17:56 20  could say I was.  But it was under Head Kandy is

09:18:01 21  what I have always referred to it as.

09:18:05 22      Q.   Do you know the name of the entity that

09:18:08 23  employed you in 2017?

09:18:12 24          ATTORNEY SADRO:  Object to form.

09:18:13 25          THE WITNESS:  Head Kandy.

09:18:14  1   BY ATTORNEY CONVERSE:

09:18:15  2        Q.   Okay.  And what -- sorry.  Strike that.

09:18:26  3                  Did your employer change from 2017 to

09:18:32  4   2020?

09:18:36  5        A.   I guess I don't understand what you are

09:18:38  6   asking.

09:18:42  7        Q.   Well, you were first discussing the name

09:18:44  8   of your employer in 2017.  What I'm trying to

09:18:49  9   understand is, did your employer change from 2017 to

09:18:55 10   2020?

09:18:57 11        A.   I guess if you want to look at it as in

09:19:00 12   terms of ownership, there were owners that came in

09:19:05 13   halfway through that timeframe, yes.  But it was --

09:19:10 14   I've always been paid by Head Kandy.

09:19:13 15        Q.   Okay.  And I'm asking about the actual

09:19:17 16   employer that paid you the money.  Not the owners of

09:19:23 17   the business.  So with regard to the actual entity

09:19:27 18   that employed you and paid you for the work that you

09:19:34 19   performed, did that entity change at all between

09:19:38 20   2017 and 2020?

09:19:42 21             ATTORNEY SADRO:  Object to form.

09:19:43 22             THE WITNESS:  I've always been employed by

09:19:45 23   Head Kandy.  So that never changed.

09:19:48 24   BY ATTORNEY CONVERSE:

09:19:49 25        Q.   All right.  During that period of time

| | | |
|---|---|---|
| 09:20:12 | 1 | that you were employed by Head Kandy that ended with |
| 09:20:18 | 2 | your departure in 2020, how were you being |
| 09:20:31 | 3 | compensated? |
| 09:20:34 | 4 | ATTORNEY SADRO:  Objection, form. |
| 09:20:35 | 5 | THE WITNESS:  I mean, I started out as an |
| 09:20:37 | 6 | hourly employee and then eventually transitioned to |
| 09:20:40 | 7 | a salary employee. |
| 09:20:43 | 8 | BY ATTORNEY CONVERSE: |
| 09:20:43 | 9 | Q.   When -- |
| 09:20:44 | 10 | A.   Always paid by Head Kandy. |
| 09:20:45 | 11 | Q.   When did you transition to a salary |
| 09:20:48 | 12 | employee? |
| 09:20:49 | 13 | A.   I don't recall the exact dates. |
| 09:20:56 | 14 | Q.   Was your hourly compensation consistent |
| 09:20:59 | 15 | until you transferred to salaried? |
| 09:21:04 | 16 | A.   I do not recall. |
| 09:21:08 | 17 | Q.   What was your salary once you were |
| 09:21:11 | 18 | converted from an hourly employee? |
| 09:21:14 | 19 | ATTORNEY SADRO:  Objection, form. |
| 09:21:15 | 20 | THE WITNESS:  I believe my first salary |
| 09:21:17 | 21 | was 54,000. |
| 09:21:19 | 22 | BY ATTORNEY CONVERSE: |
| 09:21:24 | 23 | Q.   What was your salary when you left Head |
| 09:21:30 | 24 | Kandy in 2020? |
| 09:21:33 | 25 | A.   75,000. |

09:21:46  1      Q.   Did you subsequently return to work for

09:21:51  2  Head Kandy after your departure in 2020?

09:21:56  3      A.   Yes, I believe I came back for employment

09:21:58  4  in 2021.

09:22:15  5      Q.   Do you know Bryan Feldman?

09:22:18  6      A.   Yes, sir.

09:22:18  7      Q.   How do you know Bryan Feldman?

09:22:23  8      A.   Bryan Feldman was one of the owners when

09:22:26  9  the Falic brothers came in, I believe.

09:22:28 10      Q.   And was that an owner of Head Kandy?

09:22:32 11      A.   Yes, I'm sorry.

09:22:34 12      Q.   And you reference the Falic brothers.  Who

09:22:37 13  are the Falic brothers?

09:22:39 14      A.   Jerome Falic, Leon Falic and there is

09:22:44 15  another one I can't recall his name.

09:22:55 16      Q.   Could it be Simon?

09:22:56 17      A.   That sounds right.

09:23:13 18      Q.   Let's start in reverse order.  To your

09:23:17 19  knowledge, did Simon Falic have any role with Head

09:23:23 20  Kandy other than as an owner?

09:23:27 21      A.   Not to knowledge.

09:23:30 22      Q.   Okay.  Moving to Leon Falic, to your

09:23:33 23  knowledge did he have any role with Head Kandy other

09:23:37 24  than as an owner?

09:23:38 25      A.   Not to my knowledge, no.

09:23:40  1       Q.   Mr. Jerome Falic to your knowledge, did he

09:23:44  2   have any role to with Head Kandy other than as an

09:23:47  3   owner?

09:23:49  4       A.   I believe he was involved in a lot of the

09:23:51  5   decision making, but I never directly dealt with

09:23:55  6   Mr. Falic.

09:24:06  7       Q.   And did Bryan Feldman have any role with

09:24:11  8   Head Kandy other than as an owner?

09:24:14  9       A.   Yes.  I believe he was overseeing

09:24:17  10  financials, is my understanding.

09:24:25  11      Q.   Did you have any direct contact with

09:24:27  12  Mr. Feldman?

09:24:29  13      A.   On occasion, yes.

09:24:30  14      Q.   Okay.  Specifically, did you have any

09:24:42  15  direct communication with Mr. Feldman during your

09:24:46  16  initial employment with Head Kandy that ended in

09:24:49  17  2020?

09:24:50  18      A.   Yes.

09:24:51  19      Q.   Okay.  And then when you returned to Head

09:24:59  20  Kandy, did you have any direct contact with

09:25:02  21  Mr. Feldman?

09:25:04  22      A.   Maybe once or twice, but no, not -- not --

09:25:08  23  not on an official capacity.

09:25:15  24      Q.   Did you know how to contact him if you

09:25:17  25  needed to speak to him?

| | | |
|---|---|---|
| 09:25:19 | 1 | A.   Yes. |
| 09:25:58 | 2 | Q.   Did you ever have contact with Mr. Feldman |
| 09:26:13 | 3 | that didn't include any other individuals? |
| 09:26:16 | 4 | ATTORNEY SADRO:  Object to form. |
| 09:26:16 | 5 | THE WITNESS:  Yes. |
| 09:26:17 | 6 | BY ATTORNEY CONVERSE: |
| 09:26:21 | 7 | Q.   When you came back to Head Kandy, did you |
| 09:26:25 | 8 | have a title? |
| 09:26:31 | 9 | A.   I don't really recall what that title |
| 09:26:33 | 10 | would have been specifically, no. |
| 09:26:40 | 11 | Q.   Were you in a managerial role when you |
| 09:26:44 | 12 | came back to Head Kandy? |
| 09:26:45 | 13 | A.   No. |
| 09:26:46 | 14 | ATTORNEY SADRO:  Object to form. |
| 09:26:46 | 15 | THE WITNESS:  No, I was not. |
| 09:26:47 | 16 | BY ATTORNEY CONVERSE: |
| 09:26:48 | 17 | Q.   Were you in a supervisory role when you |
| 09:26:50 | 18 | were back to Head Kandy? |
| 09:26:52 | 19 | ATTORNEY SADRO:  Object to form. |
| 09:26:52 | 20 | THE WITNESS:  No, I was not. |
| 09:26:53 | 21 | BY ATTORNEY CONVERSE: |
| 09:27:54 | 22 | Q.   I meant to ask you about your role with |
| 09:27:57 | 23 | Head Kandy before your 2020 departure and I'm going |
| 09:28:01 | 24 | to direct your attention back to this Exhibit One |
| 09:28:11 | 25 | paragraph three on page 1.  You state that, I |

RYAN THOMPSON
SEPTEMBER 06, 2024

JOB NO. 1164890

09:28:17  1    eventually rose to become the vice president of

09:28:21  2    operations for Head Kandy, LLC before I left in

09:28:23  3    March 2020.  Do you see that?

09:28:25  4         A.   Yes, sir.

09:28:26  5         Q.   Do you know when you became the vice

09:28:28  6    president of operations?

09:28:30  7         A.   I don't recall the exact date.

09:28:35  8         Q.   And then if we scroll to the second page,

09:28:39  9    top of the page paragraph six, you say at

09:28:44 10    Ms. McNeill's request I returned to Head Kandy, LLC

09:28:51 11    in June 2022 with less of a role as her personal

09:28:55 12    assistant.  Do you see that?

09:28:56 13         A.   Uh-huh.

09:28:57 14         Q.   When were you Ms. McNeill's personal

09:29:01 15    assistant?

09:29:02 16         A.   When I came back in June 2022, I -- my

09:29:07 17    role was more to take over photography for the

09:29:12 18    company and also assist Ms. McNeill with whatever

09:29:14 19    she may need assistant with.

09:29:24 20         Q.   So the question was, when were you her

09:29:26 21    personal assistant and you refer to your second

09:29:29 22    tenure at Head Kandy.  So were you her personal

09:29:33 23    assistant during your second tenure?

09:29:36 24         A.   I mean, I've always kind of been

09:29:37 25    Ms. McNeill's personal assistant.  I've always done

09:29:38  1   what she's asked and whether that be in a personal

09:29:41  2   capacity or a work capacity.  You know, when we talk

09:29:45  3   about titles, our titles were very -- on paper they

09:29:50  4   were blunt, but in her -- you know, in the actuality

09:29:52  5   of it, they were very vague so.

09:29:55  6       Q.   Okay.  So the titles didn't really mean

09:29:57  7   anything?

09:29:58  8            ATTORNEY SADRO:  Object to form.

09:29:59  9            THE WITNESS:  No.

09:29:59 10   BY ATTORNEY CONVERSE:

09:30:06 11       Q.   So when you say here that it was less of a

09:30:09 12   role as her personal assistant, what do you mean by

09:30:13 13   that?

09:30:15 14       A.   When I left in 2020, I was kind of

09:30:20 15   assisting oversee all kind of departments of the

09:30:24 16   company.  Everybody kind of reported up to Kayla and

09:30:28 17   then I was kind of the go to underneath Kayla.

09:30:32 18            So when I came back in 2022, I -- no one

09:30:38 19   really came to me with anything off the bat.  I just

09:30:42 20   kind of started slowly back in the role of taking

09:30:46 21   photos and being Kayla's right hand.

09:31:19 22       Q.   We've been discussing or referring to this

09:31:22 23   Exhibit One, do you recall signing this declaration

09:31:29 24   for this case?

09:31:31 25       A.   Yes.

09:31:32  1      Q.   Okay.  And I'm scrolling down to the

09:31:33  2  bottom.  This is page 5.  Is that your signature?

09:31:41  3      A.   Yes, it is.

09:31:43  4      Q.   Okay.  And is this date correct as to when

09:31:46  5  you executed this declaration?

09:31:50  6      A.   Yeah.

09:31:51  7      Q.   Okay.  And above it, it says under

09:31:54  8  penalties of perjury, I declare that I have read the

09:31:58  9  foregoing and that the facts stated are true to the

09:32:01  10  best my knowledge.  Do you see that?

09:32:03  11      A.   Yes.

09:32:03  12      Q.   And so you understood that you were

09:32:05  13  signing those under penalties of perjury --

09:32:08  14      A.   100 --

09:32:08  15      Q.   Correct?

09:32:08  16      A.   Yeah, 100 percent.

09:32:12  17      Q.   All right.  When you returned to Head

09:32:52  18  Kandy in a different capacity -- is that fair to

09:32:58  19  say, did you return -- was your role with Head Kandy

09:33:02  20  when you returned different than when you left in

09:33:07  21  2020?

09:33:10  22      A.   Yes.

09:33:12  23      Q.   Okay.  When you returned did you notify

09:33:16  24  anyone of the false documentation that you provided

09:33:19  25  concerning the expenses?

09:33:21  1          ATTORNEY SADRO:  Object to form.

09:33:24  2          THE WITNESS:  I don't know that I know

09:33:25  3   what you're exacting directly.  Can you restate

09:33:28  4   that?

09:33:29  5   BY ATTORNEY CONVERSE:

09:33:30  6       Q.   Yeah, when we spoke about these expenses

09:33:32  7   that you submitted to Head Kandy representatives in

09:33:41  8   the corporate office that identified personal items

09:33:45  9   of Ms. McNeill as business expenses.  Did you notify

09:33:49  10  anybody when you returned of the documents and the

09:33:55  11  correct information when you returned?

09:33:57  12      A.   No, I did not.

09:33:58  13      Q.   All right.  But you had direct

09:34:00  14  communications with Bryan Feldman during that time

09:34:03  15  period, right?

09:34:05  16      A.   During which time period?

09:34:06  17      Q.   After you returned during your second

09:34:09  18  tenure.

09:34:10  19      A.   The only direct communication I had with

09:34:13  20  Mr. Feldman was, I sent him a text just thanking him

09:34:17  21  for the opportunity to come back and that was it.

09:34:20  22      Q.   Right.  But you could get ahold of him if

09:34:22  23  you needed to notify him of -- of something

09:34:26  24  important, correct?

09:34:27  25      A.   Yes.

RYAN THOMPSON
SEPTEMBER 06, 2024

JOB NO. 1164890

09:34:27  1      Q.   And you didn't attempt to notify him?

09:34:30  2      A.   No, I did not.

09:34:32  3      Q.   Did you attempt to notify Jerome Falic?

09:34:36  4      A.   No, I did not.

09:34:36  5      Q.   Did you attempt to notify any of the

09:34:42  6   individuals in Head Kandy's corporate office?

09:34:44  7      A.   No, I did not.

09:34:46  8      Q.   Did you tell anyone of the false

09:34:53  9   information that was provided concerning the

09:34:57  10  personal expenses?

09:34:58  11           ATTORNEY SADRO:  Object to form.

09:34:59  12           THE WITNESS:  No, I did not.

09:34:59  13  BY ATTORNEY CONVERSE:

09:35:00  14     Q.   Why not?

09:35:04  15     A.   I don't know.  In my exit letter that I

09:35:06  16  provided in 2020, I did make a statement that -- I

09:35:14  17  think I have it right here (indicating).  That I did

09:35:16  18  say there were many other things that are going on

09:35:18  19  in this company which I should be addressing, but I

09:35:19  20  will only defend my own personal concerns.  So I

09:35:23  21  kind of touched on it.  No one ever reached out to

09:35:25  22  me.  So I didn't -- I didn't say anything after

09:35:27  23  that.

09:35:27  24     Q.   Yeah.  I think I see several documents in

09:35:32  25  front of you.  Can you tell me what you have in

09:35:34  1   front of you there?

09:35:34  2        A.    Yeah, of course.  I have a copy of my

09:35:37  3   resignation letter that was turned in 2020.  I

09:35:38  4   believe you have that.  And then I do have a copy of

09:35:42  5   declaration that you have on screen.  And then I

09:35:46  6   have a copy of the subpoena for deposition that you

09:35:51  7   guys sent over.

09:35:52  8        Q.    Okay.  Have those documents been altered

09:35:56  9   in any way?

09:35:59 10        A.    No.

09:36:00 11        Q.    Are there any notes on them?

09:36:01 12        A.    No.

09:36:37 13        Q.    Are you currently employed?

09:36:38 14        A.    Yes, sir.

09:36:38 15        Q.    By whom?

09:36:40 16        A.    Head Kandy.

09:36:49 17        Q.    How are you compensated by Head Kandy?

09:36:51 18        A.    I'm a salaried employee.

09:36:53 19        Q.    What's your salary?

09:36:55 20        A.    70,000.

09:37:06 21        Q.    Do you receive any other forms of

09:37:09 22   compensation related to work for Head Kandy?

09:37:13 23        A.    Not at this time, no.

09:37:16 24        Q.    And is that salary annualized?

09:37:21 25        A.    Yes.

| | | |
|---|---|---|
| 09:37:22 | 1 | Q.   So you make 70,000 per year? |
| 09:37:24 | 2 | A.   Yes, that's correct. |
| 09:37:34 | 3 | Q.   Do you have a title presently? |
| 09:37:36 | 4 | A.   Currently my title is I'm senior |
| 09:37:37 | 5 | operations director. |
| 09:37:39 | 6 | Q.   How does your role and responsibilities |
| 09:38:09 | 7 | with Head Kandy currently as senior operations |
| 09:38:13 | 8 | director differ from your role as vice president of |
| 09:38:20 | 9 | operations for Head Kandy, if at all? |
| 09:38:26 | 10 | A.   Can you repeat that?  I'm sorry. |
| 09:38:29 | 11 | Q.   Yes.  So we spoke about your first tenure |
| 09:38:34 | 12 | with Head Kandy and your title at the time of |
| 09:38:41 | 13 | resignation of vice president of operations and you |
| 09:38:44 | 14 | are currently the senior operation director.  How do |
| 09:38:49 | 15 | your duties and responsibilities for Head Kandy |
| 09:38:53 | 16 | differ between those two roles? |
| 09:38:57 | 17 | A.   In my previous employment with Head Kandy |
| 09:38:59 | 18 | back in 20 -- well, leading up to 2020, I helped |
| 09:39:04 | 19 | kind of oversee all aspects of the company.  So |
| 09:39:07 | 20 | whether that be shipping, photography, I helped a |
| 09:39:11 | 21 | little bit with like the social media.  Also with |
| 09:39:16 | 22 | affiliates, not directly, but with questions and |
| 09:39:19 | 23 | stuff.  As of right now I'm basically just kind of |
| 09:39:24 | 24 | overseeing creative for our website and/or social |
| 09:39:29 | 25 | media. |

09:39:30  1    Q.   Okay.  What does overseeing creative

09:39:46  2  entail?

09:39:47  3    A.   We have a company that's taken over that

09:39:49  4  aspect of our business.  So when they do creation of

09:39:52  5  any assets or anything like that, they send them

09:39:54  6  over for myself to approve and then I approve them

09:39:58  7  and then they are placed where they need to be

09:40:03  8  whether that be social and/or the website banners or

09:40:07  9  website itself.

09:40:13  10   Q.   Is the company that you're referring to

09:40:20  11 Affiliatly?

09:40:23  12   A.   No.

09:40:23  13   Q.   Can you tell me the name of the company?

09:40:26  14   A.   That is --

09:40:30  15   Q.   I'm sorry, Alpha --

09:40:32  16   A.   Yes.  Alphagility.

09:40:34  17   Q.   Alphagility.  That's it.  There are too

09:40:54  18 many names.  I can't recall everything, sorry.

09:40:56  19   A.   No, I understand.  Trust me.

09:40:57  20   Q.   So other than approving the creative

09:40:59  21 produced by Alphagility, do you have any other

09:41:04  22 responsibilities currently for Head Kandy?

09:41:08  23   A.   I also do help a little bit in product

09:41:11  24 development when necessary.

09:41:13  25   Q.   Are there any projects that you're

RYAN THOMPSON
SEPTEMBER 06, 2024

JOB NO. 1164890

09:41:20  1    currently involved with in the product development

09:41:25  2    area for Head Kandy?

09:41:27  3         A.   No, not at this time.

09:41:29  4         Q.   Okay.  When was the last time you were

09:41:32  5    involved in a product development project for Head

09:41:39  6    Kandy?

09:41:40  7         A.   I don't recall.

09:41:42  8         Q.   Was it this calendar year?

09:41:45  9         A.   Yes.  There's probably been some little

09:41:48  10   stuff, but nothing I can call -- recall right off

09:41:53  11   the bat.

09:41:58  12        Q.   Do you know the last time that Head Kandy

09:42:04  13   launched a new product that it developed?

09:42:16  14        A.   Not off the top of my head, no.

09:42:44  15        Q.   Going back to your first tenure with Head

09:42:50  16   Kandy.  How many hours a week were you required to

09:42:59  17   work immediately before your departure?

09:43:03  18        A.   I don't know that there was ever a set

09:43:05  19   requirement, but I was working 40 hours on average a

09:43:10  20   week.

09:43:15  21        Q.   You worked more than 40 hours on some

09:43:19  22   weeks?

09:43:19  23        A.   Yeah, I'm sure I did.

09:43:33  24        Q.   During your -- sorry, strike that.

09:43:38  25             When you returned to Head Kandy at

09:43:42   1    that time how many hours a week were you required to

09:43:48   2    work?

09:43:49   3        A.   Like I said, just like before, there was

09:43:51   4    no really requirement.  But I was, you know,

09:43:53   5    probably working about 40 hours a week on average.

09:44:03   6        Q.   Currently how many hours of week were you

09:44:06   7    working?

09:44:07   8        A.   Still about the same.

09:44:10   9        Q.   And all 40 hours on average are comprised

09:44:13   10   of approving creatives developed by Alphagility and

09:44:21   11   contributing to product development?

09:44:26   12       A.   Yeah, I mean, I'm also on email

09:44:28   13   correspondence and I sit in on meetings and stuff

09:44:31   14   like that.

09:44:34   15       Q.   Who are you corresponding by email for

09:44:38   16   Head Kandy?

09:44:39   17       A.   There are many, many different people.

09:44:40   18       Q.   Okay.  Are you able to categorize the --

09:44:52   19   the types of individuals or companies that you're

09:44:56   20   required to correspond with?

09:44:59   21       A.   I mean, there's too many to really say.

09:45:02   22   There's a lot of different moving parts to the

09:45:05   23   company.

09:45:24   24       Q.   Can you explain the role of Alphagility

09:45:28   25   currently with regard to Head Kandy?

09:45:31  1           ATTORNEY SADRO:  Object to form.

09:45:31  2           THE WITNESS:  Yeah, they kind of oversee

09:45:33  3    the website, they're in direct communication with

09:45:39  4    the third-party logistics company, they handle all

09:45:43  5    of our creative.

09:45:47  6           I don't know that they handle financials

09:45:48  7    directly, but they're involved with a lot of accounting

09:45:53  8    stuff as well.  So there's -- there's a lot of

09:45:55  9    different areas of the company that they're involved

09:45:57 10    in.

09:46:00 11    BY ATTORNEY CONVERSE:

09:46:00 12       Q.   In your role of senior operations

09:46:02 13    director, do you have -- sorry, strike that.

09:46:39 14               How many employees does Head Kandy

09:46:42 15    currently have?

09:46:46 16       A.   I believe there are three of us on staff

09:46:48 17    with Head Kandy right now.

09:46:59 18       Q.   Do you know the names of all three?

09:47:01 19       A.   Yes.  Myself, Ryan Thompson, Melissa

09:47:04 20    Keeney and Mindy McDermaid.

09:47:26 21       Q.   Okay.  And in your role as senior

09:47:29 22    operations director with Head Kandy, are you

09:47:31 23    familiar with the roles and responsibilities of

09:47:33 24    Melissa and Mindy?

09:47:39 25       A.   Not the full scope of them, no.

RYAN THOMPSON
SEPTEMBER 06, 2024

JOB NO. 1164890

09:47:41  1       Q.   All right.  Are you familiar with the

09:47:45  2  services that Alphagility is providing to Head

09:47:50  3  Kandy?

09:47:51  4       A.   Not in entirety, but yes, some of them.

09:47:54  5       Q.   Who would know the full scope of

09:47:58  6  Alphagility engagement with Head Kandy?

09:48:02  7            ATTORNEY SADRO:  Object to form.

09:48:03  8            THE WITNESS:  I would say that that would

09:48:05  9  probably be upper ownership.

09:48:07  10  BY ATTORNEY CONVERSE:

09:48:08  11       Q.   To your knowledge, does Bryan Feldman

09:48:21  12  currently have any role with Head Kandy other than

09:48:25  13  ownership?

09:48:26  14            ATTORNEY SADRO:  Object to form.

09:48:27  15            THE WITNESS:  I -- I do not know.

09:48:27  16  BY ATTORNEY CONVERSE:

09:48:28  17       Q.   Okay.  Do you know if Jerome Falic has any

09:48:38  18  role with Head Kandy other than as an owner?

09:48:42  19       A.   I don't believe so.

09:48:51  20       Q.   Do you know who John Rosenbaum?

09:48:56  21       A.   I sure do.

09:48:57  22       Q.   How do you know Mr. Rosenbaum?

09:49:00  23       A.   Mr. Rosenbaum came in to assist with the

09:49:02  24  growth of the company was my understanding when he

09:49:05  25  came on.

09:49:07  1        Q.   And how did you develop that

09:49:12  2    understanding?

09:49:12  3        A.   Just through several conversations and

09:49:14  4    meetings that we had together and then conversations

09:49:16  5    of course with Ms. McNeill and some of the other

09:49:22  6    employees that were involved in that transition.

09:49:38  7        Q.   Did you work directly with Mr. Rosenbaum

09:49:41  8    at anytime?

09:49:43  9        A.   Yeah, at times.

09:49:47 10        Q.   During what time period?

09:49:50 11        A.   I mean, it still continues.  I don't have

09:49:53 12    a lot of contact with them right now, but since his

09:49:58 13    arrival at Head Kandy.

09:50:03 14        Q.   Do you know if Mr. Rosenbaum has any

09:50:06 15    current role with Head Kandy?

09:50:08 16        A.   I'm unaware of any role that he currently

09:50:10 17    has at this time.

09:50:43 18        Q.   Are you aware of Melissa Keeney's current

09:50:43 19    position with Head Kandy?

09:50:49 20        A.   I am not aware of what her position is at

09:50:52 21    this time.

09:50:53 22        Q.   Are you aware of any services that she

09:50:56 23    provides for Head Kandy currently?

09:50:59 24        A.   She works more directly with Mindy.  I

09:51:03 25    have had her help me on a couple of different

09:51:06  1    projects for Alphagility over the last year, but

09:51:09  2    that's about the extent of my knowledge.

09:51:16  3         Q.   Are you aware of Mindy McDermaid's current

09:51:18  4    role with Head Kandy?

09:51:26  5         A.   I don't know what her exact role is at

09:51:29  6    this time, no.

09:51:29  7         Q.   Do you know of any services that

09:51:34  8    Ms. McDermaid currently provides Head Kandy?

09:51:38  9         A.   Not specifically, no.

09:51:43  10        Q.   Do you have any interaction with

09:51:47  11   Ms. McDermaid concerning your responsibilities for

09:51:54  12   Head Kandy?

09:51:56  13        A.   I mean, yeah, we talk about lot and we

09:51:58  14   bounce things off each other depending on what we're

09:52:01  15   working on.

09:52:11  16        Q.   What are some of the things that

09:52:16  17   Ms. McDermaid has bounced off you as you put it?

09:52:21  18        A.   More or less, I don't know that I can

09:52:26  19   think of any direct examples in this moment, I

09:52:29  20   apologize.

09:52:31  21        Q.   That's okay.  We're just discussing what

09:52:34  22   you know and what you can recall so.

09:52:37  23        A.   Yeah, sure.

09:52:37  24        Q.   No need to I apologize.  What are some

09:52:43  25   things that you bounced off Ms. McDermaid?

09:52:48  1      A.   Right now I'm working on filing all of our

09:52:51  2   products with the FDA.  So I do get in contact with

09:52:55  3   her regarding who suppliers are, contact information

09:53:01  4   and just in regards to that whole process.

09:53:19  5      Q.   Do you know the name of that process?

09:53:22  6      A.   I'm just registering products with the

09:53:26  7   FDA, the MOCRA.  I don't know what that stands for.

09:53:29  8      Q.   I'm sorry, what did you say?

09:53:30  9      A.   MOCRA, M-O-C-R-A.  I'm not sure what that

09:53:34 10   stands for, to be honest.

09:53:54 11      Q.   I believe you also said you had

09:54:03 12   responsibilities concerning Head Kandy's posting on

09:54:06 13   social media.  Did I understand you correctly?

09:54:10 14      A.   I don't directly have anything to do with

09:54:12 15   posting.  I just approve the assets that are used.

09:54:14 16      Q.   Okay.  What do you mean by assets?

09:54:17 17      A.   Digital assets as far as photos that are

09:54:20 18   created, marketing materials that may be posted on

09:54:24 19   the site, visuals.

09:54:40 20      Q.   Are you involved with creating those

09:54:40 21   assets?

09:54:41 22      A.   Not the physical creation.  I do take a

09:54:43 23   lot of photos that are used in the assets.

09:54:56 24      Q.   When you're taking the photos, is it part

09:54:59 25   of a formal photo shoot?

09:55:04   1          ATTORNEY SADRO:   Object to form.

09:55:05   2          THE WITNESS:   I do all -- all the product

09:55:07   3   photos at this point so.   I guess can you rephrase

09:55:14   4   that?   I don't know what you're asking.

09:55:15   5   BY ATTORNEY CONVERSE:

09:55:15   6      Q.   Sure.   I'm just trying to understand what

09:55:17   7   the process is for taking of the photos.   So do you

09:55:20   8   kind of spur of the moment, take photos and use some

09:55:25   9   of those for marketing, if you think it's

09:55:28  10   appropriate or do you guys actually have a planned

09:55:33  11   photo shoot around certain products, those type of

09:55:37  12   things.   I'm just trying to understand the process.

09:55:38  13   So could you please tell me what the process is for

09:55:41  14   you when taking pictures?

09:55:46  15      A.   Yes.   So currently the process is, really

09:55:48  16   I just take the photos for the website on a plain

09:55:51  17   white background and they the Alphagility team will

09:55:55  18   then take those images and place them on specific

09:55:58  19   backgrounds or whatnot to use in the appropriate

09:56:02  20   areas.

09:56:02  21      Q.   Okay.   And when is the last time you took

09:56:09  22   photos?

09:56:10  23      A.   A couple of weeks ago.

09:56:12  24      Q.   And how many times have you taken photos

09:56:16  25   of products this year?

09:56:23   1       A.   I mean, I take photos probably once or

09:56:26   2   twice a month and update them and, you know, if we

09:56:29   3   need new images I'll take them.  Sometimes it's a

09:56:36   4   little bit more of a process of staging a product

09:56:38   5   with specific props, if you will, and taking photos

09:56:48   6   and then they'll use that as well.

09:56:49   7       Q.   And I may have misunderstood you initially

09:56:53   8   so that's probably why you needed some

09:56:55   9   clarification.  So I just want to go back.  The

09:57:04  10   assets that you approve for marketing, is -- does it

09:57:10  11   involve the posting on the website?

09:57:13  12       A.   No.

09:57:14  13       Q.   Okay.  Does it involve posting on social

09:57:17  14   media?

09:57:18  15       A.   I guess what's your definition of

09:57:20  16   involved?

09:57:23  17       Q.   Sure.  Do you have any role with regard to

09:57:28  18   posting on Head Kandy social media accounts?

09:57:33  19       A.   No, I do not.  I just simply approve the

09:57:36  20   image.  I want to make sure that it looks on brand

09:57:38  21   and that the verbiage is correct and the products

09:57:41  22   that are being shown are actual products that we

09:57:43  23   have in stock and are, you know, overall appealing

09:57:47  24   to the customer.

09:57:49  25       Q.   And what you just described that you do,

RYAN THOMPSON
SEPTEMBER 06, 2024

JOB NO. 1164890

| | | |
|---|---|---|
| 09:57:52 | 1 | is that for post on social media accounts by Head |
| 09:57:58 | 2 | Kandy? |
| 09:57:59 | 3 | A.   Yeah.  Post on social media accounts and |
| 09:58:03 | 4 | on our website. |
| 09:58:04 | 5 | Q.   Okay. |
| 09:58:05 | 6 | A.   I don't approval all -- all posts because |
| 09:58:07 | 7 | a lot of them are post that may not be, you know, on |
| 09:58:10 | 8 | social media sometimes you post things that aren't |
| 09:58:13 | 9 | directly related to your brand.  It's like a meme or |
| 09:58:15 | 10 | something.  I don't approve those, but anything |
| 09:58:17 | 11 | that's created with product or anything like that |
| 09:58:19 | 12 | involving our specific brand of product then yes, I |
| 09:58:23 | 13 | do approve those.  I hope that clearly answers that. |
| 09:58:30 | 14 | Q.   It does.  Thank you. |
| 09:58:32 | 15 | A.   Yeah. |
| 09:58:32 | 16 | Q.   Are you familiar with Head Kandy's |
| 09:58:48 | 17 | activity on its social media account? |
| 09:58:54 | 18 | ATTORNEY SADRO:  Object to form. |
| 09:58:55 | 19 | THE WITNESS:  No.  Not specifically, no. |
| 09:58:57 | 20 | BY ATTORNEY CONVERSE: |
| 09:58:57 | 21 | Q.   Do you know how many times Head Kandy has |
| 09:59:00 | 22 | posted to its social media accounts this month? |
| 09:59:05 | 23 | A.   I do not. |
| 09:59:07 | 24 | Q.   Do you know how many times Head Kandy has |
| 09:59:10 | 25 | posted to its social media account this year? |

RYAN THOMPSON
SEPTEMBER 06, 2024

JOB NO. 1164890

09:59:14  1      A.   I do not.

09:59:15  2      Q.   Do you know who posts on behalf of Head

09:59:26  3   Kandy on social media account?

09:59:30  4      A.   I believe Mindy McDermaid and then maybe

09:59:35  5   Alphagility combined.  I'm not exactly sure on that

09:59:40  6   process.

10:00:31  7      Q.   Going back briefly to our discussion about

10:00:35  8   the personal and business expenses that you

10:00:42  9   submitted.  With regard to ones that you thought

10:00:49 10   appeared to be personal, did you do anything to

10:00:57 11   determine whether or not they -- they were personal

10:01:02 12   expenses?

10:01:04 13           ATTORNEY SADRO:  Objection.  Asked and

10:01:05 14   answered.

10:01:07 15           THE WITNESS:  Can you phrase that

10:01:09 16   differently?  I don't know exactly what you're

10:01:11 17   asking.

10:01:12 18   BY ATTORNEY CONVERSE:

10:01:12 19      Q.   Yes.  So you understand with regard to the

10:01:17 20   expenses that we're talking about before?

10:01:20 21      A.   Correct.

10:01:20 22      Q.   Okay.  You had said that they appeared to

10:01:25 23   be personal in nature.  That they were more or less

10:01:30 24   obviously personal and you gave an example.  Did you

10:01:36 25   take any other action -- or excuse me, strike that.

```
10:01:40   1              Did you take any action to determine
10:01:45   2    whether or not those expenses were personal expenses
10:01:50   3    or business expenses?
10:01:54   4              ATTORNEY SADRO:  Objection.  Asked and
10:01:54   5    answered.
10:01:56   6              ATTORNEY CONVERSE:  All right.  Just --
10:01:56   7    just form, please, Counsel.
10:01:58   8              ATTORNEY SADRO:  I'm allowed to state the
10:02:00   9    grounds briefly.
10:02:01  10              ATTORNEY CONVERSE:  No, form is fine.
10:02:02  11    Otherwise you're coaching the witness.
10:02:08  12              ATTORNEY SADRO:  No.
10:02:09  13    BY ATTORNEY CONVERSE:
10:02:09  14         Q.   With -- I'm going to scroll down here to
10:02:16  15    the concluding paragraph of this Exhibit One.  Is it
10:02:21  16    still viewable to you?
10:02:22  17         A.   Yes.
10:02:23  18         Q.   Okay.  Could you read paragraph 19 to
10:02:30  19    yourself then I'd like to ask you some questions.
10:02:49  20         A.   Sure.  Okay.
10:02:50  21         Q.   All right.  Are you the type of person who
10:02:52  22    would do personal favors for your friends?
10:02:55  23              ATTORNEY SADRO:  Objection, form.
10:02:56  24              THE WITNESS:  Yeah.
10:02:56  25    BY ATTORNEY CONVERSE:
```

10:02:56  1        Q.   Okay.  Do you expect to be compensated for

10:02:59  2   performing those favors?

10:03:01  3        A.   No, not necessarily.

10:03:02  4        Q.   Okay.  What about friends who helped you

10:03:05  5   get a job, would you do personal favors for that

10:03:09  6   friend?

10:03:10  7        A.   I would do favors for all my friends.

10:03:13  8        Q.   And would you expect compensation for

10:03:16  9   someone who helped you get a job if you did personal

10:03:21 10   favors for them?

10:03:22 11        A.   No.

10:03:22 12        Q.   Okay.  What about a best friend who let

10:03:24 13   you live in her house for free, would you help her

10:03:28 14   if asked?

10:03:31 15        A.   Can you -- I don't understand the

10:03:34 16   statement about living in your house for free.

10:03:36 17        Q.   Yeah, if somebody let you -- if somebody

10:03:42 18   allowed you to live in their house without paying

10:03:48 19   rent, would you help that person if they asked you

10:03:54 20   to help them with a favor?

10:03:57 21             ATTORNEY SADRO:  Objection, form.

10:03:57 22             THE WITNESS:  I mean, if that were the

10:03:58 23   case, I would do -- I would favors for any of my

10:04:04 24   friends, but that's -- that specific statement has

10:04:05 25   never been the case.

10:04:07  1   BY ATTORNEY CONVERSE:

10:04:08  2        Q.   Okay.  Well, why did you include this

10:04:16  3   paragraph 19 in your declaration?

10:04:21  4        A.   I mean, I'm simply stating that I was

10:04:25  5   asked do perform personal services for Ms. McNeill

10:04:28  6   while under the parameters and hours of Head Kandy.

10:04:33  7        Q.   Right.  But she was your best friend at

10:04:35  8   the time, right?

10:04:36  9        A.   Yes.

10:04:36  10       Q.   And so she asked you to do her favors,

10:04:40  11  right?

10:04:42  12            ATTORNEY SADRO:  Objection, form.

10:04:43  13            THE WITNESS:  Yes.

