**HEAD KANDY LLC vs KAYLA MCNEILL**
**Dustin McNeill on 07/16/2024**

```
 1                    UNITED STATES DISTRICT COURT
                       SOUTHERN DISTRICT OF FLORIDA
 2                          FT. LAUDERDALE

 3

       HEAD KANDY LLC,,
 4
                  Plaintiff,          CASE NO.:
 5                                    0:23-cv-60345-JB
       vs.
 6
       KAYLA MCNEILL,
 7
                  Defendant.
 8
       ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
 9

10                        DEPOSITION OF

11                        DUSTIN MCNEILL

12

13                   Tuesday, July 16, 2024

14                        9:02 A.M.

15                      Videoconference

16

17

18

19

20

21

22

23

24     Reported By Brandon Roberts, Commission No. W-00601589

25                      Job No. 00074514
```

**HEAD KANDY LLC vs KAYLA MCNEILL**
**Dustin McNeill on 07/16/2024**

```
 1                 APPEARANCES OF COUNSEL

 2

 3   On behalf of the Plaintiff, HEAD KANDY LLC,:

 4        EDWARD COLIN THOMPSON, ESQ.
          BARTLETT, LOEB, HINDS, THOMPSON & ANGELOS, PLLC
 5        100 North Tampa Street
          Suite 250
 6        Tampa, Florida 33602
          813-223-3888
 7        colint@blhtlaw.com
          APPEARED VIA VIDEOCONFERENCE
 8

 9   On behalf of the Defendant, KAYLA MCNEILL:

10        ANTONIO L. CONVERSE, ESQ.
          CONVERSE LAW GROUP, P.C.
11        600 17th Street
          Denver, Colorado 80202
12        303-534-4499
          anthony@converselawgroup.com
13        APPEARED VIA VIDEOCONFERENCE

14

15

16
     Also present:
17
          Kayla McNeil, Defendant
18        Gina Gazzaniga
          Rocco Franco, Videographer
19

20

21

22

23

24

25
```

**HEAD KANDY LLC vs KAYLA MCNEILL**
Dustin McNeill on 07/16/2024

Page 3

```
 1                      INDEX OF EXAMINATION

 2

 3   WITNESS:  DUSTIN MCNEILL

 4   EXAMINATION                                      PAGE

 5   By Mr. Thompson                                  6

 6   By Mr. Converse                                  213

 7   By Mr. Thompson                                  230

 8   By Mr. Converse                                  236

 9                      INDEX TO EXHIBITS

10

11   NO.              DESCRIPTION                     PAGE

12   Exhibit 1        Subpoena                        9

13   Exhibit 2        Order Purchase Details from

14                    Alibaba                         78

15   Exhibit 3        Documents of Screenshots of

16                    Messages                        83

17   Exhibit 4        E-mail from Home Depot to

18                    Mr. McNeill 7/5/2022            104

19   Exhibit 5        E-mail from Home Depot to       105

20   Exhibit 6        Text Message from Mr. McNeill

21                    to Mr. Feldman 10/27/2022

22                    Bates DM0015                    158

23

24

25
```

**HEAD KANDY LLC vs KAYLA MCNEILL**
Dustin McNeill on 07/16/2024

Page 4

```
 1                    INDEX TO EXHIBITS

 2

 3   NO.             DESCRIPTION                 PAGE

 4   Exhibit 7       Screenshot of Text Message

 5                   Between Mr. McNeill and Mr.

 6                   Rosenbaum Bates DM 0019       170

 7   Exhibit 8       Text Message, Group Chat

 8                   Bates KM6231                  193

 9   Exhibit 9       Text Chain                    198

10   Exhibit 10      E-mail Chain                  203

11   Exhibit 11      E-mail Correspondence 2/20/2023   213

12   Exhibit 12      Letter Dated 11/28/2022 from

13                   Mr. Ferdinand                 227

14

15       (Exhibits 1 through 12 were retained.)

16

17   Certified Question(s):

18   Page Line

19   142   16

20   "And what were you told about the yoga session as of

21   that October 27th or so date?"

22

23

24

25
```

**HEAD KANDY LLC vs KAYLA MCNEILL**
Dustin McNeill on 07/16/2024

Page 5

```
 1                 (On the record at 9:02 A.M.)

 2             THE VIDEOGRAPHER:  All right.  This is the

 3   beginning of the deposition of Dustin McNeill in the

 4   matter of Head Kandy, LLC, v. Kayla Marie McNeill.

 5   Today's date is July 16th, 2024, and the time on the

 6   monitor is 11:03 a.m.  My name is Rocco Franco and I am

 7   the videographer.  The court reporter is Brandon

 8   Roberts, and we are here with Huseby Global Litigation.

 9             Counsel, please introduce yourselves, after

10   which the court reporter will swear in the witness.

11             MR. THOMPSON:  Good morning.  Colin Thompson

12   for the plaintiff, Head Kandy, LLC, and also the

13   counter defendants and third-party defendants.  With me

14   in the room, but not on the camera, is Carson Sadro, an

15   attorney as well.

16             MR. CONVERSE:  Good morning.  Anthony

17   Converse on behalf of Defendant, Kayla McNeill and also

18   on behalf of Deponent, Dustin McNeill.

19             THE COURT REPORTER:  All right.  Mr.

20   McNeill, can you please raise your right hand for me?

21                      DUSTIN MCNEILL,

22     having first been duly sworn, testified as follows:

23             THE COURT REPORTER:  All right.  Counsel,

24   you may begin.

25             MR. THOMPSON:  Great. [inaudible 00:01:22]
```

**HEAD KANDY LLC vs KAYLA MCNEILL**
Dustin McNeill on 07/16/2024

Page 6

```
 1   spotlight.  It keeps the -- my main screen keeps

 2   switching, depending on who makes noise.

 3           THE VIDEOGRAPHER:  I can go ahead and

 4   spotlight him for you.  One moment.

 5           MR. THOMPSON:  All right.  Perfect.  All

 6   right.

 7                       EXAMINATION

 8   BY MR. THOMPSON:

 9       Q.   Good morning, sir.  Would you please state

10   your name for the record?

11       A.   Dustin McNeill.

12       Q.   All right.  Mr. McNeill, where are you

13   located today?

14       A.   In Colorado.

15       Q.   All right.  And where in -- in Colorado?

16   Are you at your home or --

17       A.   I'm at my house, yes.

18       Q.   All right.  And is there anyone else there

19   in the room with you today?

20       A.   No.  Just myself.

21       Q.   Mr. McNeill, can you provide your home

22   address, please?

23       A.   Yes.  It's 11905 Highland Circle, Salida,

24   Colorado 81201.

25       Q.   And are you planning to move from that
```

Page 7

1  address within the next year?

2       A.   As of right now, no.

3       Q.   Okay.  And sir, can we have a -- a phone

4  number at which you can be reached if a process server

5  needs to -- to reach you?

6       A.   719-221-0505.

7       Q.   Great.

8            MR. CONVERSE:  And all service can go

9  through my office, Colin.

10            MR. THOMPSON:  Certainly.

11  BY MR. THOMPSON:

12       Q.   All right, sir, have you ever had your

13  deposition taken before?

14       A.   No, sir.

15       Q.   Good.  All right.  And I know you have

16  attended a few of the depositions taken in this case;

17  is that correct?

18       A.   Yes.

19       Q.   All right.  So you've heard the rules and

20  seen them in action.  I'll just go over them real --

21  real briefly with you, because they're particularly

22  important when we do these depositions via -- via Zoom.

23  So I need you to just make sure that you allow me to

24  finish my questions so our court reporter can get them

25  down.  And I'm going to do the same.  When you answer,

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 8

1    I'm going to try to make sure I don't cut you off in an

2    answer, so that we get the full transcript correct.

3           If there is any time that -- that you can't

4    hear me or you don't understand the question, or you

5    just need me to -- to restate it, please just -- just

6    let me know.  Let me know that you don't understand it,

7    or -- or didn't hear.  And I'll repeat it, or -- or try

8    to rephrase it, if that's -- if that's what you -- you

9    need.  The answers that I need you to give need to be -

10   - to be verbal, meaning, you know, no nods.  You can

11   nod, but, you know, make sure to give a verbal answer

12   as well.  And they need to be, rather than uh-huhs or

13   uh-uhs, a yes, no, or whatever is appropriate, because

14   those -- what we use in conversation, uh-huhs and uh-

15   uhs, they just don't come out real well on the -- the

16   transcript.  Do you understand that so far?

17        A.   Yes.

18        Q.   Good.  We will -- as we've done in other

19   depositions that I think you've been a part of, we are

20   going to likely take a break every hour to every hour

21   and a half, at -- at -- at most, that we'll get farther

22   than that.  But if at any time during this process you

23   need to take a break sooner, please just let me know.

24   All I ask, if there is a question pending, that we get

25   an answer to the question before we take that -- that

**HEAD KANDY LLC vs KAYLA MCNEILL**
Dustin McNeill on 07/16/2024

Page 9

```
 1   break; is that fair?

 2       A.   Yes.

 3            MR. THOMPSON:  All right.  Going to show you

 4   periodically on the -- the -- the screen some -- some

 5   documents.

 6            And Antonio, we're going to try this chat

 7   thing again, and let's just go ahead, we'll do it now,

 8   because the first thing I'm going to show you is your -

 9   - your subpoena for your -- your deposition.  And I'm

10   going to hope that this chat function works today.

11            MR. CONVERSE:  Fingers crossed.

12            MR. THOMPSON:  It does not.  I don't know

13   what -- what -- how that ends up happening.  But, okay.

14            MR. CONVERSE:  Are you bad luck, or am I bad

15   luck, Colin?  I don't know.

16            MR. THOMPSON:  You know, it works in other

17   ones.  I just -- it's just bizarre.  So let me get an

18   e-mail open so we can start -- start a chain with

19   exhibits here.  Okay.

20            All right, we are going to mark this as

21   Exhibit 1, which is the --

22            (EXHIBIT 1 MARKED FOR IDENTIFICATION)

23   BY MR. THOMPSON:

24       Q.   All right, are you able to see that document

25   on the screen, sir?
```

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

```
 1        A.    Yes.

 2        Q.    Okay.  And this is the subpoena to testify

 3   at your deposition today.  Now, this deposition has

 4   been rescheduled due to various events beyond either

 5   party's control, couple times, but this is the most

 6   recent one.  And it requested that you bring with you

 7   certain documents or -- or produce prior to this

 8   deposition certain documents, same documents that were

 9   requested before.

10            Did you receive those document requests?

11        A.    Did I understand, did I receive them or --

12        Q.    Sure.  Did you -- did you receive this

13   Request for Documents?

14        A.    Oh, yes.

15        Q.    Okay.  All right.  And I'll also represent

16   to you that this is substantially similar, if not

17   identical, to a -- a subpoena for documents that was

18   served on you several months ago in this case.  Do you

19   recall receiving a -- a subpoena asking you to produce

20   documents several months ago?

21        A.    Yes.

22        Q.    And did you comply with that subpoena and

23   produce all the documents you were able to -- to locate

24   in response to that subpoena?

25        A.    Yes.  To the best of my knowledge.
```

**HEAD KANDY LLC vs KAYLA MCNEILL**
Dustin McNeill on 07/16/2024

Page 11

1          MR. CONVERSE:  Colin, if I could just add

2     one thing.  Sorry to interrupt.  He received some --

3     some new responsive documents.  My office is just

4     working on Batesing them.  There are only four

5     screenshots.  And we're -- we're going to get them over

6     to you here in short order.

7          MR. THOMPSON:  Okay.  All right.  Well, that

8     was going to be part of this lineup of -- of

9     questioning.

10    BY MR. THOMPSON:

11         **Q.   So sir, can you tell me first what it is**

12    **that you did when you first got the subpoena for -- for**

13    **documents, what it is that you did to try to locate**

14    **those documents?**

15         A.   I did searches through my phone

16    corresponding with whatever keywords, that type of

17    stuff, that I could find or what was looking for in

18    this paperwork that you sent to me.

19         **Q.   Okay.  And is it fair to say that after**

20    **reading the request for the documents that -- that you**

21    **first determined that the location of those documents**

22    **would be on your phone; is that -- is that fair?**

23         A.   Yeah, more than likely.  That's the only

24    electronic device I really have.  I don't have anything

25    else that I use for anything.

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 12

```
 1        Q.   So you don't have another device, a -- a --
 2   like a desktop computer that you use to -- to
 3   communicate?
 4        A.   No.
 5        Q.   How -- how about an iPad?
 6        A.   No.
 7        Q.   All right.  And what e-mail addresses do you
 8   use?
 9        A.   I have a -- it's McFury, so it's M-C-F-U-R-
10   Y-F-1-8-0@yahoo.com.  And then a D-McNeill@live.com.
11        Q.   Okay.
12        A.   And then I had an old -- it's
13   DTAutoandDiesel from my automotive shop.  And that's at
14   Gmail.  That one hasn't been used in several years.
15        Q.   Did you ever use that DTAutoandDiesel
16   account to communicate in any way regarding business of
17   Head Kandy?
18        A.   No.
19        Q.   Did you ever use that DTAutoandDetail (sic)
20   or the DTAuto e-mail address to communicate with
21   McNeill -- with Ms. McNeill about any either Head Kandy
22   business or any of the owners or employees of -- or
23   even consultants of Head Kandy?
24        A.   No.
25        Q.   All right.  So did you search the -- did you
```

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

1    search the DTAuto e-mail address for any documents

2    responsive to the subpoena that you received?

3         A.   I don't know that I searched that e-mail

4    address, because I haven't logged into that e-mail in

5    quite some time.

6         Q.   Okay.  The other two e-mail addresses, the

7    McFury and the D-McNeill address, did you search those

8    for responsive documents?

9         A.   Yes, I did.

10        Q.   And did you find responsive documents in

11   those?

12        A.   I honestly don't remember what I found.

13   That was, like, some time ago.  Whatever documents I

14   did find, I turned over to my attorney.

15        Q.   Okay.  All right.  In addition to e-mail

16   addresses, do you have any iCloud accounts that you use

17   to send iMessages or any types of private messages?

18        A.   I think I have an iCloud account.  I don't

19   know, honestly, how that whole system works, to tell

20   you the truth.

21        Q.   Sure.  Sure.  Text messages or -- or -- on

22   Apple -- well, strike that.

23             You have -- does the phone that you use to

24   communicate, is that an Apple device?

25        A.   Yes, it is.

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 14

```
 1        Q.   All right.  And the account from which you
 2   send those, are -- is that an account that's tied to
 3   your phone number?
 4        A.   Yes.
 5        Q.   Okay.  And do you have any other devices
 6   where your instant messages and text messages sent
 7   through your phone will -- will show up?
 8        A.   No.
 9        Q.   All right.  So in addition to a -- a phone
10   number that you can use to send messages, do you have
11   an iCloud account to which you can use to send messages
12   or receive messages on your Apple phone?
13        A.   I don't believe so.
14        Q.   All right.  The phone number that you gave
15   me earlier as yours, is that the phone number that you
16   use to send texts and instant messages?
17        A.   Yes.
18        Q.   All right.  And did you search your phone
19   for messages responsive to the subpoenas that were
20   served on you?
21        A.   Yes.
22        Q.   And did you produce to your attorneys all of
23   the messages and other information on your phone that
24   you found to be responsive to the subpoena served on
25   you?
```

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 15

1      A.   Yes.

2      Q.   Did you delete -- after you provided the

3   messages to your counsel, did you delete any of that

4   information that you found on your phone to be

5   responsive to the subpoena?

6      A.   I don't believe so.  My phone was set on

7   delete.  It deletes stuff out, like, I don't remember,

8   for 30 days or a year or something like that, because I

9   don't have a whole lot of storage on my phone and that

10  doesn't back up to anything, so I did after all this,

11  when -- was asked to have done stuff like that, I found

12  that setting in phone.  And I've turned that all off,

13  so believe anything and everything that's from here or

14  there forward is -- is not being deleted or anything.

15     Q.   Okay.  And when did you change the setting

16  so that it no longer auto-deletes?

17     A.   It had to have been sometime shortly right

18  after all of -- when I got all this paperwork, just so

19  everything wasn't deleted or anything after that.  I

20  don't know exactly the -- the date or time frame of

21  that.

22     Q.   So it was after you received the first

23  subpoena for the documents?

24     A.   Yes.  I believe so.

25     Q.   And do you recall what the delete was set

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 16

1   at, because I know it can be set at 30 days, 60 days, a

2   year?

3      A.   I -- I believe it was set at a year's time.

4      Q.   In going through your messages looking for

5   documents responsive to the subpoena, did you happen to

6   notice if there were any responsive communications

7   existing on your phone that were older than a year as

8   of the date you were looking up?

9      A.   I didn't -- I didn't really notice any of

10  that.  I guess I wasn't specifically looking at that.

11  I was just looking to whatever come up on -- when I did

12  those searches.

13     Q.   All right.  Is there any other devices or

14  accounts that you looked at to try to find information

15  responsive to the subpoena served on you?

16     A.   Don't believe so.  I just did whatever

17  searches I could through my phone, e-mails.  I think

18  there was a -- a WhatsApp.  I think I looked through

19  that for any communications of anything.

20     Q.   And do you have a -- a -- a WhatsApp account

21  number, other than your phone number?

22     A.   No.  Just phone number.

23     Q.   All right.  Do you have any social media

24  accounts, Facebook, Instagram, whatever other social

25  media sites there are?

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

1        A.    I have a Facebook account.

2        Q.    Okay.  All right.  And I ask that as -- as

3    today, have you previously ever had any other social

4    media accounts besides Facebook?

5        A.    Think I might have had back from I was in

6    high school or something, that -- what do they call it,

7    MySpace or something before? [inaudible 00:17:20] ever

8    went down, I don't know I ever did anything with any of

9    that, but I think that was one of the very first, like,

10   social media platforms that was coming out.  And I

11   don't -- think I had that, but I couldn't tell you

12   when, or what, or how that was.

13       Q.    Okay.  All right.  Well, I'm going to assume

14   that those are all long ago.

15       A.    Yeah, that's probably 20 some years ago, I

16   would imagine, or more.

17       Q.    The -- the Facebook, what is your Facebook

18   handle or log-in or whatever they call that?

19       A.    Just my name.

20       Q.    Dustin McNeill or Dusty McNeill?

21       A.    No.  Dustin McNeill.

22       Q.    All right.  And do you use Facebook to send

23   any instant, or private, or direct messages to anyone?

24       A.    I don't believe so.  I think I might have

25   bought some stuff off of there, like Marketplace, and,

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

```
 1   like, messaged the people there to buy some things, if
 2   you do that.  I mean, I'm not really savvy on social
 3   media.  I don't do much with it, other than scroll and
 4   look -- look at stuff, so --
 5       Q.   Sure.  Take that down.  All right.  Did you
 6   look through your -- your Facebook account messages to
 7   see if there were any documents responsive to any of
 8   the subpoenas that were served on you?
 9       A.   Yes.
10       Q.   Okay.  And do you recall if you found any
11   messages in Facebook that were responsive to any of the
12   requests in the subpoenas?
13       A.   I don't recall off the top of my head.
14       Q.   And sir, do you have your phone with you
15   today?
16       A.   It's sitting on a counter over there, turned
17   off.
18       Q.   All right, sir, are you currently employed?
19       A.   No.
20       Q.   When was the last time you were -- you were
21   employed?
22       A.   Last time I was employed, I was employed at
23   Head Kandy, and I was terminated, I believe, the end of
24   July of -- or not July, January of -- was that '23?
25       Q.   And -- and what have you done for a living
```

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 19

1   since you were terminated from Head Kandy?

2        A.   Right now, I more likely take care of my

3   children and the household stuff.  And I've tried to

4   take over and continue doing some of the mechanical and

5   automotive stuff that I was doing before, just part-

6   time whenever I can fill it in, or if somebody calls

7   and asks for something that needs to be done.

8        Q.   Okay.  And the defendant and counter-

9   plaintiff in this lawsuit, Miss -- Ms. Kayla McNeill,

10  she's your wife, correct?

11       A.   That is correct.

12       Q.   And you guys live together full-time?

13       A.   Yes.  We do.

14       Q.   At that address you -- you gave me before

15  where you're at today?

16       A.   Yes.

17       Q.   And do you own any other homes that you live

18  in?

19       A.   I don't know that I own any other homes.  I

20  think she does, but I don't own any other homes.  The

21  only other home that I owned I sold in North Carolina.

22       Q.   Okay.  And the -- the other homes that --

23  that Ms. McNeill owns, are those other, like, vacation

24  homes for you, or are those rental properties?

25       A.   No.  It's a rental property.  It was our

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 20

```
1    primary house, and then we moved out of it when I built
2    the - our other house here that we're living in now.
3         Q.   Okay.  All right.  And took Mister -- Miss -
4    - Ms. McNeill's deposition last week, and you were --
5    were present in the room for that deposition; is that
6    right?
7         A.   That is correct.
8         Q.   Now, Ms. McNeill described, told us about a
9    -- a -- a company that she owns and operates now called
10   WhipiCo, or White -- White Pineapple.  Are you familiar
11   with that?
12        A.   Yes.
13        Q.   And have you done anything to assist Ms.
14   McNeill in -- in starting, or setting up, or running
15   that WhipiCo company?
16        A.   I help my wife out whenever she needs help,
17   when she asks me for help.
18        Q.   Sure.  There's a -- a new -- I understand
19   there's a new storefront in Salida for WhipiCo, is that
20   right, that your wife owns?
21        A.   That is correct.
22        Q.   Okay.  And did you do anything to assist in
23   -- in setting up that storefront?
24        A.   If she asked me for help, to go help her
25   with something, I went and helped her with something.
```

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 21

1        Q.    What kind of things did you help with?

2        A.    Off the top of my head, I can't really

3   recall.  I might have hung some wallpaper up because it

4   was super high for her to get up to on top of a ladder.

5   But other than that, I can't really recall doing too

6   much.

7        Q.    All right.  There is a -- are -- are you

8   familiar with a -- a machine used by, or that has been

9   used by, WhipiCo that -- that's been, I guess,

10  affectionately called Wanda?

11       A.    Yes.

12       Q.    All right.  What is -- what is Wanda?

13       A.    It's a bottle-filling machine.

14       Q.    And did you build Wanda?

15       A.    No, I did not build Wanda.

16       Q.    Did you assist in -- in procuring, or

17  modifying, or setting up in any way the -- the Wanda

18  bottle-filling machine?

19       A.    Yes.  I helped her.

20       Q.    Well, what'd you do?

21       A.    I just helped her get that machine up and

22  running for her.

23       Q.    Do you know where that machine came from?

24       A.    I believe that machine come from China.

25       Q.    Did it require any, to your knowledge, any -

**HEAD KANDY LLC vs KAYLA MCNEILL**
Dustin McNeill on 07/16/2024

Page 22

1   - any modifications, or -- or changes in the parts in

2   order to -- to function as it needed to function for

3   WhipiCo?

4        A.   [inaudible 00:24:32] I believe done

5   differently, maybe a couple of pieces changed here or

6   there.

7        Q.   And did you assist with that?

8        A.   Yes.  I helped my wife out with that.

9        Q.   Have you assisted in -- with WhipiCo with

10  ordering or sourcing any products?

11       A.   I don't believe I have.

12       Q.   Have you assisted with WhipiCo in packaging,

13  or in any way, in any of the sales of any products?

14       A.   Can you define, like, packaging for me,

15  please?

16       Q.   Physically taking the products, putting them

17  into -- to boxes to be shipped out to customers?

18       A.   If she asked me to help her the time or two,

19  I'm sure I probably helped her.  If she was behind or

20  she needed, you know, a little help, I'm sure I did.

21       Q.   All right.  All right.  Want to go back to

22  your -- your time at -- at -- at Head Kandy.  So just

23  to get some -- some timeframes.  It's my understanding

24  that Head Kandy, LLC, was formed and acquired the

25  business of Head Kandy in -- in May of -- of 2018.

Page 23

1  Does that sound right to you?

2      A.   I believe so.

3           MR. CONVERSE:  Objection.  Form.

4  BY MR. THOMPSON:

5      Q.   All right.  And prior to May of 2018, did

6  Ms. McNeill own the -- the -- the business that

7  operated as -- as Head Kandy?

8      A.   Yes.  I believe so.

9      Q.   And -- and is it your understanding Ms.

10  McNeill started that -- that company?

11     A.   Yes.

12     Q.   Okay.  And then explain to me what you

13  understand how -- how -- you know, what -- what that

14  transaction was.  And I'm not looking for lawyerly

15  details, just your understanding of what the

16  transaction was in May of -- of 2018.

17     A.   When she sold the assets of Lashed Out to

18  the Fallic brothers and Brian Feldman?

19     Q.   Yeah.  Just tell me how you understand what

20  happened in May of 2018 that -- that resulted in this

21  Head Kandy, LLC, owning the -- the Head Kandy business?

22     A.   Well, that she sold the assets of Lashed Out

23  that was doing business as Head Kandy to the Fallic

24  brothers and Brian Feldman.  I mean, I don't know a

25  whole lot of the details to any of that.  I didn't -- I

Page 24

```
 1   wasn't a kind of a part of most of that, you know.
 2        Q.   Okay.  And is it your understanding that at
 3   that time, Ms. McNeill became a -- a -- owned a
 4   percentage of the -- the new company, Head Kandy, LLC?
 5        A.   Yes.
 6        Q.   Do you know what percentage?
 7        A.   I believe it was 20 percent.
 8        Q.   And after the transaction in May of 2018,
 9   did you then start working former -- formally as an
10   employee of Head Kandy?
11        A.   No.
12        Q.   Okay.  Did you ever come to work formally as
13   an employee of -- of Head Kandy?
14        A.   I come to work formally for Head Kandy,
15   like, a year and a half later when they needed my help.
16        Q.   Okay.  All right.  Prior to the -- the --
17   the Fallic brothers and Mr. Feldman purchasing the
18   business, Head Kandy, or the assets of Head Kandy, or I
19   guess it's the assets of Lashed Out, right?
20        A.   I believe so.  Yes.
21        Q.   Okay.  Did you -- were you ever an employee
22   of Lashed Out, LLC?
23        A.   No.
24        Q.   Did you ever provide assistance to the --
25   the business of -- of Lashed Out, LLC?
```

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

1     A.   Yeah.  I helped my wife out if she needed

2   help with anything.  I had another full-time job, so I

3   was doing or helping whatever I could with her nights

4   or evenings, if she needed help.

5     **Q.   All right.  So when you first became a**

6   **formal employee of Head Kandy, LLC, what was your**

7   **position?**

8     A.   I never really had a position, and I never

9   was hired on to Head Kandy, LLC, full-time.  It was a -

10   - a part-time employment deal for me, because I was

11   still running my automotive shops at that point in

12   time, when I come to be an employee, or a part-time

13   employee of theirs.  And I -- I didn't really have a

14   title.  I just carried a lot of other job roles to help

15   them out.

16          I was -- and the reason I was helping them

17   out previous to becoming an employee nights, weekends,

18   whatever spare time I had to help her with what she

19   needed -- and I was losing a lot of time, and effort,

20   and money at my job that are my automotive shop that I

21   was running.  So within a -- about a year and a half

22   into it, I come to them and I tell them if they want me

23   to continue to help them with what I was doing just

24   part-time, while it was starting to take up so much of

25   my time, that they needed to pay me to continue going

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 26

1  forward, or I was going to have to just continue on

2  with my automotive shop to keep it going, because I was

3  just losing so much money [inaudible 00:30:54].

4        So when I come on there to help them, I just

5  continued doing the same stuff that was doing before,

6  which was, oh, I would help them package products.  I

7  was a shipper.  I was a -- a truck unloader.  I helped

8  with their quality control on their products.

9        I -- I was the one that implemented setup

10  and helped them with all of their warehousing, how

11  their warehouse flowed, how the people in there

12  packaged the products, how the products went in

13  bottles, if they had problems when stuff was shipped

14  out.  If it was leaking, I was the person that figured

15  out how to make them package the product differently so

16  it wouldn't leak as it went there.

17        If they had issues with their products --

18  let's just say they have, like, hair [inaudible

19  00:31:46], if we had more than three or four of them

20  that come back with the same issues, I was the one that

21  went through that product to figure out what was wrong

22  with that product, so we could get -- they could get

23  back to the manufacture of it and tell them if it was

24  an internal problem, electronic problem, something to

25  that nature.

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 27

```
 1              When we were in Colorado, I was a runner

 2   back and forth between three warehouses that we had to

 3   move product to the warehouse where they actually

 4   packaged it and shipped it out of.  I was the trash and

 5   cardboard runner to take stuff to the freaking dump

 6   when we needed to run stuff to the dump.  I'm sure

 7   there's stuff I'm forgetting in there that I took care

 8   of to help them continue on with everything.

 9        Q.   Okay.  Now, was the -- the roles that --

10   that you just described, it's just kind of a -- it

11   sounds like a -- a -- a jack of all, for the -- the --

12   the company?

13        A.   Yes.

14        Q.   Was that -- did -- did you have that same

15   role from the time you first started former -- formally

16   working for Head Kandy about a year and a half after

17   the -- the -- the purchase transaction to the time that

18   you were terminated in -- in July of 2023?

19        A.   Yes.

20        Q.   Now, you said that when you started to

21   formally work for Head Kandy, you went and talked to

22   them and they agreed to have you come on in a -- in a

23   paid position.  Who is the "they" and "them" that you

24   are referring --

25        A.   All right.  It would have been Brian
```

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 28

```
 1   Feldman.  And I'm sure me and my wife had discussions

 2   about it, that I wasn't going to be able to continue

 3   on.  And then that's when I talked to Brian Feldman

 4   about needing to be compensated for what I was helping

 5   them out with.

 6        Q.   Okay.  And did you speak directly with Brian

 7   Feldman, or was it -- did you -- or did Ms. McNeill

 8   speak with them and tell you --

 9        A.   I think --

10        Q.   I'm sorry.

11        A.   I think she initiated it and then I spoke

12   with Mr. Feldman.  I don't remember phone call-wise or

13   what, but I know that me and him were the ones that

14   discussed what I was doing, and to continue on with

15   what I was doing, so it's --

16        Q.   And did -- at that time, did you or Ms.

17   McNeill suggest a -- a -- a salary or any type of

18   hourly wage?

19        A.   I don't remember, honestly, at that.  I

20   don't remember how we come up to what we were doing.  I

21   just -- I know that what they had paid me to start with

22   is what I had -- had kind of felt or calculated out

23   that I was losing from my other business.  So I don't

24   know how we actually, honestly, come to that, but I

25   think it was somewhere based on that.
```

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 29

1      Q.   Okay.  Do you recall what that amount was,

2   either -- either salary-wise or on a per-hour basis?

3      A.   I think it was just a salary and I believe

4   it was, like, $75,000 a year or something like that.

5      Q.   Okay.  Did that every change, the -- the --

6   the salary that you originally agreed to?

7      A.   No.  That had never changed over the time

8   period that I was employed there.

9      Q.   All right.  You -- you mentioned that you

10   had a -- you used to, and have sold a -- a house in

11   North Carolina.  When did you first purchase the house

12   in North Carolina?

13         MR. CONVERSE:  Objection.  Form.

14         THE WITNESS:  I believe -- I don't -- I

15   don't recall dates right offhand, but that was sometime

16   beginning part of '21, I believe, some -- maybe May,

17   June, somewhere in there of '21.  Whenever we shifted

18   the warehouse from Colorado that direction.

19   BY MR. THOMPSON:

20      Q.   And is that a house that you owned jointly

21   with Ms. McNeill?

22      A.   No.

23         MR. CONVERSE:  Objection.  Form.

24         THE WITNESS:  No.  I bought that house.

25   BY MR. THOMPSON:

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 30

1     Q.    Okay.

2     A.    I don't know the paperwork goes or whatever,

3  but I was the one that initiated all that, and filled

4  out the paperwork.  And they only wanted my income and

5  stuff for the house.  So I believe that was just all

6  myself.

7     **Q.    Okay.  And I believe you kind of mentioned**

8  **it, but tell me, just so the record's clear, why is it**

9  **you bought a house in North Carolina?**

10    A.    I bought a house in North Carolina so I was

11 closer to that warehouse, that type of stuff, if needed

12 anything like that.  It was just more -- more or less

13 to benefit Head Kandy is why I ended up with a house

14 out there, so we could help that business grow without

15 having to move it across the country, so --

16    **Q.    And -- and that was -- you're speaking of**

17 **the warehouse because Head Kandy as a business moved**

18 **its warehouse operation from Colorado to North**

19 **Carolina; is that right?**

20    A.    Yes.  That's correct.

21    **Q.    All right.  And did Ms. McNeill live in the**

22 **North Carolina house with you?**

23    A.    When I was there, that -- yeah, she was

24 there, and then back and forth to Colorado, where --

25 wherever, so --

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 31

1        Q.   So you -- you maintained your house in

2   Colorado, while also having the house in North

3   Carolina; is that right?

4        A.   Yes.   That's correct.

5        Q.   And how -- just trying to get a sense of how

6   the -- the -- the split went.  Were you in North

7   Carolina for, you know, particular months, and then

8   would go back to -- to Colorado?  Or -- or tell me how

9   that split is.

10        A.   I just don't know exactly how much time we

11   spent at one area, or this or that, but don't know the

12   exact time frame of what we were here and what we were

13   there, so --

14        Q.   Okay.  Were there times that Ms. McNeill was

15   in North Carolina, staying at the North Carolina house,

16   while you were back in Colorado?

17        A.   I believe there was a week or so at that

18   point.  I don't think it was much time.  I think she

19   spent more time probably back in Colorado doing stuff

20   than I did.  I was out in North Carolina more than I

21   think she was.  But I don't honestly remember how much

22   time frame is.  I don't know a lot of that.

23        Q.   Okay.  All right.  So -- so -- so generally,

24   when -- when Ms. McNeill was in Colorado, with the

25   exception of maybe a week or a few days, you were --

Page 32

```
 1   sorry, strike that.
 2           When you were in North Carolina -- hang on,
 3   let me get this right.  Strike that.  Okay.
 4           When Ms. McNeill was in North Carolina, with
 5   the exception of maybe a few days, you would also be in
 6   North Carolina at that house as -- as well; is that
 7   right?
 8       A.  Yeah.
 9       Q.  Okay.  Think I got the picture now.
10       A.  Okay.
11       Q.  And -- and is that because, for -- for Head
12   Kandy, your role required, you know, physical, hands-on
13   presence at the -- at the warehouse in North Carolina?
14       A.  Some, yes.  Some, no.  You know, I mean,
15   there was a lot of things that I didn't need to be
16   there for.  There was -- once I had people figured out
17   on what was going on, then I didn't have to necessarily
18   be there on a timely basis for it.  But when we did
19   move to North Carolina, I ended up spending a lot more
20   time than my part-time work at that warehouse and areas
21   doing stuff for them.  So I mean, I'd -- I had took on
22   more stuff for them.
23       Q.  Sure.  And can you tell me was -- is there a
24   -- a -- a general reason, or why -- why it is that --
25   that -- that you would be in North Carolina while Ms.
```

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 33

1    McNeill was back at the house in -- in Colorado?

2         A.   I don't know any specific, honestly, reason

3    at all that she would've been back here that I was

4    there, other than our house in Colorado was a lot

5    nicer, bigger, and we built it ourselves than the one

6    that we had to purchase in North Carolina.

