1          UNITED STATES DISTRICT COURT

2          SOUTHERN DISTRICT OF FLORIDA

3                FT. LAUDERDALE

4     Case No. 0:23-cv-60345-JB

5     _____

6          REMOTE VIDEORECORDED DEPOSITION OF

7                KAYLA M. McNEILL

8                July 12, 2024

9     _____

10    HEAD KANDY LLC,

11    Plaintiff,

12    v.

13    KAYLA McNEILL,

14    Defendant.

15    _____

16

17          PURSUANT TO NOTICE, the remote

18    videorecorded deposition of KAYLA M. McNEILL was

19    taken on behalf of the Plaintiff, on July 12,

20    2024, at 9:14, MST, before Wendy C. Heath,

21    Registered Professional Reporter, Denver,

22    Colorado.

23

24

25

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 2

```
 1                  A P P E A R A N C E S

 2    ON BEHALF OF PLAINTIFF HEAD KANDY, LLC:

 3          ETHAN J. LOEB, ESQUIRE
            COLIN THOMPSON, ESQUIRE
 4          CARSON SADRO, ESQUIRE
            Bartlett Loeb Hinds Thompson & Angelos
 5          100 North Tampa Street
            Suite 2050
 6          Tampa, Florida 33602
            813-223-3888
 7          Ethanl@blhtlaw.com
            Colint.@blhtlaw.com
 8          Carsons@blhtlaw.com

 9
      ON BEHALF OF DEFENDANT KAYLA McNEILL:
10
            ANTHONY L. CONVERSE, ESQUIRE
11          Converse Law Group, P.C.
            600 17th Street
12          Suite 2800
            Denver, Colorado 80202
13          303-893-8332
            Anthony@converselawgroup.com
14

15    Also Present:

16          John Sheffield, Videographer
            Ryan Thompson, Head Kandy
17          Gina Gazzaniga
            Dustin McNeill
18

19    Witness location:  Lansing, Michigan

20

21

22

23

24

25
```

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 3

```
 1                    I N D E X
 2  EXAMINATION:                              PAGE
 3  By Mr. Loeb:                                 7
 4  QUESTIONS INSTRUCTED NOT TO ANSWER:
 5  Page 156, line 1
 6  CERTIFIED QUESTIONS
 7  Page 80, line 15
 8  Page 82, line 1 through page 84, line 18
 9  EXHIBITS:                                 PAGE
10  Exhibit 1  Text messages between Kayla and  26
11             Ryan Thompson, starting 1/1/22 at
12             8:20 (HK_037366 to 039746)
13  Exhibit 2  E-mail from Kleitias Petri to    33
14             Kayla McNeill, sent 12/3/22,
15             Subject: Re: Peoples Roles
16  Exhibit 3  E-mail from Kayla McNeill to     64
17             ron@flyingamotorsports.com, sent
18             11/6/20, Subject: Head Kandy LLC -
19             Asset Purchase Agreement.pdf, with
20             attachment
21  Exhibit 4  E-mail from Jerome Falic to      94
22             Kayla@headkandypro.com, sent
23             7/26/21, Subject: Schedule a
24             call/follow up (HK_048181)
25
```

**HEAD KANDY LLC vs KAYLA MCNEILL**
**Kayla M. McNeill on 07/12/2024**

```
                                                    Page 4
 1   EXHIBITS: (Continued)                          PAGE

 2   Exhibit 5  E-mail chain.  Top e-mail from Jed   123

 3              Ferdinand to Kayla McNeill, sent

 4              12/2/22, Subject: Re: Head Kandy

 5              Employment

 6   Exhibit 6  E-mail from Jed Ferdinand to         127

 7              Kayla@headkandypro.com, sent

 8              11/28/22, Subject: Formal Legal

 9              Notice on Behalf of Head Kandy,

10              LLC, with attachments (HK_01046 to

11              50)

12   Exhibit 7  E-mail chain.  Top e-mail from Jed   129

13              Ferdinand to Kayla McNeill, sent

14              12/1/22, Subject: Head Kandy

15              Employment (HK_010130 to 45)

16   Exhibit 8  Executive Employment Agreement,      170

17              Head Kandy LLC/Kayla Marie McNeill

18   Exhibit 9  E-mail from Blake Ruschman to John   176

19              Max Bolling, Jon Rosenbaum, Kayla

20              McNeill, sent 9/20/22, Subject:

21              Head Kandy Audits, with attachment

22              (HK_008830 to 53)

23

24

25
```

**HEAD KANDY LLC vs KAYLA MCNEILL**
**Kayla M. McNeill on 07/12/2024**

```
                                                    Page 5
 1   EXHIBITS: (Continued)                          PAGE

 2   Exhibit 10 E-mail from Kayla McNeill to Jon    177

 3              Rosenbaum, sent 9/22/22, Subject:

 4              Re: Audit/Forensic Accounting

 5              (HK_011039)

 6   Exhibit 11 E-mail from Jerome Falic to Kayla   182

 7              McNeill and Jon Rosenbaum, sent

 8              9/22/22, Subject: RE:

 9              Audit/Forensic Accounting

10              (HK_011042 to 43)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 6

```
 1                    P R O C E E D I N G S
 2          WHEREUPON, the following proceedings were
 3     taken pursuant to the Federal Rules of Civil
 4     Procedure.
 5              *       *       *       *
 6          (The following proceedings were held via
 7     videoconference, with the court reporter in a
 8     remote location, separate and apart from the
 9     attorneys and the witness.  The proceedings were
10     stenographically reported to the best ability of
11     the court reporter to hear and understand the
12     proceedings.)
13          (At this time Ms. Burgess is not present.)
14          THE VIDEOGRAPHER:  This is the beginning
15     of media 1 in the deposition of Kayla McNeill in
16     the matter of Head Kandy, LLC versus Kayla Marie
17     McNeill.  Today's date is July 12, 2024.  The time
18     on the monitor is, let's see, 9:14, Mountain
19     Standard Time.
20          My name is John Sheffield, and I'm the
21     videographer; the court reporter today is Wendy
22     Heath, and we are here with Huseby Global
23     Litigation.
24          Counsel, please introduce yourselves,
25     after which the court reporter will swear in the
```

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 7

```
 1   witness.
 2         MR. LOEB:   Ethan Loeb on behalf of the
 3   plaintiff, Head Kandy, LLC.
 4         MR. CONVERSE:   Anthony Converse on behalf
 5   of Defendant Ms. McNeill.
 6                   KAYLA M. MCNEILL,
 7   having been first duly sworn to state the whole
 8   truth, testified as follows:
 9                   EXAMINATION
10   BY MR. LOEB:
11      Q   Good morning, ma'am.  Could you please
12   tell us your name.
13      A   Kayla McNeill.
14      Q   And, Ms. McNeill, do you have an address
15   that you can provide to me?
16      A   11905 Highland Circle, Salida, Colorado,
17   81201.
18      Q   Is that your residential address?
19      A   It is.
20      Q   Do you have a business address?
21      A   It's the same.
22      Q   Do you have any other addresses where you
23   conduct business, any physical locations?
24      A   I do.  208 F Street.
25      Q   What town?
```

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 8

```
 1        A   Salida, Colorado, 81201.
 2        Q   And what is at the 208 F Street location?
 3   Is that a store?
 4        A   It is.  It's a storefront.
 5        Q   And when was that opened?
 6        A   June 1.
 7        Q   What is sold at that store?
 8        A   It's a boutique.  And makeup and body
 9   wash.  Little boutique store.
10        Q   What types of products do you sell there?
11        A   Clothes, bags, bath salts, bath -- face
12   wash, makeup, cups.
13        Q   Is there any particular brand that is sold
14   at that store?
15        A   WhiPi.
16        Q   And is that short for White Pineapple?
17        A   Yes.
18        Q   Is that a company that you own?
19        A   Yes.
20        Q   Are you the only owner of that company?
21        A   Yes.
22        Q   Any other business addresses, other than
23   the two that you have provided to me now?
24        A   Yes.  There is one, but I don't know the
25   address because it doesn't have an address.  So
```

Page 9

```
 1   it's just a random building right up from my

 2   property, but it doesn't receive mail.

 3        Q  Is it on your property?

 4        A  No, it's just right up the road.  I

 5   don't -- I'll have to get that address for you.  I

 6   don't receive mail there, so I don't know the

 7   actual physical address of it.

 8        Q  Fair enough.  Is it -- is it leased?

 9        A  Yes.

10        Q  And is -- who is it leased by?

11        A  Rob -- sorry, I don't know his last name.

12   His first name is Rob.

13        Q  All right.  Is Rob the owner of the

14   building?

15        A  Yes.

16        Q  And --

17        A  I can get you that -- I can get you that

18   information --

19        Q  Sure.

20        A  -- shortly.  I just have to look it up.

21   Sorry.

22        Q  No.  No worries about that.  And we'll go

23   through some preliminaries here in a sec.  I'm

24   just trying to follow this train of thought.

25           What is the person or entity that is
```

**HEAD KANDY LLC vs KAYLA MCNEILL**
**Kayla M. McNeill on 07/12/2024**

 1   leasing the building from Rob?

 2       A   Me personally, Kayla McNeill.

 3       Q   What business is being operated out of

 4   that building?

 5       A   I do a little bit of storage there for

 6   some of the store products, and then I ship some

 7   of WhiPi's products out of there, and then I have

 8   a personal office there.

 9       Q   What is the best telephone number that you

10   can give to me, should you need to be reached by a

11   process server?

12       A   719-207-2148.

13           MR. CONVERSE:   That would be me, Ethan.

14           MR. LOEB:   Sure.   But no offense to you,

15   and I don't think it would happen, but I've seen

16   clients hire lawyers midstream and then not have

17   any contact information.   I'm not trying to be

18   disrespectful to you, but nevertheless we've got

19   her number down and that's the best number she

20   provided.

21       Q   (BY MR. LOEB)   Do you have any other phone

22   numbers, ma'am, that you have utilized for

23   business purposes over the past five years?

24       A   No.

25       Q   All right.   Over the past five years have

Page 11

1   you utilized e-mail addresses to communicate with

2   others?

3       A  Yes.

4       Q  What e-mail addresses have you utilized?

5       A  Kayla@headkandypro.com.

6       Q  All right.  What else?

7       A  Kaylamariemcneill@icloud.com.

8       Q  All right.  What else?

9       A  And dkmcneill21@gmail.com, and that's it.

10      Q  Are each of these e-mail addresses ones

11  that belong to you?

12      A  Yes.  Well, when I used them it was.  I no

13  longer have access to the first one.

14      Q  How about to the iCloud account and the DK

15  McNeill account?

16      A  I do.

17      Q  Are those e-mail accounts password

18  protected?

19      A  Yes.

20      Q  Who has access to those e-mail accounts

21  and -- actually, strike that.  Let me rephrase it.

22          Including all three of the e-mail

23  accounts, the Head Kandy Pro one, the iCloud, and

24  the DK McNeill, were there any restrictions placed

25  on who could access those e-mail accounts when

Page 12

1   you'd use them?

2      A  I'm sorry.  I don't know what you are

3   asking.

4      Q  Sure.  Like, for instance, the dkmcneill21

5   account, does anybody have access to that account

6   or do you restrict access to it?

7      A  No, I have -- my husband, Dustin McNeill,

8   has access to that account.

9      Q  Okay.  Anybody else other than your

10  husband?

11     A  Not that I'm aware of.  It's on all of my

12  devices, logged in, so someone could access it, I

13  guess, but not -- I don't really know what you are

14  asking.  But, no, it's my e-mail and I use it.

15     Q  Sure.  What I'm trying to get at is that

16  you don't have the DK McNeill e-mail address that

17  one of your employees could access and review the

18  e-mails or send e-mails out of?

19     A  Not that I'm aware of.

20     Q  Okay.  And this is not just a

21  trick question.  I'm just trying to understand who

22  has access to your --

23     A  No.  Sure.  I'm -- I'm just trying to

24  think it through, but it's on all my devices

25  but --

**HEAD KANDY LLC vs KAYLA MCNEILL**
**Kayla M. McNeill on 07/12/2024**

Page 13

1     Q   Sure.

2         MR. CONVERSE:   Make sure you let him

3   finish first.

4         THE DEPONENT:   Oh, sorry.

5     Q   (BY MR. LOEB)   Same thing for the iCloud

6   account.   Is that account accessible to anybody,

7   or do you seek to restrict access to certain

8   people?

9     A   I believe that one is just me.   Like, no

10   one else has access to that that I'm aware of.

11     Q   Fair enough.   Did kayla@headkandypro.com,

12   when you utilized that, was it accessible to

13   anybody?

14     A   I don't recall who had access to it and

15   who didn't.

16     Q   Okay.   Do you know if that was password

17   protected?

18     A   Yes.   Yeah.

19     Q   Ms. McNeill, before we get further into

20   it, get through some preliminaries.   My name is

21   Ethan Loeb.   We've met from time to time, gosh,

22   over the past year now in different settings.   You

23   understand why you are here today?

24     A   I do.

25     Q   All right.   And why do you understand that

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 14

1  you are here today?

2      A  I'm being deposed for the lawsuit that I

3  am in.

4      Q  Okay.  Have you ever given a deposition

5  before?

6      A  I have.

7      Q  How many times?

8      A  Just once.

9      Q  When did you give your deposition

10  previously?

11      A  I was deposed for a trademark infringement

12  situation that I was in with Hard Candy.

13      Q  Other than that deposition -- strike that.

14          Do you recall when that deposition

15  occurred?

16      A  Through the latter part of 2017.

17      Q  Since it's been some time, let me tell you

18  what I hope to accomplish today.  It's my

19  opportunity to ask you questions about some

20  documents, as well as your involvement in the Head

21  Kandy business throughout the years, since it was

22  acquired by the Falic family.

23          Throughout the course of the day, I'm

24  going to ask you various kinds of questions:  some

25  asking for a yes-or-no answer, some asking for an

**HEAD KANDY LLC vs KAYLA MCNEILL**
**Kayla M. McNeill on 07/12/2024**

Page 15

```
 1   explanation, some asking for a yes or no with an
 2   explanation.  I'm going to do my level best to be
 3   as clear as I possibly can.  There are going to
 4   come times today where I ask you a question and I
 5   feel it's as crystal clear as it can be, and you
 6   are going to kind of scrunch your face up and say,
 7   I don't understand what you are asking.  I think
 8   it happened already when I was asking you about
 9   the e-mail accounts.
10        I don't take it personally when someone
11   asks for clarification of good faith.  In fact,
12   it's good, because I want to make sure what I ask
13   you is clear, and that you understand it as best
14   as we can and allow you to give me answers, so
15   we've got something that's useful at the end of
16   this exercise.
17        And so to that end, if you could do me a
18   favor, like you already have.  If I ask you a
19   question and you are unclear about it, will you do
20   me a favor and say, Can you please clarify or
21   reask it a different way?
22   A  Yes.
23   Q  All right.  And you have done good with
24   that answer "yes."  Because in normal
25   conversations, if you and I were, say, at a coffee
```

**HEAD KANDY LLC vs KAYLA MCNEILL**
**Kayla M. McNeill on 07/12/2024**

1  shop or something, putting your head up and down

2  or left and right, or saying yep, or uh-huh or

3  huh-uh is perfectly acceptable.  In giving a

4  deposition, it's extremely important to verbalize

5  your answers with a yes or a no, so that way the

6  court reporter takes down everything you are

7  saying accurately.

8        When I say that, because I have taken a

9  fair amount of these depos to be dangerous, and

10  seeing where somebody thinks they've indicated a

11  yes through some sort of slang or body movement,

12  and it turns out that that's not what the witness

13  intended.  So if that happens today and I ask you,

14  Is that a yes or a no, please understand that I'm

15  not being disrespectful to you or rude.  I'm just

16  trying to make sure that the record is clear.

17  Okay?

18      A  Okay.

19      Q  All right.  And if I ask you a question

20  and you don't ask for clarification as to what I'm

21  asking but you give me an answer, could you and I

22  have an agreement that you have understood the

23  question as it was asked?

24      A  Yes.

25      Q  All right.  I will tell you that I run

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 17

1   about an hour to an hour and 15 minutes.  I don't

2   know how the video is doing with -- the

3   videographer, but that's usually about the time

4   they have to change out the media for another

5   videotape, or DVD, or whatever the latest

6   technology is.  So, you know, that kind of gives

7   you an idea as to how I kind of run things.

8          But if there comes a time where you need

9   to use the restroom or your blood sugar is low or

10  you need to grab something to drink, or anything

11  like that, you let me know.  I'm happy to

12  accommodate you as best as I can, as long as there

13  is no question pending.  Okay?

14     A  Okay.

15     Q  All right.  Do you have any questions for

16  me before we get started?

17     A  I do not.

18     Q  All right.  Who is in the room with you

19  today?

20     A  Anthony Converse and Dustin McNeill.

21     Q  What did you do to prepare for today's

22  deposition?

23     A  Not very much.  I just kind of glanced

24  over a couple, like, documents that I had and went

25  to bed.

**HEAD KANDY LLC vs KAYLA MCNEILL**
**Kayla M. McNeill on 07/12/2024**

Page 18

```
 1      Q  All right.  Fair enough.  I hope you got a
 2  good night's sleep.
 3          Do you have anything in front of you by
 4  way of documents today?
 5      A  I do not.
 6      Q  All right.  Did you receive a Notice of
 7  Taking Deposition Duces Tecum in which you are
 8  here today to provide testimony?
 9      A  I did.
10      Q  Did you review the request for documents
11  that were contained in the notice?
12      A  Sorry.  You froze, so can you repeat that
13  question?
14      Q  Sure.  You froze, too.
15          Did you review the list of documents that
16  were contained in the deposition notice?
17      A  I did.
18      Q  And did you strive to locate any documents
19  that were responsive?
20      A  I did.
21      Q  Did you locate any documents that were
22  responsive?
23      A  There was nothing to add to what was
24  previously provided.
25      Q  Okay.  So what you are telling me is that
```

Page 19

```
 1    everything that is requested in the notice you

 2    have already given to our office through your

 3    counsel?

 4        A   Anything I could find and locate was

 5    given, yes.

 6        Q   And have you withheld anything?

 7        A   No.

 8        Q   What devices did you look through in order

 9    to see if there were any responsive documents?

10        A   Mainly I just used my phone, because

11    everything is on my phone.

12        Q   Okay.  When you say everything is on your

13    phone, does that mean all e-mails, all text

14    messages, all direct messages or other kinds of

15    communications?

16        A   Correct.

17        Q   How about, like, Word documents or things

18    that would qualify as communications; are those on

19    your phone also?

20        A   Yes.

21        Q   And are all of those documents stored in

22    the cloud?

23        A   I'm not sure if they're stored in the

24    cloud, but I have like the file on my phone where

25    all of, like, the documents that I have, like, go
```

**HEAD KANDY LLC vs KAYLA MCNEILL**
**Kayla M. McNeill on 07/12/2024**

1    to so...

2        Q   Okay.

3        A   Sorry I don't know the technical where

4    they're stored, but they're on my phone.

5        Q   Okay.  You and I are in the same spot

6    because I don't either.  So I'm going to ask you

7    questions that, you know, my 13-year-old looks at

8    me as if I'm a dinosaur; which, I'm starting to

9    realize I am.  So I'm doing my best as well.

10           Speaking of electronic devices, how many

11   electronic devices have you had over the past five

12   years and which you have used to conduct business

13   of any kind?

14       A   I'm unsure.

15       Q   All right.  Have you had the same cell

16   phone for the past five years?

17       A   No.

18       Q   When did you -- what -- what model cell

19   phone do you have right now?

20       A   The newest one.

21       Q   Is it an iPhone or are you a Samsung

22   person?

23       A   iPhone.

24       Q   All right.  And when did you get that new

25   iPhone?

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 21

1    A   When they release the iPhones I usually,

2    like, try to up the iPhone to keep up with the

3    technology and video and things like that, so...

4        **Q   Fair enough.  Do you also have an iPad?**

5    A   I do.

6        **Q   Do you use the iPad to conduct business?**

7    A   Yeah.  Not really.  I basically just use

8    it for design, but I don't -- it's not linked to

9    anything, really, so not really conducting

10   business, I guess you could say, off of it.

11       **Q   Do you use it to communicate via text?**

12   A   No.

13       **Q   How about direct message?**

14   A   No.

15       **Q   Do you have a laptop or a desktop**

16   **computer?**

17   A   I do.

18       **Q   And how many laptop or desktop computers**

19   **do you have?**

20   A   I have one laptop and -- that I use.  My

21   kids have laptops, but I don't use them -- and

22   then I have one desktop computer.

23       **Q   How long have you had the laptop and the**

24   **desktop?**

25   A   I've had the laptop for maybe about, gosh,

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 22

1    a year, year and a half maybe.  And the desktop

2    computer I believe I just purchased maybe six

3    months ago.

4        Q   What are the models of the laptop and the

5    desktop?  Are they Apples?  Are they IBMs?

6        A   Apples.  They're Apple computers.

7        Q   And beyond the brand of the laptop and the

8    desktop, you are not able to tell me the type,

9    make and model, or anything like that?

10       A   Absolutely not.

11       Q   Okay.  All right.

12           Over the past five years have you

13   controlled any social media accounts?

14       A   Yes.

15       Q   What are the social media accounts you

16   have controlled over the past five years?

17       A   Kayla McNeill on Facebook.

18       Q   Anything else?

19       A   And then -- yeah, and then the Head Kandy

20   business Facebook page; Kandy Life With Kayla

21   Facebook page and Instagram.  I guess I could say

22   I had control of the Head Kandy Instagram, but I

23   never logged into it.  It was just linked so --

24   they link through Meta.

25       Q   Okay.

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 23

1      A  So I don't actually post on Instagram;

2  it's just linked through Facebook.

3      **Q  All right.  What else?**

4      A  And then I have a racing page for my kids,

5  DKRH Racing; and then I have a page called Whippin

6  Life with Kayla; and then I have a page called

7  WhiPiCo for business on Facebook.

8      **Q  Anything else?**

9      A  I help run my church's Facebook page, but

10  other than that -- this is just Cornerstone

11  Church.  Other than that, no.

12     **Q  All right.  Have you ever heard of the**

13  **Kandyholics Facebook page?**

14     A  I have.

15     **Q  And have you ever had control over the**

16  **Kandyholics page?**

17     A  I was an admin, but I didn't have control.

18     **Q  What's the difference between being an**

19  **admin and having control?**

20     A  I didn't own the page or start the page,

21  so I was able to, like, comment and approve posts,

22  but I couldn't delete the page or anything.  Like,

23  I have no admin control of the page because I did

24  not start the page.

25     **Q  Did you have at any time the ability to**

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

1    change the name of the Kandyholics page?

2       A   I believe that might be something that's

3    in the control of being, like, an admin on there,

4    but it has to be, like, approved, I believe, by

5    the owner.  I'm not -- I'm not sure, but possibly.

6       Q   Have you ever changed -- did you ever

7    change the name of the Kandyholics page?

8       A   Yeah, we changed the spelling a couple

9    times and -- like, back when it very first

10   started, and then -- but I don't remember.  I

11   didn't change the page name, but I remember the

12   name changed.

13         The one time that I did change the page

14   name was when -- maybe in December of 2022.  I

15   don't remember if I changed the name, but I know I

16   had a discussion about changing the name and the

17   name changed.

18      Q   Who did you have a discussion with about

19   changing the name?

20      A   Wendy Flood.

21      Q   Wendy who?

22      A   Wendy Flood.

23      Q   Okay.  And was Ms. Flood the owner of the

24   Kandyholics page?

25      A   Yeah, she started the page, I want to say,

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 25

1    maybe seven or eight years ago on her own and it

2    was her page.

3        Q   Do you recall, in December of 2022, what

4    you changed the Kandyholics page name to be?

5        A   To be honest with you, I don't.  Beauty

6    something.

7        Q   I do want you to be honest with me,

8    please.

9        A   I don't.

10       Q   Did you change it to Beautyholics?

11       A   Possibly.  I don't recall exactly.  That

12   was kind of a blurred time of my life.

13       Q   And despite the fact it was a blurred time

14   in your life, you still had the mental capacity to

15   be able to make changes to social media titles,

16   correct?

17       A   Like I said already, I don't remember if I

18   changed it or someone else did, but I remember the

19   conversation.

20       Q   Conversation with who, with Ms. Flood?

21       A   Correct.

22       Q   And what is it that you talked about with

23   Ms. Flood to change the title from Kandyholics to

24   Beautyholics?

25       A   It had been something that I think -- let

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 26

1   me see.  I just remember she owned the page, and

2   Head Kandy came in and said -- I don't remember if

3   it was Brandi Webb or Mindy McDermaid, but they

4   were demanding to take over the page.  And I got a

5   letter from Jed, I believe, saying that it was

6   their page.  And it was not their page.  And so I

7   just informed her, if it's her page and she wants

8   to keep it, to change the name so that it's hers,

9   because it's her page.

10      Q   I'll show you a document that we'll go

11   ahead and mark as Deposition Exhibit Number 1.

12           (Deposition Exhibit 1 was marked.)

13           MR. LOEB:  Antonio, do you want me to drop

14   these into the chat?  Some of these can be kind of

15   large.  Do you want me to go ahead and drop these

16   in the chat box as we mark them for you?

17           MR. CONVERSE:  Yes, please.

18           MR. LOEB:  Yeah, I don't know if you have

19   got a computer there also or how you are going to

20   handle that, but I'm happy to --

21           MR. CONVERSE:  I do.  I'm going to hop on

22   right now.

23           MR. LOEB:  Okay.

24           MR. CONVERSE:  See if I can't do this

25   also.

**HEAD KANDY LLC vs KAYLA MCNEILL**
**Kayla M. McNeill on 07/12/2024**

Page 27

1          MR. LOEB:  All right.  I'm having trouble

2    sending this to you, Anthony.  I may have to just

3    e-mail them to you instead of putting them in the

4    chat function.  It's saying it's not accepting the

5    transfer.  I don't know if it's because of the

6    size or not, but I will tell you that this is

7    going to be the 2022 text messages.  The exchange

8    between Ryan Thompson and Kayla McNeill.

9          MR. CONVERSE:  Okay.

10         MR. LOEB:  For your reference.

11         MR. CONVERSE:  Okay.

12         THE COURT REPORTER:  Excuse me, Counsel.

13    If you could also include me on that.  Could we go

14    off the record real quick?

15         MR. LOEB:  Sure.

16         Are we off?

17         THE COURT REPORTER:  I'm waiting for the

18    videographer.

19         MR. LOEB:  Yeah.

20         THE COURT REPORTER:  I'm going to go off

21    the steno record here.

22         (Discussion off the record.)

23      Q  (BY MR. LOEB)  Ms. McNeill, I'm going to

24    share the screen with you here and show you a page

25    of text exchange between you and Ryan Thompson.

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 28

1    Do you recognize this particular document as being

2    a text exchange between Mr. Thompson at

3    719-207-1326 and phone number of 719-207-2148?

4        A  Yes.

5        Q  And is that phone number that's on the

6    left-hand side of 719-207-2148, that's your phone

7    number?

8        A  Yes.

9        Q  And did you utilize that phone number to

10   exchange text message communications with others

11   during the time that you worked at Head Kandy?

12       A  Yes.

13       Q  And do you see here this exchange between

14   you and Mr. Thompson on December 2, 2022, where

15   you write:  Well, the name changed and a post was

16   made that this group is not an official Head Kandy

17   Group.

18       A  Yes.

19       Q  Mr. Thompson asked:  Who made it?

20           And you write:  Me, LOL, but you can't see

21   that.  Ha.

22           Do you see that?

23       A  Yes.

24       Q  How is it that you were able to make the

25   change to the Kandyholics page if you did not have

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 29

1   credentials to do so?

2       A  I don't recall actually doing it, but I

3   also don't know if I was telling Ryan the truth.

4       Q  Okay.  And have you ever lied to

5   Mr. Thompson before?

6       A  Yeah.

7       Q  Have you lied to Mr. Thompson in text

8   messages before?

9       A  If you show it to me, I can let you know

10  if it's a lie or not.

11      Q  I'm showing it to you right now.  Is this

12  the truth or a lie?

13      A  I don't recall changing the name myself.

14      Q  Okay.  So reflecting upon what's being

15  shown here in terms of text message communication

16  between you and Mr. Thompson, when you say that

17  you made the change, was that truthful or was that

18  a lie?

19      A  I was part of a conversation that it was

20  changed and I don't recall if I made the change or

21  not.

22      Q  All right.

23      A  I do not recall.

24      Q  Any reason to doubt the truthfulness of

25  the statement that you wrote here that you were

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 30

```
 1    the one that made the change?

 2       A  Considering my mental state, absolutely.

 3       Q  Okay.  And so you don't know whether you

 4    were being truthful to Mr. Thompson at the time

 5    that you wrote this text message?

 6       A  I do not recall changing the name of the

 7    group.

 8       Q  Okay.  But my question was:  Do you recall

 9    whether or not at this time you were being

10    truthful to Mr. Thompson or whether you were lying

11    to him?

12          MR. CONVERSE:  Objection, form.

13       A  Well, I don't recall changing the name, so

14    I'm not going to commit to an answer for that, as

15    I do not recall changing the name, so I'm not

16    going to say.  I don't recall.

17       Q  (BY MR. LOEB)  All right.  During the time

18    that you were exchanging text messages with

19    Mr. Thompson in December 2022, isn't it true that

20    you and he were working together to create White

21    Pineapple?

22          MR. CONVERSE:  Objection, form.

23       A  I'm sorry.  Ask that one more time.

24       Q  (BY MR. LOEB)  In December of 2022, isn't

25    it correct that you and Mr. Thompson were working
```

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

```
 1   together to establish White Pineapple?

 2         MR. CONVERSE:  Objection, form.

 3      A  I would not say we were working together,

 4   no.  That is incorrect.

 5      Q  (BY MR. LOEB)  Okay.  What would you say

 6   that you two were doing?

 7      A  We two were doing nothing.  I was starting

 8   something for me, and Ryan was wanting to be a

 9   part of it because he, too, thought that he was

10   going to lose his job.

11      Q  And was Mr. Thompson helping you in any

12   way with regard to White Pineapple in December of

13   2022?

14      A  In December of 2022, Ryan was not -- there

15   was nothing being done, so, no.

16      Q  Was Mr. Thompson helping you order

17   leggings for White Pineapple?

18      A  Ryan -- Ryan Thompson paid the invoice on

19   an Alibaba account.  He pressed Pay, so yes.  In

20   October?

21      Q  In October?

22      A  Mm-hmm.

23      Q  Yes?

24      A  Yes.

25      Q  How about between October of 2022 and
```

Page 32

```
 1   December 30 of 2022, what actions did Mr. Thompson

 2   engage in related to White Pineapple?

 3        MR. CONVERSE:  Objection, form.

 4     A  I am not sure.

 5     Q  (BY MR. LOEB)  At the time Mr. Thompson --

 6   or strike that.

 7        Between October 1, 2022, and December 1,

 8   2022, was Mr. Thompson an employee of Head Kandy?

 9     A  Yes.

10     Q  And did he report to you?

11        MR. CONVERSE:  Objection, form.

12     A  I wouldn't say he reported to me.  We

13   worked together.

14     Q  (BY MR. LOEB)  Did you consider him -- did

15   you consider yourself to be a supervisor or

16   manager of Mr. Thompson?

17     A  No.

18     Q  During the time that you worked at Head

19   Kandy, did you consider yourself to be a manager

20   or supervisor of any employees?

