**HEAD KANDY, LLC. vs KAYLA MARIE MCNEILL, ET AL.**
**Kayla Marie McNeill, Volume 2 on 09/10/2024**

```
                UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
                 Case No. 23-CV-60345-JB/JMS

HEAD KANDY, LLC              `      )
                                    )
          Plaintiff/Counterclaim    )
          Defendant,                )
                                    )
vs.                                 )
                                    )
KAYLA MARIE MCNEILL,                )
                                    )
          Defendant/Counterclaim    )
          Third Party Claimant,     )
                                    )
vs.                                 )
                                    )
JEROME FALIC and                    )
JONATHAN ROSENBAUM,                 )
                                    )
          Third Party               )
          Defendants.               )
                                    )
-----------------------------------
```

```
                     REMOTE
              VIDEOTAPED DEPOSITION
                       OF
               KAYLA MARIE MCNEILL
                    VOLUME 2
               TAKEN AT 12:19 P.M.
            ON TUESDAY, SEPTEMBER 10, 2024


                  HELD VIA ZOOM




                  Reported by
            Melissa Suzanne Shore
          Verbatim Stenomask Reporter
                 Job 99787
```

**HEAD KANDY, LLC. vs KAYLA MARIE MCNEILL, ET AL.**
**Kayla Marie McNeill, Volume 2 on 09/10/2024**

A P P E A R A N C E S

```
For the Plaintiff:         Carson Sadro, Esquire
                           BARTLETT LOEB HINDS
                             THOMPSON & ANGELOS
                           1001 Water Street, Suite 475
                           Tampa, FL 33602
                           CarsonS@blhtlaw.com
                           Counsel for Head Kandy, LLC


For the Defendants:        Laura E. Burgess, Esquire,
                           L.E. Burgess, P.A.
                           5966 S. Dixie Highway, Suite 300
                           Miami, Florida 33143,

                           Antonio L. Converse, Esquire,
                           Converse Law Group, P.C.
                           600 17th Street
                           Denver, Colorado  80202
                           anthony@converselawgroup.com

                           Jennifer Tiedeken, Esquire
                           Massey, Kelly & Priebe, PLLC
                           125 S. Howes Street, Suite 1100,
                           Fort Collins, CO 80521
                           jennifer@lawfortcollins.com,

                           Jed Ferdinand, Esquire
                           Kathleen B. Moore, Esquire
                           Ferdinand IP Law Group,
                           450 Seventh Avenue, Suite 2300
                           New York, New York 10123,
                           jferdinand@fiplawgroup.com,


Also Present:              Brandi Webb (non-party)
```

**HEAD KANDY, LLC. vs KAYLA MARIE MCNEILL, ET AL.**
**Kayla Marie McNeill, Volume 2 on 09/10/2024**

**Page 272**

* * * * * * * *

INDEX

EXAMINATION                                          Pages

By Ms. Carson Sadro                                    276

* * * * * * * *

Exhibits                         By                  Pages

(NONE OFFERED)

* * * * * * * *

Adjournment                                            327
Witness Certification and Errata Sheet            328,329
Reporter Certification                                 330

Page 273

1        P R O C E E D I N G S

2                                    (12:19 p.m.)

3        THE VIDEOGRAPHER:  This is the beginning

4    of media number one in the deposition of Kayla

5    McNeill in the matter of Head Kandy, LLC,

6    versus Kayla Marie McNeill.  Today's date is

7    September 10th, 2024, and the time is 12:19

8    p.m..  My name is Hayley Grossman, and I am the

9    videographer.  The court reporter is Melissa

10   Shore.  We are here with Huseby Global

11   Litigation.

12        Counsel, please introduce yourselves,

13   after which the court reporter will swear in

14   the witness.

15        MS. SADRO:  Carson Sadro on behalf of Head

16   Kandy, LLC.

17        MS. TIEDEKEN:  And I am Jennifer Tiedeken

18   on behalf of Ms. McNeill.  Laura Burgess and

19   Anthony Converse are also on this Zoom, and

20   they represent Ms. McNeill as well.

21        THE COURT REPORTER:  Okay.  Is that

22   everybody?  All right.  Ms. McNeill, you have

23   consented to testify under penalty of perjury.

24   I need for you to state on the record, "I

25   consent," as well as both counsel.

**HEAD KANDY, LLC. vs KAYLA MARIE MCNEILL, ET AL.**
**Kayla Marie McNeill, Volume 2 on 09/10/2024**

1      THE WITNESS:   I consent.

2      MS. SADRO:     I consent.

3      MS. TIEDEKEN:  I consent.

4      THE COURT REPORTER:  We can begin.  Thank

5   you.

6      MS. SADRO:  All right.  I -- Jennifer, we

7   can address the documents thing when we get to

8   that portion where it may or may not become an

9   issue.  That's fine.

10      MS. TIEDEKEN:  Sure.  I guess I'll just go

11   on the record.  We are going to be producing

12   some documents today responsive to a subpoena

13   received by Ms. McNeill, as well as discovery

14   requests that are due today.  Some of those

15   documents are going to be marked with a

16   confidential designation.  We do not have a

17   formal stipulation in place regarding

18   confidentiality, but the parties have produced

19   confidential documents in this case prior to

20   this deposition.  And we would just ask that

21   Ms. Sadro confirm on the record that for

22   purposes of receiving those documents today

23   that are marked confidential, that she will

24   agree to keep them confidential, preserving all

25   objections to that designation that need to be

Page 275

1   made later.

2       MS. SADRO:  And just for clarity of the

3   record, Jennifer, was there -- are there other

4   things that will be marked confidential besides

5   this audio?

6       MS. TIEDEKEN:  There may be a couple other

7   documents that are marked confidential as well,

8   yes.

9       MS. SADRO:  Okay.  We'll agree for the

10  purposes of receiving those in production

11  today.  But obviously, as Ms. Tiedeken stated,

12  without waiver of any objections.  And I will

13  note, obviously on the record, that we have not

14  yet had an opportunity to review those records

15  to determine whether or not any of those

16  documents or other production items may have

17  been responsive to an earlier discovery

18  request.  It's something we'll have to take up

19  as those documents come in and we're able to

20  review them.  Anything else, Ms. Tiedeken,

21  before I proceed?

22      MS. TIEDEKEN:  Nope, I think we're good to

23  go.

24      MS. SADRO:   Okay.  And before I begin my

25  questioning, I will -- we've stated everybody

HEAD KANDY, LLC. vs KAYLA MARIE MCNEILL, ET AL.
Kayla Marie McNeill, Volume 2 on 09/10/2024

Page 276

1          that's on the record as a party, but I would

2          also note that there is an individual who's

3          identified themselves as Brandi Webb,

4          B-r-a-n-d-I, W-e-b-b-, who is also appearing in

5          the Zoom.

6              KAYLA MARIE MCNEILL - VOLUME 2,

7      having first consented to testify under penalty of

8      perjury, testified and was examined as follows:

9              EXAMINATION BY MS. SADRO

10  Q.  All right.  Now that we have all the formality out

11      of the way, good morning, Ms. McNeill.

12  A.  Good morning.

13  Q.  Good morning.  Is it -- it's 10:30 in Las Vegas,

14      right?

15  A.  It's 9:22.

16  Q.  9:22.  I'm terrible with time changes.  Ms. McNeill,

17      you know that we're back on the second part of your

18      deposition back from July of 2024.  You remember

19      that deposition?

20  A.  I do.

21  Q.  Since that deposition, has there been any portions

22      of your testimony that you believe need to be

23      changed, omitted, modified or supplemented?

24  A.  I do not --

25              MS. TIEDEKEN:  Object to form.  And just,

**HEAD KANDY, LLC. vs KAYLA MARIE MCNEILL, ET AL.**
**Kayla Marie McNeill, Volume 2 on 09/10/2024**

Page 277

```
1              Kayla, please give me a chance to object before
2              you answer.  Thanks.
3   Q.   Ms. McNeill, I don't know if we took this down at a
4        later time.  Can you tell me your date of birth?
5   A.   11/17/1986.
6   Q.   All right.  Tank you.  All right.  So Ms. McNeill,
7        since we've taken the last portion -- first portion
8        of your deposition, I know that you've received
9        factual basis background and findings based on your
10       claims in front of the Florida Commission on Human
11       Rights.  Is that correct?
12  A.   Correct.
13              MS. TIEDEKEN:  Object to form.
14  Q.   And were those for your complaints where with that
15       Commission, you made allegations for discrimination,
16       disparate treatment and retaliation?
17              MS. TIEDEKEN:  Object to form.
18  A.   Can you ask that question again?  Sorry.  That was,
19       like, kind of a lot like.  Can you break it?  I'm
20       sorry?  Just break it down.
21  Q.   Sure.  Sure.  Absolutely.  You remember making more
22       than one complaint, right, with the Florida
23       Commission on Human Rights?
24              MS. TIEDEKEN:  Object to form.
25  A.   Correct.
```

