1        UNITED STATES DISTRICT COURT

2        SOUTHERN DISTRICT OF FLORIDA

3             FT. LAUDERDALE

4    Case No. 0:23-cv-60345-JB

5    _____

6        REMOTE VIDEORECORDED DEPOSITION OF

7             KAYLA M. McNEILL

8             July 12, 2024

9    _____

10   HEAD KANDY LLC,

11   Plaintiff,

12   v.

13   KAYLA McNEILL,

14   Defendant.

15   _____

16

17        PURSUANT TO NOTICE, the remote

18   videorecorded deposition of KAYLA M. McNEILL was

19   taken on behalf of the Plaintiff, on July 12,

20   2024, at 9:14, MST, before Wendy C. Heath,

21   Registered Professional Reporter, Denver,

22   Colorado.

23

24

25

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 2

```
 1                    A P P E A R A N C E S

 2    ON BEHALF OF PLAINTIFF HEAD KANDY, LLC:

 3         ETHAN J. LOEB, ESQUIRE
           COLIN THOMPSON, ESQUIRE
 4         CARSON SADRO, ESQUIRE
           Bartlett Loeb Hinds Thompson & Angelos
 5         100 North Tampa Street
           Suite 2050
 6         Tampa, Florida 33602
           813-223-3888
 7         Ethanl@blhtlaw.com
           Colint.@blhtlaw.com
 8         Carsons@blhtlaw.com

 9
      ON BEHALF OF DEFENDANT KAYLA McNEILL:
10
           ANTHONY L. CONVERSE, ESQUIRE
11         Converse Law Group, P.C.
           600 17th Street
12         Suite 2800
           Denver, Colorado 80202
13         303-893-8332
           Anthony@converselawgroup.com
14

15    Also Present:

16         John Sheffield, Videographer
           Ryan Thompson, Head Kandy
17         Gina Gazzaniga
           Dustin McNeill
18

19    Witness location:  Lansing, Michigan

20

21

22

23

24

25
```

Page 3

```
 1                    I N D E X

 2   EXAMINATION:                              PAGE

 3   By Mr. Loeb:                                7

 4   QUESTIONS INSTRUCTED NOT TO ANSWER:

 5   Page 156, line 1

 6   CERTIFIED QUESTIONS

 7   Page 80, line 15

 8   Page 82, line 1 through page 84, line 18

 9   EXHIBITS:                                 PAGE

10   Exhibit 1  Text messages between Kayla and   26

11              Ryan Thompson, starting 1/1/22 at

12              8:20 (HK_037366 to 039746)

13   Exhibit 2  E-mail from Kleitias Petri to     33

14              Kayla McNeill, sent 12/3/22,

15              Subject: Re: Peoples Roles

16   Exhibit 3  E-mail from Kayla McNeill to      64

17              ron@flyingamotorsports.com, sent

18              11/6/20, Subject: Head Kandy LLC -

19              Asset Purchase Agreement.pdf, with

20              attachment

21   Exhibit 4  E-mail from Jerome Falic to       94

22              Kayla@headkandypro.com, sent

23              7/26/21, Subject: Schedule a

24              call/follow up (HK_048181)

25
```

**HEAD KANDY LLC vs KAYLA MCNEILL**
**Kayla M. McNeill on 07/12/2024**

| | | Page 4 |
|---|---|---|
| 1 | EXHIBITS: (Continued) | PAGE |
| 2 | Exhibit 5  E-mail chain.  Top e-mail from Jed | 123 |
| 3 | Ferdinand to Kayla McNeill, sent | |
| 4 | 12/2/22, Subject: Re: Head Kandy | |
| 5 | Employment | |
| 6 | Exhibit 6  E-mail from Jed Ferdinand to | 127 |
| 7 | Kayla@headkandypro.com, sent | |
| 8 | 11/28/22, Subject: Formal Legal | |
| 9 | Notice on Behalf of Head Kandy, | |
| 10 | LLC, with attachments (HK_01046 to | |
| 11 | 50) | |
| 12 | Exhibit 7  E-mail chain.  Top e-mail from Jed | 129 |
| 13 | Ferdinand to Kayla McNeill, sent | |
| 14 | 12/1/22, Subject: Head Kandy | |
| 15 | Employment (HK_010130 to 45) | |
| 16 | Exhibit 8  Executive Employment Agreement, | 170 |
| 17 | Head Kandy LLC/Kayla Marie McNeill | |
| 18 | Exhibit 9  E-mail from Blake Ruschman to John | 176 |
| 19 | Max Bolling, Jon Rosenbaum, Kayla | |
| 20 | McNeill, sent 9/20/22, Subject: | |
| 21 | Head Kandy Audits, with attachment | |
| 22 | (HK_008830 to 53) | |
| 23 | | |
| 24 | | |
| 25 | | |

**HEAD KANDY LLC vs KAYLA MCNEILL**
**Kayla M. McNeill on 07/12/2024**

```
                                                    Page 5
 1   EXHIBITS: (Continued)                          PAGE

 2   Exhibit 10 E-mail from Kayla McNeill to Jon     177

 3              Rosenbaum, sent 9/22/22, Subject:

 4              Re: Audit/Forensic Accounting

 5              (HK_011039)

 6   Exhibit 11 E-mail from Jerome Falic to Kayla    182

 7              McNeill and Jon Rosenbaum, sent

 8              9/22/22, Subject: RE:

 9              Audit/Forensic Accounting

10              (HK_011042 to 43)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 91

