COPY

1

UNITED STATES DISTRICT COURT FOR THE

SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 23-CV-60345-RAR


HEAD KANDY, LLC,

      Plaintiff,

vs.

KAYLA MARIE MCNEILL, et. al

      Defendants.

_____/



August 15th, 2024

10:03 a.m. - 5:54 p.m.

Buro Central

101 N.W. 8th Street, Suite 200

Miami, Florida 33136


VIDEOTAPED DEPOSITION OF JEROME FALIC


Taken before Julio A. Mocega, Shorthand

Reporter, Notary Public in and for the State of

Florida at Large, pursuant to Notice of Taking

Deposition filed in the above case.

EXHIBIT 2

COPY

2

1                        APPEARANCES:

2    ON BEHALF OF THE DEFENDANT:

3    CONVERSE LAW GROUP, P.C.

4    600 17th Street

5    Suite 2800 South

6    Denver, Co 80202

7    BY:  Antonio L. Converse, Esq.

8    ALSO ON BEHALF OF DEFENDANT:

9    L.E. BURGESS, P.A.

10   5966 S. Dixie Highway

11   Suite 300

12   Miami, Florida 33143

13   BY:  Laura E. Burgess, Esq.

14   ON BEHALF OF THE PLAINTIFF:

15   BARTLETT, LOEB, HINDS, THOMPSON & ANGELOS

16   100 N. Tampa Street

17   Suite 2050

18   Tampa, Florida 33602

19   BY:  Ethan Loeb, Esq.

20   ALSO PRESENT: Edwin Arango, Videographer

21   PRESENT ON ZOOM: Colin Thompson
                      Gina Gazzaniga
22                    Kayla McNeill

23

24

25

COPY

3

```
 1                    I N D E X

 2

 3   JEROME FALIC                            PAGE

 4   By Mr. Converse                         5, 236

 5   By Mr. Loeb                             230

 6

 7                  E X H I B I T S

 8

 9   Defendant's Exhibit No. 1              76

10   Defendant's Exhibit No. 2              82

11   Defendant's Exhibit No. 3              106

12   Defendant's Exhibit No. 4              125

13   Defendant's Exhibit No. 5              136

14   Defendant's Exhibit No. 6              146

15   Defendant's Exhibit No. 7              198

16   Defendant's Exhibit No. 8              199

17   Defendant's Exhibit No. 9              203

18

19          (Defendant's Exhibits Retained by Counsel)

20

21

22

23

24

25
```

COPY

5

1  duly sworn, was examined and testified as

2  follows:

3                    DIRECT EXAMINATION

4  BY MR. CONVERSE:

5          Q.   Good morning, again, Mr. Falic.

6  Thank you for being here today.

7               Are you currently the managing

8  member of Head Kandy, LLC?

9          A.   Yes.

10         Q.   Did you form that entity?

11         A.   Yes.

12         Q.   When did you form it?

13         A.   It was back in -- I believe it was

14  2018.

15         Q.   And why did you form the entity?

16         A.   We had purchased the -- we took, I

17  guess, the majority of the company in

18  partnership, five partners in total, and we

19  formed an entity.

20         Q.   Could you give me the names of

21  those five partners, please?

22         A.   Yes.  It was Kayla McNeill, one;

23  myself, Jerome Falic; Bryan Feldman, Simon

24  Falic and Leon Falic.

25         Q.   Are Simon and Leon your brothers?

COPY

8

1    as they may have changed.

2         A.   So when we first -- when we first

3    bought into the company, we -- we would sit

4    down and come up with different ideas.  We

5    listened to all of Kayla's idea.  She ran the

6    day-to-day of the business, but I would -- I

7    was overseeing.

8              I would look at the numbers.  I

9    would look at the sales.  I would try to bring

10   in and increase the business by looking for new

11   avenues of distribution, or possibly bringing

12   in more marketing ideas to the business.

13             And it changed about July of --

14   June or July of '22, when I brought in a --

15   someone to oversee the operation, the

16   day-to-day operation, take a look at the

17   business, really, and to see what -- what is

18   going on and how do I make it better.

19        Q.   What is the name of that

20   consultant that you brought on?

21        A.   John Rosenbaum.

22        Q.   Why did you decide to bring on

23   Mr. Rosenbaum?

24        A.   Because I saw the company wasn't

25   growing.  It wasn't -- I felt it wasn't being

COPY

9

1    operated properly.  We needed to grow the

2    business.  We needed to lower inventories.  We

3    needed to scale down on the SKUs that we

4    carried.  We needed to increase customers.  We

5    weren't acquiring new customers.  And that was

6    why.

7              Q.   When did you become aware that the

8    company wasn't being -- it was not operating

9    properly, I believe, as you put it?

10             A.   Well, there was -- I was always

11   trying to -- I was always dealing with the

12   numbers, and I kept on questioning and saying

13   we need to grow the company, we need to grow

14   customer clientele, we have to grow sales, we

15   have to find better ways and more ways of doing

16   that.  So it was a -- it's not like I

17   discovered it overnight.

18                  I was speaking about it for quite

19   a while.  Took a few, you know, over a period

20   of time.  And I decided we need to make -- we

21   need to find a way of what is going on that is

22   not increasing the way it should.

23             Q.   How do you determine growth?  When

24   you say the company isn't growing, how do you

25   determine growth?

COPY

19

1   when you started looking into the inventory?

2          A.   I -- I -- no.

3          Q.   Did you receive reports at regular

4   intervals concerning the inventory as well?

5          A.   I did.  I don't remember from what

6   date, but yes, I started to receive them.  I

7   started asking -- requesting them more and

8   more.

9          Q.   Was that before or after you

10  retained Mr. Rosenbaum?

11         A.   It was before.

12         Q.   How did you select Mr. Rosenbaum

13  for -- to fulfill the consultant position that

14  you hired him for?

