**KANDY LLC vs KAYLA MCNEILL**
**Nicole Cook on 05/09/2024**

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2                   FT. LAUDERDALE

 3
     HEAD KANDY LLC,
 4
            Plaintiff,          CASE NO.
 5                              0:23-cv-60345-JB
     vs.
 6
     KAYLA MCNEILL,
 7
            Defendant.
 8
     ~~~~~~~~~~~~~~~~~~~~~~~~~~~~
 9

10                    DEPOSITION OF

11                    NICOLE COOK

12

13              Thursday, May 9, 2024

14                   11:07 A.M.

15                 Videoconference

16

17

18

19

20

21

22

23

24  Reported By Rocco Franco, Commission No. 202403900042

25                 Job No. 65951
```

**EXHIBIT 9**

**KANDY LLC vs KAYLA MCNEILL**
**Nicole Cook on 05/09/2024**

```
 1                    APPEARANCES OF COUNSEL

 2


 3    On behalf of the Plaintiff, HEAD KANDY LLC:

 4        CARSON SADRO, ESQ.
          ELLIOT P. HANEY, ESQ.
 5        JALEN LARUBBIO, ESQ.
          BARTLETT LOEB HINDS THOMPSON & ANGELOS
 6        100 North Tampa Street
          Suite 2050
 7        Tampa, Florida 33602
          813-223-3888
 8        carsons@blhtlaw.com
          ellioth@blhtlaw.com
 9        jasonl@blhtlaw.com
          APPEARED VIA VIDEOCONFERENCE
10

11    On behalf of the Defendant, KAYLA MCNEILL:

12        ANTONIO CONVERSE, ESQ.
          CONVERSE LAW GROUP, P.C.
13        600 17th Street
          Denver, Colorado 80202
14        303-534-4499
          anthony@converselawgroup.com
15        APPEARED VIA VIDEOCONFERENCE

16    AND

17        LAURA E. BURGESS, ESQ.
          LEBURGESS LAW
18        5966 South Dixie Highway
          Suite 300
19        Miami, Florida 33143
          305-942-8044
20        laura@leburgesslaw.com
          APPEARED VIDEOCONFERENCE
21


22    Also present:
23
          Olivia Henderson, Videographer
24        Kayla McNeill, Defendant


25
```

Page 3

```
 1                    INDEX OF EXAMINATION

 2

 3   WITNESS:  NICOLE COOK

 4   EXAMINATION                                PAGE

 5   By Ms. Sadro                                4

 6   By Mr. Converse                            73

 7   By Ms. Sadro                              159

 8   By Mr. Converse                           169

 9   By Ms. Sadro                              177

10   By Mr. Converse                           188

11

12                    INDEX TO EXHIBITS

13

14   NO.             DESCRIPTION                PAGE

15   Exhibit 1       Declaration                17

16   Exhibit 2       Text Messages              22

17   Exhibit 3       New Hire Form              32

18   Exhibit 4       Calendar Composite         47

19   Exhibit 5       TimeTree Calendar Screenshot   49

20

21      (Exhibits 1 through 5 were attached to the

22   original transcript.)

