```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF FLORIDA
 2
     CASE NO. 23-CV-60345-JB/JMS
 3

 4   HEAD KANDY, LLC,

 5            Plaintiff/Counterclaim Defendant,

 6   vs.

 7   KAYLA MARIE MCNEILL,

 8            Defendant/Counterclaimant/Third-Party
     Claimant,
 9

10   vs.

11   JEROME FALIC,

12            Third-Party Defendants.

13   _____/

14   VIDEOTAPED VIDEO TELECONFERENCE

15   DEPOSITION OF:     TONIA WERNER, M.D.

16   DATE:              Friday, November 8th, 2024

17   TIME:              11:00 a.m. - 2:37 p.m.

18   LOCATION:          All participants appearing remotely
                        via ZOOM video teleconference
19                      from their respective locations

20

21   STENOGRAPHICALLY
     REPORTED BY:        LISA SELBY-BROOD, RMR,
22                       Registered Merit Reporter and
                         Notary Public,
23                       State of Florida at large.

24

25
```

HEAD KANDY, LLC vs KAYLA MARIE MCNEILL
Tonia Werner, M.D. on 11/08/2024

Page 2

1

2   APPEARANCES:

3

4   CARSON A. SADRO, ESQ.
    Bartlett Loeb Hinds Thompson & Angelos
5   1001 Water Street, Suite 475
    Tampa, FL  33602
6   CarsonS@BLHTLaw.com
    (813)223-3888
7
            Counsel for the Plaintiff, Head Kandy, LLC
8

9

10  LAURA E. BURGESS, ESQ.
    L.E. Burgess, P.A.
11  5966 S. Dixie Highway, Suite 300
    Miami, FL  33143
12  Laura@LEBurgessLaw.com

13          Counsel for the Defendant, Kayla McNeill

14

15

16
    ALSO PRESENT:
17

18  Jordon McHugh, Videographer

19

20

21

22

23

24

25

Page 12

1   fourth years I was at Connecticut Valley Hospital, which

2   was in Middletown, Connecticut, but I still -- didactic

3   lectures through Yale, 'cause we were affiliated with

4   them.  We were still -- I was still affiliated with

5   them.

6       Q   Understood.  Do you still participate in

7   didactic lectures?

8       A   I do.  I participate in them.  I'm on faculty

9   at the University of Central Florida at the present

10  time.

11      Q   After graduating from USF, Doctor?

12      A   Yes.

13      Q   I tease you.  Go Bulls.

14      A   That's all right.

15          I worked for UF for 18 years, so --

16      Q   Are you still on faculty at UF?

17      A   I'm not.

18          I retired from there in 2015, and then that's

19  when I got the faculty position at the university.

20          I was asked to come on faculty for

21  University of Central Florida.

22      Q   Tell me a little bit about the continuing

23  education that your license would have required since

24  graduating; completing your residency.

25      A   Well, I think I just did it, 'cause I just had

Page 13

1   to renew my license.  I think I just renewed it this

2   morning.  And say it -- it was 90 CMEs they were asking

3   for.

4              I don't remember, because it keeps track.

5              And I'm very active in the Florida Psychiatric

6   Society, so I never have an issue with how many CMEs I

7   have, so -- and it's automatically reported to them.

8              And so when I went to renew my license this

9   morning it said, yep, you have enough; you're good, and

10  it just renewed.  But I don't remember the exact number

11  that we have to have every two years in the cycle.

12     Q    Okay.  And you said CME.  What's a "CME"?

13     A    Continuing Medical Education.

14     Q    And you said you don't have any issue with

15  getting CMEs.  What do you do to attain CMEs on a

16  regular basis?

17     A    Well, as I said, I'm very active in the

18  Florida Psychiatric Society.

19             So I attend meetings twice a year and receive

20  CMEs there -- education at their meetings.  I also am

21  board certified in general psychiatry and forensic

22  psychiatry, and as part of our board certification we

23  have to -- as part of our renewal every three years, we

24  have to do -- I want to say it's 30 CMEs for them.

25  Reading specific articles that they want us to read and

HEAD KANDY, LLC vs KAYLA MARIE MCNEILL
Tonia Werner, M.D. on 11/08/2024

Page 15

1  or instructions on how a screener should make a

2  diagnosis?

3      A    No.  I do not supervise them.

4      Q    Do you have any method by which you make a

5  diagnosis?

6      A    I do my evaluation, and I utilize the DSM-5-TR

7  criteria.

8      Q    What encompasses an evaluation that you

9  conduct?

10     A    So it's -- I review collateral information, if

11 I have it available to me.

12          So if a patient comes in -- you mentioned, you

13 know, my Baker Act patients; we were talking about them.

14          I review the Baker Act.  I would look at any

15 prior admissions that are in our system when I pull them

16 up and see -- you know, what was going on with them

17 previously.

18          So review anything quickly that's -- you know,

19 readily handily available to me, and then I enter -- I

20 would interview the individual.

21     Q    What is that interview -- is it called a

22 clinical interview?

23     A    It can be; yes.

24     Q    What are other names for it?

25     A    Psychiatric evaluation, psychiatric interview.

**HEAD KANDY, LLC vs KAYLA MARIE MCNEILL**
**Tonia Werner, M.D. on 11/08/2024**

1          People call it different things.

2      Q    And what do you call it when you're

3   interviewing patients at Meridian?

4      A    Interview.

5      Q    Okay.  What does that interview look like?

6      A    So I introduce myself.  I say -- you know,

7   good morning, I'm Dr. Werner, I'm one of the

8   psychiatrists, and I'm going to be meeting with you this

9   morning.  Tell me a little bit about, you know, what

10  happened that brought you in.

11          So I let them run with the story and tell me

12  their story.

13          And then I ask any follow-up questions that I

14  need about that.

15          I observe them during that time.  I pay

16  attention to their mannerisms, how they're behaving.

17  Their speech pattern, their thought process.  Are they,

18  you know, linear, logical, coherent.

19          Are they psychotic; are they delusional.  Are

20  they responding to internal stimuli.

21          So I'm looking for all of that while I'm

22  letting them kind of tell me the story.

23          And then as I said, I'll follow up with any

24  questions.  I may ask them -- if there's something

25  different that they're telling me that's in the

Page 17

1    Baker Act I may ask them that.

2          You know; what -- why does it say this in the

3    Baker Act?  Was your mom lying?  You know.

4          Was your mom lying to the police?  Why would

5    she do that; what's going on.  Just asking them all

6    those kinds of information.

7          If I need general background information --

8    typically that's already all in there; their education

9    history and work.

10         All of that is gotten by the screeners prior

11   to them seeing me, so typically I have access to all of

12   that.

13         I may, again, clarify anything that I don't

14   have or that I have questions about.

15         I'll get a medical history from them and their

16   past psychiatric history; past medications that they've

17   been on.  Meds that they're on now.  Do they feel

18   they're working for them.  Is there something that they

19   felt worked better for them in the past.

20         And ask them -- you know, prior diagnoses.

21   What do they feel they have, and is going on with them.

22         And then I'll ask them, what it is that -- how

23   they feel like we can help them.

24   Q    Okay.  When you receive a Baker Act, does it

25   have a narrative portion?

HEAD KANDY, LLC vs KAYLA MARIE MCNEILL
Tonia Werner, M.D. on 11/08/2024

1    so he kind of drug me along into some of that; yes.

2        Q    Play on words.

3        A    Sorry.

4        Q    Tell me a little bit about some of the

5    personal injury work that you do.

6             Are you evaluating traumatic brain injuries,

7    or something else?

8        A    I've done that.

9             I've done sexual assault victims on cruise

10   lines.  I did all of the young ladies who sued

11   Joe Francis and Girls Gone Wild years ago, so a lot of

12   kind of sexual assault.

13            Some employment wrongful termination

14   allegations.  Yeah.  It just runs the gamut.

15            Any time there's any kind of psychiatric

16   question, in all honesty.

17            Slip and fall, and now they say they have

18   Post-traumatic Stress Disorder.

19            Inappropriately touched by massage therapists.

20   Inappropriately touching by physicians, I've evaluated.

21   Wrongful --

22        Q    When you're -- sorry.

23            Was that wrongful death, you said?

24        A    Yes, ma'am.

25        Q    When you're evaluating -- is "client" the

Page 30

1   of the military.  How long were they in for.  Why did

2   they leave.  What kind of discharge did they have; was

3   it honorable or dishonorable, etc., etc.

4           Did they ever lose rank while they were in the

5   military for any reason.

6           I ask them about other general employment

7   history.  What kind of jobs have they held.  What was

8   the longest position they had.  What was the most recent

9   position they had.  Have they ever been fired from any

10  jobs, and why was that.

11          So just kind of getting an employment

12  background from them.

13          Then I go into -- I think medical -- oh.

14  Sorry.  Social.

15          So, are they married, have they been married.

16  How many times have they been married.  How did each

17  marriage end.  Was it divorce, they die -- you know;

18  how -- what happened with each one, and why.

19          Did they just grow apart, was there

20  infidelity.  Just kind of get a little lip on each one.

21  And how many children came out of each union, or how

22  many children do they have that didn't come from a

23  marriage.

