## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

HEAD KANDY, LLC,

      Plaintiff/Counterclaim Defendant,

v.                                       CASE NO. 23-CV-60345- JB/JMS

KAYLA MCNEILL,

      Defendant/Counterclaimant/Third-Party Claimant,

v.

JEROME FALIC,

      Third-Party Defendant.

_____/

## STATEMENT OF FACTS MATERIAL TO
## HEAD KANDY, LLC'S MOTION FOR SUMMARY JUDGMENT

Defendant/Counterclaimant/Third Party Claimant Kayla McNeill ("Ms. McNeill"), by and through her undersigned counsel, pursuant to Local Rule 56.1, hereby submits her statement responding to Plaintiff/Counterclaim Defendant Head Kandy, LLC's ("HK") Statement of Material Facts in Support of its Motion for Summary Judgment ("HK SOF") [ECF No. 470] and incorporating additional material facts.

### Response to HK SOF

1.    Disputed.  Due to HK and Third-Party Defendant Jerome Falic's ("Mr. Falic," collectively, "the HK Parties") theft of the personal social media accounts created by Ms. McNeill on November 6, 2018, including Facebook Page ID 1642077422564196, and owned by Ms. McNeill at all relevant times (the "McNeill Social Media Accounts"), Ms. McNeill has not had a substantial social media presence since December 2022.  The HK Parties ascribe varying and ambiguous meanings to the term "followers."

2.     Disputed.  Lashed Out, LLC ("LO") is a juristic person organized as a for-profit Colorado limited liability company, separate and distinct from Ms. McNeill.  [Declaration of Jerome Falic ¶ 4, ECF No. 44-2 ("Falic Dec."); Asset Purchase Agreement § 4.1, ECF No. 311-1 ("APA"); Stipulated Facts and Statement of Issues for August 1, 2023 Injunction Hearing ¶¶ 5, 7, at 1-2, ECF No. 93 ("PI SOF")].  The APA speaks for itself.  The APA was entered into between HK and LO; Ms. McNeill was not a party to the APA.  [APA at 1, 30-31].  As part of the purchase, HK acquired the "Purchased Assets" identified in Section 1.1 of the APA, including LO's "user accounts and user names/handles with Twitter, Facebook, Instagram and other social media or similar companies and the content found thereon."  [APA § 1.1(c)].  Pursuant to the Amended and Restated Limited Liability Company Operating Agreement of Head Kandy LLC (ECF No. 311-2, the "OA"), not the APA, Ms. McNeill received a 20% ownership interest in HK in exchange for her initial capital contribution of $929,569.35.  [Ex. A to OA, ECF No. 311-2 at 37].

3.     Disputed, as to HK's characterization of the OA, which speaks for itself.  Ms. McNeill does not dispute that the OA contains a choice of law provision and a choice of venue provision.  HK has prosecuted this case in Florida for nearly two years, during which it has maintained claims, such as its claim for breach of fiduciary duty, that arise due to rights and/or obligations under the OA.  [ECF No. 1].

4.     Undisputed.

5.     Disputed.  Beginning on May 3, 2018, HK's offices and warehouse were located in Colorado.  In May 2021, HK's offices and warehouse were relocated to North Carolina.  HK has only had a single employee who has worked out of Hollywood, Florida.  HK utilized several employees of unrelated companies owned by Mr. Falic to perform services related to payroll,

