**Execution Version**

## ASSET PURCHASE AGREEMENT

This **ASSET PURCHASE AGREEMENT** (this "**Agreement**"), dated as of May 3, 2018, is by and between Head Kandy LLC, a Delaware limited liability company (the "**Buyer**"), and Lashed Out LLC doing business as Head Kandy, a Colorado limited liability company (the "**Seller**").

## RECITALS

**WHEREAS**, the Seller is the sole owner of certain assets (including intellectual property rights and licenses) relating to the manufacturing, marketing and distribution business relating to the Brand (as defined below), as more fully described in Section 1.1 (the "**Business**"); and

**WHEREAS**, the Seller desires to cause the sale to the Buyer, and the Buyer desires to purchase, in accordance with the provisions of this Agreement, the Purchased Assets (as defined below).

**NOW, THEREFORE**, in consideration of the promises and the mutual representations, warranties and covenants and subject to the conditions contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties, intending to be legally bound, agree as follows:

## ARTICLE I
## SALE OF ASSETS

Section 1.1.    Purchased Assets.  The Seller hereby agrees to sell, assign, transfer and deliver to the Buyer at the Closing (as defined below), free and clear of any and all liens, security interests, pledges, mortgages, easements, leaseholds, subleaseholds, assessments, covenants, restrictions, hypothecations, licenses, title defects, title retention agreements, proxies, options, preemptive rights, rights of first offer or refusal, or any other encumbrances, claims, burdens or charges of any kind or nature whatsoever (collectively, "**Liens**") all of the Seller's right, title and interest in and to the following property, undertakings, rights and assets of the Seller (collectively, the "**Purchased Assets**"):

(a)    All rights, benefits and Liabilities of the Seller under any open purchase orders relating to the Products (as defined below) (collectively, the "**Purchase Orders**") all as listed on Schedule 1.1(a);

(b)    All of the Intellectual Property owned by the Seller and any licensee rights or interests with respect to Intellectual Property licensed to the Seller or otherwise used by the Seller in the Business and/or or used in or embodied by the Products, including, without limitation, the items listed on Schedule 1.1(b) and all rights, claims and remedies against infringement thereof (the "**Acquired Intellectual Property**");

(c)    All (i) software and content forming part of or used on or in connection with the Seller's website located at www.headkandypro.com; (ii) user accounts and user names/handles with Twitter, Facebook, Instagram and other social media or similar companies and the content found thereon; (iii) advertising, promotional, and marketing materials, and

literature and displays relating to the Business in a high resolution format suitable for mass printing; and (iv) design drawings, artwork, marketing, advertising, business and promotion plans and calendars relating to the Business;

(d)     All of the Seller's proceeds, rights, claims, credits, causes of action or rights of set-off against third parties relating to the Purchased Assets, including, without limitation, unliquidated rights under manufacturers' and vendors' warranties (the "**Claims**"), except for existing insurance claims and accounts receivable, which are excluded from the Purchased Assets;

(e)     All of the Seller's books and records pertaining to the Purchased Assets, including, without limitation, books, records and files (including computer files) relating to customers and suppliers of the Seller, operating data, business and marketing plans, budgets, regulatory filings, warranties, guarantees, bills of sale, customer and supplier lists (including supplier contact information and supplier prices and customer contact and other personal information), product manufacturer's safety data sheets and specifications (including raw material specifications, bills of materials and list of components with complete vendor and cost of goods information), artwork, product registration information and safety testing data, copies of financial and accounting records, executed Purchase Orders, documents relating to Inventory (as defined below) and the Acquired Intellectual Property, correspondence and other similar documents and records used and/or useful in connection with the Purchased Assets (collectively, the "**Records**");

(f)     All of the Seller's right, title and interest in goodwill exclusively relating to the Business (including the Acquired Intellectual Property), to the extent owned by the Seller; and

(g)     All intangible property (other than the Acquired Intellectual Property) that is related exclusively to the Brand, including without limitation, the international unique packaging codes for the Products (the "**UPC Codes**").

Section 1.2.     Assumed Liabilities; Retained Liabilities.

(a)     At the Closing, the Buyer shall assume and undertake to perform, pay, satisfy or discharge in accordance with their terms, only those Liabilities of the Seller arising out of or relating to the Business or the Purchased Assets transferred to the Buyer at Closing, in each case, arising or accruing after the Closing (the "**Assumed Liabilities**").

(b)     Buyer is assuming only the Assumed Liabilities from the Seller and is not assuming (x) any other Liabilities of the Seller of whatever nature, whether presently in existence or arising after the Closing or (y) any Liabilities of the Seller arising or accruing after the Closing but relating exclusively to an event occurring or condition existing on or prior to the Closing (except to the extent that any such Liabilities are Assumed Liabilities) (the "**Retained Liabilities**").   The Buyer does not assume and shall in no event be liable for any Retained Liabilities, including, but not limited to:

(i) All Liabilities to the extent arising out of or relating to the operation or conduct by the Seller of any retained businesses and all Liabilities to the extent arising out of or relating to any Excluded Asset;

(ii) Any product Liability or similar claim for injury to persons or property, regardless of when made or asserted, which arises out of or is based upon any express or implied representation, warranty or agreement made by the Seller or its agents, or which is imposed by operation of law or otherwise, in connection with any service performed or product manufactured by or on behalf of the Seller on or prior to the Closing Date;

(iii) Any liability or obligations to any employees, agents, independent contractors or creditors of the Seller or related to the Business (other than any set forth above under Assumed Liabilities) or under any plan or arrangement with respect thereto, including, without limitation, liabilities and obligations (A) under any life, health, accident, disability or any other employee benefit plan, and (B) under any pension, profit sharing, stock bonus, deferred compensation, retirement, bonus or other employee pension benefit plan maintained, or to which contributions have been made, by the Seller or any predecessor or any corporation which is a controlled group or corporations of which the Seller are a member, or any trade or business (whether or not incorporated) under common control with the Seller, and (C) for wages, salaries, bonuses, commissions, severance, sick pay, vacation or holiday pay, overtime or other benefits not set forth above, in each of the above cases;

(iv) The Seller's legal, accounting, investment banking or other fees or expenses arising out of the transactions contemplated by this Agreement or otherwise incurred by the Seller;

(v) Any Liabilities for any Tax, assessment or other governmental imposition of any type or description, including, without limitation, any federal income or excess profits Taxes or state, provincial or local income, sales, use, excise, ad valorem or franchise Taxes, together with any interest, assessments and penalties thereon (A) arising out of or attributable to the Seller's operations or the Business prior to the Closing Date or (B) that are the responsibility of the Seller hereunder (including the Seller's or its members' federal income or capital gain taxes or state or local income or franchise taxes arising by virtue of the transactions contemplated by this Agreement or otherwise);

(vi) All indebtedness of Seller, including, but not limited to, any debt with On Deck or Shopify;

(vii) Any Liability (A) the existence of which constitutes an inaccuracy or breach with respect to any representation, warranty, covenant or agreement of the Seller hereunder, (B) which arises out of or in connection with any breach or default by the Seller occurring prior to the Closing Date under any of the Purchase Orders, (C) which arises out of or in connection with any agreement or commitment which is not an Assumed Liability, including, without limitation, any distribution agreements, (D) which arises out of or in connection with any violation by the Seller of any requirement of law prior to the Closing Date, (E) which relates to the Purchased Assets (including those arising under the Purchase Orders) to the extent relating to

3

periods prior to the Closing Date unless such liabilities are included in the Assumed Liabilities; and

(viii)    Any Liability arising out of, or in connection with, litigation or other legal proceedings, claims or investigations related to the Seller or the Business and the operation thereof prior to the Closing Date, regardless of when made or asserted, including, without limitation, (1) any Liability arising out of, or in connection with, the claims made by Guy A. Shaked Investments Ltd.'s under that certain Letter, dated March 5, 2018, addressed to the Seller and (2) any contract, tort, intellectual property, infringement or misappropriation, crime, foreign corrupt practices, fraudulent conveyance, workers' compensation, product liability or similar claim for injury to persons or property which arises out of or is based upon any express or implied warranty, representation or agreement of the Seller or its employees or agents, or which is imposed by law or otherwise.

(c)    Notwithstanding anything to the contrary in this Agreement, the Seller shall retain and shall be solely responsible for paying, performing and discharging when due, and the Buyer shall not assume or have any responsibility or Liability for, any of the Seller's Liabilities, whether or not related to the Business or the Purchased Assets, not specifically identified and quantified as Assumed Liabilities.

## ARTICLE II
## PURCHASE PRICE

Section 2.1.    Purchase Price.  In consideration of the sale, transfer, conveyance and delivery of the Purchased Assets, the Buyer shall, in full payment thereof (the "**Purchase Price**"): (a) pay to the Seller the sum of Two Million Eight Hundred Eighty Thousand Dollars ($2,880,000.00), of which (i) One Million Two Hundred Thousand Dollars ($1,200,000.00) shall be paid at Closing in immediately available funds (the "**Initial Purchase Price Payment**") and (ii) the remaining amount shall be paid in equal installments on each of the first, second, third and fourth anniversaries of the Closing Date (the "**Installment Payments**"), which Installment Payments shall be guaranteed by Falic and Feldman pursuant to personal guarantees substantially in the form attached hereto as Exhibit F (the "**Guarantees**"); and (b) issue to the Seller (the "**Lashed Out Member**") such number of equity interests of the Buyer, which shall represent twenty percent (20%) of all of the issued and outstanding equity interests of the Buyer at the Closing Date (collectively, the "**Lashed Out Equity Interests**").  The Purchase Price shall be allocated as described in Section 2.2.

Section 2.2.    Allocation of Purchase Price.  Schedule 2.2 hereof sets forth allocations with respect to the Purchased Assets, which shall be used by the parties for purposes of reporting to the Internal Revenue Service (the "**IRS**") on Form 8594.  The Buyer and the Seller agree to cooperate with each other in connection with the preparation and filing of any information required to be furnished to the IRS under Section 1060 of the Internal Revenue Code of 1986, as amended (the "**Code**"), and any applicable regulations thereunder, and shall not take any position in any income tax return, before any Governmental Authority charged with the collection of income tax, or in a judicial proceeding inconsistent with the terms of this subsection.  The parties hereto shall promptly inform one another of any challenge by any Tax authority to any allocation made pursuant to this Section 2.2 and consult with and keep one

another informed with respect to the state of, and any discussion, proposal or submission with respect to, such challenge.

Section 2.3.   Expenses; Delivery.  Any transfer tax, excise tax, customs duty or sales, use, value added or goods and services tax or recording or filing fees imposed upon the sale, assignment and delivery of the Purchased Assets shall be paid by the Buyer.

# ARTICLE III
# CLOSING

Section 3.1.   Time and Place of the Closing.   The closing (the "**Closing**") of the transactions contemplated by this Agreement shall take place simultaneously with the execution of this Agreement (the "**Closing Date**"), concurrent with the execution of this Agreement by the parties.  The Closing shall take place on the date at such time as the transactions are complete, but shall be deemed to have occurred effective as of 8:00 a.m. on the Closing Date for all purposes.

Section 3.2.   Procedure at the Closing.   At the Closing, the parties agree to take the following steps in the order listed below (provided, however, that upon their completion all of these steps shall be deemed to have occurred simultaneously):

(a)   The Seller shall deliver or cause to be delivered to the Buyer:

(i)   A copy of a written consent of its members authorizing the transactions contemplated by this Agreement;

(ii)   A good standing certificate (or certificate of status) of such party from the Secretary of state of Colorado (which is dated not more than 15 days prior to the Closing Date);

(iii)   Possession and/or control of all tangible personal property constituting the Purchased Assets which, in the case of the Purchase Orders, the Seller shall deliver to the Buyer originals or copies thereof;

(iv)   A bill of sale in the form attached hereto as Exhibit A (the "**Bill of Sale**");

(v)   One or more assignment and assumption agreements duly executed by the Seller relating to the Purchase Orders and the Acquired Intellectual Property, in the form attached hereto as Exhibit B (the "**Assignment**");

(vi)   A copy of the Limited Liability Company Operating Agreement of the Buyer, substantially in the form attached hereto as Exhibit C (the "**LLC Agreement**"), duly executed by the Lashed Out Member;

(vii)   A copy of that certain Employment Agreement between the Buyer and Mrs. Kayla McNeill, substantially in the form attached hereto as Exhibit D (the "**Employment Agreement**"), duly executed by Mrs. Kayla McNeill;

(viii)   A properly completed and executed IRS Form W-9 or appropriate IRS Form W-8, together with a duly completed CRS self-certification form; and

(ix)   Copies or originals of all of the Records.

(b)   The Buyer shall deliver or cause to be delivered to the Seller:

(i)   One or more assignment and assumption agreements duly executed by the Buyer relating to the Purchase Orders and the Acquired Intellectual Property;

(ii)   A copy of the LLC Agreement duly executed by the Buyer and the other members thereof (excluding the Lashed Out Member); and

(iii)   A copy of the Employment Agreement duly executed by the Buyer.

(c)   The Buyer shall pay to the Seller, by wire transfer of immediately available funds, an amount equal to the Initial Purchase Price Payment.

Section 3.3.   <u>Seller's Capital Contribution</u>.   Immediately following the Closing, the Seller shall make the Initial Capital Contribution, which the Seller will have committed to make pursuant to Section 4.1 of the LLC Agreement

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller makes the following representations and warranties as of the Closing Date (except as otherwise specified herein), each of which is relied upon by the Buyer in consummating the transactions contemplated hereby regardless of any other investigation made or information obtained by the Buyer:

Section 4.1.   <u>Organization, Power and Authority</u>.   The Seller is a limited liability company duly formed, validly existing and in good standing under the laws of state of Colorado, and is duly registered, licensed or qualified to carry on its business in each other jurisdiction in which the conduct of its business or the ownership of its assets requires such registration, license or qualification, except where the failure to be so registered, license or qualified or in good standing would not have a Material Adverse Effect.   The Seller has full corporate power and authority (a) to own or lease its properties and to carry on its business (including the Business) as it is now being conducted, (b) to enter into this Agreement and to assign, transfer and deliver the Purchased Assets to the Buyer as provided in this Agreement and to assign and transfer the Assumed Liabilities, and (c) to perform the other transactions and agreements contemplated by this Agreement (the "**Ancillary Agreements**").

Section 4.2.   <u>Authorization; Binding Obligation; Consents</u>.

(a)   The execution, delivery and performance of this Agreement and the Ancillary Agreements have been duly authorized by all necessary limited liability company and requisite member action on the part of the Seller.   This Agreement and the Ancillary Agreements

6

have been duly executed and delivered by the Seller and are legal, valid and binding obligations of the Seller enforceable against it in accordance with their terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect relating to creditors' rights generally, and the remedy of specific performance and injunctive and other forms of equitable relief may be subject to equitable defenses and to the discretion of the court before which any proceeding therefor may be brought.

(b)      Except as set forth in Schedule 4.2(b)(i), the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby by the Seller does not and will not (directly or indirectly, with or without the passage of time or the giving of notice) (a) violate, conflict with or result in any breach of any provision of the organizational documents or operating agreement of the Seller, (b) violate, conflict with or result in any breach of or default under (either immediately or upon notice, lapse of time or both), or constitute a default (with or without due notice or lapse of time or both) under the terms, conditions or provisions of (i) any Purchase Order, (ii) any agreement to which the Seller is a party or (iii) any agreement to which the Purchased Assets are or may be subject, (c) materially violate any law, treaty, ordinance, rule, regulation, judgment, order, decree or injunction of a Governmental Authority applicable to the Seller or the Purchased Assets, (d) result in the creation or imposition of any Lien on any of the Purchased Assets or give to any Person any material interest or right in any of the Purchased Assets, (e) accelerate the maturity of or otherwise modify any liability or obligation relating to the Purchased Assets or the Assumed Liabilities, (f) require any filing or registration with, notice to or authorization, consent or approval of any third party, including any Governmental Authority, or (g) give any Person the right to obtain an injunction preventing any of the transactions contemplated hereby, or exercise any remedy or obtain any relief under any applicable law or any order of judicial or arbitral authority to which Seller (solely with respect to the Business) or any of the Purchased Assets may be bound.  Except as set forth in Schedule 4.2(b)(ii), no consent, action, permit, license, approval or authorization of, or material registration, declaration or filing with, any person is required or necessary to be obtained by the Seller in connection with the execution, delivery and performance by them of this Agreement and the Ancillary Agreements, including the consummation of the transactions contemplated hereby and thereby.

Section 4.3.      No Subsidiaries.  The Seller has no subsidiaries.

Section 4.4.      Title.  The Seller has good, valid and marketable title to the Purchased Assets owned by the Seller, free and clear of all Liens.  There are no outstanding options or commitments for the sale of the Purchased Assets to which the Seller is a party.  There are no unpaid taxes or other matters, which are or could become a Lien on the Purchased Assets.  The Purchased Assets constitute all of the tangible and intangible assets relating to, used or held for use in the conduct of the Business and are sufficient to enable such Business to be conducted in the same manner that it is currently conducted immediately after Closing.

Section 4.5.      Acquired Intellectual Property; Third Party Intellectual Property.

(a)      Schedule 4.5(a) sets forth a true and complete list of all of the registrations and pending registration applications for any of the Acquired Intellectual Property and all of the material unregistered Acquired Intellectual Property owned by the Seller specifying as to each,

as applicable:  (i) the nature of such Acquired Intellectual Property; (ii) the record owner of any such Acquired Intellectual Property which is registered, applied for or pending; and (iii) the jurisdictions in which such registered Acquired Intellectual Property exists or in which an application for registration has been filed including the respective registration or application numbers. Schedule 4.5(a) also lists all third party-owned Intellectual Property that is used in or forms part of the Products.

(b)     The Seller has all necessary rights to use all of the Acquired Intellectual Property for the conduct of the Business as currently conducted by the Seller, such rights are valid and enforceable, and the Acquired Intellectual Property does not infringe or otherwise violate the Intellectual Property of any third party.   The Acquired Intellectual Property constitutes all of the Intellectual Property used in and necessary for the conduct of the Business and the production, distribution, marketing and sale of the Products.   No Person other than the Seller possesses any current or contingent rights to license, make, sell or otherwise distribute the Products or use any Acquired Intellectual Property that is owned by the Seller, and (ii) there are no restrictions applicable to the Seller or, after Closing to the Buyer, with respect to the disclosure, use, license, transfer or other disposition of any Acquired Intellectual Property or any of the Products.

(c)     Schedule 4.5(c) sets forth all licenses, sublicenses and other agreements to which the Seller is a party, either as a licensor or licensee, relating to the Business, the Products or the Acquired Intellectual Property.

(d)     The Seller has obtained from all parties (including employees and current or former consultants and subcontractors) who have created any portion of, or otherwise who would have any rights in or to, any Acquired Intellectual Property owned or purported to be owned by the Seller valid and enforceable written assignments of any such work, invention, improvement or other rights to the Seller or other agreements or written documentation which vest in the Seller the exclusive ownership of such Acquired Intellectual Property.  The Seller has delivered or made available true and complete copies of such assignments, agreements or other written documentation to the Buyer.

(e)     Except as set forth in Schedule 4.5(e), no claim has been asserted or is pending against the Seller and, to the Knowledge of the Seller, no claim has been Threatened against the Seller to the effect that the operation of the Business, the manufacturing, distribution, marketing, sale or use of the Products or the use or registration of the Acquired Intellectual Property infringes upon or otherwise violates or conflicts with the rights of any Person in any country or is otherwise void, invalid or unenforceable, (ii) no claim has been asserted or notice of infringement given by the Seller against any Person in any country to the effect that such Person has infringed any of the Acquired Intellectual Property, and (iii) to the Knowledge of the Seller, other than U.S. embargoes and other generally applicable laws and restrictions, no restrictions exist relating to the use or registration of the Acquired Intellectual Property in connection with its use for the manufacture, marketing, promotion, advertising, sale and distribution of the Products throughout the world.

(f)     Except as set forth on Schedule 4.5(f)(i), as of the date hereof, neither the operation of the Business, nor the production, distribution, marketing, sale and/or use of the

Products or the use of the Acquired Intellectual Property has  in the past or  does presently infringe or otherwise violate the Intellectual Property rights of any other Person and neither the Seller nor any of its Affiliates has received notice of any claim or assertion of such infringement or other violation of the Intellectual Property rights of any other Person relating to the Business or any of the Acquired Intellectual Property prior to the date of this Agreement.  Except as set forth in Schedule 4.5(f)(ii), to the Knowledge of Seller, no third party has infringed or is infringing any of the Seller's rights with respect to the Acquired Intellectual Property and there have been no actions, and no claims or allegations, by the Seller against any third party alleging infringement of any Acquired Intellectual Property.

Section 4.6.    Compliance With Law.  The Seller has complied in all material respects with all applicable foreign, federal, state, provincial and local laws, statutes, regulations, orders of any Governmental Authority and legal requirements of any kind in respect of the Purchased Assets and the Business, including, without limitation, those relating to the packaging, manufacturing, distribution, labeling, advertising, marketing and sale of the Products, data privacy, data protection, and those relating to foreign, federal, state, provincial and local environmental and health and safety laws, regulations, orders and legal requirements of any kind. To the Knowledge of Seller, no event has occurred, and no condition or circumstance exists, that would (with or without notice or lapse of time, or both) reasonably be expected to constitute or result in a violation by the Seller of, or a failure on the part of the Seller to comply with, any of the above legal requirements.  As of the date of this Agreement, during the two (2) years prior to the date of this Agreement has received no written notice from any Governmental Authority of any violation of any applicable laws, regulations or other legal requirements having a material application to the Business.

Section 4.7.    Litigation.  There is no (a) action, arbitration, mediation, suit, claim, proceeding or investigation pending against the Seller with respect to which the Seller or any of its Affiliates have received notice or, to the Knowledge of the Seller, Threatened in writing, against or adversely affecting the Purchased Assets or the Business, and to the Knowledge of the Seller, no event has occurred which would reasonably be expected to give rise to any such proceedings; (b) action, suit, claim, proceeding or inquiry of a Governmental Authority inquiry pending or, to the Knowledge of the Seller, Threatened in writing, relating to or involving the Purchased Assets, the Business or the transactions contemplated by this Agreement; or (c) outstanding order, decree or stipulation against the Seller issued by a Governmental Authority relating to the Business or the Purchased Assets.

Section 4.8.    Financial Information.

(a)    Schedule 4.8(a) sets forth correct and complete copies of the unaudited annual financial information of the Seller as of December 31, 2017, 2016 and 2015 (the "**Financial Information**").

(b)    The Financial Information fairly presents in all material respects the financial position of the Seller.  The Financial Information was prepared from the Records and contains and reflects all necessary adjustments and accruals for a fair and accurate presentation of the financial condition of the Seller as of the respective dates in all material respects.

(c)     Except (i) as disclosed, reflected or reserved against in the Financial Information, (ii) for liabilities and obligations incurred in the Ordinary Course of Business since December 31, 2017 that, individually or in the aggregate, do not or would not reasonably be expected to be material, there are no liabilities or obligations of any nature or type (whether accrued, absolute or contingent) of the Seller that would be required to be reflected on a financial statement of the Seller as of the date hereof.

Section 4.9.    Books and Records.  The books and records of the Seller relating to the Purchased Assets, all of which have been made available to the Buyer, are complete and correct in all material respects.

Section 4.10.    Material Agreements; License Agreements.

(a)     Set forth in the respective Schedules described below is a list of all agreements, obligations and commitments of the Seller in relation to the Purchased Assets to which the Seller is a party or by which it or the Purchased Assets may be bound and that: (i) provide for the sale, marketing or distribution of products or services relating to the Product, including, without limitation, advertising agreements, retailer agreements, distribution agreements, third party beauty advisor agreements and all other agreements with other third parties relating to advertising, merchandising, sales, distribution and promotions as set forth in Schedule 4.10(a)(i); (ii) relate to the acquisition or manufacturing of the Inventory and, where accomplished by means of purchase order, a listing of such outstanding purchase orders as set forth in Schedule 4.10(a)(ii), and the Seller represents and warrants that other than as set forth in Schedule 4.10(a)(ii), no Person has any authorization to manufacture any of the Product except at the direction and for the account of the Seller; or (iii) are otherwise material to the Business or the Purchased Assets as set forth in Schedule 4.10(a)(iii).

(b)     The Seller has delivered to the Buyer true and complete copies of the written signed Purchase Orders described in Schedule 1.1(a).  The Seller has full legal power and authority to assign its rights under the Purchase Orders and such assignment will not affect the validity and enforceability of any of such agreements.  The Purchase Orders are valid obligations of the Seller enforceable against the Seller in accordance with their respective terms except to the extent that such enforcement may be subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect relating to creditors' rights generally, and the remedy of specific performance and injunctive and other forms of equitable relief may be subject to equitable defenses and to the discretion of the court before which any proceeding therefor may be brought.  The Seller is not in breach or in default of any Purchase Order in any regard that would enable or permit any party thereto to terminate its obligations thereunder or to accelerate the obligations of the Seller (or the Buyer, as assignee thereof) thereunder, and to the Knowledge of the Seller, there does not exist any event that, with the giving of notice or lapse of time or otherwise, would constitute a breach thereof or default thereunder by the Seller.

Section 4.11.    Purchase Orders.  Set forth on Schedule 4.11 are all definitive open Purchase Orders of the Seller relating to acquisition of Products by third parties.   To the Knowledge of Seller, no party to any Purchase Order is in breach thereunder, nor has any event occurred or is expected to occur (including, without limitation, the transactions contemplated

hereby), which with the giving of notice or the passage of time (or both) would constitute a default by such party thereunder, and no party to any of the Purchase Orders has cancelled, amended or otherwise modified the terms of any Purchase Order in any material respect.

Section 4.12.   Taxes.

(a)   All income and other material Tax return required to be filed with respect to the Business have been timely filed (taking into account applicable extensions) with the appropriate Governmental Authority.  All such Tax return are true, correct and complete in all material respects.

(b)   The Seller has paid (or there have been paid on its behalf) all material Taxes due and payable by it with respect to the Business (whether or not shown on any Tax return and whether or not any Tax return was required), except for Taxes, if any, that are being contested in good faith and for which appropriate reserves have been established.  The Seller has withheld, collected and paid over to the appropriate Tax authority, or is properly holding for such payment, all material Taxes required by applicable law to be withheld or collected.

(c)   There are no Liens relating to any Taxes existing or pending with regard to any of the Purchased Assets.

(d)   All material Taxes that the Seller is or was required by applicable law to withhold or collect with respect to the Business and/or the Purchased Assets have been duly withheld or collected, and have been timely paid over to the proper authorities.

(e)   There currently exists no suit, litigation, arbitration, mediation, alternative dispute resolution procedure, claim, action, proceeding, hearing, audit, inquiry, examination or investigation of any nature with respect to Taxes of or with respect to the Business or the Purchased Assets (a "**Tax Contest**") and, to Sellers' Knowledge, no such Tax Contest has been threatened or proposed.

Section 4.13.   Investment Intention; No Resales.  The Seller is acquiring the Lashed Out Equity Interests hereunder for the purpose of investment and not with a view to offer for sale in connection with any distribution of the Lashed Out Equity Interests in violation of any securities laws. The Seller acknowledges that any direct or indirect offer, transfer, sale, assignment, pledge, hypothecation or other disposition of any the Lashed Out Equity Interests shall be subject to the provisions of the LLC Agreement.

