```
 1              UNITED STATES DISTRICT COURT

 2              SOUTHERN DISTRICT OF FLORIDA

 3                     FT. LAUDERDALE

 4   Case No. 0:23-cv-60345-JB

 5   _____

 6           REMOTE VIDEORECORDED DEPOSITION OF

 7                    KAYLA M. McNEILL

 8                     July 12, 2024

 9   _____

10   HEAD KANDY LLC,

11   Plaintiff,

12   v.

13   KAYLA McNEILL,

14   Defendant.

15   _____

16

17         PURSUANT TO NOTICE, the remote

18   videorecorded deposition of KAYLA M. McNEILL was

19   taken on behalf of the Plaintiff, on July 12,

20   2024, at 9:14, MST, before Wendy C. Heath,

21   Registered Professional Reporter, Denver,

22   Colorado.

23

24

25
```

Page 46

1    Q  And can you describe to me how the e-mail
2  was written?  Was it like, Hey, I'm Jerome Falic.
3  Nice to see.  You know, like a cold call or did
4  you all have --
5    A  No, that is exactly what it was.
6    Q  Oh, all right.  And was it in connection
7  with the trademark dispute that was going on?
8    A  That was how he received my information,
9  yes.
10   Q  Okay.  And can you tell me, was it after
11 that e-mail was sent did you-all start to exchange
12 pleasantries about the Head Kandy business?  Or I
13 guess it was Lashed Out, really, but --
14   A  It was Head Kandy.
15   Q  Okay.
16   A  You know, I don't really recall.  I
17 remember that I had my guard up really high.  I
18 had no understanding of why someone of his
19 business stature would have any business
20 contacting me, because he made it very clear what
21 businesses he owned and how successful he was and
22 that he was interested in meeting with me.
23   Q  Did y'all ultimately meet?
24   A  Yes, we did.
25   Q  Okay.  Was it in person at first or

Page 47

1  through some other means?
2      A  No, he flew to Salida and came to my
3  office.
4      Q  And was that in the 2016 time period,
5  somewhere around there?
6      A  Yeah, maybe -- maybe it was 2017 by this
7  point where we actually met face-to-face.  But,
8  yeah, somewhere between 2016 and the beginning of
9  2017.
10     Q  All right.  But prior to that in-person
11 meeting, had you spoken with him on the phone?
12     A  I would assume so.  I don't recall, but I
13 would assume we had one phone exchange.  Sorry.  I
14 don't recall.
15     Q  All right.  And do you recall what it is
16 that Jerome Falic expressed to you when you had
17 your in-person meeting in Salida?
18     A  Yeah.
19     Q  Tell me what -- tell me about that
20 meeting.
21     A  That he was impressed with my ability to
22 sell products online.  That he liked the products
23 I had created.  He didn't like the packaging.  He
24 thought the packaging could be improved.  He
25 brought Stu Dolleck with him, so it wasn't just

1    A   I'm going to assume so.
2    Q   Okay.  And so how long did that initial
3    in-person meeting in Salida last?
4    A   A couple of hours.  I -- I -- it wasn't
5    all day.
6    Q   Okay.  And was that during the time there
7    was this dispute with the trademark?
8    A   Yes.
9    Q   Were there any lawyers present at that
10   meeting?
11   A   No.
12   Q   Were you represented by counsel during
13   that trademark dispute?
14   A   I was.
15   Q   Who were you represented by?
16   A   Jennifer Schlatter and --
17   Q   Is that --
18   A   And Anthony Converse.
19   Q   Oh.  After that -- strike that.
20       What else was said at that meeting that
21   you can tell us, to the best of your recollection?
22   A   That they knew that I needed someone like
23   them to actually get somewhere in this business.
24   Q   Are you talking about the online business?
25   A   I was talking about the beauty business.

