**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

HEAD KANDY, LLC,

     Plaintiff,

v.                           CASE NO. 23-CV-60345-JB/JMS

KAYLA MARIE MCNEILL,

     Defendant.

_____/

**[HEAD KANDY'S PROPOSED][1]**
**<u>FINDINGS OF FACT, CONCLUSIONS OF LAW, AND PERMANENT INJUNCTION</u>**

 

**BARTLETT LOEB HINDS**
**THOMPSON & ANGELOS**

**ETHAN J. LOEB**
FL Bar No. 668338
**E. COLIN THOMPSON**
FL Bar No. 684929
**ELLIOT P. HANEY**
Fla. Bar No. 1018829
**JALEN A. LARUBBIO**
FL Bar No. 1039258

1001 Water St., Suite 475
Tampa, FL 33602
Telephone: 813-223-3888
Facsimile: 813-228-6422

*Counsel for Plaintiff Head Kandy LLC*

---

[1]   Plaintiff Head Kandy, LLC ("**Head Kandy**") submits its Proposed Findings of Fact and Conclusions of Law pursuant to S.D. Fla. Loc. R. 16.1(k) and the Court's Orders [ECF Nos. 259, 598] directing this filing.

This case is before the Court based on the bench trial held on April 28 through 30, 2025. Having reviewed briefing by both parties, heard the argument of counsel, considered all evidence presented, and being otherwise fully advised, the Court finds as follows:

## I.     Findings of Fact

Parties' Backgrounds

Ms. McNeill is a social media influencer who uses online platforms such as Facebook, Instagram, and TikTok to reach her followers.  [ECF 629 at 4 (¶ 1)].  Ms. McNeill was the sole member of Lashed Out, LLC ("**Lashed Out**"), through which, prior to May 2018, she conducted business under the name "Head Kandy."  [ECF 629 at 5 (¶¶ 4, 5)].  Head Kandy, since May 2018, is a limited liability company organized under Delaware law with a principal place of business in Hollywood, Florida.  [Ex. 3 at introductory paragraph & §§ 12.1, 12.4(a); ECF 629 at 4 (¶ 2)].[2] Head Kandy sells haircare and cosmetics tools and products via its website.  [Ex. 19; ECF 629 at 6 (¶ 13)].  Jerome Falic ("**Mr. Falic**") is Head Kandy's Managing Member.  [ECF 629 at 5 (¶ 3)].

On May 3, 2018, Head Kandy and Lashed Out entered into the Asset Purchase Agreement (the "**APA**"), by which Head Kandy paid $2,880,000.00 to acquire Lashed Out's assets, including its intellectual property, websites and social media pages, and goodwill and other intangible property.  [Ex. 1 at §§ 1.1, 2.1, Bill of Sale; ECF 629 at 5 (¶ 6)].  Under the APA, Ms. McNeill also acquired a 20% membership interest in Head Kandy, and pursuant to the Executive Employment Agreement incorporated within the APA, Ms. McNeill became Head Kandy's Creative Director with an accompanying $200,000.00 annual salary.  [Ex. 1 at § 2.1; Ex. 2 at § 2; Ex. 3 at Ex. A (p. 37); ECF 629 at 5 (¶ 11)].  As an "Executive," Ms. McNeill agreed to bear the

---

[2]  Citations to "Ex. __" refer by number to the exhibits identified on Head Kandy's Amended Trial Exhibit List [ECF 613].

"responsibilities, duties, and authority" of "oversight and management of strategic initiatives and general operational activities of [Head Kandy]." [Ex. 2 at § 2].

<u>The Executive Employment Agreement and its Restrictive Covenants</u>

The Executive Employment Agreement, which Ms. McNeill signed [ECF 629 at 5 (¶ 9)], contains the following written restrictive covenants to which Ms. McNeill agreed:

(a) ***Non-Compete Provisions***. From and after the Effective Date and continuing for a period of thirty-six (36) months after the Executive's employment terminates for any reason, the Executive will not, within the Restricted Territory (as defined below), directly or indirectly, engage in a Restricted Business (as defined below) or provide Restricted Services (as defined below) to any Person engaged in a Restricted Business; <u>provided</u> that nothing contained herein will be construed to prevent the Executive from investing in the stock of any competing Person listed on a national securities exchange or traded in the over-the-counter market so long as the Executive is not involved in the business of such Person and the Executive does not own more than two percent (2%) of the equity of such Person.

"**Restricted Business**" means the manufacture, sale and distribution of hair-related products. "Restricted Business" shall not include Executive's business as identified in Addendum A.

"**Restricted Services**" means the provision of management, business planning, sales, marketing, financial planning, or other services similar to the services the Executive provided to the Company during her employment with the Company.

"**Restricted Territory**" means worldwide.

(b) ***No Solicitation of Customers***. Without limiting the generality of the provisions of <u>Section 5(a)</u>, the Executive hereby agrees that during the thirty-six (36)-month period after the termination of the Executive's employment with the Company, the Executive will not, and will cause each of her affiliates not to, directly or indirectly, (i) solicit business related to the Restricted Business from any Person which is or was a client, customer, supplier, licensee, licensor or other business relation of the Company during the thirty-six (36)-month period preceding the date of the Executive's termination of employment, or from any successor in interest to any such Person, or (ii) solicit or encourage any client, customer, supplier, licensee or licensor of the Company to terminate or reduce such Person's relationship with the Company (including any Person engaged in discussions with the Company related to such Person becoming a client, customer, supplier, licensee or licensor of the Company).

(c) ***No Solicitation of Employees***.  During the thirty-six (36)-month period after termination of the Executive's employment with the Company, the Executive will not, and will cause each of her affiliates not to, directly or indirectly, employ, hire, engage, recruit or solicit for employment or engagement (other than by a general advertisement not targeting the employees of the Company), any Person who is (or was during the one (1) year period preceding the date of such hire or solicitation) employed or engaged by the Company.

(d) ***Non-Disparagement***. The Executive agrees and covenants that the Executive will not, at any time, make, publish or communicate to any Person or in any public forum any defamatory or disparaging remarks, comments or statements concerning the Company or its affiliates, or their businesses, or any of their employees, officers, and existing and prospective clients, suppliers, investors, and other associated third parties. This Section 5(d) does not, in any way, restrict or impede the Executive from exercising protected rights to the extent that such rights cannot be waived by agreement, including, without limitation, the Executive's rights under the National Labor Relations Act, or rights to communicate with any other administrative or regulatory agency to report suspected unlawful conduct, or from complying with any applicable law or regulation or a valid order of a court of competent jurisdiction or an authorized government agency, provided that such compliance does not exceed that required by the law, regulation, or order. The Executive shall promptly provide written notice of any such order to an authorized officer of the Company.

[Ex. 2 at § 5(a)-(d); *see also* ECF 629 at 5 (¶ 12)].  By the Executive Employment Agreement, Ms. McNeill further agreed that:

- "the territorial, time and scope limitations set forth in this Section 5 … are reasonable and are properly required for the protection of the Company's legitimate interest in client relationships, goodwill and trade secrets of the Company's business, and that such limitations would not impose any undue burden upon the Executive" [Ex. 2 at § 5(e)];

- "in the event of the Executive's or any of her affiliate's actual or threatened breach of any of the provisions contained in Section 5 …, the Company will have no adequate remedy at law" and therefore "will be entitled to seek," inter alia, "such injunctive and other equitable relief as may be deemed necessary or appropriate by a court of competent jurisdiction" [Ex. 2 at § 5(f)];

- "the restrictive covenants contained [in Section 5] impose a fair and reasonable restraint on the Executive that is reasonably required to protect the interests of the Company," those provisions "will not interfere with the Executive's ability to earn a livelihood and do not confer a benefit upon the Company that is disproportionate to the detriment to the Executive" [Ex. 2 at § 5(g)]; and

- "she will not challenge the enforceability of Section 5 … nor will she raise any equitable defense to its enforcement" [Ex. 2 at § 5(g)].

Ms. McNeill's Employment with Head Kandy

Throughout her employment with Head Kandy, Ms. McNeill utilized social media and "live" social media video broadcasts to engage with Head Kandy customers, market Head Kandy products and develop a dependable Head Kandy customer base. [ECF 629 at 6 (¶ 14)]. Indeed, Ms. McNeill was synonymous with the Head Kandy business [ECF 629 at 6 (¶ 16)], and as Mr. Falic testified, her social media profiles, her followers, and her influence over those followers were Head Kandy's primary motive for purchasing Lashed Out from Ms. McNeill in the first place. Additionally, Mr. Falic testified that Head Kandy also invested millions of dollars in social media platforms and branding initiatives to build the Head Kandy brand and to create goodwill and loyalty among its customer base—a fact that Mr. Falic testified is unusual in the cosmetics business. Mr. Falic explained that Head Kandy also registered trademarks including "Kandy Life with Kayla" in an effort to develop Head Kandy's brand in the cosmetics industry.