10:04:43  14  BY ATTORNEY CONVERSE:

10:04:43  15       Q.   And you did those favors for her?

10:04:47  16       A.   Sure.  During company time.

10:04:48  17       Q.   Okay.  Did cheat Head Kandy out of any

10:04:53  18  time that you were supposed to be doing services for

10:04:55  19  Head Kandy?

10:04:57  20            ATTORNEY SADRO:  Objection, form.

10:04:58  21            THE WITNESS:  I don't know that I would

10:04:58  22  phrase it as cheating them out of time because I was

10:05:02  23  also doing work after hours for Head Kandy.  So

10:05:05  24  whether I'm doing it during Head Kandy hours or not,

10:05:08  25  they would have been made up if you want to look at

RYAN THOMPSON
SEPTEMBER 06, 2024

JOB NO. 1164890

| | | |
|---|---|---|
| 10:05:11 | 1 | it like that so no. |
| 10:05:12 | 2 | BY ATTORNEY CONVERSE: |
| 10:05:12 | 3 | Q.   Sure.  Were you required -- sorry, I |
| 10:05:15 | 4 | didn't mean to interrupt. |
| 10:05:17 | 5 | A.   That's okay. |
| 10:05:19 | 6 | Q.   What was the -- what did you end with? |
| 10:05:19 | 7 | A.   I was just saying so, no. |
| 10:05:21 | 8 | Q.   Okay.  Were you -- |
| 10:05:22 | 9 | A.   I didn't cheat them out of time. |
| 10:05:24 | 10 | Q.   Okay.  And giving your -- your prior |
| 10:05:29 | 11 | testimony, you said that you always worked on |
| 10:05:32 | 12 | average 40 hours a week, correct? |
| 10:05:35 | 13 | A.   Yeah. |
| 10:05:36 | 14 | Q.   Okay.  Were you required to work -- sorry, |
| 10:05:40 | 15 | strike that. |
| 10:05:42 | 16 | Were you required to perform services |
| 10:05:44 | 17 | for Head Kandy during certain hours of the day? |
| 10:05:49 | 18 | A.   No. |
| 10:05:50 | 19 | Q.   So what do you mean by company time? |
| 10:05:55 | 20 | A.   Well, what do you mean by am I cheating |
| 10:05:57 | 21 | them out of company time if there's no parameters? |
| 10:06:03 | 22 | Q.   I'm asking you what you meant by company |
| 10:06:06 | 23 | time.  I would have hope that you wouldn't have |
| 10:06:10 | 24 | cheated them out and it sounds like you didn't.  So |
| 10:06:13 | 25 | my question to you is, what do you mean when you say |

10:06:17   1   during company time?

10:06:18   2            ATTORNEY SADRO:  Objection, form.

10:06:19   3            THE WITNESS:  I mean, I guess in -- I just

10:06:22   4   assume that a normal business hours are 8:00 to

10:06:24   5   5:00.  I guess is what time saying in that

10:06:28   6   statement.

10:06:28   7   BY ATTORNEY SADRO:

10:06:29   8       Q.  Yeah, but you weren't required to only

10:06:30   9   perform services from 8:00 to 5:00?

10:06:33  10            ATTORNEY SADRO:  Objection, form.

10:06:34  11            THE WITNESS:  No.

10:06:34  12   BY ATTORNEY CONVERSE:

10:06:35  13       Q.  Okay.  So does the time of day have any

10:06:41  14   bearing on when you're performing services for Head

10:06:46  15   Kandy?

10:06:47  16            ATTORNEY SADRO:  Objection, form.

10:06:49  17            THE WITNESS:  No, I guess not.

10:06:49  18   BY ATTORNEY CONVERSE:

10:06:50  19       Q.  So again, why is it included in your

10:06:53  20   declaration?

10:06:55  21       A.  Because I was probably asked if I

10:06:59  22   performed any personal services during company

10:07:04  23   hours.

10:07:04  24       Q.  Were you told what company hours are?

10:07:08  25       A.  No, not specifically.

| | | |
|---|---|---|
| 10:07:10 | 1 | Q.   Okay.  And again, you say perform personal |
| 10:07:16 | 2 | service and never for any additional compensation. |
| 10:07:19 | 3 | Are you expecting compensation from Ms. McNeill if |
| 10:07:25 | 4 | you help her, if you help your best -- your best |
| 10:07:26 | 5 | friend? |
| 10:07:28 | 6 | A.   No.  I would not. |
| 10:07:30 | 7 | Q.   Okay.  So why is this in here? |
| 10:07:37 | 8 | A.   I don't know.  I answered the questions I |
| 10:07:39 | 9 | was asked and that's -- that's my statement. |
| 10:07:43 | 10 | Q.   Okay.  Do you think you were doing |
| 10:07:53 | 11 | anything wrong by providing personal services for |
| 10:07:56 | 12 | Ms. McNeill? |
| 10:07:58 | 13 | A.   No. |
| 10:07:59 | 14 | Q.   Okay. |
| 10:08:09 | 15 | ATTORNEY CONVERSE:  I think we've been |
| 10:08:10 | 16 | going for about an hour.  Do you want to take a |
| 10:08:13 | 17 | break, 10-minute break? |
| 10:08:15 | 18 | THE WITNESS:  No, no, I'm good. |
| 10:08:17 | 19 | ATTORNEY CONVERSE:  You're good? |
| 10:08:18 | 20 | THE WITNESS:  Yeah. |
| 10:08:19 | 21 | ATTORNEY CONVERSE:  Carson, you okay with |
| 10:08:21 | 22 | that? |
| 10:08:22 | 23 | ATTORNEY SADRO:  I'm good. |
| 10:08:25 | 24 | ATTORNEY CONVERSE:  Okay. |
| 10:08:25 | 25 | BY ATTORNEY CONVERSE: |

RYAN THOMPSON
SEPTEMBER 06, 2024

10:08:46  1      Q.   All right.  I scrolled back up in this

10:08:48  2   Exhibit One to the second page.  The top of the

10:08:52  3   page, there's a paragraph six.  Are you still able

10:08:58  4   to see that?

10:08:59  5      A.   Yes.

10:09:00  6      Q.   In that paragraph you said that you

10:09:01  7   returned to Head Kandy, LLC in June 2022.  That's

10:09:05  8   not true, is it?

10:09:09  9      A.   Yeah, I believe that's correct.

10:09:16 10      Q.   You earlier today stated that you returned

10:09:19 11   in 2021?

10:09:22 12      A.   I may have misspoke.

10:09:25 13      Q.   Okay.

10:09:34 14      A.   I believe I was 2021 so that may be -- I

10:09:37 15   may have missed that error.  I can't -- I can't

10:09:39 16   recall.  I was gone for just over a year, so it

10:09:46 17   would have been March of 2020, March of 2021, so

10:09:48 18   June of 2021.  I apologize, that is an incorrect

10:09:51 19   date.

10:09:54 20      Q.   And then paragraph starts at Ms. McNeill's

10:09:59 21   request you returned.  That's not correct either, is

10:10:02 22   it?

10:10:03 23           ATTORNEY SADRO:  Objection, form.

10:10:04 24           THE WITNESS:  That actually was more of a

10:10:05 25   mutual agreement.

RYAN THOMPSON
SEPTEMBER 06, 2024

JOB NO. 1164890

| | | |
|---|---|---|
| 10:10:07 | 1 | BY ATTORNEY CONVERSE: |
| 10:10:07 | 2 | Q.   All right.  So when you state at |
| 10:10:10 | 3 | Ms. McNeill's request, I returned to Head Kandy; is |
| 10:10:13 | 4 | that accurate? |
| 10:10:15 | 5 | A.   No, that is not accurate.  It was a mutual |
| 10:10:18 | 6 | request or mutual conversation that we had and -- |
| 10:10:21 | 7 | and then I ended up coming back. |
| 10:10:24 | 8 | Q.   Okay. |
| 10:10:24 | 9 | A.   So it was not at anybody's request. |
| 10:10:31 | 10 | Q.   And were you having financial trouble |
| 10:10:33 | 11 | leading up to your return to Head Kandy? |
| 10:10:37 | 12 | A.   No -- |
| 10:10:38 | 13 | ATTORNEY SADRO:  Objection, form. |
| 10:10:38 | 14 | THE WITNESS:  Absolutely not. |
| 10:10:39 | 15 | BY ATTORNEY CONVERSE: |
| 10:10:40 | 16 | Q.   Were you living with your grandmother in |
| 10:10:43 | 17 | 2020? |
| 10:10:44 | 18 | A.   I was renting a house from my grandmother. |
| 10:10:49 | 19 | Q.   Okay.  Did you -- |
| 10:10:50 | 20 | A.   And my time -- sorry, go ahead. |
| 10:10:53 | 21 | Q.   No, no, I didn't mean to interrupt.  I |
| 10:10:55 | 22 | thought you were done.  Please. |
| 10:10:56 | 23 | A.   No, at the time that I came back to Head |
| 10:10:57 | 24 | Kandy, I was in the process of purchasing my own |
| 10:11:01 | 25 | home. |

RYAN THOMPSON
SEPTEMBER 06, 2024

JOB NO. 1164890

| | | |
|---|---|---|
| 10:11:01 | 1 | Q.   Did you need additional income -- |
| 10:11:08 | 2 | A.   No. |
| 10:11:08 | 3 | Q.   When you returned to Head Kandy? |
| 10:11:11 | 4 | A.   No. |
| 10:11:11 | 5 | Q.   Did you ever tell Ms. McNeill that you |
| 10:11:14 | 6 | needed additional income? |
| 10:11:15 | 7 | A.   No. |
| 10:11:16 | 8 | Q.   Okay.  Did you own a computer at that |
| 10:11:22 | 9 | time? |
| 10:11:23 | 10 | A.   No, I did not. |
| 10:11:23 | 11 | Q.   Okay.  Were any of your credit cards maxed |
| 10:11:32 | 12 | out? |
| 10:11:33 | 13 | ATTORNEY SADRO:  Objection, form. |
| 10:11:33 | 14 | Mr. Thompson, I'm going to instruct you not to |
| 10:11:36 | 15 | answer that question.  That's Mr. Thompson's |
| 10:11:37 | 16 | privilege confidential financial information, |
| 10:11:39 | 17 | Anthony, no. |
| 10:11:42 | 18 | ATTORNEY CONVERSE:  Okay.  It -- it's not. |
| 10:11:43 | 19 | He -- whether or not he was having financial |
| 10:11:51 | 20 | difficulties given his testimony is discoverable so |
| 10:12:04 | 21 | I will ask one more time. |
| 10:12:07 | 22 | BY ATTORNEY CONVERSE: |
| 10:12:07 | 23 | Q.   Were any of your credit cards maxed out at |
| 10:12:11 | 24 | that time? |
| 10:12:17 | 25 | THE WITNESS:  Do I answer? |

RYAN THOMPSON
SEPTEMBER 06, 2024

JOB NO. 1164890

```
10:12:20   1              ATTORNEY CONVERSE:  Are you lodging
10:12:21   2   objection?
10:12:21   3              ATTORNEY SADRO:  I'm -- I'm lodging an
10:12:22   4   objection to that question.
10:12:24   5              ATTORNEY CONVERSE:  Okay.
10:12:24   6              ATTORNEY SADRO:  I don't think it's an
10:12:24   7   appropriate question.
10:12:25   8   BY ATTORNEY CONVERSE:
10:12:26   9       Q.   Are you personally represented today,
10:12:29  10   Mr. Thompson?
10:12:31  11       A.   Yes, I am.
10:12:32  12       Q.   Okay.  And it's by Ms. Sadro?
10:12:35  13       A.   The firm, yes.
10:12:36  14       Q.   All right.  And are you going to follow
10:12:40  15   your counsel's direction and not answer that
10:12:44  16   question?
10:12:45  17              ATTORNEY SADRO:  Anthony, if you'll give
10:12:47  18   me a break to talk to my client for a moment.  I'm
10:12:50  19   happy to step off the record for just a moment.
10:12:52  20              ATTORNEY CONVERSE:  Okay.  Yeah.  Why
10:12:52  21   don't take our 10-minute main break now.
10:12:55  22              ATTORNEY SADRO:  I'm good with five.
10:12:57  23              ATTORNEY CONVERSE:  Well, let's just go
10:12:57  24   ahead and take 10.
10:12:59  25              ATTORNEY SADRO:  Okay.
```

```
10:12:59   1              THE VIDEOGRAPHER:  We are now off the
10:13:00   2    record.  The time is 10:13 a.m. Mountain time.
10:13:06   3                   (A recess was taken.)
10:24:49   4              THE VIDEOGRAPHER:  We are now on the
10:24:50   5    record.  The time is 10:24 a.m. Mountain time.
10:24:55   6              ATTORNEY SADRO:  Okay.  Anthony, we went
10:24:56   7    off the record a moment ago because I feel that you
10:25:00   8    are quickly approaching on harassing this witness by
10:25:01   9    invading his personal confidential financial
10:25:04  10    information.  I think a couple of questions that
10:25:07  11    you've been asking have been leading down that path
10:25:09  12    for the purpose of harassing Mr. Thompson.
10:25:11  13              I'm not going to terminate the deposition at
10:25:12  14    this time, but I am putting you on notice at this point
10:25:16  15    in time that if your questions do continue to harass
10:25:18  16    Mr. Thompson without making a connection to the facts
10:25:21  17    at issue in this case and how he pertains to those
10:25:24  18    facts as a witness then I will at that point time, if I
10:25:27  19    feel it's necessary, terminate the deposition.
10:25:29  20              I don't want to do that.  I want you to be
10:25:30  21    able to finish the deposition, but I want to give
10:25:33  22    you fair and sufficient warning because I -- I --
10:25:35  23    quite frankly, I don't know if that's trying to do,
10:25:38  24    Anthony.  I don't know if you're trying to get us to
10:25:40  25    terminate, but there's going to be a line.
```

RYAN THOMPSON
SEPTEMBER 06, 2024

JOB NO. 1164890

10:25:42  1        I'm going to ask you to respect this witness

10:25:45  2   and his personal confidential financial information.  I

10:25:46  3   am going to let him answer that question you posed

10:25:48  4   before went on break to give you a little bit of

10:25:50  5   leeway, but the leeway is coming to a short and quick

10:25:53  6   end.

10:25:55  7        ATTORNEY CONVERSE:  Just let me know when

10:25:56  8   you want to terminate, if -- if ever.  If there are

10:26:02  9   confidential financial matters that you would like

10:26:06 10   to stipulate should be treated as -- as confidential

10:26:13 11   just let me know.  I'll probably more than happy to

10:26:22 12   accommodate.

10:26:23 13        ATTORNEY SADRO:  No, not confidential as

10:26:25 14   in they are marked confidential.  Confidential as in

10:26:25 15   this witness is a non-party and is not required to

10:26:28 16   disclose them at any point in time.

10:26:29 17        Like I said, I'm going to give you a little

10:26:30 18   bit of leeway to ask the question you just asked and

10:26:32 19   I'll allow Mr. Thompson to answer that question in a

10:26:35 20   good faith effort to keep this deposition moving

10:26:38 21   forward.

10:26:38 22        But I -- and I don't know where you're

10:26:39 23   getting these questions from or this information

10:26:40 24   from.  I don't know if Ms. McNeill is -- is sending

10:26:43 25   you these questions, but this is -- this is the

10:26:46  1   warning.  You can ask this question.

10:26:48  2          Otherwise, tie your questions back to the

10:26:51  3   facts at issue or I will continue to remind you about

10:26:52  4   the risk you're going to pose in the terminating this

10:26:55  5   deposition.

10:26:57  6          I don't want to do that.  I hope we can

10:26:57  7   finish and I hope we can get back to the questions

10:27:00  8   that are at issue in this case.

10:27:04  9          ATTORNEY CONVERSE:  So like I said, just

10:27:05 10   let me know if you make a decision to terminate out

10:27:11 11   of prudence if you like to go off the record and

10:27:18 12   discuss with me the -- whether or not the -- the

10:27:25 13   questions are -- are appropriate.

10:27:31 14          I'm happy to do that when and, in fact,

10:27:34 15   invite you to do so before you terminate the deposition

10:27:38 16   because as you know there -- there are ramifications

10:27:40 17   for doing so.

10:27:42 18          But are you ready to proceed?

10:27:44 19          ATTORNEY SADRO:  I'm ready to proceed at

10:27:45 20   that point in time.

10:27:47 21          ATTORNEY CONVERSE:  All right.

10:27:47 22   BY ATTORNEY CONVERSE:

10:27:57 23      Q.   All right.  Mr. Thompson, we are back from

10:28:02 24   a break.  There was a pending question, so it -- it

10:28:06 25   isn't appropriate to take a break when there is a

10:28:11  1    pending question, but I was willing to allow it to

10:28:14  2    hopefully move things forward.  Are you willing now

10:28:22  3    to answer the pending question?

10:28:25  4         A.   Yes.

10:28:26  5         Q.   Okay.  Were any of your credit cards maxed

10:28:32  6    out during the time period before you returned to

10:28:38  7    Head Kandy?

10:28:41  8         A.   Not when I returned to Head Kandy, no.

10:28:44  9         Q.   During the -- the time period before you

10:28:46  10   returned to Head Kandy?

10:28:48  11        A.   Maxed out, no.

10:28:49  12        Q.   Okay.  Did you ever tell anybody that they

10:28:52  13   were maxed out?

10:28:53  14        A.   No, not to my knowledge.

10:28:56  15        Q.   Okay.

10:28:57  16        A.   I was in the process of buying a home, so

10:28:59  17   I would think that if my credit cards were maxed out

10:29:02  18   I would have not been able to qualify for my home.

10:29:05  19        Q.   Okay.  All right.  I am going to show you

10:29:36  20   what's been marked as deposition Exhibit Two.

10:29:40  21             (Defendant's Exhibit No. 2, TEXT MESSAGES

10:29:40  22   BATES PAGES KM6698 TO KM8876, was marked for

10:29:40  23   identification.)

10:29:40  24   BY ATTORNEY CONVERSE:

10:30:03  25        Q.   Are you able to see a document on the

10:30:05   1   page -- or on your screen, sorry?

10:30:08   2        A.   Yes.

10:30:09   3        Q.   All right.  Is the text large enough for

10:30:11   4   you to read it or would you like me to zoom in some

10:30:15   5   more?

10:30:15   6        A.   I think I can read it.

10:30:16   7        Q.   Okay.  So I can represent to you that --

10:30:21   8   that this is a document that was produced in this

10:30:28   9   matter by Ms. McNeill as a rather lengthy text

10:30:38  10   exchange between you and Ms. McNeill.  Have you seen

10:30:43  11   this document before?

10:30:46  12        A.   I have seen the text, yeah.  The document

10:30:50  13   itself, no.  Well, I mean, I -- I provided something

10:30:55  14   similar to this to the attorneys.

10:30:58  15        Q.   Okay.  Is that Head Kandy attorneys?

10:31:00  16        A.   Yes, my attorneys, too.

10:31:03  17        Q.   Okay.  And your attorneys and Head Kandy's

10:31:05  18   attorneys are the -- are the same attorneys; is that

10:31:06  19   right?

10:31:07  20        A.   That's correct.

10:31:08  21        Q.   Okay.  If you'll just bear with me for a

10:31:27  22   moment.  This is over 2000 pages long so I'm going

10:31:29  23   to try to navigate this quickly to get where I need

10:31:34  24   to go.

10:31:50  25             ATTORNEY SADRO:  Anthony, I'm just asking

| | | |
|---|---|---|
| 10:31:51 | 1 | for clarification.  Is the entire 2100 pages |
| 10:31:54 | 2 | approximately the entirety of the exhibit? |
| 10:31:56 | 3 | ATTORNEY CONVERSE:  Yes. |
| 10:31:57 | 4 | ATTORNEY SADRO:  Okay. |
| 10:31:58 | 5 | ATTORNEY CONVERSE:  It should all be |
| 10:31:59 | 6 | available for you to download.  Let me know if it's |
| 10:32:01 | 7 | not. |
| 10:32:02 | 8 | ATTORNEY SADRO:  No, no, no.  I was just |
| 10:32:03 | 9 | making sure you weren't just using specific pages. |
| 10:32:06 | 10 | I just wanted to make sure it was the entirety of |
| 10:32:07 | 11 | the document. |
| 10:32:09 | 12 | ATTORNEY CONVERSE:  Oh, okay.  Whoops. |
| 10:32:44 | 13 | BY ATTORNEY CONVERSE: |
| 10:32:44 | 14 | Q.  Okay.  I'm honing in on it.  I'm trying |
| 10:32:47 | 15 | to -- in the lower right-hand corner of each page, |
| 10:32:50 | 16 | there's a document control number or what's called a |
| 10:32:52 | 17 | Bates label.  I'm going to the one that's been |
| 10:32:55 | 18 | labeled KM 8840.  So there we go.  Finally.  Do you |
| 10:33:17 | 19 | know -- by looking at this, do you recognize which |
| 10:33:22 | 20 | texts were ones that you sent? |
| 10:33:26 | 21 | A.  Yes. |
| 10:33:27 | 22 | Q.  Are they the ones on the left side? |
| 10:33:30 | 23 | A.  Yes, in gray. |
| 10:33:32 | 24 | Q.  And are the ones that Ms. McNeill sent the |
| 10:33:36 | 25 | ones in blue on the right? |

```
10:33:38   1        A.   Yes.

10:33:38   2        Q.   All right.  So if you could look at this

10:33:45   3   text that was sent on 10/26/20 at 9:34, and I'm

10:33:51   4   trying to highlight.  I don't know if the

10:33:53   5   highlighting appears on your screen or not.  But

10:33:57   6   just below it, you said he did max out my credit

10:34:01   7   card.  Do you see that?

10:34:03   8        A.   Yes.

10:34:04   9        Q.   Okay.  Who is he?

10:34:06  10        A.   That would have been my ex Ian.

10:34:10  11        Q.   What's Ian's last name?

10:34:12  12        A.   Aitkens, A-I-T-K-E-N-S.

10:34:21  13        Q.   And is that accurate that he did max out

10:34:30  14   your credit card?

10:34:32  15        A.   Yes, that was in the process of him moving

10:34:34  16   out of my house.  It was a very small credit card

10:34:38  17   with a very minimal balance that he did max out in

10:34:42  18   that time of moving back to Missouri.  But that was

10:34:45  19   a minimum amount and it was paid off very quickly.

10:34:49  20        Q.   All right.  Now, I'm trying to rather

10:35:15  21   clumsily get to page 8855.  So on page 8855, do you

10:35:44  22   see the page -- the Bates label KM 8855 on your

10:35:50  23   screen?

10:35:51  24        A.   Yes, sir.

10:35:51  25        Q.   Okay.  I just wanted to make sure you
```

| | | |
|---|---|---|
| 10:35:53 | 1 | could still see everything.  All right.  So on this |
| 10:35:55 | 2 | page there's a text that you sent on 10/25 of 2020 |
| 10:36:01 | 3 | at 6:38 p.m.  Do you see it says, I need a second |
| 10:36:07 | 4 | income? |
| 10:36:08 | 5 | A.    Uh-huh. |
| 10:36:10 | 6 | Q.    Okay.  Were you referring to you |
| 10:36:17 | 7 | personally needing a second income? |
| 10:36:19 | 8 | A.    I would assume so.  I mean, I think |
| 10:36:21 | 9 | everybody at some point could always use some extra |
| 10:36:24 | 10 | income.  I don't know what the parameters of that |
| 10:36:27 | 11 | conversation were though. |
| 10:36:28 | 12 | Q.    Okay.  So I've now gone to page 8866 and |
| 10:37:02 | 13 | here on 10/16/2020 at 10:01 p.m., you're discussing |
| 10:37:12 | 14 | being on a prepaid plan and then you say, I got to |
| 10:37:16 | 15 | stay cheap these days, ha, ha.  What did you mean by |
| 10:37:20 | 16 | that? |
| 10:37:21 | 17 | A.    I don't recall the parameters of that |
| 10:37:23 | 18 | conversation and I can't really see the green. |
| 10:37:32 | 19 | Q.    Does that help at all?  I just zoomed in. |
| 10:37:54 | 20 | A.    I don't remember why I said that. |
| 10:37:55 | 21 | Q.    Okay.  All right.  I'm going to switch |
| 10:38:06 | 22 | back to deposition Exhibit One.  Just bear with me. |
| 10:38:16 | 23 | I may have to switch back and forth. |
| 10:38:27 | 24 | A.    Okay. |
| 10:38:48 | 25 | Q.    All right.  Is the text large enough for |

RYAN THOMPSON
SEPTEMBER 06, 2024

JOB NO. 1164890

10:38:52  1   you to read?

10:38:53  2        A.   Yeah.

10:38:54  3        Q.   Okay.

10:38:54  4        A.   Thank you.

10:38:54  5        Q.   Okay.  We had previously discussed

10:38:58  6   paragraph three and -- and you leaving in March

10:39:06  7   of -- of 2020.

10:39:08  8        A.   Uh-huh.

10:39:12  9        Q.   During your time with Head Kandy up until

10:39:17 10   March 2020, did you experience any form of abuse

10:39:21 11   from Ms. McNeill?

10:39:26 12        A.   I did feel like there were areas which

10:39:30 13   could be, you know, in my definition of emotional

10:39:32 14   abuse, yes.

10:39:39 15        Q.   Did you experience any form of abuse from

10:39:42 16   Ms. McNeill before the sale in 2018?

10:39:54 17        A.   Yes.

10:39:55 18        Q.   Okay.  So just with regard to the time

10:39:57 19   period leading up to the sale, what forms of abuse

10:40:02 20   did you experience from Ms. McNeill?

10:40:04 21        A.   I think the -- the biggest one was you

10:40:08 22   never knew what was being said to other employees

10:40:15 23   behind your back.  What information was being

10:40:17 24   provided to other employees behind your back.

10:40:19 25   Whenever she was angry with someone she would go and

10:40:22  1  tell everybody that she could talk to and the story

10:40:26  2  wasn't always the same for each person.

10:40:28  3          So I mean, that's -- that's a tough place to

10:40:31  4  live in when you're working and your close with

10:40:34  5  someone.  It's always being in fear of what's being

10:40:37  6  said about you or if you do something wrong, what --

10:40:40  7  what people are being told.  And that happened for all

10:40:43  8  employees.  That wasn't just myself.  So that to me is

10:40:48  9  emotionally abusive.  It's a hard state to live in at

10:40:54 10  times.

10:40:54 11      Q.   All right.  Other than what you just

10:40:58 12  described, were there any other forms of abuse that

10:41:04 13  you experienced from Ms. McNeill during the presale

10:41:09 14  time period?

10:41:11 15      A.   Not off the top my head, not to my

10:41:14 16  knowledge.

10:41:15 17      Q.   Okay.  How did you learn that Ms. McNeill

10:41:22 18  was doing the things that you just described?

10:41:28 19      A.   Well, not only did I personally witness

10:41:30 20  with other employees, but all the employees talked.

10:41:33 21  We all talked to each other.  We all had a -- a

10:41:39 22  friendship I guess, if you will.  And everybody knew

10:41:43 23  everything.

10:41:43 24          And, you know, everybody kind of knew that if

10:41:46 25  it was coming from Kayla, it wasn't probably the truth

10:41:49   1   so they would come to that person and ask them.  So it

10:41:52   2   wasn't only just witnessed, but it was discussed

10:41:55   3   throughout the office.

10:42:07   4       Q.   What statements did Ms. McNeill make about

10:42:11   5   you that were abusive?

10:42:19   6       A.   I don't recall any exact statement at this

10:42:22   7   time during that timeframe.

10:42:25   8       Q.   Okay.  Do you recall the topic of any

10:42:32   9   statements?

10:42:40  10       A.   No, not specifically.

10:42:51  11       Q.   Did you ever speak to Ms. McNeill about

10:42:53  12   her actions?

10:42:56  13       A.   No.

10:43:02  14       Q.   Did you report Ms. McNeill to anyone

10:43:16  15   within Head Kandy?

10:43:18  16       A.   There was no one really to report Kayla

10:43:20  17   to.  She was the owner and the manager.

10:43:32  18       Q.   You said that her conduct towards you was

10:43:34  19   not unique.  Do you recall any statement she made

10:43:40  20   about any other employees that you believe to be

10:43:45  21   abusive?

10:43:46  22       A.   There is probably too many to even recall.

10:43:49  23       Q.   Can you just recall one?

10:43:52  24       A.   Not anything -- well, I mean, Shawna was a

10:43:56  25   big one, Shawna Webb.  Any time Shawna would do

10:44:01  1   something wrong, it was constantly, you know, I -- I

10:44:04  2   hate her, I -- she needs to be fired.  Like -- and

10:44:08  3   just stuff like that.  And that was about anybody.

10:44:12  4   Anybody who did something wrong or she wasn't happy.

10:44:15  5   It was just constantly those statements and anyone

10:44:22  6   that she would talk to in those moments of

10:44:25  7   irritation, it would be the same thing.  So it

10:44:25  8   wasn't just me that would hear it.  It would be, you

10:44:28  9   know, any employee that would be within ear distance

10:44:30  10  or...

10:44:47  11       Q.   Do you recall her making any abusive

10:44:50  12  statements about any employees absence the employee

10:44:53  13  making a mistake?

10:45:01  14       A.   What do you mean by absent?

10:45:03  15       Q.   So several times you said that whenever

10:45:05  16  somebody made a mistake, she would make comments

10:45:08  17  about them.  Outside of the employee acting

10:45:14  18  improperly in any way, do you recall an instant

10:45:19  19  where Ms. McNeill made a statement about an employee

10:45:23  20  that you felt was abusive?

10:45:29  21       A.   I mean, there were comments made in all

10:45:33  22  aspects of even personal lives.  I can't think of

10:45:37  23  anything specifically to state, no.

10:45:58  24       Q.   Other than the comments about Shawna Webb,

10:46:02  25  have you been able to recall any other abusive

| 10:46:04 | 1 | statements that Ms. McNeill made? |
| 10:46:07 | 2 | A.   I'm not -- no.  Not off the top of my |
| 10:46:11 | 3 | head, no. |
| 10:46:13 | 4 | Q.   How did that abuse make you feel? |
| 10:46:19 | 5 | A.   To -- it kind of makes you feel |
| 10:46:21 | 6 | challenged.  It's a challenging atmosphere to work |
| 10:46:25 | 7 | in sometimes when you know that you're being talked |
| 10:46:28 | 8 | about or there's incorrect statements being thrown |
| 10:46:31 | 9 | out or false knowledge being given.  It's a |
| 10:46:34 | 10 | stressful environment. |
| 10:46:47 | 11 | Q.   Given the impact on you, did you feel as |
| 10:46:50 | 12 | though you were still able to perform your duties |
| 10:46:56 | 13 | for the business? |
| 10:47:00 | 14 | A.   Yeah.  That's why, you know, I mean, I |
| 10:47:06 | 15 | left in 2020, but I stayed for the most part because |
| 10:47:09 | 16 | I'm able to -- I'm -- you know, I'm -- I don't give |
| 10:47:10 | 17 | up easily and I like working.  So you take the good |
| 10:47:13 | 18 | with the bad sometimes. |
| 10:47:36 | 19 | Q.   Other than it being a challenging |
| 10:47:38 | 20 | environment that you already articulated, did |
| 10:47:42 | 21 | Ms. McNeill's action and comments have any other |
| 10:47:49 | 22 | effect on you? |
| 10:47:52 | 23 | A.   Yeah, I had a lot of good experience |
| 10:47:55 | 24 | working for Kayla.  I mean, she's a brilliant woman |
| 10:48:01 | 25 | and we got a long very well.  And so, you know, even |

RYAN THOMPSON
SEPTEMBER 06, 2024

JOB NO. 1164890

10:48:06  1   though there were bad times, there were a lot of

10:48:09  2   good times, too, so.

10:48:22  3        Q.   If we could now shift to the period of

10:48:24  4   time beginning immediately after the sale up until

10:48:30  5   your departure in 2020, did you experience any other

10:48:38  6   forms of abuse from Ms. McNeill other than the ones

10:48:44  7   you identified for the prior period?

10:48:49  8        A.   Yeah.

10:48:54  9        Q.   Can you please describe those for me?

10:48:56 10        A.   Yeah.  I mean, there were a lot of times

10:48:59 11   where I would try and take some time off, a couple

10:49:03 12   of days and if I wouldn't respond to questions or

10:49:10 13   texts or wasn't able to take a call, there would be

10:49:14 14   long text messages where, you know, it was being

10:49:17 15   stated that I take too much time off and I wasn't

10:49:22 16   doing my job.

10:49:29 17        And so it never really felt like I was able

10:49:29 18   to take time off and it was always statements coming

10:49:29 19   back that Bryan thought was taking too much time off.

10:49:32 20   And Bryan thought this and Bryan thought that.  So

10:49:34 21   always being on edge thinking that the upper ownership

10:49:36 22   was disappointed in the way that I was working or

10:49:40 23   performing really, you know, is a stressful thing to

10:49:46 24   deal -- excuse me, to deal with as well.

10:49:49 25        I know for a fact that she did not

10:49:51  1   care for my ex Ian.  They butted heads a lot and so

10:49:58  2   there was always that personal strain on my

10:50:02  3   relationship because of the two of them not getting

10:50:05  4   along.  I was always being pitted against one

10:50:08  5   another.

10:50:09  6           And just I guess always being expected to be

10:50:12  7   there 100 percent and if I wasn't there was backlash.

10:50:20  8   I was also asked to lie about my relationship.  That

10:50:24  9   was extremely hard.

10:51:07  10       Q.   And you said that you were asked to lie

10:51:12  11  about your relationship.  Who asked you to lie?

10:51:15  12       A.   Ms. McNeill.

10:51:16  13       Q.   Okay.  Is the relationship you're

10:51:18  14  referring to the one with Ian?

10:51:21  15       A.   Yes, that's correct.

10:51:23  16       Q.   What did Ms. McNeill ask you to lie about?

10:51:29  17       A.   There were a couple of different things.

10:51:31  18  The first one was, is I was asked basically asked

10:51:31  19  not to discuss my sexual orientation because of the

10:51:38  20  religious nature of the new owners.  That they

10:51:42  21  didn't like the fact that I was gay.  So I was asked

10:51:45  22  not to talk about that or not to disclose that.

10:51:53  23           Then specifically when Ian and I joined

10:51:56  24  Ms. McNeill to Chicago.  I believe we went to go look

10:52:02  25  at a facility for a third-party logistics company for

RYAN THOMPSON
SEPTEMBER 06, 2024

JOB NO. 1164890

10:52:07 1    shipping and I don't know how, but somehow I guess

10:52:11 2    Bryan found out that Ian and I were sharing a room and

10:52:15 3    then it was brought to Ian -- or I'm sorry, Bryan's

10:52:18 4    attention that we were dating.  It--- the conversation

10:52:22 5    that Kayla told me that was that she told Bryan that I

10:52:31 6    had started dating Ian after we hired him and that I

10:52:32 7    had left my ex partner for him which was not the case.

10:52:37 8                    We started date in December of 2017

10:52:39 9    and this was, I think it was in February of 2020

10:52:46 10   that I was made aware of this conversation by

10:52:49 11   Ms. McNeill.  And there was another employee there

10:52:51 12   Rhonda, Rhonda Bachelor.  It was made to look like I

10:53:00 13   started dating Ian during the time that he was

10:53:03 14   employed and that was -- that was a huge shock to

10:53:08 15   me.  That was a huge disappointment.  And so I was

10:53:14 16   made to look like a bad guy.

10:53:33 17        Q.   Did you say it was Ms. McNeill who told

10:53:37 18   you that the new owners religious beliefs conflicted

10:53:50 19   with -- with your personal life?

10:53:55 20        A.   Yes.

10:53:57 21        Q.   Were you able to determine if that was

10:54:04 22   true?

10:54:06 23        A.   Not right offhand.  I mean, specifically

10:54:09 24   dealing with them on a one on one basis, I -- I come

10:54:13 25   to the assumption that it's actually truly not the

10:54:17  1    case.

10:54:34  2        Q.   Forgive me, I was trying to follow

10:54:36  3    everything that you were explaining, but I wasn't

10:54:44  4    clear on what Ms. McNeill asked you to lie about

10:54:47  5    versus what she -- the statement that she made.  So

10:54:50  6    I just want to ask a few questions around that.

10:54:55  7        A.   Okay.

10:54:55  8        Q.   Did she ask you to make a false statement

10:55:04  9    about your relationship to the other owners of Head

10:55:09  10   Kandy?

10:55:10  11       A.   No, but I was definitely under the

10:55:12  12   impression I was being let -- you know, led into

10:55:16  13   that -- that narrative, that lie about me starting

10:55:20  14   to date Ian during the time that he was employed

10:55:24  15   there.  So it was -- I guess I felt like I was

10:55:28  16   having to contribute to that lie if I were to go

10:55:31  17   forward with that which I didn't.  I very quickly, I

10:55:37  18   mean, not quickly approached my termination and that

10:55:41  19   was a big reason for my termination.

10:55:46  20       Q.   So you were terminated?

10:55:46  21       A.   Or I'm sorry, not termination.  My

10:55:49  22   resignation.

10:55:49  23       Q.   Okay.  Thank you.

10:55:54  24       A.   Yeah.

10:55:54  25       Q.   So was it Ms. McNeill who was making these

10:55:57  1   statements about your relationship?

10:55:59  2        A.   Yes.

10:56:02  3        Q.   Do you know who she made the statements

10:56:03  4   to?

10:56:05  5        A.   I believe Bryan Feldman.

10:56:07  6        Q.   And how do you know that she made the

10:56:10  7   statements to Mr. Feldman?

10:56:12  8        A.   Because that is the statement she told me.