7         Q.   Okay.  And I understand you have children

8    with Ms. McNeill.

9         A.   Yes.  I did.

10        Q.   How many?

11        A.   I have two biological and one adopted.

12        Q.   Okay.  And the kids, your children, at the -

13   - the time that you were working for Head Kandy, were

14   they still in school?

15        A.   They were homeschooled.  After COVID, once

16   COVID kicked everybody out of school and all that, we

17   started to homeschool the kids, or she did.  And so we

18   just -- they were homeschooled, basically, from when

19   COVID kicked everybody out of school from then on.

20        Q.   All right.  So the - the children traveled

21   with you then no matter what time of the year from

22   Colorado to North Carolina and -- and back; is that

23   fair?

24        A.   Yes.  They had to.  They had a -- not a very

25   stable life or stable area to be in, you know, when

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 34

1   school at that point.  So homeschooling worked best for
2   them.
3       Q.   Okay.  And during the times that -- that you
4   and Ms. McNeill would be in separate cities, one in
5   Colorado, one in North Carolina, did you communicate
6   with each other via phone?
7       A.   She's my wife, so I'm sure I had phone
8   conversations with her.
9       Q.   Sure.  And -- and did you also use text or
10  any other instant messaging to communicate?
11      A.   I'm sure there's text messages.  Yes.
12      Q.   And -- and besides just, you know, being in
13  different cities, did you also communicate with Ms.
14  McNeill when you were in the same city via -- via text
15  and -- and -- or other instant messaging?
16      A.   Oh, I'm sure.  Yes.
17      Q.   And did you, you know, working together, did
18  you discuss via text or instant messaging issues and
19  things about -- about work, about Head Kandy?
20      A.   I don't recall, but I'm -- I would imagine.
21  I don't know, 100 percent.
22      Q.   Back when the assets of Lashed Out were sold
23  to the Head Kandy, LLC, entity, did you take part in
24  any of the -- the decision to sell the Lashed Out
25  assets to Head Kandy, LLC?

**HEAD KANDY LLC vs KAYLA MCNEILL**
Dustin McNeill on 07/16/2024

Page 35

```
 1        A.    I'm sure we had discussed some of that at
 2   that point.  I think most of our decision on that was
 3   to try to get out or just get away from the litigation
 4   that we were already in with Hard Kandy on that point
 5   of everything.  I think that was probably one of our --
 6   our biggest deciding factors.  But I'm sure we probably
 7   discussed some of it.
 8        Q.    Okay.  Explain that to me.  What -- what is
 9   it about the -- the -- the -- the deciding factor of
10   getting out of litigation?  What -- how did that
11   motivate the decision to sell?
12             MR. CONVERSE:  Objection.  Form.
13             THE WITNESS:  There were in -- my wife, or
14   the Head Kandy d/b/a from Lashed Out was in a
15   litigation, I believe.  I don't know all the details to
16   it.  I don't get into much of the law stuff.  With Hard
17   Kandy over a trademark name, I think Hard Kandy thought
18   that Head Kandy was too close to their name.  So there
19   was a litigation back and forth on that.
20             And then the -- I don't know how far along
21   proceedings of that were or what.  But after they got
22   our financial -- got her financial statements from the
23   business, it wasn't too long after that that I believe
24   she got an e-mail or something from, I believe it was
25   Jerome, wanting to contact her to talk to her about,
```

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 36

1  you know, solving this and maybe just -- I don't know.

2  I don't know exactly whether it's a purchasing of the

3  business or just coming to talk to see if there was a

4  way we could solve this.

5  BY MR. THOMPSON:

6      Q.   Okay.  Solve -- solve the issues in the

7  litigation?

8      A.   Yes.

9      Q.   Okay.  All right.  And after the transaction

10 of the -- of the sale, what did you understand the --

11 the role of the new owners, the new partners, whatever

12 you called them at time, would -- would be in the

13 business?

14     A.   Now, like, I believe they told her they were

15 going to help her out and help her make the business

16 bigger.  They were going to grow what they thought that

17 there was a ton of potential with her and how to make

18 the business grow bigger, and that they have the

19 resources and the people and the places to -- to do

20 that.

21     Q.   Okay.  And you just said that they told her

22 that.  Did you -- did you learn that from Ms. McNeill,

23 she told what they said?  Or were you a part of any

24 conversations where that was discussed?

25     A.   I was -- I don't remember all the

**HEAD KANDY LLC vs KAYLA MCNEILL**
Dustin McNeill on 07/16/2024

Page 37

1   conversations or what I had sat in on with her when

2   they come.  I know I sat in on the first initial

3   meeting, when they flew their private jet to our small

4   town here in Salida, over the discussion of it when

5   they brought -- Jerome brought another guy in with him

6   that I believe was doing Hard Kandy's makeup for them.

7   And they -- they brought a box of makeup and different

8   things.  Just trying to jog my memory on most of that.

9            And that's when they first come in and were

10  talking to her about wanting to -- I think they were,

11  you know, wanting to merge the two of them.  And then I

12  -- I don't know if that was decided right then if they

13  were going to merge them or if they were going to just

14  buy Head Kandy and run it -- and then run it

15  separately.  But they, you know, they just showed her

16  that they had all makeup and all this stuff, and the

17  resources, that they could make that go bigger.  They

18  told us that they had made -- that Hard Kandy was

19  doing, like, $60 million a year or something in -- in

20  Walmart, and that there was a -- that we should be able

21  to get this business to doing that, or we could merge

22  the two of them, and tie on and kind of do the same

23  factor with it, so --

24       Q.   And do you recall who it was, the name of

25  the person, that you said Jerome brought with him for

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 38

1  that -- that meeting, the one that you said you thought

2  was doing makeup?

3      A.   Yeah.  I -- I know it's -- his first name is

4  Stu.  I don't -- I'm not 100 percent sure on, like, his

5  -- his last name.

6      Q.   Okay.

7      A.   I'm terrible with remembering names on some

8  of that stuff, so --

9           MR. CONVERSE:  Colin, while you're writing,

10  I just wanted to let you know that those supplemental

11  documents should be in your inbox now.

12           MR. THOMPSON:  Okay.  You know if those were

13  also sent to Carson?  I'm not seeing them yet.

14           MR. CONVERSE:  Yes.  They're -- they were

15  sent in a service e-mail.  I just sent it, just to make

16  sure you'd have it.

17  BY MR. THOMPSON:

18      Q.   All right.  After the purchase transaction

19  in -- in May of -- of 2018, did you notice whether Ms.

20  McNeill's role in the Head Kandy company changed?

21      A.   Not that I noticed.  She was still pushing

22  doing her live videos, doing just all the same normal

23  stuff that she was doing before to push and promote the

24  business.

25      Q.   So prior to the -- the May transaction, was

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 39

1   Ms. McNeill the -- maybe not by -- by formal title, the
2   CEO, but the -- the -- the top person at the Head Kandy
3   business?
4       A.   Well, she was -- I believe that she was the
5   only one that was really there, I think, that was doing
6   the live videos and that type of, you know, stuff with
7   it.
8       Q.   Sure.  And I -- and right now -- I'm sorry.
9   I want to make sure I'm clear.  I'm talking about
10  before the May 2018 transaction.  So at -- at that
11  time, before the transaction, Ms. McNeill was the --
12  the -- the -- the head of the company, would you say?
13      A.   Yeah.
14      Q.   Okay.  So there -- there was -- there was no
15  owner of the company, as far as you know, prior to May
16  of 2018; is that right?
17      A.   Yeah.  If there was any owners, not that I
18  knew, no.
19      Q.   So all of the hiring, firing, company
20  direction decisions, were those all made by Ms. McNeill
21  prior to the -- the May 2018 transaction?
22      A.   Not necessarily.  No, because Ryan Thompson
23  was there at that point also when they purchased the --
24  the business.  And he was -- he was the one that was
25  kind of managing, like, a few people and, like, I think

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 40

1    their -- I don't know how the whole thing was

2    truthfully structured.  I wasn't there for a lot of it.

3    But I know Ryan was there, that took care of most all

4    that stuff for her at that point.  She was still

5    working in her salon when they purchased the business,

6    and running that.  And Ryan was doing the Head Kandy,

7    Lashed Out side of things.

8         Q.   And did Ryan report to Ms. McNeill?

9         A.   Ryan -- yeah, I'm sure, because she -- she

10   owned the thing.  So I'm sure that he probably did.  I

11   -- I don't know communications of what that was.  I was

12   -- I ran my own stuff at that point.  So I wasn't -- I

13   wasn't in any part of that type of discussions or

14   anything like that with any of them.  I was busy

15   running my diesel shop or automotive shop at that point

16   in time.

17        Q.   Okay.  Now, after the May 2018 transaction,

18   as far as Ms. McNeill's day-to-day activities for the

19   Head Candy business, as -- as you observed, did those

20   change in any way?

21        A.   Yeah.  She had to report to Brian Feldman

22   every day.  She was on the phone with him, God, I don't

23   know how much.  There was times I was asking her, who

24   you on the phone with, because I didn't know if she was

25   on the phone with somebody else or what.  But she was

**HEAD KANDY LLC vs KAYLA MCNEILL**
Dustin McNeill on 07/16/2024

Page 41

1   always on the phone with him.  It didn't matter what

2   time of day or night it seemed like it was, so --

3        **Q.   Okay.  And did Ms. McNeill discuss with you**

4   **any issues with the -- the new owners of the company**

5   **with regard to strategic direction or -- or ideas for**

6   **how to do or where to do lives, or what type of**

7   **products the company was going to have, how many**

8   **products, and any such discussions?**

9             MR. CONVERSE:  So let me just jump in,

10  Colin.  We've -- we've asserted a -- a spousal

11  privilege.  So I just want to make sure that we're not

12  intruding upon that or making it seem as though we --

13  we have waived that in any manner.  So you can -- you

14  can answer with regards to -- I -- I don't want you to

15  answer with regard to anything Ms. McNeill spoke to you

16  about in her capacity as -- as spouses.  But if she

17  spoke to you about the business since you were helping

18  with it, or -- or anything like that, then -- then you

19  can provide those answers.

20             THE WITNESS:  Okay.

21  BY MR. THOMPSON:

22       **Q.   All right.  And for time frame here, I'm**

23  **talking about right after the transaction, well before**

24  **any of this current litigation time, after the**

25  **transition from Lashed Out, after the assets were sold.**

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 42

1    Now Ms. McNeill's -- has these -- it's -- is a 20

2    percent owner, with the other 20 percent owners, or

3    other owners of the business, that you -- did she

4    discuss with you any aspects of the business with

5    regard to strategic direction, different products, how

6    the company would -- would -- would change and evolve?

7         A.   Not that I recall with any of that.  I was

8    so busy running my own businesses at that point in time

9    that I don't -- we didn't discuss much.  I mean, I

10   think she discussed most of that with Brian Feldman at

11   that point, because I was a contact.  I wasn't -- the

12   only part at that point that I helped out is if they

13   needed help with moving something, doing something.

14   They were behind on packaging.  I'd go in after I was

15   done doing what I was doing.  Or if it was something

16   during the day, I would stop running my diesel shop to

17   moving some packages or whatever I needed to do at that

18   point.  But I, you know, wasn't in any direction a part

19   of the business or anything at that point.  No, I'm --

20   not that I can recall.

21        Q.   Okay.  When the business was operated by --

22   by Lashed Out, so prior to the sale, and operated out

23   of Colorado, was there any equipment that was used by

24   the business in -- in -- in Colorado, either packaging,

25   equipment, or any warehouse type of equipment, to -- to

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 43

1   move boxes, or to pack boxes, anything like that?

2       A.   No.  I don't believe so.

3       Q.   Okay.  Once the -- after the -- the May 2018

4   transaction and then -- do you recall when it was, just

5   so we can get a time period, that the warehouse

6   operations were moved to North Carolina?

7       A.   Some -- that was somewhere around -- that

8   could have been about the time I bought that house.  So

9   it had to have been May, June, April.  But I don't

10  know.  First -- first part of 2021 is when that went

11  that direction.

12      Q.   Okay.  And did you provide any assistance to

13  help move the warehouse operation from Colorado to

14  North Carolina?

15      A.   Yes.

16      Q.   Okay.  What did you do?

17      A.   Well, we had -- we had to package up a whole

18  warehouse and get it shipped across the country.  So we

19  had to load trucks and move products.  And it was a --

20  it was an undertaking to get stuff from one place to

21  the other, because we -- we did it in a few stages.  We

22  sent some stuff to North Carolina.  And we were out

23  there getting some stuff set up as far as, like, some

24  shipping lines and some stuff like that, so we had some

25  product out there.

**HEAD KANDY LLC vs KAYLA MCNEILL**
Dustin McNeill on 07/16/2024

Page 44

```
 1              We still had product back here in Colorado.
 2    We had people working here.  There was some people
 3    working out there.  And we switched the -- the system
 4    off, basically, on a -- a Friday.  And then we picked
 5    it back up, I believe, on a -- the following Monday for
 6    stuff to be -- start to be shipped out of North
 7    Carolina.  Not everything was all in one place, from
 8    one thing to another.
 9              I mean, it was a logistics kind of nightmare
10    to figure out how to get everything back and forth to
11    do that, so you did not miss any down days of people
12    not receiving, you know, their products or their
13    shipments.  And we were only -- because we're able to
14    switch that up over a weekend, where we weren't
15    shipping product anyway.  So there was -- I can't tell
16    exactly what I was doing at one point in time.  But
17    there was just a lot of moving pieces at that point.
18              I believe I was -- I think there was times
19    that I was North Carolina helping them get shipping
20    lines and stuff set up to try to get some part of that
21    moving.  Then I was back here to get stuff going to get
22    it back on trucks or pallets to get back that
23    direction.  There was just a lot going on at that point
24    in time for stuff to continue to flow, so the business
25    didn't feel any type of impact or anything from a move
```

Page 45

```
1   of, I don't know what it was, like, 1600, 1700 miles
2   across the country, you know?
3       Q.   Okay.  And -- and so you mentioned, you
4   know, you're packing up and all this product.  So is --
5   is all that was moved, and not to say that it's not a
6   lot of stuff, but is -- is what was moved from Colorado
7   to North Carolina just the actual products?
8       A.   No.  There was -- there was products, there
9   was shelving, there was -- I mean, the whole front
10  office went, so there was computers that went that
11  direction.  There was -- I mean, just the whole
12  operations went that way.  I don't know how many trucks
13  we had move that, 30-some trucks or 40 trucks.  I don't
14  remember what there actually was from the three
15  different warehouses, four different -- three, four
16  different warehouses we had here, that did everything
17  that direction.
18      Q.   Okay.  So shelving, computers, the products.
19  Was -- was there any other, you know, equipment?  I
20  mean, you know, I'm picturing assembly lines with those
21  rollers on them to -- to move things down, or any
22  machines that folded boxes?
23      A.   Never had any type of box folding machines,
24  anything like that.  There was -- oh, there was
25  conveyor belts, because that's how I had them set up.
```

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 46

1   I didn't really own, like, a conveyor belt.  It was a

2   conveyor roller system.  That's how I had them set up,

3   that their product went from point A, basically, around

4   to point B.  And they picked the product along the way

5   as it was going.

6          And it went down to the quality control

7   checkers where they quality control checked the product

8   to make sure everything was in the box right.  And it

9   went from that station down to the next station, formed

10  a -- basically package it or protect it at that point,

11  put it in a freaking box, tape it up, label it, you

12  know, send it off.  So all of that type of stuff,

13  tables, rollers, that type of stuff, you know, all went

14  that direction.

15      Q.   Okay.  Was -- was there a -- a -- a forklift

16  at any of the warehouses in Colorado before the move?

17      A.   Yes.  I had a -- a forklift here that was

18  mine personally for my automotive shop.  Yes.

19      Q.   Okay.  And did that forklift get moved to

20  North Carolina?

21      A.   No.  That forklift stayed here.

22      Q.   All right.  So after the -- the move of the

23  warehouse operations to North Carolina, did any of the

24  operations of Head Kandy, the business, remain in -- in

25  Colorado?

**HEAD KANDY LLC vs KAYLA MCNEILL**
**Dustin McNeill on 07/16/2024**

Page 47

```
 1       A.    I -- I believe there was a returns

 2  department or a product got returned here and was

 3  cleaned, or whatever, just figured out if the product

 4  had been used, not used, how it was done, the return

 5  paperwork was there.  And then that was -- that was the

 6  only thing that was left here at that point in time, I

 7  -- I believe.

 8       Q.    Okay.

 9       A.    And I think there was -- I know there was

10  some, like, remote workers that -- or a remote worker,

11  Ryan Thompson, that stayed back here and was working

12  here at that point.  So there was -- I think the

13  photography stuff was -- was still here at that moment

14  in time.  He had an office here at my house.

15            This room that I'm actually sitting in right

16  now was his photography studio that he had to take

17  pictures in.  I believe that was that type of stuff

18  that was left back here.  I don't think there was

19  anything else.  I don't know.  I don't remember much of

20  anything else besides, you know, possibly that.

21       Q.    Did -- did Head Kandy maintain any of the --

22  or keep any of the -- the -- the warehouses that it had

23  in Colorado after it moved the warehouse operations to

24  North Carolina?

25       A.    They still stored some stuff in my barn
```

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 48

1   because of the returns and stuff that were here that

2   got shipped out.  But other than that, I don't think

3   they kept any other major buildings here.  No.

4       Q.   All right.  The -- so the -- the return

5   operations remained in -- in Colorado after the

6   warehouse moved to North Carolina; is that right?

7       A.   Yes.

8       Q.   All right.  And -- and for -- did -- did

9   that remain through the -- the rest of your time at --

10  at Head Kandy?  Or did returns ever -- ever move

11  somewhere else?

12      A.   No.  Once we -- once we fully bought the --

13  the -- or once they bought that building out there, I

14  think several months after purchasing that, we started

15  transitioning the returns that just come right there,

16  so everything was housed in one house.  We didn't --

17  before that, we didn't really have a -- the best area

18  to do [inaudible 01:04:53] returns at the other place

19  that we were leasing or going through.  So then at that

20  point, it started to come this direction, or it went

21  North Carolina.

22      Q.   All right.  So the -- you mentioned there

23  was stuff that was stored in your -- your barn relating

24  to the return operations.  What is the -- the barn

25  you're -- you're talking about?

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 49

```
1       A.   I put up a -- when I built this house, I put
2   up an 8,000-square-foot pole barn.  So it's called --
3   it's called a -- we call it a barn.  It's a pole
4   building, concrete floor, insulated, 16 foot side
5   walls.
6       Q.   Okay.  And the -- the return operation that
7   remained in Colorado and -- and used part of the barn,
8   I'm trying to get an idea of -- of the -- of the -- the
9   size of this.  I mean, are you talking about, you know,
10  a -- a -- a -- the return boxes that would come in, how
11  did that return operation work?  You took in the boxes
12  that people sent back of certain product, and -- and
13  did what?
14      A.   I --
15           MR. CONVERSE:  Objection.  Form.
16           THE WITNESS:  I don't --
17  BY MR. THOMPSON:
18      Q.   Go ahead --
19      A.   I don't know how that whole process worked.
20  I wasn't -- I wasn't in any part of how the return
21  process worked.
22      Q.   Okay.  So then all you knew is -- is -- is -
23  - finding your scope of information on that is you knew
24  that there were boxes coming back of returned product,
25  and they would come back and -- and end up in your
```

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 50

```
1   barn; is that right?
2         A.   They would get -- I -- I believe, they would
3   get looked at to see what kind of condition they were
4   in, if they were still new or what.  And then they were
5   -- they would, yeah, end up stored in the barn until we
6   got them trucked or trammed back out to North Carolina
7   at that point.
8         Q.   An 8,000-square-foot barn, how much space in
9   the barn was then used for this -- for these returns?
10        A.   Probably -- trying to think.  Somewhere
11  around 3,000, because there was -- there was still
12  stuff that didn't get put on trucks from the initial
13  move to North Carolina that wasn't needed out there,
14  like, extremely right away, that got stored in there
15  from cleaning out the other warehouse and stuff like
16  that.  And that just eventually got taken over time to
17  North Carolina.
18        Q.   So did there -- there come a time then that
19  everything had been moved out of your -- your barn and
20  moved to North Carolina or somewhere else, that -- that
21  related to Head Kandy?
22        A.   No.  There's still stuff in my barn from
23  theirs.
24        Q.   What's still in the barn?
25        A.   There was still random boxes, paperwork.  I
```

Page 51

```
 1  don't know.  I didn't really go through it.  I mean, I
 2  haven't gone through it.  They don't want it back, I
 3  guess.
 4        Q.   And how much space does that -- what
 5  remains, take up in the barn?
 6        A.   About 100 square feet maybe.  I don't know.
 7  I haven't measured out what's there.  There was a bunch
 8  of appliances and stuff that were just left over in
 9  individual boxes or just thrown in boxes and stuff like
10  that.  Every time I get a chance if I need to,
11  whatever, just to try to clear out my space, I throw it
12  in a trash trailer.  And I haul it off to the trash.
13  So --
14        Q.   Okay.  So the -- the return operation where
15  boxes were -- or where the warehouse was being used for
16  the storing and looking at these returns, did I hear
17  you correctly that that continued for -- for a few
18  months after the sale before it all transitioned to
19  North Carolina?
20        A.   After -- I think -- like, after what -- what
21  sale?
22        Q.   Sure.  After the -- the May 2018 -- oh,
23  wait, I'm sorry.  After the purchase of the warehouse
24  in North Carolina.
25        A.   Yeah.  It lasted out -- I believe -- I don't
```

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 52

1    know full-on time frames or time schedule a lot.  I

2    think the -- I don't know.  I think the warehouse --

3    I'm just trying to think here of when those returns

4    actually went that way.  It had to have been somewhere

5    around September, maybe October that we transitioned

6    the returns, I think, is what they did, and changed the

7    address so they went to that warehouse once we fully

8    got somebody there in place that could handle that type

9    of stuff, I -- I -- I believe.  I mean I -- can't hold

10   me to that 100 percent because I don't know half the

11   time.

12           But I know it's somewhere latter part of the

13   year because when we bought -- we bought that building

14   in May.  And it took us quite a while to get it all

15   fully kind of set up so flow of the -- the shipping --

16   the -- the shipping line that I had come up with for

17   them to -- to ship and how we were going to I mean,

18   fully get that done to where it made sense.  I mean,

19   we're more focused on making sure our product left the

20   -- the building in a timely manner versus what people

21   sent back as far as returns, you know?

22           I do know that they were on HSN a ton

23   because she was -- and they were selling stuff on HSN.

24   They'd sell 16,000 products -- 16 to 20,000 of a -- of

25   a tool or something that went on there.  And we would

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 53

1  get back 10 to 15 percent of that back to us from

2  either somebody not liking it, buyer's remorse, you

3  know, something like that.  And I just know we had a --

4  we ended up with surpluses of stuff that would come

5  back at -- at certain points, you know, to us.  And a

6  lot of that I don't believe -- I don't know what they

7  actually went through right away or could go through

8  right away because it wasn't -- I don't -- I just don't

9  know how the whole return process went.  But I just

10  know we ended up with a ton of that stuff back at

11  points.  And we had a lot of products in areas, you

12  know?

13      Q.   Okay.  The -- the -- the -- the -- the

14  forklift that you said you had used previously in your

15  -- your diesel business, who -- who owned that -- that

16  forklift?

17      A.   I do.  There was actually two of them here

18  in Colorado.  There was one of them that I ended up

19  stationing down at the warehouse in Salida.  And then

20  there was another one that was up at the 10,000-square-

21  foot warehouse in Buena Vista.  So there was -- there

22  was two of them that -- that were being used at that

23  point.

24      Q.   And were both of those forklifts used only

25  until the warehouse operations moved to North Carolina?

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 54

```
 1      A.   They were still being used -- the one in
 2  Salida was still being used after that, when we were
 3  still loading -- I'd still load pallets into trailers
 4  and stuff like that to get some of that returns and all
 5  that stuff back to, you know, North Carolina.
 6      Q.   And for those two forklifts that were in
 7  Colorado that were used for Head Kandy, did you
 8  personally own both of those?
 9      A.   Yes.
10      Q.   And did you have an agreement with -- with
11  Head Kandy to -- to pay you any rent or for use of
12  those forklifts?
13      A.   I don't -- I don't know of any agreement
14  between myself.  I didn't -- I didn't take care of any
15  of that stuff.
16      Q.   When did those forklifts stopped being used
17  for Head Kandy purposes?
18      A.   I honestly don't remember.  I still use the
19  one here to this day to move those pallets around my
20  barn of their stuff.  So that's -- that's still being
21  used as -- for their stuff, you know?  I don't know
22  what we need to do with that.  But as far as those --
23  the thing was is they didn't just own or use forklifts
24  of mine.  I had -- they had two trucks that we used to
25  run back and forth between all the warehouses with a
```

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 55

1    couple of -- of trailers.

2              There was a trash trailer that I had that

3    they used.  There was a -- a 26-foot box truck that

4    moved pallets from a warehouse in Buena Vista to -- to

5    Salida.  Just to give you some context, that warehouse

6    is 10,000 square feet.  And it's about 35 minutes, you

7    know, away.  And we were having to tram stuff back

8    there, you know, when it was here in Colorado, just a

9    couple of times a day usually, you know, usually

10   morning, night.  And there were sometimes we'd have to

11   go during the day to replenish what they were shipping

12   out at the shipping facility there in Salida.  So there

13   was a lot of moving stuff back and forth that they had

14   to use, you know, to keep the business operations going

15   and moving.

16        **Q.   Okay.  And then did those operations stop**

17   **once the warehouse moved out to -- or stop in Colorado**

18   **once the warehouse moved out to North Carolina?**

19        A.   They were tramming the product back and

20   forth between places.  Yes, that move, you know,

21   stopped.

22        **Q.   Was there a -- a -- a forklift ever used in**

23   **the North Carolina facility?**

24        A.   Yes.

25        **Q.   And -- and who owned the forklift in the**

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 56

 1    North Carolina facility?

 2        A.   Me and my wife did.

 3        Q.   How was that forklift acquired?

 4        A.   It was purchased off of -- I believe I

 5    purchased it off of, like, Craigslist or something out

 6    there.

 7        Q.   And -- and why did you and Ms. McNeill

 8    personally purchase a forklift in North Carolina?

 9        A.   Because Brian Feldman and the managing

10    member wouldn't give us any other resources for any of

11    that or purchase any equipment.  I don't know that they

12    honestly cared or thought of how stuff was getting

13    moved around or any of that.  I mean, we just handled

14    it, took care of it.  And that's how it went.  I think

15    she even told Feldman that we were buying and bought a

16    forklift to help Head Kandy out or to use there for now

17    until they could get -- I think -- I believe it was

18    just until they could get their feet on the ground back

19    out there because I'm -- I'm pretty sure it was a -- I

20    don't know costs.  I've never seen any -- we never seen

21    money, like.  But I'm sure just mentally doing it in my

22    head they were probably a fairly substantial cost just

23    to get stuff even, you know, moved to a -- a different

24    and better facility.

25             So when we purchased that forklift, like,

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 57

```
1   we'll let -- we'll use it until you guys decide to
2   purchase and buy, you know, something of Head Kandy's
3   own or Head Kandy's that they'll own themselves, you
4   know?
5       Q.   Okay.  And how much did you pay for the
6   forklift that was used in North Carolina?
7       A.   Either 6,000 or $6,500, something like that.
8       Q.   How old was the forklift?
9       A.   You know, I believe -- I don't believe I
10  ever looked at a year or anything like that on the
11  thing.  I just -- with having my background, my
12  experience of equipment, and that I've done it for 20-
13  something years, years and stuff like that usually
14  don't bother me too much on that as long as the
15  machinery is in decent working condition, does what it
16  needs to do.  I feel most of the time some of the older
17  stuff without all the emissions, all the stuff that
18  were -- happen to be put on all this stuff, they work a
19  little bit better.  They're easier to take care of.
20  Parts are cheaper if you got to replace stuff.  Stuff
21  just is a little easier.
22           So honestly, I don't know, truthfully, year
23  of anything on it.  It just performed its operation of
24  what it needed to do when I looked at.  And I mean,
25  brakes were fine.  Hydraulics were good.  The engine
```

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 58

1   was good.  Everything that I went through and diagnosed

2   and checked was all checked out.  So basically, kind of

3   my standard and my feeling of something that would be

4   usable or to use.

5       Q.   Okay.  Did you and Ms. McNeill come to an

6   agreement for Head Kandy to lease the forklift in North

7   Carolina from you personally?

8       A.   I don't know that we'd come to that

9   agreement.  I think she'd come to that agreement with

10  Brian Feldman.

11      Q.   So it -- it's your understanding that Ms.

12  McNeill had an agreement with Brian Feldman that Head

13  Kandy would lease the -- the forklift from you?

14      A.   Yes.

15      Q.   Do you know for -- for how much those lease

16  payments were?

17      A.   I do not.  No.  I just know if we did not

18  have some sort of forklift to load and unload trailers

19  and all that, we weren't going to make it.  That's a

20  lot of work to unload a 50-foot container with -- how

21  did you think to go in there and pick up your product

22  and move it out and -- they didn't really seem to

23  bother to care how it got done, I guess.  So we were

24  just trying to make the business run a little smoother

25  and a little faster.

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 59

1       Q.    Sure.   And so that -- that was -- your

2    purpose of buying the forklift was to make the business

3    run smoother and faster; is that right?

4       A.    Absolutely.

5       Q.    All right.   Did you intend to make a -- a

6    profit personally by buying the forklift and then

7    leasing it to Head Kandy?

8       A.    I don't know that I ever cared to make a

9    profit.   I was trying to help them out so we could make

10   stuff move faster.   And then, hopefully, they -- if

11   they had to pay us whatever it was to begin with, if

12   they would eventually buy their own so they had a -- an

13   asset to the company, where they could have their own

14   stuff, then it would be what it is.   But I just -- we

15   needed something there to help manage and move product.

16          I don't know of any other warehouse or any

17   other facility of that size that doesn't have something

18   of a forklift or something to move their, you know,

19   your product, your -- your -- I had more of a problem

20   of hurting people and all that of, of like workmans

21   comp and having to move these pallets and stuff by

22   hand, I -- I believe.   You know, that's how I feel

23   versus having a forklift or something that -- that does

24   it.   So we just needed something to help move the --

25   move our product around.

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 60

```
 1              And with them, they own -- I -- I believe --
 2   [inaudible 01:21:18], so they -- they used to show us
 3   all the big warehouses and stuff they had when I'm --
 4   I'm sure they know the operations inside of a warehouse
 5   that you need some sort of machinery to move that
 6   stuff.  So you know, I was hoping that if we bought
 7   something, pushed it forward with them a little bit,
 8   they would -- Brian or Jerome or somebody would come in
 9   and say, well, let's purchase this.  Let's get them a -
10   - a -- a forklift that we can have as an asset to the
11   company or something and we can continue, you know --
12       Q.   Sure.
13       A.   -- moving when we were done whatever with
14   the other one.  But --
15       Q.   Before you purchased the -- the forklift for
16   the North Carolina warehouse, did you look at how much
17   it would cost to lease or rent a -- a forklift to use
18   in the North Carolina warehouse?
19       A.   I -- I did, at that point.  I had rented one
20   previous, before we had had this.  And it was somewhere
21   -- I believe they were charging us $1,400 a week or
22   something like that to have the forklift there on that.
23       Q.   Okay.
24       A.   And I don't know if that was 100 percent
25   true.  I just know a fair amount to have a -- you know,
```

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 61

```
 1   something like that leased from a -- a rental company

 2   that was, you know, down from -- from us.

 3        Q.   Did you discuss -- you personally discuss

 4   with Mr. Feldman or anybody else at -- at Head Kandy,

 5   besides Ms. McNeill, how much it would cost to -- to

 6   lease a -- a forklift for the North Carolina warehouse?

 7        A.   I don't believe I -- I did.  I don't -- I

 8   don't believe so.  I don't remember.

 9        Q.   Do you know if Ms. McNeill had a discussion

10   with anybody at Head Kandy about how much it would cost

11   to lease a -- a forklift for the North Carolina

12   warehouse?

13        A.   I don't know.

14        Q.   Did you have any discussions with Mr.

15   Feldman or anyone else at Head Kandy, besides Ms.

16   McNeill, about how much it would cost to just buy the -

17   - the forklift that you ended up buying?

18        A.   I don't -- I don't believe so.  I don't

19   remember any -- any of that.

20        Q.   Do you know if Ms. McNeill had any

21   conversations with Mr. Feldman or anyone else at Head

22   Kandy about what it cost you to just purchase that -- a

23   forklift that you ended up purchasing for the North

24   Carolina warehouse?

25        A.   I don't know if she did or not.  I don't --
```

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 62

1      Q.   Do you know how much total in payments Head

2   Kandy made to you and Ms. McNeill for that forklift

3   used in North Carolina?

4      A.   I do not.

5      Q.   You mentioned you inspected the forklift.

6   Everything looked good.  Did -- were you the one who

7   did the maintenance on that forklift?

8      A.   If it would need anything, yes, I would take

9   care of it.

10      Q.   Was there anybody else who did any

11   maintenance on the forklift in North Carolina?

12      A.   There might have been -- I'm trying to think

13   here.  There was a kid that we had hired in there that

14   just come in for a little bit, a young kid that was

15   trying to learn this stuff.  I think I might have had

16   him help with it a little bit when I was working on it

17   a couple of times.  I think I needed to adjust the --

18   the brakes on it to keep them up to -- to specs where

19   they needed to be.  Other than that, I don't believe

20   so.