21        MR. CONVERSE:  Objection, form.

22     A  No.

23     Q  (BY MR. LOEB)  At any time -- during any

24   time that you were working at Head Kandy, did you

25   consider yourself to be directing other managers
```

Page 33

1    of Head Kandy?

2         MR. CONVERSE:  Objection, form.

3    A  That's a complicated question, as I wasn't

4    just an employee of Head Kandy.  I was an owner.

5    So I feel like there was two completely separate

6    roles that I was paid for, and a role that I was

7    in because I was an owner, but not paid for.

8    Q  (BY MR. LOEB)  Did you consider yourself

9    to -- strike that.

10        Did you direct any managers of Head Kandy

11   between May 1st of 2018 and January 30th of 2023?

12        MR. CONVERSE:  Objection, form.

13   A  So Bryan Feldman was my boss, my

14   supervisor, my manager.  And he was not present at

15   the location at which we conducted business, so I

16   would be the middle person, I guess you could kind

17   of say, between Bryan Feldman and the supervisors

18   that were hired.  And I would not direct them.  I

19   would just relay the information that I was told

20   from Mr. Feldman.

21   Q  (BY MR. LOEB)  Let me show you what I'm

22   going to mark as Deposition Exhibit Number 2.

23        (Deposition Exhibit 2 was marked.)

24   Q  (BY MR. LOEB)  First of all, do you

25   recognize what's on the screen as an e-mail

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 34

1   between you and Ms. Petri, dated December 3, 2022?

2      A  Yes.

3      Q  And do you recognize this e-mail address

4   at the bottom of this thread, dated December 3,

5   2022, at 1:19 p.m. from Kayla McNeill?

6      A  Yes.

7      Q  Do you see where you write: Kayla

8   $200,000.00 - main point of contact for every app,

9   approves payroll, platform and issue we have.

10  Direct all managers --

11     A  So I would like --

12     Q  -- Kaylin, Jeni -- well, let me finish my

13  question.  Kaylin --

14     A  Sorry.

15     Q  -- Jeni, and Dusty.

16        Do you see that?

17     A  Yes.

18     Q  And you wrote this e-mail, correct?

19     A  With Jon Rosenbaum, yes.

20     Q  You wrote this e-mail, correct?

21     A  Yes.

22        MR. CONVERSE:  Ethan, I haven't gotten

23  that in the e-mail.  Did you put it in the chat or

24  did you e-mail it to me?

25        MR. LOEB:  Let me do this.  Hang on.

**HEAD KANDY LLC vs KAYLA MCNEILL**
**Kayla M. McNeill on 07/12/2024**

Page 35

1              (Pause in the proceedings.)

2              MR. LOEB:  It should be coming your way.

3     Hang on.

4              MR. CONVERSE:  Thank you.

5              MR. LOEB:  Antonio, what is your e-mail

6     address, so I can just type it in?

7              MR. CONVERSE:  Anthony --

8              MR. LOEB:  I gotcha.  Somehow you are

9     saved in our memory for the --

10             MR. CONVERSE:  All right.

11             MR. LOEB:  Here you go.  All right.

12        Q   (BY MR. LOEB)  And so do you see this

13    e-mail that you wrote that says you directed all

14    managers, Kaylin, Jeni, and Dusty --

15        A   Yes.

16        Q   -- Ms. McNeill?

17             And you typed this, correct?

18        A   I did.

19        Q   And when you typed it you -- strike that.

20             When you were typing this document, did

21    you ensure that it was accurate?

22        A   I -- I believe to my best ability that it

23    is accurate, but my meaning of what is being said

24    is I wanted to make sure that that's clear.

25        Q   Okay.  And when you say that you were

Page 36

1   directing all managers, what is it that you were

2   directing them to do?

3       A   Bryan Feldman would tell me, and I would

4   tell them what Bryan Feldman said or decided.

5       Q   When you were at Head Kandy, between 2018

6   to 2023, did you fire people?

7       A   After I had spoke with Bryan Feldman about

8   the issues, we would make the decision.  I would

9   tell him what was going on, ask him how to handle

10  it, and I would be the person that would tell

11  whoever that was supposed to do it that Bryan

12  Feldman said to do this.

13      Q   Did you --

14      A   I did not.

15      Q   Did you hire people?

16      A   You know what, I don't believe I ever did

17  really hire anyone, no.

18      Q   All right.  Okay.

19          Do you know Nicole Cook?

20      A   I know Nicole Cook.

21      Q   Who is Nicole Cook?

22      A   I'm sorry.  What do you mean who is Nicole

23  Cook?  She's a female that I grew up with.

24      Q   And did she work for Head Kandy?

25      A   She did.

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 37

1        Q   What did she do for Head Kandy?

2        A   Originally, she was trained to do customer

3    service online and she was going to work from

4    home.  And then we had a little bit of chaos

5    happen at the warehouse, and I needed some help to

6    get everything handled, to be able to move the

7    warehouse to North Carolina.  So she helped watch

8    Hayzlee for six weeks after I had talked to Bryan

9    Feldman and got permission.

10       Q   And did you communicate in writing with

11   Mr. Feldman to get that permission?

12       A   I don't believe -- I believe that I

13   brought the conversation up of needing help and

14   assistance in what I was needing, and I believe

15   the phone conversation maybe about Nicole

16   specifically was possibly over the phone, but he

17   very much knew I needed assistance in what was

18   happening.

19       Q   Do you know somebody by the name of Sydney

20   Cook?

21       A   I do.

22       Q   Is Sydney Cook a -- once an employee of

23   Head Kandy?

24       A   She was.

25       Q   And what functions did Sydney Cook

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

1    perform?

2       A  I believe when she first started she was

3    still in high school and she was helping a little

4    bit with photography, if I recall correctly, and

5    then she moved into the warehouse and she helped

6    ship, and then she worked in customer service.

7       Q  Did Nicole Cook get paid by Head Kandy?

8       A  Yes.

9       Q  Who approved her time?

10      A  I'm sorry?

11      Q  Who approved her time?

12      A  Well, her time would go into payroll that

13   Raissa would receive.  And then Bryan Feldman

14   would receive the payroll e-mail with me.  And

15   then I would talk to Bryan about who was on

16   payroll.  And then they would pay them.

17      Q  Who would approve the payroll?

18      A  I don't necessarily know if it was

19   approved every time, but it was sent in an e-mail

20   to Bryan Feldman and I.

21      Q  And did you --

22      A  And if there were ever any -- I'm sorry?

23      Q  Did you approve payroll?

24      A  I would just catch if people were working

25   overtime that didn't work overtime, or things like

Page 39

1    that.  I just was helping monitor the actual

2    hours, but Bryan Feldman was initially the one who

3    would sign off on payroll that he was in charge of

4    that.

5         Q   Moving back to Deposition Exhibit

6    Number 2.  Do you see here where you describe one

7    of the functions at Head Kandy was approving

8    payroll?

9              MR. CONVERSE:  Objection, form.

10        A   Again, I just was making sure that people

11   weren't working hours that they weren't working,

12   but Bryan Feldman and I were in the same e-mail,

13   and he was approving the e-mail sent from Raissa.

14        Q   (BY MR. LOEB)  And what is Raissa's last

15   name?

16        A   I don't know.

17        Q   In here you also indicate that you direct

18   all Facebook comment replies to what's to be said.

19   Do you see that?

20             MR. CONVERSE:  Objection, form.

21        A   Correct.

22        Q   (BY MR. LOEB)  What does that mean?

23        A   I just made sure that I set the tone for

24   the brand.

25        Q   And what are the comment replies that you

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

1    are referring to in this e-mail?

2        A   Any type of comments that were made by

3    anyone for the brand in general.  I wanted to make

4    sure the brand had the right feel, so I made sure

5    that the brand comments -- like, I -- I created

6    the vibe, I guess you could say, of how the brand

7    would be directed on social.  Not people,

8    specifically, but the actual -- the tone which

9    customers were treated and the way we handled

10   issues.  I wanted to make sure that the brand

11   itself was represented in a way that needed to be

12   represented properly.

13       Q   Would you provide all Facebook comment

14   replies on any Head Kandy related page?

15       A   I'm sorry.  One more time.

16       Q   Sure.  Were you the only person that

17   provided Facebook comment replies?

18       A   No.

19       Q   Were there others that did that?

20       A   Yes.

21       Q   And when you write here that you directed

22   all Facebook comment replies and what's to be

23   said, were you directing those who were writing

24   those Facebook comment replies?

25            MR. CONVERSE:  Objection, form.

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 41

```
 1     A  No.  Facebook, people who were commenting
 2  on Facebook were a part of the social -- or of the
 3  customer service team.
 4     Q  (BY MR. LOEB)  Do you have any input or
 5  direction as to what Facebook comment replies
 6  would be made?
 7     A  Again, I just set the tone of how we would
 8  handle, like, the feel of the brand.  Being polite
 9  and making sure that we're taking care of people.
10  Like, it wasn't -- I wasn't directing anyone.  I
11  just was making sure that the brand was
12  represented the way that it was initially founded.
13     Q  Okay.  Are you familiar with any employee
14  handbooks that were created at any time that you
15  were at Head Kandy?
16        MR. CONVERSE:  Objection, form.
17     A  I believe Kaylin attempted to create some
18  type of policy for cell phones and things like
19  that, but I had no involvement in the creation of
20  that in any way.
21     Q  (BY MR. LOEB)  Did you have any
22  involvement in the review of it?
23     A  No, not that I really -- I believe maybe
24  she said, Will this be okay?
25        And I was like, I'm not HR, I don't know.
```

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 42

```
 1   It looks grammatically correct to me.
 2       Q   Okay.
 3       A   But I didn't review it to be approved.
 4   Like, I just wanted to make sure that we were
 5   attempting.  Like, there was no -- we had no --
 6   there was no rules, so I was just approving her
 7   spelling and whatever it may be, if anything, but
 8   I did not create or anything of the sorts.
 9       Q   Have you ever directed Mindy McDermaid to
10   fire anybody?
11       A   I may have suggested after she complained
12   about people that -- like, Mindy was in charge of
13   people.  So if she would come to me and complain,
14   then I would say, Well, then, fire them.
15           I didn't fire them.  But it wasn't a
16   demand to fire.  It was, You are a supervisor.
17   Handle the people that work for you.  This is not
18   my job.
19       Q   Is it your testimony today under oath that
20   you have never directed Mindy McDermaid to fire
21   somebody?
22           MR. CONVERSE:  Objection, form.
23       A   I do not recall.  I'm not saying I didn't,
24   but I do not recall ever telling Mindy to fire
25   someone that I recall.
```

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 43

1       Q   (BY MR. LOEB)  Have you ever directed via

2    text message Mindy McDermaid to fire somebody?

3          MR. CONVERSE:  Objection, form.

4       A   If you would like to show me the text

5    message, I'm happy to re-jot my memory, but I do

6    not recall that text message.

7       Q   (BY MR. LOEB)  But you had the authority

8    while you were at Head Kandy to fire people?

9       A   I would, assume, being an owner of the

10   company, Bryan Feldman, Kayla McNeill, Jerome

11   Falic, Leon Falic, and Simon Falic all would have

12   had the ability to fire someone as an owner of the

13   business.  So, yeah, I would say I probably had

14   the ability to fire people, but not from my paid

15   position at Head Kandy.

16      Q   And you are talking about the paid

17   position at Head Kandy that is memorialized in a

18   document referred to as the executive employment

19   agreement?

20      A   That states I was the creative director,

21   yes.

22      Q   Is there any other contract or document

23   that you are aware of that pertains to your

24   employment with Head Kandy?

25      A   Employment, no.

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 44

1      Q   How many times have you met Leon Falic?

2      A   I don't believe I have ever met Leon.

3      Q   How many times have you met Simon Falic?

4      A   Once.

5      Q   Do you recall when that was?

6      A   I don't.  He was sitting at his desk in

7   his office in Miami, Florida.

8      Q   Did you meet him virtually, like via Zoom,

9   or were you at the offices in Miami?

10     A   I was in the office in Miami.

11     Q   Which office were you at in Miami?

12     A   Jerome Falic's office.  The Hollywood

13  office for duty free.

14     Q   And were you at that office to talk about

15  business?

16     A   I don't remember at all why I was there.

17     Q   How many times have you been in the same

18  room with Jerome Falic?

19     A   Maybe 10.  12 maybe.

20     Q   Has Mr. Falic ever physically touched you

21  in an inappropriate way?

22     A   No.

23     Q   Has Mr. Falic ever been verbally abusive

24  to you?

25     A   No.

Page 45

```
 1        Q  Has Mr. Jerome Falic always been a
 2  gentleman towards you?
 3        A  Yes.
 4        Q  Same line of questions.  Obviously Leon
 5  Falic, if you never met him, then he never would
 6  have inappropriately touched you, correct?
 7        A  Correct.
 8        Q  And for Simon Falic, has he ever
 9  inappropriately touched you?
10        A  No.
11        Q  How about Bryan Feldman, has Mr. Feldman
12  ever inappropriately touched you?
13        A  No.
14        Q  Has Mr. Feldman ever verbally abused you?
15        A  No.
16        Q  Is Mr. Feldman always a gentleman to you?
17        A  Yes.
18        Q  How did you first come to meet Mr. Jerome
19  Falic?
20        A  I received an e-mail from him.
21        Q  Do you recall when, approximately?  I'm
22  not going to hold you to an exact date.  I'm just
23  trying to get a range of when y'all first started
24  interacting.  That's all.
25        A  Probably around 2016, I would say.
```

**HEAD KANDY LLC vs KAYLA MCNEILL**
**Kayla M. McNeill on 07/12/2024**

Page 46

```
1        Q  And can you describe to me how the e-mail

2   was written?  Was it like, Hey, I'm Jerome Falic.

3   Nice to see.  You know, like a cold call or did

4   you all have --

5        A  No, that is exactly what it was.

6        Q  Oh, all right.  And was it in connection

7   with the trademark dispute that was going on?

8        A  That was how he received my information,

9   yes.

10        Q  Okay.  And can you tell me, was it after

11   that e-mail was sent did you-all start to exchange

12   pleasantries about the Head Kandy business?  Or I

13   guess it was Lashed Out, really, but --

14        A  It was Head Kandy.

15        Q  Okay.

16        A  You know, I don't really recall.  I

17   remember that I had my guard up really high.  I

18   had no understanding of why someone of his

19   business stature would have any business

20   contacting me, because he made it very clear what

21   businesses he owned and how successful he was and

22   that he was interested in meeting with me.

23        Q  Did y'all ultimately meet?

24        A  Yes, we did.

25        Q  Okay.  Was it in person at first or
```

**HEAD KANDY LLC vs KAYLA MCNEILL**
**Kayla M. McNeill on 07/12/2024**

1    through some other means?

2       A  No, he flew to Salida and came to my

3    office.

4       Q  And was that in the 2016 time period,

5    somewhere around there?

6       A  Yeah, maybe -- maybe it was 2017 by this

7    point where we actually met face-to-face.  But,

8    yeah, somewhere between 2016 and the beginning of

9    2017.

10       Q  All right.  But prior to that in-person

11   meeting, had you spoken with him on the phone?

12       A  I would assume so.  I don't recall, but I

13   would assume we had one phone exchange.  Sorry.  I

14   don't recall.

15       Q  All right.  And do you recall what it is

16   that Jerome Falic expressed to you when you had

17   your in-person meeting in Salida?

18       A  Yeah.

19       Q  Tell me what -- tell me about that

20   meeting.

21       A  That he was impressed with my ability to

22   sell products online.  That he liked the products

23   I had created.  He didn't like the packaging.  He

24   thought the packaging could be improved.  He

25   brought Stu Dolleck with him, so it wasn't just

**HEAD KANDY LLC vs KAYLA MCNEILL**
**Kayla M. McNeill on 07/12/2024**

```
 1   Jerome; it was he and Stu.  And they sat in the
 2   office and showed me a catalog of Hard Candy
 3   makeup.  And he told me how successful they were
 4   and how they had sold over $60 million in makeup
 5   at Walmart that year before, and that they were
 6   very much looking for an online brand and someone
 7   just like me to help kind of give their brand an
 8   online presence.  And so, originally, the
 9   conversation was kind of about merging Hard Candy
10   and Head Kandy.
11       Q   What was Stu's last name again?
12       A   Dolleck.
13       Q   Can you spell it for us to the best you
14   can?
15       A   D-o-l-l-e-c-k.
16       Q   Okay.  And what was Mr. Dolleck's role, if
17   any?
18       A   I think --
19       Q   Was he --
20       A   -- well.
21       Q   -- lawyer, friend --
22           THE COURT REPORTER:  Please --
23       Q   (BY MR. LOEB)  What was his -- what was
24   his role?
25           Go ahead.
```

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 49

1      A  I, at first, thought he was just a friend

2   when they arrived.  And then I was very quickly

3   told that he was the owner of New World Beauty,

4   and that he had just sold his business for -- I

5   don't remember the amount, but they were kind of

6   gloating about how much he had sold his business

7   for -- and that he was the creator, or he was in

8   charge of all of the creative for Hard Candy's

9   makeup for Jerome.

10     **Q  Okay.  And I may have missed that, but New**

11  **World, how does New World fit into the mix, if you**

12  **know?**

13     A  New World produced all of Hard Candy's

14  makeup.

15     **Q  When you say "produced," they were the --**

16  **look, I'm asking questions today.  I don't use**

17  **makeup.  I don't use hair care.**

18     A  Okay.

19     **Q  So there are questions I'm going to ask**

20  **that may sound really dumb to you.  I promise you,**

21  **I'm not -- I'm going to ask dumb questions, but**

22  **not super dumb.**

23          **So when you say that New World -- did they**

24  **like have, like, a little factory where they made**

25  **the makeup; is that what you are saying?**

**HEAD KANDY LLC vs KAYLA MCNEILL**
**Kayla M. McNeill on 07/12/2024**

Page 50

1      A   I'm going to assume so.

2      Q   Okay.  And so how long did that initial

3   in-person meeting in Salida last?

4      A   A couple of hours.  I -- I -- it wasn't

5   all day.

6      Q   Okay.  And was that during the time there

7   was this dispute with the trademark?

8      A   Yes.

9      Q   Were there any lawyers present at that

10   meeting?

11      A   No.

12      Q   Were you represented by counsel during

13   that trademark dispute?

14      A   I was.

15      Q   Who were you represented by?

16      A   Jennifer Schlatter and --

17      Q   Is that --

18      A   And Anthony Converse.

19      Q   Oh.  After that -- strike that.

20         What else was said at that meeting that

21   you can tell us, to the best of your recollection?

22      A   That they knew that I needed someone like

23   them to actually get somewhere in this business.

24      Q   Are you talking about the online business?

25      A   I was talking about the beauty business.

**HEAD KANDY LLC vs KAYLA MCNEILL**
**Kayla M. McNeill on 07/12/2024**

1      Q   Oh, okay.

2          Did they tell you why they needed someone

3      like you in order to make it in the beauty

4      business?

5      A   I don't think that for them it was about

6      the beauty business.  For them, it was that I had

7      an online business that they didn't have, and they

8      had a beauty business that I didn't have.  So I

9      think that they wanted to try to kind of happily

10     ride off into the sunset and both -- and pour into

11     both of our strengths.

12     Q   I understand.

13         Anything that between the -- between the

14     two of y'all, I think what you are telling me is

15     there was kind of a missing component.  You had

16     the online presence, but not the beauty presence.

17     They had the beauty presence, but not the online

18     presence.

19     A   And maybe more just the knowledge that

20     they had that I definitely did not have.  I had

21     never -- I had never done anything like what I was

22     doing, and so they definitely had way more

23     knowledge in manufacturing and products and the

24     connections.  They were very much all about

25     telling me about their connections, and I didn't

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

1    have that.  All I had was an online personality

2    and people were buying the product.

3         Q  Okay.  At the time of that meeting, how

4    long had you been in business?

5         A  Let me see here.  Probably about a year

6    and a half, maybe two years max.

7         Q  Did you start Head Kandy in October of

8    2015?

9         A  I made my first sale in October of 2015,

10   but I started the product development and those

11   kinds of things back in, like, April, maybe a

12   little bit sooner, of 2015.

13        Q  Okay.  All right.

14           I have seen references and documents to an

15   entity known as Lashed Out, LLC.

16        A  Correct.

17        Q  What is Lashed Out, LLC?

18        A  In 2013, the end of 2013, I started a

19   mascara business that I was selling mascara called

20   Lashed Out.  And I had that LLC, so that's what

21   that is.

22        Q  All right.  And was Lashed Out kind of the

23   entity that you would create other products out

24   of?

25        A  No.  So I only had the mascara business

**HEAD KANDY LLC vs KAYLA MCNEILL**
**Kayla M. McNeill on 07/12/2024**

Page 53

1    until I decided to create the hair products.  So I

2    had the LLC.  So then I filed a d/b/a of Head

3    Kandy under Lashed Out, LLC.

4         Q  Sure.  But what I'm trying to get at, and

5    and this is probably more of -- I'm not trying to

6    sound super lawyerly, but Lashed Out, the LLC,

7    that's the only entity that existed?  They were

8    just a d/b/a that came along known as Head Kandy

9    afterwards?

10        A  Correct.

11        Q  And Lashed Out starts out as a mascara

12   business.  And then at some point in time you

13   develop, I guess, the hair care or the hair

14   products that were under the Head Kandy label?

15        A  I actually started with headbands.

16        Q  Okay.  And did the headbands kind of start

17   to morph into shampoos and conditioners and other

18   types of things?

19        A  The headbands morphed into hair appliance

20   first.

21        Q  Okay.

22        A  And then we sold the hair appliance about

23   a year, year and a half before I ever developed

24   any products.

25        Q  And when you developed your products for

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 54

1  Head Kandy, tell me, like how would you develop

2  them?  Did you have, like, a little laboratory you

3  were putting in chemicals and things?  Tell me how

4  you created them.

5          MR. CONVERSE:  Objection, form.  You can

6  go ahead.

7     A  So when I very first started to decide

8  that I wanted to create hair care products, I

9  started with a bunch of white label businesses.

10  And they were sending me a bunch of stock

11  formulas, and I would use them and I just didn't

12  like them.  Nothing really, to me, was something

13  that -- I don't know.  I do feel like I'm fairly

14  talented at fragrances and the way things work.

15  And I don't feel like I needed to be a chemist to

16  know that something needed to be changed.

17          So I originally started with a lab.  And

18  they were telling me the minimum order quantities

19  were so high in order to do, like, a custom

20  formulation, so I started looking around and I

21  went to, like, a beauty show kind of thing that

22  was more for, like, wholesaling and that kind of

23  thing.  And I -- I did some work and found some

24  places that were willing to actually change their

25  formulas for me to make what I wanted.  So I knew

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 55

1   that if they had the base, then I could start

2   really adjusting it to be what I wanted it to be.

3       **Q   And would you take whatever formula or**

4   **whatever the concoction was and, like, make**

5   **changes and alterations to it or would you direct**

6   **others to do that?**

7       A   I wouldn't make the changes.  I would just

8   do my research on, like, what ingredients I wanted

9   and what ingredients did what.  And I just really

10  educated myself on the goal of what the product

11  was going to do and what problems it was going to

12  fix, and what I would usually provide, like, an

13  entire list of different ingredients that I

14  thought would maybe be beneficial to add or take

15  out or remove or substitute.

16      And then they would send me all of the

17  formulations in, like, little bottles that had

18  labels that were labeled as, like, sample one,

19  sample two, sample three.  And, you know, some of

20  them -- sometimes I would get 20 samples.  And I

21  would use them and just continue to adjust until I

22  was happy with the final product.

23      **Q   Okay.  And that -- that business and the**

24  **creation of these different hair products, would**

25  **you, like, ship them out of your house or a barn**

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 56

1    or basement or something like that?  How would you

2    go about selling these products?

3        A  So, originally, I didn't sell products,

4    remember?  I just sold the brush straightener.

5    And so the brush straightener --

6        Q  I call them products.  No --

7        A  Sorry.

8        Q  Whatever it is, it's just -- if it's a

9    hair product, it's a curler, whatever, I mean, at

10   least for this purpose of this question I'm just

11   going to refer to them --

12       A  Sorry.

13       Q  -- as products.

14       A  So, originally, we sold a brush

15   straightener that we created and we designed.

16   Dusty did a lot of the work with a -- we hired a

17   guy in our town to help us originally kind of

18   create like this 3D design.  And then we sent it

19   over to a humidifier factory.  And then they

20   shipped us these products.  And they were in my

21   driveway and in my basement and in my garage.  So,

22   originally, for the first couple months of our

23   business, we ran out of my basement.

24       Q  And how would you market that product or

25   that good, or whatever it is, and everything else?

Page 57

1  How -- how -- how did you get it out into the

2  marketplace?

3      A  So it was before you could even go live on

4  Facebook of any kind.  This was in 2015, and

5  Facebook Live wasn't a thing.  And I, just, would

6  randomly video myself in my bathroom or somewhere,

7  and I would use the product.  And I would post the

8  video and it would go viral all on its own.

9      Q  Okay.  And then would -- like, on your

10 Facebook account?

11     A  Yes.

12     Q  And then would people contact you and say,

13 Hey, this looks cool.  Can I buy it from you?

14     A  No, I had created a website by this point.

15 So I would post the video, and then there would

16 be, like, a link, like, up above the video.  And

17 people would click on it and people would buy the

18 product.

19     Q  Got it.

20         We're going back in time with technology a

21 little bit here, but did you also have, like, an

22 Amazon account?  I don't even know if that existed

23 back then, but that you could link your hair stuff

24 with.

25     A  So, originally, I did not do an Amazon

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 58

1  account at all because, one, I didn't understand,

2  like, how that even worked, and there wasn't a lot

3  of resources back then of how to really utilize

4  Amazon.  But it wasn't until, I want to say maybe

5  2016, when I realized that my product needed -- I

6  didn't want to be on Amazon because of the fees

7  that Amazon charged; however, I feel like for the

8  validity of your brand, being on Amazon gives you

9  a lot of creditability.

10        So I ended up being on Amazon in maybe

11  2016 or so, somewhere right in there.  I only sold

12  the one product on Amazon solely for

13  creditability, but it took off like crazy.

14      **Q  On Amazon or through the Facebook videos**

15  **that you were making?**

16      A  Well, the -- so to understand consumer

17  behavior, a lot of people will watch a video and

18  then they will immediately go to Amazon:  one,

19  because it's a secure payment site; two, it's easy

20  to read, they want to read the reviews, they want

21  to see what's truth.  So Amazon exploded and so

22  did my website.  We were doing about 50/50 in

23  sales of both.  It was just the preference of the

24  consumer of how they checked out.

25      **Q  From the time that you set up, I guess,**

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 59

1    the Amazon store or Amazon channel, did you

2    maintain the Amazon store during the time that you

3    worked at Head Kandy?

4        A  I did not.

5        Q  Did somebody maintain it on your behalf?

6        A  I wouldn't say my behalf, but for Head

7    Kandy, yes.  Like -- like, I'm not trying to trick

8    you or twist that.  I'm just trying to say, like,

9    to be honest with you it was kind of weird.

10   Amazon kind of runs its own.  Like, it didn't

11   really need maintained; it just came in to the

12   orders.

13        So when the one item was up there, it

14   would come through our ship station and we would

15   just ship it.  So nobody really had to maintain

16   it, per se.  There was no real maintaining.

17       Q  Sure.  And when I say "maintain," maybe

18   my -- my word choice isn't -- I'm not conveying my

19   question to you.  When I say "maintain," did that

20   Amazon -- is it an Amazon store; is that the right

21   terminology?

22       A  It wasn't when I set up the Amazon

23   originally.  It was just --

24       Q  Okay.  What was it?

25       A  I don't know.  You just uploaded your

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 60

```
 1   product and people bought it.  I don't really
 2   know.
 3       Q  All right.
 4       A  There was no storefront.  There was no
 5   link to, like -- it wasn't a website.  It was
 6   literally just the product was listed on Amazon.
 7       Q  All right.  And did you get, I guess,
 8   money for each sale that came through the Amazon
 9   site?
10       A  Well, yeah.  The way Amazon works is it is
11   your product.  So you would get money for selling
12   your product on Amazon.  And then Amazon would
13   charge a hosting fee of a percentage of the sale.
14   But Amazon did not ship my product.  Amazon didn't
15   hold my product.  My product was shipped from my
16   warehouse.
17       Q  All right.  Is it called Amazon
18   Marketplace?
19       A  I believe that's what it eventually grew
20   to be, yes.
21       Q  Okay.  And did you ever, after selling
22   Head Kandy to Mr. Falic and his brothers, did you
23   keep that Amazon Marketplace store?
24           MR. CONVERSE:  Objection, form.
25       A  So when we sold the business we were going
```

**HEAD KANDY LLC vs KAYLA MCNEILL**
**Kayla M. McNeill on 07/12/2024**

1  to switch the EIN over on the Amazon account, but

2  they do not allow that, so we would have lost all

3  of our reviews.  So they continued to maintain

4  running under the Amazon account that I had built

5  because they wanted the good reviews of the

6  product.

7      **Q  (BY MR. LOEB)  Do you still maintain -- do**

8  **you still -- when I say "maintain," and I'm going**

9  **to provide clarification, do you still maintain**

10  **that Amazon account today?**

11      A  I -- I have zero access to the Amazon

12  account that has Head Kandy products on it.  I did

13  receive a 1099 every year for the revenue that

14  Head Kandy was bringing in.  And my accountant

15  would provide them with the 1099 to pass the

16  income on, so I ---

17      **Q  Do you recall when you lost access to that**

18  **Head Kandy Amazon account?**

19      A  Oh, my gosh.  I didn't really have access,

20  if you could say, like, for years.  I never logged

21  in.  I never handled it.  I never took -- I

22  wouldn't even know how to log into that, even if

23  you walked me through it.

24      **Q  In 2023, did you receive any money of any**

25  **kind from Amazon?**

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

1      A   No.   From the Amazon -- sorry.  I received

2   a 1099 that said I received money for the

3   products, but it was a wash-through because it was

4   all Head Kandy's products.

5      **Q   Aside from Head Kandy's products, in 2023,**

6   **did you receive any money of any kind from Amazon?**

7      A   Not that I'm aware of.

8      **Q   All right.  Getting back to kind of that**

9   **initial meeting that occurred with Mr. Falic and**

10  **Stu, you said it lasted a couple of hours.  What**

11  **happened at the end of it?  Was it a, Hey, nice**

12  **talking to you?  What -- what happened after that?**

13     A   It was very much them telling me that they

14  really wanted to be a part of my business.

15         I remember, it would have been New Year's

16  Eve of 2017 going into 2018.  So the end of

17  December, beginning of January.  I remember we

18  took our kids to Disney World and Jerome had

19  contacted me or I con- -- somehow we connected,

20  and I said that I was in the area somewhat.  And

21  he requested a meeting at his office in Miami.

22  And I believe we met on, like, January, maybe, 3rd

23  or 4th of 2018.  And that's where he basically

24  proposed to me that they wanted to acquire a

25  portion of my company.

Page 63

1      Q  Did he -- how did he explain that to you,

2   that he wanted to acquire a portion?  Like it was

3   going to be a merger, a buyout?  How was it

4   going to --

5      A  No, they just wanted -- they wanted to

6   start over.  I remember it was, like, let's do a

7   clean slate.  We'll purchase your inventory and,

8   like, the Head Kandy business Facebook page.  At

9   the time it was the only social media.  I believe

10  we maybe had an Instagram at the time.  I don't --

11  for Head Kandy, specifically, I believe we had an

12  Instagram and a Facebook.  And that was what was,

13  like, driving all of the business.  And so that --

14  he wanted to acquire that.  And then also -- I

15  think that was pretty much it.  There wasn't a

16  lot -- a lot to it.

17     Q  All right.

18     A  And he basic -- yeah.

19     Q  Was the transaction ultimately reflected

20  in an asset purchase agreement?

21     A  Yes.

22     Q  Were you represented by counsel in

23  connection with that transaction?

24     A  Yes.

25     Q  Who were your attorneys that represented

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 64

1    you in connection with that transaction?

2        A   That was Jennifer Schlatter.

3        Q   Mr. Converse was not involved as counsel

4    for that transaction?

5        A   I don't believe so, no.

6        Q   I'm putting here on the screen what I

7    believe to be the asset purchase agreement.  I'm

8    going to mark this as Deposition Exhibit Number 3.

9            (Deposition Exhibit 3 was marked.)

10           MR. LOEB:  Hang on one sec.  You know

11   what?  We've been going for a little over an hour.

12   Let's go ahead and take a break so I can pull this

13   document up.  The file folder label is not

14   correlating with what I have here on my electronic

15   database.

16           So is five minutes okay or do you need a

17   little bit longer of a break?

18           THE COURT REPORTER:  If we could do

19   10 minutes, that would be great.

20           MR. LOEB:  All right.  We will do

21   10 minutes.  We'll endeavor to get back at 12:33.

22   If we get back at 12:45, that's okay, too, but

23   let's get back after a 10-minute break.

24       Q   (BY MR. LOEB)  Before we go off the

25   record, is there any testimony that you have given

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

1  so far, Ms. McNeill, that you would like to

2  change, modify, supplement, or amend in any way,

3  shape, or form?

4      A  No.

5      Q  All right.  Do you feel like you have

6  understood the questions that I have asked and

7  which you have provided answers?

8      A  Yes.

9      Q  All right.

10         MR. LOEB:  We will be back at -- it's

11  now -- I show 12:34, so why don't we do 11 minutes

12  just for safety, be back at 12:45 and start there.

13  Thank you.

14         MR. CONVERSE:  And can you shoot me the

15  e-mail of that document, too, while we're on

16  break, please?

17         MR. LOEB:  I -- I -- I did send it out to

18  you.  Maybe you didn't get it.

19         THE COURT REPORTER:  If we could go off

20  the record --

21         MR. LOEB:  Yeah, we can go off the record.

22         THE VIDEOGRAPHER:  The time is now 10:34

23  a.m.  This is the end of media number 1.  We are

24  off the record.

25         (Recess taken, 10:34 a.m. to 10:51 a.m.)

**HEAD KANDY LLC vs KAYLA MCNEILL**
**Kayla M. McNeill on 07/12/2024**

```
 1           THE VIDEOGRAPHER:  The time is now 10:51

 2    a.m.  This is the beginning of media number 2.  We

 3    are back on the record.

 4       Q  (BY MR. LOEB)  All right.  Back from a

 5    break.  Any testimony you have given so far you

 6    want to change, modify, supplement in any way,

 7    shape, or form?

 8       A  No.

 9       Q  All right.  We were talking before the

10    break of the beginnings of the relationship and

11    stopped off with the asset purchase agreement.

12    Let me pull it up on the screen and show it to

13    you.

14          This first page is an e-mail from you to

15    ron@flyingmotorsports [sic].  Do you know who this

16    is this, ron@ -- ron@flyingamotorsports?

17       A  Yep, I do.

18       Q  Who is that?

19       A  We were purchasing or looking into

20    purchasing a motor home, so he needed to have the

21    asset purchase agreement for the bank.

22       Q  As part of financing?

23       A  Yes.

24       Q  Attached to the e-mail is what I believe

25    to be the asset purchase agreement between Head
```

**HEAD KANDY LLC vs KAYLA MCNEILL**
**Kayla M. McNeill on 07/12/2024**

Page 67

1    Kandy, LLC and Lashed Out, LLC, doing business as

2    Head Kandy, a Colorado limited liability company.

3    Do you see this?

4        A  I see it.  I just wanted to make sure that

5    this is the original one, because I would have

6    just forwarded this from something that I had in

7    my e-mail.  So I just want to make sure, like, it

8    wasn't, like -- like, I don't know if there were

9    versions of it, so I just want to make sure that

10   we are talking about the final executed one and

11   not one I would have randomly found in my e-mail

12   and forwarded it.

13       Q  I will represent to you it says Executed,

14   Version, up here on the top right.

15       A  Okay.

16       Q  I'm happy to scroll down.  Hopefully there

17   are some signatures.  Hang on.

18          Do you see the signature here with your

19   name on it?

20       A  Yeah.  Can you show me the other

21   signatures of the other parties, just to make

22   sure?

23       Q  Sure.

24       A  I'm sorry.  I just want to make sure.

25       Q  No -- no, I'm fine with that.

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

```
 1      A  Okay.  Yep.  This is correct.

 2      Q  I'm fine with that.  No offense taken.  I

 3  appreciate you wanting to be sure about this.

 4         But after having seen these two

 5  signatures, can you confirm for me that this is

 6  the asset purchase agreement in connection with

 7  the sale of Lashed Out to Head Kandy, LLC, as

 8  referred to in this asset purchase agreement as

 9  the buyer?

10      A  Yes.

11      Q  And did you review this document before

12  you signed it?

13      A  To the best of my ability, yes.

14      Q  Sure.  And you had the opportunity to

15  negotiate through counsel the terms of this

16  agreement?

17      A  I don't recall how it went, but I did end

18  up signing the agreement.

19      Q  Okay.  And you would not have signed the

20  agreement unless you had agreed with the language

21  and terms contained therein, correct?