**HEAD KANDY, LLC. vs KAYLA MARIE MCNEILL, ET AL.**
**Kayla Marie McNeill, Volume 2 on 09/10/2024**

Page 278

```
 1  Q.  And one of those complaints was discrimination?

 2          MS. TIEDEKEN:  Object to form.

 3  A.  Correct.

 4  Q.  And to expand on that, discrimination under a couple

 5      of grounds, including harassment and sexual

 6      harassment?

 7          MS. TIEDEKEN:  Object to form.

 8  A.  Yes.

 9  Q.  And then within disparate treatment, you also made

10      claims on the basis of sex, age and religion, right?

11          MS. TIEDEKEN:  Object to form.

12  A.  I did.

13  Q.  And we already talked about retaliation.  Tell me,

14      did you, during those procedures -- proceedings,

15      have the opportunity to place evidence on the

16      record?

17          MS. TIEDEKEN:  Object to form.

18  A.  I went through the interview with the woman with the

19      Florida Human Rights Department, and she asked for,

20      like -- basically she interviewed me and I followed

21      her lead.  So I answered accordingly to what she

22      needed for her information that was she was trying

23      to collect.

24  Q.  Okay.  When she was -- when she was doing that, can

25      you give me kind of a brief rundown of what you and
```

**HEAD KANDY, LLC. vs KAYLA MARIE MCNEILL, ET AL.**
**Kayla Marie McNeill, Volume 2 on 09/10/2024**

1   the interviewee talked about?

2          MS. TIEDEKEN:  Object to form.  And also,

3   previous depositions, your -- Head Kandy has

4   made a claim that this all is confidential and

5   would not come into the litigation.  So I'm

6   curious about your position on that.

7          MR. SADRO:  Can you tell me what you mean?

8          MS. TIEDEKEN:  Sure.  That the proceeding

9   with the Florida Human Relations Commission is

10  a confidential proceeding.  And I believe Head

11  Kandy has gone on the record stating that it is

12  confidential in the sense that it cannot be

13  used in the litigation.  So I was just =-

14         MS. SADRO:  Do you --

15         MR. TIEDEKEN: -- curious as to your

16  position on that.  We don't mind if you ask

17  questions about this.  I don't believe that --

18  believe that the information from the Florida

19  Human Rights Commission can be used, but I just

20  want to get your position on that because I

21  think in prior cases when you've asked about

22  this stuff, the position has been that it's

23  confidential and doesn't come into the

24  litigation.  So if you're going to be taking

25  that position, then I don't think you can ask

Page 280

1  the questions.

2      MS. SADRO:  Okay.  Well, I don't believe I

3  was present during that deposition.  I'm happy

4  to -- if you want to take a break really quick,

5  I can see if somebody else remembers making

6  that designation.  I don't remember making it,

7  but I'm happy to check.

8      MS. TIEDEKEN:  Sure.  Yeah.  I would just

9  say if you're going to lodge the objection,

10  that it can't be used, but I don't think you

11  get to have it both ways.  So I'd just like to

12  know.

13      MS. SADRO:  We'll talk about that when we

14  get to it.  Let me -- let me see if that was

15  made.  Does everybody mind if we step off the

16  record for a brief moment?

17      MS. TIEDEKEN:  I do not mind.

18      THE VIDEOGRAPHER:  The time is at 12:26

19  p.m. and we are off the record.

20  (A short break was taken at 12:26 p.m.)

21  (The proceedings resumed at 12:29 p.m.)

22      THE VIDEOGRAPHER:  This is the beginning

23  of media number two.  The time is 12:29 p.m.

24  and we are back on the record.

25      MS. SADRO:  All right.  When we stepped

**HEAD KANDY, LLC. vs KAYLA MARIE MCNEILL, ET AL.**
**Kayla Marie McNeill, Volume 2 on 09/10/2024**

```
 1              off the record a moment ago, Ms. Tiedeken
 2              brought to my attention that she believed that
 3              my office had previously made an objection or
 4              some further statement about the
 5              confidentiality of the Florida Commission on
 6              Human Rights proceedings.  I have checked.
 7              That is not the recollection that my office
 8              has.  However, if you would like to designate
 9              this portion of her testimony as confidential,
10              of course, without any -- either of us waiving
11              any objection, but same designation, I
12              certainly understand you doing so.  But I'm
13              still going to ask questions about it.
14                   MS. TIEDEKEN:  That's fine.  I just wanted
15              to make sure that you guys weren't taking the
16              position that this stuff was confidential and
17              so we don't need to designate it as
18              confidential.
19                   MS. SADRO:  Yeah.
20      Q.   (Ms. Sadro)  All right.  So Ms. McNeill, we were
21           talking about your interviews with the Florida
22           Commission on Human Rights.  Can you tell me a
23           little bit about what you talked about?
24      A.   Are you asking, like, just the interview that I had
25           with her or, like, how the whole, like -- sorry, can
```

Page 282

```
 1        you -- sorry.  I just want to make sure --
 2   Q.   Sure.
 3   A.   -- I'm answering your question the right way.
 4   Q.   Sure.  What did you discuss during your interview?
 5               MS. TIEDEKEN:  Object to form.
 6   A.   So basically, she asked me to tell her what
 7        happened.
 8   Q.   Okay.  Did you tell her any information that you did
 9        not previously testify to during the first portion
10        of your deposition?
11               MS. TIEDEKEN:  Object to form.
12   A.   I don't recall.
13   Q.   Okay.  Do you believe you would have?
14               MS. TIEDEKEN:  Object to form.
15   A.   I believe and know fact that my story is true.  So I
16        would have only have told her the truth in all of
17        it.  And if the question would have been asked that
18        it would have been answered in the first deposition,
19        than I would have answered it in the first
20        deposition.  But I'm not going to say that -- I
21        didn't tell two different stories, if that's what
22        you're asking.
23   Q.   And that's, I guess, one part of it.  That's a good
24        clarification there to make.  So that helps answer
25        one part of it.  I appreciate that.  Do you believe
```

**HEAD KANDY, LLC. vs KAYLA MARIE MCNEILL, ET AL.**
**Kayla Marie McNeill, Volume 2 on 09/10/2024**

```
 1        that you gave her any additional information?  Did
 2        you tell her that any other action happened on part
 3        of Mr. Rosenbaum?
 4              MS. TIEDEKEN:  Object to form.
 5   A.   No, my -- I had to submit it in writing first.  So I
 6        -- I did not give her anything additional other than
 7        what has been in writing and what I have testified
 8        -- everything that I testified in the injunction
 9        hearing.  There's nothing that is -- that she got
10        more of, if that's what you're asking.  No.
11   Q.   During those proceedings, did you provide any sworn
12        statements to the commission?
13              MS. TIEDEKEN:  Object to form.
14   A.   What do you mean by sworn statements?
15   Q.   Did you have any other witnesses write a statement
16        for you and they would sign it and turn it into the
17        commission?
18   A.   No, I --
19              MS. TIEDEKEN:  Object to form.
20   A.   I believe that we did turn in nine affidavits of  -
21        - I'm not -- I can't recall specifically.  But I
22        believe that we have nine affidavits of people who
23        confirmed the story as they were told, what happened
24        as it was happening.  So I believe that that would
25        have been submitted to her as it was already
```

HEAD KANDY, LLC. vs KAYLA MARIE MCNEILL, ET AL.
Kayla Marie McNeill, Volume 2 on 09/10/2024

Page 284

```
 1         submitted into the, like, the legal docket.

 2   Q.    That was going to be my next question.  Are they the

 3         same affidavits that would have been supplied

 4         previously in your former filings?

 5                  MS. TIEDEKEN:  Object to form.

 6   A.    Correct.

 7   Q.    Okay.  So you're not aware of any new information

 8         from one of these witnesses?

 9                  MS. TIEDEKEN:  Object to form.

10   A.    No, not that I am -- that I am aware of.

11   Q.    Okay.  So I want to kind of talk about these, in

12         turn.  So one of the first claims that you addressed

13         with the commission is harassment based on sex.  Do

14         you remember that?

15   A.    Yeah --

16                  MS. TIEDEKEN: Object to form.

17   A.    I do.

18   Q.    So tell me about the harassment that you experienced

19         as -- at Head Kandy as a result of your sex or

20         gender.

21                  MS. TIEDEKEN:  Object to form.

22   A.    John Rosenbaum is a pig, and everything that came

23         out of his mouth was always to belittle women.  And

24         that in the beauty world, in his mind, he always

25         told me that women were just the face, but the men
```

1     got everything done.  That was always his position.

2     That's always how he treated me.  That's how he

3     treated every single woman that I saw him come in

4     contact with.  So he was in my -- in my business,

5     standing in my warehouse, telling me that Kaylin and

6     I were too pretty to be in the warehouse, that that

7     was not our place, and that that was what men do,

8     and that women are to wear makeup and sit in the

9     office and do office work.  And he would say that it

10     was our job to look pretty and just sell the

11     products, and that that's what women do.