```
 1      A   Nope, not that I can recall.  No.
 2      Q   In North Carolina was there a Head Kandy
 3  warehouse that was there?
 4      A   Yes.
 5      Q   Do you recall when that warehouse was
 6  acquired?
 7      A   May of 2021.
 8      Q   Was it acquired through an entity, like a
 9  special purpose entity, if you know?
10      A   Well, we rented a location for a year
11  before we acquired a building under a different
12  entity.
13      Q   Okay.  What was the entity that ultimately
14  acquired the building?
15      A   I believe it's Head Kandy Realty.
16      Q   Okay.  Was the building that was acquired
17  through Head Kandy Realty the same one that was
18  being leased the year before?
19      A   No.
20      Q   And I just want to make sure my notes are
21  accurate.  The building that was acquired through
22  Head Kandy Realty, was that May of 2021, or was
23  that when the lease started?
24      A   I'm sorry.  Ask that one more time.
25      Q   Sure.  I'm just trying to get the dates
```

Page 92

1    right chronologically.  You said --

2         A  Oh, okay.

3         Q  -- there was, I guess, a one-year lease of

4    a building, and then after that there was a

5    different building that was purchased.  When did

6    the lease start?  Kind of when Head Kandy first

7    had a building presence in North Carolina.

8         A  I believe it was May of 2021.

9         Q  Okay.  And then the building that was

10   purchased, was that around about May of 2022?

11        A  I believe it was more like April of 2022.

12        Q  Of 2022?

13        A  Yes.

14        Q  Was there a reason why there was a change

15   in the location from a leased building to a

16   building in which there was a purchase?

17        A  Yes.

18        Q  Can you tell me what those reasons are to

19   the best of your knowledge?

20        A  We were misled by the landlord at the

21   first location, and the building kept getting

22   flooded.  It didn't have power.  It had no running

23   bathrooms often.  It was a nightmare.

24        Q  Okay.  Did you help find the building that

25   was purchased by Head Kandy Realty?

Page 131

1      A   Yes.

2          Q   (BY MR. LOEB)   And that that fiduciary

3   duty included a duty of loyalty, correct?

4          MR. CONVERSE:   Objection, form.

5      A   Absolutely.

6          Q   (BY MR. LOEB)   And in this particular

7   letter that you receive, Head Kandy is putting you

8   on notice that there was a material breach of your

9   employment agreement, as well as a breach of

10   fiduciary duty that was owed by you to Head Kandy,

11   correct?

12      A   Yes.

13          Q   And this letter that's written to you, it

14   is laid out that you have started a new

15   competitive consumer product business under the

16   brand name White Pineapple, correct?

17      A   Correct.

18          Q   Prior to this letter, had you informed

19   anybody at Head Kandy that you had started White

20   Pineapple?

21      A   Can you show me where I was supposed to?

22   I'm confused, because everyone keeps saying that I

23   breached this.   And I guess I'm confused on why

24   this is coming at me that I did something wrong to

25   begin with.   So I'm confused on this entire

Page 132

1   situation.

2        So can you set this up?  You are saying

3   did I inform anyone that I had started White

4   Pineapple.  Are you asking -- informing who?

5   Because there was no protocol of who I was

6   supposed to inform, so can you please detail that

7   a little bit more?

8        **Q  Did you inform anybody at Head Kandy that**

9   **you had created White Pineapple, ma'am; yes or no?**

10       A  At Head Kandy.  Anyone?

11       **Q  Yes.**

12       A  Yes.

13       **Q  Who?**

14       A  Well, I had told -- Ryan knew.  I had told

15   Jerome Falic that I was going to start a new

16   business and leave if things didn't change, at the

17   meeting that I had with him 10 days before this

18   letter was sent to me, or eight days before this

19   letter was sent to me.  So I didn't specifically

20   say "White Pineapple," however I very much

21   informed Jerome that that was going to have to be

22   what I did.  So, yeah, I did inform people.  Yes.

23       **Q  And you -- and that's the November 20th**

24   **meeting where you say you informed Jerome Falic**

25   **that you were going to start a new business,**

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 190

1    met Mr. Rosenbaum?

2        A   I do.

3        Q   Okay.

4        A   I spoke to him on the phone.  I believe it

5    was June 30 of 2022.

6        Q   All right.  When was the first time you

7    met him in person?

8        A   He flew to the North Carolina warehouse on

9    July 5 of 2022.

10       Q   All right.  And was that for a one-day

11   visit or was it, like, for an extended stay?

12       A   I believe that was one day the first time

13   he came.

14       Q   All right.  And in your complaint in the

15   allegations against Head Kandy, you indicate that

16   Mr. Rosenbaum touched you.

17       A   He did.

18       Q   How many times?

19       A   Two that I can recall.

20       Q   All right.  And the first instance in

21   which Mr. Rosenbaum allegedly touched you, when

22   was that?

23       A   It was in July.  Actually, I believe it

24   was August 8th.  We were sitting at the conference

25   table and it was sometime in the afternoon, and we

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 191

1  were talking -- we had just had a meeting with

2  everyone.  We were all sitting in the conference

3  room.  And he was sitting to the right of me, and

4  I was sitting to the left.  And I had, like, a

5  dress on and it was -- it was mid thigh.  Like, it

6  wasn't anything, like, super short.  And we were

7  discussing how it was summer.  And he said to me

8  that he saw a Facebook ad running on Facebook for

9  tanning or something of the sorts.  And he said,

10 Were those your legs?

11      And I said yes, because in the ad, one leg

12 I had used tanning lotion and the other leg I had

13 not.  And he reached over with his left hand and

14 touched my knee and drug it up my thigh a little

15 and said, You have the perfect legs to demonstrate

16 tanning.

17      Q  And what time of the day was this?

18      A  It was middle of the day.  I remember -- I

19 feel like it was, like -- I don't know the exact

20 time, but I remember it was in the middle of the

21 day.

22      Q  And that was on -- it was on August 8 of

23 2022?

24      A  I believe that was -- I believe that was

25 August 8.  If not, I know it was in the summer and

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 193

1      A  I think that it's not very fair for you to

2  state how I should and should not act according to

3  what happened to me.  I was an owner of the

4  company and an employee, and I was being

5  approached by someone who was in charge of me, who

6  was at the same time praising me, and then in the

7  same breath tearing me down and screaming at me,

8  and telling me that the company is going to be

9  liquidated, and that I was stupid, and that I

10  didn't know what I was doing one day, but then the

11  next I was great.  He was very manipulative and he

12  was the definition of a groomer, now that I look

13  back.  And I tried to ignore a lot of it to begin

14  with.

15       When he was there on July 5th, he went to

16  the bathroom in front of everyone.  Ryan was

17  there, and Mindy was there, and Brandi was there,

18  and Rachel was there.  And he went to the bathroom

19  in the restroom with the door wide open.  And not

20  one person said anything.  And I thought to myself

21  Well, I guess this is acceptable behavior.  I

22  don't know.  I didn't know how to act.

23       And I didn't know how to handle him, four

24  days after coming in or five days after coming in,

25  calling me his girl in text messages.  At first I

Page 194

```
1    kind of brushed it off, because I felt like for
2    the first time in four and a half years that I had
3    been at Head Kandy, Jerome finally brought in
4    someone to help me to grow the business that I
5    really believed in.  And I didn't feel like I
6    should be the -- I ended up telling Jerome what
7    happened to me.  And what happened to me was
8    wrong.  I should never have been touched in any
9    way by Jon Rosenbaum.  No matter how I reacted in
10   that moment, it was unwanted and I did not ask for
11   it.  So --
12        Q  Did you suffer --
13        A  -- I'm sorry you feel I talked to him in a
14   way that I should not have, but I did not know how
15   to handle what was being done to me.
16        Q  Did you -- did you suffer any physical
17   damage as a result of him touching you?
18        A  No.
19        Q  Okay.  Did this first instance that you
20   have just described for us, was there anybody else
21   around?
22        A  Not for that one, but I did tell people
23   right away after that he did, and I thought it was
24   awkward.
25        Q  Who did you tell?
```

Page 196

1        And I took a nap.  And I woke up crying.

2   And I just said to Dusty, I really hope that Jon

3   isn't always going to be like so intense.  And

4   he -- I just remember just saying that it was

5   awkward.  Like, it was an awkward situation

6   because he touched my leg.  And I said, But he's

7   so intense.  He talks so loud.

8        So I wasn't, like, hyperfocused on that

9   specific incident, it was just more of his

10  demeanor in general, and I just kind of blew it

11  off.  Like, I felt like -- I don't know because --

12  and then -- yeah.  So I did tell my husband that

13  day I remember, yes.

14     Q   Okay.  And this occurred in

15  North Carolina?

16     A   Yes.

17     Q   At the warehouse that was owned by Head

18  Kandy Realty?

19     A   Yes.

20     Q   In what room did it occur?

21     A   The conference room.

22     Q   What's the next instance in which you

23  contend that Mr. Rosenbaum touched you?

24     A   On -- I don't remember the specific date.

25  It was toward -- I want to say it was the first of

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 197

1   September.  I was standing in the hallway outside

2   of Kaylin's office, and his office was past my

3   office and Kaylin's office at the end of the

4   hallway.  And I was talking to Kaylin through the

5   office door.  And I turned around and he was in

6   his office, like, screaming at someone on the

7   phone.  And I poked my head in.  And I looked in

8   at Kaylin and I just said, Sheesh, because he was

9   always, like, screaming.  And we joked that we

10  were happy that we weren't the target of his

11  screaming.

12       And about maybe, I don't know, 10 seconds

13  later or something he had gotten off the phone and

14  he opened the door, and he was back to calm.  He

15  wasn't, like, heightened or freaked out or

16  anything, like, worked up or whatever.  And I

17  walked toward him, toward the content room, and he

18  was walking this way toward me in the hallway.

19  And I was, like, That was loud.  Like, trying to

20  make a joke of it.  Because I think everyone knew

21  that we heard and it was really awkward to just

22  hear him screaming like that.  And as I walked

23  past him in the hallway he, like, brazed my neck

24  down to my chest.  Like -- like, he was -- sorry,

25  it was like -- it was his right hand and he just,

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 198

1  like, brazed it and touched my chest.  And he

2  said, Glad I yelled.  That's what he said.  And he

3  kept walking.

4      Q  Okay.

5      A  And he had a black zip-up hoodie on and

6  jeans and, like, a white T-shirt or something.  I

7  just remember what he was wearing.  And at the

8  time I just was, like, Uck, just Jon being Jon.

9      Q  Okay.  Was anybody else around to observe

10 that?

11     A  Kaylin was in her office, but I don't

12 think she saw it.  But I definitely told her about

13 it later in the day or something like that.  I

14 just remember that by this point we both had felt

15 like it was starting to get increasingly

16 uncomfortable.

17     Q  Okay.  And was that second time that he --

18 you allege that he touched you, was it done in a

19 sexually suggestive way?

20     A  I think a man should never touch a married

21 woman in any way like that, so, yes.

22     Q  Okay.  I just got to ask the questions.

23 Okay?  So I'm just -- I've got a job I've got to

24 perform, so you've got to let me ask these

25 questions.

**HEAD KANDY LLC vs KAYLA MCNEILL**
Kayla M. McNeill on 07/12/2024

Page 200

```
 1      A   Touched, yes.