15         A.   I knew him from past businesses.

16  I knew that he knew how to run an operation.

17  And I -- I felt I needed someone to come in and

18  take a look at the business overall, look into

19  the details and figure out the best path

20  forward.

21         Q.   How long had you known

22  Mr. Rosenbaum at that time?

23         A.   I knew him -- I met Rosenbaum in

24  2007 or '8.  I believe it was 2008.

25         Q.   And I believe you said it was due

COPY

26

1          A.    There was a report -- a generated

2    report.

3          Q.    Would you receive that report at

4    the same time you received the sales report?

5          A.    No.

6          Q.    How frequently would you receive

7    the inventory report?

8          A.    I -- I don't know if it was

9    maybe -- possibly monthly.

10          Q.    Do you know --

11          A.    Or upon request.

12          Q.    Do you know who provided you the

13    report?

14          A.    Yes.

15          Q.    Who?

16          A.    Hernan Heiber.

17               THE COURT REPORTER:   Hernan

18          Heiber?

19               THE WITNESS:   H-E-I-B-E-R.

20    BY MR. CONVERSE:

21          Q.    When did you first start receiving

22    inventory reports?

23          A.    I -- I don't remember.

24          Q.    When you first mentioned Kayla, I

25    believe you said she ran the day-to-day; is

COPY

27

1    that correct?

2           A.   Yes.

3           Q.   What was her position with the

4    company?

5           A.   Her position was in charge of

6    running the day-to-day business and all of the

7    creative.  The business -- and she also -- as

8    well as the face of the company.  She was the

9    founder of the company.

10          Q.   Who tasked Kayla with managing the

11   day-to-day operations of the business?

12          A.   From the day we -- from the day we

13   created the partnership it was -- it was

14   written that she would be running the

15   day-to-day of the business.

16          Q.   So was it pursuant to a written

17   agreement?

18          A.   It was part of the employment

19   contract, yes.

20          Q.   The employment agreement between

21   Miss McNeill and Head Kandy?

22          A.   Yes.

23          Q.   Was that employment -- was that

24   employment agreement ever revised?

25          A.   It -- the only time the position

COPY

30

1          Q.    So throughout the existence of the

2    company, has anyone, other than you, had the

3    authority to direct Head Kandy's counsel to

4    take action on its behalf concerning employment

5    matters?

6          A.    No.

7          Q.    What was the reason for the change

8    in Miss McNeill's role in 2022 that you just

9    mentioned?

10         A.    It was basically what I mentioned

11   before, that once I brought in Mr. Rosenbaum to

12   oversee and how do I fix the business.  I felt

13   that it needed a fixing.  And again, trying to

14   grow customer base, trying to grow sales, lower

15   inventory, lower the amount of SKUs we carry.

16              With all of the above, I -- and as

17   John -- as Mr. Rosenbaum went through, he would

18   visit the offices and warehouse quite

19   frequently.  He would report back to me, as

20   well as to Bryan, and tell us what is -- what

21   is -- what he sees.  And as we continued to

22   move forward and go through a few months of him

23   reviewing everything, we made the decision.

24         Q.    Did Mr. Rosenbaum produce a

25   reports concerning his review?

COPY

31

1              A.   He would -- he would discuss all

2    the details with me.

3              Q.   Did he provide you any written

4    information concerning his findings during his

5    review?

6              A.   I don't know if he might have sent

7    them to me, you know, on text or what have you.

8    I'm not sure.  But we would speak quite often.

9              Q.   Were there any other issues that

10   Mr. Rosenbaum identified during his review of

11   the company's operations?

12             A.   So he started seeing -- you know,

13   he was looking into all aspects.  So part of it

14   was how we were spending on marketing -- how we

15   were -- how we were deciding on where to spend

16   on the marketing and social media end of it.

17                  And then as he went forward, he

18   started looking into the expense of the

19   company.

20             Q.   Did Mr. Rosenbaum propose any

21   changes to you to address concerns he

22   identified?

23             A.   Yes.

24             Q.   With regard to inventory, what

25   proposals did Mr. Rosenbaum make?

COPY

32

1          A.    We -- we -- he was suggesting,
2     first of all, we need to run some drastic sales
3     to lower -- to reduce the inventory.  That was
4     one.  And -- and watch very carefully how we
5     move forward ordering product.
6          Q.    Who was in charge of ordering
7     products when Mr. Rosenbaum was retained?
8          A.    Kayla McNeill.
9          Q.    I'm sorry?
10         A.    Kayla.
11         Q.    Oh, Kayla.
12              You mentioned Hernan Heiber with
13    regard to the inventory reports.  What was his
14    role concerning inventory?
15         A.    He would create inventory reports,
16    and he would send the actual purchase orders
17    and what -- you know, on what I was needed.
18         Q.    How would he determine what was
19    needed?
20         A.    Well, he would -- he would create
21    the purchase orders.  Kayla would decide which
22    products we're going to -- we're going to
23    order, and then he would -- and most of the
24    direction, from my understanding, came from
25    Kayla to him.

COPY

38

1  adopt Mr. Rosenbaum's recommendations?

2            THE COURT REPORTER:  Whether or

3       not to?

4            MR. CONVERSE:  Adopt

5       Mr. Rosenbaum's recommendations.

6            THE WITNESS:  He spoke to me about

7       it.

8  BY MR. CONVERSE:

9       Q.   And who would ultimately decide

10  whether or not the company would actually

11  undertake his recommendations?

12      A.   I needed -- I needed whatever --

13  whatever -- I needed whatever could be done to

14  save the company, and that's what we were

15  looking at, to save the company.

16      Q.   Could he unilaterally implement

17  his recommendations?

18      A.   He would -- he would run it by me.

19      Q.   And then you would approve it?

20      A.   Yes.

21      Q.   With regard to determining orders,

22  you had said that Miss McNeill would do that.