23

24

25
```

**KANDY LLC vs KAYLA MCNEILL**
**Nicole Cook on 05/09/2024**

1     Q.   Okay.  I get it.  Ms. Cook, you said that

2  Ms. McNeill was kind of a big name around town.

3          What do you mean?

4     A.   Just, like, everybody knows her.  Everybody

5  knew that she had a -- a hair company, and she was a

6  hairstylist before.  She did nails, hair.  She started

7  Head Kandy.  She had a tanning salon.  So she was a

8  pretty big name around here because we live in a

9  little, itty-bitty town.  So she had a really nice

10  salon, and, like, everybody went to her, and everybody

11  just knew her.

12     Q.   What's the name of your little, itty-bitty

13  town?

14     A.   Salida, Colorado.

15     Q.   Do you remember the names of the businesses

16  Ms. McNeill operated in Salida?

17     A.   No.  I would say -- I -- I can't remember.

18  But --

19     Q.   Did you ever use Ms. McNeill's services in

20  those businesses prior to Head Kandy?

21     A.   Totally.  Yeah.  She definitely did my hair.

22  She did my nails.  All of that.

23     Q.   And was that regularly?

24     A.   Yeah.  I'd say regularly, like, every --

25  regularly, like, four weeks for nails and three months

Page 19

1  was advertising?  Excuse me.

2         MR. CONVERSE:  Objection.  Form.

3         THE WITNESS:  Yeah.

4  BY MS. SADRO:

5     Q.   How did you become aware of this position?

6     A.   It was on Facebook.  So she had posted a

7  little help wanted ad on a community Facebook group

8  that I was a part of, and I just responded to that.

9     Q.   What was the community Facebook group?

10    A.   I think, back then, it was called Ark

11 Mountain Valley -- Ark Valley Mountain Mamas.  Ark --

12 Ark Valley Mountain Mamas.

13    Q.   And what did the position say -- or what did

14 Ms. McNeill say what the position was for?

15    A.   Yes.  It was for a babysitter for her

16 daughter, Hayzlee.

17    Q.   Did the post, at that time, have any

18 affiliation with Head Kandy?

19    A.   I'm not sure.  I can't remember fully what

20 it said.  I also can't find it on Facebook, so I'm not

21 sure.

22    Q.   When you were reviewing the position to

23 potentially serve as Ms. McNeill's babysitter, did you

24 have the impression that you would be working for Head

25 Kandy, selling hair products?

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 20