24          So getting their marital history, or

25  significant relationship history.  'Cause sometimes they

Page 37

1  aware of that's out there through talking to the person,

2  or it's mentioned in something else that I review, and I

3  go, oh; that may be helpful to see, I may ask about it.

4       But otherwise I don't know what's out there,

5  in all honesty, so I wouldn't know what to even ask for.

6       Q    Okay.  Some of the differences that come up in

7  different types of litigation, like between perhaps a

8  slip and fall and a sexual assault or a touching

9  incident; what are the differences in your forensic

10  evaluation between those types of cases?

11      A    Well, just depends on each individual.

12       And so as you go into talking about their

13  case, someone who is a victim of a sexual assault, you

14  know, may be much more -- you know, reactive to

15  questions and giving their history; so each individual

16  is different.

17       And you take them at face value as you're

18  interviewing them, and that's just part of the training

19  and the years of experience; just being able to

20  interview different individuals.

21      Q    What do you mean, "Take them at face value"?

22      A    With regards to if they're traumatized by what

23  they're talking about and become very tearful and

24  anxious and upset, you're going to slow down your

25  questioning, you're going to -- you know, ask them

HEAD KANDY, LLC vs KAYLA MARIE MCNEILL
Tonia Werner, M.D. on 11/08/2024

Page 40

```
 1   then I give that opinion.
 2           If my opinion is that there's no diagnosis,
 3   then I give that opinion.
 4           So I would -- not hired to give a diagnosis;
 5   I'm hired to do an evaluation.
 6       Q   Okay.  And that's something I don't know.  Are
 7   you ever hired to do something beyond evaluate or give a
 8   diagnosis -- that question probably sounds broad because
 9   you're the expert, and I'm trying to make sure there's
10   not anything that I'm missing.
11           Is there anything else that you would be hired
12   to do?
13       A   -- hired as a consultant, and I don't do an
14   evaluation nor give a diagnosis; I just review things
15   and work with the team, and -- you know, give my opinion
16   on different things, or -- any question they may have,
17   that they wish to have a consultant for.
18       Q   Have you been put in situations where you've
19   had to question what an evaluee may be telling you?
20       A   Yes.
21       Q   What happened, or how do you notice that that
22   might be an appropriate question to ask?
23           MS. BURGESS:  Form.
24           THE WITNESS:  I'm not sure I understand that
25       question.
```

HEAD KANDY, LLC vs KAYLA MARIE MCNEILL
Tonia Werner, M.D. on 11/08/2024

1   BY MS. SADRO:

2        Q    I'll rephrase it; that was a bad question.

3             How do you know if you're in a situation where

4   you may need to question what an evaluee's telling you?

5        A    It could be any number of ways.

6             It can just be that it's conflicting

7   information with something they've already said.

8             It can be conflicting with information I have

9   from a collateral source.  It could just be they're

10  giving answers that are inconsistent with what would be

11  typical responses that we would expect from individuals.

12       Q    Do you do anything during an evaluation, other

13  than an interview -- and let me be more specific.

14            Do you ever give any tests?

15       A    I do a mental -- mini mental status

16  examination.

17       Q    Okay.  What's a mini mental?

18       A    It's -- again -- and I spoke about it earlier,

19  it's a brief examination that looks at their memory,

20  their cognition, their thought process, their ability to

21  abstract.  Their attention.  Orientation.

22            So it covers a number of different areas.

23       Q    Do you give any other tests or examinations?

24       A    I do not.

25       Q    Are there any other tests or examinations that

HEAD KANDY, LLC vs KAYLA MARIE MCNEILL
Tonia Werner, M.D. on 11/08/2024

1     Q     And it appears to be 21 pages.

2     A     Yes.

3     Q     And I believe that also includes your CV; not

4  just your report.

5     A     Correct.

6     Q     Okay.  And on Page 14 of this exhibit, where

7  it says, "Opinions," and under that paragraph it has

8  your signature.  Is that the signature that you put on

9  this report?

10     A     Yes.

11     Q     Okay.

12          MS. SADRO:  I'm going to go ahead and stop

13     sharing the screen.  That will be marked as

14     Exhibit 1.

15     (Plaintiff's Exhibit 1 marked for identification.)

16  BY MS. SADRO:

17     Q     Dr. Werner, that report that we were just

18  talking about, does that report include all of the

19  opinions that you've come to in this case?

20     A     I believe so.

21     Q     Okay.  Does it include all of the facts that

22  you've considered?

23     A     At the time that I wrote the report; yes.

24     Q     Have there been any additional facts that

25  you've been made aware of?

HEAD KANDY, LLC vs KAYLA MARIE MCNEILL
Tonia Werner, M.D. on 11/08/2024

1          THE VIDEOGRAPHER:  Back on record at

2     12:29 p.m.

3    BY MS. SADRO:

4          Q    Okay.  All right, Dr. Werner.  Since we went

5    on break, is there any testimony that you want to

6    change, supplement, or modify in any way?

7          A    Not that I'm aware of.

8          Q    Okay.  I want to shift a little bit now to

9    talk about some of the opinions that you listed in your

10   report.

11         A    Yes.

12         Q    And one thing; is that your report in front of

13   you?

14         A    Yes.

15         Q    So if you ever need to reference your report,

16   that's absolutely okay.  If you can, when you do that,

17   just let me know what page you're on, so I can follow

18   along with you.  Okay?

19         A    Okay.

20         Q    I want to talk about your report, the opinion

21   you come to that's a diagnosis of Major Depressive

22   Disorder.  Can you tell me a little bit about what Major

23   Depressive Disorder is?

24         A    So it is a mood disorder that has to do with

25   mood.  It's described in the DSM-5-TR.

Page 52

1              There's a constellation of eight different

2    symptoms, and they have to have five or more of those

3    symptoms for a period lasting longer than two weeks to

4    meet that criteria.

5              To meet the criteria for that diagnosis.

6        Q    And what are the eight symptoms?

7        A    Depressed mood.  Decreased interest or apathy.

8    Change in appetite.  It can be up or down, with change

9    in weight can go along with that.

10             Change in sleep pattern.  Some people have

11   difficulty with sleep.  Some people sleep all the time.

12   So again, it can be either/or.

13             Fatigue.  Loss of energy is one.

14             Worthlessness.  Feelings of excess guilt is

15   one.

16             Decreased concentration.

17             Thoughts of suicide.

18             And another one is psychomotor agitation, or

19   retardation.

20       Q    Is there anything when you're diagnosing

21   somebody with MDD that you would do differently than a

22   general forensic evaluation?

23       A    Not necessarily.

24       Q    Okay.  Like, no other different tests or

25   specific questions you would ask that relate to MDD?

Page 57

1      A    Yes.

2      Q    What did you observe in Ms. McNeill during the

3  mini mental examination?

4      A    So it's just described starting on Page 12 of

5  my report, under "Mental Status Examination."

6      Q    Yes, ma'am.  Tell me about what you observed.

7      A    She was pleasant.  Cooperative.  Related well

8  during the interview.  Had good eye contact.  There was

9  no significant psychomotor agitation or retardation.

10  Her speech was normal; not necessarily pressured.  Her

11  mood, I said, was euthymic; her affect was full and

12  congruent to the topic that we were discussing at hand.

13        You know.  She would smile if we talked about

14  her children; things like that.  And -- you know, she

15  was tearful when discussing details regarding the

16  incidents of the case.  The sexual harassment, the loss

17  of her company; she was tearful during those portions.

18        But her thought process was linear, logical,

19  goal directed.  She was not tangential or

20  circumstantial.  She denied any psychotic symptoms.

21  There was no evidence of any kind of delusional thought

22  process during my interview.

23        She was oriented fully; her attention and

24  concentration was intact.  She recalled three words, and

25  was able to recall the same three words after a period

Page 58

1   of distraction.

2          She did serial subtraction.  She had one error

3   in the serial subtraction, but that's not -- the test

4   isn't really testing arithmetic ability; it's seeing

5   does she know what it was that I asked her to do when

6   she gets to the end, and she clearly did.

7          Her general fund of knowledge was average, and

8   that's just -- you know, who's the president, can you

9   name any -- you know, of his predecessors; that kind of

10  thing.  Who's Martin Luther King, Jr.

11          General directions of travel to different

12  places.

13          And then I looked at her thought process and

14  ability for abstract thought, which was intact.

15          And I do that comparing like items,

16  similarities between items, and interpreting a proverb.

17      Q    And so throughout that examination, did

18  Ms. McNeill appear to understand your questions?

19      A    Yes.

20      Q    And throughout your interaction with

21  Ms. McNeill, did she understand your question?

22      A    Yes.

23      Q    Did Ms. McNeill appear at any point in time to

24  you to have an issue with memory or recall?

25      A    No.

**HEAD KANDY, LLC vs KAYLA MARIE MCNEILL**
**Tonia Werner, M.D. on 11/08/2024**

Page 59

1      Q     And was Ms. McNeill able to articulate her

2   childhood when you were doing her family history?

3      A     To a degree.

4            I'm just flipping back to that section in the

5   report.

6            I didn't ask her a lot of specifics with

7   regards to her childhood.  You know, I asked her about

8   Mom and Mom's job, and Dad and Dad's job.

9            As I said, I asked her about going to church,

10  and I asked her about -- you know, sexual and physical

11  abuse.