bookkeeping and other matters without formally retaining such individuals or compensating them, i.e. Ylse Lopez was an employee of a different company owned by Mr. Falic, not an employee of HK.HK. Falic Tr. 56: 22- 57:2. Raissa Tejada also was an employee of a different company of Mr. Falic, who Mr. Falic utilized to do payroll. Falic Tr. 57: 18-25. Mr. Falic is also not sure under which company he pays Ms. Tejada. Falic Tr. 163: 22-25. Ms. Tejada was never an employee of HK. Falic Tr. 59: 18-25. Falic testified that Jon Rosenbaum never met with Mr. Falic in Florida. Falic Tr. 163: 12-14. Hernan Heiber was also an employee employed under one of Mr. Falic's other companies. Falc Tr. 35: 15-23. Mr. Heiber is employed by Falic's Fashion Group, not HK. Falic Tr. 164: 3-4. Mr. Falic also swore in his affidavit were "personnel who worked in the Hollywood, Florida office…including: Hernan Haber, who since April 2020, has been responsible for purchasing and inventory control for HK;…and Yveliss Diaz, who since May 2019 has been responsible for accounting for HK." [ECF No. 44-2, ¶18]. Mr. Falic also swore under oath that "each of HK's personnel working from the Hollywood, Florida headquarters of HK regularly communicated with Ms. McNeill…. Including… payroll, financing and accounting." [ECF No. 44-2]. Mr. Falic also swore under oath that there was a "payroll" managed by the "Florida office" but this is contradicted in that there was no HK employee or HK1099 contractor running payroll out of a "HK office"; it was run by other companies Mr. Falic owned. [ECF No. 44-2, ¶¶ 23 and 24]. To date, HK has not produced a certificate of good standing from the State of Florida for the times prior to its initiation of this lawsuit that it allegedly maintained a principal place of business in Florida. The Court ruled in its Order that "…based on the allegations in the Amended Complaint *and evidence provided by Plaintiff's witnesses*, there is evidence Defendant was involved to whatever extent, in directing or facilitating the submission of expenses to *a Florida-based accounting office* to enact the

withdrawal of money form a Florida-based account.  This is sufficient to support a finding that Defendant's conduct arises out of or relates to the Defendant's contacts in Florida."  [ECF No. 151, P. 15] (*emphasis added*).

6.     Disputed, as to HK's characterization of the May 3, 2018 Executive Employment Agreement between HK and Ms. McNeill ("EA," ECF No. 187-1), which speaks for itself.  As part of her compensation, Ms. McNeill was "eligible to receive an annual bonus at the end of each fiscal year[.]"  [ECF No. 187-1 § 3(b)].  By email dated August 26, 2022, Kleitias Petri, on behalf of HK, notified Ms. McNeill that HK owed her earned and outstanding bonuses.  [ECF No. 84].  HK has not paid Ms. McNeill a bonus for any calendar year she worked for HK.  [*Id.*].  As of August 26, 2022, HK had not secured any of the audited financials it was required to obtain under Section 3(b) of the Employment Agreement.  [*Id.*].

7.     Disputed, as to HK's characterization of the EA, which speaks for itself.  The EA contains Restrictive Covenants which, according to their terms, begin to impose restrictions upon Ms. McNeill as of her hire date.  [EA § 5].

8.     Disputed, as to HK's characterization of the EA, which speaks for itself.  Pursuant to the EA, "[a]ny Annual Bonus due hereunder shall be deemed fully earned when due and shall be non-refundable following receipt by the Executive."  [EA § 3(b), at 3].

9.     Disputed, as to HK's characterization of the EA, which speaks for itself.  The EA limits the definition of "Works" to "work on and contributions to documents, programs methodologies, protocols, and other expressions in any tangible medium which have been or will be prepared by the Executive . . . in connection with the Executive's services to the Company[.]"  [EA § 8(a), at 10].  Furthermore, Works may only be rendered and made by Ms. McNeill "at the instigation of, and under the overall direction of [HK.]"  [*Id.*].

10.    Disputed, as to HK's characterization of the EA, which speaks for itself.  Pursuant to the EA, Ms. McNeill "covenants that she will not challenge the enforceability" of Section 5 "nor will she raise any equitable defense to its enforcement."  [EA § 5(g), at 9].  The EA does not preclude Ms. McNeill from challenging HK's interpretation of Section 5 and Section 16 provides a mechanism for resolving any such dispute.  [*Id.*; *Id.* § 16, at 13-14].

11.    Disputed, as to HK's characterization of the EA, which speaks for itself.  The EA contains a choice of law provision selecting Florida State law.  [EA § 15, at 13].

12.    Disputed.  Ms. McNeill agrees that HK's offices and warehouse moved from Colorado to North Carolina in May 2021.  Ms. McNeill did not work exclusively from North Carolina beginning in May 2021.

13.    Disputed.  Ms. McNeill does not dispute that each of the Members provided a loan to HK in the individual amount of $145,000 to fund HK's capital requirements.  Pursuant to the terms of the OA, HK's "financial statements or other books and records" serve to memorialize such loans when no promissory note is issued.  [OA §§ 4.2(a)(i), (b), at 10-11].