Section 4.14.   Units Unregistered.  The Seller has been advised that (a) the offer and sale of the Lashed Out Equity Interests has not been registered under the securities laws of any jurisdiction, (b) the Lashed Out Equity Interests being purchased by the Seller hereunder may need to be held indefinitely and (c) there is no established market for the Lashed Out Equity Interests and it is not anticipated that there will be any such market for the Lashed Out Equity Interests in the foreseeable future.  The Seller represents and warrants that (either alone or together with its advisors) (i) the Seller's knowledge and experience in financial and business matters are such that the Seller is capable of evaluating the merits and risks of his investment in the Lashed Out Equity Interests, or the Seller has been advised by a representative possessing such knowledge and experience, (ii) the Seller and its representatives, including its professional,

financial, tax and other advisors, if any, have carefully considered the proposed investment by the Seller in the Lashed Out Equity Interests, and the Seller understands and has taken cognizance of (or has been advised by his representatives as to) the risk factors related to the acquisition of the Lashed Out Equity Interests, and no representations or warranties have been made to the Seller or its representatives concerning the Lashed Out Equity Interests, the Buyer or the Buyer's business, operations, financial condition or prospects or other matters except as set forth herein, (iii) in making its decision to purchase the Lashed Out Equity Interests being purchased by it hereunder, the Seller has relied upon independent investigations made by the Seller and, to the extent believed by it to be appropriate, its representatives, including its professional, financial, tax and other advisors, if any, (d) the Seller and its representatives have been given the opportunity to request to examine all documents of, and to ask questions of, and to receive answers from, the Buyer and its representatives concerning the terms and conditions of the acquisition of the Lashed Out Equity Interests being purchased by the Seller hereunder and to obtain any additional information which it or its representatives deem necessary, and (e) the Seller acknowledges that the Buyer is entering into this Agreement in reliance upon the Seller's representations and warranties herein.

Section 4.15.    Certain Payments; Compliance with Anti-Corruption Acts.

(a)    Neither the Seller nor any Affiliate thereof, nor any equity holder, director, manager, officer or employee thereof nor, to the Knowledge of Seller, any agent or representative acting or purporting to act for or on behalf thereof, (i) has directly or indirectly (A) made, offered or promised to make, or authorized the making of, any unlawful payment or unlawful provision of anything of value or advantage to any Person, (B) given, offered or promised to give, or authorized the giving of, any unlawful gift, benefit, political or charitable contribution or other thing of value or advantage to any Person, (C) requested or received any unlawful payment, gift, benefit, political or charitable contribution or other thing of value or advantage or (D) violated any provision of the FCPA, the OECD Convention on Bribery, the OAS Convention Against Corruption or any other applicable law or any other applicable law that prohibits corruption, bribery or any of the foregoing actions; or (ii) has been investigated by a Governmental Authority, or been the subject of any allegation, with respect to conduct within the scope of clause (A) above.  For the avoidance of doubt, any reference to "other thing of value" in this Section 4.15(a) includes employment, meals, entertainment, travel and lodging.

(b)    Neither the Seller nor any Affiliate thereof is in material violation of any applicable law relating to sanctions, terrorism or money laundering, including Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, the USA PATRIOT ACT (Title III of Pub. L. 107-56 (signed into law October 26, 2001)), the laws and regulations administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury, the Trading with the Enemy Act (12 U.S.C. §95), and the International Emergency Economic Powers Act (50 U.S.C. §1701-1707).

Section 4.16.    Absence of Certain Developments.  Except as set forth in Schedule 4.16, since December 31, 2017, (a) the Seller has operated in the Ordinary Course of Business and (b) there have not occurred any changes, events, occurrences, conditions, circumstances or developments that has had or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 4.17.    Undisclosed Liabilities.  The Seller does not have any Liabilities as of the date of this Agreement except for (a) Liabilities reflected on the Financial Information, (b) Liabilities that have arisen since December 31, 2017 in the Ordinary Course of Business and did not result from or arise out of a breach of Contract, tort or violation of any law or order and (c) Liabilities disclosed on other Schedules to this Agreement.

Section 4.18.    Accuracy of Information.  No representation, statement or information made or furnished by the Seller to the Buyer in writing, including those contained in this Agreement and the various Schedules attached to this Agreement and the other information and statements referred to in this Agreement and furnished by the Seller or its representatives to the Buyer pursuant to this Agreement, contain any untrue statement of a material fact or omits or shall omit any material fact necessary to make the information contained in this Agreement and the Schedules not misleading.

Section 4.19.    Brokers' Fees and Commissions.  The Seller has not retained any investment banker, broker, finder or intermediary in connection with the transactions contemplated hereby who might be entitled to a fee or commission in connection with this Agreement or the transactions contemplated hereby.  The Seller shall be solely responsible for any fee or commission claimed by any investment banker, broker, finder or intermediary retained by Seller.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF BUYER

The Buyer makes the following representations and warranties as of the Closing Date (except as otherwise specified herein), each of which is relied upon by the Seller in consummating the transactions contemplated hereby regardless of any other investigation made or information obtained by the Seller:

Section 5.1.    Organization.  The Buyer is a limited liability company duly formed, validly existing and in good standing under the laws of state of Delaware, and is duly registered, licensed or qualified to carry on its business in each other jurisdiction in which the conduct of its business or the ownership of its assets requires such registration, license or qualification, except where the failure to be so registered, license or qualified or in good standing would not have a material adverse effect on the Buyer.  The Buyer has full corporate power and authority (a) to own or lease its properties and to carry on its business as it is now being conducted, (b) to enter into this Agreement, and (c) to perform the other transactions and agreements contemplated by.

Section 5.2.    Authorization; Binding Obligation: Consents.

(a)    The execution, delivery and performance of this Agreement and the Ancillary Agreements have been duly authorized by all necessary limited liability company and requisite member action on the part of the Buyer.  This Agreement and the Ancillary Agreements have been duly executed and delivered by the Buyer and are legal, valid and binding obligations of the Buyer enforceable against it in accordance with their terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect relating to creditors' rights generally, and the remedy of specific performance and

13

injunctive and other forms of equitable relief may be subject to equitable defenses and to the discretion of the court before which any proceeding therefor may be brought.

(b)     No consent, action, permit, license, approval or authorization of, or material registration, declaration or filing with, any person or a Governmental Authority is required or necessary to be obtained by the Buyer in connection with the execution, delivery and performance by the Buyer of this Agreement, including the consummation of the transactions contemplated hereby.

Section 5.3.   <u>Capitalization</u>.  The Lashed Out Equity Interests represent twenty percent (20%) of all of the issued and outstanding equity interests of the Buyer as of the Closing Date.

Section 5.4.   <u>Litigation</u>.    There is no action, arbitration, mediation, suit, claim, proceeding or investigation pending against the Buyer with respect to which the Buyer or any of its Affiliates have received notice or, to the Knowledge of the Buyer, Threatened in writing, which in any manner challenges or seeks to prevent or enjoin the transactions contemplated hereby.

Section 5.5.   <u>Brokers' Fees and Commissions</u>.    The Buyer has not retained any investment banker, broker, finder or intermediary in connection with the transactions contemplated hereby who might be entitled to a fee or commission in connection with this Agreement or upon consummation of the transactions contemplated hereby.  The Buyer shall be solely responsible for any fee or commission claimed by any investment banker, broker, finder or intermediary retained by Buyer.

### ARTICLE VI
### ADDITIONAL COVENANTS OF THE SELLER

Section 6.1.   <u>Confidentiality</u>.    Subject to the requirements of applicable law and regulations, the Seller shall, and shall cause its Affiliates and representatives to, maintain in confidence (a) the terms and provisions of this Agreement and (b) all information received from the Buyer as a result of any due diligence investigation conducted relative to the execution of this Agreement (collectively, the "<u>Confidential Information</u>") and shall use or disclose such information only in connection with evaluating the transactions contemplated hereby and if directly related to and required by the performance of the Seller's duties under this Agreement or as otherwise provided hereunder; <u>provided</u> that the Seller may disclose any Confidential Information (i) to the extent required by applicable law, in any report, statement, testimony or other submission to any Governmental Authority having jurisdiction over such Person, (ii) as may be reasonably necessary in connection with any Tax returns, accounting records or financial reporting obligations or any audit or (iii) in order to comply with any law, regulation or stock exchange rule applicable to such party, or in response to any summons, subpoena or other legal process or formal or informal investigative demand issued to such party in the course of any litigation, investigation or administrative proceeding; <u>provided</u>, <u>further</u>, that, if the Seller becomes legally compelled by deposition, interrogatory, request for documents, subpoena, civil investigative demand or similar judicial or administrative process to disclose any Confidential Information, the Seller shall provide the Buyer with prompt prior written notice of such requirement and, to the extent reasonably practicable, cooperate with the Buyer to obtain a

protective order or similar remedy to cause the Confidential Information not to be disclosed, including interposing all available objections thereto, such as objections based on settlement privilege.  In the event that such protective order or other similar remedy is not obtained, the disclosing party shall furnish only that portion of the Confidential Information that has been legally compelled, and shall exercise reasonable efforts to obtain assurance that confidential treatment will be accorded such disclosed Confidential Information.   The obligation of confidentiality and non-use shall not apply to any information which (x) is or becomes generally available to the public through no fault of the receiving party, (y) is independently developed by the receiving party or (z) is received in good faith from a third party who is lawfully in possession of such information and has the lawful right to disclose or use it.  In the event of the termination of this Agreement, the Buyer shall return to the Seller (or destroy and certify such destruction to the Seller in writing) all Confidential Information documents and materials (and reproductions thereof, electronic copies or otherwise) furnished to the Buyer or its Affiliates or representatives in connection with this Agreement for the transactions contemplated hereby.

Section 6.2.    <u>Intellectual Property</u>.  After the Closing Date the Buyer may sell existing Inventory and use the Seller's existing packaging, labeling, containers, supplies, advertising and promotional materials, technical data sheets and any similar materials which have trademarks, trade names, logos, designs, service marks or other trade dress used by the Seller for the Products, at no cost to the Buyer.  The Seller agrees to execute on or after the Closing all reasonably necessary documents with respect to the assignment by the Seller to the Buyer of all Acquired Intellectual Property, including, without limitation, registrations and pending applications therefor.   The Seller agrees it will use commercially reasonable efforts to communicate with the Buyer, its successors, legal representatives and assigns, if requested by them, all information known to them relating to the Products and the Acquired Intellectual Property, and that it will at the Buyer's expense execute and deliver any papers, make rightful oaths, testify in any legal proceedings, and perform all other lawful acts reasonably deemed necessary or desirable by the Buyer, its successors, legal representatives or assigns, to secure, convey or perfect the Buyer's rights to the Acquired Intellectual Property and to enforce or defend the Buyer's and its assigns' rights in and to the Acquired Intellectual Property. The Seller shall not, directly or indirectly, whether individually, jointly with others or through an entity: (i) challenge the Buyer's rights, title or interests with respect to any of the Acquired Intellectual Property or otherwise take any action that interferes with the Buyer's ownership of or any rights in or to the Acquired Intellectual Property or exercise of such rights; or (ii) register or apply for any registrations for any of the Acquired Intellectual Property anywhere in the world, or use, register or apply to register any other trademark or service mark or any domain name, social networking site or other online platform account name, user name, handle or URL, assumed name, entity name or other form of name that includes or is similar to the Buyer's trademarks or any trademarks forming part of the Acquired Intellectual Property without the Buyer's prior written consent, or assist third parties in connection with any of the foregoing.

Section 6.3.    <u>Domain Name and Website Account Transfers</u>.  The Seller shall take all steps necessary or otherwise requested by the Buyer to transfer ownership and control of all domain names, social networking site and other online platform accounts forming part of the Purchased Assets to the Buyer and/or its designated account administrator, including, without limitation, unlocking of domain names, provision of authorization codes and confirmatory responses to the applicable domain name registries in connection with domain name transfers

and the changing of the email address and password for social networking site and other online platform site account administration to the email address and password designated by the Buyer. To the extent that all rights, title and interests with respect to any of such social networking site or other online platform accounts cannot be assigned to the Buyer under the applicable account terms without approval from the applicable site owner and such approval has not been obtained, the Seller shall nevertheless change the email address and password for such accounts to the email address and password designated by the Buyer and permit the Buyer to exercise exclusive administrative control of said accounts, and shall otherwise take, or refrain from taking, any and all actions requested by the Buyer with respect to such accounts.

Section 6.4.   Transfer Taxes.   Notwithstanding anything to the contrary in this Agreement, the parties agree that the Purchase Price is exclusive of any and all transfer Taxes (excluding Taxes measured in whole or in part by net income) incurred or arising from the transfer of the Purchased Assets hereunder (including sales, value added, conveyance, registration, stamp, documentary, notarial, recording and similar transfer governmental processing fees, duties, levies, customs, tariffs, imposts, assessments, obligations and charges) ("**Transfer Taxes**") and the Seller shall pay, when due, and be responsible for, any such Transfer Taxes and related fees imposed on or payable in connection with the transactions contemplated by this Agreement.

## ARTICLE VII
## INVENTORY

Section 7.1.   Purchase of Inventory.   On the Closing Date, and in accordance with this Article VII, the Seller shall sell, assign, transfer to the Buyer, free and clear of any and all Liens, all of the Seller's right, title and interest in and to all of the Seller's Inventory as of the Closing Date, wherever located as set forth in Schedule 7.1(a) (the "**Purchased Inventory**").   On the Closing Date, the Seller will (a) deliver or cause to be delivered to the Buyer a bill of sale for the Purchased Inventory in the form attached hereto as Exhibit E, and (b) deliver to Buyer possession and/or control of all tangible personal property constituting the Inventory, which will be left in their current location.

Section 7.2.   Purchase Price of Purchased Inventory.   In consideration of the sale, transfer, conveyance and delivery of the Purchased Inventory, the Buyer shall, in full payment thereof, pay to the Seller an amount equal to the Final Inventory Value, as determined in accordance with Section 7.3 hereof.   The Final Inventory Value shall be paid by the Buyer in immediately available funds as follows:

(a)   on the Closing Date, the Buyer shall pay to the Seller an amount equal to eighty percent (80%) of the Estimated Inventory Value (as defined in Section 7.3 hereof)(the "**Initial Inventory Payment**"); and

(b)   within five (5) Business Days following determination of the Final Inventory Value (as defined in Section 7.3 hereof), the Buyer shall pay to the Seller an amount equal to the difference between (x) the Final Inventory Value, minus the Initial Inventory Payment.

Section 7.3.    Inventory Valuation Procedure.    Five (5) Business Days prior to the Closing Date, the quantity of the Inventory owned by Buyer shall be determined by an itemized inventory of the Seller's Inventory as of such time, as determined pursuant to an inventory count conducted by Seller in the presence of a representative of the Buyer.  Within two (2) Business Days of the completion of such inventory count, the Buyer and the Seller shall mutually agree on (i) a list of Seller's Inventory on hand as of the completion of the inventory count (the "**Estimated Inventory**") and (ii) the value of the Estimated Inventory, based on Seller's cost thereof (the "**Estimated Inventory Value**").  As soon as practicable, and in any event within thirty (30) days following the Closing Date, the Buyer and the Seller shall mutually agree on (x) the actual amount of Seller's Inventory on on of the Closing Date, which shall be determined based on the Estimated Inventory less any items sold by the Seller between the date of determination of the Estimated Inventory and the Closing Date (the "**Final Inventory**"), and (y) the value of the Final Inventory, based on Seller's cost thereof (the "**Estimated Inventory Value**")

Section 7.4.    Representations and Warranties.    The Seller makes the following representations and warranties to the Buyer as of the Inventory Purchase Date with respect to the Inventory, each of which is relied upon by the Buyer in consummating the transactions contemplated hereby regardless of any other investigation made or information obtained by the Buyer:

(a)      The list of Inventory set forth on Schedule 7.1(a) is a true, complete and correct list of all Inventory relating to the Product as of the date of such schedule, prepared in accordance with Section 7.3.  All finished goods included in the Inventory are of a quality which is saleable in the Ordinary Course of Business, except for obsolete items and items of below-standard quality all of which have been written off or written down to net realizable value, and non-saleable collateral marketing materials.  Schedule 7.4(a) sets forth a list of all of the physical locations of the Inventory, including a street address for each such location;

(b)      Schedule 7.4(b) sets forth a list of all of the Seller's customers who have returned Products for the fiscal year ended December 31, 2017 and the three months ended March 31, 2018 (the "**Reference Period**"), the current product returns policies of the Seller with respect to its customers and their amount of returns by product line for the Reference Period by account; and

(c)      Schedule 7.4(c) sets forth a list of all pending requests for returns of Products as of the date of this Agreement and quantity sought to be returned, as well as all current "**Return Authorizations**" the Seller has approved.

## ARTICLE VIII
## CERTAIN ACTIONS AFTER THE CLOSING

Section 8.1.    Dismissal of Opposition Lawsuit.    Within thirty (30) days after the Closing Date, the Seller shall provide written evidence to the Buyer of the dismissal of Opposition No. 91229178 in the United States Patent and Trademark Office before the United States Trademark Trial and Appeal Board.. Such dismissal shall be accomplished by the filing of a Joint Dismissal with Prejudice by Hard Candy, LLC, as Petitioner, and Lashed Out, LLC, as Respondent.

Section 8.2.    Further Assurances.  After the Closing, upon the reasonable request of the other, each party shall execute and deliver all further documents and instruments and shall take such other steps as may be reasonably necessary to effectuate the transactions contemplated hereby.   In the event any consent or release necessary to consummate the transactions contemplated hereby is not obtained prior to the Closing and the parties elect to close this transaction, the Buyer and the Seller will nonetheless (a) continue to use all commercially reasonable efforts to obtain the necessary consents and releases, and (b) cooperate with each other in any interim arrangement necessary to obtain for the Buyer the practical benefits of the contract or other arrangement for which the consent or release has not been obtained.

Section 8.3.    Litigation.  It is recognized by the parties to this Agreement that litigation may arise at some time in the future relating to the Seller, the Buyer, the Purchased Assets or the Assumed Liabilities which may be related directly or indirectly to the period prior to the Closing Date or the period subsequent to the Closing Date, or both.  Each of the parties to this Agreement agrees, therefore, that to the extent reasonable under the circumstances, it will fully cooperate with and provide information, records, documents and assistance of employees to the other parties with respect to any litigation or potential litigation in which the other party is or may be involved, provided, however, that this provision shall be inapplicable in the event of a dispute or litigation between the parties hereto.

Section 8.4.    Misdirected Funds.  If, after the Closing, the Seller shall receive any payment on account of the Purchased Assets, including but not limited to, payments for post-Closing sales of the Products, Seller shall cause such funds in trust for the Buyer and shall promptly remit such payments to the Buyer.  If after the Closing, the Buyer receives any payment on accounts receivables that relate to sales by the Seller prior to the Closing, it shall hold such funds in trust for the Seller and shall promptly remit such payments to the Seller.

Section 8.5.    Payment of Creditors.  From and after the Closing, the Seller agrees to continue to pay and be responsible for (unless paid on the Closing) all Liabilities to creditors of the Seller whether arising before or after Closing, other than the Assumed Liabilities and shall pay and be liable for, and shall assume, indemnify, defend and hold harmless the Buyer from and against and in respect of, any Liabilities assessed against the Buyer, that are not Assumed Liabilities, by any creditors or vendors of the Seller or any party claiming by, through or under the Seller or any such creditor or vendor of the Seller, including, but not limited to, any bankruptcy trustee or debtor-in-possession, in each case solely to the extent that such liabilities arise from the conduct of the Seller prior to Closing.  For the avoidance of doubt, (a) the Seller shall make all arrangements and payments to resolve all outstanding claims from suppliers, co-packers or fillers of the Inventory, including, but not limited to, those that relate to purchase orders or contractual arrangement that are not assumed by the Buyer, and (b) the Buyer shall be responsible for all purchase orders and contractual arrangements generated or entered into by the Buyer after Closing.

Section 8.6.    Returns.  If the Buyer or any of its authorized representatives receives any Products returned by customers that relate to sales made by the Seller to such customers prior to the Closing Date (the "**Returns**"), the Buyer shall hold the Returns in trust for the Seller and promptly notify the Seller of its receipt of Returns.  The Seller shall approve and process all reasonable requests for Returns for a period of 12 months following the Closing Date (the

18

"**Returns Period**").  The Buyer will report all quantities of Returns received and returned to Inventory.  At that time, the Buyer shall have the right to purchase from the Seller any saleable Returns that relate to sales prior to the Closing Date at a mutually agreed upon cost for each such Product, and the Seller shall immediately destroy any non-saleable Returns.   The Seller shall invoice the Buyer for any Returns purchased by the Buyer pursuant to the foregoing at the end of each calendar quarter after the Closing Date.  The Seller or its authorized representatives shall deliver the Returns to the Buyer following receipt of the Buyer's instructions, with the Buyer paying for any freight and insurance costs, and storage costs to the extent the Buyer requests storage of the Returns.

Section 8.7.   Transition Services.  The Seller agrees to provide, at no cost to the Buyer the following services (the "**Transition Services**") for a period, unless otherwise indicated below, of up to four (4) months following the Closing Date (the "**Transition Period**"):

(a)   Customer Service.   The Seller agrees to continue to respond to calls or e-mails to the Seller's customer service department with respect to questions and concerns from customers relating to the Products through the period consisting of thirty (30) days following the Closing Date.   After the period ending thirty (30) days following the Closing Date, the Seller shall refer any customer complaints and all calls received to:

> Head Kandy LLC
> Address: 6100 Hollywood Boulevard, 7th Floor
> Hollywood, Florida 33024
> Attn: Jerome Falic, Bryan Feldman and David Taney
> Email: jerome@falic.com
>       bfeldman@falicfashiongroup.com
>       dtaney@dutyfreeamericas.com

(b)   Other Services.  The Seller will provide to the Buyer during the Transition Period any other services that the Buyer reasonably requests in connection with the transition of the Business to the Buyer.

## ARTICLE IX
## INDEMNIFICATION

Section 9.1.   Indemnity by the Seller.  Subject to the other terms and conditions of this Article VIII, the Seller agrees to indemnify and hold the Buyer and its Affiliates and their respective shareholders, members, partners, directors, officers, managers, employees and agents (collectively, the "**Buyer Indemnitees**") against, and shall hold each of them harmless from, any and all Losses incurred or suffered by any of the Buyer Indemnitees arising from, in connection with or as a result of (a) any  inaccuracy or  breach of any of the representations or warranties of the Seller in this Agreement (including, without limitation, the representations and warranties of the Seller set forth in Section 7.4) or any document executed in connection with the transactions contemplated by this Agreement (disregarding, in each case for purposes of determining the amount of Losses arising therefrom, any "materiality" or "Material Adverse Effect" or similar qualifications included in any such representation or warranty); (b) any  breach or  nonfulfillment

of any of the covenants or agreements to be performed by the Seller pursuant to this Agreement; (c) the use or operation of the Purchased Assets and the Business prior to the Closing Date; (d) any Excluded Asset or Retained Liability; or (e) any action, arbitration, mediation, suit, claim, proceeding or investigation brought by any Person (including, but not limited to, Guy A. Shaked Investments Ltd. or any of its Affiliates) arising from or related to the DAFNI Hair Straightening Ceramic Brush product (each, a "**DAFNI Action**").

Section 9.2.    Indemnity by the Buyer.  The Buyer agrees that it will indemnify and hold the Seller and its Affiliates and their respective shareholders, members, partners, directors, officers, managers, employees and agents (collectively, the "**Seller Indemnitees**") against, and shall hold each of them harmless from, any and all Losses incurred or suffered by any of the Buyer Indemnitees arising from, in connection with or as a result of (a) any  inaccuracy or breach of any of the representations or warranties of the Buyer in this Agreement or any document executed in connection with the transactions contemplated by this Agreement (disregarding, in each case for purposes of determining the amount of Losses arising therefrom, any "materiality" or "Material Adverse Effect" or similar qualifications included in any such representation or warranty); (b) any  breach or  nonfulfillment of any of the covenants or agreements to be performed by the Buyer pursuant to this Agreement; (c) the use or operation by the Buyer of the Purchased Assets and the Business after the Closing Date; or (d) any Assumed Liability.

Section 9.3.    Procedure for Indemnification.

(a)    Any party seeking indemnification pursuant to this Section 9.3 (the "**Indemnified Party**") shall promptly notify in writing (an "**Indemnity Notice**") the other party or parties from whom such indemnification is sought (the "**Indemnifying Party**") of the Indemnified Party's assertion or a third party's assertion of any claim with respect to which the indemnification provisions set forth in this Article relate, providing in reasonable detail the facts giving rise to such claim, a statement of the Indemnified Party's Loss to the extent then known, and an estimate of the amount of Losses that the Indemnified Party reasonably anticipates it will suffer or incur; provided, however, that no delay on the part of the Indemnified Party in giving the Indemnity Notice shall relieve the Indemnifying Party from any obligation hereunder unless (and solely to the extent) the Indemnifying Party is prejudiced thereby.

(a)    With respect to any third party claim for which an Indemnified Party is seeking indemnification hereunder:

(i)    The Indemnified Party shall have the right to defend (at the expense of the Indemnifying Party) or, with the consent of the Indemnifying Party (such consent not to be unreasonably withheld or delayed), to settle or compromise such claim.   The Indemnified Party shall prosecute such defense, or negotiate such settlement, in good faith and in a commercially reasonable manner.  Notwithstanding the foregoing, upon the request of the Indemnified Party, the Indemnifying Party shall undertake (at its expense) the defense of such claim by counsel reasonably satisfactory to the Indemnified Party.

(ii)    If the Indemnifying Party has undertaken the defense of any such claim as provided in clause (i), the Indemnifying Party may not agree to any settlement

or compromise of such claim without the prior written consent of the Indemnified Party unless (A) prior to such settlement or compromise, the Indemnifying Party acknowledges in writing its obligation to pay in full the amount of the settlement or compromise and all associated expenses, (B) the Indemnified Party is furnished with security satisfactory to the Indemnified Party that the Indemnifying Party will in fact pay such amount and expenses, (C) the settlement or compromise does not involve anything but the one-time payment of money and has no adverse impact on (1) the Purchased Assets or the use thereof or (2) the Business or its operations, and (D) the Indemnifying Party obtains, at no cost to the Indemnified Party, a release executed and delivered by the claiming third party or parties of all claims against the Indemnified Party, which release shall be acceptable in form and substance to the Indemnified Party.  The Indemnified Party may, through counsel selected and paid by it, participate in (but not control) the defense of any claim undertaken by the Indemnifying Party.

(iii)    With regard to claims of third parties for which indemnification is required hereunder, such indemnification, for amounts actually incurred by the Indemnified Party in accordance with this Agreement, shall be paid in advance of settlement or final adjudication thereof on a current basis within ten (10) Business Days of receipt from the Indemnified Party of such supporting documentation as the Indemnifying Party may reasonably request.

(b)    Unless, within ten (10) Business Days following the Indemnifying Party's receipt of an Indemnity Notice, the Indemnifying Party gives written notice to the Indemnified Party announcing its intent to contest the assertion of such indemnification claim (the "**Contest Notice**"), such claim shall be deemed accepted by the Indemnifying Party.

Section 9.4.    Survival; Limitations.

(a)    The representations and warranties of the parties in this Agreement shall survive the Closing Date for a period of two (2) years from the Closing Date, in each such case, notwithstanding any investigation made by or on behalf of the Buyer provided that the representations and warranties contained in Section 4.1 (*Organization, Power and Authority*), Section 4.2 (*Authorization; Binding Obligation; Consents*), Section 4.5 (*Acquired Intellectual Property; Third Party Intellectual Property*), Section 4.12 (*Taxes*), Section 4.15 (*Certain Payments; Compliance with Anti-Corruption Acts*) and Section 4.19 (*Brokers' Fees and Commissions*), Section 5.1 (*Organization, Power and Authority*), Section 5.2 (*Authorization; Binding Obligation; Consents*) and Section 5.5 (*Brokers' Fees and Commissions*) shall survive until sixty (60) days after the expiration of the applicable statute of limitations; provided, further, that the representations and warranties contained in Section 4.4 (*Title*) shall survive indefinitely. All covenants and agreements contained herein which by their terms contemplate actions or impose obligations following the Closing shall survive the Closing and remain in full force and effect in accordance with their terms, and claims with respect to all other covenants and agreements set forth herein shall terminate as of the Closing.