1    Q  Oh, okay.
2         Did they tell you why they needed someone
3   like you in order to make it in the beauty
4   business?
5    A  I don't think that for them it was about
6   the beauty business.  For them, it was that I had
7   an online business that they didn't have, and they
8   had a beauty business that I didn't have.  So I
9   think that they wanted to try to kind of happily
10  ride off into the sunset and both -- and pour into
11  both of our strengths.
12   Q  I understand.
13        Anything that between the -- between the
14  two of y'all, I think what you are telling me is
15  there was kind of a missing component.  You had
16  the online presence, but not the beauty presence.
17  They had the beauty presence, but not the online
18  presence.
19   A  And maybe more just the knowledge that
20  they had that I definitely did not have.  I had
21  never -- I had never done anything like what I was
22  doing, and so they definitely had way more
23  knowledge in manufacturing and products and the
24  connections.  They were very much all about
25  telling me about their connections, and I didn't

Page 52

1  have that.  All I had was an online personality
2  and people were buying the product.
3      Q  Okay.  At the time of that meeting, how
4  long had you been in business?
5      A  Let me see here.  Probably about a year
6  and a half, maybe two years max.
7      Q  Did you start Head Kandy in October of
8  2015?
9      A  I made my first sale in October of 2015,
10 but I started the product development and those
11 kinds of things back in, like, April, maybe a
12 little bit sooner, of 2015.
13     Q  Okay.  All right.
14        I have seen references and documents to an
15 entity known as Lashed Out, LLC.
16     A  Correct.
17     Q  What is Lashed Out, LLC?
18     A  In 2013, the end of 2013, I started a
19 mascara business that I was selling mascara called
20 Lashed Out.  And I had that LLC, so that's what
21 that is.
22     Q  All right.  And was Lashed Out kind of the
23 entity that you would create other products out
24 of?
25     A  No.  So I only had the mascara business

Page 63

1    Q  Did he -- how did he explain that to you,
2    that he wanted to acquire a portion?  Like it was
3    going to be a merger, a buyout?  How was it
4    going to --
5    A  No, they just wanted -- they wanted to
6    start over.  I remember it was, like, let's do a
7    clean slate.  We'll purchase your inventory and,
8    like, the Head Kandy business Facebook page.  At
9    the time it was the only social media.  I believe
10   we maybe had an Instagram at the time.  I don't --
11   for Head Kandy, specifically, I believe we had an
12   Instagram and a Facebook.  And that was what was,
13   like, driving all of the business.  And so that --
14   he wanted to acquire that.  And then also -- I
15   think that was pretty much it.  There wasn't a
16   lot -- a lot to it.
17   Q  All right.
18   A  And he basic -- yeah.
19   Q  Was the transaction ultimately reflected
20   in an asset purchase agreement?
21   A  Yes.
22   Q  Were you represented by counsel in
23   connection with that transaction?
24   A  Yes.
25   Q  Who were your attorneys that represented

Page 64

1   you in connection with that transaction?
2       A   That was Jennifer Schlatter.
3       Q   Mr. Converse was not involved as counsel
4   for that transaction?
5       A   I don't believe so, no.
6       Q   I'm putting here on the screen what I
7   believe to be the asset purchase agreement.  I'm
8   going to mark this as Deposition Exhibit Number 3.
9           (Deposition Exhibit 3 was marked.)
10          MR. LOEB:  Hang on one sec.  You know
11  what?  We've been going for a little over an hour.
12  Let's go ahead and take a break so I can pull this
13  document up.  The file folder label is not
14  correlating with what I have here on my electronic
15  database.
16          So is five minutes okay or do you need a
17  little bit longer of a break?
18          THE COURT REPORTER:  If we could do
19  10 minutes, that would be great.
20          MR. LOEB:  All right.  We will do
21  10 minutes.  We'll endeavor to get back at 12:33.
22  If we get back at 12:45, that's okay, too, but
23  let's get back after a 10-minute break.
24      Q   (BY MR. LOEB)  Before we go off the
25  record, is there any testimony that you have given

1      A   Yes.
2      Q   (BY MR. LOEB)  And that that fiduciary
3   duty included a duty of loyalty, correct?
4          MR. CONVERSE:  Objection, form.
5      A   Absolutely.
6      Q   (BY MR. LOEB)  And in this particular
7   letter that you receive, Head Kandy is putting you
8   on notice that there was a material breach of your
9   employment agreement, as well as a breach of
10  fiduciary duty that was owed by you to Head Kandy,
11  correct?
12     A   Yes.
13     Q   And this letter that's written to you, it
14  is laid out that you have started a new
15  competitive consumer product business under the
16  brand name White Pineapple, correct?
17     A   Correct.
18     Q   Prior to this letter, had you informed
19  anybody at Head Kandy that you had started White
20  Pineapple?
21     A   Can you show me where I was supposed to?
22  I'm confused, because everyone keeps saying that I
23  breached this.  And I guess I'm confused on why
24  this is coming at me that I did something wrong to
25  begin with.  So I'm confused on this entire