Mr. Falic also testified that during Ms. McNeill's employment with Head Kandy, Ms. McNeill controlled the day-to-day operations of the company, and the other members of and investors in Head Kandy trusted her to do so. [*See also* Ex. 86]. In July 2022, Head Kandy retained a consultant, Jonathan Rosenbaum, to review the company's operations, finances, and books and records. [ECF 629 at 6 (¶ 15)]. During that review, Head Kandy discovered conduct by Ms. McNeill that Head Kandy believed to be in violation of the Executive Employment Agreement and Ms. McNeill's fiduciary duty to the company as a member and managerial employee thereof. [*See, e.g.*, Ex. 12].

First, Head Kandy discovered that Ms. McNeill had caused Head Kandy to employ and to pay individuals who performed personal services for Ms. McNeill while receiving compensation from Head Kandy for that time, including:

Elsie Hopkins. Ryan Thompson testified that when Head Kandy relocated its offices and warehouse to North Carolina in May 2021, Ms. McNeill created a position for Elsie Hopkins, who had previously worked for Head Kandy in Colorado, to tutor Ms. McNeill's child via the computer, and that after May 2021, Ms. Hopkins did not, and could not possibly have, performed any legitimate work for Head Kandy. Ms. McNeill admitted as much in an email where she described her own conduct as "unethical" and admitted that it "doesn't look good," writing "[w]hen we moved to North Carolina … I created a position where [Ms. Hopkins] reads books with [Ms. McNeill's son] on the computer." [Ex. 14 at 2]. For Ms. Hopkins, Head Kandy paid salary and employer taxes of at least $8,131.34 after May 2021. [Ex. 53].

Nicole Cook. Ms. Cook testified that Ms. McNeill hired her to babysit Ms. McNeill's daughter, and that she never performed any legitimate work for Head Kandy. [Cook Dep. at 19:5-16, 19:22-20:2, 22:22-23:18, 24:20-25:7, 33:18-34:25, 125:4-126:2]. Ms. Cook further testified that Ms. McNeill directed her to clock in even on days when she was neither watching Ms. McNeill's daughter nor performing Head Kandy business. [Cook Dep. at 29:7-20, 30:25-31:16, 39:23-40:14, 41:2-17, 42:1-18, 58:20-25]. Text messages between Ms. Cook and Ms. McNeill and other documentary evidence confirm Ms. McNeill added Ms. Cook to the payroll with a named position entitled "Facebook" even after Head Kandy refused to pay Ms. Cook to be Ms. McNeill's babysitter, and that Ms. McNeill directed Ms. Cook to clock in even when she was not babysitting Ms. McNeill's child. [Exs. 6, 7, 10; Ex. 58 at 2-3, 34-36, 51]. For Ms. Cook, Head Kandy paid salary and employer taxes of at least $743.27. [Ex. 8].

Christopher Hines. Mr. Hines testified that Ms. McNeill directed him, Dallas Perkins, and others—while on the clock as Head Kandy warehouse employees and being paid by Head Kandy—to leave Head Kandy's warehouse, go to Ms. McNeill's house, and pick up trash, clean, unload and assemble furniture and household fixtures, put up decorations, and set up a racetrack for Ms. McNeill's children. [Hines Dep. at 15:19-16:11, 18:2-14, 21:3-7, 26:5-14, 27:2-6, 27:17-29:3, 31:8-32:24, 33:11-22, 35:9-36:13, 37:19-38:9, 39:11-24, 41:14-25, 53:17-55:17, 155:19-156:14]. Mr. Hines testified Ms. McNeill told him, "if you like your job, you will go to my house and pick up my trash." [Hines Dep. at 14:1-4].

Ryan Thompson. Mr. Thompson testified that he often ran errands for Ms. McNeill that were unrelated to Head Kandy business and drove around Ms. McNeill's children, among other personal tasks and errands.

And, there is evidence in the record of other individuals hired and paid by Head Kandy who Ms. McNeill admittedly directed to perform personal services for herself and her family, including Olivia Honeycutt, Alissa Macnab, and Alex Reling. [Ex. 14 at 2].

Second, Head Kandy discovered that Ms. McNeill used Head Kandy's resources and employees to further her unrelated businesses, including White Pineapple and Hayzlee's Boutique. As to White Pineapple, video evidence shows that Ms. McNeill, while in Head Kandy's warehouse and accompanied by Head Kandy's employees, promoted White Pineapple, specifically including leggings that company sold, on Head Kandy's social media channels, including in Facebook live broadcasts on November 23 and November 26, 2022.  [Exs. 61, 62].  Ryan Thompson testified, and text messages confirm, that Ms. McNeill used Ryan Thompson's services while he was a Head Kandy employee to further her White Pineapple business.  [Ex. 56 at 7-9, 17-19, 21-26].  As to Hayzlee's Boutique, Christopher Hines testified that Ms. McNeill directed him, while on the clock for Head Kandy, to move inventory for Hayzlee's Boutique.  [Hines Dep. at 59:22-60:24].  Ryan Thompson testified, and text messages confirm, that Ms. McNeill admitted to making a "few" Alibaba charges in the total amount of "like $6,000" for clothing for Hayzlee's Boutique to Head Kandy's credit card, and causing Head Kandy to pay for that expense.  [Ex. 56 at 42].

Third, Head Kandy discovered that Ms. McNeill made personal charges to the Head Kandy American Express ("**AmEx**") credit card, including charges for the benefit of her other businesses, for which she ultimately caused Head Kandy to pay.  Head Kandy financial consultant Kleitias Petri, after reviewing all of the expenses, payments, and documentation, calculates that Ms. McNeill charged, and on net caused Head Kandy to pay for, at least $256,732.80 in charges with no ostensible business purpose and no supporting documentation.  [Ex. 55].  For example, Ms. McNeill and her husband charged to the Head Kandy credit card (1) a total of $35,359.30 for cosmetic procedures from Sono Bello, for which Ms. McNeill paid to American Express only $29,000.00 [Ex. 4 at 62; Ex. 5]; (2) $545.00 in race car parts Ms. McNeill directed Ryan Thompson to categorize as "Parts for fork lift" to pass them off as a business expense, even though Dustin McNeill testified that such parts were not and could not be used on the forklift at Head Kandy's

warehouse [Ex. 56 at 5-6; Ex. 9; D.McNeill Dep. at 82:14-18, 83:2-6, 93:7-13]; and, (3) $4,599.93 for a pool pump Ms. McNeill admitted to Ryan Thompson was a personal expense for which she did not reimburse Head Kandy [Ex. 56 at 43].

Fourth, and finally, Head Kandy discovered that Ms. McNeill had arranged to lease to the company a forklift, a dumpster, and a barn, for which she charged Head Kandy on a monthly basis. As to the forklift, Ms. McNeill charged Head Kandy $1,000.00 per month from September 2021 to December 2022, for a total of $16,000.00.  [Ex. 47; ECF 629 at 9 (¶ 28)].  Mr. Falic testified that the forklift was outdated and dilapidated, and could have been purchased by Head Kandy for far less than the amount Ms. McNeill charged the company in rent.  As to the dumpster, Ms. McNeill charged Head Kandy an additional $1,000.00 per month from September 2021 to December 2022, for a total of $16,000.00.  [Ex. 47; ECF 629 at 9 (¶ 27) & n.5].  Mr. Falic testified that there was no apparent Head Kandy business purpose for the dumpster, and that the rate Ms. McNeill charged was far in excess of the reasonable rate for a dumpster.[3]  As to the barn, Ms. McNeill charged Head Kandy $3,600.00 per month from September 2021 to December 2022, for a total of $57,600.00.  [Exs. 47, 48; ECF 629 at 9 (¶ 29)].  Mr. Falic and Ryan Thompson testified that the barn was not used for any legitimate Head Kandy purpose during that time and contained, at most, a few pallets of Head Kandy returned merchandise.  [*See also* Hines Dep. at 54:23-55:13, 158:6-20, 159:6-17].

---

[3]  Moreover, at summary judgment, Ms. McNeill did not dispute that "[b]eginning sometime in 2021, Ms. McNeill leased a dumpster to Head Kandy for $1,000 per month, which is far in excess of the reasonable rental rate for a dumpster, and there was no apparent Head Kandy business purpose for the dumpster."  [ECF 470 at ¶ 31; ECF 503 at ¶ 31].  *See Smith v. City of Fairburn, Ga.*, 679 F. App'x 916, 919 n.3 (11th Cir. 2017) (party was "bound by" its "admission" made in response to opposing party's statement of material facts at summary judgment).