10:56:14  9        Q.   Okay.  So Ms. McNeill told you that she

10:56:17 10   told Bryan Feldman that your relationship with Ian

10:56:23 11   began after his employment with Head Kandy?

10:56:27 12        A.   That's correct.  That is correct.

10:56:28 13        Q.   And that is not accurate?

10:56:32 14        A.   That is -- yes, that is not an accurate

10:56:35 15   statement.

10:56:35 16        Q.   Okay.  Did Ms. McNeill to your knowledge

10:56:46 17   have any issues with your -- sorry, strike that.

10:56:54 18             To your knowledge, did Ms. McNeill

10:56:56 19   have any issues with you being in a relationship

10:57:01 20   with Ian?

10:57:05 21        A.   Yeah, she did not approve of him.  And,

10:57:05 22   you know, that's -- that's her own opinion.  That's

10:57:12 23   fine she can have her opinions, but definitely did

10:57:15 24   not make things easy.

10:57:19 25        Q.   Do you know why she would have made the

RYAN THOMPSON
SEPTEMBER 06, 2024

JOB NO. 1164890

10:57:22  1    statement to Mr. Feldman about when you started

10:57:29  2    dating Ian?

10:57:32  3        A.   Yeah, so there was -- I don't want to say

10:57:33  4    an unspoken rule, but there was times that there

10:57:42  5    were statements made we couldn't hire family.  And

10:57:44  6    so I think that was her way of hiding the fact that

10:57:48  7    she hired Ian because we were dating.  So I felt

10:57:51  8    like that was a bit of a cop out and a cover up.

10:57:56  9        Q.   Who did you feel she was covering up for?

10:58:00  10       A.   Bryan -- herself.

10:58:09  11       Q.   Would there have been -- sorry, strike

10:58:16  12   that.

10:58:21  13            You had -- you said that there was a

10:58:25  14   prohibition on -- on hiring family members.  Are you

10:58:30  15   referring to a company policy of Head Kandy?

10:58:34  16       A.   There weren't any official company

10:58:36  17   policies.  It was just something that came in and

10:58:38  18   out.  We had hired many families of employees or

10:58:44  19   family members.  She hired -- Kayla hired her

10:58:49  20   sister.  There were two sisters that worked for us.

10:58:51  21   So it wasn't like a -- a rule.  It just had come up

10:58:55  22   that like we're not going to do that anymore and

10:58:57  23   then it would happen.  So it was like an unfollowed

10:59:02  24   suggestion, I guess, on her behalf.

10:59:06  25       Q.   Are you aware of any individual who wasn't

10:59:09   1   hired by Head Kandy solely because they were related

10:59:17   2   to an existing Head Kandy employee?

10:59:22   3        A.   I mean, I think all of them were hired for

10:59:23   4   a purpose.  They all had their own specific areas of

10:59:26   5   expertise and/or valuable assets to the company.  So

10:59:32   6   I don't believe that anybody was ever specifically

10:59:34   7   hired because they were family.  I think it was just

10:59:37   8   a convenient fact and being such a small town it's

10:59:42   9   hard to come by good employees.  So sometimes you

10:59:44  10   take what you can get.

10:59:57  11        Q.   What about potential employees who were

10:59:59  12   not hired?  Are you aware of anybody who was not

11:00:01  13   hired by Head Kandy solely because they were a

11:00:07  14   family member of an existing Head Kandy employee?

11:00:10  15        A.   No.  I do not recall anything like that.

11:00:33  16        Q.   Were you ultimately ever required by

11:00:43  17   Ms. McNeill to make up false statements about your

11:00:49  18   relationship with Ian?

11:00:53  19        A.   No.

11:00:54  20        Q.   And you mentioned that, that had a --

11:01:27  21   sorry, strike that.

11:01:29  22             You mentioned that Ms. McNeill's

11:01:32  23   actions had a strain on your relationship with Ian.

11:01:36  24   Did I understand you correctly?

11:01:39  25        A.   Yes.

| | | |
|---|---|---|
| 11:01:41 | 1 | Q.   Okay.  Did that cause the two of you to |
| 11:01:55 | 2 | breakup? |
| 11:01:56 | 3 | A.   That wasn't the direct cause, no. |
| 11:02:00 | 4 | Q.   Were you still together when you resigned |
| 11:02:02 | 5 | in 2020? |
| 11:02:03 | 6 | A.   Yes.  And can I go back on your question |
| 11:02:12 | 7 | if I was ever asked to make a false statement? |
| 11:02:17 | 8 | Q.   Yeah, please. |
| 11:02:17 | 9 | A.   I don't -- I was never asked to make a |
| 11:02:19 | 10 | direct statement, but I was asked if it ever came up |
| 11:02:24 | 11 | to, I guess, not tell the truth.  I mean, if it was |
| 11:02:31 | 12 | ever to come up, I was supposed to lie about it so. |
| 11:02:36 | 13 | Q.   And sorry, I thought you were done. |
| 11:02:39 | 14 | A.   No, I was done. |
| 11:02:41 | 15 | Q.   Okay.  And you -- that request was made by |
| 11:02:47 | 16 | Ms. McNeill? |
| 11:02:48 | 17 | A.   Yeah, basically, like, I wasn't ever |
| 11:02:49 | 18 | supposed to say that we were dating because he was |
| 11:02:53 | 19 | an employee, if it ever came up. |
| 11:03:00 | 20 | Q.   Okay.  Was -- |
| 11:03:01 | 21 | A.   I was never asked to like, you need to |
| 11:03:03 | 22 | tell him this.  Like, you know, does that make |
| 11:03:05 | 23 | sense? |
| 11:03:06 | 24 | Q.   Yes.  Yes.  Thank you for the |
| 11:03:06 | 25 | clarification.  Were you asked to lie about anything |

11:03:17   1   else concerning your relationship other than I think

11:03:21   2   you said that the two of you weren't dating?

11:03:24   3        A.   Correct.  Yeah, no, I was never asked

11:03:26   4   anything else.

11:03:27   5        Q.   Okay.  And maybe I misunderstood your --

11:03:31   6   your prior testimony.  I thought that the -- the --

11:03:38   7   we'll call it a discrepancy, was when the two of you

11:03:45   8   started dating, not whether the two of you were

11:03:48   9   dating.  Can you tell me what the discrepancy truly

11:03:56  10   concerned?

11:03:57  11        A.   Yeah, so when I go back to talking about

11:04:00  12   how there was this rule, I'm not really sure where

11:04:04  13   it came from that we weren't supposed to hire family

11:04:10  14   members or spouses.  And then we ended up hiring

11:04:11  15   Ian.  And it was at that point that if it ever came

11:04:13  16   up like him and I weren't dating.  We were not

11:04:16  17   supposed to be dating.  So we should not say that we

11:04:20  18   were dating.  And then fast forward to when Bryan

11:04:24  19   found out that we were dating, then the whole story

11:04:27  20   came that we started dating after he started working

11:04:30  21   there.  And that's where that lie came from.  And

11:04:35  22   that's, you know, where I felt like I was supposed

11:04:36  23   to go along with that lie and I did not feel like I

11:04:39  24   was going to go along with that lie.  Does that make

11:04:43  25   more sense?

RYAN THOMPSON
SEPTEMBER 06, 2024

JOB NO. 1164890

| 11:04:45 | 1 | Q.   Yes.  Thank you.  And did you ever |
| 11:04:54 | 2 | contradict that story or lie to -- to anyone? |
| 11:04:57 | 3 | A.   Yeah, as soon as I heard that at the |
| 11:04:59 | 4 | airport, we were at the airport, I immediately sent |
| 11:05:01 | 5 | a text message to Hernan Heiber because he was just |
| 11:05:08 | 6 | someone that I knew that I could talk to.  He knew I |
| 11:05:11 | 7 | was gay.  Like, it wasn't a thing.  I felt like |
| 11:05:14 | 8 | he -- I just needed someone in that moment to, like, |
| 11:05:17 | 9 | really, like tell because he was on the Falic side. |
| 11:05:22 | 10 | And so I did contact Hernan and I told him what was |
| 11:05:26 | 11 | said.  And at that moment in time it was just kind |
| 11:05:28 | 12 | of like, well, just let it go.  Like, no one cares. |
| 11:05:31 | 13 | It's not a big deal.  And so that was -- that's the |
| 11:05:33 | 14 | direction that I went with. |
| 11:05:49 | 15 | Q.   Did you feel as though the -- I'm sorry, I |
| 11:05:55 | 16 | can't believe we're talking about this in -- in |
| 11:05:57 | 17 | 2024, but did you -- so apologies for having to ask |
| 11:06:03 | 18 | these questions.  Did you feel as though you being |
| 11:06:09 | 19 | gay was a big deal to Ms. McNeill in any way? |
| 11:06:12 | 20 | A.   No, not at all. |
| 11:06:13 | 21 | Q.   Okay. |
| 11:06:16 | 22 | A.   She's always been very supportive of me. |
| 11:06:21 | 23 | Q.   Okay.  With regard to the -- I think you |
| 11:06:30 | 24 | put as an unwritten rule about not hiring family |
| 11:06:35 | 25 | members, was there an understanding by you as to |

11:06:44  1   what would happen if it was discovered that a family

11:06:50  2   member was hired?

11:06:55  3        A.   No.   There wasn't any understanding of

11:06:57  4   what would happen and I don't know anything truly

11:07:00  5   would have happened.   And there was never -- I don't

11:07:01  6   ever really believe that was actual rule.   I think

11:07:04  7   Ms. McNeill in moments when she gets upset she likes

11:07:06  8   to change the rules.   And then when it's convenient

11:07:09  9   she unchanges the rule.   So at one point I mean, I

11:07:14 10   don't know exactly how it came, but I'm sure she

11:07:16 11   probably told, you know, Bryan we're no longer going

11:07:20 12   to hire family because it has been issues in the

11:07:23 13   past.   So I think once that was said and then we

11:07:25 14   decided to hire Ian, it was all of a sudden like

11:07:28 15   ooh, I changed my mind.   I'm going against whatever

11:07:31 16   I said.   And then it just snowballs or changes or

11:07:41 17   whatever.

11:07:41 18        Q.   And were you and Ian ever family?   I guess

11:07:44 19   in other words, let me ask this, were you and Ian

11:07:47 20   married?

11:07:48 21        A.   No.

11:07:49 22        Q.   Okay.   Were you ever considered family?

11:07:54 23        A.   I mean, chosen family.

11:07:57 24        Q.   You were just dating, though, at the time,

11:07:58 25   right?

```
11:07:59   1        A.   Yeah, he was living with me.  He was my --
11:08:01   2   he was my partner.
11:08:02   3        Q.   Okay.
11:08:04   4        A.   Yeah.
11:08:04   5        Q.   Did you consider the two of you to be
11:08:08   6   married?
11:08:08   7        A.   No.
11:08:25   8        Q.   Did you to your knowledge, ever experience
11:08:28   9   any disparate treatment due to the fact that you're
11:08:46  10   gay?
11:08:47  11        A.   Can you rephrase that?  I don't understand
11:08:49  12   the question.
11:08:52  13        Q.   Sure.  Were you treated differently by
11:08:57  14   Head Kandy due to the fact that -- that you're gay?
11:09:01  15        A.   No.
11:09:16  16        Q.   All right.  We've been talking about the
11:09:19  17   period from the time of the sale to your resignation
11:09:24  18   and you've already referenced a resignation letter
11:09:31  19   that I think you said you have in front of you; is
11:09:33  20   that correct?
11:09:33  21        A.   Yeah, that's correct.
11:09:34  22        Q.   Okay.  What month did you resign in 2020?
11:09:46  23        A.   March.
11:09:46  24        Q.   Okay.  And we've touched on it some
11:09:52  25   already, but why did you -- can you give me
```

11:09:57  1   explanation as to all the reasons why you resigned

11:10:02  2   in March of 2020?

11:10:04  3        A.   Yeah, I think my resignation letter

11:10:07  4   clearly states those reasons.

11:10:18  5        Q.   Is that one marked with a document number

11:10:20  6   in the lower right-hand corner?

11:10:22  7        A.   Yes, it is.

11:10:22  8        Q.   Okay.  What's that number?

11:10:25  9        A.   HK_044714.

11:10:31 10        Q.   I'm sorry, I didn't write fast enough.  HK

11:10:34 11   underscore, did you say 044?

11:10:37 12        A.   Yep, 044714.

11:11:00 13             ATTORNEY CONVERSE:  Carson, do you have --

11:11:01 14   I was going to try to find it in my system.  Do you

11:11:01 15   have an electronics copy handy that you're looking

11:11:04 16   at also?

11:11:05 17             ATTORNEY SADRO:  I may be able to -- to

11:11:07 18   pull one up quickly if you give me just a moment.

11:11:11 19             ATTORNEY CONVERSE:  Thank you.  We'll do a

11:11:13 20   race.  See who can find it first.

11:11:13 21             ATTORNEY SADRO:  Oh, wait.  I just found

11:11:15 22   it.  Got you.  All right.  Let me know if -- if you

11:11:34 23   get that.  It should be coming through.

11:11:36 24             ATTORNEY CONVERSE:  Thank you.  All right.

11:12:13 25   It's apparently taking time to get through all the

| | | |
|---|---|---|
| 11:12:16 | 1 | filters and whatnot.  So just bear with me, |
| 11:12:20 | 2 | Mr. Thompson, sorry. |
| 11:12:22 | 3 | THE WITNESS:  No, take your time. |
| 11:12:23 | 4 | ATTORNEY CONVERSE:  There we go. |
| 11:13:02 | 5 | BY ATTORNEY CONVERSE: |
| 11:13:03 | 6 | Q.   All right.  I've marked it as Exhibit |
| 11:13:03 | 7 | Three. |
| 11:13:04 | 8 | (Defendant's Exhibit No. 3, 03/02/2020 |
| 11:13:04 | 9 | RESIGNATION EMAIL LETTER BATES PAGES HK_044714 TO |
| 11:13:04 | 10 | 044715, was marked for identification.) |
| 11:13:05 | 11 | BY ATTORNEY CONVERSE: |
| 11:13:05 | 12 | Q.   And it should be on the screen.  Are you |
| 11:13:07 | 13 | able to read that text? |
| 11:13:09 | 14 | A.   Yes. |
| 11:13:09 | 15 | Q.   Okay.  I just figured this might be an |
| 11:13:16 | 16 | easier way since you said you're -- this fully |
| 11:13:18 | 17 | detailed your reasons for leaving.  Perhaps you can |
| 11:13:21 | 18 | just walk me through this -- this letter and -- and |
| 11:13:23 | 19 | explain it to me? |
| 11:13:25 | 20 | A.   Yeah, of course.  I think all the three |
| 11:13:27 | 21 | areas we've already discussed, but I can definitely |
| 11:13:31 | 22 | recap. |
| 11:13:33 | 23 | Q.   Please. |
| 11:13:33 | 24 | A.   Obviously, number 1, I'll no longer |
| 11:13:37 | 25 | tolerate being talked about to other employees when |

11:13:38   1   Kayla is upset at me.  We talked about that any time

11:13:41   2   Kayla was upset, she would tell other employees,

11:13:43   3   call other employees.  I mean, whoever was around

11:13:46   4   knew it and that wasn't just with me.  It was all

11:13:50   5   employees.  Here, number -- letter A is a good

11:13:56   6   example.  The employees were informed that I was

11:14:00   7   given a raise because I couldn't afford a bigger

11:14:02   8   place in Salida which is true.  But it also was so I

11:14:08   9   could live in her house and that -- so basically I

11:14:10  10   was given a raise so that I could live in her house

11:14:14  11   and so that her mortgage would then be paid by me

11:14:18  12   which is essentially paid by Head Kandy.  I wasn't

11:14:21  13   given a raise because I deserved it or I worked for

11:14:24  14   it.  I mean, I appreciate the raise for sure.  B --

11:14:32  15        Q.   Can we stop right -- I'm sorry, could we

11:14:35  16   just stop on A for a moment?

11:14:38  17        A.   Yeah, sure.

11:14:39  18        Q.   How did you learn that this statement was

11:14:41  19   made about you?

11:14:45  20        A.   Well, I was told by employees that that

11:14:46  21   was -- that information was given to them.

11:14:53  22        Q.   Do you know the names of any of the

11:14:55  23   employees that told you that?

11:14:56  24        A.   I believe it was -- oh my goodness.  My

11:15:06  25   brain is -- Kelly Lynn Doherty, I believe is who

RYAN THOMPSON
SEPTEMBER 06, 2024

JOB NO. 1164890

11:15:11  1    told me that.

11:15:18  2        Q.   And was Ms. Doherty an employee of Head

11:15:22  3    Kandy at the time?

11:15:23  4        A.   Yes.

11:15:23  5        Q.   Do you know what her role was?

11:15:26  6        A.   Customer service I guess would be her role

11:15:30  7    at that time.

11:15:36  8        Q.   Did anybody else tell you that Ms. McNeill

11:15:39  9    made this statement other than Ms. Doherty?

11:15:42 10        A.   I don't recall.  I believe it was in a

11:15:42 11    group type -- or group conversation at the office.

11:15:45 12        Q.   Okay.  All right.  Please continue with B.

11:15:49 13        A.   Yep.  Sorry, I'm just going to read this

11:15:58 14    real quick.  Okay.  Yep.  So I believe within that

11:16:02 15    same conversation other employees stated that I was

11:16:05 16    given another raise because I complained that her

11:16:08 17    sister was hired at a very close comparable salary

11:16:11 18    to my own which was true.  I didn't really complain.

11:16:15 19    I just really expressed how hurtful that was and

11:16:19 20    what a kick in the face that was because I had been

11:16:21 21    working very hard for the company for the last, I

11:16:24 22    think it was two years prior.  And then she hired

11:16:28 23    her sister at a customer service position at very

11:16:31 24    comparable pay scale that I was at.  And I did not

11:16:35 25    feel that was fair.  So I did approach it as just

RYAN THOMPSON
SEPTEMBER 06, 2024

| | | |
|---|---|---|
| 11:16:38 | 1 | stating my frustration.  I did not complain.  I did |
| 11:16:40 | 2 | not ask for a raise.  It was then presented to me |
| 11:16:47 | 3 | the next day that I would be getting a raise so. |
| 11:16:49 | 4 | But just like any other time if she wants to talk |
| 11:16:55 | 5 | about something, she'll go and tell a different |
| 11:16:57 | 6 | story to someone else.  Phone calls between |
| 11:17:01 | 7 | employees is very common.  Again, if Kayla is |
| 11:17:02 | 8 | unhappy, it's disclosed to almost any and every |
| 11:17:05 | 9 | other employee via text or phone call or in person |
| 11:17:08 | 10 | if, you know, they're around. |
| 11:17:11 | 11 |     Q.   So with regard to 1B, same question I had |
| 11:17:17 | 12 | for you with regard to this statement in -- in 1A, |
| 11:17:22 | 13 | do you recall who told you that Kayla made this |
| 11:17:29 | 14 | statement? |
| 11:17:29 | 15 |     A.   Yeah, it would have been in the same |
| 11:17:31 | 16 | conversation.  I believe we were all standing in |
| 11:17:34 | 17 | the, like, foyer area of what was Head Kandy's |
| 11:17:37 | 18 | office.  So there was a group of us that were |
| 11:17:39 | 19 | talking about it and I'm pretty sure that Kelly Lynn |
| 11:17:41 | 20 | had told me both of those statements that, you know, |
| 11:17:48 | 21 | because we were talking about the pay raises being |
| 11:17:51 | 22 | disclosed and -- and all that.  So it would have |
| 11:17:52 | 23 | been in that same conversation.  I believe it was |
| 11:17:55 | 24 | Kelly Lynn.  I can't say that 100 percent for sure. |
| 11:18:00 | 25 |     Q.   And when you say it was the same |

11:18:02  1   conversation, are you referring to the revelation

11:18:06  2   about Kayla making the statement in both A and B?

11:18:12  3        A.   Yeah.  We were talking about how pay

11:18:15  4   raises, my pay raises were disclosed to them and so

11:18:17  5   both of these examples came up.

11:18:19  6        Q.   And I believe you said there was a group

11:18:21  7   of you in that conversation, do you recall?

11:18:23  8        A.   Yeah, there were -- I mean, there were

11:18:25  9   like four or five desks.  So they were a lot of

11:18:27 10   people in the office.  Kelly Lynn, Cindy Cook.

11:18:32 11   Possibly Rhonda Bachelor.  I can't -- I can't

11:18:35 12   remember who was in the office at that time because

11:18:39 13   we did have kind of a large turnover at times.  So I

11:18:42 14   just remember it being kind of a group of people.  I

11:18:46 15   think Amy was in the front office because it was

11:18:49 16   towards the end of day so I believe Amy Vaupel,

11:18:52 17   V-A-U-P-E-L, is her last name.  I believe she was in

11:18:58 18   the office as well.

11:19:12 19        Q.   Were some people simply in close proximity

11:19:19 20   to you and Ms. Doherty or were all these people

11:19:23 21   actually engaging in the conversation?

11:19:28 22        A.   We were all engaged in the conversation.

11:19:29 23        Q.   Okay.  And you said possibly Sidney Cook.

11:19:32 24   Possibly Amy Vaupel and what was -- I think you

11:19:37 25   named a third person?  Do you -- do you recall if --

11:19:41  1        A.   I mean, possibly Rhonda Bachelor.  I think

11:19:43  2   her last name is B-A-C-H-E-L-O-R, if I'm not

11:19:50  3   mistaken.  And Ian Aitkens was there as well.

11:20:39  4        Q.   With regard to the statement in 1A, it

11:20:51  5   said that the mortgage that Ms. McNeill had was

11:20:57  6   essentially being paid by Head Kandy.  Did I

11:21:02  7   understand you correctly?

11:21:03  8        A.   Yeah, in a matter of speaking.

11:21:05  9        Q.   Okay.  How was Head Kandy paying

11:21:10 10   Ms. McNeill's mortgage?

11:21:11 11        A.   I guess indirectly they weren't.  They

11:21:14 12   were paying me more and I was then paying rent to

11:21:17 13   Ms. McNeill.

11:21:19 14        Q.   Okay.  And how was the rent you were

11:21:25 15   paying Ms. McNeill set?

11:21:30 16        A.   What do you -- I'm sorry, what do you mean

11:21:33 17   by that?

11:21:34 18        Q.   How was the amount of the rent that you

11:21:36 19   were paying Ms. McNeill established?

11:21:38 20        A.   That's how much she told me that I needed

11:21:40 21   to pay to live there.  So she determined that

11:21:43 22   amount.

11:21:44 23        Q.   And what was that amount?

11:21:46 24        A.   $1,800 a month.

11:21:58 25        Q.   Did you propose a different amount?

| | | |
|---|---|---|
| 11:22:00 | 1 | A.   No. |
| 11:22:00 | 2 | Q.   Did you agree to that amount? |
| 11:22:04 | 3 | A.   After I was told that I would be getting |
| 11:22:04 | 4 | the raise to be able to afford that, yes, I did. |
| 11:22:11 | 5 | Q.   And did you ultimately pay that amount to |
| 11:22:14 | 6 | Ms. McNeill for every month that you lived at her |
| 11:22:19 | 7 | house? |
| 11:22:19 | 8 | A.   Yes. |
| 11:22:20 | 9 | Q.   Okay.  All right.  Turning back to your |
| 11:22:44 | 10 | letter, Exhibit Three.  I think we're on paragraph |
| 11:22:49 | 11 | two now. |
| 11:22:51 | 12 | A.   Okay. |
| 11:22:51 | 13 | Q.   And could you -- |
| 11:22:54 | 14 | A.   This basically -- |
| 11:22:55 | 15 | Q.   Similarly -- sorry. |
| 11:22:57 | 16 | A.   Yeah, this basically just recaps the |
| 11:23:00 | 17 | conversation we had before this.  Do you still want |
| 11:23:04 | 18 | me to go through it. |
| 11:23:05 | 19 | Q.   I'm just going to read it quickly.  All |
| 11:23:55 | 20 | right.  With regard to the first paragraph in this |
| 11:24:01 | 21 | paragraph two, so before the subparagraph A, you |
| 11:24:07 | 22 | state that, this I believe is discrimination and |
| 11:24:12 | 23 | illegal.  What was in your opinion discrimination |
| 11:24:22 | 24 | towards you? |
| 11:24:29 | 25 | A.   You will have to excuse the context of |

11:24:30  1    that statement because that was a very heated

11:24:33  2    moment.  But in that moment it really felt like I

11:24:35  3    was being asked to lie about my personal

11:24:39  4    relationship.  Not only because he worked for us,

11:24:42  5    but also because like I said, she had said that the

11:24:44  6    owners were not okay with -- with being gay.  So I

11:24:48  7    did take that as a little bit of discrimination

11:24:53  8    which sexual discrimination is illegal, so that's

11:24:55  9    where that -- that came into context.

11:25:02  10        Q.   Do you still believe that you were

11:25:05  11   subjected to discrimination or illegal conduct?

11:25:11  12        A.   I mean, I think having to lie about your

11:25:15  13   sexual orientation is discrimination, but I think it

11:25:18  14   was more on the fact that Kayla was trying to cover

11:25:20  15   up that she had hired Ian knowing that we were

11:25:25  16   dating and that's what she was trying to avoid so.

11:25:25  17   I think it was more in that context rather than

11:25:29  18   actual discrimination.  I do not believe Kayla has

11:25:32  19   anything wrong with me being gay, so I -- I don't

11:25:35  20   believe that was the -- the intent.

11:25:57  21        Q.   So you had said that through your dealings

11:26:02  22   with the other owners you came to realize that they

11:26:09  23   in fact, don't have any objection to your sexuality.

11:26:19  24   Did I understand you correctly?

11:26:21  25        A.   Yeah, I've never felt like that was an

11:26:25  1 | issue for them.

11:26:30  2 |     Q.   And given that, that's completely opposite

11:26:36  3 | as I understand from your testimony to what

11:26:39  4 | Ms. McNeill told you, did you ever learn why there

11:26:48  5 | was a disconnect between Ms. McNeill's statements

11:26:53  6 | and their -- their true feelings?

11:26:56  7 |     A.   Did I ever ask why?  No, I never asked

11:27:00  8 | why.  No.  Sorry, was that your question?

11:27:07  9 |     Q.   Yeah.  I'm just trying to understand why

11:27:14 10 | she would have told you that.  If you were able --

11:27:17 11 | ever able to determine why she told you that.

11:27:21 12 | That's -- that's more my question.  So let me just

11:27:29 13 | make it clean.  Did you ever determine why

11:27:31 14 | Ms. McNeill told you that the other owners weren't

11:27:38 15 | comfortable with your sexuality?

11:27:41 16 |     A.    No, I did not ask why.  One, because I

11:27:45 17 | really didn't care.  I mean, I live my life out and

11:27:48 18 | proud and just the way I live my life.  So I don't

11:27:50 19 | really care of what other people think of me, to be

11:27:54 20 | honest.  That doesn't mean I'm not capable of my job

11:27:57 21 | and that doesn't mean I -- you know, I'm not going

11:28:01 22 | to do my job.  So I just kind of let it roll.  As

11:28:02 23 | far as the intent of that question, that would be a

11:28:04 24 | question for Ms. McNeill.  I don't know why she

11:28:06 25 | would have said that.

11:28:17   1        Q.   And with regard to your interactions with

11:28:21   2   the other Head Kandy owners that led you to discover

11:28:30   3   their true beliefs, which owners did you have those

11:28:35   4   interactions with?

11:28:38   5              ATTORNEY SADRO:   Objection, form.

11:28:39   6              THE WITNESS:   I mean, just casual

11:28:41   7   conversation.   You know, work conversation on very

11:28:47   8   few times that I've spoken with Jerome.   And then

11:28:49   9   Bryan has always been nothing but kind to me.   So I

11:28:55  10   just formed my own assumption.   That that wasn't

11:28:56  11   really truly the case.   And if it is the case then

11:29:00  12   they have done a good job about not letting it

11:29:03  13   affect our employment relationship so.

11:29:04  14   BY ATTORNEY CONVERSE:

11:29:11  15        Q.   And were those interactions -- sorry,

11:29:19  16   strike that.

11:29:21  17              When were those interactions with

11:29:23  18   Mr. Feldman?

11:29:24  19        A.   There is no specific times.   I've dealt

11:29:27  20   with him on many occasions.

11:29:31  21        Q.   And when were those interactions that you

11:29:40  22   had with Jerome Falic?

11:29:41  23        A.   Same.   I've only interacted with him a

11:29:46  24   minimal amount of times.   But I -- I can't recall

11:29:49  25   any specific.   I mean, I've met him.   I think I've

| | | |
|---|---|---|
| 11:29:52 | 1 | met him in person two or three times, maybe three or |
| 11:29:54 | 2 | four times.  And it's always been super cordial, |
| 11:29:58 | 3 | very polite.  You know, as a normal working |
| 11:30:03 | 4 | relationship would be.  So in those, moments that's |
| 11:30:09 | 5 | when I determined that you know, that's not my |
| 11:30:11 | 6 | belief.  I don't believe that that is, that is the |
| 11:30:13 | 7 | case. |
| 11:30:14 | 8 | Q.   And going back to your resignation letter, |
| 11:30:24 | 9 | the last sentence of 2B, you talk about the |
| 11:30:36 | 10 | statement being disclosed to you on February 26th |
| 11:30:40 | 11 | and that you have a witness to this statement.  Do |
| 11:30:45 | 12 | you now recall who all was -- was present when this |
| 11:30:51 | 13 | was disclosed to you? |
| 11:30:52 | 14 | A.   Yeah, absolutely.  This was sitting in the |
| 11:30:57 | 15 | airport.  I believe in Chicago.  No, it wasn't in |
| 11:30:59 | 16 | Chicago.  I can't recall where we were at.  But I |
| 11:31:03 | 17 | know for sure -- actually I do.  It was in Miami. |
| 11:31:04 | 18 | We were flying home from Miami and we were sitting |
| 11:31:08 | 19 | in the airport.  It was myself, Kayla McNeill and |
| 11:31:13 | 20 | Rhonda Bachelor.  And I believe, if I'm not |
| 11:31:22 | 21 | mistaken, Kelly Lynn Doherty was there as well.  I |
| 11:31:27 | 22 | think that was the same trip.  But I know for a fact |
| 11:31:30 | 23 | that the first three of us were there. |
| 11:32:13 | 24 | Q.   Okay.  Can we talk about paragraph three |
| 11:32:18 | 25 | now? |

11:32:18  1      A.   Sure.  Again, this was all -- this was all

11:32:26  2   discussed earlier as well so I don't know if you

11:32:28  3   want it recap or.

11:32:46  4      Q.   Yes.  With regard to the statement that

11:32:49  5   you were told about Bryan being upset with you not

11:32:55  6   working, you had mentioned that before.  Did you

11:33:01  7   ever learn whether or not Bryan was in fact, upset

11:33:11  8   with your work habits?

11:33:16  9      A.   No.  I did not actually learn of that, no.

11:33:22 10      Q.   And you're again referring to Bryan

11:33:24 11   Feldman here?

11:33:25 12      A.   Yes.

11:33:26 13      Q.   Okay.  And I think you had said before

11:33:41 14   that when you were drafting this you were heated, I

11:33:47 15   think you put it --

11:33:48 16      A.   Yes.

11:33:48 17      Q.   Is that correct?

11:33:49 18      A.   Yeah.  I think it's appropriate, yeah.

11:33:52 19      Q.   Was there a specific event that caused you

11:34:02 20   to sit down and write this resignation letter?

11:34:10 21      A.   I don't recall a specific event.  There

11:34:12 22   probably was something that led to me breaking.  It

11:34:15 23   takes a lot for me to break.  So I'm sure that

11:34:19 24   something happened that would have initiated this,

11:34:21 25   but I do not recall the exact moment.

RYAN THOMPSON
SEPTEMBER 06, 2024

JOB NO. 1164890

11:34:30  1      Q.   Other than it being heated, was there

11:34:46  2    anything else that was affecting your mental state

11:34:51  3    at this time when you wrote this resignation letter?

11:34:54  4      A.   In what capacity are you asking that?  I

11:34:56  5    don't understand.

11:35:00  6      Q.   In -- other than angry or heated -- excuse

11:35:26  7    me, I'll start over.

11:35:27  8           Other than being heated about the --

11:35:30  9    about the -- the things you're describing in this

11:35:34 10    letter, was there anything else going on that was

11:35:51 11    affecting your mental or emotional state?

11:35:55 12           ATTORNEY SADRO:  Anthony, do you mean at

11:35:57 13    Head Kandy?

11:35:58 14           ATTORNEY CONVERSE:  No, I just mean with

11:36:00 15    him.

11:36:00 16    BY ATTORNEY CONVERSE:

11:36:00 17      Q.   I was just wondering if -- if the only

11:36:01 18    thing going on was he was just mad about this or

11:36:03 19    just there was something -- if there are other

11:36:06 20    things contributing or that were causing you to be

11:36:12 21    angry or emotional or anything like that at this

11:36:15 22    time?

11:36:17 23      A.   I mean, my -- my ex and I used to fight a

11:36:20 24    lot about Head Kandy and Kayla and work.  So I'm

11:36:23 25    sure that probably played a bit into it, too.  I

RYAN THOMPSON
SEPTEMBER 06, 2024

JOB NO. 1164890

11:36:29  1    don't -- I -- probably other than that, no.

11:36:43  2         Q.   Were you -- were you sober when you were

11:36:48  3    writing this?

11:36:50  4         A.   There were probably drinks involved, yeah.

11:36:53  5    So possibly I wouldn't -- yeah, I --

11:37:06  6         Q.   So there is a -- a final paragraph on this

11:37:11  7    first page and you reference this previously.  There

11:37:15  8    are many other things that are going on in the

11:37:20  9    company which should be addressed.  Can you tell me

11:37:30  10   the other things that were going on that you

11:37:33  11   referring and here?

11:37:34  12        A.   I think probably the two main things I was

11:37:36  13   addressing were one, the -- the issue at hand that

11:37:40  14   we talked about with personal expenses, another

11:37:43  15   thing I didn't feel was very fair was the fact that

11:37:46  16   Dusty was payroll and making a very large salary

11:37:51  17   under the context of being the warehouse manager.

11:37:55  18   And he really didn't do much and so for someone like

11:37:59  19   myself who was overseeing almost the whole business

11:38:02  20   and in a lot of aspects, for him to be making such a

11:38:07  21   high payroll under the belief that he was working

11:38:11  22   full-time for Head Kandy I thought was absurd.  So I

11:38:16  23   didn't feel that was right and they didn't know

11:38:19  24   about that.  And those -- those were the two biggest

11:38:22  25   things that I definitely thought should be brought

RYAN THOMPSON
SEPTEMBER 06, 2024

JOB NO. 1164890

| | | |
|---|---|---|
| 11:38:28 | 1 | out, but it was not my place at that moment.  Nor |
| 11:38:32 | 2 | did I -- I didn't feel at that moment it was my |
| 11:38:34 | 3 | place to unload all that.  I just needed to say my |
| 11:38:38 | 4 | peace and... |
| 11:38:41 | 5 | Q.  You weren't worried about losing your job |
| 11:38:44 | 6 | at this time if you disclosed those things, were |
| 11:38:47 | 7 | you? |
| 11:38:52 | 8 | A.  I mean, I wouldn't have probably disclosed |
| 11:38:55 | 9 | those things if I was trying to keep my job.  Well, |
| 11:38:57 | 10 | what are you trying to talking about, the first |
| 11:39:00 | 11 | three paragraphs? |
| 11:39:01 | 12 | Q.  No, the -- the last two.  The personal |
| 11:39:03 | 13 | expenses and Dusty's employment.  You were resigning |
| 11:39:12 | 14 | through this letter effective immediately, weren't |
| 11:39:14 | 15 | you? |
| 11:39:15 | 16 | A.  Yes, I was. |
| 11:39:16 | 17 | Q.  Okay.  So you didn't have any concerns |
| 11:39:18 | 18 | about loosing your job, if you disclosed any -- |
| 11:39:23 | 19 | A.  No. |
| 11:39:24 | 20 | Q.  Issues with either Dusty or the personal |
| 11:39:30 | 21 | expenses? |
| 11:39:31 | 22 | A.  No. |
| 11:39:35 | 23 | Q.  And we talked about the personal expenses |
| 11:39:37 | 24 | before.  So let me ask you about Dusty, and I don't |
| 11:39:43 | 25 | know if you said his last name, but are you |

RYAN THOMPSON
SEPTEMBER 06, 2024

JOB NO. 1164890

11:39:46  1   referring to Dusty McNeill Kayla's husband?

11:39:50  2        A.   Yes, that is correct.

11:39:51  3        Q.   And do you know if they were married at

11:39:54  4   this time?

11:39:54  5        A.   Yes, they were married.

11:39:55  6        Q.   Okay.  And did you say that -- that Dusty

11:39:59  7   was employed by Head Kandy at this time?

11:40:04  8        A.   Yes, he was a salaried employees.

11:40:07  9        Q.   Okay.  And you said -- did you say his

11:40:10 10   position was warehouse manager?

11:40:12 11        A.   I believe that was -- we didn't really

11:40:15 12   have titles at that time.  I mean, yeah, I would

11:40:22 13   assume that he was like under the warehouse

11:40:24 14   management or something.

11:40:27 15        Q.   And you stated that you oversaw almost all

11:40:35 16   aspects of the company at this time.  Did I

11:40:37 17   understand you correctly?

11:40:38 18        A.   Yeah, that's correct.

11:40:40 19        Q.   Okay.

11:40:40 20        A.   I kind of was everybody's go to.  I mean,

11:40:44 21   ultimately everybody reported to Kayla.  That was

11:40:48 22   everybody's boss but when she wasn't there or

11:40:51 23   something needed to be handled, I was always the

11:40:59 24   person that was handling it.