21      Q.   And the maintenance, did you -- did you ever

22   have to -- besides just, you know, oil changes or, you

23   know, lubing, when you had the hydraulics, did you ever

24   have to replace any parts on that forklift in -- in

25   North Carolina?

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 63

```
 1      A.   Yeah.  I replaced one part on that forklift.
 2      Q.   What did you replace?
 3      A.   The liquid -- the gas, propane converter on
 4  it.  They didn't open the -- the propane valve when
 5  they started to crank the thing.  And they cranked it.
 6  It -- it sucked the diaphragm into itself.
 7      Q.   Okay.  And where did you get that -- that
 8  part to replace it?  Where did you --
 9      A.   (crosstalk).
10      Q.   I was speaking over you.  What did you say?
11  I -- I didn't catch that.  I was speaking over you.
12  Where did you --
13      A.   I believe that part was off of the internet.
14      Q.   And did you have it shipped straight to
15  North Carolina?
16      A.   That part, yes.
17      Q.   Are there any other parts for the forklift
18  in North Carolina that -- that you had to replace on
19  the forklift or any kind of maintenance on the -- on
20  the forklift?
21      A.   For the forklift, no.
22      Q.   All right.  Did you -- at the time that the
23  forklifts in Colorado were being used for the Head
24  Kandy operations, did you ever have to replace any
25  parts on -- on those forklifts?
```

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 64

1      A.   Yes.

2      **Q.   What did you have to replace?**

3      A.   I replaced the head gasket on one of them.

4      **Q.   Anything else?**

5      A.   Fixing flat tires, stuff like that.  Other

6  than just normal routine maintenance, that's about it.

7      **Q.   And when did you replace the -- when did you**

8  **have to replace the head gasket?**

9      A.   I replaced that head gasket in -- I believe

10  it was December of '21 at that point, is when I

11  replaced that one.  They ran that forklift for a while

12  with the head gasket actually leaking.  I kept putting,

13  like, a bar of Stop Leak in it to keep it from trying

14  to leak any more while they were using it here.  And

15  then once it -- they quit using it, it was kind of over

16  here.  When we were done with our move, it sat here.

17  And then when I had come back from North Carolina that

18  December for Christmas, I -- I fixed it at that point.

19          And what had happened to it is when they

20  were using it the six or eight months previous, before

21  we had -- I think it might have even been more than

22  that, we ended up mixing the -- the two coolants on the

23  thing.  It requires a -- an orange extended-life

24  coolant.  And when somebody checked it that was running

25  it, they were removing stuff, they put a green coolant

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 65

```
1   in the reservoir.  And those two coolants don't -- they

2   don't mix with each other.  They like to fight and play

3   games and deteriorate stuff.  And it degenerated -- I

4   believe it was the corner of the head gasket where the

5   water jacket was at.  It was starting to leak a little

6   bit, so --

7        Q.   Okay.  And as of that time that you fixed

8   that in -- in -- in or about December of 2021, what

9   operations of -- of Head Kandy remained in -- in

10  Colorado that the forklift was being used for?

11       A.   That was still would have been the, like,

12  returns and stuff that were here.

13       Q.   So it was after the warehouse, the main

14  warehouse operations had been moved to North Carolina,

15  right?

16       A.   Yes, that's correct.

17       Q.   Okay.  We've been going about an hour and a

18  half.  Probably a good time to -- to take a break.  But

19  before we -- we take a break, have you understood all

20  the -- the questions that I've asked of you so far

21  today?

22       A.   To the best of my knowledge.  Yes.

23       Q.   All right.  And is there any testimony that

24  you've provided so far that you want to change or

25  modify in any way?
```

**HEAD KANDY LLC vs KAYLA MCNEILL**
Dustin McNeill on 07/16/2024

```
1       A.   I don't believe so.  No.

2            MR. THOMPSON:  All right.  How about -- does

3   10 minutes sound -- sound good for everybody?

4            THE WITNESS:  Yeah.  It's fine.  I just got

5   to go pee real quick.

6            MR. CONVERSE:  Yep.  All right.  Yeah.

7   Let's do 10.  That sounds good.

8            MR. THOMPSON:  All right.  All right.  See

9   you guys back at -- why don't we just say 12:40 -- I'm

10  sorry, 10:45.  So I've got -- I've got 32 after the

11  hour now.  So let's just say a quarter till.

12           MR. CONVERSE:  Okay.  Thanks.

13           MR. THOMPSON:  All right.

14           THE VIDEOGRAPHER:  Okay.  Time on the

15  monitor is 12:33 p.m. and we're off the record.

16           (OFF THE RECORD)

17           THE VIDEOGRAPHER:  Time on the monitor is

18  12:47 p.m. and we are back on the record.

19  BY MR. THOMPSON:

20      Q.   Okay.  Mr. McNeill, before we leave these

21  forklifts, the -- the replacing of the head gasket in

22  December of -- of -- of 2020, can you tell me, you

23  know, what -- what is involved and what parts are

24  needed for the replacement of that -- that head gasket?

25      A.   It was December of '21 is when it was.  I
```

**HEAD KANDY LLC vs KAYLA MCNEILL**
Dustin McNeill on 07/16/2024

Page 67

1   don't know if you had it wrote down as 2020.  But it

2   was '21.

3         Q.   Got it.  Okay.

4         A.   You have to -- you have to remove, you know,

5   a fair amount of stuff off the -- the side of the

6   engine.  You have to take the intake off, valve cover

7   off, rocker arms off, push things out of it.  You have

8   to remove the -- the cylinder head off the thing and

9   then clean the old gaskets and material off of it.  And

10  then you have to make sure that your surfaces are still

11  true, flat, everything is good in them, that something

12  didn't happen or screw up when you -- basically,

13  because when you mix the coolants together it can -- it

14  corrodes and it can eat the -- the -- basically, the

15  other materials or metals that are in the thing.  So

16  you just make sure that all that stuff is true, it's

17  all still there, that if you put a new gasket in the

18  thing, that you're not going to -- that it's not going

19  to leaking again on you just right away.

20              And -- and it's a fairly good undertaking.

21  It takes multiple hours to -- to do, probably.  Oh,

22  that project probably 14-hour project or better.  And

23  then you just -- or end up just -- once you've taken it

24  apart you reassemble it, you have to use, you know,

25  some head gasket, and different gaskets for the -- you

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

1  know, the stuff that you pulled off of it.  And you put

2  it all back together and refill it with your liquids

3  and pray and hope that everything is still is as good

4  as when you put it -- when it was new.

5      Q.   Okay.  Is there a -- is there a timing chain

6  on a -- on a -- involved in a head gasket replacement?

7      A.   It just depends on, I guess, what engine or

8  what it is.  There's several.  I mean, there's -- some

9  engines, you have to remove a timing chain, timing

10  belt, that type of stuff.

11     Q.   For the -- the head gasket replacement you

12  did on the forklift in Colorado in December of 2021,

13  was there a -- a timing chain involved?

14     A.   No.  That one doesn't have a timing chain.

15  It's got timing gears on it.

16     Q.   Where did you get the -- the parts that were

17  necessary for the gasket head replacement on that

18  forklift in Colorado in December of 2021?

19     A.   I believe I got those parts from, like,

20  NAPA.

21     Q.   NAPA Auto Parts?

22     A.   Yeah.

23     Q.   And -- and is that a -- a -- a -- a --

24  location, physical store-front location in or around

25  Salida?

Case 0:23-cv-60345-JB  Document 440-1  Entered on FLSD Docket 11/22/2024  Page 69 of 244
HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 69

1      A.   Yeah.

2      Q.   Okay.  And -- and why is it that you recall

3   that you bought those parts at NAPA?

4      A.   I've just done a lot of business with them.

5      Q.   Did you ever order -- did you ever order

6   parts from the internet for the replacement of -- or

7   maintenance on the forklifts in Colorado?

8      A.   No.  Not that I can recall.  But I don't

9   remember.

10      Q.   Okay.  The forklifts that are in -- in --

11   were in Colorado, were those used for the business of -

12   - of Head Kandy when it was owned by Lashed Out, LLC?

13      A.   Might have had one --

14      Q.   Okay.

15      A.   -- then, at the end of that.  I'm trying to

16   think.  I don't remember.  I had to borrow -- I

17   borrowed some equipment at that point from a local

18   contractor to move pallets and stuff around.  I -- I

19   honestly don't remember time-frame-wise of when I ended

20   up with those.

21      Q.   Okay.  Did Lashed Out, LLC, ever make any

22   lease or rental payments to you, Dusty McNeill, as the

23   owner of the forklifts that were used in Colorado?

24      A.   Not that I believe so.  I don't -- I don't

25   recall, but I don't believe so.

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 70

1      Q.   And where are those two forklifts that were

2   used in -- in Colorado, where are they today?

3      A.   One of them is sitting down at the barn

4   right now.  And the other one is up at my friend's

5   house in Buena Vista.

6      Q.   All right.  The North Carolina forklift that

7   you said that you and -- and Ms. McNeill had -- had

8   purchased, do you know where that forklift is located

9   currently today?

10      A.   I do not.  No.  I do not know where that's

11   located.  There -- we were told to leave that forklift

12   on premises and not touch it or move it.  So I do not

13   know anything about that forklift.

14      Q.   Who told you to leave it and not to touch

15   it?

16      A.   Mr. Rosenbaum told me that in December of

17   '22 when I was there cleaning out a few things of mine.

18   And then I believe she has a -- an e-mail or something

19   from an attorney at some point stating to leave the

20   forklift and hand over whatever paperwork of what we

21   have of it there.

22      Q.   Did you ever request the return of that

23   forklift, the one in North Carolina?

24      A.   No.  Because I was told to leave it there

25   and I was trying to comply, so we wouldn't get into a

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 71

1   ton of legal litigation over that.  So I just left them

2   with that forklift.

3        Q.   Have you ever been advised that Head Kandy

4   has said you can go pick up the forklift that's in

5   North Carolina?

6        A.   Not that I recall.  No.

7        Q.   Okay.  Do you believe that Head Kandy had an

8   intent to steal the forklift in North Carolina from you

9   and Ms. McNeill?

10       A.   I believe so when they told me that I had to

11   leave it on premises and not take it off.

12       Q.   Okay.  Other than -- than that, is there any

13   statements made to you that makes you believe that Head

14   Kandy had an intent to steal the forklift in North

15   Carolina?

16       A.   Other than telling me that I can't take my

17   forklift off the premises, I mean, I believe that would

18   be stealing.  Other than that, I don't know.  No.

19       Q.   And are you aware of any agreement between

20   you and Ms. McNeill on the one hand and Head Kandy on

21   the other for the rent or lease of the forklift in

22   North Carolina?

23       A.   Could you reword that?  I'm not sure that I

24   quite understand --

25       Q.   Sure.

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 72

1      A.    -- the meaning?

2      Q.    Did you and Ms. McNeill ever have an

3  agreement with Head Kandy that it would use that

4  forklift that you purchased in North Carolina for Head

5  Kandy business and then, you know, for a certain amount

6  of time, or that it would pay you a certain amount to -

7  - to do that?

8      A.    Not that I -- not that I'm aware of.  I

9  didn't -- I don't --

10      Q.    Okay.  And -- and you're not aware of any

11  amount of -- of lease or rent or other payments that

12  Head Kandy made towards that forklift, are you?

13      A.    No.  I didn't -- not that I know of.  I

14  don't -- in any of those talks, I don't believe.

15      Q.    And you're not aware if Head Kandy ever did,

16  in fact, pay any amounts to you or Ms. McNeill, or both

17  of you, for the use of that -- that forklift, are you?

18      A.    No.

19      Q.    All right.  Now, I understand that your

20  family and your kids are into race cars, I -- I guess

21  we'll call them; is that right?

22      A.    Yes.  That's correct.

23      Q.    And you -- the McNeill family personally

24  owns, I think Ms. McNeill said, approximately 15 race

25  cars; is that -- is that right?

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 73

1     A.   Yeah.  Yes.

2     Q.   And -- and these are race cars that your --

3  your -- your -- your children race in competitively; is

4  that correct?

5     A.   Yes.  Not all of them, but yes.

6     Q.   All right.  So that was going to be my next

7  question, if -- if all of them are.  So are there --

8  are there other race cars that -- that you use to

9  compete?  I mean, what are these race car -- these 15

10 different race cars comprised of?

11    A.   There is other race cars, yes, that I used -

12 - used to compete in that I don't anymore, but I still

13 own the -- own them.

14    Q.   These race cars, where are they located

15 today?

16    A.   They are located in, as we sit right now, on

17 a trailer.  But a lot of times I go between the trailer

18 to inside that barn.

19    Q.   Okay.  When you were -- when you had the

20 house in North Carolina, were the race cars, or -- or

21 any of them, ever in -- stored in -- in North Carolina

22 with you?

23    A.   Yes.

24    Q.   And where were they stored while you were in

25 North Carolina?

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

```
1        A.   That -- that varied, actually, where they
2   were stored.  When we first moved out there with the --
3   the -- the -- or the -- the business, they were stored
4   in a trailer in my -- between, like, a racetrack or in
5   my front driveway and garage of my house.
6        Q.   Okay.  Were they ever stored at the Head
7   Kandy warehouse?
8        A.   No.  When we purchased that new warehouse,
9   yes.  I stored them in the -- in the back corner of the
10  warehouse where they were basically just inside out of
11  the weather.
12       Q.   Are you aware of any agreement between you,
13  the McNeills, and -- and Head Kandy for the payment of
14  any rent or storage fee for those race cars in the
15  North Carolina warehouse?
16       A.   I believe Kayla talked to Brian Feldman on
17  that about storing them in the back corner of the --
18  the warehouse.  And he didn't have a problem with those
19  being in there.
20       Q.   Okay.  And is that -- did you ever have any
21  discussions with Brian Feldman or anyone else at -- at
22  Head Kandy, besides Ms. McNeill, about storing the race
23  cars in -- in North Carolina warehouse?
24       A.   Me personally, no.
25       Q.   So your knowledge of anyone at Head Kandy
```

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 75

1    saying it was okay to store the -- the race cars in the

2    warehouse at North Carolina is just from what Ms.

3    McNeill told you; is that right?

4         A.   Yes, that's correct.  Plus she was a 20

5    percent owner of the building also, so think they just

6    had whatever they -- they talked about.

7         Q.   Got it.  All right.  Do you -- and -- and

8    have you done the maintenance on these race cars that

9    you've owned for yourself and the -- and the children?

10        A.   If they crashed them, something like that,

11   then yes.  I -- I -- I changed parts or pieces like

12   that on them, so yes.

13        Q.   And -- and what type of -- of maintenance or

14   repair work would -- have you had to do on the race

15   cars?

16        A.   Oh, they crash them and tear up all kinds of

17   -- they tear front axles up.  They tear rear axles up.

18   They bend radius rods.  They -- you know, there's quite

19   a bit of little things that they can tear up on them

20   when they crash them.

21        Q.   And after you -- the Head Kandy warehouse

22   was moved to North Carolina, and you bought the house

23   in North Carolina, did you continue to store at times

24   the race cars in Colorado?

25        A.   Yes.

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 76

1      Q.   Is -- is that -- for lack of a better term,

2   is that where the race car's based out of, Colorado,

3   and you would go to races [inaudible 01:47:16] North

4   Carolina?

5      A.   Based out of Colorado more likely.  Yes.

6      Q.   And where -- when you did repairs of the --

7   the race cars, where did you get parts for the race

8   cars?

9      A.   Several different internet -- there were

10  some internet places you can buy them from.  Most of

11  the time you bought them, I guess, kind of from the

12  manufacturer, if it was a front axle, something like

13  that, or you could buy other parts, radius rods, and

14  different things, off -- off of the internet.

15     Q.   Okay.  And the internet, any particular

16  websites?

17     A.   No.  Not necessarily, I don't think.

18     Q.   Okay.  Have you ever ordered parts for the

19  race cars from Alibaba?

20     A.   I might -- I purchased -- I believe I

21  purchased some gaskets from there at one point in time,

22  to -- to see if they were going to be anything that was

23  legal to be maybe used on them.  And they're pretty

24  strict.  You can't use outside stuff, that I later on

25  found out.  But I never do any type of engine work or

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

1    any of that once I -- you figure out how complex and

2    how tight that rules and different things are on those

3    things.  So I got -- I just have an engine guy that

4    does all that stuff for me.  I don't want to get myself

5    into that and mess up one thing, and then you're DQ'd

6    out of a race or something like that.

7        Q.   Like performance enhancing drugs for race

8    cars, huh?

9        A.   Yeah.  Kind of, yeah.  But their rule books

10   are extremely tight.  If you win a national type race,

11   they completely tear an engine down, and make sure that

12   every -- 100 percent everything in there possible is

13   legit.

14       Q.   Okay.  And -- and it's your memory that you

15   ordered these -- these gaskets to try for the race cars

16   from Alibaba; is that right?

17       A.   I didn't remember any of this at first until

18   I got -- like, because I couldn't find anything when I

19   did all my searches and all that, until just recently

20   that stuff that I just disclosed, I believe to you

21   guys, or Anthony did, of those.  I didn't remember it,

22   that I had to jog my memory once I come across, you

23   know, that type of stuff.  I didn't at first, you know,

24   really realize or think about it.

25            MR. THOMPSON:  Okay.  All right.  I just

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 78

1   sent to you what we're going to mark as Exhibit 2.  I -

2   - well, I sent to you, Anthony, and --

3            (EXHIBIT 2 MARKED FOR IDENTIFICATION)

4            MR. CONVERSE:  Okay.  Thanks.

5            MR. THOMPSON:  Put on the screen.  All

6   right.

7   BY MR. THOMPSON:

8        Q.   Are you able to see this document on the

9   screen, sir?

10       A.   Yes.  I see that.

11       Q.   It is very small.  And I will try to --

12       A.   I can see.

13       Q.   You can.  Okay.  Do you -- well, let's go

14  down to the bottom.  Says, "Shipping address, Dustin

15  McNeill, Highland Circle, Salida, Colorado."  You see

16  that?

17       A.   Yes.  Correct.

18       Q.   All right.  And this is -- do you recognize

19  this as a receipt or an order, purchase details from

20  Alibaba?

21       A.   Yeah, I recognize that it's a receipt or

22  something from them.  Yeah.

23       Q.   Okay.  And is this parts for the -- these --

24  it's for -- for gaskets for various things.  Is this

25  for the race cars?

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 79

1      A.   No.  I have no idea what that is, honestly.

2      Q.   Okay.

3      A.   When you guys sent me that in a subpoena,

4   that was the first time I'd ever seen any of this.

5      Q.   Okay.

6      A.   Don't know what that is.

7      Q.   Sorry.  You might be able to see it.  I

8   can't see it.  Let me just try and -- oh, there we go.

9   That's easy.  Okay.

10          Do -- do you know if these are parts that

11   were ordered for a forklift repair?

12     A.   That I couldn't tell you, but I mean, it

13   shows diesel on the top, so I don't know.

14     Q.   Okay.  Number 3 here, "Cheap nbr fkm fork

15   material green brown motorcycle part."  Do you

16   recognize this as a -- a part that could be used for

17   any forklift repair?

18     A.   Not that I know of.  No.

19     Q.   Okay.  And number 6, "ATV Banshee."  Do you

20   -- do you know what an ATV Banshee is?

21     A.   No.

22     Q.   Do you recognize this as a -- a -- a part

23   that could be used for a forklift repair?

24     A.   Not that --

25     Q.   Okay.

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 80

1      A.   I don't -- I don't even know what it is.  So
2  I couldn't tell you.
3      Q.   Okay.  Do you recognize that as a -- a -- so
4  well, you don't know what it is.  You don't know if
5  that can be used for a -- for a -- a race car repair,
6  one of your race cars?
7      A.   No.  Because there's nothing of any type of
8  that for a race car, I don't believe so --
9      Q.   And number 8 (crosstalk) --
10     A.   Sorry.
11     Q.   Sure.  "Pit bike full set China graphite
12 complex kit, bonnet stainless steel flat silicone
13 gasket."  Do you recognize that as a part that could be
14 used for, or that -- that was used for the repair of
15 any forklift?
16     A.   Don't know.  I -- I'm kind of confused at
17 all this now that you blew it up.  I mean, it shows,
18 like -- is that -- like, that 3,000, 5,000, what is
19 that -- that number?
20     Q.   It is honestly bizarre, I think, probably
21 because it's converted from Chinese, but quantities,
22 sets, price, and then total in US dollars is what's
23 over on the -- the -- the right, that just looking at
24 the math, if you multiply unit price by the quantity,
25 it comes out to that dollar -- dollar amount.  It's

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 81

1   somewhat bizarre.

2           Have -- have you ever seen this order detail

3   before?

4       A.   I have not.  No.

5       Q.   Okay.  Do you recall receiving in Highland -

6   - at Highland Circle address these parts?

7       A.   All those parts?

8       Q.   Yes.

9       A.   Like 5,000 quantities and stuff of them?

10  No.

11      Q.   Yes.

12      A.   No.

13      Q.   Do you -- do you have an account with

14  Alibaba?

15      A.   I have -- I don't know if it's quite an

16  account.  I mean, it has my -- my name and stuff on it.

17  But I don't have any, like, credit cards or any of that

18  type of stuff on there.  I just -- I can go on there

19  and, like, scroll through and, like, look at stuff and

20  stuff like that.  But I don't -- I don't know if it's,

21  like, an account.  I don't know how it's fully set up.

22  A lot of times I went in, like, as, like, guest or

23  something, you know, but I don't know how that,

24  truthfully, works.

25      Q.   Now on this order details, and this is dated

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 82

1    November 9th, 2021; you see that there?

2         A.   I do.  Yep.

3         Q.   All right.  Did -- do you -- and over here

4    under the buyer, it says "The -- the Nail Dazzle,"

5    contact name Kayla McNeill.  Do you know -- what --

6    what's The Nail Dazzle?

7         A.   I believe that was a business that my wife

8    had, we had years and years ago.  I don't know exactly

9    when that truthfully was.  That was sometime back, I

10   guess, when we first maybe got married, she had that

11   thing.  She was doing fingernail stuff back then, I

12   believe.  I -- that's so long ago, I don't 100 percent

13   recognize that call, I'm sorry.

14        Q.   Do you know if Ms. McNeill ever ordered

15   parts for any repairs for any of the -- the forklifts

16   that were used for Head Kandy business?

17        A.   That I don't know.  I don't know on that.  I

18   don't think so.  But I don't know.

19        Q.   Did -- did you ever ask Ms. McNeill to order

20   you any parts for forklifts that were used for the Head

21   Kandy business?

22        A.   I don't know if I did or not.  I mean, it

23   could have been something small or little.  I don't --

24   I don't know.  I can't give you a definite answer on a

25   yes or no, if I -- if I did because I don't truthfully

**HEAD KANDY LLC vs KAYLA MCNEILL**
Dustin McNeill on 07/16/2024

Page 83

1    know if I asked her to do any of that.

2         Q.    Okay.  These -- these parts, do you

3    recognize ever having put any of these parts that are

4    listed on here into any of the forklifts that were used

5    for Head Kandy business?

6         A.    I mean, not that I am aware of.

7         Q.    Okay.

8              MR. THOMPSON:  Antonio, did you get that

9    exhibit?

10              MR. CONVERSE:  Yes.  It was a little

11    delayed, but it came in.

12              MR. THOMPSON:  Oh, there it is.  Okay.  I'm

13    going to put up what we'll mark as 3, which you already

14    have, Anthony.  But I'm sending it to -- so Heather has

15    it.

16              (EXHIBIT 3 MARKED FOR IDENTIFICATION)

17    BY MR. THOMPSON:

18         Q.    This is the documents that you just produced

19    to me during this deposition.  Do you recognize these

20    documents, sir?

21         A.    Yes.  I do.

22         Q.    Okay.  What are these?

23         A.    Those are the -- the gaskets that I bought

24    for the -- to see if they would work on -- if I was

25    able to use those on those race cars.

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 84

1      Q.   Okay.  So that's what the subject matter is,

2   but what -- what I'm asking specifically, and -- and

3   sorry to not be clear, what are we looking at on -- on

4   the screen?  These are screenshots of -- of what?

5      A.   Of a conversation that a lady had reached

6   out and sent to me just recently, is what this --

7      Q.   This -- this says at the top here,

8   "86615233620671"?

9      A.   Yeah.

10      Q.   Do you know what that number is?

11      A.   No.  I -- I would imagine that that's her

12   phone number or something.  I don't know how that whole

13   system, whatever, works there, honestly.  I'm sorry.

14      Q.   What -- this is a screenshot of -- of

15   something that was on your phone?

16      A.   Yes.  That come through on my phone.  Yes.

17      Q.   All right.  And is this the WhatsApp app?

18      A.   Yes.  That is WhatsApp, I believe, yes.

19      Q.   All right.  And it says, "Last seen today at

20   8:47."  What is -- what is today, when -- when did you

21   take this screenshot?

22      A.   I don't -- I -- honestly, I think that is

23   the last time that she had been on the -- the thing.  I

24   don't know how that works.  But if you open that, it --

25   that timeline, like, varies.  I think that's her,

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 85

```
 1  whenever she was on her WhatsApp or something like

 2  that.  I don't -- I'm not a tech guy on all that stuff.

 3  I don't know how that works, so --

 4       Q.  So this -- the first message here we see

 5  Monday, July 8th.  And is that -- well, let's -- let's

 6  establish this first.  So on the left-hand side, is

 7  that messages from whoever this person is at this 866

 8  country code?

 9       A.  I believe so.  Yeah.  I think all the -- the

10  stuff that's in, like, white is -- is her, and then

11  whatever is on the other is on the -- the green side,

12  or whatever's mine.

13       Q.  Okay.

14            MR. CONVERSE:  Colin, just for

15  clarification, I think you keep saying 866, but I just

16  see 86.  Am I wrong?

17            MR. THOMPSON:  Nope.  Nope.  You're right.

18  86.

19            MR. CONVERSE:  Okay.

20            MR. THOMPSON:  Yep.  All right.

21  BY MR. THOMPSON:

22       Q.  So we see the first indication here in the

23  middle of Monday, July 8th, just said that was of 2024,

24  just about eight days ago.  The messages above it,

25  though, the "Hello, GX120 gasket, are you Dustin
```

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 86

1    McNeill."

2            On -- on what day were those messages sent?

3        A.   You know, I don't know, Colin, I'm -- I'm

4    sorry.  I could probably go back to my phone.  I'm

5    sorry I didn't -- I don't know if it shows anything any

6    higher than that, or when that was -- was done.  I

7    don't know when that was actually sent, you know.  I

8    don't go over and check this too much.  There's a lot

9    of -- I don't know how they get in there and do that,

10   but there's a lot of spam that comes through on

11   WhatsApp anymore, like Bitcoin stuff.  They add your

12   numbers to things, groups, I don't know.  And I'm -- I

13   don't -- like I told you before, I don't -- I haven't

14   deleted anything.  I don't let anything delete.  So

15   there's a lot of stuff that shows up that I don't go

16   back through and -- and scroll to, like, look at, you

17   know.

18           So then I kind of went back through and

19   looked at this to see -- you know, I just kind of

20   scrolled through and I seen this come up.  So I don't

21   know, honestly, when that first -- when she first sent

22   me that, to -- to tell you the truth.  I don't think it

23   could be that long ago, but I -- I don't know for sure.

24   I could try to find that out for you.

25       Q.   Yeah.  We'll -- we'll go back in, in just a

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

1    second, and look at that.

2            All right.  The -- the picture that's here,

3    was that a -- just a -- a -- a screenshot?  Or is that

4    a document that was sent?

5        A.   That was -- that was just a -- a screenshot

6    that she had sent me, is all that is.

7        Q.   All right.  So then you say, "What is that?

8    I don't recognize it."

9            "Oh," she says, "Oh, are you Dustin?"

10           And is this -- so now we're on the next page

11   of the Exhibit 3 here.  Or -- she misspells -- or M,

12   yeah, misspells twice Kayla.

13           Is that the very next messages?

14       A.   That -- that is correct.  Yes.

15       Q.   Okay.  All right.  And then what is this?

16   Is this -- is this a screenshot that's sent within the

17   message?

18       A.   Yes.  That's another, like, screenshot that

19   she had sent me within the -- the message.

20       Q.   And do you know -- so that's a screenshot of

21   another messaging conversation.  Do you know who that

22   is involved in that conversation?

23       A.   I'm -- I'm guessing that it's that supplier,

24   that lady that I bought those, you know, gaskets from.

25   But without any other context on there, I'm not sure,

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 88

1    you know?  And I couldn't find any of that stuff in --

2    back in my phone, so --

3         Q.   Sure.  So the -- the -- the gaskets --

4    sorry, keep -- don't mean to bring that up.  All right.

5    So this -- this screenshot that we're looking at here

6    in the first page of the text, that's those gaskets

7    that you were looking at for the -- the race car that

8    you decided not to purchase?

9         A.   No.  I -- I ended up purchasing those, I

10   believe, after I went back through my head with

11   everything.  So yes, that is the -- is that, that's the

12   right, you know, gasket, like, numbers and numbers

13   sets, so --

14        Q.   Okay.  And I'm sorry.  So you -- you

15   purchased them.  You just didn't end up using them on

16   the race cars because it would --

17        A.   Yeah.

18        Q.   Got it.  Okay.  So this, then, is the -- the

19   -- the screenshot here on page one of this texts or --

20   or instant message chains that we have marked as

21   Exhibit 3, this is different than what is in this

22   Exhibit 2; is that -- that right?

23        A.   Looks to be different.  Yeah.

24        Q.   Okay.  All right.  And then you ask her,

25   "Can I help you with something?"  So then she's asking

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 89

1    -- looks like she's trying to sell you more gaskets,

2    huh?

3        A.   That's -- yeah.  That looks like it goes to.

4        Q.   So then you say, "No, I never ordered them."

5    What are you referring to?

6        A.   Those gaskets.  I didn't think I had ordered

7    them at that point in time.  And then I just had to go

8    back through and jog my memory of all that.  And then,

9    you know, just remembered, realized I did order those,

10   you know, because I was like, I don't remember doing

11   it, because I had a guy that was doing engines, you

12   know, for me just because they're so complex.  But --

13       Q.   All right.  Then they send -- this person at

14   the 86 country code sends another photo that I don't

15   believe we're going to be able to --

16       A.   Oh, okay.  I -- and that's my bad, too.  I'm

17   sorry.  I could probably blow that up and give it to

18   you.  I just was trying to get all this to Anthony

19   fairly quick, you know?

20       Q.   Appreciate that.  What -- what is that?

21       A.   I don't remember what that -- what that

22   actually says right there, honestly, to tell you the

23   truth.

24       Q.   Okay.

25       A.   He's asking who that is or something.  But I

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 90

1    don't know who she's asking, who's what there.

2         Q.   Okay.  If you could, now would be a good

3    time if you could grab your phone and let's see if we

4    can find both that -- figure out what that is on this

5    page three of this Exhibit 3, that -- that photo, and

6    then also what date these -- these very first messages

7    were -- were sent?

8         A.   Okay.  Let me -- can I just jump off and

9    grab --

10        Q.   Yeah.  Yeah.  It's right there in the -- the

11   room with you, so --

12        A.   Yeah.  Right over here.

13        Q.   Yeah.  Go ahead.  We can stay on the record

14   I think.

15        A.   Okay.  Sorry.  Thank you.  Do you want me to

16   -- to, like -- like, screenshot these again and, like,

17   different, and then get them -- like, send them over to

18   Anthony, they can send them to you?  Or how do we want

19   to do this call?

20        Q.   Sure.  Send them to -- to Anthony.  But if

21   you could just tell me in looking at it when that first

22   message was sent, and then send him a -- a shot that --

23   that -- that, you know, has it as far back as you need

24   to go to see when the message (crosstalk) before this

25   "hello" is?

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 91

1      A.   Okay.  I'm on it now.  It looks like that --

2  that was Friday, June 21st, is when she first said,

3  "Hello.  GX120 gaskets.  Are you Dustin?"

4      Q.   Okay.  Then what -- what -- okay, and then

5  on July -- you didn't respond.  And then eight --

6      A.   No.

7      Q.   -- days ago, she sends this again?

8      A.   Yes.

9      Q.   And this time in July 8th, you respond,

10  "Hello.  What is this?"  All right.

11      A.   Yes.

12      Q.   All right.  All right.  So then now looking

13  at the page three of this exhibit, there's that -- that

14  photo.  What is that -- that photo?

15      A.   When I -- when I click on it, that right

16  there, it just -- it scrolls right back up to the --

17  the picture that was ahead, to that (crosstalk).

18      Q.   This -- this one on Page 2.  Got it.

19      A.   That's correct.

20      Q.   And in that picture, it says, "Work e-mail

21  kenny_05@hotmail.com?

22      A.   Yeah.

23      Q.   Is that -- that -- is that an e-mail that

24  you've known your wife, Ms. McNeill, to use?

25      A.   Yeah.  I believe that's her -- one of her

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 92

1  old e-mails or whatever before we ever got married.

2  That was her maiden name.

3      Q.   Okay.  All right.  So these -- this

4  conversation is about some old order that you had made

5  through Alibaba for some gaskets that you were going to

6  try out on the race cars, but never did.  Is that a

7  synopsis?

8      A.   Yes.  Correct.

9      Q.   And -- and why -- you -- you -- you --

10  you've now produced it.  Thank you.  But why -- why is

11  it that you produced these to today regarding the race

12  cars?

13      A.   I produced these because when I go back

14  through my subpoenas and stuff like that, it just -- it

15  said, any communications between Alibaba, any

16  transactions of this or that.  So I'm just -- I was --

17  I'm trying to comply with your guys' stuff and with the

18  courts.  That's -- so that's why I gave it to Mr.

19  Converse is because of that, you know?

20      Q.   Yeah.

21      A.   I don't --

22      Q.   Because you were subpoenaed today with the -

23  - essentially the same document request as you

24  previously responded to, but now these came into your

25  possession before the deposition today, right?

**HEAD KANDY LLC vs KAYLA MCNEILL**
Dustin McNeill on 07/16/2024

Page 93

```
 1        A.    Absolutely.  Yes.

 2        Q.    And are there any other documents that you

 3   were able to locate that came into your possession

 4   after you responded to the -- the subpoena for

 5   documents, but before today?

 6        A.    Not that I have -- have found.

 7        Q.    Okay.  All right.  All right.  Going back to

 8   this Exhibit 2, do you have any knowledge of any

 9   equipment used or owned by Head Kandy that the parts

10   identified here in this Exhibit 2 could be used for?

11        A.    Not that I'm aware of.  I don't know what a

12   good chunk of that stuff is.  I don't know -- I don't

13   know where that invoice or what come from, honestly.

14        Q.    And other than -- than you, do you know of

15   any person who has replaced any gaskets or any parts on

16   any of the forklifts that were used by Head Kandy in or

17   about the end of 2021?

18        A.    Not that I'm aware of.  I mean, it's not

19   that it's not possible, but not that I was aware of or

20   told.

21        Q.    All right.  Did you have a -- a credit card

22   that you used to put business expenses for Head Kandy

23   on, or -- or charge items for Head Kandy business?

24        A.    Yes.  I had one of my wife's credit cards.

25        Q.    What -- what credit card?  You say one of
```

**HEAD KANDY LLC vs KAYLA MCNEILL**
Dustin McNeill on 07/16/2024

Page 94

1  your wife's credit cards.  What -- what do you mean?