22      A  Oh, no.  I definitely would have signed it

23  without understanding it, because that's what I

24  do.  But, listen, I'm not an attorney, and I'm not

25  a businessperson, and I'm not going to lie about
```

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 69

1  it.  So I definitely did not necessarily

2  understand everything in this --

3      Q  Sure.

4      A  -- but I definitely signed it.

5      **Q  You understood -- fair enough.  You**

6  **understood the essence of the deal, such that it**

7  **was -- it was reflected in the asset purchase**

8  **agreement, right?**

9      A  Yeah, I was selling my -- the assets of

10  the company at that date of what was created, what

11  we had agreed upon, what Jerome and I had talked

12  about, yes.

13      **Q  Okay.  All right.  And how much did you**

14  **sell the company for?**

15      A  I didn't sell the company; I sold the

16  assets.

17      **Q  Okay.**

18      A  So the assets -- remember, we didn't sell

19  the company.  We sold the assets.  This is an

20  asset purchase agreement.  Right?  Am I right on

21  that?  Like, I'm trying to just make sure you're

22  not putting words in my mouth either.  Is that --

23      **Q  I'm not --**

24      A  Sorry.

25      **Q  I'm -- I'm not trying to trick you.  I'm**

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

1    just trying to get to the essence --

2        A  Okay.

3        Q  -- of the question --

4           (Multiple people speaking simultaneously.)

5           THE COURT REPORTER:  Please, I need one at

6    a time, folks.  Please.

7        A  The assets --

8        Q  (BY MR. LOEB)  Whether it's the assets or

9    the company, what was the sales price?  Let's

10   leave it at that.

11       A  Okay.  If I -- if I remember correctly, it

12   was four times the profit that I had made in the

13   year of 2017, which was, I believe, $800,000.  And

14   so that got us to, like, 3.2.  But then I had to

15   give my 20 percent back in or something like that.

16          So I believe, like, 2.8 is what I actually

17   received, but I had to put money in also so they

18   took that off of it.  Something -- something to

19   that nature, to be honest with you, to my

20   recollection.

21       Q  All right.  And what of the assets were

22   you selling?

23       A  So we basically determined that the assets

24   of this part were for sure the Facebook page and

25   the -- well, I guess that's pretty much all that

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

1  it really had as far as that.  I think there was

2  maybe, like, two computers.  I didn't really own

3  very much.  It was more blue sky, to be honest

4  with you.

5      Q  How about any inventory?

6      A  We did sell inventory.  We had about a

7  million dollars worth of inventory.

8      Q  And that conveyed as part of the

9  transaction?

10      A  Yeah.  They did purchase the inventory as

11  well, so that was part of -- so there was

12  inventory, and then a couple of computers, and the

13  Facebook page, maybe a couple of desks.

14      Q  Was there anything that you held back?

15      A  No, I didn't really own anything.

16      Q  Okay.

17      A  The operation itself was pretty simple.

18      Q  Okay.  And did you create a Facebook page

19  that at one time was referred to by the name of

20  Kandy Life With Kayla?

21      A  Yes.

22      Q  Did that happen after the sale?

23      A  Yes.

24      Q  Okay.  And did you create that page, Kandy

25  Life With Kayla, while you were an employee of

Page 72

1   Head Kandy, LLC?

2      A  So it wasn't called Kandy Life to begin

3   with; it was just Kayla McNeill.  And there's --

4   yes, I did create it, but I created it to separate

5   my personal life from the business.

6      **Q  And did you rename that personal page**

7   **Kandy Life With Kayla?**

8      A  Yes.

9      **Q  Did you use Kandy Life With Kayla as part**

10  **of your employment with Head Kandy?**

11     A  Did I use -- I'm sorry.  Ask that one more

12  time.

13     **Q  Did you use Kandy Life With Kayla Facebook**

14  **page to promote Head Kandy products?**

15     A  I used Kandy Life With Kayla's page to

16  demonstrate products for Head Kandy.

17     **Q  And that was one of the functions that you**

18  **were hired to perform while you were at Head**

19  **Kandy, correct?**

20     A  Well, I still continued to do them on Head

21  Kandy's Facebook page, to be clear.  It wasn't

22  that I just all of a sudden switched over to this

23  other page and didn't uphold what I was supposed

24  to be doing for Head Kandy.  I was continuing to

25  do my duties and everything that I was still on

**HEAD KANDY LLC vs KAYLA MCNEILL**
**Kayla M. McNeill on 07/12/2024**

1    Head Kandy's business page, also.

2        Q  I understand.  But as it pertains to the

3    Kandy Life With Kayla Facebook page, you provided

4    tutorials for people to see, correct?

5        A  I did, but are you asking between the

6    hours of 8 and 5 or -- because I feel like you are

7    trying to ask me -- you are trying to ask me and

8    pin me down.  I need to you clarify, please.

9        Q  I'm just -- pay attention to my question.

10       Did you post tutorials for Head Kandy

11   products on the Kandy Life With Kayla Facebook

12   page; yes or no?

13       A  Yes.

14       Q  Did you promote Head Kandy products on the

15   Kandy Life With Kayla Facebook page?

16       A  I did.

17       Q  Did you perform Facebook Live sessions on

18   the Kandy Life With Kayla page?

19       A  I did.

20       Q  And those particular activities that you

21   just agreed to have done, those were on a Facebook

22   page that you created while you were employed at

23   Head Kandy, correct?

24       A  While I was employed at Head -- yes.

25       Q  And Kandy Life With Kayla, was that

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 74

1   trademarked, that name or that phrase?

2       A  Not until 2022, 20 -- like the end of

3   2022.

4       Q  But the answer is it was trademarked?

5       A  I actually don't know if it ever was

6   officially trademarked, but I know it wasn't any

7   time near when it was.  And so, to be honest with

8   you, I actually don't know if it's trademarked.  I

9   know we talked about applying for the trademark,

10  but I'm not going to say if it was or it wasn't

11  actually approved.

12      Q  The name Kandy Life With Kayla, was candy

13  spelled with a K?

14      A  Yes.

15      Q  Was that in reference to Head Kandy?

16      A  It was in reference to Kayla with a K.

17      Q  Okay.  So what about the a-n-d-y?  I don't

18  think -- and I'm looking at your name the way it's

19  spelled.  It says K-a-y-l-a.  What's the a-n-d-y

20  referring to?

21          MR. CONVERSE:  Objection, form.

22      A  Well, I named Head Kandy with a K for

23  Kayla.  So Kandy was not K because of Head Kandy.

24  K was K because of Kayla.

25      Q  (BY MR. LOEB)  And was Kandy referring to

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 75

1    Kayla?

2        A   Yeah, K for Kayla.

3        Q   No.   No, I said the word.   Was Kandy,

4    then, Kandy Life With Kayla referring to Kayla?

5            MR. CONVERSE:   Objection, form.

6        A   My answer is I named the company Head

7    Kandy with a K for Kayla.   So the K in Kandy Life

8    was because of Kayla, not because of Head Kandy,

9    because you -- sorry, that's how you asked the

10   question.

11       Q   (BY MR. LOEB)   No.   If -- the word "Kandy"

12   in Kandy Life With Kayla, "Kandy" is referring to

13   Head Kandy, correct?

14           MR. CONVERSE:   Objection, form.

15       A   It is referring to the Kandy Life, with a

16   K.

17       Q   (BY MR. LOEB)   And is Kandy referring to

18   Head Kandy or something else?

19       A   No, it's referring to the Kandy Life, with

20   a K, for Kayla.

21       Q   Okay.   And the Kandy Life, what is the

22   word "Kandy" referring to?

23           MR. CONVERSE:   Objection, form.

24       A   The sweet life.

25       Q   (BY MR. LOEB)   Okay.

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 76

1      A  Kandy with a K, for Kayla.

2      **Q  Okay.  No reference at all when it's Kandy**

3   **that -- the Kandy within Kandy Life to the company**

4   **Head Kandy?**

5         MR. CONVERSE:  Objection, form.

6      A  Well, it was convenient that it made sense

7   between the two, but Kandy Life was the sweet

8   life.

9      **Q  (BY MR. LOEB)  Okay.**

10     A  Candy is sweet.  Candy is candy.

11     **Q  All right.  Is the candy that's sweet**

12  **spelled with a K?**

13     A  No, it's spelled with a C, but it's

14  spelled with a K when you're Kayla.

15     **Q  In connection with the asset purchase**

16  **agreement you also executed an executive**

17  **employment agreement, correct?**

18     A  Yes.

19     **Q  And did you have counsel at the time that**

20  **you executed the executive employment agreement?**

21     A  Yes.

22     **Q  Did you review the executive employment**

23  **agreement before you signed it?**

24     A  Again, same answer as before, to the best

25  of my ability.

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 77

```
 1       Q  Did you understand that there were certain
 2   restrictions contained in the agreement?
 3       A  Absolutely not.
 4       Q  Did you understand there to be any
 5   restrictions in the agreement?
 6       A  A noncompete, that's pretty basic
 7   language, so that was easy to understand.
 8       Q  You understood there was a noncompete
 9   contained in the agreement?
10       A  Yes.
11       Q  Did you understand that there was also a
12   nonsolicitation clause contained in the agreement?
13       A  Yes.
14       Q  What did you understand the
15   nonsolicitation clause in the agreement to
16   restrict as it pertains to your conduct?
17       A  That I couldn't take, like, e-mails or
18   contacts and reach out to people to, like, do --
19   like -- like, I couldn't send mass e-mails for,
20   like -- to, like, steal that information or
21   something.
22       Q  All right.  Could you steal the
23   information at all?
24       A  I don't know what you mean.
25       Q  Well, you said you could --
```

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 78

1      A  I didn't.

2      **Q  -- to steal the information, that that was**

3   **a qualification.  Did you think you could steal**

4   **information at all?**

5      A  No, I -- you just asked me how -- Ethan,

6   I --

7      **Q  Kayla.**

8      A  -- answered the question.  You said what

9   did I understand it to be.  I --

10     **Q  Sure.**

11     A  -- understood it that I couldn't, like,

12  take the e-mail list, like, go in and take the

13  e-mail list and e-mail the customers to try to

14  solicit to them.  Solicitation.  Like, that's how

15  I understood it.

16        Sorry I used the word "steal" and you

17  turned it into thinking that I could steal

18  everything.  That is definitely not how I meant

19  it.

20     **Q  Did -- did you ask that Ryan Thompson help**

21  **you compile a list of suppliers that Head Kandy**

22  **used, so that you could utilize them as part of**

23  **the White Pineapple business?**

24     A  No.

25     **Q  It never happened?  You never asked him to**

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

1    do that, is your testimony?

2        A  Oh, I definitely know what you are

3    referring to.  But if you are going to let me give

4    the answer, I would love to do that.

5        Q  My question was --

6        A  I did not ask Ryan to -- I did not ask

7    Ryan to collect suppliers to use for White

8    Pineapple.  That is not correct.  I did not do

9    that.

10       Q  Okay.  Did you text him and ask that he

11   put together a list of the suppliers?

12       A  So that we could move to a solid business

13   Alibaba account specifically for Head Kandy.  To

14   separate my personal account from the business

15   account.

16       Q  Did you understand that you were not

17   allowed to employ or use the services of any Head

18   Kandy employee or any other business that you

19   might have?

20       MR. CONVERSE:  Objection, form.

21       A  Absolutely.

22       Q  (BY MR. LOEB)  Is Dusty McNeill employed

23   by Head Kandy?

24       A  Yes.

25       Q  Dusty -- Dusty McNeill, has he provided

**HEAD KANDY LLC vs KAYLA MCNEILL**
**Kayla M. McNeill on 07/12/2024**

1  services to White Pineapple?

2       MR. CONVERSE:  Objection, form.

3    A  Provide services paid as an employee, no.

4    Q  (BY MR. LOEB)  Has he provided services,

5  whether for free or for payment?

6       MR. CONVERSE:  Objection, form.

7    A  Has Dusty McNeill performed paid services,

8  no.

9    Q  (BY MR. LOEB)  No.  Services.  I didn't

10  say "paid."  Has Dusty McNeill provided services

11  to White Pineapple?

12       MR. CONVERSE:  Objection, form.

13    A  Dusty McNeill has not performed paid

14  services for White Pineapple.

15    Q  (BY MR. LOEB)  I'm taking the word "paid"

16  out.  Has Dusty McNeill provided services to White

17  Pineapple; yes or no?

18       MR. CONVERSE:  Objection, form.

19    A  Dusty McNeill has not performed paid

20  services for White Pineapple.

21       MR. LOEB:  Wendy, could I have you mark

22  that question, please.

23       THE COURT REPORTER:  (Nodded head up and

24  down.)

25    Q  (BY MR. LOEB)  Has Dusty --

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 81

1    A  Can I ask a question?

2    **Q  Has Dusty --**

3    A  Can I ask a question?

4    **Q  I'm not under oath, so unfortunately you**

5    **can't.**

6    A  I need a break.

7    **Q  Has Dustin --**

8        MR. CONVERSE:  She wants to take a break

9    before you ask the next question.

10       THE DEPONENT:  I'm taking a break, please.

11       MR. CONVERSE:  Just give us five minutes,

12   take a break.

13       MR. LOEB:  You need a five-minute break?

14   **Q  (BY MR. LOEB)  Okay.  Before we go off the**

15   **record, is there any testimony you have given so**

16   **far that you want to change, modify, supplement,**

17   **or amend in any way, shape, or form now?**

18   A  No.

19       MR. LOEB:  Okay.  We will come back at

20   1:15.

21       THE VIDEOGRAPHER:  The time is now 11:10

22   a.m.  We are off the record.

23       (Recess taken, 11:10 a.m. to 11:12 a.m.)

24       THE VIDEOGRAPHER:  This is the beginning

25   of media number 3.  The time is 11:12 a.m.  We are

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 82

1  back on the record.

2       Q  (BY MR. LOEB)  During the break did you

3  confer with counsel about your testimony?

4       A  Not about my testimony.

5       Q  During the break did counsel provide you

6  with any advice or suggestions as to how you

7  should answer?

8            MR. CONVERSE:  I'm going to object on the

9  basis of attorney-client privilege and instruct

10  you not to answer.

11      Q  (BY MR. LOEB)  Are you following your

12  counsel's advice?

13      A  Yes.

14      Q  Why did you need to take a break?

15      A  Because I needed to ask a question.

16      Q  A question to who?

17           THE DEPONENT:  Am I --

18           MR. CONVERSE:  Yeah.

19      A  I wanted to know if you were allowed to

20  bully me into changing my answer.  That's what I

21  asked and I was --

22      Q  (BY MR. LOEB)  Go ahead.

23      A  -- and I needed a break.

24      Q  Has Dusty McNeill provided unpaid services

25  to White Pineapple?

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 83

```
 1      A  Can you ask that again?

 2      Q  Has Dusty McNeill provided unpaid services

 3   to White Pineapple?

 4      A  No.

 5      Q  Has he, has Dusty McNeill hung wallpaper

 6   for White Pineapple?

 7      A  No.

 8      Q  Has Dusty McNeill helped to pack products

 9   for White Pineapple?

10      A  No.

11      Q  Has Dusty McNeill helped to create Wanda,

12   the machine, for White Pineapple?

13      A  No.

14      Q  Has Dusty McNeill done anything at all for

15   White Pineapple?

16      A  No.

17      Q  Earlier in your answers you told me that

18   Dusty McNeill did not provide paid services for

19   White Pineapple.  Do you recall telling me that

20   answer?

21      A  Yep.  Yes.

22      Q  Has Dusty McNeill provided any services

23   for White Pineapple?

24      A  No.

25         MR. CONVERSE:  Objection, form.
```

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 84

1      Q  (BY MR. LOEB)  And is it your testimony

2   that when you took the break your attorney did not

3   counsel you on how you should answer the questions

4   pertaining to Mr. McNeill's services that he may

5   or may not have provided for White Pineapple?

6          MR. CONVERSE:  Objection, that gets into

7   the attorney-client privilege because you are

8   asking what we spoke about.

9          I instruct you not to answer.

10     Q  (BY MR. LOEB)  And are you refusing to

11   answer the question?

12     A  Yes.

13          MR. LOEB:  All right.  Wendy, if you could

14   mark --

15          MR. CONVERSE:  It's also --

16          MR. LOEB:  If you could mark when we came

17   back on the record up until now, please.  And,

18   actually, if you could also make a note to certify

19   those questions.

20     Q  (BY MR. LOEB)  Has Dusty McNeill provided

21   any assistance to you in connection with the White

22   Pineapple business?

23     A  Dusty McNeill has done things for me.

24     Q  Okay.  And has he done -- strike that.

25          Has Dusty McNeill provided services for

1    you in connection with White Pineapple?

2        A    He's done things for me.

3        Q    What has he done?

4        A    He's my husband; he does everything.

5        Q    Has he helped -- has he helped you shipped

6    products during the White Pineapple label?

7        A    He's helped me with services, yes.

8        Q    How many hours would you say Dusty McNeill

9    has provided services in connection with White

10   Pineapple?

11           MR. CONVERSE:  Objection, form.

12       A    I have absolutely no clue.

13       Q    (BY MR. LOEB)  Too many to count?

14       A    No.  Actually, the opposite.

15       Q    Have you kept records of that?

16       A    No.

17       Q    And did you -- did Dusty McNeill get paid

18   for any of those services?

19       A    No.

20       Q    Would Dusty -- or, strike that.

21           Do you consider what Dusty McNeill did by

22   way of those services to provide value?

23       A    Provide value?  No, not necessarily.  I

24   mean, he's my husband.

25       Q    Did Dusty McNeill help to build out or

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 86

```
 1   create any improvements in connection with the

 2   White Pineapple business?

 3        MR. CONVERSE:  Objection, form.

 4      A  I'm sorry.  I don't understand what you

 5   are asking.

 6      Q  (BY MR. LOEB)  Sure.  When you -- since

 7   you have been working with White Pineapple, or

 8   WhiPi, have you gone onto Facebook to post

 9   Lives to help how your businesses operate?

10      A  Sure.  Yes.

11      Q  All right.  And when you make those

12   postings, are you being truthful in everything

13   that you say?

14        MR. CONVERSE:  Objection, form.

15      A  I mean, if I'm lying, I would like you to

16   please show me.  Like, I need an example of what

17   you are asking.  So, yeah.  I mean, to the best of

18   my abilities, I'm telling the truth but --

19      Q  (BY MR. LOEB)  All right.

20      A  -- you're --

21      Q  What -- what you are showing to your

22   followers and viewers on those Facebook Lives, you

23   are not trying to deceive your audience, are you?

24      A  No.

25      Q  And you are being truthful and accurate in
```

Page 87

1    what you are showing Dusty McNeill doing in those

2    Facebook Lives, correct?

3       A  Can you give me a reference of what I have

4    shown Dusty McNeill doing, just so I can be --

5       Q  (Shaking head from side to side.)

6       A  Oh, okay.

7       Q  No.

8       A  Then I don't know what you are asking.

9    I'm sorry.  I don't recall.

10      Q  Is there ever a time when you have done a

11   Facebook Live when you have been with White

12   Pineapple where you have shown Dusty McNeill to be

13   performing work or services for White Pineapple

14   that he hasn't actually performed?

15      A  I don't recall.

16      Q  Is there anything in your mind that you

17   are aware of in which you have shown Dusty McNeill

18   to be providing services for White Pineapple, when

19   in fact he has not?

20      A  I don't recall what you are talking about,

21   so I can't say, but I don't recall showing him

22   doing things that -- I don't recall.

23      Q  Have you gone onto Facebook Live and shown

24   some, I guess, some machine or something called

25   Wanda?

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 88

1    A   Yes.

2    **Q   Okay.  What is Wanda?**

3    A   It's a filling machine.

4    **Q   And where is that filling machine located?**

5    A   At my filling facility.

6    **Q   Where is the filling facility located?**

7    A   Canyon City.

8    **Q   What state?**

9    A   Colorado.  But it's not being used.

10   **Q   Has it ever been used?**

11   A   Twice.

12   **Q   Who -- who made the filling machine?**

13   A   The people who we bought it from or I

14   bought it from.

15   **Q   Dusty McNeill did not make Wanda, the**

16   **filling machine, is what you are telling me?**

17   A   Well, he didn't, like, weld the metal and

18   form it.  So he didn't make it, no.

19   **Q   Did he do anything in connection with**

20   **Wanda, the filling machine?**

21   A   He helped me source it.  Like he

22   approved -- like, he said, Yeah, that's a good

23   machine, and we made some changes.  I made some

24   changes to it.  And -- but it was monely -- mainly

25   me.

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 89

```
 1      Q   How many employees does White Pineapple
 2   have?
 3      A   Five.
 4      Q   What are their names?
 5      A   I don't necessarily know last names, but
 6   Coley, C-o-l-e-y; her name is -- I'm trying not to
 7   say Kaylin because her name is not Kaylin, but
 8   it's spelled very similar, but we called her
 9   Papaya; Deanna Lanphier; and Harmony Hartraneft;
10   and Shawn.
11      Q   Any other employees?
12      A   No.
13      Q   How about independent contractors?
14      A   Yeah, we have a couple independent
15   contractors.
16      Q   What independent contractors does White
17   Pineapple have?
18      A   Crystal Turner, LeaRaye Packard.
19      Q   LeaRaye?
20      A   Uh-huh, L-e-a-R-a-y-e.
21      Q   Okay.
22      A   LeaRaye Packard.  Who else?  Oh, and
23   Heather Berry.
24      Q   Where are all those individuals located?
25   Are they Colorado residents?
```

**HEAD KANDY LLC vs KAYLA MCNEILL**
**Kayla M. McNeill on 07/12/2024**

Page 90

```
 1      A   Yes, they are.
 2      Q   And have you always been a Colorado
 3  resident?
 4      A   Yes.
 5      Q   Have you always maintained Colorado as
 6  your primary residency?
 7      A   Yes.
 8      Q   How about North Carolina?
 9          MR. CONVERSE:  Objection, form.
10      Q   (BY MR. LOEB)  North Carolina has never
11  been your residency?
12      A   Never.
13      Q   How many times have you visited Florida in
14  connection with any business related to Head
15  Kandy?
16      A   Maybe eight.  Maybe.
17      Q   Okay.  Did you ever travel to Florida in
18  connection with Head Kandy business in which Jon
19  Rosenbaum was also present?
20      A   I don't believe so.
21      Q   What states did you physically encounter
22  Jon Rosenbaum?
23      A   North Carolina, New York, and I think
24  that's it.
25      Q   Nothing in Colorado?
```

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 91

```
 1      A   Nope, not that I can recall.  No.
 2      Q   In North Carolina was there a Head Kandy
 3   warehouse that was there?
 4      A   Yes.
 5      Q   Do you recall when that warehouse was
 6   acquired?
 7      A   May of 2021.
 8      Q   Was it acquired through an entity, like a
 9   special purpose entity, if you know?
10      A   Well, we rented a location for a year
11   before we acquired a building under a different
12   entity.
13      Q   Okay.  What was the entity that ultimately
14   acquired the building?
15      A   I believe it's Head Kandy Realty.
16      Q   Okay.  Was the building that was acquired
17   through Head Kandy Realty the same one that was
18   being leased the year before?
19      A   No.
20      Q   And I just want to make sure my notes are
21   accurate.  The building that was acquired through
22   Head Kandy Realty, was that May of 2021, or was
23   that when the lease started?
24      A   I'm sorry.  Ask that one more time.
25      Q   Sure.  I'm just trying to get the dates
```

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 92

1    right chronologically.  You said --

2        A  Oh, okay.

3        Q  -- there was, I guess, a one-year lease of

4    a building, and then after that there was a

5    different building that was purchased.  When did

6    the lease start?  Kind of when Head Kandy first

7    had a building presence in North Carolina.

8        A  I believe it was May of 2021.

9        Q  Okay.  And then the building that was

10   purchased, was that around about May of 2022?

11       A  I believe it was more like April of 2022.

12       Q  Of 2022?

13       A  Yes.

14       Q  Was there a reason why there was a change

15   in the location from a leased building to a

16   building in which there was a purchase?

17       A  Yes.

18       Q  Can you tell me what those reasons are to

19   the best of your knowledge?

20       A  We were misled by the landlord at the

21   first location, and the building kept getting

22   flooded.  It didn't have power.  It had no running

23   bathrooms often.  It was a nightmare.

24       Q  Okay.  Did you help find the building that

25   was purchased by Head Kandy Realty?

Page 93

1      A   Yes.

2      Q   Do you use a broker for that, too, or is

3   that just -- I'm trying to understand how that was

4   located.  Like, were you driving around town and

5   said, Ah, there's a great building or --

6      A   No.

7      Q   -- somebody give you a tip-off, or what?

8      A   No, I -- I was desperately trying to find

9   a new location because all of our products were

10  being ruined by water pouring from the ceilings

11  and computers being destroyed.  So I knew that we

12  had to do something.  So I got on LoopNet --

13     Q   Okay.

14     A   -- and found several locations, and sent

15  them all to Bryan Feldman.  And he and I,

16  together, kind of decided and navigated what to do

17  next.

18     Q   Okay.  I'm going to show you a document

19  we're going to mark as Deposition Exhibit Number

20  5, I believe.

21         THE COURT REPORTER:  Actually, 4.  I

22  believe it will be 4.

23         MR. LOEB:  Okay.  We're going to mark it

24  as Deposition Exhibit Number 4.  I'll pull it up.

25  I'm going to try to put this into the ShareFile,

**HEAD KANDY LLC vs KAYLA MCNEILL**
**Kayla M. McNeill on 07/12/2024**

Page 94

```
 1   Antonio.  Give me a second and let me know if you
 2   are able to get it.
 3        MR. CONVERSE:  Okay.  I haven't been able
 4   to follow the links, but the e-mail came through.
 5   That was working.
 6        (Deposition Exhibit 4 was marked.)
 7        MR. THOMPSON:  Anthony, for the ShareFile
 8   are you using your Anthony -- or antonio.converse
 9   e-mail address?
10        MR. CONVERSE:  Anthony@converselawgroup.
11        MR. THOMPSON:  Yeah.  Whatever e-mail you
12   are getting the -- the -- the e-mails on, you have
13   to log in with that address.
14        THE COURT REPORTER:  I'm sorry.  Who was
15   that speaking?
16        MR. THOMPSON:  Colin Thompson.
17        THE COURT REPORTER:  Thank you.
18        MR. CONVERSE:  When I click the link it
19   just -- it doesn't even let me log in.  It just
20   gives me the loading ring that just keeps circling
21   round and round.
22        MR. LOEB:  All right.  Let me try
23   e-mailing it to you real quick.
24        MR. CONVERSE:  Thank you.
25        Q  (BY MR. LOEB)  I show you a document we're
```

**HEAD KANDY LLC vs KAYLA MCNEILL**
**Kayla M. McNeill on 07/12/2024**

Page 95

1    marking as Deposition Exhibit 4.  Do you see

2    what's on the screen as being an e-mail from

3    Jerome Falic to Kayla McNeill dated July 26, 2021?

4        A  Yes.

5        Q  And this is an e-mail from him in which he

6    appears to be describing the business, and direct

7    your attention to where he indicates that:  All we

8    need is more customers.  Do you see that?

9        A  Yeah.  Can I read this really fast,

10   please?

11       Q  Yeah.  Sure.  Go ahead.

12       A  I just want to jog my memory.

13       Q  Yeah.  Go ahead.

14       A  (Perusing document.)  Okay.

15       Q  Did you have a chance to review the

16   e-mail?

17       A  Yes.

18       Q  And do you see here where Mr. Falic is

19   writing to you about wanting to generate more

20   customers?

21       A  Yes.

22       Q  And do you recall, during the course of

23   the relationship between you and Mr. Falic, that

24   he was always trying to develop strategies and

25   find ways to generate more customers?

**HEAD KANDY LLC vs KAYLA MCNEILL**
**Kayla M. McNeill on 07/12/2024**

Page 96

```
 1          MR. CONVERSE:  Objection, form.
 2     A   I believe that would be the goal of anyone
 3  who owns a business, yes, definitely.
 4     Q  (BY MR. LOEB)  All right.  And when you
 5  say you believe that would be the goal of any
 6  business, why is that?
 7     A  Because most businesses are -- their goal
 8  is to grow.
 9     Q  And did you share that -- that goal with
10  Mr. Fall in trying to find ways to grow the
11  company?
12     A  Absolutely.
13     Q  And was it a goal of yours to implement
14  strategies that would grow the business with new
15  customers, as opposed to simply just focusing on
16  existing customers?
17     A  Yeah, the goal was to always maintain
18  current customers and find new customers.
19     Q  Here Mr. Falic indicates that he wanted to
20  have a sit-down with you and Mr. McNeill about the
21  growth strategy in the company as a whole.  Do you
22  see that?
23     A  Sorry.  I see:  Just like I told Andrew --
24  oh, yeah, right here.  Yep.  Dusty and I, yep.
25     Q  Do you recall if, during the time that you
```

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 97

1    were with Head Kandy, you and Mr. Falic would have

2    conversations about growth strategy and the

3    company as a whole?

4        A  I wouldn't with Jerome hardly ever, but

5    Bryan Feldman and I constantly.

6        Q  Okay.  Do you recall ever having a

7    sit-down with Mr. Falic after this e-mail came out

8    about ways to implement new growth strategies in

9    the company as a whole?

10       A  I don't believe that the meeting ever

11   actually happened.  I don't recall.  I know I had

12   had meetings with him, but I can't recall the

13   specific meeting after this.  Like, specific

14   meeting or e-mail.

15       Q  Okay.

16       A  But I had had calls with him.  Maybe three

17   total over the -- the four-and-a-half-year period.

18   Maybe about three meetings with Jerome personally.

19       Q  Are you talking about in-person meetings

20   or meetings including phone calls as well?

21       A  Period.  About growth meetings with

22   Jerome.  About specifically about growing the

23   business, I would say maybe, honestly, three or

24   four that were strategized for growth, whether it

25   be phone, Zoom, e-mail, that were specifically

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 98

1    about that topic.

2        Q   What strategies, if any, did you and

3    Mr. Falic agree to implement to help with the

4    growth?

5        A   Oh, we tried everything.  We -- from the

6    day we came in -- he didn't really give any advice

7    at all or any input at all in the beginning, like

8    I was promised.  So in the beginning it was just

9    kind of to continue to do what I always did, and

10   that was Facebook Lives, and be silly with Ryan

11   Thompson, and grow organically off of our

12   personalities.

13       We would -- we would do a lot of things --

14   in the -- in the beginning it -- unfortunately, a

15   lot of people in business think that they know how

16   to just grow a business, but social media is so

17   different.  And so Ryan and I would do a lot of

18   live videos that were very humorous and very

19   funny.  And people loved coming in and they loved

20   the comradery.  And that brought in a ton of new

21   customers outside of focusing on the product

22   itself, because products just don't sell on social

23   media; personalities and engagement and

24   interaction do.

25       So, originally, when we first started,

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

1   that was kind of the platform and it worked well.

2   We -- we did grow every year in revenue and we did

3   gain new customers every year, so I can't say it

4   didn't work.

5      Q   Okay.

6      A   Jerome hired Dan Tarman at one point to

7   come in, and that was a complete flop.  That was a

8   complete waste of $100,000, but we tried it.  We

9   sure gave her heck.  We tried it.

10        Mindy put us into IPSI, and that was a

11  $500,000 loss, but we sure tried it.  Jerome was

12  really on board for that.

13        We hired several different marketing

14  agencies that swore they could really help bring

15  in new customers and grow the business.  And,

16  unfortunately, it never was the home run that we

17  all had hoped for, but we definitely gave it a

18  valiant effort.

19     Q   What is IPSI?

20     A   IPSI is a subscription box, monthly beauty

21  subscription box.

22     Q   Like Birchbox?

23     A   It's just like Birchbox, but it's called

24  IPSI.

25     Q   Okay.  Are you familiar with a boutique

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 100

1    referred to as Hayzlee's Boutique?

2        A   Yes.

3        Q   What is Hayzlee's Boutique?

4        A   In -- after I had my -- we had adopted our

5    daughter, every time she was posted on social

6    media, people were asking where I got her clothes

7    constantly.  So Bryan Feldman had actually just

8    had a baby, also.  And so we had had a lot of

9    conversations about, like, boutiques and kids'

10   clothes and things like that.  And so I started --

11   or I can't say it ever really took off, but I

12   attempted to start a little kids' clothing

13   boutique for her called Hayzlee's Boutique.

14           And I ran it for maybe two or three

15   months.  And to be honest to you, I could have

16   really poured into it, but Head Kandy took my

17   priority, so I just kind of let it fizzle out.

18       Q   Was it a storefront where you had the

19   children's clothes or was it online?

20       A   I just had a -- like a Shopify.  And if I,

21   like, posted a picture or something, I would just

22   link, like, her pants.

23       Q   What is a Shopify?

24       A   It's a -- it's a storefront online.  Like

25   it's just what houses websites.  It's like an

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 101

1    online e-commerce platform.

2        Q  All right.  And if I go to -- if I were at

3    the time trying to find Hayzlee -- was it

4    called -- it was called Hayzlee's Boutique?

5        A  Yeah.  Yes.

6        Q  Would I go -- would I search Hayzlee's

7    Boutique dot com or would I go Shopify and then

8    find Hayzlee's Boutique?

9        A  No, you would just type in Hayzlee's

10   Boutique dot com.

11       Q  And was that -- was Hayzlee's Boutique

12   created by only you?

13       A  Yes, only me.

14       Q  Was it created under a business?

15       A  No.

16       Q  Did you -- did you -- where did you order

17   the children's clothing from that was sold at

18   Hayzlee's Boutique?

19       A  Just a wholesale supplier.

20       Q  Where was the wholesale supplier located?

21       A  There were several places.  I had some

22   people in the United States; I had ordered some

23   stuff from Indonesia; I ordered some bows from a

24   friend that made bows; I ordered a couple of

25   things from China.  I was kind of just sourcing

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 102

1  stuff from wherever I could to kind of complete a

2  boutique.

3      **Q  Did you acquire some of the merchandise**

4  **for Hayzlee's Boutique from Alibaba?**

5      A  Yes.

6      **Q  And did -- how did you pay for Hayzlee's**

7  **Boutique merchandise from Alibaba --**

8      A  With a credit card.

9      **Q  And did Head Kandy --**

10     A  And a bank wire.

11         THE COURT REPORTER:  I'm sorry?

12     **Q  (BY MR. LOEB)  And what?**

13     A  And a bank wire.

14     **Q  Head Kandy's funds, were they utilized to**

15  **pay for some of the Hayzlee's Boutique**

16  **merchandise?**

17     A  So I used my personal Alibaba account that

18  has my credit card that was a VISA that I was

19  putting all of Hayzlee's stuff on in my personal

20  AmEx.  I -- we have several AmEx cards.  So I

21  charged Hayzlee's Boutique clothes to my credit

22  card to receive.

23     **Q  I asked if there was Head Kandy money**

24  **utilized to pay for any of the merchandise for**

25  **Hayzlee's Boutique.  Are you able to answer my**

Page 103

1    question?

2        A   My answer is no.

3        Q   Just a second.

4            I'm going to show you what we marked as

5    Deposition Exhibit Number 1, which was the Bryan

6    Thompson texts.  Do you see what's on the screen

7    here as being a text exchange between you and Ryan

8    Thompson, December 8 of 2022?

9        A   Yes.

10       Q   Which you write:  Those few Alibaba

11   charges from way back when are gonna be the death

12   of me if they ever find them for Tay's Boutique.

13           It's like 6,000 I hand to God didn't need

14   to have them pay for it.

15           I wanna delete the account so bad.

16           I'm scared.

17           LOL.

18           Do you see that?

19       A   Yes.

20       Q   And what $6,000 are you referring to in

21   this text thread?

22       A   Well, just to give some context, this

23   is -- what's the date?  12/8.  So I was told that

24   -- we were going back through.  Klei said that she

25   had paid off the credit card in September or

**HEAD KANDY LLC vs KAYLA MCNEILL**
**Kayla M. McNeill on 07/12/2024**

1  October of this 2022.  And I said to her, There is

2  my charges on my credit card.  Can I have a chance

3  to please pay off my charges?  Because it was my

4  credit card and she paid it off, unauthorized.

5  Just paid to my credit card.  So I was going

6  backward and Ryan was going backward through

7  Alibaba to just basically just make sure that

8  everything was clean.

9       And then I had found that there was a

10  charge for the -- on my personal Alibaba that was

11  put on my personal credit card that I didn't ever

12  actually pay for.  And Head Kandy only paid for it

13  once because it was never submitted.  It was never

14  asked to be paid for and it was not on an expense

15  report for something else.  I wanted to make sure

16  that I paid it.  But this was right after I was

17  retaliated against and told that I was losing the

18  company.  And so I was terrified.  Absolutely, I

19  was terrified, because it was an honest mistake,

20  and I wanted to make sure that I cleaned up

21  anything that should not have ever gone through.

22  So I had asked Klei, in September, if I could make

23  sure that I were to pay her October -- if I could

24  cover any charges that she paid unauthorized.

25       So when I found it, I immediately had paid

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