12          So that was the start of it.  It progressed

13     from there to where he then started telling me that

14     he felt that I wasn't as seasoned -- as seasoned in

15     business as the men that he had always been working

16     with.  And that basically he called Kaylin and I

17     little girls.  He just said, you're just little

18     girls.  And I have -- I have text messages.  I have

19     all kinds of where he called Kaylin -- what is she?

20     A twelve year old little girl?  She's just a little

21     girl.  And then he would say, oops, is that sexist,

22     in text messages.  So, I mean, that's as -- as --

23     from what I recall, it being rather sexist and not

24     appropriate.

25  Q.  Did Mr. Rosenbaum ever prevent you from working in

HEAD KANDY, LLC. vs KAYLA MARIE MCNEILL, ET AL.
Kayla Marie McNeill, Volume 2 on 09/10/2024

1        the warehouse?

2    A.   Absolutely.

3             MS. TIEDEKEN:  Object to form.

4    A.   Absolutely.

5    Q.   When did Mr. Rosenbaum prevent you from working in

6        the warehouse?

7    A.   Every day he would tell me, quit working in the

8        warehouse, I need you to be the pretty face.  Every

9        day.

10   Q.   Would you quit working in the warehouse?

11   A.   Yeah.  He would scream at me.  Yeah.

12   Q.   Okay.  And we had talked a little bit before during

13       your last deposition; you were telling us about how

14       your -- you believed your role in Head Kandy to be

15       that of creative director, right?

16             MS. TIEDEKEN:  Object to form.

17   A.   Let's just back up a little bit.  That was my role.

18       I didn't believe my role to be that.  That was what

19       my employment agreement stated.  I did not believe

20       that to be my role.  That was the role.

21   Q.   Okay.  What portions of your role as creative

22       director were you able to complete in office?

23             MS. TIEDEKEN:  Objective form.

24   A.   Ask that again.

25   Q.   What portions of your role, your job as creative

**HEAD KANDY, LLC. vs KAYLA MARIE MCNEILL, ET AL.**
**Kayla Marie McNeill, Volume 2 on 09/10/2024**

1    director, did you complete in the office as opposed

2    to the warehouse?

3                    MS. TIEDEKEN:  Object to form.

4    A.   Well, originally -- if you're asking -- I want to

5         answer this correctly so that it's a fair depiction

6         of what actually happened.  My role was to be the

7         creative director, but I was left to run the company

8         with no assistance, and that was not my job.  So if

9         I didn't do other people's jobs, then the company

10        didn't run.  So yes, I needed to be doing my job as

11        creative director, which then transitioned into

12        shipping lives and packing lives and me talking

13        about the employees within the warehouse.  So I was

14        able to then twist and create content of being a

15        creative director of a brand in the warehouse.  So

16        if you're asking if you think that just my job is to

17        be on the computer, that is incorrect.

18            So I don't really -- I don't understand your

19        question, because you're -- I don't think you

20        understand what my job was.  So can you help me

21        understand so I just want to make sure I'm answering

22        correctly?

23   Q.   Sure.  What portions of your role as creative

24        director did you complete in the workhouse or in the

25        warehouse?  Excuse me.

Page 288

```
 1                      MS. TIEDEKEN:  Object to form.

 2   A.   Well, for, like, I don't know, seven years of the

 3        company, the only area was the warehouse.  There was

 4        no separate office.  So again, I don't really know

 5        what you're asking because of the loca -- I guess

 6        I'm trying really hard to help you and get to what

 7        you need out of my answer, but I'm struggling with

 8        how you're asking it.

 9   Q.   Okay.  You told me a minute ago that sometimes you

10        would go into the warehouse for the live sale,

11        right?

12   A.   Correct.

13   Q.   And in that you would package products?

14                      MS. TIEDEKEN:  Object.

15   Q.   Can you state your answer again, Ms. McNeill?

16   A.   Correct.

17   Q.   Did Mr. Rosenbaum ever prevent you from going into

18        the warehouse to go on a live?

19                      MS. TIEDEKEN:  Object to form.

20   A.   I would say that John Rosenbaum twisted what the

21        actual work that was needed to be done was

22        controlled because he was sexist.  So if it had

23        anything to do with me having a pretty face on

24        camera, he was all for it because that was my -- in

25        his mind, that was the only thing I was good for,
```

Page 289

```
 1         was a pretty face.  Now, if it had something to do
 2         with actual fixing of the company's problems that
 3         they had, that's where I felt -- was to keep the
 4         business actually operating, he prevented that.
 5    Q.   Okay.  What tasks to keep the business operating did
 6         he prevent?
 7                   MS. TIEDEKEN:  Object to form.
 8    A.   I implemented every single aspect of the warehouse,
 9         from barcodes to -- let's just back up.  I
10         implemented every inch of the entire company from
11         the inception.  I created the labels.  I created the
12         barcodes.  I created the way we were going to ship
13         the products.  My husband and I lived in that
14         warehouse for eight years.  And so we then brought
15         in people to try to -- since I feel that -- I was
16         never in charge of anyone, but we were trying to
17         implement a system that the people we hired could
18         then take it and run with it and go, right, so that
19         I could get back to doing what I was supposed to be
20         doing, which was more content related and product
21         development.  But because of the lack of support
22         that I received from the company, I was forced to be
23         in there to help make sure that the company
24         operated.  So it would be computers going down.  It
25         would be barcodes not working.  It would be
```

Page 290

1      duplicated barcodes that someone had -- that Shawna

2      (phonetic) had made on and when she was developing,

3      or, like, putting in -- in building it into the

4      Shopify, or mistakes that Ryan had made by putting

5      in the wrong barcode.  That all trickles down to

6      your warehouse.

7           So the mistakes that the people were making up

8      at the top that I was out in control of, were then

9      trickling down and hurting the warehouse.  So I

10     would then go in to try to help fix all of the

11     problems that Mindy and Ryan were creating.  And

12     John felt like I was better being a pretty face,

13     when there was no one else to come in and fix it

14     because that was it.

15          So did he prevent me from doing my job?  I

16     don't know how to answer that because unfortunately,

17     my job was never to just be creative director

18     according to my employment agreement.

19  Q.  Okay.  Was there ever -- can you think of an example

20      of a specific task or requirement or anything that

21      you were unable to complete because Mr. Rosenbaum

22      believed you were just a pretty face?

23          MS. TIEDEKEN:  Object to form.

24  A.  That was a really big question.  You got to -- you

25      got to break it down for me.

**HEAD KANDY, LLC. vs KAYLA MARIE MCNEILL, ET AL.**
**Kayla Marie McNeill, Volume 2 on 09/10/2024**

Page 291

1  Q.  Sure.

2  A.  You asked that complex question.  I'm sorry.  I

3       don't -- I want to answer correct.  If you could,

4       just for my purposes of the way that my brain, like,

5       takes the question, I need you to break it down way

6       smaller so that I can answer correctly and not --

7       can get it correct.

8  Q.  **Okay.  So I'll contextualize first then, because I'm**

9       **going to be asking you a question based on a comment**

10      **Mr. Rosenbaum made about your appearance or your**

11      **gender.  So in that context --**

12 A.  Okay.

13 Q.  **-- was there ever a task that you were not able to**

14      **complete because of any of those statements?**

15              MS. TIEDEKEN:  Object to form.

16 A.  Is there ever a task that I couldn't complete

17      because why?

18 Q.  **Because of those statements or how that made you**

19      **feel?**

20              MS. TIEDEKEN:  Object to form.  What

21         statements are we talking about?

22 Q.  **Go ahead, Ms. McNeill.**

23 A.  Yeah, like, I don't -- I'm sorry.  I'm having a hard

24      time asking or understanding what you're asking.  Is

25      there a certain task that I wasn't able to perform

Page 292

```
1        because John Rosenbaum told me I couldn't be in the

2        -- in the warehouse?  Is that what you're asking?

3   Q.   Sure.  Let's start there.

4   A.   Okay.  So the answer would be yes.  There was a lot

5        of times that John prevented me from helping fix

6        serious issues that Mindy created or Ryan created,

7        because he would say, you're too pretty to be

8        working in the warehouse.  Don't get your dress

9        dirty, stuff like that all the time.  And one of the

10       incidences is where there was one time that Mindy

11       ordered 300,000 units of a product before we

12       received the PI for it or the pro forma invoice of

13       any kind from Ipsy.  And we received 300,000 sets of

14       something that was supposed to come packaged, and it

15       cost us, like, oh, I don't know, half a million

16       dollars or something.  It was a pretty big expense

17       that she kind of created a mess for us.  And it was

18       just my job to try to fix it.  Like, I had to help.

19       Like, I was the owner of the company.

20            And so she had made these choices of putting us

21       in a very serious predicament financially.  And in

22       the warehouse, we were drowning.  We were really

23       busy with -- with the business side of things that

24       was already rolling.  And then she added a complete

25       -- I would say a Hiroshima atom bomb to the
```

**HEAD KANDY, LLC. vs KAYLA MARIE MCNEILL, ET AL.**
**Kayla Marie McNeill, Volume 2 on 09/10/2024**

1   business.   And I was trying to help figure out what

2   we were going to do with those products.   So I was

3   out in the warehouse, and you would walk out of the

4   warehouse and, right, so you would turn left.   And

5   that's where we kept all the pallets of all of

6   Mindy's overage of products that needed repackaged.

7   And I remember I went and grabbed a knife, a box

8   cutter.   And I grabbed a box cutter, and I walked

9   over to the pallet to, like, cut open the saran wrap

10  that's, like, around the -- the -- the pallet.   And

11  John Rosenbaum followed me out.   It was one of the

12  times that he was at the warehouse.   And I was

13  wearing flips-flops.   And I remember him talking

14  about my toenails being a pretty color.   He walked

15  out, he came to the left, and he's like, those are a

16  pretty toenail color, something to that effect.   And

17  I cut the saran wrap and took the top box off of the

18  palette, and he said, whoa, whoa, whoa, whoa, whoa.