 2      Q   I understand.  Did you sustain any

 3   physical injuries as a result of him touching you?

 4      A   No.

 5      Q   Do you need to take a break or are you

 6   okay?

 7      A   I'm okay.

 8      Q   All right.

 9          MR. CONVERSE:  Are you sure?

10          THE DEPONENT:  Just let me get through it.

11      Q   (BY MR. LOEB)  Now, I understand that you

12   have said that there were instances in which

13   Mr. Rosenbaum and you and Ms. Culp did yoga

14   together, correct?

15      A   Yes.

16      Q   How many times did y'all do yoga?

17      A   I only did yoga one time.  I told him --

18      Q   What -- once?

19      A   I -- that he requested it several.  And I

20   told him no.

21      Q   All right.  And when was the first time

22   that y'all did yoga?

23      A   October 4.

24      Q   And where did that occur?

25      A   In the -- I think the warehouse had, like,
```

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 201

1  this, like, area that was, like, a photography

2  area for, like, people to take, like, selfies and

3  shopping.  And that's where it happened.

4      **Q  All right.  Do you know someone named**

5  **Silvana?**

6      A  I do.

7      **Q  Was she there that day when the yoga**

8  **occurred?**

9      A  She set the yoga up with Amber Teaster in

10  the room.  She set up --

11      **Q  And -- go ahead.  I'm sorry.**

12      A  She set up the computer screen with -- Jon

13  wanted to do, like, a program of some kind.  And

14  we didn't have a TV, so he had them bring in a

15  computer so that we could put it on, like,

16  YouTube.

17      **Q  All right.  And do you recall after this**

18  **yoga session texting both Mr. Feldman and**

19  **Mr. Thompson, indicating that Mr. Rosenbaum was**

20  **not as flexible as you thought he would be?**

21      A  I remember telling Bryan Feldman that Jon

22  did yoga with us.  And I was hoping just maybe

23  that he would think it was not appropriate.

24          And I tend to joke a lot.  Like, that's

25  how I handle things.  It just makes things less

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 206

1      Q   My understanding, based upon the

2   allegations in your complaint against Head Kandy,

3   is that you went for therapy?

4      A   I started to try to do it.

5      Q   Pardon me, ma'am?  I'm sorry.  I didn't

6   hear.  You cut off.

7      A   No, I started to do therapy.  Yeah.

8      Q   All right.  And when did you start to do

9   therapy?

10     A   Maybe, like, March or April of 2023, when

11   I realized I really needed to try to deal with,

12   like, these emotions.

13     Q   Would you say that your emotions were

14   wrapped up with being terminated from the company?

15     A   I would say that I was put in a

16   horrifically uncomfortable situation, where I was

17   the owner of a company that I worked really hard

18   to build.  And I definitely had my heart in the

19   right place with everything that I did.  And I was

20   dealing with someone who was so mentally abusive

21   to me, and threatening me, and telling me that he

22   was going to liquidate the company and that I was

23   going to lose my job, and at the same time

24   fighting for the company to just continue to

25   survive.  Because people like Ryan, who was my

Page 210

1    back on the record.

2        Q   (BY MR. LOEB)  All right.  Any testimony

3    given so far you want to change, modify,

4    supplement in any way, shape or form?

5        A   Not that I have thought about.

6        Q   Okay.

7            You were talking about -- before we go

8    back to the text, you were talking about, I guess,

9    having gone to therapy in March of 2023.

10       A   Yes.

11       Q   How many -- how many sessions did you

12   attend?

13       A   I think I tried, like, four or five, but

14   I -- I wasn't mentally ready yet.  It was -- I

15   wasn't ready.

16       Q   All right.  And did -- did you attend

17   those sessions on a weekly or biweekly basis?

18       A   Weekly.  It was a couple times a week for

19   a couple weeks.  And I just realized it was

20   triggering me to be more upset than it was helping

21   at the time.

22       Q   All right.  And who did you see?

23       A   It was a Christian counseling place that I

24   had been referred to.  So it was over the phone,

25   just --

Page 212

1      Q  Did you go and see anybody other than this

2   Christian counseling individual?

3      A  I got on medication.

4      Q  All right.  What medication did you get

5   on?

6      A  Prozac.

7      Q  Do you have a history of depression?

8      A  None.

9      Q  Do you have a history of mental illness?

10     A  None.

11     Q  And did you see any other health care

12  professional, other than speak -- sorry.  Did you

13  speak, communicate, or talk to any other health

14  care professional, other than the Christian

15  counselor?

16     A  I saw my family practice doctor, and then

17  I went to a -- like a specialist for, like,

18  women's health.  And I thought maybe she could

19  help me more so with, like, maybe hormones and

20  vitamins, rather than popping pills down my throat

21  to handle what had happened to me.

22     Q  Who was your family practice doctor?

23     A  James Wiggington.

24     Q  How long have you been seeing

25  Dr. Wiggington?

Page 213

1      A   Since I was in high school.

2      Q   **And did you grow up in Salida?**

3      A   I did.

4      Q   **And Dr. Wiggington is the one who gave you**

5  **a prescription for Prozac?**

6      A   He did.

7      Q   **Did you -- how many times did you visit**

8  **with Dr. Wiggington?**

9      A   Gosh, like total in my whole life or --

10     Q   **No, I don't want to know about high school**

11  **stuff -- come on now.**

12     A   I --

13         (Multiple people speaking simultaneously.)

14     Q   **(BY MR. LOEB)  I don't have time to go**

15  **back to high school with you, Kayla.**

16     A   Three or four times, I believe.  Maybe

17  three.

18     Q   **Over that same time period?**

19     A   No, I saw him in -- I think I finally -- I

20  tried the counseling first.  So I believe I went

21  to see him when I just -- it was not -- nothing

22  was getting better.  And I feel like maybe around

23  April, I want to say, is when I finally realized

24  that I needed medication.

25     Q   **Are you still on Prozac?**

Page 214