23           Was that part of her role in the

24  day-to-day management of the company that you

25  had delegated her?

COPY

39

```
1              A.    She was running -- she was --
2    under the agreement, she was running the -- the
3    day-to-day operation of the company.
4              Q.    Did you ever tell her that she was
5    responsible for determining inventory purchases
6    that Head Kandy made?
7              A.    That was her responsibility from
8    the time we -- we had acquired and were in
9    partnership with it.
10             Q.    Is that because you delegated it
11   to her?
12             A.    It's because she was -- what she
13   was doing when we -- when we first started, she
14   was doing it all along, and that's -- it was --
15   it was -- it was an automatic.  I never took
16   the responsibility away from her.
17             Q.    Were there any other
18   responsibilities that were a bit in automatic
19   concerning Miss McNeill's obligations to Head
20   Kandy?
21             A.    As I said, she was running the
22   day-to-day operation of the company, so all
23   aspects of the company.
24             Q.    We discussed the sales that
25   Mr. Rosenbaum recommended.
```

COPY

50

1          What does Miss McDermott do

2   concerning product development?

3          A.   So I am not in touch with Mindy on

4   a daily basis.  And John really speaks to her,

5   as well as the people from Alphagility speak to

6   her.

7          Q.   Who is her current supervisor?

8          A.   I would -- well, John.

9          Q.   I believe you also said that she

10  helps with the suppliers.

11          What does she do concerning

12  suppliers?

13          A.   I know she talks to suppliers

14  about various shipments.  You know, again, I'm

15  not in touch with her on a daily basis.

16          Q.   So you don't have any personal

17  knowledge concerning what she does day-to-day?

18          A.   No.

19          Q.   And the person who does would be

20  Mr. Rosenbaum?

21          A.   Correct.

22          Q.   Does Head Kandy -- excuse me.

23          Does Head Kandy currently have any

24  other employees?

25          A.   Yes.  Ryan Thompson is employed

COPY

51

1    with Head Kandy.

2              THE COURT REPORTER:  Ryan?

3              THE WITNESS:  Ryan Thompson.

4              And I believe that is the -- that

5         is the only two people on the payroll

6         today.

7    BY MR. CONVERSE:

8         Q.   Is Mr. Rosenbaum an independent

9    contractor?

10        A.   He's not -- he's really consulting

11   for me, but he is not on the payroll of Head

12   Kandy.

13        Q.   When did you first speak to

14   Mr. Rosenbaum about potentially assisting with

15   Head Kandy?

16        A.   Potentially?

17        Q.   Assisting with Head Kandy?

18        A.    It was sometime around -- I know

19   he came on board June or July of 2022.  So it

20   had to be a few months of -- a couple months

21   before that I started talking about -- about

22   it.

23        Q.   What were your initial discussions

24   with Mr. Rosenbaum?

25              MR. LOEB:  Object to the form.

52

```
 1   BY MR. CONVERSE:

 2          Q.   Go ahead.  Go ahead.  You can

 3   answer.

 4               What did you initially discuss

 5   with Mr. Rosenbaum?

 6          A.   Just in general, I told him about

 7   the -- about the company, and I -- I mentioned

 8   the sales that we had.  I mentioned how we --

 9   how -- you know, details about the company.

10   And I -- I told him I felt that we needed some

11   help.

12          Q.   Were you initially thinking that

13   he could potentially be the individual to help?

14          A.   Would he be?

15          Q.   He would potentially be the

16   individual to help?

17          A.   I felt he could be, yes.

18          Q.   Did Head Kandy ever have an

19   agreement with Mr. Rosenbaum concerning the

20   scope of his services and compensation for his

21   services?

22          A.   There was nothing ever written.

23          Q.   Was there anything discussed?

24          A.   The only thing that was discussed

25   was for him to come in and like I mentioned
```

COPY

63

1   acquiring enough customers.

2          Q.   Okay.  So when you say the company

3   wasn't growing in 2022, you're just referring

4   to customer acquisition?

5               MR. LOEB:  Form.

6               THE WITNESS:  Customer acquisition

7          and sales.

8   BY MR. CONVERSE:

9          Q.   Oh, and sales.  Okay.

10              So did the sales remain stagnant

11   from 2021 to 2022?

12         A.   I don't remember the exact sales

13   from each year --

14         Q.   Right.

15         A.   -- at this point.  I don't

16   remember.

17         Q.   Okay.  What about the income, did

18   it -- was it -- was the company still not

19   making any money at that point in time?

20         A.   Just in 2022, not making any

21   money.

22         Q.   Okay.  You also mentioned overall

23   expenses at the end is an area that

24   Mr. Rosenbaum looked into for Head Kandy.

25              Did he make any recommendations

COPY

64

1  that we haven't already discussed concerning

2  overall expenses?

3          A.    He -- later in the year, he --

4  he -- he went and asked me again if he could

5  hire an outside audit to be done.  And by a

6  company to do an audit on all of the

7  expenses -- on various expenses that the

8  company was paying out at -- paying out.

9          Q.    Did he tell you why he wanted to

10  have that audit performed?

11          A.    He felt the company expenses were

12  out of control.

13          Q.    And did you approve the audit?

14          A.    Yes.

15          Q.    What company performed that audit?

16          A.    K2.

17          Q.    I think it's going to be a large

18  topic, so I'm just going to ask you a couple of

19  follow-up questions and then we can take a

20  break, because we've been going for a little

21  bit.  Okay?

22          A.    Sure.

23          Q.    You had mentioned that John is

24  Miss McDermott's supervisor.

25              When did he become her supervisor?

COPY

66

1          break then.  Maybe ten minutes.

2                  THE WITNESS:  Sure.

3                  MR. CONVERSE:  Is that good for

4          you?

5                  MR. LOEB:  Sure.

6                  THE VIDEOGRAPHER:  Going off the

7          record at 11:28.