```
 1      A.   No.  I knew I was going to be watching
 2   Hayzlee.
 3      Q.   Okay.  Did you -- how did you get in contact
 4   with Ms. McNeill about your interest in working as a
 5   babysitter?
 6      A.   I just texted her.
 7      Q.   And you already had her number at this
 8   point, I'm assuming, because you had been living in her
 9   home?
10      A.   Yeah.  Yeah.  And, I mean, we were
11   acquaintances.  Like I said, she was still friends with
12   my boyfriend, so I just still had her number.
13      Q.   And what did you reach out to Ms. McNeill
14   and ask her?
15      A.   I don't know that I really asked her
16   anything.  I just said, hey, I can totally help you
17   out.  Like, I'm home.  I had -- had my own baby in
18   September, so I was home.  And I just reached out, and
19   I was like, hey, I can help you.  Like, I'm home with
20   Huxlee.  I'd totally be willing to help you out.  And
21   that's just how it started.
22      Q.   Were you looking to work in an office or to
23   have the ability to work from your home?
24      A.   Just work from home.
25      Q.   And why was that important to you?
```

Page 22

1          MS. SADRO:  Madam Court Reporter, I'm going

2    to mark this as Exhibit 2.

3          (EXHIBIT 2 MARKED FOR IDENTIFICATION)

4    BY MS. SADRO:

5      Q.   So Ms. Cook, in Exhibit 2, I'm looking at

6    the first text message here that says January 10th,

7    2021, at 7:37 a.m.

8          What are -- what is going on with this text

9    message?

10     A.   That's probably when I saw it.  I just was

11   like, I can -- I can watch her.  Like, I'm home.  I'm

12   available.

13     Q.   And it says something.  Are you at the --

14   the dentist's office?

15          Were you working at the dentist's office at

16   that time?

17     A.   Yeah.  So I had worked at the dentist's

18   office until I had had my little guy.  Then I just was

19   there very part-time, just training some people every

20   once in a while.  But I wasn't there full-time, part-

21   time, or anything like that.  It was just to fill in.

22     Q.   And when you reached out to Ms. McNeill

23   about this position, were you and Ms. McNeill able to

24   come to an agreement as you serving as her babysitter?

25     A.   Yes.

Page 23

1    Q.   What did you understand that agreement to
2  be?
3    A.   Well, I had one son that went to school in
4  Cotopaxi and one son that went to school in Salida.  So
5  I was just going to drive the one to Salida and pick up
6  Hayzlee in the mornings when I dropped him off from
7  school and take her back to my house and then bring her
8  back to town when I had to pick him up from school.
9    Q.   And I -- I got to ask you, Ms. Cook.  At
10  this point in time, did you have any understanding that
11  you would be working at the Head Kandy warehouse?
12    A.   No.
13    Q.   Did you have any understanding that you
14  would be selling Head Kandy products?
15    A.   No.
16    Q.   Was your understanding that your exclusive
17  role was to watch Hayzlee?
18    A.   Yes.
19    Q.   Now, did you have an agreed upon schedule
20  with Ms. McNeill for when you would watch her daughter?
21    A.   Yes.  Kind of.  I mean, it was a -- it was a
22  very scattered kind of babysitting job.  But I had,
23  like, all of the days that she was going to need me, or
24  they weren't going to be around or all of that.  So I -
25  - I had an idea that it was -- I can't remember if it

Page 24

1    was four or five days a week, but it was at least four

2    that I was going to have her.

3        Q.   It sounds like there was some flexibility?

4        A.   Yeah.

5        Q.   And would you and Ms. McNeill communicate to

6    determine what days she needed you to watch her child?

7        A.   We did communicate.  We kind of communicated

8    ahead of time on those days and what exactly those days

9    would look like.  She had sent me calendars when they

10   were going to be gone and when I was going to have her,

11   when I wouldn't have her.  So I knew for the most part

12   what days I would have her.

13       Q.   And -- and --

14       A.   Have her to me --

15       Q.   And correct me if I'm wrong.  I -- I think I

16   keep saying it wrong.

17            Is Ms. McNeill's child pronounced Hayzlee or

18   Hasley?

19       A.   Hayzlee.  Sorry.

20       Q.   Okay.  Thank you.  Did you ever watch

21   Hayzlee at the Head Kandy warehouse?

22       A.   No.  I never watched her there.  I did drop

23   her off there, but I never watched her there.

24       Q.   And on the occasions that you would drop

25   Hayzlee off at the Head Kandy warehouse, were you ever

**KANDY LLC vs KAYLA MCNEILL**
Nicole Cook on 05/09/2024

1    engaging in any business for Head Kandy?

2        A.   No.

3        Q.   Okay.  So when you were at the warehouse,

4    you weren't organizing boxes?

5        A.   No.

6        Q.   You weren't selling any products?

7        A.   No.

8        Q.   Okay.  How often would you go to the

9    warehouse when you had to pick up Hayzlee?

10       A.   Not often.  I would say maybe a handful of

11   times.  Four or five times maybe, at the most, is all I

12   had to take her there.

13       Q.   And so the majority -- it sounds like the

14   majority of the work you did as Ms. McNeill's

15   babysitter you did from your home?

16       A.   Correct.

17            MR. CONVERSE:  Objection.  Form.

18   BY MS. SADRO:

19       Q.   At this point in time, at -- at the

20   beginning of 2021, what was your understanding of what

21   Ms. McNeill's role at Head Kandy was?

22            MR. CONVERSE:  Objection.  Form.

23            THE WITNESS:  My understanding was that she

24   was still the owner.  I had no knowledge of, like, what

25   a partnership with her partners entailed.  I knew there

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 26

1  were people involved, other people involved.  But my

2  understanding was that she was the -- the big guy in

3  the company.

4  BY MS. SADRO:

5      Q.   When you say, "the big guy," did you

6  understand that Ms. McNeill -- or was it your

7  understanding that Ms. McNeill had authority to make

8  decisions for Head Kandy, or at least that's what you

9  believed?

10     A.   That's what I thought, yes.  Yes.

11     Q.   And obviously, you didn't ask any questions

12  with -- of Ms. McNeill about how Head Kandy was

13  operated or her operating structure at that point in

14  time?

15         MR. CONVERSE:  Objection.  Form.

16         THE WITNESS:  No.

17  BY MS. SADRO:

18     Q.   Ms. Cook, were you and Ms. McNeill able to

19  come to an understanding about how much she would pay

20  you?

21     A.   Yes.

22     Q.   Okay.  So Ms. Cook, still in Exhibit 2, I've

23  gone to a text message now, dated January 10th, 2021,

24  at 8:59 a.m.

25         Can you still see that on my screen?

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 27

```
 1        A.   Yes.