12           I didn't ask her specific questions about

13  childhood such as -- you know, when were you potty

14  trained, who was your kindergarten teacher, I didn't --

15     Q     I don't know that I would remember those

16  things --

17     A     Yeah -- in detail -- specifics, like that.

18     Q     Sure.  And you met with Ms. McNeill over two

19  separate days; right?  August 8th and August 13th?

20     A     I did; yes.

21     Q     And throughout those two days and your

22  interactions with her, would you have any concerns about

23  her ability to recall -- not necessarily specific

24  events, but large portions of her life?

25     A     Not with regards to -- there was no indication

**HEAD KANDY, LLC vs KAYLA MARIE MCNEILL**
**Tonia Werner, M.D. on 11/08/2024**

Page 60

1   of that in my interview of her.

2       Q    Was Ms. McNeill able to communicate clearly

3   with you?

4       A    Yes.

5       Q    And did she ever ask you any questions?

6       A    I don't -- she probably did, but I don't

7   recall -- 3 hours; 2 hours and 40minutes or something,

8   I'm sure she asked me some questions in that time.

9       Q    If a patient or evaluee asks a question, is

10  that something that you would write down?

11      A    Not necessarily; no.

12           That's not typically to what we're doing.

13      Q    When you were meeting with Ms. McNeill -- I

14  know you mentioned a while ago that you usually take

15  notes.

16      A    Yes.

17      Q    And did you take notes with Ms. McNeill?

18      A    I did.

19      Q    Oh.  Did you provide those notes to

20  Miss Burgess, or someone else for Ms. McNeill's counsel?

21      A    I did.

22      Q    Were those notes data, or were they a portion

23  of a report?

24      A    They're a portion of my report.

25      Q    Okay.

**HEAD KANDY, LLC vs KAYLA MARIE MCNEILL**
**Tonia Werner, M.D. on 11/08/2024**

Page 61

1      THE REPORTER:  Ms. Burgess, were you making an

2   objection?

3      MS. BURGESS:  Yes.  I'm trying to speak

4   loudly.  I've been making objections.

5      THE REPORTER:  Okay; so you're making

6   objection at this point.

7      MS. BURGESS:  I'll try to speak up even more.

8      THE REPORTER:  Thank you.

9   BY MS. SADRO:

10      Q    Dr. Werner, without telling me about the

11   contents of what you wrote down in those notes, are

12   those notes typically what you take in every evaluation

13   with an evaluee?

14      A    Yes.

15      Q    Do those notes contain behavioral

16   observations?

17      A    Some.  Like, I would write down that she was

18   tearful at different points.

19      I would write down -- you know, I have a

20   section where it says, you know, motor behavior.  So --

21   'cause it's a form that I have that I fill out as I go

22   through, like I said -- and questions.  And so there's

23   an actual part that says, "Motor behavior," so I would

24   comment on their motor behavior.

25      And a lot of times I just put "WNL".  Within

Page 62

1   Normal Limits.  So there was no agitation, there was

2   no -- retardation.  You know.

3        Q    And a moment ago you picked up what appeared

4   to be a packet of documents.

5             That packet of documents, does that contain

6   the notes that we've been discussing?

7        A    Correct.

8        Q    And again, without telling me the contents

9   right now, what else generally is in that packet?

10            Is it just your notes, or something else?

11       A    Just my notes.

12       Q    Okay.  So -- I mean, that's a pretty thick

13  packet, Doctor.  Is it about 30 pages of notes?

14       A    I believe it's 28.

15       Q    28.  I like that you knew that off the top of

16  your head.  I wouldn't have known that.

17            I guess -- well -- Doctor, in those notes,

18  does it include the reports Ms. McNeill made to you?

19       A    Yes.

20       Q    Does it include a description of the events

21  that she discussed with you throughout her evaluation?

22       A    Yes.

23       Q    Okay.  Is there anything else, other than the

24  notes that we've just talked about, that you wrote down

25  or collected or kept in Miss McNeill's file?

HEAD KANDY, LLC vs KAYLA MARIE MCNEILL
Tonia Werner, M.D. on 11/08/2024

Page 63

```
 1      A    No.

 2      Q    Did you review anything prior to meeting with

 3   Ms. McNeill?

 4      A    I reviewed her medical records from the two

 5   providers as noted in my report.

 6      Q    And that's Dr. Wiginton and Ms. McDowell.

 7      A    Correct.

 8      Q    And a minute ago we started to talk about the

 9   two different dates you met with Ms. McNeill; August 8th

10   and August 13th of 2024.  Is that right?

11      A    Correct.

12      Q    Why do you meet with somebody on two different

13   days?

14      A    I typically meet with them the first time, and

15   I get my information.  And then I go back and review

16   information, start to formulate my opinions, and write

17   my report, and I get a telephone number from them that I

18   can reach back out to them with further questions.

19           And so then I reach out a second time to kind

20   of fill in any further information.  And it also gives

21   them the opportunity -- because at the end of my

22   evaluations I always ask them, you know, is there

23   anything else important that you can think of that I

24   didn't ask you about, but that we should talk about,

25   'cause I may have missed something or left something
```

HEAD KANDY, LLC vs KAYLA MARIE MCNEILL
Tonia Werner, M.D. on 11/08/2024

Page 64

1    out.

2           So I give them the opportunity to share -- you

3    know, anything else that's important to them, or that

4    they feel like is important.

5           And so sometimes when I reach out to them the

6    second time to fill in my gaps or ask any further

7    questions that I realized that I left out, they also

8    have come up with -- they're like, oh, you know, I came

9    up with some other stuff, you know, that I wanted to

10   tell you about, so --

11      Q    Was that the case for Ms. McNeill?

12      A    I don't recall specifically if she added,

13   or -- I know I asked her more questions in trying to

14   clarify kind of the timeline, I think, was an issue for

15   me.  I was trying to clarify a timeline -- make a

16   timeline, and clarify a timeline of when things

17   happened.

18          And so I was really trying to just kind of

19   flesh out that timeline with her, was my purpose.

20      Q    Okay.  And at the conclusion of that meeting

21   when you asked Ms. McNeill if there was anything else

22   that you should be aware of, what was her response?

23      A    I don't recall specifically.

24          I don't believe that she added anything.

25      Q    Did you believe that Ms. McNeill indicated in

HEAD KANDY, LLC vs KAYLA MARIE MCNEILL
Tonia Werner, M.D. on 11/08/2024

Page 65

1    any way to you that she was withholding information?

2        A    No.

3        Q    You also said a moment ago that you received a

4    number you could call in between those meetings to ask

5    any questions that you might have.  Did you --

6        A    Yes --

7        Q    -- do that?

8        A    Yeah.  I -- that's how I spoke with her the

9    second time; is I called her directly.

10       Q    Was the -- was the meeting in person a second

11   time on the phone, or in person?

12       A    It was on the telephone.

13       Q    Okay.  How long was the first meeting on

14   August 8th?

15       A    The first meeting was -- I knew you were going

16   to ask me that.

17            The second meeting, I think I had it at

18   70 minutes.

19            So the first meeting was an hour and

20   40 minutes.

21       Q    Okay.  And I see -- I think you picked up that

22   same packet of paper that we were referencing.

23            Is that what you looked at?

24       A    Yeah.

25       Q    Did you remember those times periods of the

Page 66

1    meetings independently, or did you have to refer to the

2    notes?

3        A    I had looked at it earlier today.  Just now I

4    didn't flick to the -- I was touching it but I didn't

5    get to the page that it was on.

6            But I had looked at it earlier today, because

7    when I was rereading my report I saw that I had it as a

8    block of time, and I assumed that you would ask me how

9    much I had met with her the first time and the second

10   time; so I --

11       Q    You've done this a time or two.

12       A    I had looked at my notes earlier to try to

13   decipher how long I had met with her when.  And I know

14   the second time, I had spoken to her for 70 minutes.

15       Q    Okay.  So -- I mean -- I think I probably have

16   it as the meeting on the 8th was about 30 minutes longer

17   than the second meeting.

18           Are your second meetings usually that long?

19       A    They are not usually that long.

20           She -- as it turns out, she actually was in

21   Florida, in the middle of going through this

22   psychological testing.  So she spent some time kind of

23   talking about her anxiety about the testing, in all

24   honesty, so --

25       Q    Dr. Werner, I want to know -- and I want to be

Page 67

1  really specific about this question; because I don't

2  want to go into a privileged area of work product

3  between you and Miss Burgess or other counsel.

4          Are there any facts about this case that

5  Miss Burgess, Mr. Converse or Miss Tiedeken conveyed to

6  you, either over the phone, or via e-mail?

7          MS. BURGESS:  Objection.  Work product.

8          MS. SADRO:  Miss Burgess, do you want to

9      discuss that?

10         Sorry.  Are you instructing her not to answer,

11     was a better question.

12         MS. BURGESS:  Well, you just stated you don't

13     want to get into specific facts, but then you asked

14     her specifically about what we've communicated to

15     her, so -- I don't know if you want to rephrase the

16     question.

17         MS. SADRO:  I don't.  Under Rule 26, the

18     privilege that exists between attorney and experts

19     doesn't extend to facts about the case that you

20     would have conveyed to them in forming their

21     opinions.