14.    Disputed.  Ms. McNeill did not control all of HK's operations as of July 2022.  Mr. Falic had operational control over HK at all relevant times and involved himself in many day-to-day aspects of HK's operations.  [Falic Tr. 192:7-15].  Mr. Falic was Ms. McNeill's direct manager.  [Declaration of Jerome Falic ¶ 17, ECF No. 47-2 ("Falic Dec.")].  Mr. Falic was HK's managing member, principal owner, and granted authority and control over the hiring and firing of employees (including his decision to terminate Ms. McNeill); engaging consultants and other contractors (including retaining Mr. Rosenbaum); delegating responsibility over aspects of HK's operations (including deciding to use employees of other businesses owned by Mr. Falic to run payroll for HK); setting the terms and conditions of employee and contractor compensation

(including those for Ms. McNeill and Mr. Rosenbaum); HK's payroll; conditions of employment; HK's regular business meetings with employees and consultants and approving actions; exclusive authority to direct HK's attorneys to act on behalf of HK; management of Ms. McNeill's day-to-day activities; and, keeping HK's business records. [Falic Tr. 6:21-18:24, 26:24-65:24, 126:15-127:10; Transcript of Deposition of Jonathan Rosenbaum 25:6-15, 69:7-70:10, 75:9-13, 77:18-25, 81:7-21, 87:2-88:20, 103:22-104:10, 114:22-115:7, 126:6-22, 141:4-9, 143:2-6, 154:2-12, 186:8-17, 197:20-21, 202:5-23, 215:7-11, 226:8-17, 280:17-22, 281:2-5, 288:2-7, 288:22-24 ("Rosenbaum Tr."), ECF No. 435].

15. Disputed. Ms. McNeill was not in charge of marketing or product inventory. [Declaration of Jerome Falic ¶ 18]. Bryan Feldman authorized all of Ms. McNeill's actions HK claims constitute self-dealing. [Falic Tr. 222:5-19; McNeill Tr. 36:21-39:13].

16. Disputed. Ms. McNeill was not in charge of payroll or HR. [Falic Dec. ¶ 18]. Mr. Feldman approved the hiring of the identified individuals.

17. Disputed. The individuals were performing services for HK. The individuals did not provide any personal services for Ms. McNeill while on the clock. [McNeill Tr. 36:21-39:13].

18. Disputed. Ms. McNeill did not admit that hiring each of the individuals was "unethical."

19. Undisputed.

20. Disputed. Ms. McNeill spoke of the leggings twice on the McNeill Social Media Accounts, not HK's social media accounts. Ms. McNeill did not utilize any HK employees or resources to promote White Pineapple.

21. Disputed. Ms. McNeill did not use any HK employees or resources to benefit Hayzlee's Boutique.

22.    Disputed.   Ms. McNeill was not responsible and had no control over her husband's credit card.  HK has not asserted any claims or allegations which would impose liability upon Ms. McNeill for Mr. McNeill's conduct.   To the extent HK paid for any of her personal expenses, without her permission, Ms. McNeill has reimbursed HK.

23.    Disputed.   K2 did not engage in an investigation.   K2 was not provided any supporting documentation concerning charges.

24.    Disputed.   K2's reports merely identified charges that seemed to have no legitimate business purpose.

25.    Disputed.   Ms. Petri determined that unaccounted for charges by Mr. and Ms. McNeill totaled not more than $256,732.80.

26.    Disputed.   Mr. Negreira testified that that the changes resulted in approximately a "net zero" accounting.

27.    Disputed.   Because HK either lost or destroyed documentation it previously received concerning Ms. McNeill's charges, there is no evidence that HK paid for any of Ms. McNeill's personal expenses.