(b)    Notwithstanding anything to the contrary contained in this Agreement, these limited survival periods shall not apply to a fraudulent act or omission.  No action or proceeding may be brought with respect to any of the representations and warranties unless

written notice thereof shall have been delivered to the Buyer or the Seller, as the case may be, prior to the expiration of such applicable survival period.

(c)     With respect to claims for indemnification by the Buyer arising from, or related to, all DAFNI Actions, the Seller shall be solely responsible for an aggregate amount equal to the first $200,000 of all such Losses (the "**DAFNI Threshold**").

(d)     Notwithstanding anything to the contrary in this Agreement, except with respect to claims involving (i) fraud or intentional misconduct, (ii) breach of the representations and warranties set forth in Section 4.1 (*Organization, Power and Authority*), Section 4.2 (*Authorization; Binding Obligation; Consents*), Section 4.4 (*Title*), Section 5.1 (*Organization, Power and Authority*) or Section 5.2 (*Authorization; Binding Obligation; Consents*) or (iii) any Excluded Assets or Retained Liabilities, no party shall, in any event, be liable to any other Person for any consequential, incidental or indirect damages, in each case, that are either naturally resulting from or reasonably foreseeable as a result of the underlying claims for breach or non-performance of this Agreement (in each case other than damages awarded to a third party pursuant to a third party claim) as of the date on which the Buyer submits the corresponding claim for indemnity hereunder.

(e)     The amount of any Losses for which indemnification is provided under this Article VIII shall be net of any amounts actually recovered or recoverable (after deducting all reasonable attorneys' fees, and out-of-pocket expenses and costs of recovery) by the Indemnified Party under insurance policies or indemnity or contribution agreements or otherwise with respect to such Losses.

(f)     Notwithstanding anything in this Agreement, any amounts payable pursuant to the indemnification obligations under this Article IX shall be paid without duplication and in no event shall any party hereto be indemnified under different provisions of this Agreement for Losses that have already been paid or otherwise taken into account under this Agreement.

Section 9.5.     Set-Off.  The Buyer may, to the fullest extent permitted by applicable law, set-off and apply any amount owed and payable by the Seller to the Buyer under this Agreement against any of the obligations of the Buyer now or hereafter existing hereunder.

## ARTICLE X
## MISCELLANEOUS

Section 10.1.     Amendment and Modification.   This Agreement may be amended, modified, superseded, supplemented or cancelled by a written instrument signed by all of the parties hereto.

Section 10.2.     Binding Effect.  This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors, assigns, heirs, beneficiaries, estate, executor and personal representatives.

Section 10.3.     Entire Agreement.   This Agreement and the schedules and exhibits attached hereto constitute the entire agreement of the parties with respect to the sale of the

Purchased Assets and the other transactions contemplated in this Agreement, and supersede all prior understandings, agreements and oral representations and warranties of the parties with respect to the subject matter of this Agreement.  Any reference in this Agreement shall be deemed to include the schedules and exhibits hereto.

Section 10.4.   Headings.   The descriptive headings in this Agreement are inserted for convenience only and do not constitute a part of this Agreement.

Section 10.5.   Execution in Counterparts.   This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.

Section 10.6.   Notices.   All notices and other communications hereunder shall be in writing and shall be deemed given upon the earlier of delivery thereof if by hand, on the next business day after deposit if sent by a recognized international overnight delivery service, or when sent if sent by electronic mail (if confirmed by reply electronic mail that is not automated), as follows:

| | |
|---|---|
| If to the Buyer: | Head Kandy LLC |
| | 6100 Hollywood Blvd., 7th Floor |
| | Hollywood, Florida 33024 |
| | Attn: Jerome Falic, Bryan Feldman and David Taney |
| | Email: jerome@falic.com |
| | bfeldman@falicfashiongroup.com |
| | dtaney@dutyfreeamericas.com |
| | |
| If to the Seller: | Lashed Out, LLC |
| | P.O. Box 3 |
| | Poncha Springs, Colorado 81242 |
| | Attn: Kayla Marie McNeill |
| | Email: kayla@headkandypro.com |

Any party hereto may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other parties hereto written notice in the manner set forth above.

Section 10.7.   Expenses.   All costs and expenses incurred in connection with the consummation of the transactions contemplated by this Agreement by the Buyer shall be paid by the Buyer, including all fees incurred in connection with any antitrust or competition law filings, and all costs and expenses incurred in connection with the consummation of the transactions contemplated by this Agreement by the Seller shall be paid by the Seller.

Section 10.8.   Waiver.   Any party to this Agreement may extend the time for or waive the performance of any of the obligations of the other, waive any inaccuracies in the representations or warranties by the other, or waive compliance by the other with any of the covenants or conditions contained in this Agreement.  Any such extension or waiver shall be in

writing and signed by an officer of the Buyer or the Seller, as appropriate.  No such waiver shall operate or be construed as a waiver of any subsequent act or omission of the parties.

Section 10.9.  <u>Severability</u>.  Any term or provision of this Agreement that is held by a court of competent jurisdiction or other Governmental Authority to be invalid, void or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions of this Agreement or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.  If the final judgment of a court of competent jurisdiction or other Governmental Authority declares that any term or provision of this Agreement is invalid, void or unenforceable, the parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the fullest extent possible.

Section 10.10. <u>Publicity</u>.  Except as otherwise required by law or regulation, no press release or other public announcement related to this Agreement or the transactions contemplated by this Agreement will be issued by either party without the prior written approval of the other party.

Section 10.11. <u>Assignment</u>.  This Agreement shall not be assigned directly or indirectly by operation of law, change of control of a party or otherwise without the prior written consent of the other party; <u>provided</u> that the Buyer may assign its rights under this Agreement to any Affiliate of the Buyer, but no such assignment shall relieve the Buyer of its obligations hereunder.  Nothing in this Agreement, unless otherwise expressly provided, is intended to confer upon any Person, other than the parties hereto and their successors and permitted assigns, any rights or remedies under or by reason of this Agreement..

Section 10.12. <u>No Third Party Rights</u>.  The provisions of this Agreement are for the exclusive benefit of the parties hereto and no other party (including, without limitation, any creditor of any of the parties) shall have any right or claim against the parties by reason of those provisions or be entitled to enforce any of those provisions against the parties.

Section 10.13. <u>Prevailing Party</u>.  If either the Buyer, on the one hand, or the Seller, on the other hand, commences a suit, action or court proceeding against the other to interpret or enforce any of the terms of this Agreement or exhibits hereto or as a result of a breach by the other party of any terms hereof, and such suit, action or proceeding results in a final nonappealable judgment in favor of one party (the "**Prevailing Party**") against the other party (the "**Non-Prevailing Party**"), the Non-Prevailing Party shall pay to the Prevailing Party reasonable attorneys' fees, costs and expenses incurred in connection with the prosecution or defense of such action (including at any appellate level).

Section 10.14. <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the state of Florida applicable to contracts made and performed in such state without giving effect to the choice of law principles of such state that would require or permit the application of the laws of another jurisdiction.

Section 10.15. <u>Submission to Jurisdiction; Waivers</u>.  The parties agree that any dispute, controversy or claim arising out of or relating to this Agreement or the transactions contemplated hereby, or the validity, interpretation, breach or termination thereof, including claims seeking redress or asserting rights under any law, shall be resolved exclusively in the courts of the state of Florida or any court of the United States located in the state of Florida (the "**<u>Florida Courts</u>**") and appellate courts having jurisdiction of appeals from such Florida Courts.  In that context, and without limiting the generality of the foregoing, each party irrevocably and unconditionally:

(a)     submits for itself and its property in any action relating to this Agreement or the transactions contemplated hereby, or for recognition and enforcement of any judgment in respect thereof, to the exclusive jurisdiction of the Florida Courts, and appellate courts having jurisdiction of appeals from any of the foregoing courts, and agrees that all claims in respect of any such action shall be heard and determined in such Florida Courts or, to the extent permitted by law, in such appellate courts;

(b)     consents that any such action may and shall be brought exclusively in such courts and waives any objection that it may now or hereafter have to the venue or jurisdiction of any such action in any such court or that such action was brought in an inconvenient forum, and agrees not to plead or claim the same;

(c)     waives all right to trial by jury in any action (whether based on contract, tort or otherwise) arising out of or relating to this Agreement or the transactions contemplated hereby, or its performance under or the enforcement of this Agreement; and

(d)     agrees that nothing in this Agreement shall affect the right to effect service of process in any other manner permitted by the laws of the state of Florida.

Section 10.16. <u>Subrogation of the Buyer</u>.  In the event that the Buyer shall subsequent to the Closing Date become liable for or suffer any damage with respect to any matter which was covered by insurance maintained by the Seller on the Purchased Assets at or prior to the Closing Date for which the Seller is obligated to indemnify the Buyer under <u>Section 9.1</u> and the Seller fails to so indemnify the Buyer as provided in <u>Section 9.1</u>, the Seller agrees that, subject to the terms and conditions in such insurance maintained by the Seller on the Purchased Assets, the Buyer shall be subrogated to any rights of the Seller under the insurance coverage with respect to such amounts owed to the Buyer that the Seller has failed to pay in accordance with <u>Section 9.1</u>, and, in addition, the Seller agrees to promptly remit to the Buyer any insurance proceeds which it may receive on account of any such liability or damage.

Section 10.17. <u>Specific Performance</u>.  The parties hereby expressly recognize and acknowledge that immediate, extensive and irreparable damage would result, no adequate remedy at law would exist and damages would be difficult to determine in the event that any provision of this Agreement is not performed in accordance with its specific terms or otherwise breached.  It is hereby agreed that the parties shall be entitled to specific performance of the terms hereof and immediate injunctive relief and other equitable relief, without the necessity of proving the inadequacy of money damages as a remedy, and the parties further hereby agree to waive any requirement for the securing or posting of a bond in connection with the obtaining of such injunctive or other equitable relief.  Such remedies, and any and all other remedies provided

for in this Agreement, shall, however, be cumulative in nature and not exclusive and shall be in addition to any other remedies whatsoever which any party may otherwise have.  Each of the parties hereby acknowledges that the existence of any other remedy contemplated by this Agreement does not diminish the availability of specific performance of the obligations hereunder or any other injunctive relief.  Each of the parties further acknowledges and agrees that injunctive relief and/or specific performance will not cause an undue hardship to such party.

Section 10.18. <u>Definitions</u>.   For purposes of this Agreement, the following terms shall have the meanings ascribed below:

(a)      "**Affiliate**" means with respect to any Person, (a) a Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, another Person and (b) with respect to any partnership, joint venture, limited liability company, or similar entity, any general partner or manager thereof.

(b)      "**Brand**" means the Head Kandy brand.

(c)      "**Business Day**" means a day on which banks are open for business in Hollywood, Florida (excluding Saturdays, Sundays and public holidays).

(d)      "**Contract**" means any written contract, agreement, indenture, note, bond, loan, instrument, lease, conditional sales contract, mortgage, license, franchise, insurance policy, commitment or other binding arrangement or agreement, including all amendments, addenda, exhibits, schedules and other documents forming part thereof.

(e)      "**control**" means, with respect to any Person or group of Persons (the "**Controlling Person**"), (i) the ability of the Controlling Person, whether through the ownership of voting securities of another Person (the "**Controlled Person**") or by contract or otherwise, to directly or indirectly (A) elect the majority of the board of directors or other similar managing body of such Controlled Person, or (B) direct or cause the direction of the management or policies of such Controlled Person, or (ii) the possession, direct or indirect, of the power to vote more than fifty percent (50%) of the voting securities of such Person.

(f)      "**Excluded Assets**" means those assets of the Seller referred to or identified as follows: (i) cash, cash equivalents, commercial paper, certificates of deposit and other bank deposits, treasury bills and other cash equivalents (whether at bank or in hand) of the Seller; (ii) all bank accounts of the Seller; (iii) the benefit of any insurance policies held by the Seller which relate to the Business; (iv) the benefit of all rights and claims to the extent they relate to any of the Excluded Assets; (v) right to refund, credit or other benefit of claim in respect of Taxes imposed on the Seller relating to any taxable period (or portion thereof) ending on or prior to the Closing Date; (vi) all Tax returns and other Tax records of the Seller not relating exclusively to the Business or the Purchased Assets; (vii) all property, undertakings, rights and assets that are not Purchased Assets; and (viii) any Contracts entered into by the Seller in connection with the Business other than the Purchase Orders.

(g)      "**FCPA**" means the Foreign Corrupt Practices Act of 1977, as amended, and any rules, regulations and guidance promulgated thereunder.

(h)      "**GAAP**" means U.S. generally accepted accounting principles.

(i)      "**Governmental Authority**" means any nation or government, any local, provincial, regional, state or other political subdivision thereof, any supranational body, any agency, district, board, bureau, commission, court, department, official, tribunal, taxing authority, similar authority, quasi-Governmental Authority or any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

(j)      "**Intellectual Property**" means patents, patent registrations and applications (including design patents registrations and applications), trademarks, trademark registrations and applications, service marks, service mark registrations and applications, copyrights, copyright registrations and applications, domain names, social media user names or handles, trade dress, trade names (whether or not registered or by whatever name or designation), proprietary data, processes, formulations, technical or manufacturing know-how and materials embodying such information, and all common law, state, federal, national and international rights associated therewith.

(k)      "**Inventory**" means all of the Seller's inventories of the Products as of five (5) Business Days prior to the Closing Date calculated in accordance with Section 7.3 hereof, including, without limitation, finished goods and products, packaging, labeling, raw materials, components, work-in-process, materials, parts, accessories, supplies, corrugate, shippers, displays, testers, samples, collateral material and gifts with purchase, wherever located as set forth in Schedule 7.1(a).

(l)      "**Knowledge of the Seller**" means the actual knowledge of the members and officers of the Seller, after reasonable inquiry of the Seller's employees and its records.

(m)      "**Liabilities**" means all liabilities, claims, expenses, losses, damages, disputes, duties or obligations of every description, whether deriving from contract, common law, statute or otherwise, whether present or future, actual or contingent or ascertained or unascertained and whether owed or incurred severally or jointly or as a principal or surety.

(n)      "**Losses**" means all suits, proceedings, claims, expenses, losses, costs, Liabilities, judgments, deficiencies, assessments, actions, investigations, penalties, fines, settlements, interest and damages (including reasonable expenses of investigation and reasonable attorneys' fees and expenses in connection with any action, suit or proceeding), whether suit is instituted or not and, if instituted, whether at any trial or appellate level, and whether raised by the parties hereto or a third party.

(o)      "**Material Adverse Effect**" means any event, fact, condition, change, circumstance, occurrence or effect which, either individually or in the aggregate, is or would reasonably be expected to have a materially adverse effect on the Purchased Assets or the Business, taken as a whole, other than any change or event resulting from, relating to or arising out of (i) changes in the global economy generally; (ii) changes that are the result of factors generally affecting the industry in which the Business operates; (iii) acts of God, natural disasters, including the engagement in hostilities by any country, whether commenced before or after the date hereof, and whether or not pursuant to the declaration of a national emergency or

war (including any escalation or worsening of war), or the occurrence of any military or terrorist attack; (iv) the announcement or pendency of the transactions contemplated hereby; <u>provided</u>, <u>however</u>, that the exclusions provided for in clauses (i) and (iii) shall not apply to the extent the Business, taken as a whole, is materially disproportionately adversely affected by any change or event in such clauses relative to other participants in any of the industries in which the Business operates.

(p)     "**OAS Convention Against Corruption**" means the Organization of American States (OAS) Inter-American Convention Against Corruption (1997), as may be amended from time to time.

(q)     "**OECD Convention on Bribery**" means Organization of Economic Cooperation & Development (OECD) Convention on Combating Bribery of Foreign Officials in International Business Transactions (1997), as may be amended from time.

(r)     "**Ordinary Course of Business**" means an action taken by a Person if: (i)  such action is recurring in nature, is consistent with the past practices of such Person and is taken in the ordinary course of the normal day-to-day operations of such Person; (ii) such action is not required to be authorized by the members or managers of such Person and does not require any special or separate authorization of the members of managers of any nature; and (iii) such action is similar in nature and magnitude to actions customarily taken, without any special or separate authorization, in the ordinary course of the day-to-day operations of other Persons that are in the same line of business as the Person in question.

(s)     "**Person**" means any individual, corporation (including, without limitation, any non-profit corporation), limited liability company, general partnership, limited partnership, joint venture, estate, trust, cooperative, foundation, union, syndicate, league, consortium, coalition, committee, society, firm, company or other entity, enterprise, association, organization or Governmental Authority.

(t)     "**Products**" means the products set forth on <u>Schedule 9.18(t)</u> that are manufactured by or on behalf of the Seller using the Brand (or any derivations thereof) in connection with the operation of the Business and any other products that are under development by or on behalf of the Seller using the Brand (or any derivations thereof) as of the Closing Date.

(u)     "**Tax**" or "**Taxes**" means all taxes and governmental impositions of any kind in the nature of (or similar to) taxes, payable to any Tax Authority or other Governmental Authority, including, but not limited to, those on or measured by or referred to as income, franchise, profits, gross receipts, capital, *ad valorem*, custom duties, alternative or add-on minimum taxes, estimated, environmental, disability, registration, value added, sales, use, service, real or personal property, capital stock, license, payroll, withholding, employment, social security, workers' compensation, unemployment compensation, utility, severance, production, excise, stamp, occupation, premiums, windfall profits, transfer and gains taxes, and interest, penalties and additions to tax imposed with respect thereto, whether disputed or not, and shall include any liability for such amounts as a result of (a) being a transferee or successor, withholding or collection agent, or member of a combined, consolidated, unitary or affiliated

group, or (b) a contractual or other obligation to indemnify or otherwise assume or succeed to the Tax liability of any Person.

(v)     "**Threatened**" means a claim, proceeding, investigation, dispute, action or other matter for which any demand, statement or notice shall have been made or given, verbally or in writing, that might lead a prudent Person to conclude that there is a reasonable probability that such a claim, proceedings, investigation, dispute, action or other matter might be asserted, commenced, taken or otherwise pursued in the future.

*[Remainder of Page Intentionally Left Blank]*

**IN WITNESS WHEREOF**, the parties hereto have caused this Asset Purchase Agreement to be duly executed as of the day and year first above written.

**HEAD KANDY LLC**

By: _____

Name: Jerome Falic

Title: Authorized Representative

*[Head Kandy Asset Purchase Agreement Signature Page]*

**LASHED OUT, LLC**

By: _____

Name: Kayla Mcneill

Title: owner

*[Head Kandy Asset Purchase Agreement Signature Page]*

**EXHIBIT A**
**BILL OF SALE**

See attached.

## BILL OF SALE

This BILL OF SALE (this "**Bill of Sale**") is made and effective as of this 3rd day of May, 2018, by Lashed Out LLC, a Colorado limited liability company ("**Seller**"), to and in favor of Head Kandy LLC, a Delaware limited liability company ("**Buyer**"), and is delivered pursuant to Section 3.2(iv) of that certain Asset Purchase Agreement (the "**Purchase Agreement**"), dated as of even date herewith, entered into by Seller and Buyer. Capitalized terms used, but not defined herein, shall have the meanings ascribed to such terms in the Purchase Agreement (as defined below).

## W I T N E S S E T H:

**WHEREAS**, Seller and Buyer have entered into the Purchase Agreement, pursuant to which, among other things, Seller agreed to sell, assign, and transfer to Buyer or cause to be sold, assigned, transferred and delivered to Buyer, and Buyer agreed to purchase, all of Seller's right, title and interest in and to the Purchased Assets, free and clear of all Liens; and

**WHEREAS**, the execution and delivery of this Bill of Sale by Seller is a condition to the obligations of Buyer to consummate the transactions contemplated by the Asset Purchase Agreement.

**NOW, THEREFORE**, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, upon the terms set forth herein and intending to be legally bound hereby, the parties hereto hereby agree as follows:

1.     <u>Sale and Assignment of Assets and Properties</u>.  Seller hereby sells, assigns, transfers and conveys to Buyer, its successors and assigns, to have and to hold forever, all of Seller's right, title, interest and estate in, to and under the Purchased Assets, including, but not limited to, all of its right, title, interest and estate in, to, and under the following:

(a)     the Purchase Orders;

(b)     the Acquired Intellectual Property;

(c)     All (i) software and content forming part of or used on or in connection with the Seller's website located at www.headkandypro.com; (ii) user accounts and user names/handles with Twitter, Facebook, Instagram and other social media or similar companies and the content found thereon; (iii) advertising, promotional, and marketing materials, and literature and displays relating to the Business in a high resolution format suitable for mass printing; and (iv) design drawings, artwork, marketing, advertising, business and promotion plans and calendars relating to the Business;

(d)     the Claims;

(e)     the Records;

(f)     All of the Seller's right, title and interest in goodwill exclusively relating to

the Business (including the Acquired Intellectual Property), to the extent owned by the Seller; and

    (g)   the UPC Codes.

2.   <u>Further Assurances</u>.  Seller hereby covenants and agrees that, at any time and from time to time after the date of this Bill of Sale, at Buyer's request, Seller will do, execute, acknowledge and deliver, or will cause to be done, executed, acknowledged and delivered, any and all further acts, conveyances, transfers, assignments, and assurances as necessary to grant, sell, convey, assign, transfer, set over to or vest in Buyer any of the Purchased Assets.

3.   <u>Power of Attorney</u>.  Seller hereby constitutes and appoints Buyer, its successors and assigns, the true and lawful attorney and attorneys of Seller, with full power of substitution, in the name of Buyer or in the name and stead of Seller, but on behalf of and for the benefit of Buyer, its successors and assigns (and at the expense of Seller):

    (a)   to collect, demand and receive any and all Purchased Assets transferred hereunder and to give receipts and releases for and in respect of the same;

    (b)   to institute and prosecute in Seller's name, or otherwise, at the expense and for the benefit of Buyer any and all actions, suits or proceedings, at law, in equity or otherwise, which Buyer may deem proper in order to collect, assert or enforce any claim, right or title of any kind in or to the Purchased Assets hereby sold and assigned to Buyer or intended so to be, to defend or compromise any and all such actions, suits or proceedings in respect of any of such Purchased Assets, and to do all such acts and things in relation thereto as Buyer shall deem advisable for the collection or reduction to possession of any of such Purchased Assets;

    (c)   to take any and all other reasonable action designed to vest more fully in Buyer the Purchased Assets hereby sold and assigned to Buyer or intended so to be and in order to provide for Buyer the benefit, use, enjoyment and possession of such Purchased Assets; and

    (d)   to do all reasonable acts and things in relation to the Purchased Assets sold and assigned hereunder.

    (e)   Seller acknowledges that the foregoing powers are coupled with an interest and shall be irrevocable by it or upon its subsequent dissolution or in any manner or for any reason.  Buyer shall be entitled to retain for its own account any amounts collected pursuant to the foregoing powers, including any amounts payable as interest with respect thereto.  Seller shall from time to time pay to Buyer, when received, any amounts that shall be received directly or indirectly by Seller (including amounts received as interest) in respect of any Purchased Assets sold, assigned or transferred to Buyer pursuant hereto.

4.   <u>Seller Representations and Warranties; Covenants</u>.  Seller covenants to Buyer that

Seller is the lawful owner of the said goods and chattels; that they are free from all Liens; that Seller has good right to sell that property, and that Seller will warrant and defend the sale of said property, goods and chattels unto Buyer against the lawful claims and demands of all persons whomsoever and has executed an Assignment and Assumption Agreement in conjunction herewith.

5. <u>Miscellaneous</u>.

    (a) "Seller" and "Buyer" shall be used for singular or plural, natural or artificial, which terms shall include the heirs, legal representatives, successors and assigns of Seller and Buyer whenever the context so requires or admits.

    (b) If any term or other provision of this Bill of Sale is invalid, illegal or incapable of being enforced by any law or public policy, all other terms and provisions of this Bill of Sale shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to either Seller or Buyer.

    (c) This Bill of Sale shall be governed by, and construed in accordance with, the laws of the State of Florida applicable to contracts executed in and to be performed in that State (without regard to conflicts of law provisions thereof).

\*      \*      \*

This Bill of Sale does not convey any right, title, interest or estate in any of the Excluded Assets or Retained Liabilities, all of which are excluded from the scope of this Bill of Sale.

**<u>SELLER</u>:**

**LASHED OUT, LLC**

By: _____
      Name:
      Title:

*[Signature Page to Head Kandy Asset Purchase Agreement Bill of Sale]*

**BUYER:**

**HEAD KANDY LLC**

By:_____
    Jerome Falic
    Authorized  Representative

*[Signature Page to Head Kandy Asset Purchase Agreement Bill of Sale]*

**EXHIBIT B**
**ASSIGNMENT & ASSUMPTION AGREEMENT**

See attached.

## <u>ASSIGNMENT AND ASSUMPTION AGREEMENT</u>

This ASSIGNMENT AND ASSUMPTION AGREEMENT (this "**Agreement**") is made and effective as of this 3rd day of May, 2018, by and between Head Kandy LLC, a Delaware limited liability company ("**Buyer**"), and Lashed Out LLC, a Colorado limited liability company ("**Seller**").   Capitalized terms used, but not defined herein, shall have the meanings ascribed to such terms in the Purchase Agreement (as defined below).

## W I T N E S S E T H:

**WHEREAS**, Seller and Buyer have entered into that certain Asset Purchase Agreement (the "**Purchase Agreement**"), dated as of even date herewith, pursuant to which, among other things, Seller agreed to sell, assign, and transfer to Buyer or cause to be sold, assigned, transferred and delivered to Buyer, and Buyer agreed to purchase, all of Seller's right, title and interest in and to the Purchased Assets, free and clear of all Liens, and Buyer agreed to assume the Assumed Liabilities; and

**WHEREAS**, by execution and delivery of this Agreement, the parties hereto, as of the date hereof, desire to effect the assignment of the Purchased Assets to, and the assumption of the Assumed Liabilities by, Buyer.

**NOW, THEREFORE**, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, upon the terms set forth herein and intending to be legally bound hereby, the parties hereto hereby agree as follows:

Subject to the terms of the Purchase Agreement, Seller, intending to be legally bound hereby, does hereby sell, convey, assign, transfer and deliver to Buyer and its successors and assigns to its and their own use and behalf forever, all of its right, title and interest in and to the Purchased Assets in accordance with the terms of the Purchase Agreement.

Subject to the terms of the Purchase Agreement, as of the date hereof, Buyer agrees to accept the sale, conveyance, assignment, transfer and delivery of the Purchased Assets, and to assume, pay, perform and discharge, when due, all of the Assumed Liabilities in accordance with their respective terms, subject to the respective conditions thereof, and pursuant to the terms of the Purchase Agreement.

This Agreement is made pursuant to, and is subject to the terms of, the Purchase Agreement.   Notwithstanding anything to the contrary contained in this Agreement, nothing contained herein shall be deemed to limit, restrict, enlarge or modify in any manner the rights and obligations (including without limitation any Liability) of the parties under the Purchase Agreement, and in the event of a conflict between the terms and provisions hereof and the terms and provisions of the Purchase Agreement, the terms and provisions of the Purchase Agreement shall control.

This Agreement and the covenants and agreements contained herein shall survive the Closing.   No waiver, modification or change of any of the provisions of this Agreement shall be valid unless in writing and signed by the party against whom such claimed waiver, modification or change is sought to be enforced.

This Agreement shall not be assigned by operation of law or otherwise; provided, however, that Buyer may assign its rights and obligations to any Affiliate of Buyer (unless to do so would restrict or delay the consummation of the transactions contemplated by the Purchase Agreement), but no such assignment shall relieve Buyer of its obligations hereunder.    This Agreement will be binding upon, inure to the benefit of and be enforceable by each party and such party's respective heirs, beneficiaries, executors, representatives and permitted assigns and successors.