<u>Ms. McNeill's Termination</u>

On November 28, 2022, Head Kandy notified Ms. McNeill that it considered her conduct a breach of her fiduciary duties and of the Executive Employment Agreement, and on December 1, 2022, set forth a path by which Ms. McNeill would be permitted to continue her relationship with the company.  [Exs. 12, 13].  Thereafter, when approached by Head Kandy's other members to discuss the company's findings, Ms. McNeill expressed contrition for her conduct, and admitted in writing that some of her actions were, indeed, "unethical."  [Ex. 14 at 2].  When more evidence of Ms. McNeill's wrongdoing was exposed, on December 16, 2022, Head Kandy placed Ms. McNeill under suspension.  [Ex. 15].  Mr. Falic testified that Head Kandy intended to give Ms. McNeill an opportunity to correct her behavior and to repay Head Kandy for her misuses of its resources.  Indeed, Ms. Petri testified that she worked with Ms. McNeill during this time to reconcile Ms. McNeill's credit card charges for the year 2022.  However, Mr. Falic testified that Ms. McNeill eventually refused to continue or complete the reconciliation or to accept responsibility.  Accordingly, on January 30, 2023, Head Kandy terminated Ms. McNeill's employment with Head Kandy for cause [Ex. 18; ECF 629 at 6 (¶ 17)], and on February 17, 2023, Head Kandy reacquired Ms. McNeill's membership shares pursuant to its Operating Agreement. [Ex. 24; ECF 629 at 5 (¶ 8)].

<u>Ms. McNeill's Post-Termination Conduct</u>

Almost immediately after her termination, Ms. McNeill took to social media to review and promote haircare products from other businesses, encouraging her followers to support those businesses over Head Kandy.  Indeed, on April 7, 2023, Ms. McNeill stated "we about to give the best reviews on haircare" [Ex. 88] and on June 1, 2023, explained that she would use her social media pages to promote and review haircare products [Ex. 117].  Ms. McNeill realized that her followers to whom she was promoting these haircare products were former customers of Head

Kandy, and on May 24, 2023, commented "thank goodness a lot of you found me" at her new Facebook page.  [Ex. 113].[4]

Throughout the first half of 2023, Ms. McNeill promoted various non-Head Kandy haircare products via Facebook Live videos, including on March 14, 2023 [Ex. 70], May 30, 2023 [Ex. 115], June 1, 2023 [Ex. 117], and June 7, 2023 [Ex. 121].  During those broadcasts, Ms. McNeill commented that she was "the girl with the no compete [sic]," and although she stated she was "totally okay with … the contract I chose to sign," Ms. McNeill nonetheless continued to promote competitor haircare products and thanked her viewers for sharing the web links to those products in real time during her live broadcasts.  [Ex. 70].  And, in one such broadcast after this litigation had commenced, Ms. McNeill even derisively posed with a Hot Tools curling iron she was promoting and invited Head Kandy to "screenshot" the video for use in this lawsuit.  [Ex. 117].

Additionally, Ms. McNeill extensively promoted competitor Bo Stegall's haircare products and business, including through her Facebook Live broadcasts on February 16, 2023 [Ex. 63], March 13, 2023 [Ex. 68], March 14, 2023 [Ex. 70], March 18, 2023 [Ex. 74], March 23, 2023 [Ex. 76], April 4, 2023 [Ex. 82], April 5, 2023 [Ex. 84], and April 7, 2023 [Ex. 88].  During one such Facebook Live, Ms. McNeill notified her followers that Bo Stegall – The Collection was offering a buy one get one free promotion, showcased several of Mr. Stegall's products (including a 5-in-

---

[4] In addition to the conduct described below, Ms. McNeill uses her Facebook page, now named "Whipin Life With Kayla" [ECF 629 at 9 (¶ 32)], to promote her White Pineapple business, which sells products online and at various physical locations.  [*See, e.g.*, Ex. 138].  Ms. McNeill also employed at least two former Head Kandy employees at White Pineapple within one year of their respective separations from Head Kandy.  First, Amber Teaster was terminated from Head Kandy on March 29, 2024 [Ex. 42], and worked for White Pineapple as of August 2024.  [Culp. Dep. at 32:15-19].  Second, Shawna Webb was terminated from Head Kandy on April 21, 2023, but Ms. McNeill testified that Ms. Webb worked for White Pineapple beginning in April or May of 2023.  Text messages between Ms. McNeill and Ms. Teaster and Ms. Webb bolster those findings.  [Exs. 59, 60].

1 interchangeable curling iron, dry texture spray, healing clay, and wet brush), directed Mr. Stegall to post a link to his products on her live feed, and acknowledged that her "girls"—that is, former Head Kandy customers who followed her social media accounts—are "about to be [Bo's] girls," and remarked "we share girls." [Ex. 88]. During various other broadcasts, Ms. McNeill again requested that Mr. Stegall post a link to his website (which he did) [Ex. 76], admitted "I've been kind of directing a lot of people toward him" [Ex. 74], and explained "we've been telling all of our friends to buy the Bo stuff today" [Ex. 82]. On April 8, 2023, Ms. McNeill even posted on Mr. Stegall's page herself, expressing that she was "thankful" to be able to "refer" her followers to Mr. Stegall and praising Mr. Stegall and his ability to "help you with your haircare needs." [Ex. 30; ECF 629 at 8 (¶ 24)].

Ms. McNeill also promoted competitor haircare products to her followers outside of her live videos. On February 8, 2023, Ms. McNeill responded on Facebook to a comment from a follower regarding products the follower previously purchased from Head Kandy, stating "you want the link to the IDENTICAL product from another brand?? Hahahahhaahha wouldn't that rock their world!" [Ex. 20]. Thereafter, on February 9, 2023, Ms. McNeill replied to one of her follower's requests for a haircare product that could replace Head Kandy products she had previously purchased, and posted a link to a keratin leave-in conditioner spray sold by Evoque— one of Head Kandy's competitors in the haircare industry. [Ex. 21]. Below the link that she shared, Ms. McNeill asserted that the leave-in conditioner spray sold by Evoque was not just a "dupe" of a product sold by Head Kandy, but was "identical" to such product. [Ex. 21]. A few days later, on February 13, 2023, in response to a question from one of her Facebook followers requesting a "dupe" to the Squad Goals Third Wheel Spray sold exclusively by Head Kandy, Ms. McNeill again posted a link to an Evoque reconstructive leave-in conditioner, along with a comment "Try this, it's good." [Ex. 22]. Then, on April 4, 2023, Ms. McNeill posted on her

Instagram account a promotion of Bo Stegall's annual sale in which she called Mr. Stegall's products "the most incredible hair care" and appealed to her viewers that purchasing Mr. Stegall's products is "supporting a small family."  [Ex. 26; ECF 629 at 8 (¶ 22)].  That same day, Ms. McNeill also posted on Instagram a screenshot of a hair curling iron for sale on Amazon with the statement "Here's the iron I have been using! No link because of my 'no compete.' Being in a contract that controls your life is so weird."  [Ex. 28; ECF 629 at 8 (¶ 24)].

Throughout her Facebook Live and other social media videos, in addition to promoting non-Head Kandy haircare products, Ms. McNeill often provided her followers "updates" on the litigation between her and Head Kandy, during which she offered negative and disparaging comments aimed toward Head Kandy's business, its owners and investors, and its employees.  For example, on April 7, 2023, Ms. McNeill posted a TikTok in which she accused Head Kandy of kicking her out of a company she created and giving her "nothing."  [Ex. 90].  On April 11, 2023, Ms. McNeill posted a TikTok accusing Head Kandy of posting photos of Ms. McNeill's children to promote Head Kandy products, alleging that Head Kandy was "capitaliz[ing]" off of her children without her permission.  [Ex. 99].  On May 30, 2023, in a Facebook Live video, Ms. McNeill accused Head Kandy and its employees of engaging in a "witch-hunt … to push me out of the company."  [Ex. 115].  In her June 6, 2023, Facebook Live video, Ms. McNeill told her followers that "[her] company," i.e., Head Kandy, was "stolen from [her]."  [Ex. 119].  On June 9, 2023, Ms. McNeill accused Head Kandy and its employees of lying under oath in this action and expressly accused Head Kandy's employees of committing "perjury."  [Ex. 123].  And, on June 3, 2024, Ms. McNeill went "live" on Facebook and when discussing working in Head Kandy warehouse described her experience as "lawless," "toxic," and full of "drama."  [Ex. 136; ECF 629 at 9 (¶ 30)].

As a result of Ms. McNeill's post-termination conduct, Head Kandy's sales revenue has decreased substantially [Exs. 49, 52, 148, 149, 150, 151], and Mr. Falic testified that Head Kandy has lost a significant percentage of its customer base since Ms. McNeill's conduct began.  Indeed, Head Kandy presented evidence showing that a sampling of specific Head Kandy customers commented on Ms. McNeill's posts vowing never to purchase from Head Kandy again, and that those individuals in fact did not purchase from Head Kandy again.  [*Compare* Ex. 33 *with* Ex. 41 & Ex. 116 at cmt. 115; Ex. 37 *with* Ex. 116 at cmt. 868; Ex. 38 *with* Ex. 91 at cmt. 126].  And, such comments indicate, as Mr. Falic testified, that Head Kandy's customer goodwill and reputation in the haircare space, particularly online where Head Kandy's entire business is conducted, have suffered since Ms. McNeill began her post-termination conduct.  Mr. Falic also testified that if similar conduct by Ms. McNeill were to resume, it surely would hamper Head Kandy's ongoing efforts to recover and rebuild its business and reputation.