11:41:03 25        Q.   So you would have knowledge of who Head

11:41:10  1    Kandy employed at the time?

11:41:12  2        A.   Yeah.

11:41:13  3        Q.   Okay.  And I believe you said that an

11:41:26  4    aspect of the issue you had with Dusty was the

11:41:35  5    amount of his salary.  Did I understand you

11:41:38  6    correctly?

11:41:40  7        A.   I think the issue was more that he was on

11:41:43  8    salary.  Not specifically the amount of money, but

11:41:47  9    that he was being paid very well to really have

11:41:51  10   nothing to do with the company.  I didn't think that

11:41:54  11   was very fair.

11:41:59  12       Q.   Do you know what his salary was?

11:42:02  13       A.   Yes, I do.  Well, I think I do.

11:42:05  14       Q.   Okay.  What do you believe it to be?

11:42:06  15       A.   At that moment I believe he was being paid

11:42:09  16   75,000.

11:42:12  17       Q.   Annualized?

11:42:19  18       A.   Yes.

11:42:20  19       Q.   And do you know what his responsibilities

11:42:23  20   and duties were?

11:42:24  21       A.   He didn't really have responsibilities or

11:42:26  22   duties.  Nor was he ever there.

11:42:31  23       Q.   So I understand you to be saying that he

11:42:35  24   wasn't providing any work for Head Kandy, but do you

11:42:40  25   know what he was supposed to be doing for Head Kandy

11:42:46   1   at that time?

11:42:47   2        A.   He was supposed to be, I believe, the

11:42:49   3   warehouse manager.  He was -- it was under the

11:42:52   4   impression, I believe, to the owners that he was

11:42:55   5   there returning the warehouse.

11:42:59   6        Q.   How did you learn what the impression to

11:43:04   7   the owner were concerning Dusty's employment?

11:43:14   8        A.   I don't really -- can you rephrase that?

11:43:16   9        Q.   Yeah.  You stated that the impression to

11:43:19  10   the owners was that Dusty was serving in the role of

11:43:24  11   warehouse manager.  How did you learn that fact?

11:43:30  12        A.   I don't know that I ever learned that

11:43:32  13   fact.  I guess when you have -- when it's understood

11:43:37  14   that you're the warehouse manager and you're running

11:43:39  15   a warehouse and you're never there, I mean,

11:43:43  16   that's -- that's I guess that's just where I got

11:43:46  17   that.

11:43:48  18        Q.   Do you know what Dusty was supposed to be

11:43:53  19   doing in his capacity as warehouse manager?

11:43:56  20        A.   Running the warehouse.

11:43:57  21        Q.   Okay.  Do you know what that entailed?

11:43:59  22        A.   It entailed probably what I was doing.

11:44:03  23   Ordering all the supplies, making sure the employees

11:44:06  24   were doing their job, making sure the inventory was

11:44:10  25   there.  Going and getting inventory, bringing it

| | | |
|---|---|---|
| 11:44:13 | 1 | back, anything that would have to do with running a |
| 11:44:17 | 2 | warehouse.  I mean, that would be my understanding |
| 11:44:21 | 3 | of what his position would entail. |
| 11:44:30 | 4 | Q.   And is your understanding derived from the |
| 11:44:33 | 5 | fact that you were overseeing the warehouse? |
| 11:44:38 | 6 | A.   That's correct.  I was -- I was there |
| 11:44:39 | 7 | doing all those jobs. |
| 11:44:40 | 8 | Q.   Okay.  And all of the responsibilities or |
| 11:44:47 | 9 | the tasks that you just identified that would fall |
| 11:44:50 | 10 | under the warehouse manager role, did you say you |
| 11:44:56 | 11 | were -- you were performing all of those? |
| 11:44:58 | 12 | A.   Yes. |
| 11:44:59 | 13 | Q.   Okay.  And we were talking about at the |
| 11:45:10 | 14 | time that you resigned, how long before -- excuse |
| 11:45:18 | 15 | me, you resigned did you start doing those tasks? |
| 11:45:24 | 16 | A.   Well, let me kind of -- let me kind of go |
| 11:45:27 | 17 | back a little bit.  So I was doing all those tasks |
| 11:45:31 | 18 | up until we hired Ian to come in and take over those |
| 11:45:36 | 19 | tasks.  So when I resigned Ian was actually doing |
| 11:45:38 | 20 | that job while Dusty was being paid for it. |
| 11:45:48 | 21 | Q.   And so before you resigned when did you |
| 11:45:50 | 22 | take over all those tasks? |
| 11:45:52 | 23 | A.   I mean, I was helping with all those tasks |
| 11:45:54 | 24 | from day one.  I mean, we -- when -- we were a lot |
| 11:45:59 | 25 | smaller in the beginning so it wasn't as about -- |

11:46:03  1    and we're talking about from the takeover, correct,

11:46:05  2    from the purchase?

11:46:07  3         Q.   Yes.

11:46:09  4         A.   Yeah, so from the purchase, I -- we were

11:46:10  5    in our new building.  It was a larger operation.  So

11:46:12  6    I was doing all the stuff -- we kind of all did it

11:46:15  7    together.  But I guess in the whole context of it,

11:46:19  8    Dusty wasn't doing those -- those things that a

11:46:22  9    warehouse manager would be doing.  He was just

11:46:25 10    getting paid and then all of us were taking care of

11:46:31 11    running the warehouse.  I did not feel that that was

11:46:37 12    fair.

11:46:41 13         Q.   And you said that Ian took over those task

11:46:46 14    for you whenever you resigned?

11:46:48 15         A.   Yeah, I mean, when Ian came in, he did

11:46:52 16    kind of take over the warehouse part of it and he --

11:46:56 17    I think he did oversee the people in the office kind

11:46:58 18    of, too.  And then I stepped back in to be more

11:47:01 19    helpful with Kayla.  So it kind of -- yeah,

11:47:05 20    everything kind of shifted kind of to Ian at that

11:47:08 21    time.

11:47:18 22         Q.   Do you know if Ian also resigned from the

11:47:28 23    Head Kandy?

11:47:31 24         A.   I believe he went into work the next day

11:47:33 25    after I turned in my resignation and then he ended

11:47:41   1   up just leaving that day as well.  So yeah, he more

11:47:45   2   or less quit.

11:47:59   3        Q.   Do you know when Dusty was hired as

11:48:00   4   warehouse manager?

11:48:02   5        A.   I would assume he probably got that role

11:48:04   6   at purchase.  That might of -- like was part of that

11:48:06   7   whole -- I don't really know.  I can't say for sure.

11:48:16   8        Q.   When did you become aware that Dusty was

11:48:21   9   supposed to be providing warehouse manager services

11:48:26  10   for Head Kandy?

11:48:31  11        A.   I don't recall an exact moment.

11:48:47  12        Q.   Do you know how you became aware that

11:48:50  13   Dusty was the warehouse manager?

11:48:54  14        A.   Just like any other information you would

11:48:57  15   learn about Head Kandy probably was discussed by

11:49:00  16   Ms. McNeill, but I can't remember exactly, no.

11:49:09  17        Q.   Are you aware of Head Kandy employing a

11:49:12  18   warehouse manager prior to Dusty entering that role?

11:49:19  19        A.   No.

11:49:26  20        Q.   Are you aware of any warehouse managers

11:49:33  21   that Head Kandy employed other than Dusty?

11:49:38  22        A.   I think we had tried to hire one at one

11:49:40  23   point and he didn't work out so we just transitioned

11:49:44  24   to -- like, just a shipper.  I can't remember his

11:49:47  25   name.  And we did hire Andrew -- well, I didn't hire

RYAN THOMPSON
SEPTEMBER 06, 2024

11:49:50  1   him.  He was actually hired when I came back in

11:49:54  2   2021, Andrew Schankerman.

11:50:01  3        Q.   The individual that you said didn't work

11:50:05  4   out and had to be transferred, do you know when he

11:50:09  5   was hired as warehouse manager?

11:50:13  6        A.   No, I don't recall.

11:50:20  7        Q.   Did you come to learn when Mr. Schankerman

11:50:23  8   was hired as warehouse manager?

11:50:25  9        A.   He was already in the position when I

11:50:28  10  started back at Head Kandy in 2021.

11:50:44  11       Q.   Did you ever witness Dusty performing any

11:50:56  12  service for Head Kandy?

11:50:58  13       A.   Yes, he did at times.

11:50:59  14       Q.   Okay.

11:51:00  15       A.   Yes.

11:51:03  16       Q.   I understood you to say that he -- he

11:51:05  17  didn't really do anything concerning the warehouse

11:51:07  18  manager position, so if I could just ask you a few

11:51:14  19  questions to clarify?

11:51:16  20       A.   Sure.

11:51:17  21       Q.   Were those -- where those services that

11:51:19  22  you saw him providing under the responsibilities of

11:51:26  23  the warehouse manager?

11:51:28  24       A.   Yes, but it was more like on like a one

11:51:30  25  off basis.  If we needed help with something, he

11:51:34  1   would come help.  When I -- when I say not really

11:51:36  2   doing much, I mean, as a normal employee would as an

11:51:41  3   every day basis.  A normal and salaried employee

11:51:48  4   would be expected to be working as an employee.  And

11:51:51  5   so that's when I say wasn't doing much, it was more

11:51:57  6   as a -- as a normal scope of work, I guess you could

11:52:02  7   say.

11:52:10  8        Q.   Was he required to report to you?

11:52:11  9        A.   No.

11:52:12  10       Q.   Do you know who Dusty was required to

11:52:15  11  report to, if anyone?

11:52:16  12       A.   I don't.  No, I do not believe he was

11:52:20  13  required to report to anybody.

11:52:33  14       Q.   In your role overseeing the warehouse, did

11:52:36  15  you ever express concerns about Dusty's work to

11:52:43  16  anybody within Head Kandy?

11:52:45  17       A.   Nope.

11:52:53  18       Q.   Is there a particular reason why you

11:52:54  19  didn't?

11:52:59  20       A.   No.  The business was returning smoothly

11:53:02  21  and operating as it should be and it wasn't really

11:53:07  22  my place to say anything.  Just that's just how I

11:53:11  23  felt.  I guess you don't really question anything

11:53:21  24  regarding the owner and her husband.

11:53:43  25       Q.   I think there is one more paragraph to

11:53:45  1  your resignation letter.  It's Exhibit Three.  In

11:53:59  2  this concluding paragraph, you talk about a direct

11:54:03  3  effect on your health and wellbeing.  What were you

11:54:08  4  referring to here?

11:54:09  5      A.   Just constantly being sick to my stomach.

11:54:18  6  I mean, stress.  I was gaining weight.  I wasn't

11:54:21  7  being healthy.  And so this had a very big effect

11:54:28  8  on -- on me as a person.  My mental health and my --

11:54:31  9  my physical health, I -- you know, stress does that

11:54:35 10  and I was under a lot of stress at that time.

11:54:39 11      Q.   Did any of those symptoms dissipate after

11:54:42 12  you resigned from Head Kandy?

11:54:47 13      A.   Yeah, it was like huge weight being --

11:54:50 14  being lift off my shoulders.

11:54:52 15      Q.   Was it an immediate affect?

11:54:55 16      A.   A lot of it, yeah, yeah.  I mean, I still

11:54:59 17  have my own personal life that contributed somewhat,

11:55:03 18  but this was a big part of that.  So yeah, it did

11:55:07 19  have immediate dissipation.

11:55:09 20      Q.   And is that with regard to all of the

11:55:14 21  affects being the stomach aches the weight and the

11:55:22 22  stress?

11:55:23 23      A.   What do you mean?  Rephrase that.  Sorry.

11:55:25 24      Q.   Sure.  So you had said that it was -- it

11:55:28 25  had an immediate relief when you resigned from Head

11:55:34   1   Kandy and I -- my question is, was the relief

11:55:44   2   extended to all the symptoms that you identified?

11:55:53   3        A.   I mean, as far as when it comes to stress,

11:55:56   4   I think anybody would agree that if you're under a

11:55:59   5   lot of the stress at work and you quit working like,

11:56:01   6   it's kind of a like a breath of fresh air.  I mean,

11:56:05   7   that's every day life on top of stress at work.

11:56:08   8   Like that's a lot.  So yeah, I mean, I definitely

11:56:13   9   felt better.  I didn't immediately fixes things.

11:56:15  10   Like, that's silly to -- to think, but it did have a

11:56:19  11   positive affect on my -- my wellbeing at that -- at

11:56:23  12   that time, yes.

11:56:34  13        ATTORNEY CONVERSE:  And we've being going

11:56:36  14   for a while.  I want to make sure that I'm offering

11:56:39  15   breaks if you need them and -- and don't hesitate if

11:56:41  16   you need one because we can take one any time you

11:56:45  17   need one as long as a question isn't pending.  Do

11:56:48  18   you need a break right now or your counsel?  I can't

11:56:51  19   -- I can't see you, Carson, but does anyone need a

11:56:53  20   break?

11:56:53  21        THE WITNESS:  No, I don't think so.

11:56:53  22        ATTORNEY SADRO:  I'm okay.

11:57:01  23        THE COURT REPORTER:  Actually I need a

11:57:01  24   bathroom break.

11:57:03  25        ATTORNEY CONVERSE:  Okay.

RYAN THOMPSON
SEPTEMBER 06, 2024

JOB NO. 1164890

11:57:03   1          ATTORNEY SADRO:  You have -- you have the

11:57:03   2   big say, Madame Court Reporter.  You get to take a

11:57:04   3   break whenever you need.

11:57:07   4          ATTORNEY CONVERSE:  Yes, absolutely.  Do

11:57:09   5   you need 10 minutes, 15 minutes?

11:57:09   6          THE COURT REPORTER:  Five minutes is fine.

11:57:09   7   Bathroom break is fine.

11:57:15   8          ATTORNEY CONVERSE:  Okay.  Let's just do

11:57:16   9   10.  I don't want to -- I don't want cause you to

11:57:18  10   rush.  And we can all probably use a stretch.  So

11:57:22  11   let's -- let's see, come back at 10 after the hour?

11:57:28  12          THE COURT REPORTER:  Sounds great.  Thank

11:57:28  13   you.

11:57:30  14          ATTORNEY CONVERSE:  Okay.  Thanks.

11:57:31  15          THE VIDEOGRAPHER:  We are now off the

11:57:32  16   record.  The time is 11:57 a.m. Mountain time.

11:57:35  17               (A recess was taken.)

12:11:40  18          THE VIDEOGRAPHER:  We are now on the

12:11:41  19   record.  The time is 12:11 p.m. Mountain time.

12:11:45  20   BY ATTORNEY CONVERSE:

12:12:07  21      Q.   Mr. Thompson, just realized that I had one

12:12:11  22   more question for you about a statement in the -- in

12:12:18  23   your resignation letter.  I'll put it back up.  You

12:12:22  24   probably don't need it, but just in case I want to

12:12:28  25   show you what I'm referring to.  Oh, there it is,

12:12:35  1   yes.  So at the bottom of the first page, you

12:12:39  2   reference a laptop and cell phone --

12:12:43  3        A.    Uh-huh.

12:12:43  4        Q.    That would be turned in.  Do you see that?

12:12:46  5        A.    Yes.

12:12:48  6        Q.    Were those company devices that were

12:12:53  7   provided to you?

12:12:55  8        A.    Yeah, the laptop was and then the cell

12:12:57  9   phone was purchased for me by -- Head Kandy paid for

12:13:00 10   it, yeah.

12:13:02 11        Q.    Okay.  And so is that why you were -- you

12:13:03 12   were turning it in to Head Kandy when you resigned?

12:13:07 13        A.    Yes.

12:13:08 14        Q.    Okay.  And did you in fact, turn it in

12:13:13 15   before the end of the week as you reference here?

12:13:16 16        A.    Yes, I believe I went back the following

12:13:18 17   day and gave that to them.  Cell phone, I can't

12:13:21 18   remember the exact date, but it was very quickly

12:13:23 19   after that.

12:13:24 20        Q.    Nonetheless you returned both of them to

12:13:30 21   Head Kandy?

12:13:31 22        A.    Oh course, yeah, yeah.

12:13:32 23        Q.    Okay.  And it says that you have to erase

12:13:37 24   all personal information.  Were you storing personal

12:13:43 25   information on one or both of the devices?

| | | |
|---|---|---|
| 12:13:48 | 1 | A.   I was physically signed into my own |
| 12:13:49 | 2 | personal I-tunes account on my laptop, my cell phone |
| 12:13:54 | 3 | and on my work computer. |
| 12:13:56 | 4 | Q.   Okay. |
| 12:13:56 | 5 | A.   So technically, yes, but that's because I |
| 12:14:02 | 6 | was logged in under my own -- my own I-tunes |
| 12:14:04 | 7 | account. |
| 12:14:05 | 8 | Q.   So it was just your I-tunes account, there |
| 12:14:07 | 9 | wasn't any other personal information on the laptop |
| 12:14:09 | 10 | or cell phone? |
| 12:14:10 | 11 | A.   Correct, yeah. |
| 12:14:13 | 12 | Q.   Okay. |
| 12:14:14 | 13 | A.   But I used them also -- I used them for |
| 12:14:16 | 14 | personal things so, of course, you know, obviously, |
| 12:14:18 | 15 | I was signed into my own I-tunes so. |
| 12:14:29 | 16 | Q.   All right.  I'm going to stop sharing that |
| 12:14:32 | 17 | one and then we'll go back to the declaration which |
| 12:14:43 | 18 | is Exhibit One.  All right.  Is the text big enough |
| 12:15:00 | 19 | again for you to read? |
| 12:15:02 | 20 | A.   Yeah, I also have it right in front of me |
| 12:15:05 | 21 | too, so. |
| 12:15:06 | 22 | Q.   Okay.  So the final paragraph of page 1, |
| 12:15:25 | 23 | paragraph five, we looked at it before and in the |
| 12:15:34 | 24 | paragraph you say that Ms. McNeill was directing |
| 12:15:41 | 25 | emotional abuse towards you and pitting your |

RYAN THOMPSON
SEPTEMBER 06, 2024

JOB NO. 1164890

| | | |
|---|---|---|
| 12:15:44 | 1 | personal life against your work life and we |
| 12:15:48 | 2 | discussed that a little bit.  Did Ms. McNeill ever |
| 12:15:57 | 3 | voice any concerns about your ability to work with |
| 12:16:04 | 4 | Ethan? |
| 12:16:08 | 5 | ATTORNEY SADRO:  Ian. |
| 12:16:09 | 6 | BY ATTORNEY CONVERSE: |
| 12:16:11 | 7 | Q.   Ian, excuse me, I apologize. |
| 12:16:12 | 8 | A.   That's all right.  That's all right.  I |
| 12:16:15 | 9 | don't remember her ever saying anything directly to |
| 12:16:18 | 10 | that affect, no. |
| 12:16:19 | 11 | Q.   Okay.  Did the two of you ever have any |
| 12:16:23 | 12 | personal fights at work? |
| 12:16:27 | 13 | A.   Yeah, I'm sure we did.  Kind of the hard |
| 12:16:31 | 14 | part about working together.  Hard to keep separate. |
| 12:16:35 | 15 | Q.   Did anybody ever tell you that the fights |
| 12:16:48 | 16 | that you had with Ian were inappropriate in the |
| 12:16:59 | 17 | workplace? |
| 12:17:00 | 18 | A.   I don't know that it was ever directly |
| 12:17:01 | 19 | expressed to me, but I do know that that was |
| 12:17:04 | 20 | probably felt.  So no, not directly, but I'm sure it |
| 12:17:08 | 21 | was an issue. |
| 12:17:12 | 22 | Q.   Were you ever impaired while you were at |
| 12:17:16 | 23 | work? |
| 12:17:17 | 24 | A.   No. |
| 12:17:18 | 25 | Q.   Did you ever drink before coming into |

RYAN THOMPSON
SEPTEMBER 06, 2024

JOB NO. 1164890

| | | |
|---|---|---|
| 12:17:23 | 1 | work? |
| 12:17:24 | 2 | A.   No. |
| 12:17:25 | 3 | Q.   Did you ever use marijuana before coming |
| 12:17:29 | 4 | into work? |
| 12:17:30 | 5 | A.   No. |
| 12:17:36 | 6 | Q.   Did you and Ian eventually break up? |
| 12:17:46 | 7 | A.   Yes, we did. |
| 12:17:48 | 8 | Q.   Did you have any contact with Ms. McNeill |
| 12:18:01 | 9 | after you resigned to the time when you broke up |
| 12:18:07 | 10 | with Ian? |
| 12:18:10 | 11 | ATTORNEY SADRO:  Objection, form. |
| 12:18:11 | 12 | THE WITNESS:  Do you mean in between those |
| 12:18:13 | 13 | times? |
| 12:18:13 | 14 | BY ATTORNEY CONVERSE: |
| 12:18:14 | 15 | Q.   Yes.  So in between the time that you |
| 12:18:16 | 16 | resigned and you broke up with Ian, did you have any |
| 12:18:20 | 17 | contact with Ms. McNeill? |
| 12:18:22 | 18 | A.   There was once instance.  My father passed |
| 12:18:24 | 19 | away.  And she reached out and expressed her |
| 12:18:28 | 20 | sympathy and I thanked her for that and that was it. |
| 12:18:31 | 21 | Q.   Did you reconnect with Ms. McNeill after |
| 12:18:38 | 22 | you and Ian broke up? |
| 12:18:40 | 23 | A.   Yes, I did. |
| 12:18:42 | 24 | Q.   Was it immediately after the two of you |
| 12:18:45 | 25 | broke up? |

12:18:46  1      A.   It was fairly, fairly soon afterwards.  I

12:18:50  2   don't recall how quickly it was.

12:18:54  3      Q.   Was it essentially the same time that he

12:18:58  4   moved out of your house?

12:19:00  5      A.   I believe so, yes.

12:19:07  6      Q.   How did you reconnect with Ms. McNeill?

12:19:11  7      A.   I think I reached out to Ms. McNeill in

12:19:14  8   just hopes that I could mend that friendship because

12:19:17  9   Kayla and I did have a great friendship.  And I --

12:19:22 10   and I really missed that part of us.  So I just was

12:19:27 11   hoping that we could rekindle that friendship that

12:19:30 12   we had because I didn't have anybody like Kayla in

12:19:34 13   my life as far as a close friend.  And so I think

12:19:38 14   all of us value at some point a good friendship and

12:19:44 15   that's what I was trying to rekindle.

12:19:46 16      Q.   So on a personal level, did you ever have

12:19:51 17   any issues with Ms. McNeill?

12:19:55 18      A.   No.

12:19:56 19      Q.   Was it only your professional relationship

12:20:01 20   that you felt she was abusive?

12:20:07 21      A.   I mean, the -- it's hard to say because

12:20:10 22   those lines are very blurred when it comes to being

12:20:13 23   good friends with the person that you work for.  So

12:20:15 24   I did take a lot of it personal as well as on the

12:20:17 25   business side.  And neither one of us handled

12:20:22  1  situations very well.  I mean, it was very mutual in

12:20:26  2  the way that we handled things.  And so I just

12:20:31  3  wanted to put all that behind us and kind of start

12:20:34  4  over and that was -- that's why I reached out to

12:20:37  5  Ms. McNeill.

12:21:07  6       Q.   When you reached out to Ms. McNeill, did

12:21:10  7  you have any intention of seeking employment with

12:21:22  8  Head Kandy?

12:21:23  9       A.   No.  That was not my intent, no.

12:21:28 10       Q.   And I understand what your primary intent

12:21:32 11  was.  I think you just -- you explained it, but were

12:21:34 12  you in any way wanting to work for Head Kandy again

12:21:44 13  when you reached out to her?

12:21:46 14       A.   I was not discounting the -- the thought

12:21:53 15  of that, no.  I enjoyed the people I worked with and

12:21:58 16  ultimately, I enjoyed my job and I feel like I was

12:22:02 17  good at my job.  So I wasn't -- I wasn't opposed to

12:22:05 18  the opportunity, but that wasn't the -- you know,

12:22:08 19  the intent of my -- my reaching out to her.  I had a

12:22:14 20  job that I -- I enjoy.

12:22:17 21       Q.   Did you have any of the -- sorry, strike

12:22:26 22  that.

12:22:26 23            Did the job that you had at the time

12:22:30 24  cause any of the negative effects that you

12:22:37 25  previously stated working for Head Kandy caused you?

12:22:43   1          ATTORNEY SADRO:  Objection, form.

12:22:44   2          THE WITNESS:  I'm not quite sure I

12:22:45   3   understand what you're asking.

12:22:47   4   BY ATTORNEY CONVERSE:

12:22:47   5      Q.   Sure.  We were looking at your resignation

12:22:54   6   letter and you had talked about direct effects that

12:23:00   7   negatively impacted you as a result of your work at

12:23:08   8   Head Kandy.

12:23:09   9      A.   Uh-huh.

12:23:09  10      Q.   Did you have any of the same or similar

12:23:16  11   effects due to your work at your other employer?

12:23:21  12      A.   No.  It was a complete opposite structure

12:23:24  13   and -- and work environment.  So I did not have --

12:23:31  14   no, I was not stressed like I was before Head Kandy.

12:23:47  15      Q.   All right.  And scrolling down in Exhibit

12:23:50  16   One.  I want to direct your attention to -- excuse

12:23:51  17   me paragraph seven.  I'll give you an opportunity to

12:24:00  18   just read paragraph seven to yourself before I ask

12:24:03  19   you a question.

12:24:04  20      A.   Yeah.  Go ahead.

12:24:06  21      Q.   So you -- you start out stating that,

12:24:09  22   beginning in or about June 2018, Ms. McNeill

12:24:14  23   directed you to submit statements for an Amex card.

12:24:25  24   Is that -- is that an accurate statement?

12:24:26  25      A.   Yes, it is.

12:24:32  1      Q.   How did Ms. Max McNeill direct you to

12:24:37  2  submit those Amex statements?

12:24:41  3      A.   I'm -- what do you mean by directed, I

12:24:43  4  mean.

12:24:45  5      Q.   I'm trying to understand the -- how you

12:24:48  6  received the direction from her.  Did she -- did --

12:24:51  7  did Ms. McNeill tell you in person that you had to

12:24:57  8  submit the statements?

12:24:59  9      A.   Yeah, I was basically told that I would be

12:25:04 10  doing the expense reports now that -- this is when

12:25:07 11  Head Kandy took -- I'm sorry, when the Falic

12:25:11 12  brothers and -- and that side of the business came

12:25:14 13  as partners.  So this was a new process for us as

12:25:18 14  far as having to submit them to the accounting

12:25:23 15  department to -- I guess DFA would be a better term

12:25:25 16  for that, Duty Free.  So I was just told that I

12:25:30 17  would be doing them moving forward.  And so that's

12:25:33 18  how.  Yes, but I was instructed by Ms. McNeill to be

12:25:41 19  the person to do that.

12:25:42 20      Q.   And it states the -- sorry, strike that.

12:25:49 21           You stated that you were directed to

12:25:50 22  submit full and complete American Express card

12:25:57 23  statements.  Did you always from the -- the

12:26:06 24  June 2018 timeframe submit full and complete Amex

12:26:11 25  statements every month?

12:26:16  1        A.    Yeah, yes.

12:26:20  2        Q.    Did you ever submit statements that had

12:26:24  3   information blacked out or redacted?

12:26:30  4        A.    Yes.  So when we first started doing this

12:26:33  5   process, I thought it would be cleaner to black out

12:26:36  6   anything that was like a personal expense by Kayla

12:26:39  7   and then submit it.  But then very quickly they said

12:26:43  8   we can't have those blacked out.  So then I would

12:26:45  9   just write like personal beside it and then that was

12:26:48 10   the way we submitted them.  So yes, it was just an

12:26:51 11   early version of that to kind of make it clean

12:26:56 12   visually, I guess for someone looking at it, but I

12:26:59 13   was very quickly corrected on that process.

12:27:03 14        Q.    I believe you said that they told you that

12:27:05 15   it couldn't be submitted that way.  Who are you

12:27:07 16   referring to when you say they?

12:27:10 17        A.    The accounting team at DFA, Duty Free.

12:27:15 18        Q.    So are they the ones that directed you to

12:27:17 19   submit the full and complete Amex statements?

12:27:21 20        A.    Yes.

12:27:29 21        Q.    And do you know when they directed you to

12:27:32 22   submit the full and complete Amex statements?

12:27:35 23        A.    I think I did like one or -- I think it

12:27:38 24   was very quickly.  So I would have done like the

12:27:40 25   first month and then they said moving forward,

12:27:42  1   please, don't black out any information.  And so

12:27:46  2   then moving forward, I think it was maybe one or two

12:27:49  3   I guess.  I don't really remember how quickly, but

12:27:51  4   it was fairly quickly.

12:27:52  5         Q.   Okay.  But the process started in June of

12:27:56  6   2018 where you were submitting statements?

12:28:03  7         A.   I can't remember the exact timeframe.  I

12:28:05  8   believe that's why it says in or about June 2018.

12:28:08  9         Q.   Okay.

12:28:09  10        A.   Yeah.  I can't recall the exact.

12:28:13  11        Q.   Was it shortly after the purchase that you

12:28:16  12  started submitting the Amex statements?

12:28:20  13        A.   Yes.

12:28:23  14        Q.   And did I understand you correctly that

12:28:27  15  you submitted one or two with personal expenses

12:28:32  16  blacked out and then you were instructed to submit

12:28:35  17  the -- the full and complete statement?

12:28:39  18        A.   That is correct.

12:28:53  19        Q.   Why did you think it was preferred to

12:28:59  20  black out the personal expenses when submitting the

12:29:02  21  statements?

12:29:04  22        A.   I just didn't know any better and I

12:29:06  23  thought it would be just cleaner that way.

12:29:09  24        Q.   Okay.  What do you mean by cleaner?

12:29:11  25        A.   For them visually to see it.  Instead of

12:29:15  1   having to go through -- I don't know.  I just

12:29:16  2   thought -- I guess there is really no exact reason

12:29:19  3   for that.  In my head, it was my way of organizing

12:29:24  4   things to say this isn't yours, this is yours.

12:29:28  5        Q.   Do you know of any reason why they needed

12:29:30  6   to see the personal expenses?

12:29:33  7        A.   I would assume that anything -- when I

12:29:36  8   think back on it, I assume anything blacked out

12:29:39  9   looks sketchy.  So they wanted it full and complete.

12:29:43 10   That's why moving forward, I then wrote personal

12:29:46 11   next to those charges rather than just marking them

12:29:49 12   out.

12:29:54 13        Q.   Why do you think it -- it was sketchy

12:29:58 14   for -- for them to be blacked out?

12:30:03 15             ATTORNEY SADRO:  Objection, form.

12:30:04 16             THE WITNESS:  I don't know.  I don't have

12:30:06 17   an answer to that.

12:30:08 18   BY ATTORNEY CONVERSE:

12:30:08 19        Q.   Okay.  Are you aware of any reason why

12:30:16 20   they would need to see Ms. McNeill's personal

12:30:20 21   expenses?

12:30:22 22             ATTORNEY SADRO:  Objection, form.

12:30:26 23             THE WITNESS:  No.

12:30:26 24   BY ATTORNEY CONVERSE:

12:30:36 25        Q.   Did anyone ever raise an issue or concern

12:30:45   1    with you with the presence of personal expenses on

12:30:56   2    the Amex cards?

12:31:01   3        A.   Not that I recall, no, but that would have

12:31:04   4    all been an email communication.  But no, I don't

12:31:08   5    recall.

12:31:18   6        Q.   I'm going to stop sharing that exhibit for

12:31:22   7    a moment and I'm going to introduce Exhibit Four.

12:31:32   8             (Defendant's Exhibit No. 4, EMAILS BATES PAGE

12:31:32   9    KM5308, was marked for identification.)

12:31:32   10   BY ATTORNEY CONVERSE:

12:31:38   11       Q.   I'll show you that.  So you referenced

12:31:43   12   emails.  Are you able to see the text?

12:31:51   13       A.   Yes.

12:31:52   14       Q.   Do you recognize the -- well, let me first

12:32:00   15   state for the record that this document is Bates

12:32:04   16   labeled KM5308 and my question to you is, do you

12:32:12   17   recognize the email address of

12:32:16   18   Ylopez@dutyfreeamericas.com?

12:32:21   19       A.   Yes, I do.

12:32:22   20       Q.   Whose email address is that?

12:32:23   21       A.   Yvelisse.  I'm sorry, not Yvelisse.  I

12:32:26   22   think it's Ylse is how you pronounced it.  And

12:32:31   23   that's who at the time I was submitting the reports

12:32:33   24   to.

12:32:47   25       Q.   Do you know what her position with Head

12:32:49  1    Kandy was at that time?

12:32:50  2         A.   Yvelisse was the -- the head person in

12:32:55  3    accounting and I believe Ylse -- excuse me, I

12:32:56  4    can't -- I don't remember how to say it.  Ylse --

12:33:00  5         Q.   Ms. Lopez?

12:33:01  6         A.   Yeah, Ms. Lopez was underneath Yvelisse.

12:33:04  7    So she was part of the -- I think right there, it

12:33:07  8    says Lion Group.  I think that's part of the DFA or

12:33:11  9    maybe it's who DFA uses for accounting.  I don't

12:33:14 10    really know the role, but that was part of

12:33:16 11    accounting team that we were submitting to.

12:33:22 12         Q.   Do you know if either Ms. Lopez or

12:33:26 13    Ms. Diaz were employees of Head Kandy at this time?

12:33:30 14         A.   They were not.

12:33:31 15              ATTORNEY SADRO:  Objection, form.

12:33:32 16              THE WITNESS:  Sorry.  They were not.

12:33:34 17    BY ATTORNEY CONVERSE:

12:33:44 18         Q.   So this email says that it was sent to you

12:33:48 19    at RThompson@HeadKandypro.com.  Was that your email

12:33:52 20    address at this time?

12:33:54 21         A.   Yes, that was my email address before my

12:33:57 22    exit in 2020.

12:33:59 23         Q.   Okay.  And it's dated June 6th, 2019.  Do

12:34:07 24    you see that?

12:34:08 25         A.   Uh-huh.

12:34:09  1          Q.    Do you recall -- you can read the body of

12:34:14  2    email before responding.   But my question to you is,

12:34:20  3    do you recall receiving this email?

12:34:22  4          A.    I do not recall receiving it, but I do see

12:34:24  5    it there so.

12:34:46  6          Q.    So here in the last sentence she's asking

12:34:47  7    you to resend to her a copy of the April American

12:34:52  8    Express bill showing all details.   Do you see that?

12:34:55  9          A.    Yes.

12:34:55  10         Q.    And do you know if you initially submitted

12:34:59  11   the April bill with the blackouts or redactions that

12:35:02  12   we talked about?

12:35:05  13         A.    I would assume so, yes.

12:35:18  14         Q.    Does -- sorry.

12:35:19  15         A.    Sorry.   It appears that also with the --

12:35:22  16   the dates of this email, I guess 2018 was an

12:35:25  17   incorrect assumption on when I started doing those

12:35:30  18   expense reports because this would have been very

12:35:33  19   soon after I started doing them because I don't

12:35:36  20   believe I did very many of the expense reports with

12:35:39  21   that blacked out.

12:35:41  22         Q.    Okay.

12:35:47  23         A.    It's hard to go back to remember dates

12:35:49  24   because I don't have access to this specific email

12:35:51  25   anymore so.

12:35:53   1        Q.   What's your current email address?

12:35:57   2        A.   It's Ryan@HeadKandypro.com.

12:36:01   3        Q.   Okay.

12:36:01   4        A.   And this specific email

12:36:02   5   RThompson@HeadKandypro.com was never archived.  So

12:36:06   6   all of the documents regarding that email address, I

12:36:08   7   don't have access to anymore and I don't think Head

12:36:11   8   Kandy does either.  So this was obviously, sent to

12:36:16   9   someone so they had access to that communication,

12:36:18  10   but I -- I don't have access to those anymore.

12:36:25  11        Q.   Thank you.  That was going to be my next

12:36:27  12   question.  Did -- did you personally attempt to

12:36:33  13   access the emails on your old email account the R --

12:36:38  14        A.   Yeah, I believe we had before -- t's been

12:36:40  15   quite a while.  I reached out in hopes to find some

12:36:47  16   emails that were sent during that timeframe on this

12:36:50  17   email and DFA does -- they no longer had access to

12:36:56  18   this specific email.

12:36:57  19        Q.   Do you recall when you reached out to

12:37:00  20   inquire about the access?

12:37:03  21        A.   I do not.  I'm pretty sure it was -- et me

12:37:17  22   think here because I know -- I'm almost positive

12:37:20  23   that I reached out -- it would have been before

12:37:23  24   Kayla's exit from the company.  Around the timeframe

12:37:27  25   that we were -- that we received the report back

12:37:33  1   from the audit company for all the credit card

12:37:36  2   charges.  I think I was trying to get back in to see

12:37:38  3   if I could find those expense reports to help us try

12:37:42  4   and clean some of that up and that's when I reached

12:37:45  5   out and we were unable to do that.  So that would

12:37:47  6   have been, I guess, 2021 at some point.

12:38:01  7       Q.  Did you ask if anyone had access to the

12:38:04  8   Duty Free America's email account?

12:38:11  9       A.  I did not.

12:38:17 10       Q.  In other words, did you attempt to obtain

12:38:18 11   the expense reports from anybody that you sent the

12:38:25 12   expense reports to?

12:38:27 13       A.  No, I did not.

12:38:38 14       Q.  So you were able to provide some

12:38:40 15   clarification on the date in paragraph seven of

12:38:44 16   Exhibit One that we talked about.  Does this Exhibit

12:38:50 17   Four also refresh your recollection as to who

12:38:57 18   directed you to submit the full and complete Amex

12:39:02 19   statements?

12:39:03 20           ATTORNEY SADRO:  Objection, form.