2      A.   Yeah.  I had a credit card that I had from

3  her since 2015 that I used to put business expenses on,

4  or whatever, if need to be, or --

5      Q.   Okay.  Sorry.  Go -- sorry, I didn't mean to

6  cut you off.  Were you -- were you done?

7      A.   Yeah.  Or personal expenses, because it was

8  her -- tied under her personal name and Social Security

9  number or whatever, as --

10     Q.   Sure.

11     A.   --as far as that.

12     Q.   Okay.  And this -- was this an American

13  Express card?

14     A.   Yes.

15     Q.   And did it say on the card, Head Kandy or

16  Head Kandy, LLC?

17     A.   Mine has always, I believe, said Lashed Out

18  on it.

19     Q.   Lashed Out.  Okay.  All right.

20          Other than that credit card, did you have

21  any other credit cards that you used for your -- your

22  personal expenses or any other expenses unrelated to

23  Head Kandy?

24     A.   No.  I'm -- yeah, I'm sure I have -- I have

25  other credit cards.  Yeah.

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

1    Q.   How many other credit cards do you actively

2    use?

3    A.   Oh, I don't know that it's been -- they've

4    been super actively used recently but I -- probably,

5    four or so maybe.

6    Q.   And are any of those -- prior to January

7    2023, did you have any other American Express cards

8    that you used?

9    A.   I have an American Express card.  Yeah.

10   American Express Bonvoy card.

11   Q.   How long have you had that other American

12   Express card?

13   A.   Oh, I'm trying to think the date.  That's

14   something I'd have to look up.  17 maybe or 18 year-

15   wise, somewhere in that range, I would think.

16   Q.   All right.  And besides that AMEX -- that

17   other AMEX card, what other credit cards did you have

18   up until -- ever -- at least up until -- or before.

19   I'm sorry.  Before January of 2023.  I'm not interested

20   -- I'm going to try to -- I'm not interested in your

21   credit cards that you've used since the end of January

22   2023.

23         So what other credit cards did you have

24   before the end of January 2023?

25   A.   I mean, how -- Colin, how -- how far are we

**HEAD KANDY LLC vs KAYLA MCNEILL**
Dustin McNeill on 07/16/2024

Page 96

```
 1   going back here?
 2        Q.   Let's go back to May of 2018.  So between
 3   May of 2018 and the -- and -- and February 1st, 2023,
 4   how many other credit cards did you have?
 5        A.   Probably two or three, including that
 6   American Express card of mine.
 7        Q.   Okay.  And you said that you have this AMEX
 8   card that your wife gave you that said Lashed Out, LLC,
 9   on it, right?
10        A.   Yes.
11        Q.   And -- and you used that to put Head Kandy
12   business expenses; is that right?
13        A.   Uh-huh.
14        Q.   It's -- I'm -- I'm sorry --
15        A.   Yes.  That's correct.  Right.  Sorry.
16        Q.   Yep.  Yep.  Nope.  One of us is going to do
17   it more than once today.
18             So did you put -- other than maybe by
19   mistake, did you ever intentionally put Head Kandy
20   business expenses on any of your other credit cards?
21        A.   There is -- on my American Express card,
22   there was some Head Kandy business expenses put on
23   there, just because I -- I believe they were -- I think
24   they're just by mistake, honestly, you know?
25        Q.   All right.  So you also said that on that
```

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

1    AMEX that you said had the -- the -- the Lashed Out,

2    LLC, you also made some -- some personal purchases; is

3    that right?

4        A.   Yeah.

5        Q.   How is it that you decided to put personal

6    expenses on the AMEX that said Lashed Out, LLC, instead

7    of on one of your other two or three credit cards?

8        A.   Because at -- at that point, we were gaining

9    points off of a -- a card.  So if it was something that

10   we just used points to pay for it, we just put it on

11   whatever card, you know?

12       Q.   All right.  So explain that again.  You --

13   you wanted to earn points, so that's why you would put

14   personal expenses on the -- the -- the card that said

15   Lashed Out, LLC?

16       A.   You could earn points or use points for

17   purchases.

18       Q.   Okay.  So you would choose to put personal

19   expenses on the card that said Lashed Out, LLC, if you

20   wanted to earn points for that purchase or if you

21   wanted to use points to pay for that purchase; is that

22   correct?

23       A.   Yes.  That's correct.  But I don't believe

24   that I actually ever put personal things on that card.

25   I don't know that I actually ever did, truthfully.  I

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 98

1    don't -- I don't know.  I'd have to really think back

2    or reconcile back to see.  But I don't know that I did

3    or, if it was, it might have been just like an -- a

4    mistake or something like that, you know.  I don't --

5    to be honest with you, you know?  I can't think of any,

6    like, certain purchase off the top of my head that,

7    like, I -- yeah, I did that or something, you know?

8         Q.   Sure.  And do you know then -- if you were

9    going to use points for -- for something purchased, as

10   you testified to, would that have been a personal

11   expense that would've been put on Ms. McNeill's credit

12   -- AMEX credit card that was also used for Head Kandy

13   business expenses?

14        A.   That I don't -- I don't know on that.  I

15   didn't have access -- I don't believe I had access to

16   her card or whatever, you know?  I don't -- I'm not

17   sure what you're [inaudible 02:22:14].

18        Q.   You just told me that there could be

19   personal expenses on this Head Kandy or -- or Lashed

20   Out card that said Lashed Out --

21        A.   Uh-huh.

22        Q.   -- if you were going to want to use points

23   for it.  So where does that knowledge come from?

24   Because -- because then you said you probably never did

25   that.  So you know, where did -- where did that come

**HEAD KANDY LLC vs KAYLA MCNEILL**
Dustin McNeill on 07/16/2024

Page 99

1    from?

2       A.   The knowledge just come from that you can --

3    you can do that.  I've used points elsewhere on some

4    credit cards for some different things, like different

5    trips and stuff like that.  You know?  You can use

6    points for purchases when it's your own personal credit

7    card, you know?  So that was miss -- Ms. McNeill's

8    credit card that was tied to her Social Security number

9    and stuff.  So if there was points on there and we'd

10   use those points.  And we used, you know -- used them

11   points for whatever to pay, you know -- if there was a

12   charge here or there, whatever it was, you know?

13      **Q.   Sure.  Were you ever part of a -- a process**

14   **or -- or participate with Ms. McNeill in identifying**

15   **charges that were made on that -- her American Express**

16   **card that had the either Head Kandy or Lashed Out on it**

17   **that she would identify as -- as personal and either**

18   **pay for that or apply points?**

19      A.   Can you clarify, like, process or what kind

20   of process of -- what are we talking like there, you

21   know?

22      **Q.   Sure.  If there -- if there was a process.**

23   **What I'm -- what I'm asking, if you were -- ever**

24   **participated, in any way, if there -- if there was a**

25   **process.  You know, at the end of the month, I'm going**

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 100

1   to go through and I'm going to identify all of this.

2   And hey -- hey, Dusty, can you come over here and see

3   if there's anything on here you recognize as personal?

4          Was there a process like that that you

5   participated in to identify personal charges on that

6   American Express card?

7      A.   I don't believe there was any process to

8   that, honestly.

9      Q.   All right.  So besides any -- any process,

10  which I guess, kind of, takes some formal or planned

11  opportunity, did -- did you ever sit down with Ms.

12  McNeill from May of 2018 through January of 2023 to

13  identify charges that were made on that AMEX card that

14  had Head Kandy on it or Lashed, LLC, and identify those

15  that were personal expenses?

16     A.   Yeah.  At the end of 2022, when we got a --

17  a draft K-2 report stating that we had stole all this

18  money from Head Kandy.  And they gave us this report.

19  We both sat down and we looked at this report that was

20  quadrupled, duplicated I -- I don't know how many

21  times, of different charges, different things that were

22  all on this report that was -- they stated were all

23  personal --

24     Q.   Okay --

25     A.   -- stuff.  We sat down at that point, we --

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 101

1    and started going through this to figure out, you know,

2    if this was or wasn't, or if there was, you know,

3    anything on there.  And if there was something that was

4    on there that she found or whatever, that was, you know

5    -- she'd taken care of and -- or paid for it or

6    whatever.  But I -- I personally didn't go through that

7    whole process.  I just went through, like, if it was --

8    because they had put my -- they threw my credit card on

9    there.  I believe they threw Ryan Thompson's credit

10   card on there in this K-2 report.  They threw a -- a

11   Ronda Bachelor's credit card on this.  And we were just

12   looking at some of those to see if we knew anything

13   about those people that had access or were using her

14   account also, if there was anything there.

15        Q.  Sure.  Sure.  And -- and I don't mean to cut

16   you off, but I think I can short -- I'm -- besides

17   after you got that, what I'm -- what I'm interested in

18   is -- is as the card was being used.  So -- so before

19   the time that anyone from Head Kandy or -- or K-2 ever

20   came and presented you with that -- you and Ms. McNeill

21   with that K-2 report, was there ever a time that you

22   sat down with or participated in any way with Ms.

23   McNeill in identifying charges made on that AMEX card

24   as -- as personal expenses that either Ms. McNeill

25   would pay for personally or apply points for?

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 102

1      A.    I don't recall, honestly.

2      Q.    Okay.  And from May of 2018 to the end of

3   January 2023, do you know if Ms. McNeill also had any

4   other credit cards besides that AMEX card that had the

5   either Lashed Out or Head Kandy, LLC, on it?

6      A.    I don't -- I don't know on that.

7      Q.    The -- who in the McNeill household pays the

8   bills?  And I don't mean whose money, but receives the

9   bills in, and then writes checks or goes online and --

10  and has money transferred to make sure the credit

11  card's being paid, electric bills, sets it up on -- on

12  automatic.  Who does that?

13     A.    Not me.  She does.  That's why I got a wife,

14  to tell you the truth.

15     Q.    All right.  Prior to receiving that -- that

16  K-2 report that -- that you mentioned, what was your

17  practice for when you charged things on that AMEX card

18  that had Lashed Out or Head Kandy on it?  What was your

19  practice for -- for keeping receipts, turning in

20  receipts, or documenting the reasons for the purchases?

21     A.    I was -- I wasn't the greatest at keeping

22  receipts for purchases on there for them.  But I -- I

23  always could be able to come up with access to them.

24  Or sometimes I would -- I bought -- bought something,

25  I'd just take a picture of it, a -- a screenshot, or

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 103

```
1    just a picture of the receipt so I had it, or whatever
2    for like that.  And then the girls in the office, if --
3    when they were doing -- I don't know what you call the
4    -- what do you call that where they -- they go back
5    through and they -- I don't know.  You probably got the
6    word, it's slipped my -- I can't even think of it at
7    the moment, but when they go through to -- to see what
8    was -- whether to -- to pay that or whatever, they
9    would ask me for receipts or whatever.  Then I would
10   just provide them with a receipt if it was there, and
11   give them a -- like a description of where it went.  Or
12   a lot of times, if I just gave them the receipt, they
13   knew where it went or what was going on.  So --
14       Q.   Okay.
15       A.   Expense reports.  Sorry.  That was -- that
16   was the -- the word that was slipping my mind.
17       Q.   Did you have an account at -- at Home Depot
18   that you used online?
19       A.   I don't -- I don't believe so.  Might have
20   been something tied off of what -- like, if you entered
21   a phone number or something like that.  But I don't
22   believe there was, like, any account deal.
23            MR. THOMPSON:  Anthony, I just sent you --
24   it's going to be 5, or 4 and 5.
25            MR. CONVERSE:  Thank you.
```

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 104

```
 1              MR. THOMPSON:  Yep.  Okay.  So mark this as
 2   Exhibit 4.
 3              (EXHIBIT 4 MARKED FOR IDENTIFICATION)
 4   BY MR. THOMPSON:
 5       Q.   Did you have the e-mail address
 6   dustin@headkandypro.com?
 7       A.   Yeah.  That was -- that was mine.
 8       Q.   All right.  So this is an e-mail from the
 9   Home Depot to you, July 5th, 2022, saying you've added
10   a credit card to your Home Depot account.
11              Do you recall adding a credit card to your
12   Home Depot account?
13       A.   And I don't recall on that.
14       Q.   This credit card that was added here, last
15   four digits 4006, do you recognize that?  Do you
16   recognize that -- those last four digits?
17       A.   I do not recognize that, no.
18       Q.   Now, when you say you -- you don't recall
19   doing this, is it -- do you know that you did not add a
20   credit card to your -- to a Home Depot account or is --
21   you -- you may have, and you just don't recall?
22       A.   I -- I may have and I don't recall.  I don't
23   --
24       Q.   Okay.  Understood.  Did you ever use the --
25   the -- the -- your Home Depot account?
```

**HEAD KANDY LLC vs KAYLA MCNEILL**
Dustin McNeill on 07/16/2024

Page 105

1      A.   That's a -- I'm sure it's a possibility.  I
2  ordered some stuff around that time or had some stuff
3  from that time and -- would you say that was July on --
4  is that --
5      Q.   It was added July 5th, 2022.
6      A.   Okay.  So yeah, that was when we were in
7  that new warehouse.  And I was reconstructing or just
8  fixing a lot of things inside there, like the front
9  offices.  There was -- I would say probably 95 percent
10  of the -- the lights didn't work in the front office.
11  So I ended up having to -- I replaced a ton of light
12  bulbs, ballasts, light fixtures, the translucent
13  backing that goes in on just a lot of stuff to that
14  point, plus fixing the heaters.  And so I'm sure that
15  there was probably some stuff on there.  I -- I can't
16  recall off the top of my head what was what and what
17  come from where.  But there was definitely probably
18  some stuff there.
19          MR. THOMPSON:  Okay.  All right.  Show you
20  what we'll -- we'll mark as Exhibit 5.
21          (EXHIBIT 5 MARKED FOR IDENTIFICATION)
22  BY MR. THOMPSON:
23      Q.   This is another e-mail from the Home Depot.
24  Now we're at September 9th, 2022, again to your
25  dustin@headkandypro.com.

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 106

1        A.   And I -- sorry, Colin, I didn't mean to

2   interrupt you.  I can't -- I don't see any of this, so

3   I'm not sure what I'm even --

4             (crosstalk)

5             -- looking to at this point either, so --

6        Q.   Yep.  All right.  Let's -- let's go back and

7   make sure that we've done that.  Okay.  Sorry about

8   that.  I turned on screen share now.

9        A.   Thank you.  Thank you.

10       Q.   So Exhibit 4, I'm showing you what we marked

11   as -- as Exhibit 4.  So this is an e-mail from the Home

12   Depot to you, the July 5th, 2022, your address, adding

13   the card, the last four digits 4006.

14            So now that you actually have seen this --

15   this e-mail, now that I've showed it to you, does this

16   refresh your recollection at all as to whether you ever

17   added an American Express card to your Home Depot

18   account?

19       A.   I mean, I -- I don't -- still don't recall.

20   But, I mean, that's -- that's my Head Kandy Pro there

21   and an American Express card.  But I don't mentally

22   remember actually doing this or seeing this specific e-

23   mail, but --

24       Q.   Okay.  All right.  And now showing you what

25   we had marked as Exhibit 5.  This is the e-mail to you

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

1    at your headkandypro.com e-mail address, September 9th,

2    2022, adding the American Express card ending in 3016.

3         Do you know -- do you recognize the last

4    four digits of the card 3016?

5         A.   I don't -- I don't -- I don't recall that.

6    I don't remember card numbers or recall card numbers,

7    honestly.  Sorry.

8         Q.   Do you recall ever adding another American

9    Express card to your Home Depot account?

10        A.   I don't recall.  No.

11        Q.   Do you know what -- as you looked back, in

12   September of 2022, what you may have been purchasing

13   from the Home Depot for which you added a -- would've

14   added an American Express card to your Home Depot

15   account?

16        MR. CONVERSE:  Objection.  Form

17        THE WITNESS:  I don't.  Sorry.  So that was

18   the -- that would've been the same time -- in the same

19   time frame as that -- that warehouse somewhere, you

20   know, in that amount.  So I don't know.  Honestly, I

21   don't recall.

22        MR. THOMPSON:  Okay.  Okay.  We've been

23   going about another hour here, so probably a good time

24   to -- to take a break.  We can -- now, I guess, noon,

25   lunchtime for you all out there too.  We're past ours.

**HEAD KANDY LLC vs KAYLA MCNEILL**
Dustin McNeill on 07/16/2024

Page 108

1  How -- how long would you guys like a -- a -- a break

2  for this time?  We -- we have stuff right here so we

3  can be ready whenever you guys are.

4          MR. CONVERSE:  Sure.  I guess it just

5  depends upon if we're going to go the distance or not,

6  so the -- I think we might be able to hold out longer.

7  Do you have any --

8          MR. THOMPSON:  We've probably got more than

9  an hour to two hours.

10          MR. CONVERSE:  Okay.  All right.  So why

11  don't we do -- let's see.  What's -- I was going to say

12  45 minutes.  But we're seven minutes until the hour.

13  Want to come back at -- how -- how much -- I -- I

14  didn't ask you, Dusty.  How much time do you need?

15          THE WITNESS:  Oh, I don't need a ton of

16  time, so whatever works for you guys.  I'm -- I'm on

17  board to go through this and get it done.

18          MR. CONVERSE:  Okay.  Why don't we just -- I

19  have to grab something.  How about we come back at --

20  you want to do 2:30 your time, 12:30 our time?  Does

21  that work for you, Dusty?

22          THE WITNESS:  Yeah, that's -- that's fine.

23  BY MR. THOMPSON:

24     Q.   Okay, great.  Before we go off, have you

25  understand all the questions that I've asked you so far

**HEAD KANDY LLC vs KAYLA MCNEILL**
Dustin McNeill on 07/16/2024

1   here today?

2       A.   Yes.  To the best of my knowledge.

3       Q.   Is there anything at this time, the

4   testimony that you provided, that you want to change,

5   clarify, or modify in any way?

6       A.   No.

7           MR. THOMPSON:  All right.  We'll see you

8   back here at 30 past the hour.

9           THE WITNESS:  Thank you.

10          MR. THOMPSON:  Thank you.

11          THE VIDEOGRAPHER:  Time on the monitor is

12  1:55 p.m. and we're off the record.

13          (OFF THE RECORD)

14          THE VIDEOGRAPHER:  Time on the monitor is

15  2:56 p.m. and we're back on the record.

16  BY MR. THOMPSON:

17      Q.   All right, Mr. McNeill.  Back from a break.

18  Thanks for your patience as there was some other stuff

19  that needed to be worked out.

20          Do you have any testimony that you've

21  provided so far here today that you want to change,

22  clarify, or modify in any way?

23      A.   No.

24      Q.   All right.  All right, sir.  Do you know a

25  person by the name of Olivia Honeycut?

**HEAD KANDY LLC vs KAYLA MCNEILL**
Dustin McNeill on 07/16/2024

1      A.   Yeah, I know her.

2      **Q.   Who -- who is Olivia Honeycut?**

3      A.   She was an employee that was at Head Kandy.

4      **Q.   Okay.  What did Ms. Honeycut do for Head**

5   **Kandy?**

6      A.   I'm not 100 percent sure on what she

7   actually -- you know, what she did.  I wasn't involved

8   in that area.

9      **Q.   Did Ms. Honeycut also ever provide any work**

10  **for you or your family?**

11     A.   Not for me I don't, per se, believe.

12     **Q.   And did -- did she do anything for -- for**

13  **your -- your -- your kids or -- or Ms. McNeill at home?**

14     A.   At home?  At -- at, like, our house?  Sorry.

15     **Q.   Yes.**

16     A.   No.

17     **Q.   Okay.  Do you know if she watched your kids**

18  **or any other kids at any of the Head Kandy facilities?**

19     A.   I think she watched Kailyn's kids and a

20  couple of other employees' kids at the Head Kandy --

21  the -- the second one that we -- that -- that got

22  purchased -- at that one.

23     **Q.   In North Carolina?**

24     A.   Yes.  Sorry.

25     **Q.   Do you know if the -- the -- you, or Ms.**

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 111

1   McNeill, or the McNeills ever paid Ms. Honeycut

2   personally for any of her services for watching your

3   children?

4        A.   That I don't know.

5        Q.   All right.  Do you know a Ms. Elise Hopkins?

6        A.   Elsie Hopkins.

7        Q.   Hopkins, I'm sorry.  Yes, Elsie Hopkins?

8        A.   Yes.

9        Q.   Okay.  Who is Ms. Hopkins?

10       A.   She was an employee at Head Kandy.  She

11   started out, like, shipping packages, helping on

12   Facebook, I believe, some stuff like that.  I don't

13   really know the early on parts of what she did there.

14   But I know she was there.

15       Q.   Okay.

16       A.   And that would been in -- in Colorado, when

17   we were in Colorado.  Sorry.

18       Q.   Okay.  Did Ms. Hopkins ever provide any

19   services or help for you or any of your family?

20       A.   She helped my wife homeschool Ryker.  That

21   would be my middle child.

22       Q.   Okay.  And when you say she helped

23   homeschool, what did -- what did -- what did you

24   observe her role to be in that regard?

25       A.   I think it was just a couple hours in the --

**HEAD KANDY LLC vs KAYLA MCNEILL**
Dustin McNeill on 07/16/2024

Page 112

1  the morning.  She helped him stay on track and do his -

2  - his schooling program.  And if he had any questions

3  or anything, she was there to -- to help him as far as

4  my knowledge goes.

5      Q.   And was that at your -- your home in

6  Colorado?

7      A.   No.  I mean, it was over -- she did it over

8  -- with him over Zoom, kind of like we're doing now.

9  So if he was in Colorado with my wife or if he was in

10 North Carolina, you know, there, he would, you know, do

11 it there or, you know, it was just a Zoom thing.

12     Q.   Do you know how long that arrangement

13 existed, that he would -- that she would help your son

14 with reading and such over the -- over Zoom?

15     A.   I don't know.  I don't remember, like, a --

16 a time frame of what it was.  I just -- I think it was

17 a couple hours a -- a day, but I don't know how long --

18     Q.   Do you --

19     A.   -- that was -- went on.  Sorry.

20     Q.   Sure.  Do you know if Ms. Hopkins provided

21 similar services for other children of any other Head

22 Kandy employees?

23     A.   No.  I believe it was just Ryker.

24     Q.   Do you know if -- if you, Ms. McNeill, or

25 the -- the -- the McNeills paid Ms. Hopkins for the --

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 113

1  the services she was providing for your son, Ryker?

2      A.   That I don't know.

3      Q.   Did Ms. McNeill ever tell you that Head

4  Kandy was paying for Ms. Hopkins to provide those

5  services for helping Ryker?

6      A.   You know, honestly, I don't think I ever

7  asked.  I just left that part of the schooling and

8  whatever up to her on that, I just -- kind of marital

9  thing.  I felt that the wife does better with schooling

10  than the -- I do, or the male does.  So that was just

11  left to -- to her to handle taking care of that.

12      Q.   Okay.  Do you know a Ms. Alyssa MacNab.

13      A.   I know -- I know her to -- she was in the

14  front office there at Head Kandy when we -- when I'd

15  come, you know, back and -- through from the back to

16  the front or something like that.  She was in the --

17  the office.

18      Q.   Where?  At --

19      A.   In -- sorry.  Sorry.  In Colorado.

20      Q.   Okay.  And -- and what was her role at Head

21  Kandy in Colorado?

22      A.   I -- I don't -- I couldn't tell you.  I'm

23  sorry.  I don't know.

24      Q.   Okay.  Did Ms. MacNab ever provide any

25  services for you or the McNeill family?

**HEAD KANDY LLC vs KAYLA MCNEILL**
Dustin McNeill on 07/16/2024

```
 1      A.   Not -- not that I'm aware of.  I don't -- I
 2  don't know.
 3      Q.   Did Ms. MacNab ever -- ever come to your
 4  home in Colorado?
 5      A.   I don't know that I ever seen her at -- at
 6  our house.  But I don't -- I was never -- I don't know.
 7  I'm not -- I was never around too much, you know?
 8      Q.   Okay.  Do you know if you, or Ms. McNeill,
 9  or the McNeills ever paid Ms. MacNab out of their
10  personal funds for any services that she provided or
11  any help she provided?
12      A.   That I don't know.  I'm sorry.  I just -- I
13  never took care of any financial stuff.  I'm sorry.
14      Q.   Do you know Alex Relling?
15      A.   I do know Alex.  Yes.
16      Q.   Who is Alex Relling?
17      A.   That was that kid that come in in North
18  Carolina, the 16-year-old kid that come in looking for
19  some -- some help to -- to learn some things and all
20  that out there.  So that's who he is.
21      Q.   Okay.  And was he paid for work by Head
22  Kandy?
23      A.   Yes.  He worked at Head Kandy.  He -- he was
24  there.  I -- I kind of had a little direction over him
25  or helped him out some.  He was -- he cleaned, swept
```

**HEAD KANDY LLC vs KAYLA MCNEILL**
Dustin McNeill on 07/16/2024

Page 115

1   the floors.  He cleaned up all the trash and the

2   cardboard around the place and stuff like that that was

3   left around.  He alphabetized stuff that needed

4   alphabetized as far as, like, shirts, and different

5   products, and stuff like that.  He was just kind of a

6   go-to.  He was kind of a lost soul.  He just needed

7   some guidance, needed some help on, kind of, how to go,

8   what to go, and how to figure out how to work.

9       Q.   Okay.  Did you ever have him work on or help

10  you in any way with the -- the race cars?

11      A.   I think there was a -- there might have been

12  a time where he didn't have anything to do right at the

13  moment.  And I was busy doing something else.  And I

14  had him change some oil or something.  You know, I

15  don't recall a -- a ton of any of that.  But there was

16  probably a -- a time or so that he did that when I was

17  trying to come up with something else for him to do or

18  help that part.

19      Q.   Okay.  Did Mr. Relling ever do any other

20  type of services or help out of -- of you, Ms. McNeill,

21  or your family in a, you know -- non-Head Kandy

22  business?

23      A.   I don't believe so.

24      Q.   Okay.  Do you know if you, Ms. McNeill, or

25  the McNeills in general paid Mr. Relling for any of the

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

1    -- the -- the work that he did?

2         A.   I don't.

3         Q.   All right.  Andrew Shankerman.  Who is

4    Andrew Shankerman?

5         A.   Yeah.  Andrew Shankerman, he come into the -

6    - the business in, had to have been October --

7    September, October, November area of 2020 when we were

8    still here in Colorado.  They brought him in for, like,

9    a warehouse manager type position to -- to control the

10   -- the warehouse, like, employees, that type of stuff,

11   counts, inventory counts, different things like that.

12        Q.   Okay.  Did you know Mr. Shankerman before he

13   became employed by Head Kandy?

14        A.   I had seen him a couple of times.  I didn't

15   know him, like, super personally, anything like that.

16   There was another friend of mine that -- that knew him

17   that got him in touch with us because of COVID.  He

18   lost his job and was looking for another warehousing

19   job, so --

20        Q.   Okay.  So Mr. Shankerman originally worked

21   for Head Kandy in Colorado; is that right?

22        A.   Yes.

23        Q.   And then did he move out to North Carolina

24   when the warehouse moved to North Carolina?

25        A.   Yes.

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

1    Q.   What was Mr. Shankerman's role for Head

2    Kandy in North Carolina?

3    A.   The same as Colorado.

4    Q.   Do you know if Mr. Shankerman was a -- a

5    salaried employee or a -- or an hourly employee?

6    A.   That I don't know.  I'm sorry.

7    Q.   Do you know how many hours per work -- per

8    week -- no, strike that.

9         Do you know if he was full-time or part-

10   time?

11   A.   No.  He was definitely full-time employee.

12   Q.   And -- and what do you understand that --

13   that to mean by -- at Head Kandy?  If someone's a full-

14   time employee at Head Kandy, what -- what does that

15   mean?

16   A.   Every job I went to, somewhere full-time

17   employees, like, 40 hours a week, you know?

18   Q.   Okay.  Has Mr. Shankerman, while he was an

19   employee of -- of Head Kandy, during that time frame,

20   did he ever assist you with the race cars for the kids?

21   A.   Mr. Shankerman lived with us in both of our

22   houses and drew quite, I guess, close to our -- our

23   boys.  And so there was some Tuesday nights there in

24   North Carolina when we would go race over there, that

25   he would come over and help or be with them.  And then

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

1  there was some Saturdays at the same thing that he

2  would come over and -- and be with them or help out.

3  So I mean, yeah, there is.

4       Q.   Okay.  And did Mr. Shankerman ever accompany

5  you and the -- any of the kids on trips for racing?

6       A.   The only one that I can remember off the top

7  of my head was a -- a Las Vegas.  He went to flew out

8  to Las Vegas when we were out there.  But that's where

9  he was from.  So that was over Thanksgiving, I believe.

10  And he went and seen his family also, and then come

11  over and seen us.  He just kind of made a -- I think a

12  trip out of it as he was there.

13       Q.   So other than that trip around Thanksgiving

14  time to Las Vegas, Mr. Shankerman has never accompanied

15  you or -- or -- or been to any of the other kids'

16  racing events?

17       A.   I don't -- I don't remember.  It's a

18  possibility.  But I don't remember.

19       Q.   When -- what time period did Mr. Shankerman

20  live with -- with you?

21       A.   The whole time.

22       Q.   The whole time he was employed?

23       A.   Ever since he started, yes.  He -- he lived

24  with us from the time that he started, because Salida

25  is so expensive to find any type of housing or anything

**HEAD KANDY LLC vs KAYLA MCNEILL**
Dustin McNeill on 07/16/2024

Page 119

1    like that.  So he just -- he just moved in and lived

2    with us to -- so we could help the -- the business with

3    his abilities to grow.  And then when we went to North

4    Carolina, he decided or stated that he would go out

5    there also to help us or help with the business.  So he

6    ended up just living in a little room in our house that

7    we had out there to help -- sorry, excuse me, the

8    business also.  So he lived with us the whole time.

9        Q.   Okay.  And are you aware of any times during

10   the -- the -- the work week, so Monday through Friday

11   from, you know, say 8:00 a.m. to -- to 6:00 p.m., of

12   Mr. Shankerman helping you out in a -- in a personal

13   capacity, helping you with the race cars or with the

14   house or picking up the kids from anywhere?

15       A.   Not that I can remember.  No.

16       Q.   Do you know Dallas Perkins?

17       A.   Yeah.  He was a warehouse employee in

18   Colorado.

19       Q.   Warehouse employee for Head Kandy?

20       A.   Head Kandy.  Yes.

21       Q.   Okay.  Are you -- do you know of Mr. Perkins

22   ever doing any services or helping you or any members

23   of the McNeill family?

24       A.   Not that I can remember, honestly.

25       Q.   Do you have any -- does -- did the -- does

**HEAD KANDY LLC vs KAYLA MCNEILL**
Dustin McNeill on 07/16/2024

Page 120

```
 1   the McNeill family have any dogs?

 2       A.   We just got a puppy, like, three days ago.

 3       Q.   What kind?

 4       A.   It's a dwarf Golden Retriever.

 5       Q.   Okay.  That's the -- the first dogs that --

 6   that you've had since May of 2018?

 7       A.   We had dogs previous to that.  Had a -- a

 8   yellow lab.  But Kayla's parents took that dog.  But I

 9   don't -- I don't recall when that was.  I don't know if

10   that was before '18.  I -- sorry, I don't recall when

11   they actually ended up with that dog.

12       Q.   Did -- between May of 2018 and May of 2023,

13   did -- do you know if Ms. McNeill ever was building one

14   or more spec homes, building a house for someone to try

15   to sell it?

16       A.   I have a spec home thing, yes, that me and

17   my friend have --

18       Q.   Okay.

19       A.   -- we have.

20       Q.   That -- okay.  So you -- you -- that's your

21   that business?

22       A.   Yes.

23       Q.   All right.  Do you know if Dallas Perkins

24   ever provided any assistance for work with regard to

25   the -- the spec home business, such as transporting
```

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 121

1   building materials?

2       A.   No.

3       Q.   You -- you don't know, or you know he did

4   not?

5       A.   No, he didn't do anything for my spec house

6   stuff.

7       Q.   When did you have this spec house business?

8       A.   I -- I don't know exactly when me and my

9   friend started it.  Bought a couple of lots, then we

10  bought a couple more.  And we only built -- we built

11  only, like, three houses total.  And then we had a

12  couple more lots.  And I ended up having to sell those

13  two lots off for some money.

14      Q.   When was that?

15      A.   Which -- which part of that?  Sorry.

16      Q.   When -- all the -- the when you built the

17  spec houses, what time period was that?  You said you

18  built three?

19      A.   Yes.  That -- oh, I think I sold the last

20  one in '21 sometime.  So it would've been previous to

21  '21 and -- and previous.  So somewhere around probably

22  started somewhere in '17 to, like, '21.

23      Q.   Okay.  And did you or Ms. McNeill between

24  May of 2018 and February 2023 have any houses that you

25  rented out?

**HEAD KANDY LLC vs KAYLA MCNEILL**
Dustin McNeill on 07/16/2024

Page 122

```
 1        A.   Yes.  She has a house in Concha Springs
 2   that's been rent -- that's rented out, or does get
 3   rented out.
 4        Q.   And do you know if miss -- or I'm sorry.  Do
 5   you know if Dallas Perkins ever was asked to do repairs
 6   on and clean that residential rental property?
 7        A.   I don't know, honestly.
 8        Q.   You don't know one way or the other if he
 9   did or didn't?
10        A.   I don't know.  I don't recall any of that
11   information if it was.
12        Q.   Do you know Damien Woodruff?
13        A.   Yeah.  He was another employee in the -- the
14   warehouse.
15        Q.   Do you -- he was an employee of Head Kandy
16   in the warehouse?
17        A.   Yes.  Sorry.
18        Q.   And do you know if Mr. Woodruff ever
19   performed any services at your home in Colorado?
20        A.   I don't believe he ever did.  No.
21        Q.   Do you know if Mr. Woodruff ever helped set
22   up a -- a Christmas tree at your house?
23        A.   That I -- I don't know if it -- he did or
24   not.
25        Q.   You don't know one way or the other?
```

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

1    A.   No.

2    Q.   Okay.  Do you know if Mr. Woodruff ever

3    helped clean your -- your home?

4    A.   No, I don't believe he ever helped clean my

5    home.

6    Q.   And do you -- do you know that for -- for

7    sure, or do you --

8    A.   No, I -- I don't know that for sure, but I

9    don't know.