```
 1   it.  And I actually found the charge and made the
 2   payment on 12/6.  So I paid for it before I told
 3   Ryan about it.
 4        Q  Did you tell Klei that there was Head
 5   Kandy money that was paid for the Tay's Boutique
 6   merchandise purchased from Alibaba?
 7            MR. CONVERSE:  Objection, form.
 8        A  Klei knew that she overpaid my credit card
 9   with Head Kandy's funds, yes.
10        Q  (BY MR. LOEB)  Did you tell Klei that
11   there were Head Kandy funds that were utilized to
12   pay for the Tay's Boutique merchandise?
13            MR. CONVERSE:  Objection, form.
14        A  I don't recall what I specifically told
15   Klei, but I was very open and very honest and
16   working by the hour hand by hand with Klei.
17        Q  (BY MR. LOEB)  If that's the case, why --
18        A  There wasn't --
19        Q  If that's the case, why is it that you
20   wanted to delete the account, if you were trying
21   to be transparent and this was just an honest
22   mistake?
23        A  Because I was terrified.  I wasn't
24   sleeping.  I wasn't eating.  I couldn't function.
25   I was living in pure mental, like, chaos.
```

**HEAD KANDY LLC vs KAYLA MCNEILL**
**Kayla M. McNeill on 07/12/2024**

1      So I apologize that I said I was scared,

2   but I was reacting to being in fear.

3      **Q   Okay.  Why did you want to delete the**

4   **account, though, if you were trying to be**

5   **transparent?**

6      A   Because I personally think that Head

7   Kandy, in general, should have handled business

8   completely differently when they came in.  They

9   should have set up separate accounts.  They should

10  have had their own credit cards.  They should have

11  had everything separate, and not handed it all on

12  me to, like, hold.

13      I wanted to delete my personal account so

14  that Ryan could gather all of the -- remember you

15  asked me can Ryan please -- you said I said to

16  gather the buyers or suppliers, sorry, for Head

17  Kandy, so that Ryan could take Head Kandy's

18  suppliers and keep it completely separate from

19  mine, and I could delete the account, and I could

20  start fresh with mine.  I felt that it needed to

21  be separate.  I felt that it was a very unfair

22  situation to be put in, and I wanted to make sure

23  that I could get it handled.

24      So I wasn't not being transparent.  I was

25  in fear, because I was stuck in a situation that

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 107

1    no one gave me any help or guidance in, in being

2    the managing member of the company.

3        **Q  Were you the managing member of Head**

4    **Kandy?**

5        A  I sure wasn't, which is why I was saying I

6    needed the help from the managing member.

7        **Q  And what help did you need?**

8        A  Maybe to set up the EIN for Amazon in

9    their own name, maybe start their own Alibaba in

10   their own name, maybe provide a credit card in

11   their own EIN number, maybe pay the unpaid sales

12   taxes of $2 million that never got paid.  I just

13   feel like I needed a little bit of help from the

14   people of the managing member.  Because those are

15   managing member jobs, not creative director jobs.

16       **Q  Were you -- during the time you were at**

17   **Head Kandy, you were telling people that you were**

18   **the owner of Head Kandy, weren't you?**

19       A  I was the owner of Head Kandy.  I was the

20   owner of Head Kandy.

21       **Q  Okay.  I thought I heard you kind of**

22   **relegating yourself to being just a creative**

23   **director.**

24       A  I was --

25       **Q  You had an ownership interest, too.  Huh?**

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 108

1          THE COURT REPORTER:  I didn't catch that.

2     Please, one at a time.

3          Q  (BY MR. LOEB)  Go ahead.

4          MR. CONVERSE:  Can you repeat your

5     question?  It was cut off.

6          MR. LOEB:  Sure.

7          Q  (BY MR. LOEB)  In your prior answer you

8     seem to be relegating yourself just to this

9     creative director position, but you were an owner

10    of the company, right?

11         A  Yeah.  We discussed this earlier in the --

12    like when you asked me earlier.  I basically had

13    two roles, unfortunately, that make it kind of

14    muddy, but I was hired and paid by Head Kandy to

15    be the creative director.

16         Q  When were the charges incurred for the

17    merchandise for Tay's Boutique?

18         A  I am not sure.

19         Q  2021?

20         A  I believe so.  I'm not -- I apologize.  I

21    don't recall exactly the date.

22         Q  Did you utilize any Head Kandy employees

23    to ship Tay's Boutique clothing?

24         A  No.

25         Q  All right.  And if former Head Kandy

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 109

```
 1    employees say that you utilized them to ship Tay's

 2    Boutique merchandise, they would be lying?

 3        A   Absolutely.

 4        Q   Did you ever use Head Kandy employees to

 5    perform personal services for you?

 6        A   Not unless it pertained to a Head Kandy

 7    situation.

 8        Q   Okay.  So then the answer is that you have

 9    utilized Head Kandy employees to perform personal

10    services for you, correct?

11            MR. CONVERSE:  Objection, form.

12        A   No.  My answer is no.

13        Q   (BY MR. LOEB)  Okay.  And so if any

14    employee comes to court and testifies in front of

15    this jury that they were performing personal

16    services for you, they would be lying, correct?

17            MR. CONVERSE:  Objection, form.

18        A   Could you give me an example?

19        Q   (BY MR. LOEB)  Well, I don't think I need

20    to.  If there is an employee that comes to court

21    and testifies in front of the jury here,

22    indicating that they were performing personal

23    services for you, they would be lying, correct?

24            MR. CONVERSE:  Objection, form.

25        A   I would say that I did not use Head Kandy
```

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 110

1   employees to perform personal services for me that

2   they were not compensated from me personally for.

3   So if they worked at Head Kandy and did something

4   for me, they were not paid from Head Kandy to do.

5       Q  (BY MR. LOEB)  You paid them -- you paid

6   them out of your own pocket is your testimony?

7       A  Well, I let employees live in my house for

8   free.  I bought them cars out of my own pocket to

9   try to help them, because they were my friends.

10  So that's what friends do.  We had a friendship.

11  I think people forget that every single person

12  that worked at Head Kandy was my friend.

13          So there was never a Head Kandy employee

14  just randomly doing personal things for me on the

15  clock because that's how you are trying to paint

16  it.  That is not true.

17      Q  Okay.  Which of the Cook sisters did you

18  say was -- had performed babysitting services for

19  you?

20      A  So during COVID -- during COVID, when I

21  didn't have any help, I called Bryan Feldman and

22  said, Bryan, I'm drowning, I need serious help.

23          And he told me, You need to hire some help

24  to get this handled.

25          I did what I was allowed to do.  So,

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 111

1   therefore, in my opinion, it was so I could work

2   for Head Kandy, which is what Bryan Feldman agreed

3   to.  Because I had, in the middle of COVID, no

4   help.

5       Q  My question was which one of the Cook

6   sisters babysat your kids?  I don't think I had

7   Bryan Feldman in the question, but maybe it did

8   and I just didn't -- my memory is starting to go

9   bad.

10          Which of the Cook sisters provided

11  babysitting services?

12      A  Nicole Cook.

13      Q  What was Nicole Cook, on her job

14  application, hired to do?

15      A  Nicole Cook was hired to train to do

16  Facebook customer service.

17      Q  Are you aware that Ms. Cook has indicated

18  she did not do one thing for Head Kandy?

19      A  I am aware she's lying.

20      Q  Were you aware she had said she did not do

21  one thing for Head Kandy; yes or no?

22      A  I am aware that she stated that.

23      Q  And you -- your testimony today is that

24  Nicole Cook is also lying, correct?

25          MR. CONVERSE:  Objection, form.

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 112

```
1        A   There are text messages that we went over

2    in the deposition that state when she could get

3    trained to do customer service.  And Alissa Lamm

4    trained her to do customer service.  That is what

5    happened.  So what Nicole says is fine, but what

6    happened is -- is that she was trained to do

7    customer service.

8        Q   Ma'am, I'm just asking if it's your

9    testimony Nicole Cook is lying; yes or no?

10           MR. CONVERSE:  Objection, form.

11       A   Yes.

12       Q   (BY MR. LOEB)  Okay.  Thank you.

13           Do you know somebody by the name of Andrew

14   Schankerman?

15       A   I do.

16       Q   And was Andrew Schankerman employed by

17   Head Kandy?

18       A   He was.

19       Q   Did Andrew Schankerman also travel with

20   your family for race car events?

21       A   He did not travel with my family.

22       Q   Did Andrew Schankerman transport race cars

23   for your family?

24       A   Never.

25       Q   Did Andrew Schankerman watch your kids?
```

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 113

```
 1      A   Watch my kids?

 2      Q   Yeah, if you were at work.

 3      A   Oh, no.  No.

 4      Q   Did Andrew Schankerman, did he take care

 5   of your kids --

 6      A   No.

 7      Q   -- at any time?

 8      A   No.

 9      Q   Do you know Andrew Schankerman's phone

10   number?

11      A   I have Andrew Schankerman's phone number.

12      Q   All right.  Do you have your phone with

13   you?

14      A   Yes.  It's --

15      Q   Can you pull up your phone and tell me

16   what you understand Mr. Schankerman's number to

17   be?

18      A   Sure.

19      Q   Thank you.

20      A   760-628-8022.

21      Q   You said 628 or 828?

22      A   628-8022.

23      Q   Did you ever pay money out of your pocket

24   for any services that Andrew Schankerman provided?

25      A   No.
```

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 114

1     Q   Did you ever pay for Mr. Schankerman's

2   living expenses?

3     A   Andrew Schankerman lived with me for free,

4   but I didn't pay for him to live somewhere.

5     Q   He lived at your house?

6     A   He did.

7     Q   How long?

8     A   A year and a half.

9     Q   Okay.  And in exchange for him living at

10   your house for free, did he provide any help, aid,

11   or assistance to you or your family?

12     A   No, not for exchange.

13     Q   Did he provide any aid or assistance to

14   you or your family?

15     A   He would come on the weekends sometimes to

16   watch my kids race and hang out with his friend

17   Dusty.

18     Q   And he did work for Head Kandy, what, as a

19   warehouse employee?

20     A   He was a warehouse manager.

21     Q   All right.  And would he work a full

22   business week when he was --

23     A   Yes.

24     Q   -- the warehouse manager?

25     A   Plus.  Yes.

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 115

1      Q   Okay.  How long -- do you recall how long
2   he was employed by Head Kandy?

3      A   About a year and a half.

4      Q   And I'm talking time-wise years.

5      A   I believe October of 2020, maybe a little
6   bit before that.  Maybe September of 2020 until
7   the beginning of 2022.

8      Q   Do you know why he left -- why did he
9   leave Head Kandy?

10     A   Because he couldn't make enough money.

11     Q   Did he move out of your house at that same
12  time?

13     A   Yeah, he moved back to where he got a job
14  where he was paid a lot more, back --

15     Q   Where did he move back to?

16     A   Las Vegas.

17     Q   Okay.  Did Mr. Schankerman -- let me back
18  up.

19         Are there any racetracks in Salida for
20  the -- I think it's the quarter midget cars that
21  your kids drive.  Are there any racetracks in
22  Salida?

23     A   I don't know where Saleeda is.  Salida?

24     Q   Salida, Saleeda.  We're from Florida.  We
25  mispronounce things from time to time.

Page 116

```
 1      A  Well, there is a Sedalia, so I didn't know
 2  where you were talking about.  And I --
 3      Q  Where you --
 4         (Multiple people speaking simultaneously.)
 5      Q  No disrespect --
 6      A  No, no, you're --
 7         THE COURT REPORTER:  Guys, one at a time,
 8  please.
 9      A  Salida --
10         THE COURT REPORTER:  Please.  I would just
11  caution you both, when words are overlapped on
12  Zoom, they're lost.  So please try for one at a
13  time.  Thank you.
14      Q  (BY MR. LOEB)  Is there -- is there any
15  racetracks nearby?
16      A  No.
17      Q  What's the closest racetrack?
18      A  Two and a half hours away, but we didn't
19  race there.
20      Q  Do you all have any racetracks or --
21  again, I'm not trying to sound disrespectful.  I
22  have learned about quarter midget racing from you
23  and your family, so it's a new thing for me.
24         Is there like a place where the kids go to
25  practice their racing skills and stuff like that,
```

**HEAD KANDY LLC vs KAYLA MCNEILL**
**Kayla M. McNeill on 07/12/2024**

1    or do they just show up at events?

2        A   We just show up.

3        Q   And how many race cars does your family

4    have?

5        A   A lot.  I don't know.

6        Q   How much is "a lot"?  Five, 10, 20?

7        A   Well, we have several different racing

8    situations.  Are you asking for every race car

9    that I own or are you asking about a specific race

10   car?

11       Q   I'm just looking -- I mean, I'm just

12   learning more about the quarter midget process as

13   we speak.  Maybe there's other cars than that, but

14   how many race cars do you have?

15       A   Probably 15.

16       Q   And are those 15 race cars just for your

17   kids or are they part of -- are there other people

18   that drive those race cars?

19       A   No, they're Dusty's.

20       Q   Where are those race cars stored?

21       A   Now that we live back in Colorado, they're

22   in my barn.

23       Q   You said now that you have moved back to

24   Colorado.  Where were they before that?

25       A   My -- well, when we first moved to

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 118

1   North Carolina, they were in my driveway for --

2   and my garage for over a year.  And then when we

3   moved to the new warehouse, there was a corner.

4   And I asked Bryan Feldman if I could store them in

5   the corner because it was inside.  So they were

6   there in the corner of the warehouse.  And then

7   when we moved back to Colorado, they went to our

8   barn.

9        Q   When did you move back to Colorado?

10       A   In -- well, we didn't really move, I guess

11   you could say.  Like, we just had a residence

12   there.  Like, I didn't live in North Carolina, we

13   stayed in North Carolina, but when we moved the

14   warehouse.

15           So I, like, permanently stayed in Colorado

16   back in January of 2023.

17       Q   When in January of 2023?

18       A   I'm sorry?

19       Q   Do you recall -- do you recall the date

20   when in January of 2023?

21       A   Maybe like January 9th, I believe.

22       Q   Did you have a North Carolina driver's

23   license at all?

24       A   No.

25       Q   Did you have state taxes taken out while

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

1   you were in North Carolina?

2        A   No.  I lived in Colorado.

3        Q   How often would you return to Colorado

4   while you were in North Carolina?

5        A   No clue.  Often.  When I could.

6        Q   Were you in North Carolina and your

7   husband and kids back in Colorado, or did the

8   whole family come to North Carolina?

9        A   No, we traveled back and forth.

10       Q   Where did the kids go to school?

11       A   We home schooled them because of COVID.

12       Q   And once COVID started to wane, did they

13   continue do home schooling or did they go back to

14   school?

15       A   No, they stayed home schooling because I

16   was needed at the warehouse so frequently and I

17   didn't want to live away from my children.

18       Q   Who home schooled them?

19       A   I home schooled them from when they were

20   in -- when COVID first hit, in March of 2020, I

21   home schooled both of the boys up until around

22   January of 2021.

23           And then it just kept getting harder.  It

24   was -- people weren't going back to school yet.

25   People were trying to decide if they were sending

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 120

1 their kids back. Like, it was still kind of a

2 scary time for me.

3      So I was trying to run Head Kandy and I

4 called Bryan Feldman and asked if I could have

5 help, that I was drowning. And he said, Hire who

6 you need. And I said, I need an assistant. I

7 need something. I can't balance all of this.

8      And so I hired someone to help me with

9 Ryker, who was in third grade, a couple of hours a

10 day, to keep him in school, so that I could

11 continue to work.

12    **Q Did Head Kandy pay for the home schooling?**

13    A With permission from Bryan Feldman, yes.

14    **Q And what was the name of the person that**

15 **provided the home schooling for your children?**

16    A Her name was Elsie, and it was just a

17 couple days a week. And it wasn't "children," it

18 was just Ryker a couple of hours a week.

19    **Q Ryker was in -- was he in third grade at**

20 **that time?**

21    A Yes. Well, no. Second grade -- no, wait.

22 Hold on. He was in first grade. First? Second

23 grade; you are correct. Second grade.

24    **Q Is Ryker your oldest?**

25    A No, he is my middle.

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 121

1     Q  He is your middle.  He's the middle kid.

2         What about the older, your oldest child,

3     did he also receive home schooling?

4     A  Yes, and I home schooled him.

5         (At this time Ms. Burgess is present via

6     Zoom.)

7     Q  (BY MR. LOEB)  Okay.  No assistance from

8     anybody else?

9     A  No one.

10    Q  Did that home schooling that Head Kandy

11    paid for, that was in North Carolina?

12    A  Well, he was on Zoom.  So it was when we

13    were in Colorado or when we were at the warehouse,

14    just to keep him going.  So it was back and forth.

15    Wherever I was, my kids were with me.  Wherever I

16    was needed for work, that's where I was and that's

17    where they were.

18    Q  You said -- is it Elise or Elsie?

19    A  Elsie.

20    Q  What's her last name?

21    A  Hopkins.

22    Q  Do you recall authoring an e-mail in which

23    you admitted that utilizing Ms. Hopkins was

24    unethical?

25    A  I did write that e-mail.  Do I believe

**HEAD KANDY LLC vs KAYLA MCNEILL**
**Kayla M. McNeill on 07/12/2024**

1   that that e-mail is correct, no.

2      Q  And that e-mail, that was in response to

3   an inquiry by Head Kandy's attorney, pertaining to

4   you utilizing individuals like Ms. Hopkins to

5   provide services for your family, correct?

6         MR. CONVERSE:  Objection, form.

7      A  I don't recall why.  I just remember why I

8   wrote it.

9      Q  (BY MR. LOEB)  And in that e-mail

10  communication which you admitted you had behaved

11  unethically and that it wasn't a good look, you

12  did not indicate that you had permission to

13  utilize Ms. Hopkins to provide educational

14  instruction to your middle child with Head Kandy's

15  money, correct?

16        MR. CONVERSE:  Objection, form.

17     A  I kind of was waiting for Bryan Feldman to

18  step up at some point and help me out, because he

19  knew that he had gaven [sic] me permission.  And

20  he hadn't.  And I was being bombarded with

21  e-mails, and scare tactics, and threats.  And I

22  had tried everything.

23        And so I thought, maybe if I apologize,

24  this will end.  So do I think that that e-mail is

25  correct, I do not.  I wrote it, yes.  But I don't

Page 123

1  believe that I did anything unethical, because I

2  did have permission to do that.

3      Q  (BY MR. LOEB)  I think my question was a

4  little more direct, but it was -- and maybe I

5  wasn't good at my question, but the e-mail that

6  you authored, you did not indicate that Bryan

7  Feldman had given you permission to utilize Head

8  Kandy's money to pay for your child's education,

9  correct?

10      MR. CONVERSE:  Objection, form.

11      A  I do not believe that that e-mail is

12  accurate.

13      Q  (BY MR. LOEB)  But you authored that

14  e-mail.

15      A  You know, I don't remember, to be

16  completely honest with you.

17      Q  Do you know if somebody else would have

18  authored it for you?

19      A  With my life, you never know, Ethan.  I do

20  not recall.

21      Q  I'll mark the next exhibit as number 5.

22      (Deposition Exhibit 5 was marked.)

23      MR. LOEB:  Antonio, have you been getting

24  the e-mails with the exhibits, buddy?

25      MR. CONVERSE:  Yes, thank you.

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 124

1        MR. LOEB:  Okay.  I hadn't heard from you

2    so I had assumed that to be the case, but I didn't

3    want to get too far along and you say, Hey,

4    missing these e-mails.

5        MR. CONVERSE:  Yeah.

6        MR. LOEB:  No worries.  I'm about to send

7    this one to you also.  Hang on.  Okay?

8        MR. CONVERSE:  Okay.

9        MR. LOEB:  And, Ms. McNeill, thank you for

10   being so patient while we go through this, sending

11   things back and forth.  I know it's -- most of the

12   time it's supposed to work a little bit easier,

13   but technology has got the best of us.

14       **Q  (BY MR. LOEB)  This is the e-mail we were**

15   **just talking about from you to Jed with Jerome**

16   **Falic copied, and then Laura Spanakos, which is a**

17   **Head Kandy employment.  I'm happy to scroll down**

18   **to the bottom of the thread, so that way you can**

19   **familiarize yourself with the document, if**

20   **necessary, but you let me know.**

21       A  Are you showing me something?

22       **Q  I am, but I haven't shared the screen yet.**

23   **So let me --**

24       A  Okay.  I don't see it.  Sorry.  I was

25   like --

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 125

1              (Multiple people speaking simultaneously.)

2         Q   (BY MR. LOEB)   I'm proud of myself because

3    it's 2 o'clock and this is the first time I have

4    messed up on that regard, so thank you.

5         A   All right.

6         Q   Here we go.

7         A   Okay.

8         Q   Hey -- no, I've -- at least you said it

9    then.   I've gone through question after question

10   and the witness is just answering.   Like, Well, do

11   you see the document?   And they say, No.   I'm

12   like, What the hell are you answering the question

13   for.   So thank you for that.

14             All right.   We got the document up on the

15   screen here.   This is an e-mail that ends or

16   concludes with Mr. Ferdinand writing you on

17   December 2 of 2022, saying he will call you in a

18   few minutes.

19             And then it -- the thread goes where --

20   that e-mail about you writing unethical and the

21   like here.   And I don't know if you want -- it's a

22   14-page document.   I'm happy to show you the whole

23   thing if you want to review it.   You let me know.

24        A   I mean, I probably should review the

25   entire thing, because I don't remember any of this

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 126

1  part of my life.  So, yeah, let's scroll through

2  and let me read the entire document.  Or I can

3  read it on Anthony's, if that makes it better.  I

4  can read --

5      Q  Yeah, go ahead and review it on Anthony's.

6  I'll do the stop share screen.  And you let me

7  know when you are ready to have a conversation

8  about it.  Okay?

9      A  Okay.

10      (Perusing document.)  So I scrolled to the

11  bottom and it looks like it says, Please see the

12  attached.  Can you send those attachments, also,

13  so I can see the entire document.  It says, Please

14  see attached.  So I just want to remind myself.

15  And there is no attachments.

16      Q  Yeah, what that is -- and fair enough to

17  you, I'm happy to send it to you -- does it

18  start -- is the e-mail you are looking at at the

19  bottom dated that Thursday, December 1, 2022, at

20  7:54 in the evening from Jed to you?

21      A  No.  It says November 28 at 10:28 a.m.

22      Q  Hold on.  And is the subject there, Formal

23  legal notice on behalf of Head Kandy, LLC?

24      A  Reply, yeah -- yes.  Sorry.  Yep.  Yes.

25      Q  I'm going to send this to Antonio, too.

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 127

```
 1   We'll go ahead and mark that as Deposition
 2   Exhibit Number -- 6, I think is what we're on?
 3        THE COURT REPORTER:  Yes.
 4    Q  (BY MR. LOEB) -- in order to help you --
 5    A  Okay.
 6    Q  -- with that.  If you just give me a
 7   second.
 8        Why don't you do this.  Handle it -- start
 9   reading that and I'm going to send this other one
10   to Antonio so you can see the attachment.  Okay?
11    A  Okay.
12        (Deposition Exhibit 6 was marked.)
13    A  (Perusing document.)
14    Q  (BY MR. LOEB)  I just sent you Exhibit 6,
15   or sent Antonio Exhibit Number 6.
16    A  Okay.  Yeah, I'll read it in a second.
17   Sure.
18        (Perusing document.)  Sorry.  I'm trying
19   to read fast.  I just want to make sure I know
20   what I'm getting myself into with what we're going
21   to talk about.
22    Q  Go ahead.  Digest it.
23    A  (Perusing document.)  Okay.  He is pulling
24   up that document real quick and we'll go from
25   there.  Sorry.  14 pages is a lot to read.
```

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 128

1      Q   All right.  Do you need -- do you need to

2   review that other one real quick?

3      A   Yeah, let me review it really fast and

4   then we can go forward.

5      Q   All right.  I'm having a KIND bar anyway,

6   so I don't want to be talking with my mouth open,

7   so go ahead.

8      A   Okay.  (Perusing document.)

9          Okay.  Good.

10     Q   You good?

11     A   Yeah.  I just wanted to see what all was

12   in it.

13     Q   All right.  And I'm going to -- let me

14   show you -- I'm going to send one more document,

15   so that way we don't have to start and stop.

16   Okay?  Because your e-mail is responsive to a

17   different letter than the one to Mr. Ferdinand.

18   Okay?  Hang on one sec.

19         (Discussion off the record.)

20     Q   (BY MR. LOEB)  I'm going to mark as

21   Deposition Exhibit Number 7 an e-mail from

22   Mr. Ferdinand to you on Thursday, December 1.

23     A   That's not in this thread of the -- it's

24   an additional?

25     Q   There is an attachment to the one that is

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 129

1    in that e-mail.

2        A   Yeah.

3        Q   And so to be fair to you and give you --

4    make sure we got the --

5        A   Oh, okay.

6        Q   -- context and don't have to start and

7    stop, I'm going to send you this other one also.

8    Okay?

9        A   Okay.  Great.

10       Q   I'm just trying to avoid the start and

11   stops.

12           (Deposition Exhibit 7 was marked.)

13       Q   (BY MR. LOEB)  All right.  I just sent

14   that to Antonio, so when you get it, take a look

15   at that, too.

16       A   (Perusing document.)  Okay.  Oh, just

17   kidding.  Hold on.  Should I go to the bottom and

18   go up?

19           (Perusing document.)  Sorry.  This is a

20   lot.  (Perusing document.)  Okay.

21       Q   Okay.  You ready?

22       A   Yep.

23       Q   All right.  Since we've got all three of

24   these documents kind of on the table here, why

25   don't we go through them in chronological order.

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 130

```
 1    Okay?  Seems to make the most sense.

 2       A   Sure.

 3       Q   I'll do the share screen.  All right.  Do

 4    you see what's on the screen as being what we've

 5    marked as Deposition Exhibit Number 6?

 6       A   Yes.

 7       Q   And this is to you with a copy to

 8    Mr. Falic and Laura Spanakos, correct?

 9       A   Yes.

10       Q   And attached to this is a letter that you

11    have just been given the opportunity to review,

12    dated November 28, 2022.  Do you see this?

13       A   Yeah.

14       Q   Is this --

15       A   I mean, yes.

16       Q   Is this the first letter that you received

17    from Head Kandy indicating the position about

18    there being a material breach of the executive

19    employment agreement and a breach of fiduciary

20    duty of obligations to Head Kandy, LLC?

21       A   Yes.

22       Q   All right.  And you agree with me that

23    you, in your role as a member of Head Kandy, that

24    you did owe a fiduciary duty to the organization?

25          MR. CONVERSE:  Objection, form.
```

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 131

1     A   Yes.

2         Q   (BY MR. LOEB)  And that that fiduciary

3     duty included a duty of loyalty, correct?

4         MR. CONVERSE:  Objection, form.

5     A   Absolutely.

6         Q   (BY MR. LOEB)  And in this particular

7     letter that you receive, Head Kandy is putting you

8     on notice that there was a material breach of your

9     employment agreement, as well as a breach of

10    fiduciary duty that was owed by you to Head Kandy,

11    correct?

12    A   Yes.

13        Q   And this letter that's written to you, it

14    is laid out that you have started a new

15    competitive consumer product business under the

16    brand name White Pineapple, correct?

17    A   Correct.

18        Q   Prior to this letter, had you informed

19    anybody at Head Kandy that you had started White

20    Pineapple?

21    A   Can you show me where I was supposed to?

22    I'm confused, because everyone keeps saying that I

23    breached this.  And I guess I'm confused on why

24    this is coming at me that I did something wrong to

25    begin with.  So I'm confused on this entire

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 132

1    situation.

2          So can you set this up?  You are saying

3    did I inform anyone that I had started White

4    Pineapple.  Are you asking -- informing who?

5    Because there was no protocol of who I was

6    supposed to inform, so can you please detail that

7    a little bit more?

8          **Q  Did you inform anybody at Head Kandy that**

9    **you had created White Pineapple, ma'am; yes or no?**

10         A  At Head Kandy.  Anyone?

11         **Q  Yes.**

12         A  Yes.

13         **Q  Who?**

14         A  Well, I had told -- Ryan knew.  I had told

15   Jerome Falic that I was going to start a new

16   business and leave if things didn't change, at the

17   meeting that I had with him 10 days before this

18   letter was sent to me, or eight days before this

19   letter was sent to me.  So I didn't specifically

20   say "White Pineapple," however I very much

21   informed Jerome that that was going to have to be

22   what I did.  So, yeah, I did inform people.  Yes.

23         **Q  And you -- and that's the November 20th**

24   **meeting where you say you informed Jerome Falic**

25   **that you were going to start a new business,**

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

1   correct, unless --

2        A  I informed --

3        Q  -- unless things changed?

4        A  I informed Jerome that if things did not

5   change, I was going to be forced to leave the

6   company for my mental health and start a new

7   business, yes.

8        Q  By the time that meeting occurred on

9   November 20, White Pineapple had already been

10  created, correct?

11       A  White Pineapple was not a functioning

12  business.  It was just -- it had been created, but

13  it was nothing.  And I didn't have intentions of

14  using it as a full-time business.  So, yes, it was

15  created, but it wasn't an operational business.

16       Q  By the time that you met with Jerome Falic

17  on November 20th, you and Mr. Thompson were

18  already ordering samples of leggings for White

19  Pineapple, correct?

20            MR. CONVERSE:  Objection, form.

21       A  I ordered samples the day after I was told

22  the company was being liquidated, so, yes.

23       Q  (BY MR. LOEB)  And you in fact had those

24  leggings in your possession, correct?

25       A  I had one pair of leggings in my

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

1  possession, yes.

2  **Q  And you had created content for White**

3  **Pineapple and created a Facebook page for White**

4  **Pineapple before November 28 of 2022, correct?**

5  MR. CONVERSE:  Objection, form.

6  A  I did not create a Facebook page for White

7  Pineapple.  I just changed the name of a Facebook

8  page.

9  **Q  (BY MR. LOEB)  Okay.  Well, whether you**

10  **created one or you changed the preexisting page,**

11  **there was a new Facebook page that had the name**

12  **White Pineapple that you created, correct?**

13  MR. CONVERSE:  Objection, form.

14  A  Yeah, but I believe I changed the name

15  after I had spoke with Jerome.

16  **Q  (BY MR. LOEB)  Did you tell Jerome that**

17  **you were creating a company known as White**

18  **Pineapple, during the November 20th meeting?**

19  A  I told Jerome that if things didn't

20  change, I was going to have to, because I couldn't

21  mentally keep living like this.

22  **Q  Did you indicate to Jerome Falic that you**

23  **were going to be advertising the leggings from**

24  **White Pineapple on Facebook Lives?**

25  A  Advertising would mean that it was for

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 135

1  sale, so I did not advertise anything.  I didn't

2  have anything for sale.

3      Q  Did you promote the leggings?

4      A  I talked about how great they were, but

5  you couldn't buy them.  But I had talked about a

6  lot of clothes and how great everything was for

7  the past four and a half years.  And it had never

8  been an issue with anything I had ever talked

9  about, so I'm not really sure why this was so

10  different.

11     Q  On November 18 of 2022, two days before

12  you went to Miami to see Mr. Falic and talk with

13  him, you had already promoted on Kandy Life With

14  Kayla a new legging brand that you indicated you

15  were working on, correct?

16         MR. CONVERSE:  Objection, form.

17     A  Because November 16th I was told by Jon

18  Rosenbaum that he was drinking with Jerome and

19  that they were buddies, and I knew that I was not

20  going to get anywhere.  I knew what was coming.

21     Q  (BY MR. LOEB)  My question to you was,

22  that two days before you met with Mr. Falic in

23  Miami had gone on to the Kandy Life With Kayla,

24  Facebook Live, indicating that you were working on

25  a legging brand, correct?

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