19  You're too pretty to be lifting boxes.

20       So at first I thought he was being like, nice,

21  right.   Like, that seems like a very nice thing of a

22  man to do for a woman to, like, be like, oh, you

23  don't need to be, like, lifting this box.   But then

24  it just basically turned into, let somebody else

25  deal with this.   You're too pretty to be dealing

**HEAD KANDY, LLC. vs KAYLA MARIE MCNEILL, ET AL.**
**Kayla Marie McNeill, Volume 2 on 09/10/2024**

Page 294

```
 1    with this.  I need you to do -- to be where we make
 2    money, because you're the face.  Like, I remember
 3    that like it was yesterday.
 4         So, yeah were there specific incidences where
 5    he prevented me from helping fix serious issues that
 6    -- which led to the -- to the serious issues that
 7    Head Kandy had later?  Yeah, he did do that.
 8 Q. Okay.  Do you remember about when that incident with
 9    the box cutter happened?
10 A. Yeah.  So that probably would have been around the
11    time -- let me see here.  Ipsy came out in -- they
12    did it in waves.  So I want to say it was sometime
13    in September, I would -- I would guess.  And it
14    would have been one of the weeks that John would
15    have been in there, and it would have been when we
16    were trying to figure out what we were going to do
17    with all of the extra inventory of all of the over-
18    ordered Ipsy products that Mindy ordered.  So
19    sometime in September I would probably guess
20 Q. And you may have said the year in part of the
21    answer, but I just want to make sure I didn't miss
22    it.  2022, right?
23 A. Yes, correct.  It was 2022.
24 Q. What was the last day that you were working in the
25    warehouse?
```

**HEAD KANDY, LLC. vs KAYLA MARIE MCNEILL, ET AL.**
**Kayla Marie McNeill, Volume 2 on 09/10/2024**

Page 295

```
 1                    MS. TIEDEKEN:  Object to form.
 2   A.   I don't.  I -- my job was not in the warehouse, so
 3        I'm not really sure what you're asking.  Like, when
 4        was the last day I stepped foot in the warehouse?
 5        Like, what are you asking?  Like, working where?
 6   Q.   Well, what was the -- what was the last day that you
 7        worked in the warehouse?
 8                    MS. TIEDEKEN:  Object to form.
 9   A.   If I remember correctly, it probably would have been
10        like, November 20 -- 25th; maybe November 25th of
11        2022.
12   Q.   Okay.  After November 25th of 2022, did you ever go
13        back into the warehouse for any other reason?
14                    MS. TIEDEKEN:  Object to form.
15   A.   It was the only way to get into the building.  So I
16        would walk through the warehouse, but I wasn't like
17        -- well, I got my letter on November 28th where I'm
18        pretty sure I was told to not, like, do anything for
19        the company, so.
20   Q.   So were you in the -- and is it fair if I combine
21        the warehouse and the office to kind of cover the
22        whole premises?
23   A.   Yeah, sure.  It was one location.
24   Q.   Okay.
25   A.   Yeah.
```

HEAD KANDY, LLC. vs KAYLA MARIE MCNEILL, ET AL.
Kayla Marie McNeill, Volume 2 on 09/10/2024

Page 296

```
 1   Q.   So when was the last time you were on the premises?

 2   A.   I believe December 20th, when John Rosenbaum

 3        requested that we come in for a meeting.

 4   Q.   Was that 2022?

 5   A.   Correct.  Sorry.  We're still talking about the same

 6        time period.

 7   Q.   Sure.

 8   A.   I have not -- that I recall, I was told that I

 9        couldn't set foot on the property that I own, that

10        I'm on title for, of the building.  I could not set

11        foot in the building.  I believe they told me that

12        sometime the first December.  And so I just didn't

13        until John told me that he needed to have a meeting

14        with Dusty and I on December 20th.

15   Q.   Let's shift a little bit and -- because you've also

16        made a -- I don't want to say similar claim, because

17        I got to ask you what happened, but you made a

18        harassment claim for age based discrimination.  DO

19        you remember that?

20              MS. TIEDEKEN:  Object to form.

21   A.   I do.

22   Q.   Okay.  Tell me what you believe -- how you believe

23        you're harassed based on your age.

24              MS. TIEDEKEN:  Object to form.

25   A.   Well, I mean, I was called a little girl all the
```

**HEAD KANDY, LLC. vs KAYLA MARIE MCNEILL, ET AL.**
**Kayla Marie McNeill, Volume 2 on 09/10/2024**

```
 1    time in text message, in reference; that I was
 2    young, I didn't know what I was doing; that he has
 3    sold millions and millions and millions of dollars
 4    and he's made hundreds of millions of dollars with
 5    Jerome; and that they might be old farts, but that
 6    they definitely know what they're doing compared to
 7    Kaylin and I, who are little girls; and that I had a
 8    lot to learn in the industry.  And that happened
 9    every time I came in contact with him.
10 Q. And I know that you and I know this, but I'm just
11    going to say it so we can keep our train of thought
12    the same.  Mr. Rosenbaum, you only worked with him
13    during 2022, right?  Not any prior or subsequent
14    years?
15          MS. TIEDEKEN:  Object to form.
16 A. Correct.  I had never worked with him any year
17    before that.
18 Q. Okay.  And good catch.  January of 2023, is that
19    what you're referring to?
20 A. Correct.
21 Q. Okay.
22 A. John came in July of 2022, and I was given my notice
23    of, whatever you want to call it, November 28th.  So
24    all of the things that you are asking me about with
25    the sexual harassment and the age discrimination and
```

Page 298

```
 1      everything, happened in a very, very short period of
 2      time.
 3  Q.  Okay.  Thank you.  Did -- am I correct on my math
 4      that at about that time you would have -- would you
 5      have been 36?
 6              MS. TIEDEKEN:  Object to form.
 7  A.  Yeah, sure.  I don't know how old I am today, so I
 8      would -- yeah, probably.  That starts to happen as
 9      you get to 40.  You forget your age.  Yeah, I would
10      believe that I was probably close to 36.  Yeah, 36,
11      because my birthday -- well, I can tell you that my
12      -- the holiday release is always on my birthday.  I
13      was the founder of the company, so November 17th I
14      would have turned 37, 8, 6.  I would have been --
15      yeah -- whatever the --
16  Q.  I'm sorry.  I was cheating with the calculator next
17      to me, to be fair.  But fair enough to say you're
18      not -- you're not 40 yet.  You are still under 40?
19              MS. TIEDEKEN:  Object to form.
20  A.  I was under 40.
21  Q.  Okay.  And you're still under 40, right?
22  A.  Correct.
23  Q.  Okay.  Did Mr. Rosenbaum ever make any comments that
24      you were too old to complete a task?
25              MS. TIEDEKEN:  Object to form.
```

Page 299

 1   A.   No.

 2   Q.   **Did he ever make any comments based on your age that**

 3        **would have prevented you from doing a task?**

 4             MS. TIEDEKEN:  Object to form.

 5   A.   Mainly just belittling me, which then affected my

 6        confidence, which then made me not perform the task,

 7        because I was then -- I kind of felt like it was an

 8        absolute, like, mental -- yeah, he purposely

 9        belittled me to make me feel like I wasn't able to

10        do the tasks because I was too young and stupid and

11        I needed to always confer with someone who knew more

12        or was older or -- yeah, yeah, he did prevent me.  I

13        -- I -- yeah, he did.

14   Q.   **Okay.  And any other task other than what you've**

15        **just told me?**

16   A.   Oh, there was all kinds of things that I feel like

17        through the mental abuse of John Rosenbaum affected

18        my ability off of my age and gender, for sure.

19        There was several things and every -- every time I

20        came on -- came in contact.  I just can't remember

21        every single detail specifically because it was so

22        -- I think if it was one time, it would have been

23        easier to remember, but there was a lot.  So it's

24        actually harder.