```
 1      A   Yes.
 2      Q   Have you received a diagnosis?
 3      A   I mean, I think any health care provider
 4  that would have seen me would have seen that I
 5  went through some pretty serious trauma, so, yes.
 6  I mean, I got the medication for -- I couldn't
 7  gain weight.  I couldn't eat.  I got down to
 8  103 pounds.  I cried every day for months.  I
 9  couldn't get out of bed to feed my kids.  So I
10  don't know what diagnosis that would be, but I
11  definitely needed some help.
12      Q   All right.  But did you receive a
13  diagnosis, is my question?
14      A   I mean, my doctor said I'm clearly
15  depressed --
16      Q   Okay.
17      A   -- and --
18      Q   Were you diagnosed with depression, if you
19  know?
20      A   I don't carry a card.  I don't know what
21  that means.  Like, what -- yeah, the doctor said
22  I'm depressed and he gave me medication for it.
23  So I'm going to say I'm probably depressed.  I
24  don't know how to answer that.  Like, do they
25  stamp your forehead?  Like, what are you asking?
```

Page 215

1      Q  I don't know.  I'm asking you -- you know,

2  you hear about people who are clinically depressed

3  or they've been diagnosed with clinical

4  depression.  Did you receive an official diagnosis

5  for being depressed?

6      A  The doctor put me on an antidepressant, so

7  I'm going to say probably.

8      Q  But do you know is my question, ma'am?

9      A  I don't recall.

10     Q  Other than Dr. Wiggington, did you see

11  anybody -- did you see anybody else?  I guess the

12  specialist for women's health, what's that

13  doctor's name?

14     A  I can't remember her name, but, yes, I did

15  see someone else.

16     Q  How many times did you see the specialist

17  for women's health?

18     A  Probably four times, maybe more.

19     Q  What was the date range or time period?

20     A  June or July of last year, I believe,

21  when -- I think -- to be honest, I don't recall

22  when I first went to her, but somewhere in the

23  last year.

24     Q  Did the specialist for women's health make

25  any diagnosis of you?

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 216

1    A  Again, I don't have like a card, but she

2  definitely said that I'm deficient in -- I had my

3  blood run.  I did a lot of work.  Like, I wanted

4  to make sure I was healthy, because I thought

5  something was really wrong with me.  And so she

6  just, basically, tried to help me mentally get

7  back to a good mindset.

8        And then -- so she -- she didn't -- like I

9  said, I don't have a card.  She definitely said

10  I'm depressed.  She definitely said I have severe

11  anxiety.  It's pretty obvious.

12    **Q  Did she make any diagnosis as to the**

13  **cause?**

14    A  I feel like she definitely knows what the

15  cause was.

16    **Q  But did she make any diagnosis as to what**

17  **the cause was?**

18    A  I mean, she definitely said it was trauma.

19    **Q  Did she say trauma from what?**

20    A  She knows the whole story.

21    **Q  No, my question is:  What did she say the**

22  **trauma was that caused you to have this anxiety**

23  **and depression?**

24    A  You will have to ask her.

25    **Q  She didn't tell you?**

Page 217

1    A  I just told you, we've had several

2  conversations.  She didn't pinpoint the exact

3  moment that I was retaliated against and my whole

4  world got flipped upside down.  Like, I'm going to

5  assume that's probably what she'll say.

6    **Q  When you say "retaliated against," you are**

7  **talking about the demotion and termination?**

8    A  I'm talking about that I told my business

9  partner what happened, what was going on, and then

10  he made me report to the man that was treating me

11  that way.  So that's what I'm talking about.

12    **Q  Any other medical care professionals or**

13  **professionals that you have visited with, other**

14  **than the ones you have told me about?**

15    A  No.

16    **Q  Any other medications that you are on,**

17  **other than Prozac?**

18    A  None.

19    **Q  And are you still seeing any of these**

20  **doctors for your mental health?**

21    A  Yes.

22    **Q  Who are you seeing?**

23    A  The same doctors that I listed.

24    **Q  At what level of frequency?**

25    A  About every four months for -- her name is

Page 218

1    Dawn.  Sorry.  I remember her name is Dawn.  I

2    can't remember her last name.  She's the women's

3    health physician.  I see her maybe, like, every

4    four to six months now to get my blood work

5    continued.  I'm actually supposed to go next week,

6    I believe, or the week after to see if my levels

7    are, like, balancing out.

8        Q   All right.  As a result of what you told

9    us about, do you have any, like, rashes or hives

10   or anything like that?  Let me see if I can

11   explain it to you so you understand what --

12           Some people when they get upset they, you

13   know, they get like a rash or they get hives or

14   something.  I'm trying to think of, like, in

15   movies where you've seen people where they break

16   out in hives or something like that.  Anything

17   like that?

18           I mean, was this -- I'm not trying to be

19   disrespectful to you when I'm asking these

20   questions, so please -- please understand I just

21   got to do a job here, but did you -- was your

22   reaction to this -- it was -- it was psychological

23   in nature?

24       A   I mean, it got to a point where I was

25   shaking so bad inside and externally, like I

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 241

1          It was weird, but he wanted me to feel

2    like there was nothing I could say that would make

3    Jerome in any way think that Jon was a bad person,

4    I guess.  And things kind of slowed down a little

5    bit.  Like, he didn't come back to North Carolina

6    for a little bit.  I can't remember exactly, but I

7    know that on November 10th he texted me and said,

8    You looked really good in your live video this

9    morning.

10         And I didn't even say thanks.  I don't

11   remember.  And then I had sent him a TikTok that I

12   had made of a transition of me doing my hair.  And

13   he said, You are so hot, you're hotter -- or too

14   hot for your followers, or something.  Like --

15   **Q  Ms. McNeill, do you remember -- do you**

16   **remember the question I asked you?**

17       A  Yeah.  Well, you asked me leading up to

18   why.  And so, I'm sorry that you --

19   **Q  No, I said --**

20         (Multiple people speaking simultaneously.)

21   **Q  (BY MR. LOEB)  No.  I said tell me about**

22   **the November 20th meeting.  That's what I asked**

23   **you to tell me about.  Tell me about your**

24   **recollection of what happened at the November 20th**

25   **meeting, ma'am.**

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 242

1      A   I flew to Miami to tell Jerome exactly

2  what happened.  And I'm telling you right now

3  about what Jon Rosenbaum did and how he was really

4  aggressive with every single person that worked at

5  Head Kandy; that he screamed at every one; that he

6  didn't know what he was doing; that Brandi was

7  making bad business decisions for the company.

8          I said that he -- I asked him not to have

9  Jon come back because of the things he had done to

10  me.  I said, Please do not let Jon come back to

11  that warehouse.

12          And he said to me that he would take care

13  of it, that he would handle it.  He made me feel

14  like he heard me.  He made me feel like I

15  mattered, that he cared, and that it was going to

16  get handled.  So that's what happened.  And I

17  cried.  And his wife handed me tissues.  And she

18  cooked us breakfast.  And he heard me say and she

19  heard me say everything that I said about Jon.

20  And it wasn't just business-related, and it wasn't

21  just the sexual harassment that was related.  I

22  stood up for every single person in that company

23  that he was being horrific to.  And I said,

24  Please, do not let him come back to the warehouse.

25  I don't like being around him, and if this doesn't

Page 243

1    change I'm going to have to leave for my mental

2    health.

3        Q  Anything else?

4        A  And I left.  And I left.  And he hugged me

5    and he told me everything was going to be fine.

6    His wife hugged me.  We said our good-byes.

7            And then, weirdly, he never followed up

8    with me.  He didn't check on me the next day.  He

9    didn't ask if I was okay.  He didn't -- nothing.

10   Nothing.  That was it.  Like, I voiced my -- I

11   finally got enough courage after all of what I had

12   gone through, and told by everyone, Tell Jerome,

13   just tell Jerome.  And I finally did.  And then

14   Bryan Feldman stopped talking to me the next day.

15           I talked to Bryan Feldman every single day

16   for four and a half years.  And I fly to tell,

17   finally, the concerns that I have, and he just

18   ghosts me?  No one -- no one cared.  And then they

19   demoted me and made me report to him.

20       Q  Did you bring the texts with you for the

21   November 20th meeting?

22       A  I just told Jerome.  They're written on my

23   paper, the inappropriate things that he had been