8                  (Thereupon, a short recess was

9          taken.)

10                 THE VIDEOGRAPHER:  Back on the

11         record at 11:45.

12    BY MR. CONVERSE:

13         Q.   Before we -- well, a little before

14    we went off, you had mentioned K2 Integrity,

15    and I would like to ask you about their work

16    with Head Kandy.

17                 (Thereupon, an off-the-record

18         discussion was had.)

19    BY MR. CONVERSE:

20         Q.   Did Mr. Rosenbaum contact --

21              Who contacted K2 to retain them?

22         A.   John Rosenbaum.

23         Q.   Do you know when?

24         A.   It was sometime towards the last

25    quarter of the year.  Sometime towards the end

COPY

67

1   of the year of 2022.

2           Q.   Okay.  Thank you.

3                Do you know when K2 finished its

4   audit?

5           A.   About a month after they started.

6           Q.   What was the scope of their audit?

7           A.   They were looking into all of

8   the -- mostly the credit card expenses that the

9   company was paying -- paying for.

10          Q.   Let me go back, since you

11  mentioned credit card, and ask you about Head

12  Kandy's operations at the beginning.

13               After you formed Head Kandy, did

14  you secure any credit for the company?

15          A.   No.

16          Q.   Did Head Kandy ever obtain any

17  credit that it could use for its operations?

18          A.   It obtained loans from each of the

19  partners.

20          Q.   We did it obtain those loans?

21          A.   I don't have the exact dates.

22          Q.   Do you know the year?

23          A.   I -- I don't.

24          Q.   What was the amount of the loans?

25          A.   I don't remember the amount.  I

COPY

68

1    don't remember if it was -- one of the amounts,

2    I believe, was about 145,000 per -- per

3    partner, I believe.  And then the other ones I

4    am not sure.

5              We did get from -- we got the

6    government help during COVID.  We got a

7    $500,000 loan that we all are guaranteed on.

8         Q.   Did that loan have to be paid back

9    in full?

10        A.   Yes.

11        Q.   Is there outstanding principal on

12   that?

13        A.   I believe very low.  It's

14   guaranteed by each of the partners.

15        Q.   You mentioned a $145,000 loan that

16   each of the partners gave.  And then I believe

17   you said that there were other loans.

18        A.   I don't remember exactly.  And I

19   don't remember exactly what the other loans

20   were.

21        Q.   Okay.

22        A.   Bryan would say we need to put

23   money into the company.  We either wrote

24   checks, which we did a couple of times, I

25   believe.  It might have been once, it might

COPY

69

1   have been twice, I don't remember.

2              And then there were other times

3   where we were able to obtain money through

4   Shopify and give a discount on -- you know,

5   they would take off a percentage of the sales

6   and pay themselves back, you know, in a certain

7   way.

8              Bryan would call me up and say we

9   really need some cash.  I can do this.  It's

10  very expensive money, but we needed to do it.

11         Q.   And then in that, the Shopify

12  money that you said was expensive?

13         A.   Yes.

14         Q.   Okay.  Were there any other loans

15  from all of the partners to Head Kandy?

16         A.   I don't remember.  I remember one

17  of them.  I remember reading one of them was --

18  I believe it was 145,000.  I don't remember the

19  other ones.

20         Q.   Was the $145,000 loan

21  memorialized?

22         A.   Again, I don't remember the

23  details of it.  I -- Bryan requested it, and

24  I -- you know, we just all put it in.

25         Q.   Do you know what the interest rate

COPY

90

1           they would -- I believe they would have

2           asked for it.  They're professional.

3    BY MR. CONVERSE:

4           Q.   Did K2 request additional

5    information?

6           A.   I -- I don't know.

7           Q.   So all of the reports that we've

8    looked at in Deposition Exhibits 1 and 2 all

9    have "Draft" written across it, watermarked

10   stating "Draft."

11          Do you know why these are all

12   draft reports?

13          A.   Yes.

14          Q.   Why?

15          A.   We wanted to give Kayla an

16   opportunity to review it and come back to us

17   with the details of what she saw.

18          Q.   Do you know if K2 ever provided a

19   final report?

20          A.   We were waiting for Kayla to come

21   back with all of the details.  And she did some

22   of the details, and she said it was too much

23   work.  And we gave her help -- we even offered

24   her help to try to put all of the work together

25   from our side.

COPY

107

1          Q.    Okay.  Did you authorize

2     Mr. Ferdinand to send this letter to

3     Miss McNeill on behalf of Head Kandy?

4          A.    Yes.  Yes, I did.

5          Q.    Why did Head Kandy send this

6     letter?

7          A.    As it is stated in the letter, all

8     of the things that -- that were being done,

9     that Kayla was doing, you know, creating

10    another website, selling on -- offering

11    merchandise from our warehouse, approaching

12    Head Kandy customers, really starting a whole

13    other business on the platform of -- and under

14    all the owned cites and Facebook pages and --

15    of such that were owned by Head Kandy.

16         Q.    I'd like to go through each one of

17    those and ask you a few questions, so -- you

18    first mentioned that she was starting another

19    business, I believe.

20               When did you become aware of that?

21         A.    It is stated here.  It's stated

22    here actually.  At least as early -- which

23    right there as of November 18.  I wouldn't

24    remember the dates otherwise.

25         Q.    Okay.  How did you become aware of

COPY

108

1  that?

2        A.   I don't remember who sent me a

3  copy of the post or TikTok or one of the videos

4  that she made regarding some leggings which

5  was -- and the video was taken in the warehouse

6  of Head Kandy.

7        Q.   Do you know how it was sent to

8  you?

9        A.   I don't recall.

10        Q.   What concerned you about that

11  video?

12        A.   What concerns me is, she's a

13  partner in the business, she should be

14  dedicating her time, her full time to the

15  company and not using -- and, of course, not

16  using our company resources and sources and

17  employees and everything that's being done

18  here.  I mean, it's obviously -- it's not --

19  really unethical.