 2        Q.   Okay.  Can you -- I -- I want to make sure

 3   I've got it right.  I mean, I think it's obvious.  We

 4   all have an iPhone nowadays or an Android.

 5        A.   Right.

 6        Q.   But -- but fair to say the messages in blue

 7   are from you, and the messages in black are from Ms.

 8   McNeill?

 9        A.   Right.  Yes.

10        Q.   All right.  So in that message up on the

11   screen, can you tell me the first message that you

12   received from Ms. McNeill in that screenshot?

13        A.   Just that the hourly pay was $14.  To let

14   her know what I was going to do for spring break, and

15   she was flexible.  They race a lot for the summer.  She

16   would let you know the schedule when she knew or let me

17   know the schedule when she knew.

18        Q.   And -- and I want to go down a couple of

19   messages.  And you say, "Sounds good."

20             Was that you agreeing to the pay rate?

21        A.   Yeah.

22        Q.   Okay.  And I've got it right, Ms. McNeill

23   said, "Thank you"?

24        A.   Yep.

25        Q.   Now, I want to go to the text message that
```

Page 28

```
 1   says, "I'll have Kaylin get you paperwork for payroll."
 2           Do you know who Kaylin is?
 3       A.   Yes.
 4       Q.   Who is Kaylin?
 5       A.   She worked in the office doing payroll for
 6   Head Kandy.  Her last name is Culp.  I don't really
 7   know her outside of Head Kandy, so.
 8       Q.   Had you known Ms. Culp prior to working for
 9   Head Kandy?
10       A.   I don't think so.
11       Q.   How did you come to learn that she -- her
12   job at Head Kandy was in payroll?
13       A.   I think I just knew from that and then
14   coming to find out, like, who all worked at Head Kandy
15   and, like, what their job duties were and their roles
16   and all of that.
17       Q.   And, Ms. Cook, after you and -- or excuse
18   me, let me -- let me go down a little bit further.  I'm
19   going to scroll to the next text.  That begins, "So
20   I'll salary you."
21           Is that text again from Ms. McNeill?
22       A.   Yes.
23       Q.   Can you tell me what Ms. McNeill
24   communicated to you in that text message?
25       A.   She was going to salary me instead of paying
```

**KANDY LLC vs KAYLA MCNEILL**
Nicole Cook on 05/09/2024

1  hourly for $560 a week at $40 -- or 40 hours a week at

2  $14 an hour, and I didn't have to clock in and clock

3  out.  Do you want me to read that?

4  **Q.   Sure.  Go ahead and keep telling me what**

5  **your understanding of the arrangement you had with Ms.**

6  **McNeill.**

7  **I mean, did you -- did she tell you about**

8  **what would happen if you weren't working on a**

9  **particular day?**

10  A.   Yeah.  So then it just said she would keep

11  her that day, or if she kept her, that I would still

12  get paid.  And I'd still get paid when I was on

13  vacation.  Just a set amount for the week, if that

14  worked for me.  So I'd have her until 5:00 or later if

15  I needed to or earlier if I needed to.  And then I

16  would just get paid consistently.  So if I would come

17  to town to get my middle son, Brody, I could bring her

18  with me.  Or if he rode the bus, that she could come

19  pick her up and bring Brody with her too if I needed.

20  So she was helpful when I needed her.

21  **Q.   Ms. Cook, during your time working for Head**

22  **Kandy, did you ever work a full 40-hour week?**

23  A.   No.

24  **Q.   But that was Ms. McNeill's original offer to**

25  **you, to pay you $560 for 40 hours a week?**

Page 30