22         So I don't certainly want to go to any

23     impressions you two may have discussed about the

24     facts, but I'm certainly interested in the facts

25     you might have conveyed.

HEAD KANDY, LLC vs KAYLA MARIE MCNEILL
Tonia Werner, M.D. on 11/08/2024

Page 68

1          Do you still have an objection?

2          MS. BURGESS:  As long as it's within the

3     rules.

4          MS. SADRO:  Right.

5    BY MS. SADRO:

6     Q    And Dr. Werner, I want you to know that for my

7    part; that's very specifically what I'm asking.

8          I'm only asking about the facts you may have

9    learned; not any impression that you would have

10   discussed with counsel, or your initial impressions that

11   you would have discussed with counsel.

12         Are there any facts that were conveyed to you

13   that you would have utilized in forming your opinion?

14    A    I know when I initially -- oh -- in

15   formulating the opinion?  No.

16         I know I initially -- I guess -- I don't know

17   how to answer that.

18         I know initially when I spoke to them, prior

19   to ever meeting with Kayla, we spoke about -- they

20   reached out to me to see if I was available, and was

21   this an area that I felt like I could, you know,

22   evaluate her and possibly formulate an opinion on.

23         And they shared with me some general details

24   about the case; that she had a company.

25         You know; just general information.

HEAD KANDY, LLC vs KAYLA MARIE MCNEILL
Tonia Werner, M.D. on 11/08/2024

Page 69

1      Q     Okay.

2      A     She developed this company, and had been on

3    Home Shopping Network and on the internet, and part of

4    the company had been sold, and that there was an

5    allegation of sexual harassment and some other stuff,

6    and -- you know, that she had eventually been

7    terminated, and there was a lawsuit.

8      Q     Okay.  Thank you.

9      A     So just generic -- kind of general, and would

10   I agree to evaluate her.

11     Q     Sure.  And when you meet with somebody for the

12   second time, about how long are those meetings, usually?

13     A     Again, it depends on each individual.

14           And so -- you know; what's going on with them.

15   So certainly, if she hadn't been stressed out at the

16   time that I called her, she probably wouldn't have

17   talked as much as she talked, and that meeting would

18   have been much shorter, in all honesty.

19           So it just depends on each individual.

20           If they have some kind of cognitive

21   impairment, the meeting can take longer, because they're

22   cognitively impaired.  Longer to understand and answer

23   questions.  It can take a longer period of time.

24           So each individual's different.

25           And some people I don't even call the second

Page 70

1    time, so it just depends.

2        Q    Okay.  And Ms. McNeill conveyed to you in that

3    second communication that she was in Florida going

4    through additional testing?

5        A    Yes.  She was in the -- it was -- I think she

6    had two days of psychological testing, and I think I

7    happened to reach out to her the night in between the

8    two.

9             So she had had psychological testing that day,

10   and then was going back the following day.

11       Q    Okay.  And what did she tell you about the

12   psychological testing that she was going through?

13       A    She just spoke about the different tests,

14   and -- you know, she just was -- the blocks, and this

15   and that, and she was just -- just anxious about testing

16   in general.  It was normal anxiety.

17       Q    Did Ms. McNeill describe to you what kinds of

18   specific testing she was -- she would be undergoing?

19       A    Again, I'm not a psychologist, so I can't even

20   tell you the different -- all the different, you know,

21   psychological tests.

22            I know she spoke about blocks, answering lots

23   of questions -- you know, it was just general.

24            She was just talking in general.

25       Q    Would you have wanted to see the results of

Page 71

1   that psychological evaluation?

2            MS. BURGESS:  Form.

3            THE WITNESS:  When?

4   BY MS. SADRO:

5       Q    Well --

6       A    I did see it.

7       Q    Right.  So at the time you became aware of it,

8   is that something that you would have wanted -- I know

9   you saw it, but when you become aware of it, is that

10  something that you would want to see?

11      A    I think -- well, I did see it.

12           So when it was available, I did see it.

13      Q    Right --

14                   (Overspeak.)

15      A    My report was due.  There was a deadline, and

16  my report was due prior to that, I believe.

17      Q    Sure.  And I know you said previously you

18  didn't remember the exact date that you received this

19  report, but you've said a moment ago that you saw it

20  when it was available.  Does that mean you saw it in

21  about August or September?

22      A    I believe so.

23           If I remember correctly -- and I'm reaching

24  back, there may have been, like, a 1-page letter, and

25  then a report.

HEAD KANDY, LLC vs KAYLA MARIE MCNEILL
Tonia Werner, M.D. on 11/08/2024

Page 72

1      Q    Understood.  Would it have been something that

2  looked like a -- titled a Declaration?

3      A    Possibly.

4      Q    Okay.  Would you have seen that 1-page report

5  prior to writing your report?

6      A    I don't believe so, no, because I think there

7  was a deadline with regards to when my report was due.

8  So I was trying to get it written, and submit it.

9      Q    When you reviewed Dr. Russell's report, did

10  you believe that any of that information would change or

11  alter one of your opinions?

12      A    No.

13      Q    Why not.

14      A    The person that she was describing was not the

15  person that I interviewed, in all honesty.

16           They were completely different.

17           And I know that people can wax and wane

18  different days, but I had actually spoken to her in

19  between the two days of testing, and her cognition

20  appeared fine, so I'm not sure, you know, what all

21  that -- if it was just the anxiety, but -- it wasn't

22  consistent with my evaluation.

23           And the other thing is, some of the testing I

24  was not familiar with.  And I tried to Google it, and

25  there was nothing -- you can't even find it on Google;

Page 73

1  some of the tests that she used.

2          So I didn't understand that either; where

3  these tests came from, or what they were.

4      Q    You couldn't find some of her tests on Google?

5      A    Correct.  The Miami something or other.

6  Whatever one was from Miami.

7          Google it.  It doesn't even come up.

8      Q    So you went to Google and you typed in the

9  Miami, and selected learning test.

10     A    Yeah, 'cause I didn't know what it was --

11                   (Overspeak.)

12     A    So I tried to look it up -- and does not come

13  up.

14     Q    If there was another professional in this

15  case -- a psychologist who was reporting a different

16  experience with Ms. McNeill than you experienced --

17  would that not indicate to you a requirement of some

18  evaluation?

19          MS. BURGESS:  Form.

20          THE WITNESS:  What do you mean, "Of some

21     evaluation"?

22  BY MS. SADRO:

23     Q    To consider what that other professional might

24  be observing, or learning.

25     A    I read her report.

HEAD KANDY, LLC vs KAYLA MARIE MCNEILL
Tonia Werner, M.D. on 11/08/2024

Page 74

1    Q    Okay.  And did you consider anything in her

2  report, as it related to the opinion you made?

3    A    It did not change my opinion.

4         Her report and her opinions did not change my

5  opinions.

6    Q    And is that because it was just a different

7  person than you experienced with Ms. McNeill, or because

8  of some data in her report?

9    A    As I said, I'm not a psychologist, so I'm not

10  going to comment on her data.  And that's outside the

11  realm of my area, and -- yeah.

12         It was not -- her evaluation of her was not

13  consistent with mine.

14    Q    Okay.  A little bit ago you told me about

15  sometimes you work with psychologists to conduct

16  additional testing, like the MMPI.  Right?

17    A    Correct.

18    Q    In this case, when you noticed that there was

19  an MMPI given to Ms. McNeill, did you reach out to a

20  psychologist that you know to help you read those

21  results and understand them?

22    A    I did not.

23    Q    Why not?

24    A    I didn't feel like I needed to.

25         I had already formulated my opinions.

HEAD KANDY, LLC vs KAYLA MARIE MCNEILL
Tonia Werner, M.D. on 11/08/2024

Page 75

1              The MMPI was not going to change my opinions

2    with regards to Ms. McNeill's diagnosis of major

3    depression, nor her -- her response to her related

4    trauma.

5         Q    Okay.  Can somebody be outwardly manifesting

6    symptoms of a depressive disorder, but the cause may be

7    unknown?

8              MS. BURGESS:  Form.

9    BY MS. SADRO:

10        Q    Sorry; what was the answer?

11        A    Yeah.  They may.  It can be genetic.  Yeah.

12        Q    Sure.  So if you're presented with information

13   about a potentially different cause of the symptoms that

14   you're seeing, would that be important to you?

15        A    Yeah.  I don't remember there being a

16   potentially different cause related in her report.

17        Q    Okay.  Did you at any point in time ask to see

18   underlying data that Dr. Russell used in coming to her

19   opinions?

20        A    I do not -- again, that's not my area of

21   expertise, and I do not believe that I did that.

22        Q    Okay.  And if you had seen them, would it have

23   altered or affected your opinions in any way?