28.    Disputed.   Ms. McNeill and Mr. Feldman exchanged texts which set forth the terms of the agreement.

29.    Disputed.

30.    Disputed.   Ms. McNeill has exclusive rights to her ownership interest in the forklift. HK rented the forklift.  Falic Trans. 143: 18-20.  HK admits it is still in possession of the Forklift. Any offer to return the Forklift would not relieve HK from its obligations under the Civil Theft letter. Return of property mitigates damages for conversion; however, see below-"tort is completed when chattel is converted." A defendant cannot wholly avoid the consequences of a

conversion by return of the chattel or a tender of the proceeds of the sale of the chattel, *Roebuck Auto Sales, Inc. v. Wallace*, 293 Ala. 231, 301 So. 2d 546 (Ala. 1974) ("The fact that an owner recovers the property prior to the suit should in no way affect his right to bring an action for conversion. The tort is complete when the chattel is converted. A recovery of the property does not amount to a waiver of any right of recovery for conversion.") Likewise, civil theft rights are not barred by any return or offer to return the property, as the statutory penalties are already triggered due to the actions and theft of the Defendant.

31.   Undisputed.

32.   Disputed.

33.   Disputed.  HK approved all of the leases in advance and ratified them every month the leases were in effect.

34.   Disputed.  HK approved and ratified all of Ms. McNeill's conduct.

35.   Disputed.

36.   Disputed.

37.   Disputed.  HK did not pay Ms. McNeill's earned salary at the time of her termination.

38.   Disputed.  Ms. McNeill was terminated in retaliation for reporting harassment to Mr. Falic on November 20, 2022.  On November 28, 2022, eight days after reporting the harassment, Ms. McNeill received

39.   Disputed.

40.   Disputed.

41.   Disputed.

42.   Disputed.

43.   Disputed.

44.   Disputed.  HK terminated them.

45.   Disputed.  In excess of amount determined reasonable by Magistrate Judge Strauss. Provisions illegal.  Cannot enter into illegal contract; therefore, Ms. McNeill is compelled to refrain from continued compliance with the illegal provisions within the contract and challenge any attempt to force such compliance.

46.   Disputed, as to HK's characterization of the outcome of the Florida Commission on Human Relations ("FCHR") proceeding.  On July 26, 2024, Ms. McNeill received her Notice of Determination that reasonable cause exists for harassment claims against HK based on gender, age and religion, that reasonable cause exists for Ms. McNeill's claim of sexual harassment against HK, and that reasonable cause exists for Ms. McNeill to bring retaliation claims against HK, because HK terminated Ms. McNeill based on her complaints of the harassment (to HK manager Bryan Feldman and to Jerome Falic).  [ECF No. 360-1].  The FCHR found no reasonable cause existed for Ms. McNeill's claims of discrimination.  [*Id*.].

47.   Undisputed.

48.   Undisputed.

49.   Disputed, as to HK's characterization of the text exchange between Ms. McNeill and Mr. Rosenbaum.  Ms. McNeill does not dispute that messages within the exchange contained the quoted text.

50.   Undisputed.

51.   Disputed, as to HK's characterization of the text exchange between Ms. McNeill and Mr. Rosenbaum.  Ms. McNeill does not dispute that messages within the exchange contained the quoted text.

52.   Disputed.

53. Disputed.

54. Disputed.

55. Disputed, as to HK's characterization of Ms. McNeill's testimony.

56. Disputed, as to HK's characterization of Ms. McNeill's testimony.

57. Disputed, as to HK's characterization of Ms. McNeill's testimony.

58. Disputed, as to HK's characterization of Ms. McNeill's testimony.

59. Disputed, as to HK's characterization of the text exchange between Ms. McNeill and Mr. Rosenbaum.  Ms. McNeill does not dispute that messages within the exchange contained the quoted text.

60. Undisputed.

61. Disputed.

62. Undiputed.

63. Undisputed.

64. Disputed, as to HK's characterization of the subject text exchange.  Ms. McNeill does not dispute that messages within the exchange contained the quoted text.

65. Undisputed.

66. Undisputed.

67. Undisputed.

68. Disputed, as to HK's characterization of Ms. McNeill's testimony.

69. Disputed, as to HK's characterization of the text exchange between Ms. McNeill and Mr. Rosenbaum.  Ms. McNeill does not dispute that messages within the exchange contained the quoted text.

70.   Disputed, as to HK's characterization of the reason for the meeting and why she attended.

71.   Disputed.

72.   Disputed, as to HK's characterization of the correspondence between Ms. McNeill and Mr. Rosenbaum.

73.   Disputed, as to HK's characterization of the text exchange between Ms. McNeill and Mr. Rosenbaum.  Ms. McNeill does not dispute that messages within the exchange contained the quoted text.