The assumption by Buyer of the Assumed Liabilities does not expand the rights or the remedies of any third party against Buyer or its Affiliates as compared to the rights and remedies which such third party would have had against Seller had Buyer not assumed the Assumed Liabilities.   Nothing contained herein shall, or shall be construed to, prejudice the right of Buyer, on behalf of itself and its Affiliates, to contest any claim or demand with respect to any Liability assumed hereunder and Buyer, on behalf of itself and its Affiliates shall have all rights which Seller may have or have had to defend or contest any such claim or demand.

Sections 10.1, 10.5, 10.6, 10.9, 10.12-10.15 and 10.17 of the Purchase Agreement shall apply *mutatis mutandis* to this Agreement.

At any time and from time to time hereafter, at any party's request and without further consideration, each party shall take any and all steps and shall execute, acknowledge and deliver to the other party any and all future instruments and assurances necessary or reasonably requested in order to more fully carry out the purposes hereof.

*     *     *

**IN WITNESS WHEREOF**, the parties hereto have caused this Assignment and Agreement to be executed as of the date first above written.

**HEAD KANDY LLC**

By:_____

     Jerome Falic
     Authorized Representative

*[Signature Page to Head Kandy Assignment and Assumption Agreement]*

Agreed and acknowledged by:

**LASHED OUT, LLC**

By: _____
     Name:
     Title:

**EXHIBIT C**
**LLC AGREEMENT**

See attached.

**AMENDED AND RESTATED**
**LIMITED LIABILITY COMPANY OPERATING AGREEMENT**
**OF**
**HEAD KANDY LLC**

This **LIMITED LIABILITY COMPANY AGREEMENT** (the "**Agreement**") is effective as of May 3, 2018 (the "**Effective Date**") by and among **HEAD KANDY LLC**, a Delaware limited liability company (the "**Company**"), and the members of the Company set forth on the signature pages hereto (as modified, amended, supplemented or restated, each, a "**Member**" and collectively, the "**Members**").

**WITNESSETH:**

**WHEREAS**, the Company was formed upon the filing of its certificate of formation with the Delaware Secretary of State on April 13, 2018;

**WHEREAS**, the Company previously entered into that certain Limited Liability Company Agreement of the Company (the "**Original Operating Agreement**"), dated as of April 27, 2018, by and between the Company and the Members set forth on the signature pages thereto; and

**WHEREAS**, the Members desire to amend and restate the Original Operating Agreement in order to define and express all of their respective rights and obligations with respect to their Interests in the Company, and the operation of the Company as a limited liability company.

**NOW, THEREFORE**, in consideration of the foregoing premises and the mutual promises, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

**ARTICLE I**
**DEFINITIONS**

1.1     **Definitions**.   The following terms wherever used in this Agreement have the following meanings:

"**Act**" means the Delaware Limited Liability Company Act, 6 Del. C. §18-101 *et seq*., as amended.

"**Adjusted Capital Account Deficit**" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of such date, after giving effect to the following adjustments:

(a)     such Capital Account shall be increased to reflect the amounts, if any, such Member is obligated to restore to the Company or is deemed to be obligated to restore pursuant to Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations; and

(b)     such Capital Account shall be reduced to reflect any items described in Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6) of the Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Regulations and shall be interpreted consistently with such Regulation.

"**Additional Capital Call**" has the meaning set forth in **Section 4.2(c)**.

"**Additional Member**" means a Person admitted to the Company as a Member pursuant to **Section 8.7**.

"**Adjustment Period**" means a period of time as determined in this definition.  The first Adjustment Period commences on the Effective Date.  Each succeeding Adjustment Period will commence on the day immediately following the last day of the immediately preceding Adjustment Period.  After the commencement of such Adjustment Period, each Adjustment Period will end on the earliest to occur of (a) the last day of each Fiscal Year, (b) a Capital Date, (c) the day immediately preceding the date of the "liquidation" of a Member's interest in the Company (within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Regulations) and (d) the date on which the Company is terminated under **Article IX**.

"**Affiliate**" means, with respect to any specified Person, any other Person that directly or indirectly controls or is controlled by or is under common control with the specified Person.  As used in this definition, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, as trustee or executor, by contract or otherwise, including, without limitation, the ownership, directly or indirectly, of securities having the power to elect a majority of the board of directors or similar body governing the affairs of such Person.

"**Agreement**" has the meaning set forth in the Preamble.

"**Auditors**" has the meaning set forth in **Section 10.2(a)**.

"**BBA**" means Title XI of the Bipartisan Budget Act of 2015, including the corresponding provisions of the Code impacted thereby, and any corresponding provisions of state or local income tax law, as the same may be amended from time to time.

"**Book Gain**" and "**Book Loss**" means the gain or loss recognized by the Company for book purposes in any Adjustment Period by reason of a sale or other disposition of any Company asset.  Such Book Gain and Book Loss shall be computed by reference to the Book Value of such asset as of the date of such sale or other disposition, rather than by reference to the tax basis of the asset as of such date.  If a Company asset is distributed to a Member, the difference between the fair market value of such asset and its Book Value shall be considered a Book Gain or a Book Loss.

"**Book Value**" of a Company asset means, as of any particular date, the value at which the asset is properly reflected on the books of the Company, as of such date in accordance with the provisions of Section 1.704-1(b) of the Regulations.

(a)     The initial Book Value of any asset (i) purchased by the Company shall be the gross cost of such asset and (ii) contributed by a Member to the Company shall be the gross fair market value of such asset, as determined by the Managing Member;

(b)      The respective Book Values of all Company assets shall be adjusted to equal their respective gross fair market values as of the time of (i) the acquisition of an additional interest in the Company (other than upon the initial formation of the Company) by any new or existing Member in exchange for more than a *de minimis* capital contribution or as consideration for the performance of services on behalf of the Company or its subsidiaries (if the Managing Member determines that such an adjustment is necessary or appropriate to properly reflect the economic interests of the Members in the Company); (ii) the distribution by the Company to a Member of more than a *de minimis* amount of money or other property as consideration for an interest in the Company (if the Managing Member determines that such an adjustment is necessary or appropriate to properly reflect the economic interests of the Members in the Company); and (iii) the liquidation of the Company within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Regulations;

(c)      The Book Value of any Company asset distributed to any Member shall be the gross fair market value of such asset on the date of distribution as agreed to by the Managing Member; and

(d)      Book Value shall be adjusted for book depreciation with respect to such assets, rather than for the cost recovery deductions to which the Company is entitled for income tax purposes with respect to such assets.

"**Business**" means the manufacture, sale and distribution of hair-related products.

"**Buyer**" shall have the meaning set forth in **Section 8.3(a)**.

"**Capital Account**" means the Capital Account maintained by the Company for each Member. The balance of each Member's Capital Account, as of any particular date, shall be an amount equal to the sum of the following:

(a)      The cumulative amount of cash that has been contributed to the capital of the Company by such Member as of such date; plus

(b)      The agreed upon net fair market value (meaning net of any indebtedness encumbering the contributed property) as of the date of contribution of any property other than cash that has been contributed to the capital of the Company by such Member as of such date; plus

(c)      The cumulative amount of Gross Income, Net Profit and other items of income and gain for all Adjustment Periods ending prior to such date that have been, or are required to be, allocated to such Member pursuant to **Sections 5.1** through **5.5**, minus

(d)      The cumulative amount of Net Loss and other items of loss and deduction for all Adjustment Periods ending prior to such date that have been, or are required to be, allocated to such Member pursuant to **Sections 5.1** through **5.5**, and minus

(e)      The cumulative amount of cash and the agreed upon net fair market value (as of the date of distribution) of all other property that has been distributed to such Member by the Company as of such date under **Article VI**.

A Member's Capital Account shall also be increased or decreased as of such date to reflect any items described in Section 1.704-1(b)(2)(iv) of the Regulations that are required to be reflected in such Member's Capital Account under such Regulation (including Section 1.704-1(b)(2)(iv)(g) if Section 704(c) of the Code applies to any property of the Company) and that are not otherwise taken into account in computing such Capital Account under this definition.

"**Capital Call**" means an Initial Capital Call or Additional Capital Call, as applicable.

"**Capital Contribution**" means, with respect to each Member, the aggregate amount of money and the fair market value of any property (other than money) contributed by such Member to the Company pursuant to **Section 4.1** or **4.2**.

"**Capital Date**" when used with respect to any Book Gain or Book Loss recognized by the Company during any Adjustment Period, means the date on which such Book Gain or Book Loss is recognized by the Company.

"**Cash Available for Distribution**" for any Fiscal Year or other period means the excess of (a) the amount of gross cash receipts received by the Company (including from any reserves previously established that the Managing Member determines are no longer required by the Company), but specifically excluding proceeds from borrowed monies that the Company shall use to fund expenses and capital expenditures that arise from, or are otherwise related to, the Business, less (b) (i) all expenditures made by the Company for such Fiscal Year, (ii) any reserves established or increased by the Managing Member that the Managing Member deems reasonably necessary for the operation of the Company and/or the Business, and (iii) amounts received by the Company as Capital Contributions.

"**Cause**" with respect to any Executive will have the meaning given to such term in any applicable employment agreement.  If there is no employment agreement with such Executive, or if such agreement does not define "Cause," then "Cause" will mean: (a) the Executive's continued failure to perform her duties under this Agreement or any written policy of the Company, which the Executive fails to cure within ten (10) days of having received notice from the Company specifying in reasonable detail the facts and circumstances it contends constitute such failure; (b) the Executive's breach of any of the following covenants and/or duties: non-compete, non-solicitation, non-disparagement or confidentiality; (c) the Executive's gross negligence or willful misconduct in connection with the performance of his/her duties, including any act of embezzlement, theft, dishonesty, fraud or willful misconduct with respect to the business or affairs of the Company (including disparagement of the Company to third parties), as determined by the Company after investigation and notice of the charge to the Executive and after allowing the Executive an opportunity to explain the conduct in question; or (d) the Executive's conviction of, or plea of no contest to, any felony or misdemeanor involving theft, fraud, dishonesty or act of moral turpitude that the Managing Member reasonably concludes is damaging to the business or reputation of the Company.

"**Closing**" shall have the meaning set forth in **Section 8.3(d)**.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Contract**" means any transaction, agreement, contract, arrangement or understanding or any other instrument, whether formal or informal, written or oral, that is legally binding.

"**Company**" has the meaning set forth in the Preamble.

"**Company Minimum Gain**" means the amount computed under Section 1.704-2(d) of the Regulations.

"**Company Nonrecourse Deductions**" means any loss, deduction, or Code Section 705(a)(2)(B) expenditure, or portion of such items, that is attributable to nonrecourse liabilities of the Company as defined in Section 1.752-1(a)(2) of the Regulations.

"**Complying Member**" has the meaning set forth in **Section 4.3(c)**.

"**Delinquent Member**" has the meaning set forth in **Section 4.3(c)**.

"**Drag-Along Member**" has the meaning set forth in **Section 8.4(a)**.

"**EBITDA**" means the net income of the Company, *plus* depreciation and amortization expense, interest expense and income tax expense, *minus* interest income, income tax recoveries and depreciation and amortization recoveries, in each case as determined in accordance with GAAP consistently applied with past practice.

"**Effective Date**" has the meaning set forth in the Preamble.

"**Executive**" means Kayla Marie McNeill and any Substituted Member or any Additional Member who is classified as an Executive by the Managing Member pursuant to **Section 8.5**. Notwithstanding anything to the contrary contained herein, in no event shall the term "**Executive**" include any Member or any Affiliate of any Member notwithstanding that such Member or Affiliate thereof is employed by, or is a member of the management of, the Company.

"**Executive Units**" has the meaning set forth in **Section 8.5(a)**.

"**Fair Market Value**" means, as of the relevant date of determination, (i) with respect to a Unit, the value of the particular Unit at issue on a fully diluted basis as reasonably determined in good faith by a Majority Vote of the Members, taking into consideration the distributions to which such Unit would be entitled assuming all of the assets of the Company were sold in an arm's-length transaction between a willing buyer and a willing seller (taking into account any discount for minority interest, lack of marketability, lack of liquidity, lack of voting power or any transfer restrictions applicable to such Units) and the net proceeds of such sale were distributed to the Members pursuant to **Article VI** and (ii) with respect to all other non-cash assets, the value of such assets as reasonably determined by a Majority Vote of the Members assuming such assets were sold in an arm's-length transaction between a willing buyer and a willing seller occurring on the date of valuation, taking into account all relevant factors determinative of value (and giving effect to any transfer Taxes payable in connection with such sale).  For all purposes hereunder, the determination of the Fair Market Value by a Majority Vote of the Members shall be deemed conclusive, final and binding on all Members (and shall not be subject to collateral attack for any reason).

"**Falic Members**" refers, collectively, to Jerome Falic, Simon Falic and Leon Falic, in accordance with **Exhibit A** attached hereto.

"**Feldman Member**" refers to Bryan Feldman, in accordance with **Exhibit A** attached hereto.

"**Fiscal Year**" has the meaning set forth in **Section 10.3**.

"**Funding Notice**" has the meaning set forth in **Section 4.2(b)**.

"**GAAP**" means U.S. generally accepted accounting principles.

"**Gross Income**" means, for each Adjustment Period, an amount equal to the Company's gross income as determined for federal income tax purposes for such Adjustment Period but computed with the adjustments specified in paragraphs (a), (d) and (e) of the definition of Net Profit or Net Loss.

"**Indemnitee**" has the meaning set forth in **Section 7.6(a)**.

"**Initial Capital Call**" has the meaning set forth in **Section 4.1**.

"**Initial Capital Commitments**" has the meaning set forth in **Section 4.1**.

"**Interest**" means a Member's economic rights and other interests in the Company (including voting rights) as a Member as provided in this Agreement.

"**Majority Vote**" means an action requiring the affirmative vote or consent of Interests representing at least a majority of the Interests then held by Members entitled to vote or consent thereon.

"**Managing Member**" means Jerome Falic, or as unanimously agreed to by the Members from time to time.

"**McNeill Member**" refers to Kayla Marie McNeill, in accordance with **Exhibit A** attached hereto.

"**Members**" has the meaning set forth in the Preamble.

"**Member Nonrecourse Debt**" has the meaning set forth in Section 1.704-2(b)(4) of the Regulations for "partner nonrecourse debt".

"**Member Nonrecourse Debt Minimum Gain**" has the meaning set forth in Section 1.704-2(i)(2) of the Regulations for "partner nonrecourse debt minimum gain".

"**Member Nonrecourse Deductions**" has the meaning set forth in Section 1.704-2(i) of the Regulations for "partner nonrecourse deductions".

"**New Units Purchase Price**" has the meaning set forth in **Section 4.6(a)**.

"**Net Debt**" means, as of any date, the total indebtedness of the Company and its subsidiaries, less the cash and cash equivalents of the Company and its subsidiaries, in each case on a consolidated basis as determined in accordance with GAAP.

"**Net Profit**" or "**Net Loss**" means, for each Adjustment Period, the Company's taxable income or taxable loss for such Adjustment Period, as determined under Section 703(a) of the Code, and Section 1.703-1 of the Regulations (and for this purpose all items of income, gain, loss, or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or taxable loss), but with the following adjustments:

(a)     Any tax-exempt income, as described in Section 705(a)(1)(B) of the Code, realized by the Company during such Adjustment Period shall be taken into account in computing such taxable income or taxable loss as if it were taxable income.

(b)     Any expenditures of the Company described in Section 705(a)(2)(B) of the Code for such Adjustment Period, including any items treated under Section 1.704-1(b)(2)(iv)(i) of the Regulations as items described in Section 705(a)(2)(B) of the Code, shall be taken into account in computing such taxable income or taxable loss as if they were deductible items.

(c)     Book depreciation for such Adjustment Period shall be taken into account in computing such taxable income or taxable loss in lieu of any amortization, depreciation or cost recovery deduction to which the Company is entitled for such Adjustment Period with respect to Company assets.

(d)     Any Book Loss or Book Gain recognized by the Company during such Adjustment Period by reason of a sale or other disposition of all or part of the Company's Business shall be taken into account in computing such taxable income or taxable loss in lieu of any tax gain or tax loss recognized by the Company during any Adjustment Period by reason of such sale or other disposition.

(e)     Any Gross Income and item of income, gain, loss or deduction required to be allocated to the Members under **Sections 5.4** and **5.5** shall not be taken into account in computing such taxable income or taxable loss.

(f)     If the Book Value of any asset of the Company is adjusted pursuant to Section 1.704-1(b) of the Regulations, other than an adjustment for book depreciation, the amount of such adjustment shall be taken into account as Book Gain or Book Loss from the disposition of such asset for purposes of computing Net Profit or Net Loss.

If the Company's taxable income or taxable loss for such Adjustment Period, as adjusted in the manner provided in paragraphs (a) through (f) of this definition, is a positive amount, such amount shall be the Company's Net Profit for such Adjustment Period; and if negative, such amount shall be the Company's Net Loss for such Adjustment Period.

"**Non-Participating Falic Member(s)**" has the meaning set forth in **Section 8.3(c)**.

"**Non-Participating Falic Member's Offered Interests**" has the meaning set forth in **Section 8.3(c)**.

"**Notice of Acceptance**" shall have the meaning set forth in **Section 8.3(b)**.

"**Offer**" shall have the meaning set forth in **Section 8.3(a)**.

"**Offer Notice**" shall have the meaning set forth in **Section 8.3(a)**.

"**Offer Price**" shall have the meaning set forth in **Section 8.3(a)**.

"**Offered Interests**" shall have the meaning set forth in **Section 8.3(a)**.

"**Partnership Representative**" shall have the meaning set forth in **Section 10.5**.

"**Percentage Interest**" means a Member's Interest in the Company expressed as a percentage.  The Percentage Interest of each Member shall equal (a) the total number of Units owned by the Member, *divided by* (b) the total number of Units owned by all Members.  The Percentage Interests of the Members as of the Effective Date are set forth on **Exhibit A** attached hereto.

"**Permitted Transfer**" shall have the meaning set forth in **Section 8.2(a)**.

"**Permitted Transferee**" shall have the meaning set forth in **Section 8.2(a)**.

"**Person**" means any individual, partnership, firm, corporation, association, trust, unincorporated organization or other entity.

"**Preemptive Exercise Notice**" has the meaning set forth in **Section 4.6(a)**.

"**Preemptive Notice**" has the meaning set forth in **Section 4.6(a)**.

"**Regulations**" means the federal income tax regulations promulgated by the U.S. Department of Treasury, or any amendment or successor provision to such regulations, pursuant to or in interpretation of the Code.

"**Second Offer Notice**" has the meaning set forth in **Section 8.3(c)**.

"**Securities Act**" has the meaning set forth in **Article XI**.

"**Seller**" shall have the meaning set forth in **Section 8.3(a)**.

"**Substitute Member**" means any Person who (a) holds Units, and (b) has been admitted as a Member pursuant to **Section 8.6**.

"**Transfer**" means any direct or indirect sale, assignment, transfer, distribution or other disposition of a Member's Unit or any Interest or participation therein, or other conveyance of any legal or beneficial interest therein (including (a) any "involuntary transfer" such as a sale of any part of a Unit or any Interest therein in connection with any bankruptcy or similar insolvency proceedings, or a divorce or other marital settlement involving any Member, or any other disposition or encumbrance of a Member's Unit or any Interest therein, and (b) any direct or indirect transfer, exchange or series of transfers or exchanges of the stock, partnership, member or other ownership interests of any Member that is an entity (or any combination of such transfers or exchanges, whether direct or in connection with a merger, acquisition, sale, or similar reorganization or transaction, including issues of new stock or other ownership interests, or the exercise of options, warrants, debentures or other convertible instruments, or a redemption of other interests in the

Member, and any similar transactions involving the stock or other ownership interests of such Member), whether voluntarily or involuntarily or by operation of law or any agreement or commitment to do any of the foregoing.  Capitalized terms containing such word as a root, such as "Transferee" or "Transferring," shall have corresponding meanings in this Agreement.

"**Transferring Members**" has the meaning set forth in **Section 8.4(a)**.

"**Unfunded Portion**" has the meaning set forth in **Section 4.3(c)**.

"**Units**" means Units of Interest, which entitle the holder thereof to receive distributions of cash, allocations of profits and losses and other rights as set forth in this Agreement.  **Exhibit A** attached hereto sets forth the number of Units owned by each Member.  Units may be issued in fractional amounts.

"**Unreturned Capital**" means, with respect to each Member at any given time, the amount by which the Member's Capital Contributions, if any, exceed all distributions made to the Member under (or by reference to) **Section 6.1(a)(iii)**.

### 1.2    Other Definitions.

(a)    All terms used in this Agreement that are not defined in this **Article I** shall have the meanings set forth elsewhere in this Agreement.

(b)    As used in this Agreement, accounting terms to the extent they are not defined in this Agreement, have the respective meanings given to them under GAAP.

## ARTICLE II
## ORGANIZATION; PURPOSES

2.1    **Formation**.  The Members hereby acknowledge the formation and continuing existence of the Company under and pursuant to the Act.

2.2    **Name**.  The name of the Company is "Head Kandy LLC".  The Company's name may be changed at any time by the Managing Member, and notice of any such change shall be given to each Member within a reasonable time thereafter.

2.3    **Registered Office; Place of Business**.  The registered office of the Company shall be as set forth in the Company's certificate of formation.  The Company shall establish a place or places of business as determined by the Managing Member.

2.4    **Purpose**.  The purposes for which the Company is formed are to (a) engage in the Business, and (b) to engage in any lawful activity under the Act approved unanimously by the Members.

## ARTICLE III
## TERM

The term of the Company commenced on the date when its certificate of formation was filed with the Delaware Secretary of State and shall be perpetual unless dissolved sooner pursuant to **Section 9.1**.

## ARTICLE IV
## CONTRIBUTIONS TO CAPITAL

**4.1**     **Required Capital Contributions**.   Each Member commits to make Capital Contributions to the Company in the aggregate amount set forth next to the Member's name on **Exhibit A** attached hereto (the "**Initial Capital Commitments**").   Each Member is responsible to fund its pro rata portion of an Initial Capital Commitment equal to the product of (a) the aggregate amount of required capital contributions *times* (b) the Percentage Interest owned by such Member. The initial capital to be contributed by each Member in satisfaction of its respective Initial Capital Commitment may be comprised of cash contributed by such Member, in each case, in such amounts as unanimously agreed to by the Members.   At the sole discretion of the Managing Member, an Initial Capital Commitment may be called (an "**Initial Capital Call**") and funded in one or more capital contributions.

**4.2**     **Additional Funding**.

(a)     Company shall use its commercially reasonable best efforts to fund its ongoing operations from its operating revenues and borrowings based on its own credit.   In the event that the Company is unable to fund its ongoing operations from Initial Capital Commitments, operating revenues and borrowing based on its own credit, then, subject to approval by a Majority Vote of the Members, the Company may fund its capital requirements:

(i)     through intercompany advances or other credit support from the Members or their Affiliates; or

(ii)     through additional pro rata capital contributions by the Members.

(b)     If the Members determine that such funding is to be made in the form of advances or loans from the Members, each Member shall have the right, but not the obligation, to make a portion of such advances or loans equal to the product of (i) the aggregate amount of required funding *times* (ii) the Percentage Interest owned by such Member.   The Company shall notify each Member of the funding requested to be provided by such Member pursuant to this **Section 4.2(b)** by delivering a written notice to each Member (a "**Funding Notice**") specifying (A) the aggregate amount of requested funding required at such time and (B) the specific amount of funding requested to be made by each Member.   Each Member shall notify the Company within ten (10) days of receipt of a Funding Notice whether such Member commits to provide its share of the requested funding (and whether it is willing to provide additional funding to the extent any other Member declines to provide such funding).   If any Member elects not to provide all or a part of its share of any required funding, the Company shall offer each other Member that has agreed to provide all of its share of such funding the opportunity to fund its pro-rata share of that amount. If a Member commits to make advances or loans requested pursuant to a Funding Notice, funding thereof shall be made at such time or times requested by the Company in immediately available funds by wire transfer or other similar means to a bank account designated by the Company.   Any such advance or loan from the members shall accrue interest at a rate determined by the Members

(based on the borrowing rates then payable by the Members or their Affiliates to unaffiliated lenders) and shall be represented either by a promissory note or appropriate entries in the financial statements or other books and records of the Company.

(c)     If the Members determine that such funding is to be made in the form of additional capital contributions from the Members, then each Member shall be obligated to fund a portion of such capital contributions equal to the product of (i) the aggregate amount of required capital contributions *times* (ii) the Percentage Interest owned by such Member.  The Company shall notify each Member of the capital contribution to be made by such Member pursuant to this **Section 4.2(c)** by delivering a written notice (an "**Additional Capital Call**") to each Member specifying (A) the aggregate amount of an Additional Capital Call required at such time and (B) the amount of an Additional Capital Call to be provided by such Member and the date by which such member's capital contribution must be funded (which shall be not less than ten (10) days following the date of an Additional Capital Call).

### 4.3     Capital Call Mechanics; Unfunded Capital Calls.

(a)     Each Member that funds its portion of an Additional Capital Call shall receive a number of additional Units equal to the following quotient: (i) the capital contribution then being made by such Member, *divided by* (ii) a fraction, (A) the numerator of which is the aggregate capital contributions to the Company prior to the current Additional Capital Call and (B) the denominator of which is the total number of Units outstanding prior to the current Additional Capital Call.

(b)     Any Additional Capital Call shall be mandatory for the Members.  A Member's obligation to fund an Additional Capital Call shall be enforceable by the Company or by any other Member, but the Company may not assign a Member's obligation to fund an Additional Capital Call to any creditor or third party nor may any creditor or third party enforce such a Member obligations, as the Member's obligations hereunder are not for the benefit of any creditor or third party.

(c)     In addition to the right of the Company or any Member to enforce an Additional Capital Call, any Member that has fully funded its Additional Capital Call (a "**Complying Member**") shall have the right, but not the obligation, to fund all or any portion of any such Additional Capital Call not funded by any other Member(s) (the "**Unfunded Portion**") as an additional capital contribution to the Company.  In the event that all of the obligations of a Member that failed to fulfill its obligation to make an Additional Capital Call as required herein (a "**Delinquent Member**") are not fulfilled, (i) no additional Units shall be issued to the Delinquent Member with respect to the Unfunded Portion, and (ii) the Complying Member(s), if any, that elect to fund the Unfunded Portion shall receive, in addition to the additional Units provided for as part of its original Capital Contribution, the number of Units that would have been issued to the Delinquent Member with respect to the Unfunded Portion had such Member funded the Unfunded Portion; provided, that if more than one Complying Member elects to fund the Unfunded Portion, then each such Complying Member (A) shall have the right to fund its proportionate amount of the Unfunded Portion equal (based on proportion of the number of Units held by each such Complying Member that so elects to the number of Units held by all such Complying Members who so elect), and (B) the additional Units to be issued to the Complying

Members shall be allocated among such Complying Members in proportion to the funding of the Unfunded Portion actually provided by them.

**4.4**     **Deficit Capital Accounts**.  No Member shall have liability to the Company, to the other Members or to the creditors of the Company on account of any deficit balance in such Member's Capital Account except to the extent such deficit arises from the failure of the Member to contribute the full amount of such Member's Capital Contribution.

**4.5**     **Withdrawal of Capital Contributions**.  No Member shall have the right to withdraw or reduce such Member's Capital Contribution, or to receive any distributions from the Company, except as otherwise provided herein.  No Member shall have the right to demand or receive any Company property.  No interest or other return shall be paid to any Member on such Member's Capital Contribution.  No Member shall have priority over any other Member with respect to the return of Capital Contributions, allocations of Profits or Losses or any other distributions, except as expressly provided in this Agreement.