Procedural History

Head Kandy filed this lawsuit in February 2023 asserting claims arising out of the conduct described above, including a claim seeking injunctive relief against Ms. McNeill's alleged violations of the restrictive covenants.  [ECF 1].  Throughout the case, Ms. McNeill repeatedly contested the enforceability of the restrictive covenants by arguing that they are unenforceable on different grounds and asserted equitable defenses to their enforcement, including a prior breach defense [ECF Nos. 47, 66, 99, 116, 117, 134, 209, 214, 248, 304, 315; ECF 337 at 13-14 (¶¶ 12-15)].  Head Kandy expended $299,432.50 in attorney's fees and expenses as of December 2, 2024, to overcome those arguments and defenses by Ms. McNeill.  [Ex. 54].

Remaining for trial were Counts I and II of Head Kandy's Amended Complaint, which assert claims against Ms. McNeill for breach of the Executive Employment Agreement (Count I)

and breach of her fiduciary duties to the company (Count II).  [ECF 187].  The Court tried Head

Kandy's remaining claims in a bench trial on April 28 through 30, 2025.

## II.     Conclusions of Law

### A.  Count I: Breach of Executive Employment Agreement (Restrictive Covenants)

Head Kandy claims Ms. McNeill breached her Executive Employment Agreement by

violating the post-term restrictive covenants contained therein and by challenging the

enforceability and raising equitable defenses to the enforcement of the restrictive covenants.  To

prove a breach of the Executive Employment Agreement, Head Kandy must show (1) a valid

contract; (2) a material breach; and (3) damages.  *Rauch, Weaver, Norfleet, Kurtz & Co. v. AJP*

*Pine Island Warehouses, Inc.*, 313 So. 3d 625, 630 (Fla. 4th DCA 2021).  The Court concludes

that Head Kandy has shown the requisite elements of its claim for Breach of the Executive

Employment Agreement.[5]

### 1.  *Restrictive Covenant Elements.*

To prevail on its claim for breach of the restrictive covenants, in addition to the regular

breach of contract elements, Head Kandy must first prove that "the restrictive covenant [is] set

forth in a writing signed by the person against whom enforcement is sought," that there are "one

or more legitimate business interests justifying the restrictive covenant," and that the restriction

"is reasonably necessary to protect the legitimate business … interests justifying the restriction."

*Rauch, Weaver*, 313 So. 3d at 630.  The elements of Head Kandy's claim are readily met.

---

[5]  Here, there is no real dispute that the Executive Employment Agreement is a valid contract.
Indeed, Ms. McNeill previously alleged in asserting a claim against Head Kandy for breach of the
Executive Employment Agreement that the Executive Employment Agreement was a valid and
enforceable contract.  [ECF 337 at 64 (¶ 90) ("The [Executive] Employment Agreement is a valid
and binding contract as of the date of [Head Kandy's] breach.")].  And in any event, Ms. McNeill
presents no evidence supporting her claim that the Executive Employment Agreement is invalid.

First, the restrictive covenants are contained in the Executive Employment Agreement, which Ms. McNeill signed.  [Ex. 2 at § 5 & signature page (p. 16)].[6]

Second, Head Kandy, which as Mr. Falic testified is known online for haircare products, has legitimate business interests justifying the restrictive covenants, including its interests in maintaining a positive reputation and "customer goodwill" in the haircare space and its substantial relationships with existing and prospective customers who repeatedly and regularly purchased its products.  *See* § 542.335(1)(b), Fla. Stat. (non-exhaustively listing legitimate business interests, including "[c]ustomer … goodwill" and "[s]ubstantial relationships with specific prospective or existing customers").  Mr. Falic also testified that because Ms. McNeill was a large part of Head Kandy's reputation and goodwill, and indeed was synonymous with the brand, Head Kandy spent considerable time and effort developing Ms. McNeill's online following, and in turn, its customer base and goodwill, including by money spent to "boost" Ms. McNeill's social media posts.  *See Ansaarie v. First Coast Cardiovascular Inst., P.A.*, 252 So. 3d 287, 292 (Fla. 1st DCA 2018)

---

[6]  Contrary to Ms. McNeill's arguments, there is nothing "vague" about the restrictive covenants contained in § 5 of the Executive Employment Agreement, which Ms. McNeill signed and to which Ms. McNeill agreed.  *See, e.g.*, *Chick-Fil-A, Inc. v. CFT Dev., LLC*, 652 F. Supp. 2d 1252, 1255 (M.D. Fla. 2009) (rejecting argument that the covenant in question was "vague or of doubtful meaning" when "its plain meaning in relation to the facts of this case" was apparent and "clearly understood").  Similarly, Ms. McNeill's claim that the restrictive covenants were not supported by adequate consideration is frivolous, as Ms. McNeill was employed and monetarily compensated under the Executive Employment Agreement in exchange for her assent to the restrictive covenants [Ex. 2 at § 3], and viewed holistically, was also paid $2.8 million under the APA, in which the Executive Employment Agreement was incorporated [Ex. 1 at § 2.1].  And, there is no basis for Ms. McNeill's new argument that Head Kandy's nonpayment of bonuses Ms. McNeill claims were owed to her somehow renders the restrictive covenants unenforceable, particularly given the significant other consideration Head Kandy provided in exchange for Ms. McNeill's assent to the Executive Employment Agreement, and the fact that no evidence suggests that the potential bonuses were the sole consideration supporting the restrictive covenants anyway.  And indeed, they could not have been, because there was never any guarantee that Ms. McNeill would earn a bonus at all [Ex. 1 at § 3(b) (discussing the method of calculating a bonus)] and any bonus earned or paid by Ms. McNeill would have had to be repaid to Head Kandy upon Ms. McNeill's breach of the restrictive covenants in any event [Ex. 1 at § 5(f)].

(company's "substantial investments in developing its existing patient, client, and customer base as well as patient, client, and customer goodwill" constituted a legitimate business interest). And, Mr. Falic explained that the built-up customer goodwill (i.e., the substantial client relationships Ms. McNeill brought to the table) was one of Head Kandy's main reasons for purchasing Lashed Out and keeping Ms. McNeill on board as an executive of the company.

Third, the restrictive covenants are reasonably necessary to protect Plaintiff's legitimate business interests in its reputation, goodwill, and customer relationships, and Ms. McNeill agreed as much in the Executive Employment Agreement. [Ex. 2 at § 5(e), (g)]. Moreover, Head Kandy purchased the assets and goodwill of Ms. McNeill's former business from Ms. McNeill [Ex. 1], so Head Kandy has an interest in preventing Ms. McNeill from separately servicing or soliciting those customers, particularly because, as Mr. Falic testified and the decline in Head Kandy's sales demonstrates [Exs. 49, 52, 148, 149, 150, 151], Ms. McNeill is uniquely positioned to influence them. *See USI Ins. Servs. of Fla. Inc. v. Pettineo*, 987 So. 2d 763, 766 (Fla. 4th DCA 2008) ("By the terms of the Agreement, the buyer purchased the seller's former clients along with the goodwill associated with the insurance business. Enforcing the terms of the non-compete provision by issuing a temporary injunction was reasonably necessary to protect both those interests."); *Infinity Home Care, LLC v. Amedisys Holding, LLC*, 180 So. 3d 1060, 1066 (Fla. 4th DCA 2015) (proof that a former employee was soliciting company's referrals, combined with a decrease in referrals during that time, was "a sufficient evidentiary showing that enforcement of the restrictive covenants was reasonably necessary to prevent unfair competition"); *see also W. Shore Rest. Corp. v. Turk*, 101 So. 2d 123, 128 (Fla. 1958) ("The purchaser of the good will of a business and its goods is entitled not only to the protection of customers and patrons, but to enter the field of competition unhampered by the adverse influence of the seller.").

Additionally, Mr. Falic testified, and documentary evidence supports, that absent enforcement of the restrictive covenants, Ms. McNeill's conduct would continue to cause harm to Head Kandy's customer retention, reputation, and goodwill. Indeed, Head Kandy presented the transaction histories of a sampling of its customers who have not purchased from Head Kandy since Ms. McNeill's termination and correlated those records with social media comments seemingly made by the same individuals, in which those individuals, in response to Ms. McNeill's social media posts promoting competing products and disparaging Head Kandy and its owners, comment that they will never purchase from Head Kandy again. [*Compare* Ex. 33 *with* Ex. 41 & Ex. 116 at cmt. 115; Ex. 37 *with* Ex. 116 at cmt. 868; Ex. 38 *with* Ex. 91 at cmt. 126].[7] That also shows that the restrictive covenants are necessary to protect Head Kandy's legitimate business interests and the assets it purchased from Ms. McNeill.

The Court has also previously concluded that the restrictive covenants are reasonable in time, area, and line of business. [*See* ECF 133 at 15-18].[8] Nothing has changed to undermine that conclusion, particularly given that Ms. McNeill expressly agreed to the reasonableness of each of the restrictive covenants in the Executive Employment Agreement. [Ex. 2 at § 5(e), (g)]. As to reasonableness in time, because the transaction overall, as a practical matter, was Ms. McNeill's sale of her business to Head Kandy [Ex. 1], the three-year non-competition and non-solicitation

---

[7] Even if the Court does not consider those statements for their truth (i.e., that some particular individual would not and did not purchase from Head Kandy again), those statements still show that Ms. McNeill's statements had the effect of harming Head Kandy's reputation and goodwill among those who heard Ms. McNeill's statements.