12:39:03 21           THE WITNESS:  I mean, obviously, it's --

12:39:05 22   it's clear here that Ylse was requesting that from

12:39:11 23   me.

12:39:11 24   BY ATTORNEY CONVERSE:

12:39:29 25       Q.  All right.  I'm going to stop sharing that

12:39:31  1    one and bring back your declaration which is Exhibit

12:39:34  2    One.  I'm scrolling down to bottom of page 2, there

12:39:51  3    is a paragraph 10.

12:39:53  4         A.   Uh-huh.

12:39:53  5         Q.   Will you take a moment to review that

12:39:57  6    before I -- I ask you questions, that paragraph 10?

12:40:00  7         A.   Yes, go ahead.

12:40:02  8         Q.   Okay.  You provide examples of charge as

12:40:10  9    you put it that you were instructed should be

12:40:12 10    categorized as legitimate business expenses and

12:40:16 11    therefore paid by Head Kandy.

12:40:19 12         A.   Uh-huh.

12:40:21 13         Q.   Do you recall any other examples other and

12:40:24 14    the ones that you have identified here in paragraph

12:40:27 15    10?

12:40:28 16         A.   Well, the only other example that I can

12:40:40 17    think of specifically would be brought up in

12:40:42 18    paragraph 11 so, no, is the answer to your question.

12:40:53 19         Q.   Okay.  Great.  I'll ask you about

12:40:54 20    paragraph 11 after this one.  Thanks for pointing

12:40:57 21    that out.

12:40:58 22         A.   Yes.

12:40:59 23         Q.   So with regard to the expenses identified

12:41:02 24    in paragraph 10.  The first one is clothes for

12:41:14 25    Ms. McNeill.  Do you know -- sorry, strike that.

| | | |
|---|---|---|
| 12:41:21 | 1 | Did these clothes -- strike that |
| 12:41:28 | 2 | again. |
| 12:41:28 | 3 | Were those clothes purchased in a |
| 12:41:31 | 4 | single transaction? |
| 12:41:38 | 5 | A.   Not all the time, no. |
| 12:41:40 | 6 | Q.   So are you referring to several purchases |
| 12:41:44 | 7 | of clothes for Ms. McNeill? |
| 12:41:46 | 8 | A.   Yes. |
| 12:41:48 | 9 | Q.   Okay.  Do you know over what time period |
| 12:41:53 | 10 | those clothes were -- were charged to the Amex card? |
| 12:42:01 | 11 | A.   I think probably the majority of the |
| 12:42:02 | 12 | instances that I can recall are early in the |
| 12:42:07 | 13 | purchase when we were doing a lot more lives, live |
| 12:42:13 | 14 | videos on a more frequent basis. |
| 12:42:19 | 15 | Q.   Would early be 2018? |
| 12:42:25 | 16 | A.   I would say, yeah, 2018 to 2020.  After |
| 12:42:31 | 17 | that time I wasn't doing the expense reports so I |
| 12:42:33 | 18 | can't speak to that. |
| 12:42:37 | 19 | Q.   So the purchase would have been made |
| 12:42:40 | 20 | throughout the entire period that you were doing the |
| 12:42:43 | 21 | expense reports? |
| 12:42:46 | 22 | A.   When we're speaking about the clothing and |
| 12:42:48 | 23 | stuffer like that. |
| 12:42:49 | 24 | Q.   Yes, just the clothing. |
| 12:42:54 | 25 | A.   Yeah. |

12:42:54  1      Q.   Are you aware whether Ms. McNeill wore any

12:43:01  2   of the clothing that you've identified in

12:43:03  3   promotional materials for Head Kandy?

12:43:08  4      A.   I mean, that's -- yeah, that's why they

12:43:10  5   were purchased was for live videos and photo shoots

12:43:14  6   and stuff like that, yes.

12:43:22  7      Q.   The next example is an entire set of

12:43:26  8   makeup for Ms. McNeill while traveling because she

12:43:30  9   had forgotten her makeup kit at home.

12:43:33 10      A.   Yes.

12:43:34 11      Q.   Do you know what the purpose of her travel

12:43:36 12   was?

12:43:42 13      A.   I don't recall the specific purpose of

12:43:44 14   that travel.

12:43:45 15      Q.   Do you know if it was for Head Kandy

12:43:47 16   business?

12:43:49 17      A.   I don't recall.

12:43:54 18      Q.   Do you recall Ms. McNeill making

12:43:59 19   appearances on HSN or the Home Shopping Network?

12:44:05 20      A.   Yes.

12:44:06 21      Q.   Do you know whether those appearances were

12:44:09 22   for the purpose of promoting Head Kandy products?

12:44:12 23      A.   Yes.

12:44:14 24      Q.   Was she promoting to your knowledge any

12:44:20 25   products other than Head Kandy products?

| | | |
|---|---|---|
| 12:44:22 | 1 | A.   No. |
| 12:44:37 | 2 | Q.   Do you know when this travel occurred? |
| 12:44:40 | 3 | A.   I do not recall. |
| 12:44:51 | 4 | Q.   Since you're talking about you |
| 12:44:54 | 5 | categorizing these expenses, would the travel have |
| 12:44:58 | 6 | to have occurred between 2018 and 2020 when you were |
| 12:45:04 | 7 | submitting the expense reports? |
| 12:45:08 | 8 | A.   Can you repeat that? |
| 12:45:09 | 9 | Q.   Yes.  I'm trying to narrow down when -- |
| 12:45:13 | 10 | when this trip occurred and in this paragraph 10 |
| 12:45:19 | 11 | you're providing examples of charges that you were |
| 12:45:24 | 12 | instructed to categorize in a certain way; is that |
| 12:45:26 | 13 | correct? |
| 12:45:31 | 14 | A.   Yes. |
| 12:45:31 | 15 | Q.   So the -- the charges for the travel would |
| 12:45:38 | 16 | have then necessarily occurred while you were |
| 12:45:40 | 17 | submitting the expense reports in 2018 and 2020 -- |
| 12:45:44 | 18 | A.   That's correct. |
| 12:45:46 | 19 | Q.   Right? |
| 12:45:47 | 20 | A.   Yes. |
| 12:45:47 | 21 | Q.   Okay.  Other than this instance that you |
| 12:45:58 | 22 | reference here about Ms. McNeill forgetting her |
| 12:46:01 | 23 | makeup kit and needing one to be purchased for her, |
| 12:46:06 | 24 | are you aware of any other instances where |
| 12:46:15 | 25 | Ms. McNeill needed a makeup kit purchased for her |

12:46:19  1   when she was traveling?

12:46:22  2        A.   No, I do not recall any other times

12:46:23  3   besides the one.

12:46:29  4        Q.   And the last -- sorry.  Go ahead.

12:46:32  5        A.   That I know of.

12:46:33  6        Q.   The last example you provide here are

12:46:34  7   Christmas decorations for Ms. McNeill's home --

12:46:38  8        A.   Uh-huh.

12:46:38  9        Q.   Do you see that?

12:46:39 10        A.   Yes.

12:46:47 11        Q.   Do you know if the decorations as setup in

12:46:49 12   Ms. McNeill's home were used for promotional

12:46:53 13   materials for Head Kandy?

12:46:55 14        A.   Not directly.  They were just background

12:46:57 15   for whatever photos that she was taking of herself.

12:47:02 16        Q.   So they appeared in promotional material

12:47:07 17   for Head Kandy?

12:47:08 18        A.   Yes, as background.

12:47:12 19        Q.   Okay.  Did you say pictures that

12:47:16 20   Ms. McNeill took?

12:47:19 21        A.   Yes.  So specifically like she would take

12:47:22 22   a photo of her wearing a Head Kandy shirt that we

12:47:27 23   would sell and she would use like the Christmas tree

12:47:29 24   in the background or a bookshelf with decorations

12:47:33 25   behind her in -- in those photos in her home.

12:47:42   1        Q.   When we were talking about you performing

12:47:50   2   photography services for Head Kandy, I thought you

12:47:55   3   said that Head Kandy would arrange some formal photo

12:48:03   4   shoots for promotional materials.  Did I understand

12:48:06   5   you correctly?

12:48:07   6        A.   Yes, you did.

12:48:09   7        Q.   Okay.  Do you know if the Christmas

12:48:14   8   decorations as setup in Ms. McNeill's home were used

12:48:18   9   for any of those formal photo shoots for Head Kandy?

12:48:23  10        A.   Yes, sometimes.

12:48:26  11        Q.   Were there multiple years that Christmas

12:48:31  12   decorations were purchased to decorate Ms. McNeill's

12:48:35  13   home?

12:48:36  14        A.    In the photos?

12:48:39  15        Q.   No, just in general.  So did -- are you

12:48:42  16   aware of -- well, let me just ask directly.  The

12:48:46  17   example that you're providing here about the

12:48:48  18   Christmas decorations for Ms. McNeill's home that

12:48:51  19   you categorized as business expenses --

12:48:55  20        A.   Uh-huh.

12:48:55  21        Q.   Was that for a single Christmas or

12:48:56  22   multiple Christmas seasons?

12:48:59  23        A.    I'm thinking more households.  So I would

12:49:03  24   know two households for sure.

12:49:06  25        Q.   Okay.  Can you explain to me what you mean

12:49:09  1    by households?

12:49:10  2         A.   Yes, so I'm speaking of decorations that

12:49:13  3    were used to decorate her house for the season that

12:49:17  4    could have, yes been used at times in photos if I

12:49:20  5    needed something, but all -- most of the props that

12:49:21  6    I used in photos were purchased separately for the

12:49:24  7    photos studio, I guess you could say.  So that's two

12:49:30  8    different scenarios.  Does that make sense?

12:49:39  9         Q.   Okay.  I -- I think you said two

12:49:41 10    households at first.  Did you mean two scenarios?

12:49:43 11         A.   No.  Two households which means she

12:49:46 12    purchased Christmas decorations for her Colorado

12:49:49 13    home and Christmas decorations for her North

12:49:52 14    Carolina home.  So she furnished both homes with

12:49:55 15    decorations and expensed those to Head Kandy.

12:49:58 16    That's what I am referring to as Christmas

12:50:00 17    decorations.

12:50:01 18         Q.   Okay.  Thank you.

12:50:02 19         A.   Yeah.

12:50:03 20         Q.   And did you identify the decorations for

12:50:14 21    the North Carolina home as business expenses?

12:50:16 22         A.   I was not doing expense reports at that

12:50:19 23    time, but I know they were purchased with the

12:50:21 24    company card so I would -- I would bet that those

12:50:26 25    were paid by company funds.

12:50:30   1          Q.   Do you have any knowledge as to whether or

12:50:32   2   not those expenses were designated as business

12:50:37   3   expenses?

12:50:38   4          A.   I guess, no.

12:50:47   5          Q.   With regard to the decorations for the

12:50:48   6   Colorado home, was there just one instance that

12:50:52   7   decorations were purchased for the Colorado home?

12:50:55   8          A.   I know for sure one, yes, because I was

12:50:56   9   doing the report at that time, but I'm sure there's

12:51:03  10   probably other -- there could be other instances.

12:51:09  11          Q.   But you're only aware of the one?

12:51:12  12          A.   Correct.

12:51:12  13          Q.   Okay.  And with regard to the one

12:51:13  14   instance, did you identify those charges as business

12:51:19  15   expenses on the statement that you submitted?

12:51:22  16          A.   Yes, I did.

12:51:28  17          Q.   Do you know if the charges that you

12:51:31  18   designated -- sorry, strike that.

12:51:33  19               Do you know if the decorations for

12:51:39  20   the Colorado home that you designated as business

12:51:47  21   expenses were used in any planned photo shoot for

12:51:52  22   Head Kandy?

12:51:53  23          A.   Yeah, I believe Kayla did a photo shoot in

12:51:56  24   her home because I think I helped take those photos

12:51:59  25   so they were in the background of some personal

12:52:05  1   photos of her that we used on social media.

12:52:34  2        Q.   Are the Christmas decorations that you're

12:52:36  3   providing as an example here identifying personal

12:52:42  4   expense that that you were instructed to designate

12:52:51  5   as business expenses?

12:52:52  6        A.   Sorry.  Can you rephrase that question?

12:52:54  7        Q.   Yes.  So when you identified the Christmas

12:52:58  8   decorations we were just talking about for

12:53:00  9   Ms. McNeill's home, is that an example of a -- or a

12:53:17 10   personal expense that you were instructed to

12:53:28 11   designate as a business expense?  Do you need me to

12:53:39 12   ask it again?  I can ask it again.

12:53:39 13        A.   Yeah.  I'm sorry.

12:53:42 14        Q.   So you are talking about charges on the

12:53:49 15   Amex card and we talked previously that you were

12:53:59 16   instructed to designate certain charges as business

12:54:02 17   expenses even though you believe them to be personal

12:54:08 18   expenses?

12:54:10 19        A.   That's correct.

12:54:12 20        Q.   Okay.

12:54:13 21        A.   I did not feel that these -- I don't feel

12:54:13 22   like that's a legitimate business expense.

12:54:16 23        Q.   Okay.  So are the Christmas decorations

12:54:19 24   that we've been talking about one that you do not

12:54:20 25   feel is a legitimate business expense?

12:54:23   1      A.   Yes.

12:54:24   2      Q.   Okay.  Do you have any way for determining

12:54:41   3   what you consider a legitimate business expense?

12:54:45   4           ATTORNEY SADRO:  Objection, form.

12:54:45   5           THE WITNESS:  I mean, I can kind of look

12:54:46   6   at it as I -- my job is to take photos for, you

12:54:48   7   know, her social media for anything.  I have used

12:54:51   8   props in my own house for taking photos as

12:54:55   9   backgrounds.  My Christmas tree was in the

12:54:57  10   background.  Did Head Kandy pay for that, no.  If I

12:55:00  11   would request that Head Kandy pay for that, would

12:55:01  12   they, probably not.  So morally I don't think that's

12:55:06  13   a legitimate business expense.

12:55:09  14   BY ATTORNEY CONVERSE:

12:55:10  15      Q.   Okay.  If it was morally wrong, why did

12:55:17  16   you submit it as a business expense?

12:55:18  17      A.   I was --

12:55:19  18           ATTORNEY SADRO:  Objection, form.

12:55:20  19           THE WITNESS:  I was following instruction

12:55:22  20   per my supervisor.

12:55:24  21   BY ATTORNEY CONVERSE:

12:55:24  22      Q.   Okay.

12:55:34  23      A.   Not only my supervisor, but the owner --

12:55:36  24   an owner of the company, to be more clear.

12:56:01  25      Q.   Okay.  And I believe you told me there was

12:56:03  1    another example in paragraph 11.  So I'm going to

12:56:06  2    scroll down to paragraph 11 of this Exhibit One.

12:56:16  3    Reading it, I see that you're referencing a

12:56:20  4    mechanical part.

12:56:22  5         A.   Uh-huh.

12:56:22  6         Q.   Is this the other example that you were

12:56:24  7    referring to?

12:56:25  8         A.   Yes, that's correct.

12:56:35  9         Q.   When was this charge made?

12:56:40 10         A.   This charge was made on my company credit

12:56:42 11    card during the period where I was unemployed at

12:56:45 12    Head Kandy.  So my company card under my name was

12:56:48 13    still being used without -- well, actually, let me

12:56:57 14    think here.  I'll retract that statement because I

12:57:02 15    can't -- I can't remember if that was actually

12:57:04 16    during that timeframe.

12:57:05 17              Can you -- can you restate your question?

12:57:10 18    I'm sorry.  I got sidetracked.

12:57:12 19         Q.   Yes.  So I -- my question was when the

12:57:18 20    charge for the mechanical part was made?

12:57:21 21         A.   When it was made?

12:57:27 22         Q.   Yes.

12:57:27 23         A.   I actually cannot recall that.  That's why

12:57:30 24    I retracted my statement.

12:57:32 25         Q.   Okay.  But I believe you said that it was

RYAN THOMPSON
SEPTEMBER 06, 2024

JOB NO. 1164890

| | | |
|---|---|---|
| 12:57:37 | 1 | made on your company card; is that correct? |
| 12:57:42 | 2 | A. That's correct, yes. |
| 12:57:43 | 3 | Q. Okay. When you refer to a company card, |
| 12:57:53 | 4 | are you referring to this Amex account that we have |
| 12:57:58 | 5 | been talking about the whole time when discussing |
| 12:58:02 | 6 | your declaration? |
| 12:58:03 | 7 | A. Sorry. I want to go back real quick |
| 12:58:06 | 8 | because now that I'm fully thinking about the -- |
| 12:58:09 | 9 | what this is, this was actually purchased on |
| 12:58:11 | 10 | Alibaba. So I -- it would have been purchased on |
| 12:58:16 | 11 | the Head Kandy credit card. I think it was Kayla's |
| 12:58:19 | 12 | credit card. So this -- this specific product and |
| 12:58:24 | 13 | purchase was made via Alibaba. |
| 12:58:28 | 14 | Q. Okay. Thank you. And if you recall more |
| 12:58:36 | 15 | things about this purchase as we're talking about |
| 12:58:39 | 16 | it, feel free to let me know you recall more details |
| 12:58:45 | 17 | and I will give you an opportunity to -- to provide |
| 12:58:48 | 18 | a full response. |
| 12:58:50 | 19 | A. Sure. |
| 12:58:50 | 20 | Q. So you stated a -- that was on the Head |
| 12:58:57 | 21 | Kandy card and that it was Kayla's card. Can you |
| 12:59:02 | 22 | clarify what you mean when -- when you said that it |
| 12:59:10 | 23 | was Head Kandy's card? |
| 12:59:12 | 24 | A. Yeah. So the American Express is a |
| 12:59:14 | 25 | business account. So when I say her credit card, I |

12:59:17  1  apologize, I mean, her -- her -- her Head Kandy

12:59:21  2  credit card.  The credit card would say Head Kandy,

12:59:24  3  LLC and then Kayla's name as the user.  So it would

12:59:29  4  have been on that specific card that Kayla was in

12:59:31  5  possession of.  Does that make sense?

12:59:36  6      Q.  Were multiple people issued individual

12:59:44  7  credit cards on the same account?

12:59:46  8      A.  Yes.

12:59:47  9      Q.  Okay.  So when you say that Head Kandy

12:59:51 10  card, you are more referring to the -- the Amex

12:59:55 11  accounts?

12:59:56 12      A.  Yes.  Yeah, when a statement comes out

12:59:58 13  though, it does list each individual user and so I

01:00:03 14  believe all the Alibaba charges were on Kayla's

01:00:07 15  individual card, I guess you could say.

01:00:14 16      Q.  Do you know if the individual cards had

01:00:20 17  different numbers assigned to them?

01:00:21 18      A.  Yes, they did.

01:00:25 19      Q.  Okay.  Were you issued a card on that

01:00:33 20  account?

01:00:34 21      A.  Yes, on numerous occasions.

01:00:37 22      Q.  You had more than one credit card in the

01:00:40 23  account?

01:00:41 24      A.  I did.  I had one before I quit in 2020

01:00:43 25  and then another one, well, I can't remember when

01:00:49   1   that was one issued.  Probably in 2021 when I came

01:00:52   2   back.

01:00:58   3        Q.   And you said that the card that was issued

01:01:03   4   to Kayla said Head Kandy, LLC on it.  Did I

01:01:08   5   understand that correctly?

01:01:09   6        A.   Yes.  It should have said Head Kandy, LLC

01:01:12   7   and then her name below it.

01:01:14   8        Q.   Okay.  Did you ever see Ms. McNeill's

01:01:16   9   credit card?

01:01:18  10        A.   Oh, yeah.  I'm sure I saw it on numerous

01:01:20  11   occasions.

01:01:20  12        Q.   Okay.  So did you see the Head Kandy, LLC

01:01:25  13   on her credit card?

01:01:26  14        A.   I can't recall, but everyone else's has

01:01:29  15   their name on it so I would assume that her was the

01:01:32  16   same.

01:01:32  17        Q.   The first card that you were issued on the

01:01:35  18   account, did it say Head Kandy, LLC on it?

01:01:45  19        A.   I don't recall.  I'm pretty sure it just

01:01:46  20   said Head Kandy because Head Kandy, LLC wasn't

01:01:49  21   established yet.

01:01:55  22        Q.   Do you -- do you know if the second card

01:01:57  23   that you received on the account said Head Kandy,

01:01:59  24   LLC?

01:02:00  25        A.   Yes, I believe so.

| | | |
|---|---|---|
| 01:02:03 | 1 | Q.   Do you still have that card? |
| 01:02:05 | 2 | A.   I do not.  Yeah, it's no longer in issue. |
| 01:02:10 | 3 | Q.   Do you know what happened to the card? |
| 01:02:12 | 4 | A.   Yeah, it was destroyed. |
| 01:02:15 | 5 | Q.   Did you destroy it? |
| 01:02:17 | 6 | A.   Yes, I was asked to destroy it by Klei. |
| 01:02:34 | 7 | THE COURT REPORTER:  I'm sorry.  I had a |
| 01:02:34 | 8 | hard time hearing you.  By who? |
| 01:02:38 | 9 | THE WITNESS:  Klei. |
| 01:02:39 | 10 | THE COURT REPORTER:  Thank you. |
| 01:02:39 | 11 | THE WITNESS:  K-L-E-I.  I think. |
| 01:02:41 | 12 | THE COURT REPORTER:  Thank you. |
| 01:02:41 | 13 | BY ATTORNEY CONVERSE: |
| 01:02:41 | 14 | Q.   And is Klei's last name Petri? |
| 01:02:43 | 15 | A.   Yes. |
| 01:02:44 | 16 | Q.   Okay. |
| 01:02:45 | 17 | A.   Petri or something. |
| 01:02:46 | 18 | Q.   Petri, did you say? |
| 01:02:48 | 19 | A.   Yeah.  I think it's -- yeah, either way. |
| 01:02:49 | 20 | I don't really know for sure. |
| 01:02:50 | 21 | Q.   Okay.  I can refer to her as Klei if |
| 01:02:53 | 22 | that's what you're used to referring to her as.  Did |
| 01:02:56 | 23 | Klei tell you why she wanted you to destroy the |
| 01:03:00 | 24 | credit card? |
| 01:03:00 | 25 | A.   The only person that has a card that works |

01:03:03  1    now is Mindy McDermaid.  They just didn't feel that

01:03:08  2    there was a reason for all of us to have cards

01:03:12  3    still.

01:03:12  4         Q.   The card that Ms. McDermaid has, do you

01:03:17  5    know if it's under the same Amex account that your

01:03:22  6    credit card was?

01:03:23  7         A.   Yes.

01:03:30  8         Q.   Yes, it is on the same account?

01:03:32  9         A.   Yes.

01:03:32 10         Q.   Okay.

01:03:59 11         A.   And now that I think about it, my original

01:04:02 12    card back in -- like prior to 2020, it might have

01:04:05 13    actually said Lashed Out, LLC.

01:04:08 14         Q.   Okay.  Thank you.

01:04:10 15         A.   You're welcome.  I can't -- I can't

01:04:14 16    recall.

01:04:14 17         Q.   All right.  So you had initially

01:04:28 18    thought -- I understand that you were confused, but

01:04:30 19    you initially thought that this mechanical part was

01:04:35 20    purchased on your company credit card.  Are you

01:04:38 21    aware of any personal expenses that Ms. McNeill

01:04:47 22    placed on the credit card that you were issued on

01:04:51 23    this Amex account?

01:04:53 24         A.   There were none when I said that

01:04:54 25    statement.  I just was quick firing in my brain and

RYAN THOMPSON
SEPTEMBER 06, 2024

JOB NO. 1164890

01:04:58  1    I was incorrect in the statement.

01:05:00  2         Q.   I just want to clarify in case you a

01:05:04  3    different instance in your mind other than this

01:05:05  4    mechanical part.

01:05:07  5         A.   Okay.

01:05:07  6         Q.   So I appreciate the clarification.

01:05:09  7         A.   Of course.

01:05:22  8         Q.   And I believe you -- you said that you

01:05:23  9    couldn't recall when this mechanical part was

01:05:27 10    ordered; is that correct?

01:05:29 11         A.   I don't directly recall the date, no.

01:05:33 12         Q.   But here you state that you were directed

01:05:36 13    to designate it as a business expense.  So is it

01:05:42 14    fair to say that it would have had to occurred while

01:05:45 15    you were the doing the expense reports between 2018

01:05:49 16    and 2020?

01:05:50 17         A.   No.  It probably would have been after.

01:05:51 18    So if I could explain the scenario real quick.  So I

01:05:57 19    was asked by Hernan Heiber I believe to go back

01:06:03 20    through our entire transaction list of Alibaba

01:06:06 21    between some specific dates and I can't remember

01:06:09 22    those specific dates.  And I was supposed to

01:06:14 23    basically itemize each one and -- and say what it

01:06:17 24    was for.  Whether it was for samples or whatnot and

01:06:20 25    this specific charge was one of those -- those

01:06:23  1  charges that I was itemizing out.  Does that make

01:06:32  2  sense?

01:06:33  3      Q.   Yes.  Just a couple follow-up questions on

01:06:38  4  that.  Do you know when Hernan asked you to go back

01:06:45  5  and look at the Alibaba expenses?

01:06:49  6      A.   I don't recall exact dates.  This would

01:06:51  7  have been prior to Kayla's departure.

01:06:55  8      Q.   Is this during your second tenure with --

01:06:58  9      A.   Yes.

01:06:58 10      Q.   Head Kandy?

01:06:58 11      A.   Yeah.

01:07:02 12      Q.   Do you know if the expenses had already

01:07:09 13  been submitted to Head Kandy when you were reviewing

01:07:17 14  them?

01:07:17 15      A.   Yes, these would have already been paid.

01:07:20 16      Q.   Okay.

01:07:28 17      A.   Because it wasn't an expense report that

01:07:31 18  this was listed on.

01:07:33 19      Q.   Okay.  So paragraph 11 in this Exhibit One

01:07:38 20  begins, Ms. McNeill routinely directed me to submit

01:07:41 21  expenses that appeared to be completely personal

01:07:45 22  with no legitimate connection with Head Kandy, LLC's

01:07:49 23  business and directed that they be paid from Head

01:07:53 24  Kandy, LLC's bank account.  And then you say, for

01:07:55 25  example, and you give the example of the mechanical

01:07:58  1    parts.  Is that an accurate statement with regard to

01:08:00  2    this mechanical part?

01:08:01  3        A.   I think that's probably a mis -- a little

01:08:01  4    bit of a misinterpretation of what I was saying

01:08:07  5    because I did not submit this expense on an expense

01:08:10  6    report.  I simply found it and during -- during, I

01:08:14  7    guess you can say like an audit of Alibaba.  So it's

01:08:24  8    not really an untrue statement.  It's just

01:08:27  9    misinterpreted on -- on what I was speaking of.

01:08:31 10        Q.   Well, is it example of Ms. McNeill

01:08:34 11    directing you to submit expenses?

01:08:37 12        A.   Yes.  Once I found it and I approached her

01:08:40 13    about it, I was directed to put it down on business

01:08:45 14    expense and in the scope of the project.

01:08:58 15        Q.   Were you directed to submit the expense so

01:09:08 16    that it could be paid from Head Kandy, LLCs bank

01:09:11 17    account?

01:09:12 18             ATTORNEY SADRO:  Objection.  Form.

01:09:13 19             THE WITNESS:  No.  This had already been

01:09:16 20    paid.  This is a previous purchase.

01:09:19 21    BY ATTORNEY CONVERSE:

01:09:19 22        Q.   So what is this an example of?

01:09:21 23        A.   This is an example of item that was

01:09:23 24    purchased for personal use and was paid by Head

01:09:26 25    Kandy.

01:09:30  1      Q.   I believe you said it had already -- the

01:09:32  2   statement had already been submitted to Head Kandy.

01:09:35  3   Do you have any knowledge as to whether or not it

01:09:40  4   was identified as a business expense when it was

01:09:43  5   originally submitted to Head Kandy?

01:09:46  6      A.   So I can't say directly because I was not

01:09:48  7   doing expense reports.  But I do know that when a

01:09:51  8   charge comes through on the credit card for Alibaba,

01:09:53  9   all it states is Alibaba.  And so for accounting

01:10:03  10  team they probably just saw Alibaba and typically

01:10:06  11  everything on Alibaba is purchased for Head Kandy

01:10:07  12  and so it would have just been paid.  It wouldn't

01:10:09  13  have ever been questioned.

01:10:11  14     Q.   Do you have any knowledge as to whether or

01:10:13  15  not it was actually paid by Head Kandy?

01:10:16  16     A.   I do not.

01:10:39  17     Q.   Do you know what the purpose of the review

01:10:41  18  of the Alibaba charges was?

01:10:45  19     A.   I do not recall the purpose of it.  I

01:10:51  20  would assume it probably had something to do with

01:10:54  21  the forensic accounting.  I don't know if I want --

01:10:59  22  an investigation or whatever that was, I would

01:11:02  23  assume that was probably part of it.

01:11:10  24     Q.   Do you know who conducted that

01:11:11  25  investigation?

01:11:13   1          A.    I think the company was K2 something, if

01:11:16   2    I'm not mistaken.  I don't know.  I just -- just

01:11:19   3    remember hearing that name or seeing it maybe in an

01:11:23   4    email or something.  Or maybe the report that I

01:11:27   5    was -- I think Kayla sent me the actual report and I

01:11:30   6    think it said K2.

01:11:32   7          Q.    Do you know when the investigation

01:11:34   8    occurred?

01:11:41   9          A.    It was shortly before Kayla's exit.

01:11:50  10          Q.    So do you believe that your review of the

01:11:53  11    Alibaba charges occurred shortly before Kayla's

01:11:58  12    exit?

01:12:01  13          A.    Yeah, I can't recall the exact timeframe.

01:12:04  14    I'm sorry.

01:12:14  15          Q.    When you were conducting your review, what

01:12:20  16    resources did you use to determine if a charge was a

01:12:24  17    business expense?

01:12:26  18          A.    So I can go through and see on most of the

01:12:30  19    Alibaba -- like, you log in to Alibaba and I

01:12:35  20    reviewed every single purchase.  Like, you can --

01:12:41  21    for the most part you can see kind of what you

01:12:43  22    purchased and sometimes you can't.  So that's the

01:12:48  23    resource that I used was the actual website.

01:12:51  24          Q.    Did you do anything else to determine if a

01:12:56  25    charge was a business expense?

01:13:00   1        A.   If I questioned it, I asked Ms. McNeill

01:13:02   2   about it.

01:13:06   3        Q.   Did you question this particular charge,

01:13:08   4   this mechanical part?

01:13:12   5        A.   Yes.

01:13:30   6        Q.   What did you do with the results of your

01:13:32   7   review?

01:13:34   8        A.   I would have emailed them.  It actually

01:13:37   9   would have been placed in a Google files thing and I

01:13:40  10   submitted those back to Hernan.

01:14:04  11        Q.   Other than -- excuse me.  Other than this

01:14:06  12   mechanical part, are there any other Alibaba charges

01:14:15  13   that you believed or were told were personal

01:14:20  14   expenses?

01:14:22  15        A.   I know at one point that Kayla ordered

01:14:25  16   some clothing for another business that she had

01:14:30  17   called Hayzlee's Boutique and that was, I was told

01:14:36  18   by Ms. McNeill that those were unintentionally paid

01:14:42  19   for by Head Kandy and then I don't know what

01:14:43  20   happened after that.  She may have resolved that

01:14:46  21   with Head Kandy.  I don't know, but that was another

01:14:48  22   example that I knew of.  But that -- those are the

01:14:52  23   two that I know of offhand.

01:14:54  24        Q.   Was that charge concerning Hayzlee's

01:14:56  25   Boutique included in your review?

01:15:03  1       A.    No, I don't believe so because that was

01:15:06  2   prior to the parameters that they had given me.

01:15:17  3       Q.    After you were told by Ms. McNeill that

01:15:20  4   they would never know that the mechanical part

01:15:23  5   wasn't used for the forklift, did you identify the

01:15:27  6   mechanical part as a business expense on your

01:15:31  7   review?

01:15:34  8       A.    I believe so, yes.

01:15:35  9       Q.    And did you submit it to Hernan with that

01:15:42 10   inaccurate designation?

01:15:45 11       A.    I believe so, yes.

01:15:50 12       Q.    What was your role with Head Kandy at this

01:15:53 13   time?

01:15:54 14       A.    I think my technical title director of

01:15:57 15   operations once again.

01:16:08 16       Q.    Is that your current tile?

01:16:09 17       A.    My current title -- title is senior

01:16:09 18   operations -- Senior Director of Operations.  And

01:16:16 19   actually that's what my title would have been at the

01:16:20 20   time as well.

01:16:21 21       Q.    So at that time you were Senior Director

01:16:24 22   of Operations?

01:16:25 23       A.    Yes.

01:16:31 24       Q.    Who were you reporting to at this time?

01:16:33 25       A.    Kayla McNeill.

01:16:49  1      Q.   At that time did you believe that

01:16:50  2  Ms. McNeill had the authority to terminate you?

01:16:56  3      A.   Yeah.

01:17:05  4      Q.   Who hired you on behalf of Head Kandy when

01:17:08  5  you returned?

01:17:12  6      A.   Kayla McNeill.

01:17:22  7      Q.   Did you have conversation with anyone else

01:17:25  8  concerning your reemployment by Head Kandy?

01:17:32  9      A.   Yeah, I was excited to come back and so I

01:17:34 10  spoke to many people about it.

01:17:36 11      Q.   Okay.  Did Ms. McNeill tell you that she

01:17:45 12  needed to obtain approval from anyone else to rehire

01:17:50 13  you?

01:17:51 14      A.   She did say that she would need to talk to

01:17:54 15  Bryan, but I never saw any proof that or any

01:18:00 16  documents or anything like that.

01:18:17 17      Q.   Did you fill out a new hire or rehire form

01:18:25 18  with Head Kandy?

01:18:33 19      A.   I don't remember.  I don't recall doing

01:18:34 20  that.

01:18:35 21      Q.   Do you recall ever seeing one for your

01:18:39 22  rehiring?

01:18:46 23      A.   I'm sure that I probably would have

01:18:48 24  because -- I don't -- I just don't recall.  I don't.

01:18:50 25      Q.   Okay.  Were you salaried when you were

| | | |
|---|---|---|
| 01:18:57 | 1 | rehired? |
| 01:18:58 | 2 |     A.   Yes, I was. |
| 01:18:59 | 3 |     Q.   What was your salary when you were first |
| 01:19:02 | 4 | rehired? |
| 01:19:03 | 5 |     A.   54,000. |
| 01:19:13 | 6 |     Q.   Has that changed at any time from your |
| 01:19:19 | 7 | rehiring to today? |
| 01:19:23 | 8 |     A.   Yes, it has. |
| 01:19:24 | 9 |     Q.   How many times? |
| 01:19:26 | 10 |     A.   Once. |
| 01:19:28 | 11 |     Q.   When did that occur? |
| 01:19:32 | 12 |     A.   That occurred shortly after Kayla's exit. |
| 01:19:36 | 13 | I think it was in January of that following year. |
| 01:19:41 | 14 |     Q.   It was -- |
| 01:19:42 | 15 |     A.   My pay raise went in effect on |
| 01:19:44 | 16 | February 1st. |
| 01:19:45 | 17 |     Q.   Would that be of 2023? |
| 01:19:48 | 18 |     A.   Yes. |
| 01:19:48 | 19 |     Q.   Okay.  And what was the raise to? |
| 01:19:56 | 20 |     A.   70,000. |
| 01:19:57 | 21 |     Q.   At the time of your raise did you receive |
| 01:20:20 | 22 | a new title? |
| 01:20:23 | 23 |     A.   No. |
| 01:20:27 | 24 |     Q.   At the time of your raise did you receive |
| 01:20:31 | 25 | new responsibilities? |

01:20:35  1        A.    I was going back and forth to North

01:20:37  2    Carolina a lot making sure that the warehouse was

01:20:40  3    running smoothly and properly.  Just kind of

01:20:43  4    overseeing that aspect.  I was doing a lot more live

01:20:49  5    videos and stuff like that just to kind of keep

01:20:55  6    things rolling.  So yes, I did get a little bit more

01:20:57  7    responsibility.

01:21:08  8        Q.    Are you still creating videos?

01:21:13  9        A.    No, I'm not.

01:21:14 10        Q.    When did you stop creating videos for Head

01:21:17 11    Kandy?

01:21:20 12        A.    We have decided that the live videos

01:21:21 13    aren't really something that we're going to move

01:21:24 14    forward with so I believe that stopped -- I can't

01:21:31 15    recall the dates.  It's probably been -- I probably

01:21:39 16    did one about four or five months ago just as an --

01:21:41 17    no, I did one in March when it was right around my

01:21:45 18    birthday.

01:21:55 19        Q.    And you mentioned additional

01:21:56 20    responsibilities concerning the North Carolina

01:21:58 21    warehouse.  Did you take on those responsibilities

01:22:03 22    at the time that you received your raise?

01:22:08 23        A.    That was actually before my raise.  It

01:22:11 24    would have been during the holiday season.

01:22:22 25        Q.    When does the holiday season begin for

01:22:25   1    Head Kandy?

01:22:25   2        A.   It typically it starts to pick up in

01:22:28   3    November.  Like around Black Friday, so the end of

01:22:32   4    October, November.  Right?  Is that when Black

01:22:42   5    Friday is?

01:22:43   6        Q.   Yeah, I think.  Were you told by anyone

01:22:57   7    within Head Kandy that you would be required to take

01:23:04   8    on any new duties responsibilities or authority as a

01:23:11   9    result of your raise in February of 2023?

01:23:18  10        A.   No.  My raise was basically based off my

01:23:24  11    performance for jumping in and taking on that extra

01:23:28  12    responsibility.  I put a lot of hard work in those

01:23:31  13    times.  It was a very rough time.  So it was more of

01:23:34  14    a reward for my hard work which is how a raise

01:23:38  15    should be and so that's -- that was what I received.