10    Q.   Do you know if Mr. Woodruff ever had to --

11    was asked to -- to pick up furniture from IKEA for Ms.

12    McNeill?

13    A.   I don't ever remember him picking up IKEA

14    furniture.  I do know they had to go pick up some

15    cabinets in Denver that I found for the -- it was

16    basically for the end of the shipping line there at

17    Head Kandy at the warehouse in Colorado, because they

18    were -- the people that were at the packing station at

19    the end were complaining they didn't have any space for

20    anything to store their -- take their products, their

21    stuff like that.  So I found a place, I believe it was

22    probably on Craigslist also, that was given away some

23    cabinetry.

24         So they did go down there and pick up that

25    cabinetry so we could put it -- it was just used

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 124

1  cabinets that somebody had taken out of their house, to

2  put in that at the end of that shipping line so we

3  could make a tabletop across.  And then they had space

4  below to store their different supplies as far as,

5  like, tape and different things like that to continue

6  on to -- to pack.  I do know he went down there for

7  that.  And I think -- I'm trying to think.  I think

8  Dallas might have went with him to help him, make sure

9  they had two people to -- to load that stuff.

10      Q.   Okay.  What -- what is Hayzlee's Boutique?

11      A.   I don't know.  I think it's a business that

12  my wife had started for her daughter.

13      Q.   Do you know if Mr. Woodruff was ever asked

14  to assist with sorting any inventory or moving

15  inventory for Hayzlee's Boutique?

16      A.   That I don't know.  I don't believe so,

17  because I think that stuff was -- was stored in our

18  house.  And I don't just let, like, anybody in my house

19  to -- to do that stuff, so --

20      Q.   So you never -- you never saw Mr. Woodruff

21  there at -- at your house sorting inventory for

22  Hayzlee's Boutique?

23      A.   I never did see that.  No.

24      Q.   Do you know who Ronda Bachelor is?

25      A.   Yeah.

**HEAD KANDY LLC vs KAYLA MCNEILL**
Dustin McNeill on 07/16/2024

Page 125

1        Q.    Was she an employee of -- of Head Kandy's?

2        A.    She was an employee of Head Kandy in

3    Colorado.

4        Q.    And do you know if -- if Ms. Bachelor ever

5    took -- took photos for the Hayzlee's Boutique

6    business?

7        A.    That I don't know.

8        Q.    Do you know Sydney Cook?

9        A.    Yeah.  Yes.  Sorry.

10       Q.    Was Sydney Cook an employee of Head Kandy?

11       A.    She was an employee of Head Kandy in

12   Colorado.

13       Q.    Do you know if Ms. Cook ever providing any

14   babysitting services for the McNeill family?

15       A.    Not that I can think of.  I don't know

16   either direction.  No, I don't.

17       Q.    Do you know Nicole Cook?

18       A.    Yes.

19       Q.    Was Nicole Cook an employee of Head Kandy's?

20       A.    Yes.

21       Q.    Do you know if Nicole Cook ever performed

22   any personal services, babysitting, house cleaning,

23   anything like that for the McNeill family?

24       A.    Yeah.  She -- she started in as an employee

25   to be on Facebook for, hey, can you, like, to do

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 126

1    customer service and that.  I -- I believe that was --

2    I'm trying to think, sometime around the beginning of

3    2021, because that was just before we were going to --

4    we were in the process of getting the warehouse.  We

5    were looking to move in.  And I believe she watched

6    Hayzlee a little bit there as a process as we were

7    trying to deal with figuring out how we're going to get

8    the warehouse, packed up, moved, all that type of

9    stuff.

10        Q.   Do you know if the McNeill family paid

11   Nicole Cook out of the McNeill family funds for those

12   babysitting services?

13        A.   That I do not know.

14        Q.   Do you know if -- if Nicole Cook provided

15   any other work for Head Kandy besides you testified

16   that she started for -- for Facebook, what other work

17   she did?

18        A.   I do not know.  No.

19        Q.   And -- and what do you understood -- stand

20   she did for Facebook for Head Kandy?

21        A.   I think they talked about that she was going

22   to be a customer service person.  So her sister was

23   going to train her to -- to do customer service, or

24   start to.

25        Q.   And when you say they talked about her doing

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 127

1 that, who's they, and when?

2      A.   I don't know when that was, but that

3 would've been, like, Sydney Cook.  I -- honestly, I

4 don't know who else was in on that.

5      Q.   Do you know Jon -- I'm sorry.  Do you know

6 Jerome Fallic?

7      A.   I do.

8      Q.   When did you first meet Mr. Fallic?

9      A.   When I first met him, when he flew that

10 private plane to Salida to talk to my wife about

11 acquiring the business.  That was back in -- I don't

12 remember when that was.  About the end of seven -- it'd

13 been, like, the end of '17 sometime, I think.

14      Q.   Okay.

15      A.   When him and that Stu Fallic come there.

16      Q.   Besides that time that you first met Mr.

17 Fallic in -- in Salida, how many other face-to-face,

18 you know, in-person times have you met with Mr. Fallic,

19 Jerome?

20      A.   Maybe five.

21      Q.   Each of those times that you met with Mr.

22 Fallic, was your wife, Kayla, present?

23      A.   Yeah.  I don't believe I ever met with him

24 without her being there.

25      Q.   Do you know if Ms. McNeill ever met with Mr.

**HEAD KANDY LLC vs KAYLA MCNEILL**
Dustin McNeill on 07/16/2024

1    Fallic when you weren't present?

2         A.   I don't know.  I don't -- I don't recall.

3    But I don't know.

4         Q.   And in any of those times that -- that you

5    were present for meetings or interactions with Mr.

6    Fallic, did you ever see him be -- be rude or

7    disparaging in any way to Ms. McNeill?

8         A.   No.

9         Q.   Did you ever see Mr. Fallic touch Ms.

10   McNeill in any way?

11        A.   No.

12        Q.   Did -- have you ever heard that Mr. Fallic

13   touched Ms. McNeill in any -- in any way?

14        A.   No.

15        Q.   Do you know Jon Rosenbaum?

16        A.   I do.

17        Q.   When did you first meet Jon Rosenbaum?

18        A.   I think it was July -- sometime in July of

19   '22.

20        Q.   How was it that you came to meet Mr.

21   Rosenbaum?

22        A.   He come to the North Carolina warehouse.

23        Q.   When was that?

24        A.   In July of '22, I believe.  It might have

25   been June or something.  It was sometime right around

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 129

1  June, July.

2      Q.   And what is it that you understand the

3  purpose Mr. Rosenbaum came to the warehouse in June of

4  2022?

5      A.   That he was coming there to help just make

6  the business -- just help with the business.

7      Q.   Help with the Head Kandy business?

8      A.   Yes.  Sorry.

9      Q.   What -- what help with the -- the business

10  did you understand Mr. Rosenbaum was going to be

11  providing?

12      A.   I don't know if I ever understood what help

13  he was doing.  He just was brought in by Jerome, I

14  guess, to say -- to help with the business.  So I don't

15  know what they discussed or thought they needed or what

16  needed help or what.  I don't know on that part of it.

17      Q.   Okay.  Did Mr. Rosenbaum ever come out to

18  Colorado?

19      A.   No, he's never been to Colorado that I know

20  of, not to see me.

21      Q.   And let me rephrase that.

22          Did Mr. Rosenbaum ever come out to -- to

23  meet with you, or to your knowledge, with Ms. McNeill

24  in Colorado?

25      A.   No.

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

1    Q.   Have you ever met with Mr. Rosenbaum in

2   Florida?

3    A.   No.

4    Q.   Do you know if Ms. McNeill has ever met with

5   Mr. Rosenbaum in Florida?

6    A.   That I don't know.

7    Q.   Did you have occasions to communicate with

8   Mr. Rosenbaum via text or instant messages?

9    A.   I -- I had freaking basically just phone,

10   either phone call or text messages.

11    Q.   And -- and what was -- what was the purposes

12   that you would be communicating with Mr. Rosenbaum via

13   text or phone call?

14    A.   You know, I don't know, just if it was

15   something business or that.  I don't -- don't really

16   know, you know?

17    Q.   So you would discuss -- you would just have

18   discussions with Mr. Rosenbaum about Head Kandy

19   business via phone and text message?

20    A.   Yes.

21    Q.   And so as of this time, June of -- of -- of

22   2022 and -- and -- and forward, so through the end of

23   January 2023, what -- what was your role with the Head

24   Kandy business?

25    A.   The same as I was doing before.  I was never

**HEAD KANDY LLC vs KAYLA MCNEILL**
Dustin McNeill on 07/16/2024

1  told to change or do anything different than what I had

2  -- had been doing.  So it was just the same as shipping

3  if they needed help shipping, running, like, night

4  crews if they needed help at night.  I mean, I'd sit

5  there and I'd watch -- I set up the whole shipping

6  department inside that warehouse.  So I knew how the

7  system should flow and how the people should go.

8        I tried to keep people in the smaller areas,

9  so they didn't have to move as much.  So there was

10  times that I'd sit there and watch people to see if

11  they were moving in too many different directions, if I

12  could cut their speed down, their time down.  I mean,

13  there was just maintenance of the -- the building and

14  all that.  I mean, that's just -- I just kind of did

15  the same thing.  I was just kind of all over the place,

16  helping where needed help.

17      Q.   So in addition to that role for -- for Head

18  Kandy, and for that you were -- you were paid the --

19  the salary, I think you said 75,000 a year; is that

20  right?

21      A.   Correct.

22      Q.   And in addition to that, did you also

23  provide advice and -- and -- and serve as a -- a

24  sounding board for Ms. McNeill in ideas and -- and

25  thoughts of the -- the Head Kandy business?

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 132

1      A.   I mean, I don't know.  Maybe, I guess.

2      Q.   Did you ever have discussions with Mr.

3   Rosenbaum about, you know, growing the Head Kandy

4   business or ways that the Head Kandy business could be

5   improved?

6      A.   I believe I talked to him, that I thought

7   like -- like a -- a multi-level marketing platform or

8   something might help the business.  We talked about

9   that.

10      Q.   What -- what did you talk to him about the

11   multi-level marketing platform?

12      A.   I -- it was -- honestly, I think it was very

13   vague.  I tried to bring that up to him to talk to him,

14   and I don't -- just on the idea.  And I don't think it

15   ever rent really much any more than that.  He just had

16   to find a -- a new -- a person that could be able to do

17   that.  And I said, no, because I'm not -- I don't know

18   anybody in that industry.  And then I -- I don't think

19   it went much more than to that point, honestly.

20      Q.   Okay.  How often did Mr. Rosenbaum, from

21   that time when he first came on the scene in July of

22   2012 to the end of January 2023, how often did he come

23   to North Carolina for -- for Head Kandy?

24      A.   Every other week, I think.  Like, he was

25   there for four days, wasn't there the next week.  And

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 133

```
 1   then he was there again the next week for four days, I

 2   believe.  I don't -- I don't know it was 100 percent

 3   scheduled as that.  I don't -- you know, I think there

 4   was times it was closer during the time [inaudible

 5   03:20:10].  I don't know.

 6       Q.   And was there -- are -- are you aware of any

 7   times that Mr. Rosenbaum came to North Carolina to the

 8   Head Kandy facilities when you weren't in North

 9   Carolina at the time?

10       A.   I don't believe so.  Not when I was --

11       Q.   How -- how far was your house in North

12   Carolina from the Head Kandy facility?

13       A.   Fifteen minutes.

14       Q.   So the -- if -- if you describe for me the -

15   - the Head Kandy facility in North Carolina as far as,

16   you know, a warehouse and the offices, and -- and then

17   tell me where it was that when you were there, where --

18   where you did your work.

19       A.   Well, the offices were at the -- the very

20   front part of the -- the building.  It was a long,

21   like, skinny -- I guess it wasn't skinny.  It was 80-

22   something feet or whatever across.  But the offices

23   were in the front.  And then outside of the offices

24   there was warehouse space.  And then you went into,

25   like, another section.  There was more warehouse space.
```

**HEAD KANDY LLC vs KAYLA MCNEILL**
Dustin McNeill on 07/16/2024

Page 134

1  And you went into, like, two more.  And there was just

2  warehousing storage space to that.  And then outside of

3  there, I had a -- if you come outside the office, let's

4  just say you walk out of there, you go to the left, I

5  had some tables and different things set up over there

6  where I could test stuff.  I could do different things

7  there, but packaging, shipping --

8      Q.   That was -- I'm sorry.  That -- that was

9  right outside the -- the back of the offices where you

10  was?

11      A.   It was outside of the offices to the left,

12  and over in the very far corner of the building off

13  there onto the -- the left side of it.  So you had to

14  go out the offices.  You had to go left down the

15  building.  And it was over there in the corner.  If I

16  was in that area or if I was fixing or helping, do

17  anything else, I was wherever else around that

18  warehouse or building or whatever.

19      Q.   Okay.  And was it -- were -- were there a

20  lot of machinery going on in the warehouse?  Was it

21  loud in the warehouse or -- or were there big fans,

22  anything like that?

23      A.   There's fans and different, like, air

24  conditioner units running that I ended up get going,

25  stuff like that.  So there was a lot of -- it was noise

**HEAD KANDY LLC vs KAYLA MCNEILL**
Dustin McNeill on 07/16/2024

 1   like that.

 2        Q.   Was there any kind of intercom system or

 3   something for people in the front office to be able to

 4   communicate with the with people back in the warehouse?

 5        A.   Oh, they had a -- they had an old, like, 19

 6   -- I would say 1950s style intercom system in that

 7   building.  It wasn't much of anything.  I rigged a

 8   freaking FM recorder to those speakers that were

 9   originally there.  And we just had a -- an FM radio

10   station, like, local type station there playing.  And

11   it was just playing over whatever those little old type

12   speaker things that were in that -- that warehouse.  So

13   there was nothing, like, major.  I just played some

14   music across several of those --

15        Q.   All right.

16        A.   -- speakers for the people in the warehouse.

17        Q.   So how -- how often would you have a -- an

18   occasion when you worked in the -- the warehouse back

19   there in North Carolina, how often would you come up to

20   the -- the offices during the day?

21        A.   I honestly don't know.  It just -- just

22   varied, you know, when I'd go up there for -- if we ate

23   lunch, I'd -- I'd go up there to the conference room up

24   in that place and I'd, you know, eat lunch because

25   usually a lot of times the wife is there, so I go up

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 136

1   and eat with her or we would do that, so I don't know

2   frequency on coming from the back to the front, so --

3       Q.   And while you were there and at -- at the

4   times that -- that Ms. McNeill was -- was also, you

5   know, at the offices in North Carolina, if she had a

6   question for you or needed you to -- to -- to come up -

7   - up front, would she -- would she call you on your

8   cell phone?  Or would she send you a text, hey, can you

9   come up here, anything like that?

10      A.   No.  Usually, if she knew I was in the

11  warehouse or that a lot of times she'd just walk back

12  there, you know, would find me.  Or if Kailyn or

13  somebody else was coming back that was up in the

14  office, if they were talking to her, I mean, I --

15  somebody would just usually inform me or something, you

16  know?  I mean, maybe there was a time that there was a

17  text message or something.  I don't know.  It could be.

18      Q.   Okay.

19      A.   Before -- hold on, Colin.  Before you ask me

20  one more question, can I try to figure out how to turn

21  the volume up?  It's raining pretty bad here and I try

22  to -- I can't hardly hear you, so --

23      Q.   I just noticed that actually in the

24  background.

25      A.   Okay.  I went the wrong way the first time.

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

1  I think we might be better now.  I'm up all the way.

2      Q.  All right.  Can you -- how -- how -- how's

3  this?  Are you able to hear me any better?

4      A.  Yeah.  I got to turn you down just a little

5  bit.  Okay.

6      Q.  All right.  All right.  How -- how would you

7  describe your relationship with Mr. Rosenbaum?

8      A.  Mr. Rosenbaum come in there.  Off the bat, I

9  thought he was a great -- I thought he was coming in to

10  really help.  But I didn't have anything really bad I

11  guess to -- to say about him.  He was always trying to

12  compliment you or tell you that this was great, that's

13  great, you know?  Always was wanting to be around.  I

14  mean, he noticed -- I mean, he noticed that those race

15  cars were in the back of the front and over in the

16  corner of the warehouse, so he'd ask you about that.

17  There was a time he wanted to -- later that one evening

18  that he was there, there was a time he wanted to come

19  over and actually watch the kids practice those things

20  one night when he was there.  So he'd come over there

21  and, you know, practice the -- watch the kids practice

22  those cars, so --

23      Q.  Do you know if there were ever -- are -- are

24  you aware of a -- a time when Ms. McNeill was in town

25  in North Carolina and working at the North Carolina

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 138

1    warehouse when you worked there?

2        A.   Yes.  There was a -- there was a time that I

3    was back here in Colorado.  I had grabbed -- I was --

4    grabbed a -- a truck and a -- a trailer that we had out

5    here.  And I drove it back to North Carolina.  I filled

6    it with some of the returns and stuff that was here

7    when I went back that way.  So I don't -- that was

8    sometime in -- it was in '22, June, July-ish area,

9    somewhere in there.

10       Q.   So that would've been like right when Mr.

11   Rosenbaum first started helping Head Kandy out; is that

12   right?

13       A.   I believe so.  Yes.

14       Q.   Okay.  Do you know of any other time that

15   Mr. Rosenbaum was in North Carolina at -- at Head Kandy

16   when you worked there?

17       A.   Not that I can recall.  There might have

18   been a -- not that I can recall.

19       Q.   Did there -- there come a time when your

20   relationship with Mr. Rosenbaum deteriorated or

21   changed?

22       A.   There was a -- a time slightly, yes.  And

23   then I don't know that I had vocally expressed it to

24   him at that point or anything.  But yes, there was a

25   time that my feelings or my personal likeliness of Mr.

**HEAD KANDY LLC vs KAYLA MCNEILL**
Dustin McNeill on 07/16/2024

1  Rosenbaum has changed.

2      Q.    Okay.  Tell me first, when -- when was that?

3      A.    That would've been probably sometime around,

4  I think it was October 27th or so that my wife had come

5  to me and told me --

6          MR. CONVERSE:  Sorry to cut you off, Dusty.

7  I don't want to get into any specifics of conversations

8  between you and your wife and when she confided in you

9  as her spouse.  Anything that was said around others or

10  is otherwise not private between the two of you, you

11  can certainly discuss that.

12         THE WITNESS:  Okay.

13         MR. CONVERSE:  I hope that didn't mess up

14  your train of thought, so if -- if you had more to say,

15  please say it.  And if you need to be prompted again,

16  we can -- we can ask Colin to do so.

17         THE WITNESS:  Yeah.  Colin, could you ask

18  the question again?  Sorry.

19  BY MR. THOMPSON:

20      Q.    I had asked you if there was a time that

21  your relationship with Jon Rosenbaum changed.  And you

22  said it changed in October 27th or so.  So my next

23  question is, what -- how -- how did your relationship

24  change?

25      A.    I got some information about Jon.

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 140

1    Q.   Okay.  And what information did you get

2  about Jon?

3    A.   About his behavior.

4    Q.   What information did you get about his

5  behavior?

6    A.   The inappropriate behavior that was going on

7  in the office and text messages.

8    Q.   What information about behavior in the

9  office did you learn?

10    A.   That he was making a couple of female

11  employees do yoga.

12    Q.   When did -- when is it that -- that you

13  understand he was doing yoga with female employees in

14  the office?

15    A.   Can you ask that again, please?

16    Q.   Sure.  Let -- let me state it another way.

17  Are -- are you aware of a time that Mr. Rosenbaum

18  participated in yoga with employees at Head Kandy?

19    A.   I don't know specific dates.  Sorry.

20    Q.   Do you know -- what -- did -- you're aware

21  that Ms. McNeill has testified in this case that she

22  did yoga with Mr. Rosenbaum and Kailyn Culp in the

23  office.  You're -- you were there for that -- that

24  testimony, correct?  And -- and that occurred at the

25  Head Kandy facility in North Carolina, correct?

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 141

```
1       A.   That's correct.

2       Q.   All right.  And -- and were you present at

3  the Head Kandy warehouse in North Carolina on the day

4  that -- that -- that yoga took place?

5       A.   More than likely I was in the back of the

6  warehouse.  Yes.

7       Q.   And I believe miss -- Ms. McNeill testified

8  that Mr. Rosenbaum had asked to do yoga before and that

9  she had managed to say, no, I can't; I'm busy today,

10  and had -- had pushed it off.  Were you -- and I'm

11  paraphrasing.  I'm not trying to put words in your

12  mouth.  But do you -- do you recall that general

13  testimony from Ms. McNeill?

14      A.   Yes.

15      Q.   Okay.  So had you been aware prior to the

16  time that -- that this yoga session took place, that

17  Mr. Rosenbaum had asked Ms. McNeill or Kailyn Culp to

18  do yoga before?

19           MR. THOMPSON:  I'm sorry.  It cut off.  I

20  don't know if the court reporter --

21           THE COURT REPORTER:  No.

22           THE WITNESS:  No.

23  BY MR. THOMPSON:

24      Q.   Did you discuss after this yoga session, the

25  -- the yoga with Ms. McNeill and Kailyn Culp?
```

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 142

1     A.    No.

2     Q.    When was the first time you heard that this

3   -- learned that this yoga had -- session had taken

4   place?

5     A.    On the 27th of October, I believe.

6     Q.    And how soon in relation to that October

7   27th or so of -- of 2022, when did the yoga take place

8   as far as you understand?

9     A.    Previous to that, but I don't know.  I don't

10  remember.  I don't recall any specific dates.

11    Q.    So immediately after the yoga session,

12  neither Ms. McNeill nor Kailyn Culp told you about the

13  yoga session until October 27th or so?

14    A.    Yes.  I believe so.

15    Q.    And what were you told about the yoga

16  session as of that October 27th or so date?

17         MR. CONVERSE:  Again, if you learned from it

18  from a source other than -- than your wife or text

19  messages that you viewed.

20         MR. THOMPSON:  Well, hang on.  Are you

21  instructing him not to answer unless that's the case?

22         MR. CONVERSE:  Well, I'm instructing him not

23  to answer to the extent that requires disclosing

24  communications that are privileged between he and --

25  and his wife.

**HEAD KANDY LLC vs KAYLA MCNEILL**
Dustin McNeill on 07/16/2024

1   BY MR. THOMPSON:

2       **Q.   Okay.  So let's first, Mr. McNeill, are you**

3   **able to answer that question without disclosing**

4   **information that was provided by Ms. McNeill to you?**

5       A.   No.

6           MR. THOMPSON:  Okay.  Anthony, are -- I -- I

7   -- I think that it's -- it's waived given the -- the --

8   the claims and the facts and particularly that this is

9   at -- at -- at work and the claim here.  With that, are

10  you still going to maintain the objection?

11          MR. CONVERSE:  Well, can you provide me some

12  more -- I -- I don't understand.  If you just say the

13  claims, I -- I don't see how that waives the spousal

14  privilege anymore than it would waive, you know, the

15  attorney-client privilege, so --

16          MR. THOMPSON:  Okay.  All right.  Well, I'll

17  tell you what, we'll just certify that -- that question

18  or just mark that on the -- on the transcript.  And

19  we'll -- we'll take it up -- we'll take it up later.

20  We'll just keep going.

21          MR. CONVERSE:  Well -- well, like I said, if

22  you just want to give me your position now, we might be

23  able to resolve it.  I just don't understand the -- the

24  position.

25          MR. THOMPSON:  Yeah.  The -- I don't think

**HEAD KANDY LLC vs KAYLA MCNEILL**
Dustin McNeill on 07/16/2024

Page 144

1    the spousal privilege applies in -- in -- in this

2    context.  But if you have and you're prepared to make

3    the objection and -- and I'm not going to -- I'm not

4    going to sit here and cite law to you about it.  If you

5    want to maintain it and you're confident in the

6    objection, then -- then -- or the instruction, then

7    have at it, and we'll just deal with it.  We'll deal

8    with it later.  So are -- are -- are you going to stand

9    by the instruction or --

10         MR. CONVERSE:  Yeah.  Again, I -- I just --

11   I don't think you've provided your position.  So if you

12   want to provide your position as to why --

13         MR. THOMPSON:  I'll -- I'll make -- I'll

14   make my position clear.  I don't think it's appropriate

15   to instruct the witness not to answer.  If you do,

16   that's fine.  And we'll deal with it -- deal with it

17   later.  We'll mark the question.  If -- if I'm right,

18   we'll go forward on it.  If you're right, then -- then

19   there's nothing to -- to talk about or you'll -- you'll

20   win on the argument, so --

21         MR. CONVERSE:  No.  I understand what the --

22   I -- I -- I understand the -- the results you want.  I

23   just meant why you believe -- when I asked you, you

24   said the claims.  And I just don't understand why the

25   claims waive it, so if you can give me any --

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 145

1          MR. THOMPSON:  No.  I don't -- I don't have

2    to do that.  If you are confident in the instruction,

3    you -- you are -- are -- are welcome to maintain the

4    instruction.  If you're not confident in it or want to

5    -- to not make the instruction, then just let me know

6    now.

7          MR. CONVERSE:  Well, first, you asked me, so

8    I was providing you information.  Second of all, I

9    think we have an obligation to confer.  So if you

10   wanted me to confer on the spot so we didn't have to

11   certify it and we can maybe just get this resolved

12   quickly, I'm -- I'm making an offer to you to -- to do

13   that because I certainly don't want to create any undue

14   expense or -- or anything like that for the parties.

15   If we can resolve it, then I'd just soon resolve it

16   now.  And I just don't understand the -- the contention

17   about the claim.  So that -- that's why I -- I -- that

18   was the secondary reason as to why I asked.

19         MR. THOMPSON:  Sure.  Given the allegations

20   and the -- the basis of the -- the claims here and the

21   damages alleged, I don't believe you can hide behind

22   the -- the -- the spousal privilege.  But that is --

23   that -- that is my position.

24         MR. CONVERSE:  Okay.

25         MR. THOMPSON:  So yeah.

**HEAD KANDY LLC vs KAYLA MCNEILL**
Dustin McNeill on 07/16/2024

Page 146

```
 1              MR. CONVERSE:  But -- but we're -- we're
 2  asserting the -- the -- both on behalf of Ms. McNeill
 3  and mister -- or Mrs. McNeill and Mr. McNeill.
 4  BY MR. THOMPSON:
 5       Q.   All right.  And, sir, are you going to
 6  follow the instruction of your counsel not to answer
 7  the question?
 8       A.   Yes.
 9       Q.   Did Ms. Kailyn Culp ever tell you anything
10  about the yoga session?
11       A.   I don't believe so.
12       Q.   Did you ever ask Ms. Kailyn Culp anything
13  about the yoga session?
14       A.   I don't believe I did.  No.
15       Q.   Did you ever have any discussions with Mr.
16  Rosenbaum about the yoga session?
17       A.   No.
18       Q.   Why not?
19       A.   Well, because, honestly, I was trying to
20  keep the peace as much as I could keep the peace in
21  that place without doing something I would regret later
22  on.
23       Q.   After you learned of the yoga session and on
24  about October 27th, did your interactions or
25  relationship with Mr. Rosenbaum change?
```

**HEAD KANDY LLC vs KAYLA MCNEILL**
Dustin McNeill on 07/16/2024

Page 147

1       A.   I don't know that they honestly changed very

2   much because I was trying to at least keep the peace.

3   It was -- this has been my wife's whole life, my whole

4   life for a long time here.  We had everything invested

5   into this business.  And I was trying to keep as much

6   peace in the place as I possibly could.  Plus, when you

7   talk, Mr. Rosenbaum all the time, he just tells you how

8   close friends he is with Jerome, how much power they

9   have, what they got, what they can do, you know?  So I

10  figured the most peace I can keep with all of this, the

11  best case scenario would be for that.

12      Q.   After you learned about the -- the yoga

13  session, did you in any way change your actions or

14  behavior when Mr. Rosenbaum was at the Head Kandy

15  facility when Ms. McNeill was also -- also present?

16      A.   I stayed slightly closer to around the front

17  area to it.  I didn't wander off extremely far.

18      Q.   Besides the yoga, did you ever learn of --

19  is there anything else with regard to the -- what you

20  said the -- that Mr. Rosenbaum's behavior in the office

21  that made female employees uncomfortable?

22      A.   Well, he's -- I heard that he was a -- a

23  screamer.  He wanted to scream at everybody.  He would

24  use the freaking bathroom door with the bathroom wide

25  open.  Or he used the bathroom with the bathroom door

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

1    open.  He just -- he was not rich.

2         Q.   And when did you learn of -- of Mr.

3    Rosenbaum using the bathroom with the door open?

4         A.   I first learned that -- we had a meeting

5    there the first -- when he showed up the first time.

6    There was several other people in that meeting, also.

7    I think there was Mindy McDermaid, Rachel --

8         Q.   Pincus?

9         A.   Yes.  Sorry.  So that was -- she was in

10   there.  Ryan Thompson was in there.  Kayla was in

11   there.  Kayla was in there and myself.  And I don't

12   remember.  It was during that meeting sometime he

13   walked out, walked right outside the door and relieved

14   himself in the freaking bathroom kind of next to it

15   that everybody could hear.  And it's just -- I mean,

16   you don't necessarily like or feel good about hearing

17   somebody pee.

18        So that was the first time that I had

19   encountered that.  But he's so -- at that point, he was

20   so new there that I didn't think anything.  I thought

21   maybe there was something in front of the door and the

22   door was stuck.  I don't -- you know, I didn't know at

23   that point.  So that was the first encounter that I'd

24   had of that.  And then when I was -- I think I was told

25   of several others.  I don't know actually specifics on

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 149

1    time frame of what.  But then once I heard it, I knew

2    that he had done it once, so what's going to stop him,

3    I guess, from doing it again at that point, so --

4         Q.   Did you ever hear of mister -- other than

5    the time that -- that you say you were present for, did

6    you ever hear that Mr. Rosenbaum had used the restroom

7    in the North Carolina warehouse with the door open?

8         A.   Like me personally hearing him pee?

9         Q.   Did anybody -- no.  Did anybody else tell

10   you that, that it happened more than that one time?

11        A.   Just the conversation I had with my wife.

12        Q.   After that meeting, you know, you said, oh,

13   maybe it was the door or something was wrong.  Did you

14   -- did you take a look to see if the door wasn't

15   latching or if it was out of kilter and would -- would

16   swing opened if it wasn't latched?

17        A.   Honestly, I did not.  No, I didn't.

18        Q.   After -- during that meeting, when you say

19   Mr. Rosenbaum went and relieved himself without closing

20   the door, did -- when he came out, did Mr. Rosenbaum

21   say anything?

22        A.   I don't believe so.  No.

23        Q.   Okay.  Any other behavior of Mr. Rosenbaum?

24   You mentioned the yoga, screaming, and using the -- the

25   bathroom.  Is there any other behavior that you learned

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 150

1   of -- of on the part of Mr. Rosenbaum that was making -

2   - that you understood was making female employees

3   uncomfortable?

4        A.   Probably that if there were, just from what

5   I heard, again, talking with my wife of the -- just the

6   language, some of the language that he would use inside

7   the -- the facility.

8        Q.   Did you ever see Mr. Rosenbaum touch Ms.

9   McNeill in any way?

10       A.   I never witnessed it firsthand.  No.

11       Q.   Did you ever see Mr. Rosenbaum touch any

12   other Head Kandy employees?

13       A.   Yes.

14       Q.   Who?

15       A.   Ms. Kailyn Culp.

16       Q.   What did you see?

17       A.   It was -- I don't know dates.  It was after

18   lunch.  I had left my drink cup in the conference room

19   from having lunch.  I come from the -- outside from the

20   warehouse, walked into the office area to head to the

21   conference room.  And the two of them were standing in

22   the doorway of the conference room.  And I just had

23   watched him run his hand down the side of her face, to

24   like right here.  And as soon as he noticed me, he

25   pulled his hand back.  And he goes, oh, that's probably

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 151

1   inappropriate.

2        Q.   Do you know what the time frame of that was?

3        A.   Time frame on, as in?

4        Q.   When -- when that happened?  I'm sorry.

5        A.   I do -- I do not know the time frame on

6   that.  That was probably August area, somewhere in that

7   range, but -- and to 100 percent of it, I didn't -- I

8   was just focused on getting my drink.  I didn't really

9   think too much of it.  I just grabbed my -- went in and

10  got my drink and left, you know?  I mean, at that

11  point, what do you -- I mean, what are you supposed to

12  say to even something like that, you know?  I mean --

13       Q.   Did Kailyn Culp ever talk to you about that

14  -- that event?

15       A.   I don't know.  She never mentioned anything

16  to me about that again.

17       Q.   Did you ever mention anything to Mr.

18  Rosenbaum about that?

19       A.   No.

20       Q.   Did Ms. McNeill ever say anything to you

21  about that touching of -- of Ms. Kailyn Culp?

22       A.   I don't know that she ever did.  No.

23       Q.   Now you've used or stated that you believe

24  it was October 27th that you learned of the -- the yoga

25  session.  Why -- why does that date -- why is -- why is

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 152

1    it that you -- you used that date as the date you

2    believe you learned of it?

3        A.   I used that date because that's the date

4    that I text Brian Feldman right after I had received

5    that information asking if I could call him and

6    basically just to discuss this.  The text message was

7    just straight, can I call him?  I wasn't going to put

8    anything else in a text message.  I just needed to talk

9    to Mr. Feldman.

10       Q.   So you sent a text message to Mr. Feldman on

11   October 27th saying, can I -- can I call you?

12       A.   Yes.

13       Q.   Do you know what time that was?

14       A.   That would've been morning time maybe.  I

15   would have to look at those text messages.  Probably

16   10:00 in the morning out there, 10:30, somewhere in

17   there, I believe.

18       Q.   And you reviewed that -- that text message

19   prior to your deposition today?

20       A.   I did not review that.  No.

21       Q.   Okay.  So what -- what -- how did that -- do

22   you -- is that just something the -- October 27th,

23   2022, you sent an e-mail to Brian Feldman in the

24   morning.  Is that just something that's in your memory?

25   Or did you see that as you were gathering the documents

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

1  to produce in this -- in this case?

2      A.  I -- I'm sorry.  I didn't send an e-mail.  I

3  sent a -- a text.

**4**      Q.  A text message.  I'm sorry.

5      A.  And that is something that sticks in your

6  memory.  When you get heightened and you are elevated

7  basically emotionally-wise, your serotonin levels in

8  your brain are up there.  You remember more things at

9  that point.  And that is just one thing that has stuck

10  in my mind, is that and that date and me texting him to

11  have a discussion with him over issues.