```
 1            MR. CONVERSE:  Objection, form.
 2       A  I said that I was working on leggings.
 3       Q  (BY MR. LOEB)  And then you indicated --
 4  let's look at the letter here.  On November 22,
 5  two days after you met with Mr. Falic, indicating
 6  that according to you something had to change, you
 7  continued on to promote White Pineapple, didn't
 8  you?
 9       A  Can you show me where I promoted White
10  Pineapple?  Like, because I -- I still to this day
11  am a little confused on how you are saying I --
12  this makes it look like I did this whole live
13  segment for hours on it.  If I mentioned a pair of
14  leggings for three seconds in an eight-hour video
15  or a two-hour video, I don't really feel like it's
16  fair to say that I was just live segmenting,
17  promoting products.  That's false.
18       Q  Ma'am, whether it was three hours,
19  30 seconds, three minutes or somewhere in between
20  on that spectrum, isn't it true that on
21  November 22 you did a Facebook Live where you were
22  promoting White Pineapple?
23            MR. CONVERSE:  Objection, form.
24       Q  (BY MR. LOEB)  Yes or no?
25       A  I don't recall.
```

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 137

1      Q  Will you just accept whatever the Facebook

2   Live video shows as being accurate and truthful?

3      A  Sure.  I just don't recall.  Like, I don't

4   recall what was said.  I don't recall -- you are

5   saying I was promoting.  You are trying to make me

6   concur that I'm promoting; where, if I could see

7   the video, I would be able to say if I -- in my

8   opinion of promoting, because I talk about

9   products all the time.

10         So I feel like we have a different

11   definition.  And I'm not trying be difficult,

12   Ethan.  I'm truly, honestly -- this is where this

13   whole entire thing started.  So I would like to

14   get that clarified.

15      Q  How about we just let the video speak for

16   itself.  That sound fair to you?  And let the jury

17   make the call one way or another whether you

18   committed a breach of the agreement?  Does that

19   sound fair to you?

20      A  Can you restate that?

21      Q  I said, how about we let the video speak

22   for itself, and let the jury make the decision as

23   to whether or not you committed a breach of the

24   agreement or not.  Does that sound fair to you?

25         MR. CONVERSE:  Objection, form.

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 138

1      A   So does that mean we're moving on past

2   this question, since we didn't clarify the

3   question?

4      Q   (BY MR. LOEB)  No, I think --

5      A   I'm not sure what you're asking me.

6      Q   I think the question was clarified.  And

7   rather than parse words with you about what you

8   think, and what your opinion is, and what my

9   opinion is, I think the ultimate opinion is what

10   the jury or the judge thinks.

11         So my question to you is:  Rather than

12   going back and forth with what words mean, how

13   about we just let the November 22, 2022, Facebook

14   Live video speak for itself.  Does that sound fair

15   to you?

16      A   When we go to trial that will be great.

17      Q   Thank you.

18         Now, on November 23, did you post under a

19   header Time for a Change, with regard to the White

20   Pineapple business and the various products that

21   White Pineapple was starting to or had already

22   developed?

23      A   I was referring to Lululemon leggings

24   being a change for a new type of legging.

25      Q   Oh, so are you saying that -- okay.  Are

Page 139

1    you saying that you were trying to create a brand

2    to compete with Lululemon, and that was the time

3    for the change?

4        A   I guess I miss where I said that.  I just

5    know that everybody wears Lululemon.  And I just

6    said, It's time for a change, so I was going to

7    start wearing new leggings.

8        Q   That's what you meant here when you

9    indicated that it was time for a change, that that

10   was -- it was in regards to, I guess, competing

11   with Lululemon?

12          MR. CONVERSE:  Objection, form.

13       A   I definitely didn't say I was going to

14   compete with Lululemon.

15       Q   (BY MR. LOEB)  Do you consider White

16   Pineapple to be in the same quality of space as

17   Lululemon?

18       A   Are you asking me if I'm -- I'm sorry, ask

19   again.

20       Q   How about we do this.  How about we pull

21   up what's being referred to here and maybe we

22   can -- do you see here as being an e-mail from

23   Mindy McDermaid to Jon Rosenbaum, with

24   screenshots, and it's November 23 --

25       A   Can you scroll back up?  Can you scroll

**HEAD KANDY LLC vs KAYLA MCNEILL**
**Kayla M. McNeill on 07/12/2024**

Page 140

1  back up for me, just really quick, so I can see

2  the date --

3      Q  Yes, ma'am.

4          And you write:  Time for a change.  And

5  you refer to this being an athleisure brand.  Did

6  you take these photographs?

7      A  Where did that come from?

8      Q  From your posting.

9      A  No, I didn't --

10     Q  I'm asking you, where did these

11 photographs come from?

12     A  Are you saying that I posted this picture?

13     Q  This was part of your posting.  Do you

14 remember doing that?

15         MR. CONVERSE:  Objection, form.

16     A  That's not a post, so I'm confused.  I

17 feel like you might be confused.  But the one up

18 above is definitely a story.

19     Q  (BY MR. LOEB)  Okay.

20     A  So I posted this (indicating), yes.

21     Q  This here, Time for a change?

22     A  Correct.

23     Q  Did you post this, Coming soon?

24     A  That is the same as the one above.  It's

25 one picture.

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 141

1        Q   What about this where it says -- this
2   picture here, An athleisure brand.  Did you post
3   this?
4        A   So -- no, I didn't post that.  Because see
5   down below where it has the story thing above it?
6   I don't know where that -- that is from, but I
7   didn't post that.  That's not a post.
8        Q   Was this --
9        A   I'm not trying to correct you, but that is
10  not a post.  And I'm not going to let you say it
11  is, because it's not.  So I'm not sure.
12       Q   Was this -- was this on a website that --
13  that was for White Pineapple, this picture of
14  these leggings?
15       A   Possibly, but it's locked.  So if you
16  scroll up, the website was locked.  So there was
17  no photo.  So I'm not sure where that came from,
18  but I did not do that because the website was
19  locked.  So I'm not sure where that came from.
20            So if you are asking if I took those
21  pictures, the answer is no, and I don't recall
22  that photo.  I don't know where that came from.
23       Q   Here you write -- and this is, I guess,
24  part of the story:  There is a difference between
25  giving up and knowing when you have had enough.

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

1        Do you see that?

2      A  Yes.

3      Q  Are you talking about people giving up on

4   Lululemon and trying something new?

5      A  No.  I posted quotes daily, all the time,

6   that had no actual reference to anything.  All the

7   time.

8      Q  And was is --

9      A  I still do.

10      Q  -- this in reference to?

11      A  Nothing.  I just post motivational things

12   all the time.  They don't necessarily have to

13   refer to anything.  I didn't make that; I found

14   it.  I screenshot it and shared it.

15      Q  And here do you recall screenshotting

16   that?

17      A  Oh, I have thousands of these, so I don't

18   recall screenshotting that.

19      Q  And then you screenshot:  Know your worth.

20   Know when you've had enough and move on from the

21   people who keep ruining your happiness.

22        Who are you referring to there?

23      A  I couldn't tell you.  I share these every

24   day, all day.

25      Q  You don't make them up?  You get them from

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 143

1    other sources, right?

2        A   Sometimes I'll type them, but a lot of

3    times I'll just be scrolling and find them myself,

4    and reshare them.

5        Q   Okay.

6            Did you create this story?

7        A   I don't recall.

8        Q   Did you create the White Pineapple logo?

9        A   I did create that, yes.

10       Q   Okay.  You were responsible for all of the

11   content for White Pineapple?

12       A   There was no content on White Pineapple,

13   so I made that story, but there was no content, so

14   I'm not sure what -- can you show me the content

15   you are referring to?

16       Q   I'm referring to this.  And this may be me

17   showing my age and ignorance about certain

18   terminology that you may use, that I may use

19   differently.  I'm talking about did you create

20   this, meaning Time for a Change, with the

21   pineapple in white and then selection of, I guess,

22   the purplish-type color.  That --

23       A   I --

24       Q   -- was all -- I -- I refer to that as

25   content.

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 144

1        A  Yes, I created that story.  Yes.

2        Q  All right.  And when you say it's time for

3    a change, this is three days after you've met with

4    Mr. Falic, correct?

5            MR. CONVERSE:  Objection, form.

6        A  What was the date?  It's blurry.  Did you

7    say November 23rd?

8        Q  (BY MR. LOEB)  Yes.

9        A  Yes.

10       Q  And you met with Mr. Falic on a Sunday,

11   right?

12       A  Yes.

13       Q  And you told me already that you indicated

14   to him that -- that you were going to leave unless

15   something changed, right?

16       A  Correct.  We had -- yes.

17       Q  And you indicated to him that you were --

18   you were hopeful that things were going to change,

19   right?

20       A  Very much so.

21       Q  And that -- that you were willing to see

22   if things were going to change, before you made

23   the decision to leave and move on, correct?

24       A  Absolutely.

25       Q  And then three days -- and strike that.

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 145

1        And then you told him that what you were

2  going to do is you were going to go create another

3  company and you were going to have to move on,

4  right?

5        A   I told him if he didn't handle the sexual

6  harassment, the abuse, and everything that was

7  going on with Jon Rosenbaum, I mentally could not

8  stay, and I would need to leave after the first of

9  the year.

10       Q   Okay.

11       A   Not three days after.  You are --

12       Q   Right.

13       A   -- trying to tie this or change this.

14  Just to be clear, to stop you in wasting time and

15  we can move on, this has nothing to do with what

16  you are trying to tie it to, which is what I said

17  about the leggings, about Lululemon.

18       Q   Okay.  And you indicated to him that --

19  that you were going to -- you were going to try to

20  see it out, at least until January, beginning of

21  the year, right?

22       A   I believe that is a conversation that we

23  did have, yes.

24       Q   And three days later you are out here

25  publishing a new brand that you had been working

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 146

1   on for about a month and a half prior to that

2   November 20 meeting, right?

3         MR. CONVERSE:  Objection, form.

4      A   To be clear, to my knowledge it doesn't

5   state in my employment agreement that I can't own

6   another business.  I wasn't -- there was nothing I

7   was doing in my mind that was a breach of a

8   contract.  I didn't do anything wrong.  There is

9   nowhere that says I can't own another business, so

10  I'm confused on why everyone is so -- like, saying

11  I breached.

12     Q   Were the leggings --

13     A   I -- I don't understand what you are

14  trying to ask me.  You are trying to make me say I

15  did something wrong, when I did not do anything

16  wrong.

17     Q   All right.  When the leggings were created

18  and shipped, where were they delivered to?

19     A   Colorado.

20     Q   Whose house?

21     A   My house.

22     Q   They weren't --

23     A   Oh, you know what?  I apologize.  I

24  believe that Ryan had them shipped to Ryan -- he

25  said to have it to his house because we were

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 147

1  getting ready to drive back, and it was snowing

2  and I didn't want them sitting outside.  So I

3  think we put Ryan's address on there to where they

4  were delivered to.

5      Q  Okay.

6          Now, after the November 23 story is

7  published on November 26, do you recall being in

8  the North Carolina warehouse where you were

9  promoting the White Pineapple leggings?

10     A  I don't recall.

11         THE COURT REPORTER:  Counsel, would this

12  be an okay time for a break?

13         MR. LOEB:  Yes, it would.  Let's go ahead.

14     Q  (BY MR. LOEB)  Before we go off the

15  record, any testimony you have given so far you

16  want to change, modify, supplement, or amend in

17  any way, shape, or form?

18     A  No.

19     Q  And the questions I have asked and which

20  you have answered, do you feel like you have

21  understood my questions?

22     A  To the best of my ability.

23         MR. LOEB:  Okay.  We will stand in recess.

24         Wendy, how long do you think we should

25  take?  What will work for you?

**HEAD KANDY LLC vs KAYLA MCNEILL**
**Kayla M. McNeill on 07/12/2024**

Page 148

1        THE COURT REPORTER:  If we could go off

2   the record here real quick.

3        MR. LOEB:  Yes, ma'am.

4        THE VIDEOGRAPHER:  This is the end of

5   media number 3.  The time is 12:47 p.m.  We are

6   off the record.

7        (Recess taken, 12:47 p.m. to 1:34 p.m.)

8        THE VIDEOGRAPHER:  The time is 1:34 p.m.

9   This is the beginning of media number 4.  We are

10  back on the record.

11      Q  (BY MR. LOEB)  Back from a break,

12  Ms. McNeill.  Any testimony you have given so far

13  you want to change, modify, supplement, or amend

14  in any way, shape, or form?

15      A  No.

16      Q  All right.  And ready to continue on?

17      A  Yes.

18      Q  All right.  You were talking to me before

19  a break about Elsie Hopkins, and I'm just trying

20  to get us back up to where we were.  She was

21  somebody who was hired to help with your middle

22  son in terms of, I guess, tutoring or something

23  like that?

24      A  Yes, she had helped with, like, shipping

25  and other things kind of here and there with Head

**HEAD KANDY LLC vs KAYLA MCNEILL**
**Kayla M. McNeill on 07/12/2024**

Page 149

1    Kandy in the past, but then when it got to be too

2    much to be doing everything, like, I needed help,

3    yes.

4        Q   And how old was she?

5        A   She's probably 76 now.

6        Q   Okay.  When is the last time you spoke --

7    when is the last time you spoke with her?

8        A   A couple months ago, maybe.

9        Q   All right.  For the -- I'll refer to it as

10   the -- can I refer to it as, like, the tutoring or

11   home schooling that she was doing?  Does that

12   sound like a fair characterization?

13       A   Sure.

14       Q   All right.  When she was doing the home

15   schooling -- I just want to make sure I'm clear on

16   the facts here -- Head Kandy was paying her for

17   that to occur?

18       A   It was either that or I not work, so it

19   was getting to a point where I could not work and

20   home school at the same time.

21           So when I called Bryan Feldman and talked

22   to him about needing help and saying I was

23   drowning, he said, Well, hire an assistant.  And

24   the conversation was, basically, like, there is

25   nobody who can do what I can do.  I can't hire an

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 150

1  assistant to do these things.  It was too busy.

2  It needed too much assistance -- or needed too

3  much -- like, nobody could do what I could do.

4  Period.  Clearly.

5        And so I said, What if I hire somebody to

6  help with this instead, because this is where a

7  couple hours a day would relieve me.  Otherwise, I

8  can't -- I'm going to have to do what I have to do

9  to make sure my kid is educated.

10        And the reason he was being home schooled

11  was so that they had the flexibility of me being

12  able to do what they needed me to do.  So it was

13  kind of a give-and-take.  They couldn't have me

14  without having my -- without giving me some kind

15  of help that way.  I would have had to have moved

16  or lived permanently in Colorado, and not traveled

17  at all.  And they would have had to have figured

18  the rest of it all out, which, clearly, is not as

19  easy as everyone was led to believe.

20    **Q  Do you know how many hours Ms. Hopkins**

21  **provided tutoring services for your son?**

22    A  Gosh, I don't.  It was just a couple of

23  hours in the morning.

24    **Q  Five days a week?**

25    A  Just to -- no, sometimes it was three,

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 151

1  sometimes it was just like one whole day so that,

2  like, I could -- and then -- I'm going to say

3  maybe 15 hours a week total, maybe, average.

4  Maybe.  Maybe 20 at absolute most.

5      Q  Okay.

6      A  Because I was home schooling him in the

7  evening, too, to still finish it all up when I was

8  done with work.

9      **Q  Got it.  Okay.  Do you know if she ever**

10  **did anything with regard to Facebook?**

11     A  Yeah, there was a little bit there where

12  she was -- when we were moving before, when we

13  were moving -- we were going to move to

14  North Carolina and she wasn't going to be doing

15  any type of thing for that, she helped package

16  orders.  And then she was helping on customer

17  service with Facebook for a while.  And it was

18  just -- technology was a little bit hard for her

19  to kind of roll with, so we didn't -- that is not

20  something that she continued to do.  She wanted

21  to, and I had to very nicely -- that didn't work.

22     **Q  How long did the tutoring last?**

23     A  I believe she started in, like, maybe

24  February of 2021 up until I left.

25     **Q  February of '21 until --**

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

1    A  Yeah, because it was still during COVID.

2  So I remember COVID happened, and we decided not

3  to send them back in the fall because things

4  weren't settled yet.  And I home schooled him.

5  And I could tell that the business was definitely

6  suffering with not having me be fully available

7  150 hours a week, like I was.  Like, it -- it just

8  was too much on me.

9       So February or so of 2021 is when I

10  finally told Bryan, like, I'm tapping out.  Like,

11  I can't do this.

12    **Q  Okay.  But from February '21 until -- I'm**

13  **just trying to get the dates right -- January of**

14  **2023?**

15    A  Well, it would have been, like, December,

16  probably, of 2023.

17    **Q  Sure.  Of '22.**

18    A  Sorry.  Yes, correct.  Yes --

19    **Q  Okay.**

20    A  -- go backwards.

21    **Q  Did Kaylin Culp tell you what she was**

22  **going to be doing for Head Kandy?**

23    A  Did Kaylin Culp tell me what Kaylin was

24  going to be doing for Head Kandy?

25    **Q  Let me see if I can rephrase it.  That's**

Page 153

1  my bad.  I got my blue milk shake that's probably

2  going to my head.

3       Did you tell Kaylin Culp what Elsie

4  Hopkins was going to do for Head Kandy?

5     A  Well, she was involved when she helped

6  with packaging.  She was involved when she helped

7  with, like, the Facebook there for a while.  She

8  was -- so I'm sure she was aware that she helped

9  with the various things that she did help with.

10  So, yeah.

11     Q  Do you know how much an hour she got paid?

12     A  I don't recall.

13     Q  Do you know if -- well, if I'm doing my

14  math correctly, I'm going from February of '21

15  until December of '22, clipping away at about 15

16  to 20 hours a week where Ms. Hopkins is providing

17  tutoring services to your son.

18     A  Sure.

19     Q  Okay.  Did you ever report those payments

20  that were made by Head Kandy to Ms. Hopkins for

21  your son's tutoring on your tax returns?

22     A  No.

23     Q  Did Head Kandy ever give you any sort of a

24  documentation indicating that you had received --

25  received this income by way of it paying for your

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 154

1    son's tutor?

2      A   You are asking if Head Kandy was organized

3    enough to do any type of legal paperwork

4    correctly?  The answer is no.

5      Q   I --

6      A   I was never given any kind of paperwork

7    for anything of the sorts.  So, no --

8      Q   That's --

9      A   -- that's definitely not a thing.

10     Q   That's not what I asked you.

11         MR. LOEB:  I move to strike her answer as

12   nonresponsive.

13     Q   (BY MR. LOEB)  I asked you whether or not

14   Head Kandy ever gave you any sort of tax filings,

15   recognizing the payments that it made to

16   Ms. Hopkins on your behalf so that your son could

17   receive the tutoring; yes or no?

18         MR. CONVERSE:  Objection, form.

19     A   Head Kandy doesn't give me any tax

20   paperwork.  I have to track it down.  So if they

21   did, I'm not aware of it.  And if they -- so I'm

22   not sure.

23         I'm going to say probably not, but I'm not

24   sure because I never received my tax paperwork

25   from Head Kandy ever.  So that's my answer.

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 155

1      Q  (BY MR. LOEB)  And -- and it's your

2  testimony that Head Kandy paid Ms. Hopkins for the

3  tutoring services on your behalf, correct?

4        MR. CONVERSE:  Objection, form.

5      A  It is my testimony that instead of getting

6  an assistant to do a job that I could do better,

7  Bryan suggested that I do it the other way around.

8  That is my testimony, yes.

9      Q  (BY MR. LOEB)  And you did not report any

10  of those payments as income on a tax return,

11  correct?

12     A  I -- I'm sorry.  Ask one more time.  I'm

13  not really sure what you are asking me.

14     Q  You did not report the payments that Head

15  Kandy made to Ms. Hopkins so that your son could

16  receive tutoring?  That was not reported as income

17  on your tax return, was it?

18        MR. CONVERSE:  Objection, form.

19     A  No.

20     Q  (BY MR. LOEB)  In any year?  For tax

21  years, '21, '22, or '23, correct?

22        MR. CONVERSE:  Objection, form.

23     A  Actually, I didn't work in '23, so '23

24  wouldn't apply.  Correct?  No.  So '21 and '22,

25  no.

Page 156

```
 1      Q   (BY MR. LOEB)  Now, I'll put on the screen
 2   Deposition Exhibit Number 7.
 3           Before we do that.  Did you inform your
 4   accountant that Head Kandy was paying for
 5   educational services of your middle child so that
 6   he could receive education?
 7           MR. CONVERSE:  Objection, form.  I'm going
 8   to instruct her not to answer that.  It's
 9   privileged between the accountant and client
10   privilege.
11           MR. LOEB:  That wouldn't be an
12   accountant-client-privileged communication, but
13   perhaps we could debate that offline.
14      Q   (BY MR. LOEB)  Are you going to refuse to
15   answer the question based upon your advice from
16   your counsel?
17      A   Yes.
18      Q   Okay.  Actually, it's Deposition Exhibit
19   Number 5.  Let me pull it up.
20           Do you see here the e-mail from you dated
21   December 2, 2022, to Jed Ferdinand, where you
22   indicate that you want to explain you are not
23   justifying, and you acknowledge that it was
24   unethical?
25      A   Again, I don't agree with this being
```

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 157

1   stated that way.

2       Q  Did I read this incorrectly when I say:  I

3   just want to explain.  I am not justifying.  I

4   acknowledge it was unethical?

5       A  You did not read that incorrectly.

6       Q  All right.  And did you author this

7   e-mail?

8       A  I don't recall.

9       Q  Any reason to think somebody else authored

10  it for you?

11      A  I don't recall.

12      Q  Up here where Mr. Ferdinand responds:

13  Kayla, good morning.  Thank you for the

14  information.  I just got a voicemail from you.

15  I'm working remotely today and I'm on calls.  I'll

16  call as soon as I'm freed up.  Is the number below

17  the best number to reach you?

18          Then you write:  Yes, sorry my e-mail is

19  not sending.  So this sat in my outbox.  I

20  apologize.

21          Do you see that?

22      A  Yes.

23      Q  Any reason to doubt that this is you,

24  Kayla McNeill, responding to Mr. Ferdinand's

25  e-mail?

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 158

```
 1        A  I don't recall.  I don't remember this
 2   time of my life.  When I tell you that I was
 3   living in a very, like -- so we can go over this,
 4   but I'm not probably going to change my answer on
 5   that.  I don't recall.
 6        Q  Ms. Honeycut right here, do you know who
 7   Olivia Honeycut is?
 8        A  Yep.  Yes.
 9        Q  And it appears that Ms. Honeycut was
10   providing childcare to Ms. Culp's children?
11        A  And other warehouse employees, yes.
12        Q  All right.  And do you know, did
13   Ms. Honeycut provide childcare for you?
14        A  Not very often.
15        Q  Then that means yes, she did?
16        A  I mean, I was always at the warehouse, so
17   my children -- if Ryker wasn't being home
18   schooled.  Hayzlee would be with me or I was home
19   schooling Caeston.
20           So if she played with the other kids that
21   were there, sure.  Olivia every now and then.  But
22   that was not the purpose of Olivia, was to provide
23   me childcare.
24        Q  How about Alissa Macnab, was she somebody
25   who was strictly working on Head Kandy business?
```

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 159

```
1        A  When Alissa was paid by Head Kandy, Alissa
2    was paid for -- from Head Kandy.  And Bryan
3    Feldman knew that she was coming back to work from
4    Colorado to help me be an assistant for the
5    affiliates and figure out some paperwork that was
6    at my house from the move.
7        Q  Do you see the description that you have
8    written here about what Alissa Macnab did?
9        A  I don't -- I mean, I see it, yes, but I
10   don't recall any of that.
11       Q  Okay.  Do you agree with the
12   characterization that's contained in this
13   paragraph?
14       A  So she did help Ryan often, which was
15   Ryan, to do with Head Kandy.  So that is correct.
16          (Perusing document.)  Yes.
17       Q  And Alex Reling, do you see this here?
18       A  Yes.
19       Q  All right.  Do you know who Alex Reling
20   is?
21       A  I do.
22       Q  All right.  And after you make these
23   summaries of these individuals, you indicate that
24   you understand fully -- understand fully this
25   doesn't look good, correct?
```

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

1      A  That is what's typed, yes.

2      **Q  And at the time that you wrote this, did**

3  **you feel like -- that this did not look good?**

4      A  At the time of me writing that, I didn't

5  want to live, so I'm not going to state how my

6  mental state was of how I felt, and I'm not going

7  to say how -- I don't remember this time.

8      **Q  Okay.  So if you don't remember this time,**

9  **you don't know whether this is accurate or not, do**

10  **you?**

11      A  I've been saying since you brought it up

12  that I don't recall writing it, so I do know that

13  Alissa helped Ryan, so that part is accurate.  I

14  do know who Alex Reling is.  I know who Elsie

15  Hopkins is.  But do I believe that I say this is

16  unethical is accurate?  I don't believe that it is

17  accurate, so...

18      **Q  And so you -- let me get this straight.**

19  **In particular as pertains to Ms. Hopkins, you**

20  **don't believe it was unethical to have Head Kandy**

21  **pay for your son's education, but you not**

22  **reporting that as income on your tax returns?**

23          MR. CONVERSE:  Objection, form.

24      A  I don't consider it unethical beings, one,

25  I'm not an accountant; two, I had permission from

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 161

1  another owner who was aware and told me I could do

2  it, so therefore it would not be unethical.

3      Q  (BY MR. LOEB)  You indicated to

4  **Mr. Feldman that you were hiring a tutor to teach**

5  **your son 15 to 20 hours a week for well over a**

6  **year, and that he gave you permission to do that?**

7      A  The conversation that happened was -- was

8  that I had home schooled Ryker from the time COVID

9  started until that following winter.  And I said

10 to Bryan Feldman, I am drowning, I can't keep

11 doing this.

12      And I -- he knew, because the text

13 messages over and over of how much was on my plate

14 with no assistance.  We were very under -- the way

15 that Head Kandy operated and the way that

16 everything that was thrown on me to handle, I only

17 handled because, if I didn't, the company would

18 have completely failed.  So to ask if I upheld my

19 fiduciary duties is an absolute...

20      So I do not think it is unethical that

21 that is what -- it's -- it's not -- it's not

22 uncommon for companies to provide childcare.

23 Google does it.  There are a ton of businesses

24 that provide childcare, especially during COVID.

25 I had no choice.  I was trying my best to continue

**HEAD KANDY LLC vs KAYLA MCNEILL**
**Kayla M. McNeill on 07/12/2024**

1  to do what I was hired to do, and Bryan Feldman

2  knew that if they couldn't find someone to help

3  me, they were going -- I was not going to be able

4  to do anything more than the very basics of my

5  40 hours a week.  And I worked way more than

6  40 hours a week.

7      Q  My question to you was:  Did Bryan Feldman

8  give you permission to hire a tutor for your son

9  15 to 20 hours a week for over a year at Head

10  Kandy's expense; yes --

11      A  Yes.

12      Q  -- or no?  He did?

13      MR. CONVERSE:  Objection, form.

14      A  Yes.

15      Q  (BY MR. LOEB)  And when -- did he give you

16  permission, in writing, saying you were authorized

17  to hire a tutor for your children?

18      A  Bryan didn't give written permission for

19  anything.  Bryan -- he would text.  He would call.

20  There was never any formal paperwork from Bryan

21  about anything.  So, no, I did not get formal

22  paperwork from Bryan Feldman.

23      Q  And do you know how Ms. Hopkins was paid?

24  Was she paid in cash?  Was she paid by check?  By

25  ADP, private payroll company?  Do you know?

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 163

1      A  I don't.  I -- I don't know how she was

2  paid.  I know that Bryan Feldman saw it every --

3  I'm sure.  I know he did.  He got the e-mails,

4  so...

5      Q  And do you know what Ms. Hopkins, who's

6  described in the payroll summary, as to what it

7  is that -- the function she was performing?

8      A  I have absolutely no clue.  Because, like

9  I said, I know that her role had changed several

10  times until she settled in.

11      Q  Settled in with what?

12      A  Helping me with Ryker.

13      Q  Okay.

14          Now, to close this loop out, Mr. Ferdinand

15  -- and I believe I showed this to you before the

16  break.  I'll pull this exhibit up on the screen.

17  It's number 7.

18          Do you see what's on the screen as being

19  an e-mail from Mr. Ferdinand, dated December 1,

20  2022, to you, copying Mr. Falic and Ms. Spanakos?

21      A  Yes.

22      Q  And this is a letter indicating that

23  Jerome was going to send out an announcement to

24  the employees, but they were giving you a heads-up

25  about what the message was going to say?

**HEAD KANDY LLC vs KAYLA MCNEILL**
**Kayla M. McNeill on 07/12/2024**

Page 164

1      A   Yes.

2          Q   And here it indicates that Ryan Thompson

3   was going to report directly to you and continue

4   his role as photographer for the brand, correct?

5      A   That's what it says, yes.

6          Q   All right.  And had Ryan Thompson reported

7   directly to you prior to December 1 of 2022?

8      A   Ryan worked a couple of times at Head

9   Kandy, so his role changed several times within

10   the brand, but the reason that Ryan came back to

11   Head Kandy was so that he didn't work underneath

12   me.  He made that statement.  So I don't -- so he

13   did not report to me.  That was why he came back

14   after he left and said it was so horrible.

15          So I'm confused on -- I'm confused.  I'm

16   sorry.  You are asking if Ryan ever reported to

17   me?  The answer is no, because this is -- the date

18   of this e-mail -- because I was put on

19   administrative leave a couple days later, so Ryan

20   did not report to me.  That is also why Ryan

21   returned to the company after he quit, was so that

22   he didn't have to work underneath me, because his

23   words were I was so horrible.  So he did not work

24   under me.  He did not report to me.

25          Q   My question to you was:  Prior to

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 165

1  December 1, 2022, did Ryan Thompson ever report

2  directly to you?

3      A  He did probably before the company was

4  transitioned.  And then he became the supervisor

5  and -- he was the supervisor.  He was in charge.

6  So, no, he did not report to me.  He filled me in

7  on what he was doing and what he was supposed to

8  be doing, and he knew his job, but he did not

9  report to me.

10     Q  Ever, at any time?

11        MR. CONVERSE:  Objection, form.

12     A  Again, Ryan -- I hired Ryan in 2017, so he

13  reported to me then.  But then when I was moved to

14  a different role in the company when they -- when

15  we switched things over, he didn't report to me.

16  So before -- so, yeah.  2017, yes, Ryan reported

17  to me.

18     Q  (BY MR. LOEB)  Who did Kaylin Culp and

19  Hernan Heiber report to prior to December 1 of

20  2022?

21     A  Ryan reported to Bryan Feldman -- or,

22  sorry.  Hernan reported to Bryan Feldman and so

23  did Kaylin.

24     Q  All right.  In your role as the creative

25  director, do you agree that you had the

Page 166

1  responsibilities and duties and authority of

2  oversight and management of strategic initiatives

3  and general operational activities of the company?

4      MR. CONVERSE:  Objection, form.

5      A  For the creative side.  I was in charge of

6  the creative, yes.

7      Q  (BY MR. LOEB)  And were there people

8  within the creative department?

9      A  We didn't have departments.

10     Q  Were there people working on creativity or

11  creative initiatives?

12     A  I mean, I was the person doing that, so --

13  I mean, Ryan took pictures off of the sales

14  calendar that was created by other people.  I

15  didn't create the sales calendar.  And they didn't

16  ask me about that; they went to Hernan.  Hernan

17  went to Bryan.  So, no.

18     Q  So you were the only person dealing with

19  creative matters and creative issues and creative

20  development in all of Head Kandy?  It was just

21  you; nobody else?

22     A  Well, Patrick --

23     MR. CONVERSE:  Objection, form.

24     A  Patrick did the e-mails, and he was not an

25  employee of Head Kandy.  And he took care of all

Page 167

```
 1   of the creative for all of the e-mails and the
 2   texts and that.  And we boosted my live videos for
 3   ads, so there was no one running the creative for
 4   that.  Ryan took pictures off of the sales
 5   calendar that I did not create.  So I'm not sure
 6   what creative part of the business you are looking
 7   for but --
 8       Q  I'm just trying to figure out -- I mean,
 9   it sounds like you really didn't do anything at
10   Head Kandy based upon what you are telling me.
11       A  I didn't.  Sorry.
12       Q  Okay.  Thank you.
13       A  I was the creative director.  I did the
14   lives.  I developed the products.
15       Q  You just said you didn't do anything at
16   Head Kandy.  Now you are telling me that you did
17   stuff at Head Kandy.  Which is it?
18       A  I apologize.  You said it "sounded" that
19   way, so...
20       Q  And you said, "I didn't."
21          MR. CONVERSE:  It's not a question.  You
22   don't have to answer.
23       Q  (BY MR. LOEB)  So what did you do at Head
24   Kandy?  Help me understand.  Other than doing your
25   Facebook Lives and, I guess, creating some
```

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 168

1  products, what else did you do at Head Kandy?

2      A  I created products; I did my live videos;

3  I --

4      Q  That's what I've said.  What else did you

5  do?

6      A  Okay.  I'm not going to let you be rude.

7  I'm trying to answer your question politely.

8  Don't be rude, please.

9          THE DEPONENT:  I'm sorry.  Can I take a

10  break?

11     Q  No.  Let's keep going.  Please provide

12  answers to my questions.

13         MR. CONVERSE:  There is a question pending

14  so you have to answer the question, and then we

15  can take a break right after.

16     A  I helped ship; I helped implement bar

17  codes for scanning for proper shipping, so that

18  shipping was done properly; I helped organize the

19  warehouse; I helped make sure that the company

20  just rolled in every which direction that it

21  needed to be handled.

22     Q  (BY MR. LOEB)  What was the last one?  I'm

23  sorry.

24         MR. CONVERSE:  Hold on.  Oh, go ahead.

25         Finish.  Repeat your answer, and then if

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 169

1   you want to take a break, you can, before the next

2   question is asked.

3       A   I just made sure that orders were leaving

4   and things were handled and that the company

5   operated.

6       Q   (BY MR. LOEB)   Any other -- any other

7   descriptions you can provide other than that?

8       A   That's all I have.

9       Q   Okay.   Do you need to take a break?

10      A   I'm okay.

11      Q   When you say "operations," what do you

12  mean by that?

13      A   Just to make sure that there was product,

14  like, developed so that we could continue to move

15  forward, so...

16      Q   Anything else other than that you can

17  provide me with the definition of what

18  "operations" mean?

19      A   I did different things at different times.

20  It wasn't really -- I did a lot.

21      Q   And in your executive employment agreement

22  it indicates that you were going to be charged

23  with management of strategic initiatives.   Do you

24  agree that you were charged with management of

25  strategic initiatives?

Page 170

```
 1      A  I don't know what that means.