25   Q.   **Right.  And I don't mean that affected to where you**

**HEAD KANDY, LLC. vs KAYLA MARIE MCNEILL, ET AL.**
**Kayla Marie McNeill, Volume 2 on 09/10/2024**

Page 300

```
1       felt belittled such that it felt affected your
2       mental ability to perform.  But was there any other
3       example of a task that you were prevented from
4       performing besides how you felt your mental impacted
5       that ability?  Does that make sense?
6               MS. TIEDEKEN:  Object to form.
7    A. No, because I feel like they're two and the same.
8       If you're being told you're not capable, that -- and
9       you're belittling me with my mental health, you are
10      -- you are telling me that I am not capable.  So
11      then, therefore, you are preventing me from doing
12      so.  Because if he would have been like most bosses,
13      encouraging and uplifting and empowering, which is
14      what I thought we were going to be doing in my
15      company, because that's how I believe we uplift
16      people, I feel like I maybe would have been able to
17      do those tasks that I feel he prevented me from
18      doing.  So, mental health or not, he absolutely
19      prevented me from performing tasks, however it went
20      about the way he -- he abused me.
21   Q. With both the claims for sex gender based discrim --
22      or sexual or gender age harassment that you've
23      alleged, were those just the actions of John
24      Rosenbaum or are you alleging that anybody else from
25      Head Kandy participated?
```

**HEAD KANDY, LLC. vs KAYLA MARIE MCNEILL, ET AL.**
**Kayla Marie McNeill, Volume 2 on 09/10/2024**

 1          MS. TIEDEKEN:  Object to form.

 2  A.  Unfortunately, John was the abuser.  And we -- yeah.

 3  **Q.  And so nobody else at Head Kandy?**

 4  A.  There was nobody else at Head Kandy.  I don't -- I

 5      don't -- nobody else was there.

 6  **Q.  Okay.**

 7  A.  Who -- who -- sorry, I don't know who you're

 8      referring to because he was -- he was my boss.

 9      There was no one else.  It was him.

10  **Q.  Jerome Falic didn't say those things to you?**

11          MS. TIEDEKEN:  Object to form.

12  A.  Jerome Falic never spoke to me, but if Jerome Falic

13      did, I would assume that he would not have done

14      that.  So no.

15  **Q.  And did Bryan Feldman ever say anything like that to**

16      **you?**

17          MS. TIEDEKEN:  Object to form.

18  A.  No, he did not.

19  **Q.  Okay.  I want to talk next about your -- the**

20      **harassment claim for religion.**

21  A.  Yeah.

22  **Q.  Tell me how you feel that you were harassed based on**

23      **your religion.**

24          MS. TIEDEKEN:  Object to form.

25  A.  When John came in, things started to kind of make

Page 302

```
 1   sense of, like, I feel the way that I was kind of
 2   treated a little bit during what I feel are
 3   important holidays and things like that for any
 4   religion.  And, like, I learned pretty quickly that
 5   -- so Jerome was Jewish, and every single person
 6   that we worked with was Jewish.  And I was always so
 7   interested to learn about their religion and their
 8   holidays and why they did what they did.  I was
 9   always so intrigued on learning.  And I learned that
10   they have a lot of Jewish holidays and some that
11   prevent them from like --- they, like, don't do work
12   during certain times, and there's just a lot to it.
13   And I never knew that.
14       So then -- and there was many days where Jerome
15   would tell me, like, or, like, would tell -- like,
16   we would have something, like, something needed
17   signed, okay.  For example, like, closing on a
18   building or whatever it may have been.  And he would
19   tell Bryan Feldman, like, hey, I can't do this
20   closing on this date because of this specific
21   holiday or because this religious thing is coming
22   up.  So I knew that they took religion -- they made
23   it an important thing in their lives.  So I felt
24   like it was okay for me to try to make something in
25   my life important as well.  And I felt like that
```

Page 303

1   would be something that would be mutually

2   reciprocated, because if they get to do things

3   according to their religion, then, like, so should

4   I.

5        So I looked back once John comes in and he

6   starts telling me all about the religion, and I'm

7   learning all these things, and he starts telling me

8   that he can't believe that Jerome would ever do

9   business with anyone who was not Jewish, because

10  Jerome was so rooted in his faith, which I had seen

11  for years.  And then I start looking back and I

12  start thinking of all of the religious holidays that

13  meant something to me, like Christmas and Easter,

14  and those were, in my opinion, religious holidays.

15  That the birth of Jesus Christ was a big deal to me.

16  And I didn't feel it to be appropriate that if we

17  were receiving shipments, or whatever it may be,

18  that they just expected me to unload those

19  shipments, or anyone, for that matter, but mainly

20  me.  They knew when things were coming.  And Bryan

21  Feldman would say, you know, like, I'm sorry that

22  it's coming on this date.  And then I would take

23  pictures of me on Christmas and send them to Bryan

24  Feldman, and I would say, well, I got it handled.

25  But never once did it feel like he cared.  That to

**HEAD KANDY, LLC. vs KAYLA MARIE MCNEILL, ET AL.**
**Kayla Marie McNeill, Volume 2 on 09/10/2024**

1    me, that was an important holiday to me; or like,

2    they couldn't even sign papers on their religious

3    holidays.  So I started to feel like that was --

4    seemed really unfair to me, that they made their

5    religion so much more important than my religion,

6    when I very much respected that they had a religion

7    and that they believed what they believed in.  So I

8    never said, well, you have to sign papers on that

9    day because that's what the realtor says, or

10   whatever that may be.

11        So I feel like that was part of the

12   discrimination that I received -- was that they did

13   not care what my religion was because my religion

14   wasn't their religion.  So --

15   Q.   When did --

16   A.   -- and I was told that over and over by --

17   Q.   By who?

18   A.   By John Rosenbaum.

19   Q.   When did you tell Bryan Feldman which -- which

20        religion you practiced?

21             MS. TIEDEKEN:  Object to form.

22   A.   Gosh, probably in the very beginning when we met.

23        It just -- it was -- it wasn't anything that was

24        ever a deal.  Like, it wasn't a big deal.  Like, I

25        remember them asking me.  I remember Bryan Feldman

Page 305

1  and Jerome flying to the warehouse and the office

2  when we were on the Blake Street warehouse.  And I

3  remember them coming in, and we had this meeting in

4  my little office.  And I remember we started just

5  this conversation about the dollar amount that

6  Jerome was going to pay me.  And it had to be, like,

7  divisible by a certain number because it had

8  something to do with his religion.  And he was

9  telling me about it, and he said that had something

10  to do with things that come in -- it had something

11  to do -- listen, I can't recall because this was

12  back in 2018.  And then I remember being like, oh,

13  is that, like -- just asking, like, is that part of

14  your religion?  Like, how did we come to this?  And

15  he just said that in their -- it had something to do

16  with signs of life and something in their -- their

17  -- their book.

18       I -- listen, I apologize.  I don't know the

19  Jewish faith, and I very much respect it.  However,

20  I remember saying, oh, is that part of your religion

21  or part of your practice?  And they said, yeah.  And

22  then they just -- we just got into the conversation.

23  And Bryan Feldman was like, what religion are you?

24  And I was just like, oh I'm just Christian, non-

25  denominational.  And we -- that was kind of it.

**HEAD KANDY, LLC. vs KAYLA MARIE MCNEILL, ET AL.**
**Kayla Marie McNeill, Volume 2 on 09/10/2024**

Page 306

```
 1        Like they knew from before we even acquired the

 2        company, because I remember the number that they

 3        came to was divisible by a certain number.  And then

 4        every business deal that Jerome does always has to

 5        be divisible by that number.  And it has something

 6        to do with their religion.

 7   Q.   Did you talk about your religion during that

 8        conversation?

 9             MS. TIEDEKEN:  Object to form.

10   A.   I mean, I definitely informed them that I was a

11        Christian and that I -- like, I mean, we didn't,

12        like, get into depth about how much of a Christian I

13        was or I don't even know if that's even, like, a

14        level.  We didn't -- we didn't discuss religion at

15        that point.  But your question was when did we tell

16        it, and that would have been when.  And I don't

17        remember the extent of the conversation other than

18        the context of how we got there.

19   Q.   Okay.  Did you ever ask -- let me ask a different

20        question first.  Who would you have asked if you

21        wanted to take time off?

22             MS. TIEDEKEN:  Object to form.

23   A.   I would have let Bryan Feldman know.

24   Q.   Okay.  And is it that you would have had to ask

25        permission or were you able to take time off when
```

**HEAD KANDY, LLC. vs KAYLA MARIE MCNEILL, ET AL.**
**Kayla Marie McNeill, Volume 2 on 09/10/2024**

Page 307

1       you wanted to?