24   saying to me.  He didn't ask to see the text

25   messages.

Page 248

1      A   No, this was October 4th.

2      Q   Okay.

3      A   And I didn't assist in making sure he -- I

4    didn't pay any mind to what he needed to do.  I

5    just went about living.  And I was working at my

6    desk, and he opened the door.  I was sitting at my

7    desk.  And right across from my desk is the door

8    to the bathroom and the door, the exit door.

9    They're like side by side.  And my office door was

10   like wide open.  And I had these two chairs and

11   they were yellow.  And they kind of like tilt into

12   each other, so it kind of covers part of the door

13   a little bit from where I was sitting at my desk.

14       And at first I thought he was just poking

15   his head out, so I kind of glanced up.  And he was

16   standing there naked, butt naked.  And he said, Do

17   you have a towel?  And I went, Oh, my God.  Like,

18   it just caught me off guard.  Obviously it very

19   much caught me off guard.

20       And I kind of froze for a sec.  I

21   obviously looked away.  And I don't -- I didn't

22   give any attention to it.  And I walked out the

23   door.  I went to the right.  Silvana was sitting

24   at the front desk.  And I looked at her and I

25   immediately started crying.  I don't know if she

Page 256

 1   correct.

 2       Q   And isn't it true that towards the end of

 3   the time that you were at Head Kandy, you

 4   continued to compliment Mr. Rosenbaum and say that

 5   you looked up to him?

 6       A   I did.  I did.  As a businessperson, I

 7   did.  And, again, you are trying to complicate two

 8   very different issues.

 9       Q   Well --

10       A   I wanted -- I -- I knew Jerome was not

11   going to get rid of Jon.  That was obvious.

12   Right?

13          So I asked Jerome to make sure he didn't

14   come back to the warehouse, which would stop the

15   behavior of him touching me.  And I hoped that

16   Jerome was going to tell him.  I don't know what

17   Jerome was going to do.  I went to management of

18   the company and the managing member and did what I

19   was supposed to do.  From there forward I was only

20   supposed to do my job.  There was a meeting about

21   marketing or something that involved Jon.

22          So was I supposed to start making sure

23   that the company failed and didn't invite him to

24   the business meetings?  Because I was trying to

25   continue to grow the company and do what I was

Page 257

1    supposed to do so that I didn't -- so I could go

2    back to doing what we were supposed to do, which

3    is what Jon was supposed to be brought in to do,

4    which was grow the company, and work, and be

5    professional, because that's what Jerome brought

6    him in to do.

7        Q  All right.  You have alleged that Head

8    Kandy has defamed you.

9        A  Yes.

10       Q  Who is it at Head Kandy that defamed you?

11       A  Well, I can tell you Mindy.  I can tell

12   you the people that Mindy told lies about me to.

13   I can tell you that her affidavit, the voice

14   messages, the entire -- the entire deposition

15   yesterday proved that Angela Porta was told by

16   Mindy every lie under the sun.  Ryan.  She said

17   that Ryan said all kinds of things according to

18   Angela Porta.  They filed a public document about

19   me that was complete lies.

20       Q  What public document is that?

21       A  They filed a federal lawsuit saying that

22   they paid for my weight loss surgeries, just one

23   little lie, knowing that they did not.

24           They said that I stole, even though I was

25   able to prove clearly by an expert witness and by

Page 258

1  proof that I did not.  And they still managed to

2  make sure they got that out there publicly.

3        So, yes, I do believe that they defamed me

4  in many ways.

5     Q  So what -- what -- what, other than the

6  filings and the lawsuit, can you tell me that you

7  believe to be defamation?

8     A  Other than the lawsuit?

9     Q  Yes, ma'am.  You mentioned the federal

10  lawsuit.  You mentioned Ms. -- you said Mindy.  I

11  assume that meant Mindy McDermaid?

12     A  Mindy McDermaid was telling people that I

13  had -- well, according to letters received, that I

14  had stolen.

15     Q  When did she say that?

16     A  I had -- she just had made a lot of these

17  allegations to third parties so --

18     Q  I need you to go each one --

19     A  I'm telling --

20     Q  No, I just need you to say she -- she --

21  Ms. -- and I'm talking about things outside of the

22  lawsuit.  Ms. McDermaid's first act of defamation

23  is that she accused you of stealing to third

24  parties.  When did that happen?

25     A  I just know the letter that was sent in to

Page 259

1   the company on December 3 of 2022.  I know that on

2   February 3rd of 2023, the voice messages that

3   Angela Porta sent to customers, to all the people

4   she was talking to me about, that Mindy had told

5   her things about me.

6        Q   Anything else?

7        A   I know that Melissa Keeney, who we raced

8   with our whole lives, told the entire club that I

9   was a thief and that I -- that I was a liar.

10  Stuff like that.

11       Q   Well, I need to know it all.  What

12  other -- what other -- who is Melissa Keeney?  Is

13  she an employee of Head Kandy?

14       A   I don't know.  You will have to check your

15  records.  She was.  I don't know if she still is,

16  but she was.

17       Q   And when she made these statements you

18  have alleged, was she an employee of Head Kandy?

19       A   Yes.

20       Q   Okay.  She told your club that you were a

21  thief?

22       A   Well, she told affiliates and she told

23  other people in our race club that I was a thief.

24           She said that I -- or some of the other

25  things that I know that Mindy had said, that I'm

Page 260

1   assuming Melissa got her information from Mindy.

2   But Mindy told people that I took 3,000 orders and

3   packed them up, and put them in a room and hid

4   them and hoped that no one would find them; that I

5   changed the password to the customer service

6   e-mail to lock them out; that I told warehouse

7   employees not to come to work, and that's why they

8   were behind on three -- or all their thousands of

9   orders.  They blamed me for the problems that they

10  were having.  They told people that I was the

11  reason that the company had too much inventory.

12  They said that I was reaching out to affiliates

13  and defaming Jerome Falic.

14        The list is endless.  I mean, they said

15  that I was -- oh, that I purchased $50,000 in hair

16  care from Calgary.  I heard that from affiliates,

17  so obviously they were talking about it.  But I'm

18  not going to be able to recall every single thing

19  in this moment, but that's some of them that I can

20  recall right now.

21      **Q  Did you hear this directly from these**

22  **individuals that you allege the statements were**

23  **made, or did you hear it thirdhand, like**

24  **secondhand?**

25        A  Oh, no.  I heard it firsthand.

Page 261

1      Q  You heard all of these things from Mindy
2   McDermaid firsthand?

3      A  Well, I heard -- no, the people telling
4   everyone the information and --

5      Q  Did you hear?

6      A  -- Mindy --

7      Q  Did you hear Mindy McDermaid say these
8   things; yes or no?

9      A  Mindy McDermaid filed an affidavit.

10     Q  I'm talking about outside the lawsuit.
11  Did you hear Mindy McDermaid say these things; yes
12  or no?

13     A  I read the text messages that Mindy sent
14  about me, yes.

15     Q  Okay.  And what text messages are you
16  referring to?

17     A  Well, let me continue really quick that
18  Mindy McDermaid told --

19     Q  No, just --

20     A  Hang on.  Let me --

21     Q  No, ma'am.  You know --

22     A  I can tell you the text that I read.  I'm
23  trying to tell you --

24     Q  No -- no, ma'am.  You need to --

25     A  My time is up.

HEAD KANDY LLC vs KAYLA MCNEILL
Kayla M. McNeill on 07/12/2024

Page 262

1      Q  -- answer my --

2      A  Has it been seven hours?

3      Q  No.

4      A  I'm done.  Has it been seven hours?

5  I'm --

6      Q  No.  Here's the problem --

7          MR. CONVERSE:  Ethan -- Ethan, I let it go

8  a few times.  You got to let her answer the

9  questions.

10         MR. LOEB:  No, she --

11         MR. CONVERSE:  I understand --

12         MR. LOEB:  She -- she --

13         MR. CONVERSE:  I understand your pending

14  question, but before this question you cut her off

15  a few times and she just wants --

16         MR. LOEB:  Because she -- because, all due

17  respect, Antonio, she's not answering the

18  question.  I'm not going to debate it with you.

19  I'll let the record reflect it.  And if we've got

20  to -- which I want to avoid -- if I got to go back

21  before the judge, I will, but she just needs to

22  answer the question.  And if we're playing this,

23  We're going to drag this out and see the seven-

24  hour clock, so be it.  I'm going to go back before

25  the judge, as I indicated to you on the phone

**HEAD KANDY, LLC. vs KAYLA MARIE MCNEILL, ET AL.**
**Kayla Marie McNeill, Volume 2 on 09/10/2024**