20        Q.   Just with regard to that video

21  particularly, what -- was she doing all of

22  those things in the video?

23        A.   She was promoting leggings.  She

24  was in the warehouse of Head Kandy, which she

25  is a partner and -- she was a partner in Head

COPY

109

1   Kandy.  Using, you know, with the video,

2   approaching all of the Head Kandy customers.

3   Using the -- whichever one it was -- one of

4   the -- one of the handles of the company, it

5   belongs to the company of Head Kandy.

6           Q.   Were you able to confirm that that

7   account was owned by the company when you

8   obtained the video?

9           A.   Jed had confirmed it to us.

10          Q.   You had mentioned a couple of

11  times that --

12          A.   And -- and at the same time --

13  this is one of the -- one of the -- one of

14  the -- we paid for all of the expenses and all

15  of the boosts and all of lines of that particle

16  -- we call it "handle" -- the company pays for

17  all of it.

18          Q.   So I thought you said that you

19  weren't familiar with boosts and what that

20  meant.

21          So what's your understand- -- when

22  did you become aware of Head Kandy paying for

23  boosts?

24          A.   Well, I --

25          MR. LOEB:  Hold on.

COPY

110

1           Object to form of the colloquy.

2           Go ahead.

3           THE WITNESS:  I learned as we went

4      along.  As I told you, I wasn't -- I

5      wasn't fully aware of how it went

6      before, and as the months went through

7      and John was explaining to me the

8      different things and explaining to me

9      how we're paying for all of the boosts,

10     we're paying for all of these lives,

11     and, you know, I learned my way.

12          I mean, I've learned a lot of

13     these along -- after all of these years

14     in business.

15 BY MR. CONVERSE:

16     Q.   So at the time this letter was

17 sent, you were aware of Head Kandy's use of

18 boosting and how it was promoting accounts and

19 video using boosting?

20          MR. LOEB:  Form.

21          THE WITNESS:  I am not sure.

22 BY MR. CONVERSE:

23     Q.   So at the time this letter was

24 sent, were you aware of how Head Kandy was

25 utilizing boosting?

COPY

111

1          A.    I was starting to understand it

2    very well.  I will say I'm not an expert.

3          Q.    You mentioned a couple of times

4    that Kayla was a partner in the company as a

5    basis for concern.

6                Were the partners in Head Kandy

7    precluded from being involved in any other

8    businesses?

9          A.    Her employment agreement was

10   clearly stated for Head Kandy.  We didn't

11   have -- none of the other partners had an

12   employment agreement with the company.

13         Q.    So it was more the employment

14   arrangement that concerned you versus her state

15   as a partner in Head Kandy?

16               MR. LOEB:  Object to form.

17               THE WITNESS:  She had an

18          employment agreement with the company.

19          She's the only one that had a salary

20          with the company.

21               So -- and she had -- she was, at

22          one point, running the company for many

23          years.  She was the founder.  She was

24          the face of the company.  And she

25          should have done everything possible to

COPY

112

1              concentrate on Head Kandy and not start

2              or try to start another business under

3              the wings of Head Kandy.

4    BY MR. CONVERSE:

5         Q.   You said she was promoting

6    leggings.

7              Has Head Kandy ever sold leggings?

8         A.   Head Kandy sold other apparel that

9    Kayla brought for us to sell, for the website

10   to sell.  At that point they did not sell

11   leggings.

12        Q.   Has Head Kandy ever sold leggings?

13        A.   No.  But also she was offering the

14   leggings to all of the customers of Head Kandy

15   in the Head Kandy warehouse.  I mean, it was

16   really clearly there.

17        Q.   Do you know if the video was being

18   uploaded live to the account?

19             MR. LOEB:  Form.

20             THE WITNESS:  I -- I don't know.

21   BY MR. CONVERSE:

22        Q.   Do you know when -- what time of

23   day the video was posted?

24        A.   I don't know.  I know it was in

25   the warehouse, and I know that her, you know --

COPY

113

```
1   the only way she can -- if she was going to
2   start something else, or start another
3   business, she had to get something in writing
4   and approved by me to be able to do so.  That
5   never -- it never came up.
6              Q.   Is that requirement in her
7   employment agreement?
8              A.   Yes.
9              Q.   Did you observe her using Head
10  Kandy employees in the video to assist in any
11  way with her leggings business?
12             MR. LOEB:  Form.
13             THE WITNESS:  The video was just
14        of her in our warehouse.  I was told
15        that she was using other employees for
16        that business.
17  BY MR. CONVERSE:
18             Q.   Were you told that before this
19  letter was sent?
20             A.   This was the information that
21  was -- it's on the letter.  So we knew ahead of
22  time.
23             Q.   Who told you that she was using
24  other employees?
25             A.   I -- I don't recall.
```

COPY

Case 0:23-cv-60345-JB   Document 467-2   Entered on FLSD Docket 12/02/2024   Page 32 of 51

COPY

114

1          Q.    Do you know to what extent she was

2   using Head Kandy employees?

3          A.    At the time I didn't know to what

4   extent.  I do know that she used -- afterwards

5   I did find out some people ordered the products

6   for her, and, you know, I think -- I believe

7   some customer service people were working with

8   her as well in helping her out.

9          Q.    Do you know to what extent those

10  customer service people were helping her?

11         A.    I don't remember the details.

12         Q.    Did you learn about the assistance

13  from the customer service people prior to the

14  filing of this lawsuit?

15         A.    I don't remember.

16         Q.    Do you know if you've learned

17  about it prior to her termination by Head

18  Kandy?

19         A.    I don't remember the timing of

20  each event.

21         Q.    Did you -- it said that she was

22  also using employees for purchasing.

23         A.    From what I've heard, yes.

24         Q.    Okay.  Do you know who told you

25  that?