```
 1            MR. CONVERSE:  Objection.  Form.
 2            THE WITNESS:  Yeah.
 3            MS. SADRO:  And, Mr. Converse, what's your
 4   objection?
 5            MR. CONVERSE:  You're asking leading
 6   questions.  You're telling her -- you're giving her the
 7   answer.  This is direct, and it -- you're -- again,
 8   you're posing inappropriate questions.  And you're also
 9   mischaracterizing the documents.
10            MS. SADRO:  Okay.  Thank you, Mr. Converse.
11   BY MS. SADRO:
12       Q.   All right, Ms. Cook.  So when you were
13   initially reaching out to Ms. McNeill to babysit, did
14   you ever think that you would be working for 40 hours a
15   week?
16       A.   I mean, I knew there was a possibility
17   because I knew she was busy with Head Kandy.  So I knew
18   it was a possibility.  And I will say that I -- I
19   shouldn't say that I know for sure that I didn't work a
20   40-hour week.  I don't know for sure that I didn't work
21   a 40-hour week.  I don't remember having her
22   consistently for 10 hours for four days or eight hours
23   for five days in one whole week.  So there's a
24   possibility, but I don't remember it happening.
25       Q.   And -- and, Ms. Cook, was it your
```

Page 31

1   understanding, based on that text message, that you

2   might get paid even if you weren't working?

3       A.   Yes.

4       Q.   Ms. Cook, when you learned that you might

5   get paid for not working, did you have any thoughts

6   about that?

7       A.   I mean, my first thought was, like, that's

8   great, right.  I -- I didn't really question it because

9   to me, she was the boss of the business.  So like, if

10  she -- that's the decision she wanted to make, great.

11  I wasn't going to question it, right, because it worked

12  in my benefit.  So I wasn't going to question it.  And

13  she was willing to be helpful when I was willing to be

14  helpful.  So I never questioned it because, to me, she

15  was the boss, and she could do whatever she wanted to

16  do.

17      Q.   Now, Ms. Cook, after you and Ms. McNeill

18  exchanged these text messages, did you fill out any

19  paperwork to begin working at Head Kandy?

20      A.   Yes.

21      Q.   Okay.  I -- I'm putting on my screen a -- a

22  document titled New Hire/Rehire Data Sheet.

23           Ms. Cook, can you still see what I put on

24  the screen?

25      A.   Yes.

Page 32

1      Q.   Is this document the new hire paperwork that

2   you at least partially filled out prior to --

3      A.   Yes.  Yep.

4      Q.   Okay.  And does it appear to be in the same

5   condition as when you filled it out?

6      A.   Sorry, say that one more time.

7      Q.   Does it appear to look the same as when you

8   filled it out?

9      A.   The top part of it that I filled out; not

10   the bottom part of it.

11      Q.   And why does the bottom part not look the

12   same?

13      A.   Because I did not fill that out.  That's not

14   my handwriting.

15      Q.   Okay.  But the top portion, at least, looks

16   the same?

17      A.   Yeah.  The part about -- the whole Section 1

18   is my handwriting.  From Section 2 below is not my

19   handwriting.

20          MS. SADRO:  And, Madam Court Reporter, I'm

21   going to mark this as Exhibit 3.

22          (EXHIBIT 3 MARKED FOR IDENTIFICATION)

23          MS. SADRO:  And just for -- oh, I -- I

24   apologize.  I thought Ms. Cook's Social Security number

25   was on there.  To the extent it is, and I can't -- I'm

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 33

1  not currently recognizing it.  I don't believe it is.

2  It's just the phone number.  I will redact it.  But I

3  don't believe her Social Security number is on it.

4          THE WITNESS:  It is.  It's at the top above

5  my name, my last name.

6          MS. SADRO:  I thought I saw it.  Thank you,

7  Ms. Cook.

8          THE WITNESS:  Yeah.

9          MS. SADRO:  So for the record and for

10  Counsel's benefit, I will redact that Social Security

11  number prior to submitting it to the court reporter, if

12  that is all right with you, Mr. Converse?

13          MR. CONVERSE:  Yes.

14  BY MS. SADRO:

15      Q.  Okay.  All right.  So Ms. Cook, tell me the

16  name of the company that's on this new hire data sheet?

17      A.  Head Kandy LLC.

18      Q.  Okay.  So at this point in time, did you

19  have any understanding of what company you were working

20  for?

21      A.  I mean, I knew I was working for -- well,

22  okay.  I knew I would be working for Kayla, but under

23  Head Kandy.

24      Q.  Okay.  The -- your paycheck was coming from

25  Head Kandy?

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 34