24        A    No.  Again, that's not my area of expertise,

25   so I would not have formulated opinions based on her raw

HEAD KANDY, LLC vs KAYLA MARIE MCNEILL
Tonia Werner, M.D. on 11/08/2024

Page 76

```
 1   data.

 2           Which -- her raw data, versus her assistant's

 3   raw data.  Because a lot of the testing was done by her

 4   assistant, and not by her.

 5       Q    Are you aware of an individual named

 6   Dr. Demery?

 7       A    I am.

 8       Q    Okay.

 9       A    It's Demery.

10       Q    Demery.  Thank you.

11           Have you worked with Dr. Demery before?

12       A    I have.

13       Q    Have you work with Dr. Demery on this case?

14       A    I have not.

15       Q    Are you aware that Dr. Demery is a retained

16   expert in this case by Miss McNeill?

17       A    I am.

18       Q    And what is Dr. Demery's speciality?

19       A    He is a forensic psychologist.

20       Q    In your opinion, does he have the ability to

21   review the types of examinations conducted by

22   Miss Russell?

23       A    Absolutely.  Hundred percent.

24       Q    So why would you not have conferred with

25   Dr. Demery to understand the results of the
```

Page 77

1    psychological evaluation?

2              MS. BURGESS:  Objection.  Form.

3              THE WITNESS:  Because at the time that that

4         came in -- and it was -- I was asked for a -- if I

5         knew of anyone to review the data.  So it's outside

6         my area of expertise, but I was asked if I had --

7         if I knew of anyone to review the data.

8    BY MS. SADRO:

9         Q    And you frequently refer people to Dr. Demery?

10        A    Yes.  I've worked with Dr. Demery previously.

11             He was on faculty at the University of Florida

12   during my tenure there when I was the vice chair of the

13   Department of Psychiatry and the Director of the

14   Forensic Institute at the University of Florida.

15             He was on my faculty.

16        Q    You were -- you supervised him?

17        A    Yes.

18        Q    How long have you known Dr. Demery?

19        A    I've known him -- I don't know.  I don't

20   recall when he was hired at the University of Florida,

21   but I would have known him since then.

22             I do not have regular contact with him since

23   he -- he left the University of Florida after -- I think

24   approximately two years there with us at the Forensic

25   Institute.

**HEAD KANDY, LLC vs KAYLA MARIE MCNEILL**
Tonia Werner, M.D. on 11/08/2024

1           And he returned to the VA, and now has a

2    private practice in Gainesville, and I -- honestly, I

3    run into him at the grocery store, and I see him more

4    and chat in the grocery store with him more than

5    anything.

6           Q    Do you maintain regular communication with

7    Dr. Demery?

8           A    No.

9           Q    How often do you run into him at the grocery

10   store?

11          A    Probably once every six months.

12          Q    Okay.  How often do you refer somebody to

13   Dr. Demery?

14          A    I -- probably once a year, maybe.

15          Q    Okay.  Does Dr. Demery ever refer somebody to

16   you?

17          A    Probably once a year.

18               And typically they're actually -- they've been

19   criminal cases.

20          Q    Okay.

21          A    It's been cases in the criminal arena.

22          Q    Are those where -- cases where you and

23   Dr. Demery are working on one case, or referring

24   different cases to each other?

25          A    Typically where we're working on the same

HEAD KANDY, LLC vs KAYLA MARIE MCNEILL
Tonia Werner, M.D. on 11/08/2024

1  case.  And it may be that they -- you know, then want a

2  psychologist, or they then want to hire a

3  psychiatrist -- they have him and they want a

4  psychiatrist, because the person's on medications.

5           So it's typically that.

6      Q     How many times have you and Dr. Demery worked

7  together on a case; criminal or civil?

8      A     Well, when we were at the University of

9  Florida we discussed every case, because we were a

10  teaching facility, and I had a fellowship program that I

11  ran where we trained psychiatrists in forensic

12  psychiatry.

13          So we discussed all of our cases on a weekly

14  basis with the Fellows as part of the didactics.

15          But since leaving the University of Florida --

16  again, probably once a year, maybe.

17      Q     When you're working on the same case together,

18  do you discuss your initial opinions and evaluations

19  that you both have?

20      A     At times we do, and at times we don't.

21          I mean, I think it's also important to say

22  we've been on opposite sides of a number of cases, and

23  the state attorney and the public defender have had --

24  requested that we speak to each other and come to a --

25  you know, a consensus, if we have differing opinions.

Page 80

```
 1            So we don't always work together; sometimes we

 2   work against each other, so it just depends.

 3       Q    And have you used Dr. Demery's interpretation

 4   and psychological evaluations previously in coming into

 5   an opinion -- coming into one of your opinions?

 6       A    I would have to say yes.

 7       Q    Do you think that Ms. McNeill could have

 8   benefited from psychotherapy?

 9       A    From psychotherapy?  Yes.

10       Q    When do you think she should have engaged in

11   psychotherapy?

12       A    I think she still could benefit from it, and

13   should engage in it.  She can engage in it at any time,

14   but I think she still could benefit from it.

15       Q    Would Ms. McNeill have benefited from

16   psychotherapy if she began psychotherapy when these

17   events occurred in 2023?

18       A    Yes.  Probably.

19       Q    And do you believe if Ms. McNeill had been

20   engaging in psychotherapy during -- since that time, she

21   would have experienced an improvement in her symptoms?

22            MS. BURGESS:  Objection.

23            THE WITNESS:  She may have, she may not have;

24        because there's ongoing stressors, I think, which

25        are -- I think it's multifactorial, and I think
```

HEAD KANDY, LLC vs KAYLA MARIE MCNEILL
Tonia Werner, M.D. on 11/08/2024

Page 81

1      there are ongoing stressors which are continuing to

2      kind of feed into it and keep the symptoms going,

3      so -- you know.  You can't tell.

4  BY MS. SADRO:

5      Q     Would Ms. McNeill have benefited from

6  medication management?

7      A     She was on medication management by her

8  primary care physician.  Prescribed her Prozac; she took

9  it -- I think -- for several weeks, and then stopped

10  because she felt like she was suicidal.

11            And that is a common -- that can be a common

12  side effect with Prozac, because it is one of the more

13  activating antidepressants, and -- but she did restart

14  it, I believe, in February -- I want to say February of

15  2023 she restarted the Prozac, and has found it to be

16  helpful since then.

17      Q     Okay.  What are the -- when we were talking a

18  while ago about Major Depressive Disorder and somebody

19  needing 5 of the 8 symptoms over a period of two weeks

20  to qualify for that diagnosis, what are the five

21  symptoms you observed in Ms. McNeill, in making that

22  diagnosis?

23      A     We are in my report -- 13.

24      Q     Page 13?

25      A     Yes, ma'am.

Page 82

1    Q    Thank you.

2    A    So she had the depressed mood, she had

3  decreased energy -- she reported decreased energy.

4         She reported feeling of worthlessness and

5  guilt, and that was kind of around caring for the

6  children, loss of her company, loss of her media -- the

7  social media account.

8         She had reported difficulty thinking and

9  concentrating and making decisions.

10        She had passive thoughts of death, and she

11 actually had active thoughts of suicidal ideation at one

12 point.

13        She had change in appetite, so -- that's not

14 even in there.  She had a change in appetite, with

15 weight loss.  Decreased interest in activities.  And

16 that was specifically -- she wasn't -- she was still

17 engaging -- trying to engage as a parent in the racing

18 with the children and the children's activities, but --

19 had decreased kind of interest and pleasure out of those

20 activities.

21        Decreased energy, difficulty with sleep.

22 That's when she started doing the CBD for that.

23        So those are the big ones.

24    Q    Okay.

25    A    That's all of them, actually.

HEAD KANDY, LLC vs KAYLA MARIE MCNEILL
Tonia Werner, M.D. on 11/08/2024

Page 83

1     Q     And when you evaluated Ms. McNeill, she was
2   still on Prozac?

3     A     Yes.

4     Q     And like we said, Prozac can result in
5   feelings of suicide, or suicidal ideation.

6     A     Yes.  Early on.  And she had had that early
7   on, but then that resolved.

8     Q     Does it always resolve when somebody's on
9   Prozac?

10     A     Not necessarily.  Sometimes with the younger
11   individuals we'll take them off of it, or augment with a
12   mood stabilizer, like Depakote.

13     Q     With a change in appetite and weight loss, I
14   think you mentioned in your report Ms. McNeill had a
15   gastric bypass surgery.

16     A     Yes.

17     Q     Would that have been a potential cause of a
18   change of appetite, with weight loss?

19     A     Her gastric bypass was in 2021; so we can't
20   relate -- so her appetite and weight loss associated
21   with the gastric bypass would have been back then.

22           She had been stabilized with regards to her
23   weight and appetite, 'cause this was several years
24   later, and so a significant change at that point would
25   not be related to the gastric bypass.

HEAD KANDY, LLC vs KAYLA MARIE MCNEILL
Tonia Werner, M.D. on 11/08/2024

Page 84

1    Q    How did you determine that Ms. McNeill had

2  stabilized?

3    A    With regards to her weight.

4    Q    That the weight was stable?

5    A    Yeah.

6    Q    How did you determine that Ms. McNeill's

7  weight was stable?

8    A    From her.

9    Q    From Ms. McNeill's report to you?

10   A    Yes.

11   Q    And was that the report that Ms. McNeill at

12 some point in time had gone down to 103 pounds?

13   A    I was remembering at 110; but okay.

14   Q    110 -- 110 or 103.  I'll say 110, just in case

15 I'm remembering the number wrong.

16        Did you do anything to try to determine

17 whether or not Ms. McNeill had gotten to a weight of

18 110 pounds?