74.   Disputed. Ms. McNeill suffers from Major Depressive Disorder, Single Episode, Severe, as described in the DSM-5-TR, which requires continued medical care and treatment. [Expert Report of Tonia Werner, M.D. at 14, Exhibit A to HK and Mr. Falic's *Daubert* Motion to Exclude Testimony and Opinions of Tonia Werner, M.D., ECF No. 459-1]

75.   Disputed, as to HK's characterization of Ms. McNeill's testimony.

76.   Disputed, as to HK's characterization of Ms. McNeill's testimony.

77.   Disputed, as to HK's characterization of Ms. McNeill's testimony.

**<u>Additional Material Facts</u>**

78.   Ms. McNeill is a natural person who has continuously resided in the State of Colorado since at least 2015.  [PI SOF ¶ 1, at 1].

79.   Mr. Falic has continuously served as HK's managing member since its formation on April 13, 2018.  [PI SOF ¶¶ 3-4, at 1; Transcript of Deposition of Jerome Falic 5:7-9, ECF No. _____ ("Falic Tr."), excerpts attached hereto as **Exhibit A**].

80.   Since HK's formation, no one other than Mr. Falic has had the authority to direct HK's counsel to take actions on its behalf concerning employment matters.  [Falic Tr. 30:1-6].

81.   LO created the "Head Kandy" brand.  [Falic Dec. ¶ 4; PI SOF ¶ 5, at 1].

82.   From May 3, 2018 through at least February 17, 2023, Ms. McNeill was a member of and owned 20% of the membership units of HK ("McNeill Units").  [ECF No. 93 ¶ 9, at 2; ECF No. 44-2 ¶¶ 8, 12].

83.   Pursuant to Section 2 of the EA, Ms. McNeill agreed to serve as "Creative Director" for HK, with the agreed upon duties and authority set forth in that Section 2.  [Stipulated Facts and Statement of Issues for August 1, 2023 Injunction Hearing ¶ 14, at 2, ECF No. 93 ("PI SOF"); ECF No. 187-1].

84.   At all times Ms. McNeill was employed by HK, Ms. McNeill's supervisors were Mr. Falic and Mr. Bryan Feldman.  [ECF No. 93 ¶ 1, at 1; ECF No. 44-2 ¶ 17].

85.   No formal policies, procedures or protocols were promulgated by HK for any aspect of its business.  Transcript of 30(b)(6) Deposition of Head Kandy, LLC 77:5-14; 126:21-25; 175:21-176:4 ("HK Tr."), excerpts attached hereto as **Exhibit B**.

86.   HK did not create a human resources department or retain a human resource professional.  Falic Tr. 192:18-21.

87.   HK utilized several employees of unrelated companies owned by Mr. Falic to perform services related to payroll, bookkeeping and other matters without formally retaining such individuals or compensating them.  HK Tr. 176:20-177:25.

88.   HK did not properly maintain and reconcile its financial books and records. Transcript of Deposition of Kayla McNeill 103:20-104:8 ("McNeill Tr."), excerpts attached hereto as **Exhibit C**.

89.   HK did not secure adequate operating credit for its business operations.  McNeill Tr. 103:20-104:8; 106:3-107:15.

90.    Ms. McNeill allowed HK to charge business expenses to an American Express credit card account she owned ending in *006 (the "CC Account"), provided that HK timely reimburse Ms. McNeill for all business expenses charged to the CC Account.  McNeill Tr. 103:20-104:8; 106:3-107:15.

91.    Multiple HK employees received individual credit cards tied to the CC Account. [ECF No. 25-7 at 3].

92.    In May 2018, immediately after HK began its operations, HK placed Ms. Deborah Kassab, an employee of an unrelated company owned by Mr. Falic, in charge of reconciling, approving and processing employee expense reports.

93.    In May 2018, Mr. Ryan Thompson, an employee of HK, was responsible for determining and identifying business expenses charged to the CC Account, as well as gathering all information necessary to document such expenses.