**4.6**     **Grant of Preemptive Rights**.

(a)     In the event that, at any time, the Company shall decide to undertake an issuance of additional Units, the Company shall at such time deliver written notice of such decision to the Members.  Such written notice shall describe the amount, type and terms of such additional Units, the purchase price per such additional Unit (the "**New Units Purchase Price**") to be paid by the purchasers thereof and the other terms upon which the Company has decided to issue such new Units, including, without limitation, the expected timing of such issuance, which will in no event be more than sixty (60) days or less than thirty (30) days after the date upon which such notice is given (the "**Preemptive Notice**").  The Members shall have ten (10) days from the date on which the Preemptive Notice is given to agree by written notice to the Company (a "**Preemptive Exercise Notice**") to purchase up to their pro rata portion of such new Units for the New Units Purchase Price and upon the general terms specified in the Preemptive Notice and stating therein the quantity of new Units to be purchased by such Member.  In the event that in connection with such a proposed issuance of New Units, a Member shall for any reason fail or refuse to give such written notice to the Company within such ten (10) day period, such Member shall, for all purposes of this **Section 4.6**, be deemed to have refused (in that particular instance only) to purchase any of such new Units and to have waived (in that particular instance only) all of their rights under this **Section 4.6** to purchase any of such new Units.

(b)     In the event and to the extent that any new Units are not acquired by the Members, the Company shall be free to issue such new Units to any Person; provided, that (i) the price per new Unit at which such new Units are being issued to and purchased by such Person is equal to or greater than the New Units Purchase Price and (ii) the other terms and conditions pursuant to which such Person purchases such new Units are substantially equivalent to the terms set forth in the Preemptive Notice.  Any new Units not issued or sold within one hundred twenty (120) days after the date of the Preemptive Notice shall again be subject to the provisions of this **Section 4.6**.

**4.7**     **Units**.

(a)    The Units may be (but shall not be required to be) represented by a certificate in such form as the Managing Member may determine.  The Company shall issue additional Units (including fractional Units) to the extent provided in **Section 4.2**.  In addition, subject to **Section 4.6** and **Section 7.1(c)**, the Company may issue additional Units (including fractional Units) to the existing Members or to new Members.  The Managing Member shall from time to time attach to this Agreement a revised **Exhibit A** (and provide copies thereof to all Members) setting forth the names and addresses of the Members, the number of Units held by each of them, their Capital Contributions, and the Percentage Interests that apply to the Members.

(b)    Except as otherwise provided herein, (i) the Members shall be entitled to one (1) vote per Unit for all matters of the Company that require the vote or approval of the Members under this Agreement or the Act, and (ii) any decision that requires the approval of the Members hereunder or under the Act shall require the prior approval of Members holding not less than a majority of the Percentage Interests.

## ARTICLE V
## ALLOCATION OF PROFITS AND LOSSES

**5.1    Allocation of Net Profit and Net Loss**.  Except as otherwise provided in this Agreement, Net Profit and Net Loss of the Company shall be allocated between the Members in a manner such that, after giving effect to the special allocations set forth in **Sections 5.3**, **5.4** and **5.5**, the Capital Account of each Member, immediately after making such allocation, is, as nearly as possible, equal (proportionately) to (a) the distributions that would be made to such Members pursuant to **Section 6.1(a)(iii)-(iv)** if the Company were dissolved, its affairs wound up and its assets sold for cash equal to their Book Value, all Company liabilities were satisfied (limited with respect to each nonrecourse liability to the Book Value of the assets securing such liability), and the net assets of the Company were distributed in accordance with **Section 6.1(a)(iii)-(iv)** to the Members immediately after making such allocation, *minus* (b) such Member's share of Company Minimum Gain and Member Nonrecourse Debt Minimum Gain, computed immediately prior to the hypothetical sale of assets.

**5.2    Allocations of Net Profit or Net Loss for the Taxable Year of Liquidation of the Company**.  Notwithstanding the other provisions of this **Article V** (other than **Section 5.8** but after application of **Sections 5.4** and **5.5**), the Net Profit (or items of Net Profit) or Net Loss (or items of Net Loss) of the Company for the taxable year of liquidation of the Company shall be allocated (and such allocations shall be taken into account in determining the final liquidating distributions of the Company), to the extent possible, in a manner such that the Capital Account of each Member immediately prior to the final liquidating distribution is equal to the amount that would be distributable to such Member under **Section 9.2(b)**.

**5.3    Limitation on Allocation of Net Loss**.  Notwithstanding the provisions of **Section 5.1**, if the amount of Net Loss for any Adjustment Period that would otherwise be allocated to a Member under **Section 5.1** would cause or increase an Adjusted Capital Account Deficit of such Member as of the last day of such Adjustment Period, then a proportionate part of such Net Loss, equal to such excess shall be allocated to the other Members (except to the extent such allocation would cause the other Members to have an Adjusted Capital Account Deficit), and the remainder of such Net Loss, if any, shall be allocated to such Member.

**5.4**    **Special Allocations**.   The following special allocations shall be made in the following order before allocations of Net Profit or Net Loss are made:

(a)    **Minimum Gain Chargeback**.  Notwithstanding any other provision of this Agreement to the contrary, if in any Adjustment Period there is a net decrease in Company Minimum Gain, then each Member shall first be allocated items of Gross Income for such Adjustment Period (and, if necessary, subsequent Adjustment Periods) in an amount equal to the portion of such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Section 1.704-2(g) of the Regulations, that is attributable to the disposition of Company property subject to one or more nonrecourse liabilities of the Company that are not Member Nonrecourse Debts; provided, however, if there is insufficient Gross Income in an Adjustment Period to make that allocation for all Members for such Adjustment Period, Gross Income shall be allocated between the Members in proportion to the respective amounts they would have been allocated had there been an unlimited amount of Gross Income for such Adjustment Period.

(b)    **Minimum Gain Chargeback for Member Nonrecourse Debt**. Notwithstanding any other provision of this Agreement to the contrary other than **Section 5.4(a)**, if in any Adjustment Period there is a net decrease in Member Nonrecourse Debt Minimum Gain, then each Member shall first be allocated items of Gross Income for such Adjustment Period (and, if necessary, subsequent Adjustment Periods) in an amount equal to the portion of such Member's share of the net decrease in such Member Nonrecourse Debt Minimum Gain during such Adjustment Period (as determined in accordance with Section 1.704-2(i) of the Regulations) attributable to the disposition of Company property subject to one or more Member Nonrecourse Debts; provided, however, that if there is insufficient Gross Income in an Adjustment Period to make that allocation for all Members for such year, Gross Income shall be allocated among the Members in proportion to the respective amounts they would have been allocated had there been an unlimited amount of Gross Income for such Adjustment Period.

(c)    **Qualified Income Offset**.  After application of **Sections 5.4(a)** and **5.4(b)**, if in any taxable year a Member unexpectedly receives any adjustment, allocation or distribution described in Sections 1.704-1(b)(2)(ii)(d)(4), (5) or (6) of the Regulations, and if the Member has an Adjusted Capital Account Deficit, items of Gross Income shall be allocated to the Member in the amount and in the manner sufficient to eliminate such Adjusted Capital Account Deficit as quickly as possible; provided, however, that an allocation pursuant to this **Section 5.4(c)** shall be made only if and to the extent that the Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this **Article V** have been tentatively made as if this **Section 5.4(c)** were not in this Agreement.

(d)    **Gross Income Allocation**.  If a Member has an Adjusted Capital Account Deficit at the end of any Adjustment Period, items of Gross Income shall be allocated to the Member in the amount and in the manner sufficient to eliminate such deficit as quickly as possible; provided, however, that an allocation under this **Section 5.4(d)** shall be made only if and to the extent that the Member would have an Adjusted Capital Account Deficit in excess of such sum after all other allocations provided for in **Sections 5.1** through **5.4** have been tentatively made as if **Section 5.4(c)** and this **Section 5.4(d)** were not in this Agreement.

(e)     **Company Nonrecourse Deductions**.  Company Nonrecourse Deductions for any Adjustment Period shall be allocated among the Members in proportion to their respective Percentage Interests.

(f)     **Member Nonrecourse Deductions**.  Member Nonrecourse Deductions for any Adjustment Period or other period shall be allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable.

(g)     **Section 754 Adjustment**.  To the extent an adjustment to the adjusted tax basis of any Company asset, pursuant to Section 734(b) or 743(b) of the Code, is required, pursuant to Sections 1.704-1(b)(2)(iv)(m)(2) or 1.704-1(b)(2)(iv)(m)(4) of the Regulations, to be taken into account in determining Capital Accounts as a result of a distribution to a Member in complete liquidation of its Interest, the amount of such adjustment to Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such Section of the Regulations.

**5.5**     **Curative Allocations**.  If any Gross Income, Net Profit (or items of Net Profit), or Net Loss (or items of Net Loss) are allocated pursuant to **Sections 5.3** or **5.4**, subsequent Gross Income, Net Profit (or items of Net Profit), or Net Loss (or items of Net Loss) shall first be allocated (subject to **Sections 5.3** and **5.4**) to the Members in a manner that will result in each Member having a Capital Account balance equal to that which would have resulted if the original allocation of Gross Income, Net Profit (or items of Net Profit), Net Loss (or items of Net Loss) or deductions pursuant to **Sections 5.3** or **5.4** had not occurred; provided, however, that no allocations pursuant to this **Section 5.5** that are intended to offset allocations pursuant to **Sections 5.4(a)** or **5.4(b)** shall be made prior to the taxable year during which there is a net decrease in Member Nonrecourse Debt Minimum Gain or Company Minimum Gain, and then only to the extent necessary to avoid any potential economic distortions caused by such net decrease in Member Nonrecourse Debt Minimum Gain or Company Minimum Gain, and no such allocation pursuant to this **Section 5.5** shall be made to the extent that the Managing Member reasonably determines that it is likely to duplicate a subsequent mandatory allocation pursuant to **Section 5.4(a)** or **5.4(b)**.

**5.6**     **Tax Allocations – Code Section 704(c).**

(a)     Except as provided in subsections (b) and (c) of this **Section 5.6** or as otherwise required by the Code or Regulations, solely for federal income tax purposes, items of taxable income, gain, loss and deduction of the Company for each Adjustment Period shall be allocated among the Members in the same manner as each correlative item of income, gain, loss and deduction, as determined for Capital Account purposes, is allocated pursuant to **Sections 5.1** through **5.5**.

(b)     In accordance with Section 704(c) of the Code and the related Regulations, income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall be allocated, solely for tax purposes, among the Members so as to take account of any variation between the adjusted basis to the Company of the property for federal income tax purposes and the initial Book Value of the property.  Any elections or other decisions relating to

allocations under this **Section 5.6** shall be made in any reasonable manner permitted by the Regulations as determined by the Managing Member, including the "remedial allocation method" pursuant to Section 1.704-3(d) of the Regulations.

(c)     If the Book Value of any asset of the Company is adjusted pursuant to paragraph (b) of the definition of Book Value, subsequent allocations of income, gain, loss and deduction for tax purposes with respect to such asset shall take account of any variation between the Book Value of such asset immediately prior to such adjustment and the Book Value of such asset immediately after such adjustment, in the same manner as under Section 704(c) of the Code and the applicable Regulations.

**5.7     Other Allocation Rules**.  For purposes of determining the Net Profit, Net Loss, or any other item allocable to any period, Net Profit, Net Loss, and any such other item shall be determined on a daily, monthly, or other basis, as determined by the Managing Member using any permissible method under Section 706 of the Code and the related Regulations.

**5.8     Compliance with Code Section 704(b)**.  It is the intent of the Members that the allocations of Net Profit, Net Loss and portions of such items are in accordance with the "partners'" (*i.e.*, the Members) interests in the partnership (*i.e.*, the Company) within the meaning of Section 704 of the Code and the Regulations or similar authority promulgated under the Code or Regulations.  The allocations set forth in this Agreement shall be interpreted consistently with such intent, and shall be amended by the Managing Member, if necessary, in order to accomplish this purpose.

**5.9     Tax Withholding**.  If the Company is required by applicable law to pay any tax that is specifically attributable to a Member (or the status of a Member), including federal or state withholding taxes, federal or state taxes imposed pursuant to the BBA, state personal property taxes, and state unincorporated business taxes), then such Member shall indemnify and reimburse the Company the amount of such tax (including any interest or penalties).  The Company may offset distributions under **Section 6.1** to any Member that it is otherwise entitled to receive under this Agreement against such Member's obligation and such offset amounts shall be treated as distributed for all purposes of this Agreement.  A Member's obligation to indemnify and make contributions to the Company under this provision shall survive the Member Transferring its Units in the Company and the termination, dissolution, liquidation or winding up of the Company.  The Company may pursue remedies against any Member, including instituting a lawsuit to collect such indemnification and contribution with interest so long as such amount remains unpaid.  Any contributions made pursuant to this **Section 5.9** shall increase the Member's Capital Account, but shall not be treated as a Capital Contribution for purposes of this Agreement.

**ARTICLE VI**
**DISTRIBUTIONS**

**6.1     Cash Available for Distribution**.

(a)     Subject to **Section 9.2**, the Company shall distribute Cash Available for Distribution at such times and in such amounts as the Members shall determine, such distributions to be made to the Members in the following order of priority:

(i)      First, to the payment of accrued and unpaid interest on any advances or loans made by the Members or their Affiliates to the Company, pro rata in the ratio of the accrued but unpaid interest;

(ii)      Second, to the payment of principal on any advances or loans made by the Members or their Affiliates to the Company, pro rata in the ratio of the outstanding balances of such advances or loans;

(iii)      Third, to Members with Unreturned Capital, in proportion to the respective amounts of their Unreturned Capital, until the Unreturned Capital of all of the Members is reduced to zero; and

(iv)      Fourth, to all of the Members in proportion to their Percentage Interests.

**6.2      Tax Distributions**.  The Company may, prior to making any distributions under (or by reference to) the above provisions, advance to each Member an amount equal to (i) that portion of the Company's net taxable income allocated to such Member for such taxable period multiplied by (ii) the sum of (A) the highest federal income tax rate, and (B) if applicable, the highest state and local income tax rates in effect for such taxable period (including any surtax rates), less (iii) the amount of any distributions to such Member previously made by the Company with respect to such taxable period; provided, however, that these distributions to the Members shall not exceed the Cash Available for Distribution.  For the sake of clarification, such earlier advance to a Member shall be deemed an advance of and netted against the next distributions due to such Member under (or by reference to) **Section 6.1(a)(iv)**.

## ARTICLE VII
## MANAGEMENT

**7.1      Management of the Company**.

(a)      **General**. The Company shall be a "member-managed" limited liability company for purposes of the Act.  Except as otherwise provided herein, the Managing Member of the Company, at times acting through the officers, if any, of the Company, shall (i) manage all business and affairs of the Company, (ii) exercise the authority and powers granted to the Company, and (iii) otherwise act in all other matters on behalf of the Company, including the power to elect and appoint officers of the Company, to grant general or limited authority to officers, employees, and agents of the Company, to sign, on behalf of the Company, deeds, mortgages, bonds, contracts or other instruments and, in general, the power to perform all duties pertaining to the conduct of the business of the Company.

(b)      **Decisions Requiring Majority Approval**.  Notwithstanding anything herein to the contrary, no Member (including the Managing Member), officer, employee or agent of the Company shall be authorized to take or effect on behalf of the Company, or cause or commit the Company to take or effect, any of the actions set forth on **Exhibit B** attached hereto without a Majority Vote of the Members.

(c)      **Decisions Requiring Unanimous Approval**.  Notwithstanding anything herein to the contrary, no Member (including the Managing Member), officer, employee or agent

of the Company shall be authorized to take or effect on behalf of the Company, or cause or commit the Company to take or effect, any of the actions set forth on **Exhibit C** without the unanimous approval of Interests representing all of the Interests then held by the Members entitled to vote thereon.

(d) **Action by Members Without a Meeting**.  Any action permitted or required by the Act or this Agreement to be taken by the Members may be taken without a meeting if a consent in writing, setting forth the action taken, is thereafter signed by the requisite number of Members.

**7.2** **Officers**.

(a) **Appointment of Officers; Removal; Vacancies**.  At any time and from time to time, the Managing Member may appoint officers, agents or other delegates of the Company, with such powers, authority and responsibilities as the Managing Member delegates to them.  Any officer, agent or other delegate of the Company may be removed at any time, with or without cause, by the Managing Member.  Any vacancy occurring in any office of the Company may be filled by the Managing Member and shall remain vacant until filled by the Managing Member.

(b) **Duties of Officers Generally**.  The Officers, in the performance of their duties as such, shall owe to the Company duties of loyalty and due care of the type owed by the officers of a corporation to such corporation and its equity holders under the laws of the State of Delaware.

**7.3** **Authority to Bind the Company**.  Except as authorized in writing by the Managing Member or approved by a Majority Vote of the Members, none of the non-managing Members shall have the authority to act for or bind the Company.

**7.4** **Liability of Managing Member**.  The Managing Member shall, in no way, be deemed to guarantee the return of the Members' Capital Contributions or a profit for the Members from the operations of the Company, and the Managing Member shall not be liable to the Company or to any Member, or to any successor, assignee, or transferee of the Company or of any Member, for any losses or damages sustained by the Company or any Member, unless the loss or damage shall have been the result of fraud, deceit, gross negligence, willful misconduct or unlawful acts by the Managing Member.

**7.5** **Compensation of Managing Member**.  The Company shall promptly reimburse the Managing Member for any and all out-of-pocket, documented costs and expenses reasonably incurred by the Managing Member in connection with the business of the Company.  Except as expressly provided in this **Section 7.5**, unless approved by the Members, no Member or Managing Member, nor any Affiliate of any of the foregoing Persons shall be entitled to be paid or reimbursed by the Company for any of their operating or overhead expenses, nor shall any of the foregoing Persons be entitled to receive any fees, commissions, compensation or other amounts on account of the business conducted by the Company.

**7.6** **Indemnification**.

(a)  **General Provisions**.  Except as otherwise set forth herein, the Members, officers, employees, agents and representatives of the Company and the Partnership Representative (each herein referred to as an "**Indemnitee**") shall be indemnified, held harmless and defended by the Company against any claim and/or liability incurred by or imposed upon the Indemnitee in connection with any action to which the Indemnitee may be a party by reason of any action or omission of the Indemnitee in connection with the conduct of Company affairs.  The indemnification set forth herein shall not extend to actions or omissions of the Indemnitee (or its employee) which shall have been finally adjudicated (by settlement or otherwise) in any such action, suit or proceeding to have constituted fraud, willful misconduct or gross negligence.  In the event of settlement of any action, suit or proceeding brought or threatened, such indemnification shall apply to all matters covered by the settlement.  The foregoing right of indemnification shall be in addition to any rights to which any Indemnitee may otherwise be entitled and shall inure to the benefit of the executors, administrators, personal representatives, successors or assigns of each such Indemnitee.  Any indemnification hereunder is to be made only out of the assets of the Company and no Member shall have any personal liability on account of such indemnification.

(b)  **Advance Payment of Expenses**.  The Company shall pay the expenses incurred by an Indemnitee in defending a civil or criminal action, suit or proceeding, or in investigating or opposing any claim arising in connection with any potential or threatened civil or criminal action, suit or proceeding as incurred and in advance of the final disposition of such action, suit or proceeding, upon receipt of an undertaking by such Indemnitee to repay such payment if such Indemnitee shall be determined to be not entitled to indemnification therefor as provided herein, provided, however, that in such instance the Indemnitee is not commencing an action, suit, or proceeding against the Company, or defending an action, suit or proceeding commenced against such Indemnitee by the Company or any Member thereof or opposing a claim by the Company or any Member thereof arising in connection with any such potential or threatened action, suit or proceeding.

(c)  **Insurance**.

(i)  The Company may purchase and maintain insurance, provided that it is reasonably available and the premiums for same are not unreasonably high, with such limits or coverages as the Managing Member deems appropriate, at the expense of the Company and to the extent available, for the protection of (A) any Company asset, and/or (B) any Indemnitee against any liability incurred by such Indemnitee in any such capacity or arising out of such Indemnitee's status as such, whether or not the Company has the power to indemnify such Indemnitee against such liability.  The Company may purchase and maintain insurance for the protection of any officer, director, employee, consultant or other agent of any other organization in which the Company owns an interest or of which the Company is a creditor against similar liabilities, whether or not the Company has the power to indemnify him or it against such liabilities.  The Company shall, for its own benefit, maintain key person life and disability insurance covering Kayla Marie McNeill.  Ms. McNeill shall cooperate with the Company and provide such information or other assistance as the Company may reasonably request in connection with the Company obtaining and maintaining such key person life and disability insurance.

(ii)  Any amounts payable by the Company to an Indemnitee hereunder shall be payable first from the proceeds of any insurance recovery pursuant to policies purchased by the Company and then from the other assets of the Company, provided that the foregoing shall

not affect the Company's obligation to advance expenses hereunder in circumstances in which the insurance company who has issued such policy will not advance such expenses.

### ARTICLE VIII
### TRANSFERS

**8.1**   **General**.

(a)   Except as expressly provided in this **Article VIII**, (i) no Member may Transfer any or all of such Member's Units or any Interest therein, and (ii) a Member may Transfer its Units or any Interest therein only to a Person that has been approved in advance by the Members as a Substitute Member.  The Members' approval of a Transferee becoming a Substitute Member may be premised on such conditions as the Members may in their sole discretion deem appropriate.

(b)   All Transfers permitted pursuant to this Agreement, including any Permitted Transfer, shall be subject to the provisions of **Section 8.4** and each Transferee in all cases shall be subject to **Section 8.6(b)** until such time, if any, as the Transferee becomes a Substitute Member in accordance with **Section 8.6(a)**.

**8.2**   **Permitted Transfers**.

(a)   The restriction on Transfers set forth in **Section 8.1(a)** shall not apply to the following (each, a "**Permitted Transfer**" and any Transferee pursuant to clauses (i) and (ii) of this **Section 8.2(a)** is referred to herein as a "**Permitted Transferee**"):

(i)   any Transfer upon the death of an individual Member to such Member's executors or administrators or legal successors, including without limitation trustee(s); or

(ii)   any Transfer by a Member (A) to an Affiliate of such Member, or (B) to another Member.

(b)   The subsequent Transfer of any or all of Units that are owned by a Permitted Transferee shall be subject to the same restrictions of this **Article VIII** in the same manner as if such Units were still owned by the Member from whom such Permitted Transferee acquired such Units; and for this purpose references herein to a Transfer by a Member (or a specific Member) shall include any Transfer by the Permitted Transferee(s) that acquired all or part of such Member's Units.

**8.3**   **Right of First Refusal**.

(a)   **Offer Notice**.  If the Feldman Member and/or the McNeill Member receive from a non-affiliated third party an unsolicited bona fide written offer to Transfer all, but not less than all, of their Interests (the "**Offered Interests**") for a consideration consisting solely of cash (an "**Offer**"), and such Member(s) (the "**Seller**") desires to Transfer such Interests to such third party (the "**Buyer**") in accordance with the Offer, then the Seller shall provide the Falic Members with written notice of such Offer (the "**Offer Notice**").  The Offer Notice shall set forth the identity of the Buyer, the cash price at which a Transfer is proposed to be made (the "**Offer Price**"), and all other material terms and conditions of the Offer.  The Offer must (i) constitute a legally binding

offer of the Buyer to purchase the Offered Interests for a consideration consisting solely of cash, and (ii) contain an acknowledgment by the Buyer that the Buyer will be obligated to become a party to this Agreement as a condition to the Buyer's purchase of the Offered Interests pursuant to the Offer.

(b)     **Notice of Acceptance**.  The receipt of an Offer Notice by the Falic Members from the Seller shall constitute an irrevocable offer by the Seller to sell to the Falic Members the Offered Interests at the Offer Price.  Thereafter, the Falic Members shall have the right and option, which shall be non-assignable except to the Company, for a period of forty-five (45) days after receipt of the Offer Notice to purchase their pro rata portion of all, but not less than all, of the Offered Interests at the price and upon the terms and conditions specified in the Offer.  If a Falic Member desires to exercise its option, then it shall give notice (the "**Notice of Acceptance**") to that effect to the Seller with a copy to the Managing Member within forty-five (45) days after receipt of the Offer Notice.

(c)     **Non-Participating Falic Member(s)**.  In the event that not all of the Falic Members elect to purchase their pro rata portion of the Offered Interests (the "**Non-Participating Falic Member(s)**") in accordance with **Section 8.3(b)** within the time period set forth therein, then the Seller shall promptly provide the other Falic Member(s) with a written notice ("**Second Offer Notice**"), which notice shall set forth the portion of the Offered Interests not purchased by the Non-Participating Falic Member(s) (the "**Non-Participating Falic Member's Offered Interests**"), and shall offer such other Falic Member(s) the right and option, which shall be non-assignable except to the Company, for a period of forty-five (45) days after receipt of the Second Offer Notice, to purchase its pro rata portion of all, but not less than all, of the Non-Participating Falic Member's Offered Interests at the price and upon the terms and conditions specified in the Offer.  If a Falic Member (other than the Non-Participating Falic Member(s)) desires to exercise its option, then it shall provide a second Notice of Acceptance to that effect to the Seller with a copy to the Managing Member within forty-five (45) days after receipt of the Second Offer Notice.

(d)     **Purchase and Sale of Offered Interests**.  The consummation of any purchase and sale to the Falic Member(s) (the "**Closing**") shall take place at the offices of the Company within sixty (60) days after receipt by the Falic Members of the Offer Notice, or the Second Offer Notice (if applicable).  At the Closing, the Falic Member(s) shall purchase from the Seller, and the Seller shall sell to the applicable Falic Member(s), the Offered Interests, respectively, free and clear of all liens and encumbrances of any kind or nature.  The price to be paid by the Falic Member(s) shall be an amount equal to the Offer Price and shall be payable in accordance with the terms of the Offer.  At the Closing, if the Interests are certificated, the Seller shall deliver to the applicable Falic Member(s) certificates evidencing the Offered Interests purchased and sold, duly endorsed for transfer to such Falic Member, and such Falic Member(s) shall deliver to the Seller the Offer Price.

(e)     **Transfer to Third Party**.  If all of the Offered Interests are not purchased pursuant to the terms of this **Section 8.3** by the Falic Members, then the Seller shall thereafter have the right to Transfer the Offered Interests to the Buyer, so long as the Offered Interests are Transferred by the Seller to the Buyer strictly in accordance with the terms of the Offer and in compliance with applicable laws within thirty (30) days after the expiration of the forty-five (45) day offering period during which the Falic Member(s) may deliver a Notice of Acceptance.  If the Offered Interest is not Transferred to the Buyer within the thirty (30) days permitted by this **Section**

**8.3(e)**, then the Offered Interests shall not be Transferred without again complying with the restrictions set forth in this **Section 8.3**.

      8.4    **Drag-Along Right**.

      (a)    If Members owning eighty percent (80%) or more of all of the Interests (collectively, the "**Transferring Members**") elect to Transfer all of their respective Interests pursuant to a bona fide third party offer, then, at least twenty (20) days prior to the date upon which they intend to consummate such Transfer, the Transferring Members shall give written notice thereof (including, among other things, the material terms thereof) to the other Member(s) (the "**Drag-Along Member**") and such notice may also include notice to the Drag-Along Member that the Transferring Members desire that the Drag-Along Member Transfer all of their Interests on the same terms and conditions (other than price, which shall be determined in accordance with **Section 8.4(b)**) upon which the Transferring Members are Transferring their Interests. The Drag-Along Member shall, subject to the provisions of this **Section 8.4(a)** and in accordance with **Section 8.4(c)**, consent to and raise no objections against such Transfer by the Transferring Members and, if requested to do so by the Transferring Members, Transfer all of their Interests, subject to the provisions of this **Section 8.4(a)** and in accordance with **Section 8.4(c)**, on the same terms and conditions (other than price, which shall be determined in accordance with **Section 8.4(b)**) upon which the Transferring Members are Transferring their Interests (including, without limitation, with respect to representations, warranties and indemnification; provided, however, that any representations and warranties relating to any specific Members or any specific Interests shall only be made by the applicable Members and any indemnification provided by such Members with respect thereto shall be by each such Member severally and not jointly with other Members).