[8] Ms. McNeill also contends that the restrictive covenants are an "unreasonable restraint on trade." To the extent that is a separate argument from Ms. McNeill's contentions that the restrictive covenants are not reasonable in time, area, and line of business, that is incorrect. *See, e.g.*, *Envt'l Servs., Inc. v. Carter*, 9 So. 3d 1258, 1261-62 (Fla. 5th DCA 2009) (explaining that "[p]ost-employment restrictive covenant agreements are valid restraints of trade or commerce under certain conditions," i.e., those listed in the "comprehensive framework" in § 542.335, Fla. Stat.).

provisions are presumptively reasonable under § 542.335(1)(d)3.a., Fla. Stat., and Ms. McNeill has presented no evidence sufficient to rebut that presumption.  The restrictions are reasonable in area (worldwide) because of Ms. McNeill's capability to influence Head Kandy's customers through online social media, which has unlimited geographic reach and is the same space in which Head Kandy operates as an online-only company.  *See, e.g.*, *Autonation, Inc. v. O'Brien*, 347 F. Supp. 2d 1299, 1307 (S.D. Fla. 2004) (finding that it was reasonable for a former employer to restrict competition "in any geographic space in which [that employer] operates").  Finally, the restrictions are reasonable in line of business because they are limited to the "Restricted Business" of "the manufacture, sale and distribution of hair-related products."  [Ex. 2 at § 5(a)].  Indeed, Ms. McNeill can (and evidence and testimony shows that she currently does) engage in non-hair-related business through White Pineapple and other ventures.  [*E.g.*, Ex. 138].

For these reasons, the Court finds that the restrictive covenants in question are fully enforceable by Head Kandy against Ms. McNeill.[9]

2.  *Breach of Restrictive Covenants.*

As to breach, Head Kandy presented extensive evidence that Ms. McNeill breached the restrictive covenants through her social media posts after her termination.

First, as to the non-competition and non-solicitation of customers provisions, Ms. McNeill herself explained repeatedly during the first half of 2023 that she intended to use her "Whipin Life With Kayla" Facebook page to give reviews of and promote haircare products [Exs. 88, 117], and Ms. McNeill even acknowledged that her viewers were primarily Head Kandy's former customers

---

[9]  Additionally, to the extent that Ms. McNeill continues to contend that the restrictive covenants, specifically the non-disparagement clause, are an unenforceable restraint on speech, Ms. McNeill voluntarily waived any applicable First Amendment protections by agreeing to those provisions. [*See* ECF 133 at 32 (citing, inter alia, *Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC*, 679 F. App'x 33, 36 (2d Cir. 2017))].

when she remarked "thank goodness a lot of you found me" on her "Whipin Life With Kayla" page [Ex. 113].  True to her word, Ms. McNeill promoted numerous non-Head Kandy hair-related products to her followers, and encouraged her followers to buy those products.  [Exs. 70, 115, 117, 121].  Most notably, Ms. McNeill extensively promoted Head Kandy's competitor Bo Stegall, his products, and his "BoGo" (buy-one-get-one) sales.  [Exs. 63, 68, 70, 74, 76, 82, 84, 88].  Indeed, Ms. McNeill even requested that Mr. Stegall post a link to his website during one of her Facebook Live videos (which he did) and expressly directed her followers to Mr. Stegall and his products. [Exs. 74, 82].  Accordingly, the Court finds that Ms. McNeill has breached the non-competition and non-solicitation of customers provisions.

Second, as to the non-disparagement provision, Ms. McNeill disparaged Head Kandy and its affiliated individuals and entities repeatedly, including by stating that her company was "stolen" from her, that she was "kicked out" and "paid nothing," that Head Kandy "capitalized" of off Ms. McNeill's children, that Head Kandy engaged in a "witch hunt" against her to try to "destroy [her] life," and that representatives and employees of Head Kandy "straight up lied" and committed "perjury" in their affidavits filed in this case.  [Exs. 90, 99, 115, 119, 123].  As the Court has previously explained, "disparagement" by its plain meaning requires only a "statement cast in a negative light" or a remark that "detract[s] from the reputation of someone or something."  [ECF 133 at 31-32 (quoting *Disparagement*, BLACK'S LAW DICTIONARY (11th ed. 2019))].  Because Ms. McNeill's statements undoubtedly paint Head Kandy in a negative light and detract from its reputation, the Court finds Ms. McNeill has breached the non-disparagement provision.[10]

---

[10]  Indeed, this Court has twice sanctioned Ms. McNeill for disparaging statements she made during this litigation.  [ECF Nos. 575, 576].  That is, on contempt proceedings, the Court twice found that Ms. McNeill violated the Preliminary Injunction by making disparaging statements about Head Kandy and others protected under the non-disparagement provision, including (1) when Ms. McNeill made disparaging statements about Head Kandy and its owners to encourage a

Third, as to the non-solicitation of employees provision, the testimony and documentary evidence shows that Ms. McNeill employed at least two former Head Kandy employees, Amber Teaster and Shawna Webb, at White Pineapple within a year of their respective separations from Head Kandy.  [Exs. 42, 59, 60; Culp. Dep. at 32:15-19].  Accordingly, the Court finds that Ms. McNeill has breached the non-solicitation of employees provision by employing these individuals.

   3.   *Damages and Injunctive Relief.*

Under Florida law, upon a showing of a breach of contract (including, as here, breaches of restrictive covenants), the plaintiff is entitled at least to nominal damages.  *See, e.g.*, *Vital Pharms., Inc. v. Alfieri*, 2022 WL 1450044, at *4 (S.D. Fla. May 9, 2022) (denying summary judgment on damages element of claim for breach of restrictive covenants, inter alia, on the basis that at least nominal damages were available) (citing *Hutchison v. Tompkins*, 259 So. 2d 129, 132 (Fla. 1972)).  Thus, Head Kandy is entitled to nominal damages on its claim against Ms. McNeill for breach of the restrictive covenants.

Head Kandy, however, primarily seeks permanent injunctive relief.  "Under Florida law, a permanent injunction is proper when a party can show that (1) a clear legal right has been violated; (2) irreparable harm has been threatened; and (3) there is a lack of an adequate remedy at law."  *RJ's Int'l Trading, LLC v. Crown Castle S., LLC*, 2024 WL 1509156, at *2 (11th Cir. Apr. 8, 2024).[11]  For the reasons described above, Head Kandy has already demonstrated that its legal

---

social media influencer to cut ties with another company owned by Head Kandy's owners [ECF 271, adopted by ECF 575] and (2) when Ms. McNeill commented extensively on the purported "lawlessness" and "drama" surrounding Head Kandy's employees [Ex. 136; ECF 629 at 9 (¶ 30)], to which violation Ms. McNeill admitted and agreed to a $4,500.00 sanction.  [ECF 576].  Accordingly, there can be no doubt that Ms. McNeill has breached the non-disparagement provision.

[11]  The *RJ's International Trading* court noted that the Eleventh Circuit has not yet decided whether state or federal law governs the issuance of a permanent injunction in a diversity case.  2024 WL

rights have been violated by Ms. McNeill's breach of the restrictive covenants.  Head Kandy has

also met the remaining requisite elements—threat of irreparable harm and lack of an adequate

remedy at law—on three different bases.

First, "irreparable injury" to the party seeking enforcement of a restrictive covenant is

presumed under Florida law upon a showing of the violation of the restrictive covenant.

§ 542.335(1)(j), Fla. Stat.[12]  Here, as explained above, Head Kandy has shown that Ms. McNeill

violated each of the restrictive covenants.

---

1509156, at *2.  However, "courts in this Circuit and elsewhere have consistently applied state
law to motions for permanent injunctions."  *RJ's Int'l Trading, LLC v. Crown Castle S., LLC*, 2023
WL 2002372, at *3 (S.D. Fla. Jan. 13, 2023) (collecting cases and remarking that "Defendant does
not identify a single case where a federal court, exercising its diversity jurisdiction, applied federal
law to determine whether a permanent injunction should issue as a remedy for state-law claims");
*accord Am. Debt Counseling, Inc. v. Exclaim Mktg., LLC*, 2013 WL 12092097, at *4 (S.D. Fla.
May 16, 2013) ("In a diversity case, whether to grant a permanent injunction is governed by state
law.") (quotation omitted).  The Court is persuaded that state law governs the issuance of a
permanent injunction in this case.  *See also infra*, note 12.  Even if the federal standard applied,
moreover, the result would be the same.  In addition to the elements discussed below, "[f]ederal
law also weighs whether the permanent injunction will disserve the public interest."  *RJ's Int'l
Trading*, 2024 WL 1509156, at *2.  It is well-established that "[p]ublic policy in Florida favors
enforcement of reasonable covenants not to compete," particularly because "enforcement of a
covenant not to compete protects proprietary business interests and the enforcement of contracts."
*Winmark Corp. v. Brenoby Sports, Inc.*, 32 F. Supp. 3d 1206, 1224 (S.D. Fla. 2014).