01:23:44  16        Q.   Why were those hard times?

01:23:46  17        A.   We were going through an obvious shift in

01:23:48  18    the business.

01:23:55  19        Q.   What was that shift?

01:23:57  20        A.   Kayla's exit and just all the negativity

01:23:59  21    around all that so.  Whatever led to -- it just --

01:24:05  22    it was -- it was a transition for us all.

01:24:16  23        Q.   When did you learn that Ms. McNeill was

01:24:19  24    going to leave Head Kandy?

01:24:23  25        A.   I don't recall an exact date on that.

01:24:29   1        Q.   How did you learn that Ms. McNeill would
01:24:34   2   no longer be employed by Head Kandy?
01:24:41   3        A.   I believe -- well, Ms. McNeill told me.
01:24:43   4   It was kind of around her in person during that
01:24:47   5   whole transition.
01:24:50   6        Q.   I'm sorry, did you say her in person?
01:24:52   7        A.   Yeah, I was with -- I was with her in
01:24:54   8   person when all this happened.
01:25:04   9        Q.   By all of this, what were you referring
01:25:05  10   to?
01:25:06  11        A.   When Kayla was -- actually I was not with
01:25:08  12   her in person when she was released from the
01:25:11  13   company.  I mean, I -- Kayla and I talked about
01:25:13  14   everything all the time so I would have heard from
01:25:17  15   her that she was being let go from the company.
01:25:21  16        Q.   Did she tell you that she had already been
01:25:24  17   let go?
01:25:26  18        A.   I don't recall.
01:26:09  19        Q.   Why did you decide to return to Head
01:26:12  20   Kandy?
01:26:14  21        A.   Which instance, I assume you're speaking
01:26:17  22   of 2021?
01:26:19  23        Q.   Yes.  You only returned once, right?
01:26:21  24        A.   Yes.  Yeah --
01:26:22  25        Q.   Okay.

01:26:22   1          A.   I just wanted to make sure that's we were

01:26:24   2    talking about.

01:26:25   3          Q.   Yes.

01:26:25   4          A.   I decided to return to Head Kandy, Kayla

01:26:25   5    and I had had a conversation about what it would

01:26:29   6    look like if I came back.  And this happened for a

01:26:32   7    couple of weeks.  Maybe a month or so, maybe a

01:26:35   8    little longer, I can't remember the timeframe.

01:26:38   9               But we had talked about it once and I said,

01:26:40  10    no.  And then she came back with another offer and I

01:26:45  11    agreed to come back because we enjoyed working

01:26:47  12    together.  We worked very well together and we had

01:26:51  13    rekindled our friendship.

01:26:55  14               And I saw changes in her that were different

01:26:58  15    from before.  At least I hoped that there were changes.

01:27:01  16    And I believe that there were changes for sure in the

01:27:04  17    way that she was.  I think we both had grown since

01:27:07  18    then.

01:27:07  19               So I was excited to come back and be around

01:27:10  20    all the people that I enjoyed working with.  We always

01:27:13  21    had a good time, even though, there were negative parts

01:27:18  22    of the job.  We had a lot of good times.  And so I

01:27:20  23    enjoyed my job and I wanted to go back into that.

01:27:23  24    That's where my friends kind of worked so.

01:27:28  25               And I had pride in what I did for Head Kandy

01:27:32  1   and worked very hard with Kayla to help her grow her

01:27:36  2   business.  Like I said, she's a brilliant woman.  And

01:27:38  3   that's -- that's an infectious trait to be around.  So

01:27:41  4   I wanted to be back in -- in that environment.

01:27:43  5        Q.   All right.  The job that we spoke about

01:27:54  6   previously that you left to take the position with

01:28:00  7   Head Kandy, how much were you making at -- in that

01:28:05  8   position?

01:28:06  9        A.   54,000.

01:28:09  10        Q.   And that's the same amount that you

01:28:12  11   received from Head Kandy when you were rehired?

01:28:17  12        A.   That's correct.  Yes, she agreed to match

01:28:19  13   my salary there.

01:28:49  14        Q.   Did you experience any form of abuse from

01:28:52  15   Ms. McNeill after you were rehired by Head Kandy in

01:28:57  16   2021?

01:28:59  17        A.   No, not specifically.  I mean, there's

01:29:02  18   always a little bit of negativity involved, but I

01:29:08  19   did not experience the same thing that I was

01:29:11  20   experiencing before.  So that's why I said I felt

01:29:14  21   like there was growth between the two of us.  And

01:29:16  22   some things had change.

01:29:18  23             I felt like there was a more structure in the

01:29:20  24   business, too, which caused a lot less chaos.  So I

01:29:27  25   felt like things were different and I -- I think she

01:29:29  1   would agree with that.  So it felt right and it felt

01:29:31  2   comfortable coming back into that.

01:29:39  3        Q.   I'm going to direct your attention back to

01:29:43  4   this Exhibit One paragraph 13.  I'll give you

01:29:48  5   opportunity to read it before you ask you any

01:29:51  6   questions.

01:30:00  7        A.   Okay.

01:30:00  8        Q.   So here you're discussing employees of

01:30:05  9   Head Kandy that were performing personal services

01:30:10 10   for Ms. McNeill and you provide three examples.  Are

01:30:14 11   you aware of any other examples other than the three

01:30:18 12   that you provide here?

01:30:26 13        A.   No.  There was one other employee at the

01:30:30 14   North Carolina warehouse and I can't remember her

01:30:32 15   name.  I'm terrible with names and she was hired to

01:30:35 16   be basically a daycare worker for Kaylin Culp.  And

01:30:48 17   then, of course, Kayla when Hayzlee specifically --

01:30:51 18   the other two boys were old enough, they didn't

01:30:54 19   really need daycare.  But she would watch Hayzlee

01:30:55 20   and Kaylin's kids full-time as like a daycare

01:31:01 21   worker.

01:31:05 22        Q.   Is that while Ms. Culp and Ms. McNeill

01:31:09 23   were working?

01:31:13 24        A.   Yes.

01:31:18 25        Q.   Were there to your knowledge any Head

01:31:24  1    Kandy employees that wanted similar daycare services

01:31:27  2    while working that were not provided them?

01:31:32  3            ATTORNEY SADRO:  Objection, form.

01:31:33  4            THE WITNESS:  I don't believe that there

01:31:33  5    was anybody else that had children.  I could be

01:31:38  6    misspeaking on that.  I don't know.  I'm not aware

01:31:41  7    of any other employees that would have required that

01:31:45  8    assistance.

01:31:47  9    BY ATTORNEY CONVERSE:

01:31:47 10        Q.   Okay.  I'd like to just take them in

01:31:57 11    order, the individuals you identified.  The first is

01:32:02 12    Andrew Schankerman and you actually discuss him in

01:32:07 13    paragraphs 14 and 15 as well.  So I'll give you an

01:32:16 14    opportunity to review those paragraphs, too, before

01:32:18 15    I ask you questions about Mr. Schankerman.

01:32:37 16        A.   Okay.

01:32:42 17        Q.   In paragraph 15, and you also mention this

01:32:49 18    today while we have been talking, that

01:32:51 19    Mr. Schankerman worked as Head Kandy's warehouse

01:32:57 20    manager.

01:32:58 21        A.   Uh-huh.

01:32:58 22        Q.   Okay.  Did you personally see him

01:33:06 23    performing services as the warehouse manager for

01:33:11 24    Head Kandy?

01:33:11 25        A.   Yes, of course.

01:33:14   1        Q.   Do you know how many hours a week

01:33:18   2   Mr. Schankerman was required to work for Head Kandy?

01:33:23   3             ATTORNEY SADRO:  Objection, form.

01:33:28   4             THE WITNESS:  I would have to assume that

01:33:29   5   would be based off a 40-hour workweek.

01:33:31   6   BY ATTORNEY CONVERSE:

01:33:32   7        Q.   Do you know if Mr. Schankerman ever failed

01:33:39   8   to satisfy a 40-hour workweek requirement?

01:33:46   9             ATTORNEY SADRO:  Objection, form.

01:33:48  10             THE WITNESS:  I cannot testify to that,

01:33:50  11   no.

01:33:50  12   BY ATTORNEY CONVERSE:

01:33:53  13        Q.   So do you have any knowledge as to whether

01:33:57  14   or not Mr. Schankerman's involvement with

01:34:04  15   Ms. McNeill caused him to fail to satisfy his job

01:34:12  16   obligation for Head Kandy?

01:34:16  17        A.   When he was traveling with Ms. McNeill and

01:34:19  18   Mr. McNeill for races, I -- I could say he wasn't

01:34:24  19   working a full 40-hour workweek.

01:34:30  20        Q.   All right.  How many instances of

01:34:32  21   Mr. Schankerman traveling with the McNeills are you

01:34:37  22   aware of?

01:34:38  23        A.   I do not recall.

01:34:45  24        Q.   Is it more than five?

01:34:46  25        A.   I honestly don't recall how many times,

01:34:50  1    no.

01:34:55  2        Q.   Are you able to provide any range as to

01:35:00  3    the number of trips that Ms. Schankerman took with

01:35:06  4    the McNeill's?

01:35:08  5             ATTORNEY SADRO:  Objection, form.

01:35:09  6             THE WITNESS:  It was very sporadic just

01:35:09  7    depending on their racing schedule.  They tended to

01:35:14  8    be gone a lot.  So I would be safe to say probably

01:35:19  9    five to ten.  I don't -- but I can't answer that

01:35:22 10    100 percent.  I was -- I lived in Colorado, so I

01:35:25 11    wasn't always around physically to see.

01:35:30 12    BY ATTORNEY CONVERSE:

01:35:31 13        Q.   How -- how did you learn that

01:35:33 14    Mr. Schankerman was traveling with the McNeills on

01:35:38 15    any given trip?

01:35:45 16        A.   Are you talking specific examples or how

01:35:47 17    I'm aware that it was happening.

01:35:51 18        Q.   Did -- do you know if the McNeills took

01:35:55 19    any trips that Mr. Schankerman did not accompany

01:35:59 20    them on?

01:36:01 21        A.   Some, yeah, I'm sure.

01:36:03 22        Q.   How do you know which trips

01:36:06 23    Mr. Schankerman accompanied the McNeills on?

01:36:09 24        A.   I don't know exactly what trips.

01:36:12 25        Q.   And if you were working in a different

01:36:16  1   state, how were you able to determine what work

01:36:21  2   Mr. Schankerman performed for Head Kandy?

01:36:27  3        A.   I was not his supervisor so I -- I

01:36:29  4   wouldn't have been keeping track of that.

01:36:35  5        Q.   So you would have no way of knowing?

01:36:39  6             ATTORNEY SADRO:   Objection.

01:36:40  7             THE WITNESS:   Correct.   Or than the fact

01:36:40  8   that I was -- you know, Kayla and I text all the

01:36:41  9   time.   I think you have to understand the scope of

01:36:47  10  Kayla and I's relationship.   We talked all day,

01:36:48  11  every day via text.   So she would say, oh, Andrew,

01:36:51  12  you know -- I mean, we had conversations, so I would

01:36:54  13  hear about it.   And then -- then you know he's with

01:36:58  14  her.   Does that make sense?

01:36:59  15  BY ATTORNEY CONVERSE:

01:37:00  16       Q.   Yes.

01:37:05  17       A.   Okay.

01:37:06  18       Q.   Did she ever tell you that the trips that

01:37:12  19  Mr. Schankerman accompanied them on prevented him

01:37:17  20  from performing his work from for Head Kandy?

01:37:20  21       A.   Well, I just know, like, when they go on

01:37:23  22  those trips for the most part he would ride with

01:37:25  23  them and they would leave, you know, mid week,

01:37:26  24  Wednesday, Thursday to be able to get to these races

01:37:30  25  on the weekends.   Or sometimes he'd fly in and meet

| | | |
|---|---|---|
| 01:37:33 | 1 | them on the weekends. |
| 01:37:34 | 2 | So I'm not saying that all the time he was |
| 01:37:38 | 3 | missing work, but there were times when he would be |
| 01:37:40 | 4 | missing work and doing that while still being paid by |
| 01:37:45 | 5 | Head Kandy. |
| 01:37:47 | 6 | Q.   How do you know that he was still being |
| 01:37:51 | 7 | paid by Head Kandy? |
| 01:37:52 | 8 | A.   He was a salaried employed. |
| 01:37:56 | 9 | Q.   Do salaried employees get vacation time |
| 01:37:59 | 10 | with Head Kandy? |
| 01:38:00 | 11 | ATTORNEY SADRO:  Objection, form. |
| 01:38:01 | 12 | THE WITNESS:  Yes. |
| 01:38:01 | 13 | BY ATTORNEY CONVERSE: |
| 01:38:02 | 14 | Q.   Do you know if -- if he ever took vacation |
| 01:38:09 | 15 | days when traveling with the McNeills? |
| 01:38:13 | 16 | ATTORNEY SADRO:  Objection, form. |
| 01:38:14 | 17 | THE WITNESS:  I do not know. |
| 01:38:14 | 18 | BY ATTORNEY CONVERSE: |
| 01:38:15 | 19 | Q.   Do you know if he ever had days off when |
| 01:38:19 | 20 | traveling with the McNeills? |
| 01:38:22 | 21 | ATTORNEY SADRO:  Objection, form. |
| 01:38:23 | 22 | THE WITNESS:  I do not know. |
| 01:38:24 | 23 | BY ATTORNEY CONVERSE: |
| 01:38:24 | 24 | Q.   Okay.  So you are just assuming that he |
| 01:38:29 | 25 | was being compensated for work that he wasn't |

01:38:36  1   performing?

01:38:37  2              ATTORNEY SADRO:  Objection, form.

01:38:39  3              THE WITNESS:  To the best of my knowledge,

01:38:39  4   that's what I understand to be true.

01:38:41  5   BY ATTORNEY CONVERSE:

01:38:42  6        Q.   And the source of your knowledge are your

01:38:49  7   conversations with Ms. McNeill?

01:38:51  8        A.   That's correct.

01:38:51  9        Q.   Anything else?

01:38:52  10       A.   No.

01:39:02  11       Q.   All right.  The next person that you

01:39:05  12  identify is Ms. Hopkins and you also refer to her in

01:39:09  13  paragraph 16.  So I'll give you an opportunity to

01:39:12  14  review paragraph 16 before asking questions about

01:39:16  15  her.

01:39:17  16       A.   Yeah.  Go ahead.

01:39:28  17       Q.   Do you know what role Ms. Hopkins was

01:39:33  18  hired to perform for Head Kandy?

01:39:36  19       A.   I do not know.

01:39:51  20       Q.   Other than the tutoring services that

01:39:55  21  you've identified in this paragraph 16, are you

01:39:57  22  aware of any other responsibilities that Ms. Hopkins

01:40:03  23  has -- had?

01:40:04  24       A.   No, I'm not aware of any responsibilities

01:40:06  25  that she had involving Head Kandy directly.

01:40:15  1          Q.   Do you know if Ms. McNeill obtained

01:40:19  2     approval to hire Ms. Hopkins?

01:40:24  3          A.   I do not know that information.

01:40:42  4          Q.   The next individual is Ms. Alyssa Macnab

01:40:45  5     that you refer to in paragraph 17.

01:40:52  6          A.   Uh-huh.

01:40:53  7          Q.   So please take an opportunity to review

01:40:54  8     paragraph 17.

01:40:57  9          A.   Yeah, go ahead.

01:41:03  10         Q.   Do you know the role that Ms. Macnab was

01:41:12  11    hired to fulfill for Head Kandy?

01:41:21  12         A.   Ms. Macnab worked for Head Kandy on

01:41:21  13    numerous occasions.  So can you be more specific on

01:41:21  14    which time you're speaking of.

01:41:22  15         Q.   Yes.  I wasn't aware.  So here you

01:41:25  16    reference work that Ms. Macnab performed at

01:41:31  17    Ms. McNeill's house doing housekeeping and

01:41:34  18    organizing.

01:41:36  19         A.   Uh-huh.

01:41:37  20         Q.   What -- what time period was she providing

01:41:40  21    that work?

01:41:44  22         A.   I cannot recall exact dates, but that

01:41:46  23    would have been after we moved our operations to

01:41:49  24    North Carolina from Colorado.

01:41:56  25         Q.   Did that occur in 2021?

01:41:57  1      A.   This was probably more in the 2022 or

01:42:01  2   early -- yeah, probably 2022.

01:42:08  3      Q.   And you were referring to Ms. Macnab's

01:42:10  4   work not the -- when the warehouse was moved?

01:42:15  5      A.   Yes, that's correct.  Yeah, the warehouse

01:42:17  6   was moved in 2021.

01:42:19  7      Q.   Okay.  Do you know what Ms. Macnab's

01:42:27  8   position was when she was providing these

01:42:31  9   housekeeping and organizing services?

01:42:36 10      A.   I do not know what position she was given

01:42:50 11   so, no.

01:42:56 12      Q.   Do you have any information concerning

01:42:59 13   Ms. Macnab's services other than what you were told

01:43:05 14   by Ms. McNeill?

01:43:08 15      A.   Can you rephrase that?  I'm not sure what

01:43:11 16   you're asking.

01:43:12 17      Q.   Yes.  I'm just trying to understand the

01:43:16 18   source of -- of your knowledge concerning

01:43:20 19   Ms. Macnab.  So here you've identified being

01:43:28 20   informed by Ms. McNeill certain information about

01:43:33 21   Ms. Macnab.

01:43:34 22           Do you have any other sources of information

01:43:36 23   concerning Ms. Macnab's services that she was providing

01:43:42 24   while employed by Head Kandy other than Ms. McNeill?

01:43:46 25      A.   Not that I'm aware of.

01:44:03  1    Q.   And then could you please read paragraph

01:44:07  2    18 of this declaration.

01:44:15  3    A.   Yeah, go ahead.

01:44:21  4    Q.   You identify a sentiment that -- that

01:44:23  5    Ms. McNeill conveyed to you concerning the services

01:44:30  6    that these three individuals provided.  Did you

01:44:34  7    agree with Ms. McNeill when she told you this?

01:44:37  8         ATTORNEY SADRO:  Objection, form.

01:44:38  9         THE WITNESS:  Yeah, I tended to always

01:44:39  10   agree with Ms. McNeill just to pacify the situation.

01:44:48  11   I wasn't one to argue with Ms. McNeill.

01:44:50  12   BY ATTORNEY CONVERSE:

01:44:56  13   Q.   Apart from what you may have told

01:44:59  14   Ms. McNeill, did you personally believe that the

01:45:07  15   hiring of these individuals by Head Kandy was

01:45:12  16   appropriate based upon the representations

01:45:13  17   Ms. McNeill made to you?

01:45:17  18        ATTORNEY SADRO:  Objection, form.

01:45:18  19        THE WITNESS:  No, I did not feel it was

01:45:19  20   appropriate.

01:45:26  21   BY ATTORNEY CONVERSE:

01:45:28  22   Q.   When did Ms. McNeill provide you the

01:45:33  23   information that you have identified in paragraph

01:45:39  24   18?

01:45:41  25   A.   I just remember conversations that

01:45:42  1   happened between many people, but she would say,

01:45:47  2   like, for instance, like Elise, she would have to

01:45:52  3   hire someone because she doesn't have the time to

01:45:54  4   tutor her own kids because Head Kandy demands so

01:45:59  5   much time of her.  So if Head Kandy wanted more of

01:46:06  6   Kayla's time, they were going to have to pay for her

01:46:09  7   to have assistance in whatever aspect of her life

01:46:13  8   that may be.

01:46:21  9        Q.   Do you know if Elise was employed during

01:46:27 10   the COVID lockdowns?

01:46:30 11        A.   I was not employed by Head Kandy during

01:46:33 12   that time so, no.

01:46:38 13        Q.   Was Elise employed while you were employed

01:46:42 14   by Head Kandy?

01:46:43 15        A.   I -- I think -- I don't recall previous,

01:46:49 16   the previous up until 2020, I don't remember whether

01:46:51 17   she was or not.

01:46:53 18        Q.   Okay.  Were you employed by Head Kandy

01:46:59 19   when Ms. Macnab was doing housekeeping and

01:47:06 20   organizing for Ms. McNeill?

01:47:07 21        A.   Yes.

01:47:09 22        Q.   Okay.  When was that?

01:47:13 23        A.   I don't recall exact dates.

01:47:17 24        Q.   Okay.  The other individual that you

01:47:35 25   referenced who provided childcare services --

RYAN THOMPSON
SEPTEMBER 06, 2024

JOB NO. 1164890

01:47:42  1          A.    Uh-huh.

01:47:43  2          Q.    Do you know if she was providing those

01:47:49  3   services during the COVID lockdowns?

01:47:52  4          A.    No our -- our location was in Colorado

01:47:56  5   during COVID.  So that was -- that would have

01:47:59  6   been -- COVID would have been before North Carolina

01:48:03  7   facility.

01:48:19  8          Q.    Going back to you learning about

01:48:21  9   Ms. McNeill using these individuals for personal

01:48:26 10   services.  Once you learned it did you notify anyone

01:48:35 11   else at Head Kandy that these individuals were

01:48:38 12   performing personal services for Ms. McNeill?

01:48:41 13          A.    No, I did not.

01:48:42 14          Q.    Did you attempt to notify Mr. Feldman?

01:48:47 15          A.    No, I did not.

01:48:48 16          Q.    Did you attempt to notify Mr. Falic?

01:48:53 17          A.    No, I did not.

01:49:00 18                ATTORNEY CONVERSE:  All right.  Why don't

01:49:01 19   we take another 10-minute break unless somebody

01:49:03 20   needs longer.

01:49:04 21                ATTORNEY SADRO:  I think 10 should be

01:49:04 22   fine.

01:49:07 23                THE WITNESS:  Yeah, 10 is fine.

01:49:08 24                ATTORNEY CONVERSE:  Okay.  Great.  Let's

01:49:09 25   come back at the top of the hour.

RYAN THOMPSON
SEPTEMBER 06, 2024

JOB NO. 1164890

01:49:13  1                ATTORNEY SADRO:  All right.

01:49:14  2                THE VIDEOGRAPHER:  We are now of the

01:49:15  3     record.  The time is 1:49 Mountain time.

01:49:21  4                      (A recess was taken.)

01:49:21  5

          6

          7

          8

          9

          10

          11

          12

          13

          14

          15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25

```
 1              CERTIFICATE OF REPORTER

 2

 3        I, Solange Ruiz-Uribe, Notary Public for the

 4   State of South Carolina at Large, do hereby certify

 5   that the foregoing transcript is a true, accurate, and

 6   complete record.

 7        I further certify that I am neither related to

 8   nor counsel for any party to the cause pending or

 9   interested in the events thereof.

10        Witness my hand, I have hereunto affixed my

11   official seal this 6th day of September, 2024 at Fort

12   Mill, York County, South Carolina.

13

14

15

16

17

18

19

20

21

22                              _____

23                              Solange Ruiz-Uribe
                                My Commission expires
24                              February 2, 2027

25
```

RYAN THOMPSON
SEPTEMBER 06, 2024

JOB NO. 1164890

```
 1   ERRATA SHEET
     CHANGES IN TESTIMONY
 2   Head Kandy LLC v KAYLA MARIE MCNEILL, et al.
     Ryan Thompson
 3   September 06, 2024

 4   Page  Line   From                    To

 5   _____

 6   _____

 7   _____

 8   _____

 9   _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23

24   SIGNATURE:_____DATE:_____

25            Ryan Thompson
```

RYAN THOMPSON
SEPTEMBER 06, 2024

JOB NO. 1164890

### Exhibits

**Exhibit 1**  3:23 8:10
**Exhibit 2**  4:3 54:21
**Exhibit 3**  4:5 77:8
**Exhibit 4**  4:8 114:8

---

### $

**$1,800**  82:24

---

### -

**---oOo---**  5:2 6:20 7:4

---

### 0

**03/02/2020**  77:8
**044**  76:11
**044714**  76:12
**044715**  77:10
**05/24/2023**  8:11
**0:23-CV-60345**  5:10

---

### 1

**1**  8:10,24 21:25 77:24 104:22
**10**  50:24 102:5,9,11 119:3,6,15,24 122:10 160:21,23
**10-minute**  46:17 50:21 160:19
**10/16/2020**  58:13
**10/25**  58:2
**10/26/20**  57:3
**100**  24:14,16 65:7 80:24 152:10
**10:01**  58:13
**10:13**  51:2
**10:24**  51:5
**11**  119:18,20 129:1,2 136:19
**11:57**  102:16
**12**  14:16,18
**12:11**  102:19
**13**  149:4
**14**  150:13
**15**  102:5 150:13,17
**16**  155:13,14,21
**17**  156:5,8
**18**  158:2,24
**19**  41:18 43:3
**1:49**  161:3
**1A**  80:12 82:4
**1B**  80:11
**1st**  143:16

---

### 2

**2**  9:17 54:21 119:2
**20**  28:18
**2000**  15:21 55:22
**2017**  7:21 8:4 15:21 16:4,7,11,23 17:3,8,9, 20 66:8
**2018**  10:8,9 15:19,25 59:16 109:22 110:24 112:6,8 116:16 120:15, 16 122:6,17 135:15
**2019**  115:23
**2020**  7:22 10:10 15:19, 22 17:4,10,20 18:2,24 19:2 20:17 21:23 22:3 23:14 24:21 26:16 27:3 28:18 47:17 48:17 58:2 59:7,10 63:15 64:5 66:9 71:5 75:22 76:2 115:22 120:16 122:6,17 131:24 134:12 135:16 159:16
**2021**  19:4 47:11,14,17, 18 98:2,10 118:6 132:1
146:22 148:16 156:25 157:6
**2022**  7:22 22:11,16 23:18 47:7 157:1,2
**2023**  7:25 143:17 145:9
**2024**  5:1,5 73:17
**2100**  56:1
**26th**  87:10
**2B**  87:9

---

### 3

**3**  77:8
**30th**  7:25

---

### 4

**4**  114:8
**40**  30:19,21 31:5,9 44:12
**40-hour**  151:5,8,19
**44-1**  8:22

---

### 5

**5**  24:2
**54,000**  18:21 143:5 148:9
**5:00**  45:5,9

---

### 6

**6**  5:1,5
**6:38**  58:3
**6th**  115:23

---

### 7

**70,000**  27:20 28:1 143:20
**75,000**  18:25 93:16

---

### 8

**8840**  56:18
**8855**  57:21,22
**8866**  58:12
**8:00**  45:4,9

---

### 9

**9:03**  5:1,4
**9:34**  57:3

---

### A

**A-I-T-K-E-N-S**  57:12
**a.m.**  5:1,4 51:2,5 102:16
**ability**  105:3
**absence**  62:12
**absent**  62:14
**absolutely**  48:14 87:14 102:4
**absurd**  90:22
**abuse**  14:21 59:10, 14,15,19 60:12 63:4 64:6 104:25 148:14
**abusive**  60:9 61:5,21 62:11,20,25 107:20
**access**  8:16 9:3 116:24 117:7,9,10,13, 17,20 118:7
**accommodate**  52:12
**accompanied**  152:23 153:19
**accompany**  152:19
**account**  39:17,25 40:3 104:2,7,8 117:13 118:8 130:4,25 131:7, 20,23 132:18,23 134:5,

RYAN THOMPSON
SEPTEMBER 06, 2024

JOB NO. 1164890

8,23 136:24 137:17

**accountants** 10:16

**accounting** 32:7
110:14 111:17 115:3,9,
11 138:9,21

**accounts** 38:18
39:1,3,22 131:11

**accurate** 8:1 48:4,5
57:13 68:13,14 109:24
137:1

**aches** 100:21

**acknowledge** 6:7

**acting** 62:17

**action** 40:25 41:1
63:21

**actions** 14:18 61:12
70:23

**activity** 39:17

**actual** 14:9 17:15,17
38:22 74:6 84:18 139:5,
23

**actuality** 23:4

**additional** 46:2 49:1,
6 144:19

**address** 114:17,20
115:20,21 117:1,6

**addressed** 90:9

**addressing** 26:19
90:13

**administer** 6:9

**administered** 6:22

**affect** 86:13 100:15
101:11 105:10

**affecting** 89:2,11

**affects** 100:21

**affiliates** 28:22

**Affiliatly** 29:11

**afford** 78:7 83:4

**agree** 6:12 83:2 101:4
149:1 158:7,10

**agreed** 147:11
148:12

**agreement** 47:25

**ahead** 5:20 48:20
50:24 109:20 119:7
123:4 155:16 156:9
158:3

**ahold** 25:22

**air** 101:6

**airport** 73:4 87:15,19

**Aitkens** 57:12 82:3

**Alibaba** 130:10,13
131:14 135:20 136:5
137:7 138:8,9,10,11,18
139:11,19 140:12

**allowed** 41:8 42:18

**Alpha** 29:15

**Alphagility** 29:16,
17,21 31:10,24 33:2,6
35:1 37:17 40:5

**altered** 27:8

**Alyssa** 156:4

**America's** 118:8

**American** 110:22
116:7 130:24

**Amex** 9:19,20 10:7
13:3 14:22 109:23
110:2,24 111:19,22
112:12 114:2 118:18
120:10 127:15 130:4
131:10 134:5,23

**amount** 57:19 82:18,
22,23,25 83:2,5 86:24
93:5,8 148:10

**Amy** 81:15,16,24

**and/or** 13:23 28:24
29:8 70:5

**Andrew** 97:25 98:2
150:12 153:11

**angry** 59:25 89:6,21

**annualized** 27:24
93:17

**answers** 39:13

**Anthony** 5:17,23
8:14 49:17 50:17 51:6,
24 55:25 89:12

**anybody's** 48:9

**anymore** 69:22
116:25 117:7,10

**anytime** 34:8

**apologies** 73:17

**apologize** 11:17
35:20,24 47:18 105:7
131:1

**app** 8:16

**apparently** 76:25

**appealing** 38:23

**appearances**
121:19,21

**appeared** 40:10,22
123:16 136:21

**appearing** 6:6

**appears** 57:5 116:15

**approach** 79:25

**approached** 67:18
137:12

**approaching** 51:8

**approval** 11:1 13:1
39:6 142:12 156:2

**approve** 12:23 29:6
36:15 38:10,19 39:10,
13 68:21

**approving** 29:20
31:10

**approximately**
56:2

**April** 116:7,11

**archived** 117:5

**area** 30:2 80:17

**areas** 32:9 37:20
59:12 70:4 77:21

**argue** 158:11

**arrange** 124:3

**arrival** 34:13

**articulated** 63:20

**aspect** 29:4 93:4
144:4 159:7

**aspects** 28:19 62:22
90:20 92:16

**assets** 29:5 36:15,16,
17,21,23 38:10 70:5

**assigned** 131:17

**assist** 22:18 33:23

**assistance** 150:8
159:7

**assistant** 22:12,15,
19,21,23,25 23:12

**assisting** 23:15

**assume** 45:4 58:8
92:13 97:5 113:7,8
116:13 132:15 138:20,
23 146:21 151:4

**assuming** 154:24

**assumption** 66:25
86:10 116:17

**atmosphere** 63:6

**attempt** 8:7 9:5 26:1,
3,5 117:12 118:10
160:14,16

**attention** 21:24 66:4
109:16 149:3

**ATTORNEY** 5:17,
18,19,20,21,23 7:6
8:13,15 9:5,7,9,11,12,
14,15 11:3,5,25 12:2,7,
10 14:10,12 15:6,8,11,
14 16:12,15,24 17:1,21,
24 18:4,8,19,22 21:4,6,
14,16,19,21 23:8,10
25:1,5 26:11,13 32:1,11
33:7,10,14,16 37:1,5
39:18,20 40:13,18 41:4,
6,8,10,12,13,23,25
42:21 43:1,12,14,20
44:2 45:2,7,10,12,16,18
46:15,19,21,23,24,25
47:23 48:1,13,15 49:13,
18,22 50:1,3,5,6,8,17,
20,22,23,25 51:6 52:7,
13 53:9,19,21,22 54:24
55:25 56:3,4,5,8,12,13
76:13,17,19,21,24 77:4,
5,11 86:5,14 89:12,14,
16 101:13,22,25 102:1,
4,8,14,20 105:5,6
106:11,14 109:1,4

RYAN THOMPSON
SEPTEMBER 06, 2024

JOB NO. 1164890

113:15,18,22,24 114:10
115:15,17 118:20,24
128:4,14,18,21 133:13
137:18,21 150:3,9
151:3,6,9,12 152:5,12
153:6,15 154:11,13,16,
18,21,23 155:2,5 158:8,
12,18,21 160:18,21,24
161:1

**attorneys** 6:6 55:14,
15,16,17,18

**audit** 118:1 137:7

**August** 15:21

**authority** 142:2
145:8

**average** 30:19 31:5,9
44:12

**avoid** 84:16

**aware** 34:18,20,22
35:3 66:10 69:25 70:12
97:8,12,17,20 113:19
121:1 122:24 124:16
126:11 134:21 149:11
150:6 151:22 152:17
155:22,24 156:15
157:25

**B**

**B-A-C-H-E-L-O-R**
82:2

**Bachelor** 66:12
81:11 82:1 87:20

**back** 19:3 21:7,12,18,
24 22:16 23:18,20
25:21 28:18 30:15 38:9
40:7 47:1 48:7,23 53:2,
7,23 57:18 58:22,23
59:23,24 64:19 71:6
72:11 83:9 87:8 95:1,17
96:18 98:1,10 102:11,
23 103:16 104:17 113:8
116:23 117:25 118:2
119:1 130:7 132:2
134:12 135:19 136:4
140:10 142:9 144:1
147:6,10,11,19,23
148:4 149:2,3 160:8,25

**background** 37:17
123:14,18,24 126:25

128:10

**backgrounds**
37:19 128:9

**backlash** 65:7

**bad** 63:18 64:1 66:16

**balance** 57:17

**bank** 136:24 137:16

**banners** 29:8

**based** 13:19 145:10
151:5 158:16

**basically** 13:2 28:23
65:18 71:17 78:9 83:14,
16 110:9 135:23 145:10
149:16

**basis** 66:24 98:25
99:3 120:14

**bat** 23:19 30:11

**Bates** 54:22 56:17
57:22 77:9 114:8,15

**bathroom** 101:24
102:7

**bear** 55:21 58:22 77:1

**bearing** 45:14

**began** 68:11

**begin** 5:5 144:25

**beginning** 9:17 64:4
95:25 109:22

**begins** 14:19 136:20

**behalf** 5:13,14,22,24
40:2 69:24 142:4

**belief** 87:6 90:21

**beliefs** 66:18 86:3

**believed** 140:13

**bet** 125:24

**big** 61:25 67:19 73:13,
19 100:7,18 102:2
104:18

**bigger** 78:7

**biggest** 59:21 90:24

**bill** 116:8,11

**birthday** 144:18

**bit** 28:21 29:23 38:4
52:4,18 69:8 84:7 89:25
95:17 105:2 137:4
144:6 148:18

**black** 111:5 112:1,20
145:3,4

**blacked** 111:3,8
112:16 113:8,14 116:21

**blackouts** 116:11

**blue** 8:20 56:25

**blunt** 23:4

**blurred** 107:22

**body** 116:1

**bookshelf** 123:24

**boss** 92:22

**bottom** 8:24 24:2
103:1 119:2

**bounce** 35:14

**bounced** 35:17,25

**Boutique** 140:17,25

**boys** 149:18

**brain** 78:25 134:25

**branch** 16:18

**brand** 38:20 39:9,12

**break** 46:17 50:18,21
52:4 53:24,25 88:23
101:18,20,24 102:3,7
106:6 160:19

**breaking** 88:22

**breaks** 101:15

**breakup** 71:2

**breath** 101:6

**briefly** 40:7 41:9

**brilliant** 63:24 148:2

**bring** 119:1

**bringing** 94:25

**broke** 106:9,16,22,25

**brothers** 10:9 19:9,
12,13 110:12

**brought** 66:3 90:25
119:17

**Bryan** 19:5,7,8 20:7
25:14 33:11 64:19,20
66:2,5 68:5,10 69:10
72:18 74:11 86:9 88:5,
7,10 142:15

**Bryan's** 66:3

**building** 96:5

**business** 9:23 10:21
13:3,17 14:8 17:17 25:9
29:4 40:8 41:3 45:4
63:13 90:19 99:20
107:25 110:12 119:10
121:16 124:19 125:21
126:2,14,20 127:5,11,
16,22,25 128:3,13,16
130:25 135:13 136:23
137:13 138:4 139:17,25
140:16 141:6 145:18
148:2,24

**butted** 65:1

**buying** 54:16

**C**

**calendar** 30:8

**call** 30:10 64:13 72:7
78:3 80:9

**called** 6:22 56:16
140:17

**calls** 80:6

**capable** 85:20

**capacity** 20:23 23:2
24:18 89:4 94:19

**card** 57:7,14,16
109:23 110:22 118:1
120:10 125:24 127:15
129:11,12 130:1,3,11,
12,21,23,25 131:2,4,10,
15,19,22 132:3,9,13,17,
22 133:1,3,24,25 134:4,
6,12,20,22 138:8