**12**      **Q.  Okay.  And at -- is it fair to say that when**

**13  you learned of -- of the -- the yoga on -- on October**

**14  27th, 2022, that you were very upset with Mr.**

**15  Rosenbaum?**

16      A.  I was really concerned.  And -- and let's

17  just say, if Mr. Rosenbaum would've been in that

18  facility or somewhere around that facility, there would

19  probably be a slightly different outcome to what we

20  have going on right now.  So I was upset, yes.

21          There's another thing that goes in there.

22  You -- when he's the person that's running the whole

23  place, that's doing everything, eggs in one basket, to

24  a point, what are you going to do, you know?  I mean,

25  there's -- there's a lot that goes on, that there's a

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 154

1    lot that goes in your mind.  I have three children that

2    I have to watch of what I do with them, also, that

3    still need their father at this point, you know?

4            So I was upset with Mr. Rosenbaum, yes,

5    because one thing I thought we had a little bit better

6    maybe of a relationship between kind of the two of us

7    almost when I would talk to him in different things.

8    Just seemed like a -- two different type of person.

9    And I just -- at that point, I didn't really like it.

10       Q.   Okay.  So how -- so obviously, Mr. Rosenbaum

11   wasn't in North Carolina that -- that day, October

12   27th.  So you -- you didn't have a -- a -- a physical

13   meeting, talk with him that -- that day, so he wasn't

14   there, right?

15       A.   No.

16       Q.   Okay.  So did you reach out to Mr. Rosenbaum

17   on -- on that day?  Or did you want to take time to --

18   to cool off?  Did you ever confront Mr. Rosenbaum about

19   the -- the yoga?

20       A.   No.  I need some time to cool off at that

21   point.  And no, I did not confront him anytime after

22   that.  I didn't want to bring any of it back up with

23   everything that went on because if I start reinciting

24   all that stuff in my mind and he's right there, there

25   could be different outcomes to it.  I know myself.  I

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 155

1    know how I need to deal with stuff and how I need to

2    handle it, so -- and how my family needs to handle it

3    and how they needed to deal with it.  And I just -- I

4    wasn't going to confront him over that type of stuff.

5        Q.   Okay.  How long did it take you to -- to

6    cool down after that?

7        A.   It depends on how you want to classify cool

8    down because I'm still probably not 100 percent cooled

9    down over any of this.  So I am -- I tolerate.  But I'm

10   not sure that I cool down -- cool down, you know?  I

11   know how to be cordial to be in a business that your

12   wife has ran and poured her life into, poured her soul

13   into for me to not -- to stop to not hurt somebody

14   basically, honestly.

15       Q.   Do you recall when the next time it was you

16   -- after you learned of the yoga that you spoke with

17   Mr. Rosenbaum either by phone or by -- by -- by text?

18       A.   I don't remember.  No.

19       Q.   Okay.  One second.  The -- the text message

20   that you had with Mr. Feldman the morning of October

21   27th, do you know if you produced that -- that text

22   message in this case?

23       A.   Yes.  I did.

24       Q.   Okay.

25       A.   And if I -- that was a text message.  It was

**HEAD KANDY LLC vs KAYLA MCNEILL**
Dustin McNeill on 07/16/2024

1   text message.

2        Q.   Okay.  All right.  We've been going -- this

3   is probably a good time.  I probably have it here.  I

4   just want to make sure we got it all.  So give me a

5   second to do that.  But before we take a break, have

6   you understand all the questions that I've asked you

7   today?

8        A.   Yes.

9        Q.   And is there anything right now that you --

10  of the testimony that you provided that you want to

11  change, modify, or clarify in any way?

12       A.   No.

13       Q.   All right.

14            MR. CONVERSE:  Colin?

15            MR. THOMPSON:  Yes.

16            MR. CONVERSE:  Just to help you out, it's

17  Bates label DM 15, that text message.

18            MR. THOMPSON:  Right.  All right.

19            All right, let's take a break anyways, since

20  we already said it.  And we'll be --

21            MR. CONVERSE:  Yeah.  How long did you say?

22  Can I have 15 minutes?  I need to return a phone call.

23  Can I -- can we do a -- that -- half -- half past the

24  hour?

25            MR. THOMPSON:  Yep.  That's fine.

**HEAD KANDY LLC vs KAYLA MCNEILL**
Dustin McNeill on 07/16/2024

Page 157

1            MR. CONVERSE:  Okay.  Thanks.

2            MR. THOMPSON:  Thanks.  Bye.

3            MR. CONVERSE:  Bye.

4            THE VIDEOGRAPHER:  Time on the monitor is

5    4:16 p.m. and we are off the record.

6            (OFF THE RECORD)

7            THE VIDEOGRAPHER:  Time on the monitor is

8    4:32 p.m. and we are back on the record.

9    BY MR. THOMPSON:

**10       Q.   All right.  Mr. McNeill, now that we're back**

**11   from the break, any testimony you've provided so far**

**12   here today that you want to change, modify, or clarify**

**13   in any way?**

14       A.   No.

15            MR. THOMPSON:  Okay.  Okay.  We're going to

16   mark --

17            Anthony, do you need this?  This is the --

18   you -- you just told me where it was, the DM 15.  It's

19   actually the 1 through 15.  I'm just going to mark the

20   whole thing.

21            MR. CONVERSE:  Okay.  No.  I got it.  Thank

22   you.

23            MR. THOMPSON:  All right.  You know what,

24   after I say that -- send it to Heather anyways.

25   [inaudible 04:00:17] do that.  I'll figure that out

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 158

1    later.

2             THE COURT REPORTER:  I got it.

3             MR. THOMPSON:  And Number 15 (sic) is going

4    to be Dusty McNeill Production, DM 0001-15.

5             (EXHIBIT 6 MARKED FOR IDENTIFICATION)

6    BY MR. THOMPSON:

7        Q.   All right, sir, are you able to see that

8    document on the screen?

9        A.   Yes.

10       Q.   Okay.  And this is the -- a text message

11   from you to Mr. Feldman, Thursday, October 27th, 9:53

12   a.m., where -- where you say, "Hey, it's Dusty McNeill.

13   Can I call you?"

14            And Brian Feldman says, "Of course, Dusty,

15   any time."

16            Is this the -- the text messages that you

17   were referring to that -- that you sent to Mr. Feldman

18   immediately after learning of the yoga sessions?

19       A.   Yes.

20       Q.   Okay.  Now, I notice here this is just a

21   single text message with nothing after it.  Is this the

22   only text message you ever exchanged with -- with Brian

23   Feldman?

24       A.   Yes.  I never text Brian Feldman.

25       Q.   Okay.  And did you have a call with Brian

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

1    after this text message?  Did you call him?

2         A.   Yes.  I did.

3         Q.   What did you discuss?

4         A.   We discussed the -- I started off discussing

5    a little bit of the direction of the -- the business,

6    how, I guess, everything was kind of changing super

7    radically, super quickly on everything that was going

8    on, that I had just kind of have seen.  And then I went

9    into talking to him about Mr. Rosenbaum and how, you

10   know, what he was doing I didn't think was appropriate,

11   and what was, you know, going on.

12        Q.   Okay.  And -- and what -- as -- as well as

13   you can recall, what specifically did you say to Mr.

14   Feldman about what you thought was -- was inappropriate

15   with regard to --

16        A.   I -- sorry.

17        Q.   -- Mr. Rosenbaum?

18        A.   I talked to him about I didn't think the --

19   the yoga with the -- the female workers in the

20   warehouse and my wife was appropriate.  I told him I

21   didn't think that there needed to be screaming and

22   yelling going on, no matter what it was.  You know, I

23   didn't think that was appropriate in the -- the

24   warehouse.  And I didn't think the -- some of the text

25   messages that Jon had with my wife was appropriate

**HEAD KANDY LLC vs KAYLA MCNEILL**
Dustin McNeill on 07/16/2024

1   also.

2          And I disclosed that stuff to him.  And he

3   told me that there wasn't anything that he could do

4   about Jon because Jon -- Jerome brought Jon in, because

5   Jon wanted to be a partner or whatever in the business,

6   that that was basically his -- that Jon was Jerome's

7   friend.

8          So he says that there wasn't anything he

9   could do about that, he -- but he would try to talk to

10  Jerome and them and see if there was anything that they

11  could come up with, you know, as far as even the --

12  some of the direction that the -- like, the business

13  was -- was running also, you know?  Because he's still

14  -- he's still a 20 percent owner in the business at

15  that point, also.  And then with me having this

16  conversation with him, I mean, I didn't know exactly

17  who else to go to either.

18          There -- there was no HR resources.  There

19  was no any of that that type of stuff with, you know,

20  any of that.  And he's been the -- the contact that my

21  wife had talked to for four and a half or five years,

22  you know, on how everything went on.  So that was one

23  reason why I did that.  And I informed him and just

24  talked to him about it.

25     Q.   Okay.  And did you tell Mr. Feldman anything

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 161

1   that -- that Ms. McNeill had -- had told you about the

2   yoga exercises?

3       A.   I'm not sure that I went into 100 percent

4   specific detail with him.  I just told him I didn't

5   feel that any of that was appropriate, you know?

6       Q.   Okay.  And did you tell Mr. Feldman that Ms.

7   McNeill didn't think it was appropriate?

8       A.   I don't know if I did, or didn't, or what.

9   But I don't feel that any of them had to be doing yoga

10  with two female employees, that there's other employees

11  in a warehouse that could do the same thing.  If it's a

12  full-on company-wide deal, I think that'd be fine.  So

13  I don't know that even -- I -- you know, that's --

14  that's a real touchy subject there, Colin.  I'm sorry.

15  So --

16      Q.   I -- I understand.  And I'm sorry, I just

17  got to -- got to ask the -- the questions.  All right.

18          You mentioned you talked to Mr. Feldman

19  about text messages that you said Jon had sent to Ms.

20  McNeill.  What text messages did you talk to Mr.

21  Feldman about that Jon had sent -- that Mr. Rosenbaum

22  had sent to Kayla McNeill?

23      A.   I think I've mentioned one about him saying

24  something about going live topless, that I didn't think

25  that that was an appropriate deal.

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 162

1      Q.   Okay.  So you mentioned to Mr. Feldman a --

2    an e-mail about that Mr. Rosenbaum had sent about going

3    live topless?

4      A.   A text message.  Yes.

5      Q.   When did you learn about -- when did you

6    first hear about the -- or see that text message about

7    going live topless?

8      A.   Basically that -- that morning.

9      Q.   Okay.  So is that text message, is that

10   something else with regard to Mr. Rosenbaum's behavior

11   that -- that was making people, females in the office

12   feel uncomfortable, including Ms. McNeill?

13     A.   Yes.

14     Q.   Okay.  Because we -- I'd asked you about

15   everything.  And you had told me the -- the yoga, the -

16   - the screaming, the -- the using -- the -- the -- the

17   bathroom.  And that was -- you didn't mention the --

18   the -- the text message about -- about topless.  So

19   we'll add that to the list.

20     A.   Sorry.  You asked about that other female

21   employees.  I -- I don't, on firsthand knowledge, know

22   of any other text messages that he might have sent, or

23   has sent, or anything like that to other female

24   employees.  So I -- I didn't answer it that way.  I'm

25   sorry.  Just because that's -- I didn't understand it,

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 163

1   that you wanted that context in there that way.  Sorry.

2        Q.   Let's go back, because I'm sorry if I was --

3   if I was unclear, in that I'm including Ms. McNeill.  I

4   said, in female employees of -- of -- of Head Kandy.

5   When you said he was doing things that was making

6   female employees of Head Kandy uncomfortable, I thought

7   you were including Ms. McNeill; were you?

8        A.   I -- I'm sorry.  I just -- I was confused on

9   that.

10       Q.   Got it.  Okay.  So of -- of all the -- the -

11  - the behaviors that -- that you learned of by Mr.

12  Rosenbaum that were making anybody at Head Kandy, let's

13  expand it, any employees, including Ms. McNeill, or

14  anyone associated with Head Kandy, uncomfortable, or

15  that were felt to be inappropriate, what other such

16  behaviors do we need to add to the list?

17       A.   The -- the touching.

18            MR. THOMPSON:  Kailyn -- the -- the -- on

19  the face?

20            THE WITNESS:  And my wife on the leg.  Yes.

21       Q.   Okay.  Your -- your wife on the leg, what

22  was -- what was -- what did you learn about that?

23       A.   I learned that he had touched her on her

24  leg.

25       Q.   Okay.  When did you learn -- when did you

**HEAD KANDY LLC vs KAYLA MCNEILL**
Dustin McNeill on 07/16/2024

Page 164

1   learn the information that Mr. Rosenbaum had touched

2   Ms. McNeill on the leg?

3       A.   That same October 27th date.

4       Q.   Okay.  So October 27th, that morning, you

5   learned -- this is the first time you learned all of

6   this information about actions by -- by Mr. Rosenbaum;

7   is that right?

8       A.   That it was that extreme.  Yes.

9       Q.   And did you inform Mr. Feldman when you

10  spoke to him about the -- that -- that Mr. Rosenbaum --

11  you -- you were told that Mr. Rosenbaum had touched Ms.

12  McNeill on the leg?

13      A.   I don't exactly remember 100 percent of

14  everything that I told him.  I told him enough that I

15  would hope that he would talk to somebody, talk to some

16  people, something, whatever he could do to help with

17  what we had going on.

18      Q.   Okay.  And you spoke -- this text message

19  that -- that we still have up that we're marking as --

20          MR. THOMPSON:  What are we marking this as?

21  Exhibit -- it's not 15 .  I think I said 15.  I'm

22  sorry.  It's not Exhibit 15.  It is Exhibit 6.  And we

23  were referring to DM 0015.  But the Exhibit is 6.

24  BY MR. THOMPSON:

25      Q.   So using the exhibit on -- on the screen

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 165

1    sent at October 27, 2022, at 9:53 a.m., when was it

2    that you had the phone call then with Mr. Feldman?

3         A.   That would have been right after that.

4         Q.   Okay.  All right.  Is there anything else

5    that you recall telling Mr. Feldman during that phone

6    call?

7         A.   I don't believe so.

8         Q.   And how -- can you describe to me how your

9    demeanor was during this phone call?  I mean, you'd

10   just learned this information.  Were you angry?  Were -

11   - were -- were you yelling?  Were you just [inaudible

12   04:11:31]?

13        A.   No, I wasn't.  I don't believe I was yelling

14   or anything.  I was -- I was shaken up.  I was -- I was

15   nervous, you know, just hearing all that stuff.  So no,

16   I wasn't yelling, still in the process of processing it

17   all.  But I -- I knew I needed to contact him, you

18   know, right after finding out about it.  So --

19        Q.   And right -- and -- and it was during that

20   call that Mr. Feldman told you there wasn't anything he

21   could do about -- about Jon, is that -- Jon Rosenbaum;

22   is that right, okay?

23        A.   That's correct.

24        Q.   And -- and how did that make you feel?

25        A.   That I thought maybe he would still talk to

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 166

1   Jerome or somebody that -- Jon's best friend, and I

2   mean, Jerome still owns a good chunk of the business,

3   and if they could get it worked out, you know?

4        Q.   Okay.

5        A.   So I think they -- I don't know what went on

6   there.  But I was just hoping that, you know, somebody

7   that we had talked to all the time, or that my wife had

8   talked to all the time, was able to maybe do something.

9        Q.   Okay.  And -- and I had asked you to kind of

10  let us down into this -- these -- this path here, if

11  you -- if your relationship had ever deteriorated, or -

12  - or if there came a time that your relationship with

13  Mr. Rosenbaum deteriorated.  So would you say that as

14  of this October 27th date, your relationship with Mr.

15  Rosenbaum had deteriorated and changed?

16       A.   It had deteriorated and changed.  But I kept

17  up demeanor, profile, I guess, for business, to keep

18  the business trying to move forward at that point, you

19  know, and maybe just trying to stay cordial, stay nice

20  with him, so we didn't have a -- some sort of

21  altercation or whatever, you know?

22       Q.   Okay.  And I -- I believe -- was it -- you

23  told me -- we first asked you about Mr. Rosenbaum that

24  -- that he came in June or July of -- of 2022.  And you

25  were, you know, glad that he was there to help the --

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

1   the business; is that correct?

2        A.   Sure.

3        Q.   So would it be fair to say that after this

4   point you learn of -- of this information in October --

5   the morning of October 27th that you're no longer glad

6   Mr. Rosenbaum is -- is -- is there at -- at Head Kandy;

7   is that fair?

8        A.   Never said that I wasn't glad.  I think he

9   brings a lot of business maybe to the -- to the table

10  to help something move forward.  I mean, I don't -- I

11  had any, other than my personal feelings of being upset

12  at what he had done.

13       Q.   Yeah.  And -- and I'm sorry.  I'm not asking

14  if you ever told him, I'm not glad you're here.  I --

15  I'm -- I'm asking you, is it safe to say that after you

16  learn this information, you no longer were glad that he

17  was there at -- at -- at Head Kandy?

18       A.   I don't know that that's a truthful

19  statement.  I was still hoping that we could get this

20  stuff worked out and that he could be the person that

21  they said that he was going to be, and brought in, to

22  move the business forward, you know?  I wanted to -- to

23  move the business forward.

24            So to say that I was unhappy that he was

25  still there, I don't know that I was unhappy that he

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 168

1   was still there.  I was just hoping that this stuff

2   could get handled, could get taken care of, we could

3   move on to a cordial business type setting, and we

4   could all move forward and get, you know, a business

5   going to where we could all sort of make, I mean, just

6   a business grow, you know, to that point, so --

7         Q.   So despite learning that on the morning of

8   October 27th, despite being told that Mr. Rosenbaum was

9   -- was making your wife and other female employees

10  uncomfortable by engaging in a -- a -- a yoga session

11  that made them uncomfortable, touching Ms. McNeill's

12  leg, and touching Ms. Culp's face, and screaming at

13  them, you were still fine to have Mr. Rosenbaum there

14  to the extent that he could help turn the business

15  around, if he would change that -- that behavior; is

16  that fair?

17         MR. CONVERSE:  Objection.  Form.

18         THE WITNESS:  Yeah.  In the -- in the

19  business aspect, certainly, yes.  Now, do I think he

20  needed to be coming to the Head Kandy warehouse every

21  week to two weeks to continue on that path or doing

22  that, no, I don't think he needed to be there for that.

23  I mean, look at what is done and what's capable of

24  being done over Zoom messages or Zoom links now.  He

25  could have been in that type of deal inside the

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 169

1  warehouse, or inside the -- the business.  But as far

2  as being physically active at that warehouse, I don't

3  know that he needed to physically be active at the

4  warehouse, or the office space in North Carolina.

5  BY MR. THOMPSON:

6      Q.   Did you ever personally talk to Mr.

7  Rosenbaum about his -- about the -- the behaviors that

8  you had learned about the morning of October 27, 2022?

9      A.   No.

10     Q.   When was the next time after you learned of

11  Mr. Rosenbaum -- or what you'd been told about Mr.

12  Rosenbaum's behavior on October 27th, 2022, when was

13  the next time you spoke or messaged with Mr. Rosenbaum?

14     A.   More -- more than likely, I believe it was -

15  - it was probably the next day, or the day after,

16  somewhere in there.  I think he said that we're going

17  to -- something about doing something different with

18  marketing, some different things like that.  So at that

19  point -- I'm trying to recall my memory.  But it -- it

20  would have been probably pretty close to the -- the

21  next day, or two days, whatever.

22          MR. THOMPSON:  6, 7.  All right.  Anthony,

23  I'm sending to you -- it's -- it's two different PDFs.

24  we'll just put it together as one because I think it's

25  just a continuous string here, all right?

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

1          (EXHIBIT 7 MARKED FOR IDENTIFICATION)

2          MR. CONVERSE:  Okay.

3    BY MR. THOMPSON:

4          Q.   Okay.  You seeing the document on the

5    screen, Mr. McNeill?

6          A.   Yes.

7          Q.   Okay.  All right.  So I'm -- I'm pulling up

8    -- this is another document that is Bates stamped DM

9    0019.  This is also a -- a text message communication

10   that you produced in this -- this case.  In your phone,

11   you -- you recognize this as a screenshot of a text

12   message between you and Mr. Rosenbaum?

13         A.   Yes.

14         Q.   And this is also Thursday, October 27th.

15   And you say, "Call me when you have some time to talk."

16              And Mr. Rosenbaum responds, "I -- I had

17   COVID.  I will call you tomorrow."

18              You say, "Oh, damn, that sucks.  I'm sorry.

19   Get to feeling better."

20              "Thanks."

21              You then say, "Call me tomorrow only if you

22   feel better."

23              "Will do."

24              So as of 6:39 a.m., had you already heard of

25   the information that you learned on that October 27th

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 171

1    day about Mr. Rosenbaum?

2         A.   No.

3         Q.   Okay.  What was the purpose of reaching out

4    to Mr. Rosenbaum saying, "Call me when you have some --

5    some -- some time talk," at 6:39 a.m.?

6         A.   Probably -- you know, honestly, I don't -- I

7    don't really remember.  It had been something business-

8    wise.  I think at that point I was also working on

9    figuring out how to lower some of our shipping costs.

10   And I was working dim weights, different things like

11   that.  So I don't know if something at that point was

12   just to run some numbers or do something, ask him at

13   that point.

14        Q.   So do you recall where you were, in the

15   North Carolina or Colorado or anywhere else, on that

16   morning of October 27th, 2022?

17        A.   I was in North Carolina.

18        Q.   Okay.  And where was Ms. McNeill on that

19   day?

20        A.   North Carolina.

21        Q.   All right.  So you were up at 6:39 a.m.  And

22   you sent that, "Call me when you have some time to

23   talk," to Mr. Rosenbaum?

24        A.   Yes.

25        Q.   Before Ms. McNeill had told you the things

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 172

```
 1   she told you about Mr. Rosenbaum's behavior, correct?
 2        A.   Yes.
 3        Q.   All right.  I'm going to go back to --
 4   sorry, I'm trying to -- okay.  Go back to Exhibit 5,
 5   which is the text from you to Brian Feldman, at the
 6   end, 15.  So by 9:53 --
 7             MR. CONVERSE:  Is that 6?  I'm sorry, is
 8   that Exhibit 6 or --
 9             MR. THOMPSON:  Yes. [inaudible 04:22:18]
10   Exhibit 5.
11             MR. CONVERSE:  Yeah.  Okay.
12             MR. THOMPSON:  Yes, I'm sorry, 6.  Thank
13   you, Anthony.
14   BY MR. THOMPSON:
15        Q.   Yeah, Exhibit 6.  So 9:53 a.m., by this
16   time, Ms. McNeill had now told you about the -- what
17   she told you about Mr. Rosenbaum's behavior, correct?
18        A.   Yes.
19        Q.   All right.  So what you had texted to Mr.
20   Rosenbaum to -- that you wanted to speak to him about
21   at 6:39 a.m. is different than what you were texting
22   Mr. Feldman to talk about at 9:53; is that right?
23        A.   Yes.
24        Q.   All right.  So you -- you -- you then didn't
25   talk to Mr. Rosenbaum that -- that morning, that he's
```

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 173

1  told you he had COVID, right?

2      A.   Yeah.  Correct.

3      Q.   So then Mr. Rosenbaum sends to you a message

4  on that -- that same day, still Thursday, October 27,

5  now at 5:31 p.m.  "We are boosting Kayla's live

6  tomorrow to keep her happy and engaged.  Thanks for

7  touching base with me."

8           Now, by that time, 5:31, you had now learned

9  of the information that -- that Ms. McNeill told you

10  about.  And you had also had a conversation about it

11  with Brian Feldman, correct?

12      A.   Yes.

13      Q.   All right.  And -- and were you still upset

14  with Mr. Rosenbaum at this time?

15      A.   I probably have calmed down a majority by

16  then.  Sure, I'm still upset, but --

17      Q.   Okay.  And then so you respond on that day

18  right away to Mr. Rosenbaum, "I think it would be a

19  good thing.  Thank you for being here to help.  We will

20  stay in touch at least once a week."

21           Why, after you learned this information from

22  Ms. McNeill about these actions that were making her

23  uncomfortable by Mr. Rosenbaum and having talked to Mr.

24  Feldman and him saying there wasn't much he could do

25  about Mr. Rosenbaum, why are you telling Mr. Rosenbaum,

Page 174

1    "Thank you for being here to help"?

2                MR. CONVERSE:  Objection.  Form.

3                THE WITNESS:  Because I was thankful he was

4    going to be there to help.  This is trying to keep the

5    business aspect still into it.  This is early on after

6    I'd even talked to Brian Feldman about any of this.  I

7    don't want to frigging -- I wasn't going to shake a

8    boat if they could talk to him and get something

9    frigging figured out.

10   BY MR. THOMPSON:

11        Q.   Right.

12        A.   I mean, I -- you can't tell me how I need to

13   react at that moment in time with what we needed to do

14   with having all of your eggs in one basket, something

15   to -- to continue on.  I'm trying to keep the guy at

16   peace, or close to you [inaudible 04:25:27].

17        Q.   And -- and at this point, were -- were you,

18   in fact, still glad that he was going to be there to

19   help?

20        A.   I am -- was glad that he would be there to

21   help with different things.  I'm not glad that he was

22   inside that office doing what he was doing.  But we

23   have ran -- I mean, this business has gone years

24   without anybody's help, really, you know, of them, so I

25   just was hopeful that somebody would help.  So --

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 175

1      Q.   Okay.  All right.  And then the -- gets cut

2  off, but in the top of those words, looks like it says,

3  "Yes.  Call or text me any time."  Does that -- does

4  that look right to you?

5      A.   That looks correct.

6      Q.   Okay.  So now we're going to do this, what

7  we've marked, what we're going to keep as the second

8  page of this composite exhibit which is marked DM 20.

9  And there it is, the top of that, "Yes, call me or text

10  me any time."

11          It looks like the next text that you have

12  with Mr. Rosenbaum is about 10 days later on November

13  7th; is -- is -- is that correct?

14      A.   That's correct.

15      Q.   And you say, "I think I have a path to make

16  a ton of money with Head Kandy.  We need to talk."  And

17  that was a message to Mr. Rosenbaum at -- at that time,

18  right?

19      A.   [inaudible 04:26:59].

20      Q.   And -- and what was that -- that path?  Is

21  that the multilevel marketing idea?

22      A.   I think so.  Yes.

23      Q.   And did you talk to Mr. Rosenbaum about that

24  multilevel marketing deal at that time?

25      A.   Not at that time, no, because he said he'd

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

 1  call back.

 2       Q.   Okay.  And -- and did you -- he says, "I'll

 3  -- I'll call you tomorrow, with the Londontown

 4  (phonetic) thing."

 5            You said, "Perfect.  That works."

 6            Did you talk to him after that?

 7       A.   I don't recall if I did or not.

 8       Q.   Did you -- the -- the -- the next text

 9  message there is Thursday -- or I'm sorry, Tuesday,

10  December 6th.  Between Monday, November 7th, and

11  Tuesday, December 6th, did you have any other

12  communications with Mr. Rosenbaum at that -- that time,

13  between those dates?

14       A.   It doesn't look like text message or

15  anything.  I mean, I might have had some communication

16  with him if he was in the warehouse or in the offices

17  in North Carolina like that.

18       Q.   When Mr. Rosenbaum would -- would come to

19  North Carolina when you were there, how did he get from

20  the -- the airport to the Head Kandy warehouse?

21            MR. CONVERSE:  Objection.  Form.

22  BY MR. THOMPSON:

23       Q.   If you know.

24       A.   I don't honestly know.  He would just show

25  up.  I think he had some sort of car service or

**HEAD KANDY LLC vs KAYLA MCNEILL**
Dustin McNeill on 07/16/2024

Page 177

1   something bringing him.

2       Q.   Did -- did you ever pick him up at the

3   airport?

4       A.   I never -- I don't believe I ever picked him

5   up at the airport.  No.

6       Q.   Did you ever drop him off at the airport?

7       A.    I dropped him and Jerome Fallic off at the

8   private jet airport there in Conover, Apple (phonetic)

9   what it is.  I -- I don't know what actual town it was

10  or whatever, but that's where I dropped him off at one

11  time.

12      Q.   Do you know if any of -- do you know if Ms.

13  McNeill ever picked up or dropped off Mr. Rosenbaum at

14  the -- at the airport?

15      A.   I don't know if she did or didn't.

16      Q.   Do you know if any of Head Kandy's other

17  female employees ever dropped off or picked up Mr.

18  Rosenbaum from the airport?

19      A.   Not from the airport, I don't believe.  But

20  there's other places that they had taken him.

21      Q.   All right.  And what is -- what -- what

22  information do you have about -- about that?

23      A.   He would get in the car with Kailyn Culp and

24  have Kailyn take him over to the -- his motel that he

25  was staying at.

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 178

1    Q.   Okay.  And did Ms. Culp ever tell you or did

2  you ever learn that that made Ms. Culp uncomfortable?

3    A.   I don't believe that I ever did hear

4  anything of that.

5    Q.   When did you learn that Mr. Rosenbaum was

6  riding in a car with Ms. Culp to his hotel or motel?

7    A.   I don't remember when I learned about day.

8  I didn't really learn about it.  I watched him get in

9  her vehicle.

10    Q.   Yeah.

11    A.   I don't know a certain time frame.  But I

12  watched him get in as we were done with work for the

13  day.

14    Q.   Okay.  And when you saw that the -- how --

15  how many times did you -- did you see that?

16    A.   I probably witnessed that a couple of times.

17    Q.   And did you witness that before or after the

18  October 27th date that you had learned, that Ms.

19  McNeill had told you about what she believed were these

20  inappropriate actions and behaviors of Mr. Rosenbaum?

21    A.   That would have been before.

22    Q.   Did you ever tell Ms. Culp or anybody else

23  at Head Kandy, including Ms. McNeill after you learned

24  the information October 27th, 2022, that they shouldn't

25  be driving him to the airport, picking him up from

**HEAD KANDY LLC vs KAYLA MCNEILL**
Dustin McNeill on 07/16/2024

Page 179

```
 1   hotels or -- or anywhere else?

 2        A.   No.  I don't think that was my place to do,

 3   I guess.

 4        Q.   Okay.  Did you ever talk with -- after you

 5   learned the information on -- on October 27th, 2022,

 6   did you ever talk to anybody at -- at Head Kandy,

 7   including miss -- Ms. McNeill or any other female

 8   employees about, you know, making sure that when Mr.

 9   Rosenbaum was there, that -- that people weren't alone

10   with him?

11        A.   No, I did not.  I just -- I watched myself

12   just a little closer.  But I did not inform any of them

13   to, you know -- I wasn't really the HR person.  I

14   wasn't -- I didn't feel like I was the person that

15   should be doing that.

16        Q.   All right.  Ms. McNeill during her

17   deposition talked about a November 20th, 2022, meeting

18   at Mr. Fallic's house in south -- south Florida, that -

19   - that -- that you attended.

20             Did you hear that testimony last week?

21        A.   Yes.

22        Q.   Okay.  And you were in fact present at that

23   November 20th, 2022, meeting?

24        A.   I was.

25        Q.   How did it come about that you were going to
```

Page 180

1  meet with Mr. Fallic at his house in -- in south

2  Florida?

3      A.   My wife said she needed to have a sit down

4  meeting with Mr. Fallic.

5      Q.   Okay.  And -- and when -- when was it

6  determined -- I want to use as -- as bookmarks the

7  October 27th, 2022, is when Ms. McNeill told you of --

8  of -- of behaviors of -- of Mr. Rosenbaum that she felt

9  uncomfortable with.

10          How soon after that was it that it was

11  determined that you were going to go down to see Mr.

12  Fallic in -- in south Florida?

13      A.   I think she decided she was going to go tell

14  Jerome on -- I think it was on the 19th.  So it was

15  just the day before we ended up going down there.

16      Q.   And -- and what -- was there anything that -

17  - that -- that had happened on the -- the 19th that

18  drove that decision to -- to go down there on the 20th?

19      A.   I honestly couldn't tell you what has

20  happened with her or what.  I don't -- I don't know.

21      Q.   Between October 27th, 2022, and the November

22  20th, 2022, meeting, are you aware of any additional

23  actions by Mr. Rosenbaum that made Ms. McNeill or any

24  other employees at Head Kandy uncomfortable?

25      A.   Not that I'm aware of.  I don't know that it

**HEAD KANDY LLC vs KAYLA MCNEILL**
Dustin McNeill on 07/16/2024

Page 181

```
1    got any better as far as the screaming.  Just I don't -
2    - I don't know, honestly.  I don't think so.  I think
3    she had to take some time to cope with what was
4    actually going on.  And then that's when she decided to
5    go down there to tell him.
6         Q.   And did you -- between October 27th, 2022,
7    and November 20th, 2022, did you observe any conduct by
8    Mr. Rosenbaum that you felt was inappropriate in any
9    way or that -- that -- that you thought could make
10   others feel uncomfortable?
11        A.   Not that I can recall.
12        Q.   All right.  So the November 20th, 2022,
13   meeting, was it originally supposed to be at Mr.
14   Fallic's home?
15        A.   That I don't know.
16        Q.   And how did you get to Mr. Fallic's home?
17        A.   I took an Uber from the airport.
18        Q.   And well, do you recall approximately what
19   time it was you arrived at the house?
20        A.   No.  It was early morning because we flew
21   out early.  So it was early morning, 8:00, 7:00, 8:00,
22   maybe something like that.
23        Q.   And when you arrived at Mr. Fallic's home,
24   who was present?
25        A.   Jerome had come out.  He was present, or
```

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

1  opened the door for us at that time.  It was raining

2  really bad.  So --

3      Q.   All right.  And then you and Ms. McNeill

4  went inside the home.  And where'd you go, living room,

5  kitchen?

6      A.   I went -- you go in the home and go straight

7  in.  There's a table sitting in there.  I'm guessing

8  the kitchen table.  I didn't go any other direction of

9  the -- the house to any other rooms.  But the kitchen

10 is -- we went in.  And the table was there.  The

11 kitchen was right off to the -- to the left.

12      Q.   Okay.  And was there anybody else at -- at

13 the home?

14      A.   His wife was there.

15      Q.   Debra Fallic?

16      A.   Yes.  I believe that's her name.

17      Q.   All right.  All right.  So take me through

18 what -- what -- what happens.  You -- you arrive.  Mr.

19 Fallic lets you in.  Ms. Fallic is there.

20           And -- and what -- how does the -- the

21 conversation go?  Or how do you get into the

22 conversation?