 2      Q  All right.  Well --

 3         MR. LOEB:  Wendy, are we on 8 or 9?

 4         THE COURT REPORTER:  8.

 5         (Deposition Exhibit 8 was marked.)

 6      Q  (BY MR. LOEB)  Do you see what is on the

 7   screen here is the executive employment agreement,

 8   effective May 3, 2018, between Head Kandy, LLC and

 9   Kayla Marie McNeill?  Do you need me to blow it up

10   a little bit?

11      A  Yeah.  Yeah.  Yes.

12         MR. CONVERSE:  Did you e-mail that one to

13   me?

14         MR. LOEB:  Yes, sir.  I just sent it to

15   you.

16         MR. CONVERSE:  Thank you very much.

17         MR. LOEB:  Yep.  Let me know if you got

18   it.

19         MR. CONVERSE:  I did.  I just realized my

20   Internet went down.  I got it.  I'm back up.

21         MR. LOEB:  Okay.

22      Q  (BY MR. LOEB)  Do you recognize this as

23   being your signature?

24      A  Yes.

25      Q  And is this the agreement that you signed
```

Page 171

```
 1   in connection with the sale of 80 percent of

 2   Lashed Out Head Kandy to Head Kandy, LLC?

 3        MR. CONVERSE:  Objection, form.

 4     A  The assets, yes.

 5     Q  (BY MR. LOEB)  Do you see where it

 6   describes your position and duties?

 7     A  Yes.

 8     Q  Did you read this section before you

 9   signed the document?

10     A  I don't recall.

11     Q  At any time after this document was signed

12   did you inform anybody at Head Kandy, and

13   including the managing member, Mr. Jerome Falic,

14   that you disagreed with the position and duties

15   that you had agreed to accept as contained in this

16   document?

17     A  I informed Bryan Feldman that I had too

18   much on my plate that was above what I was getting

19   paid for several times.

20     Q  Did you inform the managing member,

21   Mr. Falic, that you disagreed with the description

22   contained in this agreement that you signed,

23   ma'am; yes or no?

24     A  Yes.

25     Q  When?
```

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 172

1      A  At my meeting in -- November 20th.

2      Q  **Prior to November 20 of 2022, and the four**

3  **years prior to the execution date of this**

4  **agreement, did you inform Mr. Falic that the**

5  **description contained in this agreement was wrong**

6  **in any way, shape, or form?**

7      A  I informed Jerome Falic at many of our

8  four meetings that we had in person about trying

9  to grow the business, that in order to grow the

10  business and do what he needed, I needed to not

11  have more than what was on this on my plate, yes.

12     Q  **Did you tell him that what was on this was**

13  **in any way wrong in its description of your duties**

14  **and responsibilities?**

15     A  Can I read this?

16     Q  **Sure.  Go ahead.**

17     A  (Perusing document.)  Okay.  So what are

18  you asking?

19     Q  **Did you ever inform Mr. Falic, as the**

20  **managing member of Head Kandy, LLC, that the**

21  **description contained herein in, in paragraph 2,**

22  **was wrong in any way, shape, or form?**

23     A  If you are asking if I told him that I was

24  saying more than what was here, then, yes, I

25  didn't -- I'm confused on how --

**HEAD KANDY LLC vs KAYLA MCNEILL**
**Kayla M. McNeill on 07/12/2024**

1    Q  Did you tell -- did you tell him that this

2  was wrong?

3    A  This isn't wrong.  This is what my job was

4  supposed to be, so I'm confused why you are asking

5  if this is wrong when this was supposed to be my

6  job but --

7    Q  And your job --

8    (Multiple people speaking simultaneously.)

9    THE COURT REPORTER:  I didn't get that.

10  Please, I need one at a time.  Please repeat the

11  answer.

12    Q  (BY MR. LOEB)  Go ahead.

13    A  No.  You interrupted.  You're good.  You

14  have the floor.

15    Q  You were supposed to manage strategic

16  initiatives of the company, correct?

17    A  I don't know what that means.

18    Q  The document that we have on the screen

19  says that you were to manage the strategic

20  initiatives of the company, correct?

21    A  That's what it says, yes.

22    Q  This document also indicates that you were

23  to manage the general operational activities of

24  the company, correct?

25    A  General operational activities, meaning

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 174

1  like motions of the business?  Yes.

2      Q  And that you were also to provide

3  oversight of the strategic initiatives of the

4  company, correct?

5      A  I don't know what "strategic initiatives"

6  defined is.  It's not defined.  So it says that,

7  but I don't know what that definition is.

8      Q  Did you ever ask for anybody to flesh that

9  definition out for you?

10     A  I did not.

11     Q  Did you ever express confusion about the

12  meaning of this particular clause as it pertains

13  to your duties and responsibilities?

14     A  Unless someone said I wasn't doing my

15  duties and responsibilities, I wasn't aware that I

16  wasn't doing it, so I assumed I was doing what I

17  was supposed to be doing.

18     Q  And isn't it true that in the summer of

19  2022 Mr. Falic indicated to you that the sales

20  growth of the company was not performing up to

21  expectations?

22         MR. CONVERSE:  Objection, form.

23     A  That's not exactly how that went.

24     Q  (BY MR. LOEB)  Did Mr. Falic indicate to

25  you, right at the time that Mr. Rosenbaum was

Page 175

1  being brought on board, that he was looking to

2  bring in consultants to find a way to generate

3  growth and bring on new customers?

4      A  Yes.

5      Q  And did Mr. Falic also express to you in

6  writing that he was starting to become frustrated

7  with the performance that you were providing, as

8  it pertains to the strategic initiatives and

9  operational activities of the company?

10     A  No.

11     Q  Okay.

12     A  That was never stated.

13     Q  Okay.  Do you know who Blake Ruschman is?

14     A  I do not.

15     Q  Do you know of a company by the name of

16  DR --

17     A  I do not.

18     Q  -- Digital Consulting --

19         THE COURT REPORTER:  I'm sorry, I

20  didn't --

21     A  I do not.

22         THE COURT REPORTER:  Excuse me, Counsel.

23  There was an overlap.  Can you say the name of the

24  company again?

25         MR. LOEB:  DR Digital Consulting.

Page 176

1        Q   (BY MR. LOEB)   I want to show you a

2   document we're going to mark as Exhibit Number 9.

3          (Deposition Exhibit 9 was marked.)

4        Q   (BY MR. LOEB)   Do you see what's on the

5   screen as being an e-mail from Blake Ruschman to

6   John Bolling, you, and Jon Rosenbaum, dated

7   September 20 of 2022, with the subject being Head

8   Kandy audits?

9        A   Yes.

10       Q   And attached to that is a series of audits

11   that were performed by DR Digital Consulting of

12   various platforms that Head Kandy was utilizing in

13   the course of its business.   Do you see this?

14       A   Yes.

15       Q   Do you recall these audits?

16       A   No.

17       Q   Are you taking a position that you did not

18   receive these?

19       A   I didn't say I didn't receive them.   I

20   said I don't recall.   Like, I do not recognize

21   them.   I did not -- this was not my job.   I was

22   not in charge of marketing or the budgets.   It did

23   not -- so...

24       Q   All right.   Let's mark as the next

25   deposition exhibit number 10.

**HEAD KANDY LLC vs KAYLA MCNEILL**
**Kayla M. McNeill on 07/12/2024**

Page 177

```
1          MR. CONVERSE:  I don't think 9 has come

2    through yet, Ethan.

3          MR. LOEB:  I'm going to send you 9 and 10

4    in the same e-mail.  Okay?

5          MR. CONVERSE:  Thank you.

6          MR. LOEB:  I'm going to put 9 and 10 on

7    the subject line.  All right?

8          MR. CONVERSE:  Perfect.

9          (Deposition Exhibit 10 was marked.)

10       Q  (BY MR. LOEB)  All right.  Did you see

11   what I put up here, which we're going to mark as

12   Deposition Exhibit Number 10, which is an e-mail

13   from you to Jon Rosenbaum, Bryan Feldman, Jerome

14   Falic, and D. Taney being copied, in which it is

15   an e-mail thread that begins at the bottom for

16   Mr. Rosenbaum talking about Mr. Ruschman and DR

17   consulting and the audits that were performed.

18       A  Yes.

19       Q  And do you see here where he indicates:

20   As discussed, a few weeks ago we hired an

21   expert -- and the findings, to say the

22   least, are troubling.  Our Facebook spend the past

23   three years has been about $4 million, which

24   should have been less, and according to the audit

25   has been completely mismanaged.
```

Page 178

1           Do you see that?

2       A   Yes.

3       Q   All right.  Now, decisions on Facebook,

4   that was within the scope of your duties and

5   responsibilities, correct?

6       A   I was not in charge of advertising ad

7   spend in any way, shape, or form.  I was in charge

8   of posting and creating content.  And then what

9   the marketing people did from there, which was

10  with Bryan Feldman and John Max Bolling.  They

11  were the ones who decided the budgets and the

12  spend.  I had no say on the spend.

13      Q   All right.  And if that's the case, do you

14  see your response where you indicate that you cut

15  $1 million in spending in 2020 up to '21, and kept

16  the same revenue:  I'm going to say that it is

17  pretty far from mismanaged -- in your opinion.

18          Do you see that?

19      A   Yes, I see that.

20      Q   How could you have an opinion about

21  whether something was managed or mismanaged if you

22  didn't have anything to do with it?

23      A   Am I allowed to give context or are you

24  just wanting me to do a yes-or-no answer

25  because --

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

1    Q  I just want --

2    A  Because there --

3    Q  I just -- I just want you to answer my

4    question.

5    A  Well, it's not a yes-or-no answer, so I

6    would like to give context to the question.

7    Q  It wasn't a yes-or-no question.  I asked

8    how.  So are you able -- please pay attention to

9    my question.

10         How is it that you are able to give a

11    written statement -- let's see, it appears to be

12    just an hour or so after you received it --

13    indicating that this was pretty far from

14    mismanaged in your opinion if you weren't involved

15    in any part of Facebook spending.

16         MR. CONVERSE:  Objection, form.

17         Go ahead and answer.

18    A  I was on vacation that I was supposed to

19    be able to take a vacation from, which I was never

20    allowed to do or had.  And this e-mail came across

21    while I was on vacation, and they were making

22    massive changes while -- I guess I didn't need a

23    say in it or whatnot, but I wanted to for sure

24    give the honest numbers.

25         So when I received the e-mail, I then

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 180

1   immediately e-mailed John Max and asked him for a

2   very quick ad spend revenue for 1920, '21, and

3   '22.  And the reason that I asked for that was

4   because the e-mail stated it was so mismanaged.

5        I felt that we needed to have a

6   conversation together, as owners, before we just

7   rip the rug out, when Jon Rosenbaum clearly was

8   making horrible business decisions in a ring that

9   he did not understand.  And in my text messages

10  leading up to this, I felt like I was jumping up

11  and down, begging Jerome to listen to me.  And he

12  did not listen to me.  And I said, Wait, but look

13  at the numbers.  Because Jon Rosenbaum kept saying

14  that 15 percent is where you should be for ad

15  spend.

16       So according to the numbers that were

17  actually run, you can run all the audits and all

18  you want, but black and white, I was basically

19  saying I didn't run this report.  I didn't put

20  this into this grid.  I just forwarded it.

21  Clearly, it's a screenshot.

22       I forwarded it from the person who had

23  been running the ads, because I felt it was

24  important for Jerome to see all sides.  I wasn't

25  fighting.  I wasn't disagreeing.  I was just

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 181

1  giving my opinion before they decided to make a

2  massive change that I knew was going to be

3  detrimental to the company, and so I gave my

4  opinion.

5      Q  (BY MR. LOEB)  And you go on to write:  My

6  questions are, what are the goals in this and

7  what's the plan?

8      Correct?

9      A  Say that one more time.

10     Q  You go on to write:  My questions are,

11  what is the goal in this?  What is the plan?

12     A  Correct.

13     Q  And are you writing that as an employee or

14  are you writing this as an owner?

15     A  Well, you set the context up that Jerome

16  said to me that we needed to find new customers

17  and growth.  So this is a continued conversation

18  from the same thing that we had been trying to

19  figure out for years.

20        So I was asking, what do I need to change?

21  What is the goal in this?  Is the goal to lower

22  the ad spend?  Is the goal to acquire new

23  customers?  Is the goal to increase the revenue?

24  Because those all have different paths, and it

25  directly affected my job of being creative

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 182

1  director because I needed to know what I needed to

2  do.  Like what is the plan?  What are we going to

3  implement?

4          So I wanted to have John have a meeting

5  with Blake to discuss it, so that we were making

6  informed decisions as a group, not just someone

7  who had no skin in the game, making these massive

8  changes.  It was just me trying to be a part of

9  the company that I had built and caringly [sic]

10  wanting my fiduciary duties to be -- is for the

11  company to succeed and us all be successful in

12  this.

13          So I wanted to make sure that we were

14  making an informed decision.

15      **Q  I'll show you a document we're going to**

16  **mark as Deposition Exhibit Number 11.**

17          (Deposition Exhibit 11 was marked.)

18          MR. LOEB:  Coming your way, Antonio.

19          MR. CONVERSE:  Thank you.

20      **Q  (BY MR. LOEB)  Do you see what's on the**

21  **screen here is being Mr. Falic writing back to you**

22  **in your e-mail, in which you are inquiring about**

23  **what's the goal in this and what is the plan?**

24      A  Yes.

25      **Q  Please take a moment to review this.**

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

1      A   (Perusing document.)   Okay.

2      Q   All right.   Have you had the opportunity

3   to review it, ma'am?

4      A   Yes.

5      Q   All right.   And this is Mr. Falic

6   responding to you that same day, on the 22nd, in

7   which he explains to you in the first bullet

8   point, based on the chart that you had cut and

9   pasted, that the company had not grown at all in

10   the sales over the past three years, correct?

11      A   That's what he states.   I don't agree with

12   that.

13      Q   Well, isn't this the past -- this the

14   numbers that you provided.   It shows the revenue.

15   It's going sideways, isn't it?

16      A   But it also shows we cut a million dollars

17   in ad spend, so therefore we should profit a

18   million dollars more.   So sorry that the revenue

19   didn't increase, but the bottom dollar line should

20   have.   So we're fighting two different battles

21   here, which is why I asked for clarification of

22   what is the goal in this?   Do you want higher

23   revenue or do you want -- like that's what I was

24   asking.   So if we cut a million dollars, but we

25   stay at the same amount, we should still -- to me,

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 184

1  basic girl math, we should increase our profit,

2  correct?

3       So I apologize that I don't agree with

4  that statement, but I do not agree with that

5  statement.

6    Q  And at the time you didn't agree with it

7  either, did you?

8    A  I wanted him to see that we had saved a

9  million dollars, and not just look at it that the

10  company's top dollar wasn't growing, but that we

11  were doing things in the right direction.

12    Q  And you wrote that at the e-mail below

13  Mr. Falic's.  And in response to that he tried to

14  tell you that:  From the chart you sent with

15  sales, you can see what I said a few months ago.

16  We have not grown at all.  The sales have been the

17  same the last three years and trending the same

18  this year.

19       Correct?

20       MR. CONVERSE:  Objection, form.

21    Q  (BY MR. LOEB)  He's not talking about

22  profits; he's talking about sales and the fact

23  that they've been moving sideways for three years,

24  right?

25       MR. CONVERSE:  Objection, form.

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

1    A   Apparently, yes.

2    Q   (BY MR. LOEB)  And he goes on to write

3    that:  They've only been able to keep up with this

4    because you created more product lines for the

5    same people, which is also not healthy.  We should

6    be more focused and not so spread out.  Build what

7    we are strong in first then slowly expand

8    categories.

9         Do you see that?

10   A   Yes.

11   Q   Did you agree with that observation?

12   A   No.

13   Q   All right.

14        He goes on to say:  They have one person

15   handling the advertising spend.  From the audit,

16   it clearly was mismanaged.  We targeted the same

17   people, and over and over and from what it shows

18   we advertised -- over advertised to them.

19        Did you agree with that statement?

20   A   No, because Bryan Feldman was just as much

21   involved.  It was not one person.  Bryan Feldman

22   was very involved.

23        So it wasn't one person.  There was

24   definitely at least two people at all times

25   talking about and having meetings about the ad

Page 186

```
1    spend.  So I didn't feel that Jerome was getting

2    the right information.

3        Q  In here Mr. Falic goes on to write that:

4    We need more customers and less expansion of

5    products.

6            Did you agree with that statement?

7        A  I agree that more customers would have

8    been wonderful.

9        Q  And less expansion of products, did you

10   agree with that?

11       A  If that's the direction that he wanted to

12   do, I would have been okay with that, yeah.  Made

13   my job easier.

14       Q  Isn't it fair to say that around this, as

15   summer is turning to fall in 2022, that you

16   started to see there being a shift in the way that

17   Mr. Falic wanted to take Head Kandy?

18       A  Yeah, and I was okay with it.  I really

19   was okay with him finally coming in for the first

20   time in four and a half years and trying to help

21   me grow the business that he sold to me that --

22   the story was sold to me that that's what he was

23   going to do on day one.  So I was never mad that

24   he was actually trying to help productively grow

25   the business, which is why I was excited that I
```

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 187

1  felt like we were trying to take some off of my

2  plate.  Because, again, I had said to you, I was

3  drowning.

4      **Q  Do you recall Mr. Falic continuing through**

5  **September and ultimately into October, writing to**

6  **you to say that the model as it presently stood at**

7  **Head Kandy was not a sustainable model?**

8      A  I don't agree with that statement, but if

9  that's how he felt.  But as an owner of the

10  company I felt -- I had sent several text messages

11  to Jon Rosenbaum, in July of 2022, that basically

12  stated, I don't need anyone to come in and tell me

13  that we need to do sales to increase the revenue.

14  That's -- that's a very no-brainer.

15      I wanted us to make informed decisions as

16  a team to grow the company that made sense.  I

17  find it crazy now that I said two years ago, on

18  July 11, 2022, to Jon Rosenbaum, that this method

19  that you are trying to do is going to fail, and we

20  are going to be chasing sales forever.  And now

21  here I sit, being blamed that the company has

22  failed.  I do think --

23      **Q  How much --**

24      A  -- he's wrong.

25      **Q  How much in inventory -- let me back up a**

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

1    second.  Who was in charge of purchasing

2    merchandise for sale to the consuming public?

3        A  Hernan Heiber.

4        Q  And was Hernan in charge of making those

5    purchasing decisions in terms of quantities?

6        A  Yes.

7        Q  All right.  And you gave him no direction

8    on how much to purchase?

9        A  I always tried to tell him to buy less.

10       Q  Okay.

11       A  And just to be clear, Bryan Feldman signed

12   off on every single wire and every single invoice

13   that was sent and paid for, because Bryan was in

14   charge of the money.  So Bryan Feldman was also in

15   charge of inventory with Hernan.

16       Q  You didn't have anything to do with that?

17       A  No.

18       Q  In this e-mail Mr. Falic also indicates

19   that they're going to let John Max go.  Do you see

20   that?

21       A  Yes.

22       Q  And that ultimately happened, correct?

23       A  Yes.

24       Q  That upset you, didn't it?

25       A  It didn't upset me.  I felt that it wasn't

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

```
1   the smartest decision, because I knew that Brandi
2   was not qualified.  It was obvious that I felt
3   that Brandi wasn't qualified, but I was trusting
4   that they knew better than I did so I -- what can
5   I do?  John was in charge and John made that
6   decision.
7        Q  Did you indicate that you were very upset
8   about how the John Max thing was handled on a
9   professional level?
10       A  Very much so.
11       Q  And you indicated that you thought letting
12  him go was a huge mistake?
13       A  I do believe that, yes.
14       Q  Did you also indicate the changes that
15  were starting to come about at Head Kandy made you
16  feel like the company was more akin to TJ Maxx?
17       A  I feel like I know social media and social
18  media sales better than anyone that was working
19  with me.  And I felt that my opinion should have
20  mattered.  And I feel like I didn't believe that a
21  discount brand was the right direction.  And Jon
22  Rosenbaum agreed with me over and over in text
23  messages and in person while he was screaming at
24  me one day and praising me the next.
25       Q  Okay.  Do you remember the first time you
```

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

1    met Mr. Rosenbaum?

2        A  I do.

3        Q  Okay.

4        A  I spoke to him on the phone.  I believe it

5    was June 30 of 2022.

6        Q  All right.  When was the first time you

7    met him in person?

8        A  He flew to the North Carolina warehouse on

9    July 5 of 2022.

10       Q  All right.  And was that for a one-day

11   visit or was it, like, for an extended stay?

12       A  I believe that was one day the first time

13   he came.

14       Q  All right.  And in your complaint in the

15   allegations against Head Kandy, you indicate that

16   Mr. Rosenbaum touched you.

17       A  He did.

18       Q  How many times?

19       A  Two that I can recall.

20       Q  All right.  And the first instance in

21   which Mr. Rosenbaum allegedly touched you, when

22   was that?

23       A  It was in July.  Actually, I believe it

24   was August 8th.  We were sitting at the conference

25   table and it was sometime in the afternoon, and we

Page 191

1   were talking -- we had just had a meeting with

2   everyone.  We were all sitting in the conference

3   room.  And he was sitting to the right of me, and

4   I was sitting to the left.  And I had, like, a

5   dress on and it was -- it was mid thigh.  Like, it

6   wasn't anything, like, super short.  And we were

7   discussing how it was summer.  And he said to me

8   that he saw a Facebook ad running on Facebook for

9   tanning or something of the sorts.  And he said,

10  Were those your legs?

11          And I said yes, because in the ad, one leg

12  I had used tanning lotion and the other leg I had

13  not.  And he reached over with his left hand and

14  touched my knee and drug it up my thigh a little

15  and said, You have the perfect legs to demonstrate

16  tanning.

17      Q  And what time of the day was this?

18      A  It was middle of the day.  I remember -- I

19  feel like it was, like -- I don't know the exact

20  time, but I remember it was in the middle of the

21  day.

22      Q  And that was on -- it was on August 8 of

23  2022?

24      A  I believe that was -- I believe that was

25  August 8.  If not, I know it was in the summer and

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 192

1  I know that I had just done that tanning ad.  And

2  I know that for sure -- I remember what I was

3  wearing, the dress.  I believe it was August 8th.

4      Q  Okay.

5      A  To my best recollection it might be the

6  9th, maybe, but I know that it was -- it was in

7  the month of August.

8      Q  Okay.  August has 31 days, so I'm just

9  trying to get, was it in early August or -- trying

10  to get a frame of reference.

11      A  It was in the month of August.

12      Q  All right.

13         And August 8th.  And you recall, in the

14  evening time, texting Mr. Rosenbaum, thanking him.

15  And when he responds for what, you say:  Believing

16  in me.

17      A  Yes.

18      Q  And do you recall also texting with him

19  saying you two made a great team?

20      A  Yeah.  Yes.

21      Q  And is it your testimony that

22  Mr. Rosenbaum engaged in these touching activities

23  with you, but you nevertheless, that same evening,

24  said, Thank you for believing in me, that y'all

25  were a great team?

**HEAD KANDY LLC vs KAYLA MCNEILL**
**Kayla M. McNeill on 07/12/2024**

Page 193

1      A   I think that it's not very fair for you to

2    state how I should and should not act according to

3    what happened to me.  I was an owner of the

4    company and an employee, and I was being

5    approached by someone who was in charge of me, who

6    was at the same time praising me, and then in the

7    same breath tearing me down and screaming at me,

8    and telling me that the company is going to be

9    liquidated, and that I was stupid, and that I

10   didn't know what I was doing one day, but then the

11   next I was great.  He was very manipulative and he

12   was the definition of a groomer, now that I look

13   back.  And I tried to ignore a lot of it to begin

14   with.

15          When he was there on July 5th, he went to

16   the bathroom in front of everyone.  Ryan was

17   there, and Mindy was there, and Brandi was there,

18   and Rachel was there.  And he went to the bathroom

19   in the restroom with the door wide open.  And not

20   one person said anything.  And I thought to myself

21   Well, I guess this is acceptable behavior.  I

22   don't know.  I didn't know how to act.

23          And I didn't know how to handle him, four

24   days after coming in or five days after coming in,

25   calling me his girl in text messages.  At first I

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 194

```
 1   kind of brushed it off, because I felt like for
 2   the first time in four and a half years that I had
 3   been at Head Kandy, Jerome finally brought in
 4   someone to help me to grow the business that I
 5   really believed in.  And I didn't feel like I
 6   should be the -- I ended up telling Jerome what
 7   happened to me.  And what happened to me was
 8   wrong.  I should never have been touched in any
 9   way by Jon Rosenbaum.  No matter how I reacted in
10   that moment, it was unwanted and I did not ask for
11   it.  So --
12        Q  Did you suffer --
13        A  -- I'm sorry you feel I talked to him in a
14   way that I should not have, but I did not know how
15   to handle what was being done to me.
16        Q  Did you -- did you suffer any physical
17   damage as a result of him touching you?
18        A  No.
19        Q  Okay.  Did this first instance that you
20   have just described for us, was there anybody else
21   around?
22        A  Not for that one, but I did tell people
23   right away after that he did, and I thought it was
24   awkward.
25        Q  Who did you tell?
```

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 195

```
 1      A   I told Veronica in the warehouse.

 2      Q   What's her last name?

 3      A   Montes.

 4      Q   Montes, M-o-n-t-e-s?

 5      A   Yes.

 6      Q   Okay.  Who else did you tell?

 7      A   I told my husband.

 8      Q   Okay.  And anybody else?

 9      A   Rachel Pincus.

10      Q   All right.  That same day?

11      A   I don't remember if it was the same day,

12  but I know it had been brought up several times.

13      Q   Anybody else other than your husband,

14  Ms. Pincus, and Ms. Montes?

15      A   About that specific incident, no.

16      Q   Yes, ma'am.

17      A   Not that I recall.

18      Q   And do you recall telling your husband

19  about what you just told us on the day that it

20  occurred?

21      A   I remember going home and I found out I

22  had COVID.  And I remember laying there being

23  like, Oh, my gosh, I can't believe we just tested

24  positive for COVID and we were just around Jerome

25  and Jon, and all these people.
```

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 196

```
 1            And I took a nap.  And I woke up crying.
 2   And I just said to Dusty, I really hope that Jon
 3   isn't always going to be like so intense.  And
 4   he -- I just remember just saying that it was
 5   awkward.  Like, it was an awkward situation
 6   because he touched my leg.  And I said, But he's
 7   so intense.  He talks so loud.
 8            So I wasn't, like, hyperfocused on that
 9   specific incident, it was just more of his
10   demeanor in general, and I just kind of blew it
11   off.  Like, I felt like -- I don't know because --
12   and then -- yeah.  So I did tell my husband that
13   day I remember, yes.
14       Q  Okay.  And this occurred in
15   North Carolina?
16       A  Yes.
17       Q  At the warehouse that was owned by Head
18   Kandy Realty?
19       A  Yes.
20       Q  In what room did it occur?
21       A  The conference room.
22       Q  What's the next instance in which you
23   contend that Mr. Rosenbaum touched you?
24       A  On -- I don't remember the specific date.
25   It was toward -- I want to say it was the first of
```

Page 197

```
 1   September.  I was standing in the hallway outside
 2   of Kaylin's office, and his office was past my
 3   office and Kaylin's office at the end of the
 4   hallway.  And I was talking to Kaylin through the
 5   office door.  And I turned around and he was in
 6   his office, like, screaming at someone on the
 7   phone.  And I poked my head in.  And I looked in
 8   at Kaylin and I just said, Sheesh, because he was
 9   always, like, screaming.  And we joked that we
10   were happy that we weren't the target of his
11   screaming.
12        And about maybe, I don't know, 10 seconds
13   later or something he had gotten off the phone and
14   he opened the door, and he was back to calm.  He
15   wasn't, like, heightened or freaked out or
16   anything, like, worked up or whatever.  And I
17   walked toward him, toward the content room, and he
18   was walking this way toward me in the hallway.
19   And I was, like, That was loud.  Like, trying to
20   make a joke of it.  Because I think everyone knew
21   that we heard and it was really awkward to just
22   hear him screaming like that.  And as I walked
23   past him in the hallway he, like, brazed my neck
24   down to my chest.  Like -- like, he was -- sorry,
25   it was like -- it was his right hand and he just,
```

1  like, brazed it and touched my chest.  And he

2  said, Glad I yelled.  That's what he said.  And he

3  kept walking.

4      Q  Okay.

5      A  And he had a black zip-up hoodie on and

6  jeans and, like, a white T-shirt or something.  I

7  just remember what he was wearing.  And at the

8  time I just was, like, Uck, just Jon being Jon.

9      Q  Okay.  Was anybody else around to observe

10  that?

11      A  Kaylin was in her office, but I don't

12  think she saw it.  But I definitely told her about

13  it later in the day or something like that.  I

14  just remember that by this point we both had felt

15  like it was starting to get increasingly

16  uncomfortable.

17      Q  Okay.  And was that second time that he --

18  you allege that he touched you, was it done in a

19  sexually suggestive way?

20      A  I think a man should never touch a married

21  woman in any way like that, so, yes.

22      Q  Okay.  I just got to ask the questions.

23  Okay?  So I'm just -- I've got a job I've got to

24  perform, so you've got to let me ask these

25  questions.

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 199

1        And you said it was -- you don't recall

2    the exact date, but it was sometime in the

3    beginning of September?

4        A  I feel like I remember it was in

5    September.  I know that it was after the first

6    time.  And there was a decent amount of time

7    between the two, because I remember thinking,

8    like, maybe it was just, like -- like, I didn't

9    like, hyperfocus on the first time.  I thought it

10   was maybe just, like -- like, a one-and-done kind

11   of thing.  I remember thinking that.

12       And then when it happened the second time,

13   I remember thinking, like, Uck, because he touched

14   me again.

15       Q  All right.  And aside from Ms. Culp, being

16   in her office, do you recall if anybody else saw

17   this occur?

18       A  No.

19       Q  All right.  And you told Ms. Culp.  Did

20   you also tell Mr. McNeill?

21       A  No.

22       Q  Okay.  Did you tell anybody else?

23       A  No.

24       Q  Are those the only instances in which

25   Mr. Rosenbaum touched you?

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 200

1    A  Touched, yes.

2       Q  I understand.  Did you sustain any

3    physical injuries as a result of him touching you?

4    A  No.

5       Q  Do you need to take a break or are you

6    okay?

7    A  I'm okay.

8       Q  All right.

9       MR. CONVERSE:  Are you sure?

10      THE DEPONENT:  Just let me get through it.

11      Q  (BY MR. LOEB)  Now, I understand that you

12   have said that there were instances in which

13   Mr. Rosenbaum and you and Ms. Culp did yoga

14   together, correct?

15   A  Yes.

16      Q  How many times did y'all do yoga?

17   A  I only did yoga one time.  I told him --

18      Q  What -- once?

19   A  I -- that he requested it several.  And I

20   told him no.

21      Q  All right.  And when was the first time

22   that y'all did yoga?

23   A  October 4.

24      Q  And where did that occur?

25   A  In the -- I think the warehouse had, like,

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 201

1   this, like, area that was, like, a photography

2   area for, like, people to take, like, selfies and

3   shopping.  And that's where it happened.

4       **Q  All right.  Do you know someone named**

5   **Silvana?**

6       A  I do.

7       **Q  Was she there that day when the yoga**

8   **occurred?**

9       A  She set the yoga up with Amber Teaster in

10  the room.  She set up --

11      **Q  And -- go ahead.  I'm sorry.**

12      A  She set up the computer screen with -- Jon

13  wanted to do, like, a program of some kind.  And

14  we didn't have a TV, so he had them bring in a

15  computer so that we could put it on, like,

16  YouTube.

17      **Q  All right.  And do you recall after this**

18  **yoga session texting both Mr. Feldman and**

19  **Mr. Thompson, indicating that Mr. Rosenbaum was**

20  **not as flexible as you thought he would be?**

21      A  I remember telling Bryan Feldman that Jon

22  did yoga with us.  And I was hoping just maybe

23  that he would think it was not appropriate.

24          And I tend to joke a lot.  Like, that's

25  how I handle things.  It just makes things less

Page 202

1  awkward for me, I guess.  I don't know.

2      **Q  But my question is, do you recall sending**

3  **text messages, both to Mr. Thompson and**

4  **Mr. Feldman, indicating that Mr. Rosenbaum was not**

5  **as flexible as you thought he might be?**

6      A  I don't really recall much of what I said

7  after.  I just remember what happened and how I

8  felt.  And so I remember texting Bryan Feldman for

9  sure.  Because I remember it was just, like, my

10  way of crying out for him to be, like, Why are you

11  doing yoga?

12      I don't know.  Wishful thinking, I guess.

13      **Q  Did you -- you said there was only one**

14  **instance where you did yoga with Mr. Rosenbaum.**

15  **Did he -- did he do the yoga exercises with you?**

16      **I'm not a yoga person so I'm -- I kickbox.**

17  **I don't do yoga.  So I just don't know how -- how**

18  **yoga is done.  Like, did he do yoga with you?  Did**

19  **he just watch?  Tell me -- tell me how it all went**

20  **down.**

21      A  We -- we did this yoga session with

22  Adriene.  It was, like, Yoga with Adriene or Yoga

23  by Adriene on YouTube.  And it was Jon's idea.

24  And we tried to, like, avoid it.  Like, we were

25  in, like, a three-way message with Jon and Kaylin

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 203

1    and I.  And I knew it was going to be weird

2    because Jon basically told us we had to be

3    barefoot and that we had to paint our toenails.

4         And, like, Kaylin and I both -- like, I

5    think there are text messages.  We joked.  We were

6    just, like, What the hell?  This is so ridiculous.

7    Like -- and so we tried to avoid doing it.

8    Because I remember I said, I have a meeting or I

9    have to go live or something and the timing isn't

10   going to work out.  And he was like, No.  Yoga

11   relieves stress, or whatever, we're doing yoga.

12        So Silvana and Amber set up the -- it was

13   like a gray cart, and the computer screen on the

14   cart in the corner.  And then I -- Kaylin and I

15   were kind of in the front and Jon was kind of

16   behind us.  And I remember not -- I didn't -- he

17   definitely did yoga with us.  I didn't look back

18   much.  I just -- it was very uncomfortable.  He

19   was making very uncomfortable sounds.  I don't

20   know if it was him stretching.  I have no clue.  I

21   just know that it was very uncomfortable.

22        And when we were done I was kind of like,

23   Okay, that was weird.  Like, we're done.  Like,

24   that was weird.  Like, I'm not doing that again.

25   No.  And I wasn't, like, emotional or upset during

Page 204

1   that.  Like, I just kind of felt like that was

2   something I got through.

3         I remember wondering why he didn't offer

4   to do yoga with, like, more people, like Silvana

5   and Amber.  Like, he made comments about Silvana

6   and Amber, like, in the past about Silvana being

7   older and who he was attracted to and who he

8   wasn't.  So I think I understood kind of like why

9   he didn't want -- I don't -- I don't know why.  I

10  just -- maybe that's why he didn't invite them

11  also, because she was sitting right there.

12        She even -- I'm pretty sure she videoed

13  it.  She stood there and watched us for a little

14  while.  And she even said how weird it was and how

15  uncomfortable it made her.  She even went into --

16  I'm pretty sure she went into Amber's office.  And

17  she was, like, This is crazy.  Why are they doing

18  yoga?  So I knew that other people thought it was

19  weird as well, but --

20      **Q   Are you saying Silvana made the videotape**

21  **or the recording?**

22      A  I don't remember if she actually videoed

23  or what, but she did stand there.  You will have

24  to -- you will have to ask her.  Obviously that's

25  part of your (indiscernible) but she did --

1      Q  I have.

2      A  -- she stood there and watched.  And she

3  made the comments to Amber and others that she

4  thought it was weird that we were doing yoga, and

5  that it seemed inappropriate.  That --

6  she definitely said that.  And I remember

7  thinking, Yeah, this is not okay.  This is weird.

8      Q  All right.

9      A  And he -- it felt like he purposely

10  positioned himself behind Kaylin and I.  He wasn't

11  in front of us; that's for sure.  He wasn't in

12  front, leading the yoga session.  He was behind

13  us, so...

14      Q  What was -- what was he wearing?

15      A  He had shorts on.  I remember he had

16  shorts and a T-shirt.  He had, like, black shorts

17  maybe.  He was barefoot and he didn't have socks

18  on.  I think he had a plain, white T-shirt on, if

19  I recall.

20      Q  What were you wearing?

21      A  I was wearing leggings.  I remember I

22  wanted to wear leggings so that my legs were

23  covered.  I didn't want to wear shorts.  And I had

24  just, like, an active top on that wasn't tight.  I

25  remember making sure my clothing was loose.

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 206

1      Q  My understanding, based upon the

2  allegations in your complaint against Head Kandy,

3  is that you went for therapy?

4      A  I started to try to do it.

5      Q  Pardon me, ma'am?  I'm sorry.  I didn't

6  hear.  You cut off.

7      A  No, I started to do therapy.  Yeah.

8      Q  All right.  And when did you start to do

9  therapy?

10      A  Maybe, like, March or April of 2023, when

11  I realized I really needed to try to deal with,

12  like, these emotions.

13      Q  Would you say that your emotions were

14  wrapped up with being terminated from the company?

15      A  I would say that I was put in a

16  horrifically uncomfortable situation, where I was

17  the owner of a company that I worked really hard

18  to build.  And I definitely had my heart in the

19  right place with everything that I did.  And I was

20  dealing with someone who was so mentally abusive

21  to me, and threatening me, and telling me that he

22  was going to liquidate the company and that I was

23  going to lose my job, and at the same time

24  fighting for the company to just continue to

25  survive.  Because people like Ryan, who was my

Page 207

```
 1  friend, relied upon the job for his -- to pay his

 2  bills.