2                   MS. TIEDEKEN:  Object to form.

3   A.  Well, there was no policies or handbooks or

4       procedures.  So I felt to report to my boss, who was

5       Bryan Feldman, but if I wanted to take time off and

6       be away from Head Kandy, like an actual --- well,

7       let me back up.  Are we talking about religion or

8       are we talking about vacation now?  Because I'm

9       confused now, because I don't feel like I should

10      request to be off on religious holidays that are

11      practiced by banks.  So for -- in my opinion, I

12      didn't know that I needed to request Christmas off.

13  Q.  That was going to be my question.  I'm just trying

14      to break it up to make sure it stays clear.

15  A.  Okay.

16  Q.  Bryan Feldman, is that the individual you would have

17      asked to take any time off?

18                  MS. TIEDEKEN:  Object to form.

19  A.  I reported to Bryan Feldman.

20  Q.  Okay.  So you would have asked him?

21  A.  Correct.

22  Q.  Okay.  And I think this is what you're saying, but I

23      just want to make sure.  You never made a request to

24      take Christmas off?

25                  MS. TIEDEKEN:  Object to form.

HEAD KANDY, LLC. vs KAYLA MARIE MCNEILL, ET AL.
Kayla Marie McNeill, Volume 2 on 09/10/2024

Page 308

```
 1   A.   No, I never made a request to take mass -- like

 2        holidays where children weren't in school, banks

 3        were closed, UPS didn't run.  No, I didn't send a

 4        request for that.  And I wasn't an hourly employee

 5        with a schedule of Monday through Friday.  So that

 6        wouldn't have been something that would have been

 7        done.  I feel like that was just been universally

 8        just, like, I don't know, understood.

 9   Q.   Did you ever make a request to take time off on a

10        Christian holiday and Mr. Feldman said no?

11             MS. TIEDEKEN:  Object to form.

12   A.   I feel like Christmas is a holiday that you

13        shouldn't be expected to work.  So he didn't say no,

14        but he sure as heck was happy that I was there

15        because I had no choice, because no one else was

16        going to do it.  And he didn't say no, no, no, let's

17        reschedule it, like you -- he didn't respect my

18        religion the way he respected his religion, if

19        that's what you're asking.  My religion didn't

20        matter because it didn't affect him.  So he didn't

21        tell me no, because he didn't care.  But I would

22        assume that he knew that Christmas is a pretty

23        standard religious holiday.  Holiday, no matter, but

24        definitely a religious holi -- holiday.

25   Q.   Aside from being able to take off on a holiday, did
```

**HEAD KANDY, LLC. vs KAYLA MARIE MCNEILL, ET AL.**
**Kayla Marie McNeill, Volume 2 on 09/10/2024**

Page 309

1          Mr. Feldman ever make any kind of negative comments

2          about Christianity?

3                    MS. TIEDEKEN:  Object to form.

4    A.   Yeah, yeah.  I got to sit there and listen to them

5          talk about the Palestinians and the Jewish people

6          and the Christians and killing these people that are

7          horrible and bombing and pushing them out of their

8          houses and how that was their land and -- yeah,

9          yeah, I did.  I heard a lot of really negative talk

10         on Christianity.

11   Q.   Hold on, Ms. McNeill.  Was that in reference to the

12         Israel-Palestine conflict?

13                   MS. TIEDEKEN:  Object to form.

14   A.   You mean the one that's been going on since before

15         you were even an inception of a person?  Yeah, it's

16         been going on for a hot minute, and I definitely

17         heard them talk about it all the time.  Yes.

18   Q.   Right.  So aside from the Israel-Palestine conflict,

19         and I don't mean to debate the merits of the

20         conflict, but was there any other remarks that

21         Mr. Feldman made about Christianity outside of that

22         specific issue?

23                   MS. TIEDEKEN:  Object to form.

24   A.   I'm confused on what you're asking because that

25         issue directly involves Christianity also.  And your

HEAD KANDY, LLC. vs KAYLA MARIE MCNEILL, ET AL.
Kayla Marie McNeill, Volume 2 on 09/10/2024

Page 310

1      question was, did Bryan Feldman ever make comments

2      about Christianity.  So the answer is yes, he did.

3  Q.  **No.  Right.  But I'm narrowing my question down.  So**

4      **outside of that particular conflict, did Mr. Feldman**

5      **make any comments about Christianity?**

6          MS. TIEDEKEN:  Object to form.

7  A.  The conversation -- I think you're not understanding

8      what I'm saying is, I think, the problem.  So you're

9      saying out of that conflict.  I'm saying that the

10     conflict -- they would talk about Israel and

11     Christianity and what the Palestinians were doing

12     all the time when I was around them, when I was on

13     the phone with them, when I would go to their work

14     and it was on their TV's, inside their elevators.

15     So then when I would be around Bryan Feldman, yeah,

16     they talked about it all the time.  All the time.

17     Yeah, he filled me in daily about -- like, if I was

18     on the phone with Bryan Feldman and something

19     happened in the world that had anything to do with

20     Christianity, Israel bombings, Benjamin Netanyahu,

21     any of that, I heard all about it.  And what was it

22     nega -- did I feel that it was a negative depiction

23     of Christianity?  Yeah, yeah, I did.  Yeah, I did.

24 Q.  **Did Mr. Feldman, when you brought up, if at all,**

25     **Christianity, make any negative comments about your**

HEAD KANDY, LLC. vs KAYLA MARIE MCNEILL, ET AL.
Kayla Marie McNeill, Volume 2 on 09/10/2024

1   practice of Christianity?

2          MS. TIEDEKEN:  Object to form.

3   A.   They made it pretty clear how they stood in the

4        world.

5   Q.   **Did they make any comments about your practice of**

6        **Christianity?**

7          MS. TIEDEKEN:  Object to form.

8   A.   They didn't know about my practice of Christianity.

9        They just knew that I was a Christian.

10  Q.   Okay.  I --

11  A.   I was also instructed not to post anything about my

12       religion on my social media.

13  Q.   **By who?**

14  A.   By Bryan Feldman.  And --

15  Q.   **When did he tell you that?**

16  A.   Well, every single time that holiday came around,

17       because we had to refer to it as holiday moving

18       forward and I wasn't allowed to refer to it as

19       Christmas.  I was the brand creative director who

20       started the business in my basement that was a

21       Christian.  And I love Christmas and everything that

22       it stands for with why Christmas is even an event.

23       And I feel like outside of the secular world of

24       retail, of people commercializing Christmas, it was

25       a part of my business, unfortunately, right.  So how

HEAD KANDY, LLC. vs KAYLA MARIE MCNEILL, ET AL.
Kayla Marie McNeill, Volume 2 on 09/10/2024

Page 312

1   holiday, which is what it eventually became, I

2   wanted to sell what I felt depicted my brand.  And

3   so I would do designs that would have Christmas

4   trees in them.  I would do designs that it said

5   Christmas.  And they would -- they --

6        You have to understand that they -- they don't

7   -- I didn't know this until later, but they don't

8   celebrate Christmas the same way that, like, I

9   celebrate Christmas.  And that's great.  Like, I am

10  totally okay with that, but I -- that's not my

11  world.  And so I created the design sometimes that

12  maybe reflected a little bit more my beliefs.  And

13  then I basically was told that it was ridiculous

14  that I was -- that I was marketing to one religion

15  and that I wasn't including the Jewish religion.  So

16  that in -- and I understand kind of where they were

17  coming from originally, but then it turned into this

18  whole thing that it was, like, you cannot post about

19  your religion.  And I was just kind of like, why?

20  I'm not saying anything negative about any other

21  religion.  I love Jesus, and that's who I am.  And

22  I'm sorry that you don't want your bran -- like --

23  but it was always that way.

24       It was like that before they bought in.  Every

25  -- I talked about my Christianity on my live videos

**HEAD KANDY, LLC. vs KAYLA MARIE MCNEILL, ET AL.**
**Kayla Marie McNeill, Volume 2 on 09/10/2024**

Page 313

```
 1    always before they bought the business.  So then
 2    when I was told that it needed to be more
 3    presentable and digestible to companies like Ulta or
 4    -- we were -- their goal was to get into a box
 5    store.  They didn't want me to depict myself as a
 6    Christian, I guess.  I'm not sure.  I'm not sure
 7    what the motive was in any of that, but I will say
 8    that it made me feel very -- it made me sad because
 9    my religion matters, too.
10  Q.  Okay.  I want to talk to you about the retaliation
11      claim you made with the Florida Human Rights --
12      Commission on Human Rights.  Is there anything else
13      other than the sexual harassment that you've alleged
14      by Mr. Rosenbaum or -- actually, on the part of Mr.
15      Rosenbaum, that you believe you were retaliated for,
16      any other conduct besides the sexual harassment that
17      you've alleged?
18          MS. TIEDEKEN:  Object to form.
19  A.  No.  I think that John Rosenbaum tried to cover up
20      what he did, and he knew that John -- John knew that
21      Jerome was going to believe anything that he said.
22      And Jerome did believe everything that he said, so.
23  Q.  So yes, just those actions or accusations for the
24      sexual harassment, right?
25          MS. TIEDEKEN:  Object to form.
```