```
                 UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF FLORIDA
                 Case No. 23-CV-60345-JB/JMS

HEAD KANDY, LLC                   `      )
                                         )
        Plaintiff/Counterclaim   )
        Defendant,               )
                                         )
vs.                                      )
                                         )
KAYLA MARIE MCNEILL,             )
                                         )
        Defendant/Counterclaim   )
        Third Party Claimant,    )
                                         )
vs.                                      )
                                         )
JEROME FALIC and                 )
JONATHAN ROSENBAUM,              )
                                         )
        Third Party              )
        Defendants.              )
---------------------------------        )




                     REMOTE
              VIDEOTAPED DEPOSITION
                       OF
               KAYLA MARIE MCNEILL
                    VOLUME 2
              TAKEN AT 12:19 P.M.
          ON TUESDAY, SEPTEMBER 10, 2024


                 HELD VIA ZOOM




                  Reported by
            Melissa Suzanne Shore
         Verbatim Stenomask Reporter
                 Job 99787
```

**HEAD KANDY, LLC. vs KAYLA MARIE MCNEILL, ET AL.**
**Kayla Marie McNeill, Volume 2 on 09/10/2024**

A P P E A R A N C E S

For the Plaintiff:          Carson Sadro, Esquire
                            BARTLETT LOEB HINDS
                              THOMPSON & ANGELOS
                            1001 Water Street, Suite 475
                            Tampa, FL 33602
                            CarsonS@blhtlaw.com
                            Counsel for Head Kandy, LLC


For the Defendants:         Laura E. Burgess, Esquire,
                            L.E. Burgess, P.A.
                            5966 S. Dixie Highway, Suite 300
                            Miami, Florida 33143,

                            Antonio L. Converse, Esquire,
                            Converse Law Group, P.C.
                            600 17th Street
                            Denver, Colorado  80202
                            anthony@converselawgroup.com

                            Jennifer Tiedeken, Esquire
                            Massey, Kelly & Priebe, PLLC
                            125 S. Howes Street, Suite 1100,
                            Fort Collins, CO 80521
                            jennifer@lawfortcollins.com,

                            Jed Ferdinand, Esquire
                            Kathleen B. Moore, Esquire
                            Ferdinand IP Law Group,
                            450 Seventh Avenue, Suite 2300
                            New York, New York 10123,
                            jferdinand@fiplawgroup.com,


Also Present:               Brandi Webb (non-party)

**HEAD KANDY, LLC. vs KAYLA MARIE MCNEILL, ET AL.**
**Kayla Marie McNeill, Volume 2 on 09/10/2024**

**Page 272**

\* \* \* \* \* \* \* \*


INDEX


EXAMINATION                                    Pages

By Ms. Carson Sadro                              276

\* \* \* \* \* \* \* \*


Exhibits                  By              Pages

(NONE OFFERED)


\* \* \* \* \* \* \* \*

Adjournment                                      327
Witness Certification and Errata Sheet      328,329
Reporter Certification                           330

**HEAD KANDY, LLC. vs KAYLA MARIE MCNEILL, ET AL.**
**Kayla Marie McNeill, Volume 2 on 09/10/2024**

Page 296

1  Q.  So when was the last time you were on the premises?

2  A.  I believe December 20th, when John Rosenbaum

3      requested that we come in for a meeting.

4  Q.  Was that 2022?

5  A.  Correct.  Sorry.  We're still talking about the same

6      time period.

7  Q.  Sure.

8  A.  I have not -- that I recall, I was told that I

9      couldn't set foot on the property that I own, that

10     I'm on title for, of the building.  I could not set

11     foot in the building.  I believe they told me that

12     sometime the first December.  And so I just didn't

13     until John told me that he needed to have a meeting

14     with Dusty and I on December 20th.

15  Q.  Let's shift a little bit and -- because you've also

16     made a -- I don't want to say similar claim, because

17     I got to ask you what happened, but you made a

18     harassment claim for age based discrimination.  DO

19     you remember that?

20          MS. TIEDEKEN:  Object to form.

21  A.  I do.

22  Q.  Okay.  Tell me what you believe -- how you believe

23     you're harassed based on your age.

24          MS. TIEDEKEN:  Object to form.

25  A.  Well, I mean, I was called a little girl all the

**HEAD KANDY, LLC. vs KAYLA MARIE MCNEILL, ET AL.**
**Kayla Marie McNeill, Volume 2 on 09/10/2024**

Page 297

```
 1        time in text message, in reference; that I was
 2        young, I didn't know what I was doing; that he has
 3        sold millions and millions and millions of dollars
 4        and he's made hundreds of millions of dollars with
 5        Jerome; and that they might be old farts, but that
 6        they definitely know what they're doing compared to
 7        Kaylin and I, who are little girls; and that I had a
 8        lot to learn in the industry.  And that happened
 9        every time I came in contact with him.
10   Q.   And I know that you and I know this, but I'm just
11        going to say it so we can keep our train of thought
12        the same.  Mr. Rosenbaum, you only worked with him
13        during 2022, right?  Not any prior or subsequent
14        years?
15             MS. TIEDEKEN:  Object to form.
16   A.   Correct.  I had never worked with him any year
17        before that.
18   Q.   Okay.  And good catch.  January of 2023, is that
19        what you're referring to?
20   A.   Correct.
21   Q.   Okay.
22   A.   John came in July of 2022, and I was given my notice
23        of, whatever you want to call it, November 28th.  So
24        all of the things that you are asking me about with
25        the sexual harassment and the age discrimination and
```

**HEAD KANDY, LLC. vs KAYLA MARIE MCNEILL, ET AL.**
**Kayla Marie McNeill, Volume 2 on 09/10/2024**

Page 298

```
1          everything, happened in a very, very short period of
2          time.
3     Q.   Okay.  Thank you.  Did -- am I correct on my math
4          that at about that time you would have -- would you
5          have been 36?
6               MS. TIEDEKEN:  Object to form.
7     A.   Yeah, sure.  I don't know how old I am today, so I
8          would -- yeah, probably.  That starts to happen as
9          you get to 40.  You forget your age.  Yeah, I would
10         believe that I was probably close to 36.  Yeah, 36,
11         because my birthday -- well, I can tell you that my
12         -- the holiday release is always on my birthday.  I
13         was the founder of the company, so November 17th I
14         would have turned 37, 8, 6.  I would have been --
15         yeah -- whatever the --
16    Q.   I'm sorry.  I was cheating with the calculator next
17         to me, to be fair.  But fair enough to say you're
18         not -- you're not 40 yet.  You are still under 40?
19              MS. TIEDEKEN:  Object to form.
20    A.   I was under 40.
21    Q.   Okay.  And you're still under 40, right?
22    A.   Correct.
23    Q.   Okay.  Did Mr. Rosenbaum ever make any comments that
24         you were too old to complete a task?
25              MS. TIEDEKEN:  Object to form.
```

Page 299

```
 1   A.   No.

 2   Q.   Did he ever make any comments based on your age that

 3        would have prevented you from doing a task?

 4             MS. TIEDEKEN:  Object to form.

 5   A.   Mainly just belittling me, which then affected my

 6        confidence, which then made me not perform the task,

 7        because I was then -- I kind of felt like it was an

 8        absolute, like, mental -- yeah, he purposely

 9        belittled me to make me feel like I wasn't able to

10        do the tasks because I was too young and stupid and

11        I needed to always confer with someone who knew more

12        or was older or -- yeah, yeah, he did prevent me.  I

13        -- I -- yeah, he did.

14   Q.   Okay.  And any other task other than what you've

15        just told me?

16   A.   Oh, there was all kinds of things that I feel like

17        through the mental abuse of John Rosenbaum affected

18        my ability off of my age and gender, for sure.

19        There was several things and every -- every time I

20        came on -- came in contact.  I just can't remember

21        every single detail specifically because it was so

22        -- I think if it was one time, it would have been

23        easier to remember, but there was a lot.  So it's

24        actually harder.