COPY

115

```
 1          A.   I don't remember.
 2          Q.   Do you know if you learned of that
 3    before her termination?
 4          A.   I don't remember.  And I don't
 5    believe so.
 6          Q.   Okay.  Do you know if you've
 7    learned of Head Kandy employees helping her
 8    with purchasing before the lawsuit was filed?
 9          A.   Again, I don't remember the timing
10    of each event.
11          Q.   You also stated that Head Kandy
12    owned the account that she was posting on; is
13    that correct?
14          A.   Yes.
15          Q.   Do you know how Head Kandy
16    acquired that account?
17          A.   I --
18               MR. LOEB:  Form.
19               Go ahead.
20               THE WITNESS:  I -- I don't know.
21          I don't know.
22    BY MR. CONVERSE:
23          Q.   Did anyone ever tell you that Head
24    Kandy did not own that account?
25          A.   Kayla argued the point.  Jed
```

COPY

116

1   confirmed otherwise.

2          Q.   Did anyone else tell you that Head

3   Kandy did not own the account, other than

4   Kayla?

5          A.   No.  And I was told also -- we

6   also -- that Head Kandy paid for all of the

7   expenses of that account, all of the lives, all

8   of the things that go with it.

9          Q.   Do you know what expenses are

10  involved in those type of accounts?

11         A.   What I was told, again, was

12  boosting -- boosting the lives -- boosting all

13  of the lives.

14         Q.   This might be a way that you can

15  help inform me.

16              What does boosting do?

17         A.   It's -- again, I don't know.  I'm

18  good but I'm not that good.  Let me just say

19  that we boost them -- they just push it

20  through.  They go out and, you know, as many

21  viewers as possible.

22              Again, I just know we paid the

23  expenses.  When I see these, you know, I am

24  told that we're paying for all of these live

25  videos to go and get boosted.  It's an expense.

COPY

117

1      So again, if the company is paying

2  for it and the site belongs to the company,

3  then it's on company time; it's on company

4  resources.

5      Q.   So it sounds like boosting

6  concerns exposure.

7      Is it tied to running ads in any

8  way?

9      A.   Again, I'm not -- I'm not an

10  expert, like I said before.

11      Q.   Okay.  You also stated that you

12  were concerned because Kayla was approaching

13  Head Kandy customers concerning the leggings.

14      How did you determine that she was

15  approaching Head Kandy customers?

16      A.   It was on one of the Head Kandy

17  handles, which is what -- what -- what the Head

18  Kandy customers -- you're talking to the Head

19  Kandy customers.  That's how -- it's -- it's

20  one and the same.

21      Q.   Do you know if there are any

22  individuals who view those posts who are not

23  Head Kandy customers?

24      A.   I assume there are.

25      Q.   Do you know if there's a

COPY

118

1   difference between viewers and followers on

2   those pages?

3           A.   Yeah.   Some people just view an

4   Instagram post, and some people follow the

5   Instagram post.

6           Q.   Okay.   And are all of the --

7   strike that.

8               Do you also assume that all of the

9   followers on the page are Head Kandy customers?

10          A.   No.

11          Q.   How do you determine who is a Head

12  Kandy customer?

13          A.   Someone that has purchased Head

14  Kandy product.

15          Q.   During any particular time period?

16          A.   Anyone that purchased anything

17  from Head Kandy is a customer.

18          Q.   At any time?

19          A.   Yes.

20          Q.   You had said that Kayla would need

21  approval to start another business; is that

22  correct?

23          A.   Yes.

24          Q.   Did she ever receive approval to

25  be involved with another business?

COPY

119

1          A.   She never asked to be involved in

2     another business.

3          Q.   So she was never provided

4     authority?

5          A.   And I obviously didn't expect it

6     either, because this was -- you know -- Head

7     Kandy was -- she was the founder.  She, you

8     know, she was the -- she ran the company for

9     many years.  She was the face of the brand.

10              I didn't expect her to spend time

11    and build up another company, but she never

12    even -- she never asked either.

13         Q.   Do you know the names of any of

14    the Head Kandy employees that were assisting

15    Miss McNeill in any manner concerning the new

16    venture that is referenced in this Exhibit 3?

17         A.   From what I heard afterwards?

18         Q.   At any time.

19         A.   At any time?

20         Q.   Yes.

21         A.   I know that Ryan was working very

22    close to Kayla, and was -- and assisted her.

23    And I know that Kaylin was very close to her.

24              I don't know most of the other

25    people that were working in the company, so I

COPY

120

1    don't -- I don't know them by name, and so I

2    don't know which other ones were assisting her

3    as well.

4              Q.    Just to clarify, is that Ryan

5    Thompson?

6              A.    Ryan, Thompson, yes.

7              Q.    And then did you say Kaylin?

8              A.    Kaylin, yes.

9              Q.    Is that Culp?

10             A.    Yes.

11             Q.    Did you learn what Ryan was doing

12   for Miss McNeill concerning another business?

13             A.    I heard at one point he was

14   ordering some of the product for her, helping

15   order product.

16             Q.    Do you know who told you?

17             A.    I don't remember.

18             Q.    And then with regard to Miss Culp,

19   did you learn what she was doing for Kayla?

20             A.    I'm not -- I just know that she

21   helped.  I don't know exactly what she was

22   doing.

23             Q.    So at the bottom of page 3 of this

24   Exhibit 3, the final paragraph says that -- I'm

25   summarizing, that her actions constitute

COPY

121

1    material breaches of the employment agreement.

2              Did Head Kandy -- sorry, strike

3    that.

4              Did Miss McNeill every resolve the

5    issues identified in this letter --

6         A.   I'm sorry, I can't hear you.

7         Q.   Oh, sorry.

8              Did Miss McNeill resolve the

9    issues that are identified in this letter

10   concerning the breaches of her employment

11   agreement to Head Kandy's satisfaction?