```
1          A.    Right.

2          Q.    Okay.  Ms. Cook, when you filled this form

3    out, was your understanding still that you were going

4    to be serving as Ms. McNeill's babysitter?

5          A.    Yes.

6          Q.    Now, I want to go to the bottom part of the

7    form that you told us a minute ago was not your

8    handwriting.  Do you know whose handwriting this is?

9          A.    I don't.

10         Q.    All right.  And I -- I want to go to the

11   kind of top of that bottom section where it says,

12   position.  What position does that say?

13         A.    Oh, it says Facebook.

14         Q.    Ms. Cook, at any point in time, did you work

15   for Head Kandy in the capacity of serving for Facebook?

16         A.    No.

17         Q.    Did you ever work for Head Kandy's social

18   media team?

19         A.    No.

20         Q.    Did you ever make any social media posts for

21   Head Kandy on behalf of Head Kandy?

22         A.    No.

23         Q.    Okay.  So do you know why that says

24   Facebook?

25         A.    I have no idea why it says Facebook.
```

**KANDY LLC vs KAYLA MCNEILL**
**Nicole Cook on 05/09/2024**

1    Q.   Okay.  And you don't recognize the

2    handwriting?

3    A.   No.  I don't know who -- it had to have been

4    either Keli-Lyn or Kaylin because they were the two in

5    charge of, like, the front of the house or the front of

6    the warehouse.  So it had to have been one of them.

7    From my understanding of the way that the world works

8    would be one of them.

9    Q.   While you were working for Head Kandy, did

10   anybody bring this form back to you and show you the

11   bottom portion?

12   A.   No.

13   Q.   So you had no idea that somebody had listed

14   your position as Facebook?

15   A.   No idea.

16   Q.   All right.  So let's start with when you

17   began work babysitting under Head -- under Head Kandy.

18        What was your day-to-day like?

19   A.   I would get my first one off to school, and

20   I would drive to town with the second one.  I think I

21   would pick Hayzlee up at, like, 8:00 or 8:30 at the

22   hospital, and then I'd just drive her back to my house,

23   and we'd just play and hang out.  And she would play

24   with my little guy, and we'd eat, and she would take a

25   nap.  Then I'd throw her in the car, and we'd head back

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

1      Q.   Okay.  When that happened, did Ms. McNeill

2   tell you the days that she might be out of town?

3      A.   She tried to give me a heads up, you know,

4   like at least a week in advance.  Like, they were going

5   to be gone on these days or whatever.  There were a few

6   that it was like, oh, I'm just going to keep her today,

7   kind of stuff, which was fine.

8      Q.   Did Ms. McNeill communicate with you about

9   any longer periods of time that she might be out of the

10  area?

11     A.   Yeah.

12     Q.   And what was that like?

13     A.   Like the days that they were going to be

14  gone racing.  They would be gone like for a week or two

15  weeks or three weeks at a time.  I don't know.  I'd

16  have to look.  But that they would be gone for, you

17  know, extended lengths of time because they would be

18  racing.

19     Q.   And when the -- the McNeill family was gone,

20  I'm assuming you weren't watching Hayzlee during that

21  time period; is that right?

22     A.   Right.

23     Q.   Okay.  When that happened on the days you

24  weren't watching Hayzlee, did Ms. McNeill offer to pay

25  you for that time?

Page 40

1        A.    Yes.

2        Q.    **What did she offer to pay you?**

3        A.    She just offered to pay me my normal wage.

4    So in those messages, it comes out that, like, I -- I

5    couldn't be salaried, so then she did put me on $14 an