19   A    No.

20   Q    I want to talk a little bit about the medical

21 records that you reviewed; the medical records that

22 Dr. Wiginton and Ms. McDowell -- so Dr. Wiginton -- like

23 we've been talking about -- is Ms. McNeill's primary

24 care provider.  Right?

25   A    Yes.

HEAD KANDY, LLC vs KAYLA MARIE MCNEILL
Tonia Werner, M.D. on 11/08/2024

Page 85

1        Q     Okay.  Is it your understanding that

2   Dr. Wiginton diagnosed Ms. McNeill with depression and

3   anxiety?

4        A     Yes.

5        Q     Did you utilize that diagnosis and the history

6   of that diagnosis in coming to your opinions?

7        A     Not necessarily.  I don't recall that in his

8   notes that he had an actual diagnosis with regards to

9   generalized anxiety disorder or Major Depressive

10  Disorder.  I think he just was treating symptoms; that

11  she complained of it, and he started Prozac.

12            I don't remember the notes being very, you

13  know, thorough, or long in detail, I should say.

14       Q     Sure.  And per Ms. McDowell's records, do you

15  recall reviewing those records?

16       A     Yes.

17       Q     And do you recall in your report mentioning

18  that Ms. McNeill had a diagnosis of depression and

19  anxiety?

20       A     Yes.  But it doesn't say a specific diagnosis;

21  it just says, "anxiety and depression."

22       Q     And those are mental health problems.

23            If it's not a diagnosis, it's a mental health

24  concern.  Right?

25       A     Correct.

HEAD KANDY, LLC vs KAYLA MARIE MCNEILL
Tonia Werner, M.D. on 11/08/2024

Page 86

1      Q    And did you utilize Ms. McDowell's notes in
2   forming your opinion?
3      A    No.  I certainly took it into account, but it
4   didn't come into -- I mean, that's not why I diagnosed
5   her with what I diagnosed her with.
6      Q    So if Dr. Wiginton and Ms. McDowell testified
7   that they did not evaluate Ms. McNeill's mental health,
8   would that change your opinion?
9      A    Well, I think it's in their notes, so it's --
10  it's -- I would find that difficult to understand;
11  especially when Ms. McNeill describes symptoms, and
12  Dr. Wiginton describes symptoms, and prescribed
13  medication.
14          So for him to say he didn't evaluate her for
15  that, but yet describes symptoms and prescribed her
16  medication would be odd.
17     Q    So hypothetically, if Ms. McDowell testified
18  that at no point in time did she evaluate Ms. McNeill
19  for mental health concerns, would that alter your
20  opinion?
21     A    No.
22     Q    Would that alter your opinion if that is what
23  Ms. McNeill conveyed to you?
24          MS. BURGESS:  Form.
25          THE WITNESS:  Would what alter my opinion if

HEAD KANDY, LLC vs KAYLA MARIE MCNEILL
Tonia Werner, M.D. on 11/08/2024

1      what was what Ms. McNeill conveyed to me?

2   BY MS. SADRO:

3      Q    If Ms. McNeill conveyed that she had a prior

4   diagnosis for depression or anxiety.

5      A    No.

6      Q    Okay.  How would you have utilized the prior

7   medical records in forming your opinion, and conducting

8   an analysis in this case?

9      A    Just as I did.

10          I noted that -- the symptoms that they

11   discussed previously.  I noted -- you know, both of them

12   discussed a lot of symptoms.  Dr. Wiginton discussed the

13   stressors that she was under.

14          He also discussed her weight; and that she was

15   having difficulty maintaining her weight above

16   110 pounds, which we discussed earlier.

17          That's in his notes.  It's documented.

18          I look at the medications that are prescribed.

19   Because then I talked to her about it, and -- you know,

20   did you take those medications.

21          Like, he prescribed Adderall for her.  And I

22   was like -- and that was one of the questions that I

23   asked her when I called her back the second time, when I

24   was writing it up.  I was like, you know, you didn't

25   tell me about the Adderall.  We didn't discuss whether

HEAD KANDY, LLC vs KAYLA MARIE MCNEILL
Tonia Werner, M.D. on 11/08/2024

Page 88

1  you were taking the Add -- and she said, oh, I never

2  took it.  And I'm like, oh.  Okay.

3          So -- that was one of the questions I actually

4  clarified with her; because when I was typing it up I

5  was like, oh, what about the Adderall.

6          We only talked about the Prozac.

7      Q    -- Ms. McNeill having a history of those

8  symptoms have supported your opinion?

9      A    Yes.

10     Q    So if Dr. Wiginton testified that he just

11 wrote down what Ms. McNeill told him, would that affect

12 your opinion?

13     A    No.

14     Q    If Ms. McDowell testified that she just wrote

15 down that Ms. McNeill had been diagnosed with

16 depression, would that change your opinion?

17     A    No.

18     Q    Sorry; I'm checking my time.

19          MS. SADRO:  I'll give us a break here, 'cause

20     this is a good pause point.  Why don't we take

21     another break to 1:25?

22          THE WITNESS:  Okay.

23          THE VIDEOGRAPHER:  Off the record, at

24     1:17 p.m.

25              (Brief recess taken.)

**HEAD KANDY, LLC vs KAYLA MARIE MCNEILL**
**Tonia Werner, M.D. on 11/08/2024**

1           THE VIDEOGRAPHER:  Back on record, at

2      1:29 p.m.

3   BY MS. SADRO:

4      Q    Dr. Werner, a little bit ago we were talking

5   about the variety of different things that could cause

6   somebody to experience stress, depression or anxiety.

7           Were you aware that Miss McNeill was being

8   accused of stealing from her company?

9      A    Yes.

10     Q    Is that something that could cause anxiety?

11     A    Yes.

12     Q    Is it something that could cause depression?

13     A    Yes.

14     Q    And if she was being investigated for

15  stealing, is that something that could cause anxiety and

16  depression?

17     A    Yes.

18     Q    Were you aware that Ms. McNeill hired personal

19  friends and family to perform personal services with

20  her, and had the company pay for it?

21          MS. BURGESS:  Objection.  Form.

22          THE WITNESS:  I'm not sure what you're

23      referring to.  I know that there were -- I know

24      that her husband worked for the company; I know

25      that there were other friends of hers that worked

Page 90

1        for the company, because she spoke about one friend

2        that was actually fired while she was on vacation,

3        but I don't know what you're specifically referring

4        to.

5    BY MS. SADRO:

6        Q    Sure.  I'll give you an example.

7             Were you aware that Ms. McNeill hired someone

8    to babysit her child and have Head Kandy -- the

9    company -- pay for it?

10       A    I have no knowledge of that.

11       Q    If Ms. McNeill was accused of doing that,

12   could it cause stress?

13       A    Yes.

14       Q    If Ms. McNeill was investigated for improperly

15   hiring personal friends and family on company resources,

16   could that cause depression?

17       A    Yes.  Whether you did it or didn't do it, if

18   you're being accused of it and investigated for it, that

19   will cause stress.

20            Stress can be brought on by positive things;

21   like getting married.  Having a baby.

22       Q    Sure.

23       A    So stress is brought on by any number of

24   things.

25       Q    Are you aware that Ms. McNeill admitted that

HEAD KANDY, LLC vs KAYLA MARIE MCNEILL
Tonia Werner, M.D. on 11/08/2024

Page 91

1    that was unethical behavior?

2        A    I'm not.

3        Q    So if Ms. McNeill had been engaging in

4    unethical behavior in her company, could that have been

5    a cause of her stress, or depression, or anxiety?

6            MS. BURGESS:  Form.

7            THE WITNESS:  It may be; it may not be.

8        Again, each individual's different.

9    BY MS. SADRO:

10       Q    If Ms. McNeill had been accused of mismanaging

11   company resources, could that have affected her mental

12   health?

13       A    Yes.  Again, being accused of anything, any

14   kind of wrongdoing can affect your mental health.

15       Q    If she had been mismanaging company resources

16   and was being investigated for it, could that affect her

17   mental health?

18       A    Yes.

19       Q    Is starting a new company a stressor?

20       A    It can be.

21       Q    Is moving across the country a stressor?

22       A    It can be.

23       Q    Is homeschooling three children a stressor?

24       A    I imagine it can be.

25       Q    Me too.

HEAD KANDY, LLC vs KAYLA MARIE MCNEILL
Tonia Werner, M.D. on 11/08/2024

Page 92

1          Dr. Werner, I want to talk a little bit about

2   the opinion you gave again.  Not just the diagnosis, but

3   in your report you say that those symptoms are directly

4   related to the sexual harassment and loss of her job.

5       A    Yes.

6       Q    Are you aware that Ms. McNeill has dismissed

7   the claims against Mr. Rosenbaum?

8       A    I'm not aware of that.

9       Q    Would that change your opinion?

10          MS. BURGESS:  Objection.  Form.

11          THE WITNESS:  Again, not necessarily, because

12       that's just a piece of one of the stressors.  I

13       think it's multifactorial, and I had it as having

14       to do with the sexual harassment, being suspended,

15       being terminated, loss of her social media account

16       and her presence, and kind of identity -- you know,

17       being accused of the theft and investigated, and

18       then the lawsuit, which she perceived as

19       retaliative.