94.    Mr. Thompson would obtain the monthly statements for the CC Account and black out all personal expenses charged to the CC Account.  Mr. Thompson would then submit the expense reports directly to Ms. Kassab.

95.    Ms. McNeill would personally pay the balance of the CC Account every month, including the business expenses charged by HK.

96.    After Ms. Kassab reconciled, approved and processed the expense reports, HK would issue a check to reimburse Ms. McNeill for its business expenses.

97.    HK subsequently revised its practice for paying its business expenses charged to the CC Account.  HK began paying its business expenses directly to the CC Account, rather than having Ms. McNeill pay for the expenses and then reimbursing her.

98.    On June 6, 2019, Mr. Thompson was instructed by Ylse Lopez, an employee of an unrelated company owed by Mr. Falic who assisted HK with its bookkeeping, to submit the full, unaltered statements for the CC Account to the "accounting department" every month as expense reports.  [Exhibit 4 to Declaration of Kayla McNeill, ECF No. 53-2].

99.    To facilitate submission of the statements for the CC Account, Ms. McNeill provided HK her online credentials to access to her CC Account.

100.  In July 2022, Mr. Falic, as HK's managing member, retained his close personal friend, Mr. Jonathan Rosenbaum, as a consultant for HK.  [Falic Tr. 187:4-25; PI SOF ¶ 31, at 3].

101.  In 2022, HK's revenues were more than double those of LO at the time its assets were acquired by HK.

102.  As part of her compensation, Ms. McNeill was "eligible to receive an annual bonus at the end of each fiscal year[.]"  [ECF No. 187-1 § 3(b)].

103.  By email dated August 26, 2022, Kleitias Petri, on behalf of HK, notified Ms. McNeill that HK owed her earned and outstanding bonuses.

104.  HK has not paid Ms. McNeill a bonus for any calendar year she worked for HK.

105.  As of August 26, 2022, HK had not secured any of the audited financials it was required to obtain under Section 3(b) of the EA.

106.  On November 28, 2022, only eight days after her meeting with Mr. Falic, Ms. McNeill received, from HK's outside legal counsel, her first letter of retaliation, styled as a Notice of Material Breach of the EA ("First FLR").  [Exhibit B to Complaint, ECF No. 187-2].

107.  In the First FLR, HK and Mr. Falic disclosed their desire and felonious intent to steal (for personal gain) the McNeill Units and inflict significant financial distress upon Ms. McNeill,

wherein they state, without authority, that HK could terminate her employment, "cancel" the McNeill Units, and "void" all of HK's financial obligations to Ms. McNeill. [*Id.* at 3, 4]. No complaint or allegation of impropriety pertaining to Ms. McNeill's professional conduct had been made during her multi-year tenure with HK.

108.   By letter dated December 1, 2022, HK notified Ms. McNeill that she would no longer have an active role in the operations of the business or management of Head Kandy. [ECF No. 93 ¶ 29, at 3].

109.   By letter dated December 1, 2022, HK notified Ms. McNeill that Mr. Falic would make a formal announcement on December 2, 2022 that Mr. Rosenbaum oversee and manage HK's business and operations. [ECF No. 93 ¶ 28, at 3].

110.   Dec 1 Ltr; Mr. Falic also admits Ms. McNeill was permitted to engage in other business ventures during her off hours. Falic Tr. 131: 1-7.

111.   Hardy Candy, LLC. Falic Tr. 169: 23-171:7; Falic Tr. 172: 11-12, 18-19; Falic Tr. 173: 2-4; Falic Tr. 112: 12-13; Falic Tr. 114:12- 115:5

112.   By letter dated December 16, 2022, HK placed Ms. McNeill's employment "under suspension effective immediately" and Ms. McNeill was "no longer permitted to do any work whatsoever for the company" [Notice of Suspension of Employment Due to Apparent Fraud and Dishonesty, ECF No. 187-3]. [ECF No. 93 ¶ 30, at 3].

113.   January 10, 2023 Ltr [Notice of Material Breach of Executive Employment Agreement and Notice of Breach of Fiduciary Duty of Obligations [sic] to Head Kandy, LLC, ECF No. 187-4].