      (b)    The purchase price paid by a bona fide third party purchaser to the Transferring Members and the Drag-Along Member in connection with the consummation of a Transfer contemplated by **Section 8.4(a)** shall be allocated among the Transferring Members and the Drag-Along Member in the same proportion as such Transferring Members and Drag-Along Member would be entitled if the amount of such purchase price was distributed to them by the Company in accordance with **Article VI** with respect to their respective Interests included in such Transfer.  Each of the Transferring Members and the Drag-Along Member acknowledges and agrees that the amount of the purchase price to which such Member is entitled from the consummation of a Transfer contemplated by **Section 8.4(a)** shall be determined in accordance with the preceding sentence.

      (c)    All of the Members shall take all necessary and desirable actions in connection with the consummation of the Transfer contemplated by **Section 8.4(a)**, which shall include, without limitation, (i) voting in favor of such Transfer, (ii) waiving any appraisal or similar rights with respect to such Transfer and (iii) executing and delivering any agreements, documents and instruments reasonably necessary in connection with such Transfer.

      (d)    Each Member will bear its pro rata share (based upon such Member's pro rata share of the aggregate net proceeds resulting from such Transfer) of any reasonable costs incurred by or on behalf of the Company in connection with such Transfer to the extent such costs are not otherwise paid by the Company or the acquiring party.  Costs incurred by any Member on its own behalf in connection with such Transfer shall not be considered costs of the Company in connection with such Transfer.

**8.5**     **Company's Repurchase Option upon Termination of Employment of an Executive**.

(a)     Subject to the other express provisions of any other agreements with the Company (including any employment agreement) to which an Executive may be subject (which such agreement shall govern in the event of any inconsistency herewith), upon the termination of employment of any Executive, the Company may elect to purchase all or any portion of the Units held by such Executive or his or her Permitted Transferees (the "**Executive Units**") at a purchase price per Unit equal to its Fair Market Value or, in the case of unvested Units, a purchase price equal to the lesser of such Unit's Fair Market Value and the amount originally paid for such Unit by the initial holder thereof, by delivering a written notice of such election to such Executive within one hundred eighty (180) days after the termination of employment; provided that upon termination for Cause, the purchase price for all Units shall be the lesser of such Unit's Fair Market Value and the amount originally paid for such Unit by the initial holder thereof. If the Company elects to purchase less than all of the Executive Units, the Company shall deliver written notice thereof to each Member (other than a Member that is beneficially owned by such Executive) and such Members may elect to purchase all or any portion of the Executive Units not subject to the election of the Company upon the same terms and conditions within one hundred eighty (180) days of the termination of employment. If more than one of such Members elects to purchase the Executive Units, such Executive Units shall be allocated among those Members in an amount equal to the lesser of (i) the maximum amount requested by each such Member and (ii) such Member's pro rata portion of such Executive Units (with such procedure being repeated until either all Executive Units requested to be purchased by Members have been so allocated or no Executive Units remain available for purchase). The applicable Members and/or the Company will be given up to sixty (60) days following the date of such election to consummate such purchase and sale. If a Member elects to purchase any Units pursuant to this **Section 8.5(a)**, the purchase price with respect to such Units shall be payable in cash or such other form of consideration agreed to by the parties.

(b)     Notwithstanding anything herein to the contrary, all repurchases of Executive Units shall be subject to applicable restrictions contained in the Act and the Company's debt financing agreements, if any. In the event that any such restrictions prohibit the repurchase of Executive Units that the Company is otherwise entitled to make, the Company shall be entitled, by delivery of written notice to the applicable Executive within one hundred eighty (180) days after termination of employment, to defer such rights until all such restrictions have ceased, in which event the provisions of **Section 8.5(a)** shall become effective as though termination of employment occurred on the date of such cessation (except that the actual date of termination will continue to apply to the determination of the number of unvested Units which have become vested Units, and no further vesting shall occur by reason of such deferral).

**8.6**     **Substitute Members**.

(a)     No Transferee of any Units (including a Permitted Transferee) shall become a Substitute Member in place of the Transferor of such Units unless and until: (i) the Transferor has stated such intention in a written instrument of assignment; (ii) the Transferee has executed an instrument agreeing to be bound by the terms and conditions of this Agreement; and (iii) the Transferor or Transferee has paid all reasonable expenses of the Company in connection with the admission of the Transferee as a Substitute Member. Upon satisfaction of all of the foregoing

conditions with respect to a particular Transferee, this Agreement (including **Exhibit A** attached hereto) shall be duly amended by the Managing Member to reflect the admission of the transferee as a Substitute Member.

        (b)    Unless and until admitted as a Substitute Member pursuant to **Section 8.6(a)**, a Transferee of a Member's Units shall not be entitled to exercise any rights of a Member of the Company or to receive distributions hereunder.  A Transferee who has become a Substitute Member shall have, to the extent of the Interest Transferred to it, all the rights and powers of the Transferring Member, as applicable, for which it is substituted and shall be subject to the restrictions and liabilities of the Member from which the Interest was Transferred, as applicable, under this Agreement and the Act.

       **8.7**    **Additional Members**.  A Person may be admitted to the Company as an Additional Member only as contemplated under **Section 4.7** and only upon furnishing to the Company (a) an executed instrument agreeing to be bound by the terms and conditions of this Agreement (including the power of attorney granted in **Section 12.5**), in form satisfactory to the Managing Member and (b) such other documents or instruments as may be deemed necessary or appropriate by the Managing Member to effect such Person's admission as a Member.  Such admission shall become effective on the date on which the Managing Member determines that such conditions have been satisfied and when any such admission is shown on the books and records of the Company.  The Managing Member shall classify each Additional Member as an Executive, but solely to the extent such classification is applicable to such Additional Member and, upon such classification, such Additional Member shall for all purposes be an Executive under this Agreement.

       **8.8**    **Improper Transfer**.  Any direct or indirect offer to Transfer, or any attempted or purported Transfer of, any Units in violation of this Agreement shall be void *ab initio*; and the Company shall reject and refuse to transfer on its books any Units which are purported to have been transferred otherwise than in compliance with the provisions of this Agreement.  The Company shall not recognize any Person receiving any Units as a member of the Company, nor shall any Person have any rights as a member of the Company, unless the Transfer of Units to such Person shall have been made pursuant to the terms of this Agreement.

**ARTICLE IX**
**DISSOLUTION AND WINDING UP OF THE COMPANY**

       **9.1**    **Dissolution of the Company**.  The Company shall be dissolved upon the first to occur of any of the following events:

        (a)    Majority Vote of the Members;

        (b)    An order by a court of competent jurisdiction decrees that the Company be dissolved; or

        (c)    The cessation of business by the Company.

       **9.2**    **Winding Up of the Company**.  The Members shall continue to share distributions and allocations of profits and losses during the period of liquidation in accordance with **Article V**.  Any gain or loss realized by the Company upon the sale of property shall be deemed recognized

and allocated to the Members in the manner set forth in **Article V**.  Upon a dissolution of the Company, the Managing Member shall take full account of the Company's assets and liabilities and the assets shall be liquidated as promptly as is consistent with obtaining the fair market value thereof and as shall be necessary to timely make the distributions below described, and the proceeds therefrom, to the extent sufficient therefor, shall be applied and distributed in the following order:

        (a)    First, to the payment and discharge of the Company's debts and liabilities, including establishment of any necessary contingency reserves; and

        (b)    Second, to the Members, in accordance with and in the same order as described in **Section 6.1**.

## ARTICLE X
## BOOKS OF ACCOUNTS, REPORTS AND FINANCIAL STATEMENTS, FISCAL YEAR, BANKING AND PARTNERSHIP REPRESENTATIVE

    **10.1**    **Books of Account**.  The Company shall maintain at its principal place of business or such other places as the Managing Member shall determine books of account for the Company which shall show a true and accurate record of all costs and expenses incurred, all charges made, all credits made and received, and all income derived in connection with the conduct of the Company and the operation of its business in accordance with GAAP consistently applied and, to the extent inconsistent therewith, in accordance with this Agreement.  The Company shall use either the cash method or the accrual method of accounting in preparation of its annual reports and for tax purposes and shall keep its books and records accordingly.

    **10.2**    **Reports and Financial Statements**.

        (a)    The Company shall prepare and maintain books of account for the Company that shall show a true and accurate record of all costs and expenses incurred, all charges made, all credits made and received and all income derived in connection with the operation of the Company's business in accordance with GAAP, consistently applied, and, to the extent inconsistent therewith, in accordance with this Agreement.  The books of account and the records of the Company shall be examined by and reported upon as of the end of each Fiscal Year by a firm of independent certified public accountants that shall be selected by the Members (the "**Auditors**").

        (b)    The Company shall transmit to each Member, within a reasonable time after the close of each year, a Schedule K-1 indicating such Member's share of all items of income or gain, expense, loss or other deduction and tax credit of the Company for such year, and such additional information to enable the Members to complete their tax returns.

    **10.3**    **Fiscal Year**.  The Fiscal Year of the Company shall be the calendar year or such fiscal year as shall be approved by the Members.

    **10.4**    **Company Funds**.  All funds of the Company shall be deposited in its name in a separate bank account or accounts at a commercial bank as shall be determined by the Managing Member.

**10.5** **Partnership Representative**.   Jerome Falic is hereby designated as the "partnership representative" (the "**Partnership Representative**") within the meaning of amended Section 6223(a) of the Code (as amended by the BBA).  The Partnership Representative shall have the right to make on behalf of the Company any and all elections and take any and all actions that are available to be made or taken by the Partnership Representative under the Code (including an election under Section 6226 of the Code and using any procedures provided pursuant to Section 6225(c)(3) of the Code, as amended by the BBA and as the same may subsequently be amended), and the Members shall take such actions requested by the Partnership Representative consistent with any such elections made and actions taken by the Partnership Representative, including filing amended tax returns and paying any tax due in accordance with Section 6225(c)(2) of the Code as amended by the BBA, it being understood that no such amended tax return shall be filed in accordance with such section with respect to the Company without the advance written consent of the Partnership Representative in its sole discretion.  The Managing Member shall have the authority to amend this Agreement to make any changes in good faith consultation with the Company's tax accountants and tax counsel as are necessary or appropriate: (1) to reduce any Company level assessment under Section 6226 of the Code, as set forth in the BBA, (2) to determine any apportionment of any tax, including with respect to Section 6225(c)(3) of the Code, or (3) to comply with the BBA and administrative, judicial or legislative interpretations thereof or changes thereto.   Any "imputed underpayment", within the meaning of amended section 6225(a)(1) of the Code, together with interest and penalties thereon, paid by the Company with respect to a distributive share of Company items of income, deduction and the like may be recovered by the Company from the person or persons to whom such distributive share is directly or indirectly allocable, including by way of offsets against distributions, and from heirs, successors and assigns of such person or persons.  The principles of this **Section 10.5** apply with respect to similar provisions of state, local or foreign income tax law relating to partnership tax audits.

## ARTICLE XI
## REPRESENTATIONS AND WARRANTIES OF THE MEMBERS

Each Member hereby represents and warrants to the Company and each other Member, as follows:

(a)     Such Member has all necessary power and authority (as the case may be) to execute and deliver this Agreement, and to perform such Member's obligations hereunder.

(b)     This Agreement, when executed and delivered by such Member, shall constitute a valid and legally binding obligation of such Member, enforceable against such Member in accordance with its terms except: (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or other laws of general application relating to or affecting the enforcement of creditors' rights generally, or (ii) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

(c)     Such Member is an accredited investor as such term is defined in Rule 501 of Regulation D under the Securities Act of 1933, as amended (the "**Securities Act**"), and has been advised that the Units have not been registered under the Securities Act, or any state securities laws and, therefore, cannot be resold unless they are registered under the Securities Act and applicable state securities laws or unless an exemption from such registration requirements is available. Such Member is acquiring the Units to be issued to such Member hereunder for such

Member's own account for investment, not as a nominee or agent, and not with a view to, or for resale in connection with, the distribution thereof, and such Member has no present intention of selling, granting any participation in, or otherwise distributing the same. Such Member has such knowledge and experience in financial and business matters that such Member is capable of evaluating the merits and risks of an investment in the Units, is able to incur a complete loss of such investment without impairing such Member's financial condition and is able to bear the economic risk of such investment for an indefinite period of time.  With respect to the accredited investor representation only, each Member is deemed to be a director, executive officer or general partner pursuant to Rule 501(a)(4).

## ARTICLE XII
## MISCELLANEOUS

**12.1     Notices**.  All notices, consents, waivers and other communications required or permitted by this Agreement shall be in writing and shall be deemed received by a party when (a) delivered to the appropriate address by hand or by internationally recognized overnight courier service (costs prepaid), or (b) sent by email, with oral confirmation of receipt, in each case to the addresses or email address and marked to the attention of the person designated in this Agreement (or to such other address, email address or person as a party may designate by notice to the other parties).  The address for notices to the Company is 6100 Hollywood Boulevard, 7th Floor, Hollywood, Florida 33024, Attention: Jerome Falic, Bryan Feldman and David Taney, Email: jerome@falic.com, bfeldman@falicfashiongroup.com and dtaney@dutyfreeamericas.com, and the addresses for notices to the Members are set forth on **Exhibit A** hereto.

**12.2     Expenses**.  Each party shall pay all costs and expenses that it incurs with respect to the negotiation, execution, delivery and performance of the Agreement.

**12.3     Parties Bound; No Third Party Beneficiaries**.  This Agreement shall inure to the benefit of and shall be binding upon the parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto without the prior written consent of all of the other parties.  No provision of this Agreement is intended to or shall be construed to grant or confer any right to enforce this Agreement or any remedy for breach of this Agreement to or upon any Person other than the parties hereto.

**12.4     Governing Law; Jurisdiction; Venue; Service of Process; Waiver of Jury Trial; Venue; Attorneys' Fees**.

(a)     The internal laws of the State of Delaware will govern all questions concerning the relative rights of the parties hereto and all other questions concerning the construction, validity and interpretation of this Agreement, without giving effect to the application of the principles pertaining to conflicts of laws.

(b)     Each party, by its execution hereof, (i) hereby irrevocably submits to the exclusive jurisdiction of the state courts of the State of Delaware or the federal courts located in Delaware for the purpose of any suit, action or proceeding between the parties arising in whole or in part under or in connection with this Agreement, (ii) hereby waives to the extent not prohibited by applicable Law, and agrees not to assert, by way of motion, as a defense or otherwise, in any

such suit, action or proceeding, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that any such suit, action or proceeding brought in one of the above-named courts should be dismissed on grounds of *forum non conveniens*, should be transferred or removed to any court other than one of the above-named courts, or should be stayed by reason of the pendency of some other proceeding in any other court other than one of the above-named courts, or that this Agreement or the subject matter hereof may not be enforced in or by such court and (iii) hereby agrees not to commence any such suit, action or proceeding other than before one of the above-named courts. Notwithstanding the previous sentence, a party may commence a suit, action or proceeding in a court other than the above-named courts solely for the purpose of enforcing an order or judgment issued by one of the above-named courts or in connection with or related to, with regard to any party hereto, the bankruptcy, insolvency, or the enforceability of creditors' rights generally of such party.

(c)     Each party hereby (i) consents to service of process in any suit, action or proceeding between the parties arising in whole or in part under or in connection with this Agreement in any manner permitted by Delaware law, (ii) agrees that service of process made in accordance with clause (i) or made by registered or certified mail, return receipt requested, at its address specified pursuant to **Section 12.1**, will constitute good and valid service of process in any such suit, action or proceeding and (iii) waives and agrees not to assert (by way of motion, as a defense, or otherwise) in any such suit, action or proceeding any claim that service of process made in accordance with clause (i) or (ii) does not constitute good and valid service of process.

(d)     TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW THAT CANNOT BE WAIVED, THE PARTIES HEREBY WAIVE, AND COVENANT THAT THEY WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE), ANY RIGHT TO TRIAL BY JURY IN ANY SUIT, ACTION OR PROCEEDING ARISING IN WHOLE OR IN PART UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE CONTEMPLATED TRANSACTIONS, WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.  THE PARTIES AGREE THAT ANY OF THEM MAY FILE A COPY OF THIS PARAGRAPH WITH ANY COURT AS WRITTEN EVIDENCE OF THE KNOWING, VOLUNTARY AND BARGAINED-FOR AGREEMENT AMONG THE PARTIES IRREVOCABLY TO WAIVE THEIR RIGHTS TO TRIAL BY JURY IN ANY ACTION WHATSOEVER BETWEEN OR AMONG THEM RELATING TO THIS AGREEMENT OR ANY OF THE CONTEMPLATED TRANSACTIONS, WHICH ACTION WILL INSTEAD BE TRIED IN A COURT OF COMPETENT JURISDICTION BY A JUDGE SITTING WITHOUT A JURY.

(e)     Should it become necessary for one or more of the parties hereto to institute legal action to enforce the terms and conditions of this Agreement, and such legal action results in a final judgment in favor of such party(ies), the prevailing party(ies) shall be entitled to payment from the non-prevailing party(ies) of all of the reasonable attorneys' fees and related costs at all trial and appellate levels incurred by the prevailing party(ies).

**12.5**   **Power of Attorney**.  Each Member hereby constitutes and appoints the Managing Member and the liquidators, and their respective designees, with full power of substitution, as his, her or its true and lawful agent and attorney in fact, with full power and authority in his or its name,

place and stead, to execute, swear to, acknowledge, deliver, file and record in the appropriate public offices (a) all certificates and other instruments in accordance with the terms of this Agreement which the Managing Member deems appropriate or necessary to form, qualify, or continue the qualification of, the Company as a limited liability company in the State of Delaware and in all other jurisdictions in which the Company may conduct business or own property; (b) all instruments which the Managing Member deems appropriate or necessary to reflect any amendment, change, modification or restatement of this Agreement effected in accordance with **Section 12.7**; (c) all conveyances and other instruments or documents which the Managing Member and/or the liquidators deems appropriate or necessary to reflect the dissolution and liquidation of the Company pursuant to the terms of this Agreement, including a certificate of cancellation; and (d) all instruments relating to the admission, withdrawal or substitution of any Member hereunder.  The foregoing power of attorney is irrevocable and coupled with an interest, and shall survive the death, disability, incapacity, dissolution, bankruptcy, insolvency or termination of any Member and the Transfer of all or any portion of his, her or its Units and shall extend to such Member's heirs, successors, assigns and personal representatives.

**12.6**  **Entire Agreement**. This Agreement constitutes the entire understanding and agreement among the parties hereto with respect to the subject matter hereof, and supersede all prior and contemporaneous agreements and understandings, inducements or conditions, express or implied, oral or written.

**12.7**  **Amendments.** Subject to the right of the Managing Member pursuant to **Sections 8.6** and **8.7** to amend this Agreement in accordance with the terms hereof, this Agreement may be amended, modified, or waived with the written consent of the Members holding eighty-five percent (85%) of the issued and outstanding Units.  Any amendment, modification or waiver approved by such Members in accordance with the foregoing sentence shall be binding upon and effective as to each other Member; provided, however, that any amendment, modification, or waiver of this Agreement that would treat a holder or group of holders of Units in a manner differently from any other holders of Units shall also require the consent of such holder or the holders of a majority of the Units held by the group adversely treated.

**12.8**  **Remedies**.  Except as otherwise provided herein, no remedy herein conferred or reserved is intended to be exclusive of any other available remedy or remedies, and each and every remedy shall be cumulative and shall be in addition to every remedy under this Agreement or now or hereafter existing at law or in equity.

**12.9**  **Specific Performance**.  Each party hereto acknowledges and agrees that its respective remedies at law for a breach or threatened breach of any of the provisions of this Agreement would be inadequate and, in recognition of that fact, agrees that, in the event of a breach or threatened breach by a party of the provisions of this Agreement, in addition to any remedies at law, any other party shall, without posting any bond, be entitled to obtain equitable relief in the form of specific performance, a temporary restraining order, a temporary or permanent injunction or any other equitable remedy which may then be available.

**12.10**  **No Waiver**.  The failure of any party hereto to insist upon strict performance of a covenant hereunder or of any obligation hereunder or to exercise any right or remedy hereunder, regardless of how long such failure shall continue, shall not be a waiver of such party's right to

demand strict compliance therewith in the future unless such waiver is in writing and signed by the party giving the same.

**12.11   Counterparts**.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but together shall constitute the same instrument; and signatures delivered by facsimile transmission or by e-mail delivery of a ".pdf" format data file, shall be given the same legal force and effect as original signatures.

**12.12   No Effect Upon Lender Relationship**.  Notwithstanding anything herein to the contrary, nothing contained in this Agreement shall affect, limit or impair the rights and remedies of a Member in its capacity as a lender to the Company pursuant to any agreement under which the Company has borrowed money.  Without limiting the generality of the foregoing, any such Person, in exercising its rights as a lender, including making its decision on whether to foreclose on any collateral security, will have no duty to consider (a) its status or the status of any of its Affiliates as a direct or indirect Member or equityholder of the Company, (b) the interests of the Company or (c) any duty it may have to any other direct or indirect Member or equityholder of the Company, except as may be required under the applicable loan documents or by commercial law applicable to creditors generally.

*[Signature Page Follows]*

**IN WITNESS WHEREOF**, the undersigned have executed this Amended and Restated Limited Liability Company Operating Agreement of Head Kandy LLC as of the Effective Date.


**COMPANY:**

**HEAD KANDY LLC**


By:_____
     Name: Jerome Falic
     Title: Authorized Representative

**MEMBERS:**

_____
Jerome Falic

_____
Simon Falic

_____
Leon Falic

_[Signature Page to Amended and Restated Limited Liability Company Operating Agreement]_

_____

Bryan Feldman

_____

Kayla Marie McNeill

*[Signature Page to Amended and Restated Limited Liability Company Operating Agreement]*

## Exhibit A

## MEMBERS, ADDRESSES, CAPITAL CONTRIBUTIONS, NUMBER OF UNITS AND PERCENTAGE INTERESTS

| Name and Address | Capital Contribution | Number of Units | Percentage Interest |
|---|---|---|---|
| Jerome Falic<br><br>6100 Hollywood Blvd., 7th Floor<br>Hollywood, Florida 33024<br>Attn: Jerome Falic<br>Email: jerome@falic.com | $929,569.36 | 20 | 20.00% |
| Simon Falic<br><br>6100 Hollywood Blvd., 7th Floor<br>Hollywood, Florida 33024<br>Attn: Simon Falic<br>Email: simon@falic.com | $929,569.35 | 20 | 20.00% |
| Leon Falic<br><br>6100 Hollywood Blvd., 7th Floor<br>Hollywood, Florida 33024<br>Attn: Leon Falic<br>Email: leon@falic.com | $929,569.35 | 20 | 20.00% |
| Bryan Feldman<br><br>6100 Hollywood Blvd., 7th Floor<br>Hollywood, Florida 33024<br>Attn: Bryan Feldman<br>Email:<br>bfeldman@falicfashiongroup.com | $929,569.36 | 20 | 20.00% |
| Kayla Marie McNeill<br>P.O Box 3<br>Poncha Springs, Colorado 81242<br>Attention: Kayla Marie McNeill<br>Email: kayla@headkandypro.com | $929,569.35 | 20 | 20.00% |
| **Totals** | $4,647,846.77 | 100 | **100.00%** |

## **Exhibit B**

## **MATTERS REQUIRING MAJORITY MEMBER APPROVAL**

1. Approve any Capital Call.

2. Sell or dispose of all or any substantial part of the Company's business or assets, or enter into a merger, consolidation or other business combination transaction involving the Company.

3. Cause the Company to (i) institute any proceeding to adjudicate the Company bankrupt; (ii) consent to the filing of any bankruptcy proceeding against the Company; (iii) file any petition or answer or consent or proceeding seeking the Company's liquidation or reorganization or relief from debtors under the United States bankruptcy laws or any other similar applicable federal or state law, or consent to the filing of any such petition against the Company; (iv) consent to the appointment of a receiver or liquidator or trustee or assignee in bankruptcy or insolvency over the Company or its property; (v) make an assignment for the benefit of its creditors; or (vi) admit its inability to pay its debts generally as they become due.

4. Dissolve or liquidate the company.

5. Determine not to dissolve the Company upon a sale of all or substantially all the Company's assets.

## <u>Exhibit C</u>

## <u>MATTERS REQUIRING UNANIMOUS MEMBER APPROVAL</u>

1.     Issue or sell any new Units, or grant or enter into a Contract to grant any option, pledge or other encumbrance over new Units of the Company.

2.     Change the tax status or entity classification of the Company or change the form of entity structure of the Company.

3.     Adopt or amend any equity incentive plan and approve any grants made under such plans.

4.     Capital calls under **Section 4.2**.

**EXHIBIT D**
**EMPLOYMENT AGREEMENT**

See attached.

<u>**EXECUTIVE EMPLOYMENT AGREEMENT**</u>

This **EXECUTIVE EMPLOYMENT AGREEMENT** (this "<u>**Agreement**</u>") dated as of May 3, 2018 (the "<u>**Effective Date**</u>"), is by and between Head Kandy LLC, a Delaware limited liability company (the "<u>**Company**</u>"), and Kayla Marie McNeill, an individual resident of the State of Colorado (the "<u>**Executive**</u>").

<u>**WITNESSETH:**</u>

**WHEREAS**, the Executive and the Company desire to enter into this Agreement providing for the Executive's employment by the Company on the terms and conditions provided herein.

**NOW, THEREFORE**, in consideration of the mutual promises and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

<u>**AGREEMENT**</u>

1.    <u>**Term**</u>.

(a)    The term of this Agreement shall begin on the Effective Date and end on the fifth (5th) anniversary of the Effective Date (the "<u>**Initial Term**</u>"), unless it is renewed or earlier terminated in accordance with <u>Section 4</u> of this Agreement (the Initial Term and any renewal thereof are referred to collectively herein as the "<u>**Term**</u>"). In the event that the Net Profit (as defined below) of the Company increases during each successive year of the Initial Term, then, if not earlier terminated, this Agreement shall automatically renew for an additional five (5)-year period unless either the Company or the Executive provides written notice to the other of its or her intent not to renew this Agreement at least sixty (60) days prior to the end of the Initial Term.

(b)    For purposes of this Agreement, "<u>**Net Profit**</u>" shall mean, for each fiscal year, the Company's taxable income as determined under Section 703(a) of the Internal Revenue Code of 1986, as amended (the "<u>**Code**</u>"), and Section 1.703-1 of the Regulations (as defined below) (and for this purpose all items of income, gain, loss, or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income), but with the following adjustments:

(i)    Any tax-exempt income, as described in Section 705(a)(1)(B) of the Code, realized by the Company during such fiscal year shall be taken into account in computing such taxable income as if it were taxable income.

(ii)    Any expenditures of the Company described in Section 705(a)(2)(B) of the Code for such fiscal year, including any items treated under Section 1.704-1(b)(2)(iv)(i) of the Regulations (as defined below) as items described in Section 705(a)(2)(B) of the Code, shall be taken into account in computing such taxable income as if they were deductible items.

(iii)    Book depreciation for such fiscal year shall be taken into account in computing such taxable income in lieu of any amortization, depreciation or cost recovery deduction to which the Company is entitled for such fiscal year with respect to Company assets.

(iv)     Any book loss or book gain recognized by the Company during such fiscal year by reason of a sale or other disposition of all or part of the Company's business shall be taken into account in computing such taxable income in lieu of any tax gain recognized by the Company during any fiscal year by reason of such sale or other disposition.

(v)     Any gross income and item of income, gain, loss or deduction required to be allocated to the Members in accordance with Article V of the LLC Agreement (as defined below) as a (i) minimum gain chargeback, (ii) minimum gain chargeback for member nonrecourse debt, (iii) qualified income offset, (iv) gross income allocation, (v) company nonrecourse deduction, (vi) member nonrecourse deduction, (vii) Section 754 adjustment, or (viii) curative allocation shall not be taken into account in computing such taxable income.

(vi)     If the book value of any asset of the Company is adjusted pursuant to Section 1.704-1(b) of the Regulations (as defined below), other than an adjustment for book depreciation, the amount of such adjustment shall be taken into account as book gain or book loss from the disposition of such asset for purposes of computing Net Profit.