[12]  The Court recognizes that Judge Strauss declined to apply the Florida statutory presumption of
irreparable harm at the preliminary injunction stage based on Chief Judge Pryor's opinion in *Vital
Pharmaceuticals, Inc. v. Alfieri*, 23 F.4th 1282, 1299 (11th Cir. 2022) (Pryor, C.J., concurring).
[*See* ECF 133 at 35-36].  Judge Strauss, following Chief Judge Pryor's analysis, reasoned that "a
federal court should not apply state law presumptions when deciding whether to grant a
preliminary injunction—a procedural issue."  [ECF 133 at 35-36].  However, the same reasoning
does not apply here, where the question before the Court is whether to grant a *permanent*
injunction, which is a substantive issue.  Chief Judge Pryor recognized as much, explaining:

> [I]t is unlikely that equitable exceptionalism *alone* can justify a federal court's
> departure from state law, especially when it comes to the final object of the suit.
> *Guaranty Trust* [*Co. v. York*] was clear that, "[i]n giving federal courts 'cognizance'
> of equity suits in cases of diversity jurisdiction, Congress never gave ... the power
> to deny substantive rights created by State law."  326 U.S. [99,] 105 [(1945)].  And
> later decisions have defined a substantive rule as a rule that would cause "the
> character or result of a litigation materially to differ," *Hanna* [*v. Plumer*], 380 U.S.

Second, Ms. McNeill expressly agreed in her Executive Employment Agreement that "in the event of [Ms. McNeill's] actual or threatened breach of any of the [restrictive covenants] …, [Head Kandy] will have no adequate remedy at law."  [Ex. 2 at § 5(f)].  *See E.A. Renfroe & Co., Inc. v. Moran*, 249 F. App'x 88, 93 (11th Cir. 2007) (finding threat of irreparable injury sufficient when the defendants "expressly acknowledged in writing the virtual impossibility of quantifying the damages that would be caused by a breach of confidentiality, and expressly … authorized the remedy of a preliminary injunction as appropriate"); *cf. Dunkin' Donuts Franchised Restaurants LLC v. KEV Enters., Inc.*, 634 F. Supp. 2d 1324, 1336 (M.D. Fla. 2009) (threat of irreparable harm established when, in addition to applicable presumption of irreparable harm, the parties contractually agreed that breach "shall constitute an incurable default causing irreparable harm subject to injunctive relief").

Third, Head Kandy has presented sufficient evidence to establish irreparable harm for which it lacks an adequate remedy at law.  "To demonstrate irreparable harm, a plaintiff must show that it has no adequate remedy at law, meaning that its injury cannot be undone through monetary remedies."  *Marine Turbo Eng'g, Ltd. v. Turbocharger Servs. Worldwide, LLC*, 2012 WL

---

[460,] 467 [(1965)]—a definition that is broad enough to encompass some equitable relief.  For example, the extent of a court's power to award a permanent injunction undoubtedly affects the character—if not the result—of the litigation.

*Alfieri*, 23 F.4th at 1297 (Pryor, C.J., concurring).  That is, while "preliminary injunctions are not final awards in any sense," *id.* at 1298 (quotation omitted), permanent injunctions plainly are.  *See id.*; *see also* Wright & Miller, 19 Fed. Prac. & Proc. § 4513 (3d ed.) (explaining that "when forum state law defines the underlying substantive right, state law also governs the availability of such equitable remedies as a permanent injunction," and collecting cases for the proposition that in a diversity case, the standard for permanent injunctive relief is a substantive matter governed by state law); *cf. AcryliCon USA, LLC v. Silikal GMBH & Co.*, 46 F.4th 1317, 1326 (11th Cir. 2022) ("The substantive rights of the parties are most assuredly affected by the entry of a permanent injunction …."); *Coral Springs St. Sys., Inc. v. City of Sunrise*, 371 F.3d 1320, 1340 (11th Cir. 2004) (referring to the "substantive remedy of injunctive relief").  Accordingly, the Court finds that it is appropriate to apply the Florida law presumption of irreparable harm in this case.  And, as explained below, Head Kandy has established irreparable harm even without the presumption.

{00084320:1}                                          21

13005808, at *9 (S.D. Fla. Jan. 6, 2012). "[T]he loss of customers and goodwill is an 'irreparable' injury." *Ferrero v. Associated Materials Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991). Head Kandy demonstrated loss of specific customers by pointing to several regular customers who viewed Ms. McNeill's violative social media posts, expressed a negative sentiment toward Head Kandy in their comments to Ms. McNeill's posts, and did not purchase from Head Kandy again thereafter. [*Compare* Ex. 33 *with* Ex. 41 & Ex. 116 at cmt. 115; Ex. 37 *with* Ex. 116 at cmt. 868; Ex. 38 *with* Ex. 91 at cmt. 126]. More broadly, Mr. Falic testified that Head Kandy experienced a catastrophic decrease in its customer base and its revenues after Ms. McNeill's violative conduct occurred. [Exs. 49, 52, 148, 149, 150, 151]. And, as Mr. Falic also testified, the customers and goodwill Ms. McNeill had built and could build were a driving factor behind Head Kandy's purchase of Lashed Out and its significant investment in and promotion of Ms. McNeill as the face of the company thereafter. *See Ferrero*, 923 F.2d at 1449 (finding irreparable harm when absent an injunction, the plaintiff "will lose its investment in good will and will lose its long-time customers"). At bottom, "[t]he harm caused to Plaintiff involves loss of customers and … reputational damage, which cannot be remedied solely monetarily." *Fortun Ins., LLC v. Rouco*, 2025 WL 936707, at *12 (S.D. Fla. Mar. 25, 2025) (Becerra, J.). Thus, injunctive relief is appropriate.

For these reasons, the Court will enjoin Ms. McNeill from violating the Executive Employment Agreement's restrictive covenants for the full durations specified therein, beginning as of the date this Order is entered. *See Capelouto v. Orkin Exterminating Co. of Fla.*, 183 So. 2d 532, 534-35 (Fla. 1966) (affirming injunction with full restrictive period beginning after entry rather than at employee's resignation because employer was "entitled to have a period of two years during which [employee] would not be in competition with it," especially when employee "participated in the prohibited activities during the course of the litigation," because to do otherwise "would be to nullify … the effectiveness of such agreements"); *Orkin Exterminating*

*Co. v. Bailey*, 550 So. 2d 563, 565 (Fla. 4th DCA 1989) (same); *Kverne v. Rollins Prot. Servs. Co.*, 515 So. 2d 1320, 1321-22 (Fla. 3d DCA 1987) (same).

    B.  <u>Count I: Breach of Executive Employment Agreement (Covenant Not to Raise Defenses)</u>

        Head Kandy also claims that Ms. McNeill breached §5(g) of the Executive Employment Agreement by challenging the enforceability of the restrictive covenants and raising equitable defenses to the enforcement of the restrictive covenants.  The Court agrees.

        It is beyond dispute that Ms. McNeill has challenged the enforceability of the restrictive covenants repeatedly throughout this litigation.  For example, Ms. McNeill repeatedly (and incorrectly) argued that the non-disparagement provision was invalid under the National Labor Relations Act.  [ECF Nos. 209, 214, 248, 304, 315, 505].  Ms. McNeill also claimed at the preliminary injunction stage [ECF Nos. 66, 99, 116, 117, 134], and in fact continues to claim now [ECF 629 at 2] that the restrictive covenants are unenforceable for a variety of reasons.  It is also beyond dispute that Ms. McNeill has raised equitable defenses to the enforcement of the restrictive covenants.  For example, Ms. McNeill asserted at the preliminary injunction stage [ECF Nos. 66, 99, 116, 117, 134], again as an affirmative defense [ECF 337 at 13 (¶ 15)], and yet again at trial [ECF 629 at 2, 14 (¶ 2)], that Head Kandy could not enforce the restrictive covenants because it had, according to Ms. McNeill's version of events, previously breached the Executive Employment Agreement—plainly an equitable defense.  *See Leighton v. First Universal Lending, LLC*, 925 So. 2d 462, 464 (Fla. 4th DCA 2006) ("An employer's breach of the contract is an equitable defense to the enforcement of a non-compete clause.").  Ms. McNeill presented nothing to undermine those facts.  Accordingly, the Court concludes that Ms. McNeill breached § 5(g) of the Executive Employment Agreement.