**cards** 49:11,23 54:5,
17 114:2 131:7,16
134:2

**care** 65:1 85:17,19
96:10

**cares** 73:12

RYAN THOMPSON
SEPTEMBER 06, 2024

JOB NO. 1164890

**Carolina** 125:14,21
144:2,20 149:14 156:24
160:6

**Carson** 5:18,21 9:2
46:21 76:13 101:19

**case** 5:8,9 23:24
42:23,25 51:17 53:8
66:7 67:1 86:11 87:7
102:24 135:2

**casual** 86:6

**categorizations**
10:6

**categorize** 9:23
31:18 122:12

**categorized** 119:10
124:19

**categorizing** 122:5

**caused** 88:19 108:25
148:24 151:15

**causing** 89:20

**cell** 103:2,8,17 104:2,
10

**challenged** 63:6

**challenging** 63:6,19

**change** 17:3,9,19
74:8 148:22

**changed** 11:14
17:23 74:15 143:6

**chaos** 148:24

**charge** 9:23 10:1
13:16,17,25 119:8
129:9,10,20 135:25
138:8 139:16,25 140:3,
24

**charged** 120:10

**charges** 14:22
113:11 118:2 122:11,15
126:14,17 127:14,16
131:14 136:1 138:18
139:11 140:12

**chat** 8:14

**cheap** 58:15

**cheat** 43:17 44:9

**cheated** 44:24

**cheating** 43:22
44:20

**Chicago** 65:24
87:15,16

**childcare** 159:25

**children** 150:5

**chosen** 74:23

**Christmas** 123:7,23
124:7,11,18,21,22
125:12,13,16 127:2,7,
23 128:9

**Cindy** 81:10

**clarification** 15:23
38:9 56:1 71:25 118:15
135:6

**clarify** 98:19 130:22
135:2

**clean** 85:13 111:11
118:4

**cleaner** 111:5
112:23,24

**clear** 67:4 118:22
128:24

**client** 50:18

**close** 7:15,20 8:4 60:4
79:17 81:19 107:13

**clothes** 119:24
120:1,3,7,10

**clothing** 14:2 120:22,
24 121:2 140:16

**clumsily** 57:21

**coaching** 41:11

**Colorado** 125:12
126:6,7,20 152:10
156:24 160:4

**combined** 40:5

**comfortable** 85:15
149:2

**comments** 62:16,
21,24 63:21

**common** 80:7

**communication**
20:15 25:19 32:3 114:4
117:9

**communications**
10:15,22 25:14

**companies** 31:19

**company** 22:18
23:16 26:19 28:19 29:3,
10,13 31:23 32:4,9
33:24 43:16 44:19,21,
22 45:1,22,24 65:25
69:15,16 70:5 79:21
90:9 92:16 93:10 103:6
117:24 118:1 125:24,25
128:24 129:10,12
130:1,3 134:20 139:1
146:13,15

**comparable** 79:17,
24

**compensated** 18:3
27:17 42:1 154:25

**compensation**
18:14 27:22 42:8 46:2,3

**complain** 79:18 80:1

**complained** 79:16

**complete** 109:12
110:22,24 111:19,22
112:17 113:9 118:18

**completely** 85:2
136:21

**comprised** 31:9

**computer** 49:8
104:3

**conceivable** 9:24

**concern** 113:25

**concerned** 72:10

**concerns** 26:20
91:17 99:15 105:3

**concluding** 41:15
100:2

**conduct** 61:18 84:11

**conducted** 138:24

**conducting** 139:15

**confidential** 49:16
51:9 52:2,9,10,13,14

**conflicted** 66:18

**confused** 134:18

**connection** 51:16
136:22

**considered** 7:15
74:22

**consistent** 18:14

**constantly** 62:1,5
100:5

**contact** 20:11,20,24
21:2 34:12 36:2,3 73:10
106:8,17

**contacts** 11:12

**context** 83:25 84:9,
17 90:17 96:7

**continue** 9:19 51:15
53:3 79:12

**continues** 34:11

**contradict** 73:2

**contribute** 67:16

**contributed** 100:17

**contributing** 31:11
89:20

**control** 56:16

**convenient** 70:8
74:8

**conversation** 48:6
58:11,18 66:4,10 79:11,
15 80:16,23 81:1,7,21,
22 83:17 86:7 142:7
147:5

**conversations**
34:3,4 153:12 155:7
158:25

**Converse** 5:17,19,
20,23 7:6 8:15 9:7,11,
14,15 11:5 12:2,10
14:12 15:8,14 16:15
17:1,24 18:8,22 21:6,
16,21 23:10 25:5 26:13
32:11 33:10,16 37:5
39:20 40:18 41:6,10,13,
25 43:1,14 44:2 45:12,
18 46:15,19,21,24,25
48:1,15 49:18,22 50:1,
5,8,20,23 52:7 53:9,21,
22 54:24 56:3,5,12,13
76:13,19,24 77:4,5,11
86:14 89:14,16 101:13,

25 102:4,8,14,20 105:6
106:14 109:4 113:18,24
114:10 115:17 118:24
128:14,21 133:13
137:21 150:9 151:6,12
152:12 153:15 154:13,
18,23 155:5 158:12,21
160:18,24

**converted** 18:18

**conveyed** 158:5

**Cook** 81:10,23

**cop** 69:8

**copy** 27:2,4,6 76:15
116:7

**cordial** 87:2

**corner** 56:15 76:6

**corporate** 11:13,18,
19 12:20 25:8 26:6

**correct** 8:2,6 10:13,
23 11:2,4 15:7,22 24:4,
15 25:11,24 28:2 38:21
40:21 44:12 47:9,21
55:20 65:15 68:12 72:3
75:20,21 88:17 92:2,18
95:6 96:1 104:11
112:18 122:13,18
126:12 127:19 129:8
130:1,2 135:10 148:12
153:7 155:8 157:5

**corrected** 111:13

**correctly** 15:20
36:13 70:24 82:7 84:24
92:17 93:6 112:14
124:5 132:5

**correspond** 31:20

**correspondence**
31:13

**counsel** 5:15,25 6:4,
11 41:7 101:18

**counsel's** 50:15

**couple** 34:25 37:23
51:10 64:11 65:17
136:3 147:7

**court** 5:9,13 6:3,5,12,
24 7:2 8:20 101:23
102:2,6,12 133:7,10,12

**cover** 69:8 84:14

**covering** 69:9

**COVID** 159:10 160:3,
5,6

**created** 36:18 39:11

**creating** 36:20 144:8,
10

**creation** 29:4 36:22

**creative** 28:24 29:1,
20 32:5

**creatives** 31:10

**credit** 49:11,23 54:5,
17 57:6,14,16 118:1
129:10 130:11,12,25
131:2,7,22 132:9,13
133:24 134:6,20,22
138:8

**Culp** 149:16,22

**current** 34:15,18 35:3
117:1 141:16,17

**customer** 38:24
79:6,23

**D**

**date** 22:7 24:4 47:19
66:8 67:14 103:18
118:15 135:11 145:25

**dated** 8:11 115:23

**dates** 18:13 116:16,23
135:21,22 136:6 144:15
156:22 159:23

**dating** 66:4,6,13 69:2,
7 71:18 72:2,8,9,16,17,
18,19,20 74:24 84:16

**day** 44:17 45:13 80:3
81:16 95:24 96:24 97:1
99:3 101:7 103:17
153:10,11

**daycare** 149:16,19,
20 150:1

**days** 58:15 64:12
154:15,19

**deal** 64:24 73:13,19

**dealing** 66:24

**dealings** 84:21

**dealt** 11:13 20:5 86:19

**December** 66:8

**decide** 146:19

**decided** 74:14
144:12 147:4

**decision** 20:5 53:10

**declaration** 8:11
23:23 24:5 27:5 43:3
45:20 104:17 119:1
130:6 158:2

**declare** 24:8

**decorate** 124:12
125:3

**decorations** 123:7,
11,24 124:8,12,18
125:2,12,13,15,17,20
126:5,7,19 127:2,8,23

**defend** 26:20

**defendant's** 8:10
54:21 77:8 114:8

**definition** 38:15
59:13

**demands** 159:4

**department** 10:16
110:15

**departments** 23:15

**departure** 7:21 18:2
19:2 21:23 30:17 64:5
136:7

**depending** 35:14
152:7

**deposition** 5:6,11
6:6,8,9,15 8:8 27:6
51:13,19,21 52:20 53:5,
15 54:20 58:22

**depositions** 7:23

**derived** 95:4

**describe** 64:9

**describing** 89:9

**deserved** 78:13

**designate** 127:4,11,
16 135:13

**designated** 10:20
126:2,18,20

**designation** 141:10

**designations** 10:18

**desks** 81:9

**destroy** 133:5,6,23

**destroyed** 133:4

**detailed** 77:17

**details** 116:8 130:16

**determination**
13:19

**determine** 13:17
40:11 41:1 66:21 85:11,
13 139:16,24 153:1

**determined** 82:21
87:5

**determining** 128:2

**develop** 34:1

**developed** 30:13
31:10

**development** 29:24
30:1,5 31:11

**devices** 103:6,25

**DFA** 110:15 111:17
115:8,9 117:17

**Diaz** 115:13

**differ** 28:8,16

**differently** 40:16
75:13

**difficulties** 49:20

**Digital** 36:17

**direct** 7:5 20:11,15,20
21:24 25:13,19 32:3
35:19 71:3,10 100:2
109:6,16 110:1 149:3

**directed** 109:23
110:3,21 111:18,21
118:18 135:12 136:20,
23 137:13,15

**directing** 104:24
137:11

RYAN THOMPSON
SEPTEMBER 06, 2024

JOB NO. 1164890

**direction** 14:21 50:15 73:14 110:6

**directly** 20:5 25:3 28:22 32:7 34:7,24 36:14 39:9 105:9,18,20 123:14 124:16 135:11 138:6 155:25

**director** 28:5,8,14 32:13,22 141:14,18,21

**disappointed** 64:22

**disappointment** 66:15

**disclose** 52:16 65:22

**disclosed** 80:8,22 81:4 87:10,13 91:6,8,18

**disconnect** 85:5

**discounting** 108:14

**discover** 86:2

**discoverable** 49:20

**discovered** 74:1

**discrepancy** 72:7,9

**discrimination** 83:22,23 84:7,8,11,13, 18

**discuss** 53:12 65:19 150:12

**discussed** 59:5 61:2 77:21 88:2 97:15 105:2

**discussing** 17:7 23:22 35:21 58:13 130:5 149:8

**discussion** 40:7

**dismiss** 8:23

**disparate** 75:9

**dissipate** 100:11

**dissipation** 100:19

**distance** 62:9

**District** 5:9

**document** 8:8,21 9:3 54:25 55:8,11,12 56:11,16 76:5 114:15

**documentation** 12:19 15:4 24:24

**documents** 25:10 26:24 27:8 117:6 142:16

**Doherty** 78:25 79:2,9 81:20 87:21

**download** 9:3,6 56:6

**drafting** 88:14

**drink** 105:25

**drinks** 90:4

**dropped** 8:15

**due** 75:9,14 109:11

**Dusty** 90:16 91:20,24 92:1,6 93:4 94:10,18 95:20 96:8 97:3,8,13, 18,21 98:11 99:10

**Dusty's** 91:13 94:7 99:15

**duties** 28:15 63:12 93:20,22 145:8

**Duty** 110:16 111:17 118:8

**E**

**ear** 62:9

**earlier** 47:10 88:2

**early** 111:11 120:12, 15 157:2

**easier** 77:16

**easily** 63:17

**easy** 68:24

**edge** 64:21

**effect** 63:22 100:3,7 143:15

**effective** 91:14

**effects** 108:24 109:6, 11

**effort** 52:20

**electronics** 76:15

**Elise** 159:2,9,13

**else's** 132:14

**email** 10:14 31:12,15 77:9 114:4,17,20 115:18,19,21 116:2,3, 16,24 117:1,4,6,13,17, 18 118:8 139:4

**emailed** 140:8

**emails** 11:11 114:8, 12 117:13,16

**emotional** 14:20 59:13 89:11,21 104:25

**emotionally** 60:9

**employed** 15:18 16:16,23 17:18,22 18:1 27:13 66:14 67:14 92:7 93:1 97:21 146:2 154:8 157:24 159:9,11,13,18

**employee** 18:6,7,12, 18 27:18 62:9,12,17,19 66:11 70:2,14 71:19 79:2 80:9 99:2,3,4 149:13

**employees** 32:14 34:6 59:22,24 60:8,20 61:20 62:12 69:18 70:9, 11 77:25 78:2,3,5,6,20, 23 79:15 80:7 92:8 94:23 115:13 149:8 150:1,7 154:9

**employer** 16:10,13 17:3,8,9,16 109:11

**employing** 97:17

**employment** 19:3 20:16 28:17 68:11 86:13 91:13 94:7 108:7

**end** 44:6 52:6 81:16 103:15 145:3

**ended** 18:1 20:16 48:7 72:14 96:25

**engaged** 81:22

**engagement** 33:6

**engaging** 81:21

**enjoy** 108:20

**enjoyed** 108:15,16 147:11,20,23

**entail** 29:2 95:3

**entailed** 94:21,22

**entering** 97:18

**entire** 56:1 120:20 121:7 135:20

**entirety** 33:4 56:2,10

**entity** 16:6,22 17:17, 19

**environment** 63:10,20 109:13 148:4

**erase** 103:23

**error** 47:15

**essentially** 14:13 78:12 82:6 107:3

**established** 82:19 132:21

**Ethan** 105:4

**event** 88:19,21

**eventually** 18:6 22:1 106:6

**everybody's** 92:20, 22

**exact** 18:13 22:7 35:5 61:6 88:25 97:11 103:18 112:7,10 113:2 136:6 139:13 145:25 156:22 159:23

**exacting** 25:3

**EXAMINATION** 7:5

**examined** 6:23

**examples** 35:19 81:5 119:8,13 122:11 149:10,11 152:16

**exchange** 11:11 55:10

**exchanged** 11:10

**excited** 142:9 147:19

**excuse** 11:8 40:25 64:24 83:25 89:6 95:14 105:7 109:16 115:3 140:11

**executed** 24:5

RYAN THOMPSON
SEPTEMBER 06, 2024

JOB NO. 1164890

**exhibit** 8:8,10,22,25 14:17 21:24 23:23 41:15 47:2 54:20,21 56:2 58:22 77:6,8 83:10 100:1 104:18 109:15 114:6,7,8 118:16 119:1 129:2 136:19 149:4

**existing** 70:2,14

**exit** 26:15 115:22 117:24 139:9,12 143:12 145:20

**expect** 42:1,8

**expected** 65:6 99:4

**expecting** 46:3

**expense** 9:23,24 10:8,11,15 12:23 13:12, 17,22 110:10 111:6 116:18,20 118:3,11,12 120:17,21 122:7,17 125:22 127:4,10,11,22, 25 128:3,13,16 135:13, 15 136:17 137:5,14,15 138:4,7 139:17,25 141:6

**expensed** 125:15

**expenses** 10:8,21 13:4 14:8,9,24,25 24:25 25:6,9 26:10 40:8,12,20 41:2,3 90:14 91:13,21, 23 112:15,20 113:6,21 114:1 119:10,23 122:5 124:19 125:21 126:2,3, 15,21 127:5,17,18 134:21 136:5,12,21 137:11 140:14

**experience** 59:10, 15,20 63:23 64:5 75:8 148:14,19

**experienced** 60:13

**experiencing** 148:20

**expertise** 70:5

**explain** 14:17 31:24 77:19 124:25 135:18

**explained** 108:11

**explaining** 67:3

**explanation** 76:1

**express** 99:15 110:22 116:8 130:24

**expressed** 79:19 105:19 106:19

**extended** 101:2

**extent** 35:2

**extra** 58:9 145:11

**extremely** 65:9

## F

**face** 79:20

**facility** 65:25 160:7

**fact** 53:14 64:25 65:21 69:6 70:8 75:9,14 84:14,23 87:22 88:7 90:15 94:11,13 95:5 103:14 153:7

**facts** 24:9 51:16,18 53:3

**fail** 151:15

**failed** 151:7

**fair** 14:1 24:18 51:22 79:25 90:15 93:11 96:12 135:14

**fairly** 107:1 112:4

**faith** 52:20

**Falic** 10:9 12:9 19:9, 12,13,14,19,22 20:1,6 26:3 33:17 73:9 86:22 110:11 160:16

**fall** 95:9

**false** 24:24 26:8 63:9 67:8 70:17 71:7

**falsified** 15:4

**familiar** 32:23 33:1 39:16

**families** 69:18

**family** 69:5,14,19 70:7,14 72:13 73:24 74:1,12,18,22,23

**fast** 72:18 76:10

**father** 106:18

**favor** 42:20

**favors** 41:22 42:2,5,7, 10,23 43:10,15

**FDA** 36:2,7

**fear** 14:19 15:4 60:5

**February** 66:9 87:10 143:16 145:9

**feel** 14:15 51:7,19 59:12 63:4,5,11 69:9 72:23 73:15,18 79:25 90:15,23 91:2 96:11 108:16 127:21,25 130:16 134:1 158:19

**feelings** 85:6

**Feldman** 19:5,7,8 20:7,12,15,21 21:2 25:14,20 33:11 68:5,7, 10 69:1 86:18 88:11 160:14

**felt** 62:20 64:17 67:15 69:7 72:22 73:7 84:2,25 99:23 101:9 105:20 107:20 148:20,23,25 149:1

**fight** 89:23

**fights** 105:12,15

**figured** 77:15

**filed** 8:21

**files** 140:9

**filing** 36:1

**fill** 142:17

**filled** 10:12

**filling** 13:2

**filters** 77:1

**final** 90:6 104:22

**Finally** 56:18

**financial** 48:10 49:16,19 51:9 52:2,9

**financials** 12:22 20:10 32:6

**find** 76:14,20 117:15 118:3

**fine** 41:10 68:23 102:6, 7 160:22,23

**finish** 51:21 53:7

**fired** 62:2

**firing** 134:25

**firm** 50:13

**fixes** 101:9

**Florida** 5:9 7:1

**fly** 153:25

**flying** 87:18

**follow** 50:14 67:2

**follow-up** 136:3

**foregoing** 24:9

**forensic** 138:21

**forgetting** 122:22

**Forgive** 67:2

**forgotten** 121:9

**forklift** 141:5

**form** 11:3,25 12:7 14:10 15:6,11 16:12,24 17:21 18:4,19 21:4,14, 19 23:8 25:1 26:11 32:1 33:7,14 37:1 39:18 41:7,10,23 42:21 43:12, 20 45:2,10,16 47:23 48:13 49:13 59:10,15 86:5 106:11 109:1 113:15,22 115:15 118:20 128:4,18 137:18 142:17 148:14 150:3 151:3,9 152:5 154:11, 16,21 155:2 158:8,18

**formal** 36:25 124:3,9

**formed** 15:25 86:10

**forms** 27:21 59:19 60:12 64:6

**forward** 9:8 52:21 54:2 67:17 72:18 110:17 111:25 112:2 113:10 144:14

**found** 66:2 72:19 76:21 137:6,12

**foyer** 80:17

RYAN THOMPSON
SEPTEMBER 06, 2024

JOB NO. 1164890

**frankly** 51:23

**free** 42:13,16 110:16 111:17 118:8 130:16

**frequent** 120:14

**fresh** 101:6

**Friday** 5:1 145:3,5

**friend** 7:8,14,16 42:6, 12 43:7 46:5 107:13

**friends** 7:19 8:4 41:22 42:4,7,24 107:23 147:24

**friendship** 60:22 107:8,9,11,14 147:13

**front** 26:25 27:1 75:19 81:15 104:20

**frustration** 80:1

**fulfill** 156:11

**full** 32:25 33:5 110:22, 24 111:19,22 112:17 113:9 118:18 130:18 151:19

**full-time** 90:22 149:20

**fully** 77:16 130:8

**funds** 125:25

**furnished** 125:14

———————

**G**

**gaining** 100:6

**gave** 40:24 103:17

**gay** 65:21 73:7,19 75:10,14 84:6,19

**general** 124:15

**give** 50:17 51:21 52:4, 17 63:16 75:25 76:18 109:17 130:17 136:25 149:4 150:13 155:13

**giving** 44:10

**good** 5:3 46:18,19,23 50:22 52:20 63:17,23 64:2 70:9 78:5 86:12 107:14,23 108:17 147:21,22

**goodness** 78:24

**Google** 140:9

**grandmother** 48:16,18

**gray** 56:23

**great** 9:11 102:12 107:9 119:19 160:24

**green** 58:18

**grounds** 41:9

**group** 12:9 79:11 80:18 81:6,14 115:8

**grow** 148:1

**grown** 147:17

**growth** 33:24 148:21

**guess** 7:22 10:16 16:9,19 17:5,11 37:3 38:15 45:3,5,17 60:22 65:6 66:1 67:15 69:24 71:11 74:18 79:6 82:11 94:13,16 96:7 99:6,23 110:15 111:12 112:3 113:2 116:16 118:6 125:7 126:4 131:15 137:7

**guy** 66:16

**guys** 27:7 37:10

———————

**H**

**ha** 58:15

**habits** 88:8

**halfway** 17:13

**hand** 23:21 90:13

**handle** 32:4,6

**handled** 92:23 107:25 108:2

**handling** 92:24

**handy** 76:15

**happen** 69:23 74:1,4

**happened** 12:22 60:7 74:5 88:24 133:3 140:20 146:8 147:6 159:1

**happening** 152:17

**happy** 50:19 52:11 53:14 62:4

**harass** 51:15

**harassing** 51:8,12

**hard** 60:9 65:9 70:9 79:21 105:13,14 107:21 116:23 133:8 145:12, 14,16 148:1

**hate** 62:2

**Hayzlee** 149:17,19

**Hayzlee's** 140:17,24

**head** 5:6,22 7:21 8:5, 23 9:25 10:17,25 11:17, 19,22 12:6,17 13:21 14:22 15:19,24 16:2,4, 8,13,18,20,25 17:14,23 18:1,10,23 19:2,10,19, 23 20:2,8,16,19 21:7, 12,18,23 22:2,10,22 24:17,19 25:7 26:6 27:16,17,22 28:7,9,12, 15,17 29:22 30:2,5,12, 14,15,25 31:16,25 32:14,17,22 33:2,6,12, 18 34:13,15,19,23 35:4, 8,12 36:12 38:18 39:1, 16,21,24 40:2 43:6,17, 19,23,24 44:17 45:14 47:7 48:3,11,23 49:3 54:7,8,10 55:15,17 59:9 60:15 61:15 63:3 67:9 68:11 69:15 70:1,2,13, 14 75:14 78:12 79:2 80:17 82:6,9 86:2 89:13,24 90:22 92:7,25 93:24,25 96:23 97:10, 15,17,21 98:10,12 99:16 100:12,25 103:9, 12,21 108:8,12,25 109:8,14 110:11 113:3 114:25 115:2,13 117:7 119:11 121:3,15,22,25 123:13,17,22 124:2,3,9 125:15 126:22 128:10, 11 129:12 130:11,20,23 131:1,2,9 132:4,6,12, 18,20,23 136:10,13,22, 23 137:16,24 138:2,5, 11,15 140:19,21 141:12 142:4,8,18 144:10 145:1,7,24 146:2,19

**147:4,25** 148:7,11,15 149:9,25 150:19,24 151:2,16 153:2,20 154:5,7,10 155:18,25 156:11,12 157:24 158:15 159:4,5,11,14, 18 160:11

**heads** 65:1

**health** 100:3,8,9

**healthy** 100:7

**hear** 62:8 153:13

**heard** 73:3 146:14

**hearing** 6:19 133:8 139:3

**heated** 84:1 88:14 89:1,6,8

**Heiber** 73:5 135:19

**helped** 28:18,20 42:4, 9 126:24

**helpful** 96:19

**helping** 95:23

**Hernan** 73:5,10 135:19 136:4 140:10 141:9

**hesitate** 101:15

**hiding** 69:6

**high** 90:21

**highlight** 57:4

**highlighting** 57:5

**hire** 69:5 72:13 74:12, 14 97:22,25 142:17 156:2 159:3

**hired** 66:6 69:7,18,19 70:1,3,7,12,13 74:2 79:17,22 84:15 95:18 97:3 98:1,5,8 142:4 149:15 155:18 156:11

**hiring** 69:14 72:14 73:24 158:15

**HK** 76:10

**HK_044714** 76:9 77:9

**holiday** 144:24,25

RYAN THOMPSON
SEPTEMBER 06, 2024

JOB NO. 1164890

**home** 48:25 54:16,18 87:18 121:9,19 123:7, 12,25 124:8,13,18 125:13,14,21 126:6,7, 20,24 127:9

**homes** 125:14

**honest** 36:10 85:20

**honestly** 151:25

**honing** 56:14

**hope** 39:13 44:23 53:6,7

**hoped** 147:15

**hopes** 107:8 117:15

**hoping** 107:11

**Hopkins** 155:12,17, 22 156:2

**hour** 46:16 102:11 160:25

**hourly** 18:6,14,18

**hours** 30:16,19,21 31:1,5,6,9 43:6,23,24 44:12,17 45:4,23,24 151:1

**house** 42:13,16,18 48:18 57:16 78:9,10 83:7 107:4 125:3 128:8 156:17

**households** 124:23,24 125:1,10,11

**housekeeping** 156:17 157:9 159:19

**HSN** 121:19

**huge** 66:14,15 100:13

**hurtful** 79:19

**husband** 92:1 99:24

— I —

**I's** 153:10

**I-TUNES** 104:2,6,8, 15

**Ian** 57:10 65:1,14,23 66:2,3,6,13 67:14 68:10,20 69:2,7 70:18,

23 72:15 74:14,18,19 82:3 84:15 95:18,19 96:13,15,20,22 105:5,7, 16 106:6,10,16,22

**Ian's** 57:11

**identification** 8:12 54:23 77:10 114:9

**identified** 25:8 64:7 95:9 101:2 119:14,23 121:2 127:7 138:4 150:11 155:21 157:19 158:23

**identify** 5:15 125:20 126:14 141:5 155:12 158:4

**identifying** 127:3

**illegal** 83:23 84:8,11

**image** 38:20

**images** 37:18 38:3

**immediately** 30:17 64:4 73:4 91:14 101:9 106:24

**impact** 63:11

**impacted** 109:7

**impaired** 105:22

**important** 25:24

**impression** 67:12 94:4,6,9

**improperly** 62:18

**inaccurate** 141:10

**inappropriate** 105:16

**include** 21:3 43:2

**included** 13:22 14:23 45:19 140:25

**income** 49:1,6 58:4, 7,10

**incorrect** 47:18 63:8 116:17 135:1

**indicating** 26:17

**indirectly** 82:11

**individual** 69:25 98:3 131:6,13,15,16

156:4 159:24

**individuals** 12:3,12, 20 21:3 26:6 31:19 150:11 158:6,15 160:9, 11

**infectious** 148:3

**information** 8:21 11:24 12:5,12 25:11 26:9 36:3 49:16 51:10 52:2,23 59:23 78:21 97:14 103:24,25 104:9 111:3 112:1 156:3 157:12,20,22 158:23

**informed** 78:6 157:20

**initial** 20:16

**initially** 38:7 116:10 134:17,19

**initiated** 88:24

**inquire** 117:20

**instance** 106:18 122:21 126:6,14 135:3 146:21 159:2

**instances** 120:12 122:24 126:10 151:20

**instant** 62:18

**instruct** 49:14

**instructed** 9:22 10:5,7 12:11,15 13:14 110:18 112:16 119:9 122:12 127:4,10,16

**instruction** 128:19

**instructions** 13:20

**intent** 84:20 85:23 108:9,10,19

**intention** 108:7

**interacted** 86:23

**interaction** 35:10

**interactions** 86:1,4, 15,17,21

**interrupt** 44:4 48:21

**introduce** 114:7

**invading** 51:9

**inventory** 94:24,25

**investigation** 138:22,25 139:7

**invite** 53:15

**involve** 38:11,13

**involved** 20:4 30:1,5 32:7,9 34:6 36:20 38:16 90:4 148:18

**involvement** 151:14

**involving** 39:12 155:25

**irritation** 62:7

**issue** 51:17 53:3,8 85:1 90:13 93:4,7 105:21 113:25 133:2

**issued** 131:6,19 132:1,3,17 134:22

**issues** 68:17,19 74:12 91:20 107:17

**It---** 66:4

**item** 10:1 13:16,18,25 137:23

**itemize** 135:23

**itemizing** 136:1

**items** 25:8

— J —

**January** 7:25 143:13

**Jerome** 19:14 20:1 26:3 33:17 86:8,22

**job** 14:20 15:5,10 42:5, 9 64:16 85:20,22 86:12 91:5,9,18 94:24 95:20 108:16,17,20,23 128:6 147:22,23 148:5 151:15

**jobs** 95:7

**John** 33:20

**joined** 65:23

**jumping** 145:11

**June** 22:11,16 47:7,18 109:22 110:24 112:5,8

RYAN THOMPSON
SEPTEMBER 06, 2024

JOB NO. 1164890

115:23

## K

**K-L-E-I** 133:11

**K2** 139:1,6

**Kandy** 5:7,22 7:21
8:5,23 9:25 10:17,25
11:22 12:6,17 13:21
14:23 15:19,24,25 16:2,
4,8,14,18,20,25 17:14,
23 18:1,10,24 19:2,10,
20,23 20:2,8,16,20
21:7,12,18,23 22:2,10,
22 24:18,19 25:7 27:16,
17,22 28:7,9,12,15,17
29:22 30:2,6,12,16,25
31:16,25 32:14,17,22
33:3,6,12,18 34:13,15,
19,23 35:4,8,12 38:18
39:2,21,24 40:3 43:6,
17,19,23,24 44:17
45:15 47:7 48:3,11,24
49:3 54:7,8,10 55:15
59:9 61:15 67:10 68:11
69:15 70:1,2,13,14
75:14 78:12 79:3 82:6,9
86:2 89:13,24 90:22
92:7 93:1,24,25 96:23
97:10,15,17,21 98:10,
12 99:16 100:12 101:1
103:9,12,21 108:8,12,
25 109:8,14 110:11
115:1,13 117:8 119:11
121:3,15,22,25 123:13,
17,22 124:2,3,9 125:15
126:22 128:10,11
129:12 130:11,21
131:1,2,9 132:4,6,12,
18,20,23 136:10,13,22,
24 137:16,25 138:2,5,
11,15 140:19,21 141:12
142:4,8,18 144:11
145:1,7,24 146:2,20
147:4,25 148:7,11,15
149:9 150:1,24 151:2,
16 153:2,20 154:5,7,10
155:18,25 156:11,12
157:24 158:15 159:4,5,
11,14,18 160:11

**Kandy's** 11:19 26:6
36:12 39:16 55:17
80:17 130:23 150:19

**Kayla** 5:7,24 7:8
23:16,17 60:25 61:16
63:24 66:5 69:19 78:1,2
80:7,13 81:2 84:14,18
87:19 89:24 92:21
96:19 107:9,12 111:6
126:23 131:4 132:4
139:5 140:15 141:25
142:6 146:11,13 147:4
148:1 149:17 153:8,10

**Kayla's** 23:21 92:1
117:24 130:11,21
131:3,14 136:7 139:9,
11 143:12 145:20 159:6

**Kaylin** 149:16

**Kaylin's** 149:20

**Keeney** 32:20

**Keeney's** 34:18

**keeping** 153:4

**Kelly** 78:25 80:19,24
81:10 87:21

**kick** 79:20

**kids** 149:20 159:4

**kind** 22:24 23:14,15,
16,17,20 26:21 28:19,
23 32:2 37:8 60:24 63:5
73:11 81:13,14 85:22
86:9 92:20 95:16 96:6,
16,17,19,20 101:6
105:13 108:3 111:11
128:5 139:21 144:3,5
146:4 147:24

**kit** 121:9 122:23,25

**Klei** 133:6,9,21,23

**Klei's** 133:14

**KM** 56:18 57:22

**KM5308** 114:9,16

**KM6698** 54:22

**KM8876** 54:22

**knew** 59:22 60:22,24
73:6 78:4 140:22

**knowing** 84:15 153:5

**knowledge** 19:19,
21,23,25 20:1 24:10
33:11 35:2 54:14 60:16
63:9 68:16,18 75:8

92:25 121:24 126:1
138:3,14 149:25 151:13
155:3,6 157:18

## L

**label** 56:17 57:22

**labeled** 8:25 56:18
114:16

**laptop** 103:2,8 104:2,
9

**large** 55:3 58:25 81:13
90:16

**larger** 8:19 96:5

**Lashed** 16:3,9,16,19
134:13

**launched** 30:13

**leading** 28:18 48:11
51:11 59:19

**learn** 60:17 78:18 85:4
88:7,9 94:6,11 97:15
98:7 145:23 146:1
152:13

**learned** 94:12 160:10

**learning** 160:8

**leave** 145:24 153:23

**leaving** 59:6 77:17
97:1

**led** 13:24 67:12 86:2
88:22 145:21

**leeway** 52:5,18

**left** 15:19 18:23 22:2
23:14 24:20 56:22
63:15 66:7 148:6

**legal** 5:12

**legitimate** 119:10
127:22,25 128:3,13
136:22

**lengthy** 55:9

**Leon** 19:14,22

**letter** 26:15 27:3
75:18 76:3 77:9,18 78:5
83:10 87:8 88:20 89:3,
10 91:14 100:1 102:23

109:6

**letting** 86:12

**level** 107:16

**licensed** 6:12,14

**lie** 14:14 15:9 65:8,10,
11,16 67:4,13,16 71:12,
25 72:21,23,24 73:2
84:3,12

**life** 66:19 85:17,18
100:17 101:7 105:1
107:13 159:7

**lift** 100:14

**likes** 74:7

**lines** 107:22

**Lion** 115:8

**list** 131:13 135:20

**listed** 136:18

**live** 42:13,18 60:4,9
78:9,10 82:21 85:17,18
120:13 121:5 144:4,12

**lived** 83:6 152:10

**lives** 62:22 120:13

**living** 42:16 48:16
75:1

**LLC** 5:7 9:25 14:23
16:3,9 22:2,10 47:7
131:3 132:4,6,12,18,20,
24 134:13

**LLC's** 136:22,24

**LLCS** 137:16

**location** 160:4

**lockdowns** 159:10
160:3

**lodging** 50:1,3

**log** 139:19

**logged** 104:6

**logistics** 32:4 65:25

**long** 55:22 63:25
64:14 95:14 101:17

**longer** 74:11 77:24
117:17 133:2 146:2
147:8 160:20

RYAN THOMPSON
SEPTEMBER 06, 2024

JOB NO. 1164890

**looked** 104:23

**loosing** 14:20 91:18

**Lopez** 115:5,6,12

**losing** 15:5 91:5

**lot** 11:15 20:4 31:22 32:7,8 34:12 35:13 36:23 39:7 63:23 64:1, 10 65:1 81:9 88:23 89:24 90:20 95:24 100:10,16 101:5,8 107:24 120:13 144:2,4 145:12 147:22 148:24 152:8

**lower** 56:15 76:6

**Lynn** 78:25 80:19,24 81:10 87:21

**M**

**M-O-C-R-A** 36:9

**Macnab** 156:4,10,12, 16 157:19,21 159:19

**Macnab's** 157:3,7, 13,23

**mad** 89:18

**Madame** 102:2

**made** 10:18 43:25 61:19 62:16,19,21 63:1 66:10,12,16 67:5 68:3, 6,25 69:5 71:15 78:19 79:9 80:13 120:19 129:9,10,20,21 130:1, 13 158:17

**main** 50:21 90:12

**majority** 120:11

**make** 8:18 10:5 13:19 26:16 28:1 38:20 53:10 56:10 57:25 61:4 62:16 63:4 67:8 68:24 70:17 71:7,9,22 72:24 85:13 101:14 111:11 125:8 131:5 136:1 147:1 153:14

**makes** 63:5

**makeup** 14:3 121:8,9 122:23,25

**making** 20:5 51:16 56:9 62:11,13 67:25 81:2 90:16,20 94:23,24 121:18 144:2 148:7

**management** 92:14

**manager** 61:17 90:17 92:10 94:3,11,14, 19 95:10 96:9 97:4,9, 13,18 98:5,8,18,23 150:20,23

**managerial** 21:11

**managers** 97:20

**manner** 6:17

**March** 15:22 22:3 47:17 59:6,10 75:23 76:2 144:17

**Marie** 5:7

**marijuana** 106:3

**mark** 8:8 14:8

**marked** 8:12 52:14 54:20,22 76:5 77:6,10 114:9

**marketing** 36:18 37:9 38:10

**marking** 113:11

**married** 74:20 75:6 92:3,5

**match** 148:12

**material** 123:16

**materials** 36:18 121:3 123:13 124:4

**matter** 5:6 7:24 8:21, 24 55:9 82:8

**matters** 52:9

**Matthew** 5:12

**max** 57:6,13,17 110:1

**maxed** 49:11,23 54:5, 11,13,17

**Mcdermaid** 32:20 35:8,11,17,25 40:4 134:1,4

**Mcdermaid's** 35:3

**Mcneill** 5:7,24 7:8,25

9:22 10:5,11 13:8 14:13,24 16:8 22:18 25:9 34:5 43:5 46:3,12 49:5 52:24 55:9,10 56:24 59:11,16,20 60:13,17 61:4,11,14 62:19 63:1 64:6 65:12, 16,24 66:11,17 67:4,25 68:9,16,18 70:17 71:16 73:19 74:7 79:8 82:5, 13,15,19 83:6 85:4,14, 24 87:19 92:1 97:16 104:24 105:2 106:8,17, 21 107:6,7,17 108:5,6 109:22 110:1,7,18 119:25 120:7 121:1,8, 18 122:22,25 133:20 134:21 136:20 137:10 140:1,18 141:3,25 142:2,6,11 145:23 146:1,3 148:15 149:10, 22 151:15,17,18 155:7 156:1 157:14,20,24 158:5,7,10,11,14,17,22 159:20 160:9,12