23      A.   First off, right before they ever even got

24 into a conversation, he offered me a cup of coffee.  So

25 he went just right over to the kitchen and made a cup

**HEAD KANDY LLC vs KAYLA MCNEILL**
Dustin McNeill on 07/16/2024

Page 183

1   of coffee.  It was extremely hot, but -- and so -- and

2   then he'd come back over with his cup of coffee and sat

3   there.  And my wife had a -- a couple pages of -- of

4   notes that she had.  And she just started to talk to

5   Jerome about all the -- the notes, and all the things

6   that she had, and different things, and all of that.

7        Q.   And where was Ms. Fallic at this time?

8        A.   I believe she was still in the bedroom right

9   there early at that first part of the -- the thing.

10          And I -- we probably weren't there, I don't

11  know, maybe 10 or 15 minutes, somewhere in that range.

12  And then she come out and said, hi, and then asked if,

13  you know, wanted breakfast because she was going to

14  cook some breakfast.

15          And so I told her, yeah, I'll -- I'll eat

16  some breakfast.  It was super early.  We hadn't had

17  anything yet.  So she made -- made some breakfast.  And

18  she made some scrambled eggs and some I think they're

19  like crepe type things rolled up.  And so she made that

20  and put it on the table for us.

21       Q.   Okay.  All right.  And for -- for how much

22  of the whole conversation or meeting was Ms. Fallic

23  present in the room, the same room, the kitchen with

24  you?

25       A.   A good majority of that.  I think she walked

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 184

```
1   back to her -- I mean, I don't know what room she

2   walked back to.  I don't know what room she walked back

3   to.  But she walked past us, walked back for just a few

4   minutes, and then come back out to the kitchen.  And

5   we're right there in the kitchen.  I think she was

6   cleaning dishes and doing different things just, like,

7   right there, you know, next to us.  So --

8        Q.   Okay.  And tell me what it is that Ms.

9   McNeill told or talked to Mr. Fallic about.

10       A.   I just -- I don't recall everything.  She

11  was just going off of her list on everything that she

12  had and needed to, you know, talk to him about

13  different things of the business, how things were --

14  were going, where it was going.  Then she started in on

15  -- on Jon and talking about Jon and how he was changing

16  everything, and then that some of the, I don't know,

17  some of the reports weren't quite the same that they

18  were getting from different places.  That they needed

19  to look at the actual reporting right.

20            Then she just went into -- and talked to him

21  about what Jon, you know, has done.  And then begged

22  Jon not to harass Jerome.  You know, begged Jerome to

23  have Jon not come back, basically.  You know?  She was

24  crying throughout.  There was just -- there was a lot

25  of conversation and stuff that was going on.  I was
```

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 185

1   just -- I was there for a lot of moral support at that

2   point, basically.

3       Q.   Okay.  And did Ms. McNeill tell Mr. Fallic

4   any of the things that Ms. McNeill had -- had told you

5   on that morning of October 27, 2022?

6       A.   Yeah.  She told him all of it that had gone

7   on.

8       Q.   All right.  What -- what specifically did

9   she tell him?

10      A.   Basically everything that Jon had done that

11  I had stated before to her and Kailyn and all of the

12  things that had went on that she had mentioned to me

13  about the text messages that had gone on, the doing of

14  yoga, the -- Jon exposing himself after he did yoga

15  with them.  And what else was it?

16          There was, I mean, the screaming, that Jon

17  was just in there screaming.  He was screaming out,

18  that they were going to liquidate the company.  There

19  was -- I mean, she kind of just poured it all out.  She

20  was pretty upset and crying through the middle of that.

21  And his wife was there, gave her a -- a tissue for, you

22  know, being upset at that point in the end.

23      Q.   Okay.  You just mentioned she told him about

24  Jon exposing himself after yoga.  That's not something

25  that you told me you learned October 27, 2022.

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 186

1      What -- what -- first of all, when did you -

2  - when did anybody tell you about Jon exposing himself

3  after yoga?

4      A.   Sorry.  On -- on October 27th.

5      Q.   Okay.

6      A.   I didn't know if we were -- I'm sorry.  I

7  didn't know if we were in that marital thing or what.

8  That's why I didn't -- I didn't -- so I'm sorry about

9  that.

10     Q.   Okay.  So you learned of the -- that -- that

11  Jon had exposed himself.  What -- what did you -- what

12  did you learn that -- that Jon had -- had done?

13     A.   That he had showered in a shower in between

14  Kailyn and Kayla's office, and then come -- opened the

15  door looking for a towel.

16         MR. CONVERSE:  And just to clarify on the

17  state of the privilege, we're not waiving it.  But

18  since you testified that she -- that -- that your wife,

19  Ms. McNeill, told Jerome this -- this -- excuse me, Mr.

20  Fallic, the same things that she told you -- you can

21  identify the things that she has told both of you

22  without waiving the -- the privilege.

23         THE WITNESS:  Okay.  I'm sorry.

24  BY MR. THOMPSON:

25     Q.   Okay.  All right.  So she told you that Jon

Page 187

1    had showered and showered between Kailyn and Ms.

2    McNeill's office, and had come out looking for a -- a -

3    - a towel.

4            So you knew that -- you had -- you had

5    learned of that that morning of October 27th, 2022; is

6    that correct?

7        A.   Correct.  Yes.

8        Q.   All right.  The -- the -- the showers -- the

9    showers -- I understand there were showers in this

10   warehouse between offices, like, kind of like a Jack

11   and Jill bathroom; is that right?

12       A.   Yeah.  There was -- there was multiple

13   showers in the -- in the warehouse or in the office

14   facility or --

15       Q.   And -- and were all of those showers used

16   regularly by employees?

17       A.   No.

18       Q.   All right.  What was --

19       A.   Sorry.  There was one upstairs that was used

20   regularly by employees or whoever would come stay

21   there.  There was like a -- a -- a bed and a just kind

22   of, like, a little apartment type deal set up upstairs

23   where somebody come in for a day or two or something to

24   help out, they could, you know, bunk in there.  And

25   there was a bathroom up there and -- with a shower, and

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 188

```
 1   all that type of stuff upstairs in the warehouse.
 2        Q.   So what was the condition of the showers
 3   that were in the -- the -- in between the offices
 4   downstairs?
 5             MR. CONVERSE:  Objection.  Form.
 6             THE WITNESS:  They were a normal -- they
 7   were a typical shower.
 8   BY MR. THOMPSON:
 9        Q.   Sure.  And -- and by that, I mean, were they
10   -- were they clean?  Did they have shower curtains on
11   them?  Were they used for storage of -- of -- of boxes?
12             I mean, describe the physical condition of
13   the shower.
14             MR. CONVERSE:  Same objection.
15             THE WITNESS:  The -- the shower or the
16   bathrooms were -- were clean.  It was just a -- a
17   bathroom in between the offices down below.  So I mean,
18   it's clean.  The girls kept everything there clean.
19   BY MR. THOMPSON:
20        Q.   All right.  And -- and what was -- what --
21   what was explained as far as Jon had showered and came
22   out and exposed himself?
23        A.   It was just explained to me that he had --
24   he had chosen or whatever to shower in that -- that
25   shower there, showered, and then opened the door and
```

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 189

1  asked for a towel, if Ms. McNeill could get him a

2  towel.  And that was what was explained to me.

3       Q.   And -- and opened the door how was it -- it

4  described, you know, opened the door and stuck his head

5  out or --

6       A.   No.  I think he just opened the door and

7  asked for a -- a towel.

8       Q.   And you were told what happened after that?

9       A.   I think she -- she told me she just had got

10  up and -- and had left from that situation.

11       Q.   Okay.  All right.  And -- and this was told

12  to Mr. Fallic on -- on November 20th, 2022?

13       A.   Yes.

14       Q.   Okay.  All right.  And what else was told to

15  Mr. Fallic on November 20th, 2022?

16       A.   It would've been that she was uncomfortable

17  about the text messages, the yoga, the screaming, the -

18  - the yelling, the -- you know?

19       Q.   The -- was it explained to you -- Mr.

20  Rosenbaum opens the -- the -- the door and asks for a -

21  - a -- a towel.

22            Was it explained to you that this was done

23  in a -- in any kind of sexually suggestive way, or a,

24  hey, I need a towel kind of way?

25       A.   I -- I don't know that it was explained to

**HEAD KANDY LLC vs KAYLA MCNEILL**
Dustin McNeill on 07/16/2024

Page 190

1    me in any way other than he just opened the door and

2    was asked for a towel.

3         Q.    Okay.  And so you -- you were -- all you

4    were told is, he opened the door and asked for a towel.

5              What -- you weren't told if he made any

6    motions, or said anything else, or how long he left the

7    door open, nothing else?

8         A.    No.  I didn't ask for a ton of details.  I

9    just -- I just know he showered and opened the door

10   looking for a towel.  You should probably have your

11   stuff together before you go into the shower.

12        Q.    And then you never talked to Mr. Rosenbaum

13   about that episode, did you?

14        A.    No.

15        Q.    And what did Mr. Fallic say in -- in

16   response to -- in response to these statements?

17        A.    He told my wife that he would talk -- talk

18   to him about it.  And that they would get it handled,

19   and they would get it figured out as far as him talking

20   to Rosenbaum and then him talking to my wife.  And I

21   think they had set up that they had wanted to have

22   another meeting in New York.  And he requested that I -

23   - I would be present there also.  I -- and I don't know

24   why he did that other than if it was to reassure that

25   he was going to take care of the stuff or what, but --

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 191

1        Q.    Okay.  We've gone over -- after Ms. McNeill

2    told you about all these things that she said Mr.

3    Rosenbaum had -- had done and his behaviors on October

4    27th, you had that phone call with Brian Feldman.  You

5    told me what you discussed there, but hadn't mentioned

6    the Jon coming out after the -- after the shower.

7            Did you discuss that with Mr. Feldman?

8        A.    I don't know if I discussed that with Mr.

9    Feldman.  I didn't go 100 percent in depth to

10   everything that was truthfully going on.  I just

11   mentioned enough of it hoping that he would see that

12   there's some serious issues going on.

13       Q.    Okay.  But you don't recall specifically

14   telling Mr. Feldman about Mr. Rosenbaum coming out with

15   the door open asking for a -- a -- a towel?

16       A.    I don't know if I specifically said that or

17   not 100 percent.

18       Q.    Do you know if -- if Ms. McNeill ever told

19   Brian Feldman that Mr. Rosenbaum had done that?

20       A.    I don't know.  I don't know about their

21   conversations.

22       Q.    After you had spoken with Mr. Fallic in

23   November, on November 20th, 2022, did your relationship

24   with Mr. Rosenbaum change after that?

25       A.    I don't believe so.  I think it was still

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 192

1    the -- my relationship with him was still the -- the

2    same way that it had gone through -- throughout there,

3    hoping that just trying to keep peace and hoping

4    everything could get taken care of.

5        Q.   All right.  And Ms. McNeill testified at the

6    other day, I think you were -- you were present for --

7    for that -- that after that episode, she would have

8    meetings with Jon but wanted them to be via Zoom.

9            Do you recall that testimony?

10       A.   Yes.  Because she had begged Jerome when we

11   were there to not have Jon come back to the warehouse.

12       Q.   Okay.  And did you -- did you and Ms.

13   McNeill take any actions to try to make sure that --

14   that any interactions from after the November 20th,

15   2022, meeting, any interactions with Jon would be just

16   via Zoom or -- or over the phone rather than in person

17   in -- in North Carolina?

18       A.   No.  I didn't feel that -- that was our

19   place to make those kind of recommendations.  I think

20   that the managing member or the person that was

21   managing the business would make sure that -- that was

22   taken care of, that there would be Zoom meetings or

23   something outside of the source of him just coming

24   back.

25       Q.   After the October 27th, when Ms. McNeill

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 193

```
1   told you these things about Jon, did you -- did you

2   have a sit-down meeting with Jon to discuss anything

3   about Head Kandy or -- or his interactions with Ms.

4   McNeill?

5       A.  I don't believe I did.  No.

6           MR. THOMPSON:  I'll show you -- I'm going to

7   mark as -- as Exhibit 8.

8           (EXHIBIT 8 MARKED FOR IDENTIFICATION)

9   BY MR. THOMPSON:

10      Q.  All right.  This is Bates marked KM6231.

11  This is a Text Message Conversation produced by Ms.

12  McNeill that group chat between -- she's got identified

13  as -- as hubby with the phone number 719-221-0505.

14          Is that your phone number?

15      A.  Yeah.  I don't see anything on the screen.

16  I'm sorry.

17      Q.  Yep.  Well, I'm doing that again.  Okay.

18  Now I've got it on the screen.  All right.  Is that

19  your -- your phone number that I've highlighted?

20      A.  Yes, that's correct.

21      Q.  All right.  Do you recognize this as Jon

22  Rosenbaum's phone number?

23      A.  I don't -- I don't recall.  I don't know

24  Jon's number.

25      Q.  Okay.  Do you -- do you have your phone
```

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

1  there with you that you can type that in and just

2  confirm that -- that is Jon Rosenbaum?

3      A.   Yeah.  One second.  Six, two -- I'm not

4  coming up with anything with that -- that -- that

5  number in my phone there under any text messages.  Let

6  me go out to -- let me just look under my contacts if I

7  type that into contacts, if it --

8      Q.   Sure.  And you may be able to -- I -- I

9  mean, I'll represent to you this was produced as

10  conversations between you -- a group text between you,

11  Ms. McNeill, and -- and Jon.  And you may just

12  recognize the -- the -- the text.  So you know, I'll go

13  down to the start of this thing, which is KM6237.

14          And the first message here from that 862

15  number is, "Changed my flight to North Carolina to

16  Tuesday morning because Thanksgiving travel will be

17  nuts on -- on Monday."

18      A.   Okay.

19      Q.   Ms. McNeill responds, "Okay."  You respond,

20  "Sounds good.  We will see you then."

21          Do you recognize this -- this 862 number now

22  as -- as it's comments of -- of mister -- Mr.

23  Rosenbaum?

24      A.   Right.  Yeah.

25      Q.   Okay.  All right.  So this is November 23rd,

```
1   2022.  So this is two days after the meeting in south
2   Florida with Mr. Fallic, correct?
3       A.   Correct.
4       Q.   All right.  And Mr. Rosenbaum is now telling
5   you that -- that two days later he's coming to North --
6   North Carolina, right?
7       A.   Yep.
8       Q.   Okay.  And you -- you -- you this is you
9   responding, "Sounds good.  We will see you then,"
10  correct?
11      A.   Correct.
12      Q.   And at this point, did you ever send to Mr.
13  Fallic or to Mr. Feldman any message saying, hey, we
14  just had this meeting in -- in south Florida and here
15  it is two days later and Jon's coming to -- to North
16  Carolina?
17      A.   Did I send any message to either one of
18  them?  No.
19      Q.   Yes.  Did you ever have any conversations
20  with either Mr. Fallic or Mr. Rosenbaum -- I'm sorry,
21  or -- or Mr. Feldman about Mr. Rosenbaum coming back to
22  North Carolina three days after that November 20th,
23  2022, meeting?
24      A.   No.
25      Q.   Okay.  I'm going to jump forward in this
```

Page 196

1   text chain.  November 29th, 2022, now you send a

2   message back saying, "Are you coming to North Carolina,

3   or NC today?"  That's North Carolina, right?

4        A.   Correct.

5        Q.   And you send this back to -- you're asking

6   Mr. Rosenbaum here if he's coming to North Carolina on

7   -- on that day, right?

8        A.   Yep.

9        Q.   And -- and so now this is, you know, another

10  week after -- so nine days after the meeting in south -

11  - south Florida, right?

12       A.   Yes.

13       Q.   And -- and had Mr. Rosenbaum already come

14  down to North Carolina once in between there and he is

15  coming back?  Or is this the -- the first time he came

16  back to North Carolina after the meeting in south

17  Florida?

18            MR. CONVERSE:  Objection.  Form.

19            THE WITNESS:  That I don't recall.  But as

20  you can see here, now there's messages between him, my

21  wife, and me.  I got brought into this scenario now to

22  be in the middle of whatever messages and text messages

23  were going back and forth so stuff wasn't getting

24  corresponded where he wasn't doing his normal thing

25  back and forth.  Nobody has -- has stopped him at that

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 197

1  point of coming.

2          So I mean, this was our best option was to

3  try to have all of us, between me and her for me to be

4  inside this text messages so he could -- whatever she

5  was doing or different could be inside of here.  So I

6  had more access to it or whatever, you know?

7  BY MR. THOMPSON:

8      **Q.   So are -- are -- are you saying that you --**

9  **that -- that somebody added you to this text message**

10 **group?**

11     A.   Yeah.  I don't know how or when this went,

12 but yes, I -- obviously, I was added or we got into a

13 group together somehow, some way.

14     **Q.   All right.  But the -- the reason was so**

15 **that Mr. Rosenbaum was communicating with Ms. McNeill**

16 **while you were on the chain, not just with her alone?**

17     A.   Outside of it, yes.  I believe that's why

18 this was done.

19     **Q.   Okay.  Well, let's look at the very first**

20 **message here in this chain.  This is Mr. Rosenbaum**

21 **initiating the -- the -- the text chain, isn't it?**

22     A.   Yeah, I don't know.  I don't know where that

23 comes from.  It -- it could be.  I don't know who did

24 it or what.  I don't know when I was added.  I don't

25 know how that technology works.  I'm sorry.

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

1      Q.   Okay.  Did you ever ask Mr. Rosenbaum to

2  make sure to include you on any text messages that he

3  would have with Ms. McNeill?

4      A.   I don't believe I asked him that.  I don't

5  know if Ms. McNeill added to me this.  I don't know how

6  I got, honestly, in this.  Well --

7           MR. THOMPSON:  What are we on, 9, Exhibit 9,

8  I believe?

9           (EXHIBIT 9 MARKED FOR IDENTIFICATION)

10           THE COURT REPORTER:  Yes.

11           MR. CONVERSE:  Yes.

12  BY MR. THOMPSON:

13      Q.   All right.  Coming to you.  All right.  So

14  start with this text chain.  This is another text chain

15  that -- that we had gone over before.  The -- the idea

16  that you're referring to here, the path to make a ton

17  of money that you sent to -- to Mr. Rosenbaum, that was

18  the multi-level marketing thing, right?

19      A.   Think so.  Yes.

20      Q.   Okay.  All right.  Mr. Rosenbaum says at the

21  end of this -- on -- on Tuesday, now, December 26th, so

22  now we're jumping forward.  This is after October 27th

23  when Ms. McNeill tells you about Mr. Rosenbaum's

24  behavior, and after you've gone down to Mr. Fallic's

25  home at -- in -- on November 20th, correct?

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

1      A.   Correct.

2      Q.   All right.  Tells you, "I'll be back in --

3   in two weeks."

4           Now you're saying, "Yeah.  Yeah, I will see

5   you a -- see you in a week, right, in New York?"

6           That's -- that's you saying that, right?

7      A.   Yes.

8      Q.   Okay.  And then you say to -- to Mr.

9   Rosenbaum after you say -- after his response, yes, you

10  say, "Perfect.  See then you then, buddy."  Correct?

11     A.   That's correct.

12     Q.   All right.  And -- and why is it that after

13  you've -- Ms. McNeill has informed you of -- of Mr.

14  Rosenbaum's conduct in -- in October 27, 2020, you go

15  down and have this meeting with Mr. Fallic on November

16  20th, 2022, and Mr. Rosenbaum is now still coming to

17  North Carolina in person.

18          Why are you referring to Mr. Rosenbaum as --

19  as -- as buddy in this text message?

20     A.   I call everybody buddy, honestly.

21     Q.   Okay.

22     A.   So --

23     Q.   Is that -- and is the just a friendly term

24  that you use?

25     A.   Could be.  So -- but I try to keep -- again,

Page 200

```
 1   I'm trying to keep peace with this to where we can
 2   actually have maybe a freaking business go or something
 3   that goes.  When you have all your eggs in one basket
 4   and nothing is happening, they're not keeping him from
 5   there.  Nobody up above us made any changes for him to
 6   not be around.  I mean, what are you going to do?  You
 7   got to try to, you know, be cordial with him.  And if
 8   he's going to be back in two weeks, okay, I'll see you
 9   then.  I'm trying to step up, be maybe a little bit
10   more of a middle man in between some stuff.
11        Q.   All right.  When was the -- did you have
12   that -- that meeting in New York?
13        A.   Yeah, I believe -- yes, we did.  Sorry.
14   Yes.  I don't -- I don't remember dates on that.  I
15   think it was -- it was on December 13th, something like
16   that, I believe.
17        Q.   So yeah, it says -- so this -- these texts
18   are December 6th.  And you're saying, "I'll see you in
19   a week."  So that sounds about right.
20             December 13th is approximately the New York
21   meeting, correct?
22        A.   Yes.
23        Q.   Okay.  And what was discussed at the New
24   York meeting?
25        A.   Basically, they discussed that they didn't
```

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 201

1   want my wife a part of the business anymore is what was

2   discussed at that meeting.

3       Q.   So then text message December 20th, 5:10,

4   "Are you okay?"  That's Mr. Rosenbaum sending that to

5   you, correct?

6       A.   Yep.

7       Q.   All right.  You say, "Yeah.  I'm good."  So

8   the -- this -- this message is after the -- the meeting

9   in New York, correct?

10      A.   That's correct.

11      Q.   All right.  It says, "Thank you for asking."

12  Or you say, "Thank you for asking."

13           And Mr. Rosenbaum says to you, "I don't

14  enjoy this job right now.  And I'm sure you don't as --

15  as -- as well."

16      A.   Yep.

17      Q.   And at that -- at that December meeting,

18  were there accusations made by Mr. Fallic about actions

19  they had learned that Ms. McNeill had engaged in?

20      A.   I don't recall.  But I don't -- I don't

21  believe so.  I don't think there was any accusations.

22      Q.   Well, you -- you said that at the meeting

23  they were -- you were told that they did not want Ms.

24  McNeill to be a part of the business anymore, correct?

25      A.   Yes.

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 202

1      Q.   And what was the -- the reason that was

2   explained why they didn't want her to be a part of the

3   business anymore?

4      A.   They wanted the -- the business to go a

5   different direction.  They didn't want the business to

6   be founder focused.

7      Q.   Okay.

8      A.   So they come up and said that they would

9   like to buy her out of her shares of the -- the

10  business, is what was brought up in that meeting.

11     Q.   And are -- are you aware of the company,

12  White Pineapple?

13     A.   I am.  Yes.

14     Q.   And by -- by this time in -- in December of

15  2020, had Ms. McNeill already been working on setting

16  up the White Pineapple company?

17     A.   That I don't know.

18     Q.   Are you aware of when Ms. McNeill did a Live

19  on Facebook talking about leggings that she had created

20  for the -- the White Pineapple company?

21     A.   No.  Not -- I don't get live on Facebook.

22     Q.   Was there any discussions during the

23  December meeting in New York about the White Pineapple

24  company?

25     A.   I don't remember.  I -- I don't -- I don't

**HEAD KANDY LLC vs KAYLA MCNEILL**
Dustin McNeill on 07/16/2024

Page 203

```
 1   know if she told him she was going to do something

 2   else.

 3       Q.   Yeah.  At Ms. McNeill's deposition last

 4   week, she talked about receiving numerous letters from

 5   an attorney of -- of Head Kandy's.

 6            Had you -- did you review any of those

 7   letters?

 8       A.   I read through part of them.  A lot of them

 9   just made me sick, sick to my stomach with what was in

10   them or being said, so I didn't review a ton of

11   everything on them.

12       Q.   Okay.  Now, we had talked earlier about -- I

13   had asked you about the roles of -- of several

14   employees and several who had done babysitting and

15   other -- other work for -- for the McNeill family.

16            And are you aware that Ms. McNeill had sent

17   an e-mail stating that those -- that -- that her using

18   a certain employees was unethical?

19            MR. CONVERSE:  Objection.  Form.

20            THE WITNESS:  No.  I was not aware of that

21   e-mail.

22            MR. THOMPSON:  All right.  I'm going to show

23   you what we're going to mark as Exhibit 10.

24            (EXHIBIT 10 MARKED FOR IDENTIFICATION)

25   BY MR. THOMPSON:
```

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

1      Q.   And this is an e-mail chain.  I'll just go

2  down to the start of it here because it's kind of a

3  long one.  Starts with a letter being sent on November

4  28th to Ms. McNeill from Jed Ferdinand, a -- a lawyer,

5  multiple back and forths.

6           And on Friday, December 2nd, 2022, Ms.

7  McNeill sends an e-mail to Mr. Ferdinand and copying

8  Mr. Fallic, Head Kandy Employment, saying, "I just want

9  to explain, and I'm not justifying, I acknowledge it

10  was unethical."  And goes on to talk about those

11  employees that -- that you and I spoke of earlier,

12  Olivia Honeycut, Elsie Hopkins, Alyssa MacNab, Alex

13  Relling.  And says, "I understand fully this doesn't

14  look good."

15           Had you ever seen this e-mail before?

16      A.   No, I have not.

17      Q.   Was it discussed during the December 13th

18  meeting in New York, anything about Ms. McNeill's use

19  of -- of Head Kandy paid employees to do certain

20  personal tasks?

21           MR. CONVERSE:  Objection.  Form.

22           THE WITNESS:  No, not that I know.

23  BY MR. THOMPSON:

24      Q.   All right.  What was the results -- what was

25  the -- the result of that December 13th meeting?  What

**HEAD KANDY LLC vs KAYLA MCNEILL**
Dustin McNeill on 07/16/2024

1  was said at the end of it?

2      A.   I believe we walked out of there.  They

3  restated that they were going to buy her ownership out

4  of the -- the company, and that they were going to get

5  back to her on what the terms was, whatever Jerome come

6  up with, that he was going to buy her out of the

7  business for.

8      Q.   And was Ms. McNeill asked to go and justify

9  or provide support for business expenses that -- or for

10  expenses that were charged to a the -- that AMEX card

11  that Head Kandy paid for?

12     A.   No.

13          MR. CONVERSE:  Objection.  Form.

14  BY MR. THOMPSON:

15     Q.   Do you recall going through an exercise to

16  provide receipts and support for the -- for charges

17  that were made on the American Express card?

18     A.   I looked at a K2 draft report.

19     Q.   Uh-huh.  And during the December 13th

20  meeting, was there any discussions about that K2 draft

21  report, or -- or in general about charges being made on

22  a -- an AMEX card that Head Kandy paid for?

23     A.   No.  And that -- if you want to go back to

24  those text messages of mine, where Jon asked me if I'm

25  okay, December 20th.

**HEAD KANDY LLC vs KAYLA MCNEILL**
Dustin McNeill on 07/16/2024

Page 206

1      Q.   Okay.  What about them?

2      A.   That was the -- on December 20th right

3  there, that day, Jon Rosenbaum come to the office and

4  personally just walked right straight up to me, didn't

5  say anything, handed me a letter.  And that letter was

6  a -- an e-mail from that mister -- that Ferdinand

7  [inaudible 05:20:16].

8      Q.   Uh-huh.

9      A.    And I read through it.  It basically stated

10  that we were using Head Kandy's money, are using it as

11  our own personal piggy bank, that we had stole all

12  kinds of money and this and that off of that, or of --

13  that we had stole a ton of money, and that basically

14  that they were, at that point, were putting us on

15  administrative leave, I believe is the terminology or

16  what was in there.  And that was -- so that was the

17  first time right there that I had ever heard or seen,

18  and I think Ms. McNeill was the same, because after I

19  read it I handed it to her at that point.  And that was

20  the first that we had known or that they had mentioned

21  anything to us about stealing or anything at that point

22  when they gave us that letter.

23      Q.   Okay.  And -- and at that point, did you

24  believe that -- that Mr. Rosenbaum had anything to with

25  -- with you and Ms. McNeill being accused of -- of --

**HEAD KANDY LLC vs KAYLA MCNEILL**
Dustin McNeill on 07/16/2024

Page 207

1   of stealing or using Head Kandy money to pay for

2   personal items?

3        A.   At this point, I had no idea who was

4   involved and who was in what and what was going on.

5        Q.   Okay.  Now, in response to this message by

6   Mr. Rosenbaum, where he says, "I don't enjoy this job

7   right now, and I'm sure you don't as well," you write,

8   "Yeah, it really sucks right now.  I'm sorry you had to

9   come in and deal with this also."

10           Mr. Rosenbaum writes, "Don't worry about me.

11   Everything will work out fairly."

12           What -- why -- why did you say to Mr.

13   Rosenbaum, "I'm sorry you had to come in and deal with

14   this also"?

15       A.   Because I had talked to him about stuff that

16   was going on, or he disclosed to me about how bad the

17   accounting was, and all of their bookkeeping, and all

18   of that type of stuff that was going on in the business

19   that he was trying to get some of that stuff

20   straightened out.

21           That's what I was referring to there is he

22   had to come in and deal with that part of it.

23       Q.   Okay.  At -- at this point, did you think

24   that Mr. Rosenbaum was trying to help you and Ms.

25   McNeill get -- get through this process?

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 208

1      A.   No.  I don't know.  He acts like he wants to

2   help you on one hand and then he turns around and he's

3   kind of two-faced in another hand it seems like, you

4   know?  And so I don't know what to -- to believe or

5   think at -- at whatever point, you know?

6      Q.   All right.

7      A.   Because like -- right -- yeah, I -- I mean,

8   that's kind of my answer.  I just couldn't -- you know?

9   You don't know what to think at this point, when

10   somebody is saying that to you at that point.

11      Q.   And you -- you've told me before that the

12   reason that you didn't confront or talk to Mr.

13   Rosenbaum about the -- the conduct that Ms. McNeill had

14   told you about is because you were trying to keep the

15   peace, because you were trying to save the -- the

16   business and -- and Ms. McNeill's role in the business,

17   right?

18      A.   Correct.

19      Q.   All right.  So -- so after this point, after

20   the December 13th meeting, where Mr. Fallic had said

21   that they were -- didn't want Ms. McNeill to be a part

22   of the business any -- anymore, you -- you still didn't

23   confront Mr. Rosenbaum about what Ms. McNeill had told

24   you about his conduct; is that right?

25      A.   That is correct.  Because they were stating

**HEAD KANDY LLC vs KAYLA MCNEILL**
Dustin McNeill on 07/16/2024

Page 209

1  that they were going to pay us out for her portion of

2  the -- the business, so at this point, I'm still not

3  trying to rock the boat at any point in time at that.

4  And they just told us that we needed to be kept quiet

5  of any of this or anything that was going on.  I don't

6  know for what -- for what -- why reasoning.  But they

7  said, yeah, they needed to keep quiet, and then they

8  were going to work on terms to -- to get paid out.

9          So at this point I'm still trying to keep

10  the peace, because at this point, we have never -- we'd

11  never had reached any agreement that I know of.  I

12  don't think she did.  And there's nothing that -- that,

13  you know, states with any of that, so I don't want to

14  screw up something until we actually had them paying us

15  for our portion of the business.

16      Q.  Okay.  And then do you recall how soon after

17  this the -- the lawsuit was filed against Ms. McNeill?

18      A.  I believe the lawsuit was filed.  And I

19  don't know the actual times on it.  I think it was

20  somewhere around the end of February, if I believe.

21      Q.  And at that point, did you know that -- that

22  Head Kandy believed that -- or was stating that -- that

23  Ms. McNeill owed Head Kandy a substantial amount of

24  money, and it caused damage to Head Kandy?

25      A.  Well, they're stating that, but I don't know

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 210

```
 1   -- I mean, that's how I guess you guys state it.

 2       Q.   Right.  When -- when are you aware of the

 3   first time that -- that Ms. McNeill had ever informed

 4   anyone other than you or Mr. Fallic or -- or Mr.

 5   Feldman about the alleged conduct of Jon Rosenbaum?

 6       A.   Can you ask that again?  I kind of lost you

 7   halfway through that one.

 8       Q.   Sure.  You -- you've told me that Ms.

 9   McNeill told you about Mr. Rosenbaum's conduct in -- in

10   October 27th, 2022, and then told -- and then you told

11   Mr. Feldman that same day, and that you -- or that Ms.

12   McNeill told Jerome Fallic on November 20th, 2022,

13   correct?

14       A.   Yeah.

15       Q.   All right.  So when -- are -- are you aware

16   of any time that -- that -- that Ms. McNeill ever

17   responded to, say, any of Mr. Ferdinand's letters and

18   demands with the accusations of Mr. Rosenbaum's

19   conduct?

20       A.   Oh, I don't -- I don't know any of that

21   information.

22       Q.   And do you know if after the filing of the -

23   - the -- the lawsuit, the original lawsuit, when it was

24   that -- that Ms. McNeill responded by making the

25   accusations against Mr. Rosenbaum?
```

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

1       A.   I don't know.

2       Q.   Do you know when it is -- Ms. McNeill has

3   alleged in this action that she has had to seek

4   treatment from medical providers for mental anguish and

5   issues relating to the conduct of -- of Mr. Rosenbaum

6   and Mr. Fallic's response to it.

7            Are you aware of that?

8       A.   Yes.

9       Q.   And -- and when do you know that Ms. McNeill

10  first started seeking that -- that treatment?

11      A.   That I don't recall.  Early on.  It was

12  early in probably '22.  We -- we kind of -- she went in

13  a dark, deep -- she went in a dark place, basically,

14  couldn't get out of bed, couldn't do anything, couldn't

15  function.  She was having a hard time with all of it.

16           My kids were feeding themselves.  I was

17  trying to keep everything going.  I mean, it was a bad

18  time, so I think she started seeing psychiatrists,

19  stuff like that at that point.  I just -- I -- it was

20  sometime early on in there, at that point.

21           And honestly, I -- I've had to do the same.

22  I have not gone to a psychiatrist.  But I have been put

23  on medications and stuff over all of this and the toll

24  that it's put on our family.

25      Q.   Okay.  When did you first notice Ms.

1  McNeill's mental state changing?

2      A.    In '22.

3      Q.    When in 2022?

4      A.    Probably somewhere around October-ish of

5  '22.  September, October-ish.  She wasn't her same

6  normal, bubbly, carry on self.  And it just

7  progressively got worse as time went on.  It wasn't the

8  same wife that I married freaking 13 years [inaudible

9  05:29:59] than that.  Sorry.

10          MR. CONVERSE:  Do you want to take a break?

11          MR. THOMPSON:  Yeah.  Let's go ahead and

12  take a break.  We've been going for -- for a while

13  right now.  Let's take a break and see if we can wrap

14  this up.

15          MR. CONVERSE:  Okay.

16          THE VIDEOGRAPHER:  Okay.  Time on the

17  monitor is 6:03 p.m., and we're off the record.

18          (OFF THE RECORD)

19          THE VIDEOGRAPHER:  Time on the monitor is

20  6:21 p.m, and we are back on the record.

21  BY MR. THOMPSON:

22      Q.    All right.  Mr. McNeill, we're back from

23  another break.  Is there any testimony that you've

24  provided so far today that you want to alter, change,

25  clarify, or amend in any way?