 3       And I didn't know which battle was worth

 4  fighting.  Like, I didn't know if I should fight

 5  the battle of letting Jon single-handedly tank the

 6  company or continue to sexually harass me so that

 7  it would just be easy for me.

 8       It wasn't until he really started doing it

 9  to Kaylin, too, that I just -- I knew I didn't

10  want to live like that anymore.  I didn't want to

11  be screamed at.  I didn't want to be told I was

12  hot by someone.  I didn't want to be told that I

13  needed to be topless.  I didn't want to be told

14  that I was dumb, and screamed at.

15     Q  Didn't you --

16       THE COURT REPORTER:  Counsel, could you

17  please -- could you please face the camera.  I'm

18  having trouble hearing you.

19     Q  (BY MR. LOEB)  Didn't you --

20       MR. LOEB:  Well, I'm looking at documents.

21  I'm happy to speak up, but don't tell me how to

22  conduct the deposition.

23       THE COURT REPORTER:  I meant no

24  disrespect.

25     Q  (BY MR. LOEB)  Did -- did you text
```

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 208

1    Mr. Rosenbaum in December of 2022, letting him

2    know that you had a breast implant surgery?  And

3    I'll quote:  I legit have an appointment for a

4    boob job in January.

5          Did you --

6      A  Right after --

7      Q  -- say that to him?

8      A  Again, I try to handle things with humor

9    and take the awkwardness out of something.  And if

10   you'd give the context before that, he had just

11   told me to go live topless.  I didn't know how to

12   respond to him.  I didn't know what to say.

13         And as a man you should not sit there and

14   tell me, Didn't you say this to him?  Like, I did,

15   but it was just purely to try to deter from what

16   was happening.  I don't know how your wife would

17   respond, but there is not really a book of how to

18   reply.

19         So the text message right before that was:

20   You should go live topless.  Am I correct?  Can

21   you put that on a screen, so we can see that?

22   Because --

23     Q  Sure.

24     A  -- I want to make sure I'm accurate.

25     Q  I'm -- I'm happy to do that because I

Page 209

1  don't think that's what it says, but I'm happy to

2  put it on the screen for you.

3          And while I'm pulling that up, do you also

4  recall sending Mr. Rosenbaum pictures from your

5  surgery that you had?

6     A  He told me he didn't like fat people, so I

7  felt like if I sent him pictures of me fat, he

8  would quit.  So, yeah, I did.  Ethan, I did.

9          MR. CONVERSE:  Are you sure you don't want

10  to take a break while he is getting his document?

11          THE DEPONENT:  That's fine.

12          MR. LOEB:  Yeah, let's go ahead and take a

13  break because I have to find where Heather stored

14  this, because she's got one version of the text.

15  Let's -- it's 5:03.  Let's come back in

16  12 minutes.  Grab some water and cool off, and

17  then we'll keep going.  Okay?

18          MR. CONVERSE:  Okay.

19          MR. LOEB:  Thank you.

20          THE VIDEOGRAPHER:  This is the end of

21  media number 4.  The time is 3:03 p.m.  We are off

22  the record.

23          (Recess taken, 3:03 p.m. to 3:27 p.m.)

24          THE VIDEOGRAPHER:  This is the beginning

25  of media number 5.  The time is 3:27 p.m.  We are

**HEAD KANDY LLC vs KAYLA MCNEILL**
**Kayla M. McNeill on 07/12/2024**

1  back on the record.

2      Q  (BY MR. LOEB)  All right.  Any testimony

3  given so far you want to change, modify,

4  supplement in any way, shape or form?

5      A  Not that I have thought about.

6      Q  Okay.

7         You were talking about -- before we go

8  back to the text, you were talking about, I guess,

9  having gone to therapy in March of 2023.

10     A  Yes.

11     Q  How many -- how many sessions did you

12  attend?

13     A  I think I tried, like, four or five, but

14  I -- I wasn't mentally ready yet.  It was -- I

15  wasn't ready.

16     Q  All right.  And did -- did you attend

17  those sessions on a weekly or biweekly basis?

18     A  Weekly.  It was a couple times a week for

19  a couple weeks.  And I just realized it was

20  triggering me to be more upset than it was helping

21  at the time.

22     Q  All right.  And who did you see?

23     A  It was a Christian counseling place that I

24  had been referred to.  So it was over the phone,

25  just --

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 211

```
 1      Q  What's the name of the -- what's the name
 2  of the Christian counseling, over-the-phone
 3  counselor?
 4      A  I don't recall.
 5      Q  And did you pay for any of that
 6  counseling?
 7      A  Yes.
 8      Q  How much did you pay?
 9      A  I don't recall.
10      Q  Was it covered by insurance?
11      A  No.
12      Q  Was it a psychiatrist who you saw?
13      A  I'm not sure if she was a psychiatrist or
14  not.
15      Q  Spoke to, I guess.  Was it -- was it on
16  the phone or was it virtual like Zoom, or did you
17  see somebody in person?
18      A  I spoke to her on the phone.  I had all
19  three options, but I chose phone.
20      Q  And if I'm doing the math correctly,
21  would, like, from March to May or June of 2023?
22      A  I don't feel like it was that long.  I
23  feel like that it was maybe, like, two months.  It
24  felt like it wasn't helping yet, so I didn't
25  continue.
```

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 212

```
 1        Q  Did you go and see anybody other than this
 2   Christian counseling individual?
 3        A  I got on medication.
 4        Q  All right.  What medication did you get
 5   on?
 6        A  Prozac.
 7        Q  Do you have a history of depression?
 8        A  None.
 9        Q  Do you have a history of mental illness?
10        A  None.
11        Q  And did you see any other health care
12   professional, other than speak -- sorry.  Did you
13   speak, communicate, or talk to any other health
14   care professional, other than the Christian
15   counselor?
16        A  I saw my family practice doctor, and then
17   I went to a -- like a specialist for, like,
18   women's health.  And I thought maybe she could
19   help me more so with, like, maybe hormones and
20   vitamins, rather than popping pills down my throat
21   to handle what had happened to me.
22        Q  Who was your family practice doctor?
23        A  James Wiggington.
24        Q  How long have you been seeing
25   Dr. Wiggington?
```

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 213

1      A   Since I was in high school.

2      **Q   And did you grow up in Salida?**

3      A   I did.

4      **Q   And Dr. Wiggington is the one who gave you**

5   **a prescription for Prozac?**

6      A   He did.

7      **Q   Did you -- how many times did you visit**

8   **with Dr. Wiggington?**

9      A   Gosh, like total in my whole life or --

10      **Q   No, I don't want to know about high school**

11   **stuff -- come on now.**

12      A   I --

13         (Multiple people speaking simultaneously.)

14      **Q   (BY MR. LOEB)  I don't have time to go**

15   **back to high school with you, Kayla.**

16      A   Three or four times, I believe.  Maybe

17   three.

18      **Q   Over that same time period?**

19      A   No, I saw him in -- I think I finally -- I

20   tried the counseling first.  So I believe I went

21   to see him when I just -- it was not -- nothing

22   was getting better.  And I feel like maybe around

23   April, I want to say, is when I finally realized

24   that I needed medication.

25      **Q   Are you still on Prozac?**

**HEAD KANDY LLC vs KAYLA MCNEILL**
**Kayla M. McNeill on 07/12/2024**

1      A   Yes.

2         Q   **Have you received a diagnosis?**

3      A   I mean, I think any health care provider

4  that would have seen me would have seen that I

5  went through some pretty serious trauma, so, yes.

6  I mean, I got the medication for -- I couldn't

7  gain weight.  I couldn't eat.  I got down to

8  103 pounds.  I cried every day for months.  I

9  couldn't get out of bed to feed my kids.  So I

10  don't know what diagnosis that would be, but I

11  definitely needed some help.

12        Q   **All right.  But did you receive a**

13  **diagnosis, is my question?**

14      A   I mean, my doctor said I'm clearly

15  depressed --

16        Q   **Okay.**

17      A   -- and --

18        Q   **Were you diagnosed with depression, if you**

19  **know?**

20      A   I don't carry a card.  I don't know what

21  that means.  Like, what -- yeah, the doctor said

22  I'm depressed and he gave me medication for it.

23  So I'm going to say I'm probably depressed.  I

24  don't know how to answer that.  Like, do they

25  stamp your forehead?  Like, what are you asking?

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 215

1     Q  I don't know.  I'm asking you -- you know,

2  you hear about people who are clinically depressed

3  or they've been diagnosed with clinical

4  depression.  Did you receive an official diagnosis

5  for being depressed?

6     A  The doctor put me on an antidepressant, so

7  I'm going to say probably.

8     Q  But do you know is my question, ma'am?

9     A  I don't recall.

10     Q  Other than Dr. Wiggington, did you see

11  anybody -- did you see anybody else?  I guess the

12  specialist for women's health, what's that

13  doctor's name?

14     A  I can't remember her name, but, yes, I did

15  see someone else.

16     Q  How many times did you see the specialist

17  for women's health?

18     A  Probably four times, maybe more.

19     Q  What was the date range or time period?

20     A  June or July of last year, I believe,

21  when -- I think -- to be honest, I don't recall

22  when I first went to her, but somewhere in the

23  last year.

24     Q  Did the specialist for women's health make

25  any diagnosis of you?

Page 216

```
 1       A   Again, I don't have like a card, but she
 2   definitely said that I'm deficient in -- I had my
 3   blood run.  I did a lot of work.  Like, I wanted
 4   to make sure I was healthy, because I thought
 5   something was really wrong with me.  And so she
 6   just, basically, tried to help me mentally get
 7   back to a good mindset.
 8           And then -- so she -- she didn't -- like I
 9   said, I don't have a card.  She definitely said
10   I'm depressed.  She definitely said I have severe
11   anxiety.  It's pretty obvious.
12       Q   Did she make any diagnosis as to the
13   cause?
14       A   I feel like she definitely knows what the
15   cause was.
16       Q   But did she make any diagnosis as to what
17   the cause was?
18       A   I mean, she definitely said it was trauma.
19       Q   Did she say trauma from what?
20       A   She knows the whole story.
21       Q   No, my question is:  What did she say the
22   trauma was that caused you to have this anxiety
23   and depression?
24       A   You will have to ask her.
25       Q   She didn't tell you?
```

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 217

1      A  I just told you, we've had several

2  conversations.  She didn't pinpoint the exact

3  moment that I was retaliated against and my whole

4  world got flipped upside down.  Like, I'm going to

5  assume that's probably what she'll say.

6      **Q  When you say "retaliated against," you are**

7  **talking about the demotion and termination?**

8      A  I'm talking about that I told my business

9  partner what happened, what was going on, and then

10  he made me report to the man that was treating me

11  that way.  So that's what I'm talking about.

12      **Q  Any other medical care professionals or**

13  **professionals that you have visited with, other**

14  **than the ones you have told me about?**

15      A  No.

16      **Q  Any other medications that you are on,**

17  **other than Prozac?**

18      A  None.

19      **Q  And are you still seeing any of these**

20  **doctors for your mental health?**

21      A  Yes.

22      **Q  Who are you seeing?**

23      A  The same doctors that I listed.

24      **Q  At what level of frequency?**

25      A  About every four months for -- her name is

Page 218

1   Dawn.  Sorry.  I remember her name is Dawn.  I
2   can't remember her last name.  She's the women's
3   health physician.  I see her maybe, like, every
4   four to six months now to get my blood work
5   continued.  I'm actually supposed to go next week,
6   I believe, or the week after to see if my levels
7   are, like, balancing out.
8       Q  All right.  As a result of what you told
9   us about, do you have any, like, rashes or hives
10  or anything like that?  Let me see if I can
11  explain it to you so you understand what --
12          Some people when they get upset they, you
13  know, they get like a rash or they get hives or
14  something.  I'm trying to think of, like, in
15  movies where you've seen people where they break
16  out in hives or something like that.  Anything
17  like that?
18          I mean, was this -- I'm not trying to be
19  disrespectful to you when I'm asking these
20  questions, so please -- please understand I just
21  got to do a job here, but did you -- was your
22  reaction to this -- it was -- it was psychological
23  in nature?
24      A  I mean, it got to a point where I was
25  shaking so bad inside and externally, like I

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 219

```
 1   couldn't even hardly write some days.  I couldn't
 2   eat.  I -- so, no, I didn't get a rash.  That
 3   would have been nice, actually, because --
 4       Q  I'm not saying that to be rude to you.
 5       A  No, I don't mean it rude.  I just mean,
 6   like, I was suicidal and I didn't want to live.
 7   So, no, I didn't get a rash.
 8       Q  All right.  But I guess I'm trying to say,
 9   there was nothing -- there was no physical injury
10   or physical harm as a result of this?  This was --
11   this was psychological and mental anguish that you
12   are telling us that you encountered, correct?
13       MR. CONVERSE:  Objection, form.
14       A  Well, I wouldn't say that there's not any
15   physical harm.  I would assume my lifespan has
16   definitely lessened.
17       Q  (BY MR. LOEB)  You're talking about future
18   lifespan?
19       A  I --
20       Q  Years off your life?
21       A  Yeah, definitely.  I can -- everything
22   about me is not normal anymore.
23       Q  Okay.
24          In your counterclaim against Head Kandy
25   you indicate that there were some general -- or
```

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 220

1  you indicated that Mr. Rosenbaum demeaned you

2  because of your gender.  Can you give us the facts

3  that support that allegation?

4     A  Jon was pretty vocal about how he felt

5  about people, their race, their gender, their sex,

6  everything.  It was just what he talked about.

7  And -- so he would always say that Jerome -- he

8  always thought it was surprising that Jerome was

9  in business with me being a woman.  That Jerome

10  never goes into business with women.  He had said

11  that a couple of times.

12        I think it was more just a tactic to try

13  to make me feel belittled.  He was really -- he

14  always wanted to make sure -- like, he would make

15  comments to Kaylin and I to make sure that,

16  like -- he didn't want us in the warehouse,

17  because he would say, That isn't where pretty

18  girls should go.  You guys should work up front in

19  the office.  That's where women should be.

20        Stuff like that.  He would say it kind of

21  like joking.  It wasn't very funny.

22     Q  Did Jerome ever say anything like that to

23  you directly, like, I don't know why I went into

24  business with a woman, or anything like that?

25     A  No, never.

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 221

1    Q  Okay.

2    A  And that's why I didn't understand.

3    Q  You didn't understand what?

4    A  Like, I didn't understand why Jon kept

5    saying things like that to me, because that's not

6    who I thought Jerome was.

7    Q  All right.  Anything else you can tell me

8    other than that?

9    A  That's all I remember right now.

10   Q  Okay.  And when I say "other than that,"

11   I'm talking about these -- these allegations

12   you've indicated that were somehow being treated

13   differently or demeaned in a nonsexual way because

14   of your gender.

15   A  Yeah, he definitely treated me different

16   because I was a woman.  He would say things all

17   the time, like -- like, everything was

18   gender-roled it seemed like.  Like, men were

19   supposed to do this, and women were supposed to do

20   this.  And he always referred to Ryan as, like,

21   being in the middle, and made fun of Ryan for

22   being gay.  And is Ryan more woman or is Ryan more

23   man?  And comments like that.

24        But I just feel like he just didn't ever

25   give me the credit I feel like I deserved for the

**HEAD KANDY LLC vs KAYLA MCNEILL**
**Kayla M. McNeill on 07/12/2024**

Page 222

1  hard work that I truly put in there.  Like, it

2  definitely was pretty obvious where he felt women

3  should -- should be and what they should do.

4       And he would always call Ryan a faggot,

5  and then, like, make comments about -- like, he

6  was surprised that Ryan -- Ryan can do manly stuff

7  because -- like, because Ryan would always be the

8  one who had to, like, do stuff in the warehouse or

9  something when he was there, or we would move the

10 warehouse or whatever.

11      Like, I remember telling Jon a story one

12 time about how Ryan and I moved the warehouse by

13 ourselves and -- because, really, Ryan and I moved

14 the warehouse by ourselves.  And said that he was

15 shocked that Ryan could do manly things like that.

16 That he wouldn't expect me as a woman to do that,

17 and he couldn't believe that Jerome let that

18 happen with the way that Jerome thinks that women

19 shouldn't be, like, in business like that.  Like,

20 I remember comments like that.  Like, stuff like

21 just gender roles kind of.

22      **Q  Any other facts you can tell me, other**

23 **than what you have already testified to?**

24      A  Not that I can recall right now.

25      **Q  All right.**

**HEAD KANDY LLC vs KAYLA MCNEILL**
**Kayla M. McNeill on 07/12/2024**

Page 223

1           Now, at the November 20th meeting that

2    occurred in South Florida, you initiated the

3    meeting by sending a text message to Mr. Falic,

4    correct?

5      A  I originally had kind of initiated the

6    meeting because Bryan Feldman -- I reached out to

7    Bryan Feldman.  And he's the one who said, You

8    have to talk to Jerome.  And so I reached out to

9    Jerome with a text message saying that I needed to

10   talk to him.

11     Q  Okay.  Did Mr. Rosenbaum suggest that you

12   talk to Mr. -- strike that.

13           Did Mr. Rosenbaum suggest that you talk to

14   Jerome?

15     A  The conversations that I had had with Jon

16   were so -- it was so complicated because, like I

17   said, I was fighting for the business to be

18   successful, and fighting with Jon in that way.

19   But then at the same time I was also dealing with

20   the way that he was treating me.  And so for me I

21   was trying to decide, like, which -- which battle

22   was worth fighting.

23           And so when I was talking to Jon in one of

24   his rants of tearing me down and pulling me up, he

25   told me that I needed to ask for a raise because I

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

1   did so much there, and that Jerome took advantage

2   of me, and that I needed to have a meeting with

3   Jerome, and how much money did I want to get paid,

4   and I deserved a raise.

5         So he did tell me that I should talk to

6   Jerome, but it was more like he was trying to make

7   me feel like -- in one of his -- I don't know if

8   you want to call it a high or low, but

9   manipulation tactics, was that I should talk to

10  Jerome about how much I was getting paid.

11       Q  All right.  And did you tell Ryan Thompson

12  that you were going to go meet with Jerome?

13       A  I believe so.

14       Q  I'm going to show you Deposition Exhibit

15  Number 1.  Do you see what's on the screen?

16       A  Yeah.  Yes.

17       Q  All right.  And here you write, on

18  November 19, 2022, at 6:49, that you booked a

19  flight:  We leave at 6 a.m. for Miami.

20         And Mr. Thompson writes:  Tomorrow?

21         You write:  Yep.  LOL.

22         He writes back:  You go, girl.

23         And you write:  Meeting with him in the

24  morning.

25         I guess it was cold Wherever y'all were at

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 225

1   because Mr. Thompson asked to bring some warmness

2   back.  And he asked, also, for some raises.

3          And you said, I wish.  But you said, It's

4   more I don't work for Jon and I expect a team, and

5   how Jerome let us down.  We're here for the

6   growth, but I won't be pushed out.

7          And you said:  I wrote it all out so I

8   stay on track.

9          Do you see that?

10    A  Yes.

11    Q  What is it that you wrote out in

12  preparation for the meeting?

13    A  I made a list of all of the issues that I

14  needed to talk to Jerome about.

15    Q  And how -- was that list handwritten or

16  was it typed?

17    A  No, I'm a handwriter-note person.

18    Q  Did you keep those notes?

19    A  I don't believe so.  It was just a single

20  piece of paper.

21    Q  And at that time when you were headed to

22  meet with Mr. Falic down in Miami, at least it

23  appears here that you were indicating that you

24  were having a feeling that you were being pushed

25  out.

Page 226

1      A  I didn't think I was being pushed out of

2  the company.  I meant like pushed out of my -- I

3  worked for the company, and we were working on

4  advertising and all these things.  And Ryan had so

5  many concerns.

6          So the conversations that I'm talking

7  about with Ryan were a lot about Ryan's concerns

8  about his role and how Jon treated Ryan, and what

9  was changing for Ryan.

10          And so -- meaning like they're not going

11  to push me out, not let me say, like, and voice

12  my -- my opinion for these people who had serious

13  concerns, including my extra concerns that I had

14  that were about me, and Kaylin, and every person

15  who had serious concerns that saw the way the

16  direction the company was headed, and how Jon was

17  treating people, and the names, and the -- it --

18  it was so much more than just that.

19      **Q  And in this text communication with**

20  **Mr. Thompson you didn't put any of that out there,**

21  **other than these -- about how Jerome had let y'all**

22  **down and that you would not be pushed out,**

23  **correct?**

24      A  I mean, there is not a lot of conversation

25  there at all, so I -- I don't really -- I didn't

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