HEAD KANDY, LLC. vs KAYLA MARIE MCNEILL, ET AL.
Kayla Marie McNeill, Volume 2 on 09/10/2024

Page 314

```
 1   A.   Yeah.

 2             CONFIDENTIAL PORTION BEGINS

 3   Q.   Okay.  Thank you.  All right.  I'm going to shift

 4        gears a little bit.  I want to talk about one of the

 5        nurses that you have treated with before, Dawn

 6        McDowell.  Do you remember her name?

 7   A.   Yes.

 8   Q.   Okay.  Are you still seeing Ms. McDowell?

 9   A.   No.

10             MS. TIEDEKEN:  Object to form.

11   Q.   When was the last time that you went to Ms. McDowell

12        for treatment?

13   A.   I don't recall.  Probably about a year ago.  Maybe a

14        little bit shy of that.

15   Q.   Okay.  Why did you stop going?

16             MS. TIEDEKEN:  Object to form.

17   A.   I couldn't afford it.  Every penny I make goes to a

18        lawsuit.  I couldn't afford it.

19   Q.   Okay.  Do you need a moment, Ms. McNeill?

20   A.   No, I'm fine.

21   Q.   Okay. . When you went to Ms. McDowell, was that the

22        first time that you had received hormone therapy or

23        hormone replacement therapy?

24             MS. TIEDEKEN:  Object to form.

25   A.   Maybe ten years before that I had done it one time,
```

Page 315

```
 1        maybe ten years before, and that was it.
 2   Q.   Do you know what kind of therapy that was or what
 3        kind of hormone they were replacing?
 4               MS. TIEDEKEN:  Object to form.
 5   A.   Well, they run your blood, and then they make a
 6        custom formula to try to help you.
 7   Q.   Right.  Did they tell you whether or not it was
 8        testosterone, estrogen, progesterone?
 9   A.   It was probably a whole combination, according to my
10        levels, that were low because of -- are you -- are
11        you asking about the first time I went or are you
12        asking about the second time?
13   Q.   Not with Dawn McDowell.  Whoever you received that
14        hormone treatment with prior.
15   A.   I don't recall.
16   Q.   Okay.  Did you just go once during that prior
17        treatment?
18               MS. TIEDEKEN:  Object to form.
19   A.   I think it was only once.  I don't recall.  It was
20        very -- I went in for weight loss.  It was more of a
21        weight loss thing because I was heavy.  And I went
22        in for weight loss, and they suggested that maybe my
23        hormones were out of whack.  And I was like, okay.
24        So they ran the blood, and they said that we think
25        that maybe giving you a little bit of whatever this
```

Page 316

1      is might help you.  And so that was my first

2      introduction, I guess you could say, to that method

3      of medical practice.

4    Q.  Okay.  Do you remember the provider that you

5      received that care with?

6    A.  I do not.

7    Q.  Would it have been Dr. Wiggington?

8    A.  No.

9    Q.  Okay.  Do you remember the facility that you

10      received that treatment at?

11   A.  Salida Derma -- it was a -- it was a -- like a

12      specialist that came into our town because we don't

13      live where they have that type of resources.  So

14      they came from out of town and came and kind of

15      staged at a doctor's office in town.  And the only

16      reason why I heard about them was because I was a

17      hairdresser.  So they were kind of the new buzz in

18      town of basically being, like, these -- these people

19      are kind of helping with weight loss and they're

20      kind of helping with women's, like, health.  And I

21      had never been to a woman doctor of any kind, and so

22      I thought it would be worth maybe trying.  I had

23      just had my son, if I recall, or maybe it would have

24      right have maybe been before.  So this is probably

25      ten or eleven years ago.  So I'm sorry, I don't

**HEAD KANDY, LLC. vs KAYLA MARIE MCNEILL, ET AL.**
**Kayla Marie McNeill, Volume 2 on 09/10/2024**

Page 317

```
 1        recall.
 2   Q.   That's okay.
 3             MS. TIEDEKEN:  And I'm going to jump in
 4        here.  This protected HIPAA information, so we
 5        need to mark this -- this portion of the
 6        deposition confidential.
 7             MS. SADRO:  Sure, that's fine.  Continue
 8        to mark.  I have a couple more brief questions,
 9        I guess, for lack of a better phrase.
10   Q.   Ms. McNeill, have you ever been familiar with
11        something called T only pellets or testosterone
12        pellets?
13             MS. TIEDEKEN:  Object to form.
14   A.   Absolutely -- I have absolutely no idea what you're
15        talking about.
16   Q.   Okay.  Did you ever tell Ms. McDowell that you had
17        been receiving T-only or testosterone pellets for
18        the previous five years?
19             MS. TIEDEKEN:  Object to form.
20   A.   No.  She definitely misunderstood what I said, if
21        that's what's in her report, because that is not
22        true.
23   Q.   Okay.
24   A.   I have not received whatever pellets you just said
25        for the past five years.  That is not fact.  That is
```

**HEAD KANDY, LLC. vs KAYLA MARIE MCNEILL, ET AL.**
**Kayla Marie McNeill, Volume 2 on 09/10/2024**

Page 318

```
 1        an incorrect statement on the her part, because that
 2        is not fact.  That did not happen.
 3   Q.   Okay.  No, I appreciate that clarification.  That's
 4        what I wanted --
 5                    (Cross communication)
 6   A.   So I don't really -- because that one statement is
 7        not true.
 8   Q.   Yeah.  I got to ask, right, because she wrote it
 9        down.  So I got to check with you to see if it's
10        right.
11   A.   Sure.  No, I'm not mad.  I just wanted to --
12   Q.   Yeah.
13   A.   I'm not mad.  I just wanted to clarify, just so that
14        you didn't keep going down a rabbit hole that
15        doesn't exist.
16   Q.   No.  I'm going to check one more thing.  Is there
17        any other treatment you would have been undergoing
18        for the five years prior to visiting Ms. McDowell
19        that you think she might have wrote down?
20                    MS. TIEDEKEN:  Object to form?
21   A.   I was never given any medication, any type of
22        anything that I put into my body from any doctor for
23        probably ten years before I saw that I recall of any
24        kind.  I don't take medication.  I don't get any
25        hormone therapy.  I get nothing.  And until I went
```

**HEAD KANDY, LLC. vs KAYLA MARIE MCNEILL, ET AL.**
**Kayla Marie McNeill, Volume 2 on 09/10/2024**

```
1        in over me weighing 103 pounds, being the darkest
2        time of my entire life all at the hands of my
3        abuser, until I went and saw Dawn McDowell for any
4        kind of help.
5   Q.   Okay.  Are you still taking any other medication?
6             MS. TIEDEKEN:  Object to form.
7   A.   I take Prozac off and on.  I tried to get off of it,
8        and I'm not mentally ready yet.
9   Q.   Okay.  Can you -- I want to ask you about when
10       you've gone off and on.  How often do you stop
11       taking Prozac?
12            MS. TIEDEKEN:  Object to form.
13  A.   Oh, I only stopped one time in the entire time that
14       I've been taking it, and I stopped taking it because
15       I really wanted to not be on -- I don't like
16       medication.  I've never liked medication.  I try not
17       to take any medication.  I don't take Tylenol.  It's
18       just how I prefer to live.  And so the fact that I
19       had to be placed on a medication in order to help me
20       function because of what had happened to me was
21       another issue that I felt was feeding my mental
22       health to just continue to decline, because then I
23       felt like I wasn't even able to function as a normal
24       person like I had always been.  And so I decided
25       that I was going to try to take control and not take
```

HEAD KANDY, LLC. vs KAYLA MARIE MCNEILL, ET AL.
Kayla Marie McNeill, Volume 2 on 09/10/2024

Page 320

```
 1        the medication.  But then I stopped taking it for

 2        maybe four or five days.  I'm not really sure how

 3        long, but I -- I'm not able to not get off of it

 4        yet.  I'm too -- my trauma is not to that stage of

 5        healing yet.

 6   Q.   The period of time that you stopped taking Prozac,

 7        was that the period in 2023, right when you

 8        initially were prescribed Prozac?

 9             MS. TIEDEKEN:  Object to form.

10   A.   No.  No, this was just like three weeks ago.

11   Q.   How long were you off Prozac?

12   A.   Four days maybe, five days.

13   Q.   Do you know what your dosage is?

14             MS. TIEDEKEN:  Object to form.

15   A.   I don't.  More than I should.

16             CONFIDENTIAL PORTION ENDS

17   Q.   Okay.  Do you know -- do you remember talking to us

18        before about seeking out therapy in 2023?

19             MS. TIEDEKEN:  Object to form.

20   A.   I do.

21   Q.   Okay.  And do you remember telling us that that was

22        a Christian counseling service?

23             MS. TIEDEKEN:  Object to form.

24   A.   I do.

25   Q.   Did you have to pay for those therapy sessions?
```