25   Q.   Right.  And I don't mean that affected to where you
```

**HEAD KANDY, LLC. vs KAYLA MARIE MCNEILL, ET AL.**
**Kayla Marie McNeill, Volume 2 on 09/10/2024**

Page 301

```
 1                    MS. TIEDEKEN:  Object to form.
 2   A.   Unfortunately, John was the abuser.  And we -- yeah.
 3   Q.   And so nobody else at Head Kandy?
 4   A.   There was nobody else at Head Kandy.  I don't -- I
 5        don't -- nobody else was there.
 6   Q.   Okay.
 7   A.   Who -- who -- sorry, I don't know who you're
 8        referring to because he was -- he was my boss.
 9        There was no one else.  It was him.
10   Q.   Jerome Falic didn't say those things to you?
11                    MS. TIEDEKEN:  Object to form.
12   A.   Jerome Falic never spoke to me, but if Jerome Falic
13        did, I would assume that he would not have done
14        that.  So no.
15   Q.   And did Bryan Feldman ever say anything like that to
16        you?
17                    MS. TIEDEKEN:  Object to form.
18   A.   No, he did not.
19   Q.   Okay.  I want to talk next about your -- the
20        harassment claim for religion.
21   A.   Yeah.
22   Q.   Tell me how you feel that you were harassed based on
23        your religion.
24                    MS. TIEDEKEN:  Object to form.
25   A.   When John came in, things started to kind of make
```

1   sense of, like, I feel the way that I was kind of

2   treated a little bit during what I feel are

3   important holidays and things like that for any

4   religion.  And, like, I learned pretty quickly that

5   -- so Jerome was Jewish, and every single person

6   that we worked with was Jewish.  And I was always so

7   interested to learn about their religion and their

8   holidays and why they did what they did.  I was

9   always so intrigued on learning.  And I learned that

10  they have a lot of Jewish holidays and some that

11  prevent them from like --- they, like, don't do work

12  during certain times, and there's just a lot to it.

13  And I never knew that.

14       So then -- and there was many days where Jerome

15  would tell me, like, or, like, would tell -- like,

16  we would have something, like, something needed

17  signed, okay.  For example, like, closing on a

18  building or whatever it may have been.  And he would

19  tell Bryan Feldman, like, hey, I can't do this

20  closing on this date because of this specific

21  holiday or because this religious thing is coming

22  up.  So I knew that they took religion -- they made

23  it an important thing in their lives.  So I felt

24  like it was okay for me to try to make something in

25  my life important as well.  And I felt like that

Page 303

1    would be something that would be mutually

2    reciprocated, because if they get to do things

3    according to their religion, then, like, so should

4    I.

5         So I looked back once John comes in and he

6    starts telling me all about the religion, and I'm

7    learning all these things, and he starts telling me

8    that he can't believe that Jerome would ever do

9    business with anyone who was not Jewish, because

10   Jerome was so rooted in his faith, which I had seen

11   for years.  And then I start looking back and I

12   start thinking of all of the religious holidays that

13   meant something to me, like Christmas and Easter,

14   and those were, in my opinion, religious holidays.

15   That the birth of Jesus Christ was a big deal to me.

16   And I didn't feel it to be appropriate that if we

17   were receiving shipments, or whatever it may be,

18   that they just expected me to unload those

19   shipments, or anyone, for that matter, but mainly

20   me.  They knew when things were coming.  And Bryan

21   Feldman would say, you know, like, I'm sorry that

22   it's coming on this date.  And then I would take

23   pictures of me on Christmas and send them to Bryan

24   Feldman, and I would say, well, I got it handled.

25   But never once did it feel like he cared.  That to

**HEAD KANDY, LLC. vs KAYLA MARIE MCNEILL, ET AL.**
**Kayla Marie McNeill, Volume 2 on 09/10/2024**

Page 304

```
 1    me, that was an important holiday to me; or like,

 2    they couldn't even sign papers on their religious

 3    holidays.  So I started to feel like that was --

 4    seemed really unfair to me, that they made their

 5    religion so much more important than my religion,

 6    when I very much respected that they had a religion

 7    and that they believed what they believed in.  So I

 8    never said, well, you have to sign papers on that

 9    day because that's what the realtor says, or

10    whatever that may be.

11         So I feel like that was part of the

12    discrimination that I received -- was that they did

13    not care what my religion was because my religion

14    wasn't their religion.  So --

15  Q.  When did --

16  A.  -- and I was told that over and over by --

17  Q.  By who?

18  A.  By John Rosenbaum.

19  Q.  When did you tell Bryan Feldman which -- which

20      religion you practiced?

21          MS. TIEDEKEN:  Object to form.

22  A.  Gosh, probably in the very beginning when we met.

23      It just -- it was -- it wasn't anything that was

24      ever a deal.  Like, it wasn't a big deal.  Like, I

25      remember them asking me.  I remember Bryan Feldman
```

Page 305

1   and Jerome flying to the warehouse and the office

2   when we were on the Blake Street warehouse.  And I

3   remember them coming in, and we had this meeting in

4   my little office.  And I remember we started just

5   this conversation about the dollar amount that

6   Jerome was going to pay me.  And it had to be, like,

7   divisible by a certain number because it had

8   something to do with his religion.  And he was

9   telling me about it, and he said that had something

10  to do with things that come in -- it had something

11  to do -- listen, I can't recall because this was

12  back in 2018.  And then I remember being like, oh,

13  is that, like -- just asking, like, is that part of

14  your religion?  Like, how did we come to this?  And

15  he just said that in their -- it had something to do

16  with signs of life and something in their -- their

17  -- their book.

18      I -- listen, I apologize.  I don't know the

19  Jewish faith, and I very much respect it.  However,

20  I remember saying, oh, is that part of your religion

21  or part of your practice?  And they said, yeah.  And

22  then they just -- we just got into the conversation.

23  And Bryan Feldman was like, what religion are you?

24  And I was just like, oh I'm just Christian, non-

25  denominational.  And we -- that was kind of it.

Page 306

```
 1        Like they knew from before we even acquired the

 2        company, because I remember the number that they

 3        came to was divisible by a certain number.  And then

 4        every business deal that Jerome does always has to

 5        be divisible by that number.  And it has something

 6        to do with their religion.

 7   Q.   Did you talk about your religion during that

 8        conversation?

 9             MS. TIEDEKEN:  Object to form.

10   A.   I mean, I definitely informed them that I was a

11        Christian and that I -- like, I mean, we didn't,

12        like, get into depth about how much of a Christian I

13        was or I don't even know if that's even, like, a

14        level.  We didn't -- we didn't discuss religion at

15        that point.  But your question was when did we tell

16        it, and that would have been when.  And I don't

17        remember the extent of the conversation other than

18        the context of how we got there.

19   Q.   Okay.  Did you ever ask -- let me ask a different

20        question first.  Who would you have asked if you

21        wanted to take time off?

22             MS. TIEDEKEN:  Object to form.

23   A.   I would have let Bryan Feldman know.

24   Q.   Okay.  And is it that you would have had to ask

25        permission or were you able to take time off when
```

**HEAD KANDY, LLC. vs KAYLA MARIE MCNEILL, ET AL.**
**Kayla Marie McNeill, Volume 2 on 09/10/2024**

Page 307

```
1       you wanted to?
2                  MS. TIEDEKEN:  Object to form.
3   A.  Well, there was no policies or handbooks or
4       procedures.  So I felt to report to my boss, who was
5       Bryan Feldman, but if I wanted to take time off and
6       be away from Head Kandy, like an actual --- well,
7       let me back up.  Are we talking about religion or
8       are we talking about vacation now?  Because I'm
9       confused now, because I don't feel like I should
10      request to be off on religious holidays that are
11      practiced by banks.  So for -- in my opinion, I
12      didn't know that I needed to request Christmas off.
13  Q.  That was going to be my question.  I'm just trying
14      to break it up to make sure it stays clear.
15  A.  Okay.
16  Q.  Bryan Feldman, is that the individual you would have
17      asked to take any time off?
18                 MS. TIEDEKEN:  Object to form.
19  A.  I reported to Bryan Feldman.
20  Q.  Okay.  So you would have asked him?
21  A.  Correct.
22  Q.  Okay.  And I think this is what you're saying, but I
23      just want to make sure.  You never made a request to
24      take Christmas off?
25                 MS. TIEDEKEN:  Object to form.
```

HEAD KANDY, LLC. vs KAYLA MARIE MCNEILL, ET AL.
Kayla Marie McNeill, Volume 2 on 09/10/2024

Page 308

```
 1   A.   No, I never made a request to take mass -- like

 2        holidays where children weren't in school, banks

 3        were closed, UPS didn't run.  No, I didn't send a

 4        request for that.  And I wasn't an hourly employee

 5        with a schedule of Monday through Friday.  So that

 6        wouldn't have been something that would have been

 7        done.  I feel like that was just been universally

 8        just, like, I don't know, understood.