12        A.   What do you mean "resolve the

13   issue"?

14        Q.   From Head Kandy's perspective, was

15   Miss McNeill always in material breach of her

16   employment agreement following this letter?

17        A.   I don't think she ever ceased and

18   desist the White Pineapple business.

19        Q.   Okay.  So Head Kandy always --

20   sorry.  Strike that.

21             Head Kandy believed her to be in

22   material breach of her employment agreement due

23   to these actions at all times after this letter

24   was sent?

25        A.   Yes.  And we continued to give her

COPY

1   chance after chance.  As you can see, we even

2   put it in writing there, we're giving you

3   another opportunity.  And this has been -- you

4   know, I gave -- I gave her -- even beyond that,

5   we gave her even more opportunities.  I'm sure

6   we'll get to some of those after lunch

7   probably.

8        Q.   Right.  And we'll break shortly

9   for lunch.  I was just trying to make it

10  through this document.

11            MR. LOEB:  You're getting close to

12       the end?

13            MR. CONVERSE:  Yeah, no.

14  BY MR. CONVERSE:

15       Q.   The first paragraph on page --

16  well, it says page 3 of 4 at the top, but the

17  first page is the exhibit page, so it's really

18  page 4 in this deposition exhibit.

19            The last sentence of that first

20  paragraph says that Head Kandy would be within

21  its right to cancel Kayla's ownership units and

22  void any financial obligations owed to her.

23       A.   Uh-huh.

24       Q.   What financial obligations did

25  Head Kandy have to her at this time?

COPY

143

1   do with the company during her suspension?

2           A.   I don't know.

3           Q.   Okay.  What was the basis of her

4   suspension?

5           A.   Again, I have to go through the

6   document again.

7           Q.   Sure.

8           A.   It's all here.  I think it's all

9   written out for us here in the documents.

10              Again, the basis of the suspension

11  was, when we started seeing what was going on,

12  using the company funds for personal expenses

13  rather than just not business expenses.  Not

14  only -- and not only business expenses, hiring

15  employees or having employees work for you that

16  the company paid for, the company payroll.

17  That were for personal use.

18              Abusing the company in other ways

19  as well that we saw.  You know, we were renting

20  a forklift for $2,000 a month, which is, again,

21  it's astronomical.  An old used forklift for

22  years.  You can buy a forklift for a lot less

23  than what it cost for renting for a year.

24              We paid for a barn that never did

25  anything we were told it was going to be used

COPY

144

1    for.

2              Refurbishment of product.  Nothing

3    was ever shipped there, nothing was received

4    there, nothing was refurbished there.  We paid

5    $3,000 a month for that.

6              Like I said, where there's a

7    little bit, you find a lot.  And that's just a

8    few of the things that we saw.

9         Q.   Other than the issue with the

10   expenses that's addressed in the K2 report,

11   were those other reasons known to you at the

12   time that this letter was sent?

13        A.   Which other reasons?

14        Q.   You had mentioned a forklift.  And

15   you had mentioned employment of certain

16   individuals.

17        A.   Uh-huh.

18        Q.   So everything, excluding the

19   personal expenses, was that known to you at the

20   time this letter was sent?

21        A.   At this time?

22        Q.   Yes.

23        A.   Yes.

24        Q.   Okay.  Is there any reason why

25   they weren't included in this letter?

COPY

156

```
1   picture of me and my wife online, and I don't
2   remember what was said.  Again, I -- I don't
3   recall.
4          Q.   Do you recall any other posts that
5   she made concerning your wife?
6          A.   I -- I really don't remember.  At
7   one point, I -- I was just getting fed up
8   with -- with just speaking bad about me and my
9   family and for no reason.
10         Q.   You mentioned a couple of times
11  that you think Head Kandy would be a successful
12  business today if Miss McNeill hadn't made
13  certain posts about the company and the owners.
14              Why do you believe that?
15              MR. LOEB:  Object to form.
16              Go ahead.
17              THE WITNESS:  Because, again, like
18         I said, the whole reason why I got into
19         the business, I was -- I was -- when I
20         met Kayla I felt she was very creative.
21         She was really good on, you know,
22         selling product, and she had a great
23         following.  We could have built up more
24         followers, if -- and again, that's why
25         I made the change when I made it.  I
```

COPY

164

1    one word.

2    BY MR. CONVERSE:

3         Q.    What company employs Hernan?

4         A.    Falic's Fashion Group.

5         Q.    Were there any other employees of

6    other companies that provided services for Head

7    Kandy?

8         A.    I'm not sure if I had anyone else

9    doing -- getting -- getting paid.  I can't

10   recall.

11        Q.    I believe you said Mr. Thompson is

12   currently employed by Head Kandy.

13            What are his current duties and

14   responsibilities for Head Kandy?

15        A.    I haven't spoken to -- even when

16   he was -- during -- during the time that --

17   going back for 2022, 2021, I never worked

18   hand-in-hand with Ryan Thompson.  He is still

19   employed by the company.  And again, I don't

20   speak to them on a day-to-day basis.

21            John is really working on the

22   company as well as Alphagility, and they speak

23   with them.

24        Q.    So you don't know what

25   Mr. Thompson currently does for the company?

COPY

203

1   some reason, so can you go in the chat and open

2   the document that was just uploaded?

3            MR. LOEB:  Will that be Exhibit 9,

4       "Resolution"?

5            MR. CONVERSE:  Yes.

6            (Thereupon, the above-mentioned

7       document was marked as Defendant's

8       Exhibit No. 9, for identification.)

9   BY MR. CONVERSE:

10       Q.   This document is a couple of pages

11  as well.

12            Please review it and then I'll ask

13  you some questions.

14       A.   Okay.

15       Q.   Do you recall these resolutions?

16       A.   Somewhat.  I had a lot of letters

17  being sent, so somewhat.