6    hour.  And then it was discussed that because of what

7    she had told me about being salaried and how much I was

8    going to make, that, to be fair to me, she was going to

9    allow me to clock in on the days that I did not have

10   Hayzlee from 10:00 a.m. to 3:00 p.m.  So it wasn't a

11   full day, which was still super helpful, but not to

12   tell anybody, like any of the girls at the warehouse,

13   like Keli-Lyn or Kaylin or Sydney or really anybody at

14   the warehouse, to avoid the drama aspect of it.

15       Q.    **Okay.  And -- and like you said, when you**

16   **communicated about that with Ms. McNeill, was that via**

17   **text message?**

18       A.    It was, yes.

19       Q.    **I'm going to share my screen again.**

20             MS. SADRO:  And for the record, I'm going

21   back into Exhibit 2.

22   BY MS. SADRO:

23       Q.    **And I'm beginning with the text message**

24   **screenshot where -- from Ms. Cook.  The first message**

25   **on that screenshot is, "It's totally fine."  But I want**

1   to scroll down to the first message from Ms. McNeill.

2          Ms. McCook -- or, Ms. Cook, what did Ms.

3   McNeill communicate to you in that message?

4      A.   She said that Kaylin -- or she told Kaylin

5   she wanted to salary me, and she said that they didn't

6   approve it.  She felt bad because she needed my help,

7   so that this was between us.  I was just going to clock

8   in on the days that I didn't have Hayzlee from 10:00

9   a.m. to 3:00 p.m.

10     Q.   And in that text message, miss -- Ms. Cook,

11  it says "when you don't have her;" is her referring to

12  Hayzlee?

13     A.   Yes.

14     Q.   So was it your understanding that on the

15  days you didn't have Hayzlee, you were still going to

16  get paid?

17     A.   Right.

18          MR. CONVERSE:  Objection.  Form.

19  BY MS. SADRO:

20     Q.   How many hours would you be paid for on

21  those days?

22     A.   Just 10:00 to 3:00.  Ten -- or -- so five

23  hours.

24     Q.   And how much per hour were you making?

25     A.   $14.

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 42

1    Q.    Okay.  So how often do you think you were

2  paid for days you didn't have Hayzlee?

3    A.    I would have to go back and look but maybe

4  10 or so.  I'm not sure.

5    Q.    And, Ms. Cook, on the days you didn't have

6  Hayzlee, were you performing any other work for Head

7  Kandy?

8    A.    No.

9    Q.    On the days you didn't have Hayzlee, were

10  you performing any other work for the McNeills?

11    A.    No.

12    Q.    Were you performing any work other than

13  watching your own children at home?

14    A.    No.

15    Q.    And -- and again, Ms. Cook, did this seem

16  odd to you?

17    A.    Yeah.  I mean, weird.  But again, she was

18  the boss, and it was helpful.  To me, she was the boss.

19  And it was helpful to me that she was being helpful

20  because I was helping her out, so I just didn't

21  question it.

22    Q.    Now, Ms. Cook, we were talking about a

23  couple times Ms. McNeill let you know that she wasn't

24  going to be there.  How would she let you know?

25    A.    She would just text me.  Or if I would,

Page 50

1   10:00 a.m. to 3:00 p.m.

2        Q.   What about the 24th?

3        A.   The same as the 23rd and the 22nd.

4        Q.   And what about the 25th?

5        A.   The same.  No Hayzlee, clocked in from 10:00

6   to 3:00.

7        Q.   And, Ms. Cook, during the time that you

8   worked as a babysitter looking after Hayzlee, who --

9   where did your paychecks come from?

10       A.   They came from Head Kandy.

11       Q.   Did you ever receive any direct payments

12  from Ms. McNeill?

13       A.   No.

14       Q.   Did you ever receive payments from anybody

15  else for watching Hayzlee?

16       A.   No.