20   BY MS. SADRO:

21       Q    How do you make a determination about why

22   somebody is experiencing those causes that's causing

23   depression?

24       A    I'm not sure I understand the question.

25       Q    And I can probably phrase it a little bit

HEAD KANDY, LLC vs KAYLA MARIE MCNEILL
Tonia Werner, M.D. on 11/08/2024

Page 93

```
 1   better.  How do you determine why somebody is
 2   experiencing depression, and then make an analysis as to
 3   it being from a specific event?
 4        A    For each person -- again, it's individualized.
 5   And that's -- you know, coming from her, coming from her
 6   history.  It was described in her medical records
 7   previously, so it's coming from the collateral
 8   information.  It's coming from her, coming from --
 9        Q    And when you say the information in her
10   medical records, do you mean when Ms. McNeill was
11   reporting to Dr. Wiginton and Ms. McDowell that she was
12   in a lawsuit?
13        A    What they documented; yes.
14        Q    So those are Ms. McNeill's reports; not
15   Dr. Wiginton or Ms. McDowell's commentary.
16        A    Well; it's what they documented in their
17   medical records.
18        Q    Why do you believe that -- excuse me.
19             Are there any other reasons that you believe
20   Ms. McNeill is experiencing depression -- or Major
21   Depressive Disorder, other than the sexual harassment
22   and the loss of her company?
23        A    Well, I think it's -- again, it's the kind of
24   the sequelae of the loss of the company.  You know, the
25   loss of her identify; all the things that come from
```

HEAD KANDY, LLC vs KAYLA MARIE MCNEILL
Tonia Werner, M.D. on 11/08/2024

Page 94

1    that.  The financial stressors.  You know.

2              So it's kind of a landslide of other issues

3    that come out of that, I guess, so to speak.

4         Q    Does determining that the depression is

5    arising out of the loss of the company and a sexual

6    harassment rely upon Ms. McNeill having told you the

7    truth?

8         A    Yes.

9         Q    Do those opinions rely on Ms. McNeill giving

10   you a full accounting of what happened?

11        A    It relies on her giving me her accounting of

12   what happened, because it's how each individual

13   perceives what happened and how it happened to them and

14   how it affected them, and each individual is different.

15        Q    And if there were documented evidence that may

16   contradict some of Ms. McNeill's reports, could that

17   affect your opinion?

18        A    It may affect -- it may affect my opinion.

19             I'd have to review it.

20        Q    Did you review Dr. Russell's report to

21   determine if there were any contradictions given by

22   Ms. McNeill?

23        A    I don't recall specific contradictions, in all

24   honesty, from my report to Dr. Russell's report.

25        Q    Did you review the report for that purpose?

**HEAD KANDY, LLC vs KAYLA MARIE MCNEILL**
**Tonia Werner, M.D. on 11/08/2024**

1      A    I had already authored my report at that point

2  and offered my opinion, so I did not review the report

3  for that purpose.

4      Q    Okay.  And the review of that report would not

5  have altered your opinion.

6      A    It did not alter my opinion; correct.

7      Q    Dr. Werner, do you intend on meeting with

8  Ms. McNeill any further?

9      A    I don't believe so, unless I receive

10  information that I review and I feel like I need to meet

11  with her, or speak with her.

12      Q    Do you think it would be necessary to meet

13  with Dr. Demery to discuss his opinions on the case?

14      A    I don't believe that Dr. Demery has opinions

15  on the case, to my knowledge.  I don't know, and I don't

16  know what they're planning on doing with Dr. Demery.

17      Q    Have you spoken to Dr. Demery about this case?

18      A    I spoke with him initially to ask -- to make

19  an introduction, and then got off the call.

20      Q    And have you ever called Dr. Demery to

21  determine what his interpretation of Dr. Russell's

22  report might be?

23      A    No.  I haven't spoken to him regarding the

24  case since then, in all honesty.  I haven't spoken to

25  him regarding anything since then, in all honesty.

**HEAD KANDY, LLC vs KAYLA MARIE MCNEILL**
**Tonia Werner, M.D. on 11/08/2024**

1        MS. SADRO:  I know we just took a break a

2     moment ago, but I'm trying to get you out of here,

3     Dr. Werner.  Would anybody mind a 10-minute break

4     so I can kind of wrap up; see what else we might

5     need to cover?

6        MS. BURGESS:  That's not an issue for me.

7        MS. SADRO:  Okay.  Come back at 1:50?

8        MS. BURGESS:  Perfect.

9        MS. SADRO:  Okay; thank you.

10       THE VIDEOGRAPHER:  Off the record.  1:38 p.m.

11            (Brief recess taken.)

12       THE VIDEOGRAPHER:  Back on record, at

13     1:53 p.m.

14   BY MS. SADRO:

15     Q    All right.  Dr. Werner, anything about your

16   testimony so far today that you want to change, amend,

17   modify, or supplement in any way?

18     A    The only thing I would supplement is I think I

19   was asked for referrals, and I believe I gave them two

20   different names.

21          So Dr. Demery was not the only name that I

22   gave them.

23     Q    Okay.  Who was the other name you gave?

24     A    Michael Herkov.

25     Q    How do you spell that last name?

**HEAD KANDY, LLC vs KAYLA MARIE MCNEILL**
**Tonia Werner, M.D. on 11/08/2024**

Page 97

```
 1       A    H-E-R-K-O-V.

 2       Q    Okay; thank you.

 3            And did you speak at all with Mr. Herkov about

 4  this case?

 5       A    With Dr. Herkov?  I did not.

 6       Q    Okay.  Is there any -- other than that,

 7  anything else you want to change, modify, amend or

 8  supplement in any way?

 9       A    No.

10       Q    If the answer to this question is yes,

11  Dr. Werner, I don't want to know the content; just a yes

12  or no.  At any point in time today, have you spoken with

13  Ms. McNeill's counsel; either Miss Burgess or one of her

14  other attorneys?

15       A    No.

16       Q    Okay.  And did you speak with them in

17  preparing for today's deposition?

18       A    I spoke with them earlier this week, just with

19  regards to logistics, and I received an e-mail about the

20  change in Zoom link.

21       Q    Okay.  About how long did you speak with them

22  for?

23       A    Oh, gosh.

24            Five minutes.  Maybe ten, at the most.

25       Q    Okay.  And did you do anything else to prepare
```

HEAD KANDY, LLC vs KAYLA MARIE MCNEILL
Tonia Werner, M.D. on 11/08/2024

Page 98

1    for the deposition?

2        A    No.  I just reviewed my report.

3        Q    Okay.

4        A    And I sent them the notes.

5        Q    Understood.  The notes that you have in front

6    of them, do you anticipate needing to rely upon them to

7    refresh your recollection in trial?

8        A    My report?

9        Q    The notes.  The -- those 28 pages that we were

10   talking about earlier.

11       A    No.

12       Q    Do you have -- do you anticipate offering any

13   other opinions than those that are listed in your

14   report?

15       A    Not as I sit here today.

16            If I'm asked something different I guess I

17   could formulate an opinion on it.

18            But as I sit here today; no.

19       Q    Do you currently hold any other opinions than

20   what's listed in your report?

21       A    No.

22       Q    Have you ever been the subject of a Daubert

23   motion?

24       A    No.

25       Q    Do you keep a list of prior testimony that

Page 99

1    you've given for the past four years?

2        A    Yes.  I believe it was submitted.

3        Q    Okay.  I'll get with counsel about that.

4             Dr. Werner, do you know what rating scales

5    are?

6        A    Yes.

7        Q    What are rating scales?

8        A    Well -- with regards to what?

9        Q    I want to make sure I'm using your words.

10            Is there a general definition of a rating

11   scale?

12       A    A rating scale, with regards to what?

13       Q    Are there rating scales that are usual scales

14   that can -- that are asked to determine somebody's

15   emotional status?

16       A    There can be; yes.

17       Q    Okay.  Are there scales that are frequently

18   used in your profession to help either track somebody's

19   emotional status, or help log it?

20       A    I don't use any in my practice.

21       Q    Why don't you use any rating scales?

22       A    I think my patients typically are not present

23   for a significant period of time.  I think they're more

24   effective probably in the outpatient setting, where

25   you're tracking somebody over a longer period of time

HEAD KANDY, LLC vs KAYLA MARIE MCNEILL
Tonia Werner, M.D. on 11/08/2024

Page 100

1    than 3 days.

2        Q    Have you ever used a rating scale in any of

3    your forensic evaluations?

4        A    I have not.

5        Q    And why not?

6        A    I just haven't.  I'm seeing them one time.

7    I'm just -- again, it's more for tracking them over

8    periods of time and being able to assess whether they're

9    improving or declining.

10       Q    Can a rating scale also give you an initial

11   impression about somebody's self report of their

12   symptoms?

13       A    It may, but I do that verbally with them.

14   It's kind of a -- a substitution for actually asking

15   them the questions.

16            So primary care physicians may use them for

17   something for them to do in the lobby, and then they can

18   just quickly look over it and ask them to elaborate on

19   something that they may have said yes on, as opposed to

20   asking them each of the questions.