114.   By letter dated January 30, 2023, HK provided formal notice to Ms. McNeill that HK terminated Ms. McNeill's employment with HK, effective January 30, 2023 (the "Termination

Letter") [Termination of Employment of Kayla Marie McNeill for Cause, ECF No. 187-5]. [ECF No. 93 ¶ 12, at 2].

115. On February 13, 2023, Ms. McNeill filed a lawsuit in Colorado state court under Colorado's Wage Claim Act, C.R.S. § 8-4-101, et seq., styled as *Kayla M. McNeill v. Head Kandy, LLC*, Chaffee County District Court, Case No. 2023CV30007, seeking payment of unpaid wages, bonuses, vacation time and business expenses (the "Colorado Suit"). [ECF No. 93 ¶ 35, at 4].

116. The Colorado Suit was dismissed, upon motion by HK, for lack of jurisdiction under the Federal Arbitration Act, 9 U.S.C. § 1, *et seq*. [ECF No. 93 ¶ 35, at 4].

117. On February 17, 2023, HK adopted resolutions [Resolutions of Head Kandy, LLC, ECF No. 187-6] whereby HK "exercise[d] its option to repurchase all Units belonging to McNeill" pursuant to Section 8.5 of the OA [ECF No. 311-2]. [ECF No. 93 ¶ 37, at 4].

118. The Resolution provides that Ms. McNeill's "termination was, *inter alia,* based upon McNeill improperly charging various improper expenses to the Company, costing the Company an amount in excess of $1,000,000[.]" [ECF No. 187-6].

119. Mr. Falic unilaterally decided to execute the Resolutions. [Transcript of Deposition of Jerome Falic 203:15-204:23, ECF No. _____ ("Falic Tr.")].

120. Section 8.5 of the OA sets forth a comprehensive method for determining the purchase price of units repurchased from a departing "Executive," as that term is defined in the OA. [ECF No. 311-2 § 8.5(a)].

121. Pursuant to the OA, "in no event shall the term 'Executive' include any Member or any Affiliate of any Member notwithstanding that such Member or Affiliate thereof is employed

by, or is a member of the management of, the Company."  [ECF No. 311-2 § 1.1] (emphasis in original).

122.  The repurchase price for units repurchased under Section 8.5 of the OA, "upon termination [of the Executive] for Cause, the purchase price for all Units shall be the lesser of such Unit's Fair Market Value and the amount originally paid for such Unit by the initial holder thereof."  [ECF No. 311-2 § 8.5(a)].

123.  Pursuant to the Resolution, HK priced the McNeill Units as "the amount originally paid for McNeill's Units, based on the books and records of the Company, is not more than $720,000."  [ECF No. 187-6].

124.  Once an election to repurchase ownership units under Section 8.5 of the OA is made, "the Company will be given up to sixty (60) days following the date of such election to consummate such purchase and sale."  [ECF No. 311-2 § 8.5(a)].

125.  Section 8.5 of the OA does not allow for credit against or setoff of the prescribed purchase price.  [ECF No. 311-2].

126.  Since adoption of the Resolution, Ms. McNeill has not received the payment amount set forth in Section 8.5 of the OA, or any other amount, for the repurchase of her membership units in HK.  [ECF No. 93 ¶ 38, at 4].

127.  Pursuant to the Resolution, HK "determined that McNeill presently owes the Company an amount to be determined for reimbursement of improper charges and for other damage to the Company, in excess of $1,000,000.00[.]"  [ECF No. 187-6].

128.  Pursuant to Section 1.1(c) of the APA, HK acquired Lashed Out's "user accounts and user names/handles with Twitter, Facebook, Instagram and other social media or similar companies and the content found thereon."  [ECF No. 311-1].

129. The Facebook page currently named "Kandy Life," Page ID 1642077422564196, is an individual influencer account that was personally created by Ms. McNeill on November 6, 2018 (the "McNeill FB Account").  [ECF No. 93 ¶ 27, at 3; Exhibit 1 to Declaration of Kayla McNeill ("McNeill Dec.") at 5, ECF No. 53-2].

130. On November 6, 2018, Ms. McNeill created the McNeill FB Account and a corresponding personal TikTok account (collectively, the "McNeill Social Media Accounts"). [Exhibit 1 to McNeill Dec. at 5].