If the Company's taxable income for such fiscal year, as adjusted in the manner provided in paragraphs (i) through (vi) of this definition, is a positive amount, such amount shall be the Company's Net Profit for such fiscal year.

(c)     For purposes of this Agreement, "**Regulations**" shall mean the federal income tax regulations promulgated by the U.S. Department of Treasury, or any amendment or successor provision to such regulations, pursuant to or in interpretation of the Code.  For purposes of this Agreement, "**LLC Agreement**" shall mean the Amended and Restated Limited Liability Company Operating Agreement of the Company, dated as of the date hereof, by and among (i) the Company, (ii) Jerome Falic, (iii) Simon Falic, (iv) Leon Falic, (v) Bryan Feldman and (vi) the Executive.

2.     **Position and Duties**.  During the Term, the Company shall employ the Executive as "Creative Director" of the Company.  The Executive shall have such responsibilities, duties and authority as are consistent with her position and reasonably assigned to her by the Managing Member of the Company (the "**Managing Member**").  Such responsibilities, duties, and authority of the Executive include, but are not limited to, oversight and management of strategic initiatives and general operational activities of the Company.  The Executive shall report directly to the Managing Member.  The Executive shall fulfill her duties and responsibilities in a reasonable and appropriate manner and in compliance with all applicable Company policies and practices and the laws and regulations that apply to the Company's operation and administration.  Except as specifically provided in this Agreement, the Executive shall devote her full professional time and attention to the business and affairs of the Company in accordance with the terms hereof and shall not be employed by any other business without the prior written approval of the Managing Member. Subject to the terms herein, the parties agree that Executive shall be able to continue her business as described in Addendum A. Notwithstanding the foregoing, during the Term, the Executive may participate (as a board member, officer, volunteer or otherwise) in charitable, educational, trade associations and similar types of activities; provided, however, that such activities do not interfere with the performance of the Executive's duties hereunder.

2

3.     **Compensation and Benefits**.  For all services rendered by the Executive during the Term, the Company shall compensate the Executive as follows:

(a)     ***Base Salary***.  During the Term, the Company shall pay to the Executive a base salary at the rate of Two Hundred Thousand Dollars ($200,000) (the "**Base Salary**") per year. The Base Salary shall be payable to the Executive in accordance with the Company's standard payroll procedures and shall be subject to all applicable withholdings.

(b)     ***Annual Bonus***.  In addition to the Base Salary described above, the Executive shall be eligible to receive an annual bonus at the end of each fiscal year (the "**Annual Bonus**") equal to ten percent (10%) of the amount by which the Company's Net Profit for each such year exceeds the Company's Net Profit for the immediately preceding year; <u>provided</u>, that, for purposes of calculating the Annual Bonus for the fiscal year ended December 31, 2018, the parties shall assume that the Net Profit of the Company for the fiscal year ended December 31, 2017 was Nine Hundred Thousand Dollars ($900,000).  For example, (i) if the Company's Net Profit for the fiscal year ended December 31, 2018 totals One Million Two Hundred Thousand Dollars ($1,200,000), then the Executive's Annual Bonus for that year would be Thirty Thousand Dollars ($30,000) (i.e., 10% of ($1,200,000 *minus* $900,000)); and (ii) if the Company's Net Profit for the fiscal year ended December 31, 2019 totals One Million Four Hundred Thousand Dollars ($1,400,000), then the Executive's Annual Bonus for that year would be Twenty Thousand Dollars ($20,000) (i.e., 10% of $1,400,000 *minus* $1,200,000)).  The Annual Bonus shall be paid to the Executive within ten (10) business days after the date on which the Managing Member receives the Company's audited financial statements for the applicable fiscal year and determines whether and to what extent the Annual Bonus has been achieved.  In order to receive and retain the Annual Bonus, the Executive must (x) be employed by the Company on the date on which the Annual Bonus is paid; and (y) fully comply with the terms of <u>Section 5</u>, <u>Section 6</u> and <u>Section 8</u> of this Agreement.  Any Annual Bonus due hereunder shall be deemed fully earned when due and shall be non-refundable following receipt by the Executive.

(c)     ***Vacation***.  The Executive shall be entitled to fifteen (15) business days paid vacation per calendar year in accordance with the Company's vacation policies.  The Executive will take her vacation at her and the Company's reasonable and mutual convenience.

(d)     ***Withholding***.  The payment of any Base Salary or any other cash bonus or payment (whether in cash or other consideration) hereunder shall be subject to applicable withholding and payroll taxes, and such other deductions as may be required under applicable law.

(e)     ***Plans***. During the Term, the Executive shall be entitled to participate in all benefit plans, practices, policies and programs established and maintained by the Company from time to time and applicable to other executive personnel of the Company (the "**Benefit Plans**"), including, but not be limited to, medical, prescription, dental and vision plans, subject to the general eligibility and participation provisions set forth in each such plan.

4.     **Termination**.  This Agreement may be terminated upon the earliest to occur of any of the following:

(a)     ***Termination by the Company***.

3

(i)      ***Death or Disability***.  In the event the Executive dies or becomes Disabled (as defined below), the Term and the Executive's employment with the Company shall immediately terminate.  For purposes of this Agreement, "**Disabled**" or "**Disability**" shall mean that the Executive is physically or mentally unable to carry out her duties (with or without reasonable accommodation) for a period of thirty (30) consecutive days as determined reasonably and in good faith by the Managing Member after consultation with at least one (1) qualified medical expert selected by the Managing Member and at least one (1) qualified medical expert selected by the Executive (or her family representative).

(ii)      ***Termination for Cause***.  The Company may terminate the Term and the Executive's employment with the Company for Cause (as defined below), effective immediately upon giving notice to the Executive.  For purposes of this Agreement, "**Cause**" shall mean: (A) the Executive's continued failure to perform her duties under this Agreement or any written policy of the Company, which the Executive fails to cure within ten (10) days of having received notice from the Company specifying in reasonable detail the facts and circumstances it contends constitute such failure; (B) the Executive's breach of any covenant and/or duty described in Section 5, Section 6 and Section 8 of this Agreement (any breaches by the Executive of Section 5, Section 6 and Section 8 of this Agreement require no notice or opportunity to cure); (C) the Executive's gross negligence or willful misconduct in connection with the performance of her duties, including any act of embezzlement, theft, dishonesty, fraud or willful misconduct with respect to the business or affairs of the Company (including disparagement of the Company to third parties), as determined by the Company after investigation and notice of the charge to the Executive and after allowing the Executive an opportunity to explain the conduct in question; (D) the Executive's conviction of, or plea of no contest to, any felony or misdemeanor involving theft, fraud, dishonesty or act of moral turpitude that the Managing Member reasonably concludes is damaging to the business or reputation of the Company; or (E) the Executive ceases to be a beneficial owner of the Company.

(iii)      ***Termination without Cause***.  At any time during the Term, the Company may, for any reason or no reason whatsoever (including, but not limited to, without Cause), terminate this Agreement and the Executive's employment hereunder, by providing written notice to the Executive.

(b)      ***Termination by the Executive***.

(i)      ***Termination for Good Reason***.  The Executive may terminate this Agreement and the Executive's employment hereunder for Good Reason (as defined below) by providing the Company thirty (30) days' prior written notice specifying in reasonable detail the reason therefor.  For purposes of this Agreement, "**Good Reason**" shall mean: (A) a material diminution of Executive's duties or responsibilities relative to duties and responsibilities in effect at the time of execution of this Agreement; (B) a material reduction in Executive's salary or benefits (excluding the substitution of substantially equivalent compensation and benefits); (C) relocation of your place of employment to a location more than 35 miles from Executive's location at the time of execution of this Agreement; (D) the Company's material breach of this Agreement, which the Company fails to cure within thirty (30) days of the Company having received written notice from the Executive of the facts and circumstances she contends constitute such material

4

breach; or (E) the Company and any successor to all or a substantial part of the business and activities of the Company as of the date hereof cease to conduct business activities.

(ii)     *Termination without Good Reason*.  The Executive may terminate this Agreement and the Executive's employment hereunder for any reason or no reason whatsoever by providing the Company sixty (60) days' prior written notice (or such shorter period as may be approved by the Company in writing).

(c)     ***Effect of Termination***.  Upon termination of the Executive's employment for any reason, the Executive shall immediately tender her resignation to the Company as a manager, officer and any other capacity the Executive holds with the Company (whether as an employee, consultant or independent contractor).   Upon termination of the Executive's employment for any reason, the Executive shall be entitled to receive all Base Salary earned but not paid through the termination date and any reimbursements due through the termination date. In addition to the foregoing:

(i)     If this Agreement is (A) terminated by the Company without Cause or (B) terminated by the Executive for Good Reason, then (1) the Company shall pay the Executive a severance payment consisting of an amount equal to the weekly Base Salary in effect on the date of the Executive's termination (or, if the Good Reason for the Executive's decision to terminate her employment hereunder is reduction in the Base Salary, then an amount equal to the weekly Base Salary in effect prior to such reduction), paid in substantially equal bi-weekly installments over the remainder of the employment contract still in effect, beginning on the date of the Executive's termination of employment in accordance with the Company's usual payroll practices and subject to applicable withholding and other taxes; and (2) the Executive shall receive (x) a continuation of the Benefit Plans in effect for the remainder of the employment contract still in effect, beginning on the date of the Executive's termination of employment but solely to the extent allowed by the terms of the applicable Benefit Plans and applicable law and subject to the general eligibility and participation requirements of such Benefit Plans; provided that the Company shall take all commercially reasonable efforts to permit the Executive to continue to be covered by the Benefit Plans during such period, or (y) if continuation of such Benefit Plans is not possible, reimbursement from the Company for the monthly premium paid by the Executive for herself and her dependents for continuation coverage under the Consolidated Omnibus Reconciliation Act of 1985 ("**COBRA**").

(ii)     If this Agreement is terminated because of the Executive's death or Disability, then (A) the Company shall pay the Executive (in the event of her Disability) or the Executive's estate (in the event of her death), a severance payment consisting of an amount equal to the weekly Executive's Base Salary in effect on the date of the Executive's death or Disability, which amount shall be paid in substantially equal weekly installments over the twelve (12) month period beginning on the date of the Executive's termination of employment in accordance with the Company's usual payroll practices and subject to applicable withholding and other taxes; and (B) in the event of a Disability, the Executive shall receive (1) a continuation of the Benefit Plans in effect for six (6) months, beginning on the date of the Executive's termination of employment but solely to the extent allowed by the terms of the applicable Benefit Plans and applicable law and subject to the general eligibility and participation requirements of such Benefit Plans; provided that the Company shall take all commercially reasonable efforts to permit the Executive to

5

continue to be covered by the Benefit Plans during such period, or (2) if continuation of such Benefit Plans is not possible, the Company shall reimburse the Executive for the monthly premium paid by the Executive for herself and her dependents for continuation coverage under COBRA.

(iii)     Notwithstanding anything to the contrary contained in this Agreement, the Company shall have no obligation to make any payments under Section 4(c)(i) or Section 4(c)(ii) if (A) the Executive breaches Section 5, Section 6 or Section 8 of this Agreement, or (B) the Company chooses not to renew this Agreement either at the expiration of the Initial Term or at the expiration of any succeeding term thereafter, or (C) the Executive (or her proxy, estate or trust) fails to execute (or executes but then revokes) a general release, in form and substance satisfactory to the Company in its sole discretion, of any and all claims she may have against the Company and its affiliates (the "**Release**").  The payment of any severance payments described in this Section 4(c) shall be made or shall commence (as applicable) within the thirty (30) day period following the Executive's termination; provided, that the Executive executes the Release and the Release becomes effective and irrevocable within thirty (30) days following the Executive's termination; provided, further, that if such thirty (30) day period begins in one (1) calendar year and ends in a second (2nd) calendar year, such payments shall be made or shall commence in the second (2nd) calendar year.

(iv)     Notwithstanding anything to the contrary contained in this Agreement, if a Change of Control (as defined below) occurs, neither the Company nor any acquirer or successor of the Company will have any obligation to make payments under Section 4(c)(i) solely as a result of such Change of Control unless the Executive's employment is terminated without Cause or the Executive resigns for Good Reason, in each case, in accordance with the terms of this Agreement.

(v)     For purposes of this Agreement, the term "**Change of Control**" means the consummation of any of the following: (A) the sale or disposition of all or substantially all of the consolidated assets of the Company (other than a transfer to an entity that is wholly owned by the Company); or (B) any transaction pursuant to which any Person (as defined below) or group of Persons becomes the beneficial owner, directly or indirectly, of securities of the Company representing more than fifty percent (50%) of the combined voting power of the Company's outstanding securities immediately after such transaction if such Person or group of Persons was not the beneficial owner, directly or indirectly, of securities of the Company representing more than fifty percent (50%) of the combined voting power of the Company's outstanding securities immediately prior to such transaction.  For purposes of this Agreement, the term "**Person**" means an individual, corporation, limited liability company, general or limited partnership, joint venture, trust, unincorporated organization, or other entity.

5.     **Executive Covenants**.

(a)     ***Non-Compete Provisions***.   From and after the Effective Date and continuing for a period of thirty-six (36) months after the Executive's employment terminates for any reason, the Executive will not, within the Restricted Territory (as defined below), directly or indirectly, engage in a Restricted Business (as defined below) or provide Restricted Services (as defined below) to any Person engaged in a Restricted Business; provided that nothing contained herein will be construed to prevent the Executive from investing in the stock of any competing

Person listed on a national securities exchange or traded in the over-the-counter market so long as the Executive is not involved in the business of such Person and the Executive does not own more than two percent (2%) of the equity of such Person.

"**Restricted Business**" means the manufacture, sale and distribution of hair-related products.  "Restricted Business" shall not include Executive's business as identified in Addendum A.

"**Restricted Services**" means the provision of management, business planning, sales, marketing, financial planning, or other services similar to the services the Executive provided to the Company during her employment with the Company.

"**Restricted Territory**" means worldwide.

(b)      *__No Solicitation of Customers__*.  Without limiting the generality of the provisions of Section 5(a), the Executive hereby agrees that during the thirty-six (36)-month period after the termination of the Executive's employment with the Company, the Executive will not, and will cause each of her affiliates not to, directly or indirectly, (i) solicit business related to the Restricted Business from any Person which is or was a client, customer, supplier, licensee, licensor or other business relation of the Company during the thirty-six (36)-month period preceding the date of the Executive's termination of employment, or from any successor in interest to any such Person, or (ii) solicit or encourage any client, customer, supplier, licensee or licensor of the Company to terminate or reduce such Person's relationship with the Company (including any Person engaged in discussions with the Company related to such Person becoming a client, customer, supplier, licensee or licensor of the Company).

(c)      *__No Solicitation of Employees__*.  During the thirty-six (36)-month period after termination of the Executive's employment with the Company, the Executive will not, and will cause each of her affiliates not to, directly or indirectly, employ, hire, engage, recruit or solicit for employment or engagement (other than by a general advertisement not targeting the employees of the Company), any Person who is (or was during the one (1) year period preceding the date of such hire or solicitation) employed or engaged by the Company.

(d)      *__Non-Disparagement__*.  The Executive agrees and covenants that the Executive will not, at any time, make, publish or communicate to any Person or in any public forum any defamatory or disparaging remarks, comments or statements concerning the Company or its affiliates, or their businesses, or any of their employees, officers, and existing and prospective clients, suppliers, investors, and other associated third parties.  This Section 5(d) does not, in any way, restrict or impede the Executive from exercising protected rights to the extent that such rights cannot be waived by agreement, including, without limitation, the Executive's rights under the National Labor Relations Act, or rights to communicate with any other administrative or regulatory agency to report suspected unlawful conduct, or from complying with any applicable law or regulation or a valid order of a court of competent jurisdiction or an authorized government agency, provided that such compliance does not exceed that required by the law, regulation, or order.  The Executive shall promptly provide written notice of any such order to an authorized officer of the Company.

(e)     ***Reasonable Limitations***.  The Executive recognizes that the territorial, time and scope limitations set forth in this Section 5 and Section 6 are reasonable and are properly required for the protection of the Company's legitimate interest in client relationships, goodwill and trade secrets of the Company's business, and that such limitations would not impose any undue burden upon the Executive.  In the event that any such territorial, time or scope limitation is deemed to be invalid, prohibited or unenforceable by a court of competent jurisdiction, the Company and the Executive agree, and the Executive submits, to the reduction of any or all of said territorial, time or scope limitations to such an area, period or scope as said court will deem reasonable or enforceable under the circumstances.  If such partial enforcement is not possible in such jurisdiction, the provision will be deemed severed as to such jurisdiction and the remaining provisions of this Agreement will remain in full force and effect.  The covenants in each of Sections 5(a)-(d) and Section 6(a) are severable and separate, and the unenforceability of any specific covenant shall not affect the provisions of any other covenant.  If any provision of Section 5 and Section 6 relating to time period, scope or geographic areas of the restrictive covenants in Section 5 and Section 6 shall be declared by a court of competent jurisdiction to exceed the maximum time period, scope or geographic area, as applicable, that such court deems reasonable and enforceable, then this Agreement shall automatically be considered to have been amended and revised to reflect such determination.

(f)     ***Equitable Relief***.  The Executive acknowledges and agrees that in the event of the Executive's or any of her affiliate's actual or threatened breach of any of the provisions contained in Section 5 and Section 6, the Company will have no adequate remedy at law. Accordingly, the Executive agrees that in the event of any actual or threatened breach by her of any of the provisions contained in Section 5 and Section 6, the Company will be entitled to seek the following rights and remedies, each of which rights and remedies will be independent of the others and severally enforceable: (i) such injunctive and other equitable relief as may be deemed necessary or appropriate by a court of competent jurisdiction; (ii) the right and remedy to require the Executive to account for and pay over to the Company any profits, monies, accruals, increments or other benefits derived or received by the Executive as the result of any transactions or conduct constituting a breach of any of the provisions contained in Section 5 and Section 6; (iii) all damages suffered by the Company; and (iv) repayment of all Annual Bonuses paid to the Executive. Nothing contained herein will be construed as prohibiting the Company from pursuing any other remedies available to it for such breach or threatened breach, including the recovery of any damages that it is able to prove.  The parties acknowledge and agree that the required forfeiture and repayment of all Annual Bonuses by the Executive upon any breach or threatened breach of Section 5 and Section 6 of this Agreement is not a liquidated damages provision, will not adequately compensate the Company and its affiliates for any such breach or threatened breach, and is merely a forfeiture of a portion of the consideration being paid to the Executive to ensure her full compliance with Section 5 and Section 6 of this Agreement.

(g)     ***Fair and Reasonable Restrictions***.  The Executive has carefully read and considered the provisions of Section 5 and Section 6 and, having done so, agrees that the restrictive covenants contained therein impose a fair and reasonable restraint on the Executive that is reasonably required to protect the interests of the Company.  The Executive acknowledges and agrees that the provisions of Section 5 and Section 6 will not interfere with the Executive's ability to earn a livelihood and do not confer a benefit upon the Company that is disproportionate to the

detriment to the Executive.  The Executive covenants that she will not challenge the enforceability of <u>Section 5</u> and <u>Section 6</u> nor will she raise any equitable defense to its enforcement.

(h) ***No Waiver of Other Rights***.  Nothing in this <u>Section 5</u> shall be deemed a waiver or modification of any rights or remedies the Company may have under applicable foreign, federal, state or local laws.

6. **Trade Secrets and Confidential Information**.

(a) ***Hold Trade Secrets and Confidential Information in Confidence***.  The Executive acknowledges and agrees that (i) with regard to each item constituting all or any portion of the Trade Secrets (as defined below), for so long as such item continues to constitute a Trade Secret under applicable law and (ii) with regard to any Confidential Information (as defined below), during her employment and for a period of five (5) years after the termination thereof for any reason, the Executive shall hold in confidence all Trade Secrets and all Confidential Information and will not, either directly or indirectly, use, sell, lend, lease, distribute, give, transfer, assign, show, disclose, disseminate, reproduce, copy, appropriate or otherwise communicate any Trade Secrets or Confidential Information to any Person without the prior written consent of the Company.

"**Confidential Information**" means data or other information relating to the business of the Company, not including a "Trade Secret," which is or has been disclosed to the Executive or of which the Executive became aware as a consequence of her relationship with the Company and which has value to the Company, is not generally known to the Company's competitors, and is subject to reasonable efforts by the Company to prevent disclosure. Confidential Information includes, without limitation, information in any form or media (including documents, records, agreements, drafts, and email) regarding the Company's officers, employees, members, managers, customers, or actively sought prospective customers, investors and investments or actively sought investors and investments, suppliers, manufacturers, and distributors gained by the Executive as a result of the Executive's relationship with the Company. Confidential Information shall not include any data or information that has been voluntarily disclosed to the public by the Company (except where such public disclosure has been made by the Executive without authorization), that has been independently developed and disclosed by others or that otherwise enters the public domain through lawful means.

"**Trade Secrets**" means information, including, without limitation, technical or non-technical data, techniques relating to the preparation or production of illustrations and animations for use in the Company's computer software products, source codes, flow charts, diagrams, technical documentation, scripts, algorithms, file structures, metadata, data definitions and principles of operation, relating or reflected in the Company's computer software programs, formulas, patterns, compilations, programs, devices, methods, techniques, drawings, processes, or other information similar to any of the foregoing, which derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other Persons who can derive economic value from its disclosure or use and are the subject of efforts that are reasonable under the circumstances to maintain their secrecy.  For purposes of this Agreement, the term "Trade Secret" will not include information that the Executive can show by competent proof (i) was generally known to the public at the time the Company disclosed the

information to the Executive; or (ii) became generally known to the public after disclosure by the Company through no act or omission of the Executive.

(b) ***Specific Performance***.  The Executive acknowledges and agrees that if she were to breach any of the provisions of Section 6(a), her breach would result in immediate and irreparable harm to the Company which cannot be adequately or reasonably compensated at law. Accordingly, the Executive acknowledges and agrees that the Company shall be entitled, if any such breach shall occur or be threatened or attempted, to seek a decree of specific performance and a temporary, preliminary, and permanent injunction, without being required to post a bond.

(c) ***No Waiver of Other Rights***.  Nothing in this Section 6 shall be deemed a waiver or modification of any rights or remedies the Company may have under applicable foreign, federal, state or local laws.

7.   **Return of the Company Property**.  All records, designs, patents, business plans, financial statements, manuals, memoranda, customer lists, customer databases, rolodexes, personal computers, mobile telephones, mobile e-mail devices and the like, and other property delivered to or compiled by the Executive by or on behalf of the Company which pertain to the Company or the business of the Company shall be and remain the property of the Company and shall be subject at all times to its discretion and control.  Upon the termination of the Executive's employment with the Company for any reason, the Executive shall deliver all such materials to the Company.  Likewise, all correspondence, reports, records, charts, advertising materials, and other similar data pertaining to the business of the Company which are collected by the Executive shall be delivered promptly to the Company without request by it upon termination of the Executive's employment. Notwithstanding anything to the contrary in this Section 7, any personal computers, mobile telephones, mobile e-mail devices and other similar personal property paid for and owned by the Executive shall be and remain the property of the Executive and shall not be subject to the Company's discretion and control, and the Executive shall not be required to return such property to the Company; provided that the Executive shall be required, at the request of the Company, to return or delete any information that belongs to the Company and is stored on any such property.

8.   **Work Product and Inventions**.

(a) ***Works***.  The Executive acknowledges and agrees that the Executive's work on and contributions to documents, programs methodologies, protocols, and other expressions in any tangible medium which have been or will be prepared by the Executive, or to which the Executive has contributed or will contribute, in connection with the Executive's services to the Company (collectively, the "**Works**") are and will be within the scope of the Executive's services and part of the Executive's duties and responsibilities.  The Executive's work on and contributions to the Works will be rendered and made by the Executive for, at the instigation of, and under the overall direction of, the Company, and are and at all times shall be regarded, together with the Works, as "work made for hire" as that term is used in the United States Copyright Laws. However, to the extent that any court or agency should conclude that the Works (or any of them) do not constitute or qualify as "work made for hire," the Executive hereby assigns, grants, and delivers, exclusively and throughout the world, to the Company all rights, titles, and interests in and to any such Works, and all copies and versions, including all copyrights and renewals.  The Executive agrees to cooperate with the Company and to execute and deliver to the Company, its

10

successors and assigns, any assignments and documents the Company reasonably requests for the purpose of establishing, evidencing, and enforcing or defending its complete, exclusive, perpetual, and worldwide ownership of all rights, titles, and interests of every kind and nature, including all copyrights, in and to the Works, and the Executive constitutes and appoints the Company as her agent to execute and deliver any assignments or documents the Executive fails or refuses to execute and deliver, this power and agency being coupled with an interest and being irrevocable.  Without limiting the preceding provisions of this Section 8(a), the Executive agrees that the Company may edit and otherwise modify, use, publish, and otherwise exploit, the Works in all media and in such manner as the Company, in its sole discretion, may determine.

(b)     ***Inventions and Ideas***.  The Executive shall disclose promptly to the Company (which shall receive it in confidence) and only to the Company, any invention or idea of the Executive in any way connected with or related to the business of the Company, the Company's research and development, or demonstrably anticipated research or development (developed alone or with others), conceived or made during the Executive's employment with the Company, and hereby assigns to the Company any such invention or idea.  The Executive acknowledges and agrees to cooperate with the Company and sign all papers reasonably deemed necessary by the Company to enable it to obtain, maintain, protect, and defend patents covering such inventions and ideas and to confirm the Company's exclusive ownership of all rights in such inventions, ideas, and patents, and irrevocably appoints the Company as her agent to execute and deliver any assignments or documents the Executive fails or refuses to execute and deliver promptly, this power and agency being coupled with an interest and being irrevocable.  This constitutes the Company's written notification that this assignment does not apply to an invention for which no equipment, supplies, facility or Trade Secret information of the Company was used and which was developed entirely on the Executive's own time unless (i) the invention relates directly to the business of the Company or to the Company's actual or demonstrably anticipated research or development or (ii) the invention results from any work performed by the Executive for the Company.

9.     **No Conflicting Agreements**.  The Executive hereby represents and warrants to the Company that the execution of this Agreement by the Executive and her employment by the Company and the performance of her duties hereunder will not violate or be a breach of any agreement with a former employer, client or any other Person.

10.     **Assignment; Binding Effect**.  The Executive understands that she has been selected for continued employment by the Company on the basis of her personal qualifications, experience, and skills.  The Executive agrees, therefore, that she cannot assign all or any portion of her performance under this Agreement.  The Company may assign this Agreement in whole or in part to any subsidiary or affiliate of the Company or to any assignee or successor to the Company, whether by merger, consolidation, sale of stock, sale of assets or otherwise; provided, however, that the terms of any such transaction shall require such assignee or successor to assume all of the obligations of the Company hereunder.  Subject to the preceding sentences of this Section 10, this Agreement shall be binding upon, inure to the benefit of, and be enforceable by the parties and their respective heirs, legal representatives, successors, and assigns.

11.     **Complete Agreement; Waiver; Amendment**.  This Agreement constitutes a single integrated contract expressing the entire agreement of the parties with respect to the subject

matter hereof and supersedes and replaces any and all other agreements, whether written or oral, express or implied, between the Executive and the Company with respect to the subject matter hereof.  This Agreement is the final, complete, and exclusive statement of expression of the agreement between the Company and the Executive with respect to the subject matter hereof, and cannot be varied, contradicted or supplemented by evidence of any prior or contemporaneous oral or written agreement.  This written Agreement may not be later modified except by a further writing signed by a duly authorized representative of the Company and the Executive, and no term of this Agreement may be waived except by a writing signed by the party waiving the benefit of such term.