        As to its damages from those breaches, Head Kandy points to its attorneys' billing records representing Head Kandy's expenses incurred in its efforts to overcome Ms. McNeill's arguments

as to enforceability of the restrictive covenants and her equitable defenses to the enforcement of the restrictive covenants. [Ex. 54]. Those records show that as of December 2, 2024, Head Kandy had incurred $299,432.50 in attorney's fees arising out of those efforts. [*Id.*]. Head Kandy also presented fee expert Franklin Zemel, a local practitioner, who opined that Head Kandy's fees incurred in those efforts were reasonable. Ms. McNeill presented no countervailing evidence on either point.[13] Accordingly, the Court finds that Head Kandy is entitled to a judgment for $299,432.50 on its claim for Ms. McNeill's breach of § 5(g) of the Executive Employment Agreement, representing its reasonable attorney's fees incurred.[14] *See, e.g.*, *Wilmington Trust, N.A. v. Estate of Gonzalez*, 2016 WL 11656681, at *10-11 (S.D. Fla. Nov. 1, 2016) (plaintiff entitled to attorney's fees it incurred as damages in action where defendants breached promises not to sue and not to raise defenses).

---

[13] Insofar as Ms. McNeill intends for her set-off defense to apply against the amount of attorney's fees Head Kandy incurred to rebut the arguments and defenses she agreed she would not bring or make, that argument fails, because "under Florida law … contingent or unmatured claims may not be used to effect a setoff." *In re First Foliage, LC*, 2014 WL 2616618, at *13 (S.D. Fla. Bankr. June 11, 2014) (both parties agreeing that rule applied, and the Court accepting the rule that a party would be "barred from asserting its setoff defense if its claim was unliquidated or contingent" and labeling it "logical") (relying on *In re Aquasport, Inc.*, 155 B.R. 245 (S.D. Fla. 1992), in which the district court affirmed the bankruptcy court's determination that "contingent and unmatured claims cannot be used as a setoff under Florida law"); 80 C.J.S. Set-off and Counterclaim § 33 ("Unliquidated damages ordinarily cannot be set off at law or in equity."); *id.* at § 30 ("A proper set-off alleges a debt that is presently due and arising from a liquidated claim."); *see also Griffing Bros. Co. v. Winfield*, 43 So. 687, 688 (Fla. 1907) ("Unliquidated damages resulting from a tort cannot be made available as a set-off in an action for breach of a written contract.").

[14] The Court previously sanctioned Ms. McNeill and awarded to Head Kandy $26,794.66 based on one of Ms. McNeill's violations of the Preliminary Injunction. [ECF 575]. In the proceedings arising from that violation, Ms. McNeill primarily argued that the non-disparagement provision is unenforceable. The attorney's fees already awarded to Head Kandy during those proceedings are therefore included in the total attorney's fees Head Kandy claims as damages arising out of Ms. McNeill's breach of § 5(g) of the Executive Employment Agreement. To avoid duplicative recovery, the Court will subtract $26,794.66 from Head Kandy's $299,432.50 in damages, leaving a total of $272,637.84.

C.  Count II:  Breach of Fiduciary Duties

Head Kandy claims Ms. McNeill breached her fiduciary duties owed to the company as a member through Ms. McNeill's self-dealing conduct.  Under Delaware law, "[t]he elements of a breach of fiduciary duty claim are (1) that a fiduciary duty exists and (2) that the fiduciary breached that duty."  *York Lingings v. Roach*, 1999 WL 608850, at *2 (Del. Ch. July 28, 1999).[15]

1.  *Existence of Fiduciary Duty.*

The first element—existence of a fiduciary duty—is established by virtue of Ms. McNeill's indisputable status as a member of Head Kandy during the time of the alleged breaches.  [Ex. 3 at Ex. A (p. 37)].  *See Bay Ctr. Apartments Owner, LLC v. Emery Bay PKI, LLC*, 2009 WL 1124451, at *8 n.33 (Del. Ch. Apr. 20, 2009) (explaining that a member of a limited liability company owes fiduciary duties of care and loyalty to the other members and to the company analogous to the duties a director owes a corporation or a general partner owes a partnership and its partners).[16]

2.  *Breach of Fiduciary Duty.*

The second element—breach of fiduciary duty—is also easily established.  That is, the evidence and testimony adduced at trial show that Ms. McNeill (1) caused Head Kandy to hire and pay individuals for time individuals spent performing personal services for Ms. McNeill or services for Ms. McNeill's other business interests, under the false pretense that all time for which these individuals were paid was spent on legitimate Head Kandy business [Exs. 8, 10, 14, 53, 56,

---

[15]  Delaware substantive law applies to Count II because Ms. McNeill's fiduciary duty arises out of her membership in Head Kandy, and Head Kandy's Operating Agreement setting forth that membership elects Delaware law.  [Ex. 3 at § 12.4(a); ECF 629 at 15 (¶ 3)].

[16]  Moreover, Ms. McNeill recognized in one of her online broadcasts that the other members placed their trust in her to run the business.  [Ex. 86].  *See, e.g.*, *U.S. W., Inc. v. Time Warner Inc.*, 1996 WL 307445, at *21 (Del. Ch. June 6, 1996) ("Most basically, the duty of loyalty proscribes a fiduciary from any means of misappropriation of assets entrusted to [her] management and supervision.").

58, 61, 62; Cook Dep. at 19:5-16, 19:22-20:2, 22:22-23:18, 24:20-25:7, 29:7-20, 30:25-31:16, 33:18-34:25, 39:23-40:14, 41:2-17, 42:1-18, 58:20-25, 125:4-126:2; Hines Dep. at 14:1-4, 15:19-16:11, 18:2-14, 21:3-7, 26:5-14, 27:2-6, 27:17-29:3, 31:8-32:24, 33:11-22, 35:9-36:13, 37:19-38:9, 39:11-24, 41:14-25, 53:17-55:17, 59:22-60:24, 155:19-156:14]; (2) falsely represented that personal expenses and charges for supplies and inventory for unrelated ventures Ms. McNeill charged to the Head Kandy credit card were Head Kandy business expenses, directed and allowed Head Kandy funds to pay for those expenses, and failed to reimburse Head Kandy for those expenses [Exs. 4, 5, 9, 55, 56; D.McNeill Dep. at 82:14-18, 83:2-6, 93:7-13]; and, (3) leased to Head Kandy a forklift, barn, and dumpster she owned, and overcharged for those items even though they had no legitimate business use, or at least no business use sufficient to justify the exorbitant rate Ms. McNeill charged [Exs. 47, 48].

Similar conduct to that in which Ms. McNeill engaged has readily been found to be a breach of the fiduciary duty of loyalty.  For example, in *QC Communications Inc. v. Quartarone*, the court found that a director and officer of a corporation breached his fiduciary duty when he "use[d] [his] position of trust and confidence to further [his] private interests," including by "converting th[e] company's assets to his own use" and "exploiting [the company's] assets for his personal benefit" and the benefit of his side business.  2014 WL 3974525, at *11 (Del. Ch. Aug. 15, 2014).  Likewise, in *Sorrento Therapeutics, Inc. v. Mack*, the court found that a corporate officer breached his fiduciary duty when he, inter alia, "solicited opportunities for his other businesses" while being compensated by the company on company trips, "asked [the company's] employees to perform work for [his side business], treating them as resources for himself personally rather than company resources," and used (or asked the company's employees to use) the company's other resources for the benefit of his side business, thereby "[taking] advantage of" his position and the company's

employees to benefit himself and his side business "without independently compensating them." 2023 WL 5670689, at *28 (Del. Ch. Sept. 1, 2023).

Accordingly, having found that Ms. McNeill engaged in the same type of conduct Delaware courts have held constitutes a breach of the fiduciary duty of loyalty, the Court finds that Ms. McNeill breached her fiduciary duty to Head Kandy.

3. *Ms. McNeill's Defenses.*

Ms. McNeill asserts a variety of defenses to Head Kandy's breach of fiduciary duty claim, each of which is without merit.

First, Ms. McNeill claims that the transactions described above were "approved" by Bryan Feldman, who, like Ms. McNeill, held a 20% membership interest in Head Kandy.  In essence, Ms. McNeill claims that Head Kandy consented to or acquiesced in her self-dealing transactions through Mr. Feldman.  However, the Court has already stricken Ms. McNeill's affirmative defenses of "waiver, estoppel, unclean hands, and consent" and "voluntary waiver or acquiescence" [ECF 337 at 12-13 (¶¶ 4, 9); ECF 578], and no such defense appears in the Pretrial Stipulation.  Moreover, the testimony and evidence suggested that Ms. McNeill, when she sought Mr. Feldman's "approval," did not tell him the full truth about the transactions into which she ultimately entered Head Kandy.

Second, and relatedly, Ms. McNeill asserts that she acted in good faith and with reasonable care.  But even if there was any evidentiary support for that assertion, "[s]elf-dealing fiduciaries are liable because they breached their duty of loyalty if the transaction was unfair, regardless of whether they acted in subjective good faith."  *In re Primedia, Inc. S'holders Litig.*, 67 A.3d 455, 489 (Del. Ch. 2013).  Accordingly, that defense is without merit.

Third, Ms. McNeill asserts that the business judgment rule precludes her liability. However, the business judgment rule does not apply when a fiduciary has a self-interest in the

transactions at issue.  *See, e.g.*, *Schreiber v. Pennzoil Co.*, 419 A.2d 952, 956 (Del. Ch. 1980) ("The business judgment rule is a presumption that a rational business decision of the officers or directors of a corporation is proper unless there exists facts which remove the decision from the protection of the rule—such as self-dealing, conflict of interest, etc."); *David J. Greene & Co. v. Dunhill Int'l, Inc.*, 249 A.2d 427, 430-31 (Del. Ch. 1968) ("But when the persons … who control the making of a transaction and the fixing of its terms, are on both sides, then the presumption and deference to sound business judgment are no longer present.").  Here, Ms. McNeill cannot claim the protections of the business judgment rule, because she had a personal interest in, and derived personal benefits from, each of the transactions at issue.

Finally, Ms. McNeill claims the protection of the "corporate shield doctrine."  The Court assumes Ms. McNeill is referring to the concept that the existence of a business entity generally shields individual actors from personal liability for the company's obligations.  *See, e.g.*, *Wais v. Thompson*, 2023 WL 2641489, at *4 (Del. Super. Mar. 24, 2023) ("Delaware law generally shields individual members of a limited liability company from liabilities of the limited liability company."). That rule, however, has no application here because Head Kandy's claims center on Ms. McNeill's conduct independent of, and to the detriment of, Head Kandy, not conduct she performed on behalf of Head Kandy that caused Head Kandy to be liable to someone else.

Accordingly, the Court concludes that Ms. McNeill's defenses to Head Kandy's claim for breach of fiduciary duty fail.

*4. Damages.*

To show damages for Ms. McNeill's breaches of her fiduciary duty, Head Kandy presented (1) evidence showing money paid to employees Nicole Cook and Elsie Hopkins, who performed no legitimate business activities for Head Kandy during the relevant time period, totaling $8,874.61 [Exs. 8, 53]; (2) a report summarizing the net amount of charges Ms. McNeill and her

husband made to the Head Kandy AmEx credit card for which Head Kandy paid and for which Ms. McNeill failed (and refused) to provide any documentation to substantiate a legitimate Head Kandy business purpose or justification, totaling $256,732.80 [Ex. 55]; and (3) payment records reflecting the amounts Head Kandy paid to Ms. McNeill for the forklift, dumpster, and barn rentals, totaling $89,600.00 [Exs. 47, 48].

Ms. McNeill presented no evidence to contradict these amounts.  Instead, Ms. McNeill contends that she is entitled to a set-off of amounts she claims Head Kandy owes her, which mirror elements of the damages Ms. McNeill sought by her now-abandoned counterclaims, including (1) bonuses she claims Head Kandy owes to her, (2) business expenses for which she claims she paid and was not reimbursed by Head Kandy, and (3) a "repurchase payment" Ms. McNeill claims Head Kandy owes to her for its reacquisition of her membership interest.[17]  But that is incorrect, because under Delaware law, "[a] contingent or unmatured obligation which is not presently enforceable cannot be the subject of set-off," and "[t]here is no right to set-off of a possible unliquidated liability against a liquidated claim that is due and payable."  *CanCan Dev., LLC v. Manno*, 2011 WL 4379064, at *5 (Del. Ch. 2011) (internal quotations and citations omitted); *see also IronRock Energy Corp. v. Pointe LNG, LLC*, 2021 WL 3503807, at *8 (Del. Super. Ct. July 19, 2021) (when the plaintiff's claim for damages was liquidated at summary judgment, the defendant could not then set off damages it claimed to be owed on an unliquidated claim against the plaintiff, because "[s]et-offs are properly taken only as to judgments, not claims," "[a] contingent or unmatured

---

[17]  The Court concluded on summary judgment that Ms. McNeill had "abandoned" her claims for relief seeking those amounts by her failure to support them with record evidence on summary judgment.  [ECF 587 at 8-9].  Ms. McNeill has already had, and failed to take advantage of, her one opportunity to establish her entitlement to and liquidate the amount of any of those damages. *See Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) ("[S]ummary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events.") (quotation omitted).

obligation which is not presently enforceable cannot be the subject of set-off," and "[t]here is no right to set off a possible unliquidated liability against a liquidated claim that is due and payable") (cleaned up); 80 C.J.S. Set-off and Counterclaim § 33 ("Unliquidated damages ordinarily cannot be set off at law or in equity."); *id.* at § 30 ("A proper set-off alleges a debt that is presently due and arising from a liquidated claim.").  Accordingly, Ms. McNeill's setoff defense fails.

Ms. McNeill also contends that Head Kandy failed to mitigate its damages, but puts forth no evidence of that either.  To the contrary, Mr. Falic testified that Head Kandy only discovered the personal services employees long after the fact, terminated the leases soon after discovering them, and attempted to have Ms. McNeill reconcile with Ms. Petri and repay the credit card charges immediately after an investigation revealed the charges, which Ms. McNeill ultimately refused to fully complete.  And, Ms. McNeill's mitigation defense ignores that she, as a fiduciary and the one in charge of Head Kandy's day-to-day operations, controlled the self-serving expenses in question, and in fact sometimes even actively concealed them from Head Kandy.  [*See, e.g.*, Ex. 56 at 5-6.]

Accordingly, the Court concludes that Head Kandy is entitled to $355,207.41 in damages on its claim for Ms. McNeill's breach of her fiduciary duty.

## Conclusion

For the above reasons, it is **ORDERED** that:

1.     Judgment will be entered in Head Kandy's favor on Counts I and II of its Amended Complaint [ECF 187];

2.     Head Kandy is awarded damages in the amount of $627,845.25;

3.     Ms. McNeill is hereby enjoined and restrained from further violating § 5 of the Executive Employment Agreement, including by directly or indirectly:

(i)     for a period of 36 months following the entry of this Order, engaging in business related to the manufacture, sale, and distribution of hair-related products;

(ii)    for a period of 36 months following the entry of this Order, providing management, business planning, sales, marketing, financial planning, or other similar services she provided to Plaintiff during her employment therewith, including social media promotion and influencing services, to or for any person engaged in the manufacture, sale, or distribution of hair related products;

(iii)   for a period of 36 months following the entry of this Order, soliciting business related to the manufacture, sale, and distribution of hair-related products from any person who is or was a client, customer, supplier, licensee, licensor or other business relation of Plaintiff;

(iv)    for a period of 36 months following the entry of this Order, soliciting or encouraging any client, customer, supplier, licensee, or licensor of Plaintiff to terminate or reduce such person's relationship with Plaintiff in any manner;

(iv)    for a period of 36 months following the entry of this Order, employ, hire, engage, recruit, or solicit for employment or engagement any person who is, or was during the one year period preceding the date of such hire or solicitation) employed or engaged by Plaintiff; and

(v)     at any time, making, publishing, or communicating to any person or in any public forum any defamatory, disparaging, or otherwise negative or degrading comments, remarks, or statements concerning Plaintiff, or its

affiliates, or their businesses or any of their respective employees, officers, existing and prospective clients, suppliers, investors, and other associated third parties.

4.      The Court shall retain jurisdiction over this matter for the purposes of:

a.      enforcing this Judgment and Permanent Injunction; and

b.      determining Head Kandy's entitlement to taxable costs and prevailing party attorney's fees and expenses, and the amount of such costs, fees, and expenses, in accordance with Loc. R. 7.3.

**DONE and ORDERED** in Miami, Florida on this _____ day of _____, 2025.

<br>

_____
**Jacqueline Becerra**
**United States District Judge**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on _____, 2025, I filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send notice of this filing to: Laura E. Burgess, Esquire, laura@leburgesslaw.com, L.E. Burgess, P.A., 5966 S. Dixie Highway, Suite 300, Miami, Florida 33143, *Counsel for Defendant*; Antonio L. Converse, Esquire, anthony@converselawgroup.com, Converse Law Group, P.C., 600 17th Street, Denver, Colorado 80202, *Counsel for Defendant;* Jennifer Tiedeken, Esquire, jennifer@lawfortcollins.com, jamie@lawfortcollins.com, Massey, Kelly & Priebe, PLLC, 125 S. Howes Street, Suite 1100, Fort Collins, CO 80521*, co-counsel for Defendant;*. and Jed Ferdinand, Esquire, jferdinand@fiplawgroup.com, Kathleen B. Moore, Esquire, kmoore@fiplawgroup.com, Ferdinand IP Law Group, 450 Seventh Avenue, Suite 2300, New York, New York 10123, *Counsel for Plaintiff.*

/s/ _____
**ETHAN J. LOEB**
FL Bar No. 668338
ethanl@blhtlaw.com
KerriR@blhtlaw.com
eservice@blhtlaw.com
**EDWARD C. THOMPSON**
FL Bar No. 684929
colint@blhtlaw.com
heatherw@blhtlaw.com
**ELLIOT P. HANEY**
FL Bar No. 1018829
ElliotH@blhtlaw.com
MarjorieP@blhtlaw.com
**JALEN A. LARUBBIO**
FL Bar No. 1039258
JalenL@blhtlaw.com
**BARTLETT LOEB HINDS**
**THOMPSON & ANGELOS**
1001 Water St., Suite 475
Tampa, FL 33602
Telephone: 813-223-3888
Facsimile: 813-228-6422

*Counsel for Head Kandy LLC*