**Mcneill's** 14:21 22:10,14,25 47:20 48:3 63:21 70:22 82:10 85:5 113:20 123:7,12 124:8, 12,18 127:9 132:8 152:4 156:17

**Mcneills** 151:21 152:14,18,23 154:15,20

**means** 125:11

**meant** 21:22 44:22

**mechanical** 129:4, 20 134:19 135:4,9 136:25 137:2 140:4,12 141:4,6

**media** 28:21,25 36:13 38:14,18 39:1,3,8,17, 22,25 40:3 127:1 128:7

**meet** 153:25

**meetings** 31:13 34:4

**Melissa** 32:19,24 34:18

**member** 70:14 74:2

**members** 69:14,19 72:14 73:25

**meme** 39:9

**mend** 107:8

**mental** 89:2,11 100:8

**mention** 150:17

**mentioned** 70:20,22 88:6 144:19

**message** 73:5

**messages** 54:21 64:14

**met** 86:25 87:1

**Miami** 87:17,18

**mid** 153:23

**mind** 74:15 135:3

**Mindy** 32:20,24 34:24 35:3 40:4 134:1

**minimal** 57:17 86:24

**minimum** 57:19

**minutes** 102:5,6

**mis** 137:3

**misinterpretation** 137:4

**misinterpreted** 137:9

**missed** 47:15 107:10

**missing** 154:3,4

**Missouri** 57:18

**misspeaking** 150:6

**misspoke** 47:12

**mistake** 62:13,16

**mistaken** 82:3 87:21 139:2

**misunderstood** 38:7 72:5

**MOCRA** 36:7,9

**moment** 35:19 37:8 50:18,19 51:7 55:22 73:8,11 76:18 78:16 84:2 88:25 91:1,2 93:15 97:11 114:7 119:5

**moments** 62:6 74:7 87:4

RYAN THOMPSON
SEPTEMBER 06, 2024

JOB NO. 1164890

**money** 17:16 93:8

**month** 38:2 39:22
75:22 82:24 83:6
110:25 111:25 147:7

**months** 144:16

**morally** 128:12,15

**morning** 5:3

**mortgage** 78:11
82:5,10

**motion** 8:22

**Mountain** 5:4,5 51:2,
5 102:16,19 161:3

**move** 54:2 144:13

**moved** 107:4 156:23
157:4,6

**moving** 19:22 31:22
52:20 57:15,18 110:17
111:25 112:2 113:10

**MST** 5:1

**multiple** 124:11,22
131:6

**muted** 6:2

**mutual** 47:25 48:5,6
108:1

**N**

**named** 81:25

**names** 11:15,16,23
29:18 32:18 78:22
149:15

**narrative** 67:13

**narrow** 122:9

**nature** 40:23 65:20

**navigate** 55:23

**necessarily** 13:13
14:5 42:3 122:16

**needed** 13:5 20:25
25:23 38:8 49:6 73:8
82:20 91:3 92:23 98:25
113:5 122:25 125:5
142:12

**needing** 58:7 122:23

**negative** 108:24
147:21

**negatively** 109:7

**negativity** 145:20
148:18

**Network** 121:19

**non-party** 52:15

**Nonetheless**
103:20

**normal** 45:4 87:3
99:2,3,6

**North** 125:13,21
144:1,20 149:14 156:24
160:6

**notary** 6:13

**notes** 27:11

**notice** 51:14

**notify** 24:23 25:9,23
26:1,3,5 160:10,14,16

**November** 145:3,4

**number** 5:10 7:23
56:16 76:5,8 77:24 78:5
152:3

**numbers** 131:17

**numerous** 131:21
132:10 156:13

**O**

**oath** 6:10,23

**Object** 11:3,25 12:7
14:10 15:6,11 16:12,24
17:21 21:4,14,19 23:8
25:1 26:11 32:1 33:7,14
37:1 39:18

**objection** 6:16 18:4,
19 40:13 41:4,23 42:21
43:12,20 45:2,10,16
47:23 48:13 49:13 50:2,
4 84:23 86:5 106:11
109:1 113:15,22 115:15
118:20 128:4,18 137:18
150:3 151:3,9 152:5
153:6 154:11,16,21

155:2 158:8,18

**obligation** 151:16

**obtain** 118:10 142:12

**obtained** 156:1

**obvious** 14:7 145:17

**occasion** 20:13

**occasions** 86:20
131:21 132:11 156:13

**occur** 143:11 156:25

**occurred** 122:2,6,10,
16 135:14 139:8,11
143:12

**October** 145:4

**offer** 147:10

**offering** 101:14

**offhand** 66:23 140:23

**office** 11:13,19,20
12:20 25:8 26:6 61:3
79:11 80:18 81:10,12,
15,18 96:17

**official** 20:23 69:16

**ooh** 74:15

**operating** 99:21

**operation** 28:14
96:5

**operations** 22:2,6
28:5,7,9,13 32:12,22
141:15,18,22 156:23

**opinion** 68:22 83:23

**opinions** 68:23

**opportunity** 25:21
108:18 109:17 130:17
149:5 150:14 155:13
156:7

**opposed** 108:17

**opposite** 85:2
109:12

**order** 19:18 150:11

**ordered** 135:10
140:15

**Ordering** 94:23

**organizing** 113:3
156:18 157:9 159:20

**orientation** 65:19
84:13

**original** 134:11

**originally** 138:5

**oversaw** 92:15

**oversee** 23:15 28:19
32:2 96:17

**overseeing** 20:9
28:24 29:1 90:19 95:5
99:14 144:4

**owner** 19:10,20,24
20:3,8 33:18 61:17 94:7
99:24 128:23,24

**owners** 17:12,16
19:8 65:20 66:18 67:9
84:6,22 85:14 86:2,3
94:4,10

**ownership** 12:18
17:12 33:9,13 64:21

**P**

**p.m.** 58:3,13 102:19

**pacify** 158:10

**pages** 54:22 55:22
56:1,9 77:9

**paid** 17:14,16,18
18:10 57:19 78:11,12
82:6 93:9,15 95:20
96:10 103:9 119:11
125:25 136:15,23
137:16,20,24 138:12,15
140:18 154:4,7

**paper** 23:3

**paperwork** 10:12,25
11:7,9

**paragraph** 9:17,18,
21 13:9 14:16,18 21:25
22:9 41:15,18 43:3
47:3,6,20 59:6 83:10,
20,21 87:24 90:6 99:25
100:2 104:22,23,24
109:17,18 118:15
119:3,6,14,18,20,24
122:10 129:1,2 136:19

RYAN THOMPSON
SEPTEMBER 06, 2024

JOB NO. 1164890

149:4 150:17 155:13,
14,21 156:5,8 158:1,23

**paragraphs** 9:21
91:11 150:13,14

**parameters** 43:6
44:21 58:10,17 141:2

**part** 12:8 36:24 63:15
96:16 97:6 100:18
105:14 107:10 115:7,8,
10 129:4,20 134:19
135:4,9 137:2 138:23
139:21 140:4,12 141:4,
6 153:22

**parties** 6:11,14

**partner** 66:7 75:2

**partners** 110:13

**parts** 31:22 137:1
147:21

**party** 6:16

**passed** 106:18

**past** 74:13

**Paster** 5:13

**path** 51:11

**pay** 79:24 80:21 81:3,4
82:21 83:5 128:10,11
143:15 159:6

**paying** 42:18 82:9,12,
15,19

**payment** 11:1 13:5,
23 14:22

**payroll** 90:16,21

**peace** 91:4

**penalties** 24:8,13

**pending** 53:24 54:1,3
101:17

**people** 31:17 60:7
81:10,14,19,20 85:19
96:17 108:15 131:6
142:10 147:20 159:1

**percent** 24:16 65:7
80:24 152:10

**perform** 43:5 44:16
45:9 46:1 63:12 155:18

**performance**
145:11

**performed** 17:19
45:22 153:2 156:16

**performing** 42:2
45:14 64:23 95:11
98:11 124:1 149:9
150:23 153:20 155:1
160:12

**period** 7:18 10:4
17:25 25:15,16 34:10
54:6,9 59:19 60:14
64:3,7 75:17 120:9,20
129:11 156:20

**periods** 15:16

**perjury** 24:8,13

**person** 10:19 41:21
42:19 60:2 61:1 80:9
81:25 87:1 92:24 100:8
107:23 110:7,19 115:2
133:25 146:4,6,8,12
155:11

**personal** 10:1,21
13:16,18,25 14:9,24,25
22:11,14,21,22,25 23:1,
12 25:8 26:10,20 40:8,
10,11,23,24 41:2,22
42:5,9 43:5 45:22 46:1,
11 51:9 52:2 62:22 65:2
66:19 84:3 90:14 91:12,
20,23 100:17 103:24
104:2,9,14 105:1,12
107:16,24 111:6,9
112:15,20 113:6,10,20
114:1 126:25 127:3,10,
17 134:21 136:21
137:24 140:13 149:9
160:9,12

**personally** 50:9
58:7 60:19 117:12
150:22 158:14

**pertains** 51:17

**Petri** 133:14,17,18

**phone** 80:6,9 103:2,9,
17 104:2,10

**photo** 36:25 37:11
121:5 123:22 124:3,9
126:21,23

**photography** 22:17
28:20 124:2

**photos** 23:21 36:17,
23,24 37:3,7,8,16,22,24
38:1,5 123:15,25
124:14 125:4,6,7
126:24 127:1 128:6,8

**phrase** 40:15 43:22

**physical** 36:22 100:9

**physically** 6:7 104:1
152:11

**pick** 145:2

**pictures** 37:14
123:19

**pitted** 65:4

**pitting** 104:25

**place** 5:11 37:18 60:3
78:8 91:1,3 99:22

**plain** 37:16

**plan** 58:14

**planned** 37:10
126:21

**played** 89:25

**point** 13:21 37:3
51:14,18 52:16 53:20
58:9 72:15 74:9 97:23
107:14 118:6 140:15

**pointing** 119:20

**policies** 69:17

**policy** 69:15

**polite** 87:3

**pose** 53:4

**posed** 52:3

**position** 34:19,20
79:23 92:10 95:3 98:9,
18 114:25 148:6,8
157:8,10

**positive** 101:11
117:22

**possession** 131:5

**possibly** 81:11,23,24
82:1 90:5

**post** 39:1,3,7,8

**posted** 36:18 39:22,
25

**posting** 36:12,15
38:11,13,18

**posts** 39:6 40:2

**potential** 70:11

**preferred** 112:19

**prepaid** 58:14

**presale** 60:13

**presence** 114:1

**present** 6:7 87:12

**presented** 80:2

**presently** 28:3

**president** 22:1,6
28:8,13

**pretty** 11:16 80:19
117:21 132:19

**prevented** 153:19

**previous** 28:17
137:20 159:15,16

**previously** 59:5
90:7 108:25 127:15
148:6

**pride** 147:25

**primary** 108:10

**prior** 44:10 64:7 72:6
79:22 97:18 134:12
136:7 141:2

**privilege** 49:16

**procedure** 13:7

**proceed** 6:19 7:3
53:18,19

**process** 13:1 36:4,5
37:7,12,13,15 38:4 40:6
48:24 54:16 57:15
110:13 111:5,13 112:5

**produced** 29:21
55:8

**product** 29:23 30:1,
5,13 31:11 37:2 38:4
39:11,12 130:12

**products** 36:2,6 37:11,25 38:21,22 121:22,25

**professional** 107:19

**prohibition** 69:14

**project** 30:5 137:14

**projects** 29:25 35:1

**promoting** 121:22, 24

**promotional** 121:3 123:12,16 124:4

**pronounced** 114:22

**proof** 142:15

**properly** 144:3

**propose** 82:25

**props** 38:5 125:5 128:8

**protect** 15:10

**proud** 85:18

**provide** 118:14 119:8 123:6 130:17 149:10,12 152:2 158:22

**provided** 24:24 26:9, 16 55:13 59:24 103:7 150:2 158:6 159:25

**providing** 33:2 46:11 93:24 97:9 98:22 122:11 124:17 127:3 156:20 157:8,23 160:2

**proximity** 81:19

**prudence** 53:11

**pull** 8:7 76:18

**purchase** 10:8 12:22 96:2,4 97:6 112:11 120:13,19 130:13,15 137:20 139:20

**purchased** 103:9 120:3 121:5 122:23,25 124:12 125:6,12,23 126:7 130:9,10 134:20 137:24 138:11 139:22

**purchases** 120:6

**purchasing** 48:24

**purpose** 51:12 70:4 121:11,13,22 138:17,19

**put** 13:12 35:17 73:24 88:15 102:23 108:3 119:9 137:13 145:12

**putting** 51:14

**Q**

**qualify** 54:18

**question** 22:20 44:25 49:15 50:4,7,16 52:3,18,19 53:1,24 54:1,3 71:6 75:12 80:11 85:8,12,23,24 99:23 101:1,17 102:22 109:19 114:16 116:2 117:12 119:18 127:6 129:17,19 140:3

**questioned** 138:13 140:1

**questions** 28:22 41:19 46:8 51:10,15 52:23,25 53:2,7,13 64:12 67:6 73:18 98:19 119:6 136:3 149:6 150:15 155:14

**quick** 52:5 79:14 130:7 134:25 135:18

**quickly** 51:8 55:23 57:19 67:17,18 76:18 83:19 103:18 107:2 111:7,13,24 112:3,4

**quit** 10:10 97:2 101:5 131:24

**R**

**race** 76:20

**races** 151:18 153:24

**racing** 152:7

**raise** 78:7,10,13,14 79:16 80:2,3 83:4 113:25 143:15,19,21,24 144:22,23 145:9,10,14

**raises** 80:21 81:4

**ramifications** 53:16

**range** 152:2

**reached** 26:21 106:19 107:7 108:4,6, 13 117:15,19,23 118:4

**reaching** 108:19

**read** 10:2 13:9 24:8 41:18 55:4,6 59:1 77:13 79:13 83:19 104:19 109:18 116:1 149:5 158:1

**Reading** 129:3

**ready** 53:18,19

**real** 79:14 130:7 135:18

**realize** 84:22

**realized** 102:21

**reason** 67:19 99:18 113:2,5,19 134:2

**reasons** 76:1,4 77:17

**recall** 12:4 13:6 18:13, 16 19:15 21:9 22:7 23:23 29:18 30:7,10 35:22 47:16 58:17 61:6, 8,19,22,23 62:11,18,25 70:15 79:10 80:13 81:7, 25 86:24 87:12,16 88:21,25 97:11 98:6 107:2 112:10 114:3,5 116:1,3,4 117:19 119:13 120:12 121:13, 17,18 122:3 123:2 129:23 130:14,16 132:14,19 134:16 135:9,11 136:6 138:19 139:13 142:19,21,24 144:15 145:25 146:18 151:23,25 156:22 159:15,23

**recap** 77:22 88:3

**recaps** 83:16

**receive** 27:21 143:21, 24

**received** 110:6 117:25 132:23 144:22

145:15 148:11

**receiving** 116:3,4

**recess** 51:3 102:17 161:4

**recognize** 56:19 114:14,17

**recollection** 118:17

**reconnect** 106:21 107:6

**record** 5:4 50:19 51:2,5,7 53:11 102:16, 19 114:15 161:3

**redacted** 111:3

**redactions** 116:11

**reemployment** 142:8

**refer** 22:21 130:3 133:21 155:12 156:5

**reference** 9:19 19:12 90:7 103:2,15 122:22 156:16

**referenced** 75:18 114:11 159:25

**referencing** 129:3

**referred** 7:7,14 16:4, 21

**referring** 11:19 23:22 29:10 58:6 65:14 69:15 81:1 88:10 90:11 92:1 100:4 102:25 111:16 120:6 125:16 129:7 130:4 131:10 133:22 146:9 157:3

**refresh** 118:17

**regard** 17:17 31:25 38:17 40:9,19 59:18 73:23 80:11,12 82:4 83:20 86:1 88:4 100:20 119:23 126:5,13 137:1

**registering** 36:6

**rehire** 142:12,17

**rehired** 143:1,4 148:11,15

**rehiring** 142:22 143:7

**reimbursement** 13:5,22

**rekindle** 107:11,15

**rekindled** 147:13

**related** 13:20 27:22 39:9 70:1

**relationship** 65:3,8, 11,13 67:9 68:1,10,19 70:18,23 72:1 84:4 86:13 87:4 107:19 153:10

**released** 146:12

**relief** 100:25 101:1

**religious** 65:20 66:18

**remember** 58:20 81:12,14 97:16,24 103:18 105:9 112:3,7 115:4 116:23 129:15 131:25 135:21 139:3 142:19 147:8 149:14 158:25 159:16

**remind** 53:3

**remotely** 6:9,10,23

**rent** 42:19 82:12,14,18

**renting** 48:18

**repeat** 12:1 28:10 122:8

**rephrase** 37:3 75:11 94:8 100:23 127:6 157:15

**report** 10:15 12:23 13:3,12,22 61:14,16 99:8,11,13 117:25 126:9 136:17 137:6 139:4,5

**reported** 23:16 92:21

**reporter** 5:13 6:1,3,5, 12,24 7:2 101:23 102:2, 6,12 133:7,10,12

**reporting** 6:8,17 141:24

**reports** 10:8,11 110:10 114:23 116:18, 20 118:3,11,12 120:17, 21 122:7,17 125:22

**represent** 5:16 55:7

**representations** 158:16

**representative** 10:25

**representatives** 11:22 12:5 25:7

**represented** 50:9

**request** 22:10 47:21 48:3,6,9 71:15 128:11

**requesting** 118:22

**required** 30:16 31:1, 20 44:3,14,16 45:8 52:15 70:16 99:8,10,13 145:7 150:7 151:2

**requirement** 30:19 31:4 151:8

**resend** 116:7

**resign** 75:22

**resignation** 27:3 28:13 67:22 75:17,18 76:3 77:9 87:8 88:20 89:3 96:25 100:1 102:23 109:5

**resigned** 71:4 76:1 95:14,15,19,21 96:14, 22 100:12,25 103:12 106:9,16

**resigning** 91:13

**resolved** 140:20

**resource** 139:23

**resources** 139:16

**respect** 52:1

**respond** 64:12

**responding** 116:2

**response** 8:22 130:18

**responsibilities** 28:6,15 29:22 32:23 35:11 36:12 93:19,21 95:8 98:22 143:25 144:20,21 145:8 155:22,24

**responsibility** 144:7 145:12

**restate** 25:3 129:17

**result** 109:7 145:9

**results** 140:6

**retract** 129:14

**retracted** 129:24

**return** 19:1 24:19 48:11 146:19 147:4

**returned** 13:1 20:19 22:10 24:17,20,23 25:10,11,17 30:25 47:7, 10,21 48:3 49:3 54:6,8, 10 103:20 142:5 146:23

**returning** 94:5 99:20

**revelation** 81:1

**reverse** 19:18

**review** 119:5 138:17 139:10,15 140:7,25 141:7 150:14 155:14 156:7

**reviewed** 139:20

**reviewing** 136:13

**reward** 145:14

**Rhonda** 66:12 81:11 82:1 87:20

**ride** 153:22

**right-hand** 56:15 76:6

**risk** 53:4

**role** 19:19,23 20:2,7 21:11,17,22 22:11,17 23:12,20 24:19 28:6,8 31:24 32:12,21 33:12, 18 34:15,16 35:4,5 38:17 79:5,6 94:10 95:10 97:5,18 99:14 115:10 141:12 155:17 156:10

**roles** 28:16 32:23

**roll** 85:22

**rolling** 144:6

**room** 6:8 66:2

**rose** 22:1

**Rosenbaum** 33:20, 22,23 34:7,14

**rough** 145:13

**routinely** 136:20

**RTHOMPSON@
HEADKANDYPR
O.COM** 117:5

**Rthompson@
headkandypro.
com.** 115:19

**Ruiz-uribe** 6:5

**rule** 69:4,21 72:12 73:24 74:6,9

**rules** 74:8

**running** 94:14,20 95:1 96:11 144:3

**rush** 102:10

**Ryan** 5:6,22 6:21 8:11 32:19

**Ryan@
headkandypro.
com.** 117:2

## S

**Sadro** 5:18,21 8:13 9:5,9,12 11:3,25 12:7 14:10 15:6,11 16:12,24 17:21 18:4,19 21:4,14, 19 23:8 25:1 26:11 32:1 33:7,14 37:1 39:18 40:13 41:4,8,12,23 42:21 43:12,20 45:2,7, 10,16 46:23 47:23 48:13 49:13 50:3,6,12, 17,22,25 51:6 52:13 53:19 55:25 56:4,8 76:17,21 86:5 89:12 101:22 102:1 105:5 106:11 109:1 113:15,22 115:15 118:20 128:4,18 137:18 150:3 151:3,9 152:5 153:6 154:11,16, 21 155:2 158:8,18 160:21 161:1

RYAN THOMPSON
SEPTEMBER 06, 2024

JOB NO. 1164890

**safe** 152:8

**salaried** 18:15 27:18 92:8 99:3 142:25 154:8, 9

**salary** 18:7,11,17,20, 23 27:19,24 79:17 90:16 93:5,8,12 143:3 148:13

**sale** 59:16,19 64:4 75:17

**Salida** 78:8

**samples** 135:24

**satisfy** 151:8,15

**scale** 79:24

**scenario** 135:18

**scenarios** 125:8,10

**Schankerman** 98:2,7 150:12,15,19 151:2,7,21 152:3,14,19, 23 153:2,19

**Schankerman's** 151:14

**schedule** 152:7

**scope** 32:25 33:5 99:6 137:14 153:9

**screen** 27:5 55:1 57:5,23 77:12

**scroll** 14:16 22:8 41:14 129:2

**scrolled** 47:1

**scrolling** 8:24 9:16 24:1 109:15 119:2

**season** 125:3 144:24, 25

**seasons** 124:22

**seeking** 108:7

**sell** 123:23

**send** 13:4 29:5

**sending** 11:24 52:24

**senior** 28:4,7,14 32:12,21 141:17,18,21

**sense** 71:23 72:25 125:8 131:5 136:2

153:14

**sentence** 10:2 14:19 87:9 116:6

**sentiment** 158:4

**senting** 12:4

**separate** 105:14

**separately** 125:6

**September** 5:1,5

**service** 46:2 79:6,23 98:12

**services** 33:2 34:22 35:7 43:5,18 44:16 45:9,14,22 46:11 97:9 98:21 124:2 149:9 150:1,23 155:20 157:9, 13,23 158:5 159:25 160:3,10,12

**serving** 94:10

**set** 30:18 82:15 121:7

**setup** 123:11 124:8

**sexual** 65:19 84:8,13

**sexuality** 84:23 85:15

**sharing** 66:2 104:16 114:6 118:25

**Shawna** 61:24,25 62:24

**she'll** 80:5

**shift** 64:3 145:17,19

**shifted** 96:20

**shipper** 97:24

**shipping** 28:20 66:1

**shirt** 123:22

**shock** 66:14

**shoot** 36:25 37:11 126:21,23

**shoots** 121:5 124:4,9

**Shopping** 121:19

**short** 52:5

**shortly** 112:11 139:9, 11 143:12

**shoulders** 100:14

**show** 54:19 102:25 114:11

**showing** 116:8

**shown** 38:22

**sick** 100:5

**side** 56:22 73:9 107:25 110:12

**sidetracked** 129:18

**Sidney** 81:23

**signature** 24:2

**signed** 8:10 104:1,15

**signing** 23:23 24:13

**silly** 101:10

**similar** 55:14 109:10 150:1

**Similarly** 83:15

**Simon** 19:16,19

**simply** 13:2,14 38:19 43:4 81:19 137:6

**single** 120:4 124:21 139:20

**sir** 10:3 12:13 19:6 22:4 27:14 57:24

**sister** 69:20 79:17,23

**sisters** 69:20

**sit** 31:13 88:20

**site** 36:19

**sitting** 87:14,18

**situation** 158:10

**situations** 108:1

**sketchy** 113:9,13

**slowly** 23:20

**small** 57:16 70:8

**smaller** 95:25

**smoothly** 99:20 144:3

**snowballs** 74:16

**sober** 90:2

**social** 28:21,24 29:8 36:13 38:13,18 39:1,3, 8,17,22,25 40:3 127:1 128:7

**Solange** 5:14 6:5

**solely** 70:1,13

**sound** 8:1

**sounds** 19:17 44:24 102:12

**source** 155:6 157:18

**sources** 157:22

**Southern** 5:9

**speak** 9:20 20:25 61:11 120:18

**speaking** 15:24 82:8 120:22 125:2 137:9 146:21 156:14

**specific** 37:18 38:5 39:12 42:24 56:9 70:4 86:19,25 88:19,21 116:24 117:4,18 121:13 130:12 131:4 135:21, 22,25 152:16 156:13

**specifically** 11:15 12:15 20:14 21:10 35:9 39:19 45:25 61:10 62:23 65:23 66:23 70:6 93:8 119:17 123:21 148:17 149:17

**spoke** 25:6 28:11 142:10 148:5

**spoken** 86:8

**sporadic** 152:6

**spouses** 72:14

**spur** 37:8

**staff** 32:16

**staging** 38:4

**standing** 80:16

**stands** 36:7,10

**start** 19:18 89:7 95:15 108:3 109:21

**started** 15:21 16:5 18:5 23:20 66:6,8,13 69:1 72:8,20 98:10

RYAN THOMPSON
SEPTEMBER 06, 2024

JOB NO. 1164890

111:4 112:5,12 116:17, 19

**starting** 7:20 67:13

**starts** 47:20 145:2

**state** 5:16 6:13,18,25 9:22 13:3 21:25 41:8 48:2 60:9 62:23 83:22 89:2,11 114:15 135:12 153:1

**stated** 6:18 10:20 24:9 47:10 64:15 79:15 92:15 94:9 108:25 110:21 130:20

**statement** 26:16 42:16,24 45:6 46:9 61:6,19 62:19 67:5,8 68:8,15 69:1 71:7,10 78:18 79:9 80:12,14 81:2 82:4 84:1 87:10,11 88:4 102:22 109:24 112:17 126:15 129:14, 24 131:12 134:25 135:1 137:1,8 138:2

**statements** 9:19,20 61:4,9 62:5,12 63:1,8 64:18 68:1,3,7 69:5 70:17 80:20 85:5 109:23 110:2,8,23,25 111:2,19,22 112:6,12, 21 118:19

**states** 5:8 76:4 110:20 138:9

**stating** 43:4 80:1 109:21

**stay** 58:15

**stayed** 63:15

**Steno** 5:13,14

**step** 50:19

**stepped** 96:18

**stipulate** 6:14 52:10

**stipulation** 6:4

**stock** 38:23

**stomach** 100:5,21

**stop** 78:15,16 104:16 114:6 118:25 144:10

**stopped** 144:14

**storing** 103:24

**story** 60:1 72:19 73:2 80:6

**strain** 65:2 70:23

**stress** 100:6,9,10,22 101:3,5,7

**stressed** 109:14

**stressful** 63:10 64:23

**stretch** 102:10

**strike** 10:19 11:9 17:2 30:24 32:13 40:25 44:15 68:17 69:11 70:21 86:16 108:21 110:20 119:25 120:1 126:18

**structure** 109:12 148:23

**studio** 125:7

**stuff** 28:23 30:10 31:13 32:8 62:3 96:6 121:6 144:5

**stuffer** 120:23

**subject** 14:20

**subjected** 84:11

**submit** 11:8 12:11 109:23 110:2,8,14,22, 24 111:2,7,19,22 112:16 118:18 128:16 136:20 137:5,11,15 141:9

**submitted** 8:23 10:24 11:7 15:3 25:7 40:9 111:10,15 112:15 116:10 126:15 136:13 138:2,5 140:10

**submitting** 12:19,24 14:22 112:6,12,20 114:23 115:11 122:7,17

**subparagraph** 83:21

**subpoena** 27:6

**subsequent** 9:20

**subsequently** 19:1

**sudden** 74:14

**sufficient** 51:22

**suggestion** 69:24

**super** 87:2

**supervisor** 128:20, 23 153:3

**supervisory** 21:17

**suppliers** 36:3

**supplies** 94:23

**supportive** 73:22

**supposed** 43:18 71:12,18 72:13,17,22 93:25 94:2,18 97:9 135:22

**swear** 6:1

**switch** 58:21,23

**sympathy** 106:20

**symptoms** 100:11 101:2

**system** 76:14

---

**T**

**takeover** 96:1

**takes** 88:23

**taking** 5:11 12:21 23:20 36:24 37:7,14 38:5 64:19 76:25 96:10 123:15 128:8 145:11

**talk** 23:2 35:13 50:18 60:1 62:6 65:22 73:6 80:4 87:9,24 100:2 142:14

**talked** 60:20,21 63:7 77:25 78:1 90:14 91:23 109:6 116:12 118:16 127:15 146:13 147:9 153:10

**talking** 40:20 72:11 73:16 75:16 80:19,21 81:3 91:10 95:13 96:1 122:4 124:1 127:8,14, 24 130:5,15 147:2

150:18 152:16

**Tampa** 7:1

**task** 96:13

**tasks** 95:9,15,17,19, 22,23

**team** 37:17 111:17 115:11 138:10

**technical** 16:3 141:14

**technically** 104:5

**ten** 152:9

**tended** 152:7 158:9

**tenure** 22:22,23 25:18 28:11 30:15 136:8

**term** 110:15

**terminate** 51:13,19, 25 52:8 53:10,15 142:2

**terminated** 7:25 67:20

**terminating** 53:4

**termination** 8:5 67:18,19,21

**terms** 17:12

**terrible** 149:15

**testified** 6:23

**testify** 151:10

**testimony** 7:24 44:11 49:20 72:6 85:3

**text** 25:20 54:21 55:3, 9,12 57:3 58:2,25 64:14 73:5 77:13 80:9 104:18 114:12 153:8,11

**texts** 56:20 64:13

**thanked** 106:20

**thanking** 25:20

**thing** 62:7 64:23 73:7 89:18 90:15 140:9 148:19

**things** 13:12 14:4 26:18 35:14,16,25 37:12 39:8 54:2 60:18 65:17 68:24 89:9,20 90:8,10,12,25 91:6,9

96:8 101:9 104:14
108:2 113:4 130:15
144:6 148:22,25

**thinking** 64:21
124:23 130:8

**third-party** 32:4
65:25

**Thompson** 5:6,22
6:21 7:7 8:11,18 9:16
32:19 49:14 50:10
51:12,16 52:19 53:23
77:2 102:21

**Thompson's** 49:15

**thought** 14:7 40:9
48:22 64:19,20 71:13
72:6 90:22,25 108:14
111:5 112:23 113:2
124:2 134:18,19

**thrown** 63:8

**Thursday** 153:24

**tie** 53:2

**tile** 141:16

**time** 5:4,5 7:13,18 8:5
10:4 11:14 12:22 14:5
15:15 17:25 25:14,16
27:23 28:12 30:3,4,12
31:1 34:10,17,21 35:6
37:21 43:8,16,18,22
44:9,19,21,23 45:1,5,13
48:20,23 49:9,21,24
51:2,5,14,15,18 52:16
53:20 54:6,9 57:18
59:9,18 60:14 61:7,25
64:4,11,15,18,19 66:13
67:14 73:11 74:24
75:17 76:25 77:3 78:1
79:3,7 80:4 81:12 89:3,
22 91:6 92:4,7,12,16
93:1 94:1 95:14 96:21
100:10 101:12,16
102:16,19 106:9,15
107:3 108:23 114:23
115:1,13,20 120:5,9,17
125:23 126:9 130:5
133:8 141:13,20,21,24
142:1 143:6,21,24
144:22 145:13 146:14
147:21 153:9 154:2,9
156:14,20 159:3,5,6,12
161:3

**timeframe** 10:10
17:13 61:7 110:24
112:7 117:16,24 129:16
139:13 147:8

**times** 34:9 37:24
39:21,24 60:10 62:15
64:1,2,10 69:4 81:13
86:8,19,24 87:1,2 98:13
106:13 123:2 125:4
143:9 145:13,16 147:22
151:25 154:3

**title** 21:8,9 28:3,4,12
141:14,17,19 143:22

**titles** 23:3,6 92:12

**today** 47:10 50:9
143:7 150:18

**told** 14:8 45:24 60:7
66:5,17 68:8,9,10 73:10
74:11 78:20,23 79:1
80:13,20 82:20 83:3
85:4,10,11,14 88:5
110:9,16 111:14 128:25
140:13,17 141:3 145:6
146:3 157:13 158:7,13

**tolerate** 77:25

**top** 11:17 22:9 30:14
47:2 60:15 63:2 101:7
160:25

**topic** 61:8

**touched** 26:21 75:24

**tough** 60:3

**town** 70:8

**track** 153:4

**trait** 148:3

**transaction** 120:4
135:20

**transferred** 18:15
98:4

**transition** 18:11
34:6 145:22 146:5

**transitioned** 18:6
97:23

**travel** 121:11,14
122:2,5,15

**traveling** 121:8
123:1 151:17,21 152:14

154:15,20

**treated** 52:10 75:13

**treatment** 75:9

**tree** 123:23 128:9

**trip** 87:22 122:10
152:15

**trips** 152:3,19,22,24
153:18,22

**trouble** 48:10

**true** 15:3,15 24:9 47:8
66:22 78:8 79:18 85:6
86:3 155:4

**Trust** 29:19

**truth** 60:25 71:11

**truthful** 7:10,13

**turn** 103:14

**turned** 27:3 96:25
103:4

**turning** 83:9 103:12

**turnover** 81:13

**tutor** 159:4

**tutoring** 155:20

**type** 37:11 41:21
79:11

**types** 31:19

**typically** 138:10
145:2

## U

**Uh-huh** 22:13 58:5
59:8 103:3 109:9
115:25 119:4,12 123:8
124:20 129:5 150:21
156:6,19 160:1

**ultimately** 70:16
83:5 92:21 108:16

**unable** 118:5

**unaware** 34:16

**unchanges** 74:9

**unclear** 11:6

**underneath** 23:17
115:6

**underscore** 76:11

**understand** 15:20
17:5,9 29:19 36:13
37:6,12 40:19 42:15
70:24 75:11 82:7 84:24
85:3,9 89:5 92:17 93:5,
23 108:10 109:3 110:5
112:14 124:4 132:5
134:18 153:9 155:4
157:17

**understanding**
16:1 20:10 33:24 34:2
73:25 74:3 95:2,4

**understood** 14:25
24:12 94:13 98:16

**unemployed**
129:11

**unfollowed** 69:23

**unhappy** 80:8

**unintentionally**
140:18

**unique** 61:19

**United** 5:8

**unload** 91:3

**unspoken** 69:4

**untrue** 137:8

**unwritten** 73:24

**update** 38:2

**upper** 33:9 64:21

**upset** 74:7 78:1,2
88:5,7

**Uribe** 5:14

**user** 131:3,13

## V

**V-A-U-P-E-L** 81:17

**vacation** 154:9,14

**vague** 23:5

**valuable** 70:5

RYAN THOMPSON
SEPTEMBER 06, 2024

JOB NO. 1164890

**Vaupel** 81:16,24

**venue** 5:8

**verbal** 14:20

**verbiage** 38:21

**version** 111:11

**versus** 5:7 67:5

**vice** 22:1,5 28:8,13

**video** 14:3

**videoconference** 5:12

**videos** 120:14 121:5 144:5,8,10,12

**viewable** 41:16

**viewed** 9:24

**visually** 111:12 112:25

**visuals** 36:19

**voice** 105:3

---

**W**

**wait** 76:21

**walk** 77:18

**wanted** 56:10 57:25 108:3 113:9 133:23 147:1,23 148:4 150:1 159:5

**wanting** 108:12

**warehouse** 90:17 92:10,13 94:3,5,11,14, 15,19,20 95:2,5,10 96:9,11,16 97:4,9,13, 18,20 98:5,8,17,23 99:14 144:2,21 149:14 150:19,23 157:4,5

**warning** 51:22 53:1

**watch** 149:19

**wearing** 123:22

**Webb** 61:25 62:24

**website** 28:24 29:8,9 32:3 37:16 38:11 39:4 139:23

**Wednesday** 153:24

**week** 30:16,20 31:1,5, 6 44:12 103:15 151:1 153:23

**weekends** 153:25 154:1

**weeks** 30:22 37:23 147:7

**weight** 100:6,13,21

**wellbeing** 100:3 101:11

**whatnot** 37:19 77:1 135:24

**white** 37:17

**Whoops** 56:12

**witnessed** 61:2

**woman** 63:24 148:2

**wondering** 89:17

**words** 74:19 118:10

**wore** 121:1

**work** 17:18 19:1 23:2 27:22 30:17 31:2 34:7 43:23 44:14 63:6 86:7 88:8 89:24 93:24 96:24 97:23 98:3 99:6,15 101:5,7 104:3 105:1,3, 12,23 106:1,4 107:23 108:12 109:7,11,13 145:12,14 151:2 153:1, 20 154:3,4,25 156:16, 21 157:4

**worked** 30:21 44:11 69:20 78:13 84:4 108:15 147:12,24 148:1 150:19 156:12

**worker** 149:16,21

**working** 16:7 30:19 31:5,7 35:15 36:1 60:4 63:17,24 64:22 72:20 79:21 87:3 88:6 90:21 99:4 101:5 105:14 108:25 147:11,20 149:23 150:2 151:19 152:25

**workplace** 105:17

**works** 34:24 133:25

**workweek** 151:5,8, 19

**worn** 14:2

**worried** 91:5

**write** 76:10 88:20 111:9

**writeoff** 14:5

**writing** 14:2 90:3

**wrong** 13:10 46:11 60:6 62:1,4 84:19 128:15

**wrote** 89:3 113:10

---

**Y**

**year** 28:1 30:8 35:1 37:25 39:25 47:16 143:13

**years** 79:22 124:11

**Ylopez@ dutyfreeamericas .com** 114:18

**Ylse** 114:22 115:3,4 118:22

**Yvelisse** 114:21 115:2,6

---

**Z**

**zoom** 5:11 55:4

**zoomed** 58:19

**zooming** 8:18