**HEAD KANDY LLC vs KAYLA MCNEILL**
Dustin McNeill on 07/16/2024

```
 1        A.   No.

 2        Q.   All right.  And have you understood all the

 3   -- the -- the questions that I've asked you today?  And

 4   if you not, you asked me to clarify?

 5        A.   Yes.

 6        Q.   All right.  Thank you very much for your --

 7   your time today.  I have no further questions for you.

 8        A.   Okay.

 9             THE COURT REPORTER:  Do we have any recross?

10             MR. CONVERSE:  All right, Mr. McNeill, I

11   have a few questions for you.  I'm going to share my

12   screen.  This will be -- where are we?  Exhibit 11, I

13   believe.

14             (EXHIBIT 11 MARKED FOR IDENTIFICATION)

15             THE COURT REPORTER:  Yes.  That's correct.

16             MR. CONVERSE:  Thank you.

17                       EXAMINATION

18   BY MR. CONVERSE:

19        Q.   All right.  Are you able to view this e-

20   mail?  The first -- is an e-mail correspondence, the

21   first page here, that's from me, dated February 20th,

22   2023 at 11:59 p.m. to Mr. Ferdinand, with a few people

23   copied; do you see that?

24        A.   Yes.

25        Q.   I'm going to scroll down in the attachments,
```

Page 214

1  follow the e-mail string.  And the -- one of the

2  attachments is a February 21st, 2023 letter from me

3  again that starts on Page 3.  I'm going to scroll down

4  to Page 6 here.

5          As we've been scrolling, have you ever -- do

6  you recall seeing this specific letter?

7      A.   No.  Can't say specific, but I've read

8  several of them.

9      Q.   Okay.  And you were asked questions about

10  whether or not a demand had been made for the -- the

11  forklift that you were instructed to leave in North

12  Carolina by Head Kandy.  Do you remember those

13  questions?

14      A.   Yeah.  Yes.

15      Q.   So if you could just read where it says

16  "demand to Head Kandy" the heading, and then below it,

17  number 1, and can you tell if that refreshes your

18  recollection as to whether or not there had been any

19  demands for return of the forklift on your behalf?

20          MR. THOMPSON:  Object to the form.

21          THE WITNESS:  Yes.  It states in the -- I

22  guess the first sentence there, "Return the forklift."

23  McNeill's forklift.

24  BY MR. CONVERSE:

25      Q.   And so do -- do you now believe that one or

**HEAD KANDY LLC vs KAYLA MCNEILL**
Dustin McNeill on 07/16/2024

1  more requests had been made for return of the forklift

2  that you were told to leave in North Carolina?

3      A.   Yes.

4      Q.   All right.  I'm going to take this off the

5  screen.  Okay.

6           You were asked -- excuse me.  Strike that.

7           You were also asked if the race cars that

8  your boys used were -- were ever stored in the North

9  Carolina warehouse that Head Kandy used.  Do you recall

10  those questions?

11      A.   Yes.

12      Q.   Did Head Kandy own that warehouse?

13      A.   To my knowledge, no.

14      Q.   When the race cars were located there, did

15  any Head Kandy owners ever see them there?

16      A.   Yes.

17           MR. THOMPSON:  Object to the form.

18  BY MR. CONVERSE:

19      Q.   Did -- can you tell me which owners of Head

20  Kandy viewed the race cars in the North Carolina

21  warehouse?

22      A.   Brian Feldman and Jerome Fallic.

23      Q.   All right.  Starting with Mr. Feldman, how

24  do you know that he saw the race cars in the warehouse?

25      A.   He had come to North Carolina.  Once he

**HEAD KANDY LLC vs KAYLA MCNEILL**
Dustin McNeill on 07/16/2024

Page 216

1   borrowed our vehicle to go on a skiing trip.  So he'd -

2   - he'd come to the warehouse at that point because our

3   vehicle was there.  And he needed a vehicle to get up

4   to the ski resort.  I guess they didn't have any 4-

5   wheel drive vehicles or something, so he -- he'd come

6   there for that, and then walk through the warehouse.

7   And all of those racing vehicles were in the back

8   corner of the warehouse, like they always have been.

9        Q.   And did he have an opportunity to view that

10   back corner of the warehouse where the race cars were

11   located at that time?

12        A.   Yes.  Because we walked all the way through

13   the whole warehouse.

14        Q.   Moving to the second owner that you named,

15   Mr. Jerome Fallic, how do you know that he viewed the

16   race cars in the warehouse?

17        A.   Because he did the -- the same thing on a

18   different day, come there and walked through the whole

19   warehouse, looking at -- just looking at everything.

20        Q.   Did you guys speak about the race cars

21   specifically, or -- or racing?

22        A.   Yeah.  There was a -- a thing mentioned.  My

23   little boy was talking to -- Ryker was talking to

24   Jerome about race cars.  And they got to talking about

25   sponsorships.  And Jerome said that he should sponsor

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 217

1  Ryker, and told Ryker that he would sponsor him.  And

2  so that was basically the conversation of that as far

3  as race cars with him.

4      Q.   So turning to the questions you were asked

5  about the forklift -- excuse me.  Strike that.

6           Turning to the -- the questions you were

7  asked about repairing the forklift that was used in

8  North Carolina, you reference some parts that were

9  purchased to repair the forklift.  Do you recall that?

10     A.   Yes.

11     Q.   Did Head Kandy reimburse you for the parts

12  you purchased to repair the forklift?

13     A.   The -- the forklift that I repaired in

14  Colorado with the head gasket, no.

15     Q.   Okay.  And it was Head Kandy employees that

16  used the -- the wrong coolant in the forklift; is that

17  correct?

18     A.   That is correct.  They mixed it wrong.

19     Q.   And is that what necessitated the -- the

20  repair on the gasket?

21     A.   Yes.  That's what I had to replace the head

22  gasket for.  Yes.  That's correct.

23     Q.   When you were being asked about

24  reimbursements for certain expenses, you had referenced

25  the girls in the office reaching out to you, I believe.

**HEAD KANDY LLC vs KAYLA MCNEILL**
Dustin McNeill on 07/16/2024

1  Do you recall that?

2      A.  Yes.

3      Q.  Was there a Head Kandy employee responsible

4  for reconciling business expenses?

5      A.  Yes.

6      Q.  And is that for all times that you were

7  involved with Head Kandy?

8      A.  Yes.  There was always somebody that did

9  that.

10     Q.  Was that employee ever yourself?

11     A.  No.

12     Q.  What about your wife, Mrs. McNeill, was she

13  ever the employee responsible for reconciling the

14  business expenses charged to -- or made by employees?

15     A.  No.  I don't believe so.

16     Q.  You were also asked about a Home Depot

17  account in some e-mails that were received on your Head

18  Kandy Pro e-mail account; do you recall that?

19     A.  Yes.

20     Q.  Was the Head Kandy Pro e-mail account that

21  you used the default e-mail for the Home Depot account?

22     A.  I'm sure it was, yes.

23     Q.  Do you know if administrative e-mails like

24  the ones that you were shown about changes to the

25  accounts were automatically sent to that e-mail

1   address?

2          MR. THOMPSON:  Object to the form.

3          THE WITNESS:  I would believe they would be.

4   Yes.

5   BY MR. CONVERSE:

6      Q.   You were also asked some questions about Mr.

7   Alex Relling.  Do you recall those?

8      A.   Yes.

9      Q.   And I believe you were asked if you asked

10  him to do anything regarding the race cars.  Do -- do

11  you recall those specifically?

12     A.   (No audible response).

13     Q.   I'm sorry, did you say yes?

14     A.   Sorry.

15     Q.   I -- I -- I believe you said that you

16  couldn't really recall, but you may have asked him to

17  change the oil on one of the race cars.  Do you recall

18  that?

19     A.   Yeah.

20     Q.   I understand that you don't really recall,

21  but with regard to that potential task you may have ask

22  him to do, do you know if he was on the clock when you

23  asked him to do that?

24     A.   I don't know when he clocked in or clocked

25  out from the time -- time thing, so I don't know that

**HEAD KANDY LLC vs KAYLA MCNEILL**
Dustin McNeill on 07/16/2024

Page 220

```
 1   for sure.
 2        Q.   You were asked -- excuse me, let me start
 3   over.
 4             You were also asked about IKEA furniture.
 5   Do you recall that?
 6        A.   Yes.
 7        Q.   Do you recall if Head Kandy had any IKEA
 8   furniture in its offices?
 9        A.   Yes, they did.
10        Q.   Do you know if it was multiple pieces of
11   furniture that they had in their offices?
12        A.   Yeah, it was multiple pieces.  It was desks,
13   tables, cabinet compartments, different things like
14   that.
15        Q.   You were also asked about childcare service
16   that a -- a Head Kandy employee had provided.  Do you
17   recall that?
18        A.   Yes.
19        Q.   I -- I believe your testimony was that one
20   employee who would bring her kids to the office was Ms.
21   Culp; is that correct?  Did -- to your knowledge, did
22   any other Head Kandy employees bring their children to
23   the office?
24        A.   Yes.
25        Q.   You also discussed cross-country trips that
```

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 221

1    you made for Head Kandy.  Do you recall that?

2         A.   Yes.

3         Q.   Did those trips result in you working more

4    than 20 hours per week?

5         A.   It's a 24-hour trip from Colorado just to

6    North Carolina, so there would've been several hours

7    there.

8         Q.   I think you were shaking your head yes.  But

9    if you could just give me a verbal response?

10        A.   Sorry.  Yes.  There was.

11        Q.   Did Head -- excuse me.  Strike that.

12             Did Head Kandy compensate you for those

13   extended trips?

14        A.   No.  I just did -- did that extra time and

15   stuff on behalf of -- just for Head Kandy to -- to help

16   keep the business moving, going.  I never -- I never

17   asked for any more pay, any type of anything else, from

18   the very time that I was brought on to help them.  And

19   me and my wife, this was everything we had.  All of our

20   eggs were in one basket at this.

21             So I've put in extra time, extra things,

22   extra effort to make sure that the business was

23   actually going and growing, and trying to move forward.

24   So I didn't mind doing some of that extra stuff for

25   them just knowing that our home run or our -- our --

**HEAD KANDY LLC vs KAYLA MCNEILL**
Dustin McNeill on 07/16/2024

Page 222

1  our deal in the end hopefully was someday the business

2  would be big enough where we could, you know, sell it,

3  sell our portion, something to where we can, you know,

4  financially be a little better off than we are.

5      Q.   Did you regularly work more than 20 hours

6  per week?

7      A.   There was a lot of times that I put in more

8  than 20 hours, yes.

9      Q.   You also discussed Mr. Rosenbaum, and I'll

10  put it as delicately as I can, relieving himself in

11  front of yourself and other Head Kandy employees; do

12  you recall that?

13      A.   Yes.

14          MR. THOMPSON:  Object to the form.

15          THE WITNESS:  Sorry.  Yes.

16  BY MR. CONVERSE:

17      Q.   Did he do that, the -- the one that you

18  spoke about, did he do that in the middle of a -- a

19  meeting?

20      A.   Yes, we were all in a meeting in a -- in the

21  conference room at Head Kandy's office in North

22  Carolina.

23      Q.   So was the meeting still going on when he

24  got up and relieved himself?

25      A.   Yes.

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

1     Q.   So did you feel like you could leave during

2  the time that he was relieving himself?

3     A.   No.  We were all in the conference room

4  having a -- a meeting.

5     Q.   You were also asked questions about mister -

6  - sorry, strike that.

7         You were also asked questions about your

8  feelings towards Mr. Rosenbaum and his presence at the

9  business, I believe.  Do you recall those questions?

10    A.   Yes.

11       MR. THOMPSON:  Form.

12  BY MR. CONVERSE:

13    Q.   And -- and in answer to -- to one of them

14  about a -- a -- a potential attribute, I think you said

15  Mr. Rosenbaum's business etiquette.  Did you -- were

16  you referring to his -- him engaging improper conduct

17  around the office?

18    A.   No.  I'm sorry.  I probably used the wrong

19  language there.  I was more saying his knowledge of --

20  of business because he'd been in business for quite

21  some time and done a lot of big business stuff with a

22  lot of big companies, so just more or less his

23  knowledge, I guess.  Honestly, I did kind of just over-

24  spoke on that.  I'm sorry.

25    Q.   That's all right.  I just wanted to clarify.

**HEAD KANDY LLC vs KAYLA MCNEILL**
Dustin McNeill on 07/16/2024

Page 224

1  Did you have the authority to fire Mr. Rosenbaum?

2       A.   Absolutely not.

3       Q.   After your learned about his conduct towards

4  your wife, would you have pushed harder for him to be

5  terminated had it not been for his relationship with

6  Mr. Fallic?

7       A.   Yes.

8            MR. THOMPSON:  Form.

9            THE WITNESS:  Because he always said that he

10  was best friends with Jerome.  So --

11  BY MR. CONVERSE:

12       Q.   I believe you were also asked questions

13  about your wife's conduct following your meeting with

14  Mr. Fallic in -- the in-person meeting in November of

15  2022.  Do I have that right?

16       A.   Yes.

17       Q.   And I -- I think you were specifically asked

18  to identify if she -- if -- if your wife was

19  uncomfortable with -- with Mr. Rosenbaum's continued

20  presence at the warehouse.  Do you recall that?

21       A.   Yes.

22       Q.   In response to another question, you stated

23  that your wife begged Jerome, I -- I believe you're

24  referring to Mr. Fallic, to prevent Jon, Mr. Rosenbaum,

25  from being at the North Carolina warehouse.  Do you

**HEAD KANDY LLC vs KAYLA MCNEILL**
*Dustin McNeill on 07/16/2024*

1   recall that?

2       A.   Yes.

3       Q.   Do you know why she begged Mr. Fallic to not

4   allow Mr. Rosenbaum to be at the warehouse any longer?

5            MR. THOMPSON:  Object to the form.

6            THE WITNESS:  She was uncomfortable with him

7   being there.  She didn't want him around her.

8   BY MR. CONVERSE:

9       Q.   You were also asked questions about Mr.

10  Rosenbaum exposing himself to your wife.  Do you recall

11  that?

12      A.   Yes.

13      Q.   And there was a lot of talk about him asking

14  for a towel.  Do you recall that?

15      A.   Yeah.

16      Q.   I -- I want to ask about what you know about

17  that event.  Did Mr. Rosenbaum simply crack the door

18  open and yell out and ask for a towel, so he was still

19  shielded by the door?

20      A.   No.

21           MR. THOMPSON:  Objection.

22           THE WITNESS:  Sorry.

23  BY MR. CONVERSE:

24      Q.   Did he poke his head out and simply ask for

25  a -- a towel from --

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 226

1      A.   No --

2      Q.   -- your wife?

3           MR. THOMPSON:  Objection.

4           THE WITNESS:  No, not that I recall.

5   BY MR. CONVERSE:

6      Q.   Did he discuss taking a shower before he

7   actually went in to take the shower?

8      A.   She had told me that, yes, he discussed

9   taking a shower before he actually took a shower.

10      Q.   Do you know if he asked for a towel before

11   he took a shower?

12      A.   I don't --

13           MR. THOMPSON:  Objection.

14           THE WITNESS:  Sorry, Colin.

15           I don't believe he -- he did ask for a

16   towel.

17   BY MR. CONVERSE:

18      Q.   And -- and then going back to how he asks

19   for the -- the towel, I -- I had asked if he was -- you

20   know, just yelled out for help or -- or stayed behind

21   the door.  Is it your understanding that he opened the

22   door and presented his fully naked body to your wife?

23           MR. THOMPSON:  Object to the form.

24           THE WITNESS:  That was my understanding,

25   that he had opened the door and asked for a towel

Page 227

```
1   showing basically the -- the front side of him.

2   BY MR. CONVERSE:

3        Q.   Full frontal nudity?

4        A.   Yes.

5        Q.   All right.  Let me share my screen again and

6   introduce Exhibit 12 now.

7             THE COURT REPORTER:  Just for clarification,

8   is this Defendant's Exhibit 12 or is it still

9   Plaintiff's Exhibit?

10            MR. CONVERSE:  [inaudible 05:50:12].

11            MR. THOMPSON:  It's -- I think do a running.

12            MR. CONVERSE:  Okay.  So -- so this will

13  just be --

14            MR. THOMPSON:  Depo.

15            MR. CONVERSE:  Yeah, Depo Exhibit 12.

16            THE COURT REPORTER:  Okay.  Thank you.

17            (EXHIBIT 12 MARKED FOR IDENTIFICATION)

18  BY MR. CONVERSE:

19        Q.   All right.  I have to switch the tab.  There

20  we go.  This is a letter dated November 28th, 2022, in

21  the upper right-hand corner, from Mr. Ferdinand.  Do

22  you see this letter?

23        A.   Yes.

24        Q.   And I'm going to scroll down.  It's four

25  pages long.  I'm just going to ask you if you recall
```

Page 228

1    seeing this letter previously or are at least aware of

2    the contents.  And let me know if I'm going too fast?

3        A.   I -- I'm aware of the contents of this e-

4    mail or letter.  Yes.

5        Q.   All right.  I'm going to scroll maybe to the

6    -- the final page, Page 4, which is really just a -- a

7    -- a signature by and large.  I'm going to go back up

8    to Page 2.  And direct yourself to the final paragraph

9    on this Page 2 and actually the concluding sentence of

10   that last paragraph.  It says, "As of today, Head Kandy

11   would be within it's right to terminate you for cause

12   under Sections 4A ii(b) and 4A ii(c) of the Employment

13   Agreement, with no notice or opportunity to cure."  Do

14   you see that?

15       A.   Yes.

16       Q.   Is the you referring to your wife, Ms.

17   McNeill?

18       A.   I believe so.  Yes.

19       Q.   And then it goes on, beginning of Page 3,

20   the second paragraph of that -- excuse me, the second

21   sentence of that first paragraph states, "As of today,

22   Head Kandy would be within its right to remove you as a

23   company officer under Section 7.2 of the Operating

24   Agreement and to cancel your ownership units and void

25   any remaining financial obligations owed to you."  Do

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 229

1   you see that?

2       A.   Yes.

3       Q.   And then if we scroll down to the

4   penultimate paragraph on this Page 3, the final

5   sentence says, "Otherwise, if the company does not

6   receive your written assurance of the terms by that

7   point, Head Kandy will move forward to terminate your

8   employment with the company and cancel your ownership

9   units and all additional financial obligations owed to

10  you with immediate effect."  Do you see that?

11      A.   Yes.

12      Q.   You were asked a lot of questions about your

13  behavior after the meeting with Mr. Fallic in person as

14  -- at his residence and -- and after the following

15  meeting in New York.  Did the statements included in

16  this letter have any impact on your actions after you

17  received it?

18      A.   Absolutely.

19      Q.   In what way?

20      A.   That me and my wife had put everything into

21  this business.  And they're stating here that they can

22  rip all that from us at any point in time over whatever

23  is said or happened, or any of that, and that -- you

24  know, that we just needed to comply with them.  So of

25  course, that -- that scared the crap out of me of what

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

1    to do.

2             So I mean, of course you're not going -- I

3    just go back to my part of -- with Mr. Rosenbaum of not

4    confronting him, causing any other issues with the --

5    the business at that point because right here in this

6    letter, I mean, they stated to us that they can just

7    take everything right there basically from us.  I was

8    just trying to comply and just keep the business moving

9    forward.

10       Q.   Thank you.  I -- I know this was emotional

11   for you.  I don't have any other -- other questions.

12                        EXAMINATION

13   BY MR. THOMPSON:

14       Q.   Mr. McNeill, I'm -- I'm going to try to be

15   brief.  I don't have a -- a -- a -- a lot for you.

16            I want to talk about, quickly, the -- the --

17   Mr. Converse asked you about other owners of Head Kandy

18   seeing the race cars in the warehouse.  You testified

19   that Mr. Fallic and Brian Feldman saw them.  And I

20   believe you -- what I thought I heard was you said that

21   they had seen them -- one of them when they were on

22   their way to a ski resort.

23            So when you were talking about Mr. Fallic

24   and -- and Brian Feldman seeing the race cars in the

25   warehouse, were you talking about the warehouse in

Page 231

1    Colorado or North Carolina?

2         A.    North Carolina.

3         Q.    North Carolina.  Okay.  All right.  We saw

4    Exhibits 11 and 12 that Mr. Converse showed you of

5    lawyer correspondence, some by him and some by Head

6    Kandy's lawyer, going back and forth about accusations

7    of conducts against Ms. McNeill and the ramifications

8    of that as stated by -- by Head Kandy's attorney, what

9    they could -- what they could do under the -- the

10   agreements and such.  So is that a fair

11   characterization of that was being said?

12        A.    Yeah.

13        Q.    Okay.  And that -- I think you said that was

14   -- terrified -- or scary for you; is that right?

15        A.    Yeah.

16        Q.    Right.  So -- and -- and during this -- this

17   time, which was that -- did you understand that does --

18   was also terrifying and very scary for Ms. McNeill?

19        A.    Yes.

20        Q.    And -- and you -- you talked about -- in

21   your testimony before, about Ms. McNeill's mental state

22   and she went into a very dark place.  Was that, you

23   know, dark -- dark place that Ms. McNeill as a -- a --

24   a -- did you understand that to be a result of the

25   whole circumstances of the accusations that were being

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 232

1  made against her by Head Kandy's attorneys and Head

2  Kandy?

3      A.   No.  Sorry.  I -- I believe that it was

4  previous to these letters or that single letter there.

5  But that started to make it even spiral even -- even

6  more depression at that point.

7      Q.   When did you first start noticing Ms.

8  McNeill's mental state changing?

9      A.   Like I told you before we went on break, I

10  noticed it -- it had to have been in, like, September,

11  October.  She just wasn't her upbeat, normal, bubbly

12  self.  Everything was just kind of -- and she just

13  wasn't herself.  I could -- I could tell with being

14  married to her for a long time that she wasn't herself

15  at that point.  But I can't say that I'm the greatest

16  of husband to comfort and figure out what it is.  I

17  don't -- I try not to spill my emotions too much and I

18  try not to probe into somebody else's honestly, you

19  know?

20      Q.   And -- and can you tell me, and I -- I'm

21  sorry I have to ask these questions, but how -- how was

22  it that she changed?  What did you notice at that time

23  period in September, October that -- that she wasn't

24  her -- her -- herself?  Anything specific?

25      A.   Her expressions, the way that she was always

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

```
 1   jumping up to go do something, to go -- just wanting to
 2   be with our kids, wanting to do that type of stuff.  It
 3   just -- it started to decline.  She didn't want to be
 4   up and going anywhere.  She'd just be at the house.
 5   She wanted to -- she didn't really want to spent a
 6   whole lot of time with our -- our children and just --
 7   it just was at that point that I noticed.  And it just
 8   started to kind of gradually get worse, you know?  She
 9   was always outgoing of everything, was always just
10   pushing to go and stuff like that.  And just -- it
11   started to -- at that point, I could tell that she
12   wasn't her normal self.
13        Q.   And at -- at that time that you noticed that
14   you -- is it correct that you didn't -- you didn't know
15   why that was happening at that point?
16        A.   No, I did not know why.
17        Q.   And did you come to -- to learn why it was
18   that she was exhibiting those changes in her mental
19   state in that September to October time period?
20        A.   No.  I kind of put it together after she had
21   told me everything that was kind of going on, that --
22   that probably was what caused a lot of her not being
23   upbeat, bubbly, bouncy, normal Kayla self.
24        Q.   And -- and -- and what was it that you learn
25   the -- that -- that was causing that?  Or that -- that
```

**HEAD KANDY LLC vs KAYLA MCNEILL**
Dustin McNeill on 07/16/2024

Page 234

1   you put together, at least?

2       A.   Once we had that conversation on October

3   27th.

4       Q.   Okay.  All right.  And that was about the --

5   the -- the conduct that she said had occurred my Mr.

6   Rosenbaum, correct?

7       A.   Correct.

8       Q.   All right.  And then you -- it was October

9   27th that you also informed Mr. Feldman about that --

10  that alleged conduct, correct?

11      A.   Correct.

12      Q.   And -- and prior to that time, October 27,

13  2022, do you know if anyone else at -- at Head Kandy

14  had been made aware of miss -- what Ms. McNeill stated

15  about the -- the -- the conduct of Mr. Rosenbaum?

16      A.   I don't -- I don't know that.

17      Q.   Okay.  Other than Mr. Rosenbaum's conduct,

18  was there any -- any conduct of -- that -- that you're

19  aware by any other of the -- the owners or executives

20  of Head Kandy that was causing, as far as you know,

21  miss -- Ms. McNeill's mental -- mental state to

22  decline?

23      A.   No, that I'm aware of, no.  Brian Feldman

24  was always super nice to her.  And I believe Jerome was

25  also.

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 235

1      Q.   And you stated that things started to get

2   worse as the dispute started to arise with regard to

3   the -- is that with regard to the American Express

4   charges and the -- the other accusations that were

5   stated in those letters, like the Exhibit 12 we just

6   looked at?

7      A.   Yes.

8      Q.   And -- and how did -- how did the mental

9   state start to get worse at that point?

10     A.   Just -- you could just see she was

11  struggling more and more in her face.  She started

12  losing more weight. she wouldn't eat.  She just was

13  continuing to go through the motions of the day but

14  just not like real emotions, you know?  I mean, we

15  weren't as close as we were previous, any of that type

16  of stuff.  It was kind of, like, she -- I was being

17  pushed out myself.  She wasn't close with our -- our

18  children, she was just really short, like, fused with

19  our kids and it just -- it took a toll even on my

20  children.

21     Q.   And has her mental state since that time

22  period start to improve?

23     A.   I would say later on now we're probably a

24  touch better than she was before.  We really try to

25  work on ourselves and our -- our communications and

**HEAD KANDY LLC vs KAYLA MCNEILL**
Dustin McNeill on 07/16/2024

Page 236

1    stuff to try to make it better.

2        Q.  And can you -- do you know if -- if Ms.

3    McNeill is still seeing professionals to -- to help

4    with her -- her mental state?

5        A.  I don't think she's seeing psychiatrists or

6    anything at the moment.  She is seeing Dr. Raverly

7    (phonetic).  And it's a -- I don't remember her -- it's

8    a women's doctor for, like, wellness or something like

9    that for, like, hormones and different things to that

10   state which -- and I know she's on some -- some

11   medications because I have to be the one that remembers

12   to give it to her in the morning.

13       Q.  All right.  Mr. McNeill, I have -- I have

14   nothing further for you.  Thank -- thank you very much

15   for your -- for your time today and for -- for getting

16   through this.

17       A.  Thank you.

18                      EXAMINATION

19   BY MR. CONVERSE:

20       Q.  Yeah.  I just wanted to ask you a

21   clarification.  When you were asked if there were

22   actions -- and I can stop for a second if you need me

23   to.

24       A.  No.  You're good.

25       Q.  Just exclusively with regard to the question

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 237

1   about actions by other Head Kandy representatives,

2   other than Mr. Rosenbaum, that caused your wife

3   distress, after Mr. Feldman was notified of issues with

4   Mr. Rosenbaum, to your knowledge did he take any

5   actions to remedy those?

6       A.   No.  He basically quit talking to her, I

7   think.  She didn't get any more messages from him.  He

8   just kind of went radio silent.

9       Q.   After you and your wife met in person with

10  Mr. Fallic in November and discussed Mr. Rosenbaum's

11  actions, do you know if he took any actions to remedy

12  Mr. Rosenbaum's conducts?

13          MR. THOMPSON:  Object to the form.

14          THE WITNESS:  Not that I'm aware of.  I -- I

15  don't think he even text her back or anything, or

16  messaged her back.  He just -- I think he set up the

17  time or the place, or whatever, that we were going to

18  have that meeting in New York.

19  BY MR. CONVERSE:

20      Q.   Did that conduct or lack of conduct by

21  Misters Feldman and Fallic to your knowledge have any

22  effect on -- on Ms. McNeill?

23      A.   I --

24          MR. THOMPSON:  Object to the form.

25          THE WITNESS:  Sorry.  I'm sure it did.  I --

**HEAD KANDY LLC vs KAYLA MCNEILL**
Dustin McNeill on 07/16/2024

Page 238

```
 1   I know the -- the Feldman one did because they were so
 2   -- they talked about everything all the time, all day,
 3   every day.  And then he just never talked to her any
 4   more.  And I think she was hoping that Jerome would
 5   even just send her a message or something the next day
 6   or two stating that, you know, we'll get stuff taken
 7   care of or we'll work through something.  You know?  So
 8   I'm sure it had some effect.
 9   BY MR. CONVERSE:
10        Q.   Again, thank you very much.
11             I don't have anything further.
12             MR. THOMPSON:  Nothing for me.  Thank you.
13             And we'll -- we will order the transcript.
14   Hold on the video.
15             THE COURT REPORTER:  Okay.
16             MR. THOMPSON:  And electronic on the
17   transcript.
18             THE COURT REPORTER:  Okay.
19             For you, Mr. Converse?
20             MR. CONVERSE:  Yeah, that sounds good.
21   We'll do the same.  We'll also read and sign.  And you
22   all can send it to my office and I'll -- I'll get it to
23   Mr. McNeill.  And actually, we'll go ahead and order
24   the video, just so I don't forget.
25             THE COURT REPORTER:  Okay.  Video.
```

**HEAD KANDY LLC vs KAYLA MCNEILL**
Dustin McNeill on 07/16/2024

Page 239

1            Okay.  And then I'll let Rocco get us off

2    the record but if -- Mr. McNeill, if you don't mind

3    hanging tight just -- I have three names of spelling I

4    just need to ask you.  Thank you.

5            THE WITNESS:  Okay.

6            THE VIDEOGRAPHER:  All right.  Time on the

7    monitor is 6:58 p.m., and we are off the record.

8            (DEPOSITION CONCLUDED AT 6:58 P.M.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 240

1                    REPORTER S CERTIFICATE

2

3              I, BRANDON ROBERTS, a Court Reporter and

4    Notary Public in and for the State of Georgia, do

5    hereby certify:

6              That DUSTIN MCNEILL, the witness whose

7    examination is hereinbefore set forth, was first

8    duly sworn by me and that this transcript of said

9    testimony pages 5 through 110 is a true record of

10   the testimony given by said witness.

11             I further certify that I am not related

12   to any of the parties to this action by blood or

13   marriage, and that I am in no way interested in the

14   outcome of this matter.

15             IN WITNESS WHEREOF, I have hereunto

16   subscribed my name this 25th day of July, 2024.

17

18             *Brandon Roberts*

19             BRANDON ROBERTS

20             Court Reporter and Notary Public

21             Notary Commission No. Georgia/W-00601589

22             Commission Expires:  April 6, 2024

23

24

25

HEAD KANDY LLC vs KAYLA MCNEILL
Dustin McNeill on 07/16/2024

Page 241

```
 1                    REPORTER'S CERTIFICATE

 2

 3              I, MARIAH NORTH, a Court Reporter and

 4    Notary Public in and for the State of Georgia, do

 5    hereby certify:

 6              That DUSTIN MCNEILL, the witness whose

 7    examination is hereinbefore set forth, that this

 8    transcript of said testimony pages 110 through 239

 9    is a true record of the testimony given by said

10    witness.

11              I further certify that I am not related

12    to any of the parties to this action by blood or

13    marriage, and that I am in no way interested in the

14    outcome of this matter.

15              IN WITNESS WHEREOF, I have hereunto

16    subscribed my name this 25th day of July, 2024.

17

18    _____

19    MARIAH NORTH

20    Court Reporter and Notary Public

21    Notary Commission No. Georgia/W-00601063

22    Commission Expires:  April 3, 2027

23

24

25
```

**HEAD KANDY LLC vs KAYLA MCNEILL**
Dustin McNeill on 07/16/2024

Page 242

```
 1                    DEPOSITION ERRATA SHEET

 2

 3    Our Assignment No. 00074514

 4    Case Caption: HEAD KANDY LLC, v. KAYLA MCNEILL

 5

 6            DECLARATION UNDER PENALTY OF PERJURY

 7

 8            I declare under penalty of perjury that I

 9    have read the entire transcript of my deposition

10    taken in the above-captioned matter or the same has

11    been read to me, and the same is true and accurate,

12    save and except for changes and/or corrections, if

13    any, as indicated by me on the DEPOSITION ERRATA

14    SHEET hereof, with the understanding that I offer

15    these changes as if still under oath.

16

17        Signed on the _____ day of _____, 2024.

18

19

20            _____

21                    DUSTIN MCNEILL

22

23

24

25
```

**HEAD KANDY LLC vs KAYLA MCNEILL**
**Dustin McNeill on 07/16/2024**

**Page 243**

```
 1                 DEPOSITION ERRATA SHEET

 2    Page No._____Line No._____Change to:_____

 3    Reason for change:_____

 4    Page No._____Line No._____Change to:_____

 5    Reason for change:_____

 6    Page No._____Line No._____Change to:_____

 7    Reason for change:_____

 8    Page No._____Line No._____Change to:_____

 9    Reason for change:_____

10    Page No._____Line No._____Change to:_____

11    Reason for change:_____

12    Page No._____Line No._____Change to:_____

13    Reason for change:_____

14    Page No._____Line No._____Change to:_____

15    Reason for change:_____

16    Page No._____Line No._____Change to:_____

17    Reason for change:_____

18    Page No._____Line No._____Change to:_____

19    Reason for change:_____

20    Page No._____Line No._____Change to:_____

21    Reason for change:_____

22    Page No._____Line No._____Change to:_____

23    Reason for change:_____

24    SIGNATURE:_____DATE:_____

25              DUSTIN MCNEILL
```

**HEAD KANDY LLC vs KAYLA MCNEILL**
**Dustin McNeill on 07/16/2024**

**Page 244**

```
 1                  DEPOSITION ERRATA SHEET

 2    Page No._____Line No._____Change to:_____

 3    Reason for change:_____

 4    Page No._____Line No._____Change to:_____

 5    Reason for change:_____

 6    Page No._____Line No._____Change to:_____

 7    Reason for change:_____

 8    Page No._____Line No._____Change to:_____

 9    Reason for change:_____

10    Page No._____Line No._____Change to:_____

11    Reason for change:_____

12    Page No._____Line No._____Change to:_____

13    Reason for change:_____

14    Page No._____Line No._____Change to:_____

15    Reason for change:_____

16    Page No._____Line No._____Change to:_____

17    Reason for change:_____

18    Page No._____Line No._____Change to:_____

19    Reason for change:_____

20    Page No._____Line No._____Change to:_____

21    Reason for change:_____

22    Page No._____Line No._____Change to:_____

23    Reason for change:_____

24    SIGNATURE:_____DATE:_____

25             DUSTIN MCNEILL
```