```
1   list it out for Ryan.  If I recall, he asked me,
2   Tell me what you talked about.  And I said, I have
3   it all on a list.  And I said, I'll have to tell
4   you later.
5         So I might not have typed it, but I didn't
6   type anything to Ryan after the meeting.  I told
7   him I had it on a list and I would get back to
8   him.  So I didn't tell Ryan any of it, even after.
9      Q  Well, afterwards you write -- in your
10  response from Mr. Thompson you write:  I'm not
11  sure.  I mean, I laid it out and he was very nice
12  and he said he would talk to Jon.
13      A  Correct.
14      Q  You said:  We were there -- you said you
15  were there for three hours.
16      A  Correct.
17      Q  You say:  For sure.  And you said:  And
18  I'm not going to be blamed for the lack of growth.
19  And he agreed.  And then you write:  I'm so tired
20  and that it's pouring there, and I guess Miami
21  weather.  But that's it, right?
22      A  Yeah, I just remember that there is
23  somewhere in there that I had told Ryan that I
24  wrote the list.  Right?  And then he said:  What
25  did it say?
```

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 228

1      Q   I'll scroll back up for you.  You are

2   right, you did.

3      A   I said something about, like, I'm not

4   going to lay it all out.

5          And he said, Let me see.

6          And I said, Hold on.  And I said, It's

7   weird notes.  Because I handwrote it.  So I only

8   gave him a couple of my topics, but I had a -- it

9   was two pages of handwritten notes.

10         So, no, I didn't tell him, but I

11  definitely had what I had written on my notes to

12  talk to Jerome about.

13     Q   Okay.

14     A   And I didn't follow up with Ryan on the

15  rest of what I probably would have told him,

16  because I -- I just didn't follow up with him.  I

17  said, Hold on.  And, clearly, I -- I don't know.

18     Q   And when you flew down to Miami on

19  November 20, the original plan was to meet at a

20  hotel somewhere near the airport, correct?

21     A   Yes.

22     Q   And then the plan changed and it was to

23  move locations to the Ritz Carlton?

24     A   I believe so.

25     Q   So are you aware of the allegations in

Page 229

1    your counterclaim against Head Kandy where you

2    suggest that this was a meeting to meet at

3    Mr. Falic's house?

4        A   Well, that's where it ended up being,

5    because Jerome didn't want to leave his house, so

6    we went to his house.  It was a meeting to meet

7    with Jerome and we ended up at Jerome's house.

8        Q   I just want to make sure it wasn't

9    intended -- that the original meeting was not

10   intended to be at Mr. Falic's house, correct?

11       A   I don't believe that we were meant to be

12   at Jerome's house, Mr. Falic's house; however,

13   he's the one that suggested we go there.  So the

14   meeting was to meet with him, whether that be

15   anywhere, as long as it was in person and

16   face to face.

17       Q   That's what I'm trying to get at, but it

18   wasn't intended -- I'm just following the text

19   threads between you and him.  It wasn't

20   originally:  I'm landing.  I'm coming to your

21   house.  I'll be there in 30 minutes.  It was first

22   a hotel close to the airport.  Then moved to the

23   Ritz Carlton.  Then it ultimately occurred at his

24   house, correct?

25       A   Correct.

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 230

1      Q  And tell me what you recall at the

2   meeting.

3      A  Really quick, can I say something, because

4   it's just how my brain is?  We were going to go

5   over those text messages and I can't stop thinking

6   about it.  So can you just bring them up really

7   fast, so I can get it out of my head that I'm

8   wrong?  I'm sorry.  I can't stop.  I'm sorry.  And

9   it totally pertains to this specific situation, so

10  I just want to make sure that it's clear on the

11  record that I definitely was told to go live

12  topless, and that --

13     Q  Okay.  Sure.  I'm happy to do that.

14     A  You said you were going to pull that up,

15  and my brain can't stop thinking about it.  I'm

16  sorry.

17     Q  Well, I want to relieve your brain of

18  that.  Hang on.

19        All right.  Here we go.  This is on 9/15

20  at 7 o'clock at night.

21     A  Can you scroll up a little bit to set the

22  tone of where it says that?

23     Q  I'm actually going to go -- I actually

24  have to scroll down to set the tone.

25     A  Okay.  Sorry.  Sure.  So this goes

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 231

1  backwards, is what you are saying?

2      Q  It does.

3      A  You read from the bottom up?  Okay.

4      Q  At least that's the way this report comes

5  out.

6      A  Okay.  So the date's 9/15; is that

7  correct?

8      Q  Yes, ma'am.

9      A  Okay.  Okay.  Can you go to the 9/22 text,

10  just so I can see that?  Sorry.  I just --

11      Q  We're going to go to the 9/15 text first,

12  because that's where this reference is that you

13  are saying about he said you should go topless

14  live.

15          He writes -- I guess you are talking about

16  dates here.  He writes back:  I want you to relax.

17  You deserve it.

18          You write:  It will get done.  Don't

19  worry.  I really do enjoy working at Head Kandy.

20  It's a great thing.  And doing lives doesn't feel

21  like work.

22          He writes back:  I know, but everyone

23  needs a break and you need to show your kids

24  balance.

25          You write:  I have to go live every day

Page 232

1    I'm there.  My idea for the must-have stuff.  I'll

2    show them what to do.  Show them that to go to

3    Cancun you have to work.  Ha, ha.

4         And he writes:  Bikinis?

5         You write:  Ha, ha, no.  I ain't that

6    skinny.

7         He writes:  Topless?  They do that there.

8         You write:  Maybe after a boob job.

9    A  Okay.

10   Q  I'll go at spring break.

11   A  Okay.

12   Q  And then he writes:  Is that an expense?

13        And then you say that you are going to

14   hire chicks for him.

15   A  Yeah, I try to take the focus off of me.

16   Okay.

17   Q  Okay.

18        Were you serious about hiring chicks for

19   him or were you joking?

20   A  No, I was trying to take -- no, I was

21   joking, but I was trying to take the focus -- like

22   I told you, I laughed.  I tried to joke to make

23   myself not be in an awkward situation.  And so

24   when he was trying to talk to me about it, I tried

25   to take the focus off of me.  Like, you can have

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 233

1   someone off in a bikini, but ain't gonna be me.

2   It's not going to be me.

3      Q  Okay.

4      A  He can hire somebody else to wear a bikini

5   for him to go live and topless, and not me.

6   That's what I meant.

7      Q  Okay.  And so where does he say you should

8   go topless live?

9      A  Well, we're talking -- you just said I

10  said I have to go live.  And then he says in a

11  bikini.  That's exactly the conversation.  It

12  says:  I just showed them that to go to Cancun you

13  have to work.

14         And we're talking about me going live in

15  Cancun.  You are not going to twist this.  This is

16  exactly how the conversation went and he said

17  "topless."

18     Q  I'm just -- I'm just --

19     A  Sorry.  No.  Sorry.  That offends me and

20  I'm not going to let you twist this.  He said --

21     Q  They do --

22     A  -- "topless."

23     Q  They do -- but -- but "they," who is "they

24  do that"?  They do what, topless lives in Cancun?

25  I'm not -- I'm not following you.

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 234

1     A  I don't know.  You will have to ask Jon

2  what he meant about bringing up being topless in

3  Cancun, because I didn't say topless in Cancun.  I

4  just wanted --

5     **Q  Have you ever talked to him about what he**

6  **meant by that?**

7     A  No.

8     **Q  Okay.**

9     A  I didn't want to, because I didn't need to

10  be in a bikini or topless in front of Jon

11  Rosenbaum.

12     **Q  Okay.**

13        **Where else do you want me to go?**

14     A  Well, you said on 9/22 I texted him and

15  told him that I had a -- that I told him I was

16  getting a boob job on 9/22.  So I just wanted to

17  clarify that that did -- I just am trying to make

18  sure that my timeline is right, also, if you are

19  questioning me about it.

20     **Q  Okay.  Fair enough.  Hold on.**

21     A  Sorry.  That's --

22     **Q  I --**

23        (Multiple people speaking simultaneously.)

24     **Q  (BY MR. LOEB)  I was not tracking the 9/22**

25  **reference.  Hang on.**

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 235

1    A  Sorry.

2    Q  Yeah.  It's okay.  It happens.  No

3  offense.

4       It was 9/15 and it's in the same context

5  as the --

6    A  Oh, okay.  So it is the same thread of

7  where he brought up me being --

8    Q  It is.

9    A  I just wanted to clarify that and I wanted

10  it on the record, because I didn't just openly

11  tell Jon Rosenbaum that I had a boob job planned

12  on 9/22, which you stated.  So I wanted to clarify

13  that.

14       Sorry.  My brain doesn't move past when

15  someone is incorrect about something like that.

16    Q  Okay.  Well, you know, we --

17    A  Sorry.  This is my life and -- this is my

18  life.

19    Q  Well, I'm glad to know it's your life.  We

20  can't -- I mean, we do have the text showing where

21  you are informing Mr. Rosenbaum that you are

22  having a boob job in January, right?

23    A  After he suggested I go live topless is

24  what I said.  And then you said that is not true.

25  So I wanted to clarify that on the record.  You

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 236

1  stated that it was on 9/22, so I wanted to make

2  sure that I was not being incorrect.  That is all

3  I wanted to do.  So we can now move on.

4      Q  Well, we might as well continue on with

5  your conversation, because then you say you had --

6  legit have a boob job in January.  Then you talk

7  with Mr. Rosenbaum.  Rather than just shutting off

8  the conversation, you continue on with him to tell

9  him about the plastic surgery that you had in

10  Mexico, right?

11      MR. CONVERSE:  Objection, form.

12      A  Yeah, he continued to ask questions.

13      Q  (BY MR. LOEB)  And you talk about, I

14  guess, whatever surgery occurred in Mexico with

15  you, and then you attach an image.  What image did

16  you send to him?

17      A  A picture of me fat.

18      Q  All right.

19      A  Because he said he does not like fat

20  people.

21      Q  Okay.  You said -- and then you continue

22  on.  He says:  Don't get a boob job there.

23      And then you go on to say:  For real, I'm

24  going in Charlotte.  I don't think I can do

25  another Mexico surgery.

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 237

1          Do you see that?

2     A  We were talking about surgeries now at

3  this point.  Like, I didn't feel like it was

4  focused on -- sure, maybe it was the surgery, but

5  to me the conversation was shifting.  So, okay.

6     **Q  But you are still indicating to him that,**

7  **for real, you are going to get a boob job in**

8  **Charlotte.  You have already told him.  Why are**

9  **you telling him again?**

10    A  Because he said:  Don't get a boob job

11 there.  He said:  Don't get a boob job there.

12          And I said:  I'm going in Charlotte.

13    **Q  Do you think it was appropriate for you to**

14 **be talking about those things with him?**

15    A  Do you think that it's appropriate for him

16 to tell me to go topless, and know how to handle

17 how I should handle what he is saying to me that's

18 inappropriate?  He's my superior in a job.  It was

19 never appropriate, absolutely not.  Do I think

20 this is appropriate?  No, Ethan.  And did I ask

21 him to talk to me about going topless live in

22 Mexico?  No.

23    **Q  Do you think --**

24    A  Next time I'm in that position I'll be

25 sure to handle it differently.  Thank you for the

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 238

1  advice of what is appropriate and what is not, and

2  I hope you give him the same spiel.

3      Q  Do you think it was appropriate for you to

4  be engaging in this conversation?

5      A  I think that until you are in the shoes of

6  a person who is being treated the way that I was

7  treated, you have no right to tell me how or how I

8  should not act.

9      Q  All right.  And from time to time while

10  you were at Head Kandy, did you send texts or

11  electronic messages of yourself naked to other

12  employees?

13      A  Can you show me?

14      Q  No.  I'm asking whether or not you have a

15  recollection of you sending pictures of yourself

16  naked to other employees; yes or no?

17      A  Like sexual pictures of myself naked to

18  employees?  Like, are you --

19      Q  Did you send -- did you send -- just

20  answer my question.  Did you send any pictures of

21  yourself naked to any employees while you were at

22  Head Kandy?

23      A  Not that I recall.

24      Q  So, we were talking about the

25  November 20th meeting, and you were getting ready

**HEAD KANDY LLC vs KAYLA MCNEILL**
**Kayla M. McNeill on 07/12/2024**

1    to start telling me about what happened.  Now that

2    we've resolved the issue that you asked us to talk

3    about, can you tell us about the November 20

4    meeting?

5        A  I had finally felt like I had had enough

6    of the way that Jon was treating me.  I felt like

7    I could avoid him for a while.  So after the

8    October 4th incident, where he showered in my

9    office and exposed himself and asked for a towel,

10   I didn't -- that's when my depression and

11   everything really started to feel like I didn't

12   know what to do, and that I didn't know what to

13   say or how to handle any of it.  Because I -- he

14   kept threatening me that he was going to liquidate

15   the company.

16          So I had reached out to Bryan Feldman

17   on -- On October 17 Jon came back and said we

18   needed to do yoga.  And I lied and said that I had

19   a meeting.  And there's text messages between

20   Kaylin and I where we were trying to avoid having

21   to be put in that situation.  And I -- I didn't do

22   yoga and Kaylin did.

23          And the next day he basically immediately

24   started screaming at me, telling me that they were

25   going to liquidate the company, that the company

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 240

1   was worth nothing, that Jerome is over all of it.

2   And this had been, like, the first that I had

3   heard that, like, Jerome felt so passionately

4   angry, according to Jon.

5        So I texted Bryan Feldman and I texted

6   Jerome, and asked if they were liquidating the

7   company.  And they said -- Bryan said I was crazy,

8   or something to that effect.

9        And then the conversation went on with

10  Bryan Feldman.  That I basically started leaning

11  in to him, telling him what was going on with Jon.

12  Like, it was getting to be too much.  And I

13  wasn't -- and he said, You need to go talk to

14  Jerome.

15       And so I believe that was, like, maybe

16  November 4th when he was, like, You have to go

17  talk to Jerome.

18       And I said, Jerome doesn't want to hear

19  what I have to say.  And I meant that because it's

20  his friend.  Right?  Like, Jon made it a point to

21  let me know every day that him and Jerome were

22  best friends, and that they go back like brothers,

23  and that he had stolen all this money from Jerome.

24  And Jerome just continued to be his friend, and

25  that he was so rich, and all these things.

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 241

1          It was weird, but he wanted me to feel

2    like there was nothing I could say that would make

3    Jerome in any way think that Jon was a bad person,

4    I guess.  And things kind of slowed down a little

5    bit.  Like, he didn't come back to North Carolina

6    for a little bit.  I can't remember exactly, but I

7    know that on November 10th he texted me and said,

8    You looked really good in your live video this

9    morning.

10          And I didn't even say thanks.  I don't

11   remember.  And then I had sent him a TikTok that I

12   had made of a transition of me doing my hair.  And

13   he said, You are so hot, you're hotter -- or too

14   hot for your followers, or something.  Like --

15     **Q  Ms. McNeill, do you remember -- do you**

16   **remember the question I asked you?**

17     A  Yeah.  Well, you asked me leading up to

18   why.  And so, I'm sorry that you --

19     **Q  No, I said --**

20          (Multiple people speaking simultaneously.)

21     **Q  (BY MR. LOEB)  No.  I said tell me about**

22   **the November 20th meeting.  That's what I asked**

23   **you to tell me about.  Tell me about your**

24   **recollection of what happened at the November 20th**

25   **meeting, ma'am.**

**HEAD KANDY LLC vs KAYLA MCNEILL**
**Kayla M. McNeill on 07/12/2024**

1       A  I flew to Miami to tell Jerome exactly

2   what happened.  And I'm telling you right now

3   about what Jon Rosenbaum did and how he was really

4   aggressive with every single person that worked at

5   Head Kandy; that he screamed at every one; that he

6   didn't know what he was doing; that Brandi was

7   making bad business decisions for the company.

8           I said that he -- I asked him not to have

9   Jon come back because of the things he had done to

10  me.  I said, Please do not let Jon come back to

11  that warehouse.

12          And he said to me that he would take care

13  of it, that he would handle it.  He made me feel

14  like he heard me.  He made me feel like I

15  mattered, that he cared, and that it was going to

16  get handled.  So that's what happened.  And I

17  cried.  And his wife handed me tissues.  And she

18  cooked us breakfast.  And he heard me say and she

19  heard me say everything that I said about Jon.

20  And it wasn't just business-related, and it wasn't

21  just the sexual harassment that was related.  I

22  stood up for every single person in that company

23  that he was being horrific to.  And I said,

24  Please, do not let him come back to the warehouse.

25  I don't like being around him, and if this doesn't

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 243

1  change I'm going to have to leave for my mental

2  health.

3      Q  Anything else?

4      A  And I left.  And I left.  And he hugged me

5  and he told me everything was going to be fine.

6  His wife hugged me.  We said our good-byes.

7          And then, weirdly, he never followed up

8  with me.  He didn't check on me the next day.  He

9  didn't ask if I was okay.  He didn't -- nothing.

10  Nothing.  That was it.  Like, I voiced my -- I

11  finally got enough courage after all of what I had

12  gone through, and told by everyone, Tell Jerome,

13  just tell Jerome.  And I finally did.  And then

14  Bryan Feldman stopped talking to me the next day.

15          I talked to Bryan Feldman every single day

16  for four and a half years.  And I fly to tell,

17  finally, the concerns that I have, and he just

18  ghosts me?  No one -- no one cared.  And then they

19  demoted me and made me report to him.

20      Q  Did you bring the texts with you for the

21  November 20th meeting?

22      A  I just told Jerome.  They're written on my

23  paper, the inappropriate things that he had been

24  saying to me.  He didn't ask to see the text

25  messages.

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 244

1    Q  So then the answer is you did not bring a

2  copy of the texts to share with Jerome, correct?

3    A  Not true.  I had my phone and he very

4  easily could have said, Can I see the text

5  messages?  And he did not.  I did not print them

6  off, but they were with me.  Yes, the text

7  messages were with me.

8    Q  And did you have -- did you say, And here

9  they are right here, Jerome, look at the texts?

10  Did you do that?

11    A  No.  I told him and he cared.  He was

12  replying like he was concerned.  He was responding

13  like it mattered.  He didn't make me feel like he

14  didn't believe me or anything.  He made me feel

15  safe and that it was going to be okay, and that he

16  was going to take care of it.  So, no, I didn't

17  throw text messages in his face, but he knew.  I

18  told him.

19    Q  And after -- anything else about the

20  meeting you can tell me about?

21    A  Not that I can recall.

22    Q  Excuse me.  I can't hear you.

23    A  Not that I can recall.

24    Q  Where in the Falic house did the meeting

25  occur?

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 245

1      A  In the kitchen.

2      **Q  Was there, like, a table inside the**

3  **kitchen?**

4      A  Yes.

5      **Q  And was Ms. Falic there for the entire**

6  **meeting?**

7      A  She walked in and out of the room, but she

8  was there for the majority of it.

9      **Q  Did she say anything?**

10     A  Yeah.

11     **Q  In between the time you and Mr. Falic were**

12  **talking, she offered statements?**

13     A  You can tell that she's a mom.  She would

14  make eye contact with me and give me this smile

15  of, like, empathy that, like, she felt bad.  So

16  she didn't say anything, but she definitely knew

17  that I was needing, like, the comfort of a mom in

18  that moment when I was telling Jerome what was

19  going on.

20         She's a very nice lady.  She -- she

21  brought me tissues and she cooked Dusty breakfast.

22  I couldn't eat I was so sick to my stomach.  She

23  was so kind, honestly.  She really was.  She

24  hugged me and she showed me around her patio, and

25  was like telling me how they installed this thing,

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 246

1  these doors -- I don't know -- and about how their

2  family comes over.  She told me it was going to be

3  okay.  And she hugged me and then I left.

4      **Q   Anything else you can tell me about any**

5  **interaction you had with Mrs. Falic during that**

6  **November 20th meeting?**

7      A  Not that I can recall.

8      **Q  And you mentioned that Jon Rosenbaum**

9  **showered in your office?**

10     A  So the way that the warehouse is set up is

11  that there was a shower upstairs.  And then there

12  is a shower at the end of the hall.  And then

13  there is a shower in between, like, Kaylin's

14  office and my office.  It was like a Jack-and-Jill

15  bathroom, and that is where Jon showered.

16     **Q  Okay.  And did you know that he was taking**

17  **a shower?**

18     A  He said to -- right after yoga that he

19  needed to take a shower.  And we were standing in

20  Kaylin's office and it was -- I was there and

21  Amber was there.  I don't remember if Silvana was

22  there or not.  I know she was in and out.  So

23  Amber, Kaylin, I, Jon.  And we were standing in

24  her office.  Kaylin was sitting.  And he said, I

25  need to take a shower.  And Kaylin said, Upstairs,

**HEAD KANDY LLC vs KAYLA MCNEILL**
**Kayla M. McNeill on 07/12/2024**

1  if you go out into the warehouse and you go

2  upstairs, there is a shower upstairs.  And it's

3  private.  Like, she didn't say that, but, like,

4  that's what she meant.  We just thought, well,

5  there is a whole apartment that Ryan stays in, so

6  shower upstairs.

7      And he said that he didn't want to shower

8  where the faggot showered and get the gay disease

9  and, like, joked about it.  And we knew he was

10  talking about Ryan because the shower upstairs and

11  the room that was put in, was put in because Ryan

12  would stay at the warehouse to save Head Kandy

13  money when he would travel.  And Ryan was not

14  there at the time.  So there was an open bathroom,

15  private, upstairs.  And he said, No, I don't want

16  to shower where the faggot showers.

17      And I said, At the end of the hallway,

18  across from your office, is a shower, so you could

19  use that one.  And he said, No, I'm going to

20  shower right there.  And he pointed to the shower

21  right in Kaylin's office.

22      And I said, Okay.  Like, I didn't think --

23  I didn't think -- he's showering, right?  So,

24  okay.

25    **Q  By the way, when did this -- October 17?**

**HEAD KANDY LLC vs KAYLA MCNEILL**
**Kayla M. McNeill on 07/12/2024**

1      A   No, this was October 4th.

**2      Q   Okay.**

3      A   And I didn't assist in making sure he -- I

4    didn't pay any mind to what he needed to do.  I

5    just went about living.  And I was working at my

6    desk, and he opened the door.  I was sitting at my

7    desk.  And right across from my desk is the door

8    to the bathroom and the door, the exit door.

9    They're like side by side.  And my office door was

10   like wide open.  And I had these two chairs and

11   they were yellow.  And they kind of like tilt into

12   each other, so it kind of covers part of the door

13   a little bit from where I was sitting at my desk.

14        And at first I thought he was just poking

15   his head out, so I kind of glanced up.  And he was

16   standing there naked, butt naked.  And he said, Do

17   you have a towel?  And I went, Oh, my God.  Like,

18   it just caught me off guard.  Obviously it very

19   much caught me off guard.

20        And I kind of froze for a sec.  I

21   obviously looked away.  And I don't -- I didn't

22   give any attention to it.  And I walked out the

23   door.  I went to the right.  Silvana was sitting

24   at the front desk.  And I looked at her and I

25   immediately started crying.  I don't know if she

**HEAD KANDY LLC vs KAYLA MCNEILL**
**Kayla M. McNeill on 07/12/2024**

1   saw me crying or not, but I immediately in that

2   moment knew this had gone way too far.  Like, this

3   is too much.  Like, first it was the yoga, and I

4   thought the yoga was weird.  But now, like -- now

5   I'm being subjected to, like -- it was too much.

6          And I texted Kaylin, grabbed Jon a towel.

7   And I was so, like, flustered that I -- I realized

8   that I accidentally texted the group text between

9   Jon and Kaylin and I.  And I was like, Oh, shit.

10  Like, I was panicking.  I was crying.  And then I

11  just sent, like, a ha, ha after because I didn't

12  want him to think, like -- I just wanted to run

13  away.  Like, I did not know how to ever handle --

14  it was too much.

15         I walked out into the warehouse, and Amber

16  was standing at the time clock thing.  And there

17  is a door right there.  And by this point I was

18  bawling.  I was crying and I just said, I just saw

19  Jon frickin' naked.  I said the F word.  And she

20  said, What?  Like, she was really confused or

21  something.  And I said, Where's Kaylin?  She said,

22  I don't know.  And she was just looking around

23  like she had no clue what was going on.

24         And I walked out the door, and my car was

25  sitting right by the trash can.  There is like a

**HEAD KANDY LLC vs KAYLA MCNEILL**
**Kayla M. McNeill on 07/12/2024**

1  trash can at the end of that.  And I went out and

2  I sat in my car and I cried because I didn't want

3  Dusty to see me, because I knew -- (pause in the

4  proceedings) -- I knew that, like, he would get

5  really upset or not know how to handle what had

6  just happened, and I didn't know what to say.  I

7  didn't know how to feel.

8      And then Kaylin came out and she said to

9  me, What is wrong?  And I was crying and shaking

10  and I told her.  And I said, Kaylin, we're done.

11  You can't give him rides anymore because he was

12  making Kaylin give him rides to the hotel every

13  day.  He would make her, after work, drive him to

14  her -- to his hotel.  And he would always make

15  really inappropriate comments to her like when she

16  was driving him home.  Like, Oh, if your kid

17  wasn't with us you could come up with us and have

18  a drink or go in and have a drink, or something

19  like that.  And that was -- I felt like the line

20  had just been crossed.  Like, it was too much.

21  And she didn't need to be alone with him and

22  neither did I.  And I didn't -- I didn't know what

23  to say.  I didn't now how to -- I've never been in

24  a situation like that, and I didn't know how to

25  handle it, being that he kept telling me over and

**HEAD KANDY LLC vs KAYLA MCNEILL**
**Kayla M. McNeill on 07/12/2024**

Page 251

1   over that he was Jerome's best friend, and that

2   they were so tight, and -- I didn't know what to

3   do.

4        And so I waited a little while before I

5   finally told Dusty.  It really started to eat at

6   me.  And that's when my mental health and just

7   everything started to just deteriorate really bad.

8   I -- I didn't want to be there anymore.  I wanted

9   to avoid him.  I didn't want to talk to him, but

10  at the same time it was my livelihood.

11       So I finally told Dusty on October 27 what

12  happened, and he immediately called Bryan Feldman.

13  He had never talked to Bryan Feldman before on the

14  phone, ever, like that.  And he texted him and

15  said, Can I call you?  And he talked to Bryan

16  Feldman.  And Bryan Feldman told him, We have to

17  tell Jerome.  And, like, he kind of felt like he

18  was being blown off, too, I guess.

19       I don't know.  It was -- I felt like

20  everything I had worked for, everything that I had

21  poured my heart and my soul into, and, like, was

22  just -- like, I didn't know how to -- like, what

23  was I going to do?  It was my job.  It was my

24  livelihood.  It was my kids, how I feed my kids.

25  I -- I was scared to say anything.  I wanted it to

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 252

1  just stop.  I wanted it to just end.

2       And then that's when Jon started to get,

3  like, really mean.  Like, that's when, like, on

4  October 19 or whatever, he told me he was -- they

5  were going to liquidate the company and stuff.

6  Like, his threats got progressively more

7  aggressive.  But then he somehow always had the

8  ability to, like, manipulate me.

9       I learned a lot about myself and my

10 character traits in this whole thing.  And he

11 definitely knew, like most predators do, who to --

12 who to target.

13      When I finally got enough courage to tell

14 Jerome, I really thought something was going to

15 change.  I really thought that -- I mean, at least

16 he could keep him away from me.  He could at least

17 tell him not to come back to the warehouse, you

18 know.  If nothing else, just keep me separated.

19 Like, he didn't have to come.  He didn't do

20 anything when he came, and I told Jerome that.  I

21 said, I don't know why he keeps coming.  I said,

22 He does nothing when he comes.  I told Jerome, I

23 sat there at that table and I said, He does

24 nothing when he comes.  He just sits in his office

25 and screams at us, and shuts the door, and -- why

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 253

1    can't he do that from his own office at his house?

2    And I thought Jerome was going to do something.

3        Q   Now, after the meeting, do you recall

4    texting Mr. Rosenbaum the next day about your

5    meeting with Mr. Falic?

6        A   Yeah.  I hoped that it was going -- I knew

7    that he wasn't going to remove Jon from the

8    business.  That's not what I was asking for.  I

9    was asking him to keep Jon away from me.  So I

10   said -- I went and talked to Jerome.

11       Q   Here's the text.  You write to

12   Mr. Rosenbaum:  I flew to Miami.  I took your

13   talk-to-Jerome advice.

14           And he asks:  What's his advice?

15           And you say:  No, I took your advice to

16   talk to him, and just basically voiced my concerns

17   and said we have to come up with goals and plans.

18   It's the blind leading the blind.  It's a revenue

19   new customer's profit.  We can't have it all.  We

20   have to start with one to lead to each other.  He

21   wrote that he agreed.

22           And now I need us to work as a team.  I

23   told him, I don't work for you.  You are not my

24   boss.

25       A   Yes.

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 254

1      Q   That you and I have to do this together.

2   We can disagree all day long, but we have to

3   disagree in conversation together.

4      A   Correct.

5      Q   He writes, Okay.

6          And then you write back, Would you like to

7   be on the meeting at 2 for this?

8      A   Correct.

9      Q   Do you recall engaging in that text

10   exchange with Mr. Rosenbaum?

11     A   I recall immediately going back to

12   business on Monday morning, hoping we could be

13   professional after I had just told Jerome what

14   happened.  I wasn't talking about anything

15   personal here.  I was saying that if you are not

16   going anywhere, like, don't come back to the

17   warehouse.

18         Like, I did exactly what I thought I was

19   supposed to do, was continue to do my job.  This

20   was on Monday morning.

21     Q   I think my question was do you recall

22   exchanging this text communication, ma'am.

23     A   Yes.

24     Q   I didn't ask about you going back to the

25   office.  I just said, do you recall exchanging

Page 255

1   this text communication?

2       A   Yes.

3       Q   Okay.  And not once in here do you

4   describe to Mr. Rosenbaum any of what it is that

5   you just spent the past half hour telling me,

6   correct?

7       A   Are you asking me if I --

8       Q   I just need you to say yes or no.  You

9   know what I'm asking you.  Did you spend any --

10  did you -- the text exchange that you had with

11  Mr. Rosenbaum here, nothing in here describes

12  about your conversation that you alleged to have

13  had with Mr. Falic about there being sexual

14  harassment or inappropriate conduct, correct?

15      A   Jon didn't need told.  He knew.  So

16  correct, I didn't bring it up because he knew what

17  happened.  So, no, I did not.

18      Q   And, in fact, you invite Mr. Rosenbaum,

19  after telling him about the meeting and

20  summarizing it, you ask him to join in a meeting

21  with you and others, correct?

22      A   On Zoom.

23      Q   Correct.  But you asked that he join in a

24  meeting, correct?

25      A   That involved the company and business,

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 256

1   correct.

2       Q  And isn't it true that towards the end of

3   the time that you were at Head Kandy, you

4   continued to compliment Mr. Rosenbaum and say that

5   you looked up to him?

6       A  I did.  I did.  As a businessperson, I

7   did.  And, again, you are trying to complicate two

8   very different issues.

9       Q  Well --

10      A  I wanted -- I -- I knew Jerome was not

11  going to get rid of Jon.  That was obvious.

12  Right?

13          So I asked Jerome to make sure he didn't

14  come back to the warehouse, which would stop the

15  behavior of him touching me.  And I hoped that

16  Jerome was going to tell him.  I don't know what

17  Jerome was going to do.  I went to management of

18  the company and the managing member and did what I

19  was supposed to do.  From there forward I was only

20  supposed to do my job.  There was a meeting about

21  marketing or something that involved Jon.

22          So was I supposed to start making sure

23  that the company failed and didn't invite him to

24  the business meetings?  Because I was trying to

25  continue to grow the company and do what I was

Page 257

1   supposed to do so that I didn't -- so I could go

2   back to doing what we were supposed to do, which

3   is what Jon was supposed to be brought in to do,

4   which was grow the company, and work, and be

5   professional, because that's what Jerome brought

6   him in to do.

7        Q   All right.  You have alleged that Head

8   Kandy has defamed you.

9        A   Yes.

10       Q   Who is it at Head Kandy that defamed you?

11       A   Well, I can tell you Mindy.  I can tell

12  you the people that Mindy told lies about me to.

13  I can tell you that her affidavit, the voice

14  messages, the entire -- the entire deposition

15  yesterday proved that Angela Porta was told by

16  Mindy every lie under the sun.  Ryan.  She said

17  that Ryan said all kinds of things according to

18  Angela Porta.  They filed a public document about

19  me that was complete lies.

20       Q   What public document is that?

21       A   They filed a federal lawsuit saying that

22  they paid for my weight loss surgeries, just one

23  little lie, knowing that they did not.

24           They said that I stole, even though I was

25  able to prove clearly by an expert witness and by

Page 258

1   proof that I did not.  And they still managed to

2   make sure they got that out there publicly.

3        So, yes, I do believe that they defamed me

4   in many ways.

5        **Q  So what -- what -- what, other than the**

6   **filings and the lawsuit, can you tell me that you**

7   **believe to be defamation?**

8        A  Other than the lawsuit?

9        **Q  Yes, ma'am.  You mentioned the federal**

10  **lawsuit.  You mentioned Ms. -- you said Mindy.  I**

11  **assume that meant Mindy McDermaid?**

12       A  Mindy McDermaid was telling people that I

13  had -- well, according to letters received, that I

14  had stolen.

15       **Q  When did she say that?**

16       A  I had -- she just had made a lot of these

17  allegations to third parties so --

18       **Q  I need you to go each one --**

19       A  I'm telling --

20       **Q  No, I just need you to say she -- she --**

21  **Ms. -- and I'm talking about things outside of the**

22  **lawsuit.  Ms. McDermaid's first act of defamation**

23  **is that she accused you of stealing to third**

24  **parties.  When did that happen?**

25       A  I just know the letter that was sent in to

Page 259

```
 1   the company on December 3 of 2022.  I know that on

 2   February 3rd of 2023, the voice messages that

 3   Angela Porta sent to customers, to all the people

 4   she was talking to me about, that Mindy had told

 5   her things about me.

 6       Q  Anything else?

 7       A  I know that Melissa Keeney, who we raced

 8   with our whole lives, told the entire club that I

 9   was a thief and that I -- that I was a liar.

10   Stuff like that.

11       Q  Well, I need to know it all.  What

12   other -- what other -- who is Melissa Keeney?  Is

13   she an employee of Head Kandy?

14       A  I don't know.  You will have to check your

15   records.  She was.  I don't know if she still is,

16   but she was.

17       Q  And when she made these statements you

18   have alleged, was she an employee of Head Kandy?

19       A  Yes.

20       Q  Okay.  She told your club that you were a

21   thief?

22       A  Well, she told affiliates and she told

23   other people in our race club that I was a thief.

24          She said that I -- or some of the other

25   things that I know that Mindy had said, that I'm
```

Page 260

1    assuming Melissa got her information from Mindy.

2    But Mindy told people that I took 3,000 orders and

3    packed them up, and put them in a room and hid

4    them and hoped that no one would find them; that I

5    changed the password to the customer service

6    e-mail to lock them out; that I told warehouse

7    employees not to come to work, and that's why they

8    were behind on three -- or all their thousands of

9    orders.  They blamed me for the problems that they

10   were having.  They told people that I was the

11   reason that the company had too much inventory.

12   They said that I was reaching out to affiliates

13   and defaming Jerome Falic.

14        The list is endless.  I mean, they said

15   that I was -- oh, that I purchased $50,000 in hair

16   care from Calgary.  I heard that from affiliates,

17   so obviously they were talking about it.  But I'm

18   not going to be able to recall every single thing

19   in this moment, but that's some of them that I can

20   recall right now.

21       Q  Did you hear this directly from these

22   individuals that you allege the statements were

23   made, or did you hear it thirdhand, like

24   secondhand?

25       A  Oh, no.  I heard it firsthand.

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 261

1      Q  You heard all of these things from Mindy

2   McDermaid firsthand?

3      A  Well, I heard -- no, the people telling

4   everyone the information and --

5      Q  Did you hear?

6      A  -- Mindy --

7      Q  Did you hear Mindy McDermaid say these

8   things; yes or no?

9      A  Mindy McDermaid filed an affidavit.

10     Q  I'm talking about outside the lawsuit.

11  Did you hear Mindy McDermaid say these things; yes

12  or no?

13     A  I read the text messages that Mindy sent

14  about me, yes.

15     Q  Okay.  And what text messages are you

16  referring to?

17     A  Well, let me continue really quick that

18  Mindy McDermaid told --

19     Q  No, just --

20     A  Hang on.  Let me --

21     Q  No, ma'am.  You know --

22     A  I can tell you the text that I read.  I'm

23  trying to tell you --

24     Q  No -- no, ma'am.  You need to --

25     A  My time is up.

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 262

1     Q  -- answer my --

2     A  Has it been seven hours?

3     Q  No.

4     A  I'm done.  Has it been seven hours?

5     I'm --

6     Q  No.  Here's the problem --

7         MR. CONVERSE:  Ethan -- Ethan, I let it go

8     a few times.  You got to let her answer the

9     questions.

10         MR. LOEB:  No, she --

11         MR. CONVERSE:  I understand --

12         MR. LOEB:  She -- she --

13         MR. CONVERSE:  I understand your pending

14     question, but before this question you cut her off

15     a few times and she just wants --

16         MR. LOEB:  Because she -- because, all due

17     respect, Antonio, she's not answering the

18     question.  I'm not going to debate it with you.

19     I'll let the record reflect it.  And if we've got

20     to -- which I want to avoid -- if I got to go back

21     before the judge, I will, but she just needs to

22     answer the question.  And if we're playing this,

23     We're going to drag this out and see the seven-

24     hour clock, so be it.  I'm going to go back before

25     the judge, as I indicated to you on the phone

Page 263

1  anyways to ask for more time, because rather than

2  just answer the question, we're getting these

3  long, extended narratives that are not responsive.

4  So, yes --

5          (Multiple people speaking simultaneously.)

6          MR. LOEB:  Hold on, please.  Let me finish

7  and I'll let you respond.

8          MR. CONVERSE:  (Indiscernible.)  All

9  right.

10         MR. LOEB:  No worries.  But I'm at a point

11 now where it's 6:37 on a Friday.  I've got a

12 family dinner set for 7, and I'm having to, yes,

13 ask Ms. McNeill to just please answer the question

14 directly, instead of going on and editorializing.

15         So that's my piece.  If we need to take a

16 break, I'm fine to take a break to let everybody

17 cool off.  It's late.  But I'm not going to --

18 we're not going to sit here and just keep doing

19 this to run out the clock.

20         Go ahead, Antonio.  Whatever you need to

21 say, bud.  Go ahead.

22         MR. CONVERSE:  I was going to say -- and

23 you can ask her this, obviously -- I think she's

24 not -- no one is playing a run-up-the-clock game.

25 I think she just said are the seven hours up

Page 264

1   because she's frustrated in the moment.  And I

2   didn't talk to her about what you and I spoke

3   about, so she's -- she was just wondering if it

4   was over.  So it's not -- it's not her playing a

5   run-the-clock -- run-the-clock-out game.  She --

6   she's just frustrated, so --

7        MR. LOEB:  I understand.

8        MR. CONVERSE:  I understand what you are

9   saying about answering the questions.  There were

10  just a couple of times when she was trying to

11  answer a more open-ended question and she felt

12  like she was cut off.  So that -- that's all I was

13  referring to.  And I appreciate what you are

14  saying about answering the question.  So I just --

15  and I want to get through this as well.

16       MR. LOEB:  How about we do this.  Give

17  everybody a chance to reset.  Why don't we take

18  five minutes and then come back.  Okay?

19       MR. CONVERSE:  Okay.  Sounds good.

20       MR. LOEB:  All right.

21    **Q   (BY MR. LOEB)  Before we go off the**

22  **record, any testimony -- before we go off the**

23  **record -- please put the video back on -- any**

24  **testimony you have given so far you want to**

25  **change, modify, supplement, or amend in any way,**

Page 265

1  shape or form?

2      A  No.

3      Q  And do you feel like you have understood

4  the questions that I have asked of you and which

5  you have provided answers?  Correct?

6      A  Yes.

7      Q  I'm sorry.  Could you please speak up,

8  ma'am?

9      A  Yes.

10     Q  Thank you.  We will come back in five

11  minutes.

12         THE VIDEOGRAPHER:  The time is 4:38 p.m.

13  This is the end of media number 5.  We are now off

14  the record.

15         (Recess taken, 4:38 p.m. to 4:47 p.m.)

16         THE VIDEOGRAPHER:  This is the beginning

17  of media number 5 [sic].  The time on the monitor

18  is 4:47 p.m.  We are back on the record.

19         MR. LOEB:  All right.  Back from a break.

20  I've conferred with counsel.  It's 6:47 in the

21  evening, and we are going to suspend the

22  deposition for today and continue on to a

23  different date, whether that is by consent of the

24  parties with another date or whether it's a

25  request that is made to the Court, and see where

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 266

1   it goes from there.  But as I have explained to

2   counsel, there is a need, given the defenses and

3   the counterclaims made against Head Kandy and the

4   forthcoming motion to dismiss.  We're going to

5   need a little more time, but -- so I'm not closing

6   the deposition.  And hopefully with cooperation of

7   counsel we can figure out a game plan going

8   forward to finish Ms. McNeill on behalf of Head

9   Kandy, and then we will take it from there.

10         Before I go off the record or at least

11  turn it over to Mr. Converse to say anything --

12      Q  (BY MR. LOEB)  Ms. McNeill, is there any

13  testimony that you have given so far that you want

14  to change, modify, supplement, or amend in any

15  way, shape, or form?

16      A  Not to my knowledge.

17      Q  Okay.  All right.  And just to make sure,

18  and you probably figured it out because I have

19  asked you this a few times today, is there any

20  question that I have asked in which you have

21  answered that you did not understand?

22      A  No.

23      Q  All right.  And as it pertains to today,

24  given what you have told me about your -- the

25  medication you are on, has that medication

Page 267

1   impaired your ability to testify truthfully and

2   accurately and to recall events as you testified

3   to them today?

4        A   Not that I'm aware of.

5        Q   Okay.  I asked that.  I can tell you some

6   horror stories off the record, but there are

7   reasons that I ask these questions, and it's not

8   to make you feel uncomfortable.

9            And aside from the depression issues that

10  you have described to me, is there any other

11  disability or impairment that you suffer from that

12  impairs your ability to testify under oath

13  truthfully and accurately, and to recall events

14  throughout the course of today's deposition?

15       A   No.

16           MR. LOEB:  Okay.  All right.  We will

17  stand in recess.

18           Antonio, I don't know if you want to add

19  anything on the record, but I have said my piece.

20           MR. CONVERSE:  Thank you.  I'll say that's

21  a fair characterization of our conversation.  You

22  have expressed a desire to continue the

23  deposition.  And I've agreed on behalf of

24  Ms. McNeill to continue our conferral to see if we

25  can potentially come to some terms on that

Page 268

1   request.  And we're going to follow up with each

2   other after this.

3          And I don't think there is anything else

4   that needs to be on the record in that regard at

5   this time.

6          MR. LOEB:  Okay.  Sounds good.

7          Wendy and John, we can go off the record.

8          THE VIDEOGRAPHER:  Ms. Stenographer, would

9   you like to get orders on the record or off the

10  record?

11         THE COURT REPORTER:  If you could please

12  tell me, are you ordering this, Mr. Loeb?

13         MR. LOEB:  Yes, ma'am, we are.

14         THE COURT REPORTER:  And would you like a

15  copy, Mr. Converse?

16         MR. CONVERSE:  Yes, please.  Just the

17  transcript.  We don't need the video at this time.

18         THE COURT REPORTER:  Okay.  Thank you.

19         THE VIDEOGRAPHER:  The time is now 4:51

20  p.m.  We are off the record.

21         WHEREUPON, the within proceedings were

22  adjourned at the approximate hour of 4:51 p.m. on

23  the 12th day of July, 2024.

24         *         *         *         *         *

25

**HEAD KANDY LLC vs KAYLA MCNEILL**
**Kayla M. McNeill on 07/12/2024**

Page 269

```
 1            REPORTER'S CERTIFICATE

 2   STATE OF COLORADO          )
                                )  ss.
 3   CITY AND COUNTY OF DENVER  )

 4         I, WENDY C. HEATH, CSR 14567, CRR, RPR, do

 5   hereby certify that previous to the commencement

 6   of the examination, the said deponent was duly

 7   sworn or affirmed by me to testify to the truth in

 8   relation to the matters in controversy between the

 9   parties hereto; that the said deposition was taken

10   in machine shorthand by me at the time and place

11   aforesaid and was thereafter reduced to

12   typewritten form; that the foregoing is a true

13   transcript of the questions asked, testimony

14   given, and proceedings had.

15         I further certify that I am not employed

16   by, related to, nor of counsel for any of the

17   parties herein, nor otherwise interested in the

18   outcome of this litigation.

19

20         _____

21         Wendy C. Heath, CSR 14567
           Certified Realtime Reporter
22         Registered Professional Reporter

23

24

25
```