Page 321

```
 1   A.   Yes.

 2   Q.   How did you pay for them?

 3             MS. TIEDEKEN:  Object to form.

 4   A.   My credit card.

 5   Q.   What kind of credit card?

 6             MS. TIEDEKEN:  Object to form.

 7   A.   A Visa.

 8   Q.   Have you looked at your Visa statement to see

 9        whether or not it would tell you the name of that

10        practice?

11             MS. TIEDEKEN:  Object to form.

12   A.   No.

13   Q.   Why not?

14             MS. TIEDEKEN:  Object to form.

15   A.   Because it didn't come across at my credit card

16        statement as the practice.  I'm not sure -- I'm not

17        sure what you're asking.  Did I look at my credit

18        card statement for the name of the practice?  No.

19        It doesn't -- I'm almost positive it doesn't come

20        across that way.  So I know that I would have looked

21        at it when the charge was made, and I looked at the

22        credit card statement when it came across.  I'm not

23        really sure what you're asking --

24   Q.   In 2024 --

25   A.   -- in your question.
```

**HEAD KANDY, LLC. vs KAYLA MARIE MCNEILL, ET AL.**
**Kayla Marie McNeill, Volume 2 on 09/10/2024**

Page 322

```
 1   Q.   In 2024, have you looked at your Visa statement from
 2        those therapy charges to determine whether or not it
 3        says the name of the therapy center that you
 4        visited?
 5             MS. TIEDEKEN:  Object to form.
 6   A.   No.
 7   Q.   Okay.  Let's talk about Dr. Warner (phonetic).  When
 8        did you retain Dr. Warner?
 9             MS. TIEDEKEN:  Object to form.
10   A.   I don't recall.
11   Q.   Do you know a ballpark?
12   A.   Nope.  I'm sorry, I do not.
13   Q.   Was it 2024?
14             MS. TIEDEKEN:  Object to form.
15   A.   I believe it would have been in 2024.
16   Q.   Okay.  Do you know if it would have been before
17        June, after June?
18             MS. TIEDEKEN:  Object to form.
19   A.   I do not recall.
20   Q.   Okay.  How did you hear about Dr. Warner?
21             MS. TIEDEKEN:  Object to form.  Also, I'm
22        going to object on privileged grounds, that
23        this is privileged conversation.  Kayla, you
24        don't have to testify to what we told you.  So
25        if you know through us, just say that.
```

HEAD KANDY, LLC. vs KAYLA MARIE MCNEILL, ET AL.
Kayla Marie McNeill, Volume 2 on 09/10/2024

Page 323

1   A.   I know through my attorneys.

2   Q.   **Okay.  So you did not independently know Dr. Warner?**

3             MS. TIEDEKEN:  Object to form.

4   A.   I know through my attorneys.

5   Q.   **Okay.  When did you -- do you remember meeting with**

6        **Dr. Warner?**

7   A.   I do.

8   Q.   **Do you remember how long you met with Dr. Warner?**

9   A.   I don't recall, like, how long.  It was just a

10       pretty long Zoom meeting.  Like, I had a session

11       with her or like, whatever you want to call that.  I

12       don't remember if it was --

13  Q.   **Sure.**

14  A.   I don't recall, but a while.

15  Q.   **Sure.  When you met with Dr. Warner, was she asking**

16       **specific questions or were you just telling her**

17       **about what had happened?**

18            MS. TIEDEKEN:  Object to form.

19  A.   No, she asked very specific questions for a big

20       portion of the interview.

21  Q.   **Okay.  What did you talk to Dr. Warner about?**

22            MS. TIEDEKEN:  Object to form.

23  A.   She basically just asked questions like how old I

24       was.  She asked questions like, did I have a good

25       relationship with, like, my family, my parents, my

HEAD KANDY, LLC. vs KAYLA MARIE MCNEILL, ET AL.
Kayla Marie McNeill, Volume 2 on 09/10/2024

Page 324

1      growing up.  She asked about my background.  She

2      asked about any trauma that I would have gone

3      through growing up.  She basically just got, like, a

4      pretty basic rundown on, like, how I was raised, my

5      religion, what type of relationships I had with the

6      people in my life.  She asked about my marriage.

7      She asked about my children.  She asked about what

8      led to me needing -- because I spoke about getting

9      the hormone therapy and, like, because those are the

10     things that, like, led up.  And then she basically

11     led into asking how we got to where we got.

12          And then she would ask questions on, like, if,

13     for example, I would say, well, John Rosenbaum said

14     this, and then this is how I reacted.  And then she

15     would say, you know, like, well, what did you do or

16     how did you react or what was the protocol?  So she

17     asked very specific questions in order to try to, I

18     think, paint a picture of what really happened.  So

19     that was what we talked about.

20  Q.  Okay.  Do you recall if there was anything that you

21      told Dr. Warner that you would not have also told

22      Dr. Sally Russell?

23          MS. TIEDEKEN:  Object to form.

24  A.  One more time.

25  Q.  Sure.  Did you tell Dr. Warner anything that you did

Page 325

```
 1         not tell Dr. Russell?

 2                   MS. TIEDEKEN:  Object to form.

 3   A.    I don't recall.  But my story is the same, again,

 4         that I testified in court, that I have said in every

 5         document I have ever submitted, any person I've ever

 6         said the story to.  My story does not change.  And

 7         there is absolutely zero less or more information

 8         that one party would have.  So did I give every

 9         specific detail to both of them identically?  I

10         cannot recall.  But there was not extra information

11         that one knew over the other.

12   Q.    That's just my question I got to ask.

13   A.    No, I'm not mad.  I just am trying to get there for

14         you, so.

15   Q.    Sure.  When you -- before meeting with Dr. Warner,

16         did Dr. Warner have you fill out any paperwork?

17                   MS. TIEDEKEN:  Object to form.

18   A.    I don't recall.  I believe -- I can't remember if I

19         did it with her, like, intake person on the computer

20         or if I did it independently.  But I do recall,

21         like, giving my, like, medical.  Yeah, I mean, I

22         remember.  I feel like I remember giving like my

23         medical history and stuff, but I don't recall how we

24         got -- if I did it or if their lady did it.  I don't

25         remember that part.
```

HEAD KANDY, LLC. vs KAYLA MARIE MCNEILL, ET AL.
Kayla Marie McNeill, Volume 2 on 09/10/2024

Page 326

```
 1   Q.   Okay.  Do you remember if, during the time period

 2        that you met with Dr. Warner, did she have you fill

 3        anything out while you were meeting with her?

 4             MS. TIEDEKEN:  Object to form.

 5   A.   She filled stuff out.  She was writing while we were

 6        meeting.  Lots and lots of writing.

 7   Q.   Sure.  But did she have you fill anything out during

 8        that meeting?

 9             MS. TIEDEKEN:  Object to form.

10   A.   I don't recall, like, signing any paperwork during

11        our meeting or, like, writing on any paper.

12   Q.   Yeah, I wanted to know, did you have -- did you have

13        to answer any written questions?

14             MS. TIEDEKEN:  Object to form.

15   A.   Well, she would ask me the written questions and

16        then write my answer.

17   Q.   Right.  But you did not have to do any additional

18        written answers yourself?  That's what I'm trying to

19        make sure.  I understand that Dr. Warner may have

20        wrote some things down.  Did you have to write

21        anything down?

22             MS. TIEDEKEN:  Object to form.

23   A.   I did not write anything.

24             MS. SADRO:  We've been going for an hour-

25             ish and I'm about to change topics anyway, so
```

Page 327

1    it's probably a good time for a break if

2    everybody would like a quick moment.

3          MS. TIEDEKEN:  Love it.  I need to use the

4    restroom, so that's great for me.

5          MS. SADRO:     All right.  For five

6    minutes?

7          MS. TIEDEKEN:  Can we do ten, please?  Is

8    that okay?

9          MS. SADRO:     Yeah, sure, sure.  Why

10   don't we just come back on the 40 of the hour?

11         MS. TIEDEKEN:  That's great.

12         THE VIDEOGRAPHER:  The time 1:27 p.m., and

13   we are off the record.

14   (A long recess was taken at 1:27 p.m.)

15   (WHEREUPON, a separate court reporter resumed

16   coverage of the foregoing deposition at 3:15

17   p.m.)

18          * * * * * * * * *

19

20

21

22

23

24

25

**HEAD KANDY, LLC. vs KAYLA MARIE MCNEILL, ET AL.**
**Kayla Marie McNeill, Volume 2 on 09/10/2024**

**Page 328**

WITNESS CERTIFICATION


I, KAYLA MARIE MCNEILL, declare under the penalties of perjury under the State of North Carolina that I have read and examined the contents of the foregoing testimony as given by me on 10TH day of September, 2024, and that to the best of my knowledge and belief the foregoing pages are a complete and accurate record of the testimony given by me, except as noted on the Errata Sheet attached hereto.


I have ___ made changes/corrections.

I have not ___ made changes/corrections.



_____

KAYLA MARIE MCNEILL