 9   Q.   Did you ever make a request to take time off on a

10        Christian holiday and Mr. Feldman said no?

11             MS. TIEDEKEN:  Object to form.

12   A.   I feel like Christmas is a holiday that you

13        shouldn't be expected to work.  So he didn't say no,

14        but he sure as heck was happy that I was there

15        because I had no choice, because no one else was

16        going to do it.  And he didn't say no, no, no, let's

17        reschedule it, like you -- he didn't respect my

18        religion the way he respected his religion, if

19        that's what you're asking.  My religion didn't

20        matter because it didn't affect him.  So he didn't

21        tell me no, because he didn't care.  But I would

22        assume that he knew that Christmas is a pretty

23        standard religious holiday.  Holiday, no matter, but

24        definitely a religious holi -- holiday.

25   Q.   Aside from being able to take off on a holiday, did
```

HEAD KANDY, LLC. vs KAYLA MARIE MCNEILL, ET AL.
Kayla Marie McNeill, Volume 2 on 09/10/2024

Page 309

```
 1         Mr. Feldman ever make any kind of negative comments

 2         about Christianity?

 3                   MS. TIEDEKEN:  Object to form.

 4   A.   Yeah, yeah.  I got to sit there and listen to them

 5         talk about the Palestinians and the Jewish people

 6         and the Christians and killing these people that are

 7         horrible and bombing and pushing them out of their

 8         houses and how that was their land and -- yeah,

 9         yeah, I did.  I heard a lot of really negative talk

10         on Christianity.

11   Q.   Hold on, Ms. McNeill.  Was that in reference to the

12         Israel-Palestine conflict?

13                   MS. TIEDEKEN:  Object to form.

14   A.   You mean the one that's been going on since before

15         you were even an inception of a person?  Yeah, it's

16         been going on for a hot minute, and I definitely

17         heard them talk about it all the time.  Yes.

18   Q.   Right.  So aside from the Israel-Palestine conflict,

19         and I don't mean to debate the merits of the

20         conflict, but was there any other remarks that

21         Mr. Feldman made about Christianity outside of that

22         specific issue?

23                   MS. TIEDEKEN:  Object to form.

24   A.   I'm confused on what you're asking because that

25         issue directly involves Christianity also.  And your
```

**HEAD KANDY, LLC. vs KAYLA MARIE MCNEILL, ET AL.**
**Kayla Marie McNeill, Volume 2 on 09/10/2024**

Page 310

```
 1        question was, did Bryan Feldman ever make comments

 2        about Christianity.  So the answer is yes, he did.

 3   Q.   No.  Right.  But I'm narrowing my question down.  So

 4        outside of that particular conflict, did Mr. Feldman

 5        make any comments about Christianity?

 6             MS. TIEDEKEN:  Object to form.

 7   A.   The conversation -- I think you're not understanding

 8        what I'm saying is, I think, the problem.  So you're

 9        saying out of that conflict.  I'm saying that the

10        conflict -- they would talk about Israel and

11        Christianity and what the Palestinians were doing

12        all the time when I was around them, when I was on

13        the phone with them, when I would go to their work

14        and it was on their TV's, inside their elevators.

15        So then when I would be around Bryan Feldman, yeah,

16        they talked about it all the time.  All the time.

17        Yeah, he filled me in daily about -- like, if I was

18        on the phone with Bryan Feldman and something

19        happened in the world that had anything to do with

20        Christianity, Israel bombings, Benjamin Netanyahu,

21        any of that, I heard all about it.  And what was it

22        nega -- did I feel that it was a negative depiction

23        of Christianity?  Yeah, yeah, I did.  Yeah, I did.

24   Q.   Did Mr. Feldman, when you brought up, if at all,

25        Christianity, make any negative comments about your
```

Page 311

1     practice of Christianity?

2                MS. TIEDEKEN:  Object to form.

3  A.  They made it pretty clear how they stood in the

4     world.

5  Q.  **Did they make any comments about your practice of**

6     **Christianity?**

7                MS. TIEDEKEN:  Object to form.

8  A.  They didn't know about my practice of Christianity.

9     They just knew that I was a Christian.

10 Q.  **Okay.  I --**

11 A.  I was also instructed not to post anything about my

12    religion on my social media.

13 Q.  **By who?**

14 A.  By Bryan Feldman.  And --

15 Q.  **When did he tell you that?**

16 A.  Well, every single time that holiday came around,

17    because we had to refer to it as holiday moving

18    forward and I wasn't allowed to refer to it as

19    Christmas.  I was the brand creative director who

20    started the business in my basement that was a

21    Christian.  And I love Christmas and everything that

22    it stands for with why Christmas is even an event.

23    And I feel like outside of the secular world of

24    retail, of people commercializing Christmas, it was

25    a part of my business, unfortunately, right.  So how

Page 312

1  holiday, which is what it eventually became, I

2  wanted to sell what I felt depicted my brand.  And

3  so I would do designs that would have Christmas

4  trees in them.  I would do designs that it said

5  Christmas.  And they would -- they --

6      You have to understand that they -- they don't

7  -- I didn't know this until later, but they don't

8  celebrate Christmas the same way that, like, I

9  celebrate Christmas.  And that's great.  Like, I am

10  totally okay with that, but I -- that's not my

11  world.  And so I created the design sometimes that

12  maybe reflected a little bit more my beliefs.  And

13  then I basically was told that it was ridiculous

14  that I was -- that I was marketing to one religion

15  and that I wasn't including the Jewish religion.  So

16  that in -- and I understand kind of where they were

17  coming from originally, but then it turned into this

18  whole thing that it was, like, you cannot post about

19  your religion.  And I was just kind of like, why?

20  I'm not saying anything negative about any other

21  religion.  I love Jesus, and that's who I am.  And

22  I'm sorry that you don't want your bran -- like --

23  but it was always that way.

24      It was like that before they bought in.  Every

25  -- I talked about my Christianity on my live videos

HEAD KANDY, LLC. vs KAYLA MARIE MCNEILL, ET AL.
Kayla Marie McNeill, Volume 2 on 09/10/2024

Page 313

```
 1      always before they bought the business.  So then
 2      when I was told that it needed to be more
 3      presentable and digestible to companies like Ulta or
 4      -- we were -- their goal was to get into a box
 5      store.  They didn't want me to depict myself as a
 6      Christian, I guess.  I'm not sure.  I'm not sure
 7      what the motive was in any of that, but I will say
 8      that it made me feel very -- it made me sad because
 9      my religion matters, too.
10  Q.  Okay.  I want to talk to you about the retaliation
11      claim you made with the Florida Human Rights --
12      Commission on Human Rights.  Is there anything else
13      other than the sexual harassment that you've alleged
14      by Mr. Rosenbaum or -- actually, on the part of Mr.
15      Rosenbaum, that you believe you were retaliated for,
16      any other conduct besides the sexual harassment that
17      you've alleged?
18              MS. TIEDEKEN:  Object to form.
19  A.  No.  I think that John Rosenbaum tried to cover up
20      what he did, and he knew that John -- John knew that
21      Jerome was going to believe anything that he said.
22      And Jerome did believe everything that he said, so.
23  Q.  So yes, just those actions or accusations for the
24      sexual harassment, right?
25              MS. TIEDEKEN:  Object to form.
```

**Deposition Excerpts from Volume III of Kayla McNeill September 10, 2024
Deposition will be filed separately under seal**