18       Q.   In the second paragraph of this

19  document, in the second resolution, it states

20  that "Miss McNeill damaged the company in an

21  amount in excess of a million dollars."

22            Do you see those two statements?

23       A.   Yes.  Yes.

24       Q.   And at the end of the document it

25  says you've executed this as the managing

COPY

204

1    member of Head Kandy.

2              Do you see that?

3         A.   Yes.

4         Q.   Do you still believe that

5    Miss McNeill has damaged Head Kandy in excess

6    of a million dollars?

7         A.   I think she damaged -- damage to

8    the company, I think, was way beyond a million

9    dollars.

10             Q.   Did you unilaterally pass these

11   resolutions?

12             A.   What do you mean "unilaterally"?

13             Q.   Was there any vote of the other

14   members of the company?

15             A.   Not that I recall.

16             Q.   Was there a meeting held of the

17   other members to discuss these resolutions?

18             A.   The way I work with my brothers --

19   since I was overseeing this company, doesn't

20   mean with other companies -- we had 60 percent

21   between the three of us, so I speak for the

22   three of us as it is, so there was no -- there

23   was no meeting.

24             Q.   What happened to Miss McNeill's

25   shares after this resolution was passed?

COPY

205

1        A.    They get, how do you call it?

2   Dissolved.

3        Q.    So they were taken back by Head

4   Kandy and then dissolved?

5        A.    Yes.

6        Q.    So all of the -- strike that.

7              Are all of the approved membership

8   interests distributed and held by the other

9   four original members of Head Kandy?

10       A.    Yes.

11       Q.    Are you aware of a report by an

12  expert retained by Miss McNeill concerning the

13  expenses on the K2 report?

14       A.    No.

15       Q.    You had mentioned a forklift

16  previously.

17             Was there an agreement between

18  Miss McNeill and Head Kandy concerning Head

19  Kandy's use of that forklift?

20       A.    I don't believe there was a

21  written agreement.  From my knowledge, she had

22  brought it up to Bryan Feldman's attention

23  asking him if it's okay.

24             Again, with an agreement or not an

25  agreement, it's definitely -- and obvious

COPY

206

1   today, it's taking advantage of the company and

2   the partnership when we had total trust in her.

3          And, you know, it's just total

4   taking advantage of everybody.

5          Q.   Is that due to the value of the

6   forklift?

7          A.   The charge per month for the

8   forklift -- again, I didn't -- I guess I didn't

9   realize it was going to go on forever, but it

10   went on.  They had the forklift anyway.  You

11   know, if it was going to be -- there should

12   have been something agreed upon.  They could

13   have said, look, we paid whatever it might be,

14   $12,000 for the forklift, and we want to get

15   back our money for it, we'll put it into the

16   company.  Something like that.

17          Just like going back to the barn.

18   The barn was told we have to build this barn,

19   we're going to use it for a warehouse, we'll

20   use some refurbished product.  We paid $3,000

21   for an empty barn we never used once.

22          You know, unfortunately we didn't

23   come out to Salida, Colorado to take a look at

24   the barn and see how much product was in there.

25   But I know if we would have gone there, it

COPY

209

1    leased it to Head Kandy?

2              A.    Yes.

3              Q.    Do you know why they purchased a

4    forklift?

5              A.    They -- I understood it was a

6    forklift from their -- from before we

7    purchased -- before we went partners on the

8    business.

9              Q.    So you think that forklift was

10   transported from Colorado to North Carolina?

11             A.    I believe so.

12             Q.    Do you know if Head Kandy ever

13   leased a forklift for its warehouse?

14             A.    Prior?

15             Q.    At any time.

16             A.    I don't -- that was the forklift

17   we used.

18             Q.    So the same forklift was always

19   used --

20             A.    I believe it was only one

21   forklift, from my memory.

22             Q.    You stated the barn was never used

23   once.

24                   How do you know that the barn was

25   never used once?

COPY

210

1           A.   I know I heard about it.  John,

2     when he was doing -- looking and digging in

3     deep, I don't know who he spoke to, who

4     mentioned it to him, but he had told me, we

5     were paying for a barn that was never used.

6                I was always questioning and

7     asking what is the barn used for.  I did ask,

8     and they said, oh, we send in the refurbished

9     product -- the hair tools get refurbished over

10    there.  From what John found out, it was never

11    used.

12          Q.   Who told you that the tools were

13    being refurbished in the barn?

14          A.   I understood that from -- I don't

15    know if it was -- if it was brought up by

16    Dusty, by Kayla or Bryan mentioned it to me.

17    It was one of the three.

18          Q.   Do you know if Bryan -- excuse me.

19               Do you know if John ever visited

20    the barn in Colorado?

21          A.   Not to my knowledge.

22          Q.   Do you know if Bryan ever visited

23    the barn in Colorado?

24               THE COURT REPORTER:  Did you just

25          ask the same question twice?

COPY

217

```
 1   BY MR. CONVERSE:

 2          Q.   Okay.  Back from the break.

 3               Do you know approximately how many

 4   times Head Kandy moved its warehouse?

 5          A.   So, yes, we moved from Salida to a

 6   warehouse in North Carolina.  And then we moved

 7   one more time to another warehouse in North

 8   Carolina.

 9          Q.   Were inventories conducted when

10   the warehouse was moved?

11          A.   I believe so.

12          Q.   With regard to the Hollywood

13   office that we have discussed a number of

14   times, how many of your businesses are run out

15   of there?

16          A.   In Hollywood?

17          Q.   Yes.

18          A.   We have several.

19          Q.   Okay.  Is it more ten?

20          A.   I don't believe so.

21          Q.   Okay.  Because we had talked about

22   two others, Falic Fashion, the one that Raissa

23   works at.  I don't recall how to pronounce it.

24   Yasha Zim (phonetic)?

25          A.   Yasha Zim.
```