17       Q.   And, Ms. Cook, I've got back up on screen

18  what was -- we've already talked about as Exhibit 2.

19  And going back to the text where we originally saw the

20  February 2021 calendar.

21            Did Ms. McNeill send you other calendars?

22       A.   Yes.  I believe there's a calendar for every

23  month through December of 2021.

24       Q.   And -- and like Ms. McNeill said, she said,

25  "So the yellow is when we are gone, and the other days

Page 58

1  were going to be gone in yellow.

2      Q.   October 2021?

3      A.   Same thing.  All the days they'd be gone

4  were in yellow.

5      Q.   November 2021?

6      A.   The same.  They'd be gone those days.

7      Q.   December 2021?

8      A.   The same.  They'd be gone on those days.

9      Q.   Did Ms. McNeill ever clarify for you that

10  there were days that she was going to be out of town

11  where you shouldn't clock in from 10:00 to 3:00?

12     A.   I don't think so.

13     Q.   Was it your --

14     A.   Or I don't -- go ahead.

15     Q.   No.  I interrupted you.  Go ahead.

16     A.   That's okay.  I just was going to say, I

17  don't -- I would have to go back and look through all

18  of the messages, but I don't think there was a day

19  where she told me not to clock in.

20     Q.   And did you believe you had permission to

21  clock in on those days that you weren't watching

22  Hayzlee?

23     A.   Yes.

24     Q.   And who did that permission come from?

25     A.   From Kayla.

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 59

1        Q.   Okay.  Ms. Cook, can you see what I've

2   shared on my screen again?

3        A.   Yes.

4             MS. SADRO:  And again, this is just

5   Composite Exhibit 2 that's on the screen.

6   BY MS. SADRO:

7        Q.   Okay.  So on Composite Exhibit 2, we're on

8   the text that the first message begins with, "LOL.  She

9   won't care."  Ms. Cook, I want to go down to the text

10  message from Ms. McNeill that begins, "Anyways, it

11  works for me."

12            Did Ms. McNeill indicate to you whether or

13  not she wanted you to share that you were being paid

14  for time not working with anybody else?

15       A.   Yeah.  She definitely told me not to tell

16  anybody else.

17       Q.   How did you know that?

18       A.   That's what she says, is she doesn't want to

19  -- she doesn't want other people to, like, think she's

20  giving me special treatment, so not to tell anybody and

21  to avoid the drama within the warehouse.

22       Q.   And in the text message where it says, "Not

23  even Keli, please," do you know who Keli is?

24       A.   Yeah.  Keli is my older sister who worked in

25  the warehouse.

KANDY LLC vs KAYLA MCNEILL
Nicole Cook on 05/09/2024

Page 60

1      Q.   Okay.  And so your understanding was that

2   Ms. McNeill didn't want you to tell any Head Kandy

3   employee, right?

4      A.   Right.

5      Q.   Did you ever understand -- did you ever

6   learn why Ms. McNeill did not want other Head Kandy

7   employees to know that you were being paid for time not

8   working?

9      A.   I charged it up to the drama because there

10   was a lot of that.  I didn't question it for any other

11   reason other than, like she said, people saying that

12   she was going to give me special treatment, or it

13   wasn't fair; things like that.

14      Q.   Ms. Cook, how long did this arrangement go

15   on for?

16      A.   Just until the --

17           MR. CONVERSE:  Objection.  Form.

18           THE WITNESS:  Just until the beginning of

19   March.

20   BY MS. SADRO:

21      Q.   Oh, did you -- what happened in the

22   beginning of March?

23      A.   There was just something that happened

24   between Kayla and I.  She was talking about my middle

25   son when I wasn't around.  And I confronted her about