21       Q    Are you aware of other psychiatrists that use

22   rating scales on a frequent basis?

23       A    Yes.  Again, it's frequently done in the

24   outpatient setting, where they're following them for a

25   significant period of time.

HEAD KANDY, LLC vs KAYLA MARIE MCNEILL
Tonia Werner, M.D. on 11/08/2024

Page 101

1      Q     Are you aware of other psychiatrists that
2   utilize rating scales during forensic evaluations?
3      A     Yes.
4      Q     Okay.  Is that a usual practice?
5      A     Not necessarily.
6      Q     Okay.  How many times would you say you've
7   seen another psychiatrist utilize a rating scale for a
8   forensic evaluation?
9      A     Rarely.  A rating scale?  Rarely.
10     Q     Doing a last check, Dr. Werner.
11     A     No problems.
12     Q     Dr. Werner, at any point in time did you
13  request to review Ms. McNeill's deposition testimony?
14     A     No.  I don't know that I knew that she'd had
15  one; no.
16     Q     Okay.  If Ms. McNeill testified during her
17  deposition in a contradictory manner than the
18  information she shared with you, could that affect your
19  opinion?
20     A     It could.  I'd have to review.
21     Q     If she testified in an inconsistent manner
22  about an event that had happened, could that affect your
23  opinion?
24     A     It may; it may not.
25           Again, I'd have to review it.

HEAD KANDY, LLC vs KAYLA MARIE MCNEILL
Tonia Werner, M.D. on 11/08/2024

Page 102

1     Q     Would Ms. McNeill's demeanor during a

2  deposition affect your opinion?

3     A     It may; it may not.  I'd have to review it.

4     Q     And have you reviewed deposition testimony in

5  other cases?

6     A     Yes.

7     Q     Have you requested deposition testimony in

8  other cases?

9     A     If I'm aware that it's available.

10    Q     Okay.  And you were not made aware that it was

11 available in this case?

12    A     I don't recall that; no.

13    Q     Okay.  All right.  I think that is all I have

14 for you, Dr. Werner.

15    A     Okay.

16    Q     Thank you for hanging out with me.

17          MS. BURGESS:  And I would just ask, Carson, if

18     we could do the same thing; if I can have

19     10 minutes to check all my notes --

20          MS. SADRO:  Absolutely.

21          MS. BURGESS:  Perfect.

22          2:10, you want to say, or 2:15?

23          MS. SADRO:  It'll be your choice.

24          MS. BURGESS:  Let's do 2:15, and I'll wrap it

25     up quickly.

HEAD KANDY, LLC vs KAYLA MARIE MCNEILL
Tonia Werner, M.D. on 11/08/2024

Page 103

1            MS. SADRO:  All right.

2            THE VIDEOGRAPHER:  Off record at 2:00 p.m.

3                 (Brief recess taken.)

4            THE VIDEOGRAPHER:  Back on record, at

5       2:20 p.m.

6                      CROSS EXAMINATION

7    BY MS. BURGESS:

8       Q    Good afternoon, Dr. Werner.

9       A    Good afternoon.

10      Q    Do you have experience, or -- do you have

11   medical expertise on how people present in their

12   interviews with you?

13           MS. SADRO:  Object to the form.

14           THE WITNESS:  I would say so.

15   BY MS. BURGESS:

16      Q    And in that, do you do any type of -- when

17   they're presenting to you in interviews, can you

18   generally make a determination as to -- do they exhibit

19   any signs if they're not being truthful in the

20   interviews?

21           MS. SADRO:  Object to form.

22           THE WITNESS:  Yeah.  So you want to look at

23       whether there affect is congruent with what they're

24       talking about that, and I talked about that earlier

25       in the deposition.  You know.  And that -- you

**HEAD KANDY, LLC vs KAYLA MARIE MCNEILL**
**Tonia Werner, M.D. on 11/08/2024**

1      know, her affect.  She would smile and -- when she

2      would talk about her children.

3           And then when she talked about the issues that

4      were stressing her out, issues with the company and

5      the harassment that she perceived, she was tearful

6      and crying.  So you look at their affect, and is it

7      congruent with what she's talking about at the

8      time.

9  BY MS. BURGESS:

10     Q    Did Kayla ever malinger with you in the

11  interviews?

12          MS. SADRO:  Object to form.

13          THE WITNESS:  I did not detect any malingering

14     were her during the interview; no.

15  BY MS. BURGESS:

16     Q    And earlier it had been brought up about

17  whether or not you were aware if that there was an

18  action dropped against Jonathan Rosenbaum; the

19  perpetrator.

20          MS. SADRO:  Object to form.

21          MS. BURGESS:  I didn't finish the question.

22          MS. SADRO:  Sorry.  I'll let you finish.

23          MS. BURGESS:  Okay.

24  BY MS. BURGESS:

25     Q    If you had learned that that action was

**HEAD KANDY, LLC vs KAYLA MARIE MCNEILL**
**Tonia Werner, M.D. on 11/08/2024**

Page 105

1    dropped strictly for jurisdictional purposes, would that

2    affect your analysis in any way?

3              MS. SADRO:  Object to form.

4              THE WITNESS:  It would not affect my analysis;

5         because it's a legal issue.

6    BY MS. BURGESS:

7         Q    And in a scenario -- well -- is loss of all

8    household income a stressful situation where people

9    could manifest a disorder, or anxiety or stress?

10        A    I would think for most people; yes.

11        Q    And similarly with sexual abuse, would that be

12   a stressful situation where people could manifest a

13   disorder, or anxiety or stress?

14             MS. SADRO:  Object to form.

15             THE WITNESS:  Yes.

16   BY MS. BURGESS:

17        Q    In your practice -- well, let me phrase it

18   this way:  In your experience and in your practice, are

19   you aware of any literature -- or from your own

20   experience -- where someone would exhibit a certain

21   level of anxiety, simply tied to a -- let me correct

22   that real quick.

23             In the scenario where there were payments

24   identified by a company to be made for bookkeeping

25   purposes, and the person determined a payment of $10,000

HEAD KANDY, LLC vs KAYLA MARIE MCNEILL
Tonia Werner, M.D. on 11/08/2024

Page 106

1   and actually paid that $10,000, have you ever seen any

2   literature, or from your own experience, how a scenario

3   such as that between a company and a requesting a

4   payment be made, where it would result in the level of

5   stress and anxiety noted in your report?

6           Maybe I can rephrase it.

7           That was a little long.

8           The quickest way to say it is if a company had

9   a small de minimus bookkeeping discrepancy with an

10  individual, and that individual ended up making a

11  payment as requested by the company, have you ever, in

12  your own experience or pursuant to any literature, seen

13  a scenario like that resulting in a depression

14  diagnosis?

15          MS. SADRO:  Object to form.

16          THE WITNESS:  I have not seen it.  It may or

17      may not -- you know, because it depends on each

18      individual.

19  BY MS. BURGESS:

20      Q    Okay.  And if someone actually paid back an

21  amount of money requested or determined by the company,

22  in that scenario such as that, have you ever seen any

23  literature where that would result in depressive

24  disorder?

25      A    No.  I haven't seen literature to that effect.

Page 107

1      Q    And in your own experience have you ever

2   seen -- in your own experience, have you seen that

3   occur?

4      A    No.  I haven't seen that.

5      Q    You were asked earlier if you were given

6   additional information that showed some of the data was

7   incorrect, it could potentially change your opinion on

8   the matter.

9           You haven't seen any data to -- you have not

10  been provided any data showing that -- whether or not

11  there was or was not a theft.  Correct?

12     A    Correct.

13     Q    And that was not -- you were not hired to

14  determine whether there was or was not a theft.

15     A    Correct.

16     Q    And so -- would whether or not there was a

17  theft or not any determination on the manifestation of

18  anxiety, or any determination of suffering from sexual

19  abuse, and the results there?

20          MS. SADRO:  Object to form.

21          THE WITNESS:  No.

22  BY MS. BURGESS:

23     Q    And why is that?

24     A    Well, again, because it's -- it's not related.

25  Her symptoms are and the stressors are multifactorial.

Page 108

1  There's a number of them.  And that's not related to --

2  you know, the stressors with regards to -- you know, all

3  of the loss of her identify, the loss of the company,

4  and the other things that are playing into it.

5      Q    And just for clarification, I believe earlier

6  we were talking about the date when Ms. McNeill got back

7  on medication.  Could you please reconfirm that date,

8  and the year specifically?

9      A    I'm going to refer to my notes.

10     Q    Yes --

11     A    My note.  February 23rd, 2023.

12     Q    Was there any time Ms. McNeill -- that you're

13 aware of -- got back on medication in 2024?

14     A    I'm sorry.  I believe it was in 20 -- hang on.

15 Let me look at her -- I think the 2023 is when she was

16 prescribed and then she only took it for a short period

17 of time and then stopped, and then -- June of 2024 she

18 restarted, it looks like.

19     Q    And are there any publications you relied upon

20 to reach your ultimate conclusions?

21     A    Just the DSM-5-TR.

22          MS. BURGESS:  I don't have any additional

23     questions for you.  We appreciate your time.

24          MS. SADRO:  I've got some follow-up, Laura.

25          MS. BURGESS:  Yes.