131. The McNeill Social Media Accounts were not and could not have been identified within the "Purchased Assets" described in Section 1.1 of the APA.  [ECF No. 311-1].

132. Ms. McNeill's claim of ownership to the McNeill Social Media Accounts was acknowledged by HK no later than December 1, 2022.  [Email from counsel for HK to Ms. McNeill on December 1, 2023, attached hereto as **Exhibit D**; Falic Tr. 115:23-25].

133. Around the time of Ms. McNeill's termination, HK surreptitiously changed her login credentials and has continually prevented her from accessing the McNeill Social Media Accounts or obtaining the information she uploaded to the McNeill Social Media Accounts.  HK Tr. 180:18-181:11.

134. HK asserts ownership over the McNeill Social Media Accounts because it paid to increase the exposure of videos Ms. McNeill posted to the page in which she was promoting HK products, referred to as "boosting."  [Falic Tr. 116:2-117:4].

135. Mr. Falic is unaware of what "boosting" is or entails.  [Falic Tr. 116:9-117:10].

136. Mr. Falic testified extensively that he was an owner of the business and indisputably had the power to hire and fire employees (including that he made the decision to hire Jonathan Rosenbaum and terminate Ms. McNeill); controlled conditions of employment as the managing

member of HK; had control over the terms and conditions of employee pay, including Ms. McNeill; retained ability to approve all decisions of appointed personal employees to take care of HK payroll and maintained control over those individuals, approved hiring of outside consultants, had regular business meetings regarding company business and approved actions, had sole authority to direct HK's attorneys; had regular meetings with employees, and directly managed Ms. McNeill's day-to-day operations. Jerome Dep at 6:21-18:24; -26:24-65:24] [Resolution signed by Jerome terminating Kayla]; Employment Agreement that Mr. Falic is the "managing member" responsible for assigning Ms. McNeill tasks and Ms. McNeill shall report to Mr. Falic); Jonathan Rosenbaum Dep at 87:2-88:20 (Jerome Falic had control over hiring and firing). This is more than sufficient to hold Mr. Falic personally liable for the unpaid bonus amounts.

137.  Beginning in May 2018, Ms. McNeill leased her personal forklift (the "Forklift") to HK without payment from HK.

138.  Beginning in May 2018, Ms. McNeill leased her personal forklift (the "Forklift") to HK without payment from HK.

139.  On June 10, 2021, Ms. McNeill and HK entered into a lease agreement (the "Forklift Lease") for HK's use of the Forklift.

140.  HK approved the Forklift Lease before HK began making lease payments to Ms. McNeill.  Falic Tr. 222:5-16.

141.  HK possessed the forklift.

142.  HK and Mr. Falic acknowledge that Ms. McNeill owns the forklift and HK only ever leased it.  Falic Tr. 208:24-209:2.

143.  HK defines a HK customer as anyone who has ever place an order with HK.  [Falic Tr. 118:11-19].

144. Mr. Falic believes, without knowledge or evidence, HK's customer service employees were assisting

DATED this 16th day of December, 2024.

Respectfully Submitted,

By:  _/s/ Laura Burgess_
Laura E. Burgess, Esq. Florida Bar No. 0105073
L.E. Burgess P.A.
5966 S Dixie Highway, Suite 300
Miami, FL 33143
Tel.: 305.942.8044
Alt. Tel.: 713.818.5055
laura@leburgesslaw.com

AND

By:  _/s/ Antonio L. Converse_
Antonio L. Converse, Esq.
Admitted _Pro Hac Vice_
Converse Law Group, P.C.
600 17th Street, Suite 2800 South
Denver, CO 80202
Tel: 303.228.9471
anthony@converselawgroup.com

AND

By:  _/s/ Jennifer A. Tiedeken_
Jennifer A. Tiedeken, Esq.
Admitted _Pro Hac Vice_
125 S. Howes Street, Suite 1100
Fort Collins, CO 80521
Tel: 970.482.5058
jennifer@fortcollinslaw.com

COUNSEL FOR KAYLA MCNEILL

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 17, 2024 I electronically filed the foregoing document

with the Clerk of the Court using CM/ECF and through that filing served all counsel of record.


By: *<u>/s/ Laura Burgess</u>*
Laura Burgess