12.    **Notice**.  Whenever any notice is required hereunder, it shall be in writing and addressed as follows:

|  |  |
|---|---|
| To the Company: | Head Kandy LLC |
|  | Address: 6100 Hollywood Boulevard, 7th Floor |
|  | Hollywood, Florida 33024 |
|  | Email:jerome@falic.com |
|  | bfeldman@falicfashiongroup.com |
|  | dtaney@dutyfreeamericas.com |
|  | Attn: Jerome Falic, Bryan Feldman and David Taney |
| To the Executive: | Kayla Marie McNeill |
|  | Address: P.O Box 3 |
|  | Poncha Springs, Colorado 81242 |
|  | Email: kayla@headkandypro.com |
|  | Attn: Kayla Marie McNeill |

A notice sent by overnight courier service or personal delivery shall be considered to have been given when actually received by the intended recipient.  All such notices, requests and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5:00 p.m. in the place of receipt and such day is a business day in the place of receipt. Otherwise, any such notice, request or communication shall be deemed not to have been received until the next succeeding business day in the place of receipt.

13.    **Severability; Headings**.  If any portion of this Agreement is held invalid or inoperative, the other portions of this Agreement shall be deemed valid and operative and, so far as is reasonable and possible, effect shall be given to the intent manifested by the portion held invalid or inoperative.  This severability provision shall be in addition to, and not in place of, the provisions of Section 5(e) above.  The section headings are for reference purposes only and are not intended in any way to describe, interpret, define or limit the extent of the Agreement or of any part hereof.

14.    **Construction**.  No provision of this Agreement shall be construed against or interpreted to the disadvantage of the Executive or the Company by any court or government or judicial authority by reason of the Executive or the Company having or being deemed to have structured or drafted such provision of this Agreement.

15.     **Governing Law and Forum Selection**. THIS AGREEMENT AND THE LEGAL RELATIONS BETWEEN THE PARTIES HERETO SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF FLORIDA, EXCLUDING ANY CONFLICTS OF LAW RULE OR PRINCIPLE THAT MIGHT OTHERWISE REFER CONSTRUCTION OR INTERPRETATION OF THIS AGREEMENT TO THE LAW OF ANOTHER JURISDICTION.  SUBJECT TO THE PROVISIONS OF SECTION 16, THE PARTIES TO THIS AGREEMENT SUBMIT TO THE EXCLUSIVE JURISDICTION OF THE STATE COURTS LOCATED IN THE STATE OF FLORIDA OR THE COURTS OF THE UNITED STATES LOCATED IN THE STATE OF FLORIDA IN RESPECT OF THE INTERPRETATION AND ENFORCEMENT OF THE PROVISIONS OF THIS AGREEMENT AND ANY RELATED AGREEMENT, CERTIFICATE OR OTHER DOCUMENT DELIVERED IN CONNECTION HEREWITH AND BY THIS AGREEMENT WAIVE, AND AGREE NOT TO ASSERT, ANY DEFENSE IN ANY ACTION FOR THE INTERPRETATION OR ENFORCEMENT OF THIS AGREEMENT AND ANY RELATED AGREEMENT, CERTIFICATE OR OTHER DOCUMENT DELIVERED IN CONNECTION HEREWITH THAT THEY ARE NOT SUBJECT THERETO OR THAT SUCH ACTION MAY NOT BE BROUGHT OR IS NOT MAINTAINABLE IN SUCH COURTS OR THAT THIS AGREEMENT MAY NOT BE ENFORCED IN OR BY SUCH COURTS OR THAT THEIR PROPERTY IS EXEMPT OR IMMUNE FROM EXECUTION, THAT THE ACTION IS BROUGHT IN AN INCONVENIENT FORUM OR THAT THE VENUE OF THE ACTION IS IMPROPER.  SERVICE OF PROCESS WITH RESPECT THERETO MAY BE MADE UPON EITHER PARTY BY MAILING A COPY THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO SUCH PARTY AT ITS ADDRESS AS PROVIDED IN SECTION 12.

16.     **Resolution of Disputes**.

(a)     In the event of a dispute arising between the parties with respect to their rights or duties under this Agreement or any matter related to the termination of the Executive's employment with the Company (a "**Dispute**"), the parties shall use all reasonable efforts to amicably resolve the Dispute by discussion on a good faith basis.

(b)     If the parties fail to reach an amicable settlement of a Dispute within thirty (30) days of receiving written notice thereof, then the parties shall undertake to resolve such Dispute through mediation.  Mediation shall take place in the State of Florida and shall be in English.  The Mediation shall be conducted before a single mediator to be agreed upon by the parties.  If the parties cannot agree on the mediator, each party shall select a mediator and such mediators shall together unanimously select a neutral mediator who will conduct the mediation.  Each party shall bear the fees and expenses of its mediator and both parties shall equally bear the fees and expenses of the final mediator.  If the Dispute is not resolved in such mediation, then such Dispute shall be referred to binding arbitration pursuant to Section 16(c) below.

(c)     In the event that any Dispute is not resolved in the manner set forth in Section 16(a) or Section 16(b) above, then such dispute shall be decided by final and binding arbitration in the State of Florida, in accordance with the then-current Commercial Dispute Resolution Rules of the American Arbitration Association (the "**AAA**").  The arbitrator shall be selected by the parties in accordance with AAA procedures from a list of qualified people

maintained by the AAA.  The arbitration shall be conducted in English and shall commence when one party serves the other party with a written demand to arbitrate.

        (d)     Except as provided in <u>Section 16(e)</u> below, no party may commence any proceedings before any court in relation to a Dispute except for the purposes of enforcement of an arbitration award.  Judgment on the award of the arbitrator may be entered in any court having jurisdiction.

        (e)     Notwithstanding the provisions of this <u>Section 16</u>, the Company shall be entitled to commence legal proceedings in any court of competent jurisdiction in order to enforce the rights of the Company under <u>Section 5</u>, <u>Section 6</u>, <u>Section 7</u>, and/or <u>Section 8</u> of this Agreement.

        (f)     Except as may be prohibited by a federal statute, the costs and expenses of the arbitration (including, without limitation, the reasonable cost of experts, evidence and legal counsel) shall be borne by the non-prevailing party in the arbitration, as determined by the arbitrator.  Both parties agree to use their commercially reasonable efforts to cause a final decision to be rendered with respect to the matter submitted to arbitration within sixty (60) days after its submission.

    17.     **Waiver of Jury Trial.**  TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW THAT CANNOT BE WAIVED, EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, AND COVENANTS THAT IT WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE), ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE, CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING IN WHOLE OR IN PART UNDER, RELATED TO, BASED ON OR IN CONNECTION WITH THE RESTRICTIVE COVENANTS, WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER SOUNDING IN TORT OR CONTRACT OR OTHERWISE.  ANY PARTY MAY FILE AN ORIGINAL COUNTERPART OR COPY OF THIS <u>SECTION 17</u> WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF EACH PARTY TO THE WAIVER OF ITS RIGHT TO TRIAL BY JURY.

    18.     **Survivorship**.  The respective rights and obligations of the parties hereunder shall survive the termination of the Executive's employment with the Company and this Agreement to the extent necessary to the intended preservation of such rights and obligations.

    19.     **Understanding**.  The Executive acknowledges and agrees that she has read and fully understands the contents and the effect of this Agreement.  The Executive accepts each and every term, condition, and provision in this Agreement, and does so voluntarily and with full knowledge.

    20.     **Counterparts**. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

*[Signature Page Follows]*

14

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed as of the Effective Date.

<u>**COMPANY**</u>:

**HEAD KANDY LLC**


By:_____
          Name: Jerome Falic
          Title: Authorized Representative

*[Signature Page to Executive Employment Agreement]*

**<u>EXECUTIVE</u>**:

_____
Kayla Marie McNeill

*[Signature Page to Executive Employment Agreement]*

## ADDENDUM A

Executive shall be entitled to continue her business which is operation of a beauty salon that provides hair salon services, such as hair cutting, styling, coloring, and extension services. The salon shall also offer for sale hair care products, including those offered by Head Kandy, LLC. The business shall be operated as a Sole Proprietorship under the name of Kayla McNeill.

**EXHIBIT E**
**INVENTORY BILL OF SALE**

See attached.

## BILL OF SALE

This BILL OF SALE (this "**Bill of Sale**") is made and effective as of this 3rd day of May, 2018, by Lashed Out LLC, a Colorado limited liability company ("**Seller**"), to and in favor of Head Kandy LLC, a Delaware limited liability company ("**Buyer**"), and is delivered pursuant to Section 7.1 of that certain Asset Purchase Agreement (the "**Purchase Agreement**"), dated as of even date herewith, entered into by Seller and Buyer. Capitalized terms used, but not defined herein, shall have the meanings ascribed to such terms in the Purchase Agreement (as defined below).

## W I T N E S S E T H:

**WHEREAS**, Seller and Buyer have entered into the Purchase Agreement, pursuant to which, among other things, Seller agreed to sell, assign, and transfer to Buyer or cause to be sold, assigned, transferred and delivered to Buyer, and Buyer agreed to purchase, all of Seller's right, title and interest in and to the Purchased Inventory, free and clear of all Liens; and

**WHEREAS**, the execution and delivery of this Bill of Sale by Seller is a condition to the obligations of Buyer to consummate the transactions contemplated by the Asset Purchase Agreement.

**NOW, THEREFORE**, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, upon the terms set forth herein and intending to be legally bound hereby, the parties hereto hereby agree as follows:

1.      Sale and Assignment of Assets and Properties.  Seller hereby sells, assigns, transfers and conveys to Buyer, its successors and assigns, to have and to hold forever, all of Seller's right, title, interest and estate in, to and under the Purchased Inventory.

2.      Further Assurances.  Seller hereby covenants and agrees that, at any time and from time to time after the date of this Bill of Sale, at Buyer's request, Seller will do, execute, acknowledge and deliver, or will cause to be done, executed, acknowledged and delivered, any and all further acts, conveyances, transfers, assignments, and assurances as necessary to grant, sell, convey, assign, transfer, set over to or vest in Buyer any of the Purchased Inventory.

3.      Power of Attorney.  Seller hereby constitutes and appoints Buyer, its successors and assigns, the true and lawful attorney and attorneys of Seller, with full power of substitution, in the name of Buyer or in the name and stead of Seller, but on behalf of and for the benefit of Buyer, its successors and assigns (and at the expense of Seller):

(a)      to collect, demand and receive any and all Purchased Inventory transferred hereunder and to give receipts and releases for and in respect of the same;

(b)      to institute and prosecute in Seller's name, or otherwise, at the expense and for the benefit of Buyer any and all actions, suits or proceedings, at law, in equity or otherwise, which Buyer may deem proper in order to collect, assert or enforce any claim, right or title of any kind in or to the Purchased Inventory hereby sold and assigned to Buyer or intended so to be, to defend or compromise any and all such actions, suits or proceedings in respect of any of such

Purchased Inventory, and to do all such acts and things in relation thereto as Buyer shall deem advisable for the collection or reduction to possession of any of such Purchased Inventory;

(c)     to take any and all other reasonable action designed to vest more fully in Buyer the Purchased Inventory hereby sold and assigned to Buyer or intended so to be and in order to provide for Buyer the benefit, use, enjoyment and possession of such Purchased Inventory; and

(d)     to do all reasonable acts and things in relation to the Purchased Inventory sold and assigned hereunder.

(e)     Seller acknowledges that the foregoing powers are coupled with an interest and shall be irrevocable by it or upon its subsequent dissolution or in any manner or for any reason. Buyer shall be entitled to retain for its own account any amounts collected pursuant to the foregoing powers, including any amounts payable as interest with respect thereto. Seller shall from time to time pay to Buyer, when received, any amounts that shall be received directly or indirectly by Seller (including amounts received as interest) in respect of any Purchased Inventory sold, assigned or transferred to Buyer pursuant hereto.

5.     <u>Seller Representations and Warranties; Covenants</u>.  Seller covenants to Buyer that Seller is the lawful owner of the said goods and chattels; that they are free from all Liens; that Seller has good right to sell that property, and that Seller will warrant and defend the sale of said property, goods and chattels unto Buyer against the lawful claims and demands of all persons whomsoever and has executed an Assignment and Assumption Agreement in conjunction herewith.

6.     <u>Miscellaneous</u>.

(a)     "Seller" and "Buyer" shall be used for singular or plural, natural or artificial, which terms shall include the heirs, legal representatives, successors and assigns of Seller and Buyer whenever the context so requires or admits.

(b)     If any term or other provision of this Bill of Sale is invalid, illegal or incapable of being enforced by any law or public policy, all other terms and provisions of this Bill of Sale shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to either Seller or Buyer.

(c)     This Bill of Sale shall be governed by, and construed in accordance with, the laws of the State of Florida applicable to contracts executed in and to be performed in that State (without regard to conflicts of law provisions thereof).

*        *        *

This Bill of Sale does not convey any right, title, interest or estate in any of the Excluded Assets or Retained Liabilities, all of which are excluded from the scope of this Bill of Sale.

**<u>SELLER</u>:**

**LASHED OUT, LLC**

By: _____
  Name:
  Title:

*[Signature Page to Head Kandy Inventory Bill of Sale]*

**<u>BUYER</u>:**

**HEAD KANDY LLC**

By:_____
     Jerome Falic
     Authorized Representative

*[Signature Page to Head Kandy Inventory Bill of Sale]*

**EXHIBIT F**
**FORM OF GUARANTEE**


See attached.

## <u>PERSONAL GUARANTY</u>

**THIS PERSONAL GUARANTY** (this "<u>Guaranty</u>") is made as of May 3, 2018 and is executed and delivered by the undersigned (the "<u>Guarantor</u>"), in favor of Lashed Out LLC doing business as Head Kandy, a Colorado limited liability company ("<u>Seller</u>").

### RECITALS:

**WHEREAS**, Head Kandy LLC, a Delaware limited liability company ("<u>**Buyer**</u>"), and Seller have entered into that certain Asset Purchase Agreement (the "<u>Purchase Agreement</u>"), dated as of even date herewith, pursuant to which Buyer shall acquire substantially all of the assets of Seller. Capitalized terms used herein without definition have the respective meanings ascribed to them in the Purchase Agreement;

**WHEREAS**, the Guarantor has agreed to guaranty each Installment Payment (the "<u>**Guaranteed Obligations**</u>") of Buyer;

**WHEREAS**, it is a condition precedent to the effectiveness of the Purchase Agreement that the Guarantor execute and deliver this Guaranty and affirm its obligation to guaranty the Obligations of Buyer under the Purchase Agreement; and

**WHEREAS**, will derive substantial direct and indirect benefits from the transactions contemplated under the Purchase Agreement.

**NOW, THEREFORE**, for good and valuable consideration, the receipt of which is hereby acknowledged, and to induce Seller to enter into the Purchase Agreement with Buyer, the Guarantor agrees as follows:

1. <u>Recitations</u>. Each and all of the foregoing recitals are true and correct and are incorporated herein by reference.

2. <u>Guaranteed Obligations</u>. The Guarantor hereby absolutely, irrevocably and unconditionally, guarantees to Seller, its successors and assigns, the full and prompt payment (whether at stated maturity, by acceleration, or otherwise) and performance of the Guaranteed Obligations. If Buyer fails to pay any Guaranteed Obligation in full when due, the Guarantor agrees to promptly pay the same to Seller. This Guaranty is a guaranty of payment and not merely of collection.

3. <u>No Offset, Defenses, Counterclaims</u>.

(a) The Guarantor shall not be entitled to any abatement, deferment, suspension, reduction, set-off, defenses or counterclaim in respect of the Guaranteed Obligations. In addition, the Guarantor waives any and all rights he might have to claim the benefit of any statutes of limitation applicable to Seller's claims against it in order to allow Seller to proceed with claims against Buyer and such other guarantors.

(b) The Guaranteed Obligations shall not be reduced or discharged by without the prior written consent of each of the parties hereto.

4.      Guaranty of Payment; Right to Proceed Directly Against Guarantor.   This is an irrevocable, absolute, continuing guaranty of payment (inter alia) and not a guaranty of collection; and the Guarantor waives any right to require that any action be brought against Buyer, any other guarantor of the Guaranteed Obligations, or any other person or to require that resort be had to any security.   Seller may, at its option, proceed against the Guarantor, in the first instance to collect any monies the payment of which is guaranteed hereby, without first proceeding against Buyer or any other person or guarantor, and without first resorting to any security held by them as collateral or to any other remedies, at the same or different times, as they may deem advisable; and the liability of the Guarantor hereunder shall be in no way affected or impaired by an acceptance by Seller of any security for, or other guarantors upon, any indebtedness, liability or obligation of Buyer to Seller, or by any failure, delay, neglect or omission by Seller to realize upon or protect any such indebtedness, liability or obligation or any notes or other instruments evidencing same or any collateral or security therefor.

5.      Consent to Extensions, Renewals and Releases.   The Guarantor hereby consents that Seller from time to time, before or after any default by Buyer, with notice to or assent from the Guarantor, may, without in any manner affecting the liability of the Guarantor, and upon such terms and conditions as they may deem advisable:  (a) extend in whole or in part (by renewal or otherwise), modify, accelerate, change or release any indebtedness, liability or obligation of Buyer or of any other person secondarily or otherwise liable for any indebtedness, liability or obligation of Buyer, or waive any default with respect thereto; (b) sell, release, surrender, modify, impair, exchange, substitute or (if a chose or choses in action) extend the duration or the time for performance or payment of any and all property, of any nature and from whomsoever received, held by Seller as security for the payment or performance of any indebtedness, liability or obligation of Buyer to Seller; and (c) settle, adjust or compromise any claim of Seller against Buyer or any other person secondarily or otherwise liable for any indebtedness, liability or obligation of Buyer.   The Guarantor hereby ratifies and confirms any such extension, renewal, change, release, waiver, surrender, exchange, modification, impairment, substitution, settlement, adjustment or compromise and agrees that the same shall be binding upon the Guarantor, and the Guarantor hereby expressly waives any and all defenses, counterclaims or offsets which he might or could have by reason thereof, it being understood that the Guarantor shall at all times be bound by this Guaranty and remain liable to Seller hereunder.

6.      Waivers by Guarantor.   The Guarantor hereby waives:  (a) notice of acceptance of this Guaranty by Seller, or of the creation, renewal or accrual of any liability of Buyer, present or future, or of the reliance of Seller upon this Guaranty (it being understood that every indebtedness, liability and obligation of Buyer to Seller forming a part of the Guaranteed Obligations shall conclusively be presumed to have been created, contracted or incurred in reliance upon this Guaranty); (b) demand of payment from any person indebted in any manner or for any of the liabilities or obligations hereby guaranteed; (c) presentation for payment of any instrument of Buyer or any other person, protest thereof and notice of its dishonor to any party thereto and to the Guarantor; (d) any defense arising by virtue of the lack of authority, death, or disability of the Guarantor or other party, or revocation hereof by any other party; (e) any duty on the part of Seller to disclose to the Guarantor any facts which Seller may now or hereafter know about Buyer, regardless of whether Seller have reason to believe that any such facts materially increase the risk beyond that which the Guarantor intends to assume or has reason to believe that such facts are unknown to the Guarantor or have a reasonable opportunity to

2

communicate such facts to the Guarantor, it being understood and agreed that the Guarantor is fully responsible for being and keeping informed of the financial condition of Buyer and of all circumstances bearing on the risk of non-payment of all obligations hereby guaranteed; and (f) notice of intent to accelerate.

7.  Effect of Bankruptcy.  In the event that, pursuant to any insolvency, bankruptcy, reorganization, receivership or other debtor relief law, or any judgment, order or decision thereunder, Seller must rescind or restore any payment, or any part thereof, received by Seller in satisfaction of the Guaranteed Obligations, as set forth therein, any prior release or discharge from the terms of this Guaranty given to the Guarantor by Seller shall be without effect, and this Guaranty shall remain in full force and effect.  It is the intention of Seller and the Guarantor that the Guaranteed Obligations hereunder shall not be discharged except by the Guarantor's performance of all such obligations and then only to the extent of such performance.

8.  Remedies.  In the event that the Guarantor shall fail to perform promptly as herein provided, Seller shall have the right (from time to time, without first requiring performance on the part of Buyer) to require performance by the Guarantor of any Guaranteed Obligations, by action at law or in equity or both, and further to collect in any such action reasonable compensation for all reasonable, actual or out-of-pocket loss, costs, damage, injury and expense sustained or incurred by Seller as a consequence of such breach.

9.  Consideration.  The Guarantor acknowledges that his undertakings given hereunder are given in consideration of Seller entering into the Purchase Agreement with Buyer and that Seller would not enter into the Purchase Agreement were it not for the execution and delivery of this Guaranty.

10.  No Waiver.  No failure on the part of Seller to pursue any remedy hereunder or under the Purchase Agreement shall constitute a waiver on their part of the right to pursue said remedy on the basis of the same or a subsequent breach, nor shall such failure give rise to an estoppel against Seller, nor excuse the Guarantor from his obligations hereunder.  No extension, substitution, modification or amendment of the Purchase Agreement shall discharge the Guarantor from any obligation herein contained in whole or in part, except to the extent expressly provided by Seller in writing.

11.  Guaranty Independent.

(a)  The Guarantor agrees that the obligations hereunder are independent of and in addition to the undertakings of Buyer pursuant to the Purchase Agreement and any other obligations of the Guarantor to Seller.  A separate action may be brought to enforce the provisions hereof against the Guarantor whether or not Buyer, or any other guarantor, is a party in any such action.  Buyer and/or the Guarantor, and/or any other guarantor may be sued together, or any of them may be sued separately without first or contemporaneously suing the other.

(b)  The Guarantor waives any right to require Seller to (i) proceed against Buyer, (ii) proceed against or exhaust any security held from Buyer, (iii) proceed against any other guarantors of the Guaranteed Obligations, or (iv) pursue any remedy in Seller' power

3

whatsoever.  The Guarantor waives any defense arising by reason of any disability or other defense of Buyer or by reason of the cessation from any cause whatsoever of the liability of Buyer other than full payment of Buyer's indebtedness to Seller.

12.  <u>Subrogation</u>.  Notwithstanding anything to the contrary contained herein, the Guarantor hereby irrevocably waives all rights he may have at law or in equity (including, without limitation, any law subrogating the Guarantor to the rights of Seller) to seek contribution, indemnification, or any other form of reimbursement from Buyer, any other guarantor, or any other person now or hereafter primarily or secondarily liable for any obligations of Buyer to Seller, for any payment or disbursement made by the Guarantor under or in connection with this Guaranty or otherwise.  If any amount shall be paid to the Guarantor on account of such subrogation rights at any time, such amount shall be held in trust for the benefit of Seller to be credited and shall forthwith be paid to Seller to be credited and applied upon such indebtedness, whether matured or unmatured, in such order as Seller, in their sole and absolute discretion, shall determine.  The Guarantor waives the benefit of, and any right to participate in, any security now or hereafter held by Seller from Buyer.

13.  <u>Amendments, Etc</u>.  No amendment or waiver of any provision of this Guaranty nor consent to any departure by the Guarantor therefrom shall in any event be effective unless the same shall be in writing and signed by Seller and the Guarantor, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which such waiver or consent has been given.

14.  <u>Subordination</u>.  Any indebtedness of Buyer now or hereafter held by the Guarantor ("**Subordinated Indebtedness**") is hereby subordinated to the indebtedness of Buyer to Seller, and such indebtedness of Buyer to the Guarantor shall, after an event of default, if Seller so request, be collected, enforced and received by the Guarantor as trustee for Seller and be paid over to Seller on account of the indebtedness of Buyer to Seller, but without reducing or limiting in any manner the liability of the Guarantor under the other provisions of this Guaranty.  The Guarantor will take no action to collect any such Subordinated Indebtedness from Buyer until such time as the Guaranteed Obligations have been paid in full and any and all obligations of Seller thereunder have terminated.

15.  <u>Separate Property</u>.  The Guarantor hereby subjects his separate property to this Guaranty and hereby expressly agrees that recourse may be had against such separate property for all of his obligations hereunder, and the Guarantor does further agree that any and all of such separate property shall be subject to execution for any judgment or decree on or enforcing this Guaranty by a court of competent jurisdiction.

16.  <u>Claims in Bankruptcy</u>.  In the event of a receivership, bankruptcy, reorganization, arrangement, debtor's relief, or other insolvency proceedings involving Buyer as debtor, Seller shall have the right to prove their claims in any such proceeding so as to establish their rights hereunder and receive directly from the receiver, trustee or other court custodian dividends and payments which would otherwise be payable to the Guarantor upon the Subordinated Indebtedness.  The Guarantor hereby assigns such dividends and payments to Seller.

4

17.     <u>Right to Specific Performance</u>.  Seller shall have, and may exercise, in addition to all other rights, privileges, or remedies available to them under this Guaranty and by law, the specific rights and remedies, exercisable by them in their discretion, to sue for and obtain specific performance by the Guarantor of the Guarantor's covenants and agreements set forth herein, all at the cost and expense of the Guarantor.

18.     <u>Representations and Warranties</u>.  The Guarantor represents and warrants to Seller as follows:

(a)     <u>Existence and Power</u>.  The Guarantor is an adult individual and is <u>sui juris</u> and has the power and authority to own his properties and assets.

(b)     <u>Authority</u>.  The Guarantor has the power and authority to execute, deliver and perform, and by all necessary action has authorized the execution, delivery and performance of all of his obligations under this Guaranty.

19.     <u>Limitation on Guarantor's Liability</u>.   For the avoidance of doubt, and notwithstanding anything else to the contrary herein, the Guarantor shall only be liable to satisfy the obligations which the Guarantor may owe pursuant to or in connection with the terms of this Guaranty.

20.     <u>Miscellaneous</u>.

(a)     This Guaranty shall be governed by and construed in accordance with the laws of the state of Florida without regard to principles of conflicts of law.

(b)     Time is of the essence hereof with respect to the Guaranteed Obligations hereunder.

(c)     If any term, provision, covenant or condition hereof or any application thereof should be held by a court of competent jurisdiction to be invalid, void or unenforceable, all terms, provisions, covenants and conditions hereof, and all applications thereof not held invalid, void or unenforceable shall continue in full force and effect and shall in no way be affected, impaired or invalidated thereby.

(d)     This Guaranty creates a continuing obligation and the obligation of the Guarantor hereunder shall be binding upon the Guarantor and his successors, heirs, representatives and assigns, and shall inure to the benefit of and be enforceable by Seller and their successors and assigns.

(e)     The Guarantor irrevocably and unconditionally (i) submits to the non-exclusive jurisdiction of any Florida state or federal court sitting in Miami-Dade County, Florida and any appellate court from any jurisdiction thereof in any action or proceeding arising out of or relating to this Guaranty or the Guaranteed Obligations, or for recognition or enforcement of any judgment related thereto, (ii) agrees that all claims in respect of such action or proceeding may be heard and determined in such Florida state court or in such federal court and (iii) waives, to the fullest extent it may effectively do so, the defense of an inconvenient forum to the maintenance of such action or proceeding.  A final non-appealable judgment in any

such action or proceeding will be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.   Nothing herein will affect Seller's right to serve legal process in any other manner permitted by law or affect Seller's right to bring any action or proceeding against such Guarantor or its property in the courts of other jurisdictions.   To the extent that the Guarantor has or hereafter may acquire any immunity from jurisdiction of any court or from any legal process (whether through service or notice, attachment prior to judgment, attachment in aid of execution, execution or otherwise) with respect to itself or its property, such Guarantor hereby irrevocably waives such immunity in respect of its obligations under this Guaranty and, without limiting the generality of the foregoing, agrees that the waiver set forth in this sentence shall have the fullest scope permitted under the Foreign Sovereign Immunities Act of 1976 of the United States of America and is intended to be irrevocable for purposes of such Act.

(f)     <u>Waiver of Jury Trial</u>.   THE GUARANTOR IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS GUARANTY OR PURCHASER'S ACTIONS IN THE NEGOTIATION, ADMINISTRATION OR ENFORCEMENT HEREOF.

*[Signature to follow.]*

**IN WITNESS WHEREOF,** the undersigned has duly executed this Guaranty as of the date first above written.

**<u>GUARANTOR</u>:**

_____

Name: